```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3     ---------------------------x
       UNITED STATES, et al.,      :    Civil Action No.:
 4                                  :    1:23-cv-108
                      Plaintiffs,   :
 5          versus                  :    Thursday, September 19, 2024
                                    :    Alexandria, Virginia
 6     GOOGLE LLC,                  :    Day 9 p.m.
                                    :    Pages 1-153
 7                    Defendant.    :
       ---------------------------x
 8

 9          The above-entitled bench trial was heard before the
       Honorable Leonie M. Brinkema, United States District Judge.
10     This proceeding commenced at 2:00 p.m.

11                      A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                              OFFICE OF THE UNITED STATES ATTORNEY
13                            2100 Jamieson Avenue
                              Alexandria, Virginia  22314
14                            (703) 299-3700

15                            JULIA TARVER WOOD, ESQUIRE
                              AARON TEITELBAUM, ESQUIRE
16                            AMANDA STRICK, ESQUIRE
                              MICHAEL WOLIN, ESQUIRE
17                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
18                            450 Fifth Street, NW
                              Washington, D.C.  20530
19                            (202) 894-4266

20     (State of VA)          JONATHAN HARRISON, ESQUIRE
                              OFFICE OF THE ATTORNEY GENERAL
21                            OFFICE OF THE SOLICITOR GENERAL
                              202 North Ninth Street
22                            Richmond, Virginia  23219
                              (804) 786-7704

23

24

25          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1

```
 1                        A P P E A R A N C E S:

 2    FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                              LAW OFFICE OF CRAIG C. REILLY
 3                            209 Madison Street
                              Suite 501
 4                            Alexandria, Virginia  22314
                              (703) 549-5354
 5
                              KAREN DUNN, ESQUIRE
 6                            JEANNIE RHEE, ESQUIRE
                              BRYON BECKER, ESQUIRE
 7                            MARTHA GOODMAN, ESQUIRE
                              WILLIAM ISAACSON, ESQUIRE
 8                            PAUL, WEISS, RIFKIND,
                              WHARTON & GARRISON LLP
 9                            2001 K Street, NW
                              Washington, D.C.  20006
10                            (202) 223-7300

11    COURT REPORTER:         RHONDA F. MONTGOMERY, CCR, RPR
                              Official Court Reporter
12                            United States District Court
                              401 Courthouse Square
13                            Alexandria, Virginia  22314
                              (703) 299-4599
14                            RMontgomery@courtreport.net

15

16

17

18

19

20

21

22

23

24

25
```

                                                                    2

```
 1                      TABLE OF CONTENTS

 2                         WITNESSES

 3     On behalf of the Plaintiffs:
```

```
 4     BO BRADBURY (read in)......................5

 5     SAMUEL COX (read in)......................15

 6     BONITA STEWART (read in)..................16

 7     GEORGE LEVITTE (read in).................18

 8     WOOJIN KIM (read in)......................29

 9     MICHAEL SHAUGHNESSY (read in).............38

10     ROBIN LEE

11     Direct examination by Ms. Wood ...........43
```

```
12                        MISCELLANY
```

```
13     Proceedings September 19, 2024 ...........4
       Certificate of Court Reporter ............153
14
```

