<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3      -------------------------x
        UNITED STATES, et al.,      :   Civil Action No.:
 4                                  :   1:23-cv-108
                    Plaintiffs,     :
 5         versus                   :   Monday, September 23, 2024
                                    :   Alexandria, Virginia
 6      GOOGLE LLC,                 :   Day 11 p.m.
                                    :   Pages 1-156
 7                  Defendant.      :
        -------------------------x
 8

 9           The above-entitled bench trial was heard before the
        Honorable Leonie M. Brinkema, United States District Judge.
        This proceeding commenced at 2:00 p.m.
10

11                       A P P E A R A N C E S:

12      FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                               OFFICE OF THE UNITED STATES ATTORNEY
13                             2100 Jamieson Avenue
                               Alexandria, Virginia  22314
14                             (703) 299-3700

                               JULIA TARVER WOOD, ESQUIRE
15                             AARON TEITELBAUM, ESQUIRE
                               MICHAEL WOLIN, ESQUIRE
16                             JEFFREY VERNON, ESQUIRE
                               KATHERINE CLEMONS, ESQUIRE
17                             UNITED STATES DEPARTMENT OF JUSTICE
                               ANTITRUST DIVISION
18                             450 Fifth Street, NW
                               Washington, D.C.  20530
19                             (202) 894-4266

20      (State of VA)          TYLER HENRY, ESQUIRE
                               OFFICE OF THE ATTORNEY GENERAL
21                             OFFICE OF THE SOLICITOR GENERAL
                               202 North Ninth Street
22                             Richmond, Virginia  23219
                               (804) 786-7704
23

24

25           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
</pre>

                                                                    1

```
 1                      A P P E A R A N C E S:

 2   FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 3                          209 Madison Street
                            Suite 501
 4                          Alexandria, Virginia  22314
                            (703) 549-5354
 5
                            KAREN DUNN, ESQUIRE
 6                          JEANNIE RHEE, ESQUIRE
                            WILLIAM ISAACSON, ESQUIRE
 7                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
 8                          2001 K Street, NW
                            Washington, D.C.  20006
 9                          (202) 223-7300

10                          ERIC MAHR, ESQUIRE
                            SARA SALEM, ESQUIRE
11                          FRESHFIELDS BRUCKHAUS DERINGER, LLP
                            700 13th Street, NW
12                          10th Floor
                            Washington, D.C.  20005
13                          (202) 777-4500

14                          JUSTINA SESSIONS, ESQUIRE
                            FRESHFIELDS BRUCKHAUS DERINGER, LLP
15                          855 Main Street
                            Redwood City, California  94063
16                          (212) 277-4000

17   COURT REPORTER:        RHONDA F. MONTGOMERY, CCR, RPR
                            Official Court Reporter
18                          United States District Court
                            401 Courthouse Square
19                          Alexandria, Virginia  22314
                            (703) 299-4599
20                          RMontgomery@courtreport.net

21

22

23

24

25
```

1   On behalf of the Defendant:

2   SARAH STEFANIU

3   Direct examination by Ms. Rhee ............4
    Cross-examination by Ms. Clemons .........52
4   Redirect examination by Ms. Rhee .........60
    Recross-examination by Ms. Clemons .......63

5   KENDALL OLIPHANT

6

7   Direct examination by Ms. Goodman ........64
    Cross-examination by Ms. Wood ............100
    Redirect examination by Ms. Goodman ......105
8   MS. SESSIONS

9   Direct examination by Ms. Sessions .......107

10  BENNEASER JOHN (continued read-in)........136

11

12                  MISCELLANY

13  Proceedings September 23, 2024 ...........4
    Certificate of Court Reporter ............156
14

15

16

17

18

19

20

21

22

23

24

25

Direct Examination - S. Stefaniu

1              P R O C E E D I N G S

2          THE COURT:  All right.  Begin.

3          MS. RHEE:  Good afternoon, Your Honor.  Google

4     calls Sarah Stefaniu.

5          THE COURT:  All right.

6          SARAH STEFANIU, DEFENDANT'S WITNESS, SWORN

7              DIRECT EXAMINATION

8     BY MS. RHEE:

9     Q    Good afternoon, Ms. Stefaniu.  I can already tell we

10    are going to have trouble hearing you.  So can you keep

11    that --

12    A    Yes.

13    Q    Fabulous.  Okay.

14         Could you please introduce yourself to the Court

15    and then spell your name for the court reporter.

16    A    Yes.  My name is Sarah Stefaniu, spelled S-A-R-A-H,

17    S-T-E-F-A-N-I-U.

18    Q    Now, Ms. Stefaniu, where do you work?

19    A    I work at Google.

20    Q    What is your current title at Google?

21    A    My current title is a global products solution lead for

22    privacy and regulations with the Google marketing platform.

23    Q    Because the Court is familiar with the terms "buy-side"

24    and "sell-side," which side do you work on at Google?

25    A    I specifically work on the buy-side.

Direct Examination - S. Stefaniu

1    Q    As a global products solution lead working in privacy

2    and regulation, are there specific Google buy-side products

3    that you work on?

4    A    I do.

5    Q    What are they?

6    A    Specifically Display and Video 360 and Campaign Manager

7    360.

8    Q    And when you talk about Display and Video 360, is it

9    commonly referred to as DV360?

10   A    That's correct.

11   Q    Can you explain for the Court what Campaign Manager 360

12   is?

13   A    Yes.  Campaign Manager 360 is an ad serving and

14   measurement platform.

15   Q    Now, as a global products solution consultant working

16   in privacy and regulation, what do you specifically do in

17   connection with DV360 and Campaign Manager 360?

18   A    I support privacy initiatives that the platforms would

19   like to pursue.  An example is third-party cookie

20   degradation.  And I also ensure that these platforms comply

21   with regulations regarding data privacy that are taking into

22   effect in various countries across the globe.

23   Q    Now, in connection with your present position working

24   with DV360, do you have familiarity with that product's

25   interface?

Direct Examination - S. Stefaniu

1   A    I do.

2   Q    And have you actually been in that interface in

3   connection with your position?

4   A    I have.

5   Q    Now --

6          MS. CLEMONS:  Your Honor, objection.  She has not

7   established at this point that Ms. Stefaniu's role with

8   respect to any of that is predating the end of the discovery

9   period in this litigation.

10          THE COURT:  Is there going to be an issue about

11   the time of all of this?

12          MS. RHEE:  I don't think so, Your Honor.  I can

13   just lay that foundation.

14          THE COURT:  All right.

15   BY MS. RHEE:

16   Q    How long have you been working with DV360?

17   A    I started this role in April 2023.

18   Q    Now, rewinding in time, when did you first start at

19   Google?

20   A    I started at Google in February 2018.

21   Q    And how close in time was that to your college

22   graduation, Ms. Stefaniu?

23   A    About a year from when I graduated.  I graduated in

24   December 2016.

25   Q    And where did you go to college?

Direct Examination - S. Stefaniu

1   A    I attended Loyola University Chicago.

2   Q    What was your degree in?

3   A    Bachelor in Business Administration.

4   Q    Now, going back to the time when you first joined

5   Google in 2018, what was the role at Google that you started

6   in?

7   A    I was hired in as an account manager in a rotational

8   program.

9   Q    And were there specific Google products or product that

10  you were an account manager for in that rotational program?

11  A    Yes.  I specifically supported the Google Ads platform.

12  Q    Now, within the rotational program, were you assigned

13  to a specific group associated with Google Ads?

14  A    I did support a specific group.  The group is named

15  large customer sales, acronymed to LCS.

16  Q    Now, what does LCS do in connection with supporting

17  Google Ads?

18  A    It supports some of the largest spending customers that

19  use the platform.

20  Q    And how large is the LCS or large customer sales group

21  at Google supporting Google Ads?

22  A    It is quite large.

23  Q    By how large, can you give us an approximate head

24  count?

25  A    Internally, thousands of Googlers.

Direct Examination - S. Stefaniu

1    Q    And how many large customers at the time that you were

2    an account manager for Google Ads were there who were

3    covered by the LCS team?

4    A    Thousands.

5    Q    Now, insofar as you worked for Google Ads, were you

6    aware of another sales support group or team that worked

7    with small- and medium-sized customers?

8    A    Yes.

9    Q    And what was that group or team called?

10   A    The team, when I was supporting my customers during

11   this time, was called SMB, small and medium businesses.  It

12   is now called GCS, which is Google customer solutions.

13   Q    And how many Google employees, approximately, worked on

14   the SMB, now GCS team?

15   A    Thousands.

16   Q    Now, at the time that you were an account manager

17   supporting Google Ads, were there any other teams that we

18   haven't covered?  We've talked about LCS and GCS.  Any other

19   team?

20   A    There is another large group called gTech.

21   Q    And what does gTech do?

22   A    They provide on-demand support for customers who have

23   an immediate troubleshooting question, reporting question.

24   Q    And when you say troubleshooting, what kind of

25   troubleshooting are we talking about?

Direct Examination - S. Stefaniu

1   A    This could be ads are having trouble serving.  This

2   could be a question with the reports that may have had an

3   anomaly to it.  And they, again, provide on-demand support

4   to help the customer address their issues.

5   Q    And does that include technical support, Ms. Stefaniu?

6   A    That's correct.

7   Q    And how large is the gTech team that supports Google

8   Ads?

9   A    There are thousands of people who are also in gTech.

10           THE COURT:  And did you say that only supports

11   large customers or also the medium and small?

12           THE WITNESS:  All types of customers.

13           THE COURT:  Okay.

14   BY MS. RHEE:

15   Q    So even for the smallest customer of Google Ads, are

16   they able to call the on-demand technical support team at

17   gTech?

18   A    That's correct.

19   Q    And why are there so many employees who are assigned to

20   gTech, Ms. Stefaniu?

21   A    Because Google supports so many customers on a daily

22   basis.

23   Q    Okay.  Now, how long were you an account manager

24   associated with Google Ads?

25   A    I was an --

9

Direct Examination - S. Stefaniu

1    Q    Can you give us a time period?

2    A    I was an account manager from February 2018 through

3    September 2022.

4    Q    And during that period, were you familiar with and able

5    to actually log into the Google Ads interface?

6    A    Yes.

7    Q    And did you have firsthand knowledge and familiarity

8    with that product?

9    A    Yes.

10   Q    Now, walking through the rotational program, which is

11   how you first got hired for Google Ads, how many rotations

12   did you go through as a rotational account manager?

13   A    I supported three different rotations.

14   Q    Okay.  And why is there a rotational program like this?

15   A    The rotational program was founded because of Google's,

16   in my opinion, wonderful parental leave policies, and we

17   came into six-month rotations to support a Googler on a team

18   that was on parental leave.

19   Q    And then after you finished your three rotations, did

20   you get assigned to a permanent position as an account

21   manager for Google Ads?

22   A    I did.

23   Q    Okay.  So walking through each of the rotations in

24   turn, Ms. Stefaniu, what was your first rotation and what

25   did you cover?

Direct Examination - S. Stefaniu

1   A    I supported a team in Seattle supporting Amazon.

2   Q    Now, I just want to make sure we got that clear.  Was

3   Amazon at that point in time then a Google Ads customer?

4   A    Yes.

5   Q    And what are the kind of campaigns that you helped

6   support in that first rotation for Amazon using Google Ads?

7   A    I helped support launches for a variety of campaigns

8   that they ran, search campaigns, display campaigns, video

9   campaigns for their various business units, like Amazon

10  Prime Video, AWS, their devices business.

11  Q    And are there very specific campaigns that you can

12  recall?  Let's take for example in the Amazon video

13  business.

14  A    Yes.  I helped support the launch of premiers for

15  different Amazon Prime Video series, one of which being

16  "Jack Ryan," another one being "The Marvelous Mrs. Maisel."

17  Those were the two most notable ones that come to mind.

18  Q    And what was the objective of those campaigns that you

19  helped support in that first rotation?

20  A    The objective was to drive mass brand awareness for

21  these new series that were launching.

22  Q    And what about for another of Amazon businesses, the

23  retail business?  Do you recall working on a campaign in

24  connection with Prime?

25  A    Yes.  I helped support the Amazon Prime Day launch in

Direct Examination - S. Stefaniu

1  2018.

2  Q    Just in case there's somebody who is not familiar with

3  Amazon Prime --

4        THE COURT:  You don't have to go into that.

5        MS. RHEE:  Okay.

6  BY MS. RHEE:

7  Q    Again, in connection with each of these examples, what

8  was the Google tool that these large customers used?

9  A    Google Ads.

10 Q    Okay.  Now, was Amazon one of the larger customers who

11 used Google Ads during your time supporting Google Ads

12 accounts?

13 A    Yes.

14 Q    Were they the largest customer?

15 A    They were the second-largest customer at the time I was

16 servicing them.

17 Q    Who was the largest customer?

18 A    The largest customer was Booking.com.

19 Q    And, again, just in case people don't know, what is

20 Booking.com --

21        THE COURT:  It's all right.  We know what that is

22 too.

23        MS. RHEE:  Okay.  Great.

24 BY MS. RHEE:

25 Q    Let's go to your second rotation, Ms. Stefaniu.  What

Direct Examination - S. Stefaniu

1  did you cover as an account manager for Google in your

2  second rotation?

3  A    I supported web, newspaper, and book publishers in New

4  York.

5  Q    Can you give us specific names of those kinds of Google

6  Ads customers you supported in your second rotation?

7  A    Yes.  I supported Condé Nast and their different

8  business lines.  I also supported Penguin Random House and

9  HarperCollins.  And I also worked with *New York Times* and

10 *Wall Street Journal*.

11 Q    And can you give the Court specific examples of the

12 kind of campaigns that you helped support for these large

13 publishing advertisers when you were working on Google Ads?

14 A    Yes.  Like Amazon, I helped launch search, display, and

15 video campaigns for all of these different customers.

16 Q    And is there a specific, for example, a book campaign

17 that you could walk us through on what you did?

18 A    Yes.  I consulted with Penguin Random House to help

19 launch display campaigns for the publication "Where the

20 Crawdad Sings."

21 Q    Now, turning to your third rotation when you were on

22 the rotational program as an account manager for Google,

23 what did you cover in that third and last rotation?

24 A    I supported the federal agency team in Washington, DC.

25 Q    And how many federal agencies were covered by that

13

Direct Examination - S. Stefaniu

 1  federal agency team in Washington, DC?

 2  A    At the time that I was supporting them, about 65.

 3  Q    And can you give the Court an example of a specific

 4  campaign that you worked with during that third rotation in

 5  connection with the federal agency?

 6  A    Sure.  I helped launch search campaigns for the

 7  Department of Veterans Affairs, specifically ensuring that

 8  certain search text ads popped up when keywords around

 9  veteran mental health crises were being searched for in

10  Google.com.

11  Q    And what about display campaigns?  Did you cover those

12  as well?

13  A    I did.

14  Q    Can you give the Court an example of one of those?

15  A    Yes.  I helped the Social Security Administration

16  launch a number of different display campaigns to ensure

17  that retirees knew of their public benefits.

18  Q    Now, in connection with supporting large customers both

19  in your rotational position, as well as your permanent

20  position for Google Ads, what kind of different types of

21  campaigns did you cover?  You talked about search.  You

22  talked about display.  Any others?

23  A    Video campaigns as well.

24  Q    And how long were you an account manager -- I think we

25  actually covered that.  So from 2018 to 2022?

Direct Examination - S. Stefaniu

1    A    That is right.

2    Q    Okay.  Now, Ms. Stefaniu, did you prepare some

3    demonstratives to show the Court how to use each one of

4    these tools, Google Ads and DV360?

5    A    I did.

6    Q    Okay.  So if we could please turn to and pull up on the

7    screen Stefaniu Demonstrative 1.1.

8              And, Ms. Stefaniu, you can see it --

9              MS. CLEMONS:  Your Honor, we just want to preserve

10   any objections to testimony based on this document, which

11   is -- it appears to have been created in the last week or

12   two -- on any testimony beyond her time period with Google

13   Ads, which ended in September 2022.

14             THE COURT:  All right.

15   BY MS. RHEE:

16   Q    Okay.  Ms. Stefaniu, do you see the screen in front of

17   you?

18   A    I do.

19   Q    Okay.  And is this screen the landing page for a Google

20   Ads customer?

21   A    This is what a customer would see when they sign up for

22   a Google Ads account, though there are some steps before

23   this where the customer would need to submit billing

24   information and basic information about their business once

25   they appear on the Google Ads public website to sign up for

Direct Examination - S. Stefaniu

1    the account.

2    Q    Now, in addition to just signing up for the account on

3    the Google Ads website, are you familiar with or aware of

4    other vetting steps that Google takes before a new potential

5    advertiser can be a Google Ads customer?

6    A    Yes.

7    Q    And just at a high level, what are you aware of?

8    A    Of a billing verification process.

9    Q    Okay.  So, now, when a Google Ads customer logs into

10   their Google Ads account and wants to launch a new campaign,

11   is this the page that they see?

12   A    They do.

13   Q    Okay.  And then directing your attention --

14        MS. RHEE:  And if we could, blow up to the text

15   here --

16   BY MS. RHEE:

17   Q    Underneath the "Welcome to Google Ads," what kind of

18   channels and formats can a Google Ads advertiser run their

19   Google Ads campaign on?

20   A    They'd be able to do this on a vast network of search,

21   websites, videos, bubble apps, and shopping listings, as

22   well as more.

23   Q    Okay.  Is this the same as when you were actually

24   working in Google Ads?

25   A    Very much so.

Direct Examination - S. Stefaniu

1    Q    Okay.  Now, what does an advertiser do when they get to

2    this landing page and they would like to create a new

3    campaign?

4    A    There is a large "New Campaign" button that they can

5    click.

6    Q    Okay.  So did you click that button in order to create

7    this demonstrative?

8    A    That's correct.

9    Q    Okay.  Let's go to Stefaniu Demonstrative 1.2.  Is this

10   the page that pops up when you click that nice blue button?

11   A    It is.

12   Q    Okay.  And so what does the advertiser do next here,

13   and what are we seeing on the screen?

14   A    The advertiser is prompted to choose an objective.

15   Q    Okay.  Now, if this is a brand-new Google Ads

16   advertiser, somebody who has never run a digital ad campaign

17   before, what happens if that advertiser doesn't know exactly

18   what the campaign objective should be?

19   A    There's an option for them to create a campaign without

20   Google's guidance.

21   Q    And then if you have a very large Google Ads customer,

22   like an Amazon or a Random House, are there different

23   options for at least that swathe of customer?

24   A    Yes.  They can select, say, the sales button in that

25   case.

Direct Examination - S. Stefaniu

1  Q    Okay.  And if they want to select as the campaign
2  objective driving sales, what does it tell you in terms of
3  what that campaign objective is here on the interface?
4  A    To drive sales online, in app, by phone, or in store.
5  Q    Okay.  So let's use the example of the brand-new, never
6  before digital advertising customer here and what happens
7  after you click "I'm going to create a campaign" and I'm not
8  quite sure what I'm doing here.
9  A    The advertiser is then prompted to select a campaign
10 type.
11 Q    Okay.  In terms of campaign types here on the
12 interface, is "display" a campaign type that's available on
13 Google Ads?
14 A    It is.
15 Q    Okay.  And if a Google Ads advertiser is interested in
16 a display campaign, what does the Google Ads interface tell
17 that customer?
18 A    That the customer can reach users across 3 million
19 sites and apps with engaging creative.
20 Q    And if an advertiser is interested in a display
21 campaign, does that campaign type support video ads?
22 A    It does.
23 Q    What about ads that appear in apps?
24 A    Yes.
25 Q    What about websites?

18

Direct Examination - S. Stefaniu

1   A    Yes.

2   Q    Now, is there a campaign type on Google Ads that serves

3   only ads on websites and not apps?

4   A    No.

5   Q    Why is that, Ms. Stefaniu?

6   A    Well, websites do still exist today.  More and more

7   individuals are using apps to consume information primarily

8   on their mobile device or tablet.

9   Q    Okay.  Now, you see amongst the options here a campaign

10  type called "performance max"?

11  A    That's correct.

12  Q    Okay.  And what is performance max?

13  A    It is a campaign type where the advertiser can reach

14  audiences across all of Google with a single campaign.

15  Q    So I just want to make sure.  In other words, if an

16  advertiser chooses performance max, does that encompass

17  search?

18  A    It does.

19  Q    Display?

20  A    It does.

21  Q    Video?

22  A    Yes.

23  Q    App?

24  A    Yes.

25  Q    Okay.  Now, after a Google Ads advertiser selects the

Direct Examination - S. Stefaniu

1  campaign type, where does that advertiser go next in Google
2  Ads?
3  A    They would select "continue" and then be prompted to a
4  campaign settings page.
5  Q    Okay.  Now, is this Stefaniu Demonstrative 1.4?
6  A    Yes.
7  Q    Okay.  And the first prompt with respect to selection
8  of campaign settings is location.  Do you see that?
9  A    That's correct.
10 Q    Okay.  Now, what does it mean for a Google Ads
11 advertiser to select a specific location?
12 A    The advertiser would be able to reach users who are
13 in -- regularly in and/or show interest in particular
14 locations.
15 Q    Now, how broad can the location setting be set by a
16 Google Ads advertiser?
17 A    It could be set as broad as the advertiser would like.
18 Q    So, for example, here on the screen, can an advertiser
19 select all countries and territories around the world?
20 A    That is an option, yes.
21 Q    Okay.  And how specific can a Google Ads advertiser get
22 with respect to the locations in which they want to serve
23 their ad?
24 A    Very specific.
25 Q    Okay.  So let's go to the next demonstrative that you

Direct Examination - S. Stefaniu

1  prepared.  This is Stefaniu Demonstrative 1.5; is that

2  right, Ms. Stefaniu?

