```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES, et al.,      :    Civil Action No.:
 4                               :    1:23-cv-108
                  Plaintiffs,    :
 5        versus                 :    Tuesday, September 24, 2024
                                 :    Alexandria, Virginia
 6   GOOGLE LLC,                 :    Day 12 p.m.
                                 :    Pages 1-104
 7                Defendant.     :
     --------------------------x
 8
             The above-entitled bench trial was heard before the
 9   Honorable Leonie M. Brinkema, United States District Judge.
     This proceeding commenced at 2:00 p.m.
10
                     A P P E A R A N C E S:
11
     FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12        OFFICE OF THE UNITED STATES ATTORNEY
                            2100 Jamieson Avenue
13                          Alexandria, Virginia  22314
                            (703) 299-3700
14
                            JULIA TARVER WOOD, ESQUIRE
15                          AARON TEITELBAUM, ESQUIRE
                            RACHEL HANSON, ESQUIRE
16                          JEFFREY VERNON, ESQUIRE
          UNITED STATES DEPARTMENT OF JUSTICE
17                          ANTITRUST DIVISION
                            450 Fifth Street, NW
18                          Washington, D.C.  20530
                            (202) 894-4266
19
     (State of VA)          TYLER HENRY, ESQUIRE
20        OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
21                          202 North Ninth Street
                            Richmond, Virginia  23219
22                          (804) 786-7704

23

24

25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1                      A P P E A R A N C E S:

 2  FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 3                          209 Madison Street
                            Suite 501
 4                          Alexandria, Virginia  22314
                            (703) 549-5354
 5
                            KAREN DUNN, ESQUIRE
 6                          JEANNIE RHEE, ESQUIRE
                            WILLIAM ISAACSON, ESQUIRE
 7                          LEAH HIBBLER, ESQUIRE
                            PAUL, WEISS, RIFKIND,
 8                          WHARTON & GARRISON LLP
                            2001 K Street, NW
 9                          Washington, D.C.  20006
                            (202) 223-7300
10
    COURT REPORTER:         RHONDA F. MONTGOMERY, CCR, RPR
11                          Official Court Reporter
                            United States District Court
12                          401 Courthouse Square
                            Alexandria, Virginia  22314
13                          (703) 299-4599
                            RMontgomery@courtreport.net
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                   TABLE OF CONTENTS

2                       WITNESSES

3  On behalf of the Defendant:

4  PAUL MILGROM

5  Cross-examination by Mr. Vernon ...4
   Redirect examination by Ms. Rhee ..25
6  Recross-examination by Mr. Vernon .41

7  PER BJORKE

8  Direct examination by Ms. Morgan ..42
   Cross-examination by Mr. Freeman ..81
9  Redirect examination by Ms. Morgan 96
   Recross-examination by Mr. Freeman 100
10
   KENNETH BLOM (video)..............102
11

12                      MISCELLANY

13 Proceedings September 24, 2024    4

14 Certificate of Court Reporter    104

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2           MR. FREEMAN:  Welcome back.

3           May I proceed?

4           THE COURT:  Please.

5           THE WITNESS:  Good afternoon.

6              CROSS-EXAMINATION (Resumed)

7    BY MR. VERNON:

8    Q    Let's turn to first look.  Going first can give AdX an

9    advantage over other exchanges, correct?

10   A    Advantages and disadvantages, yes.

11   Q    You used the analogy of a clothing sale.  Do you

12   remember that?

13   A    I did, yes.

14   Q    Under that analogy, there are some buyers that get the

15   chance to buy first?

16   A    Yes.

17   Q    And then the later buyers don't get to see all of the

18   inventory; is that right?

19   A    That's what my example was, yes.

20   Q    So what can happen is the buyer that goes first can get

21   the best inventory; is that right?

22   A    They can get the deals that are best for them.

23   Q    And then the later buyers might miss out on the best

24   clothing because it's already been purchased, correct?

25   A    It could be the ones that are best for them are gone,

Cross-Examination - P. Milgrom

1  yes.

2  Q    And that's the advantage of going first, right?

3  A    That's right.

4  Q    Let's turn to, in your binder, PTX 308, which the

5  United States will move to admit.

6            THE COURT:  Any objection to 308?

7            MR. VERNON:  It's towards the beginning, the

8  second one.

9            MS. RHEE:  No objection, Your Honor.

10           THE WITNESS:  Okay.

11  BY MR. VERNON:

12  Q    This is a series of emails involving some Google

13  employees.  Do you see that?

14  A    Well, it's all printed over here.  Let's see.  Yes, I

15  see that it's between two Google employees.

16  Q    Let's focus on the second email from the top from

17  Michelle Sarlo Dauwalter, in particular, the part in the

18  first paragraph after "Rubicon strategy."

19       Do you see that?

20  A    Rubicon strategy, yes.

21  Q    This says, "Rubicon is pitching header bidding to

22  several of our partners because DRX" -- and DRX refers to

23  DFP, right?

24  A    It can, yeah.

25  Q    -- "DRX has historically made it difficult for SSPs to

Cross-Examination - P. Milgrom

1   compete on a level playing field with AdX.  (Publishers have

2   historically had to book an average CPM rate which would not

3   allow for Rubicon to compete effectively for higher-value

4   impressions.)"

5   A    I see it, yeah.

6   Q    And Rubicon at this time was another exchange?

7   A    Well, 2016, yeah.

8   Q    And so this email is saying that first look would not

9   allow Rubicon, the other exchange, to compete effectively

10  for higher-value impressions?

11  A    That's what it says, yes.

12  Q    And that's consistent with what we just walked through

13  about clothing where the first buyer can buy the clothing

14  that's best and the later buyers don't get it.  Correct?

15  A    The first buyer can buy clothing that's best for it,

16  right.

17  Q    This email describes first look as being an advantage

18  for AdX; is that correct?

19  A    It seems to, yes, this part of it that we've read.

20  Q    And you said that first look would create a mix of

21  advantages and disadvantages; is that right?

22  A    That's right.

23  Q    This email -- I won't ask you to look at the whole

24  thing, but at least these two paragraphs we're looking at,

25  they do not describe first look as a disadvantage for AdX,

Cross-Examination - P. Milgrom

1  correct?

2  A    Well, I see.  "But" -- and that's in boldface -- "tends

3  to transact at higher CPMs."  That's the disadvantage for

4  AdX buyers.  It's right there in the second paragraph.

5  Q    Doesn't that refer to header bidding?

6  A    No, I don't think so.

7  Q    It says, "Overall, we believe that HB" -- that refers

8  to header bidding?

9  A    I'm looking at the next sentence.  It says, "This tends

10  to mean that AdX loses matched impression share on pubs that

11  implement HB, but trends to transact at higher CPMs."

12  Q    Even the sentence that you're reading refers to header

13  bidding?  That's the HB?

14  A    It does refer to the header bidding as to modify which

15  impressions AdX uses.

16  Q    And the first look, you're aware, is about the

17  pre-header bidding time period?

18  A    We're talking about first look.  Oh, we're talking

19  about first look now.

20  Q    First look.

21  A    Right.  We're talking about the first look period.  So

22  I'm not sure why I'm reading this paragraph then.  Okay.

23  Q    Okay.  So this document does not describe first look as

24  a disadvantage for AdX; is that correct?

25  A    Right.  The only paragraph I see that's relevant is the

Cross-Examination - P. Milgrom

1    one you highlighted, yes.

2    Q    Let's turn to PTX 551, which has already been admitted.

3    A    Okay.

4    Q    Let's focus on the email from Ms. Dauwalter starting

5    with the second paragraph.

6            MS. RHEE:  I'm sorry.  This is 501?

7            MS. WOOD:  551.

8            MS. RHEE:  Okay.  Sorry.  Thank you.  I misheard.

9    BY MR. VERNON:

10   Q    The second full paragraph three lines from the bottom,

11   "Our buyers enjoy a competitive advantage from dynamic

12   allocation because they receive first look on inventory."

13       Do you see that?

14   A    I see that, yes.

15   Q    And then in the next paragraph, it writes, the first

16   line, "Launching AdX into a non-DFP server destroys this

17   competitive first look advantage and would most likely lead

18   to AdX (1) losing access to overall queries, and (2) losing

19   access to highest-value queries."

20       Do you see that?

21   A    I do see that, yes.

22   Q    And highest value is in italics.  Do you see that?

23   A    I do, yes.

24   Q    So this email is describing first look as giving AdX an

25   advantage for the, quote, highest-value queries; is that

Cross-Examination - P. Milgrom

1  right?

2  A    It does describe it that way, yes.

3  Q    And you can set that one aside.  I will just do one

4  more.

5      Let's go to 1650, which has already been admitted.

6  It's a document from The Trade Desk.

7  A    All right.

8  Q    The Trade Desk is one of the largest DSPs along with

9  Google's DV360; is that right?

10  A    It is one of the largest, yes.

11  Q    Let's turn to page 6 titled Google's Position Before

12  Header Bidding.

13  A    Yes.

14  Q    The second half box, half circle reads, "Google's SSP

15  was tightly integrated with its ad server, allowing

16  preferential access to ad inventory before other SSPs."

17      Do you see that?

18  A    I do, yes.

19  Q    That describes first look?

20  A    It seems to, yes.

21  Q    The next square/circle says, "As a result, Google had a

22  significant competitive advantage in the programmatic ad

23  market."

24      Do you see that?

25  A    I do, yes.

Cross-Examination - P. Milgrom

1  Q    So this is another document that describes first look

2  as giving an advantage to AdX, correct?

3  A    Yes.

4  Q    This document does not say first look created a

5  disadvantage for AdX, correct?

6  A    It does not say that.

7  Q    Okay.  You can set that document aside.

8       First look could be described as a right of first

9  refusal; is that right?

10 A    I don't think so, no.

11 Q    Okay.  Well, we'll agree to disagree on that one.

12      You agree that a right of first refusal can reduce

13 competition, correct?

14 A    Yes, I do agree that that's possible.

15 Q    But you express no opinion about whether first look

16 reduced competition among exchanges; is that correct?

17 A    I expressed no opinion about that, right.

18 Q    So you expressed no opinion about whether any harm to

19 competition from first look is larger or smaller than any

20 benefits that could result from first look, correct?

21 A    I did not express an opinion.  That's correct.

22 Q    On your direct, you talked about the innovation that

23 was involved in dynamic allocation.  Do you remember that?

24 A    Yes.

25 Q    Dynamic allocation did not allow multiple exchanges to

Cross-Examination - P. Milgrom

1  bid against each other simultaneously, correct?

2  A    No, but dynamic allocation was an AdX program.   That

3  did not.   That's right.

4  Q    Allowing multiple exchanges to bid simultaneously

5  against each other was something that came from header

6  bidding; is that right?

7  A    Header bidding did allow that, yes.   That was the first

8  to allow it.

9  Q    And header bidding was not created by Google; is that

10 right?

11 A    That's right.

12 Q    Header bidding was introduced by other companies; is

13 that correct?

14 A    Yes.

15 Q    Other companies introduced header bidding years before

16 Google introduced its own version of simultaneous

17 competition being open bidding; is that correct?

18 A    Well, open bidding emerged a couple of years after

19 header bidding became popular.   I'm not sure when header

20 bidding was first available.

21 Q    But header bidding was before open bidding, right?

22 A    Yes.   Absolutely, yes.

23 Q    Okay.   Header bidding had some downsides.   I think you

24 referred to that on your direct.

25 A    Yes.

Cross-Examination - P. Milgrom

1   Q    But the industry introduced header bidding because it

2   needed a way around the fact that dynamic allocation only

3   allowed other exchanges to compete after AdX was the first

4   one to run its real-time auction, correct?

5   A    Header bidding had several things that were associated

6   with it, but that was one of them.

7   Q    Okay.  Let's turn to Project Poirot.  On your direct,

8   you talked about whether Google intended to limit or

9   interfere with or dry up header bidding when it did Project

10  Poirot; is that right?

11  A    I talked about intent since I don't try to be a mind

12  reader.  But I testified that it had other reason to -- good

13  reason to implement Poirot.

14  Q    You do offer the opinion in your report that the design

15  of Poirot is inconsistent with an intent to drive header

16  bidding; is that right?

17  A    Yes.

18  Q    And you think that a bidder that was trying to dry up

19  another exchange would choose not to bid on that exchange at

20  all; is that right?

21  A    I think there's -- that's one possible strategy, lots

22  of possible strategies.

23  Q    You did write that in your report.  You wrote a bidder

24  seeking to, quote, dry up an exchange might choose not to

25  bid at all, but that is not the effect that Poirot had.

Cross-Examination - P. Milgrom

1    Do you remember that?

2    A    Yes.  Now that you remind me, I remember.

3    Q    But you are aware that Google did experiment with not

4    bidding on header bidding at all before doing Poirot,

5    correct?

6    A    Not bidding on header bidding at all?  It wouldn't be

7    bidding -- I'm sorry.  I don't understand the question.

8    Q    I can rephrase slightly.

9    You are aware that Google did experiment with not

10   bidding on exchanges that participated in header bidding,

11   not bidding on them at all before Google did Poirot,

12   correct?

13   A    I don't remember that.

14   Q    Okay.  You stated on direct that not bid shading on AdX

15   made sense because AdX was a clean second-price auction; is

16   that right?

17   A    That's not my testimony, no.

18   Q    You are aware that through Project Poirot, DV360 did

19   not bid shade onto AdX until the introduction of the unified

20   first-price auction; is that right?

21   A    That's correct, yeah.

22   Q    Okay.  So before September 2019, DV360 did not bid

23   shade onto AdX; is that correct?

24   A    That's right.  It passed the Poirot test.

25   Q    And it is your view -- or you can tell me if it's

Cross-Examination - P. Milgrom

1  not -- that that made sense because AdX was a clean

2  second-price auction?

3  A    It was my view that that's correct that it passed the

4  test and, therefore, wasn't bid on.  I mean...

5  Q    Maybe I'll just ask you:  Do you have a view one way or

6  another whether AdX was a clean second-price auction at the

7  time?

8  A    What does the word "clean" mean in that?  You packed

9  something in there.

10  Q    I will try to define it as best as I can recognizing

11  that I am asking questions of a Nobel Prize winner.

12      I will define a clean second-price auction as being an

13  auction where bidders do not have an incentive to bid shade.

14  Does that make sense?

15  A    Okay.  That's a very nonstandard definition, but okay.

16  Q    Using that definition, is it your opinion that AdX was

17  or was not a second-price auction before the UFBA?

18  A    So, again, that's not my definition.  But using that

19  definition, there were times when bidders did have an

20  incentive to shade their bids somewhat.