```
15

16

17

18

19

20

21

22

23

24

25
```

Deposition Read-In - B. Bradbury

1                    P R O C E E D I N G S

2              THE COURT:  Ms. Dunn, are you going to cross or

3    not?

4              MS. DUNN:  Your Honor, we have no questions for

5    this witness.

6              THE COURT:  All right.  Does anybody anticipate

7    calling Mr. Bellack later in the case?

8              MR. TEITELBAUM:  No, Your Honor, not if Google is

9    releasing him as well.

10             MS. DUNN:  We do not either.

11             THE COURT:  Then, sir, we are going to release

12   you.  That means you can stay in court and watch the

13   proceedings or leave, but you are not to discuss your

14   testimony with any witness who has not yet testified.

15             All right.  Are we going to depositions now?

16             MS. WOOD:  Yes, Your Honor.  We will do first --

17   the continuation now substantially narrowed of Bo Bradbury

18   from GSD&M.

19             My colleague, Isabel Agnew, will do the read-in.

20             We have an updated binder for the Court and our

21   wonderful witness.

22             THE COURT:  What page are we on?

23             MS. AGNEW:  We will be reading from page 1 of 12

24   starting at the very bottom of page 42, line 13.

25             THE COURT:  All right.  I've got it.

                                                            4

Deposition Read-In - B. Bradbury

1    (The deposition of Bo Bradbury is read as

2    follows:)

3  Q    Next under the engaged phase, would you prescribe -- we

4  already -- you already talked about video and social.  The

5  next one is online display.  Can you tell me what that

6  includes?

7  A    Certainly.  Again, this would be more of what you might

8  want to consider your kind of traditional Internet or web

9  advertising of messaging typically in a static form, which

10 is then providing some call to action or a link through to a

11 designated -- typically, a page or home page, if you will,

12 or airforce.com, airnationalguard, a corresponding website,

13 etc.  So somewhere capturing interest.

14         And then if -- if we're doing a good job of

15 intriguing the individual, they access that unit and then

16 pursue more information at another destination.

17 Q    And so that would include, like, banner ads?

18 A    It would.

19 Q    Does it include native ads?  What about rich media

20 adds.

21 A    Display -- I think technically you could -- could

22 probably consider that under, really, video.  But yes, I

23 think as we look to deliver video, it's agnostic whether

24 that is in a digital sense or a streaming sense.  But

25 certainly, from a technical perspective, you could probably

Deposition Read-In - B. Bradbury

1    serve a rich unit or a video unit through display.  Yes,

2    ma'am.

3    Q    Well, maybe I should have asked this question first:

4    What does rich media mean to you?

5    A    From my perspective, ma'am, I would say some element of

6    motion, whether that is animation, actual playing a video

7    asset within a unit, or maybe some interactive element.  If

8    there is essentially kind of maybe a gamification aspect

9    within a display, some level of -- in its crudest

10   description, motion interactivity.

11   Q    So, Mr. Bradbury, you've just walked me through the

12   different open auctions, programmatic guaranteed, and

13   private marketplaces.  And I was starting to ask you how --

14   what are the various ways -- whether there are various ways

15   that GSD&M purchases display advertising on behalf of the

16   Air Force?

17   A    For the Air Force, we primarily, if not exclusively,

18   use DV360, and some display may technically go through

19   Google AdWords.  But there's advantageous tactics, reasons

20   for using that from an Air Force perspective.

21   Q    Okay.  I see you've got under tactic -- it says engage

22   for the first four and then recruit for the bottom two.  And

23   then the next one over says media channel.  And can you read

24   me the different media channels used for the engaged tactic?

25   A    Yes.  For engaged tactics, media channels supporting

6

Deposition Read-In - B. Bradbury

1    our YouTube, DV360, Snapchat, and Meta.

2    Q    And those -- what does it mean for them to all be

3    listed here as the media channel for an engaged tactic?

4    A    Their presence in this list denotes that they were

5    leveraged concurrently in pursuit of the objectives of this

6    particular task order and initiative.

7    Q    And what are the objectives of this particular task

8    order?

9    A    Engagement with the Air Force brand.

10   Q    So these were used in order to obtain the same

11   objection of engagement?

12   A    Yes.  Yes.  In my view, yes.

13   Q    Is there a benefit to an advertiser of using multiple

14   different channels to achieve an objective?

15   A    Yes.

16   Q    And what are some of the benefits of having a mix of

17   channels?

18   A    Certainly.  There is great bodies of research over many

19   years showing that the multiplicity of channels actually can

20   provide greater impact for the brand, whatever the brand is,

21   in terms of awareness, recall, positive reactions to

22   communications.

23   Q    Does -- do the channels that will be -- will best reach

24   a particular audience vary depending on the specific

25   campaign?

7

Deposition Read-In - B. Bradbury

1   A    Yes.

2   Q    In what way?

3   A    Well, the audience -- a campaign is constructed for an

4   audience, and that audience may be dramatically different

5   from one campaign to another.  Therefore, you're speaking to

6   different individuals who have different habits, practices,

7   and preferences.  And so the answer to your question is,

8   yes, those could be different.

9   Q    Do different channels reach different audiences based

10  on which types of people interact with that channel?

11  A    Yes.

12  Q    For example, how does the audience in a social media

13  channel compare with an audience on the open Internet, for

14  example?

15  A    Those could be similar, but they could be quite

16  different depending on the nature of that particular

17  platform.  So, for instance, if -- let's start using your

18  example.  If it's a social media setting that is connected

19  to it and an affinity group of some sort tightly, that

20  audience may be very focused on that particular area of

21  interest versus the open web whereby its definition is

22  speaking to many, many more people.  While some of them may

23  share that same affinity, there will be certainly others who

24  do not share that affinity.  So it would be a specificity of

25  audience in those instances that would be different.

Deposition Read-In - B. Bradbury

1   Q    And do the differences in audience and for a particular

2   social media avenue versus the open web, does that affect

3   how GSD&M would recommend one channel over another for a

4   given campaign?

5   A    Yes.

6   Q    Can you think of an example with respect to Air Force

7   where you would recommend a display for a particular

8   objective where you might not recommend social media or some

9   other channel?

10  A    Yes.  Let me think of an appropriate one here.  Say,

11  for instance, a specific example being one of the -- what we

12  would refer to as a specialized career.  For instance,

13  within the Air Force, health professions for instance.  We

14  have the ability via display to reach individuals who we

15  think may be interested in potentially serving in that

16  capacity, in a medical capacity in the service.  And we

17  would be reaching individuals who either have expressed

18  through some data signal an interest in health profession,

19  or the site itself may be medical careers related or

20  something.  And we would appear there, recommend appearing

21  there versus, say, for instance, going to Facebook or

22  Instagram where it may be less of a potential connection.

23  Q    It could.  Would -- are there circumstances in which

24  you would recommend doing programmatic media buying rather

25  than doing a direct deal with a particular publisher?

Deposition Read-In - B. Bradbury

1    A    Yes.

2    Q    What are some of those circumstances?

3    A    If, for example -- one variable would be scale, would

4    be an important factor to consider.  If the marketing

5    objective is requiring a broad reach or exposure to a

6    message, then scale becomes important.  Therefore,

7    programmatic is an attractive vehicle given its ability to

8    reach many, many particular audience sets.

9        A direct publisher, as you cited, can still be

10   very beneficial, but it becomes a matter -- typically, it

11   comes at a lower scale.  And so those are kind of the

12   balances of -- that we are assessing in our media.

13   Q    Would it be more costly to do advertising across

14   hundreds or thousands of websites via a direct deal?

15   A    I believe so.

16   Q    What would make it more costly?

17   A    Two factors in my mind.  I think there would be the

18   cost of administering and executing them.  As you cited,

19   doing direct deals with individual parties would require

20   time, talent, labor, if you will, to do that.

21       Also, inefficiencies in performance may come into

22   play there because the data variables and audience

23   understanding of certain platforms varies versus others.  So

24   the ability to target perhaps as discreetly as you would

25   like can vary by publisher.

Deposition Read-In - B. Bradbury

1   Q    Is it important for GSD&M's clients to have access to

2   both digital display advertising on the Internet, as well as

3   social media?

4   A    Yes.

5   Q    Why is it important for Air Force and other advertisers

6   to have access to both of those different channels?

7   A    Audiences may favor one channel, if you will, over

8   another would be one factor.  So the audience that a brand

9   or client is pursuing may be more prevalent in one of those

10  avenues than another.  So that would be one reason.

11       Another would be as -- again, back to the power of

12  a combination, a mix if you will, where a presence of a

13  message in multiple communication forms has greater

14  likelihood of being -- creating an impact and being seen.

15       So there would be a benefit to be in both

16  channels, so to speak, using that terminology.

17  Q    Are there times on a given campaign where it's

18  necessary for an advertiser to shift from one channel to

19  another based on what they're seeing in terms of campaign

20  success and key performance indicators?

21  A    Yes.  I would also add that -- and maybe shifts within

22  the channel.

23  Q    So does the use of the KPI cost for engagement for

24  different media channels within, say, a single campaign mean

25  that those media channels are essentially interchangeable?

                                                              11

Deposition Read-In - B. Bradbury

1   A     I would not characterize them as interchangeable.

2   Q     Why not?

3   A     From an audience consumption perspective, they may use

4   those potential two platforms separately, and different

5   individuals may have a preponderance to one over another.

6   So there may be some overlap between those, but they could

7   have reached discreet audiences and, therefore, have some

8   use cases where you would not consider them interchangeable

9   per se.

10  Q     Are there particular -- can you think of any examples

11  of particular use cases where programmatic online display

12  advertising is particularly useful for Air Force campaigns

13  in particular?

14  A     Yes.

15  Q     What are some of those examples?

16  A     Instances where there are, again, hard to reach

17  audiences, where there may be unique data signals that are

18  important us to or easier to follow, find and follow in a

19  programmatic setting than in a direct publisher type

20  environment.  And then combined with that would be the scale

21  in which to reach them as well.

22          Another benefit would be, in a programmatic sense,

23  is again thinking about approaching an engagement into a

24  display universe, so to speak, and a common point of entry

25  via DSP.  There is a typically greater data -- data quality

12

Deposition Read-In - B. Bradbury

1   in terms of frequency and exposure, meaning that you have

2   greater confidence in the data you're sending of how often

3   the audiences are seeing a particular message as that is

4   beneficial for a brand and an agency and so forth in that we

5   are able to implement what's referred to as frequency

6   capping.  We can determine how much advertising someone is

7   seeing and be judicious.  And when we've hit the levels we

8   want, know that we've reached those and saved dollars

9   potentially for the client.

10          So those are some top of line examples in my mind

11  where that would be advantageous.

12  Q    Right.  So is there an advantage to open web non-walled

13  garden display advertising with respect to the breadth of

14  reach across different kinds of audiences?

15  A    Yes.  There's advantage, and that advantage would be

16  scale, access to a value, an audience which may be of

17  importance to an advertiser.

18  Q    Are there some circumstances where direct and

19  programmatic buys can be used to achieve the same goals?

20  A    Yes.

21          MS. AGNEW:  That's it.  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MS. WOOD:  The next deposition will be of a Google

24  witness, Mr. Cox.  We'll hand out the binders.

25          THE COURT:  All right.

13

Deposition Read-In - B. Bradbury

1          MS. WOOD:  We also have a set of exhibits pursuant

2     to our stipulation with Google that we would like to enter

3     in connection with the Cox testimony.

4          THE COURT:  All right.

5          MS. WOOD:  Those are PTX 429, PTX 438, PTX 452,

6     PTX 502, PTX 631, and PTX 712.

7          THE COURT:  All right.  Those are all in, correct?

8     Ms. Dunn, there's no objection?

9          MS. WOOD:  And, yes, we will redact the comments

10    pursuant to our practice.  One of the exhibits has the

11    comments on the side, and we will redact those.

12         THE COURT:  All right.  They're all in.

13         Which exhibit has the comments?  Do you know

14    offhand?

15         MS. DUNN:  PTX 429.

16         THE COURT:  All right.

17         MS. DUNN:  And PTX 712.

18         THE COURT:  Now the Court doesn't need to even see

19    those comments; they're just out, right?

20         MS. WOOD:  Understood, Your Honor.

21         THE COURT:  So the only version that goes into the

22    record, which will also be publicly available is -- I am

23    going to still call it a redacted version, but that's how

24    we'll handle that.

25         MS. WOOD:  Understood, Your Honor.

14

Deposition Read-In - S. Cox

1          THE COURT:  That's fine.

2          MS. WOOD:  All right.  Are we ready?

3          THE LAW CLERK:  (Nods head up and down.)

4      (The deposition of Samuel Cox is read as follows:)

5  Q    You started working for Google in May 2016; is that

6  correct?

7  A    That is correct.

8  Q    All right.  Let's talk a little bit about what you did

9  in your four-and-a-half years with Google.  Am I correct

10 that you were a group project manager?

11 A    Yes.

12 Q    Were you sometimes --

13          THE COURT:  Let me stop you for one second.  For

14 the record, this is Samuel Cox.

15          MS. WOOD:  This is Samuel Cox.

16 Q    Were you sometimes referred to as the lead for DRX

17 buy-side?

18 A    Yes, I was.

19 Q    And what is DRX?

20 A    DRX is Google's ad server and ad exchange.

21 Q    And can you help the jury understand what you mean by,

22 quote, display inventory, closed quote?

23 A    Anything that is pictographic and static.

24 Q    And that --

25 A    That could --

Deposition Read-In - B. Stewart

1   Q    I'm sorry.

2   A    That could also include video.  So basically, anything

3   that is pictographic.

4   Q    And do you distinguish between instream or out-of

5   stream-video?

6   A    We did make that distinction, yes.

7   Q    And what is that distinction?

8   A    Instream video is within the stream of a show or a

9   piece of content whereas outstream is a video ad running in

10  what is normally a static placement.

11          MS. WOOD:  That's it for that one.  We will now

12  read Ms. Stewart, Bonita Stewart.

13      (The deposition of Bonita Stewart is read as

14      follows:)

15          MR. LIU:  Are you ready?

16          THE LAW CLERK:  (Nods head up and down.)

17  Q    Can you spell your name for the record, please?

18  A    Yes.  It's B-O-N-I-T-A, and the last name is Stewart,

19  S-T-E-W-A-R-T.

20  Q    Do you know what an on-the-record chat is?

21  A    Yes.

22  Q    What is it?

23  A    It's when the history is recorded on a chat.

24  Q    Have you ever marked a chat as, quote, on the record,

25  unquote?

16

Deposition Read-In - B. Stewart

1   A     No, not intentionally.

2   Q     What is your current position at Google?

3   A     I am the vice president of global partnerships at

4   Google.

5   Q     Do others at Google describe your position in any terms

6   other than your formal title?

7   A     Head of our publisher partnerships.

8   Q     How long have you been the vice president for global

9   partnerships with responsibility for large publisher

10  partnerships in the United States?

11  A     Since October of 2012.

12          MR. LIU:  That's all, Your Honor.

13          MS. WOOD:  And the next deposition is of George

14  Levitte, who is a former Google employee.

15          And we do have certain exhibits to move in in

16  connection with his testimony pursuant to our stipulation

17  and with no objections, as I understand it, from Google.

18  They are PTX 507, PTX 786, PTX 882, PTX 945, and PTX 1021.

19  I believe PTX 882 may have some double-hearsay.  But again,

20  those would not be offered for the truth of the matter but

21  simply for context.

22          MS. DUNN:  No objection, but 786, 882, 945, and

23  1021 all have the sames comments, and I assume the

24  government will redact those comments.

25          MS. WOOD:  We will handle those accordingly.

17

Deposition Read-In - G. Levitte

1     THE COURT:  All right.  That's fine.

2     MS. DUNN:  The only other flag, Your Honor, is I

3  understand portions of this testimony are sealed.  So one

4  portion by Google, two portions by the plaintiffs.

5     MS. WOOD:  In the version that I have, I believe

6  those may have been further narrowed and are no longer here.

7     THE COURT:  Now, you've given me the complete

8  deposition.

9     MS. WOOD:  Only for your reference, Your Honor.

10  All we are seeking to actually admit for purposes of the

11  record is that first tab that has the designation digest.

12     THE COURT:  All right.

13     MS. DUNN:  And that's with respect -- just for

14  clarity of the record, that's with respect to all of the

15  read-ins.

16     MS. WOOD:  Yes, for all the read-ins.  The first

17  tab contains what we're proposing for the record.  The full

18  deposition transcript is just for reference if issues come

19  up.

20     THE COURT:  That's correct.  All right.

21     (The deposition of George Levitte is read as

22     follows:)

23  Q     Good morning, Mr. Levitte.  How are you doing today?

24  A     I'm good.  Thank you.

25  Q     Sure.  So let's start before the reorg.  Before the

18

Deposition Read-In - G. Levitte

1   reorg, what were your responsibilities as a PM?

2   A     When I started at Google, I worked on what we then

3   called the AdX buy-side, which was to provide functionality

4   and tools for third-party demand sources who are integrating

5   with our auction.

6   Q     Did you work with any other products besides AdX?

7   A     Yes.  I worked with a number of Google's display ads

8   products in that -- while I was in that role.

9   Q     Which products did you work on that were successful?

10  A     That were successful?  So some of them are described in

11  this LinkedIn document.  So ads.txt was successful.  That

12  was a -- something I created.  Exchange bidding, which we

13  later called open bidding is something that I worked on

14  which has been successful.

15  Q     And how do you measure success?

16  A     Sometimes it's hard to measure success.  Sometimes

17  there are easy metrics.  Sometimes there aren't easy

18  metrics.

19        Ads.txt, for example, was designed to solve a

20  fraud problem in the industry.  So it was at the time very

21  common that someone would sell ad inventory in a misleading

22  way that misrepresented the quality of the inventory, and

23  buyers would be fooled into buying low quality inventory

24  when they thought they were buying high quality inventory.

25  It was hard to know exactly how big the scale of that fraud

Deposition Read-In - G. Levitte

1    was, but we believed it happened a lot.  Ads.txt was

2    designed to make it much harder for people to do this sort

3    of thing and thereby to limit the amount of fraud in the

4    industry.

5              It's a little bit hard to measure exactly how

6    successful that was.  But one way of measuring would be to

7    see the percentage of properties that contain ads.txt, the

8    percentage of ad queries where there is a valid ads.txt.

9              So for each project, we do our best to come up

10   with metrics that describe success acknowledging that

11   sometimes it's very difficult to really specifically

12   quantify something when there are some unknowns or things

13   that are happening outside of your -- you know, our system.

14   Q    Do you have a rough sense of how many impressions go

15   through exchange bidding.

16   A    I have a rough sense that it's roughly about a billion

17   dollars in annual run rate, but I don't know how many

18   impressions.  If you were to assume, you know, a dollar --

19   you could either assume a certain CPM and then back out a

20   rough number of impressions, but I don't -- I haven't been

21   monitoring it very clearly.  So I don't have the latest

22   stats, but I'm sure those are available.

23             MS. WOOD:  And then counsel identifies a document.

24   It is PTX 796, but we're not seeking to admit that as part

25   of this.

Deposition Read-In - G. Levitte

1        THE COURT:  All right.

2  Q    And how are you familiar with this document?

3  A    This is a document that I wrote in preparation for

4  going for a promotion, I believe, in 2018.

5  Q    And there you wrote, quote, build and led strategic

6  DFP/AdX effort to launch and scale an HB alternative more

7  favorable to Google (fees, data, control, user latency) as

8  defense against long-term threat posed by HB.

9        Do you see that?

10  A    I do, yes.

11  Q    Exchange bidding is more favorable to Google than

12  header bidding with respect to fees?

13  A    I'm sorry.  Are you asking me?

14  Q    Yes.

15  A    Yes, it is.

16  Q    Can you explain why that's so?

17  A    With exchange bidding, we take a percent media fee.

18  Oftentimes it's 5 percent.  With header bidding, we take an

19  ad serving fee.  It ranges, but it might be like a two cents

20  CPM.

21  Q    Going back to what you wrote here, is exchange bidding

22  more favorable to Google than header bidding with respect to

23  data?

24  A    Yes.

25  Q    Can you explain why that's the case?

21

Deposition Read-In - G. Levitte

1   A     One of the things that we do as a platform for

2   publishers is that we help them to manage their yield, and

3   we provide optimizations to help them earn the most money.

4   In the example of exchange bidding, because the bids are

5   flowing through our platform, that data can be used in that

6   way to help the publisher with those optimizations.

7            With header bidding, the publisher doesn't get the

8   same benefit of our optimizations being able to help them in

9   the same way, in part, because the data isn't available to

10  us to use in that way for them.

11  Q     And what specific data does Google see in exchange

12  bidding that it doesn't see in header bidding?

13  A     So there's bid data.  So some of these optimizations

14  use the bid data that we get in a more precise way with

15  exchange bidding.  There might also be troubleshooting data,

16  things that might, you know, help a publisher know if

17  something is going on.

18  Q     When you say, quote/unquote, bid data, does that

19  include a price or a bidding price?

20  A     Yes.

21  Q     And you mentioned troubleshooting data.  What's an

22  example of troubleshooting data?

23  A     We have a feature called RTB breakout that illustrates

24  the end-to-end funnel for bidding into a system like ours.

25  And there are many ways in which errors might pop up that

Deposition Read-In - G. Levitte

1    could prevent a bid from entering the auction.  But by

2    providing detailed troubleshooting information, we try to

3    help folks understand and figure out when something is going

4    wrong so they can correct it, the goal being to make sure

5    that all of these bids are able to compete in the auction.

6    Q    Are those data that you use to help exchanges

7    troubleshooting issues that they have?

8    A    Yes.

9    Q    Can they also be used to help publishers?

10    A    Sometimes it helps publishers as well, yes.

11    Q    Today do you believe that header bidding poses a threat

12    to ad serving functionality of GAM?

13    A    Still, I don't think header bidding is a competitor so

14    much as a technology.  It's a type of technology, and it can

15    be used in all sorts of different ways.  It facilities

16    competition among different providers.

17         So I think a publisher still, you know, needs to

18    pick in the case of ad manager and a platform either their

19    own or someone from a third-party vendor to use.  Header

20    bidding is a mechanism that can empower competition, but

21    it's not in itself a competitor, I don't think.

22    Q    Did exchange bidding turn AdX's competitors into

23    customers?

24    A    Yes.

25    Q    How did it do that?

Deposition Read-In - G. Levitte

1   A    Well, exchange bidding is a product for other ad

2   exchanges.  So by participating in exchange bidding, they

3   are customers.

4   Q    Did exchange bidding change your -- change AdX's

5   financial relationship with its competitors?

6   A    It changed Google's financial relationship but maybe

7   not AdX's financial relationship.  Exchange bidding -- the

8   exchanges don't participate in AdX.

9   Q    How did exchange bidding change Google's financial

10  relationship with AdX's customers?

11  A    Well, they became --

12           MS. WOOD:  I'm sorry.  I misread that.

13  Q    With AdX's competitors?

14  A    Well, they became our customers.

15  Q    So they would buy ad inventory using exchange bidding

16  and pay us for --

17           MS. WOOD:  Sorry.

18           THE LAW CLERK:  I'll restart from that line.

19  A    Well, they became our customers.  So they would buy ad

20  inventory using exchange bidding and pay us for it.

21  Q    So the exchange bidding participants would pay Google,

22  right?

23  A    Yes.

24  Q    And then Google would pass on the revenue minus

25  Google's fees to the publishers?

24

Deposition Read-In - G. Levitte

1    A    Yes.

2    Q    So the exchange bidding participants were no longer

3    directly paying publishers for impressions won in exchange

4    bidding?

5    A    They continued to pay publishers directly for

6    impressions won by other channels, but for exchange bidding,

7    they would pay us for that.  And then, as you described, we

8    would remit to the publisher.

9    Q    Did exchange bidding change Google's data relationship

10   with AdX's competitors?

11   A    Yes.

12   Q    How did it change that relationship?

13   A    Well, as we were discussing earlier, there are

14   optimizations that we would run -- that we run as part of

15   our service and other things we provide, such as

16   troubleshooting and reporting, for instance, all of which

17   use data, in this case, from exchange bidding demand.  So

18   that's data that wouldn't have been in our system to use for

19   optimizations or troubleshooting or reporting that now is.

20   Q    Did exchange bidding change Google's technical