3  A    That is correct.

4  Q    Okay.  So, now, in demonstrating how specific an

5  advertiser can get in selecting the location in which they

6  want their ads to appear, what is the location criteria that

7  is set here?

8  A    This is a ZIP code, and it is specifically my ZIP code.

9  Q    Okay.  So I'm not going to ask that you read it into

10  record.

11        What does it mean for a Google Ads advertiser to

12  target a ZIP code?

13  A    They'd be able to reach users who are in, regularly in,

14  or show interest in this particular ZIP code.

15  Q    Now, can you give the Court an example of a Google Ads

16  advertiser that may be interested in targeting a specific

17  ZIP code?

18  A    It could be a brick-and-mortar business that only

19  services individuals in this particular ZIP code.

20  Q    So by brick-and-mortar, as an example, perhaps a

21  restaurant?

22  A    That's correct.

23  Q    And why is it that a restaurant in a certain actual

24  physical location is potentially interested in just

25  targeting that ZIP code?

Direct Examination - S. Stefaniu

1    A    Because they would only be able to reach individuals

2    who are maybe living in this location.

3    Q    Okay.  Now, after making a location selection, let's go

4    back.  What are the next and additional campaign settings

5    that a Google Ads advertiser can choose?

6    A    They'd be able to select ad schedule here.

7    Q    Okay.  And then you see they also can select ad

8    rotation?

9    A    Yes.

10   Q    Okay.  And then above that, right underneath location,

11   they can select language; is that right?

12   A    That is correct.

13   Q    Okay.  So how many languages can an advertiser choose

14   from?

15   A    Dozens.

16   Q    And what is an example, if you can give one to the

17   Court, of an advertiser, a Google Ads advertiser who may be

18   interested in targeting a particular language over another?

19   A    The brick-and-mortar business may just be servicing

20   people who speak Italian.  If it's, say, a pizza restaurant

21   or Italian restaurant, they can reach users who exclusively

22   speak Italian.

23   Q    Now, within the new campaign settings, you also talked

24   about ad rotation?

25   A    That is correct.

Direct Examination - S. Stefaniu

1   Q    Can you explain to the Court what that is?

2   A    This is a means by which Google Ads can automatically

3   surface ads based on their performance.  There is also an

4   option for the ads to rotate evenly, which means the system

5   will just serve ads, again, evenly throughout the course of

6   the campaign duration.

7   Q    Now, what about ad schedule, Ms. Stefaniu?  What are

8   the Google Ads advertisers able to do with respect to

9   selection of when their ads appear?

10  A    The advertiser can use this setting to only show their

11  ads during a particular time of the day.

12  Q    Now, using the same example that you gave to the Court

13  of a pizza shop in a particular ZIP code, why would that

14  advertiser perhaps want to run ads at a certain time versus

15  another time?

16  A    The advertiser may want to be reaching parents who are

17  waiting to pick their child up from school in the carpool

18  line.

19  Q    And so are you able to actually specify in this

20  interface to run ads at the time that school pickup happens?

21  A    In the afternoon, yes.

22  Q    Now, you see the screen in front of you.  Within

23  campaign settings, after you run through everything that we

24  just talked about, you have the ability to select devices;

25  is that right?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - S. Stefaniu

1    A    You do.

2    Q    Okay.  What is the device setting that is available or

3    the device settings that are available to a Google Ads

4    advertiser?

5    A    Computers, mobile phones, and tablets.

6    Q    Okay.  And does that actually tell the Google Ads

7    advertiser that they can select what type of device their

8    ads run on?

9    A    That's correct.

10   Q    Okay.  And is a Google Ads advertiser able to select

11   all three types of devices?

12   A    They are.

13   Q    Two of the three types of devices?

14   A    Yes.

15   Q    And are they able to select just one type of device?

16   A    That's correct.

17   Q    Okay.  So, now, Ms. Stefaniu, what happens when a

18   Google Ads advertiser selects just computers on this

19   interface?

20   A    There is a large warning sign that appears in the

21   interface.

22          MS. RHEE:  Okay.  And if we could, blow that up.

23   BY MS. RHEE:

24   Q    Okay.  So here a Google Ads advertiser has selected

25   "just computers."  And when you talk about the warning, what

24

Direct Examination - S. Stefaniu

1    pops up, Ms. Stefaniu?

2    A    A universal warning sign for danger icon pops up, and

3    the specific language that appears is "Targeting computers

4    isn't compatible with advanced mobile and tablet targeting

5    options."

6    Q    Okay.  Why does a warning pop up with that

7    triangle/exclamation point next to it?

8    A    This is the system letting this particular customer

9    know that they may not be reaching the full breadth of users

10   they can likely reach with this particular campaign if they

11   were only targeting computers.

12   Q    Now, does that same warning pop up if a Google Ads

13   advertiser selects only mobile phones?

14   A    It does not.

15   Q    Does that same warning appear if a Google Ads

16   advertiser selects only smart tablets?

17   A    No.

18   Q    Why is that, Ms. Stefaniu?

19   A    That's because most individuals today are using mobile

20   phones and/or tablets to consume information online.

21   Q    Now, in the entire time that you were an account

22   manager for Google Ads, did you encounter a single

23   advertising customer who wanted to select only computers?

24   A    No.

25   Q    And, again, why is that?

Direct Examination - S. Stefaniu

1    A    For the same purpose that I just mentioned.  These

2    advertisers would want to be reaching as many individuals as

3    possible, again, on the devices that they frequent.  So

4    that's the reason why that never popped up in conversation.

5    Q    Okay.  So now after making --

6         MS. CLEMONS:  Objection, Your Honor, to the extent

7    she is trying to speak about what advertisers want and she

8    is not an advertiser.

9         THE COURT:  Well, I didn't see that as a problem.

10   She's testifying as to what her experience is as to what

11   happened.  That's all I'm taking that for.

12   BY MS. RHEE:

13   Q    Okay.  Now, Ms. Stefaniu, after making the device

14   selection, where does the Google Ads advertiser go next?

15   A    This page where they can select start and end dates for

16   their campaign, as well as content exclusions.

17        MS. RHEE:  Okay.  So if we could, blow up for

18   those of us who really appreciate the blowup content

19   exclusions.

20   BY MS. RHEE:

21   Q    Can you explain for the Court what content exclusions

22   are for a Google Ads advertiser?

23   A    Yes.  These are a series of options, as you see here on

24   the screen, that allow an advertiser to opt out of showing

25   their ads on content that may not be suitable for their

Direct Examination - S. Stefaniu

1    brand.

2    Q    Okay.  So using the example that you gave of the local

3    pizza joint in a specific ZIP code, if that advertiser is

4    interested in the after-school family crowd, what are the

5    kind of content exclusions that that advertiser can select

6    to make sure their ads don't appear next to certain kinds of

7    content?

8    A    They'd be able to select any of these categories.  They

9    may not want to run on content for mature audiences or

10   content that has profane or rough language on it in this

11   example.

12   Q    Okay.  After the Google Ads advertiser makes the

13   content exclusion selections, what does the Google

14   advertiser need to do next?

15   A    They'd click the "Next" button, and then they'd be

16   prompted to a budget and bidding settings page.

17   Q    Okay.  And here in this demonstrative, the top of the

18   interface asks for a daily budget; is that right?

19   A    That's correct.

20   Q    And what is a daily budget?

21   A    This is the amount that the advertiser would like to

22   spend each day on this particular campaign.

23   Q    Now, is there a minimum daily budget for a Google Ads

24   advertiser to use this interface?

25   A    There is no minimum.

Direct Examination - S. Stefaniu

1  Q    Okay.  So could a Google Ads advertiser, for example,
2  just select 1 cent every day?
3  A    That's correct.
4  Q    Okay.  Now, conversely, Ms. Stefaniu, is there a
5  maximum daily budget limit that is placed on a Google Ads
6  advertiser?
7  A    I never saw any maximum threshold.
8  Q    In your time working on Google Ads accounts, what is
9  the largest daily budget that you worked with for an
10 advertiser?
11 A    I have seen advertisers spend four, five, six figures
12 daily and at times millions.
13 Q    And does the interface allow that range from either a
14 cent up to millions a day?
15 A    That's correct.
16 Q    So after setting the daily budget, where does the
17 Google Ads advertiser go next, Ms. Stefaniu?
18 A    The biddings settings section.
19 Q    Okay.  And, similarly, how much control does the
20 interface give a Google Ads advertiser over how they set
21 their bid?
22 A    All the control they would like.
23 Q    Okay.  And if, for example, you're a brand-new digital
24 advertiser and this is your very first campaign and maybe
25 you don't quite know what you're doing, is there an option

28

Direct Examination - S. Stefaniu

1   in this interface that allows the bidding process and

2   selection to be automated?

3   A    That's correct.

4   Q    And if you are one of the larger, more sophisticated

5   Google Ads advertisers, like an Amazon, are there manual

6   settings and/or the ability to manually input what the

7   bidding strategy and the bidding terms should be?

8   A    That's correct.

9   Q    Okay.  Now, after selecting the bidding terms and the

10  bidding strategy, what additional settings are available to

11  a Google Ads advertiser?

12  A    Targeting settings.

13  Q    Okay.  And are these additional types of targeting

14  criteria that an advertiser can select beyond what we

15  already covered, like location, language, and the like?

16  A    That's correct.

17  Q    Okay.  So, now, how granular can an advertiser get in

18  terms of what targeting criteria they would like to select?

19  A    Very granular.

20  Q    Okay.  So let's walk through your pizza restaurant

21  example.  Through this interface, is that pizza advertiser

22  able to select the kind of audience they would like to

23  reach?

24  A    Yes, there's a variety of audience segments available

25  to the advertiser.

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - S. Stefaniu

1  Q     And when you talk about audience segments, can you

2  explain for the Court what you mean by that?

3  A     These are groups that Google Ads has matched together

4  based on their shared interests and demographics.

5  Q     Okay.  And so here on the screen in the demonstrative,

6  what did you select in terms of an audience segment for this

7  pizza restaurant in your scenario?

8  A     Three different audience segments, pizzerias and pizza

9  deliveries, pizza delivery, and pizza restaurants.

10  Q     Okay.  And admission to selecting an audience segment,

11  is the Google Ads interface able to provide the Google Ads

12  advertiser more specific demographic criteria?

13  A     Yes.

14  Q     Okay.  So let's go to the next demonstrative that you

15  prepared.

16        MS. RHEE:  And if we could, blow that up.

17  BY MS. RHEE:

18  Q     And here, in terms of additional demographics, again

19  using your pizza restaurant example, what might this pizza

20  restaurant want to select in terms of demographics that they

21  want to target?

22  A     In the case where we were talking about parents waiting

23  to pick their children up from school, they may just want to

24  target parents, and specifically, you can also target

25  parents who have children of certain ages.

Direct Examination - S. Stefaniu

1   Q    So not parents of grownup children but school-aged

2   children?

3   A    That's correct.

4   Q    Okay.  And then, again, even though the demonstrative

5   doesn't capture all the different targeting criteria,

6   approximately how many different types of targeting criteria

7   are we talking about here in the interface?

8   A    A hundred plus.

9   Q    And how is it that Google is able to provide a Google

10  Ads advertiser these kinds of audience slices and segments

11  and demographics?

12  A    Google technologies can assess a user's activity on

13  different Google sites, as well as third-party websites to

14  compile these groups.

15  Q    And just using an example that the Court may be

16  familiar with, can a Google Ads advertiser use these more

17  granular targeting criteria to select football fans?

18  A    That's correct.

19  Q    As well as spaghetti fans?

20  A    Yes.

21  Q    And an audience that likes both football and spaghetti?

22  A    Absolutely.

23  Q    Okay.  Now, after the selection of additional targets,

24  here on the side of this interface, there is a sidebar that

25  talks about estimated performance.  Do you see that?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - S. Stefaniu

1   A     I do.

2   Q     What is Google Ads providing this Google Ads advertiser

3   at this time?

4   A     Based on all of the settings that have been input so

5   far, the platform gives an estimate as to how much

6   performance that this particular advertiser can derive,

7   again, based on the inputs that they've selected.

8   Q     Okay.  And, again, how is Google able to provide this

9   estimate just based on the targeting settings and the daily

10  budget that they've input already?

11  A     Sophisticated machine-learning capabilities that are

12  part of this platform.

13  Q     Okay.  Now, after going through all of that and

14  tinkering with all of the options, at that point in time,

15  what does a Google Ads advertiser need to do next in order

16  to run a campaign?

17  A     They will be prompted to actually create the ad.

18  Q     Okay.  When you say "create the ad," is that the actual

19  thing that the user sees?

20  A     That's correct.

21  Q     Okay.  Now, again, if the Google Ads advertiser is a

22  large and sophisticated advertiser, like an Amazon, is there

23  the ability for that advertiser just to upload the ad

24  creative that has already been prepared elsewhere and

25  through others?

Direct Examination - S. Stefaniu

1   A    Yes.

2   Q    Okay.  Now, what about a brand-new Google Ads

3   advertiser who's never done this before and doesn't have a

4   fancy ad agency behind them?

5   A    Google Ads can provide sample images for that

6   adviser.

7   Q    Okay.  So going to the next demonstrative you prepared,

8   are these sample images for your pizza joint?

9   A    That's correct.

10  Q    And how does Google offer up these images?

11  A    In this case, we inputted the website of the business,

12  and these images had appeared.

13  Q    Okay.  And so is the Google Ads advertiser able to

14  select from these images, these stock images, in order to

15  create an ad through the interface?

16  A    That's correct.

17  Q    Okay.  So in addition to an image selection, is the

18  advertiser able to just put in some keywords in order to get

19  text to appear around the image to create an ad?

20  A    Yes.

21  Q    Okay.  So, for example, for this advertiser, what are

22  the kinds of just words that they might put in in order to

23  help generate the ad?

24  A    Pizza, wood oven, fire pizza.

25  Q    Okay.  And then if you go to the next demonstrative

Direct Examination - S. Stefaniu

1  that you prepared, what is the helpful kind of toolbar help
2  information that is provided on the side here?
3  A   This is --
4        MS. RHEE:  If we could, pull it up.  Thank you.
5  A   This is providing more details about a responsive
6  display ad, as well as the various optimization options that
7  a customer can leverage as part of this ad.
8  Q   Okay.  So now, using the same image and the same
9  keyword, does the interface allow a brand-new Google Ads
10  advertiser to create a static image ad?
11  A   Yes.
12  Q   What about a video ad?
13  A   That's correct.
14  Q   And what about a native ad?
15  A   Yes.
16  Q   So after the Google Ads advertiser either uploads their
17  own ad creative or uses this interface to generate an actual
18  advertisement, what happens next?
19  A   They'd be able to see a preview of that ad, again,
20  based on the inputs they've selected and optimizations
21  they've selected on the right-hand side of the screen.
22  Q   Okay.  And this is your stock image of pizza with a
23  craft pizza experience that you selected here?
24  A   That's correct.
25  Q   Okay.  Now, after a campaign has actually been created

Direct Examination - S. Stefaniu

1    and then launched, does Google Ads provide reporting metrics

2    and reporting features for any Google Ads advertiser?

3    A    Yes.

4    Q    Okay.  So if we could, go to the next demonstrative.

5    What are we seeing here, Ms. Stefaniu?

6    A    This specific demonstrative is of an insights page.

7    Q    Okay.  And when it says "Insights and Reports," what is

8    available to a Google Ads advertiser after they have

9    actually launched their campaign?

10   A    A variety of different reports where the advertiser can

11   track performance of either this particular campaign or the

12   series of campaigns that are running in this account.

13   Q    So, now, because we don't have time to sit here all day

14   playing with the Google Ads interface, can you tell the

15   Court how many different slices of metrics and measurements

16   are available to a Google Ads advertiser on the insights and

17   reports page?

18   A    Over a hundred.

19   Q    Now, Ms. Stefaniu, have you prepared a similar

20   demonstration for the Court with respect to DV360?

21   A    I have.

22   Q    Okay.  So now if we could, go to your

23   Demonstrative 1.20.  Similarly, without getting into the

24   details, does a DV360 advertising customer need to get

25   vetted in order to actually get an account to log in?

Direct Examination - S. Stefaniu

1    A    There is a contracting process --

2          MS. CLEMONS:  Your Honor, I just want to preserve

3    for the record the objection to any testimony about DV360

4    prior -- or from after September of 2023.

5          THE COURT:  All right.

6    BY MS. RHEE:

7    Q    So if you could, answer, Ms. Stefaniu.

8    A    There is a contracting process involved in order for an

9    advertiser to have access to a DV360 account.

10   Q    Okay.  And if that advertiser successfully gets through

11   the contracting process, are they able to log in with an

12   account to DV360?

13   A    Yes.

14   Q    Okay.  Now, going through the same --

15         THE COURT:  Well, how different is that process

16   from Google Ads?

17         THE WITNESS:  I'm not familiar with the

18   contracting process, Your Honor.  I've never supported

19   customers that were in DV360 accounts.  I only supported on

20   the Google Ads side, but I'm aware of the contracting

21   process.

22         MS. RHEE:  So let me just lay the foundation, Your

23   Honor.

24   BY MS. RHEE:

25   Q    Even though you did not have individual customers for

                                                        36

Direct Examination - S. Stefaniu

1    DV360, in your current position that you've been in since

2    April of 2023, are you familiar with how the DV360 interface

3    works?

4    A    I am.

5    Q    And have you actually been in the actual interface

6    yourself to know its functionality?

7    A    Yes.

8              THE COURT:  Is that the area that you were

9    objecting to?

10             MS. CLEMONS:  Just in general, anything that she

11   does not have personal knowledge with respect to.  So if

12   there's any testimony about how advertisers would use this

13   or --

14             THE COURT:  I'm going to sustain the objection.  I

15   don't think the witness is qualified on DV360.

16             MS. RHEE:  I think a foundation has been laid with

17   respect to its functionality, Your Honor.

18             THE COURT:  No.  I'm sustaining the objection.

19   BY MS. RHEE::

20   Q    Ms. Stefaniu, with respect to its features and its

21   capabilities, do you have direct firsthand knowledge?

22   A    I do.

23             MS. RHEE:  And, Your Honor, at this point in

24   time --

25             THE COURT:  That means have you actually worked

Direct Examination - S. Stefaniu

1  with it.  Have you actually worked with customers?

2           THE WITNESS:  I have never worked with customers

3  on their DV360 campaigns, but my current role does work with

4  specific widgets that are features in DV360.  And so I have

5  access to DV360 as a platform.

6           THE COURT:  Since you left the previous position?

7           THE WITNESS:  My previous position only -- I only

8  worked with customers in their Google Ads accounts.  There

9  was a separate account team called a programmatic account

10 team that would have access to my customer's DV360 accounts,

11 and those individuals worked in their accounts directly.

12          MS. RHEE:  And, Your Honor, if we limit this to

13 the functionality because she has direct personal knowledge

14 of its interface and what it's doing, we will not ask about

15 advertisers.

16          MS. CLEMONS:  Your Honor, we would just continue

17 to object to any testimony other than this is what the

18 interface looked like over a year ago.

19          THE COURT:  Can you tell if there's been any

20 difference done to the DV360 since the time that you left

21 your position?

22          THE WITNESS:  Because I didn't have access to my

23 customer's DV360 accounts when I was working on Google Ads

24 teams, I don't have knowledge of what the interface looked

25 like prior to today.

Direct Examination - S. Stefaniu

1      THE COURT:  Did you prepare the slides that we're
2  about to go through?
3      THE WITNESS:  Yes.
4      THE COURT:  And the data that you used for
5  preparing them came from what sources?
6      THE WITNESS:  This is a test account that was
7  created for the purpose of the walk-through with you.
8      THE COURT:  Do you know whether or not this set of
9  instructions and pages existed during the time period that's
10  relevant here?
11      THE WITNESS:  Yes.
12      THE COURT:  So what's the date you're looking at?
13      MS. CLEMONS:  So the discovery cutoff was
14  September 2023, Your Honor.
15      THE COURT:  All right.  Do you know whether or not
16  the pictures that are in this slide set would have existed
17  before September of 2023?
18      THE WITNESS:  I knew about the details of what is
19  in the DV360 interface, and all of what I'm going to walk
20  through is what had been offered, to my knowledge, when I
21  was working with customers directly with Google Ads.
22      MS. RHEE:  And let me -- if I could just clarify,
23  Your Honor.
24  BY MS. RHEE:
25  Q    Ms. Stefaniu, are you currently in a role that supports

39

Direct Examination - S. Stefaniu

1    DV360?

2    A    I am.  I started that role in April of 2023.

3    Q    Okay.  And is your demonstration that you prepared

4    walking through the interface and features that were

5    available to DV360 when you started in April 2023?