21  Q    Onto AdX?

22  A    Onto AdX, yeah.

23  Q    And is that because of RPO?

24  A    Well, the context of this is confusing the words a lot.

25  It's been known for decades that in a second-price auction,

Cross-Examination - P. Milgrom

1  which is part of a larger process, the theorem that I

2  described doesn't include all the incentives.  You could --

3  you might choose to shade your bid because you were worried

4  about revealing you had a high value for lots of reasons.

5  RPO was one of those reasons, yes.

6  Q     So you are aware that Google Ad Manager ran RPO on AdX;

7  is that correct?

8  A     Yes.

9  Q     And it is your testimony, I think, that RPO meant that

10  AdX was not a clean second-price auction using my

11  definition.  Is that correct?

12           MS. RHEE:  Objection, Your Honor.  I think that

13  mischaracterizes this exchange.

14           THE COURT:  Well, you can address that on

15  redirect.  All right.  Overruled.

16           THE WITNESS:  I think you've got a definition of

17  clean second-price auction that says that -- means that it

18  had an incentive to shade its bid because of RPO.  Yes, RPO

19  did create a reason to shade bids.

20  BY MR. FREEMAN:

21  Q     Okay.  Let's turn to DTX 308, which the United States

22  would move to admit.  It's at the very end of your binder.

23  A     The end of the binder?

24  Q     Yeah, the end of the document binder.

25           THE COURT:  This is a defense exhibit.  Is that

1   correct, Counsel?

2            MR. VERNON:  Yes, it's a DTX.

3            THE COURT:  I'm assuming there's no objection.

4            MS. RHEE:  No objection, Your Honor.

5            THE COURT:  It's in.

6   BY MR. VERNON:

7   Q    Let's turn to page 9, which ends in 716.  And I

8   apologize if this is too small to read.  I will do my best.

9   Let's look at the last bullet point at the very bottom.

10  A    I can see it.

11  Q    This reads, "RPO must be carefully introduced to the

12  market since it has been live since 2015 and moves Google

13  away from a 2nd-price auction."

14       Do you see that?

15  A    I do see that.

16  Q    So at least in this document, this document describes

17  AdX as not being a fully clean second-price auction because

18  of RPO.  Is that correct?

19  A    Using your definitions of clean, yes, that is correct.

20  Q    I think you also mentioned --

21       And you can set this document aside.  Thank you.

22       When you were discussing Poirot in your testimony, you

23  mentioned the fact that, I think, only 1 percent of

24  advertisers opted out of Poirot.  Is that right?

25  A    Yes, sir.

Cross-Examination - P. Milgrom

1  Q    Are you aware of exactly what Google disclosed to

2  advertisers when it gave them the chance to opt-out or not?

3  A    I was aware that they had a chance to opt-out, yes.

4  Q    But do you know the details of that disclosure?

5  A    Of the disclosure, no, I don't.

6  Q    Okay.  Let's turn to UPR.

7       You offered the opinion on your direct that UPR was

8  intended or designed to reduce price fishing; is that right?

9  A    Yes.

10 Q    And you didn't in any of your report quantify how often

11 price fishing happened; is that right?

12 A    Well, price fishing in the Unified First Price Auction

13 was not possible because of UPR.  So it was done

14 preventatively.

15 Q    Okay.  But the question is you did not quantify that;

16 is that right?

17 A    The question -- can you repeat the question, please?

18 Q    You did not quantify how often price fishing happened;

19 is that right?

20 A    There was no price fishing as far as I know because of

21 UPR.

22 Q    Okay.  I'll try a slightly different question.

23      You've heard of the phrase "self-competition"; is that

24 right?

25 A    Yes.

Cross-Examination - P. Milgrom

1  Q    That's a related concept that applies in a second-price

2  auction; is that fair?

3  A    Yes.

4  Q    You did not quantify how often self-competition

5  happened before the Unified First Price Auction, correct?

6  A    I studied that there was a response.  I didn't quantify

7  how often it happened.  That's right.  Correct.

8  Q    You have not analyzed whether Google had other ways of

9  reducing price fishing other than UPR, correct?

10  A    I did not.

11  Q    You are aware that Project ELMO was a project based on

12  cookie throttling to reduce price fishing; is that right?

13  A    To reduce the related multicalling problem, yes.

14  Q    And you have not analyzed whether Google's Project ELMO

15  actually reduced price fishing; is that fair?

16  A    We're switching back and forth between price fishing

17  and multicalling, which are very close I agree.  So if you

18  could phrase your question using multicalling since price

19  fishing applied to the first-price auction, and I will have

20  a precise question to answer.

21  Q    You have not analyzed whether Google's Project ELMO

22  reduced multicalling; is that correct?

23  A    I didn't analyze that quantitatively, that's right.

24  Q    And you have not analyzed whether Google could use a

25  query ID to reduce price fishing, correct?

Cross-Examination - P. Milgrom

1  A    A query ID to reduce -- I understand people are still

2  struggling to create query IDs, but I didn't analyze that,

3  no.

4  Q    And a query ID is an ID that could be applied to an

5  impression so that buyers would know when they are bidding

6  on a duplicate impression; is that right?

7  A    That's what I understand it to mean.

8  Q    And you did not analyze whether Google could have used

9  a query ID to reduce price fishing, correct?

10 A    I didn't evaluate that at all in my report, right.

11 Q    Your opinion was that having different floors for

12 different exchanges can lead to price fishing; is that

13 right?

14 A    Yes.

15 Q    UPR stops publishers from giving AdX a higher floor

16 than other exchanges; is that right?

17 A    Right, and ensures -- yes.

18 Q    But UPR does not stop a publisher from giving AdX a

19 lower floor than other exchanges, correct?

20 A    It doesn't allow different -- UPR -- DFP doesn't allow

21 different floors for different exchanges except in the ways

22 we described.

23 Q    But you are aware that other exchanges have their own

24 flooring tools; is that right?

25 A    Other exchanges could have their own flooring tools and

1  did previously, yes.

2  Q    And a publisher can use the flooring tools of another

3  exchange to give that other exchange a higher floor than AdX

4  even after UPR; is that correct?

5  A    If the other exchange permitted that, that's correct.

6  Q    And that can lead to price fishing; is that right?

7  A    If the other exchange permitted, it could, yes.

8  Q    UPR didn't stop that price fishing, correct?

9  A    UPR would not prevent another exchange from

10 disadvantaging itself in that way, that's right.

11 Q    And you have not analyzed whether UPR actually was

12 effective at reducing price fishing; is that correct?

13 A    Well, there's no before and after.  There's only -- I

14 couldn't do an empirical evaluation of that.

15 Q    You have not analyzed whether UPR actually was

16 effective at reducing price fishing, correct?

17 A    I think I've given my analysis using the evidence

18 that's available to me, that people were concerned about

19 price fishing, that the method of price fishing -- the most

20 common method of price fishing was blocked, and that the

21 alternatives to it were largely against the interests of the

22 exchanges that might have caused it.

23 Q    When I asked you about this at your deposition, you

24 said you have not analyzed how effective UPR actually was at

25 reducing price fishing in practice, correct?

Cross-Examination - P. Milgrom

1  A   I don't have -- what I meant then and what I mean now

2  is I don't have data about that.

3  Q   Okay.  So you have not analyzed whether it was actually

4  effective, correct?

5  A   In the sense I have just said that precisely, yes.

6  Q   In your direct, you talked about UPR imposing equal

7  floors; is that right?

8  A   Yes, sir.

9  Q   But I think, as we've just been discussing, UPR stops

10  publishers from giving AdX a higher floor but does not stop

11  publishers from giving AdX a lower floor compared to other

12  exchanges; is that correct?

13         MS. RHEE:  This is asked and answered, Your Honor.

14         THE COURT:  Sustained.

15  BY MR. FREEMAN:

16  Q   Let's talk about the competitive effects of UPR.  You

17  have heard of the term "most favored nations clause"; is

18  that right?

19  A   I think you referred me to it in the deposition as I

20  recall.

21  Q   If I use the phrase MFN to refer to the most favorite

22  nations clause, will you know what I'm talking about?

23  A   Yes.

24  Q   MFNs require that one particular company not get a

25  higher price than its competitors; is that right?

Cross-Examination - P. Milgrom

1    A    Yes.

2    Q    UPR also works like an MFN because it requires that no

3    exchange get a lower floor than AdX; is that correct?

4    A    I see the analogy there.

5    Q    When a firm with market power adopts an MFN, that could

6    reduce competition, correct?

7    A    I haven't analyzed competition in this market, but in

8    the abstract, it could.

9    Q    But when I asked you about this at your deposition, you

10   did agree that when a firm with market power adopts an MFN,

11   that can reduce competition, correct?

12   A    Yes.  And I have just agreed again, yes.

13   Q    Okay.  Let me ask you one related question.  On your

14   direct, you refer to the possibility of publishers turning

15   AdX off as a way around UPR.  Do you remember that?

16   A    They can turn -- I don't -- pardon?

17   Q    On your direct, you refer to the possibility that

18   publishers to get around UPR, meaning to steer to other

19   exchanges, could turn AdX off or choose not to turn it on,

20   correct?

21   A    They could choose to turn it on or not.  That's their

22   option.

23   Q    But you didn't study how often publishers turned AdX

24   off, correct?

25   A    No, I did not.

Cross-Examination - P. Milgrom

1  Q    You didn't study AdX's market share; is that right?

2  A    I did not.

3  Q    If AdX has a high market share, that would suggest that

4  publishers do not frequently turn it off, correct?

5  A    Well, the quantitative things speak for themselves,

6  yes.  The higher its market share, the less possible that it

7  is that it's turned off frequently.

8  Q    UPR eliminated a tool that publishers could use to

9  steer away from AdX; is that fair?

10 A    A tool that publishers could use?  Yeah.  That they

11 could use, yes.

12 Q    It is good for customers to be able to switch away

13 their suppliers if they want to, correct?

14 A    It is, yes.

15 Q    And that's because customer choice -- customer choice

16 encourages competition and innovation; is that correct?

17 A    Yes, I think so.

18 Q    On your direct, you talked about the different reasons

19 why publishers used floors before the Unified First Price

20 Auction and how those might change after the Unified First

21 Price Auction.  Do you remember that?

22 A    How they did change, yes.

23 Q    You were aware that one reason publishers used higher

24 floors for AdX before UPR was to limit low quality ads; is

25 that right?

Cross-Examination - P. Milgrom

1   A    I have heard that alleged.

2   Q    And in that use case for higher floors for AdX would

3   not be affected by the change to a first-price auction,

4   correct?

5   A    That use would not be affected.

6   Q    You are also aware that publishers used higher floors

7   for AdX to reduce their dependence on AdX, again, before

8   UPR?

9   A    I've heard that alleged.

10  Q    And that use case for higher floors would not be

11  eliminated by the shift to a first-price auction, correct?

12  A    The first-price auction wouldn't affect the set of

13  options that were available for that purpose, right.

14  Q    You were also aware that another reason publishers used

15  higher floors for AdX was to help them fulfill volume

16  discount deals that they had with other exchanges; is that

17  right?

18  A    I've heard that alleged.  I'm very skeptical about it,

19  yeah.

20  Q    Okay.  But that's a use case for higher floors for AdX

21  that would not be affected by the shift to a first-price

22  auction, correct?

23  A    If that were sensible, it would not be affected, yeah.

24       MR. VERNON:  I pass the witness.

25       Thank you.

25

1          THE COURT:  All right.

2          MS. RHEE:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4  BY MS. RHEE:

5  Q    I don't talk quite as quickly as Mr. Vernon.  So let me

6  take each one of these in turn that Mr. Vernon did on your

7  cross-examination.

8  A    Yes.

9  Q    Now, you remember that the cross-examination began with

10 last look, and Mr. Vernon posed a series of hypotheticals to

11 you?  Do you remember that?

12 A    I remember more or less, yes.

13 Q    Okay.  And the first hypothetical was if a publisher

14 chose as the line item the same number as a header bid --

15      (Counsel confer.)

16 BY MS. RHEE:

17 Q    So the first hypothetical was if a publisher chose to

18 insert the line item where the header bidding winning bid

19 was the same as that line item.  Do you remember that's the

20 first qualifier?

21 A    That's one of the qualifiers, yes.

22 Q    And then the second qualifier was if the publisher then

23 also chose not to adjust the floor price for AdX.  Do you

24 remember that second qualifier?

25 A    Absolutely, I do.

26

                    Redirect Examination - P. Milgrom

1   Q    Okay.  And then the third qualifier was and if the AdX

2   auction only had one single bidder that cleared the floor

3   price set by the publisher --

4            MR. VERNON:  Objection.  It's the third question

5   leading in a row.

6            THE COURT:  She's just clarifying what you had

7   asked.  No.  I'll overrule the objection.

8   BY MS. RHEE:

9   Q    Do you remember that?

10  A    Yes, I do.

11  Q    Okay.  I think we're up to three "ifs."  Is that right?

12  A    So far we are, yes.

13  Q    Okay.  And then the fourth "if" was an if there was a

14  turning on of DRS because otherwise that impression that the

15  publisher chose to put to the AdX auction would not

16  otherwise be filled?

17  A    Right.

18  Q    Okay.  So we're up to four "ifs" now?

19  A    Yes.

20  Q    Okay.  And then Mr. Vernon asked you if and only then

21  would there be an advantage for Google?

22  A    Then there would be an advantage for Google, yes.

23  Q    Okay.  And then if you take all of those ifs away, what

24  is your opinion, Professor Milgrom?

25  A    Last look does not create a necessary advantage for

Redirect Examination - P. Milgrom

1   Google because of the high floor price that the publisher

2   could set and was incentivized to set.

3   Q    Now, with each of those ifs, whose choice and whose

4   control is it to put Google in an advantageous position and

5   rivals at a disadvantage?

6   A    That would be the publisher's choice.

7   Q    So is it the publishers or is it Google that is putting

8   the rivals at a disadvantage?

9   A    It would be the publishers who are doing that.

10  Q    Okay.  Now, you remember Mr. Vernon then turned to

11  first look and what Mr. Vernon characterized as the first

12  look advantage?

13  A    Yeah.

14  Q    Okay.  And he walked you through your example of the

15  clothing store.  Do you remember that?

16  A    Yes.

17  Q    Okay.  Now, the form of the question seemed to imply

18  that the high-quality inventory or the nicest clothes would

19  go to the first buyer.  Do you remember that line of

20  questioning?

21  A    I sure do, yes.

22  Q    And I heard you very carefully qualifying each one of

23  your answers, but I want to make sure that the Court

24  understood your qualification.