21   relationship with AdX's competitors?

22   A    Yes.

23   Q    And how did it change that technical relationship?

24   A    We built RTB integrations with these exchanges.  So we

25   now send them bid requests when inventory is available to

Deposition Read-In - G. Levitte

1    notify them, and they will respond with a bid response.

2    Now, technical integration is fairly onerous and didn't

3    exist prior to exchange bidding.

4    Q    Can you explain what made that integration onerous?

5    A    It takes quite a lot of time and effort to set up a new

6    server-side integration.  We've done a whole bunch of these

7    over the years, and it's very effort intensive.  There are a

8    lot of things that can break, a lot of things that can go

9    wrong.  So it's a staged process and entails a significant

10   investment of time and effort both on our part and on the

11   part of the bidder that's bidding into our system.

12   Q    What do you mean by, quote/unquote, secret sauce?

13   A    Apologies.  This was a while ago, so my memory is a

14   little bit hazy.  But I recall that there were times where

15   it was a little bit ambiguous how the AdX buy-side would be

16   allowed to use certain data that existed within Google.

17         And I think secret sauce in this context was a

18   term that was used to demark what sorts of things were data

19   reserved for Google's buy-side as opposed to, you know,

20   things that were okay to share with other parts of the

21   ecosystem.

22   Q    Are you aware of any AdX feature being scraped or

23   scrapped because it infringed on the buy-side secret sauce?

24   A    I think there were some features related to

25   cross-device where this was a tricky topic, the general idea

26

Deposition Read-In - G. Levitte

1  being that a cross-device graph was valuable intellectual

2  property.  And we received that as guidance from our

3  executives that that valuable intellectual property they

4  desired to use for Google's buy-side but not to make

5  available to the AdX buy-side.

6  Q    When you say a cross-device graph, are you referring to

7  tracking the same individual across multiple devices?

8  A    It could mean across multiple devices or across

9  different browsers on the same device, for example.

10  Q    So the strategy to increase gross revenue was to

11  increase AdX's share of wallet from DV360 and authorized

12  buyers?

13  A    That was, I think, one of the strategies that was

14  listed in this table among others, yes.

15  Q    And the share of wallet for DV360 is to increase AdX's

16  share of wallet from DV360 means that more of DV360 spend

17  goes to AdX?

18  A    Yeah.  For both DV3 and for authorized buyers.  This

19  role basically says we'd like for them to spend more on our

20  exchange than they do presently, yeah.

21  Q    And the tactic for this, as you wrote, 1p auction and

22  the Unified Pricing Rules?

23  A    Yes.

24  Q    1p auction is the first-price auction?

25  A    That's right.

Deposition Read-In - G. Levitte

1   Q    So the change to first-price auction and Unified

2   Pricing Rules were a tactic to accomplish the strategy of

3   increasing AdX's share of wallet?

4   A    I think this is maybe a simplified way, and I wouldn't

5   necessarily describe increase share of wallet as the goal of

6   these projects.

7   Q    It was a strategy, right?

8   A    One of the things that we wanted.  So if I recall

9   correctly, I think this was a structure that would give us

10  some idea around a concept called input metrics and output

11  metrics where output metrics is something that you're trying

12  to achieve, like grow overall revenue.  But you can't

13  necessarily control all of the things that result in gross

14  revenue.

15          Input metrics was, you know, sort of more concrete

16  objectives.  So I'm not sure if strategy is the right way to

17  describe it, but one of the goals, among others, was trying

18  to get buyers to spend more on our exchange.  Strategy might

19  not be the right way to put it.

20          MS. WOOD:  Okay.  We'll now read the testimony of

21  former Google employee Woojin Kim.

22          And we also have some documents, three documents,

23  in connection with Mr. Kim.  They are PTX 794, PTX 1107, and

24  PTX 1108.

25          THE COURT:  Any objection to those three?

28

Deposition Read-In- W. Kim

 1           MS. WOOD:  The first, 794, is pursuant to the

 2   stip, and 1107 and 1108 relate to plaintiffs' motion for an

 3   adverse inference.

 4           THE COURT:  Okay.

 5           MS. DUNN:  And just -- sorry.  The Court's

 6   indulgence, Your Honor.

 7       (Counsel confer.)

 8           THE COURT:  Is there an issue?

 9           MS. DUNN:  I am just trying to clarify whether

10   these documents are the documents that were met and

11   conferred over last night.  And subject to that, there's no

12   objection.

13           THE COURT:  All right.  They're in then.

14           MS. WOOD:  Again, this is the deposition of Woojin

15   Kim taken on March 30, 2021, and it's Woojin, W-O-O-J-I-N,

16   last name Kim, K-I-M.

17       (The deposition of Woojin Kim is read as follows:)

18   Q    When did you leave the role with Google Display

19   Network?

20   A    I left the Google Display Network team, I believe, in

21   February of 2017.

22   Q    What was your title while you held the role with the

23   Google Display Network?

24   A    At the end -- by the end of my tenure there with Google

25   Display Network, I was director of product management.

                                                           29

Deposition Read-In- W. Kim

1   Internally, senior director of product management.

2   Q     How many advertisers did GDN or Google Ads have?

3   A     I count in the millions.

4   Q     What type of businesses did you target as potential

5   customers for GDN?

6   A     Businesses from all different industries really, and as

7   I said, we tried to build a truly flexible offering that

8   allowed advertisers to do a lot of different things.  So no

9   particular industry sector in mind, global as well, a lot of

10  different advertisers.

11  Q     So if I was a small business, a mom-and-pop shop like

12  you said, and I wanted to spend just a few thousand dollars

13  a year on display advertising, would I be a customer that

14  GDN would be seeking?

15  A     We would certainly welcome them.

16  Q     But GDN was designed so that it could be used by a

17  mom-and-pop shop who only wanted to spend a few thousand

18  dollars a year for display advertising.  Is that correct?

19  A     We certainly built our product to be flexible enough

20  that it could be used by small advertisers, mom and pops,

21  that only had a few dollars to spare.  But we were proud of

22  the fact that we built a platform that was powerful enough

23  also to be used by the largest advertisers.  So we did try

24  to be quite inclusive in terms of advertisers we welcomed.

25           MS. WOOD:  And then the deposition marked a

Deposition Read-In- W. Kim

1  document which is in the binder as PTX 579, and plaintiffs

2  would move PTX 579 into evidence.

3          THE COURT:  Any objection?

4          MS. DUNN:  No objection, Your Honor.

5          THE COURT:  All right.  It's in.

6  Q    Do you recognize the document?

7  A    I don't.

8  Q    The title of the document in the first slide is, quote,

9  Media Review GDN/DBM Customer Segmentation and GDN Marketing

10  Refresh.  Do you see that?

11  A    Yes.

12  Q    And the date is September 2015; is that correct?

13  A    I see that.

14  Q    Do you recall playing any role in preparing this

15  document?

16  A    I don't remember.

17  Q    Do you recall the purpose of this document?

18  A    I don't.

19  Q    Do you see the column with the title, quote, Target Use

20  Case, closed quote?

21  A    Yes, I see that.

22  Q    It says -- in the GDN row, it states, quote, most

23  effective starting point for display and as a turnkey media

24  solution, closed quote.

25          Do you see that language?

31

Deposition Read-In- W. Kim

1   A     Yes, I see it.

2   Q     Turn to the next page with Bates ending in 510.

3   A     Okay.

4   Q     On the right side of the page, the slide lists four

5   segments of buyers; is that correct?

6   A     I think that's right with different segments.

7   Q     It lists four categories, correct?

8   A     Correct.

9   Q     Do you think that those four categories were a complete

10  and accurate way to categorize the advertisers that use GDN

11  or DBM?

12  A     Is it a complete way to do it?  Like I said, this is

13  probably one way of segmenting it.  We do it different ways.

14  Q     Do you see in the top right corner, there's color

15  coding for quote, DBM focus, and, quote, GDN focus, close

16  quote?

17  A     Yes, I see that.

18  Q     But Bucket No. 3 is fully within the GDN focus; is that

19  correct?

20  A     Bucket No. 3 seems to be shaded entirely gray, GDN.

21  Q     And Bucket No. 2 is partially in DBM and partially in

22  GDN, correct?

23  A     That's what I see in this graphic.

24  Q     And Bucket No. 1 is almost entirely in DBM focus but a

25  small portion in GDN, correct?

Deposition Read-In- W. Kim

1   A    At least the shading portions look that way.

2   Q    Number 3 refers to non-agency subscaled, correct?

3   A    That's what I see written here.

4   Q    There it says, quote, smaller digital advertisers,

5   close quote?

6   A    That's what it says, yes.

7   Q    And they would be a focus only for GDN, correct?

8   A    That's at least what this slide says.

9   Q    What did GDN think?

10  A    GDN certainly had small digital advertisers, smaller,

11  small, smallest digital advertisers.  They're in our

12  customer base because, as I told you, we built GDN to be

13  flexible, to be used by a lot of different sizes of

14  advertising, types of advertisers.  So they were certainly

15  within our customer set back then, and we didn't shy away

16  from servicing them.

17  Q    Did GDN impose any minimum spending requirements on

18  advertisers?

19  A    I don't think so.

20  Q    So I want to focus on that time period before AWBid,

21  A-W-B-I-D, came into being.  Were there any benefits to the

22  advertisers of GDN only buying through Google-owned

23  exchanges or Google-owned channels as I think you referred

24  to it?

25  A    I believe so at the time.

33

Deposition Read-In- W. Kim

1    Q     What were those benefits?

2    A     So I remember -- again, this is -- you're talking about

3    a time period back before AWBid.  So maybe 2014, '13, '15,

4    or before that.  As I mentioned, publishers oftentimes would

5    list their inventory on multiple different network and

6    exchanges and pools of inventory even simultaneously.

7          And an advertiser buying from multiple different

8    DSPs or ad networks could -- there was always the risk that

9    they could be bidding for the same exact impression through

10   a multitude of channels and basically competing with himself

11   or herself in that auction.  So that's one risk.

12         Another risk is the -- you know, we believed at

13   the time that -- you know, we thought we were

14   differentiating from our competitors in the display ad

15   business by making sure that we have a high-quality bar in

16   what types of publishers and what types of inventory we get

17   monetized with Google's advertisers and Google's demand,

18   meaning that there was a lot of publishers that couldn't

19   apply for AdSense or ad exchange, maybe even list their

20   inventory through AdSense and ad exchange.  But we wouldn't

21   actually monetize because the content or the traffic was

22   low-quality, spammy bought traffic sometimes.

23         And so the other benefit that we offered we

24   thought was that we protected advertisers, Google

25   advertiser, GDN advertisers in this case, from potentially

34

Deposition Read-In- W. Kim

 1  low-quality spam traffic out there and spammy publishers as

 2  well.

 3          MS. WOOD:  And then another exhibit is marked,

 4  which is in your binder as PTX 103, and plaintiffs would

 5  move PTX 103 into evidence.

 6          THE COURT:  Any objection?

 7          MR. ISAACSON:  No objection, Your Honor.

 8          THE COURT:  All right.  It's in.

 9  Q    Do you recognize this document?

10  A    I don't.

11  Q    In the next two sentences, you say, quote, if this is

12  the case, I would like to have GDN buy on all exchanges, not

13  just AdX, since all our competitors are doing so.  We want

14  truly equal inventory access.

15          Do you see that?

16  A    I do.

17  Q    And that's referring to what we discussed earlier about

18  GDN buying on exchanges that were not owned by Google.  Is

19  that correct?

20  A    When it says, quote, GDN buy on all exchanges, end

21  quote, all exchanges is -- I take it seems to be referring

22  to the non-Google exchanges out there.

23  Q    When you say, quote, truly equal inventory access,

24  close quote, what are you referring to there?

25  A    I think it's referencing -- I'm just reading off the

                                                              35

Deposition Read-In- W. Kim

1   email.  I think it's in reference to the previous sentence

2   where, quote/unquote, all our competitors are buying on all

3   exchanges.

4           So we want equal access to what those competitors

5   are doing.  I think that's how I would interpret this email

6   sitting here.

7   Q    And then the last sentence of that paragraph says,

8   quote, no, you cannot buy on other exchanges.  That will

9   weaken the value proposition of AdX as a sell-side platform,

10  close quote.

11          Do you see that sentence?

12  A    I do.

13  Q    Is that something that was conveyed to you by others at

14  Google?

15  A    I think this is, I guess, my crude -- my summary of the

16  conversation that I must have had with someone at Google, I

17  presumed.

18  Q    Do you recall others at Google having the view that it

19  would weaken the value proposition of AdX as a sell-side

20  platform if GDN, meaning Google Ads, buys on other

21  exchanges?

22  A    I believe that's what I must've thought through this

23  recollection recounted in this email.

24  Q    So you thought someone else had Google had that view?

25  A    It seems like it.  That's what's written here.

Deposition Read-In- W. Kim

1    Q    Do you have any understanding of why it would weaken

2    the value proposition of AdX as a sell-side platform if GDN

3    buys on other exchanges?

4    A    I think it's -- I think it's AdX is using the same type

5    of logic that's conveyed in the previous paragraph.  If AdX

6    has unique buyers, that's something that AdX would have as

7    an advantage to other platforms that don't have those

8    buyers.

9    Q    Were there also groups who were in favor of launching

10   AWBid?

11   A    Yes.

12   Q    Who were in those groups?

13   A    I was in favor of it.

14   Q    And who else?

15   A    My product managers and the people that worked in AWBid

16   were also presumably in favor of it.

17   Q    So is it fair to say, then, that the GDN product

18   management team was in favor of AWBid while members of the

19   sell-side product management team were against it?

20   A    I think there was -- I don't know if there were -- it's

21   possible that some folks within GDN actually did not want to

22   do it and vice versa.  Some people on the sell-side might

23   have wanted.  I think it depends on the individual really.

24   These are individual opinions.

25            MS. WOOD:  We have one last deposition, Your

Deposition Read-In - M. Shaughnessy

1    Honor.

2            THE COURT:  All right.

3            MR. PRITCHETT:  Good afternoon.  Chase Pritchett

4    for the United States.  I'll be reading in the deposition of

5    Michael Shaughnessy from Kargo that's dated August 9, 2023.

6            THE COURT:  Are there any exhibits being moved in?

7            MR. PRITCHETT:  No, Your Honor.

8            THE COURT:  All right.

9        (The deposition of Michael Shaughnessy is read as

10       follows:)

11   Q    Can you please state your name for the record, please?

12   A    Yes.  Michael Shaughnessy.

13   Q    Where are you currently employed?

14   A    Kargo.

15   Q    When did your employment at Kargo begin?

16   A    In 2018.

17   Q    Where were employed prior to Kargo?

18   A    I was employed by a few companies, including Evite,

19   IAC, which was about.com, and Bauer Media.

20   Q    Of those three companies, which would you consider to

21   be website publishers?

22   A    All three.

23   Q    At a high level, what is Kargo's business?

24   A    Kargo is a business that transforms standard creative

25   and creates bespoke experiences for the largest advertisers,

                                                              38

Deposition Read-In - M. Shaughnessy

1  as well as the best publishers.

2  Q    And what's your role at Kargo?

3  A    I am currently the chief operating officer.

4  Q    In our role at Kargo, how often do you interact with

5  publishers?

6  A    Frequently.

7  Q    Could you give me some examples of some of the

8  publishers that you interact with?

9  A    Yes.  We work with the largest publishers, which have

10  taken their magazine businesses and made them digital

11  businesses.  So think of the Meredith and the Hurst.  We

12  also work with digital first publishers, including Bustle

13  and BuzzFeed, and then we work with broadcasters, like CBS,

14  NBC, and Discovery.

15  Q    Is part of Kargo's business offer a supply-side

16  platform?

17  A    Yes.

18  Q    So it's your view that Google is the dominant publisher

19  ad server on the market today?

20  A    Yes.

21  Q    And what, if any, effect has Google's position as the

22  dominant publisher ad server had on Kargo?

23  A    It has influenced product and engineering investments,

24  learning and development opportunities for existing

25  employees so that they can manage relationships with their

39

Deposition Read-In - M. Shaughnessy

1    publishers.  And it also influences the way that we deliver

2    our campaigns.

3    Q    What, if any, effect has Google's position as the

4    dominant publisher ad server had on Kargo's ability to

5    innovate?

6    A    We have had to build a lot of our infrastructure and

7    architecture around the Google ad server, which if anyone in

8    this room were to go on a publisher site, there is a high

9    likelihood that Google Ad Manager is on the publisher's page

10   and descending ad requests, that is, the ad server

11   delivering ads.

12   Q    What effect has it had on Kargo's ability to innovate

13   that you've had to build a lot of your infrastructure and

14   architecture around the Google ad server?

15   A    It has slowed down our ability to bring some of the

16   research and development we've done over the years to

17   advance the industry at the pace we would like.

18   Q    Are there any other demand sources that publishers have

19   available that can bring the massive amount of demand that

20   Google's GDN brings?

21   A    My understanding is no.

22   Q    What's that understanding based on?

23   A    My experience being a publisher.

24   Q    Does Criteo in particular provide a substitute for the

25   massive amount of demand that's available on Google's GDN?

Deposition Read-In - M. Shaughnessy

1   A     In my experience, no.

2   Q     What's your basis for saying that?

3   A     Being a publisher who analyzed demand sources and was

4   able to understand where revenues were coming from.  That's

5   part of our top-line revenues.

6   Q     Does Amazon provide a substitute for publishers to that

7   massive amount of demand in Google's GDN?

8   A     Today, no.

9   Q     And what's your basis for saying that today Amazon does

10  not provide that?

11  A     Based on my understanding of the DSP landscape,

12  conversations that I have with advertisers and agencies, in

13  addition to the contributions of Amazon's transparent ad

14  marketplace, TAM, and the way it was configured into my ad

15  stacks at about.com, as well as our media.

16  Q     Are you aware of any source of demand for display

17  advertising available on the market today that's a

18  substitute for publishers to the demand available in

19  Google's GDN?

20  A     I am not aware.

21  Q     Do you agree that if a publisher was to switch away

22  from Google's platforms, it would have to replace that

23  revenue that's offered through Google's platforms?

24  A     It would be extremely difficult for a publisher to make

25  this change.  And in the short term, it would create pain

41

Deposition Read-In - M. Shaughnessy

1  for the publisher's business.

2  Q    Why would it be extremely difficult for a publisher to

3  switch away from Google's platforms?

4  A    Because publishers are dependent on Google for every

5  facet of their business.  So zooming out, Google use --

6  sorry, publishers use Google analytics when it comes to

7  analyzing their site traffic.  They build their businesses

8  to surface their content within Google search.  Publishers

9  are seeing decreased traffic from this platform because of

10  things like the answer box within search.  Or snippets of

11  their content are surfacing there where they have less ad

12  opportunities.

13        So based on macro trends that are happening within

14  the industry, other components of the Google infrastructure

15  that influences their business, it would be very, very

16  difficult for fact-based publishers and journalists to have

17  their commercial teams move away from this demand source.

18  Q    Why do you view the ad tech industry as important?

19  A    I believe the ad tech industry is important because

20  there is a value exchange between content creators and

21  consumers, and it's really important to our democracy in

22  making sure there is fact-based information that is

23  accessible to all.

24        MR. PRITCHETT:  Thank you, Your Honor.

25        MS. WOOD:  Plaintiffs call Robin Lee.

42

Direct Examination - R. Lee

1          THE COURT:  Now, this is your last witness?

2          MS. WOOD:  Yes, Your Honor.

3          THE COURT:  All right.  Are we set?

4              ROBIN LEE, PLAINTIFFS' WITNESS, SWORN

5                     DIRECT EXAMINATION

6   BY MS. WOOD

7   Q    Good afternoon, Professor Lee.  Can you please

8   introduce yourself to the Court?

9   A    Good afternoon, Your Honor.  My name is Robin Lee.

10          I am a tenured processor of economics at Harvard

11  University where I have taught undergraduate and graduate

12  students for the past ten years.  Prior to that, I taught

13  NBA students at NYU.

14          I receive my BA, master's, and PhD in economics

15  from Harvard.

16  Q    And can you spell your first and last name for the

17  record?

18  A    R-O-B-I-N, L-E-E.

19  Q    And how long have you been a professor?

20  A    Fifteen years.

21  Q    Can you please describe your research and scholarship?

22  A    So my teaching and research is in a field economics

23  known as industrial organization, which studies the

24  functioning of markets in competition among firms.

25  Q    Have you received any special recognition for your

                                                            43

Direct Examination - R. Lee

1   work?

2   A    Yes.  For example, I received The Econometrics

3   Society's Frisch Medal recognized as a top research award in

4   economics.

5   Q    And let me put before you PTX 1778.  We can put it on

6   the screen, but there's also a copy in exhibit order in your

7   binder.

8             THE COURT:  Is that the CV?

9             MS. WOOD:  Yes, Your Honor.

10            THE COURT:  I assume there's no objection to 1778.

11            MR. ISAACSON:  No objection.

12            THE COURT:  All right.  It's in evidence.

13            And in what field specifically are you offering

14   this expert?

15            MS. WOOD:  Economics and industrial organization,

16   Your Honor.

17            THE COURT:  Any objection, Mr. Isaacson?

18            MR. ISAACSON:  No objection.

19            THE COURT:  All right.  He is so qualified.  Let's

20   go.

21   BY MS. WOOD

22   Q    So let's turn directly to work in this matter.  What

23   was your assignment in this case?

24   A    So my assignment had three parts:  First, to determine

25   whether markets alleged by the plaintiffs are appropriate,

44

Direct Examination - R. Lee

1   relevant antitrust markets for examining Google's market

2   power and the competitive effects of its conduct.  The

3   second part was to evaluate the extent of Google's market

4   power in these markets, and the third was to determine

5   whether Google's conduct related to these markets created,

6   enhanced, or sustained its market power, whether it harmed

7   competition and/or continues to harm competition, and

8   whether it resulted in material harm to customers and

9   consumers.

10  Q    And did you reach opinions with respect to each part of

11  your assignment?

12  A    I did.

13  Q    And can you briefly describe your opinions regarding

14  market definition?

15  A    So the first opinion related to market definition is

16  that publisher ad servers, ad exchanges, and advertiser ad

17  networks are all well-defined, appropriate, relevant

18  antitrust product markets for evaluating Google's market

19  power and the competitive effects of its conduct.

20          All of these product markets contain tools that

21  are used to transact open-web display advertising, as well,

22  both worldwide with limited exceptions and the United States

23  are appropriate geographic markets for each product market.

24  Q    We'll obviously get more into the substance of your

25  opinion as we go.  But before we do that, can you briefly

Direct Examination - R. Lee

1   describe your opinions related to market power?

2   A     So Google possesses substantial and sustained market

3   power that is protected by significant barriers to entry in

4   each of the relevant markets.  It has possessed that market

5   power in recent years and likely since at least 2015.

6   Q     And with respect to your third assignment, can you

7   describe the opinions you reached regarding Google's conduct

8   and its effect?

9   A     So Google has engaged in conduct comprising five

10  specific acts that has excluded competitors from

11  participating in the relevant markets and impeded their

12  ability to attract advertiser spending and publisher

13  inventory.  These acts have also denied rivals scale further

14  harming their competitiveness.  Now, these acts have harmed

15  competition and have enhanced Google's market power and have

16  also harmed customers and likely harmed consumers.

17  Q     Now, before we get into the meat of your opinions, can

18  you tell us:  When did you first begin working on this

19  matter?

20  A     So I began working on this matter in the fall of 2019.

21  Q     And can you describe the types of materials you have

22  reviewed over the course of your time working on this

23  matter?

24  A     So I reviewed thousands of pages of documents produced

25  by industry participants, sworn testimony.  I also reviewed

46

Direct Examination - R. Lee

1    public sources and academic sources, examined internal

2    Google experiments, expert reports submitted by Google's

3    experts, and also analyzed and performed analysis of over a

4    petabyte of data, a lot of data produced in this matter.

5    Q    And what methods did you employ in evaluating those

6    materials?

7    A    So I used accepted theoretical and quantitative

8    econometric techniques to evaluate the material.  This is

9    both theoretical and quantitative methods paired with my

10   training as an industrial organization economist.

11   Q    Now you mentioned that you applied quantitative methods

12   as well as your training and experience.  Can you give the

13   Court some examples of the quantitative methods you used?

14   A    So some examples include regression analyses, auction

15   simulations, market share calculations.  And as I mentioned

16   before, I also examined internal Google experiments and

17   simulations.

18   Q    So putting aside the Google internal experiments and

19   simulations, how many independent quantitative analyses did

20   you yourself perform?