6    A    That's correct.

7              THE COURT:  All right.  I will let the testimony

8    come in, but I put a star by it.  Okay.

9    BY MS. RHEE:

10   Q    Okay.  So now, Ms. Stefaniu, for DV360 in this test

11   account, for somebody who is interested in a new campaign,

12   is this what the interface for DV360 looks like?

13   A    Yes.

14   Q    Okay.  And then can you see there is a big blue button

15   that says "New Campaign" similar to what we just saw in

16   Google Ads?

17   A    That's correct.

18   Q    Okay.  What happens when you click on that new campaign

19   button?  Where does the DV360 interface go to next?

20   A    Like in Google Ads, you are prompted to a campaign

21   settings page.

22   Q    Okay.  And in that campaign settings page on Google

23   360, is there a tab that talks about the selection of an

24   overall campaign goal?

25   A    That's correct.

Direct Examination - S. Stefaniu

1  Q    Okay.  And then, similarly, is there a selection for
2  the creative type that is expected to be used in connection
3  with that campaign?
4  A    That's correct.
5  Q    Okay.  And with respect to the creative type that is
6  expected to be used, you see there are three boxes?
7  A    Yes.
8  Q    Okay.  And are those boxes display, video, and audio?
9  A    That's correct.
10 Q    Okay.  Now, with respect to the display box, what are
11 the types of ads that can be shown if there is the selection
12 of that display box?
13 A    Like in Google Ads, these would be images and videos.
14 Q    Okay.  And does that also include native ads?
15 A    That's correct.
16 Q    Okay.  Now, if there is a selection of the video box,
17 what is able to be shown?
18 A    Short videos.
19 Q    Okay.  And does that include instream, as well as
20 outstream video?
21 A    That's correct.
22 Q    Okay.  And what is the audio box?
23 A    This would be a voice clip or just sound clip that a
24 customer may have that they can advertise.
25 Q    Now, all of these types of ads, can they appear through

Direct Examination - S. Stefaniu

1   the DV360 interface on websites?

2   A    Yes.

3   Q    In apps?

4   A    Yes.

5   Q    On smartphones?

6   A    Yes.

7   Q    Okay.  On smart tablets?

8   A    Yes.

9   Q    What about connected television?

10  A    Yes.

11  Q    And what about other digital out-of-home locations?

12  A    Yes.

13          MS. RHEE:  Okay.  Now, if we could, get out of the

14  creative type here.

15  BY MS. RHEE:

16  Q    After going through the campaign criteria, does a DV360

17  interface have an inventory source page?

18  A    It does.

19          MS. RHEE:  Okay.  So if we could, please go to

20  Demonstrative 1.24.

21  BY MS. RHEE:

22  Q    Okay.  Now, Ms. Stefaniu, what does "inventory source"

23  mean?

24  A    This would be the different publishers that an

25  advertiser can place their ad on.

Direct Examination - S. Stefaniu

1          MS. RHEE:  Now, if we could, go to public

2   inventory on that interface --I.  Think that is the next

3   demonstrative.  Thank you, Mr. Spalding.

4   BY MS. RHEE:

5   Q    How many different public inventory sources are

6   available on the DV360 interface for a DV360 customer?

7   A    Over a hundred.

8   Q    Okay.  And if we could actually start scrolling down

9   that selection list, does it include --

10         MS. CLEMONS:  Objection again, Your Honor, to the

11  extent that this is not the same as it was a year ago.

12         MS. RHEE:  I can lay the foundation for each of

13  the inventory sources at issue, Your Honor.

14         THE COURT:  Go ahead.

15  BY MS. RHEE:

16  Q    Now, in the public inventory sources available for a

17  DV360 customer, does that include Google Ads manager?

18  A    Yes.

19         MS. RHEE:  Okay.  So if we could, pause there,

20  Mr. Spalding.

21  BY MS. RHEE:

22  Q    And was that a feature that was available or an

23  inventory source available back in April of 2023?

24  A    That's correct.

25  Q    Okay.  Now, on the DV360 interface, Ms. Stefaniu, is a

                                                                43

Direct Examination - S. Stefaniu

1  DV360 customer able to unclick or click on that particular
2  box?
3  A    That's correct.
4  Q    Okay.  What happens if the DV360 customer clicks on
5  that box?
6  A    Then they would be able to serve on inventory through
7  this exchange.
8  Q    Okay.  And if they unclick the box, what happens?
9  A    They would not be able to serve on inventory offered
10 through this exchange.
11 Q    Okay.  Now, is there a feature on DV360 that was
12 available in April of 2023 where a DV360 customer could
13 select all the inventory sources available on this dropdown?
14 A    With the exception of Netflix and potentially a few
15 others, yes.
16 Q    Okay.  And now, similarly, was the DV360 customer back
17 in April 2023 able to just select either one or a handful of
18 these inventory sources by going through and clicking on
19 these boxes?
20 A    That's correct.
21 Q    Okay.  So if we could keep going through, in April of
22 2023, did the inventory sources that a DV360 customer could
23 bid on include third-party exchanges?
24 A    Yes.
25 Q    And did that include the Index Exchange, which we can

Direct Examination - S. Stefaniu

1   scroll through and find here?

2   A    Yes.

3   Q    Okay.  And did it include --

4         MS. CLEMONS:  Objection, Your Honor, again to the

5   extent I don't think that foundation has been laid with

6   respect to whether Ms. Stefaniu was familiar with all of the

7   exchanges that are or were not available on DV360.

8         THE COURT:  Are you familiar with all the

9   exchanges that are listed on this list?

10         THE WITNESS:  There have been some that have been

11  added since I joined the -- my current role in April.

12         THE COURT:  All right.  Just address the ones that

13  you know were there before April.

14         MS. RHEE:  And I believe that was the form of the

15  question, Your Honor.

16  BY MS. RHEE:

17  Q    So back in April of 2023, could a DV360 customer bid on

18  Index Exchange inventory?

19  A    Yes.

20  Q    What about Magnite inventory?

21  A    Yes.

22  Q    What about OpenX inventory?

23  A    Yes.

24  Q    What about PubMatic inventory?

25  A    Yes.

Direct Examination - S. Stefaniu

1   Q    And could a DV360 customer back in April of 2023 click

2   on all of those exchanges that we just walked through,

3   Ms. Stefaniu, and unclick Google Ad Manager?

4   A    Yes.

5   Q    Now, if we could pull out of the available inventory,

6   are there targeting options available for DV360 customers on

7   this interface?

8   A    There are.

9   Q    Okay.  And similar to Google Ads, are there demographic

10  targeting criteria that can be selected?

11  A    There are.

12  Q    And how granular can those demographic target

13  selections be?

14  A    Similar to Google Ads, very granular.

15  Q    And similarly, the geographic or the location

16  targeting, is it similar to Google Ads?

17  A    Yes.

18  Q    And was it similar as of April 2023?

19  A    That's correct.

20  Q    And what about language?  As of April 2023, were the

21  language targeting criteria similar to what you walked the

22  Court through with Google Ads?

23  A    That is correct.

24  Q    What about brand --

25          THE COURT:  The word "similar" though is not the

Direct Examination - S. Stefaniu


1  same as the word "same."  So are there some differences

2  between the two in these respects?

3          THE WITNESS:  I don't know whether particular

4  languages had come online since April 2023 through September

5  2023, Your Honor.

6          THE COURT:  So is it possible certain languages

7  would have been available for Google Ads but not for DV360

8  at the same time?

9          THE WITNESS:  It's a possibility that more could

10  have been added during those months.

11          THE COURT:  All right.

12  BY MS. RHEE:

13  Q    If we could, go to brand safety targeting selection.

14  Now, Ms. Stefaniu, here in the DV360 interface, you see a

15  dropdown with respect to brand safety criteria?

16  A    That's correct.

17  Q    And is this what the options looked like to you back in

18  April 2023?

19  A    Yes.

20  Q    Okay.  Now, here, like Google Ads, do you see a brand

21  safety selection criteria with respect to profanity, for

22  example?

23  A    Yes.

24  Q    Shocking content?

25  A    That's correct.

Direct Examination - S. Stefaniu

1   Q     Sensitive social issues?

2   A     Yes.

3   Q     Now, let's go through where the interfaces start to

4   look a little bit different.

5           After setting the campaign selection and criteria

6   for a DV3 customers, is there a thing called an insertion

7   order?

8   A     Yes.

9   Q     Okay.  And what is an insertion order, if you can

10  explain, for the Court?

11  A     This is a level below the campaign level where the

12  advertiser will be able to select a type of insertion order.

13  There are three types.  There's open exchange.  There is

14  connected and screaming devices, and then there's also

15  digital out-of-home.  They'd also be able to select the

16  settings for bidding and budgets and pacing, similar, again,

17  to what you saw in Google Ads for all of the ads that would

18  live under this insertion order, which would be at the line

19  item level.

20  Q     Okay.  And can you explain for the Court what a line

21  item level is?

22  A     This is the third level down where an advertiser would

23  be able to create their ad.

24  Q     And what is the relationship between an insertion order

25  and a line item, Ms. Stefaniu, if you can explain for the

48

Direct Examination - S. Stefaniu

1   Court?

2   A    The ads that live under the line item would be able to

3   pull from the budget and bidding settings noted in the

4   insertion order.

5   Q    But in terms of the bidding and the budgeting, is that

6   similar to what we walked through or you walked the Court

7   through with respect to Google Ads?

8   A    That's correct.

9   Q    Okay.  And with respect to either budgeting or bidding,

10  like Google Ads, is there an automated option for DV360

11  customers?

12  A    That's correct.

13  Q    Now, finally, Ms. Stefaniu, in terms of differences,

14  for a DV360 customer, is there an ability to use the

15  interface to make a direct deal with the publisher without a

16  sales team?

17  A    That's correct.

18          MS. CLEMONS:  Objection, Your Honor.  She

19  mentioned not being aware of contracts or details of DV360

20  customers --

21          MS. RHEE:  This is an interface demonstration,

22  Your Honor.

23          THE COURT:  I'm permitting it.

24  BY MS. RHEE:

25  Q    Okay.  So now for a DV360 customer that might be

49

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - S. Stefaniu

1    interested in a programmatic guaranteed deal, where do they

2    go to in the interface?

3    A    They'd be able to go to the marketplace.

4    Q    Okay.  So let's click on marketplace.  And what shows

5    up?

6    A    These suite of different publishers that the advertiser

7    can negotiate a deal with.

8    Q    Okay.  So what happens here in this roster if a

9    customer finds an inventory source that they might be

10   interested in cutting a deal and placing ads on?

11   A    They can click on a particular publisher.

12   Q    Okay.  So let's go to the next demonstrative.  And if

13   you click on a particular publisher -- and here it's *The New*

14   *York Times* in the marketplace -- what pops up, Ms. Stefaniu?

15   A    A forecast of the characteristics and demographics that

16   this publisher reaches in terms of their user base.

17   Q    And what happens if a DV360 customer clicks on a

18   publisher profile and decides that it would be great if they

19   had the ability to cut a deal and place ads with that

20   publisher?

21   A    They could select their "request for proposal" button.

22   Q    Okay.  And what happens when you click on the "request

23   for proposal" button?  Is this the interface that you're

24   directed to?

25   A    That's correct.

Direct Examination - S. Stefaniu

1   Q    Okay.  And here for the DV360 customer that might be
2   interested in getting a direct deal through this interface
3   without a sales team, what do you put in?
4   A    They'd be able to put in details about the budget they
5   would like to spend; the start/end dates for this deal;
6   their preferred cost-per-impression amount; their inventory
7   type, whether that's guaranteed or not guaranteed; the
8   format of the ad they would like to place; the device type
9   that the user may be frequenting; the country that they
10  would like to reach; as well as audience lists or
11  segmentation details.
12  Q    Now, with respect to the inventory type, Ms. Stefaniu,
13  it looks like there are two options there that you just
14  walked the Court through.  Is that right?
15  A    That's correct.
16  Q    Okay.  What does it mean to select "guaranteed"?
17  A    This is a directly negotiated deal between one single
18  advertiser and a publisher.
19  Q    So is that a guarantee for the delivery of a certain
20  set of impressions and a certain set of criteria?
21  A    For a particular cost per impression amount, yes.
22  Q    Okay.  And then after the DV360 customer fills in all
23  of these selection criteria, what happens when the customer
24  hits "Send the RFP"?
25  A    They would then send the RFP to this publisher.

Cross-Examination - S. Stefaniu

1   Q    Okay.  And if the publisher opens up the RFP and agrees
2   to the terms and conditions that have been filled out, is
3   there a direct deal that is actually transacted through this
4   interface?
5   A    If both parties agree to the deal, then yes.
6   Q    And what if the counterparty or the would-be
7   counterparty wants to negotiate any of these terms and
8   conditions?  Is that capable of being done through the
9   interface?
10  A    That's correct.
11          MS. RHEE:  No further questions, and we pass the
12  witness, Your Honor.
13          THE COURT:  All right.
14          MS. RHEE:  Are there binders?
15          MS. CLEMONS:  There are binders.
16          MS. RHEE:  Okay.
17                    CROSS-EXAMINATION
18  BY MS. CLEMONS:
19  Q    All right.  So, Ms. Stefaniu, during your time at
20  Google, you have not managed any publisher accounts, right?
21  A    I did not work with publishers.  I only worked with
22  advertisers.
23  Q    Okay.  With any of your advertiser accounts, were you
24  ever selling Google's DFP publisher ad server product to any
25  of your accounts?

Cross-Examination - S. Stefaniu

```
 1   A    No.

 2   Q    Or Google's AdX ad exchange product?

 3   A    No.

 4   Q    If you could please in the notebook -- or in the binder

 5   that you have, turn to DTX 855.

 6           MS. CLEMONS:  We're not seeking to admit this into

 7   evidence at this time, Your Honor.

 8           THE COURT:  All right.

 9           MS. RHEE:  We certainly wouldn't have an objection

10   to having it admitted into evidence, but there's clearly no

11   objection then, Your Honor.

12           THE COURT:  Well, do you want it in or not?

13           MS. CLEMONS:  No, we don't need it in.

14           THE COURT:  All right.

15   BY MS. CLEMONS:

16   Q    So if you will turn to page 27, I'd like to ask you a

17   few questions about that document.

18           And you're listed as one of several account

19   managers here in this document, right?

20   A    Yes.

21   Q    But there are also dedicated product specialists on the

22   right for video, search, and programmatic, correct?

23   A    Yes.

24   Q    Okay.  And who is Marco Hardie?

25   A    This is my former manager on my Google Ads account team
```

Cross-Examination - S. Stefaniu

1    for the federal government.

2    Q    Okay.  So that was your third rotation, right?  You

3    worked for Mr. Hardie?

4    A    I did.

5    Q    And you worked with him on the census account?

6    A    That was an account I worked on him with, yes.

7    Q    You worked with him on the VA account?

8    A    I did.

9    Q    Okay.  And you both worked together in the government

10   advocacy group during that rotation, right?

11   A    Yes.

12   Q    And in that, your accounts were limited to government

13   and nonprofit advertisers, right?

14   A    That's correct.

15   Q    And what was your role as an account manager within

16   that larger team?

17   A    I helped strategize on how federal government agencies

18   who I supported as part of this team could best leverage

19   Google Ads and the different campaign types that are offered

20   in Google Ads to accomplish a goal or goals that the federal

21   agencies were interested in achieving.

22   Q    Okay.  And you can close that document.

23        So speaking of the demonstrative that you created,

24   the first half that's about Google Ads, you created this in

25   Google Ads' current interface, right?

                                                              54

Cross-Examination - S. Stefaniu

1  A     That is correct.

2  Q     When did you create it?

3  A     A month ago.

4  Q     Okay.  And is it a fair and accurate representation of

5  Google Ads' options and features as of when you last worked

6  with Google Ads in September of 2022?

7  A     That is correct.

8  Q     So there have been no developments or changes to the

9  Google Ads product in the past two years?

10 A     There have been additions made; though, there are

11 campaign types that I specifically worked with with my

12 clients when I was on Google Ads that are still in platform

13 and available today.

14 Q     So this is an accurate representation of what it was

15 like two years ago?

16 A     There are some differences; though, for the most part,

17 it is the same platform that I worked in with my customers.

18 Q     Okay.  And if you could, turn, please, to Stefaniu

19 DX 1.8.

20        And it says -- this is the content exclusions

21 page, right?  And you see it says at the bottom, "We can't

22 guarantee that all recommended content will be excluded,"

23 right?

24        I'll give you a chance to get there.

25 A     That's correct.  That's a description that is there.

Cross-Examination - S. Stefaniu

1   Q    Okay.  And you agree with that description, right?

2   Google is not able to guarantee that all related content

3   will be excluded?

4   A    That is correct.

5   Q    Okay.  Now, you've been with Google since you started

6   your career out of college, right?

7   A    No, that's not the case.

8   Q    Okay.  Didn't you say it was shortly after you

9   graduated that you started at Google in 2018?

10   A    I started about a year and two months after I graduated

11   from college.

12   Q    Where did you work before you were at Google?

13   A    A market research firm in Chicago called Mintel.

14   Q    Okay.  And did they have any advertising buy-side

15   tools?

16   A    To my knowledge, no.

17   Q    Okay.  So your only experience with advertising

18   buy-side tools available in the marketplace is with Google,

19   right?

20   A    That's correct.

21   Q    And you don't have any personal experience and can't

22   speak to rivals' features or quality?

23   A    That's not correct.

24   Q    So what is your personal experience with rivals'

25   features and quality?

Cross-Examination - S. Stefaniu

1   A    I helped make pitches and competitive documents that

2   spoke to the potential features that competitors, like

3   Facebook, could potentially offer.

4   Q    But those were all -- those were all --

5            MS. RHEE:  Objection, Your Honor.  She is cutting

6   off the witness here.

7            THE COURT:  She's answered the question.  Next

8   question.

9   BY MS. CLEMONS:

10  Q    Yeah.  I'm just making sure that you learned all of

11  that from Facebook, right -- or from Google, right, and not

12  from your own personal experience.

13  A    It was within my role at Google.

14  Q    Okay.  If you could, please -- let's see, actually.

15           So you talked about performance max, and part of

16  the value proposition of the performance max product is the

17  ability of Google to buy media across multiple channels and

18  inventory, right?

19  A    That's correct.

20  Q    And one key component of that is the ability for Google

21  to place display ads on websites across the Internet, right?

22  A    It is one of many capabilities.

23  Q    And performance max also enables Google to draw more ad

24  buying into Google tools, right?

25  A    What do you mean by more "ad buying"?

Cross-Examination - S. Stefaniu

1   Q    Performance max has allowed Google to make more ad

2   purchases for Google Ads' customers, right?

3   A    I don't know what you mean by more ad purchases.

4   Q    Does performance max have a benefit for Google of

5   bringing more ad buying into Google's tools?

6   A    I would not say it's more of a benefit for Google.

7   It's a benefit for the advertiser to show their ad across

8   multiple properties that you can reach with this campaign

9   type.

10  Q    But performance max allows Google to make more money,

11  right?

12  A    I did not say that.

13  Q    I could you, please turn to DTX 1248.

14       Could you look at page 8, please?

15       MS. RHEE:  Your Honor, is this being admitted into

16  evidence?  There's no objection.

17       MS. CLEMONS:  We're not seeking to admit this into

18  evidence, Your Honor.

19       THE COURT:  All right.

20  BY MS. CLEMONS:

21  Q    Do you see on this slide that Google sees performance

22  max as a $1 billion incremental revenue opportunity for

23  Google?

24  A    I'm not sure of which page you are on, ma'am.

25  Q    Page 8.

Cross-Examination - S. Stefaniu

1    A    I am looking at the slide that you're referring to.

2    Q    And do you see there that it says that performance max

3    is a $1 billion incremental revenue opportunity for Google?

4    A    It says this on the slide.

5    Q    And in the speaker notes, do you see it says,

6    "Performance max is important because it is a huge revenue

7    opportunity for us," meaning Google?

8    A    I see the description; though, I do not see my name,

9    and I'm unsure of this document.  I've never seen this

10   document before.

11   Q    This document was in your files, correct?

12   A    I don't recall.

13   Q    If you turn to the very front page of that tab, do you

14   see your name listed after the word "custodian"?

15   A    I see my name on the front page.  But I don't recall

16   this document, and I did not work for the food and beverage

17   business.

18   Q    Okay.  And then you mentioned that you worked on

19   widgets in DV360, right?  What did you mean by widgets?

20   A    I helped launch at times certain features within the

21   platform, again, for privacy or regulatory purposes.

22   Q    And was one of those features the inventory source

23   feature of DV360?

24   A    It was not.

25   Q    And so you --

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Redirect Examination - S. Stefaniu

1          MS. CLEMONS:  No further questions, Your Honor.

2          THE COURT:  Is there any redirect?

3          MS. RHEE:  Very quickly, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. RHEE:

6    Q    Now, you were shown on cross-examination DTX 855; is

7    that right?