25  A    Yes.

1  Q    So if you could, explain.

2  A    Well, the nicest clothes might not fit me or the price

3  might be higher.  But I'd look at the things that are best

4  for me that are -- it's a matching market.  What's good for

5  me and what's best for me and what's best for you might be

6  different.  And the one with first look is able to select

7  the ones that are best for the first buyer.  And if they are

8  the same, then that results in a significant reduction in

9  inventory to later buyers.  And if they're not, then it

10 doesn't.  It's the first buyer's quality that matters.

11 Q    So now, insofar as the questions posed to you in your

12 cross-examination suggested that the buyers later on in the

13 sequence would only get, quote/unquote, the scraps, do you

14 agree or disagree with that characterization?

15 A    I disagree.

16 Q    And can you explain to the Court why?

17 A    Well, there's -- two reasons:  One is the logical

18 reason, but I also did some empirical analysis.  This is

19 something that hasn't come up but -- in the rest of the

20 testimony here, but about what's called adverse selection,

21 which is exactly this.  That if quality means the same thing

22 to you and me and I get first choice, does that result in

23 you getting lower quality?  I studied that empirically and

24 found no evidence that that was taking place.

25 Q    Okay.  Then I believe Mr. Vernon on cross-examination

1   moved on to Poirot.

2   A     Right.

3   Q     Now, he asked you to answer a series of hypothetical

4   questions based on a definition of a, quote/unquote, clean

5   second auction.  Do you remember that?

6   A     I sure do, yes.

7   Q     And again, I was watching you closely, and you said --

8   well, that is not a standard definition.  Can you explain to

9   the Court why Mr. Vernon's definition of a, quote/unquote,

10  clean second auction caused you to make the facial

11  expression that you made on the stand?

12  A     I'm sorry for my facial expression.

13        Your Honor, when I presented the second-price auction

14  to you, I presented it without any other third parties,

15  without rev shares and take rates and so on.  And I

16  presented it as a single auction, which is the standard --

17  it was the standard presentation, but it omits -- there's

18  much longer studies that say how you bid when you're bidding

19  in a sequence of auctions.  You might have an incentive to

20  bid your full value in the first auction, but that might be

21  affected if you're worried about somebody learning your

22  value and using it against you subsequently.  That's been

23  studied in economics for decades.  A full analysis leads to

24  bid shading in a wider range of circumstances, even in a

25  second-price auction.  So that was one of the things.

1    He wanted me to define a second-price auction as one in

2  which there's never an incentive for bid shading, and that's

3  just not what it means to be -- what it means to be a

4  second-price auction is that the high bidder wins and pays

5  the higher of floor price or the second highest bid.  That's

6  the standard definition, and that's not what he wanted to

7  use.

8  Q    And when you say a standard definition, standard to

9  whom?

10  A    I've never heard anyone else use any other definition,

11  actually.  It's certainly standard in the economics

12  literature.

13  Q    Okay.  So the definition that the government posed to

14  you in a hypothetical, is that the first time you have heard

15  a definition so defined in this way?

16  A    It's the first time I have heard anyone say that

17  defines a second-price auction.

18  Q    Okay.  Now, you remember being asked on

19  cross-examination, again, in the context of Poirot, whether

20  or not you were aware of Google, quote/unquote,

21  experimenting with not bidding on exchanges that

22  participated in header bidding.  Do you remember that

23  question?

24  A    I remember that question.

25  Q    And you did not recall any such experiment?

1    A    I didn't recall one, no.

2    Q    Okay.  More importantly, in your review of the

3    documentation, are you aware of Google ever launching a

4    program or an act of conduct where Google stopped bidding on

5    exchanges that participated in header bidding?

6    A    No, I'm not aware of that.

7    Q    And then Mr. Vernon directed your attention to UPR.  Do

8    you remember that?

9    A    Yes.

10   Q    Now, it got a little confusing in that discussion

11   because even though --

12            THE COURT:  Counsel, we don't need the prefaces,

13   please.

14   BY MS. RHEE:

15   Q    So do you remember being asked a series of questions

16   about query IDs in the context of multicalling rather than

17   price fishing?

18   A    Yes, I do remember.

19   Q    Okay.  And you talked about query IDs or the problem of

20   query IDs, solving them is continuing to this day?

21   A    Yeah.  Well, I remember seeing documents at least from

22   2023 where people were trying to figure out how to do that.

23   Q    And why is it --

24            MR. VERNON:  Objection to foundation, Your Honor.

25   I think he testified on cross that he didn't analyze query

Redirect Examination - P. Milgrom

1  IDs as a way to reduce price fishing.

2  THE COURT:  This answer doesn't say that he

3  analyzed them.  He just said he was aware of problems in the

4  field.  So overruled.

5  BY MS. RHEE:

6  Q    And then insofar as you're aware of problems in the

7  field, why is it so hard and it's continuing to perplex

8  people today?

9  A    Well, to create query IDs -- well, the publishers, the

10  one who has since called for bids and the -- if he's sending

11  multiple calls to know that there are calls for the same

12  impression has proved difficult.  How do I know when you ask

13  me to bid twice that it's exactly the same impression that

14  you're asking me to bid for?

15  MR. VERNON:  Objection, Your Honor.  I just ask

16  counsel to identify where in his report that testimony comes

17  from.

18  MS. RHEE:  This was in response to --

19  THE COURT:  I've already heard it.  So overruled.

20  BY MS. RHEE:

21  Q    And then staying on the topic of UPR, counsel for the

22  government asked whether or not UPR prevented publishers

23  from lowering the floor for other exchanges.  Do you

24  remember that?

25  A    Yes.

Redirect Examination - P. Milgrom

1  Q    Okay.  Now, under the rollout of UPR, can publishers

2  lower AdX's floor in comparison to rival exchanges?

3  A    They just set one set of pricing rules.

4       (Reporter clarification.)

5  A    Yes, they only set one set of pricing rules that apply

6  to all, yes.

7  Q    Okay.  So they can neither preference AdX nor

8  disadvantage AdX or any other exchange?

9  A    That's right.

10          MR. VERNON:  Objection.  Leading.

11          THE COURT:  Sustained.

12 BY MS. RHEE:

13 Q    Okay.  Now, insofar as the government then asked you

14 about whether or not UPR can prevent other exchanges from

15 setting discriminatory floors, you answered, well, UPR

16 can't.  Is that right?

17 A    UPR doesn't control any other publishers -- any other

18 exchange, yeah.

19 Q    Okay.  And that's because those other exchanges are

20 separate companies that are free to do what they want?

21 A    That's correct, yes.

22 Q    Now, finally, you remember being asked by the

23 government attorney with respect to first look that -- I

24 think the question was, well, first look does not allow

25 multiple exchanges to bid against each other.  That didn't

34

Redirect Examination - P. Milgrom

1   come about until header bidding; is that right?

2   A    Something like that, yes.

3   Q    Okay.  And what's the span of time that we're talking

4   about from the introduction by DoubleClick of dynamic

5   allocation to the time we even get to header bidding?

6   A    Well, let's see.  DoubleClick introduces the first

7   version in 2007 and with live bids, which is what's

8   important for this, I think, was in 2009.  And we start to

9   see header bidding adopted maybe five years later, 2014,

10  2015, something like that.

11  Q    So we're just jumping around in time?

12  A    Yes.

13  Q    Okay.  And then finally, before we get to the documents

14  that the government showed you, Professor Milgrom, to what

15  extent, if at all, as a matter of economics do you believe

16  that Google's changes to its own auction were improvements

17  at the time in which they occurred relative to what had come

18  before?

19  A    Every one of the conducts we've described, Google's

20  programs benefited its own customers, either advertisers or

21  publishers or both.

22  Q    Okay.  So now flipping just quickly through some of the

23  documents in the government's binder, I want to direct your

24  attention to PTX 238.

25  A    PTX what?

1  Q    238.  I believe it's the very first tab.

2  A    Thank you.

3  Q    Okay.  Now, if we can, go to the page ending in 609,

4  and if we could --

5          MR. VERNON:  Objection.  Scope.  I don't think I

6  showed this document on cross.

7          MS. RHEE:  Your Honor, it was in the government's

8  binder, and I think you'll see the point in its relevance

9  very shortly.

10          THE COURT:  Where are you looking on 609?

11          MS. RHEE:  And we can blow it up on the screen

12  here, Your Honor:  It's probably unwise.

13  BY MS. RHEE:

14  Q    You see here in this email chain involving a lot of

15  parties, one of the participant's writes, "It's probably

16  unwise for me to reply to this thread (next to Jonathan I

17  have basically zero experience in the business) so read this

18  with a grain of salt, an innocent idea proposed by an

19  engineer who knows very little about anything."

20          MR. VERNON:  Your Honor, I renew the objection to

21  scope.  I'm not sure how this addresses anything on cross.

22          THE COURT:  Well, I can't recall.  Did you move

23  238 in during your examination?

24          MR. VERNON:  No, not during this examination.

25          THE COURT:  It's a part of the case.

1          MS. RHEE:  It's a PTX document, Your Honor.

2          THE COURT:  Yes, I'm going to permit it in.

3          Go ahead.

4     BY MS. RHEE:

5     Q    And this is -- the author of this is Martin Blais.  Do

6     you see that?

7     A    I do see that, yes.

8     Q    And the government did introduce other documents during

9     your cross-examination using the same individual.

10         Dr. Milgrom, at any point in time when the government

11    showed you documents, did they identify who the speaker is?

12    A    Oh, goodness.  I'm not sure I can remember whether they

13    always did or not.  Yeah.

14    Q    Okay.  All right.  Then moving on to a document that

15    they did show you, let's go to PTX 542.  And if we could, go

16    to the page ending in 337, which is something that the

17    government did not show you in this document --

18         MR. VERNON:  Objection.  We didn't show it because

19    it was redacted when it was produced.

20         THE COURT:  Let's just move this along.  Go ahead.

21    Ask the question.

22    BY MS. RHEE:

23    Q    Okay.  Here do you see that --

24    A    There's nothing on my screen.

25         MS. RHEE:  If we could show that, Your Honor, I

Redirect Examination - P. Milgrom

1    don't believe it's redacted.  This is the page ending in

2    337.

3            Oh, I apologize.  It is redacted.  So let me move

4    on.

5            Thank you very much.  Sorry about that.

6    BY MS. RHEE:

7    Q    PTX 308, going back to a paragraph that the government

8    showed you and asked you questions about, PTX 308.  And if

9    we could, go to the analyses section at the top, which is

10   where the government talked to you.

11   A    Yeah.

12   Q    Thank you so much.

13       Now, here the date of this document is 2016, or at

14   least this email correspondence is 2016.  Do you see that?

15   A    I see that, yes.

16   Q    Okay.  And to the extent that you go back to your

17   timeline, Professor Milgrom, by 2016, was header bidding

18   gaining a lot of traction and adoption?

19   A    It was, yes.

20   Q    Okay.  And then insofar as the government basically

21   just told you this applied to first look rather than last

22   look, when you put it in the right time period, what are we

23   talking about?

24   A    Okay.  I'm not sure.  What sentences am I looking at

25   here?  I'm a little confused.

Redirect Examination - P. Milgrom

1    Q    Here the government read to you the sentence that says,

2    "AdX looses matched impression share on pubs that implement

3    HB" -- header bidding --

4    A    Yes.

5    Q    -- "but tends to transact at higher CPMs."

6         Do you see that?

7    A    Yes.

8    Q    Okay.  And here in this time period, because of header

9    bidding's adoption, has first look morphed into last look?

10   A    So first look refers to first look over the waterfall.

11   Last look refers to last look over header bidding.  I'm

12   sorry for the confusion.  They have different applications.

13        When header bidding is dominant, first look loses its

14   important -- so many of the participants in the waterfall

15   and/or ones that haven't bid yet, and it becomes essentially

16   just last look.

17   Q    Okay.  Then here, in connection with last look, what is

18   the significance about the fact that AdX tends to transact

19   at higher CPMs?

20   A    Well, that's the disadvantage.  The disadvantage is

21   that the publisher is going to boost the -- is going to

22   boost the floor price and extract a greater revenue from

23   AdX.

24   Q    And then similarly, the government showed you PTX 551.

25   And if we could, go to that email as well and particularly

Redirect Examination - P. Milgrom

1  focus on the date of that email at the top.  It's all the

2  way down to the second paragraph that was shown by the

3  government.

4  A     8-27-17.

5  Q     Again, by 2017, are we talking about first look or last

6  look?

7  A     Last look would be the dominant there.

8  Q     Okay.  So, again, when you look at the sentence that

9  was called out by the government, "Our buyers enjoy a

10 competitive advantage from dynamic allocation" -- and here

11 the author, again, is not identified -- "because they

12 receive first look on inventory, which inherently provides

13 higher CPMs."

14     Again, just given the timing of this document, are we

15 really talking about first look or last look?

16 A     No.  It's confusing here because this explicitly refers

17 to first look in a period when last look had grown and

18 accounted for much of the transactions in the industry.

19 Q     Okay.  And then, again, when the sentence goes on to

20 talk about, "which inherently provides higher CPMs," is that

21 consistent with the testimony that you gave to the Court

22 about the disadvantage of last look?

23 A     Yeah.  And first look, whichever they're referring to.

24 The whole arrangement set higher CPMs for AdX.

25 Q     Now, you were also shown by the government PTX 1650,

Redirect Examination - P. Milgrom

1   which is a Trade Desk document.  And if we could, go to the

2   page ending in 055, which was not shown to you.  And again,

3   the document here talks about Palooza 17.  That's 2017?

4   A    It sure looks that way, yes.

5   Q    Okay.  And by 2017, as reflected in this Trade Desk

6   document, you see here that not just Google but Amazon,

7   OpenX, PubMatic, and Rubicon are known to be developing more

8   efficient solutions for header bidding on the server side?

9   A    Yes.  That's referring to the client side

10  implementation, the first implementation having all the

11  problems that we discussed earlier.

12  Q    Okay.  And then similarly, what the government did not

13  show you in this deck ending in 058 -- again, this is a

14  Trade Desk document from 2017.  The Trade Desk is

15  representing that its gaining market share?

16  A    Yes.

17  Q    And it's emerging as a stronger company?

18  A    Yes.

19       MS. RHEE:  Now, at this time, Your Honor, I think

20  we would seek to admit, without doing more, PTX 1674, which

21  is also in the government's binder, and it's a PTX document.

22       THE COURT:  All right.  Then it's in.

23       MS. RHEE:  And then to move PTX 528, which we just

24  briefly discussed at the beginning of this.