21   A    I performed approximately a hundred quantitative

22   analyses to support my opinions regarding market definition,

23   market power, and competitive effects.

24   Q    And when you conducted these independent quantitative

25   analyses, what data did you use?

47

Direct Examination - R. Lee

1  A     So I relied on data produced by Google and, in some

2  cases, data also produced by other third-parties or industry

3  participants.

4  Q     Now, you also indicated that in certain instances, you

5  relied on analyses done by Google itself.  How many

6  quantitative analyses of Google did you rely on?

7  A     So I relied on approximately 20 internal Google

8  experiments and simulations.

9  Q     And why would you rely on Google's own internal

10 experiments and simulations?

11 A     So this is for at least two reasons:

12        First, there's evidence that Google regularly

13 relies on these experiments in ordinary course to evaluate

14 potential exchanges.

15        Second, Google has control over its own pricing

16 and the features of its products.  So this allows it to

17 evaluate exchanges that have occurred or even exchanges that

18 may never have been implemented.

19        Moreover, these experiments allow Google to

20 isolate the effects of certain changes while holding fixed

21 other things in the environment, and that's an important

22 reason why experiments can be valuable more so than relying

23 solely on observational data or just looking at what's

24 happened in the past.

25 Q     Now, I want to turn now to the first assignment, which

                                                              48

Direct Examination - R. Lee

1   was market definition.  Can you explain to us what is the

2   role of market definition to an economist such as yourself?

3   A     So market definition is a tool used to analyze

4   antitrust and monopolization claims.  It helps to focus

5   attention on areas over which market power can be exercised,

6   and the competitive effects of the conduct issue are most

7   likely to manifest.

8   Q     And you've also described market power.  What is market

9   power as a economists use that term?

10  A     So economists define market power to be the ability to

11  profitably charge prices above-competitive levels, which are

12  oftentimes measured by incremental or marginal costs, and

13  these are the additional costs to produce an additional unit

14  of a product.

15  Q     So you said that market power is associated with

16  pricing and the ability to price above-competitive levels.

17  Are there acts other than pricing that can be indicative of

18  market power?

19  A     Yes.  So economists recognize that market power can

20  also be exercised by failing to maintain quality, product

21  variety, or innovation at competitive levels.

22  Q     All right.  Can you describe how -- what constitutes a

23  relevant antitrust product market?

24  A     So for a monopolization claim, a relevant antitrust

25  product market represents a set of products over which an

49

Direct Examination - R. Lee

1  alleged or potential monopolist by controlling can exercise

2  significant market power.  That is a single firm by

3  controlling the set of products could profitably price

4  significantly above-competitive levels because enough

5  customers would keep buying those products and not go

6  elsewhere.

7  Q    And how do economists, such as yourself, go about

8  evaluating whether a given set of products constitute a

9  relevant antitrust product market?

10  A    So the most common method, the method that I employ, is

11  known as the hypothetical monopolist test, abbreviated as

12  the HMT.

13  Q    All right.  And I want to talk now about the

14  relationship, if any, between market power and monopoly

15  power.  How are those two things related, if at all?

16  A    So it's important to note that market power is not

17  binary.  It's not 1-0.  It can vary both in degree and

18  duration.  So in terms of monopoly power, as an economist,

19  my understanding is that monopoly power is a legal

20  conclusion that is typically supported by economic evidence

21  of substantial and sustained market power that is protected

22  by significant barriers to entry.

23  Q    What do you mean by substantial and sustained market

24  power?

25  A    So by that, I mean the ability to profitably charge

Direct Examination - R. Lee

1    prices significantly above-competitive levels.  That is not

2    quickly eliminated by the entry or expansion of competitors.

3    Moreover, it persists long enough to meaningfully affect

4    competition.

5    Q    So you also reference barriers to entry.  What are

6    those?

7    A    So barriers to entry refer to factors that limit or

8    display entry or expansion by potential competitors.  And

9    when significant barriers to entry exist, market power can

10   persist and not quickly be eroded by competition.

11   Q    Now, when you defined what you've found were three

12   relevant antitrust product markets, you said that each

13   involved tools used to transact open-web display

14   advertising.  Can you please describe to the Court what you

15   understand open-web display advertising to mean?

16   A    So by that term, I'm referring to display banner ads

17   shown to the websites of open-web publishers.  And open-web

18   publishers are those web publishers who rely on products

19   provided by other third parties to sell display advertising

20   in contrast to walled garden providers with their own

21   integrated display ad tech tools.

22   Q    And when was the first time that you recall hearing

23   those four words "open-web display advertising" used

24   together?

25   A    So I recall hearing the term "open web" and "display

Direct Examination - R. Lee

1    advertising," but I don't recall hearing those four words in

2    that order prior to my work in this case.

3    Q    And I want to make one question clear:  Are you opining

4    that open-web display advertising itself is a relevant

5    product market?

6    A    I am not.

7    Q    And what is the product market as you understand it and

8    have opined on?

9    A    So the three relevant product markets are tools that

10   are used to transact or can transact open-web display

11   advertising.

12   Q    Now, how does open-web display advertising then fit

13   into the three relevant product markets as you've defined

14   them?

15   A    Well, I think it's still important to understand why

16   open-web display advertising is distinct from other forms of

17   digital advertising because that explains why customers

18   would be willing to pay more than competitive prices for the

19   tools used to transact those advertisements.

20   Q    And who are the customers that use tools to transact

21   open-web display advertisements?

22   A    So the customers are advertisers and open-web

23   publishers.

24   Q    So I want to talk about each one of those in turn.

25   Let's start with open-web publishers.  How, if at all, is

Direct Examination - R. Lee

1    open-web display advertising differentiated from other forms

2    of digital advertising from the perspective of an open-web

3    publisher?

4    A    So I think the most important way is that open-web

5    display advertising helps open-web publishers monetize parts

6    of their digital inventory.  That is -- that would not be

7    suitable for other forms of digital advertising.  For

8    example, a web publisher without an app or without video

9    content or social content wouldn't be able to rely on app

10   advertising, instream video advertising, social advertising.

11   But even a web publisher who might have those other

12   channels, they still would have these web impressions, web

13   display impressions they would want to monetize.  If they --

14   Q    Sorry to interrupt.  But when you say monetize, what do

15   you mean?

16   A    I mean sell for revenue.  So if a web publisher had a

17   perishable web impression they didn't sell, well, they would

18   be giving up valuable revenue.

19   Q    Now, for advertisers, how is open-web display

20   advertising different from other forms of digital

21   advertising?

22   A    So from an advertiser's perspective, open-web display

23   allows them to reach users across a wide range of websites

24   accessing them at particular -- or at different points in

25   time.  For example, a retailer might see a user put a pair

Direct Examination - R. Lee

1  of shoes in their shopping cart at macys.com and then target

2  them with an ad later when they're browsing the news of the

3  *New York Times* or checking the weatherer at weather.com.

4  Q    And based on your review of the record, do advertisers

5  use open-web display ads in addition to other forms of

6  digital ads?

7  A    Yes.  Advertisers often use other forms of digital

8  advertising as well.  Sometime it's to achieve different

9  complementary goals.  For example, advertisers often use

10  search advertising alongside display advertising, but that

11  doesn't necessarily mean they are close substitutes for one

12  another.  They often -- or seem to achieve different goals.

13  Q    All right.  We'll talk more about that in a bit.

14         But did you have occasion in connection with your

15  work in this matter to calculate the size of the open-web

16  display advertising marketplace?

17  A    Yes.  So from my independent analysis of the data, I

18  calculated in 2022, approximately $24 billion were spent

19  through advertiser buying tools for indirect programmatic

20  auction open-web display ads.  In addition, that year

21  another $11 billion was spent on direct deals through

22  Google's DFP publisher ad server.

23  Q    All right.  So with that understanding, let's turn now

24  to the publisher ad server product market.  What was your

25  opinion regarding market definition for publisher ad

Direct Examination - R. Lee

1   servers?

2   A    So my opinion is that publisher ad servers for open-web

3   display is a well-defined, appropriate, relevant product

4   market.  To reach that conclusion, I used the HMT.

5   Q    And can you tell us:  Did you reach an opinion as to

6   Google's market power in that market?

7   A    I did.  Google possesses substantial and sustained

8   market power protected by significant barriers of entry in

9   the publisher ad server market with DFP.

10  Q    Now, you said that you used the hypothetical monopolous

11  test or HMT.  Can you please describe to the Court:  What is

12  the hypothetical monopolous test?

13  A    So in a monopolization case, the HMT begins with a

14  product offered by the alleged monopolous.  Here it would be

15  DFP provided by Google.  And also, those products that would

16  likely impose the most significant constraints on that

17  product.  Typically, you know, products that offer the same

18  features, that cater to the same set of customers.  So here

19  it would be publisher ad servers, and that would form what

20  is known as the candidate market.

21       The HMT would then proceed to ask the question:

22  If a single firm owned all the products in the candidate

23  market, would this hypothetical monopolous be able to charge

24  prices significantly above-competitive levels?  And if so,

25  it means enough customers are continuing to buy those

Direct Examination - R. Lee

1    products and not substituting to alternatives so that that

2    price increase would be profitable.  And then the HMT would

3    be set to pass, and those products would be enough to form a

4    relevant product market.

5    Q    So how did you go about applying the hypothetical

6    monopolous test to the publisher ad server market in this

7    case?

8    A    So basically, I used the steps I outlined before

9    starting with DFP and other publisher ad servers and looking

10   at evidence that would support or determine whether one firm

11   owning all of those products could price significantly

12   above-competitive levels.

13   Q    And can you give us a simple example of how the

14   hypothetical monopolous test might work with products we use

15   more often than ad tech tools?

16   A    Sure.  So one way of thinking about it is imagine

17   there's an isolated town and maybe a half a dozen gas

18   stations which are all competing with one another.  Maybe

19   their pricing close to competitive levels or close to their

20   cost.  And to evaluate whether there would be a relevant

21   product market for gas or gas stations, it would begin by

22   asking the question:  If a single firm owned all of those

23   gas stations, could that single firm charge prices

24   significantly above-competitive levels?

25              Now, imagine this is an isolated town, so

Direct Examination - R. Lee

1    customers aren't driving somewhere else.  It's still the

2    case that maybe some customers would start walking, taking a

3    bike, buying an electrical vehicle.  They are all

4    substitutes to gas to some extent.  But the relevant

5    question is is there enough substitution to those

6    alternatives so that a firm owning all of those gas stations

7    wouldn't find it profitable to raise prices

8    above-competitive levels.

9    Q    So turning back to this case, what products, if any,

10   are excluded from a relevant product market?

11   A    So the products that are appropriately excluded are

12   those that are not close substitutes to products within the

13   market.  The ones that are excluded are not significant

14   enough competitive constraints to prevent a hypothetical

15   monopolous from exercising significant market power.

16   Q    Now, are you familiar with something that is referred

17   to as the SSNIP or S-S-N-I-P test?

18   A    I am.

19   Q    And can you explain what the SSNIP test is?

20   A    So apologies to the Court for using another

21   abbreviation.  But the SSNIP stands for a "Small but

22   Significant Non-transitory Increase in Price."  The SSNIP

23   test is another way of referring to the HMT because the HMT

24   evaluates whether a hypothetical monopolous could profitably

25   implement a SSNIP above-competitive prices.

Direct Examination - R. Lee

1   Q    Now, is there such a thing in economics as a

2   quantitative application of the SSNIP test?

3   A    So this notion of a quantitative SSNIP test is

4   sometimes used to refer to a particular version used in

5   merger cases where information about customer substitution

6   patterns is used to determine whether a hypothetical

7   monopolous could increase prices further above current price

8   levels, but that type of test isn't appropriate for this

9   case here.

10  Q    Why do you say a quantitative SSNIP would not be

11  appropriate for this case?

12  A    Well, that form I just outlined wouldn't be appropriate

13  because this is a monopolization case.

14         In a merger case, the concern is that the merger

15  would lead to prices that would increase above current

16  levels, the merger would cause prices to increase further.

17  And that's why the benchmark they use is current level

18  prices.  You would look at how customers substitute away.

19         Now, in a monopolization case, the concern is

20  identifying a set of products that could be monopolized or

21  could have already been monopolized.  That's why the

22  appropriate benchmark are competitive price levels, which

23  may not be current price levels.

24  Q    And are there any considerations that economists follow

25  when deciding whether to apply a quantitative SSNIP test in

58

Direct Examination - R. Lee

1   the context of a monopolization case?

2   A    So in addition to using different benchmark prices --

3   right, in a monopolization case, the appropriate benchmark

4   are competitive prices.  Economists also recognize -- want

5   to be careful when you rely on customer substitution

6   patterns at current prices.  And this is because of

7   something known as the cellophane fallacy.  So the

8   cellophane fallacy refers to the idea that when a firm is

9   already exercising significant market power, it's already

10  increasing prices to a level at which there is going to be

11  significant substitution to alternatives.  But those

12  alternatives aren't necessarily close substitutes to the

13  products in a candidate market where those products price

14  competitively.  In fact, those alternatives haven't

15  constrained the exercise in market power to begin with.

16  Q    Can you give us an example of the type of cellophane

17  fallacy that you're talking about?

18  A    Sure.  For this, let's go back to this example I gave

19  before with an isolated town and gas stations.  You know,

20  imagine a single firm ended up buying up all of these gas

21  stations and started raising prices up to the point where

22  it's no longer profitable to raise prices anymore.  Well, at

23  that price, maybe there's a lot of customers who are

24  walking, taking their bike, using mass transit.  But that

25  doesn't mean gas stations isn't a relevant product market

Direct Examination - R. Lee

1    even know there's a lot of substitution elsewhere.  It's

2    because that market has already been subject to the exercise

3    of significant market power.

4    Q    All right.  So in this matter, what evidence did you

5    consider in conducting the hypothetical monopolous test for

6    the publisher ad server market in particular?

7    A    So both for this market and all the markets, I looked

8    at both qualitative or descriptive evidence and quantitative

9    evidence to value whether the HMT would pass.

10             And this evidence falls into two broad buckets.

11   In the first bucket, there's evidence that the products in a

12   relevant product market offer distinct features valued by

13   customers not provided by alternatives.  This bucket also

14   includes evidence that industry participants, including

15   Google, recognize these products as distinct competing

16   against a different set of competitors.

17             The second bucket of evidence is known as direct

18   evidence of market power.

19   Q    And what is that?  What is direct evidence of market

20   power?

21   A    So direct evidence of market power is evidence that

22   Google is already able to deviate significantly away from

23   competitive behavior.  This includes evidence that Google is

24   already charging prices that are significantly

25   above-competitive levels or failing to maintain quality at

60

Direct Examination - R. Lee

1   competitive levels.

2            Now, it's important to recognize that direct

3   evidence of market power doesn't rely on having already

4   defined a relevant market, nor does it rely on market share

5   calculations.

6   Q    Now, as an economist, why is direct evidence of market

7   power useful in assessing a relevant product market?

8   A    It's very useful evidence because if a single firm in a

9   candidate market is already exercising significant market

10  power, then a hypothetical monopolous that owned even more

11  products would be able to as well.  Put another way, if

12  Google is already exercising significant market power, then

13  a hypothetical monopolous would be able to as well.

14  Q    So what conclusion did you reach as to whether the

15  publisher ad server market passed the HMT?

16  A    I reached the conclusion that indeed it does pass the

17  HMT and hense forms a relevant antitrust product market.

18  Q    So let's talk now about one of the items you said you

19  considered, which are features of publisher ad servers.

20  What are the key features of publisher ad servers that can't

21  be obtained through other tools?

22  A    There are many features, but one of the most important

23  ones is a publisher ad server's ability to effectively

24  manage both directly sold and indirectly sold open-web

25  display advertisements for publishers.

                                                              61

Direct Examination - R. Lee

1   Q    And are publisher ad servers used by Facebook or

2   Amazon?  Would they be included in the publisher ad server

3   market for open-web display?

4   A    They wouldn't be.

5   Q    And why is that?

6   A    It's because these products aren't available to

7   open-web publishers as an alternative.  They wouldn't

8   constrain a hypothetical monopolous of publisher ad servers

9   for open-web display from charging prices above-competitive

10  levels because Facebook and Amazon's publisher ad servers

11  aren't available as alternatives to these customers, to

12  these open-web publisher customers.

13  Q    What do you mean they're not available?

14  A    They just aren't able to be used by open-web

15  publishers.  They're not provided to them as an option.

16  Q    So who does use Facebook and Amazon's publisher ad

17  server?

18  A    Facebook does it for its properties, and Amazon does

19  for the Amazon publisher ad server.

20  Q    Now, based on your review of the evidence, can

21  publisher ad servers serve other types of digital ads, let's

22  say video or app, besides open-web display ads?

23  A    Yes, it's possible.  For example, Google's DFP also is

24  able to transact app adds.

25  Q    And is it unusual for a product in a relevant antitrust

62

Direct Examination - R. Lee

1    market to have the ability to perform functions outside that

2    product market?

3    A     No, it's not.

4          MR. ISAACSON:  I'm going to object.  I think we're

5    now leaving his report behind.

6          THE COURT:  I'm sorry?

7          MR. ISAACSON:  I don't think this is in his

8    reports.

9          MS. WOOD:  Paragraphs 258 to 260, Mr. Isaacson.

10          MR. ISAACSON:  I appreciate the citation.

11          All right.  Go ahead.  Thank you.  No objection at

12    this point.

13          THE COURT:  All right.

14          MS. WOOD:  Can we get the question read back.

15       (Question read.)

16          THE WITNESS:  No, it's not unusual.  For example,

17    going back to gas situations again, some gas stations

18    perform tire changes, replace your oil, sell potato chips,

19    but a gas station would still be part of a relevant product

20    market for gas.

21    BY MS. WOOD

22    Q    And so if you were looking and assessing market power

23    for a gas station that sells gas, would you measure the

24    amount of their potato chip sales?

25    A     No, I wouldn't.  So I'll come to this, but when

63

Direct Examination - R. Lee

1   calculating market shares in this market, you would form

2   market power over gas sales.  I wouldn't, as a starting

3   point, put potato chips in that calculation.

4   Q    Okay.  Let's talk now about the competitive restraints

5   that are available in the publisher ad server market.  Did

6   you consider whether there were competitive constraints on

7   publisher ad servers that transact open-web display ads?

8   A    I did consider alternatives.  This includes other forms

9   of digital advertising insofar as those alternatives would

10  allow a publisher to move away from a publisher ad server.

11          I also considered building an internal publisher

12  ad server, sometimes referred to as self-supply as a

13  potential constraint.

14  Q    And let me take each one of those in turn.  What were

15  the other forms of advertising that you considered as a

16  potential competitive constraint on publisher ad servers for

17  open-web display?

18  A    So I considered some of the ones I mentioned before, in

19  app, native advertising, including social or instream video.

20  I mentioned before that tools provided by walled garden

21  providers, like Facebook and Amazon, aren't available to

22  open-web publishers as alternative.  And I also described

23  earlier why.  An open-web publisher, regardless if they have

24  other forms of content, still would have these valuable web

25  impressions they would want to monetize or sell for revenue.

                                                              64

Direct Examination - R. Lee

1    And that's why an open-web publisher ad server is still

2    important to them, and those other alternatives wouldn't be

3    significant enough competitive restraints.

4    Q    And you also mentioned you considered whether the

5    ability to build your own internal publisher ad server might

6    impose or not impose a competitive constraint on the product

7    market.  What did you find in that regard?

8    A    So I found that wouldn't impose a significant

9    competitive constraint.

10   Q    Why not?

11   A    And this is for two main reasons:

12          First, it's costly, and it's difficult to build an

13   internal ad server.  Very few publishers have successfully

14   managed to do so.  Even the *New York Times*, which is a large

15   publisher, had at one point their own internal publisher ad

16   server but came back to DFP.

17          The second reason is that a publisher building

18   their own internal publisher ad server would actually lose

19   access to real-time bids from AdX, which at the moment are

20   only provided to DFP.

21   Q    Sir, you also mentioned earlier that one of the things

22   economists consider when looking at relevant product markets

23   is industry recognition.  What did your analysis of industry

24   participants show with respect to the publisher ad server

25   tool market?

Direct Examination - R. Lee

1    A     There are numerous documents I've seen, including those

2    from Google, that recognize publisher ad servers as

3    different products, differentiated from other ad tech

4    products.  In particular, highlighting the important role a

5    publisher ad server plays in managing between direct and

6    indirectly sold display ads.

7    Q     Now, you also mentioned that sometimes direct evidence

8    of market power can help define a product market.  With

9    regard to DFP, did you examine any direct evidence of

10   Google's market power in the publisher ad server market?

11   A     I did.

12   Q     And what did you observe?

13   A     So I think one of the most telling examples is DFP's

14   ability to degrade its quality or remove features without

15   losing too much business.  So in 2019, Google implemented

16   the Unified Pricing Rules, which took away the ability for

17   publishers to use variable pricing floors.  In a more

18   competitive environment, publishers could turn to

19   alternatives, and Google would be constrained in what it

20   could do.

21        Additionally, historically, Google placed

22   restrictions within DFP on how publishers could work with

23   rival ad exchanges.  And for a long time, publishers weren't

24   able to run real-time auctions among many ad exchanges and

25   AdX.  The industry actually had to go outside of DFP and

Direct Examination - R. Lee

1    create header bidding to bring that functionality, but at

2    the same time, even with header bidding, most publishers

3    still had to go back to DFP.  And again, in a more

4    competitive environment, publishers would have other

5    alternatives that would have allowed them to run those

6    real-time auctions against one another.

7    Q    And how does that lead you to conclude that it's direct

8    evidence of market power, DFP?

9    A    So this is evidence that DFP has, in some cases,

10   provided quality below competitive levels or failed to

11   maintain quality at competitive levels.

12   Q    So based on all the evidence you examined, what did you

13   conclude about the relevance of a publisher ad server

14   market?

15   A    Again, I concluded that DHMP would pass for the

16   publisher ad server market and it forms a relevant product

17   market.

18   Q    So let's talk now about Google's market power in that

19   market.  What types of evidence do you consider in

20   determining whether a firm possesses market power?

21   A    So probably -- I can think of three sets of evidence,

22   how to organize this.  First would be this direct evidence

23   of market power that I already spoke to.

24           The second would be additional evidence that these

25   products -- or rather a product in a relevant market is

                                                              67

Direct Examination - R. Lee

1    significantly different from other alternatives in that

2    market.  As well as other evidence that customers have

3    limited ability to substitute away when faced with

4    above-competitive pricing.