8    A    That's correct.

9          MS. RHEE:  And for purposes of just walking

10   through this piece of it, Your Honor, we would seek to

11   display this on the screen.

12         THE COURT:  Go ahead.

13         MS. RHEE:  Thank you.

14   BY MS. RHEE:

15   Q    And if we could, go to page 27 of 28, which is the only

16   page that the government showed you.  And?

17         MS. RHEE:  If we could, blow that up so everybody

18   can see it.

19   BY MS. RHEE:

20   Q    Okay.  There you are, Ms. Stefaniu; is that right?

21   A    That is my name and image.

22   Q    Okay.  And to the extent that the government asked you

23   about these dedicated product specialists on the right-hand

24   side, you see those?

25   A    That is correct.

Redirect Examination - S. Stefaniu

1  Q    Do you see anywhere a so-called dedicated website
2  specialist?
3  A    No.
4  Q    Do you see an app specialist?
5  A    I do not.
6  Q    Do you see a native ad specialist?
7  A    No.
8  Q    And here, how many just programmatic account
9  strategists are being featured -- or programmatic product
10 specialists are being featured?
11 A    Three.
12 Q    Now, you were also asked on cross-examination about
13 whether or not you had any direct visibility or knowledge
14 about the competitors.  Do you remember that?
15 A    I do.
16 Q    And you started to talk about Facebook as a competitor.
17 A    That's right.
18 Q    Can you explain to the Court:  Why is Facebook a
19 competitor for the Google advertising customers?
20 A    That's because --
21       MS. CLEMONS:  Objection, Your Honor.  This is not
22 actually within the scope of cross-examination where I was
23 asking her about her familiarity with system tools.
24       THE COURT:  No, but you raised the issue.  I'm
25 going to permit it.  Overruled.

Redirect Examination - S. Stefaniu

1           THE WITNESS:  Can you repeat the question?

2     BY MS. RHEE:

3     Q     Can you explain for the Court, Ms. Stefaniu, why

4     Facebook is a competitor for Google Ads and DV360

5     advertising customers?

6     A     Advertisers have --

7           MS. CLEMONS:  I will object again, Your Honor.

8     Her testimony was she's not familiar with DV360 advertising

9     customers, at least not more than a year ago.  She needs a

10    foundation for her to testify about those customers, I

11    believe.

12          THE COURT:  Well, start with Google Ads, and we'll

13    see.

14          MS. RHEE:  All right, Your Honor.  The door was

15    opened.

16    BY MS. RHEE:

17    Q     So let's try this again.  Ms. Stefaniu, can you explain

18    for the Court why Facebook is a competitor for the Google

19    buy-side customers?

20    A     Customers have a lot of options they can choose from

21    today to serve ads.  And so I frequently was working with

22    advertising agencies who serviced customers that I worked

23    with to try and shift budgets between the other options that

24    a lot of my advertisers were using to run digital ads, one

25    of those being Facebook.  I have also had conversations

Recross-Examination - S. Stefaniu

1    about shifting budgets from other social platforms, like

2    TikTok, and also just traditional means of sharing out your

3    ads, like television, radio, etc.

4              MS. RHEE:  No further questions, Your Honor.

5              THE COURT:  All right.  Any recross?

6              MS. CLEMONS:  Yes, Your Honor, very briefly.

7                      RECROSS-EXAMINATION

8    BY MS. CLEMONS:

9    Q    You testified that one of the value propositions of

10   Google Ads and DV360 is the ability to buy display

11   advertising across the Internet, right?

12             MS. RHEE:  Your Honor, this is not proper.

13             THE COURT:  It's outside the scope of redirect.

14             MS. CLEMONS:  It was in the scope of --

15   BY MS. CLEMONS:

16   Q    Can you buy -- can your customers buy --

17             MS. RHEE:  Your Honor, objection.

18             THE COURT:  It was outside the scope of redirect.

19             MS. CLEMONS:  I'm asking about Facebook, so I'm

20   happy to change the question -- withdrawn.

21             THE COURT:  Well, make it specific as to Facebook.

22   BY MS. CLEMONS:

23   Q    Can your customers buy display advertising across the

24   Internet using Facebook?

25   A    I can't speak on behalf of Facebook's advertising

Direct Examination - K. Oliphant

1    capabilities.

2              MS. CLEMONS:  No further questions, Your Honor.

3              THE COURT:  All right.  Does anybody anticipate

4    calling this witness again?

5              MS. WOOD:  Plaintiffs do not, and I don't believe

6    they have a surrebuttal case.

7              MS. RHEE:  No, Your Honor.

8              THE COURT:  All right.  That's fine.

9              You're now excused as a witness.  You can stay in

10   courtroom and watch the proceedings or leave, but don't

11   discuss your testimony with any witness who has not yet

12   testified.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  All right.  Your next witness.

15             MS. DUNN:  Your Honor, Google calls Marco Hardie.

16             THE COURT:  All right.

17             MS. DUNN:  Your Honor, with apologies, we had a

18   miscommunication -- probably my fault -- with the

19   government.  We would like to call Kendall Oliphant before

20   Marco Hardie, but we will call them in that order.

21             THE COURT:  All right.  Kendall Oliphant.

22             MS. DUNN:  Yes.

23             THE COURT:  All right.  You may start.

24             MS. GOODMAN:  Thank you.

25          KENDALL OLIPHANT, DEFENDANT'S WITNESS, SWORN

64

Direct Examination - K. Oliphant

1                        DIRECT EXAMINATION

2    BY MS. GOODMAN:

3    Q    Hello, Ms. Oliphant.  I'm Martha Goodman.  I'm an

4    attorney for Google.  We met last summer at your deposition.

5    I'm going to ask you a few questions today.  Okay?

6    A    Okay.

7    Q    You work at the Census Bureau, correct?

8    A    Yes.

9    Q    And you've worked at the Census Bureau since

10   April 2007, approximately?

11   A    That was my second stint, but yes.

12   Q    So you've had at least 17 years of experience at the

13   Census Bureau?

14   A    More than that, but yes, at least.

15   Q    Okay.  During the 2020 census, you were the chief of

16   the integrated communications contract program management

17   office, correct?

18   A    Yes.

19   Q    And just so the -- high level, can you describe for the

20   Court your responsibilities as chief of the integrated

21   communications contract program management office in the

22   2020 census?

23   A    It is a lot, I know.  My job was to oversee everything

24   related to the contract, not necessarily the contract itself

25   but the communications, the management, the budget, the

Direct Examination - K. Oliphant

 1   staffing, etc.

 2   Q    And can you just describe for the Court, as well the

 3   communications contract -- what kind of contract is that

 4   that you're referring to?

 5   A    It's a multimodal IDIQ hybrid, firm fixed-price,

 6   time-and-materials contract that involved paid media,

 7   partnership, statistics and schools, earned media, travel,

 8   website development, etc.

 9   Q    And this was all in connection with executing on the

10   2020 census; is that right?

11   A    Yes, it was.

12   Q    I believe you just said this main communications

13   contract included paid advertising.  Correct?

14   A    Yes, it did.

15   Q    Okay.  And you had a similar role with respect to the

16   2010 census; is that correct?

17   A    Yes.

18   Q    Okay.  And the 2010 census, you were chief of the

19   contract management branch for the publicity office; is that

20   right?

21   A    Yes.

22   Q    And what were your responsibilities in that role with

23   respect to the 2010 census?

24   A    In that role, I was actually the COR on the integrated

25   communications contract, in addition to managing the staff

Direct Examination - K. Oliphant

1   of COR's that also worked on the contract.

2   Q    And was the communications contract with respect to the

3   2010 census similar in what it was attempting to achieve as

4   to the 2020 census?

5   A    Yes.

6   Q    All right.  Let's focus now on the 2020 census.  You're

7   familiar with the term "Order 15"?

8   A    Yes.

9   Q    And was that the name given to the paid media task

10  order under the --

11  A    Yes, it was.

12  Q    And that was under the main communications contract,

13  right?

14  A    Yes.

15  Q    Okay.  And Order 15 covered media strategy planning and

16  purchasing of all paid media for the 2020 census; is that

17  right?

18  A    Yes.

19  Q    And that also, then, included digital advertising,

20  right?

21  A    Yes.

22  Q    And your responsibilities with respect to Order 15 were

23  to make sure that all of the requirements were met on time,

24  within scope, and within budget?

25  A    Yes.

Direct Examination - K. Oliphant

1   Q    And do you recall what the budget for paid media for

2   the 2020 census was, approximately?

3   A    The original budget or the final budget?

4   Q    The final budget, ma'am.

5   A    Approximately 364 million.

6   Q    Okay.  And so that was money to be spent on all kinds

7   of paid advertising for the 2020 census; is that right?

8   A    That was the actualized amount, yes.

9   Q    Fair to say that the objective of the paid media

10  campaign for the 2020 census was to motivate all people

11  living in the United States to actually complete the census?

12  A    Yes.

13  Q    And in order to achieve that goal, the census tried to

14  reach Americans wherever they may be found?

15  A    Yes.

16  Q    There were a lot of diverse audiences that you needed

17  to reach, correct?

18  A    Correct.

19  Q    And they all consumed digital media in a variety of

20  different ways, correct?

21       MS. WOOD:  Objection.  I don't believe there's

22  been a foundation laid for that.

23  BY MS. GOODMAN:

24  Q    Are you aware that Americans consume media in a large

25  variety of ways?

Direct Examination - K. Oliphant

1   A    Yes.

2   Q    Okay.  And so is it true that you had to reach diverse

3   audiences who all consumed media in a variety of different

4   ways?

5   A    Yes.

6   Q    In order to actually purchase advertising for the 2020

7   census, the Census Bureau used contractors, correct?

8   A    Correct.

9   Q    The census did not do the buying itself; they used

10  their contractors and their subcontractors, correct?

11  A    Correct.

12  Q    In your binder -- you have a big black binder -- there

13  are a variety of exhibits there.  So I'd like you to turn to

14  DTX 1343.

15            MS. GOODMAN:  And we'd offer this into evidence.

16            THE COURT:  Any objection to 1343?

17            MS. WOOD:  Yes.  We would object on hearsay

18  grounds.  The majority of Exhibit 1343 was prepared by the

19  census' advertising agency, which, obviously, Google was

20  free to subpoena for this trial and to testify at this

21  trial.  I think this all represents hearsay, and we would

22  object on that basis.

23            MS. GOODMAN:  Your Honor --

24            MS. WOOD:  The attachment itself.

25            THE COURT:  Is it being offered for the truth of

Direct Examination - K. Oliphant

1    its contents or to explain various actions this witness

2    took?

3         MS. GOODMAN:  I think it could be offered for the

4    truth, Your Honor, because this was prepared by the agent,

5    the ad agency that served the Census Bureau, and it's

6    admissible as a party agent admission.  It's also admissible

7    under the business records exception.

8         MS. WOOD:  I don't believe there's been a

9    foundation with anyone from the ad agency to establish the

10   business record exception, and it's certainly not a

11   statement of a party opponent given that they have dismissed

12   the federal agency advertisers and are treating them as

13   third parties, supposedly.  So on multiple bases, I think

14   this exhibit cannot be offered for the truth of matter.

15        THE COURT:  I'm not sure I'm going to take the

16   exhibit into evidence, but you can ask questions about it

17   because, in particular, the cover and email is from this

18   witness, who can be cross-examined.  And it's saying -- I

19   don't know who this Kia person is -- "You may find some

20   information in the attached deck helpful.  It was provided

21   to our team as an introduction into media buying.  Let me

22   know if you have any questions."

23        So I think to the extent she found portions of

24   information helpful, you can ask her that.

25        MS. GOODMAN:  Okay.  If I -- with Your Honor's

Direct Examination - K. Oliphant

1    permission, I may attempt to lay a foundation for its

2    admissibility under a hearsay exception or as a party agent

3    admission.

4             THE COURT:   All right.

5    BY MS. GOODMAN:

6    Q    So, Ms. Oliphant, you went to a paid media training

7    during the planning for the 2020 census, correct?

8    A    Correct.

9    Q    Okay.  And that was led by your contractor Young &

10   Rubicam, correct?

11   A    Correct.

12   Q    And Young & Rubicam was the contractor engaged under

13   that large 2020 integrated communications contract we talked

14   about earlier?

15   A    They were the prime contractor of record, yes.

16   Q    And as the prime contractor of record, that ad agency

17   acted on behalf of the Census Bureau, correct?

18   A    Correct.

19   Q    And was it your practice to maintain the presentations

20   that Young & Rubicam provided to you in the course of your

21   work for the 2020 census?

22   A    Some of them, yes.

23   Q    And this example in DTX 1343, is this an example of a

24   deck that you kept in the ordinary course of your work at

25   the Census Bureau?

Direct Examination - K. Oliphant

1    A    Yes, because it's a basic industry standard discussion

2    of the various types of media.

3                MS. GOODMAN:  At this point, I think I've laid the

4    foundation for its admission, Your Honor.

5                THE COURT:  I'm letting it in.

6    BY MS. GOODMAN:

7    Q    And if you look at page 4 of the exhibit where it's

8    titled "Objective" --

9    A    Yes.

10   Q    -- the objective of this training was to educate the

11   census media review team on industry offerings, best

12   practices, and metrics for the advertising media planning

13   and buying process, correct?

14   A    Correct.

15   Q    Okay.  And in your view, the training that you provided

16   at this time in October of 2018, the training was providing

17   you the most up-to-date information on industry offerings

18   and practices, correct?

19   A    At that time, yes.

20   Q    Okay.  So let's look at page 36.  And you see here this

21   is titled "State of Census Then Versus Now."  This is

22   describing the differences that had -- or the changes that

23   had taken place between the 2010 and upcoming 2020 census,

24   correct?

25   A    Yes.

Direct Examination - K. Oliphant

1  Q    Okay.  And is it accurate, ma'am, that what you were

2  used to for advertising in 2010 was very different from what

3  you were used to for 2020?

4              MS. WOOD:  Objection.  Vague.

5              THE COURT:  Overruled.

6              THE WITNESS:  What I would say is that the

7  industry evolved significantly between 2010 and 2020.  So a

8  lot of what we were used to in 2010 was still relevant.

9  There were just things that had progressed.  There were new

10  technologies, new ways of reaching people.

11              So that was what was addressed here specifically

12  because -- you talk about the difference between 2010 and

13  2020.  This doesn't -- this particular slide does not talk

14  about advertising at all.  It's just talking about -- well,

15  not really.  It's really talking about the fact that for the

16  first time you could complete a census online.

17  BY MS. GOODMAN:

18  Q    And so what you're saying is that there was more and

19  new options available to you to reach Americans for purposes

20  of the 2020 census as compared to the 2010 census; is that

21  fair?

22  A    I don't think that's a fair statement.  I will say

23  there were expanded -- so digital, for example, was a larger

24  portion in 2020.  It doesn't mean it did not exist in 2010.

25  It just meant that we made more use of it in 2020.

Direct Examination - K. Oliphant

1  Q    And is it accurate that between the 2010 and 2020

2  census, digital had changed very much in those ten years?

3  A    That's a fair statement, yes.

4  Q    And is it accurate that for the 2010 census digital was

5  a minimal part of your advertising budget?

6  A    Yes.

7  Q    And for purposes of this training that you're

8  receiving, it was important for you to understand why to put

9  more money toward digital advertising for the 2020 census?

10 A    I think the purpose of this training was more so to

11 explain the different types of media and how each type of

12 media was used to reach different audiences, not necessarily

13 making the case to spend more money in digital.

14 Q    Ma'am, you have a spiral binder in front of you -- or

15 notebook, the fat one.  This is a transcript of your

16 deposition --

17 A    Okay.

18 Q    -- from last summer.  And if you could, turn to

19 page 131.

20 A    Okay.

21 Q    And I'd just like you to read to yourself lines 3

22 through 17, and let me know when you have read it.

23          And so after having reread your deposition

24 testimony from last summer, is it fair to say that you

25 needed to be sure that you understood why it was important

Direct Examination - K. Oliphant

1  to put more money toward digital advertising in the 2020

2  census?

3  A     It is what I stated, but that doesn't mean that -- what

4  I will say is, yes, it was important for us to understand

5  why it was more important to put more money towards digital,

6  but this particular presentation really outlined the

7  different types of media so that we would understand what we

8  were doing if we decided to put more money towards digital.

9  Q     Thank you.

10       And looking back at DTX 1343, if you go to page 3,

11  this is the agenda for the day presentation.  And in the

12  beginning, your ad agency talked to you about the overview

13  of media and industry practices, correct?

14  A     Yes.

15  Q     And they also covered media terminology, correct?

16  A     Yes.

17  Q     And they also covered what was different about media

18  between 2010 and 2020, correct?

19  A     Yes.

20  Q     And then in the afternoon sessions, they talked to you

21  about all of the different digital media and traditional

22  media channels that you could use for purposes of the 2020

23  census, correct?

24  A     Yes.

25  Q     Okay.  Now, let's look at page 38 of this document.

Direct Examination - K. Oliphant

1          And here you see that important -- that other
2     media factors that the Census Bureau needed to consider were
3     listed in these four bullets, correct?
4     A     Yes.
5     Q     And that included a change in video landscape?
6     A     Yes.
7     Q     And the emergence of social platforms?
8     A     Yes.
9     Q     And a shift in the digital buying process and
10    technology, correct?
11    A     Yes.
12    Q     And those were things that were new with respect to the
13    advertising for purposes of the 2020 census?
14    A     Yes.
15    Q     And let's look at page 42.  And here your contractor is
16    explaining to you that digital ad spending has jumped
17    525 percent since 2010, correct?
18    A     Yes.
19    Q     And the percentage change for traditional forms of
20    advertising is just 35 percent, right?
21    A     Yes.
22    Q     Okay.  And let's look at page 45.  So this is
23    discussing the changing video landscape, correct?
24    A     Yes.
25    Q     And this slide shows that connected TV household

Direct Examination - K. Oliphant

1  penetration increased from 24 percent in 2010 on the chart,

2  on the graph, to 74 percent in 2018, correct?

3  A    Yes.

4  Q    And so between the 2010 and 2020 census, connected TV

5  had become much more prominent, correct?

6  A    Yes.

7  Q    And there were a lot of different video platforms even

8  available in 2020 than there were in 2010, correct?

9  A    Yes.

10 Q    I believe you mentioned before Vine as a platform that

11 had come and gone?

12 A    Yes.

13 Q    So Vine was around for a little bit to do video

14 advertising, but by the 2020 census, it wasn't available

15 anymore?

16 A    Yes.

17 Q    And TikTok was also part of the changing video

18 landscape?

19 A    Yes.

20 Q    But you couldn't advertise on TikTok because the

21 federal government didn't approve that particular platform,

22 correct?

23 A    Correct.

24 Q    And let's look at page 57.  And here we're seeing that

25 the social landscape had changed between the 2010 and 2020

Direct Examination - K. Oliphant

1   census, correct?

2   A     Yes.

3   Q     And in 2010, Pinterest, Snapchat, and Tumblr didn't

4   have any users, right?

5   A     According to this, yes.

6   Q     And so they came into existence sometime in that

7   decade, between the 2010 and 2020 census?

8   A     Yes.

9   Q     And Twitter grew by over 40,000,000 users in that time

10  period?

11  A     Yes.

12  Q     And Instagram by 120 million individuals?

13  A     Yes.

14  Q     And we don't even see TikTok on this chart.  That's

15  also a social platform?

16  A     Yes.

17  Q     Okay.  And let's look at page 104.  So this is the part

18  of the presentation I think you were referencing earlier

19  where the ad agency is explaining to you the different

20  digital media channels available to you for the 2020 census.

21  A     Yes.

22  Q     Okay.  And let's look at page 133.

23         MS. GOODMAN:  Actually, Mr. Spalding, if you

24  could, go back to page 128 just quickly to show the witness

25  which section of the presentation we're in.

Direct Examination - K. Oliphant

1    BY MS. GOODMAN:

2    Q    So now we are in the programmatic section of the

3    presentation, correct?

4    A    Yes.

5    Q    And now let's go to page 133.

6         This is describing the programmatic advertising

7    ecosystem as it existed as of the date of this presentation,

8    correct?

9    A    Correct.

10   Q    And we see advertisers and ad agencies on the left-hand

11   side of that ecosystem?

12   A    Yes.

13   Q    And we see publishers and consumers on the right-hand

14   side of the ecosystem?

15   A    Yes.

16   Q    And there's just a variety of tools in the middle,

17   DSPs, SSPs, ad exchanges, and ad networks, yes?

18   A    Yes.

19   Q    So that accurately depicted the programmatic system as

20   of that date, yes?

21        MS. WOOD:  Objection, foundation again.  This is

22   for the truth of the matter with a witness who didn't

23   prepare this document.