25       THE COURT:  All right.  It's in as well.

41

Recross-Examination - P. Milgrom

1          MS. RHEE:  No further questions.

2          Thank you very much, Professor Milgrom.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right.  Any recross?

5                    RECROSS-EXAMINATION

6  BY MR. VERNON:

7  Q    I'll be really brief.  I don't want to go through all

8  of the documents.  Let's just do one.  Let's do PTX 308.

9       So again, the language that we looked at was under

10  "Rubicon strategy:  Rubicon is pitching header bidding to

11  several of our partners because DRX has historically made it

12  difficult for SSPs to compete on a level playing field with

13  AdX."

14       Do you see that?

15  A    I see that.

16  Q    That sentence is talking about the difficulty that

17  dynamic allocation or first look created for exchanges

18  before header bidding, correct?

19  A    It says historically.  It's dated 2016.  So it

20  presumably refers to some period before that, which includes

21  part -- a header bidding period and a pre-header bidding

22  period.  I'm sorry.  I don't see anything more than what is

23  here.

24  Q    This is talking about Rubicon pitching header bidding

25  trying to popularize header bidding because without header

Direct Examination- P. Bjorke

1   bidding, first look would create a disadvantage for Rubicon,

2   correct?

3   A     I see.  You're interpreting because it's pitching

4   header bidding, so people who haven't used header bidding.

5   Yes, I see.  So it must be referring to first look.  I

6   infer.

7               MR. VERNON:  Thank you.  No further questions.

8               THE COURT:  All right.  Does anybody anticipate

9   calling this witness again?

10              MR. VERNON:  Plaintiffs do not.

11              MS. RHEE:  We reserve, Your Honor.

12              THE COURT:  All right.  Professor, then I want to

13  thank you for your testimony.  At this point, you may have

14  to testify again.  As an expert, you are allowed to be in

15  the courtroom.

16              MS. WOOD:  Yes, Your Honor.  I just have a

17  question about what they would be reserving.  As I

18  understand it, they don't have a surrebuttal.  So they're

19  intending to reserve him for later in their case?

20              THE COURT:  Let it be.  Because surrebuttal is

21  sometimes permitted by a court.  So it's not absolutely

22  prohibited.  But let's move on, please.

23              MS. DUNN:  Your Honor, Google calls Per Bjorke.

24              THE COURT:  All right.

25

                        Direct Examination- P. Bjorke

1           MS. MORGAN:  Sorry, Your Honor.  My second chair,

2     Annelise Corriveau, is just handing out the binders.

3           THE COURT:  All right.

4           PER BJORKE, DEFENDANT'S WITNESS, SWORN

5                      DIRECT EXAMINATION

6     BY MS. MORGAN:

7     Q    Hello, Mr. Bjorke.  Please introduce yourself and spell

8     your name for the court reporter.

9     A    My name is Per Bjorke, P-E-R, B-J-O-R-K-E.

10    Q    Where do you work?

11    A    I work at Google.

12    Q    And what's your current title?

13    A    My title is director of product management.

14    Q    How long have you worked for Google?

15    A    Eleven years.

16    Q    And what was your first position there?

17    A    I was a product manager.

18    Q    Do you work on a specific team at Google?

19    A    Yes.  I work on the team called air traffic quality

20    team, internally known as the AdSpam team.

21    Q    Have you always been on the AdSpam team the whole time

22    you've been at Google?

23    A    Yes, I have.

24    Q    Aside from the work you've done at Google, do you have

25    other experience working on the integrity of online systems?

Direct Examination- P. Bjorke

1  A    Yeah.  In my time at Yahoo, I spent some of the time

2  there working on ensuring the integrity and accuracy of the

3  metrics that they use for measuring traffic, number of

4  visitors, and so forth to their web pages.

5  Q    Was any of the work you did at Yahoo related to online

6  advertising?

7  A    Yes.  We did a lot of the back-end data processing and

8  a lot of analytics for the ad systems at Yahoo.

9  Q    Do you have a background in computers and technology

10 besides the work that you've just described at Google and at

11 Yahoo?

12 A    Yes.  I have an undergraduate and a graduate degree in

13 computer science, and I spent my career working in software

14 and computer science fields.

15 Q    Mr. Bjorke, your voice is a little low for me.  If you

16 could speak up a little bit just to make sure everyone can

17 hear, that would be great.

18 A    Will do.

19 Q    And I didn't hear you say.  Do you have academic

20 degrees in computer-related fields?

21 A    Yes.  I have a bachelor's degree and a master's degree

22 in computer science.

23 Q    You said you work on the AdSpam team.  Where does that

24 team sit within Google's business?

25 A    The AdSpam team is part of an organization called the

parseInt

1 Ads Privacy And Safety, APAS, which is part of the Google

2 Ads organization.

3 Q    Okay.  I'd like to publish Bjorke Demonstration 1.  You

4 have it in your binder, but you can also see it on the

5 screen there.

6 A    Yeah.

7 Q    What does this demonstration show?

8 A    This diagram shows part of the Google organizational

9 chart, specifically, the knowledge and information division,

10 K&I, and the ads business.  And then on the left, there's a

11 separate organization called trust and safety, which belongs

12 to a different part of the Google organization.

13 Q    Okay.  So let's take that a little bit at a time.  What

14 is knowledge and information?

15 A    That's the organization who handles search, Google

16 search, as well as Google -- the Google Ads products.

17 Q    Okay.  And then below that is the ads team, and there's

18 five squares below the ads team.  What are those units?

19 A    So the first one on the left is the ads privacy and

20 safety.  That's where we belong.  Then you have the search

21 ads, the YouTube ads, AviD, and BAM.

22 Q    What does the ads privacy and safety team do?

23 A    We handle all of the aspects related to privacy and

24 value, safety and integrity issues for the Ads business.

25 Q    Okay.  I think the Court has probably understood by

Direct Examination- P. Bjorke

1    this point what search ads and YouTube ads are.

2        Can you tell us what AviD is?

3    A    AviD stands for apps, video, and display, and that's

4    basically all of the AdMob, AdSense, and AdX products.

5    Q    And then what about BAM?  What is that?

6    A    BAM is buying analytics and measurements.  Those are

7    the products that we provide to advertisers for running ad

8    campaigns, like Google Ads and DV360, as well as Google

9    analytics and other measurement products and technologies.

10   Q    You pointed out trust and safety in the yellow on the

11   left side of the page.  How does trust and safety fit into

12   this picture?

13   A    So trust and safety is part of the legal organization,

14   and they have as many teams that support other teams across

15   Google.  So we have a team in trust and safety that works as

16   an extension of Google AdSpam team.

17   Q    Okay.  Are there other teams within APAS or ads privacy

18   and safety besides your team?

19   A    Yeah.  Most of the Ads privacy and safety teams will

20   have a corresponding group inside of the trust and safety

21   team that works for them.

22   Q    Okay.  So let me now show Demonstration No. 2, which

23   will also show up on your screen.

24       What is this chart showing?

25   A    This shows more details about the ads and privacy and

Direct Examination- P. Bjorke

1  safety organization, specifically, the five groups inside of

2  APAS.

3  Q    Okay.  Can you walk us just very briefly through what

4  each of those groups do?

5  A    Yes.  Privacy and regulatory deals with privacy and

6  regulatory compliance type of issues.  Ad safety are dealing

7  with advertiser and publisher policy compliance to make

8  sure, for example, we don't show ads on sites that are not

9  meeting our policy criteria, like sites with illegal file

10 sharing, and that advertising campaigns are compliant with

11 our policies and regulations.

12     Then we have the AdSpam team.  We deal with the

13 traffic, the traffic that goes between advertiser and

14 publisher.

15     Compliance deals with the various compliance type

16 related concerns and ads understanding deals with

17 classifying content related to advertising.  For example, is

18 this content about cooking, is this content about sports,

19 and so forth.

20 Q    How many employees do all of the APAS teams reflected

21 in this chart represent?

22 A    All of APAS has over 700 employees.

23 Q    Okay.  Now I want to talk a little bit about your team

24 specifically, the AdSpam team.  I know you said that you

25 deal with traffic.  So tell us what the ads traffic quality

1  team or the AdSpam team does?

2  A    So we deal with making sure that the impressions and

3  the clicks that the advertisers are paying for are valid to

4  ensure that they get value for their spend.  So, for

5  example, if a click is not from an actual user, then the

6  advertiser doesn't want to pay for it.  And we make sure

7  that we detect that and don't charge the advertiser for it.

8  Q    Are you familiar with the term "invalid traffic"?

9  A    I am very familiar with that term.

10  Q    Okay.  What is invalid traffic?

11  A    Invalid traffic are any ad clicks and impressions that

12  are not representative of a genuine user interaction or

13  intent.  So, for example, if you have a software problem

14  sitting in the data center and you're visiting web pages and

15  clicking on links on a web page, that's not a user.  An

16  advertiser would not want to pay for that.

17       Likewise, if you have a fat finger or accidentally

18  click on an ad on a mobile phone, that's also not valid

19  traffic because that's not the intentional user activity.

20  And as an advertiser, you probably don't want to pay for an

21  accidental click on a mobile device.

22       So those are all examples of invalid traffic.

23  Q    Are you familiar with the term "ad fraud"?

24  A    Yes, I am.

25  Q    What is ad fraud?

Direct Examination- P. Bjorke

1   A    So ad fraud isn't a well-defined term.  It's typically

2   used in cases where people think about invalid traffic

3   generated for malicious purposes, typically, for making

4   money out of it for illegitimate reasons.

5   Q    Okay.  You described how invalid traffic impacts

6   advertisers.  How does invalid traffic impact publishers, if

7   at all?

8   A    So say an advertiser wants to spend a million dollars

9   with -- for running an ad campaign and they want to spend a

10  million dollars with, say, *New York Times*.  If fraudsters

11  are able to siphon off $100,000 of that spend, then that's a

12  $100,000 that *New York Times* did not receive.  So for every

13  dollar that goes to a bad actor, that's a dollar that good

14  publishers are not receiving.

15  Q    How does your team actually combat invalid traffic day

16  to day?

17  A    So we use every tool and approach you can imagine to do

18  this.  So we mostly do it through automatic detection

19  through computers algorithms and machine learning and so

20  forth.  We process a trillion-plus events every day.  So

21  most of it has to be done through automation.

22       But we also have a large group of people, data

23  scientists and domain experts, that continuously analyze the

24  traffic and the patterns we see to try to identify new types

25  of attacks that the bad actors are developing.

Direct Examination- P. Bjorke

1    Because the bad actors are continuously evolving and

2    improving the way they try to defraud us in order to stay

3    ahead of us.  It's an adversarial arm's race.  So it's

4    through the manual analysis that we are able to understand

5    these type of attack factors and then update our automated

6    systems to catch them.

7    Q    Do you have an understanding based on your experience

8    of why bad actors want to engage in ad fraud?

9         MR. FREEMAN:  Objection, Your Honor.  It calls for

10   the proposition -- and there has not been a proper

11   foundation.

12        MS. MORGAN:  I am just asking based on his

13   experience.

14        THE COURT:  I'm going to sustain the objection.

15        MS. MORGAN:  Okay.

16   BY MS. MORGAN:

17   Q    Do you know how much Google invested in the AdSpam team

18   in 2022?

19   A    Yeah.  Google invested in the ballpark of $100 million

20   to $150 million in running both paying salaries, as well as

21   all of the computers we run.  To give you an idea, if you

22   compare it to a powerful desktop computer, we probably

23   consume 150,000 work of computers every day in just

24   processing all the data we do to try to keep the ecosystem

25   healthy.

Direct Examination- P. Bjorke

1   Q    Is the AdSpam team a revenue-generating team for

2   Google?

3   A    No, we are not a direct revenue-generating team.  We

4   don't have a revenue target.  Our job is to protect the

5   integrity of the Ads products and protect the long-term

6   sustainability of Google Ads' business.  Through our work,

7   we have a healthier Ads business.  So that helps the

8   business indirectly, but we do not have a direct revenue

9   goal for our team.

10  Q    So you have talked a little bit about catching invalid

11  traffic.  In addition to that, does Google do any more to

12  prevent bad actors from using its publisher tools?

13  A    Yes.  We do a lot of upfront work, so to speak, to

14  keep -- try to keep bad actors out of our ad networks.

15           MS. MORGAN:  Okay.  So if we could, put up

16  Demonstrative No. 3.  Great.

17  BY MS. MORGAN:

18  Q    Mr. Bjorke, what is this showing?

19  A    This shows a diagram that shows the main processes we

20  use to try to keep bad actors out of our ad networks.

21  Q    Okay.  So tell us what happens in step one.

22  A    So in step one, a publisher will sign up with our

23  network online, and they will provide name and email and

24  address and so forth as part of that sign-up process.

25  Q    Okay.  What about step two?

1  A    This is where we are running checks on the account

2  sign-up information.  We look at the information they

3  provide.  Does it look like a legitimate email address?

4  Does it look like a name and address we've seen before?  We

5  even look at the technical indicators and signals we get

6  from the sign-up computer, like IP address and so forth, to

7  see if this is someone trying to sign up tens of thousands

8  of accounts from the same computer.

9  Q    How many publishers are trying to sign up on a daily

10 basis?

11 A    On a daily basis, we are running probably 15 to 20

12 thousand attempted account sign-ups.

13 Q    Okay.  So what happens then in step three after you've

14 gone through the account approval process?

15 A    So at that point, the publisher would have to provide

16 the domain or the mobile app that they want to monetize, and

17 we will then check that that domain exists and that it has

18 some content and seems to be a legitimate publisher website.

19 Q    Okay.  And what about step four?

20 A    Step four is a verification when they have started

21 making some money.  So when you reach $10 in earnings, we

22 will apply a bunch of additional verification steps.  We may

23 try to verify their ID.  We will actually send them a letter

24 in the mail to their address in order to provide a PIN code

25 that they have to give us into our system to verify their

Direct Examination- P. Bjorke

1   physical address.  And we also check things like bank

2   account information and so forth that they provide to us.

3   Q    When you say that you send the PIN verification to

4   their physical address, why do you do that instead of just

5   sending it on email?

6   A    Ironically enough, since all of this is online --

7   online is really easy to fake a name and things like that.

8   It's easy to create lots of unique email addresses and so

9   forth.  But if you want to create 10,000 accounts and you

10  have to have 10,000 unique postal addresses, that's

11  difficult.

12      Likewise, if you are sitting in Vietnam and you're

13  trying to pretend to be in the U.S. or in the U.K., it's

14  difficult to provide a physical address that you have access

15  to.

16      So it turns out that a physical address verification is

17  one of the most effective tools we have to try to ensure

18  that the -- prevent these bad actors from creating lots of

19  accounts or misrepresenting where they are.