5            And the third category of evidence relates to the

6    structure of the market.  This includes barriers to entry

7    and market shares.

8            MS. WOOD:  So if we can, show Plaintiffs'

9    Demonstrative O.

10   BY MS. WOOD

11   Q    Did you prepare this demonstrative?

12   A    Yes.

13   Q    And what does it show?

14   A    So this demonstrative shows the different categories of

15   evidence that were used both for market definition and

16   market power.  And in the middle, it shows how direct

17   evidence of market power, which doesn't rely on having to

18   find a market, can be used both for market definition and

19   for market power.  And the other types of evidence I've

20   described are shown elsewhere in the chart.

21   Q    Okay.  So let's talk now about some of the --

22           MS. WOOD:  You can put that down for now.  Thank

23   you.

24   BY MS. WOOD

25   Q    -- some of the barriers to entry in the publisher ad

                                                              68

Direct Examination - R. Lee

1   server market.  Can you describe the evidence you evaluated

2   in that regard?

3   A     Yes.  So for barriers to entry, I think there are four

4   significant ones:

5           First would be the costs of building a new

6   publisher ad server or expanding it.  Even Facebook, which

7   has relatively deep pockets, valued an entry into this

8   market and decided not to enter.

9           Second, there are costs of maintaining a publisher

10  ad server, continuing to run it.  These are also meaningful.

11  There's been recent exit -- or there's been exit in the

12  publisher ad server market with Verizon and OpenX.

13          Third, there are large switching costs.  So a new

14  entrant seeking to gain transaction and expand will have to

15  overcome switching costs of customers who may already be

16  using DFP.

17          My analysis of the data indicates that from 2018

18  to 2022, of the top hundred publishers who use DFP, only one

19  stopped using DFP during that time period.

20          And the fourth bucket -- fourth category relates

21  to Google's conduct, and this is, again, the conditioning of

22  real-time access to AdX -- sorry, the conditioning of access

23  to AdX -- sorry, one more time -- the conditioning of access

24  to AdX real-time bids to the use of DFP.  So an entrant

25  publisher ad server wouldn't get access to those real-time

Direct Examination - R. Lee

1   bids.

2   Q    Now, are market shares direct evidence of market power?

3   A    No.

4   Q    Why not?

5   A    Well, they're considered indirect evidence of market

6   power.  Market shares on their own are not determinative of

7   market power, and that's why I'm looking at market shares in

8   conjunction with all of this other evidence to inform a

9   conclusion of market power.

10  Q    And did you analyze DFP's market share in the publisher

11  ad server market for open-web display?

12  A    I did.

13          MS. WOOD:  And I'd like to introduce PTX 1278.

14  This is Figure 108 from Professor Lee's report.

15          THE COURT:  Any objection to that?

16          MR. ISAACSON:  No objection.

17          THE COURT:  All right.  1278 is in.

18          MS. WOOD:  And, Your Honor, again, we will have

19  the unanonymized go in as 1278 and the anonymized would be

20  1278A.

21          THE COURT:  All right.  So 1278 and 1278A are in.

22  BY MS. WOOD

23  Q    Professor Lee, can you tell us:  What does figure PTX

24  1278 show?

25  A    So this figure reports publisher ad server market

                                                              70

Direct Examination - R. Lee

1   shares based on both directly sold and indirectly sold

2   open-web display ads.  It reports these shares for five

3   years, from 2018 to 2022.  The top panel is worldwide.  The

4   bottom restricts attention to U.S. publishers.

5   Q    All right.  We'll talk about the worldwide versus U.S.

6   shortly, but can you summarize what's shown here?

7   A    Yes.  So in the first row of each panel reports

8   Google's market share for DFP among the set of both direct

9   and indirectly sold open-web display ads.  In 2022, Google

10  had a market share of 91 percent of these impressions and

11  maintained that 91 percent share over this five-year period.

12  In the U.S. in 2022, DFP had an 86.5 percent market share,

13  and for that five-year period, shares were always at that

14  level or above.  For both worldwide and the U.S., this share

15  that DFP had was 15 times larger than the next closest

16  competitor.

17  Q    Now, how, if at all, did you compute the shares that

18  are seen in this chart?

19  A    So to compute these numbers, I relied on data produced

20  by Google, as well as other publisher ad servers.

21  Q    Okay.  And did you look at open-web display ads, or did

22  you look at all digital ads that are processed by DFP?

23  A    Yes.  Again, these are limited to open-web display

24  impressions but includes both directly sold and indirectly

25  sold transactions.

Direct Examination - R. Lee

1    Q    So why did you not include impressions that DFP

2    processed if they were not open-web display?

3    A    So the role of market shares in my analysis here is to

4    inform market power, to inform the ability of DFP to

5    exercise market power over customers seeking to transact

6    open-web display ads.  And for that purpose, it wouldn't be

7    appropriate to include other types of transactions if those

8    customers aren't looking -- well, I'm -- sorry, it wouldn't

9    be appropriate to include those other types of transactions.

10   Q    Why wouldn't it be appropriate to include them?

11   A    Well, I think we talked about this before in an analogy

12   of gas stations.  If I'm looking at the market power of a

13   gas station over retail gas, I wouldn't necessarily include

14   tire changes or oil changes or potato chip sales.  Here, if

15   I'm focusing on the ability to exercise market power over

16   customers seeking to transact open-web display ads, I

17   wouldn't be including other forms of digital advertising.

18   Q    Okay.  And ultimately, what was your conclusion with

19   respect to DFP's market power in the market for publisher ad

20   servers used to transact open-web display?

21   A    So Google with DFP possessed substantial -- or

22   possesses and sustained market power that's protected by

23   significant barriers of entry, and it has possessed that

24   market power in recent years.

25   Q    So let's move to the second product market at issue,

                                                              72

Direct Examination - R. Lee

1    the ad exchange product market.  What are the valuable

2    features of ad exchanges based on your review of the

3    material in this case?

4    A    So ad exchanges allow open-web publishers to auction

5    off their remnant inventory to thousands of advertisers

6    without having to form individual direct relationships with

7    each and every one.

8    Q    And who are the customers of ad exchanges?

9    A    Both open-web publishers and advertisers.

10   Q    So when you evaluate the ad exchange market, do you

11   consider substitution by both sets of customers, meaning the

12   advertisers and the publishers?

13   A    I do.

14   Q    And from an economic economist perspective, can a

15   relevant market exist for a set of ad tech products if one

16   side of the market can more readily substitute to other

17   products than the other side of the market is able to

18   substitute to other products?

19   A    Yes.  As long as one side of the market lacks close

20   substitutes and would be willing to bear above-competitive

21   prices to keep using those products, then the hypothetical

22   monopolous test would pass.  And this would still form a

23   relevant product market.

24   Q    So can you explain why that is.  If advertisers have

25   lots of different substitutes but publishers don't, how does

Direct Examination - R. Lee

1   that matter in terms of assessing a relevant product market?

2   A    So one way of thinking about this is imagine if --

3   let's say it's actually cost nothing to transact these

4   open-web display ads via auction.  So advertisers would pay

5   a dollar per thousand impressions or a dollar CPM, and maybe

6   publishers would be paid out a dollar CPM.

7          Now, let's assume, contrary to evidence, that

8   advertisers actually have close substitutes.  So advertisers

9   will never pay more than a dollar because if they get

10  charged more than a dollar, they'll go somewhere else.

11  Q    So it's not a competitive constraint for them because

12  they will just choose somewhere else.

13  A    They'll just go somewhere else, right.  But if open-web

14  publishers are willing to accept less than a dollar because

15  they lack close substitutes, right.  They have perishable

16  web impressions that they can't monetize some other way.

17  They might be willing to accept 90 cents, 80 cents, even

18  less per thousand impressions, which would allow a

19  hypothetical monopolous of these ad tech tools, like ad

20  exchange, to be charged a 10 percent, 20 percent, or even

21  more.  It would be taken out of publishers get paid out

22  without charging advertiser anymore.

23          And that's why it's possible for market power to

24  only be exercised over one set of customers.  However,

25  there's significant evidence that when fees are actually

Direct Examination - R. Lee

1   taken out by these ad tech products, it's actually borne by

2   both advertisers and publishers.

3   Q   Now, earlier, I believe, you mentioned something

4   referred to as indirect network effect.  What are indirect

5   network effects?

6   A   So indirect network effects refers to when a product

7   value to one set of customers depends on the usage of that

8   product by another set.  So for these ad tech products, like

9   ad exchanges, for publishers, an ad exchange is more

10   valuable because it's expected to deliver better yield when

11   more advertisers are bidding into it.  And from the other

12   side, advertisers value an ad exchange more if there's more

13   access to publisher inventory, the more publishers are

14   selling impressions through that exchange.

15   Q   And what did you find with respect to indirect network

16   effects in the ad exchange market?

17   A   So although indirect network effects exists for ad

18   exchanges, they don't constrain the market power of a

19   hypothetical monopolous that's evidently shown by

20   Google's -- or direct evidence of Google's market power with

21   AdX.

22         Moreover, indirect network effects limit the

23   ability of a smaller firm to expand.  That's because it has

24   to attract, again, both advertisers and publishers to

25   perform more transactions.  And it's this chicken-and-egg

Direct Examination - R. Lee

1    problem that also serves to protect the market power of

2    Google and of a hypothetical monopolous.

3    Q    You said the chicken-and-egg problem.  What do you

4    mean?

5    A    It's this idea that a product that has network effects

6    has to get on board with both publishers and advertisers,

7    and it's oftentimes seen as a significant barrier to entry

8    and expansion.

9    Q    So I want to talk about the competitive constraints

10   that you considered with respect to the ad exchange market

11   for open-web display transactions.  What products did you

12   consider in that regard?

13   A    So for ad exchanges, I also considered other forms of

14   digital advertising.  I also considered the possibility that

15   advertising and publishers could resort to using direct

16   deals as opposed to these auction deals.  And I also looked

17   at ways in which advertisers perhaps could use DSPs through

18   these SPO or supply-path optimization products to bypass

19   exchanges and go straight to publishers or publisher ad

20   servers.

21   Q    I want to talk about each one of those in turn.  First,

22   other digital advertising formats other than open-web

23   display, what did you conclude as to whether those served as

24   competitive constraints on ad exchanges for open-web

25   display?

Direct Examination - R. Lee

1   A   So I concluded that they would not serve as significant

2   enough competitive restraints to prevent the hypothetical

3   monopolous test for passing.  And this is for the reasons I

4   discussed earlier.

5         For advertisers, there's significant value to be

6   able to advertise on open-web publisher sites, target users

7   across a wide range of websites.  And from open-web

8   publishers' perspectives, again, they have web display

9   inventory that's not monetizable through these other

10   formats.  Moreover, integrated walled garden tools aren't

11   available to those open-web publishers.

12   Q   Now, did you consider whether a publisher's ability to

13   do direct deals with advertisers imposes a competitive

14   constraint on the ad exchange market?

15   A   I did consider direct deals and found that they

16   wouldn't impose a significant enough competitive constraint.

17   This is because for many small open-web publishers, they

18   don't have the sales teams to actually generate significant

19   revenue from direct sales.  But even for larger publishers

20   who might have direct sales, recall that programmatic

21   indirect open web emerges a way for these publishers to sell

22   the remanet inventory, the other inventory that wasn't

23   already locked up with direct deals.  And as evidenced by

24   the widespread use of ad exchanges, this ability to sell all

25   that leftover inventory is really valuable.

Direct Examination - R. Lee

1  Q    Now, did you perform any quantitative analysis to

2  examine the difference between direct deals and indirect

3  transactions on ad exchanges?

4  A    I did.  I looked at the relative price differences

5  between directly sold and indirectly sold open-web display

6  transactions.

7  Q    And what did you see were the price differences when

8  the publishers negotiated directly with advertisers versus

9  when they sold through an exchange?

10 A    So using data from DFP, I calculated that direct deals

11 sold on average for almost $7 CPM or $7 per thousand

12 impressions.  Whereas indirect deals on average were a

13 bit -- a little bit above a dollar CPM.

14 Q    What is that price difference of $7 versus $1 tell you

15 about the potential for competitive constraint?

16 A    Well, that's a big difference, $1 and $7, and it's

17 evidence that these are significantly differentiated

18 products and publishers aren't able to easily substitute to,

19 you know, the more expensive products, right.  If they

20 could, they would want to sell what they're selling for a

21 dollar for $7.  But they can't do that.

22 Q    Now, you also mentioned something called supply-path

23 optimization and your consideration of whether that might

24 serve as a competitive constraint on ad exchanges

25 transacting open-web display.  First, can you describe what

Direct Examination - R. Lee

1    supply-path optimization is?

2    A    So SPO refers to, I guess -- well, sorry.  It refers to

3    products introduced oftentimes by DSPs.  It allows those

4    DSPs to bypass ad exchanges for certain types of digital

5    advertising and transactions and go straight to a

6    publisher's ad server or publisher.

7    Q    And did you find that that supply-path optimization

8    path had the potential to impose a competitive constraint on

9    a hypothetical monopolous?

10   A    Not a significant enough one, and this is because many

11   of these products aren't for open-web display.  For example,

12   for Magnite and PubMatic, their SPO products focus on video

13   or connected TV, not open-web display.

14         The Trade Desk has a product called Open Path,

15   which is limited in the publishers it works with.  I think

16   it's approximately 20.  And from sworn deposition testimony,

17   The Trade Desk said that it wasn't meant to be a competitor

18   for exchanges.  It's focusing on a limited set of publisher

19   needs.

20   Q    Now, this Court has heard a lot about Facebook's ad

21   tech tools.  Did you evaluate whether Facebook's ad tech

22   tools impose a competitive constraint on ad exchanges that

23   transact open-web display?

24   A    I did evaluate those tools and reached the conclusion

25   that they would not impose a significant enough competitive

Direct Examination - R. Lee

1   constraint on ad exchanges.

2   Q    And why is that if they're so large?

3   A    Well, again, the Facebook tools for display aren't

4   available to open-web publishers, not since Facebook exited

5   the advertiser ad network market with its FAN product in

6   2020.

7   Q    And what about Amazon?  Did you evaluate whether Amazon

8   ad tech tools would impose a competitive constraint on a

9   hypothetical monopolous in the market or ad exchanges for

10  open-web display?

11  A    So Amazon does offer some tools that are primarily for

12  its owned-and-operated properties, again, not available to

13  open-web publishers.  They do also offer a DSP, which is not

14  a competitor to ad exchange.  They're oftentimes used in

15  conjunction with one another.  Similarly, for Amazon's

16  header bidding products, they are not substitutes for ad

17  exchanges.  They're, again, used in conjunction with ad

18  exchanges.  What I mean they're not substitutes, they're not

19  close enough substitutes to constrain a hypothetical

20  monopolous of ad exchanges.

21  Q    So you mentioned Amazon's header wrapper, and I think

22  there's been discussion of other header wrapping tools

23  provided by third parties.  Could publishers just switch to

24  header wrapping tools and not use exchanges for open-web

25  display?

80

Direct Examination - R. Lee

1    A    So by and large, again, header bidding tools are a

2    software code that allows publishers to run real-time

3    bidding auctions among multiple exchanges, right.  Exchanges

4    are using alongside or within these header wrapper tools.

5    Q    So what does that tell you about whether they would

6    constitute a sufficient competitive constraint to restrain a

7    hypothetical monopolous?

8    A    Again, they are not close substitutes for one another,

9    so it wouldn't constrain a hypothetical monopolous of ad

10   exchanges.

11   Q    Now, let's talk about industry recognition of ad

12   exchanges.  What evidence did you review, if any, about

13   whether ad exchanges are viewed by industry participants as

14   a distinct product?

15   A    So similar to publisher ad servers, I have seen many

16   industry documents setting aside ad exchanges as a separate

17   set of products.  Also, I have seen Google analyses that

18   examine the effects of program changes on other ad exchanges

19   or other 3PEs or third-party exchanges or SSPs.

20   Q    All right.  I want to talk now about direct evidence of

21   market power in the ad exchange market.  Did you evaluate

22   any direct evidence of AdX's market power?

23   A    I did.

24   Q    And what did you conclude in that regard?

25   A    So AdX has charged on average -- or maintained an

81

Direct Examination - R. Lee

1    approximately 20 percent take rate for at least a decade at

2    this point.  I've seen evidence that in limited

3    circumstances, when it faced greater competition, Google was

4    willing to reduce the fee on AdX in some cases to 15 percent

5    in very limited circumstances.  It also considered fees as

6    low as 10 percent or less.  So that indicates that the

7    20 percent is above-competitive levels.  I've also seen

8    evidence that customers of AdX have very limited price

9    responsiveness to its fees.

10   Q    And what do you mean by that?

11   A    That AdX has the ability to maintain fees

12   above-competitive levels because customers wouldn't be

13   willing to substitute away to alternatives in a sufficient

14   manner to constrain the exercise in market power.

15   Q    So I'd like to show you a document that was marked for

16   identification as PTX 188.  I believe this was relied on in

17   your report.

18             THE COURT:  Is there any objection to 188?

19             MR. ISAACSON:  No objection.

20             THE COURT:  All right.  It's in.

21   BY MS. WOOD

22   Q    And do you recognize PTX 188?

23   A    I do.

24   Q    And what is it?

25   A    It's a Google document from 2014 examining pricing for

Direct Examination - R. Lee

1    its ad tech products.

2    Q    So let's turn to the page ending in Bates stamp 979.

3    That's PDF page 20, I believe.

4         And what does this page show as you understand it?

5    A    So as I understand this, this page examines the price

6    responsiveness of different sets of AdX customers, and it

7    shows that for many of its customers -- or most of its

8    customers by revenue, they exhibited very limited price

9    responsiveness.

10        So what this page is showing is four different

11   groupings of publishers.  The top three boxes represent the

12   large publishers, and the bottom are the smaller publishers

13   representing here 43 percent of revenue for the small ones.

14   Q    So the numbers in the internal box inside the box, what

15   do those represent?

16   A    It's a percent of AdX's gross revenues.

17   Q    Okay.  So 43 percent of AdX's gross revenue would be

18   attributed to OPG pubs?

19   A    That's what this page show.

20   Q    Okay.  And 27 percent to LPS pubs, for example?

21   A    Well, the LPS with less than 20 percent volume on AdX.

22   Q    Understood.  Okay.

23   A    So on the slide, it reports the elasticity.  Now,

24   elasticity is an economic concept, one that I teach my

25   students.  And it represents the percent change in quantity

83

Direct Examination - R. Lee

1    for a percent change in price.  So an elasticity of, let's

2    say, 2 says for a 1 percent change in price, quantity would

3    change by 2 percent.  Now, an elasticity of one or less than

4    one is known as inelastic demand, and that's a strong

5    indicator of possessing significant market power.  Because

6    when a firm faces inelastic demand, it can raise prices,

7    increase revenue, and generate profit.

8            And what one sees from this chart is Google is

9    reporting that for the bottom three groups of publishers

10   representing over 70 percent of AdX's gross revenue, their

11   elasticity or expected elasticity is one or less.  And for

12   the smallest publishers, the OPG ones, it's report

13   elasticity of approximately zero; that is, these publishers

14   aren't price responsive.  They wouldn't substitute away for

15   an increase in price.  And that to me, again, is a strong

16   indicator that AdX possesses substantial market power.

17   Q    And what is the total blended number at the bottom of

18   the expected elasticity column show?

19   A    It shows that across all of these publishers

20   weighted -- demand is inelastic or elasticity is less than

21   one.

22   Q    And what does that tell you about Google's market

23   power, if anything?

24   A    Again, as I mentioned, this slide indicates that AdX

25   possesses significant market power over its customers.

Direct Examination - R. Lee

1    Q    So based on all the evidence that you examined, what

2    did you conclude about whether ad exchanges that serve

3    open-web display ads are a relevant product market?

4    A    So this, as well as the other evidence I examined,

5    indicates that to me the HMT would pass for ad exchanges and

6    ad exchanges is a relative and appropriate antitrust product

7    market.

8    Q    So let's talk now about Google's market power in the ad

9    exchange market.  Did you examine other evidence indicating

10   whether AdX is differentiated from other ad exchanges?

11   A    I did.  I performed quantitative analyses to examine

12   the extent to which AdX faces competition on the auctions

13   that it wins and the impact that AdX would have if

14   publishers didn't have access to AdX bidding into their

15   auctions.

16   Q    So let me show you what we've marked for identification

17   as PTX 1393.

18          THE COURT:  Any objection to 1393?

19          MS. WOOD:  This is a figure from Professor Lee's

20   report, his rebuttal report.

21          MR. ISAACSON:  No objection.

22          THE COURT:  All right.  It's in.

23          MS. WOOD:  And again, Your Honor, we'll do both

24   the sealed version of 1393 and a redacted version.

25          THE COURT:  All right.  1393A will be the one

Direct Examination - R. Lee

1    that's on the public site.

2    BY MS. WOOD

3    Q    Now, can you describe to us, Professor Lee, what is

4    being presented in this figure in your report?

5    A    So what this figure is based on is something known as

6    the GAM log-level data.  It's basically all the auctions run

7    in a particular day in June -- this is June 28, 2023 --

8    through Google's ad manager or DFP.  And it's approximately

9    20 billion auctions on this day.

10            And on this figure, the height of the bar

11   represents a number of auctions won by Google's AdX on the

12   left and other exchanges identified in the data.  And you

13   can see that by the height of the AdX bar, it wins about

14   half of all the auctions that day.  And each of the other

15   exchanges win far less than that.

16            Now, what this bar also shows is how many of the

17   auctions that each exchange wins where it faces competition.

18   And by competition, I mean when an exchange wins, is there

19   another bidder that clears the price floor for that auction?

20   And we can see by the size of the green is that for over

21   60 percent or almost two thirds of the auctions that AdX

22   wins, it faces no competition.  There isn't another bidder

23   above the floor.  In contrast, for all of the other

24   exchanges, they face competition on 70 percent or more of

25   the impressions they win.

Direct Examination - R. Lee

1    Q    So if you look at the first firm, LL, do you see

2    there's blue and then a tiny sliver of green?

3    A    That's right.

4    Q    And what does that show?

5    A    So that shows, again, that most of Firm LL's auctions

6    won are facing competition with some other bidder that

7    clears the floor.  So this to me is an indication that AdX

8    is significant differentiated even from other exchanges in

9    this product market.

10   Q    So what conclusions do you draw from this analysis?

11   A    As I mentioned, it's differentiated, that there's many

12   auctions that AdX wins where there isn't, again, another

13   bidder above the floor, and publishers aren't able to

14   replace that with that -- those auction -- the revenue from

15   AdX necessarily with any of these other exchanges.  And I

16   think the next analysis speaks to this as well.

17            MS. WOOD:  Let's look at PTX 1395, which is Figure

18   28 from Professor Lee's rebuttal report.

19            THE COURT:  Any objection?

20            And we'll have the same issue with the A version

21   as well?

22            MS. WOOD:  Yes, Your Honor.

23            MR. ISAACSON:  No objection.

24            THE COURT:  All right.  It's in.

25

Direct Examination - R. Lee

1   BY MS. WOOD

2   Q    Can you describe, Professor Lee?   What does PTX 1395A

3   show.

4   A    So this figure reports results from a series of auction

5   simulations.   So I'm using the same dataset, the same 20

6   billion auction s or so -- more than 20 billion auctions

7   from June.   And what I do is for each of the exchanges

8   across all the auctions, I just remove them one at a time.

9   So the left bar says, if I take AdX out, I remove its bid

10  from all the auctions and hold all the bids from the other

11  exchanges fixed and reallocate the winner to the next

12  highest bid if AdX won -- now, if AdX is removed and it

13  didn't win, it doesn't change what happens.

14          And I do that for each of the exchanges here, and

15  I calculate what is the percent reduction in publisher

16  payouts if each exchange were removed.   And so what this

17  shows is publishers' payouts would be reduced by 28 percent

18  on average -- or 28 percent overall if AdX is removed.

19  Whereas any other exchange, the reduction is 1 percent or