24        THE COURT:  It says what it says.  All right.

25        MS. GOODMAN:  I'll move on.

Direct Examination - K. Oliphant

1  BY MS. GOODMAN:

2  Q    Okay.  Let us now look at DTX 629.

3            THE COURT:  Any objection to 629?

4            MS. WOOD:  The same objection, Your Honor.  These

5  are just a series of documents prepared by a third party

6  they've elected not to call to testify in their case.

7            THE COURT:  All right.  That's fine.  That's

8  overruled for the same reason.

9            MS. GOODMAN:  Thank you.

10            So for the record, DTX 629 is in evidence, Your

11  Honor.

12            THE COURT:  Yes.

13            MS. GOODMAN:  Thank you.

14  BY MS. GOODMAN:

15  Q    Now, this deck is laying out the actual media strategy

16  for the Order 15, correct?

17  A    Correct.

18  Q    And let's look at page 4.  This is describing that the

19  actual communications efforts around the 2020 census was

20  going to proceed in four phases; is that right?

21  A    At the time, yes.

22  Q    Are you referring to COVID, ma'am?

23  A    Yes.  COVID and -- yes.

24  Q    Well, I will ask you about COVID momentarily.  But the

25  four phases that you were planning for the 2020 census are

80

Direct Examination - K. Oliphant

1   denoted in these four boxes, awareness, motivation,

2   reminder, and the thank-you phase; is that right?

3   A    That is correct.

4   Q    Okay.  And let's look at page 33.  And this is showing

5   that digital advertising was going to be used in all four

6   phases of the advertising campaign; is that right?

7   A    Yes.

8   Q    And let's look at page 37 of the deck.

9          And one type of digital that you were considering

10  for use in the 2020 census was programmatic; is that right?

11  A    Yes.

12  Q    And this slide is describing the various strategies for

13  programmatic advertising that your advertiser -- that your

14  ad agency recommended that you use; is that right?

15  A    Yes.

16  Q    And it's accurate, ma'am, that the Census Bureau used

17  programmatic advertising for streaming video, rich media,

18  and banner ads, correct?

19  A    Correct.

20  Q    And let's look at page 40, site direct.  That's another

21  mode of programmatic advertising; is that right?  Or is

22  what -- withdraw -- programmatic.  I'm sorry.  Withdraw the

23  question.

24          Site direct is a form of display advertising that

25  the Census Bureau used in 2020?

Direct Examination - K. Oliphant

1   A    It was more than display ads, but yes.

2   Q    What else was it beyond display ads for site direct?

3   A    With site direct, you're able to be more integrated in

4   content, expand what you're able to do with that site, the

5   use of influencers, events.  So it's a lot more than just

6   placing an ad.

7   Q    Thank you.

8         And you see in this first bullet, the slide says,

9   "More and more people are using ad blockers to limit

10  advertising showing as they browse the internet."

11        Do you see that?

12  A    Yes.

13  Q    And it goes on to say, "This particularly affects

14  programmatic display."

15        Do you see that?

16  A    Yes.

17  Q    And so is it accurate that one reason you used site

18  direct for the 2020 census was because more and more people

19  used ad blockers?

20  A    No.

21  Q    Okay.  And is it also the case that the Census Bureau

22  reached individuals who had ad blockers through paid social?

23  A    And other forms of media, yes.

24  Q    And what are the other forms of media that the Census

25  Bureau used to reach individuals who had ad blockers?

Direct Examination - K. Oliphant

1    A    TV, radio, print, out-of-home.

2    Q    Would it have included connected TV?

3    A    Yeah, because you can't get rid of the ads on connected

4    TV.

5         THE COURT:  I'm sorry.  You need to speak up or

6    put the microphone back.

7         THE WITNESS:  Yes.

8         MS. GOODMAN:  Okay.  Mr. Spalding, you can take

9    this document down.

10   BY MS. GOODMAN:

11   Q    So we saw many different types of digital ads in some

12   of the slides we looked at in these decks.  But,

13   Ms. Oliphant, it's true that during the 2020 census, at the

14   bureau you talked about digital in the aggregate or as a

15   whole, correct?

16   A    Yes.  Depending on who we were speaking to, yes.

17   Q    And you didn't speak about it in a broken-down format,

18   correct?

19   A    No -- yes, that's correct.

20   Q    And you talked about digital as a whole at the Census

21   Bureau because most people didn't care about the difference

22   among all of the types of digital; is that accurate?

23   A    The audiences that we were presenting to only cared

24   about the category, not the different channels within the

25   category.

Direct Examination - K. Oliphant

1    Q    And it's fair that the vast majority of people that you

2    spoke to didn't evaluate each piece of individual -- each

3    individual piece of digital advertising, correct?

4    A    Correct.

5    Q    And site direct and programmatic, that fell within the

6    digital moniker at the Census Bureau, correct?

7    A    Correct.

8    Q    And from your point of view at the Census Bureau, it

9    did not matter how your contractors deployed digital

10   advertising.  Is that accurate?

11   A    It did matter.  What was important was how the

12   audiences that we were trying to reach interacted with that

13   particular type of digital advertising.  It wasn't about

14   what we wanted.  It was about what swayed the audience.

15   Everybody interacts differently with different types of

16   digital advertising.

17   Q    If you can, look at your deposition transcript again on

18   page 192.

19   A    The big book?

20   Q    Yes, ma'am, starting at line 6 and going through

21   line 18.

22   A    You said 192?

23   Q    Yes.  Page 192 starting at line 6 through 18.  Let me

24   know when you've read that to yourself.

25   A    The context --

84

Direct Examination - K. Oliphant

1   Q    May I?  You read it?

2   A    Yes.

3   Q    Okay.  And so it's accurate that from your point of

4   view as a representative of the census working in

5   advertising, it did not matter to you how your advertiser

6   deployed digital advertising, correct?

7   A    In my deposition, yes.

8   Q    And from your point of view at the Census Bureau, it

9   did not matter how an ad got placed on a website through

10  whatever mechanism that it got on the website?  That didn't

11  matter to you; did it?

12  A    No.

13  Q    And from your point of view at the census, it did not

14  make a difference whether a digital ad was served

15  programmatically or through site direct, correct?

16  A    It did not matter as long as the audience was

17  responding to the ad.

18  Q    Right.  And if you could, look at page 177 of your

19  deposition, lines 7 through 11, and let me know when you've

20  read that.

21  A    Lines 7 through 11?

22  Q    Yes.

23  A    Yes.

24  Q    Okay.  And so it's accurate, ma'am, that from your

25  point of view, it did not make a difference whether an ad

85

Direct Examination - K. Oliphant

1   was placed programmatically or through a direct buy,

2   correct?

3   A     Correct.

4   Q     And from the census' point of view, it did not make a

5   difference whether a digital ad was served programmatically

6   through an open auction versus a private marketplace; did

7   it?

8   A     No, it didn't matter.

9   Q     Did not matter?

10  A     We didn't have anything to do with that, so I don't

11  know.  I don't know anything about that.

12  Q     But I'm asking from your point of view as --

13         THE COURT:  I think you've asked that type of

14  question.  It's been answered enough.  Let's move on.

15         MS. GOODMAN:  Okay.

16  BY MS. GOODMAN:

17  Q     And there was $360 million allocated -- or eventually

18  spent on paid media for the 2020 census, right?

19  A     Yes.

20  Q     And when you allocated money to digital advertising,

21  you approved a total amount of money for digital spending,

22  correct?

23  A     We had a media plan where we had a suggested amount per

24  type of media by audience.  When we approved funding, we

25  approved it by audience for particular periods of time.  We

Direct Examination - K. Oliphant

1    didn't take $364 million and just parse it out right then

2    and there.

3    Q    But it is accurate, ma'am, that for digital

4    advertising, that money was allocated to digital as a

5    bucket, correct?

6    A    That's not accurate.  Well, in the conversation, yes.

7    But in the format -- the forms that actually gave approval

8    to spend the dollars, it was broken out by the type of

9    digital.

10   Q    Okay.  We'll look at those forms in just a minute, but

11   if you could, please, just take a look at page 173 of your

12   deposition, the fat one, starting at line 17 going to

13   page 174, line 6.  Let me know when you have read that.

14   A    I have read it.

15   Q    Okay.  So it's accurate that within the total

16   allocation of money to digital advertising, you approved a

17   total amount of digital, and you relied on your agency to

18   spread it across the different types of digital advertising

19   as appropriate to reach the audiences that you needed to

20   reach, correct?

21   A    That's what's said in the deposition, but I think it's

22   a little out of context.

23   Q    Okay.  But that is what you testified to in your

24   deposition, correct?

25   A    Yes.

Direct Examination - K. Oliphant

1    Q    And let's look at DTX 1464.

2              THE COURT:  Any objection to 1464?

3              MS. WOOD:  No objection.

4              THE COURT:  All right.  It's in.

5    BY MS. GOODMAN:

6    Q    Okay.  This is the media authorization form that you

7    were speaking about just a moment ago, yes?

8    A    Yes.

9    Q    And if you look at page 2, this is where you're

10   describing the breakout of funding by category?

11   A    Yes.

12   Q    Okay.  But it is true, ma'am, that your contractor had

13   authority to move money among all the different types of

14   digital categories listed on a media authorization form,

15   correct?

16   A    Not without being -- doing so in consultation with the

17   Census Bureau.

18             MS. GOODMAN:  And let's put up DTX 1335.

19             THE COURT:  Any objection to 1335?

20             MS. WOOD:  No objection to 1335.

21             THE COURT:  All right.  It's in.

22   BY MS. GOODMAN:

23   Q    Let's look at page 2 of this email which -- you're on,

24   yes?

25   A    Yes.

Direct Examination - K. Oliphant

1   Q    Okay.  And you see -- actually, if you go back to

2   page 1, you're writing to Alyce Chong at the OIG; is that

3   right?

4   A    That is correct.

5   Q    And you write, "I provide responses below in bold."

6         Do you see that?

7   A    Yes.

8   Q    Okay.  So let's look at one of your responses on

9   page 2.

10        Under No. 2 -- it's at the top.  The MAF referred

11  to in this first couple sentences, that's the media

12  authorization form?

13  A    Yes.

14  Q    Just like the exhibit that we just looked at?

15  A    Yes.

16  Q    Okay.  And you see in bold you say, "The MAF only

17  provides authorization to spend the total amount listed on

18  the document.  And, even though there is funding listed for

19  each media type, the agencies had authority to move that

20  money between media types if opportunities became available,

21  as long as the total spend did not exceed the amount

22  authorized on the actual MAF."

23        That was a true statement?

24  A    That is true but with consultation -- in consultation

25  with the Census Bureau.

Direct Examination - K. Oliphant

1   Q    Okay.  All right.  You can put that document down.

2           And let's turn to 929, DTX 929.

3           THE COURT:  Any objection?

4           MS. WOOD:  The same objection with respect to this

5   being a third-party document from the ad agencies that

6   Google didn't elect to call.

7           THE COURT:  All right.  It's overruled.

8   BY MS. GOODMAN:

9   Q    Ms. Oliphant, you participate --

10           THE COURT:  It's in.  Sorry.  It's in.

11           MS. GOODMAN:  Thank you.

12   BY MS. GOODMAN:

13   Q    Ms. Oliphant, you participated in briefings to members

14   of congressional staff, correct?

15   A    Yes.

16   Q    And this is the kind of slide deck that you would

17   present at meetings with congressional staff, correct?

18   A    Presentations to congressional staff were often done

19   with members from the ad agency.  So together, yes.

20   Q    Okay.  And let's look at page 6 of this deck.

21           MS. GOODMAN:  Actually, I'm sorry, Matt.  Can we

22   go back to page 4, please, first.

23   BY MS. GOODMAN:

24   Q    And you see in the fourth bullet, "Shifting,

25   programming and media consumption patterns necessitated

Direct Examination - K. Oliphant

1    rapid adjustment in media planning and tactics."

2         That was what the Census Bureau had to do as a

3    result of COVID-19, correct?

4    A    Yes.

5    Q    COVID hit just as you were attempting to roll out the

6    2020 census, right?

7    A    Correct.

8    Q    And let's look at page 6.  And one way that the Census

9    Bureau adapted to the COVID-19 media environment is what's

10   listed in the second bullet here under adjusted --

11   "adjusting digital media," yes?

12   A    Yes.

13   Q    And so the Census Bureau adjusted its digital media mix

14   as people had been consuming more digital news, streaming

15   audio, interacting on social networks, and using more apps

16   on their mobile devices.  Correct?

17   A    Yes.

18   Q    And it's accurate, Ms. Oliphant, that the Census Bureau

19   invested more money in digital advertising as a result of

20   COVID, correct?

21   A    That is correct.

22   Q    And you had to do that because that is where the

23   audience you were trying to reach could be found, right?

24   A    That and the fact that traditional ways that we would

25   have normally expended media dollars were no longer

Direct Examination - K. Oliphant

1    available because of COVID.

2    Q    So people were not at the football games where you

3    might put a big billboard up "complete the census."  They

4    were online, right?

5    A    Correct.

6    Q    And while you invested more money in digital

7    advertising as a result of COVID, you did not allocate

8    dollars to any particular type of digital advertising, just

9    digital as a whole, correct?

10   A    Correct.

11   Q    Ms. Oliphant, was a critical component of the paid

12   media strategy for the 2020 census the ability to reallocate

13   advertising dollars?

14   A    Yes.

15           MS. GOODMAN:  And let's go to DTX 439.

16           THE COURT:  Any objection to 439?

17           MS. WOOD:  No objection.

18           THE COURT:  All right.  It's in.

19   BY MS. GOODMAN:

20   Q    And let's look at page 107 of this communications plan

21   document.

22           And you see in the section "Rapid Response

23   System," this document is describing why it was important --

24   or the fact that it was important to be able to reallocate

25   paid media spending during the campaign, correct?

Direct Examination - K. Oliphant

1   A    Yes.

2   Q    And it says, "The ability to optimize and refine media

3   placements throughout the campaign will differ according to

4   the type of media used.  For example, digital placements can

5   be altered quickly, and many will be continuously and

6   automatically optimized for best performance by ad

7   platforms."

8           The Census Bureau in conjunction with its ad

9   agency did, in fact, do those kinds of optimizations

10  described in this document?

11  A    Among others, yes.

12          MS. WOOD:  Objection.  Compound.

13          THE COURT:  No, I don't think it was, and the

14  witness was able to answer it.

15          Go ahead.  What was your answer?

16          THE WITNESS:  I said among others, yes.

17  BY MS. GOODMAN:

18  Q    And is it true, Ms. Oliphant, that the ability to

19  adjust media across channels, programming, and messaging

20  added significantly to the effectiveness of the 2020 media

21  campaign?

22  A    It did.  But for clarity, it wasn't just digital.  But

23  yes.

24  Q    Okay.  But digital --

25          THE COURT:  She's answered the question.  Move

Direct Examination - K. Oliphant

1   along.

2   BY MS. GOODMAN:

3   Q    And you would say that all digital advertising types

4   were almost equally flexible in terms of the ability to

5   reallocate ad dollars, correct?

6   A    Equally flexible, but not the same.

7   Q    And as we saw in the media authorization forms, you

8   approved a total amount of money for digital advertising

9   and -- correct?

10  A    Yes.

11          THE COURT:  That's repeating.

12  BY MS. GOODMAN:

13  Q    And you had the ability to move money between and among

14  the channels of digital advertising, correct?

15          MS. WOOD:  Objection.  Asked and answered.

16          THE COURT:  Sustained.

17  BY MS. GOODMAN:

18  Q    Okay.  Shifting gears just a bit to Order 8.  Are you

19  familiar with Order 8?

20  A    Yes.

21  Q    And that was the order under the communications

22  contract to advertise to recruit people to work for the

23  census, right?

24  A    Yes.

25          MS. GOODMAN:  And let's look at DTX 1074.

94

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K. Oliphant

1          THE COURT:  Any objection to 1074?

2          MS. WOOD:  No objection.

3          THE COURT:  All right.  It's in.

4    BY MS. GOODMAN:

5    Q    And this is the final report for Order 8, correct, an

6    email attaching the final report?

7    A    Yes.

8    Q    And look at page 4.  This is where the final report

9    begins in the document?

10   A    Yes.

11   Q    And turn to page 39, please.  And now we're in the

12   section of the report on lessons learned.  Do you see where

13   I am?

14   A    Yes.

15   Q    And it's accurate that through an iterative process,

16   your ad agency, TYR, recruitment efforts were designed to

17   ramp up in the most effective channels and tactics over

18   time, correct?

19   A    Correct.

20   Q    And if you turn the page to 40, we see three bullets at

21   the top.  The first bullet describes job boards as a tactic

22   to recruit workers for the census, yes?

23   A    Yes.

24   Q    And then we see in the second bullet that social media

25   advertising on Facebook proved effective, correct?

Direct Examination - K. Oliphant

1   A    Yes.

2   Q    And to your knowledge, that was accurate, right, that

3   it did prove effective?

4   A    For this effort, yes.

5   Q    And if we look at the third bullet, it says, "Less

6   effective tactics included advertising through display,

7   Gmail, and Nextdoor."

8           That was accurate, correct?

9   A    Correct.

10  Q    And it was accurate that after testing these tactics,

11  including display, investment was shifted to job boards,

12  Facebook, and keyword search based on performance, correct?

13  A    Correct.

14  Q    And if you just flip back to page 36, you see at the

15  bottom there's an example of a display ad in English at the

16  bottom?

17  A    Yes.

18  Q    So this is an example of the kind of creative that the

19  Census Bureau used to recruit census workers in Rhode

20  Island, yes?

21  A    Yes.

22  Q    And look at the next page, the Facebook ad at the top.

23  A    Yes.

24  Q    This is a very similar, if almost identical, Facebook

25  ad to recruit census workers in Rhode Island, yes?

Direct Examination - K. Oliphant

1   A    Just a different size, yes.

2   Q    And, Ms. Oliphant, do you agree that this is showing

3   nearly the same display ad can be placed on Facebook that

4   could be placed on a website?

5   A    To some degree, yes.  Again, each platform requires

6   different sizing.  In some cases -- well, in this one, you

7   have the opportunity to click and learn more button.  On the

8   Facebook, you did not.  So, yes, they're close to being the

9   same but...

10  Q    Okay.  For purposes of programmatic ad buying, the

11  census used DV360, correct?

12  A    Yes.

13  Q    And DV360 was used to serve not just display ads but

14  also video and audio ads by the census?

15  A    Yes.

16  Q    And the census did not use Google Ads as its

17  programmatic ad buying tool, correct?

18  A    I don't know.

19          THE COURT:  All right.  It's time for the

20  afternoon break.  It's starting a little late.  We'll come

21  back in at 4:35.

22      (Brief recess taken.)

23          THE COURT:  All right.  Proceed.  I assume we're

24  going to wrap this up pretty quickly.

25          MS. GOODMAN:  Yes, ma'am.

Direct Examination - K. Oliphant

1   BY MS. GOODMAN:

2   Q    Ms. Oliphant, do you know which ad exchanges were used

3   in the 2020 census digital advertising efforts?

4   A    No, I don't.

5   Q    And do you know whether the census used more than one

6   exchange?

7   A    I don't.

8   Q    And was it important to you which ad exchange was used?

9   A    No.

10  Q    As of your deposition in August 2023, you were not sure

11  what the term "open-web display advertising" meant, correct?

12  A    Correct.

13  Q    And do you have an understanding of what that term

14  means now?

15  A    It's industry jargon, no.

16  Q    Well, the first time you heard the term "open-web

17  display advertising" was in this lawsuit, right?

18  A    Yes.

19  Q    And you had not heard the term "open-web display

20  advertising" prior to this lawsuit, correct?

21  A    Not that I could recall.

22  Q    Okay.  And the term "open-web display advertising" was

23  not a term you heard in the course of what you were doing

24  for the 2020 census, correct?

25  A    Correct.

98

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K. Oliphant

1  Q    And if you heard it at any time prior to this lawsuit,

2  you would not have committed it to memory, correct?

3  A    Correct.

4  Q    Because it was not a terminology you used in the course

5  of what you do for your work?

6  A    Correct.

7              MS. WOOD:  Objection.  Asked and answered.

8              THE COURT:  Sustained.

9  BY MS. GOODMAN:

10  Q    And in the course of your work overseeing paid

11  advertising for the 2020 census, you never formed a view

12  that Google was engaged in anticompetitive conduct; did you?

13              MS. WOOD:  Objection.  Foundation.

14              THE COURT:  I'm going to sustain that objection as

15  well.

16              MS. GOODMAN:  Your Honor, the witness answered

17  this precise question with a proper foundation in her

18  deposition.

19              THE COURT:  No.  Let's move on.

20  BY MS. GOODMAN:

21  Q    Let's look at DTX 1403.

22              THE COURT:  Is there an objection to 1403?

23              MS. WOOD:  No objection.

24              THE COURT:  All right.  It's in.

25

Cross-Examination - K. Oliphant

1   BY MS. GOODMAN:

2   Q    Okay.  And that was the only reason I wanted to show

3   this document.

4        This is a document you received, Ms. Oliphant?

5   A    Yes.

6   Q    Okay.  And let's look at 903, DTX 903.

7        THE COURT:  Any objection to 903?

8        MS. WOOD:  No objection.

9        THE COURT:  All right.  It's in.

10        MS. GOODMAN:  I have no further questions for you

11  at this time, Ms. Oliphant.  Thank you very much.