20  Q    Okay.  Then there's a Box 5 that's in red here.  What

21  happens in that step 5?

22  A    So after a publisher has gone through all of this and

23  they reach the payment threshold -- so we pay them the first

24  time when they reach $100.  We will then continue to monitor

25  their activity and look for signs of bad activity, or maybe

Direct Examination- P. Bjorke

1    they are changing the addresses and things like that that

2    seems to be suspicious.  And then we will figure additional

3    verification or reviews as needed based on that risk.

4    Q    So you just walked us through the vetting process and

5    monitoring process for publishers.  Is there a similar

6    process on the advertiser's side?

7    A    So I only deal with the publisher's side as part of my

8    job typically.  But we have a sister team, AdSafety, that

9    handles the same thing on the buy-side for advertisers, and

10   they have similar vetting processes to ensure that bad

11   actors don't penetrate our systems and come in as a fake

12   advertiser.

13   Q    What are the benefits of Google's vetting process?

14   A    The benefit is that instead of catching the invalid

15   traffic fraud later on, we can keep the bad actors out in

16   the first place.  Then we don't need to battle and fight

17   them and catch them later on.  So the more you keep them

18   out, the better luck you have on your front door.  The

19   better you are protected basically.

20   Q    And you talked a little bit about the ongoing

21   monitoring process.  To what extent is that computer

22   automated?

23   A    The vast majority is computer automated, but depending

24   on what we determine, it may be that we have some risk

25   indicators.  And in that case, it will also go to manual

Direct Examination- P. Bjorke

1  reviews for further analysis and review.

2  Q    Does Google own the computer automation systems that it

3  uses to do that monitoring?

4  A    Yes, we own the systems ourselves.

5  Q    Do you update the filters for those systems?

6  A    Yeah.  All of this is continuously updated.  Some of

7  the systems are machine-loading base system.  They will auto

8  tune themselves on a daily basis.  Other systems we update

9  with various frequency from weekly to monthly.

10  Q    Okay.  You also mentioned manual portions of the review

11  process.  What does that look like?

12  A    So that's where we use the data scientists and the

13  domain experts to sit down and review the activity and try

14  to look for new types of attack and new types of abuse that

15  our automated systems haven't detected.

16      Again, it's an adversarial race, and the bad actors are

17  always trying to outsmart us.  So we have to constantly stay

18  on top of them, look at what they're doing, and figure out

19  what's the new way of them abusing us.

20  Q    What happens when your team actually detects invalid

21  traffic whether through automated screening or through

22  manual review?

23  A    When we detect invalid traffic, we basically market it

24  as invalid and basically zero it out.  It's almost like it

25  didn't happen.  So, for example, if an advertiser had a

Direct Examination- P. Bjorke

1   click that was costing a dollar and the publisher paid 90

2   cents, we would just mark it as nonexisting, and the

3   advertiser would not be charged or maybe refunded if they

4   had already charged them.  And the publisher wouldn't be

5   paid.

6   Q    Okay.  When that happens, does Google still take a

7   revenue share?

8   A    No, we don't because we basically zero out the

9   transaction.  It's just like the transaction didn't happen.

10  So we don't make our profit on that.  No one makes any

11  economic benefit from that transaction.

12  Q    Why do you not charge a revenue share or a transaction

13  fee even though you go through the process of detecting

14  invalid traffic?

15  A    We look at fighting fraud as an integral part of our

16  product.  It's a key part of what you get when you advertise

17  with Google, and we don't charge extra for that.

18  Q    Does your team ever work with third-party vendors to

19  detect invalid traffic?

20  A    Yes.  We have a partnership with one vendor, a company

21  called Human Securities, previously known as White Ops, that

22  we use to augment our in-house defenses.  Because in this

23  space, no one is perfect.  We believe that by using a

24  vendor, as well as our in-house defenses, we are even a

25  little better than we would be otherwise.

Direct Examination- P. Bjorke

1  Q    Could Google outsource all of its work related to

2  detecting and containing invalid traffic to a third-party

3  vendor like Human Securities?

4  A    No, it would not be effective.

5  Q    Why not?

6  A    Because an outside vendor will not have access to all

7  of the data we have.  A lot of the data is, for business and

8  commercial and contractual reasons, confidential, and they

9  couldn't have access to all of that information.

10  Q    Okay.  Do you recall working on a team to develop a

11  product called AWBid?

12  A    Yes, I do.

13  Q    What is AWBid just very briefly?

14  A    AWBid is a mechanism for AdWords' or Google Ads'

15  advertisers to be able to reach users that are coming in

16  through inventory through third-party exchanges.  So these

17  may be publishers that are not working with any of the

18  Google Ads' networks.

19  Q    When did Google start working on AWBid?

20  A    Google had started working on AWBid before I joined in

21  2013.  I believe it was around 2011 they started working on

22  it.

23  Q    Before that, was Google Ads closed to third-party

24  exchanges to your knowledge?

25  A    Yes.

Direct Examination- P. Bjorke

1   Q    From your experience in AdSpam, was there a benefit to

2   Google Ads being closed to third-party exchanges?

3   A    Yes, there was a very clear significant benefit of

4   being closed and only operating in a closed ecosystem.

5   Q    What is the benefit?

6   A    There were several.  When we started going -- when we

7   had to support AWBid and basically buy from the open market,

8   it fundamentally changed how the foundation for how we

9   developed our spam defenses.

10       So, one, we didn't have a closed ecosystem anymore.  We

11   didn't have a secure environment that we could control to

12   prevent tampering and misrepresentations through the

13   ecosystem to ensure the integrity of signal collection.

14       Two, we couldn't vet the publishers because they didn't

15   sign up with us anymore.  So we couldn't keep bad actors out

16   of the network.

17       Three, the whole open ecosystem at that point were

18   based on prebid defenses, real-time ID detection before the

19   transaction happened.  No one had the ability to collect

20   this financially after the fact, and that was completely

21   different than what we did.

22       And lastly, in the closed ecosystem for AdWords,

23   advertisers paid by click, and we paid the publishers by

24   click.  In the AWBid world, we would still charge

25   advertisers on clicks, but we had to pay publishers on

Direct Examination- P. Bjorke

1   impressions.  That further complicated the whole mechanism,

2   how we can ensure that bad actors couldn't profit from

3   committing ad fraud in that space.

4   Q    What was the AdSpam team's role in AWBid?

5   A    We consulted and advised the AWBid team on how to

6   develop the product in a way where we could continue to

7   protect our advertisers to the level they expected from

8   having used AdWords in the past.

9   Q    When you first started working on AWBid, did your team

10  make any observations in terms of the level of invalid

11  traffic from third-party exchanges available through AWBid?

12  A    Yes, we did.  Some of the first experiments that they

13  ran on AWBid resulted in very, very high level of invalid

14  traffic, an exceptionally high level of invalid traffic.

15  Q    Based on your experience and your analysis, why was

16  that?

17  A    To a large degree, it's because those networks did not

18  invest much in trying to keep bad actors out of the

19  networks.

20  Q    Earlier you mentioned challenges with signal collection

21  related to opening up Google's ecosystem.  When Google had

22  started bidding on third-party exchanges through AWBid, to

23  what extent was signal collection a challenge for invalid

24  traffic detection?

25  A    It was a big challenge because the bad actors will try

Direct Examination- P. Bjorke

1    to manipulate and falsify the information they use to

2    pretend to be valid traffic.  In our closed ecosystem, we

3    have control of it.  We can obfuscate it so they don't know

4    what they are collecting, and we can ensure the integrity of

5    that collection.  It is very difficult for someone to

6    manipulate the signals we rely on when we're operating our

7    closed ecosystem.

8         When we operated in the open ecosystem, the information

9    we got when we got a bid request, it just came through a

10   text message, a text stream in the open AWBid protocol.

11   There was no integrity there.  We had no way to know if

12   someone had tampered with that on the way to us.

13        And we couldn't necessarily deploy our normal signal

14   collection because it would be out in open.  And then the

15   bad actors could immediately see what information we were

16   looking for and, therefore, know what they needed to fake.

17        So we had to invest a lot in trying to find an

18   alternative way to secure the integrity of our signaling

19   collection and obfuscate it such that the bad actors

20   couldn't falsify.

21   Q    Why does signal collection matter just really simply?

22   A    Signal collection is the foundation for all of our

23   detection.  For us to detect if something is invalid, we

24   need to know things about the users, about the computer,

25   about the publisher, and so forth.  If we don't have those

Direct Examination- P. Bjorke

1  signals, we don't know whether this is valid or not.

2      Imagine if your credit card company didn't know the

3  location, the time, the merchant, and so forth about your

4  credit card transaction.  There's no way they could catch

5  credit card fraud.  The same with us.  If we don't know a

6  lot of details about these ad impressions and add clicks --

7      For example, where does a user click on an ad?  If they

8  are always clicking on the same spot in the ad, well, that's

9  not human.  Things like that are things we need to do in

10  order to detect the fraud.

11  Q    Earlier you also talked a little bit about enforcement

12  of AdSpam policies.  What challenges, if any, did AWBid

13  raise for your team in terms of enforcement?

14  A    So I touched on the fact that in the open ecosystem

15  before that, every spam detection was done before you bought

16  the transaction.  No one had the mechanism for correcting

17  for spam after the fact.  So if we detected spam after the

18  fact, we were obligated to pay the publisher, and the

19  publishers were obligated -- so we were obligated to pay the

20  exchange, and the exchange would pay the publisher.  We

21  couldn't claw back the money after the fact.

22      Just like in a credit card transaction.  If a credit

23  card transaction is determined to be fraudulent after the

24  fact, the bank would claw back the money from the merchant.

25      That didn't exist in the open ecosystem before that.

Direct Examination- P. Bjorke

1  So we had to fundamentally renegotiate contracts with

2  exchanges and build out a lot of technology to handle that

3  because that did not exist.

4  Q    I now want to show you Defense Trial Exhibit 277, which

5  has already been admitted in the case.

6       Do you recognize this document?

7  A    Yes, I do.

8  Q    Okay.  What is it?

9  A    This is an update about the AWBid project from 2015.

10 Q    Okay.  Since the Court has already seen this exhibit, I

11 just want to direct you to page 23 of the document, which is

12 titled Spam Issues.

13      Do you see that?

14 A    Yes.

15 Q    Okay.  Great.

16      What is this slide showing?

17 A    This is showing some of the challenges and some of the

18 efforts that have gone in to address those challenges

19 related to IVT and ad fraud, spam.

20 Q    Okay.  I want to talk about the bullets that are

21 underneath the heading protections in place and see if you

22 can help translate for everyone what these mean.  The first

23 one says, "Auto-rampup spam-aware whitelist."

24      What protection is that referring to?

25 A    I don't remember the details with that.  I believe it

Direct Examination- P. Bjorke

1    had to do that we would check on the level of invalid

2    traffic for each exchange before we ramped up from, say,

3    1 percent to full integration with those exchanges.

4    Q    Okay.  And what about the -- the second bullet says,

5    "Botguard coverage via encrypted creative in type 1 and

6    available in type 2."

7         What is that referring to?

8    A    Botguard is one of the technical mechanisms we have

9    collecting signals from the user's browser and the activity

10   that goes on that browser.

11        And encrypted means that we needed to try to protect

12   this signal collection so the bad guys couldn't reverse

13   engineer it.

14        Types 1 and 2 are two different types of integration

15   exchanges.  So we had implemented the necessary steps to

16   encrypt the botguard signal collection for one of them but

17   not for the other one.

18   Q    Okay.  The next bullet says, "RTSF integration in XBFE,

19   same as DBM."

20        So I'm going to break that up because it's a lot of

21   letters.  What is RTSF integration referring to?

22   A    RTSF stands for real-time spam filtration.  That's the

23   mechanism we have for detecting invalid traffic in

24   real-time.

25   Q    Okay.  So what is this describing?

Direct Examination- P. Bjorke

1  A    This basically described that we had to integrate our

2  real-time spam detection into the pipelines, the computer

3  pipelines that the AWBid team built for hooking up Google

4  Ads or AdWords to buy from the third-party exchanges.

5  Q    Okay.  At the end, it says, "same as DBM."  What is DBM

6  in reference to?

7  A    DBM was the previous name of DV360.

8  Q    The last bullet here is referring to a refund clause.

9  Do you see that?

10  A    Yes.

11  Q    So what is that referring to?

12  A    That's referring to what I mentioned about the

13  contractual terms, to be able to claw back for invalid

14  traffic that had been detected after the fact.

15      So at this point in time, we had negotiated refund

16  rights, a process in the contracts with the exchanges, but

17  the process, the automation to be able to handle it had not

18  been implemented yet.  That was still work that was

19  remaining to be done.

20          MS. MORGAN:  Okay.  We can go ahead and take this

21  down.

22  BY MS. MORGAN:

23  Q    At the time Google was working to put these protections

24  in place, did Google already have a buying tool that bought

25  out third-party exchanges?

Direct Examination- P. Bjorke

1  A    Yes.  DV360, DBM at the time, was buying from

2  third-party exchanges at that point.

3  Q    So if Google had DV360 buying on third-party exchanges

4  already, why couldn't it just do the same thing in Google

5  Ads that it did in DV360?

6  A    Because the technology and the pipes and systems that

7  DV360 was running on was different than what AdWords or

8  Google Ads were running on.

9  Q    Okay.  And how was it different?

10  A    It was just different systems, different software that

11  were running.  It didn't have a unified consolidated stack.

12  Q    Okay.  I'm now going to show you a document that's been

13  marked PTX 791, which has already been admitted.

14      Do you recognize this document?

15  A    Yes, I do.

16  Q    What is it?

17  A    This is an update about AWBid from November 2019.

18  Q    Okay.  So again, the Court has already seen this.  So

19  I'm just going to go to one slide which is marked with the

20  last Bates digits 224.  And I just want to point you to the

21  second bullet here which says, "Spam:  It's a wild world out

22  there."

23      What is this referring to?

24  A    This was a rather casual description of what the

25  challenges we were facing with regard to invalid traffic in

Direct Examination- P. Bjorke

1   the open ecosystem in third-party exchanges.  It was pretty

2   crazy.

3   Q    So at this point in 2019, was your team continuing to

4   work to contain invalid traffic from third-party exchanges

5   on AWBid?

6   A    Yes, it was an ongoing effort.

7   Q    Are you still doing that work today?

8   A    Yes, we do.

9        MS. MORGAN:  Okay.  We can go ahead and take that

10   down.

11   BY MS. MORGAN:

12   Q    I want to turn to another topic.  Are you familiar with

13   the fraud scheme known as Eve?