20  less.   This is a 50 times difference between AdX and the

21  next closet rival.

22          One contributing factor to this difference is what

23  the previous slide showed.   Because AdX faces no competition

24  for over 60 percent of the auctions it wins, when it's

25  removed, the auction goes to the floor.   And right now it

Direct Examination - R. Lee

1    may not be allocated to anybody.  Whereas the other

2    exchanges, when they're removed, because they face

3    competition, some other exchange is there more often than

4    not to pick up that bid.  So the publisher's loss in revenue

5    isn't as large.  Again, this speaks to AdX's significant

6    differentiation and the reliances publishers have on AdX for

7    generating revenue.

8    Q    And what does this analysis say about the uniqueness of

9    demand that can be found via AdX?

10   A    So it says, again, the AdX demand has a meaningful

11   effect on publisher payouts, and it's not easily replaceable

12   with an alternative exchange or demand source.

13   Q    Now, I want to talk --

14           MS. WOOD:  You can put that down.  Thank you.

15   BY MS. WOOD

16   Q    I want to talk about the barriers to entry to the ad

17   exchange market.  Can you describe those?

18   A    So for the ad exchange market, there are costs

19   associated with building a new ad exchange.  There are costs

20   of overcoming scale effects.  I referenced -- or I discussed

21   costs of overcoming indirect network effects and bringing

22   onboard both advertisers and publishers.

23           Another category of barriers to entry comes from

24   Google's conduct, the conditioning of unrestricted access to

25   Google ads to AdX -- it's not provided to rival exchanges --

89

Direct Examination - R. Lee

1    and actions that DFP has taken to advantage AdX over rivals.

2    Those represent barriers to entry and expansion as well.

3    Q    And next I want to talk about what you described

4    earlier as indirect evidence of market power, which is

5    market shares.  Did you calculate market shares for AdX?

6    A    I did.

7    Q    Let's look at PTX 1258.

8              THE COURT:  Any objection to 1258?

9              MS. WOOD:  Again, that is from Professor Lee's

10   report.

11             MR. ISAACSON:  No objection.

12             THE COURT:  All right.  It's in.

13   BY MS. WOOD

14   Q    And what does PTX 1258 show?

15   A    So this shows AdX's market shares across various

16   specifications for both impressions and fees over a

17   five-year period.  It uses data produced by Google, as well

18   as by third parties or other exchanges.

19   Q    And how did you calculate the shares that appear in PTX

20   1258?

21   A    So I restricted attention here to indirect open-web

22   display transactions coming through ad exchanges and, again,

23   relied on both data from AdX and from other third-party

24   exchanges.  And I will get to this, but one of the

25   specifications also uses data from bidding tools to impute

Direct Examination - R. Lee

1    impressions that might have come from exchanges that did not

2    provide data.  And I'll discuss that in a bit.

3    Q    So let's look at the two metrics you have for looking

4    at market share.  You have an impression's metric and a fees

5    metric.  Do you see that?

6    A    I do.

7    Q    Can you describe the difference between those two

8    metrics?

9    A    Sure.  So impressions is just a count of transactions

10   that are fulfilled by an exchange.  Fees are looking at the

11   share of net revenues that are collected by these exchanges.

12   Q    And do you have an opinion as to which metric is more

13   relevant to assess market power?

14   A    I think they both can inform market power.  Again,

15   remember, market shares are not alone determinative.  It's

16   important to look at the totality of the evidence.  But

17   impressions speaks to scale effects generated by data.  So

18   in that sense, impressions could tell or could speak to

19   scale advantages in data that different exchanges have.

20   Q    So let's look at the impressions metric rows, row 1

21   through 4.  Can you describe what those show for the years

22   2018 to 2022?

23   A    Sure.  So I think it's easiest to start with row 4.  So

24   row 4 computes market shares among the exchanges that

25   produce data.  This is approximate 12 exchanges, and it

91

Direct Examination - R. Lee

1    shows that in 2022, based on impressions -- this is

2    worldwide by the way -- AdX had a 63 percent share in 2022

3    worldwide.

4           Now, in row 1, what I've done is taken information

5    from the buying tools and try to impute or determine how

6    large are the other exchanges that did not provide data.  I

7    can see from these bidding tools where else are they buying

8    impressions from and use that information to perform this

9    exercise.

10          Once I do that, I find that these other exchanges

11   have approximately 10 percent of impressions in 2022, which

12   brings AdX's market share to 56 percent in 2022 once I do

13   that imputation.

14          Now, rows 2 and 3, take that row 1 as the baseline

15   and perform some small exchanges.  Row 2 includes these SPO

16   or DSP-to-publisher ad server transactions we discussed.

17   And it shows that even if you were to include these SPO or

18   DSP to PAS transactions, it doesn't change market share by

19   very much.

20          Now, row 3 just excludes Verizon, which exited the

21   SSP market in 2023.  So what row 3 is showing the market

22   share among those firms still remaining at present.

23   Q    And what do you conclude based on the numbers seen in

24   PTX 1258 about U.S -- I mean worldwide market share for AdX

25   for open-web display?

92

Direct Examination - R. Lee

1   A    So I show -- if you just look at impressions, row 1,

2   AdX has a 56 percent share in 2022.  It's maintained at

3   least a 54 percent over this five-year period.

4   Q    Now, let's look at PTX 1259, which is the similar

5   chart, Figure 89, from your report but this time for U.S.

6              THE COURT:  Any objection?

7              MR. ISAACSON:  No objection.

8              THE COURT:  All right.  It's in.

9   BY MS. WOOD

10  Q    And what does PTX 1259 show?

11  A    So this table is the same as before.  Now it's

12  restricted to impressions generated by U.S. users, but it's

13  the same other restrictions, indirect open-web display

14  transactions through ad exchanges, same sets of

15  specifications, and same market share metrics.

16             Here it shows that among the exchanges that

17  produced data, AdX had a 52 percent share of impressions in

18  2022.  And if I do this imputation for other exchanges, AdX

19  had a 47 percent share in 2022 on U.S. impressions.

20  Q    Now I want to look -- did you also compare AdX's market

21  share to the market shares of other participants in the ad

22  exchange market?

23  A    I did.

24  Q    And can we look at PTX 1238?

25             THE COURT:  Any objection to 1238?

93

Direct Examination - R. Lee

1          MS. WOOD:  This is from figure 48.

2          MR. ISAACSON:  No objection.

3          THE COURT:  All right.  It's in.

4          MS. WOOD:  Again, this will have a redacted

5   version, and the public version will be PTX 1238A.

6          THE COURT:  All right.

7   BY MS. WOOD

8   Q    Can you tell us what PTX 1238A shows?

9   A    So this now takes the 2022 market shares, not just for

10  AdX but for all the other exchanges from which I obtained

11  data.  And it plots -- this is specification 1 from the

12  earlier table where I imputed impressions for the exchanges

13  that did not report data.  But regardless of whether I do

14  this imputation or not, on worldwide impressions, AdX has

15  nine times worldwide impressions of the next closest rival.

16  Q    And what is the significance, if any, of that fact to

17  you, that AdX's market share using this methodology on a

18  worldwide basis is nine times the largest of the next

19  competitor?

20  A    I think it's important to examine relative scale

21  advantages as it also informs the extent to which a firm in

22  a market has market power.

23         MS. WOOD:  And if we can look at PTX 1261, this is

24  the same information but on a U.S. basis.  It also comes

25  from Professor Lee's report.

Direct Examination - R. Lee

1              THE COURT:  Any objection?

2              MS. WOOD:  1261.

3              MR. ISAACSON:  No objection.

4              THE COURT:  Again, there will have to be a 1261A.

5              MS. WOOD:  Yes, Your Honor.

6              THE COURT:  All right.  They're in.

7    BY MS. WOOD

8    Q    And can you just for the record identify what is

9    depicted in 1261A?

10   A    So this does the same exercise as the previous slide

11   but now using the U.S. user impressions.  And here it shows

12   that AdX has a five times greater number of impressions than

13   the next closest ad exchange in the data.

14             MS. WOOD:  All right.  And let's look at PTX 1292,

15   which is Figure 122 from Professor Lee's report.

16             THE COURT:  Again, is there any objection to this

17   one?

18             MR. ISAACSON:  No objection.

19             MS. WOOD:  And this will have an A as well, Your

20   Honor.

21             THE COURT:  It's in.

22   BY MS. WOOD

23   Q    What does 1292 show?

24   A    So 1292 is now plotting on a monthly basis from the

25   beginning of 2018 to the end of 2022.  Market share is based

Direct Examination - R. Lee

1    on impressions for worldwide indirect open-web display

2    transactions through ad exchanges.

3    Q    And what is the purpose of depicting the information in

4    this format on a monthly basis?

5    A    So one thing this shows is AdX's relative size

6    advantage over its closest rivals has persisted over this

7    period of time.  So AdX is that blue line up top with all

8    the other exchanges at the bottom where the light gray line

9    represents the set of all other imputed exchanges.  But you

10   can see that AdX here has maintained, again, this relative

11   size advantage over this five-year period.

12              MS. WOOD:  And if we could look at PTX 1294, that

13   is figure 124 from Professor Lee's report.

14              THE COURT:  I am going to assume the same pattern

15   here.  This is for the U.S.

16              MS. WOOD:  Yes, Your Honor.

17              THE COURT:  Any objection to 1294?

18              MR. ISAACSON:  No objection.

19              THE COURT:  With an A.

20              MS. WOOD:  With an A, yes, Your Honor.

21              THE COURT:  It's in.

22   BY MS. WOOD

23   Q    What does 1294 show?

24   A    As Your Honor has noted, this is for the U.S. noting

25   that the relative size advantage for AdX over its next

Direct Examination - R. Lee

1   closest rivals has also persisted over this time period.

2   Q    I want to show you PTX 1242.

3           MS. WOOD:  This is from figure 55 from Professor

4   Lee's report.

5           THE COURT:  Any objection to this?

6           MR. ISAACSON:  No objection.

7           THE COURT:  It's in.

8   BY MS. WOOD

9   Q    What does PTX 1242 show?

10  A    So this figure uses worldwide open-web display

11  transactions through ad exchanges computes an average take

12  rate for AdX in the blue line and the weighted average for

13  other exchanges in green.

14  Q    And what is on the right-hand vertical line?

15  A    So the right-hand vertical line, it says AdX share, and

16  that corresponds to the shaded gray area in the background.

17  That's just reporting AdX's worldwide share of indirect

18  open-web display impressions in the exchange market

19  underlaid behind the average take rates.

20  Q    And what does this figure show with respect to the blue

21  and the green lines?

22  A    So the figure shows that over this time period, AdX's

23  take rate has remained relatively stable at 20 percent.

24  Whereas the weighted average of other third-party exchanges

25  was below the blue line.

97

Direct Examination - R. Lee

1  Q    Now, this indicates some of the gray area is not

2  consistent over time or always upwards sloping over time; is

3  that right?

4  A    That's right.

5  Q    Does declining market share indicate that a firm does

6  not have substantial and sustained market power?

7  A    No.  And this is because, again, market powers aren't

8  the complete story.  To make a determination of market

9  power, it's important to look at the totality of evidence.

10 It includes relative scale advantages, differentiation,

11 direct evidence of market power.

12 Q    And ultimately, with respect to market definition and

13 market power, what did you conclude with respect to the ad

14 exchange product market?

15 A    So I concluded the ad exchange product market is a

16 well-defined, appropriate, relevant antitrust product

17 market.

18 Q    And what did you conclude with respect to AdX's market

19 power in that market?

20 A    That AdX possesses substantial and sustained market

21 power protected by significant barriers of entry.

22          MS. WOOD:  Is now a good time for a break?

23          THE COURT:  You timed yourself perfectly.

24          So we will go to the third market when we get back

25 from the break.

Direct Examination - R. Lee

1          We'll be back at 4:30.

2       (Brief recess taken.)

3          MS. WOOD:  May I proceed?

4          THE COURT:  Yes, ma'am.

5   BY MS. WOOD

6   Q    Let's turn now to the last product market, advertiser

7   ad networks.  What are the prominent features of an

8   advertiser ad network based on your review of the evidence?

9   A    So there are two important features:

10          First, advertiser ad networks provide a simplified

11   user interface that is useful to smaller advertisers with

12   less complex advertising needs.

13          Second, advertiser ad networks provide the ability

14   to pay on a CPC or cost-per-click basis.

15   Q    And what is Google's advertiser ad network product

16   called?

17   A    Google Ads.

18   Q    And how, if at all, does Google's search engine or

19   search business relate to Google Ads?

20   A    So a key part of Google Ads' market power comes from

21   the search advertisers used its product and are then

22   available for purchasing display advertising.

23   Q    And what, if anything, is significant about Google's

24   search advertisers?

25   A    It's a large number of advertisers ranging from small

Direct Examination - R. Lee

1   to large businesses that, again, are available to purchase

2   display advertising through Google Ads.

3   Q    I want to talk now about the competitive constraints on

4   the advertiser ad network market for open-web display.  What

5   alternative products did you consider might serve as

6   competitive constraints?

7   A    So I examined, as with the other product markets, other

8   forms of digital advertising, including social ads sold

9   through walled gardants.  I also examined other types of

10  advertiser buying tools known as DSPs or demand-side

11  platforms.

12  Q    So the Court has heard about DSP's.  What is Google's

13  DSP called?

14  A    DV360, also previously referred to as DV3 or DBM.

15  Q    And did you reach a conclusion as to whether

16  demand-side platforms, DSPs, are a competitive constraint on

17  advertiser ad networks since they're both buying tools?

18  A    So my conclusion -- I concluded that DSPs are not a

19  significant enough competitive constraint on a hypothetical

20  monopolous of advertiser ad networks to prevent it from

21  exercising significant market power.

22  Q    So I'd like to show you what's been marked for

23  identification as PTX 1231, which is a figure from your

24  report.

25          THE COURT:  Any objection?

100

Direct Examination - R. Lee

1           MR. ISAACSON:  No objection.

2           THE COURT:  All right.  It's in.

3   BY MS. WOOD

4   Q     And what does PTX 1231 show, Professor Lee?

5   A     So this uses data from Google that allows me to use

6   advertiser usage of both ads at DV360.  So this figure plots

7   the total number of distinct advertisers identified in this

8   data who use only Google Ads, only DV360, or both Google Ads

9   and DV360 in 2022.

10  Q     And what data did you use to prepare figure 35?

11  A     Again, this is data from Google that looked across both

12  of these buy-side products, Google Ads and DV360.

13  Q     And was that the Google log level data?

14  A     No.  This is a different dataset.

15  Q     Okay.  You have source Google XP data DOJ RFP 7.  Is

16  that the data that you relied upon?

17  A     Yes, for this figure.

18  Q     And what does is show with respect to the number of

19  advertisers who use only Google Ads?

20  A     So there are a far greater number of advertisers who

21  among the set who used Google's buying products only used

22  Google Ads and not DV360.

23  Q     Okay.  And if we can also turn to PTX 1232.

24          THE COURT:  Any objection to 1232?

25          MR. ISAACSON:  No objection.

Direct Examination - R. Lee

1          THE COURT:  All right.  It's in.

2    BY MS. WOOD

3    Q    And can you tell us -- is PTX 1322 based on the same

4    data?

5    A    It is.

6    Q    What does it show?

7    A    I now plots total spending for these advertisers who

8    use either of Google Ads or DV360.  And for the advertisers

9    who only use Google Ads, they spend about the same amount --

10   a little bit less than those advertisers who use both Google

11   Ads and DV360.  Now, I recall that there were a far greater

12   number of advertisers who only use Google Ads.  So that

13   means on average, these advertisers who use Google Ads are

14   smaller than the advertisers who use both tools.  Even so,

15   the total spending from these smaller advertisers is

16   significant.

17          Also, it's worth noting that for those advertisers

18   who use both Google Ads and DV360, there's a large amount of

19   their spending on Google Ads as well.  And this is indicated

20   by the area in blue on the right most column.

21   Q    And what does that tell you about Google Ads and its

22   demand?

23   A    So it tells me, one, there's a lot of demand that comes

24   through Google -- or a lot of transaction volume through

25   Google Ads even though these advertisers are smaller on

                                                              102

Direct Examination - R. Lee

1   average.  But another thing I draw from this figure is that

2   the types of customers that DV360 and Google Ads cater to

3   are different.  Even though there's some overlap, they have

4   different attributes.

5   Q    Now, let's look at PTX 1235, another figure from your

6   report.

7            THE COURT:  Any objection?

8            MR. ISAACSON:  No objection.

9            THE COURT:  All right.  It's in.

10  BY MS. WOOD

11  Q    And was PTX 1235 also based on the same data produced

12  by Google?

13  A    It was.

14  Q    And what does it show?

15  A    So now I'm going to be looking at only the advertisers

16  who are identified as using Google Ads, and I'm going to

17  break these advertisers into five groups based on their

18  total spending.

19           On the way left are the top hundred advertisers

20  going to smaller and smaller and smaller advertisers being

21  moved to the right.  Now, the vertical axis reports the

22  percent of these groups of advertisers who only use Google

23  Ads versus also using DV360.

24  Q    And I'll tell you:  It's a little hard to read the key.

25  Is the Google Ads only blue or black?

Direct Examination - R. Lee

1   A    The Google Ads only is blue.  So if one begins with the

2   right most column -- these are the advertisers outside the

3   top hundred thousand -- you can see that pretty much

4   essentially all of them are only using Google Ads.  That's

5   because the bar is almost completely blue.

6           But as you go to the left, you start looking at

7   larger and larger advertisers and you see the fraction of

8   them that also are using DV360 increases, again, consistent

9   with the pattern that larger advertisers are the ones who

10  are more likely to use DSPs, like DV360.

11  Q    And what, if anything, does this PTX 1235 lead you to

12  conclude?

13  A    Well, it's additional that DSPs and advertiser ad

14  networks cater to different needs and different sets of

15  customers even though there might be some customers who use

16  both tools.

17  Q    So I'd like to show you next PTX 1385.

18          THE COURT:  Any objection to 1385?

19          MS. WOOD:  This is also a figure from his report.

20          MR. ISAACSON:  No objection.

21          THE COURT:  All right.  It's in.

22  BY MS. WOOD

23  Q    And in 1385 the colors are very hard to see, we have

24  prepared Plaintiffs' Demonstrative S where we tweaked the

25  colors to make it a little more legible.  Plaintiffs'

Direct Examination - R. Lee

1   Demonstrative S is what's up on the screen now.  Do you see

2   that?

3   A    Yes.

4   Q    Okay.  So looking at this demonstrative, are all the

5   figures and data the same in Plaintiffs' Demonstrative S

6   as in PTX 1385?

7   A    Yes.

8   Q    Okay.  And the only thing that's been changed is the

9   colors for readability?

10  A    Yes.

11  Q    Okay.  Now, can you describe what this figure shows

12  starting with the legend on the top, CPM, CPC to CPM, CPA to

13  CPM, CM -- CPMAV to CPM?

14  A    Again, apologize for the additional acronyms.

15          I think for the purposes of this chart, it might

16  be more effective just to focus on the first two boxes.

17  This is the blue and the orange.  So the blue represents CPM

18  transactions, cost per mille or cost per thousand

19  impressions.  The orange is written as CPC to CPM, and what

20  this means is advertisers pay on a cost-per-click basis.

21  But publishers are paid out on a cost per mille or cost per

22  thousand impression basis.

23  Q    What's the significance of that, that advertisers pay

24  cost per click but publishers receive CPM?

25  A    So CPC and CPM are different ways of paying for ads,

Direct Examination - R. Lee

1    and there's evidence that discusses why different types of

2    bidding are more appropriate for different kinds of

3    advertising objectives.  For example, CPC bidding when you

4    pay per click is suitable for when you're trying to drive

5    conversions.  Let's say a click through to a website.

6    Advertisers might care about that.  Whereas bidding on an

7    impression basis can be useful for, let's say, driving brand

8    awareness, when you're just trying to show an ad.

9    Q    And what does Plaintiffs' Demonstrative S, as in Sam,

10   and PTX 1385 show you with respect to Google Ads in

11   particular?

12   A    Sure.  So all of the bars with the exception of Google

13   Ads are DSPs.  DV360 is Google's DSP.  And what you'll see

14   for all the DSPs, except for DV360, it's all CPM.  DV360 has

15   a little bit of transactions that are paid out on a CPC

16   basis.  And this is using data from 2018 to 2022.  In

17   contrast, Google Ads -- I think it's approximately

18   80 percent are in a CPC payment basis on the part of

19   advertisers.  So this is evidence that Google Ads is

20   differentiated from these other DSPs in the manner that

21   advertisers pay for advertising.

22   Q    Now, you can put that aside.

23        Did you consider whether buying tools offered by

24   Facebook are competitive constraints for advertiser ad

25   networks that transact open-web display ads?

106

Direct Examination - R. Lee

1    A    I did examine this.  So Facebook's Audience Network or

2    FAN was part of the advertiser ad network for open-web

3    display until its exit from open-web display in 2020.  And

4    that's why it's included in the market share calculations

5    we'll come to.

6              But at present, it's not available as a source of

7    demand for open-web publishers.  They can't sell their

8    impressions to Facebook for open-web display.  And for the

9    reasons I discussed earlier whereby walled gardens restrict

10   advertisers to basically walled garden's properties.

11   Whereas Google Ads and other advertising reach a wider range

12   of websites, can target users at different points in times

13   across these sites, those are reasons why Facebook's tools

14   are not competitive constraints or significant enough to

15   constrain the exercise of market power by a hypothetical

16   monopolous of advertiser ad networks.

17   Q    So I want to talk now about direct evidence of market

18   power in the advertiser ad network market for open-web

19   display.  Did you examine direct evidence that Google Ads

20   has market power in that market?

21   A    Yes, I did.

22   Q    Let me show you what's marked for identification as PTX

23   1808.  This is from your report.

24              THE COURT:  Any objection to 1808?

25

Direct Examination - R. Lee

1   BY MS. WOOD

2   Q    I'm sorry.  It is not from your report.  It is cited in

3   your report.

4           MR. ISAACSON:  The objection is only to -- this is

5   one with a lot of notes.

6           THE COURT:  All right.

7           MR. ISAACSON:  So if we submit the copy without

8   the notes --

9           THE COURT:  All right.  The copy without the

10  notes, 1808, is in.

11          MS. WOOD:  Without the comments, yes, Your Honor.

12  BY MS. WOOD

13  Q    And what is PTX 1808?

14  A    This is a Google document describing an experiment, the

15  value and the impact of increasing GDN or Google Ads' fee

16  when bidding on AdX.

17  Q    And was this an experiment that Google itself ran

18  internally?

19  A    That's my understanding, yes.

20  Q    Okay.  And if you can turn to page 2 -- sorry, at

21  page 1, do you see under RASTA for AdWords on AdX slice?  Do

22  you see that?

23  A    Yes.

24  Q    And what is this talking about?  If you could, explain

25  that chart for us.

Direct Examination - R. Lee

1   A     Sure.  This experience being described is increasing

2   the Google Ads take rate or margin on AdX from 14 percent to

3   15 percent.  That represents a 7 percent price increase.

4   It's essentially -- you can think of it as a real-world HMT

5   run just on Google Ads at its prevailing price at the time.

6   What this click shows is that it's predicted to increase

7   Google Ads' and Google's profit -- in other words, a

8   significant price increase would be profitable.  It also

9   notes that publisher payouts would fall from this change,

10  and there would be a slight reductions in the number of

11  impressions transacted.

12  Q     And what do those facts tell you about the market power

13  of Google Ads and the advertiser ad network market?

14  A     Well, it indicates that Google with Google Ads has

15  significant market powers able to profitably implement a

16  significant price increase above what are at the time

17  current levels.

18  Q     What would you expect to happen in a competitive market

19  if market a participant increased its price by 7 percent?

20  A     Well, in a more competitive market, one would expect

21  such a price increase of 7 percent to lead to a greater

22  reduction in impressions.  Right here it shows a 7 percent

23  increase in price is only predicted to have a quarter of a

24  percentage point reduction in the number of impressions

25  transacted.

Direct Examination - R. Lee

1   Q    All right.  I'd like to look at another experiment you

2   examined in connection with Google Ads.  If we can, look at

3   PTX 858.

4           MS. WOOD:  This is already in evidence, Your

5   Honor.

6           THE COURT:  Okay.

7   BY MS. WOOD

8   Q    Is this one of the documents that Google produced that

9   you relied on in connection with your report?

10  A    It is.

11  Q    And what does it show?

12  A    So this examines some years later, in 2018, also

13  changing Google Ads' margins on AdX web publishers.  So it

14  says here in the first paragraph it's focusing on AdX web

15  publishers and not on app publishers.  So it demonstrates

16  the ability to target different prices for web versus app

17  impression.  And it varies, the margin that AdX charges on

18  AdX, from 10 percent to 25 percent via a series of

19  simulations and experiments.

20  Q    So let's look at the next page ending in Bates stamp

21  247, PDF page 2.  What does this diagram and chart show?