12        THE COURT:  All right.  Ms. Wood.

13                    CROSS-EXAMINATION

14  BY MS. WOOD:

15  Q    Ms. Oliphant, can you describe to the Court just at a

16  high level what is the purpose of the census?

17        THE COURT:  Oh, we don't need that.

18        MS. WOOD:  Okay.

19  BY MS. WOOD:

20  Q    What is the purpose of advertising conducted in

21  connection with the census?

22  A    To increase participation.  The trust in government has

23  declined as has survey response, and paid advertising is a

24  way to encourage participants to actually self-respond to

25  the census.

Cross-Examination - K. Oliphant

1   Q    Now, do you consider yourself an expert in digital

2   media buying?

3   A    No.

4   Q    And who does census rely on for expertise regarding

5   digital media?

6   A    Our ad agencies.

7   Q    And what do you consider your job to be at the census

8   vis-a-vis digital media buying?

9   A    To oversee and manage the contract and anything related

10  to that.

11  Q    Now, did you or anyone at census make media purchases

12  directly on behalf of the census?

13  A    No.

14  Q    Who does that?

15  A    The ad agencies.

16  Q    Do you or anyone at the census personally use ad tech

17  tools?

18  A    No.

19  Q    Do you even know what a demand-side platform is?

20  A    I don't need to know.

21  Q    Do you know what a publisher ad server is?

22  A    No.

23  Q    Do you know what an advertiser ad network is?

24  A    No.

25  Q    And you never used any of those products?

Cross-Examination - K. Oliphant

1    A    No.

2    Q    Are you responsible for the direct payment -- strike

3    that.

4             Are you responsible for the selection of what ad

5    tech vendors the census ad agencies use to buy digital

6    media?

7    A    No.

8    Q    Are you responsible for assessing the quality of

9    various ad tech vendors?

10   A    No.

11   Q    Are you responsible for assessing the relative cost of

12   ad tech vendors?

13   A    No.

14   Q    What is the census' approach, as you understand it, to

15   paid digital media?

16   A    Our approach is we work directly with our ad agencies

17   to agree upon a media plan, at which point the ad agencies

18   execute that plan by going out and purchasing the media that

19   will be used.

20   Q    And based on your working with ad agencies, did you

21   come to have an understanding as to the role played by

22   programmatic display ads on websites?

23   A    Yes.

24   Q    And what was your understanding of the role based on

25   those conversations with your media advisers?

Cross-Examination - K. Oliphant

1   A     They were basically to remind people --

2          MS. GOODMAN:   Your Honor, objection with respect

3   to testifying to conversations.   The question elicited, I

4   believe, testimony about conversations the witness had.

5          THE COURT:   Overruled.

6          Go ahead.

7          THE WITNESS:   Programmatic and display ads,

8   they're basically ways to remind people to do something or a

9   very quick way to grab their attention.   And so we use those

10  to encourage people to either go to our website to learn

11  more or to click on the button and go specifically to the

12  self-response tool and respond.

13  BY MS. WOOD:

14  Q     And to what extent does census need a mix of channels

15  to achieve its campaign objectives?

16  A     It's incredibly important because not -- everybody does

17  not consume media the same way.   Everybody doesn't consume

18  digital the same way.   Some people prefer traditional media.

19          So you have to have a -- they're all part of the

20  toolbox, right?   You have all these different tools.   And in

21  order to be effective in what we do, we have to surround the

22  population or the prospective respondents with messages from

23  every possible way that we can.

24  Q     Do you remember being asked some questions about site

25  direct media advertising?

Cross-Examination - K. Oliphant

1   A    Yes.

2   Q    Can you describe what your understanding of that is?

3   A    That's where we specifically go to a site, and we --

4   the ad agency goes directly to a site.  They negotiate with

5   that site, and our ads are placed not only on that site, but

6   we're integrated -- it's a much -- it's more than just

7   placing an ad.  When we do site direct, we were integrating

8   into the content on the website.  We utilized their

9   influencers.  We were part of the programming.  It was more

10  than just placing an ad.

11  Q    And to what extent could census just do all site direct

12  and not need to do programmatic display?

13  A    It doesn't make sense.  Programmatic is like a

14  sprinkler, right?  You provide all this -- this criteria for

15  who you're trying to reach.  You feed that criteria into

16  whatever they're using as a sprinkler, and it sort of just

17  spews it out to thousands and thousands of websites.

18         We don't have that time or that inclination to go

19  website by website by website.  It is not the best use of

20  time.  It's not the best use of money.  The use of

21  programmatic for that effort is best.  It allows multiple --

22  it allows you to reach out to multiple websites at one time

23  as opposed to site direct, which is very, very intentional.

24         MS. WOOD:  I'll pass the witness.

25         THE COURT:  Any redirect?

                                                          104

Redirect Examination - K. Oliphant

1          MS. GOODMAN:  Just briefly, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. GOODMAN:

4    Q    You testified that you were not an expert in digital ad

5    buying; is that correct?

6    A    That is correct.

7    Q    Okay.  If you look in the black binder, the last tab,

8    which is your LinkedIn page, you state that you have

9    expertise in communications program, campaign development,

10   and implementation, correct?

11   A    Correct.

12   Q    Okay.  And within the digital advertising budget that

13   you had available to you for the 2020 census, you had to

14   decide how much money to put into, for example, site direct

15   as compared to programmatic, correct?

16   A    No.  We actually -- when we went through the media

17   plan, we talked about how much money should be applied to

18   digital, the digital category by audience, based upon the

19   recommendations of our ad agencies.

20   Q    And the total dollars amount available to you within

21   digital ad as whole was fixed?  It wasn't limitless,

22   correct?

23   A    It was not limitless, yes.

24   Q    And so you had to appropriately allocate between the

25   types of digital within that bucket as a whole, correct?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Redirect Examination - K. Oliphant

1    A    We applied a certain amount of funding to digital.  And

2    the amount that went to each different channel within the

3    digital moniker, so to speak, it varied by audience.

4              So if I were to reach, let's say,

5    African-Americans, I might have a different mix than I would

6    have for the Hispanic population or for older adults versus

7    younger adults or for -- you know, we could be very

8    specific, but we had to be -- we had audiences.  There were

9    languages.  There were lifestyles.  A lot of that played

10   into what the mix was of the different types of digital

11   categories that we used to serve the ads.

12   Q    And so based on all of those factors that you just

13   described, you determined the appropriate mix for those

14   various audiences and the like between such digital ad

15   strategies, like site direct and programmatic, correct?

16   A    Working with the ad agencies, yes.

17             MS. GOODMAN:  No further questions, Your Honor.

18             Thank you very much, Ms. Oliphant.

19             THE COURT:  Any recross, Ms. Wood?

20             MS. WOOD:  No, Your Honor.

21             THE COURT:  I assume no one is going to call this

22   witness again.  Is that correct?

23             MS. WOOD:  That's correct, Your Honor.

24             MS. GOODMAN:  Correct.

25             THE COURT:  Ma'am, you're free to stay and watch

Direct Examination - K.M. Hardie

1    the proceedings, or you may leave.  But don't discuss your

2    testimony with any witness who has not yet testified.

3               THE WITNESS:  Thank you.

4               THE COURT:  All right.  Are you now calling

5    Mr. Hardie?

6               MS. SESSIONS:  Yes, Your Honor.

7               THE COURT:  All right.  Go ahead.

8               MS. SESSIONS:  May I proceed, Your Honor?

9               THE COURT:  Yes, ma'am.

10              MS. SESSIONS:  Thank you.  Justina Sessions.

11         KENNETH MARCO HARDIE, DEFENDANT'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MS. SESSIONS:

14   Q    Good afternoon, Mr. Hardie.  Could you please introduce

15   yourself to the Court and spell your first and last name.

16   A    Yes.  My name is Kenneth Marco Hardie, K-E-N-N-E-T-H,

17   M-A-R-C-O, H-A-R-D-I-E.

18   Q    Thank you.

19              And, yeah, Mr. Hardie, you've got a lapel mic on

20   there, but you might actually want to hold it up to your

21   mouth.  It sometimes doesn't pick you up if it's on your

22   lapel.

23   A    Oh, okay.

24   Q    We'll try with that, but otherwise, just hold it

25   podcast style.

Direct Examination - K.M. Hardie

1   A   Will do.

2   Q   Mr. Hardie, where do you work?

3   A   I work at Google.

4   Q   In which office of Google do you work?

5   A   I work in the Washington, D.C., office.

6   Q   How long have you worked at Google?

7   A   I have worked at Google a little over seven years.

8   Q   And what do you do at Google?

9   A   My title is head of industry within the government and

10  advocacy group.

11  Q   What is a head of industry?

12  A   A head of industry is essentially a leader of a sales

13  team focused on driving revenue for Google, selling the

14  Google advertising products.

15  Q   And so you work to sell Google advertising products to

16  the government and advocacy industry; is that right?

17  A   Yes, that is correct.

18  Q   Okay.  And what does government and advocacy include?

19  A   Sure.  So the government and advocacy vertical

20  essentially consists of five teams:  Elections, which is

21  left of center, right of center; the U.S. government is

22  divided amongst two teams; and then all major nonprofits.

23  Q   Let's go back in time a little bit and talk about how

24  you got to Google.

25  A   Sure.

Direct Examination - K.M. Hardie

1    Q     Did you go to college?

2    A     Yes, I did.

3    Q     And I must ask you where you went to college,

4    Mr. Hardie.

5    A     For my undergraduate degree, I went to Yale University.

6    Q     And then what did you do after you graduated from Yale?

7    A     For a number of years, I worked in bank and finance and

8    then a number of other different things, marketing -- but

9    primarily banking and finance before going back to get my

10   MBA.

11   Q     You said you went back to get your MBA.  Where did you

12   get your MBA?

13   A     From NYU, Leonard N. Stern School of Business.

14   Q     What did you do after you received your MBA?

15   A     I actually moved to Boston for a couple of years to

16   work, again, back in banking for Bank of America/U.S. Trust

17   in more of a strategic role in the private bank.

18   Q     How did you end up back in D.C. then?

19   A     Good question.  I am from the D.C. area, born and

20   raised.  And if you look at my career history, I've always

21   tried to find a way back to D.C.  Both my parents work.  My

22   father worked in the government.  My mother was a government

23   contractor.  So after being in Boston for a number of years,

24   I wanted to get back to D.C. and get back into this area.

25   Q     Okay.  And, Mr. Hardie, I'll just ask you if you can

Direct Examination - K.M. Hardie

1    try to slow down a little bit -- sometimes I know we can get

2    excited and speak a little fast -- for our court reporter's

3    sake.

4    A    Indeed.

5    Q    And so how did you end up, then, working at Google?

6    A    Sure.  So at the time, I was actually at Deloitte in

7    federal consulting.  And a good friend of mine, who I went

8    to Stern with, was already at Google.  He made me aware of a

9    program called Google Sandbox, which was designed to

10   introduce Google to not only areas and places where they

11   didn't have a big presence -- so the Washington, D.C.,

12   area -- but also to communities of color and things of that

13   nature.

14          So I attended the Google Sandbox program.  It's

15   just a two-night program.  I became really excited about the

16   prospects of working at Google and particularly in the

17   government space.  And it just so happened that within -- I

18   don't know -- maybe six to eight weeks after that night, the

19   role posted for head of industry government was listed.

20          And really kind of the rest is history.  I

21   applied, interviewed, and have been in the role essentially

22   ever since.

23   Q    What was interesting to you about that Google job?

24   A    Sure.  So it was really kind of the right mix of all of

25   the things that I was looking for.

Direct Examination - K.M. Hardie

1              So, one, it was in technology, which is,

2     obviously, a big industry that a lot of people were trying

3     to get into at the time, but it also covered up an area in

4     which I have a decent amount of expertise.  Like I said, I

5     was at Deloitte in federal consulting, advising government

6     agencies and executives on a wide variety of business

7     issues.  So much it was kind of the right -- I was able to

8     work at Google and work in the government space, and so it

9     appealed to me.

10    Q    I want to talk a little bit more about now your work on

11    the government affairs and advocacy team.  Have you been on

12    that team for your entire time at Google?

13    A    Yes.

14    Q    What's kept you working on that team?

15    A    I think the public sector space is a very, very

16    interesting space to work in.  In many ways, I think it's

17    more interesting than the private sector.

18    Q    Why is that?

19    A    The private sector is pretty straightforward in the

20    sense of, you know, we're trying to make more money.  In the

21    public sector, it's much more mission-focused, especially

22    when you're working for the government or working with the

23    government.  They are trying to meet the needs of the

24    American people.

25              And that, actually, becomes a lot more

Direct Examination - K.M. Hardie

1    complicated, I think, in a lot of ways.  People's incentive

2    structures are not the same.  The decisions they can make

3    are quite different.  It's a digital calculation, and that

4    adds a layer of, I would say, complexity that doesn't

5    necessarily exist in the private sector.

6    Q     So what types of customers do you work with?

7    A     So primarily government agencies.  So you know, actual

8    government agencies like, you know, Veterans Affairs or USPS

9    and things of that nature.  But then also, we do work with a

10   number of advocacy groups and things of that nature.  So

11   think smoking cessation with, like, the Truth campaign or

12   something like that.  So really spreading across the

13   government and advocacy space, but primarily U.S.

14   government.

15   Q     Okay.  And in your work, do you talk directly with your

16   customers, those government agencies or those advocacy

17   groups?

18   A     Yes, for sure at times.

19   Q     Do you also work with ad agencies that work with your

20   customers?

21   A     Yes, very, very much so.  In many cases, especially

22   within the government space, we spend a good majority of our

23   time interfacing with the agencies that work with -- that

24   support the federal government agencies.

25   Q     Could you give us some specific examples of customers

Direct Examination - K.M. Hardie

1    that you've worked with on advertising with Google?

2    A    Sure.  Well, I always kind of -- the first couple that

3    come to mind are two campaigns that I'm obviously very proud

4    of.  Working with the census for the 2020 decennial census.

5    I've always worked with Health and Human Services on the

6    COVID campaign, whether that was vaccine uptake or just

7    information related to it.  I worked with USPS or the United

8    States Postal Service, Veterans Affairs.

9            Really, if it's a civilian-based agency within the

10   federal government, there's a good chance that my team

11   covers it or has worked with them.

12   Q    Okay.  And just as a slight aside, have you worked at

13   Google with someone named Sarah Stefaniu?

14   A    Yes.  Yes, I have.

15   Q    Was she on your team previously?

16   A    Yes, she was.

17   Q    Okay.  So you said that you lead a team, a sales team.

18   What is it that you're selling?

19   A    Sure.  We are selling Google's advertising platform.

20   So that starts with search, as well as YouTube, and then its

21   programmatic platform, the Google marketing platform as

22   well.

23   Q    What's the Google marketing platform?

24   A    So the Google marketing platform is really kind of a

25   wrapper of a number of different products designed to give

Direct Examination - K.M. Hardie

1    advertisers access to display and video and apps as well

2    across the internet.

3    Q    Okay.  Is Display and Video 360 a part of the Google

4    marketing platform?

5    A    Yes.  Yes, it is.

6    Q    And so just so we have it clear, you are selling across

7    Google ad formats, including, I think you said, search,

8    YouTube, then things available through the Google marketing

9    platform.  Is that right?

10   A    Yes, that is correct.

11   Q    Okay.  So what are you trying to do with this Google

12   advertising that you're offering to clients?

13   A    Yes.  I think, ultimately, we are trying to help our

14   customers, you know, achieve their business goals, whatever

15   those may be.  And in this context, we are trying to help

16   them reach the right person with the right message at the

17   right time in order to get them to do whatever thing it is

18   that the advertiser wants them to do.

19   Q    And how, at a high level, do the advertising products

20   that Google offers help your clients achieve those

21   objectives?

22   A    Sure.  So, you know, an advertiser is going to have any

23   set of goals, right.  In some cases, it is to drive

24   awareness.  So they want to make people aware of some

25   service or some thing.

114

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K.M. Hardie

1           And other times, it's designed to drive action.

2    There's an action we want you to take.  So to carry on the

3    example, we want you to go find out about a vaccine, and

4    potentially, if it's right for you, get a vaccine.  We want

5    you to do something.

6           In other cases, we are also trying to change

7    behavior or potentially prevent a behavior.  So, for

8    example, working with the Department of Transportation, we

9    may work on a don't drink and drive campaign or railroad

10   safety or things of that nature.  We're trying to actually

11   prevent some negative thing from happening as well.

12   Q    In your experience, when you're talking to clients

13   about potentially advertising with Google, what are they

14   thinking about when they're thinking about where they want

15   to buy ads?

16   A    They are thinking about their ultimate kind of business

17   objective.

18           MS. CLEMONS:  Objection, Your Honor, as far as a

19   foundation for what his other clients are thinking about.

20           THE COURT:  You can rephrase that questions.

21           MS. SESSIONS:  Sure.

22   BY MS. SESSIONS:

23   Q    What is your understanding of your client's goals

24   when --

25           THE COURT:  What about the types of goals do the

Direct Examination - K.M. Hardie

1    clients give you?

2              THE WITNESS:  Sure.  It can range.  Like to the

3    point, those business goals could be kind of all of the

4    above, and it could exist all within one campaign.

5              So to try to give an example within the census,

6    for an example, early on we may want to make you aware that

7    there is a census, right.  And then as we get closer to

8    when, let's say, we want you to fill it out, we want you to

9    consider, you know, why the census; why it's important to do

10   your civic duty and fill out the census; or what do you

11   actually do -- how do you actually go about filling out the

12   census.

13             Then when you get to the tool is actually open, we

14   may want -- our goal may be to actually drive you to click

15   on the website to go actually fill out your census; or, if

16   you haven't done that, if someone comes and knocks on your

17   door, to answer the door and know what questions they're

18   going to ask you.

19             So at any given phase, depending on what they're

20   doing, they may come to us with help with any of those

21   goals, either all of those goals at times or one of those

22   goals.  But that's essentially how we work with them.

23   There's really no way to work without them without, like,

24   understanding.  Our ultimate goal is to help them meet their

25   business objectives.

Direct Examination - K.M. Hardie

1   BY MS. SESSIONS:

2   Q    So how, if at all, does the goal that the advertiser

3   has relate to where they might be buying advertising?

4   A    The goal that they have -- you know, if you think about

5   advertising platforms and products, those goals -- or those

6   tools help you achieve those goals.  And so they are coming

7   to us for kind of the right combination of tools and

8   approaches to help them hit those goals.

9   Q    Okay.  Are you familiar with the concept of an audience

10  in advertising?

11  A    Yes, absolutely.

12  Q    Okay.  How, if at all, does the concept of an audience

13  relate to the goals that an advertiser might have?

14  A    It relates heavily.  So depending on the type of

15  campaign that you're having, you're typically always going

16  to have some target audience or audiences that you want to

17  reach.

18          In the government space, it can actually be really

19  interesting because there are -- unlike in the private

20  sector, again, which I think goes back to my original point

21  that makes it interesting, there are actual cases in which

22  the government is trying to reach, essentially, everybody.

23  And so that maybe is pretty interesting as you start to

24  think about audiences.

25  Q    And how, if at all, does the audience relate to the

Direct Examination - K.M. Hardie

1    specific places or channels where an advertiser might buy

2    at?

3    A    It relates quite a bit of ways in the sense that -- I

4    mean, ultimately, advertisers are following eyeballs.  They

5    are trying to reach people wherever they are.  And,

6    obviously, in today's society where people are on a number

7    of different screens and devices throughout the day, it can

8    be harder to reach people and grab their attention,

9    especially if you think -- you know, not to be funny, but if

10   you think about younger generations and how they're reached.

11         So it's important that the platform that you're

12   using or the platforms that you are using have the ability

13   to reach the audiences no matter how kind unique or bespoke

14   they may be.

15   Q    In your experience, are the clients that you work with

16   focused on reaching a particular audience via a particular

17   format, or are they focused on reaching that audience more

18   broadly?

19   A    So I think people or advertisers -- they have a goal in

20   mind, ultimately.  Ultimately, they want to reach who they

21   want to reach at the time they want to reach them to

22   persuade them to do the thing, whatever it is they want them

23   to do.  Especially increasingly, as I just said, given if

24   you think about how fragmented just your interaction as a

25   human every day on devices is, it can be more challenging to

Direct Examination - K.M. Hardie

1   do that.

2            And so I think we spend a lot of time -- and I

3   certainly spend a lot of time -- thinking about just

4   connecting people to -- connecting the right message to the

5   right people.  That is a phrase that I kind of say quite

6   often because that's what we're focused on, and it's really

7   kind of -- it can be agnostic of a particular -- a

8   particular platform at any given time.

9   Q    And you said it can be agnostic as to the particular

10  platform at a particular time.  What do you mean by that?