14   A    Yes, I am very familiar with the Eve scheme.

15   Q    Why are you very familiar with it?

16   A    We spend a lot of time on it in over five years before

17   it finally got closed out.  It was a very large fraud

18   operation that had been battled for years.

19   Q    Okay.  When did that happen?

20   A    It started in 2017.

21   Q    And what was Eve -- how was Eve operating?

22   A    Eve was a set of fraud operations by a group of people.

23   They had three or four different types of operations.  The

24   primary one was leveraging was called a botnet.  They had a

25   large number of home computers infected with malware that

Direct Examination- P. Bjorke

1  they used to execute their fraud scheme.  Those computers

2  were set up to go and visit lots of fake web pages that

3  pretended to be legitimate publishers.  And then the

4  fraudsters were able to get paid for all of those fake ad

5  impressions.

6  Q    What was Google's involvement in Eve?

7  A    We were the -- one of two primary companies that

8  detected and understood an Eve operation.  And in the end,

9  we referred it to law enforcement, which successfully

10  apprehended several of the people behind it and prosecuted

11  them.  And it followed up with the takedown of the whole

12  operation after a year and a half.

13  Q    Where did you see the fraud from Eve happening in

14  Google systems?

15  A    The vast, vast majority of the Eve traffic we received

16  and bought came from the third-party ecosystem.  It was a

17  very small portion that had infiltrated.

18  Q    Why is that?

19  A    I believe that is primarily because we made it very

20  hard for bad actors to infiltrate our AdSense and AdX

21  networks.  While in the opaque ecosystem, supply chain in

22  the third-party exchange ecosystem, it was very easy to

23  blend in and infiltrate that ecosystem.

24  Q    Okay.  I would like to now show Defense Trial

25  Exhibit 635.

Direct Examination- P. Bjorke

1          THE COURT:  Any objection to 635?

2          MR. FREEMAN:  Yes, Your Honor.  We object on

3  hearsay and relevancy grounds.  I mean, this is basic

4  character like evidence for Google about their referral to

5  the FBI.

6          THE COURT:  I'm going to overrule the objection.

7  I think it does assist the defense in this case.

8          Go ahead.

9  BY MS. MORGAN:

10 Q    Okay.  Mr. Bjorke, I'm showing you what's been marked

11 as Defense Trial Exhibit 635.  Do you recognize this?

12 A    Yes, I recognize this.

13 Q    What is it?

14 A    This is a blog we published in late 2018 about our work

15 on the Eve case.  This was after the Department of Justice

16 and the FBI had announced their efforts in this case and the

17 takedown they had.

18 Q    Okay.  I want to direct your attention to page 3 of the

19 document to the operation summary chart.

20       Do you see that?

21 A    Yes.

22 Q    Okay.  So I want to walk you through what some of these

23 numbers mean.  On the left side, it says, "3b+ daily bid

24 requests."  What is that referring to?

25 A    So bid request is how many ad slots or ad impressions

Direct Examination- P. Bjorke

1  that they make available for you to potentially buy.

2      And in this case, these people -- this fraud operation

3  produced more than 3 billion bid requests.  These are

4  attempts to sell you an ad slot, 3 billion of those per day.

5  It was quite a lot higher at the peek.  This is how much

6  traffic they created.  It was a very, very large operation.

7  Q    And next to that, there's a figure that says, "1m

8  Compromised IPs."  What does that figure represent?

9  A    That represents how broadly they had distributed the

10 traffic to make it look like it was normal.  It looked like

11 it was 1 million people who were browsing the web, and they

12 did that to make it look like it was normal users visiting

13 it.

14     In fact, most of those one million were actually

15 compromised home computers that they had infected with

16 malware.  Then they, through the control and command

17 servers, directed those home computers to visit these web

18 pages in the background.  So you had about a million people

19 who had -- or 700 to a million people who had these

20 infections on their home computers.

21 Q    And below that, it says "10k+ websites counterfeited."

22 What is that referring to?

23 A    The way these people got away with so much traffic was

24 to pretend to be well-known websites.  They pretended to be

25 the New York Times and the Washington Post and so forth.  So

Direct Examination- P. Bjorke

1    when advertisers saw their placement reports, they would

2    see, oh, lots of ads on *New York Times*, NBC, CBC, and so

3    forth.  So they didn't react.

4         And they did that by basically faking or counterfeiting

5    over ten thousand different websites.  So they created fake

6    copies of that.  And all of the trafficking and reporting

7    and verification happened by the ad tech companies -- they

8    successfully made it look like it was those legitimate

9    websites, but it wasn't.

10   Q    Do you have an estimate of financial impact to Google's

11   publisher and advertiser customers from the Eve scheme?

12   A    Our advertisers did not lose money because we refunded

13   them for all of the Eve traffic that we detected.

14   Publishers lost money because these bad actors got paid

15   $30 million to $40 million -- $20 million to $30 million for

16   this operation.

17        Google lost between $30 million and $40 million on this

18   operation.

19        And then there were losses in other parts of the ad

20   tech industry that we don't know how big they were, but it

21   was likely significantly bigger than ours.

22   Q    That might answer my next question, which is did Eve

23   only impact Google?

24   A    No.  Eve impacted the whole industry.  We bought

25   this -- as you see on this slide, this fake inventory was

Direct Examination- P. Bjorke

1   sold through 60,000 -- over 60,000 different sellers in the

2   ecosystem.  It was everywhere.  So there's no reason to

3   believe we were the only ones who bought it because it was

4   everywhere.

5   Q    Once your team detected the Eve scheme, were you able

6   to contain the problem?

7   A    We did, but it was an ongoing battle.  Because as soon

8   as we detected it, the bad actors updated their fraud

9   operation to try to hide.  So it was a cat-and-mouse game

10  for several quarters.  We had to develop new solutions.  We

11  had to specifically go and probe for certain functions in

12  their versions of the Chrome browser they used and so forth

13  in order to detect them.  It was an ongoing battle for many

14  months to contain it.

15  Q    Were there other schemes related to Eve that you also

16  detected?

17  A    Yes.  And there was a well-known case a few months ago

18  that was called Massbot (phonetic) that Human Securities

19  wiped out at the time, had published about it.  It was a

20  very similar operation.

21  Q    What was the overlap between the two schemes?

22  A    They had a lot of similarities, and there's several

23  reasons to believe they collaborated -- the bad actors

24  collaborated to some degree on those two schemes.

25  Q    So you talked a little bit earlier about the fraudulent

Direct Examination- P. Bjorke

1    websites that were generated through the Eve scheme.   Were

2    impressions on fraudulent websites being sold through

3    Google's tools?

4    A     A minimum.   There was very little impact through our

5    AdX network.

6    Q     If there was very little, how were you able to detect

7    the scheme?

8    A     So DV3 bought this from third-party exchanges, and

9    through our antifraud effort on DV3, on DBM at the time, we

10   detected this.

11         We also collaborated actively with White Ops, and we

12   collaborated with other security companies, antivirus

13   companies, and so forth to understand this operation.   We

14   had helped to diverse engineer and find the malware.   It was

15   a very intense industry collaboration to fully understand

16   this operation and try to minimize the harm from it.

17   Q     What, if anything, did you learn about the benefits of

18   end-to-end integration from the Eve and Methbot schemes?

19   A     The end-to-end integration allows you to have better

20   signal collection.   You can protect your signal collection

21   from manipulation and adverse engineering, and you can much

22   more effectively keep bad actors out.

23         In the end, there was only two shell companies behind

24   all of this traffic, but most of the companies, the

25   intermediaries in the ecosystem, had not done a decent

Direct Examination- P. Bjorke

1  vetting process.  We had no transparency interest.  So we

2  didn't know that it all came from two companies.  If it had

3  been in our ecosystem, they couldn't have done that because

4  we have that visibility into all of publishers.

5  Q    All right.  I want to take this down, and the next

6  exhibit I want to go to is Defense Trial Exhibit 476.

7           THE COURT:  Any objection to 476?

8           MR. FREEMAN:  No objection.

9           THE COURT:  All right.  It's in.

10  BY MS. MORGAN:

11  Q    Mr. Bjorke, do you recognize this document?

12  A    Yes, I do.

13  Q    What is it?

14  A    This was a proposal for a long-term strategy that we

15  developed in 2017 during the height of battling Eve for how

16  we could better fight ad fraud in the future.

17  Q    Why did you put this presentation together?

18  A    Because in 2017, this was really an existential

19  question for the online advertising industry.  We had very

20  large companies trying to stop online advertising.  We had

21  the CMO of a large Japanese auto manufacturer fly to

22  Mountain View to talk to us about ad fraud.  This was

23  existential for Google's business and for the rest of the

24  online advertising business.

25           And we needed -- when we saw how much money these guys

1    made, the Eve guys made from this fraud operation, they

2    could hire a ton of people and develop more advanced fraud

3    operations.  We needed to cut off funding, and we needed to

4    improve marketers' confidence in online advertising.

5    Otherwise, the online advertising wouldn't prosper going

6    forward.  We were not winning the battle at that point.

7    Q    I want to direct your attention to page 5 of this

8    document, which says, "Two fundamental options, with many

9    sub considerations."

10        Are you familiar with this slide?

11   A    Yeah, I'm very familiar with this.

12   Q    Okay.  Can you summarize what you saw at this point as

13   the two basic options for strategy moving forward?

14   A    The two options were either we would focus internally

15   in Google to protect Google's advertisers and Google's ad

16   products from invalid traffic and ad fraud, or we would try

17   to focus on helping clean up the whole industry, the whole

18   ecosystem from ad fraud.

19   Q    Okay.  So staying on this same page and laying out the

20   two options, you summarize each by writing in parentheses,

21   "grow slice," option A, or "grow pie," option B.

22        Why did you label the two options this way?

23   A    Because if we were to just focus on Google, it wouldn't

24   help create trust in the whole online advertising ecosystem.

25   It would just hopefully create trust in Google's ability to

Direct Examination- P. Bjorke

1  fight fraud, and maybe more advertisers would use Google.

2       But that wouldn't help very much because at that point,

3  online advertising wasn't that large.  And the growth in

4  online advertising would come from convincing marketers to

5  move budgets from TV and traditional media online.  And if

6  you had the regular drum beat of bad news in the press about

7  fraud everywhere in online advertising, the CMOs would

8  likely not feel comfortable moving TV budgets online.  So we

9  proposed instead to try and help clean up the whole

10  ecosystem and help grow a market, grow a pie instead of a

11  slice.

12       Lastly, also, we needed to cut off funding for the bad

13  guys because the bad guys don't care where they get paid

14  from.  If they get paid from us or someone else, it doesn't

15  matter.  If they make a $100 million, they can hire an awful

16  lot of people.  If they are sitting in Eastern Europe or

17  wherever they are, they can hire a lot people.  And they are

18  smart, and they can get much, much more sophisticated.  That

19  would be very hard for us to defend.  We had to cut off

20  funding for the bad guys.

21  Q    So which of these two options, option A or option B,

22  would be more work for Google?

23  A    Option B would be clearly more work for Google.

24  Q    And which option did your team recommend?

25  A    We strongly recommended option B.

Direct Examination- P. Bjorke

1  Q    How, if at all, does option B relate to protecting

2  Google advertisers who buy on third-party exchanges?

3  A    It's essential for us to protect Google advertisers who

4  buy from third-party exchanges.  Because if we couldn't help

5  clean up the whole ecosystem, there would be so much fraud

6  in that third-party ecosystem.  Even if we were able to keep

7  our closed ecosystem reasonably clean, we would be exposed

8  when they bought from third-party exchanges.

9  Q    So which of these two options did Google ultimately

10 choose?

11 A    We went with option B.  Not all of the items in here,

12 but we went with option B.

13 Q    How, if at all, did that change the nature of your work

14 on the AdSpam team?

15 A    So specifically, it changed my -- our team's mission

16 from only focusing on Google to also helping clean up the

17 whole industry.  And specifically, it meant I spent a lot of

18 my time working on industry work, collaboration, industry

19 standards development, and other efforts to try to help

20 clean up the whole industry instead of just Google.

21     Lastly, it meant that we were much more willing to

22 share our understanding and our expertise with others

23 because we knew it would benefit everyone else.  It wasn't

24 going to be used as a competitive advantage.

25 Q    You were just talking about standards.  Are you

Direct Examination- P. Bjorke

1  familiar with something called ads.txt?

2  A    Yes, I am.

3  Q    Okay.  And how are you familiar with ads.txt?

4  A    I was integral -- I was part of the core team who

5  developed the idea and executed and drove the adoption of

6  ads.txt across the industry.

7  Q    Okay.  Very briefly, what is ads.txt?

8  A    Ads.txt is a way for publishers to share with the world

9  who is allowed -- who is authorized to sell your inventory.

10 Imagine that Rolex will publish a list of authorized Rolex

11 dealers.  That way you know if you go to a jeweler downtown,

12 you can see if they are authorized.  While if you see a guy

13 on the street trying to sell you a Rolex, you can check that

14 they are not authorized.  There's a way of decentralizing

15 the effort of creating awareness of who can sell whose

16 inventory.

17     So *New York Times* can tell who is authored to sell *New*

18 *York Times* inventory.  *Washington Post* can tell us who is

19 authorized to sell *Washington Post* and so on.

20 Q    Why was there a need for a standard like ads.txt?

21 A    Because when you look at the Methbot and Eve cases,

22 they did domain misrepresentation.  That was the most common

23 approach for bad actors to commit in ad fraud operations up

24 until then.  It was a multibillion dollar business at that

25 point.  And we needed a way to stop that.  We needed an

Direct Examination- P. Bjorke

1    effective way to stop that instead of just chasing the

2    signals and so forth.  We needed to follow the money.

3          Because one thing is standard for all cyber crime is

4    you follow the money as an effective way to do it.  And by

5    allowing publishers to tell everyone who is authorized to

6    sell it and ensure the money goes to them, we would

7    effectively stop that type of ad fraud attack.

8    Q    So how do you actually access ads.txt to see who the

9    authorized sellers are for a publisher?

10   A    You simply go to a website's URL -- so say

11   washingtonpost.com -- and then you add slash ads.txt, or you

12   go to newyorktimes/ads.txt and so forth.  And then one can

13   go and look at any publisher that ads.txt list publicly on

14   the Internet.

15   Q    Okay.  Let's take a look at how that works.  I am going

16   to put up Demonstrative No. 4.

17         What is this demonstrative?

18   A    This is page 4 of a publisher named News Leader.

19   Q    Okay.  And if you wanted to go to the ads.txt page, how

20   would you do that?