22  A    So on the right, it plots the -- on the vertical axis,

23  the percent changed and its profit from on the horizontal

24  axis varying Google Ads' margin on AdX from 10 percent

25  upwards 12.5, 15, and so on up to 25 percent.  It shows that

110

Direct Examination - R. Lee

1    as Google Ads increases its margin from 50 percent upwards,

2    it actually increases its profit.  So for -- on the left, it

3    shows the revenue change.  But for every dollar of loss in

4    revenue, it makes up for it more and profits actually

5    increase.

6    Q    What does that tell you as an economist?

7    A    So, again, this is evidence that AdX possesses

8    significant market power, the ability to increase prices and

9    do so profitably.

10   Q    Now, what do these two different experiments that

11   Google itself ran tell you about competition in the

12   advertiser ad network market?

13   A    So it's helpful with these two analyses.  It indicates

14   that substitution to all alternatives other forms of digital

15   advertising to DSPs and so on aren't sufficient to constrain

16   this exercise of market power, that Google Ads is predicted

17   here in these experiments to still be able to increase

18   profits by increasing its fees.

19   Q    So I want to talk now about --

20              MS. WOOD:  We can put that down.

21   BY MS. WOOD

22   Q    -- about quality.  As you as an economist, what do you

23   mean by quality when you are looking at customer products?

24   A    So as a general matter, quality can refer to -- or

25   refers to rather non-price attributes of a product that

Direct Examination - R. Lee

1  customers value.  In the case of ad tech products, from

2  publishers' perspective, evidence indicates the most

3  important quality attribute is how well that product

4  monetizes or generates yield; how well it, again, provides

5  revenue to a publisher when selling impressions.  And

6  oftentimes that's driven by the advertising demand that that

7  ad tech product can source.

8       From the advertiser's perspective, an important

9  attribute of quality is the publisher inventory that's

10  available to the advertiser to bid upon.

11  Q   And what did you find with respect to the quality of

12  Google Ads with respect to advertisers?

13  A   So with Google Ads, I think in terms of quality,

14  there's evidence that increasing Google Ads' inventory to

15  advertisers would actually increase advertiser ROI.  There's

16  a Google document when evaluating opening up Google Ads to

17  other exchanges or bidding on more inventory, that doing so

18  would increase advertiser ROI.

19       And so that's consistent with it restricting

20  access to other exchanges, it's actually degrading the

21  quality or failing to maintain quality at competitive levels

22  consistent with the possession and exercise of significant

23  market power as well.

24  Q   And ultimately, what did you conclude about the

25  relevance of an advertiser ad network market for open-web

Direct Examination - R. Lee

1   display?

2   A     I concluded that such a market would pass the HMT and

3   is an appropriate, relevant antitrust product market.

4   Q     So we've already talked about some of the direct

5   evidence of Google Ads' market power.  You discussed that

6   before.

7         Let's talk about differentiation.  Did you look at

8   ways in which Google Ads was able to differentiate itself

9   from other rivals?

10  A     I did.

11  Q     And if we can pull up PTX 1444 --

12        THE COURT:  Any objection to 1444?

13        MS. WOOD:  This is also from Professor Lee's

14  report.

15        MR. ISAACSON:  No objection.

16        THE COURT:  Again, this is in with a requirement

17  for redaction.

18        MS. WOOD:  Yes, Your Honor.  1444A will be the

19  redacted version.

20  BY MS. WOOD

21  Q     Professor Lee, what did you do to prepare this exhibit?

22  A     Sp this exhibit is actually a similar auction simulate

23  as the one I described before with AdX.  It uses the same

24  GAM log-level data.  This is over 20 billion auctions run in

25  June of 2023 in a single day.

113

Direct Examination - R. Lee

1          Now, what it does is it actually removes, instead

2     of just exchanges -- there are still some exchanges in the

3     firms.  That's how the data is identified.  But it also

4     removes where possible individual bidding tools or buying

5     tool.  So you see Google Ads on the way left.  You see

6     DC360.  There are DSPs and other buying tools that are

7     identified.

8          Now, among the set of auctions, Google Ads won

9     approximately 28 percent of them, and on the auctions that

10    it won, it faced competition on approximately half of it.

11    Now, it shows that Google Ads, if it's removed, it would

12    reduce publisher payouts holding all the other bids fixed by

13    14 percent.  And this is much larger than any other

14    non-Google bidding tool or non-Google exchange.  It would

15    also be predicted to reduce the number of impressions won by

16    AdX by 40 percent.

17         So this is consistent not only with Google Ads

18    being differentiated from other buying tools in the

19    nature -- or how much demand it can bring and the impact on

20    publisher payouts, but it's also consistent with Google Ads

21    not bidding into other exchanges as harming those other

22    exchanges' ability to deliver yield for publishers.

23    Q    Now, why did you consider non-advertiser ad networks in

24    PTX 1444A?

25    A    Well, I just -- again, in the data, it identified other

Direct Examination - R. Lee

1    buying tools.  It identified other exchanges.  This goes to

2    show that even if one were to conclude other sources of

3    demand, Google Ads is significantly differentiated.  It has

4    a much bigger impact on publisher payouts than these other

5    sources.

6    Q    And is that a way to look at competitive constraints in

7    the advertiser ad network market?

8    A    It informs, and it's a reason why Google Ads possesses

9    market power.  It's the impact on publisher payouts.

10   Q    Now, did you conduct any other analysis on the value of

11   Google Ads to publishers of open-web display?

12   A    I did.

13   Q    So if we can, look at Plaintiffs' Demonstrative P, as

14   in Peter.

15           What is Plaintiffs' Demonstrative P., as in Peter,

16   based on?

17   A    So this is based on a set of analyses I conducted in my

18   report.  This uses also the log-level data, so 20 billion in

19   auctions in a single day in June of 2023.

20           And let's focus on the left pie chart first.  What

21   the left pie chart shows is -- actually, let me reset for a

22   moment.

23           So among these 20 billion auctions, there are

24   255 million unique advertiser publisher pairs, that is, all

25   the different sets of advertisers who are buying impressions

115

Direct Examination - R. Lee

1    from different publishers.  Some of these advertisers and

2    publishers interact multiple times in that day.

3          Now, what the left shows is among all those pairs

4    of advertisers and publishers, 58 percent of those pairs

5    only interacted through Google Ads that day.  Now, in this

6    dataset, only one particular tool is identified per

7    transaction.  So Google Ads is identified as a transaction

8    for that advertiser publisher pair.  There's another

9    15 percent of these pairs that exclusively transact through

10   DV360.  Now, what the right pie chart does, it examines what

11   fraction of revenues are represented by these different

12   advertiser publisher pairs.

13         Focusing on the dark blue slice of the right pie

14   chart, it shows that among the pairs that transact that day

15   only through Google Ads, that's 20 [sic] percent of

16   publisher revenues in the data.

17   Q    You said 20 percent or 27 percent?

18   A    27 percent.

19   Q    And what is the significance of that to you as an

20   economist?

21   A    Well, to me that's -- a significant share of the

22   revenue from all of these auctions are between advertisers

23   and publishers who are only going through Google Ads that

24   day.  It speaks to one way of quantifying the sense in which

25   Google Ads demand is unique or differentiated.  I just

Direct Examination - R. Lee

1    wanted to note on the right, another 37 percent of revenues

2    is represented by advertisers and publishers who interact

3    through Google Ads in some other channel.  But there's only

4    .3 percent that transact through another firm, and another

5    2.3 percent of revenues that transact exclusively through

6    some other buyer in AdX.  These are big differences between

7    the 27 percent and 2.3 percent or .3 percent.  Again,

8    speaking to the differentiated nature of Google Ads.

9             MS. WOOD:  And, Your Honor, I will just note that

10   there has been a confidentiality redaction on Plaintiffs'

11   Demonstrative P.  So we will put Plaintiffs' Demonstrative

12   PA on the website, but you have Plaintiffs' Demonstrative P

13   in your binder.

14            THE COURT:  Thank you.

15   BY MS. WOOD

16   Q    Taken together, Professor Lee, what do these

17   quantitative analyses tell you about Google Ads?

18   A    It informs to the extent, again, to which Google Ads is

19   significantly differentiated from other advertiser ad

20   networks, as well as from other sources of demand that

21   publishers can access.

22   Q    Now, what is the relationship between unique demand and

23   substantial and sustained market power?

24   A    Well, I think the extent to which unique demand matters

25   for substantial and sustained market power is the extent to

117

Direct Examination - R. Lee

1  which that demand here affects publisher payouts and to the

2  extent it's replaceable with alternatives, the extent to

3  which a publisher can move to a different demand source to

4  replace lost revenue informs the extent to which a tool has

5  market power.

6  Q    So is it your opinion that any ad tech firm has unique

7  demand necessarily has substantial and sustained market

8  power?

9  A    No.  As I alluded to just before, what's important is

10 the extent to which it affects publisher revenues and the

11 extent to which it's replaceable with other alternatives.

12 Q    Now, let's talk about barriers to entry or expansion.

13 Do any barriers or entry or -- do barriers to entry or

14 expansion exist in the advertiser ad network market for

15 open-web display?

16 A    Yes.  This includes the costs, again, of building or

17 launching an ad exchange, obtaining the necessary data and

18 scale -- and overcoming scale and network effects to expand

19 on advertiser ad network.  It also include cost of

20 overcoming factors related to Google's conduct in accessing

21 inventory for a new advertiser ad network.

22 Q    And did you see any examples of barriers to entry and

23 expansion in the evidence you reviewed in this case with

24 respect to advertiser ad networks?

25 A    So I think there's evidence that some of these barriers

Direct Examination - R. Lee

1    contributed to or were a factor in Facebook's exit of the

2    advertiser ad network for open-web display.

3    Q    Now, let's turn now to indirect evidence of market

4    power.  Did you calculate Google's market share in the

5    advertiser ad network market?

6    A    I did.

7    Q    So let's look at PTX 1243.

8          THE COURT:  Any objection to 1243?

9          MS. WOOD:  And again, this will have an A for the

10   public version.

11         THE COURT:  All right.

12         MR. ISAACSON:  No objection.

13         THE COURT:  All right.  It's in.

14   BY MS. WOOD

15   Q    What does 1243A show, Professor Lee?

16   A    So this figure uses data from Google and from other

17   advertiser ad networks and plots market shares on the

18   vertical axis on a monthly basis from the beginning of 2018

19   to the end of 2022.  It's using only indirect open-web

20   display transactions.

21   Q    And is that on a worldwide basis?

22   A    This is on a worldwide basis.

23   Q    Okay.  And what does it show you about Google Ads'

24   market share relative to its competitors?

25   A    It shows it's much larger than its next closest rivals.

119

Direct Examination - R. Lee

1   In 2022 on a worldwide basis, Google Ads had an 87 percent

2   share of this market, six times larger than the next closest

3   rival.

4   Q    So let's look at its twin counterpart, which we've come

5   to expect.  Let's look at PTX 1269, please.

6            MS. WOOD:  And that will also have an A for the

7   public version.

8            THE COURT:  Any objection?

9            MR. ISAACSON:  No objection.

10           THE COURT:  All right.  It's in.

11  BY MS. WOOD

12  Q    What is 1269A?

13  A    So this is repeating the same figure now restricting

14  attention to U.S. impressions.  Google Ads had an 88 percent

15  share of these impressions in 2022.  Again, also six times

16  larger than the next closest competitor.  In both worldwide

17  and U.S., Google Ads maintained an 86 percent share annually

18  since 2018.

19  Q    All right.  So ultimately, did you reach a conclusion

20  with respect to market definition and market power for the

21  advertiser ad network market?

22  A    I did.

23  Q    What were your conclusions?

24  A    That advertiser ad networks for open-web display ads is

25  an appropriate and relevant antitrust product market and

Direct Examination - R. Lee

1   that Google Ads possesses substantial and sustained market

2   power protected by significant barriers to entry.

3   Q    So I want to talk briefly about geographic markets.

4   How do you go about evaluating as an economist what is an

5   appropriate geographic market?

6   A    So for this I also employed the HMT and examined the

7   extent to which a hypothetical monopolous of a set of

8   products could exercise market power over customers located

9   in any particular region.

10   Q    Now, as an economist, can there be more than one

11   geographic market that is relevant for your analysis?

12   A    Yes, there can be.

13        I just wanted to note that also for a geographic

14   market, it's important to consider the extent to which it's

15   appropriate for evaluating the competitive effects of the

16   conduct at issue.

17   Q    Tell me what you mean by that.

18   A    So basically, looking at areas over which competition

19   can be impacted by the conduct, and I'll discuss more when I

20   talk about the patterns --

21   Q    Okay.

22   A    -- if that's okay.

23   Q    So did you reach a conclusion with respect to what you

24   consider relevant geographic markets for these three product

25   markets?

Direct Examination - R. Lee

1    A    I did.

2    Q    And what did you conclude?

3    A    I concluded that both worldwide with some limited

4    exceptions and the United States are both appropriate or

5    relevant geographic markets for all of the product markets.

6    Q    What do you mean worldwide with some exceptions?

7    A    So the exceptions are excluding China, which

8    substantially restricts Internet access, and also some

9    limited regions that are subject to U.S. sanctions.

10   Q    Okay.  And did any of your conclusions change with

11   respect to the geographic market for each of the three

12   product markets you examined?

13   A    No.  My conclusions regarding competitive effects hold

14   for all geographic -- for both geographic markets in all

15   product markets.

16   Q    And what evidence did you consider to make a

17   determination about the appropriate, relevant geographic

18   market?

19   A    So I considered how customers of the products interact

20   with each other, how suppliers compete with each other, and

21   the scope of Google's conduct that is at issue here.

22   Q    So let's look at PTX 904.

23        MS. WOOD:  I don't believe there's been an

24   objection lodged to PTX 904.

25        THE COURT:  All right.  Any objection,

122

Direct Examination - R. Lee

1    Mr. Isaacson?

2            MR. ISAACSON:  No objection.

3            THE COURT:  Oh this came in, didn't it, before?

4            MS. WOOD:  Okay.

5            THE COURT:  Yes, it's in.

6    BY MS. WOOD

7    Q    And is this PTX 904 cited in your report?

8    A    Yes.

9    Q    And what is PTX 904?

10   A    It's an internal Google presentation examining the

11   sell-side.

12           MS. WOOD:  Oh, I recognize the puppy and Darth

13   Vader.  You're absolutely right, Your Honor.  It's been a

14   long day.

15   BY MS. WOOD

16   Q    Can you turn to the page ending in Bates stamp 553,

17   which is PDF page 19, and you also look at it on the screen,

18   whichever is easier for you.

19           What is being displayed on this page?

20   A    So on this page is a map of the world which divides the

21   world into three regions, the Americas; EMEA, which is

22   Europe and Africa; and then APAC or Asian specific region.

23           The arrows show -- we'll basically go from these

24   circles, which is the advertising spend origin where

25   advertisers are located and show where that money goes to

123

Direct Examination - R. Lee

1   different publishers located around the world.  And it shows

2   that indeed customers of these ad tech products interact

3   across country and regional boundaries.

4           The diagram also provides in the lower left sort

5   of numbers indicating how much spend goes from each region

6   to another region.  And it shows that almost a third of

7   spending from the Americas goes to customers located

8   elsewhere in the world and almost a third of spending into

9   the Americas comes from advertisers located elsewhere in the

10  world.  And so this is consistent with customers, again,

11  interacting worldwide across country boundaries.

12  Q    Now, how, if at all, do publishers sell impressions

13  factor into your geographic market analysis?

14  A    Can you repeat your question, please?

15  Q    Yeah.  How do suppliers, meaning publishers -- how does

16  competition in that market -- what does that tell you about

17  a relevant geographic market?

18  A    Yeah.  So publishers I indicated here that they are

19  selling impressions to customers located worldwide, but

20  also, the suppliers of these products, these ad tech

21  products are located worldwide and sell to customers located

22  worldwide as well.

23  Q    So let's look at PTX 657.

24          MS. WOOD:  I believe this is subject to our stip

25  if it's not already in evidence.

124

Direct Examination - R. Lee

1           MR. ISAACSON:  We have no objection, Judge.

2           THE COURT:  All right.  657 is in.

3    BY MS. WOOD

4    Q    If we can, turn to PDF page 29, which is Bates stamp

5    351.  This is a 2018 presentation by Google.  Can you

6    explain what you understand to be presented on this page?

7    A    Yes.  So this is a Google page that's tracking what

8    fraction of what they call addressable ad impressions that

9    available to these open-web display products are going

10   through Google's sell-side products.  What's notable is they

11   are tracking this fraction on a global excluding China

12   basis.  So that's consistent with competition for these

13   products being global as well.

14   Q    And I see there's a heading there, Web Display Sizing.

15        What do you understand that to mean?

16   A    This is referring to open-web display impressions.

17   Q    Okay.  Now, let's talk about the geographic market of

18   the United States.  Did you also conclude that it would be

19   appropriate to consider the United States as well as a

20   relevant geographic market?

21   A    Yes.  First, it's -- given evidence that Google is

22   actually able to price discriminate on its products, charge

23   different fees at the customer level or even impression

24   level, a hypothetical monopolous of any of these products

25   could also target price differences to customers located in

Direct Examination - R. Lee

1    a particular geographic region.  But for the United States,

2    it's a particular meaningful share of revenues for many of

3    these ad tech players, and it also can be useful to focus

4    attention on customers located in this country.

5    Q    Now, is that appropriate, to have two different

6    relevant geographic markets in one antitrust case, from an

7    economist's point of view obviously?

8    A    It can be helpful sometimes to look at a broader lens

9    to see the complete scope or effects of Google's conduct but

10   also examine whether those conclusions would hold even if

11   one ordered restrict retention of customers located in only

12   a particular area.

13   Q    And based on your work on this case and applying your

14   experience and expertise, do you believe that one geographic

15   market is more useful than the other for assessing Google's

16   market power?

17   A    Well, for assessing market power, my conclusions hold

18   for both geographic markets.  But in terms of value and the

19   competitive effects of Google's conduct, for the reasons I

20   discussed, that customers interact across country

21   boundaries, supplier competition is global, and the scope of

22   Google's conduct is global as well.  It's not restricted to

23   any one country.  I think it's more appropriate to look at

24   the competitive effects on a worldwide basis.

25   Q    Why is that?

126

Direct Examination - R. Lee

1   A     For the reasons I just described, that, again the

2   conduct crosses country boundaries and affects customers

3   worldwide.

4   Q     All right.  Let's talk finally about your last opinion,

5   which is about Google's conduct.

6             MS. WOOD:  Again, Your Honor, we're not going to

7   repeat with respect to all the anticompetitive conduct in

8   this case but just the specific analysis Professor Lee did

9   with respect to the conduct in this case.

10  BY MS. WOOD

11  Q     So what were the five pieces of conduct that you found

12  to be anticompetitive?

13  A     So the five pieces of conduct that I evaluated and

14  examined to be anticompetitive relates to the conditioning

15  of unrestricted access to Google Ads to the use of AdX.

16  This is referred to sometimes as near-exclusive relationship

17  between the two products.

18            Second, the conditioning of real-time bids from

19  AdX to -- I'm sorry.  The conditioning of access of

20  real-time bids from AdX to DFP.

21            Third, exclusive advantages within DFP provided to

22  AdX.  This relates to these first and last look advantages.

23            Fourth, Unified Pricing Rules.

24            And, fifth, the acquisition of Admeld.

25  Q     And did you find each of those five pieces of conduct

Direct Examination - R. Lee

1    that you just identified to be anticompetitive?

2    A    Yes.

3    Q    And did you evaluate pro-competitive justifications in

4    your analysis of Google's conduct?

5    A    I did.

6    Q    And did your evaluation of the pro-competitive

7    justifications for Google's conduct change your opinion?

8    A    No, they did not.

9    Q    And why was that?  Why did they not change your

10   opinion?

11   A    So I evaluated certain pro-competitive justifications

12   put forth by Google's experts.  I found that many were not

13   specific to the conduct in question.

14   Q    What do you mean by that, many of the pro-competitive

15   justifications were not specific to the conduct in question?

16   A    That is, they could have been realized without engaging

17   in the conduct at issue here.  They are not necessarily only

18   realizable with that conduct.

19   Q    And then I think I interpreted you.  So apologies for

20   that.

21        What else did find with respect to your evaluation

22   of pro-competitive justifications?

23   A    So I also found that the -- for the justifications that

24   were related to the conduct, they weren't substantiated by

25   what I had seen.

                                                              128

Direct Examination - R. Lee

1   Q    Okay.  So let's look at the first conduct you

2   identified, unrestricted access to Google Ads to AdX.   And

3   if we could, look at PTX 1389.

4           THE COURT:  Any objection to 1389?

5           MS. WOOD:  This is figure 18 from Professor Lee's

6   report.

7           MR. ISAACSON:  No objection.

8           THE COURT:  All right.  It's in.

9           MS. WOOD:  And again, this will have a 1389A for

10  the public version.

11          THE COURT:  All right.

12  BY MS. WOOD

13  Q    What does PTX 1389 show?

14  A    So earlier I discussed why -- or rather, I described

15  Google Ads's market share of the advertiser ad network

16  market.  Here, what I'm showing is that even if one were to

17  include other buying tools, including DSPs, Google Ads still

18  has a very large share of all indirect open-web transactions

19  worldwide here through all of these advertiser buying tools

20  with a share of 45 percent and very little of that -- you

21  can see at the top -- is available or made available to

22  third-party exchanges.

23  Q    And how does that influence your opinion about the

24  anticompetitive conduct of Google's restricting full access

25  to AdWords or Google Ads to AdX?

Direct Examination - R. Lee

1   A    Again, it's another measure of how large Google Ads is

2   as an advertising demand source.

3   Q    Okay.  And then we looked earlier at PTX 1444, which is

4   already in evidence.  So just briefly, if you can, tell us

5   how that relates to Google's anticompetitive conduct.

6   A    Yes.  So this is the auction simulation I discussed

7   earlier where one removes Google Ads.  As I alluded to

8   before, in this auction simulation, if Google Ads wasn't

9   bidding, AdX would be predicted to lose 40 percent of the

10  impressions it had previously won.  So this is consistent

11  with other exchanges not having access to Google Ads or all

12  of Google Ads harming their competitiveness and ability to

13  win impressions.

14  Q    And can you describe how Google Ads bidding on an ad

15  exchange affects that ad exchange's competitiveness?

16  A    So this goes again to quality of an ad exchange by

17  generating yield.  An ad exchange runs auctions, and if

18  there's more advertisers bidding into that auction, all is

19  equal that tends to increase the expected price that

20  exchange can provide to a publisher.

21  Q    So let me -- let's look at PTX 324, which is already in

22  evidence.  And you cite this document in your report,

23  Professor Lee?

24  A    Yes.

25  Q    And what does PTX 324 show?

Direct Examination - R. Lee

1  A    So this is an auction simulation run now using -- well,

2  this is a Google simulation from 2014 running a similar

3  simulation where it examines what happens if GDN or Google

4  Ads didn't participate in AdX auctions.  And even in this

5  simulation, it finds that AdX would win far fewer

6  impressions and publisher payouts would be reduced.

7  Q    So if we can look on page 2 ending in Bates stamp 609,

8  can you show us what you're referring to there?

9  A    So the first row and the last row look side by side

10  at -- in the simulation, the query is when there are GDN

11  bids and then the right without the GDN bids.  And it's that

12  difference that indicates the reduction in the queries won

13  by AdX, as well as the reduction in the publisher payout.

14  And it's significant.

15  Q    So for this simulation run on January 5, 2014, the

16  daily queries with Google Ads is 7.49 billion.  Am I reading

17  that correctly?

18  A    Yes.

19  Q    And without Google Ads, the daily queries drops down to

20  3.64 billion; is that right?

21  A    Yes.

22  Q    And what does that show with respect to the daily

23  publisher payout with and without Google Ads?

24  A    It reduces, as said in the abstract -- it's a

25  65 percent reduction in publisher payout.

Direct Examination - R. Lee

1  Q    So from about $3.9 million to about $1.3 million in one

2  day?

3  A    Yes.

4  Q    And what does that tell you for purposes of assessing

5  the anticompetitive effect of Google's conduct?

6  A    Again, it's consistent with my own auction simulation,

7  that the impact of Google Ads bidding into an exchange is as

8  large.  And an exchange that doesn't Google Ads bidding into

9  it would be -- it's competitiveness would be adversely