11  A    At the end of the day, if I'm an advertiser, I have

12  business goals.  I don't actually -- I don't actually care

13  where I'm reaching these people if I'm getting them the

14  right message at the right time, and I ultimately drive

15  value for them.  Like, I ultimately get them to do the thing

16  I want them to do.

17           So on my end, again, my goal is to truly try to

18  match that, right?  Because at the end of the day, we are

19  able -- we do well when our customers do well and, we drive

20  value for them.  And so I don't care what platform per se so

21  long as we are helping drive their business goals.

22  Q    Now, you said you work with a lot of government and

23  advocacy advertisers.  Have you worked on campaigns that

24  have commercial goals as opposed to sort of public welfare

25  goals as well?

Direct Examination - K.M. Hardie

1   A    Yes.  Yes, I have.  USPS, for example, obviously

2   functions very, very similar to the way a business does.

3   They compete with FedEx and UPS just like anyone else does.

4            And then also Amtrak is another good example who

5   obviously is going to compete with any other travel

6   organization and is going to have business goals.  They are

7   essentially self-funded.

8   Q    And I think earlier you mentioned working with the

9   census.  Did you work on advertising for the 2020 census?

10  A    Yes.

11  Q    Okay.  And the Court has already heard some about the

12  2020 census campaign, so we will not retread old ground.

13  But could you just tell the Court what was particularly

14  interesting or notable about your work on advertising for

15  the 2020 census?

16  A    Sure.

17           MS. CLEMONS:  Objection, Your Honor, with respect

18  to what the relevance of this particular --

19           THE COURT:  I'm going sustain that objection.

20  We've heard a lot about that.  Let's move on.

21  BY MS. SESSIONS:

22  Q    How did Google get involved working with the census on

23  advertising?

24  A    Sure.  It was actually maybe -- probably the first

25  meaningful project that I remember working on or being kind

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K.M. Hardie

1  of assigned to when I first started.

2         We had the goal of being the lead strategic media

3  and digital partner, essentially, for the census.

4  Obviously, it was a massive campaign.  It's the largest

5  thing that the government does, basically, outside of war.

6  And so, you know, it was very important to us, as a

7  business, to be, you know, the lead partner there.

8  Q    Did Google have to compete to get the census' business?

9  A    Very, very much so, yes.

10 Q    Could you give some examples of some of the things that

11 Google felt that it needed to do in order to win the census'

12 business?

13         THE COURT:  Hold on a second.

14         Was this handled through the FARs?  Did you have

15 to comply with the Federal Acquisition Regulations?

16         THE WITNESS:  No.  So that's -- the way our

17 business works, essentially, from an advertising

18 perspective, there's an essentially almost intermediary

19 step.  So when the government decides to use that example,

20 we are going to advertise for the census.  They're going to

21 put out their RFP through the natural procurement process,

22 and advertising agencies compete and respond to those RFPs.

23 They are awarded -- they become the agency of record, and

24 then we work with those agencies on those campaigns.

25         So we -- I am -- I am, as part of my job, not

Direct Examination - K.M. Hardie

1    responding to RFPs and things of that nature.  We don't deal

2    with that on the advertising side.

3            THE COURT:  So the decision-maker in your case was

4    not the census bureau, but it was Rubicam -- or the ad

5    agency?

6            THE WITNESS:  Yes and no, right.  So yes.  I mean,

7    ultimately, the ultimate decision-maker is the census.  And

8    so we definitely worked hard to develop a good relationship

9    with the decision-makers at the census.  But yes, primarily,

10   we are absolutely kind of beholden to or working with -- I

11   spent the vast majority of my time working with Y&R in order

12   to execute on the census.

13   BY MS. SESSIONS:

14   Q    And what is Y&R?

15   A    Young and Rubicam.

16   Q    That's an ad agency?

17   A    Correct.

18   Q    Okay.  So did the census or the ad agencies that you

19   were working with have any particular requests of Google

20   while you were pitching the business?

21   A    Yes.  There were lots of things that we -- that we did

22   in order to help win the business.

23   Q    Could you give some examples of those things?

24   A    Sure.

25            MS. CLEMONS:  Objection to the extent that he's

Direct Examination - K.M. Hardie

1     about to talk about requests that other entities made and on

2     hearsay grounds, Your Honor.

3                  MS. SESSIONS:  This is purely offered -- going to

4     be offered for what Google did in order to win the business,

5     not for the --

6                  THE COURT:  Overruled.

7                  THE WITNESS:  Sure.  So there were a number of

8     different things.  So there were a number of different

9     agreements that we did or concessions we made in terms of

10    our payment terms just given the way government contracting

11    works as we just talked about.  Our natural terms, our

12    standard terms don't really fit with how it was going to

13    work with the census given the fact that the census agencies

14    really had eight or nine different media agencies working

15    underneath this one agency.  That's an example.

16                 Another thing is we help them -- they had a

17    request around making sure that their website tool didn't

18    crash.  So if you think about it, Google obviously gets

19    billions of searches any given day and Google never goes

20    down.

21                 The census was very concerned that there would be

22    potentially a repeat of a healthcare.gov.  If you remember

23    when that first started, there was a long period of time

24    when that went down, that site went down.  So they asked us

25    to give them -- talk to our engineers and give them, like,

Direct Examination - K.M. Hardie

1   pointers essentially.  That's beyond my experience -- my

2   reason of expertise.  But to give pointers in terms of how

3   do we make sure that the site doesn't go down on launch date

4   and things of that nature.

5           So it really kind of ran the gamut for different

6   types of concessions and things that we could do to be

7   helpful.

8           They also cared quite a bit about mis- and

9   disinformation.  So, obviously, again, as a big platform

10   such as ours, we helped surface insights and trends on

11   various pockets of mis- and disinformation within -- you

12   know, within the web, essentially, to help them better kind

13   of get a handle on what was happening online, essentially,

14   what the chatter was to better prepare to combat

15   misinformation as we led up to the actual launch of the

16   tool.

17   BY MS. SESSIONS:

18   Q    Okay.  And did Google, in fact, work with some of the

19   ad agencies that the census was working with in order to

20   advertise for the 2020 census?

21   A    Yes.  We spend, again, the vast majority of our time

22   working with the actual agencies themselves.  They were the

23   ones who were really, essentially, kind of running the

24   campaign.  We certainly had -- we tried to have, to the

25   extent that we could, regular meetings with the census

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K.M. Hardie

1    themselves.  We -- a lot of those times we would -- to kind

2    of drive home the point, we would end up -- those weren't

3    necessarily always media-based conversations.  We would

4    bring folks from PR or from policy or from trust and safety

5    in order to kind of advise them, again, on handling

6    something of this scope.

7    Q    Were there any challenges during the advertising

8    campaign for the 2020 census?

9    A    Yes.  Yes, there were.

10            MS. CLEMONS:  Objection --

11            THE COURT:  I think we've heard enough.  This is

12   not about the census.  All right.  Let's move on.

13   BY MS. SESSIONS:

14   Q    All right.  What media was used in the census'

15   advertising campaign?

16   A    Specifically Google media?

17   Q    We can start with Google media, sure.

18   A    Sure.  So they used Google search, obviously YouTube,

19   and then DV360 -- programmatic through DV360.

20   Q    Okay.  Did -- to your knowledge, did the census also

21   use non-Google media to advertise for the 2020 census?

22   A    Yes, they did.

23   Q    Okay.  Mr. Hardie, you've got a document in front of

24   you there, just one I think.  Do you have a folder?

25   A    Yes, a folder.

Direct Examination - K.M. Hardie

1   Q    Okay.  And the document in this folder is DTX 1030.

2              THE COURT:  Any objection?

3              MS. CLEMONS:  I just object because it's

4   cumulative of other testimony given by other witnesses and

5   other documents already in evidence, Your Honor.

6              MS. SESSIONS:  Your Honor, I don't believe it's

7   cumulative, and I will not spend too much time on it.  But

8   there are some specific things about this use of advertising

9   that I'd like to discuss with Mr. Hardie.

10             THE COURT:  I'll permit it.  It's in.

11             MS. SESSIONS:  Thank you.

12  BY MS. SESSIONS:

13  Q    Mr. Hardie, what is DTX 1030?

14  A    This is a summary that the team put together following

15  the campaign to show the impact of our strategy in helping

16  them reach their goals.

17  Q    If we could, go to page 2 of this document, which has

18  an executive summary.  And the -- in the first paragraph

19  here, after the little arrow, it says, "Achieve equitable

20  reach for diverse mass and hard-to-reach audiences."

21             Do you see that?

22  A    Yes, I do.

23  Q    What does that mean in the context of an advertising

24  campaign or an advertising effort?

25  A    Sure.  So within the census especially but in larger --

Direct Examination - K.M. Hardie

1    especially when you're dealing with the government, we talk

2    about reach.  But it's not just important to reach, you

3    know, a wide swath of people.  Equitable reach is is it done

4    in an equitable way.

5            To kind of make the point, there are audiences and

6    segments of our population, whether it's rural, for an

7    example, or communities of color that aren't necessarily

8    going to be reached just -- aren't as easy to reach, I

9    should say, as some other mass audiences.

10           And so it was really important -- again, if you

11   think about where there have historically been rates of

12   undercollection of -- an underrepresentation within the

13   census, it was important not to just have reach but to have

14   equitable reach, so make sure that we are reaching every

15   American.  So that was -- essentially, that was their -- the

16   census' goal for the campaign.

17   Q    Okay.  Could you turn now to page 3 of the document.

18   A    Yes.

19   Q    And I want to ask you about the headings on this

20   diagram "Awareness and Motivation."

21   A    Uh-huh.

22   Q    Do you see that?

23   A    Yes.

24   Q    Just in the interest of speeding this along, were those

25   phases of the census' advertising campaign?

Direct Examination - K.M. Hardie

1   A    Yes.  Those were, like, the official phases that came

2   from the census for the campaign.

3   Q    Are you familiar with what's sometimes called the sort

4   of traditional advertising funnel?

5   A    Yes.  Yes, I am.

6   Q    Okay.  What phases or levels of the funnel would you

7   put awareness and motivation into?

8   A    So --

9           MS. CLEMONS:  Objection, Your Honor.  This

10  continues to be cumulative testimony.

11          THE COURT:  Yeah, this is really not going very

12  far.  Make it more pointed at the issues that are in this

13  case.

14          MS. SESSIONS:  Okay.

15  BY MS. SESSIONS:

16  Q    Mr. Hardie, at page 3, what formats of advertising did

17  the census use during its awareness and motivation phases?

18  A    They used DV360, so programmatic display and video.

19  There was, obviously, just direct YouTube O&O.  Search as

20  well was a big component of the campaign -- or, essentially,

21  all of our products within our platform.

22  Q    Okay.  And programmatic display and video, I think you

23  said that's media bought through DV360?

24  A    Yes, that is correct.

25  Q    Did that include ads and apps?

Direct Examination - K.M. Hardie

1    A    Yes.

2    Q    Did that include ads on websites?

3    A    Yes.

4    Q    And did that include video advertising?

5    A    Yes.

6    Q    Okay.  So the census used all of these formats during

7    the awareness and motivation phases of its campaign?

8    A    Yes.

9    Q    Is that right?  Okay.

10            I want to ask you now about something on page 4 of

11   the document.  There's a reference here on page 4.  There's

12   a box that says "late April."

13            Do you see that?

14   A    Yes.

15   Q    It says, "Built tool to showcasing DMA-specific media

16   consumption habits" --

17   A    Yes.

18   Q    -- "audience insights, and Google reach to inform

19   digital and traditional media planning."

20   A    Yes.

21   Q    Do you know what this is referring to?

22   A    I do.

23   Q    What is it?

24   A    So if you remember back at that time, we all were

25   sitting home, essentially, in March of 2020, which was right

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - K.M. Hardie

1    when the tool opened.  And so the census had a huge part of

2    their marketing plan involved in-person on-the-ground

3    efforts.  And once the pandemic hit, they essentially had to

4    abandon all of that.

5            And so what was going to be, like, the first

6    digital census -- so meaning that this is the first time in

7    history that people would be able to fill out their census

8    online -- it went from digital first to digital only.  And

9    so what we did was to build a tool, which would help them

10   better make media decisions.

11           So this tool essentially looked at consumption

12   habits in different DMAs.  So, like, different location

13   areas and, you know -- for an example, someone in

14   Charleston, South Carolina, is going to consume media in

15   different ways than someone maybe in New York City or in

16   Manhattan.

17           So this tool was actually built agnostic of

18   digital media.  It was all media.  So that included

19   out-of-home, radio, and all of these types of things.  What

20   it would do is it would show, based on that location, what

21   those preferences were and then help the census essentially

22   make decisions on how to allocate resources in order to

23   reach the audience they wanted to.

24   Q    When you say how to allocate resources, does that

25   include allocating among different ad channels or formats?

Direct Examination - K.M. Hardie

1    A    Yes.  It means -- I mean, literally, the -- this is not

2    just digital.  This is everything.  So out-of-home, TV, but

3    then also if someone were to be -- you know, this audience,

4    for example, is more likely to listen to podcasts or

5    something of that nature.  It's like all of those things,

6    all media that people consume, it made recommendations based

7    on that.

8    Q    Okay.  And this was a tool, I think you said, that

9    Google built?

10   A    Yes.

11   Q    Okay.  Let's go now to page 6.  And on page 6, there's

12   a discussion of audience segment details here on the right.

13   A    Yes.

14   Q    And I'm not going to go through all of these various

15   audience segments but my -- but -- well, I'll back up for a

16   second.

17         Does this slide refer to buying media via Display

18   and Video 360?

19   A    Yes.

20   Q    Okay.  So this refers to ads on the Internet or on

21   YouTube bought through DV360?

22   A    Yes.

23         MS. CLEMONS:  Objection, Your Honor.  I'm going to

24   reiterate the objection regarding cumulative and how this is

25   relevant to the core issue of this case.

131

Direct Examination - K.M. Hardie

1        MS. SESSIONS:  I'm about to -- I will ask two more

2   questions and get to the point on this.

3        THE COURT:  See if you can tie it up.

4        MS. SESSIONS:  Thank you, Your Honor.

5   BY MS. SESSIONS:

6   Q    You see these audience segments on the right here?

7   A    Yes.

8   Q    Okay.  Did the census use local advertising bought

9   through DV360 to reach any of these audience segments here

10  on the right?

11  A    Yes.

12  Q    So just to be clear, one can buy local advertising

13  through DV360; is that right?

14  A    That is correct, yes.

15  Q    All right.  You can put that document aside.

16        And we talked, actually, for a minute about ads on

17  YouTube.  In what format do ads show up on YouTube?

18  A    A wide variety of formats.  On YouTube, there can be

19  what's a masthead, which is essentially when you go to the

20  website and something pops up.  That's essentially the

21  masthead.

22        MS. CLEMONS:  Objection, Your Honor, as to

23  relevance in this line of questions.

24  BY MS. SESSIONS:

25  Q    Does YouTube have static image ads on it?

Direct Examination - K.M. Hardie

1   A    Yes.

2   Q    Okay.  So we talked a little bit earlier about the work

3   that Google did to gain the business, you know, from the

4   census.  I want to step back for a minute and talk more

5   generally about your work with clients.

6           Once you land a client or land a campaign, is your

7   work done?

8   A    No.  In many ways, the work is just beginning.

9   Q    So what kinds of things do you do to support clients

10  once you've won their business initially?

11          MS. CLEMONS:  Objection.

12          THE COURT:  I think, again, this is not advancing

13  Google's position on the key issues in this case.  So let's

14  get to something that's relevant or else we're done with

15  this witness.

16          MS. SESSIONS:  All right, Your Honor.  I will just

17  have a few more questions for Mr. Hardie.

18          I did think that the work that Google continues to

19  do to support its clients is relevant, but I take your

20  point.

21          THE COURT:  At this point, it's sounding more like

22  PR than relevant to the issues in this case.  All right?

23          MS. SESSIONS:  All right.

24  BY MS. SESSIONS:

25  Q    I would just like to ask you about one more ad campaign

133

Direct Examination - K.M. Hardie

1    that you've worked on, and we'll limit your testimony to the

2    particular sort of goals and formats that were used with

3    this campaign.

4            But did you work on the HHS COVID awareness and

5    vaccine campaign?

6    A    Yes, I did.

7    Q    Okay.  And what kinds of formats and media did HHS use

8    when advertising that campaign?

9    A    They used Google --

10           MS. CLEMONS:  Same objection, Your Honor,

11   regarding relevance and cumulative.

12           THE COURT:  You've made the point that these big

13   campaigns use multiple types of advertising, which I think

14   is the main thing you're putting these witnesses on for.

15   Let's move it along.

16           MS. SESSIONS:  Yes, Your Honor, as well as that

17   the formats are used for the same purposes.  I take your

18   point.

19           And with that, I will pass the witness then.

20           Thank you, Mr. Hardie.

21           THE COURT:  Now, I doubt there's much cross

22   needed.

23           MS. CLEMONS:  We don't have any cross, Your Honor.

24           THE COURT:  Even better.  That's fine.

25           Does anybody plan to call Mr. Hardie again?

                                                           134

Direct Examination - K.M. Hardie

1              MS. SESSIONS:  No, Your Honor.

2              MS. CLEMONS:  We do not, Your Honor.

3              THE COURT:  Thank you, then, sir, for your

4    testimony.  You're free to watch the proceedings, but you

5    are not to discuss your testimony with any witness who has

6    not yet testified.

7              THE WITNESS:  Okay.

8              THE COURT:  All right.  Are we now into video

9    reads, or do you have another live witness?

10             MS. DUNN:  Your Honor, our next live witness we

11   are expecting to call tomorrow, and that will be Professor

12   Paul Milgrom.  So we'd like to complete the Microsoft

13   read-in if the wonderful reader is available.

14             THE COURT:  Yes.  We'll go get him.

15             MS. DUNN:  Thank you.

16             THE COURT:  We're going to have to find those

17   depositions again.

18             MS. DUNN:  Your Honor, do you have the transcript?

19             THE COURT:  I'm sorry?

20             MS. DUNN:  Do you have the transcript in front of

21   you?

22             THE COURT:  Is it still up here?

23             MS. DUNN:  We can see if we have a new one for the

24   Court.

25             THE COURT:  We've got it.

Read-In Deposition - B. John

1          MS. DUNN:  And in case it assists the Court, we're

2     at 229:09.

3          THE COURT:  All right.  I've got it.  All right.

4          MS. DUNN:  Thank you, Your Honor.

5     (The deposition of Benneaser John is read as

6          follows:)

7  Q    One of the things you were talking about there was

8     scale.  How, if at all, does scale affect whether it's easy

9     or difficult for a company to enter the ad tech business?

10 A    So when it comes to scale, let's use the example of

11    user.  On the buy-side, let's say an advertiser wants to

12    advertise their product across the age group of 40 and 50 or

13    across a specific region.  They won't be able to reach

14    through only one publisher or through only one format.  So

15    they are looking for multiple publishers where the user

16    swings or goes or navigates across multiple properties.  So

17    that's the -- that is the scale of reach advertisers need.

18          And on the publisher side, they don't have the

19    scale that they'll be able to meet the needs of advertisers.

20    So they're looking for diversity of demand that they'll be

21    able to attract.  And how will they participate into that

22    market or network where they don't have all the scale an

23    advertiser is looking for?

24          THE COURT:  All the scales.  All the scales, yeah.

25          THE WITNESS:  That's where, when you run a

Read-In Deposition - B. John

1    marketplace, you'll be able to match the advertising dollars

2    that advertisers need to multiple publishers and vice versa.

3    Q    Focusing on the U.S., do you view search and display

4    advertising as substitutes or not?

5    A    They're not substitutes.

6    Q    Why do you think search and display advertising are not

7    substitutes?

8    A    Because when you think -- when you think about the

9    user, right, you go use search.  And then you also go use

10   maps, and you also go read the news.  As a user, you visit

11   all of those properties.  So from a user perspective, search

12   is another web property.  That's another user interaction to

13   the digital ecosystem from a user perspective.  So an

14   advertiser would like to reach the user across all -- so

15   that's why, you know, you can't substitute within those two

16   concepts.

17   Q    Focusing on the U.S., do you view social media

18   advertising and display advertising as substitutes or not?

19   A    So to give an example, the users go between social

20   media and search and nonsearch properties, so from those

21   characteristics.  But from an advertiser perspective, they

22   would have different targeting parameters for social media

23   versus nonsocial media.

24   Q    When you said there are different targeting parameters

25   for social compared to display, what did you mean by that?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Read-In Deposition - B. John

1   A    So that the format of the ad and how you measure an ad

2   and how you expect a user to interact with those ads,

3   attribution, all of those, because social media is more like

4   a closed net.  That data is not available, and advertisers

5   need to run different metrics to match how their advertising

6   dollar is spent between social versus nonsocial.

7   Q    So focusing on the U.S., you view social advertising

8   and display advertising as substitutes or no?

9   A    They're not substitutes.  Also, based on the RFPs that

10  we've seen and how agencies -- advertisers are organized,

11  there's a separate group or team that they buy social media

12  advertising.  There's a separate team that buys non.  So one

13  won't be able to replace or substitute the other.

14  Q    Was Google's AdX the largest display exchange five

15  years ago?