21   A    You just add a slash and A-D-S.txt at the end of the

22   URL.

23   Q    Okay.  And now let's look at Demonstrative No. 5.  What

24   is this showing?

25   A    This shows the ads.txt slide for newsleader.com.

Direct Examination- P. Bjorke

1   Q    This is a very long list.  So we have a scroll on it.

2   I'll just let you go all the way down.

3   A    Yeah.

4   Q    What do each of these names represent?

5   A    Each of these names represent an ad tech company that

6   newsleader.com has authorized to sell their inventory.

7   Q    Okay.  And so what are some of the companies that the

8   Staunton News Leader has put on here?

9   A    You see everyone almost here.  You see Rubicon, Yahoo,

10  Facebook, Google, AppNexus, Rubicon, PubMatic, AOL.  Pretty

11  much every company you can imagine in the industry are

12  listed here it looks like.

13  Q    Okay.  What role did you have in making ads.txt an

14  industry standard?

15  A    So after we developed the proposal, we shared it with

16  the IAB Tech Lab, which is an industry body, and it adopted

17  the standard.

18       And as soon as the standard was published, I was very

19  active in trying to educate the industry about it, raise

20  awareness for the need for it.  Of course, we had the

21  firsthand experience from the fraud cases.

22       We had some publishers who did a test.  They turned off

23  their ad servers, and we could see how much traffic was

24  still coming pretending to be from these publishers.

25       *Financial Times* did an interesting study where they

Direct Examination- P. Bjorke

1  found that there's only two authorized sellers of *Financial*

2  *Times* of video inventory, but there was like 50 of them in

3  the marketplace.  So there's obviously a lot of bad stuff

4  going on.

5      So I was very active in education, awareness, and then

6  I lobbied internally for us to start using our products in

7  order to kind of kick off that process of adoption and

8  enforcement using it.

9  Q    Okay.  What effect has the widespread adoption of

10  ads.txt had on ad fraud issues?

11  A    This little simple text file has basically closed the

12  door on this type of fraud.  Domain misrepresentation as in

13  fraud vector no longer exist in this space.  It's basically

14  eliminated a $50 billion abuse fraud opportunity.

15  Q    Okay.  With widespread adoption of ads.txt, could Eve

16  or Methbot operate today?

17  A    They could not.  They could not operate the way they

18  operated today.  This thing has closed that opportunity.

19  It's been very successful.

20  Q    Why did you not keep ads.txt only for Google's use?

21  A    One, our objective, our mission was to help clean up

22  the industry.  Two, it wouldn't be very effective if we kept

23  it in-house because we needed all publishers everywhere in

24  the world to adopt, and we wanted every company to adopt it.

25  Because then when we buy traffic from the third-party

1  exchanges, there's less fraud there.

2      As well as, it helps reduce funding for the bad guys,

3  and it helps increase trust in online advertising.  So it's

4  a win-win for everyone when you get the whole industry to do

5  it.  We could simply not do it by ourselves and get that

6  benefit.

7  Q    What parts of Google's ecosystem benefit the most from

8  the adoption of this standard?

9  A    It's the DV3 and AWBid buyer from third-party exchanges

10 that benefits the most directly.

11 Q    Have you to date been able to achieve parity in terms

12 off traffic threats on Google's end-to-end to integrated

13 system versus buying on third-party exchanges?

14 A    No, we haven't.  And we have made great progress, but

15 there's inherent difficulties that you cannot solve and that

16 will mean that it's never quite at parity.

17         MS. MORGAN:  Okay.  I pass the witness.

18         THE COURT:  All right.

19                  CROSS-EXAMINATION

20         MR. FREEMAN:  May I proceed, Your Honor?

21         THE COURT:  Yes, sir.

22                  CROSS-EXAMINATION

23 BY MR. FREEMAN:

24 Q    Good afternoon.  My name is Michael Freeman.  I work

25 with the Department of Justice.  I have some questions for

Cross-Examination - P. Bjorke

1    you.  Okay.

2         So I just want to be clear about kind of the scope of

3    your testimony that you gave on direct.  Since you've been

4    working at Google, you've been exclusively working in AdSpam

5    and ad traffic quality; is that fair?

6    A    That's correct.

7    Q    And you've been there since -- I think you said 2013.

8    A    Yes.

9    Q    Okay.  So your role at Google had nothing to do with

10   the DoubleClick or Admeld acquisitions?

11   A    Correct.

12   Q    You're not in charge of determining kind of the auction

13   logic of the sale of digital display advertising?

14   A    Correct.

15   Q    Meaning you're not in charge or you don't weigh in on

16   whether it should be a first- or second-price auction?

17   A    Correct.

18   Q    You're not involved in whether Google should bid shade

19   into the auction?

20   A    Correct.

21   Q    Whether publishers could set floors or not set floors?

22   A    Correct.

23   Q    Okay.  So I do want to talk to you about the area that

24   you work on in terms of inventory, about it.  It's fair to

25   say, though, that no one who operates in this space is

Cross-Examination - P. Bjorke

1   perfect in this regard, right?

2   A    No one is perfect in the ad fraud space.

3   Q    And the concerns that you addressed on direct are

4   concerns industry-wide, meaning they apply to Google as much

5   as any other companies that we've talked about here, OpenX,

6   Rubicon, Index Exchange?  It's an industry-wide problem,

7   right?

8   A    The basic problem of invalid traffic in ad fraud

9   applies everywhere.  The nature of it varies depending on

10  business models and so forth.

11  Q    Because it's an industry-wide problem, Google then

12  collaborates with other industry participants in various

13  groups or consortiums, right?

14  A    In the ad fraud space -- fighting ad fraud space, yes,

15  we collaborate with other companies.

16  Q    And one of those groups or consortiums that Google

17  collaborates with other people is a group called IAB or

18  sometimes even an offshoot of that being IAB Tech Labs,

19  right?

20  A    Yes.  The IAB Tech Lab is an organization we

21  collaborate with.

22  Q    And it's not just Google who is a part of IAB Tech

23  Labs, right?

24  A    Correct.  Many companies are participating in the IAB

25  Tech.

1  Q    And you talked about on direct examination the -- how I

2  think you finished was the ads.txt, the A-D-S.T-X-T, right?

3  Do you remember that testimony?

4  A    Yes.

5  Q    All right.  That innovation, that actually came out of

6  the IAB Tech Labs, right?

7  A    That's correct.

8  Q    Okay.  So it was not Google proprietary technology that

9  was --

10 A    The authorized seller standard is not a Google

11 proprietary standard.

12 Q    And many different industry participants contributed to

13 the ads.txt beyond just Google, right?

14 A    If you're referring to the development of the standard,

15 the standard was developed by Google, and it was reviewed

16 and ratified by the industry group.  A lot of companies

17 contributed to driving adoption of the standard.

18 Q    Well, the author of the ads.txt -- version 1 I'm

19 talking about, the very first version, that came out in

20 2017.  The first author listed was Neal Richter, right, who

21 worked for not Google, right?

22 A    Neal --

23 Q    It is a yes or no.

24 A    He was -- he worked for Google at the time as a

25 consultant.

Cross-Examination - P. Bjorke

1    Q    Right, as a consultant.  He was not a Google employee?

2    A    Correct.

3    Q    All right.  And there are other significant

4    contributors to that report, including people from the Index

5    Exchange, right?

6    A    They were contributors to the standard in the review

7    process.  They did not contribute to the development on the

8    proposal for a standard.

9    Q    And there were other significant contributors from

10   Criteo?

11   A    Yes, again, for the review and finalization of the

12   standard, correct.

13   Q    Other major contributors were AppNexus?

14   A    Yes.

15   Q    The Trade Desk?

16   A    Probably.  I don't have it in front of me.  So I don't

17   remember exactly who were involved.  Again, the standard was

18   developed by Google.

19   Q    The actual announcement of ads.txt did not come from

20   Google, right?

21   A    Correct.

22   Q    Okay.  And in the report announcing it, it listed all

23   of those other industry participants of significant

24   contributions, right?

25   A    That's likely correct.  I don't have the announcement

Cross-Examination - P. Bjorke

1    in front of me.

2            THE COURT:  Well, after a review process, was

3    there feedback and were changes made then to the basic

4    program?

5            THE WITNESS:  There were some minor -- there were

6    feedback and review, and there were some minor modification.

7    I don't remember exact details, but the whole concept came

8    from the proposal that we developed in-house at Google.  We

9    developed it, and we shared it with the industry body to

10   increase the chances of it being adopted as an industry

11   standard and help fight fraud.

12   BY MR. FREEMAN:

13   Q    So other industry participants, then, made modification

14   before it was initially announced?

15   A    As far as I remember, there were minimal modifications,

16   maybe some small additions to it, but the concept didn't

17   change.

18   Q    Another group that you work with or consortium that

19   Google works with beyond IAB is called TAG or The

20   Trustworthy Accountability Group?  Are you familiar with

21   that group?

22   A    Yes, I'm familiar with them.

23   Q    And the purpose of that group is similar to these other

24   consortiums, meaning that they exist to eliminate and fight

25   ad fraud and malware and invalid traffic, right?

Cross-Examination - P. Bjorke

1   A    That's part of their charter, yes.

2   Q    And Google participates in this group TAG?

3   A    We have participated in the past, yes, and we are still

4   a member.

5   Q    And other members are still the companies that we had

6   previously talked about, meaning like the Criteo, The Trade

7   Desk -- I don't need to go on, but there are other industry

8   participants who are a part of TAG, right?

9   A    Yeah, I believe a good number of companies are members

10  of TAG.

11  Q    And one of the things that TAG does is you can apply to

12  have a brand safety certification; is that right?

13  A    I believe that is correct.  Brand safety is not my area

14  of expertise, but I believe they have that type of

15  certification.

16  Q    Well, are you aware of whether Google seeks to have any

17  certifications from TAG about fraud and malware and things

18  like that?

19  A    I believe it currently has three certifications from

20  TAG.

21  Q    And the purpose of these certifications is to tell the

22  outside world, world meaning users, publishers, advertisers,

23  basically you can trust these companies, right?

24  A    The purpose of the certification is to try to up level

25  everyone's ability to fight fraud in the case of ad fraud.

1   And they set -- they define some guidelines for what you

2   need to do, and it's kind of a minimum bar for what you need

3   to do.  It is not a very effective certification, but it is

4   kind of a bear minimum certification.

5   Q    And other companies that we have talked about, like

6   Index Exchange, has TAG certifications against fraud and

7   malware, right?

8   A    I do not remember who has certifications.  I think it's

9   publicly disclosed, but I don't remember exactly who has

10  what type of certifications from TAG.

11  Q    Okay.  Do you have the binder in front of you?

12  A    I do.

13  Q    Just to refresh your recollection, if you go to the Tab

14  2018.03.22 --

15  A    Sorry.  Can you repeat that?

16  Q    Sure, 2018.03.22.

17  A    Okay.

18  Q    Great.  In looking at this, this is that organization

19  that we've been talking about, TAG, in their 2018

20  announcement of recertification for antifraud, antipiracy,

21  antimalware, and transparency programs, right?

22  A    Yes.

23  Q    Okay.  I want you to turn, then, to the second page of

24  that document.  At the very top, it talks about the CO

25  recipients in 2018, right?

Cross-Examination - P. Bjorke

1    A    Yes, I see that page too.

2    Q    Okay.  This is the kind of public announcement that you

3    were referring to about what companies have certifications

4    and which ones don't or -- or at least which ones do?  I'm

5    sorry.

6    A    I was referring to -- I think TAG published on their

7    websites, but this is probably a list derived from the

8    website.  So probably the same list.

9    Q    And you see in this announcement that in 2018, for

10   antifraud, antipiracy, antimalware, Index Exchange had it,

11   right?

12   A    Yes, I see Index Exchange on the list.

13   Q    OpenX?

14   A    Yes.

15   Q    Rubicon?

16   A    Yes.

17   Q    And Google is on that list as well with the rest of the

18   companies in the first column, right?

19   A    Yes.

20   Q    Okay.  And Google would refer to -- and we will get to

21   the AWBid story -- but would refer to those type of

22   companies, Index Exchange, OpenX, and Rubicon, as

23   third-party exchanges; is that fair?

24   A    That's correct.

25   Q    Okay.  Beyond these specific groups of like TAG and

Cross-Examination - P. Bjorke

1    IAB, at times industry participants communicate with each

2    other in real-time if they're seeing any sort of fraud or

3    malware, right?

4    A    There are at times collaboration between individuals in

5    the industry in trusted manners to share intelligence when

6    we see attacks.

7    Q    And at times, people email Google, like OpenX, to tell

8    them that they're seeing fraud or malware coming from

9    Google, right?

10   A    Malware is not my area of expertise.  I'm advertising.

11   But when it comes to fraud, yes, we have occasionally

12   companies report activities that look suspicious to us so we

13   can investigate it.

14   Q    So you do remember occasionally other industry

15   participants -- let's just take OpenX for example --

16   contacting Google to say that they have detected some sort

17   of ad fraud coming from Google and to investigate further?

18   A    I don't remember specifically OpenX, but I have

19   received -- we have received tips from other industry

20   participants about suspected fraud cases, and it has at

21   times been informative and helpful.

22   Q    I do want to talk to you just briefly about AWBid,

23   which we just talked about on direct.  AWBid, right, was

24   limited at least at its initial to remarketing, is that

25   right, remarketing inventory?

Cross-Examination - P. Bjorke

1   A    Yes.

2   Q    And you were shown some slide decks, but Google would

3   then test various third-party exchanges to determine things

4   like inventory quality and then also like spam click rates,

5   right?

6   A    Yes.

7   Q    I'm going to show you what's already been admitted PTX

8   199.  It should be in your binder and will also be on the

9   screen too.

10        The title of this particular is AWBid Update, and this

11  is from September 2014, right?

12  A    Yes.

13  Q    If you go to page 12 of that document -- it will also

14  be on of your screen in case you don't want to flip through,

15  whichever is easier for you.

16  A    Okay.

17  Q    So this is a 2012 -- or 2014 AWBid looking at the

18  inventory quality of various third-party exchanges, right?

19  A    Correct.

20  Q    And Google found that in 2014, that the inventory

21  quality on third-party exchanges met AdX's policy ratings,

22  right?

23  A    So this is talking about inventory --

24  Q    Is that a yes or no?

25  A    For inventory quality, yes.

Cross-Examination - P. Bjorke

1    Q    Right.  And specifically, you rate -- it's a policy

2    rating.  You rate third-party exchanges as six out of ten

3    and then versus seven out of ten for AdX, right?