10 impacted.

11 Q    Now, have you examined documents that discuss the

12 relationship between Google Ads' and AdX's market power?

13 A    Yes, I have.  I've seen many Google documents that link

14 Google Ads' relationship with AdX to AdX's ability to

15 support and sustain its 20 percent price or take rate.

16 Q    So let's look at PTX 1403.

17          THE COURT:  Any objection?

18          MS. WOOD:  This is also a figure from Professor

19 Lee's reports.

20          THE COURT:  And this --

21          MS. WOOD:  And this will have an A version, Your

22 Honor.

23          MR. ISAACSON:  No objection.

24          THE COURT:  All right.  1403 is in with A.

25

Direct Examination - R. Lee

1   BY MS. WOOD

2   Q    Can you describe for the Court what PTX 1403A shows?

3   A    Yeah.  So on the left, it examines the share of

4   impressions from another advertiser ad network and which

5   exchanges it buys through.  And the right, it shows the same

6   statistic for Google Ads.  And it shows that on the left,

7   AdX gets 54 percent of those impressions, but the rest go to

8   other firms.  Whereas on the right, Google Ads -- 91 percent

9   of its impressions are transacted through AdX.

10  Q    And ultimately, what did you conclude from this

11  analysis in PTX 1403A?

12  A    So it shows that it's feasible and it does happen that

13  other advertiser ad networks do bid more widely than Google

14  Ads in other exchanges.  Also, DSPs, like Xandr and DV360,

15  also bid more widely on Google Ads and other exchanges.

16  Q    Now, you can put that document aside.

17        How, if at all, does the presence of AWBid -- the

18  Court has heard a lot about AWBid.  How does the presence of

19  AWBid affect your opinions about Google's -- anticompetitive

20  effect of Google's conduct?

21  A    So AWBid does not change my opinion that this

22  near-exclusive relationship between AdX and --

23  near-exclusive relationship between Google Ads and AdX harms

24  competition.  This is because with AWBid, Google Ads does

25  not bid on all impressions and it represents a small share

133

Direct Examination - R. Lee

1    of Google Ads' impressions transacted.  Moreover, when

2    Google Ads bids on third parties, it wins at a far lower

3    rate than when it bids through AdX.

4              MS. WOOD:  So if we could, pull up Plaintiffs'

5    Demonstrative Q, as in query.

6    BY MS. WOOD

7    Q    And is this a demonstrative you prepared, Professor

8    Lee?

9    A    It is.

10   Q    And is this based on information from your report?

11   A    It is.

12   Q    And what data did you use to prepare Plaintiffs'

13   Demonstrative Q?

14   A    So this is a sample of that June 2023 GAM log-level

15   data.

16   Q    And can you tell us:  What does this demonstrative

17   show?

18   A    So it shows that when Google Ads bids through AdX, it

19   wins the impression 26 percent of the time.  But when it

20   actually bids through a third-party exchange, it wins

21   1 percent of those impressions.

22             And one contributing factor is when Google Ads

23   bids through a third-party exchange, it charges a much

24   higher take rate or fee than when it bids through AdX.  I

25   calculated using the data that through AWBid, the average

134

Direct Examination - R. Lee

1    margin that Google Ads takes is 32.5 percent.  Whereas it's

2    much lower when it bids through AdX.

3    Q    Let's look at Plaintiffs' Demonstrative R, as in Romeo.

4    There's a lot of material on this, and it's late in the day.

5    But we are almost close to the end, so let's muscle through

6    this together.

7              What does Plaintiffs' Demonstrative R show with

8    respect to the patterns you observed in the data of Google

9    Ads bidding on AdX versus Google Ads bidding on third-party

10   exchanges?

11   A    So this demonstrative attempts to show why a higher

12   take rate or a higher margin charged when ads bids and

13   third-party exchanges can contribute to a lower win rate.

14   Q    So let's take the top part first.

15   A    Sure.

16   Q    So from Google Ads to AdX, explain the math there,

17   please.

18   A    So let's say an advertiser is starting off with a

19   dollar bid or spend into Google Ads and that Google Ads is

20   going to -- let's just make it simple, submits that on

21   behalf of the advertiser as a bid into AdX.  Well, if Google

22   Ads takes a 15 percent rate, it means it's essentially

23   submitting an 85 percent bid into AdX.  Now, if AdX takes

24   out a 20 percent, it means there's 68 cents that would be

25   bid into the publisher and into some final auction.  Now, if

Direct Examination - R. Lee

1    Google Ads takes out instead of 32 percent when it bids via

2    AWBid, it's now bidding only 68 cents to a third-party

3    exchange, which means now the third-party exchange, if it

4    charged a lower take rate than 20 percent -- it could be 17

5    as one firm does or 8 percent as one firm does.  Or even if

6    it we want all the way down to zero, it's not going to be

7    able to beat AdX.  So all else equal, those other exchanges,

8    if they were to take any amount wouldn't be able to beat

9    AdX's bid.  In all else equal, they would only win if AdX

10   wasn't bidding on, let's say, an incremental impression that

11   only they saw and AdX didn't.

12   Q    And what does Plaintiffs' Demonstrative R tell you

13   about the effect of Google's anticompetitive conduct, in

14   particular the tie between Google Ads and AdX?

15   A    Sorry.  Can you repeat your question?

16   Q    Yes.  What does Plaintiffs' Demonstrative R tell you

17   about the effect of the anticompetitive conduct Google Ads'

18   unrestricted bidding on AdX versus other third-party

19   exchanges?

20   A    So these exercises indicate the extent to which this

21   conduct has harmed rivals' competitiveness, has impeded

22   their ability to actually compete for publisher impressions

23   and advertiser spending.  That is the restriction to certain

24   impression types, but also, this difference in fees is

25   making it difficult for customers to transact through other

136

Direct Examination - R. Lee

 1    exchanges.

 2            THE COURT:  It's late in the day, so I may have

 3    missed it.  But why are you taking 32 percent of Google Ads

 4    when it's going to the third-party exchange?

 5            THE WITNESS:  That's how much it charges for

 6    remarketing impressions.

 7            THE COURT:  That's what's being charged?

 8            THE WITNESS:  Correct.

 9            THE COURT:  Okay.

10    BY MS. WOOD

11    Q    And how do you know that, Professor Lee?

12    A    So both from Google documents --

13            (Reporter clarification.)

14            THE WITNESS:  And submissions to the DEC, as well

15    as my own independent calculations using data.

16    BY MS. WOOD

17    Q    All right.  So let's turn now to the second conduct

18    that you identified as having an anticompetitive effect,

19    which is the real-time bids from AdX being provided

20    exclusively to Google's own publisher ad server DFP.  How,

21    if at all, did that conduct harm the ability of rival

22    publisher ad servers to compete on a fair basis for

23    customers?

24    A    I'm sorry.  There was a lot in there.  Can you repeat

25    your question again?

                                                              137

Direct Examination - R. Lee

1    Q    Sure.  Talk to me about how the tie between AdX and DFP

2    harmed publishers, their rival publisher ad servers?

3    A    Sure.  So real-time bids from AdX are important for a

4    publisher ad server because that would allow the publisher

5    ad server to run auctions between AdX and other exchanges.

6    And that's an important way in which publishers can increase

7    their yield in monetization.  By restricting access to those

8    real-time bids to other publisher ad servers, those

9    publisher ad servers aren't able to offer that to customers

10   impairing their ability to compete for those customers.

11   This matters because AdX represents an important source of

12   advertiser spend as some of my earlier quantitative analyses

13   show.

14   Q    Now, relative to this point, let's look back at PTX

15   1395.  And how does PTX 1395A reflect what you were just

16   describing?

17   A    Yes.  So this is one of the quantitative exercises I

18   was alluding to showing the relative difference in this

19   auction simulation where different exchanges were removed,

20   where AdX has a 50 times greater impact than publisher

21   payouts in this simulation than any other exchange.

22   Q    And why would that negatively impact rival publisher ad

23   servers?

24   A    Because if those rival publisher ad servers weren't

25   able to offer publishers real-time competition with AdX and

138

Direct Examination - R. Lee

1   these other exchanges, they would be at a relative

2   disadvantage to DFP.

3   Q    Now, how, if at all, does the presence of what's been

4   described as AdX Direct affect your opinions about the tie

5   between AdX and DFP?

6   A    So AdX Direct, which is a way in which rival publisher

7   ad servers can connect to AdX but not obtain real-time bids,

8   tat presence does not change my opinion that this conduct

9   harmed competition.  And that's because this connection is

10  not a replacement for real-time bids.  It's not an effective

11  replacement.

12  Q    I'm sorry?

13  A    Effective.

14  Q    It's not an effective replacement.

15  A    And it represents a small share of AdX revenues.  It's

16  not a meaningful exemption in that regards.

17  Q    So you said it's not an effective replacement.  Why do

18  you say that?

19  A    Again, as I was describing, it doesn't allow a rival

20  publisher ad server to get those real-time bids from AdX and

21  run real-time auctions between AdX and other exchanges.

22  Q    Well, it if doesn't allow them to get real-time bids,

23  what does it allow them to do?

24  A    It allows them to submit basically a floor to AdX.  AdX

25  will basically take it or leave it without reporting back.

Direct Examination - R. Lee

1   Q    I'm sorry.  I couldn't hear you.  Take it or leave it?

2   A    Take or it leave it and not report back the real-time

3   bid.

4   Q    So isn't a take it or leave it sufficient for other

5   rival publisher ad servers to compete?

6   A    Again, it's this benefit that comes about from having

7   different exchanges, different demand sources compete in

8   real-time, which we've seen happen in this industry where --

9   for example, with header bidding, having real-time

10  competition among exchanges -- whereas prior to that, they

11  were restricted to using the waterfall -- improved publisher

12  yield.

13  Q    Okay.  Let's's look at PTX 1302.

14          THE COURT:  Any objection?

15          MS. WOOD:  This is from Professor Lee's report.

16          MR. ISAACSON:  No objection.

17          THE COURT:  All right.  It's in.

18  BY MS. WOOD

19  Q    And what does PTX 1302 show, Professor Lee?

20  A    So this is analysis of Google's data that plots the

21  fraction of AdX's worldwide revenue from indirect open-web

22  display that is going through AdX Direct.  What's important

23  to note is that some of this AdX Direct revenue is actually

24  going to DFP publishers.  So some DFP publishers were also

25  using AdX Direct.

140

Direct Examination - R. Lee

1      It's the non-DFP users which likely represents

2  those publishers using other publisher ad servers than DFP.

3  And you can see that this blue line for non-DFP users by

4  2023 represented less than 1 percent of AdX's worldwide

5  indirect open-web display revenue.

6  Q    And what does that tell you, again, about this tie

7  between AdX and DFP?

8  A    Well, it says that this real-time bidding

9  restriction -- even though there's AdX Direct -- doesn't

10 have many people using AdX outside of DFP.

11 Q    Now, I want to turn to your last and final opinion,

12 which is about the harm that Google's conduct has caused to

13 its publisher and advertiser customers.  How would your

14 conclusions with respect to harm to competition be impacted

15 if overall web display advertising volume had increased over

16 time?

17 A    It wouldn't be affected.

18 Q    And why not?

19 A    Well, it's important to recognize that industries can

20 be growing in spite of anticompetitive conduct.  Time trends

21 alone don't tell the complete story.  There are many reasons

22 why overall display advertising spending can be increasing.

23 It includes more people using the Internet or buying things

24 online.  That the industry is growing is in spite of

25 Google's exercise in market power and conduct.

Direct Examination - R. Lee

1   Q    And did you reach any conclusions as to how Google's

2   conduct in the ad tech products at issue in this case had

3   the potential to harm everyday consumers?

4   A    I did.

5   Q    And what did you conclude?

6   A    So consumers are likely harmed from reductions in

7   content available online arising from lower publisher

8   payouts, for example, sustained by higher ad tech fees.

9   Consumers can also be harmed if higher advertising prices

10  are passed through to higher retail prices.

11  Q    All right.  And what did you conclude with regard to

12  whether Google's conduct harmed its own customers,

13  publishers and advertisers?

14  A    So I concluded that Google's conduct harmed open-web

15  publishers and advertisers in three ways:

16          First, by sustaining higher prices for transacting

17  open-web display ads.  Higher prices would harm customers

18  leading to lower publisher payouts or higher advertising

19  prices.

20          Second, Google's conduct has reduced the quality

21  of options that customers had to transact open-web display

22  ads likely reducing the efficiency of the transactions that

23  occurred.

24          And third, Google's conduct likely reduced

25  innovation in the relevant markets.

Direct Examination - R. Lee

1    Q    Now, what evidence supports your conclusion that higher

2    fees harm both advertiser and publisher customers?

3    A    So I mentioned earlier evidence that in limited

4    circumstances in the past, Google was willing to reduce its

5    fees on its products when it faced greater competition

6    indicating with more competition, fees would be lower.  And

7    fees for these products act similar to a tax and are borne

8    generally by both advertisers and open-web publishers.

9    Q    And did you review any internal Google simulations that

10   examined this?

11   A    I did.  So these earlier experiments and simulations

12   related to Google Ads informed my opinion that higher fees

13   would be borne by both advertisers and publishers.

14   Q    So let's look at PTX 858, which was already admitted

15   into evidence earlier.

16         Was this cited in your report?

17   A    Yes.  This is a document that we looked at earlier.

18   Q    And if we can, look at the table on page 2 ending in

19   Bates stamp 247.

20         What is depicted here in this table?

21   A    So this reports simulation experiment results for

22   changing Google Ads' margin or take rate on AdX web

23   publishers.  And you can sort of see it on the left going

24   from 10 all the way to 25 percent.  On the way right,

25   represent the change in payout, and you can see that as the

143

Direct Examination - R. Lee

1   fee goes up from 10 to 25, the payout falls.  That's

2   consistent with publishers being harmed by increases in

3   fees.

4           I also used results from that earlier 2014 Google

5   Ads' experiment to calculate what the implied change in

6   advertising prices would be from an increase in Google Ads'

7   fee and found that advertise prices also would increase.  So

8   this is consistent with both sets of customers being harmed

9   by an increase in fees.

10  Q    And is that consistent with economic theory based on

11  your professional judgment?

12  A    It is.  This relates to that earlier point that this is

13  like a tax.  These fees act like a tax that are borne by

14  both sides of this market.

15  Q    All right.  You can put that aside.

16          You indicated that the second way Google's own

17  publisher and advertiser customers might be harmed or were

18  harmed was through reduced quality of options.  Can you

19  explain what you meant by that?

20  A    Sure.  So some of Google's conduct involved limiting

21  the pathways through customers -- through which customers

22  could transact these near-exclusive relationships.  And

23  there was an earlier experiment where when Google Ads was

24  removed from AdX, many transactions were no longer matched.

25  There was no longer a sale.  So that's consistent with these

144

Direct Examination - R. Lee

1   limitations imposed by Google's conduct likely leading to

2   fewer matches or harming the efficiency of advertisers

3   finding publishers to transact with.

4   Q    And so did you find empirical evidence that Google's

5   own customers were harmed by this reduced quality?

6   A    Well, I mentioned that there's that experiment which

7   spoke to the reduction in transactions.  That would be

8   predicted to occur when AdX removed its bids from AdX.

9   Q    And how is that consistent with reduced quality of

10  options for customers?

11  A    Well, by options, I'm talking about -- the different

12  ways in which they can interact.

13  Q    Now, the third element you mentioned of harm to

14  Google's customers was lack of innovation.  Can you describe

15  what you mean by that?

16  A    So Google's conduct reduced the benefits that is rivals

17  could expect to gain from innovation.  That's because much

18  of its conduct impeded their ability to compete for spending

19  and for impressions.

20        Also, there's been notable exit in the markets.

21  We discussed Facebook Audience Network from the advertiser

22  ad network market and Verizon and OpenX from the publisher

23  ad server market.  That represents a loss in innovation as

24  well due to exit.

25  Q    Why do you say that exit of market participants is an

Direct Examination - R. Lee

1    indication of loss of invasion?

2    A    Well, I mean, they're no longer available as options.

3    They're no longer available as competitors who can provide

4    additional product variety or product features to customers.

5    Q    And finally, Professor Lee, did you reach conclusions

6    as to whether Google's conduct from earlier time period

7    still has competitive effects in the markets today?

8    A    I did.

9    Q    And what did you conclude in that regard?

10   A    So three of the acts that I looked at, this

11   near-exclusive relationship between the ads and AdX, the

12   conditioning of real-time bids from AdX to DFP, and Unified

13   Pricing Rules still persist today, as well due to the

14   durability of network effects and scale effects and the exit

15   of competitors, the impact of all of Google's conduct still

16   persists.

17          MS. WOOD:   Thank you.  I'll pass the witness.

18          THE COURT:  Well, I am going to give you-all a

19   break.  I think it makes sense to start the cross tomorrow

20   morning since it's been a long day and this is technical

21   stuff.

22          So, Mr. Isaacson, you will start tomorrow morning.

23          MR. ISAACSON:  Yes.

24          THE COURT:  Professor, thank you.  You will need

25   to be back here at 9:00 for cross-examination.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Let's go ahead and do our routine.

3   Unfortunately, I do have one matter at 8:30, so you, once

4   again, have to clear the desks.  That should not take that

5   long.  So I'm sure you will be able to get back in here by

6   ten to 9:00.

7          MS. WOOD:  Thank you, Your Honor.

8          MR. TEITELBAUM:  Your Honor, at the risk of

9   spoiling the early dismissal, I was wondering if I could

10  address just some brief undisputed exhibit issues that have

11  accumulated over the past 24 hours or so.

12         THE COURT:  Undisputed?

13         MR. TEITELBAUM:  Undisputed.

14         THE COURT:  All right.  That's fine.

15         MR. TEITELBAUM:  The first is with regard to PTX

16  1385, which came in during the examination of Professor Lee,

17  I think we should also request from the Court that we have a

18  1385A for a redacted version.

19         THE COURT:  That's fine.

20         MR. TEITELBAUM:  Secondly, with respect to the

21  examination of Mr. Spencer yesterday, we had, on the Court's

22  instructions, conferred with Google about four exhibits that

23  were submissions to regulatory authorities about narrowing

24  the scope.  And so we have reached agreement with Google

25  with respect to those four.  We have hole-punched copies for

                                                          147

1      the Court.  So at this time, pursuant to agreement with

2      Google, we would move into evidence as modified PTX 1092,

3      PTX 1093, PTX 1096, and PTX 1099.

4              MR. ISAACSON:  Your Honor, over the lunch break, I

5      consulted with my colleagues about this issue, and we had

6      not yet reached agreement.  So it's possible that

7      Mr. Teitelbaum is talking about developments that have

8      happened since lunch, but I am not aware of those.  So I ask

9      for the opportunity to figure that out overnight.

10             MR. TEITELBAUM:  No objection here.  My note says

11     earlier this afternoon we reached agreement with Google,

12     which sounds like after the lunch break, but I am not in a

13     rush if Ms. Dunn wants to check.

14             THE COURT:  There's too many lawyers in this case.

15             All right.  That's fine.  We will do it tomorrow.

16             MR. TEITELBAUM:  Then the last two items, Your

17     Honor.  We have two exhibits that we cited in our pretrial

18     findings of fact, which are also on the defense exhibit

19     list, which we would like to move in on that basis.  Those

20     are PTX 946, which is also DTX 1020, and second is PTX 1031,

21     which is also DTX 723.  And we also have hole-punched copies

22     for the Court and for counsel as well.

23             MS. DUNN:  With the Court's indulgence, I would

24     just like to review.

25             THE COURT:  Go ahead.

 1              MS. DUNN:  With respect to 946, Your Honor, PTX

 2   946, no objection.

 3              THE COURT:  All right.

 4              MS. DUNN:  And 1031 no objection.

 5              THE COURT:  All right.  They're both in.

 6              MR. TEITELBAUM:  So I take it we should still wait

 7   on 1092 to 1099 just to make sure.

 8              THE COURT:  Yes.

 9              MS. DUNN:  Thank you, Your Honor.

10              THE COURT:  All right.

11              THE COURT SECURITY OFFICER:  Can the witness

12   leave?

13              THE COURT:  Yes.

14              Ms. Dunn.

15              MS. DUNN:  Your Honor, I do have a couple of

16   housekeeping items just about the trajectory of our case,

17   but I don't know if you would like to do exhibits first.

18              THE COURT:  What do you have in mind?

19              MS. DUNN:  So Google expects that we'll start our

20   case tomorrow as discussed earlier.  Our first witness is

21   going to be Scott Sheffer.  Depending on how much time

22   remains, given Dr. Lee's cross-examination and redirect, at

23   that time, we will either call another witness or seek to do

24   a read-in from Microsoft, which we -- it's probably by far

25   our most lengthy read-in.  It's about an hour.

                                                              149

1          THE COURT:  All right.

2          MS. DUNN:  Obviously, a significant witness.

3          Then we anticipate at this point just for

4    planning -- and I know there are a lot of people that want

5    to know this is that our case will take until Wednesday or

6    Thursday of next week depending on the length of plaintiffs'

7    cross-examination.

8          THE COURT:  All right.  Now, let me just remind

9    you again.  It's Tuesday night I think is the early -- we

10   are going to stop around 4:30 Tuesday.

11         MS. DUNN:  Right.

12         THE COURT:  Wednesday we have our same amount of

13   hours, but the lunch break is going to be earlier.  It's

14   going to be a 12:00 to 1:00 lunch break, which makes the

15   afternoon much longer.  So we'll have to see.

16         I know we are way ahead of schedule, and you've

17   done very well.  So I may relax things slightly.  Now,

18   again, there may be a rebuttal case, so I want to make sure

19   I don't get too far behind.  But that's very good news.

20         Again, a lot of -- I suspect some of your case has

21   somewhat come in through cross-examination.  A lot of the

22   concepts don't have to be rediscussed, you know, again.

23   Accumulative evidence is not favored.

24         MS. DUNN:  Understood, Your Honor.  We are very

25   mindful of that, and obviously, given the time frame, we are

1   trying very hard to not extend this longer than needed and

2   to not have accumulative evidence.

3           THE COURT:  All right.  Now the other thing to be

4   just thinking about is I think it makes sense, after all the

5   evidence comes, for there to be a break so that you, number

6   one, can prepare your revised findings of fact and

7   conclusions and have an opportunity to make closing

8   arguments.

9           MS. DUNN:  Thank you, Your Honor.

10          THE COURT:  I believe Judge Mehta did something

11  similar to that in D.C.  I will permit the closing arguments

12  to be more than half an hour but don't expect a whole day.

13  Because, again, you know, I will have been looking at these

14  materials as we go.

15          MS. DUNN:  Understood.

16          THE COURT:  And we can talk about the scheduling

17  for that, you know, next week.  That's my plan.  I assumed

18  you had figured you wouldn't have to close.

19          MS. DUNN:  We did not know, and we are happy for

20  the clarity.  I think the Court is contemplating this, and I

21  assume that my friend on the other side would agree with

22  this.  We just want an opportunity to confer with the Court

23  on the schedule for picking the date of the closing.

24          THE COURT:  Definitely.

25          MS. DUNN:  Thank you very much.  We are grateful

1   for that.

2              THE COURT:  All right.  So we'll now read in those

3   exhibits that we believe were admitted today.

4              Let's let the folks leave for a second.

5         (Discussion off the record.)

6              THE COURT:  There you go.  Okay.

7              THE COURTROOM DEPUTY:  DTX 2532, DTX 2532A, DTX

8   2533, DTX 2533A, DTX 2066, DTX 2066A, PTX 695, PTX 904, PTX

9   1507, PTX 468, PTX 285, PTX 239, PTX 234, PTX 275, PTX 470,

10  PTX 1543, PTX 453, PTX 403, PTX 367, PTX 639, PTX 429, PTX

11  438, PTX 452, PTX 502, PTX 631, PTX 712, PTX 507, PTX 786,

12  PTX 882, PTX 945, PTX 1021, PTX 794, PTX 1107, PTX 1108, PTX

13  579, PTX 103, PTX 1778, PTX 1278, PTX 1278A, PTX 188, PTX

14  1393, PTX 1393A, PTX 1395, PTX 1395A, PTX 1258, PTX 1259,

15  PTX 1238, PTX 1238A, PTX 1261, PTX 1261A, PTX 1292, PTX

16  1292A, PTX 1294, PTX 1294A, PTX 1242, PTX 1231, PTX 1232,

17  PTX 1235, PTX 1385, PTX 1385A, PTX 1808, PTX 1444, PTX

18  1444A, PTX 1243, PTX 1243A, PTX 1269, PTX 1269A, PTX 657,

19  PTX 1389, PTX 1389A, PTX 1403, PTX 1403A, PTX 1302, PTX 946,

20  PTX 1031.

21             MS. WOOD:  That's what we have, Your Honor.

22             MR. ISAACSON:  So I had a couple of discrepancies.

23  So just to check.

24        (Counsel confer.)

25             THE COURT:  All right.  So we're all

                                                              152

1   right,Ms. Dunn?

2              MS. DUNN:  Yes.  Thank you, Your Honor.

3              THE COURT:  All right.  Very good.

4              If there's nothing further, then we'll recess

5   court until 8:30 tomorrow morning.

6                 (Proceedings adjourned at 5:53 p.m.)

7                 ----------------------------------

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          I certify that the foregoing is a true and

24      accurate transcription of my stenographic notes.

25                              _____
                                        /s/
                                Rhonda F. Montgomery

153