16  A    Yes, yes.  It still is.

17  Q    Why is Google able to maintain its position as the

18  largest display SSP at least for the last five years?

19  A    You know, the customers that Google ad server and AdX

20  had access that I mentioned before, they are sticky.  And I

21  believe that's one of the reasons the supply is consistently

22  staying there.

23  Q    When you say that customers are sticky, what do you

24  mean by that?

25  A    Make the publishers those that are leveraging Google ad

Read-In Deposition - B. John

1  server and makes the supply available on AdX.  Also, it's my

2  belief that the 1p, all the supply, is also part of the

3  exchange, Google's O&O.

4  Q    How does Xandr's SSP take rates compare to -- for open

5  auction compare to AdX's take rate for open auction?

6  A    Xandr's take rates are the lowest in the industry.

7         MS. DUNN:  Move to admit, Your Honor, DTX 1376.

8         THE COURT:  Any objection?

9         MS. WOOD:  No objection.

10         THE COURT:  All right.  It's in.

11         MS. DUNN:  Thank you, Your Honor.

12  Q    Now, Mr. John, you recognize this as a Xandr business

13  record prepared on -- dated November 2022 in the ordinary

14  course of business?

15  A    Yes, I do.

16  Q    And if you look at the left-hand side of the page, this

17  is a Xandr document after the acquisition by Microsoft, and

18  it refers to, quote/unquote, unique demand.

19         Do you see that?

20  A    That is correct.

21  Q    And if you look at unique demand, then there are four

22  categories, and the four categories are projects that

23  Microsoft and Xandr are working on.  Do you see that?

24  A    That is correct.

25  Q    And you don't dispute that when the document says,

139

Read-In Deposition - B. John

1    "Microsoft Audience Network demand originated from Bing

2    search and Microsoft audience -- Microsoft Audience Network

3    audience buys," that it's describing this as unique demand

4    to which Xandr's publishers will have access following the

5    Microsoft Xandr acquisition?

6    A    That is correct.

7    Q    If you look at the next page, there is -- on the

8    left-hand side of the page, it says "Unique data."  Do you

9    see that?

10   A    That's right.

11   Q    So what this document is saying is that Microsoft is

12   working on a project to unify Microsoft's first-party data

13   and Xandr's third-party data that is available to both,

14   right?

15   A    To join the data to scale the audience, correct.

16             MS. DUNN:  Your Honor, move to admit DTX 1756.

17             MS. WOOD:  No objection.

18             THE COURT:  All right.  1756 is in.

19             MS. DUNN:  Thank you, Your Honor.

20   Q    And Microsoft -- this is on Microsoft's website, and

21   it's telling advertisers and publishers that they can "help

22   solve your buyers' and sellers' greatest advertising

23   challenges with Xandr's platforms that enable you to unlock

24   the full value of running programmatic advertising campaigns

25   across screens and tapping into engaged audiences."

Read-In Deposition - B. John

1           And so you don't disagree that this is what
2    Microsoft is telling people today; do you?
3    A     I don't disagree.
4    Q     And would -- you do agree that having an end-to-end
5    platform helps prevent fraud?
6    A     Yes.
7    Q     If you look at page 2 of the printout from Microsoft's
8    website, it says that "Premium advertising is available for
9    a variety of formats through Microsoft."
10          Do you see that?
11   A     Yes, that is correct.
12   Q     Microsoft is telling people through its website that
13   "You can reach your desired audience with one of the world's
14   largest marketplaces."
15          It's talking about Xandr, right?
16   A     Yes, that is correct.
17   Q     And it specifically mentions that that goes from
18   connected TV to display to native.  Do you see that?
19   A     Right.  You can reach the audience through one of those
20   marketplaces, correct.
21   Q     And then if you go to the part at the bottom of the,
22   quote, advertiser platform, today what Microsoft is telling
23   people who may be interested in its products that it has a
24   "robust data marketplace with access to premium supply
25   across digital formats and flexible ways to transact."

Read-In Deposition - B. John

1          Do you see that?

2   A    Yes, I do.

3   Q    And do you happen to know when it says "across digital

4   formats," what formats its talking about?

5   A    It's display, audio, video, CTV.

6          MS. DUNN:  Your Honor, move to admit 1384.

7          MS. WOOD:  No objection.

8          THE COURT:  All right.  1384 is in.

9   BY MS. DUNN:

10  Q    Yes, the first page is metadata.  This is a document

11  produced by Microsoft to Google, and the date is November 9,

12  2022, on this document.  It follows the Microsoft/Xandr

13  acquisition, and it is a top track for buyers meant to

14  accompany slides.  And Microsoft's expansive ecosystem

15  allows you to access over 1 billion people.

16          Do you see where it says that?

17  A    Yes, I do.

18  Q    And so when Microsoft and Xandr are talking to the

19  buyers about buying across channels and formats, what they

20  are talking about is at least CTV, gaming, shopper

21  marketing, native, and display, right?  Is that what it

22  says?

23  A    It says advertisers were able to reach across different

24  audiences and different formats.

25  Q    Right.  And it's telling buyers, advertisers, that they

Read-In Deposition - B. John

1   can reach people through CTV, gaming, shopper marketing, and

2   native all as a result of Microsoft and Xandr, right?

3   A    That is correct.

4           MS. DUNN:  Your Honor, move to admit -- the next

5   three exhibits are in a row.  So DTX 1544, DTX 1091, and

6   DTX 1083.

7           MS. WOOD:  No objection.

8           THE COURT:  All three of them are in.

9           MS. DUNN:  Thank you, Your Honor.

10  Q    So my question about each of those three is the same,

11  whether you recognize those documents -- whether you

12  recognize those as documents prepared by your company

13  employees in the ordinary course of business.

14  A    That is correct.

15          MS. DUNN:  Your Honor, move to admit DTX 1288.

16          THE COURT:  Any objection?

17          MS. WOOD:  No objection.

18          THE COURT:  All right.  It's in.

19  Q    Now, this is a document where the metadata suggests

20  that you prepared it.

21  A    That is correct.

22  Q    Okay.  And is it -- was it prepared in the ordinary

23  course of business?

24  A    That is correct.

25  Q    So if you look at Slide 10 of 14 --

Read-In Deposition - B. John

1   A      10 of 14, yes.

2   Q      -- the title of the slide is "Microsoft's 'Meta DSP.'

3   And it describes meta DSP as a "fully integrated omnichannel

4   DSP that provides an easy way to run omnichannel campaigns

5   using premium inventory and exclusive data."

6          Do you see that?

7   A      That is correct.

8   Q      What is an omnichannel campaign?

9   A      An omnichannel DSP or campaign is where a buyer can buy

10  multiple formats through one DSP.

11  Q      And then in your slide that talks about the omnichannel

12  campaign, it lists in red what I take to be the various

13  channels.  Is that correct?

14  A      Formats, channels, that's correct.

15  Q      The channels that you've listed as part of Microsoft's

16  meta DSP, which would be a fully integrated omnichannel DSP,

17  includes search, display, native, video, CTV, DOOH -- which

18  is?

19  A      Digital out of home.

20  Q      -- gaming, audio, and social.

21         Now, let me ask you this question, which is you

22  said earlier that display is on a decline.  Are any of these

23  various channels on a growth trajectory?

24  A      Video and CTV are in the growth.

25         MS. DUNN:  Your Honor, move to admit 1757.

Read-In Deposition - B. John

1              MS. WOOD:  No objection.

2              THE COURT:  All right.  It's in.

3      Q    This is just a computerized version of the schematic

4      that you marked up earlier, and I want to give you one more

5      opportunity -- I think we got everything right that you

6      said, but if there's anything that we got wrong, please let

7      us know.  And, otherwise, we will be done.

8      A    Can I clarify a couple of things?

9      Q    Sure.

10     A    So when you put a Microsoft advertising line to here,

11     Bing is the only one.  DuckDuckGo, AOL, and Yahoo run

12     separately.  We provide the APIs and the mechanisms so users

13     don't -- that's one thing because just -- you know, since

14     you put that box here, I just wanted to clarify that.

15              The MSX display and native, just one change there.

16     Yes.

17              MS. DUNN:  Was Your Honor done?

18              THE COURT:  Yes.

19              MS. DUNN:  Okay.  Your Honor, that concludes the

20     Microsoft deposition.

21              We have a number of exhibits that we'd like to

22     move in, and I can list the DTX numbers.

23              THE COURT:  Hold on a second.

24              MS. WOOD:  Your Honor, we would object to

25     proceeding in this fashion with respect to a third-party

1    witness.  This was done by the United States because we

2    entered into a stipulation with Google that we would forgo

3    calling certain Google witnesses in exchange for their

4    waiver of certain types of objections and our ability to use

5    documents without a sponsoring witness, but we don't think

6    that opens the door to moving in a whole slew of exhibits

7    without a witness on the stand to authenticate them or be

8    questioned about them.

9         MS. DUNN:  Your Honor, just for the record, it's

10   not a slew.  Also, we have a 902(11) declaration from

11   Microsoft.  And on September 13, the plaintiffs did do this

12   with a third-party witness where they moved in several

13   documents.

14        MS. WOOD:  Well --

15        THE COURT:  The problem I'm having, as I mentioned

16   to you before, is just loading up the record with documents

17   for which there is no context because there was not a

18   witness who was questioned about the document.  It's very

19   problematic.  And so, in my view, if the document is

20   sufficiently important, then it should have been raised in

21   the context of questioning.  Just throwing a whole bunch of

22   things in, I'm not going to give them much attention.

23        MS. DUNN:  So, Your Honor, understood.  It's not

24   throwing a whole bunch of things in, and the parties have

25   thus far proceeded to add on several, not a whole slew, of

```
 1   documents.
 2             THE COURT:  I agree.  The government has done it
 3   as well.  But how many are you talking about?
 4             MS. DUNN:  Let me just count.  These are just the
 5   priority ones.
 6             Nine, Your Honor.
 7             MS. WOOD:  And, again, Your Honor, the difference
 8   is stipulation.  We agreed to forgo calling certain
 9   witnesses to shorten the length of the trial and make it
10   more efficient, certain Google witnesses, in exchange for
11   the stipulation.  There's been no reciprocal agreement.  We
12   have no agreement with respect to documents.  We don't have
13   a live Microsoft witness to testify about these documents.
14   So it's a very different situation than was presented when
15   we moved certain documents in that related to multiple
16   Google witnesses.
17             THE COURT:  Well, give me an example.  Do you have
18   them with you?
19             MS. DUNN:  I am using the -- yes, Your Honor.
20             MS. WOOD:  I don't even have a copy.
21             THE COURT:  I understand.
22             MS. DUNN:  We have copies.  But also, just for the
23   record, the precedent I'm citing is with respect to the
24   Facebook witness, which was Day 5 of the trial.  I'm citing
25   a third-party witness, not the Google witnesses.  And I
```

1    understand that.

2              MS. WOOD:   But that's a live witness on the stand,

3    Your Honor.

4              MS. DUNN:   And you moved in the documents after

5    the witness was done, and that has been the practice through

6    this trial.   If it were not the practice through this trial,

7    I would understand.

8              Now, with respect to --

9              THE COURT:   Wait.   Hold on.   Are these exhibits

10   that you want to introduce connected to that witness you

11   just mentioned, or is it as to the deposition person?

12             MS. DUNN:   No.

13             THE COURT:   The ones that you want to introduce

14   right now are related to what person?   I thought it was to

15   the deposition.

16             MS. DUNN:   The Microsoft witness, who was the

17   30(b)(6) -- and we have the 902(11) declaration from

18   Microsoft about these particular documents.

19             THE COURT:   All right.   Before we go any further,

20   I hope you have a copy that Ms. Wood can look at and a copy

21   I can look at.   Let me see what we are talking about.

22             MS. DUNN:   Thank you.

23             THE COURT:   And for the record, what's the number

24   of the first document?

25             MS. DUNN:   DTX 352.

1            THE COURT:  Now, it was on your witness list,

2   correct?  On your exhibit list?

3            MS. DUNN:  Or on the exhibit list, yeah.

4            DTX 352, the government's objection is an 802

5   objection.

6            MS. WOOD:  And, again, this witness --

7            THE COURT:  All right.  Let me see it.  I don't

8   have it, so I can't even begin to think about it.  Make sure

9   Ms. Dunn has a copy and Ms. Wood has a copy.

10            MS. DUNN:  And we will get the Court a copy of the

11   exhibits.

12        (Documents are passed up to Court.)

13            MS. WOOD:  But then I still need a copy.

14            MS. DUNN:  And, obviously, we will get one for the

15   government as well.

16            THE COURT:  I don't need to see them all.  I'm

17   just going to get a sense of what we're talking about here.

18            A lot of this -- as I'm looking at 352, it's

19   cumulative.  We've heard a lot about AppNexus.  We've heard

20   about --

21            MS. DUNN:  Well, AppNexus is a very critical

22   player, and the individual deposed was the CTO of AppNexus.

23            Your Honor, the other thing I will mention is, you

24   know, we do have the certificate from Microsoft, which the

25   government has had, that lists these specific exhibits and

1    also far more than we are trying to move in.  So it's a

2    really -- it is a limited set.

3              MS. WOOD:  Again, Your Honor, they could've --

4              THE COURT:  You don't need to speak because I'm

5    granting your objection.  I'm not going to take exhibits

6    like this.  This record is already extremely big.  If it's

7    important enough, there needs to be a witness to testify

8    about it.

9              That's going to be going on for the rest of this

10   case, the requirement.  We're just not going to load up the

11   record with dozens and dozens of exhibits for which there's

12   no context.  I'm not able to ask a witness a question about

13   the exhibit if it goes in, and I've been doing a bit more of

14   that.  So these exhibits are not going in.  All right.

15             MS. DUNN:  Your Honor, one question and one thing

16   for the record, which is I do think we have proceeded, at

17   least in the beginning of our case, based on how the past

18   practice of this trial has gone.

19             So, for example, with Mr. Sheffer, there are

20   documents that we're discussing with the government about

21   their admission.  So we will come to the Court tomorrow

22   after meeting and conferring with the government about that.

23   But we acted with Mr. Sheffer in reliance on the past

24   practice of this trial.

25             THE COURT:  If you want to revisit any exhibits

                                                          150

 1  that have been entered for which there was not robust

 2  questioning during the examination, I've got an open mind to

 3  striking them.

 4          MS. DUNN:  Thank you, Your Honor.  I think we will

 5  take you up on that, and we appreciate it very much, the

 6  consideration.

 7          I think we have one housekeeping item before the

 8  end -- at least one housekeeping item before the end of the

 9  day.

10          THE COURT:  What's that?

11          MS. DUNN:  My colleague, Mr. Justus, will address

12  it if the Court is amenable to that.

13          MS. WOOD:  The plaintiffs also have a housekeeping

14  matter.

15          MS. DUNN:  I just want to make sure the Court is

16  ready for housekeeping.

17          THE COURT:  Yes, I'm ready.

18          MR. JUSTUS:  Sorry, Your Honor.  That was a big

19  entrance for a pretty minor housekeeping item.

20          THE COURT:  Okay.

21          MR. JUSTUS:  Nonetheless, on Tuesday you'll

22  probably recall during Mr. Cadogan's redirect examination,

23  counsel for the government questioned Mr. Cadogan about a

24  November 2018 OpenX email from Mr. Cadogan to Google

25  regarding DV360 spend on OpenX.  Your Honor asked a question

1  of Mr. Cadogan, which was did Google ever get back to

2  Mr. Cadogan regarding his November 21 email -- November 21,

3  2018, email.  That was entered as PTX 1600.

4          Mr. Cadogan couldn't recall receiving a response.

5  We've now had a chance to look into this, and it appears

6  that Google actually did meet with Mr. Cadogan regarding his

7  concern.

8          So we would be happy to make a submission on this

9  point if it would be helpful to the Court.

10          THE COURT:  The testimony is in.  It is what it

11  is.  All right.  I've made it -- so I'm not going to keep

12  reopening things.  He couldn't recall, and that was his

13  answer.  All right.

14          MR. JUSTUS:  Yes, Your Honor.  Understood.

15          THE COURT:  All right.  Ms. Wood.

16          MS. WOOD:  The only housekeeping I have with

17  respect to -- on behalf of plaintiffs is with respect,

18  again, to the FFAs.  We renew our concern or objection to

19  calling multiple FFA witnesses who will be -- who we

20  anticipate will be like today's federal agency advertiser

21  witness, who worked with ad agencies and relied on the

22  expertise of ad agencies.  And we believe calling two more

23  of these federal agency advertiser witnesses is not only

24  cumulative but also is not appropriate, particularly given

25  their involuntary dismissal from this litigation.  And so --

1          THE COURT:  Okay.  Let me get a response on that.

2          MS. DUNN:  Your Honor, in our last colloquy with

3     the Court, I believe Your Honor ruled that we could have two

4     and not three, and we understand that.  So the first thing

5     I'll say is having two more is not on the table.  We intend

6     to call one more limitedly in a noncumulative way.

7          THE COURT:  What else is that witness going to say

8     if they're not the ones directly placing the advertising?

9     Which apparently they're not.  They're using another agency.

10          MS. DUNN:  So --

11          THE COURT:  I mean, is the whole point of these

12     witnesses -- I thought the whole point was to show that

13     there are multiple platforms, multiple approaches to the

14     media to get the message out.  The point is you're using a

15     wide variety, and your argument is about the

16     interchangeability and the width of this area.  I don't see

17     how another government witness is going to add anything new.

18          MS. DUNN:  So I'm going to let Ms. Goodman, who's

19     been working on this, answer Your Honor's question.  I do

20     think, just as a very high level, we're talking in this case

21     about a buy-side and a sell-side, and it's important to hear

22     from the buy-side witnesses as well.  But Ms. Goodman knows

23     the answer to Your Honor's question.

24          THE COURT:  All right.  What is the witness going

25     to say?

```
 1              MS. GOODMAN:  Mr. Karpenko, he's executive
 2    director of brand marketing for the U.S. Postal Service.
 3    His ad agency of record is Universal McCann.  Mr. Lowcock
 4    testified, the first witness in this trial, about how
 5    advertising works.  Mr. Karpenko will be called to testify
 6    to provide specific examples that undermine, from my point
 7    of view, the way Mr. Lowcock testified as to how he worked
 8    with the advertiser clients.
 9              In addition, the postal service is an advertising
10    channel.  They operate -- they sell -- they use --
11    advertisers use direct mail, and Mr. Karpenko testified at
12    length at deposition about how direct mail competes with
13    digital advertising.  And that is highly relevant to our
14    relevant market arguments and market definition arguments in
15    this case.
16              So his testimony will not be cumulative of
17    Ms. Oliphant's testimony, who talked about advertising in a
18    completely different way than the way Mr. Karpenko will
19    testify about it in trying to do two things:
20              One, make direct mail compete with other forms of
21    advertising; and
22              Two, how he uses digital advertising to promote
23    and sell U.S. Postal Service products and services.
24              And it will be short.
25              THE COURT:  Do either of your experts talk about
```

1  direct mail?  I don't think so.

2          MS. GOODMAN:  I don't believe so, but I do think

3  that this witness' testimony is also important factual

4  information for the Court to have in order to -- from a

5  market participant point of view, that how relevant markets

6  are defined, you need to hear from fact witnesses about

7  their point of view.

8          THE COURT:  No.  I'm going to sustain -- I can

9  tell from Ms. Wood's body language that she's going to

10  oppose that.  I'm going to grant that request.  No, it's too

11  cumulative.  It's not going to add anything to the case.

12          So we did a little bit of housekeeping.  Now let's

13  get the exhibits.  And, unfortunately, I do have a criminal

14  docket tomorrow morning.  It's not long, but you'll have to

15  clear your desks.  All right.

16          THE COURTROOM DEPUTY:  DTX 213, DTX 1771, DTX 125,

17  DTX 212, PTX 1144, PTX 797, PTX 949, PTX 933, PTX 555,

18  PTX 113, PTX 816, PTX 1631, PTX 911, DTX 1343, DTX 629,

19  DTX 1464, DTX 1335, DTX 929, DTX 439, DTX 1074, DTX 1403,

20  DTX 903, DTX 1030, DTX 1376, DTX 1756, DTX 1384, DTX 1524,

21  DTX 1091, DTX 1083, DTX 1288, DTX 1757.

22          MS. WOOD:  That's what plaintiffs have, Your

23  Honor.

24          THE COURT:  Perfect.  All right.

25          Does Google have the same?

1          MS. DUNN:  So did you say the DTX 1335?

2          THE COURT:  Yes, she did.

3          MS. DUNN:  That is on our list too, Your Honor.

4   Thank you.

5          THE COURT:  Excellent.  All right.  Very good.

6          All right.  So we will see you-all back here at

7   9:00 tomorrow, and we'll recess court for the evening.

8          (Proceedings adjourned at 5:56 p.m.)

9          ----------------------------------

10

11

12

13

14

15

16

17

18

19

20

21

22          I certify that the foregoing is a true and

23   accurate transcription of my stenographic notes.

24                              _____
                                        /s/
25                              Rhonda F. Montgomery, CCR, RPR


                                                              156
          Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599