4    A    For policies, yes.

5    Q    So this is something that you initially agreed that

6    even this own policy rating of AdX indicates that AdX is not

7    perfect in this regard, right?

8    A    For policies, yes.

9    Q    Are you aware of other reports about, say, for example,

10   an analytics report from 2023 that stated Google violated

11   the wishes of companies by serving their ads on sanctioned h

12   entities in Iran?

13   A    That is not my area of expertise, but I am somewhat

14   familiar with the report.  But that's not my area of

15   expertise.  That belongs to the AdSafety team.

16            MS. MORGAN:  I'm sorry, Your Honor.  Objection.

17            What's the date of the report you're referring to?

18   Is it before or after the close of discovery?

19            MR. FREEMAN:  It's before.

20            MS. MORGAN:  What's the date?

21            MR. FREEMAN:  I don't have the precise date.

22            MS. MORGAN:  Well, discovery was cut off in

23   September of 2023.

24            MR. FREEMAN:  We can move on.

25            THE COURT:  Let's move on.

Cross-Examination - P. Bjorke

1   BY MR. FREEMAN:

2   Q    Are you familiar of a ProPublica investigation from

3   October 29, 2022, which found that Google through Google Ads

4   revenue was putting ads on sites, including prohibited sites

5   from Bosnia?

6           MS. MORGAN:  Objection.  Hearsay.

7           MR. FREEMAN:  I said is he aware.

8           THE COURT:  Overruled.

9   BY MR. FREEMAN:

10  Q    Are you aware of that report?

11  A    I don't remember that specific report.  I probably read

12  it at the time, but I don't remember it right now.

13  Q    Are you aware of the University of Michigan in 2021

14  finding that 48 percent of all ad traffic on fake news sites

15  came from Google?

16  A    I'm not familiar with that report.

17  Q    Then fast-forwarding to 2018, I'm going to show you

18  what's been marked, already admitted, PTX 835.

19          THE COURT:  I think you're going backwards.  You

20  said fast-forward.

21          MR. FREEMAN:  I'm sorry.  The previous --

22          THE COURT:  I'm giving you a hard time.

23          MR. FREEMAN:  I understand, Your Honor.  That's

24  fair enough.

25

1  BY MR. FREEMAN:

2  Q    Again, this is a 2018 AWBid review.  Do you see that?

3  Are you with me?

4  A    I see that, yes.

5  Q    And if you go to the fourth page of that, there's a

6  chart that says, "AWBid Remarketing Growth," and there's a

7  note, though, that says, "Spam click rate comparable to

8  AdX," right?

9  A    I see that.

10  Q    At times Google, through their attempt to block invalid

11  traffic, also blocks valid traffic, right?

12  A    Occasionally, yes, there will be some false positives

13  and occasionally blocked valid traffic.  We incorrectly

14  think it's invalid traffic.  That's correct.  There will

15  also be some false positives.

16  Q    There's times that Google will block inventory made

17  available to third-party exchanges but allow that same

18  inventory to be bid on on AdX, right?

19  A    That can happen because we have different risk

20  profiles, different signals, different data.  So it may

21  trigger a risk classification to lead us to block it on a

22  third-party exchange while on other networks we may believe

23  it's okay.  It can also happen the other way around.

24  Q    Do you remember specifically that the *Financial Times*

25  inventory, Google blocked that ability for it to be bid on

Cross-Examination - P. Bjorke

1  third-party exchanges but permitted inventory from the

2  *Financial Times* to be bid on on AdX?

3  A    I don't remember that specific case.  Do you have more

4  details?

5  Q    Yeah.  Sure.  So in your binder in front of you --

6         MR. FREEMAN:  We are not seeking to admit this,

7  Your Honor, just to refresh the recollection.

8         THE COURT:  All right.

9  BY MR. FREEMAN:

10  Q    It will be Bates Google, so GOOG-DOJ-13566376.  So it

11  ends in 376.

12       Are you there?

13  A    I am there, yes.

14  Q    Okay.  And at the very top is an email from you, and

15  then even surely below that is an email from you on

16  September 13, 2017.

17       Do you see that?

18  A    Yes.

19  Q    And your summary that you have is that the ft.com,

20  FinancialTimes.com, was selling inventory through AdX and

21  through a third-party exchange, that being TrustX or

22  BidSwitch.  Do you see that?

23  A    Yeah.

24  Q    I'm not going to read the whole thing, but the net

25  result is it appears that DBM, which we've already

96

1    established is DV360, is accepting inventory when coming via

2    AdX but blocking it when it comes through the third-party

3    exchange of TrustX, right?

4    A     That's what the email is saying, yes.

5    Q     And you have a note, then, just above your summary that

6    this implies that DBM or DV360 is giving AdX preferential

7    treatment, right?

8    A     Let me see.  Where do you say that was?

9    Q     Just right above your summary, the last clause right

10   above your summary.

11   A     Oh, yes, I see it.

12         MR. FREEMAN:  I have nothing further, Your Honor.

13         Thank you.

14         THE COURT:  All right.  Redirect?

15         MS. MORGAN:  I'll be very brief, Your Honor.

16                      REDIRECT EXAMINATION

17                      REDIRECT EXAMINATION

18   BY MS. MORGAN:

19   Q     First, I want to go to PTX 199, which is one of the

20   documents that you were shown.

21         Do you see the date on this document?

22   A     Yes, 2014.

23   Q     Is that from before the launch of AWBid?

24   A     That was during a time they were experimenting with

25   AWBid.  I believe it was before they fully launched AWBid.

Redirect Examination - P. Bjorke

1    Q    Okay.  At this point, how much traffic had actually

2    been reviewed that flowed through AWBid?

3    A    I am -- I think it was experiment traffic, maybe

4    1 percent on a few exchanges.  I don't remember exactly how

5    much they bid on at that point in time.

6    Q    Okay.  And you were shown a slide that ends in the

7    No. 7240 in this deck.  My colleague here cut you off when

8    you were describing what inventory quality is.  Can you

9    describe for the Court what this is referring to?

10   A    Yeah.  So if you look at the table there in the middle

11   of the screen, you will see the types of policies.  This is

12   inventory quality from a policy perspective.  Are you

13   monetizing web money, which was not policy compliant; are

14   you monetizing copyrighted content; are you monetizing

15   sexual content, desktop app, and things like that.  This is

16   not about invalid traffic.  This is about policy compliance.

17        In fact, if you look at the next slide in that deck,

18   it's talking about the invalid traffic aspect.

19   Q    Okay.  And what is this showing?

20   A    This is showing the percentage of traffic at this point

21   with the analysis and experiments it was running and how

22   much invalid traffic we had there.  The online column shows

23   how much our automated detection is catching, and it hadn't

24   been updated very much, so it didn't catch an awful lot.

25   And then the offline was what we found from the manual

Redirect Examination - P. Bjorke

1    analysis in addition to the automated systems.

2         And if you look at one there, we had 100 percent

3    invalid traffic, and a couple of them didn't have enough

4    traffic because it was early stages.  So they hadn't ramped

5    up enough.  There's clearly issues here in terms of invalid

6    traffic that needed further work and further defenses.

7              MS. MORGAN:  Okay.  You can go ahead and take that

8    down.

9    BY MS. MORGAN:

10   Q    You were also shown a document related to AWBid from

11   2018.  Do you remember that?

12   A    Can you refresh my memory, please?

13   Q    We can.  What's -- it's PTX 835.  I am just going to

14   show you the first page here.  What's the date on this

15   document?

16   A    This is September 2018.

17   Q    And at this point, had your team already implemented

18   several protections in order to bring spam clicks down from

19   third-party exchanges?

20   A    Yes, at that point.  So this is four years later.  We

21   had made good progress on building out the integrations,

22   building out the defenses necessary and so forth.

23             MS. MORGAN:  Okay.  We can take that down.

24   BY MS. MORGAN:

25   Q    And then the last document I want to ask you about is

Redirect Examination - P. Bjorke

1  one that was in the government's binder.  It's at Bates

2  No. 13539879.

3  A    I may need help finding that one.

4  Q    It's one of the Bates stamped tabs.  I think it's -- I

5  don't know.  It has that number on it with the last four

6  digits 9879.

7  A    9879.  Okay, I found it I think.

8  Q    Do you see it in -- it's unfortunately in the middle of

9  the binder.

10  A    Yeah.  Is that an email?

11  Q    Yes, it's an email.

12      Do you remember being asked some questions about your

13  participation in the fight against ad fraud?

14  A    I probably need more context on that.

15  Q    Okay.  Well, here, let me just ask you a question about

16  this document.

17      At the bottom of your email here, it says, "P.S.  Want

18  to join the good fight against ad fraud?  Join our PM team.

19  We are hiring and MTV."  What are you saying there?

20  A    Oh, it's just an internal job hiring ad, so to speak,

21  that we were promoting with people internally at Google.  If

22  you want to join us in our fight against ad fraud, we had an

23  open position on our team.

24          MS. MORGAN:  Okay.  I have no further questions.

25          THE COURT:  Any recross?

Recross-Examination - P. Bjorke

1          MR. FREEMAN:  Just briefly.

2                    RECROSS-EXAMINATION

3                    RECROSS-EXAMINATION

4    BY MR. FREEMAN:

5    Q    In that last document that they showed you, it shows

6    that third-party exchanges were also regularly scanning

7    creatives for malware, other quality issues, right?  It says

8    OPenX does?

9    A    Is that in this email?

10   Q    That's correct.

11   A    Okay.

12   Q    So you agree that third-party exchanges were also doing

13   similar things to Google by scanning the inventory for

14   malware and other quality issues, right?

15   A    So malware scanning is not my area of expertise, and I

16   don't know a lot about what everyone is doing in that space.

17   Q    Right.  But at least in this email that you are on,

18   that you saw, it shows that OpenX is regularly doing that?

19   A    Let me scan through the email.

20          THE COURT:  It's the bottom paragraph.

21          THE WITNESS:  Oh, yeah.  I see that the OpenX

22   author is saying that OpenX regularly scans creatives for

23   malware.  Yes, I see that in the original email from

24   August 16.

25          MR. FREEMAN:  Nothing further, Your Honor.

Recross-Examination - P. Bjorke

1        THE COURT:  All right.  Does anybody anticipate

2   calling this witness again?

3        MS. MORGAN:  We do not, Your Honor.

4        MR. FREEMAN:  No, Your Honor.

5        THE COURT:  Sir, you are free to watch the

6   proceedings now.  Just don't discuss your testimony with any

7   witness who has not yet testified.

8        Thank you.

9        All right.  I think we have 15 minutes before we

10  end for today.  So do you want to start with the next

11  witness?

12       MS. DUNN:  Your Honor, next our plan was to call

13  Kenneth Blom via video.  The video will exceed the time from

14  now until 4:30, but we can certainly start it if the Court

15  is open to that.

16       THE COURT:  How long is it going to take?

17       MS. DUNN:  It's a 29-minute video.  So we can get

18  through half of it.

19       THE COURT:  Yeah.  Let's go ahead and get it

20  started.

21       MS. DUNN:  Thank you, Your Honor.

22       Your Honor, we will hand up the binder.

23       THE COURT:  All right.

24       MS. DUNN:  Your Honor, there's a pause in the

25  video when you get to a sealed portion.  So just to make

Read-In Deposition -

1    sure to tell the Court.

2            THE COURT:  All right.

3            MS. DUNN:  And just also for the record, this is

4    the designations with the least amount in dispute.  So we're

5    just going to play it while the team comports with Your

6    Honor's request of this morning.

7            THE COURT:  All right.

8        (Counsel confer.)

9        (The video deposition of Kenneth Blom is played.)

10            THE COURT:  We need to stop here so we can finish

11    getting the exhibits read into the record.

12            Tomorrow morning I have nothing in court, so we

13    can start at 9:00, and you don't need to change anything on

14    your tables.  All right.

15            MS. DUNN:  Yes, Your Honor.

16            One question -- and I already flagged this for

17    plaintiffs about the lead-off witness tomorrow morning.

18    Previously I believe Your Honor had a conversation about

19    witness Adam Stewart.  Adam Stewart has a medical issue.

20            THE COURT:  Have we given him the authorization?

21            MS. DUNN:  I believe so, and we'll check.

22            My question is as follows:  I believe Your Honor

23    had said he should come in at 9:00.  Due to the tetras like

24    effort of scheduling, we would like to lead off tomorrow

25    morning with our take rate expert, Professor Chevalier, and

1  follow her with Mr. Stewart.  And I just wanted to make sure

2  that was okay with the Court.

3              THE COURT:  That's all right.

4              MS. DUNN:  Thank you, Your Honor, and I'll check

5  on the authorization.

6              THE COURT:  So tomorrow morning there's going to

7  be just live witnesses?

8              MS. DUNN:  Yes, Your Honor.

9              THE COURT:  That's good for planning purposes.

10             All right.  So let's get the exhibits into the

11  record.

12             THE COURTROOM DEPUTY:  DTX 2536; DTX 2077 and

13  2077A; DTX 117, pages 115 to 148 only; DTX 405; DTX 578; DTX

14  2085 and 2085A; DTX 705; DTX 298; PTX 528; PTX 308; DTX 308;

15  PTX 1674; DTX 635; DTX 476.  That's all.

16             THE COURT:  Does that comport?

17             MS. WOOD:  Yes, that's what we have as well, Your

18  Honor.

19             THE COURT:  Again, just as a repeat, the demos are

20  all also being shown to the public, correct?

21             MS. DUNN:  The demonstratives, yes.

22             THE COURT:  All right.  At some point, we probably

23  want just a nice clean list of those.  All right.  We don't

24  have to worry about that now.

25             All right.  Anything further before we recess for

1    the evening?

2            MS. WOOD:  I would just ask defense counsel.

3            I know we'll have Professor Chevalier first and

4    then Stewart.  But if you know the rest of your witnesses

5    for tomorrow, that would be helpful.

6            MS. DUNN:  I will -- let me --

7            THE COURT:  You-all can do that.

8            MS. DUNN:  I will not take the Court's time, and

9    we will --

10           THE COURT:  Just remember the schedule tomorrow is

11   a little bit different.  Lunch will be at noon.  So it's a

12   noon to 1:00 lunch break, and the afternoon will be a little

13   bit longer because it's an extra hour.  Okay.

14           We recess court for the evening.

15           MS. DUNN:  Thank you, Your Honor.

16           (Proceedings adjourned at 4:29 p.m.)

17           ----------------------------------

18

19

20

21

22

23       I certify that the foregoing is a true and

24    accurate transcription of my stenographic notes.

                                    _____
25                                   /s/
                                    Rhonda F. Montgomery, CCR, RPR

         Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599