```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3     --------------------------x
       UNITED STATES, et al.,     :    Civil Action No.:
 4                                :    1:23-cv-108
                    Plaintiffs,   :
 5          versus               :    Wednesday, September 25, 2024
                                  :    Alexandria, Virginia
 6     GOOGLE LLC,                :    Day 13 p.m.
                                  :    Pages 1-188
 7                  Defendant.    :
       --------------------------x
 8
 9          The above-entitled bench trial was heard before the
       Honorable Leonie M. Brinkema, United States District Judge.
10     This proceeding commenced at 1:00 p.m.

11                       A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:   GERARD MENE, ESQUIRE
              OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             DANIEL GUARNERA, ESQUIRE
16                           AMANDA STRICK, ESQUIRE
                             KELLY GARCIA, ESQUIRE
17            UNITED STATES DEPARTMENT OF JUSTICE
                             ANTITRUST DIVISION
18                           450 Fifth Street, NW
                             Washington, D.C.  20530
19                           (202) 894-4266

20     (State of VA)         JONATHAN HARRISON, ESQUIRE
              OFFICE OF THE ATTORNEY GENERAL
21                           OFFICE OF THE SOLICITOR GENERAL
                             202 North Ninth Street
22                           Richmond, Virginia  23219
                             (804) 786-7704

23

24

25            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1

1                          A P P E A R A N C E S:

2    FOR THE DEFENDANT:        CRAIG REILLY, ESQUIRE
                               LAW OFFICE OF CRAIG C. REILLY
3                              209 Madison Street
                               Suite 501
4                              Alexandria, Virginia  22314
                               (703) 549-5354
5
                               KAREN DUNN, ESQUIRE
6                              JEANNIE RHEE, ESQUIRE
                               PAUL, WEISS, RIFKIND,
7                              WHARTON & GARRISON LLP
                               2001 K Street, NW
8                              Washington, D.C.  20006
                               (202) 223-7300
9
                               BRADLEY JUSTUS, ESQUIRE
10                             AXINN VELTROP & HARKRIDER, LLP
                               1901 L Street, NW
11                             Washington, D.C.  20036
                               (202) 699-0950
12
                               BLAKE PESCATORE, ESQUIRE
13                             AXINN VELTROP & HARKRIDER, LLP
                               114 West 47th Street
14                             New York, New York  10036
                               (212) 782-3181
15
                               CAROLINE BOISVERT, ESQUIRE
16                             AXINN, VELTROP & HARKRIDER LLP
                               90 State House Square
17                             Hartford, Connecticut  06103
                               (860) 275-8100
18
     COURT REPORTER:           RHONDA F. MONTGOMERY, CCR, RPR
19                             Official Court Reporter
                               United States District Court
20                             401 Courthouse Square
                               Alexandria, Virginia  22314
21                             (703) 299-4599
                               RMontgomery@courtreport.net
22

23

24

25
                                                                    2

```
1                      TABLE OF CONTENTS

2                         WITNESSES

3   On behalf of the Defendant:

4   COURTNEY CALDWELL

5   Direct examination by Ms. Phillips 4
    Cross-examination by Ms. Garcia ...15
6
    ADAM STEWART
7
    Direct examination by Ms. Sessions 25
8   Direct examination by Ms. Sessions 25
    Cross-examination by Mr. Teslicko .74
9   Redirect examination by Ms. Sessions 95

10  ALEJANDRO BORGIA

11  Direct examination by Ms. Morgan ..101
    Cross-examination by Mr. Freeman ..131
12  Redirect examination by Ms. Morgan 149

13  KENNETH BLOM (video) .............156

14  KENNETH HOCHBERGER (read-in).......160

15

16                        MISCELLANY

17  Proceedings September 24, 2024

18  Certificate of Court Reporter

19

20

21

22

23

24

25
```

Direct - C. Caldwell

1                P R O C E E D I N G S

2            THE COURT:  You may proceed.

3                  DIRECT EXAMINATION (Resumed)

4    BY MS. PHILLIPS:

5    Q    Good afternoon, Ms. Caldwell.

6         Ms. Caldwell, do you engage in digital advertising for

7    ShearShare?

8    A    Yes, we do.

9    Q    Do you use Google's tools, ad tech tools, to engage in

10   digital advertising for ShearShare?

11   A    Yes, we do.

12   Q    Which tools do you use?

13   A    We use Google AdWords, various different types of

14   campaigns from display to video to image.

15   Q    And how did you first learn about Google AdWords or

16   Google Ads?

17   A    Oh, gosh.  I think my first job back in 2001 after I

18   had my son.  That job allowed me to start using Google

19   AdWords.  So I think I've been using it since the very

20   beginning.

21   Q    And when did you begin digital advertising for

22   ShearShare?

23   A    At a company called eVerge Group.  They are a software

24   company.

25   Q    I'm sorry.  When did you start using Google Ads in

                                                              4

1  connection with your work --

2  A    Oh, I'm sorry.  With ShearShare in 2017 as soon as we

3  launched the mobile app.

4  Q    Okay.  And in 2017, when you began using Google Ads for

5  ShearShare, did you set up your own account?

6  A    I did.

7  Q    Okay.  And how did you find that experience?

8  A    Super easy.  The user interface is very simplistic.

9  It's very flexible.  I didn't have an issue setting it up on

10  my own.

11  Q    And at the time, did you create your own creative ads

12  and your copy, the words that went with your ads?

13  A    We did, yes.

14  Q    I'd like to show you a demonstrative that we have

15  already seen in court.

16        MS. PHILLIPS:  If we could, pull up, Mr. Spalding,

17  Stefaniu DX 1.3.

18  BY MS. PHILLIPS:

19  Q    And these are the different campaign types that are

20  available in the Google Ads interface.

21     Which campaign types have you used in connection with

22  digital advertising for ShearShare?

23  A    We use search, performance max, display, video, and

24  app.

25  Q    And why do you use those different campaign types?

1    A    They allow us to reach the broadest audience as

2    possible.

3    Q    And when you run specifically a display campaign, do

4    you run image ads?

5    A    We do.

6    Q    And when you run a display campaign, do you run native

7    ads?

8    A    We do.

9    Q    And when you run a display campaign, do you run

10   in-stream video ads?

11   A    Absolutely.

12         MS. PHILLIPS:  If we could look next, Matt, at the

13   same demonstrative but page 1.6, please.

14   BY MS. PHILLIPS:

15   Q    When you're on Google Ads setting up a campaign,

16   Ms. Caldwell, do you select which kinds of devices to target

17   for your customers?

18   A    We do.

19   Q    And of these options, computers, mobile phones, and

20   tablets, which devices do you choose to target?

21   A    All three.

22   Q    Okay.  Have you ever chose to target users only using

23   computers?

24   A    No.

25   Q    And why not?

Direct - C. Caldwell

1   A    Our users don't hang out on computers all the time.

2            MS. PHILLIPS:  Okay.  You can take that down.

3            Thank you, Matt.

4   BY MS. PHILLIPS:

5   Q    Ms. Caldwell, does ShearShare use any non-Google ad

6   tech tools?

7   A    We do.

8   Q    Which ones?

9   A    Instagram, we've tried Facebook, we've tried LinkedIn

10  ads, and I'm now dipping my toe into TikTok.

11  Q    Okay.  Let's talk about Facebook.

12       When did you start using Facebook's ad tech tools in

13  connection with ShearShare?

14  A    It was back in 2017.  We were going through a startup

15  accelerator called 500 Global, and our mentor at the time,

16  which is all about growth, was helping us decide where to

17  spend our limited funds.  And so we tried Facebook to start.

18  Q    And how did that work out?

19  A    Epic fail.

20  Q    Okay.

21  A    Sorry.

22  Q    How did you -- why do you say it was an epic fail?

23  A    Every other startup that was going through this program

24  seemed to have immense success with Facebook ads, and so we

25  tried to run a couple of look-alike campaigns.  It did not

7

Direct - C. Caldwell

1   work for us.  We know that stylists and salon owners may

2   have profiles on Facebook, but they do not use Facebook for

3   business purposes.  And so I feel like I spent a lot more

4   money and time than I needed to on Facebook before I decided

5   to cut the cord.

6   Q    How long was it until you cut the cord?

7   A    Oh, about eight to nine months.

8   Q    And then what did you do with the advertising budget

9   that you had been spending on Facebook?

10  A    We just shifted it to various other platforms, and we

11  tried Google AdWords.

12  Q    Okay.  And you mentioned that you also use Instagram ad

13  tech tools in connection with ShearShare.

14  A    We do.

15  Q    Have you had success doing that?

16  A    We have, yes.

17  Q    Okay.  And do you monitor the -- do you monitor the

18  performance of your advertising campaigns both on Google Ads

19  and on Instagram?

20  A    Yes, like a hawk.

21  Q    Okay.  How frequently do you monitor that information?

22  A    I'm looking at that information on a biweekly basis.

23  We are reporting that back to our board of directors on a

24  quarterly basis.  We have team meetings with my leadership

25  team on a monthly basis.

1    Q    And why do you monitor that performance?

2    A    Well, as a startup, unfortunately, you have a lack of a

3    lot of things, usually a lack of money, a lack of resources,

4    a lack of people, a lack of time and sleep.  And so when I

5    think about the limited marketing budget that we have, we

6    have to make sure that every dollar that our board is

7    approving for us to spend on a marketing campaign comes back

8    to the business in full.

9    Q    And if you don't see performance somewhere, what do you

10   do with your money?

11   A    We shift.

12   Q    Okay.  You mentioned TikTok.  Why are you interested in

13   beginning to advertise on TikTok?

14   A    That's where stylists are.  If my core audience, my

15   target audience was not on a certain digital platform, I

16   would not advertise there.  And as much as I don't know

17   about TikTok, I know that I have to learn TikTok and show up

18   there because that's where the eyeballs are.

19   Q    How much of your 2022 digital advertising budget was

20   allocated between Instagram and Google Ads?

21   A    In 2022, it would have been 70 percent Google,

22   30 percent Instagram.

23   Q    Okay.  How about at the start of 2023?  What was that

24   allocation?

25   A    About 65/35, 65 Google.

Direct - C. Caldwell

1  Q    And to what extent was the decision to make that shift

2  between 2022 and 2023 due to performance of your advertising

3  on Google Ads and Instagram?

4  A    Yeah.  So, again, our board approves our marketing

5  spend a year in advance.  And so as we are reporting back to

6  the board on a quarterly basis how our marketing campaigns

7  are vetting, if there's something where we have higher

8  engagement in certain areas or there's a campaign that's

9  trending upwards for digital demand for our mobile app

10  downloads, then we'll reallocate spend and shift our numbers

11  accordingly.

12  Q    Okay.  What do you like about using Google Ads and

13  Google ad tech tools?

14  A    It's super simple.  I mean, we have a very small team.

15  We have five full-time team members, one part-time team

16  member, and a couple of contractors.  And so because of

17  that, anything that we decide to put our time and effort and

18  energy towards, it has to be very simple and cover a lot of

19  bases.

20      I feel like when I use the Google AdWords platform, I

21  am really getting about four people in one.  I get someone

22  who can help write the ads, I get campaign execution, I get

23  the tracking capability, and I get the analytics.

24  Q    So speaking about the analytics, how, if at all, do you

25  use the sort of reporting and data that Google Ads gives you

10

Direct - C. Caldwell

1  after you run a campaign?

2  A    Uh-huh.  We take a look at how many website visitors

3  we've seen, we take a look at how many app downloads, did

4  those people convert to a new ShearShare host, which is a

5  salon owner on our platform, did that convert to a new

6  ShearShare stylist who actually made a booking.  We look

7  very closely at the numbers to tell us where we're going to

8  spend the next month.

9  Q    And to what extent do you use that data to determine

10  how, as a business, you will expand?

11  A    Yeah.  So it's important for us that we not just say,

12  oh, we're going to go open up ShearShare locations in Paris,

13  Texas, of all places.  And the information we're able to get

14  from Google tells me, oh, there are 1,000 stylists that have

15  joined the platform in New York City, and there are also 50

16  salon owners who have added their inventory to that city.

17  So then we know that's where we need to spend our time and

18  our monies.

19  Q    Okay.  To what extent have you used any customer

20  service available to you through the Google Ads platform?

21  A    I don't spend a lot of time with Google customer

22  service.  I probably reach out maybe three times a year, but

23  that's because the knowledge bases and the self-help is very

24  intuitive.

25  Q    And I think you mentioned earlier you get some

11

Direct - C. Caldwell

1  assistance from Google customer support as it relates to

2  your advertising copy.

3  A    That's correct.

4  Q    Can you explain that?

5  A    Yes, that's correct.

6       Yes.  We've had a couple of cold email -- just a

7  Googler reaching out to us saying, hey, how can we be

8  helpful as it relates to your Google --

9                   (Reporter clarification.)

10            THE WITNESS:  Sure.

11            We've had Googlers reach out to us and ask how

12  they can be helpful in helping us to optimize our campaigns.

13  So I've been able to meet one-on-one with Google employees

14  to be able to re-craft the copy that we used in our Google

15  Ads.

16  BY MS. PHILLIPS:

17  Q    And were you able to use that advice that you got from

18  the Google customer support folks in your ads on other

19  platforms as well?

20  A    Oh, yes.  Yes.  So we use that -- the same AdWords copy

21  across Instagram and any other marketing vehicle that we

22  leverage.

23  Q    Do you know if you were charged for that particular

24  advice with regard to --

25  A    Oh, it was free.  No.

                                                            12

Direct - C. Caldwell

1   Q    Okay.  Have you ever received any grants to support
2   ShearShare?
3   A    We have, yes.
4   Q    Have you ever received any grants from Google?
5   A    Yes, we have.
6   Q    What was that grant?
7   A    We were a part of the first cohort during COVID for the
8   Google Black Founders Fund.
9   Q    What is the Google Black Founders Fund, if you know?
10  A    Yes.  It's -- after George Floyd and during COVID, to
11  help businesses that were founded by usually black female
12  founders, black male founders, to help them keep their
13  businesses open.
14       I know for us -- obviously, as everyone can probably
15  assume, in the beauty industry during COVID, it's hard to do
16  someone's facial being 6 feet away or do someone's hair
17  having to have that time apart.  And so our revenues went to
18  zero, and thankfully, you know, we were able to receive this
19  grant from Google that helped me to continue to pay our team
20  and keep the business open.
21  Q    Did you have to apply for that grant?
22  A    We did.
23  Q    Okay.  Do you know whether you're eligible for another
24  grant?
25  A    It's one time, yeah.

13

Direct - C. Caldwell

1    Q    And how were you able to use that grant money during

2    COVID?

3    A    Yeah.  We have the best team, and they stayed on.  You

4    know, again, our revenues for the company went to zero, and

5    so our team was not able to be paid for about three months

6    as we were trying to navigate through all the PPP funds.

7    And so the team was able to be made whole in their salaries,

8    and we were able to keep our servers that we have supporting

9    the app up and running.

10   Q    Okay.  Just a couple of other questions for you,

11   Ms. Caldwell.

12        Have you been contacted by the plaintiffs in this case?

13   A    Yes.

14   Q    Okay.  Have you spoken to them?

15   A    I have.

16   Q    Okay.  How many times?

17   A    Once.

18   Q    Okay.  And what did they say to you when you spoke with

19   them?

20   A    We talked a little bit about DSPs, about me

21   understanding the nuances of the case.  They asked if I had

22   read the case, and they asked me if understood what perjury

23   is.

24   Q    Okay.  What did you say to that?

25   A    That I do understand what it means to perjure oneself.

14

1          MS. PHILLIPS:  I don't have anything further.

2          THE COURT:  All right.  Any cross?

3          MS. GARCIA:  Yes.  And, Your Honor, we do have one

4  small binder.

5          THE WITNESS:  All right.

6          MS. GARCIA:  May I proceed?

7          THE COURT:  Yes.

8                    CROSS-EXAMINATION

9  BY MS. GARCIA:

10  Q    Good afternoon, Ms. Caldwell.

11  A    Good afternoon.

12  Q    We've met.  I'm Kelly Garcia.

13  A    Nice to meet you in person.

14  Q    Nice to meet you in person.

15       Earlier you testified that the ShearShare app launched

16  in 2017; is that right?

17  A    Yes, correct.

18  Q    And ShearShare is backed by a few venture capital

19  investors; correct?

20  A    Yes.  We have an amazing group of investors.

21  Q    You've generated significant funding over the years,

22  right?

23  A    I wouldn't say significant.  As black female founders,

24  I am the most founded but the least funded.

25  Q    You wouldn't say significant.  Isn't it true that you

1    generated millions of dollars in funding in the past few

2    years?

3    A    Yes.  I'm actually part of the -- what I consider the

4    saddest and the best list, which is how many black female

5    founders --

6                   (Reporter clarification.)

7              THE WITNESS:  Oh, so sorry.  So sorry.

8              I am a part of what I consider to be the saddest

9    and one of the best list, which is how many black female

10   founders have been able to raise over a million dollars in

11   venture capital.

12   BY MS. GARCIA:

13   Q    And you mentioned receiving grant money from Google; is

14   that right?

15   A    Correct.

16   Q    And how much money has ShearShare received from Google

17   in the past five or so years?

18   A    $100,000 in the grant funding.

19   Q    And that's a significant sum for a small business like

20   ShearShare, right?

21   A    I mean, we support 66,000 other small businesses.  So I

22   wouldn't say that was significant.

23   Q    Do you consider yourself a small business?

24   A    Absolutely.

25   Q    On direct you testified about using Google's products,

Cross-Examination - C. Caldwell

1  Google Ads, to advertise ShearShare, right?

2  A    Correct.

3  Q    And you testified that you also advertise on Instagram;

4  is that right?

5  A    Yes.

6  Q    All right.  Well, I'd like to talk to you about display

7  ads, and I think you mentioned them on direct.

8       Is it fair to say you're familiar with the term?

9  A    We are.

10           THE COURT:  Counsel, you should slow down, too.

11           MS. GARCIA:  Apologies, Your Honor.

12           THE COURT:  All right.

13  BY MS. GARCIA:

14  Q    You've used the term display ad or banner ad to

15  describe your advertisements; is that right?

16  A    Yes, that's correct.

17  Q    Could you please explain for the record:  How do you go

18  about placing a display ad on Instagram?

19  A    So I'm usually on my phone.  There will be a post that

20  we make generally to our Instagram page, which is

21  @ShearShare, and then there's a button at the bottom that

22  says boost post.  So you go through a series of questions

23  where Instagram is asking who would you like to see this ad,

24  for how much money, how long would you like for us to run

25  this ad for you, and then you hit submit.  And the little

17

1   pop-up says we are now -- we have now received your ad

2   request.  We will then approve it.  And once it is approved,

3   it will now be live.

4   Q    And is that the same Instagram app that someone like me

5   might use to post pictures of their children?

6   A    Yes.

7   Q    Okay.  And do you have to register as business owner?

8   A    No, I don't have to.

9   Q    Okay.  You use your personal Instagram to post?

10  A    Oh, no.  I use my personal Instagram for personal.  I

11  use ShearShare for the brand.

12  Q    Got it.

13       So just to be clear, you're a Google Ads customer, but

14  you wouldn't use Google Ads to place an advertisement on

15  Instagram; is that right?

16  A    No.  Correct.

17  Q    You use a different tool to places those ads?  The

18  Instagram app?

19  A    Correct.

20  Q    And, similarly, you wouldn't use Google Ads to place an

21  advertisement on Facebook, right?

22  A    Correct.

23  Q    On direct you were asked about your use of the Google

24  Ads platform, and I think they brought it up on the screen.

25  Do you recall that?

Cross-Examination - C. Caldwell

1   A     I do.

2   Q     And you mentioned that you're able to select which type

3   of ads you want to place, for example, search ads, display

4   ads, video ads; is that right?

5   A     Correct.

6   Q     And so now focusing, again, on display ads, could you

7   give me an example of a website where we might see a display

8   ad for ShearShare?

9   A     I wouldn't know where those websites -- like, the exact

10  websites.  It could be 123.com.  It could be xyz.com.  I

11  trust Google and its network to put my ad in front of the

12  right target audience.

13  Q     Might an advertisement for ShearShare appear on

14  weather.com?

15  A     I'm not sure.

16  Q     Okay.  Maybe a beauty website?

17  A     Definitely a beauty website.

18  Q     Okay.  So let's use beauty.com as an example.

19  A     Okay.

20  Q     You wouldn't use the Instagram app to place a display

21  ad on beauty.com, right?

22  A     Correct.

23  Q     Have you ever used the Instagram app to place a display

24  ad on beauty.com?

25  A     No, I have not.

Cross-Examination - C. Caldwell

1   Q    You agree with me that the audience for display ads or

2   banner ads on websites skews older than the audience for

3   Instagram, right?

4   A    I can't say that.  Because as we serve as mentors and

5   sit on the boards of beauty schools and barber colleges,

6   we've noticed that the age of the students coming in skews

7   older now.

8   Q    All right.  So the age of the students skews older?  Is

9   that what you said?

10  A    Correct.

11  Q    Got it.

12       And what about TikTok?  What's the general demographic

13  you're looking to --

14  A    Definitely younger.

15  Q    You said definitely younger?

16  A    Younger.

17  Q    And, Ms. Caldwell, you don't have any display ads on

18  your own website, shearshare.com, right?

19  A    Correct.

20  Q    Okay.  And there aren't any display ads in the

21  subsections of your website, like the Newsroom for example?

22  A    No.  We used to have some ads on our blog post, and

23  then we realized that people were only coming to the website

24  as an informational piece and not to download the app.  So

25  we wanted to make sure that we limited the number of stops

Cross-Examination - C. Caldwell

1   that someone had to make in order to download the app.

2          MS. GARCIA:  All right.  So if we could, just pull

3   up what's been marked Plaintiffs' Demonstrative X.

4   BY MS. GARCIA:

5   Q    And that's going to be in your binder, but it's

6   probably easier to look up at the screen.

7   A    Oh, yes.

8   Q    All right.  Do you see that?

9   A    Yes.

10  Q    And do you recognize that?

11  A    Yes, this is our website.

12  Q    That's your website?

13  A    Uh-huh.

14  Q    And I think, you know, if we scroll down a little bit,

15  you can see there's no display ads here.

16       You agree with me there, right?

17  A    Correct.

18  Q    And going back to the first slide or the first page of

19  this, the top of the virtual screen before you, you can see

20  that ShearShare features a link to a Google for startups

21  webpage.  Do you see that?

22  A    Yes, in the right.

23  Q    Okay.  And if you were to click on that, that would

24  bring you to the next page, which --

25          MS. GARCIA:  If we can, just go there.

                                                          21

Cross-Examination - C. Caldwell

1    BY MS. GARCIA:

2    Q    Which is -- well, I'll let you take a look and let me

3    know.

4         Do you recognize this?

5    A    Yes, I do.

6    Q    And what is this?

7    A    This was a feature about ShearShare on the Google

8    website.

9    Q    Okay.  And if you were to scroll down on that website

10   just a bit, you'd see that you're listed as using different

11   Google products.  Do you see that?

12   A    I do.

13   Q    And one of those products is Firebase?

14   A    Correct.

15   Q    And that is a tool to build mobile apps?

16   A    Yes.

17   Q    Another product is Google analytics?

18   A    Uh-huh.

19   Q    Is that what you were speaking about on direct?

20   A    Yes.

21   Q    And you're aware that ShearShare is also described

22   using -- or described as using Google words in this article,

23   right?

24   A    Google AdWords, yes.

25   Q    Or AdWords.  Thank you for that correction.

                                                            22

Cross-Examination - C. Caldwell

1       And that's the product that you were speaking about
2   with respect to Google Ads; is that right?
3   A    Yes, correct.
4   Q    You don't use Google's DV360; do you?
5   A    Say that again.
6   Q    You don't use Google's DV360?
7   A    No.   I do not know what that is.
8   Q    Have you ever used a demand-side platform?
9   A    I've used AdRoll in a past life, but not for
10  ShearShare.
11  Q    AdRoll is a demand-side platform?
12  A    I believe it is, yes.
13  Q    Okay.   And before becoming involved in this case, had
14  you heard the term "demand-side platform" or DSP?
15  A    Yes.
16  Q    You had?
17  A    Yes, in our conversation.
18  Q    So before September -- before this month, have you
19  heard the term "demand-side platform"?
20  A    No.   AdRoll was not -- they did not talk about
21  themselves or describe themselves as a DSP.   It was just an
22  AdWords -- or an ad platform.
23  Q    And now, it's your understanding, since our
24  conversation, as you mentioned, that -- sorry -- AdRoll is a
25  demand-side platform?

23

Cross-Examination - C. Caldwell

1    A    Is a DSP, yes, correct.

2    Q    Okay.  You don't use Google's publisher ad server, DFP,

3    right?

4    A    No.

5    Q    Had you heard the term "publisher ad server" before?

6    A    Yes, but I don't use that.

7    Q    When was the first time you heard the term "publisher

8    ad server"?

9    A    Oh, goodness.  I've been using Google products for 20

10   years.  So I don't have an exact date for you.

11   Q    Okay.  What is the name of Google's publisher ad

12   server?

13   A    I don't know the exact name.

14   Q    What about AdX?  Had you heard of AdX before becoming

15   involved in this case?

16   A    No.

17   Q    Have you read the complaint?

18   A    Yes, after our conversation.

19   Q    Do you know whether Google Ads bids on third-party

20   exchanges on your behalf?

21   A    I do not know.  I go to Google to make sure that I --

22   when I'm placing an ad, that it's getting in front of the

23   right audience where my target audience usually hangs out.

24   Q    Okay.  And if Google could increase your ROI by bidding

25   on third-party exchanges, would you support that strategy?

24

Direct Examination - A. Stewart

1   A     If Google could -- ask that --

2   Q     Increase your ROI by bidding on third-party exchanges,

3   would you support that strategy?

4   A     Yes.

5             MS. GARCIA:  Thank you.  No further questions.

6             THE COURT:  Any redirect?

7             MS. PHILLIPS:  No, Your Honor.  Thank you.

8             THE COURT:  All right.  Ms. Caldwell, thank you

9   for your testimony.  You are free to stay and watch the

10  proceedings or leave, but do not discuss your testimony with

11  any witness who has not yet testified.

12            Thank you.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  Your next witness, Ms. Dunn.

15            MS. DUNN:  Yes, Your Honor.  Google calls Adam

16  Stewart.

17            THE COURT:  All right.  Go ahead.

18            MS. SESSIONS:  May I proceed, Your Honor?

19            THE COURT:  Yes.

20            MS. SESSIONS:  Thank you.  Justina Sessions for

21  Google.

22            ADAM STEWART, DEFENDANT'S WITNESS, SWORN

23                    DIRECT EXAMINATION

24  BY MS. SESSIONS:

25  Q     Good afternoon, Mr. Stewart.  Could you please

Direct examination - A. Stewart

1   introduce yourself to the Court and spell your name for the
2   court reporter.
3   A    Yes.  My name is Adam Stewart.  A-D-A-M.
4   S-T-E-W-A-R-T.
5   Q    And, Mr. Stewart, you're a little soft-spoken.  So that
6   is the microphone in front of you, so please try to lean
7   over if you can -- or even better.  So you can hold that up.
8   A    Okay.  Is that better?
9   Q    And sometimes it's just easiest to kind of do it
10  podcast style.
11  A    Okay.
12  Q    And who is your current employer?
13  A    I work for Google.
14  Q    Okay.  How long have you worked at Google?
15  A    For almost 18 years.
16  Q    And what do you do at Google?
17  A    I'm the vice president of consumer goods, government,
18  and entertainment and large customer sales for Google.
19  Q    And at a high level, what does that job entail?
20  A    I oversee our media sales business across multiple
21  industries.
22  Q    And what are media sales?
23  A    Advertising sales.
24  Q    So in your job, do you talk with companies that are
25  seeking to market themselves?

26

1   A    I do.

2   Q    How often?

3   A    Daily, weekly, yes.

4   Q    Do you also supervise other Google employees who talk

5   with companies seeking to market themselves?

6   A    I do.  I oversee a team of about 500 people.

7   Q    Okay.  Could you tell the Court briefly about your

8   career before Google.

9   A    I've been in advertising for 33 years.  I was one of

10  the first employees at the Discovery Channel -- the first

11  300 employees at the Discovery Channel.  I worked there for

12  almost 14 years.  I've worked briefly for a couple of other

13  companies.  I've worked for Univision.  I've worked for

14  Screenvision and now 18 years at Google.

15  Q    So have all of your jobs involved advertising?

16  A    They have.

17  Q    How did you come to work at Google?

18  A    Google at that time, when I joined Google, was looking

19  for someone to run the media and entertainment business at

20  Google.  And after a long interview process, I got that job.

21  Q    And since that time, has your role expanded beyond

22  media and entertainment?

23  A    It has.  So I oversee multiple verticals for Google.

24  So those are industries.  I oversee automotive, home and

25  personal care, food and beverage, consumer technology, media

1    and entertainment, and our government and advocacy business.

2    Q    Okay.  And those verticals, are those the categories of

3    customers that you serve?

4    A    They are.  That's how our large customer sales teams

5    are organized.

6    Q    Okay.  So in your over 20 years of working in

7    advertising, has digital advertising changed over that time?

8    A    It's changed -- incredibly changed.  Digital

9    advertising has advanced so much over my career in

10   advertising.  I did a little bit of it in my career at

11   Discovery.  It's obviously much more advanced since then.  I

12   think the data -- the capabilities of digital advertising

13   are far beyond what they were certainly back then.  And I

14   think the other significant change is just our ability to

15   measure the outcomes of the work that we do.

16   Q    And what do you mean by measuring the outcomes of the

17   work that you do?

18   A    We work in an industry that is reliant on measurement:

19   How are the products that Google is offering or or our

20   competitors are offering, how are they performing relative

21   to all of the other choices that marketers have to advertise

22   and market themselves?

23   Q    Could you give us an example of how measurement might

24   work in digital advertising?

25   A    Sure.

Direct examination - A. Stewart

1      So one very common practice amongst marketers is media

2  mix modeling.  And this is basically a way that marketers

3  can measure the different channels that they're advertising

4  in or different partners that they're advertising with.  It

5  might be search, linear, television, and on through.  And

6  what marketers are looking to understand as a result of that

7  measurement is their return on ad spend.  For every dollar

8  that I invest, how much revenue am I gaining as a result.

9  Q    Do you personally work with customers that use media

10  mix modeling in their marketing?

11  A    Most of the customers I work with are using -- we call

12  them MMSs in their marketing.

13  Q    What, if anything, does the availability of this

14  measurement data or media mix modeling mean for the

15  competitiveness of the digital advertising ecosystem?

16  A    What it really means is that everyone who is in the

17  advertising ecosystem on the sales side needs to put forth

18  the best product that they have in order to measure for

19  their customer in order to provide return on investment for

20  their customer.

21      So from a competitive standpoint, whether you're

22  selling display or video or whatever product you have, you

23  need that product to perform as measured by a third party

24  better than the other choices that advertisers have in order

25  to continue to stay part of the transaction, in order to

Direct examination - A. Stewart

1    stay on the media buy.

2    Q    So are the customers that you work with making

3    allocation decisions among advertising channels or formats

4    based on media mix modeling?

5    A    Without question.

6    Q    Okay.  Now, despite that fact, are you aware that ad

7    agencies or advertisers might still have distinct budgets

8    for particular ad formats or channels?

9    A    I am.

10   Q    For example, some agencies might work with kind of

11   distinct social budgets?

12   A    That's correct.

13          MR. TESLICKO:  Objection, Your Honor.  Leading.

14          THE COURT:  Sustained.

15   BY MS. SESSIONS:

16   Q    In your experience, are distinct budgets fixed?

17   A    No.

18   Q    What is your experience with respect to budgets that

19   are distinct for a particular channel?

20   A    Yeah.  My experience is that marketers representing the

21   companies that they work for are looking to get the highest

22   return on their investment.  So marketers are looking at all

23   of the channels that they are advertising with, across all

24   of the partners that they are advertising with, using

25   measurement to make allocation changes as that measurement

Direct examination - A. Stewart

1    is available to them.

2    Q    Does Google offer any advertising formats designed

3    specifically to compete for social media budgets?

4    A    We do.  So we have a format that's called DemandGen,

5    which was designed intentionally to compete with social

6    budgets.

7             MR. TESLICKO:  Objection, Your Honor.  It's

8    unclear unless the witness can lay a foundation that

9    DemandGen was launched prior to the close of fact discovery

10   here.

11            THE COURT:  Let's get a context for that.

12   BY MS. SESSIONS:

13   Q    Mr. Stewart, were DemandGen ads launched prior to the

14   September of 2023?

15   A    Yes.

16   Q    So could you just explain, again, what DemandGen ads

17   are?

18   A    Yeah.  So we have a couple of formats that are designed

19   to compete with social.  DemandGen is one of them.  And

20   DemandGen -- I am holding the microphone, so I will try to

21   demonstrate.  There are feeds that are available for Google

22   products.  So the Google app on a phone or the YouTube

23   application.  And DemandGen service puts ads in those feeds

24   in a similar way that a user might see an ad on Instagram.

25   Q    So if you -- if you could, turn if your binder --

                                                              31

1    MS. SESSIONS:  And if we could put up on the

2  screen, please, Stewart Demonstrative 1.

3  BY MS. SESSIONS:

4  Q    And, Mr. Stewart, you can see it on your computer

5  screen.  That might be easier than just going in your

6  binder.

7  A    Yes.

8  Q    Could you explain what is being shown on the left-most

9  pane of Stewart Demonstrative 1?

10  A    Yeah.  What we're looking at here is an image ad, a

11  DemandGen image ad.  The ad is for Airbnb for $218 a night,

12  I guess.  And this is within the Google feed.  So this is

13  the feed that I was talking about.  If you have a Google app

14  on your phone and you are scrolling through it, you would

15  see this ad.

16  Q    Okay.  And the DemandGen ad in the Google feed, is that

17  an image ad?

18  A    It is.

19  Q    Okay.  What's being shown in the center pane?

20  A    The same ad in an Instagram feed.

21  Q    Okay.  And then on the right?

22  A    The same ad on *The Washington Post*.

23  Q    Okay.  We can put that aside.

24    Mr. Stewart, when buying ads through Google, does a

25  customer have to buy only one ad format per campaign?

Direct examination - A. Stewart

1   A     No.

2   Q     Does Google offer any tools that help advertisers buy

3   across ad formats?

4   A     Yeah, we do.  I mean, we have basically ad formats that

5   run across multiple media types.  So the one that's very

6   common for us right now is a product called Performance Max.

7   And so Performance Max includes search.  It includes image

8   display advertising.  It includes video advertising as well.

9   It runs across Google surfaces and outside Google.

10  Q     Sorry.  I didn't catch the end of that.  I believe you

11  said it runs across Google surfaces and --

12  A     And outside of Google.

13                    (Reporter clarification.)

14             THE WITNESS:  I'm sorry.

15             It runs on -- sorry.  It runs on Google surfaces

16  like the one that we just looked at, and ads also run

17  outside of Google surfaces as well.

18  BY MS. SESSIONS:

19  Q     So Performance Max ads could run on third-party

20  websites?

21  A     That's correct.

22  Q     Okay.  Why does Google offer the Performance Max

23  product?

24  A     So Performance Max is designed similar to what we were

25  talking about before.  We design products, and we want our

33

1    products to provide the greatest return on investment for

2    our advertisers.  And Performance is a product that does

3    that across multiple surfaces and has demonstrated to show

4    really efficient and effective returns for our partners.

5              THE COURT:  Are any of these products offered

6    through AdX -- I'm sorry, through Google Ads?

7              THE WITNESS:  So Performance Max is available via

8    Google Ads.  It's bought on Google Ads, the kind of front

9    buying door of Google.

10             THE COURT:  Okay.

11   BY MS. SESSIONS:

12   Q    How often does Performance Max adjust among formats?

13   A    Yeah.  This is, I think, where a lot of value gets

14   created for Performance Max.  Media is complicated and

15   decisioning is complicated.  And historically, where media

16   had been more siloed before and someone might have been

17   managing one particular search budget or display or video,

18   Performance Max, as a result of essentially AI, is allowed

19   to basically make decisioning to help provide the greatest

20   amount of run for marketers.  So showing the right ad to the

21   right user at the right time to help our marketers gain

22   return on their investment.

23   Q    And you work with -- you work with some of Google's

24   larger advertising customers; is that right?

25   A    I do.

34

Direct examination - A. Stewart

1    Q    And do you work with companies that use the Performance

2    Max product?

3    A    I do.

4    Q    Okay.  If you could, please turn in your binder to

5    Tab 8.

6    A    Will it come up on here as well?

7         MS. SESSIONS:  And it won't show up there maybe

8    quite yet, but this is Defense Exhibit 1248.  And this

9    document was discussed yesterday during Ms. Stefaniu's

10   testimony but was not moved into evidence at that time.

11        Your Honor, we would like to move it into evidence

12   at this time.

13        THE COURT:  Any objection?

14        MR. TESLICKO:  Your Honor, we'd object on hearsay,

15   and frankly, the relevance of this to the claims in this

16   case.

17        MS. SESSIONS:  All right.  Well, I can lay a

18   foundation for it as a business record, Your Honor.

19        THE COURT:  Go ahead.

20   BY MS. SESSIONS:

21   Q    Okay.  Mr. Stewart, do you recognize this document

22   that's been marked as Exhibit 1248?

23   A    I do.

24   Q    What is it?

25   A    This was a document that was put together.  I run the

                                                              35

Direct examination - A. Stewart

1    FBRs, the food and beverage.  That's one of my teams.  And

2    this is a document that they put together to help getting

3    excited about selling -- and enable selling Performance Max.

4    Q    Okay.  Was this document prepared in the ordinary

5    course of Google's business?

6    A    It was.

7    Q    And did the people on your team who prepared this

8    document have knowledge of its contents when they made it?

9    A    They did.

10        MS. SESSIONS:  Your Honor, I would now move to

11   admit --

12        THE COURT:  We have been admitting multiple

13   documents like this.  It's in.

14        MS. SESSIONS:  Thank you.

15   BY MS. SESSIONS:

16   Q    Mr. Stewart, if you could just go to -- let's see --

17   page -- it's page 7.

18   A    This document?

19   Q    Yes, and its on your screen also now.

20   A    Uh-huh.

21   Q    Mr. Stewart, what is being depicted on page 7 of

22   Defense 1248?

23   A    Yeah.  This is just demonstrating some of the surfaces

24   that Performance Max is showing.

25   Q    Thanks.  You can put that aside.

Direct examination - A. Stewart

 1          THE COURT:  Does an advertiser who opts to use

 2   Performance Max pay any different rate?

 3          THE WITNESS:  No.

 4          THE COURT:  So it's just part of the Google Ads

 5   platform?

 6          THE WITNESS:  That's right.  It's a Google product

 7   offering.  There's no special rate that's assigned to it in

 8   any different structure than how we sell other

 9   advertising -- other performance advertising.

10          THE COURT:  And is that same feature available for

11   DV360 advertising?

12          THE WITNESS:  Performance Max is not available on

13   DV360.

14          THE COURT:  Thank you.

15   BY MS. SESSIONS:

16   Q    Does Google offer any tools to its customers to convert

17   advertising creative from one format to another?

18   A    We do.

19   Q    Could you explain that?

20   A    Yeah.  I think DemandGen.  What we saw is a really good

21   example of that.  Video can be watched in different formats.

22   Some people watch video horizontally, and other people watch

23   video vertically.

24          Many advertisers don't create or may not have the types

25   of assets that they need in order to show up as best they

                                                              37

Direct examination - A. Stewart

 1   can in a particular format.  So we can help advertisers turn

 2   their video essentially from being horizontal to vertical.

 3   And we can also help advertisers who are image advertisers

 4   create display ads -- create video ads.  And we can also

 5   help advertisers who may have video ads secure display out

 6   of their ads as well.

 7   Q    Could you explain that last point, converting video

 8   creative to display format?

 9   A    Yeah.  I mean, video, you've obviously got a bunch of

10   images that can be valuable as display format.  So we have

11   tools that are available that would allow us to make that

12   conversion.

13   Q    Okay.  And when you say allow us to make that

14   conversion, so Google would do the conversion?

15   A    We help our partners do that.

16   Q    Okay.  Does Google also offer any tools that help

17   advertisers change the size of their creatives?

18   A    Yeah.  The versions that I talked about before

19   essentially does change the size because you have gone from

20   something that's horizontal on a wide screen.  And when you

21   make it a smaller screen and you are seeing it on your

22   mobile device, it has to be sized appropriately for that

23   device.  So it is still a high-quality ad.  It doesn't lose

24   its impact.  So we do help our marketers do that.

25   Q    Okay.  I want to turn now to talking about Display &

                                                              38

Direct examination - A. Stewart

1    Video 360 and Google Ads.

2        So do you have customers that use both Google Ads and

3    Display & Video 360?

4    A    I do.

5    Q    Okay.  And do you know if the customers that you work

6    with are also buying ads through non-Google buying tools?

7    A    Yes.

8    Q    Okay.  Does Google place any restrictions on where a

9    Google Ads' customer can buy ads?

10   A    None.

11   Q    Okay.  Does Google place any restrictions on where a

12   DV360 customer can buy other ads?

13   A    No.

14   Q    Okay.  If you could now turn in your binder to Tab 5,

15   please, which is Defense Exhibit 486.

16          THE COURT:  Are you moving that in?

17          MS. SESSIONS:  Yes, Your Honor.

18          THE COURT:  Any objection?

19          MR. TESLICKO:  Just the same hearsay objection,

20   Your Honor.

21          THE COURT:  Let's just lay a foundation for it.

22          MS. SESSIONS:  Yes, Your Honor.

23   BY MS. SESSIONS:

24   Q    Mr. Stewart, do you recognize the document at Tab 5 in

25   your binder, which is Defense Exhibit 486?

                                                            39

Direct examination - A. Stewart

1   A     I do.

2   Q     What is it?

3   A     This was a planning document from November 2017.  It is

4   a common document that we have looking at our products and a

5   go-to-market position that we have for the products.

6   Q     And what's a go-to-market position?

7   A     Well, go-to market is essentially -- go-to market is

8   actually a function within Google.  So as we are working on

9   our products, we want to ensure that we have teams that are

10  supporting our ability to bring those products to market.

11  Q     Okay.  And I'll just ask you to slow down just a little

12  bit, Mr. Stewart.

13  A     Thank you.  Okay.

14  Q     Thank you.

15        Was this document prepared in the ordinary course of

16  Google's business?

17  A     It was.

18  Q     And did the people who prepared it have knowledge of

19  its contents when they made it?

20  A     They did.

21        MS. SESSIONS:  Your Honor, we move to admit

22  Defense Exhibit 486.

23        THE COURT:  It's in.

24        MS. SESSIONS:  Thank you.

25  BY MS. SESSIONS:

Direct examination - A. Stewart

1   Q    Now, in the binder, I think there are two printouts of

2   this document.  There's the original stamped version, and

3   then behind a blue sheet, there's a printout that's a little

4   bit more legible.  And so you may want to use the version

5   behind the blue sheet.

6        If you could, turn to page 4 of the 486N version behind

7   the blue sheet.  And it's also going to be on your screen.

8   A    I will look at it on the screen.

9   Q    Okay.  Could you please explain at a high level what

10  page 4 of this document is showing?

11  A    Yeah.  This is a fairly common frame that we use.  It's

12  a focusing facts just trying to understand what's happening

13  with our products and also what's happening with the market

14  at the same time.

15  Q    Okay.  And what's GDN at the top of this slide?

16  A    Yeah, Google Display Network.

17  Q    Okay.  Is that -- are those ads that can be bought via

18  Google Ads?

19  A    They are.

20  Q    Okay.  If you could, look at the first bullet.  It

21  says, "Market & competitive baseline."

22  A    Uh-huh.

23  Q    "Substantial untapped opportunity within Display+Video

24  market, with significant competition, primarily from

25  Facebook, Criteo, Amazon."  Do you see that?

41

Direct examination - A. Stewart

1    A      Yes.  Yes, I do.

2    Q      Okay.  What is this bullet?

3    A      Yeah.  I mean, this was, you know, understanding where

4    we were performing relative to the market and recognizing

5    that we were facing competition from Facebook, Criteo, and

6    Amazon.

7    Q      Okay.  And then could you look at the second bullet,

8    please.

9    A      Yeah.

10   Q      The second bullet says, "Revenue and growth are highly

11   concentrated and dual platform usage (DBM+GDN) is high."  Do

12   you see that?

13   A      Yes.  Yes, I do.

14   Q      Okay.  What is the reference to revenue and growth

15   being highly concentrated?

16   A      The second bullet point below it illustrates that

17   point.  40 percent of the customers that were being serviced

18   by the large customer sales organization represented

19   70 percent of the display revenue.

20   Q      Okay.  And then what is the reference to dual platform

21   usage?

22   A      Yeah.  These are clients -- so DBM, the prior name for

23   DV360, and GDN.  This means that these clients were using

24   both DBM and GDN at the same time.

25   Q      All right.  If you could, now turn to page 5 of this

Direct examination - A. Stewart

1    document.  I think it's the next page.

2         And just in the interest of speeding this along,

3    Mr. Stewart, does this slide also reflect a discussion of

4    the competition from Facebook, Criteo, and Amazon that we

5    discussed with respect to Slide 4?

6    A    It does.

7    Q    Okay.  Let's turn to page 6, please.

8         And what is page 6 showing?

9    A    Yeah.  A discussion of a similar point but with more

10   focus in terms of how we were competing with Facebook at

11   this time.  We were looking at Facebook's revenue

12   acceleration in display and video relative to Google.  And

13   then we were looking at kind of the year-over-year change

14   here with regards to growth rate looking at Google DBM,

15   Facebook, and Google GDN.

16   Q    And then if you could, turn to page 7, please.

17        And is this slide -- does this slide provide more

18   detail about the revenue concentration?

19   A    It does.

20   Q    Okay.  And so this slide, just, again, in the interest

21   of moving it along, reflects that 10 percent of the clients

22   are making up 70 percent of the GDN revenue in 2017?

23   A    That's correct.

24   Q    Okay.  Do smaller advertisers use -- actually, I'll ask

25   you that question at a later time.

43

Direct examination - A. Stewart

1        Could you turn to page 9 of this document.

2        And does this -- does page 9 provide more information

3   about the dual platform usage?

4   A    It does.  This is a more close look at the segmentation

5   depending upon -- based upon how clients were using our

6   products.  So high DBM; hybrid -- using both -- full DBM;

7   high GDN; and full GDN.

8   Q    And just because there are a lot of acronyms, the DBM

9   here, what is that?

10  A    Yes.  Yeah.  DV360, as it's known today.

11  Q    Okay, got it.

12       And is this -- is the data on this slide consistent

13  with your experience that customers use both DV360 and GDN

14  or Google Ads?

15  A    Yes.

16  Q    Okay.  Let's turn to page 15 now, please.

17       And I'd like to ask you about the competitive selling

18  capability bullet point on this slide.

19  A    This is a discussion about specialism, which is our

20  resources that are put in place in order to support a

21  particular product.  And the point on competitive

22  capabilities, again, pointing out that GDN was competing

23  with players who were focused on the display business,

24  Facebook, Criteo, Amazon, DSPs, and others.

25  Q    Okay.  And this slide says DSPs, and you mentioned

                                                            44

Direct examination - A. Stewart

1   DSPs.  So did Google believe that GDN or Google Ads was

2   competing with DSPs?

3   A    Yes.

4   Q    Okay.  You can put that document aside.

5        Mr. Stewart, are there smaller advertisers that use

6   Display & Video 360?

7   A    There are.

8   Q    Could you give an example of some smaller advertisers

9   that you work with that use Display & Video 360?

10  A    Yeah.  There are a couple of industries that I serve in

11  particular that do have clients that use DV360.

12       So one example would be the automotive business.

13  Obviously, you have manufacturers, but the automotive

14  business goes all the way through to regional associations.

15  So the Southern California Dealer Association.  And then

16  there are dealers that sit underneath that in dealer groups.

17  Some of those companies do use DV360 all the way through.

18       In addition, I work with restaurants, quick-serve

19  restaurants in particular.  So companies like McDonald's and

20  Wendy's, they have their national efforts, but they also

21  have other efforts that go underneath that in terms of local

22  franchisees.  And some of those companies are using DV360 as

23  well.

24  Q    I'd now like to turn to an example of another

25  particular advertiser that you've worked with.  Could you

45

1    turn to Tab 2 in your binder, please.

2              MS. SESSIONS:  And this is Defense Exhibit 1214,

3    which we would move into evidence, Your Honor.

4              THE COURT:  Any objection to 1214?

5              MR. TESLICKO:  Your Honor, we would object on

6    hearsay, and this appears to be some kind of a pitch

7    relating to a particular FAA contract, which is no longer

8    particularly relevant to this case.

9              MS. SESSIONS:  Your Honor, I'm happy to lay a

10   foundation for this document as a business record, and we

11   are using this as an example of a representative advertiser

12   and advertising campaign.  It is not for the fact that this

13   is a federal agency advertiser but for some specific work

14   that this particular advertiser did.

15             THE COURT:  Well, it's more like a demonstrative,

16   isn't it, at this point?

17             MS. SESSIONS:  Well, this is -- I'm happy to lay a

18   foundation for the document as a business record as well.

19   But I was just making the point, Your Honor, that we are

20   not -- we are using this document to make some points about

21   the way that advertising was purchased and the particular

22   advertising purchases made in this campaign, not simply

23   because this is a federal agency advertiser.

24             THE COURT:  Well, this document is not showing

25   that something was actually purchased.  Isn't this showing

46

Direct examination - A. Stewart

1   what was -- I think the plaintiffs' counsel said pitched.

2           MS. SESSIONS:  Well, if I may lay a foundation,

3   Your Honor.

4           THE COURT:  All right.

5   BY MS. SESSIONS:

6   Q   Mr. Stewart, do you see the document at Tab 2 of your

7   binder?

8   A   I do.

9   Q   Could you explain -- do you recognize it?

10  A   I do.

11  Q   Could you explain what it is, please?

12  A   Yeah.  This document is a recap of the joint business

13  partnership that we have with the Army and their agency.  It

14  was prepared for me in a review of the business.  We like to

15  celebrate some of the work that we're proud of.  That's

16  where this document originated.

17  Q   So does this document, Defense Exhibit 1214, reflect

18  some of the advertising purchases or campaign strategies

19  that you and your team and the Army actually executed on?

20  A   It does.

21  Q   Okay.  And was this document prepared in the ordinary

22  course of business?

23  A   It was.

24  Q   Okay.  And the people who prepared it on your team had

25  knowledge of its contents when they made it?

Direct examination - A. Stewart

1    A    Yes.

2              MS. SESSIONS:  Your Honor, we move to admit

3    Defense Exhibit 1214.

4              THE COURT:  And from the information on the first

5    page, this was produced in 2022.  Is that right?

6              THE WITNESS:  That's correct.

7              THE COURT:  Yeah.  Then it's appropriate.  It's

8    in.

9              MS. SESSIONS:  Thank you, Your Honor.

10   BY MS. SESSIONS:

11   Q    Could you please turn to page 19.

12        And on page 19 on the left-hand side, there's a heading

13   where Army was.  Could you explain what's being shown

14   underneath that heading?

15   A    Yeah.  This is a listing of different partners that the

16   Army was using to purchase media whether they were direct

17   publishers or other partners.

18   Q    So you said direct publishers or other partners?

19   A    Yes.

20   Q    Could you explain that?

21   A    Yes.  So you've got direct publisher buying at the

22   bottom with Turner, Bleacher Report, and Viacom being

23   mentioned.  And then you have other partners, like DSPs,

24   like Display & Video 360, Trade Desk, and other trading

25   partners, MiQ and AppNexus and others.

48

Direct examination - A. Stewart

1    Q    So the Army was buying both directly from publishers

2    and through DSPs and trading partners?

3    A    That's correct.

4    Q    What is a non-DSP trading partner?

5    A    So they offer different media buying services that are

6    not acting as a DSP.

7    Q    Okay.  Then if you could, go to page 21, please.  And

8    I'd like to ask you something about the notes here on

9    page 21.

10   A    Yeah.

11   Q    There's a discussion of using cookie overlap reports in

12   campaign manager?

13   A    Uh-huh.

14   Q    And it says, "We are able to see what publishers Army

15   is running direct with, and what percentage of impressions

16   served on those publishers directly overlap with DV360

17   impressions."

18        And then there's a description of an overlap chart

19   above.  Could you explain what this means?

20   A    What this is saying is that the Army was purchasing

21   media from multiple partners, and there was significant

22   overlap in the media they were purchasing.

23        It correlates to what we've determined basically is

24   reach and frequency.  This is the frequency side.  And what

25   this essentially is offering the Army or indicating to the

Direct examination - A. Stewart

1    Army is that they're probably hitting the same consumer

2    many, many times, the same potential recruit many, many

3    times.  There's diminishing returns in that.

4    Q    So just to make sure I understand, the Army was buying

5    some impressions direct from publishers?

6    A    That's correct.

7    Q    And the Army was buying some impressions through DV360?

8    A    That's correct.

9    Q    And those direct bought and DV360 impressions were

10   potentially hitting the same recruits with the same

11   advertising?

12   A    Yes.

13   Q    Let's now look at another document.  Please, if you

14   could, turn to Tab 1 of your binder, and this is Defense

15   Exhibit 1429.

16             THE COURT:  Are you moving it in?

17             MS. SESSIONS:  Yes, Your Honor.

18             THE COURT:  So it's another one of the Google

19   documents.  I assume it's the same objection.  So why don't

20   you just lay a foundation.

21             MS. SESSIONS:  Thank you, Your Honor.

22   BY MS. SESSIONS:

23   Q    Mr. Stewart, do you recognize the document that's been

24   marked as Defense Exhibit 1429?

25   A    I do.

Direct examination - A. Stewart

1   Q    What is it?

2   A    This is a document that was prepared for the Army and

3   their agency to talk about the partnership that we have and

4   our planning for 2024.

5   Q    Okay.  And was it prepared in the ordinary course of

6   Google's business?

7   A    It was.

8   Q    And did the people who prepared it have knowledge of

9   its contents when they made it?

10  A    They did.

11          MS. SESSIONS:  All right.  Your Honor, we move to

12  admit Defense Exhibit 1429.

13          THE COURT:  Any objection?

14          MR. TESLICKO:  Your Honor, I still think this is

15  made for an Army audience and is not -- does not appear to

16  be a business record that would have been relied upon by

17  Google for purposes of running their business so much as to

18  pitch the Army on the 2024 joint business plan.

19  BY MS. SESSIONS:

20  Q    Mr. Stewart, what is a joint business plan?

21  A    We have joint business plans with many of our partners,

22  and what they're designed to do is help us understand what

23  our partners' goals are and for us to bring forth what we

24  have to help work towards those goals.

25          THE COURT:  Is this a response to what the Army

51

1 │ has indicated to you their goals are?

2 │       THE WITNESS:  When we go into a joint business

3 │ plan, we have an understanding, a general understanding of

4 │ what those goals are, and we are working with them to show

5 │ them how we are basically going to be able to deliver on

6 │ those goals.

7 │       THE COURT:  So this document is a response --

8 │ basically, it represents your understanding of what the Army

9 │ is looking for?

10 │       THE WITNESS:  It does.

11 │       THE COURT:  It's in.

12 │       MS. SESSIONS:  Thank you, Your Honor.

13 │ BY MS. SESSIONS:

14 │ Q   And this one has a blue sheet in the middle.  An easier

15 │ to read version is behind the blue sheet.

16 │ A   Thank you.

17 │ Q   So if you could, turn to page 10 of the blue sheet

18 │ version.

19 │       THE COURT:  Now, we don't need both in the record.

20 │ So we'll keep the better form, and that's the one that's the

21 │ one on the website.

22 │       MS. SESSIONS:  Understood, Your Honor.

23 │ BY MS. SESSIONS:

24 │ Q   Do you see -- oh, sorry.  Are we on the wrong page?

25 │       Oh, no.  We're there.

Direct examination - A. Stewart

1      I want to ask you about the third point here, which

2   says, "Local & National Synergies."

3   A      Yes.

4   Q      And in particular, the third bullet point, which says,

5   "Education & training sessions across local programmatic

6   team."

7   A      Yes.

8   Q      What does the local programmatic training sessions

9   refer to?

10  A      This refers to supporting the Army and their ability to

11  work effectively locally.  The Army's ability to find

12  recruits varies depending upon certain markets.  So this was

13  basically -- an offer basically in response to that to

14  provide education and training for programmatic teams that

15  were going to be working locally.

16  Q      Sorry.  You said programmatic teams that were going to

17  be working locally?

18  A      Yes.

19  Q      So was the Army purchasing through programmatic

20  advertising local advertising?

21  A      The Army was using --

22          MR. TESLICKO:  Objection, Your Honor.  Leading.

23          THE COURT:  Sustained.

24  BY MS. SESSIONS:

25  Q      Okay.  What kind of advertising is this referring to?

Direct examination - A. Stewart

1  A    So the other previous examples that I mentioned, like

2  automotive where you have dealers and dealer groups, this is

3  a similar approach.  The Army is utilizing DV360 in order to

4  buy local advertising.

5  Q    Would local advertising through DV360 include

6  advertising in local newspapers?

7  A    It could.

8  Q    And I think we've already gone through maybe some other

9  examples of DV360 advertisers buying local advertising.

10         THE COURT:  That's not a question.  That's a

11 statement.

12         MS. SESSIONS:  I will move on, Your Honor.

13         Thank you.

14 BY MS. SESSIONS:

15 Q    I'd like to shift and talk a little bit more about

16 competition.

17 A    Okay.

18 Q    When you walk into a meeting, who are you selling

19 against?

20 A    We sell against the broad choices that marketers have

21 to where they would place their media.  So that could be

22 inclusive of companies like Amazon, Meta, Snapchat, NBC

23 Universal, and increasingly, companies like Walmart.

24 Q    How is Walmart a competitor to Google Ads or Display &

25 Video 360?

Direct examination - A. Stewart

1    A    So retail media, companies like Walmart and Target and

2    many others, is one of the fastest growing segments of the

3    media business.  Walmart has data that consumer package good

4    companies and others are interested in.  So Walmart has

5    built essentially Walmart Connect, and they have a DSP that

6    is actually powered by The Trade Desk.  So we're

7    increasingly competing with companies like Walmart in that

8    fashion.

9    Q    If you know, the advertising that can be bought through

10   Walmart partnership with The Trade Desk -- I'll ask you a

11   better question.

12       Where can that advertising be bought?

13   A    Well, that advertising -- so the actual function --

14   it's powered by The Trade Desk.  Walmart Connect is the name

15   of Walmart's retail media network.

16   Q    Where do those ads show up?

17   A    They show up in connected television.  They will show

18   up in a display.  They'll show up in other videos.  So

19   similar choices as other media types and other programmatic

20   sellers.

21   Q    Okay.  And I believe you testified earlier that Google

22   views Amazon as a competitor in advertising.

23   A    We do.

24   Q    Could you turn to Tab 10 of your binder, please.

25       MS. SESSIONS:  And this is Defense Exhibit 435,

Direct examination - A. Stewart

1    Your Honor.

2            THE COURT:  All right.  Just lay a foundation.

3    BY MS. SESSIONS:

4    Q    Okay.  Mr. Stewart, if you are there, do you recognize

5    this document that's been marked as Defense Exhibit 435?

6    A    I do.

7    Q    What is it?

8    A    A competitive analysis that was prepared in 2018 to

9    understand what Amazon was doing in the display business.

10   Q    Does Google prepare competitive analyses like these in

11   the ordinary course of its business?

12   A    This is a common practice in the course of our

13   business.

14   Q    And what is the purpose of these competitive analyses?

15   A    It helps our teams, be it leadership or our sellers,

16   understand our competition.

17           MS. SESSIONS:  Your Honor, I would move Defense

18   Exhibit 435 into evidence.

19           MR. TESLICKO:  Objection, Your Honor.

20           THE COURT:  All right.

21           MR. TESLICKO:  I would also note that Mr. Stewart

22   doesn't appear as one of the authors, and it is unclear if

23   these people worked as part of Mr. Stewart's business

24   organization.

25           THE COURT:  Do you recognize any of the names on

                                                              56

Direct examination - A. Stewart

1    the front?

2            THE WITNESS:  I do.

3            THE COURT:  Do any of them work with you or for

4    you?

5            THE WITNESS:  In the past, but not currently.

6            THE COURT:  Would they have been working for you

7    in 2017, '18?

8            THE WITNESS:  No.

9            MS. SESSIONS:  So if I may, Your Honor?

10           THE COURT:  Go ahead.

11   BY MS. SESSIONS:

12   Q    Despite the fact that the people whose names are on

13   this document were not on your team, is this a sort of

14   document that you might have used or your team might have

15   used in your work?

16   A    Yes.

17           THE COURT:  I'm still going to let it in.

18           MS. SESSIONS:  Thank you, Your Honor.

19   BY MS. SESSIONS:

20   Q    I'm actually not going to ask you any questions about

21   this document, Mr. Stewart.

22           THE COURT:  Well, then why did you even have it?

23           MS. SESSIONS:  Because, Your Honor, this is -- in

24   trying to move this along, we have --

25           THE COURT:  I appreciate everybody's interest in

57

Direct examination - A. Stewart

1    moving it along.  At the same time, as I've said before,

2    with these exhibits, I want some context.  If there's

3    something valuable in this exhibit, you should be bringing

4    it out with a witness.

5             MS. SESSIONS:  Understood, Your Honor.  I will say

6    this exhibit, as well as two others that we have, we are

7    offering really for the purpose of demonstrating to Your

8    Honor that Google does competitive analyses of these

9    companies in the ordinary course of its business.

10            THE COURT:  I think I can take judicial notice of

11   that, frankly.  Of course, we've heard that.

12            MS. SESSIONS:  All right.  In that case --

13            THE COURT:  To unclutter the record, I'm not going

14   to admit 435.

15            MS. SESSIONS:  Okay.  Thank you, Your Honor.

16   BY MS. SESSIONS:

17   Q    Mr. Stewart, are you familiar with something called AMG

18   off-site?

19   A    I am.

20   Q    What is the AMG off-site?

21   A    The AMG off-site -- this is a leadership team of the

22   Americas, a team that I sit on.  We meet once a quarter at

23   an off-site to discuss business.

24   Q    And are there written materials prepared for the AMG

25   off-site meetings?

Direct examination - A. Stewart

1    A    Every one.

2    Q    Okay.  Do you recall attending an off-site meeting in

3    or around June of 2019?

4    A    Yes.

5    Q    Could you turn to Tab 7 of your binder, please, and

6    this is Defense Exhibit 733.

7              THE COURT:  Is there any objection to this

8    document?

9              MR. TESLICKO:  Just the normal objection that I

10   don't think a full foundation has been laid to make this --

11             THE COURT:  Did you read this document?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  That's enough foundation.

14   It's in.

15   BY MS. SESSIONS:

16   Q    Mr. Stewart, this presentation or document is titled

17   "Accelerating Display."  What does display refer to here?

18   A    It's referring to display advertising.

19   Q    And again, this is one where we've got a more legible

20   version behind the blue sheet.  So if you could, go to

21   page 3 of the blue sheet version, please, and it will be on

22   your screen.

23        This slide has a heading "Key takeaways on Display

24   performance."  And then under that, it says, "Loosing share

25   in US Display market overall and to key competitors (FB &

Direct examination - A. Stewart

1   TTD) primarily driven by GDA."

2        Could you explain what that means?

3   A    What this is saying is that we recognized that we were

4   losing share to Facebook and to The Trade Desk and that the

5   losses were coming primarily from GDA, which is the same as

6   GDN to clarify.

7   Q    Okay.  Could you then go down to the next heading

8   here --

9            MS. SESSIONS:  Thank you, Mr. Spalding.

10  BY MS. SESSIONS:

11  Q    -- that starts with, "Growth deceleration."  And the

12  minor -- the first minor bullet there says, "Majority of

13  decline driven from torso clients (-$20M GDA growth)" --

14       What is the reference to torso clients here?

15  A    It's a reference to a segmentation of clients.  So

16  within the LCS channel of Google, head clients would be the

17  largest clients.  Torso clients is that middle section of

18  clients, and then there are also tail customers.  What this

19  was just noting is that we were seeing declines from this

20  torso set of customers.

21           THE COURT:  Would that be medium-size clients?

22           THE WITNESS:  Yes, within the large customer

23  sales.  Yes, exactly, kind of midsize.

24  BY MS. SESSIONS:

25  Q    And if you could, then, turn to page 5 of this

1    document.

2        What is being shown on page 5?

3    A    Yeah.  So what this is looking at are growth rates and

4    looking at where -- reporting growth rates of the U.S.

5    display market, so the industry overall; what was happening

6    with Google and GDA, which is that light blue; DV360 as

7    well, the darker blue; and the trend line that we saw with

8    Facebook.

9    Q    Okay.  Could you please then turn to page 17.

10       Are you there?  It's on your screen.

11   A    Yeah, it's on the screen.

12   Q    Okay.  And what -- at a high level, what is page 17

13   depicting?

14   A    Yeah.  This is a deeper assessment of where it was that

15   we were seeing kind of where we were and basically where we

16   were losing.  So it's looking at a couple of different

17   categories here with regards to both measurement, creative,

18   and data.  There's also an assessment of kind of where we

19   were currently and where we were projected to be by the end

20   of the year.

21   Q    Mr. Stewart, which companies is Google comparing its

22   display products to on this page?

23   A    Amazon, Facebook, Instagram, Criteo.

24   Q    Okay.  You can put that document aside, please.

25       Could you now turn to Tab 3 of your binder, which is

Direct examination - A. Stewart

1    Defense Exhibit 1132.

2              THE COURT:  Any objection to 1132?

3              MR. TESLICKO:  Just the same hearsay objection

4    absent a foundation and some connection to this witness,

5    Your Honor.

6              MS. SESSIONS:  I'm happy to lay a foundation, Your

7    Honor.

8              THE COURT:  Go ahead.

9    BY MS. SESSIONS:

10   Q    Mr. Stewart, do you recognize this document?

11   A    I do.

12   Q    What is it?

13   A    A planning document that was used in September of '21

14   to plan for 2022.

15   Q    Okay.  And this says ALCS on it.  What is ALCS?

16   A    America's large customer sales.

17   Q    And so is that your group at Google?

18   A    Yes.  Yes.

19   Q    Was this document prepared in the ordinary course of

20   Google's business?

21   A    It was.

22   Q    And did the people who prepared it have knowledge of

23   its contents when they made it?

24   A    They did.

25              MS. SESSIONS:  I move to admit Defense

                                                              62

Direct examination - A. Stewart

1    Exhibits 1132, Your Honor.

2              THE COURT:  It's in.

3              MS. SESSIONS:  Thank you.

4    BY MS. SESSIONS:

5    Q    If you could, please turn to page 5 of this document.

6         There's a section that begins at page 5.  Could you

7    just explain what this section of the document is?

8    A    Yeah.  If I could get that -- is it page 5 or -- oh,

9    sorry.  Yeah, Market & ALCS context.  So this is just a look

10   at -- as we're planning for the next year, we want to

11   understand what's happening in the market -- in the

12   advertising market in the Americas and then also

13   contextualize it for where we are in that market as well.

14   Q    Could you turn to page 9, please, in that document.

15        And what does page 9 reflect?

16   A    A competitive environment.  So what we're looking at

17   here are Facebook ads, which were having growth that was

18   faster than Google Ads despite a narrow gap you see there;

19   Amazon; and Microsoft within search.  And then sharing

20   non-search ads, what we saw was that there was continued

21   growth happening with companies like TikTok, Snap,

22   Pinterest, and Twitter.

23   Q    The non-search ads on the right-hand side of this

24   slide, would that include display ads?

25   A    Display and video.

Direct examination - A. Stewart

1   Q    Okay.  Could you please turn to page 10.

2        And I'd like to ask you about the last point on the

3   left-hand side with the little arrows.  It says, "Ability to

4   quickly shift resources to cost-effective, efficient digital

5   platforms when necessary."

6   A    Yeah.

7   Q    Do you see that?

8   A    I do.

9   Q    How did this relate to Google's large customer sales

10  business planning in 2022?

11  A    We recognized that our partners and our CMOs were under

12  incredible pressure to deliver the highest amount of return

13  they can for the investment that they were making.  This

14  particular point is basically pointing towards the fact that

15  CMOs had a lot of choice and that they were going to be able

16  to make decisions, that they were going to make decisions

17  based on the choice they have and at times -- continuing

18  through today -- they are always looking for the most

19  cost-effective and efficient platforms.

20  Q    Could you, please, then turn to page 12.

21       This page starts with a heading, "eCommerce remains a

22  dynamic space."

23       Do you see that?

24  A    I do.

25  Q    Could you explain what this eCommerce point is and how

64

Direct examination - A. Stewart

1   it relates to planning for Google's large customer business

2   2022?

3   A    Yes.  So the eCommerce trend that grew so rapidly

4   during COVID changed how consumers were buying products.

5   And when consumers were shifting from buying things in

6   retail stores to buying things online, Walmart, CVS, Target

7   Home Depot and the other companies you see there, it

8   basically changes how those marketers are thinking about

9   their advertising.

10  Q    How does it change how marketers are thinking about

11  their advertising?

12  A    In this case, marketers were thinking about -- with the

13  movement towards eCommerce, marketers -- back to the

14  previous point about having measurable accountable cost

15  efficient and effective advertising.  In this case, it's

16  highly measurable when a transaction takes place online.

17  Q    This slide also says kind of on the right-hand side,

18  "Competition increasing as existing and new players react to

19  consumer behavior."

20  A    Yes.

21  Q    What does that mean?

22  A    This just meant that as this was taking place in other

23  companies -- like Amazon is obviously very large in

24  eCommerce -- that that was just increasing the competitive

25  environment for us.  This kind of led to what we were

Direct examination - A. Stewart

1  talking about before with regards to the rising of retail

2  media networks.

3  Q    All right.  You can put that document aside.

4       Thank you.

5       Does Google also face competition from companies that

6  offer buying tools for display ads?

7  A    We do.

8  Q    Could you give me some examples?

9  A    The Trade Desk is a good example.  Yahoo would be

10 another example.

11 Q    How is Yahoo a competitor?

12 A    Yahoo has a DSP, and they are often competing for the

13 same DSP opportunities that we are.

14 Q    Okay.  And then you mentioned The Trade Desk?

15 A    The Trade Desk.

16 Q    How is The Trade Desk a competitor?

17 A    A very big DSP.  They work with a lot of partners.

18 Q    Okay.  Is The Trade Desk -- I believe you testified

19 before The Trade Desk is involved in retail media networks.

20 A    They are.

21 Q    Does Google do competitive analyses of companies like

22 The Trade Desk?

23 A    We do.

24 Q    Okay.  If you could, turn to Tab 4 of your binder,

25 please, and this is Defense Exhibit 1053.

1      Mr. Stewart, I'll ask you:  Do you recognize Defense

2   Exhibit 1053?

3   A     I do.

4   Q     What is it?

5   A     This is a competitive overview of The Trade Desk.

6   Q     Was this competitive overview of The Trade Desk

7   prepared in the ordinary course of Google's business?

8   A     It was.

9   Q     And did the person who prepared this competitive

10   overview have knowledge of its contents when they made it?

11   A     Yes.

12          MS. SESSIONS:  Your Honor, we move to admit

13   Defense Exhibit 1053.

14          THE COURT:  All right.  It's in.

15          MS. SESSIONS:  Thank you, Your Honor.

16   BY MS. SESSIONS:

17   Q     Could you please turn to page 4, again, of the version

18   behind the blue sheet.

19   A     Yeah.

20   Q     Could you please explain what's being shown on page 4.

21   A     Yeah.  What we were looking at page 4 was essentially a

22   view in terms of the reasons why customers were choosing The

23   Trade Desk as compared to DV360 and listing them with dollar

24   amounts that were assigned to them in terms of what we had

25   already lost or what we felt was at risk on the basis of

                                                              67

1    these different areas of product.

2    Q     Could you explain what the CTV bar is?

3    A     Yeah, connected television.

4    Q     Okay.  And then there's a bar that says targeting

5    limits.

6    A     Yeah.

7    Q     What is that?

8    A     This is a reference to categories that Google deems as

9    sensitive categories, like pharma and gambling, where we

10   have different policies than The Trade Desk does.  Our

11   policies don't offer some of the same things that The Trade

12   Desk does in terms of maybe targeting capability for others.

13   So we felt and saw here that we had lost some customers in

14   this area and we were at risk for losing more as a result of

15   the policy differences between Google and The Trade Desk.

16   Q     Are these policy differences a competitive

17   differentiator for The Trade Desk?

18   A     Yes.

19            MR. TESLICKO:  Your Honor, leading.

20            THE COURT:  Sustained.

21   BY MS. SESSIONS:

22   Q     How, if at all, does this policy point affect

23   competition with The Trade Desk?

24   A     It significantly affects competition with The Trade

25   Desk because they are willing to do things in a way that

68

Direct examination - A. Stewart

1    maybe the marketers had chosen but that Google won't let

2    them.  So it gives them a competitive advantage.

3    Q     And please hold the microphone up.

4    A     Sorry about that.

5    Q     Thank you.

6          Mr. Stewart, do you know what The Trade Desk's Open

7    Path is?

8    A     I believe I know what Open Path is.  I think this is

9    their new SSP version of what they're doing, but I don't

10   know that much about it.

11   Q     Could you turn to page 8, please.

12         Could you please explain what's being shown on page 8?

13   A     Yeah.  This is an analysis of the cost and fee

14   structure between Google -- between DV360 and The Trade

15   Desk, including take rate and other factors.

16   Q     And I want to ask you about a couple of lines here.  So

17   maybe let's start with fraud and brand safety.  Do you see

18   that?

19   A     Yes.

20   Q     What does it mean when it says CPM fee under The Trade

21   Desk?

22   A     Yeah.  This is a common discussion that we have with

23   our partners when they're evaluating Google DV360 against

24   The Trade Desk.  And what this references to is that Google

25   DV360 provides this fraud and brand safety protection at no

69

Direct examination - A. Stewart

1   cost, and The Trade Desk has additional fees above and

2   beyond their rate in order for an advertiser to utilize

3   those services.

4   Q    In your experience, whose all-in fees are higher?

5   Google's or The Trade Desk?

6   A    In my experience, The Trade Desk is higher.

7   Q    And is that because of some of these added CPM fees?

8   A    It is definitely driven by the additional fees that

9   advertisers get -- with advertisers, this is a discussion

10  that we have, I think, when they look back.  While their

11  take rate differential could be lower in some cases, most

12  advertisers are utilizing these services, audience data,

13  contextual targeting, all of these other things here.  And

14  by the time they look back, many do find that their fees

15  with The Trade Desk are higher than their fees are with

16  Google DV360.

17  Q    All right.  You can now put that document aside.

18       Thank you.

19       Mr. Stewart, have there been any notable new entrants

20  in the digital advertising market in recent times but before

21  September of 2023?

22  A    Yeah.  I think the most notable new entrant in

23  advertising is Netflix.

24  Q    And could you explain what you mean by that?

25  A    Yeah.  So Netflix for a very long period of time said

Direct examination - A. Stewart

1   that they were never going to accept ads.  But as their

2   business continued to change and consumption changed to many

3   other things, Netflix decided to create an ad tier for their

4   business where for a lower subscription price, you would

5   gets ads with your Netflix.

6   Q     Was Google trying to support Netflix when it launched

7   this advertising product?

8   A     We were, yes.

9   Q     What happened?

10  A     So there were multiple companies that were talking to

11  Netflix at this time to become the tech provider DSP, and

12  Netflix -- I think Microsoft, NBCU, Google, and probably

13  some others were in that discussion.  Ultimately, Netflix

14  chose Microsoft.

15  Q     And what did it mean when Netflix chose Microsoft?

16  A     That they chose Microsoft to be their partner in

17  building out their ad platform.

18  Q     What, if anything, did that mean for where marketers

19  could buy ads on Netflix?

20        MR. TESLICKO:  Objection, Your Honor.  I just ask

21  for a clarification on when the events being discussed

22  happened, if that was past the discovery cutoff in this

23  case.

24        THE COURT:  I think that was the preface in the

25  question originally about Netflix.

Direct examination - A. Stewart

1           MS. SESSIONS:  Yes.

2           THE COURT:  More specifically, do you know?

3           THE WITNESS:  This goes back several years, two

4   plus, maybe three.

5           MR. TESLICKO:  Okay, Your Honor.

6   BY MS. SESSIONS:

7   Q    Okay.  So what, if anything, did this partnership mean

8   for the availability of ads on Netflix?

9   A    They were going to be sold by Microsoft.

10  Q    Mr. Stewart, has Google also -- has Google partnered

11  with any companies that might have previously been known as

12  walled gardens to buy ads on their platforms?

13  A    We have.

14  Q    Could you give an example?

15  A    Sure.  So right now there are a few companies

16  considered perhaps as walled gardens where you can buy ads

17  through Google.  Pinterest would be one.  X would be

18  another.

19  Q    And is X -- what was X formerly known as?

20  A    Formerly known as Twitter.

21          MS. SESSIONS:  And just for the record -- I

22  understand that previously there had been an objection to

23  this testimony as potentially involving things that were not

24  disclosed during the fact discovery period.  But we, in

25  fact, went back and looked, and Google did produce documents

72

Direct examination - A. Stewart

1    to the Department of Justice that reflect these partnership

2    discussions during the fact discovery period.

3    BY MS. SESSIONS:

4    Q    Mr. Stewart, one last question for you, I hope.

5         You've worked at Google for a long time?

6    A    I have.

7    Q    Why do you stay working at Google?

8    A    So I've been advertising for 33 years.  You were kind

9    with the 20s.  So thank you for that.

10        And in my career in advertising -- selling Discovery

11   and coming up with Discovery was a really great experience,

12   but I never really was able to see the impact of the work

13   that we were doing.  I couldn't really tell if the ads that

14   we were making available were really, truly making a

15   difference.

16        And one of the things that I've experienced at Google

17   and one of the reasons why I've stayed at Google for as long

18   as I have is because I can sit across from our partners and

19   show them what we've done.  I have the opportunity to work

20   with partners like St. Jude, who at one point in time were

21   really struggling to find their next generation of donors.

22   And we helped them understand how to use YouTube.  And so

23   when we can do work that helps -- whether it's St. Jude or

24   General Motors -- and really see the impact of the work,

25   that's created meaning for me in what I do.

1              MS. SESSIONS:  Thank you, Mr. Stewart.

2              I pass the witness.

3              THE COURT:  Go ahead.

4              MR. TESLICKO:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6      BY MR. TESLICKO:

7      Q    Good afternoon, Mr. Stewart.  My name is David

8      Teslicko.  I'm an attorney for the Department of Justice.

9           Mr. Stewart, just to clarify, you are part of the sales

10     organization at Google, correct?

11     A    That's correct.

12     Q    You ultimately report up to Philipp Schindler, Google's

13     chief business officer?

14     A    I do.

15     Q    And you're not part of the ads product management group

16     at Google, right?

17     A    I'm not.

18     Q    And you're also not part of the ads engineering group

19     at Google, correct?

20     A    I'm not.

21     Q    And you mentioned you primarily work with advertisers,

22     right?

23     A    That's correct.

24     Q    Not website publishers?

25     A    No.

1   Q    Okay.  And just to clarify, which products does your

2   team sell?

3   A    We sell across Google's ad products.  So search,

4   display, DV360, YouTube.

5   Q    And your team does not sell, for example, the DFP

6   publisher ad server, right?

7   A    No.

8   Q    Your team does not sell the AdX ad exchange?

9   A    No.

10  Q    Now, I think you mentioned this briefly.  You

11  previously did work for a website publisher, Discovery,

12  correct?

13  A    Yeah.  When I worked for Discovery, it was a cable

14  channel.  Websites were coming up in that era.  So I was

15  there during that period.

16  Q    Okay.  Did Discovery have a website at the time?

17  A    Towards the latter part of my tenure but not in the

18  beginning.

19  Q    Okay.  Based on your experience at Google, you would

20  agree with me that a website publisher can't use a tool like

21  DV360 to sell inventory on their website, right?

22  A    I'm not sure I understand your question.

23  Q    Sure.  Can a website publisher, like Discovery now, use

24  DV360 to sell advertising?

25  A    No.

Cross-Examination - A. Stewart

1  Q    Okay.  In your public speeches, Mr. Stewart, you often

2  talk about the importance of using the right mix of

3  advertisements, right?

4  A    I do.

5  Q    Okay.  And that means advertisers generally should use

6  more than one form of advertising; is that right?

7  A    Most advertisers do.

8  Q    Would it be fair to say that for many advertisers,

9  display advertising is important to having the right mix

10  overall?

11  A    For some.

12  Q    For many?

13  A    I would say for some.

14  Q    And that's true for the LCS advertisers, the large

15  advertisers that you work with, right?

16  A    Yes.

17  Q    And you would agree that different forms of digital

18  advertising can have different reach?

19  A    Yes.

20  Q    For example, you're involved in advertising sales for

21  YouTube, right?

22  A    I am.

23  Q    Not everyone uses YouTube?

24  A    No.

25  Q    So an advertiser that buys on YouTube might also buy

Cross-Examination - A. Stewart

1    display ads on the open web to reach additional Internet

2    users, right?

3    A    Yes.

4    Q    Different forms of advertising can also impact Internet

5    users differently; is that fair?

6    A    I'm not sure what you mean by impact.

7    Q    Sure.  We'll go to an example.  For example, Google

8    markets video ads, in part, because they typically have

9    sound on and they play automatically when an Internet user

10   visits the website, right?

11   A    Yes.

12   Q    And by contrast, display ads normally have sound off,

13   right?

14   A    To clarify though, not all video ads have sound on on

15   load.

16   Q    Okay.  Let's focus on in-stream video ads.  Do

17   in-stream video ads typically have sound on?

18   A    On YouTube, yes.

19   Q    And by contrast, you would agree that display ads

20   typically have sound off?

21   A    I can't say that with certainty.  There's a lot of use

22   cases.

23   Q    Now, Google also markets itself as providing a full

24   funnel solution; is that right?

25   A    Yes.

Cross-Examination - A. Stewart

1  Q     And the funnel refers to advertising that targets

2  consumers in different ways -- right?

3  A     That's correct.

4  Q     -- at different points in their decision-making

5  process?

6  A     That's correct.

7  Q     And you'd agree with me that certain types of

8  advertising, like search, are generally thought of as lower

9  funnel advertisements, right?

10 A     For some.

11 Q     And other types of advertising, such as display

12 advertising, can be better suited toward upper funnel brand

13 awareness campaigns?

14 A     For some.

15 Q     Now, on direct, you testified about the importance of

16 measurement to advertisers.  Do you remember that testimony?

17 A     I do.

18 Q     What exactly did you mean by measurement?

19 A     What I meant by measurement were in the example that I

20 gave, which was of an MMN.  The ability to measure the

21 impact of the advertising that you're doing across channels,

22 across partners to understand how effective that is in terms

23 of generating your return on ad spend.

24 Q     And what type of data does Google use to measure

25 attribution for advertisers in connection with MMNs?

78

Cross-Examination - A. Stewart

1  A    I'm not an expert in attribution, but Google provides

2  data.  To answer the latter part of your question, Google

3  and other providers, Meta and others, provide data to MMNs

4  who are third parties for the MMNs to apply the measurement.

5  Q    You talked about Google Ads on your direct; is that

6  right?

7  A    I did.

8  Q    And Google Ads provides measurements along the lines of

9  conversions and attributions, correct?

10 A    Yes.

11 Q    Where does the data come from that Google uses to

12 measure attributions or conversions on Google Ads?

13        MS. SESSIONS:  I object as to outside the scope,

14 and I object on foundation grounds.

15        MR. TESLICKO:  Your Honor, I could ask if he knows

16 this, but he did testify about the importance of measurement

17 on Google Ads.

18        THE COURT:  Go ahead and ask your foundation.

19 BY MR. TESLICKO:

20 Q    Mr. Stewart, do you have a general understanding of

21 where the data comes from that Google Ads uses to provide

22 measurement that you said was important to advertisers?

23 A    For Google Ads?  For which part of Google Ads?

24 Q    Let's focus on Google Ads display advertisement earning

25 returns on Google Ads.

Cross-Examination - A. Stewart

1    A    A general understanding.

2    Q    Okay.  And where does the data come from that Google

3    uses to track measurement for a display campaign on Google

4    Ads?

5    A    I'm just not an expert in this area of the exact

6    sources of data that are going to provide that measurement.

7    Q    Do you have any general understanding about the sources

8    Google uses to track measurment on Google Ads?

9    A    There are clicks on those ads.

10   Q    Do you know if Google uses data from its various other

11   services to track measurement of the performance of ad

12   campaigns on Google Ads?

13   A    I'm not sure what you mean by your question.

14   Q    Sure.  Does Google use any data from its logged-in

15   services on Google search or YouTube or Gmail to track

16   measurement of Google Ads' campaigns?

17   A    You're asking specifically if logged-in users -- if

18   that data is used to track or to measure.  Again, I'm not an

19   expert on how logged-in data is used.  So I assume it plays

20   a role, but I can't be specific on it.

21   Q    Okay.  Do you know if Google shares that data with any

22   other ad tech entities?

23            MS. SESSIONS:  Again, Your Honor, he just said he

24   doesn't know.

25            THE COURT:  Well, this is a different question.

80

Cross-Examination - A. Stewart

1    This is about sharing.

2         MS. SESSIONS:  Okay.  If we could be more specific

3    then about what data is being asked in the question.

4         THE COURT:  All right.  Logged-in data, correct?

5    BY MR. TESLICKO:

6    Q    Sure.  Does Google share any data associated with its

7    logged-in services with other ad tech companies?

8    A    No.

9    Q    Okay.  Now, you mentioned, Mr. Stewart, that you and

10   your team are responsible for selling both Google's

11   advertising -- both of Google's advertising buying tools,

12   DV360 and Google Ads, right?

13   A    That's correct.

14   Q    And you'd agree that those are different products?

15   A    Google Ads and DV360 are different buying doors to buy

16   ads.

17   Q    Uh-huh.  And you mentioned on direct that several

18   advertisers use both DV360 and Google Ads when we're talking

19   about the large advertisers you work with, right?

20   A    I only work with large advertisers.

21   Q    So the answer is for the large advertisers you work

22   with, many do use both Google Ads and DV360?

23   A    Some do.

24   Q    Some do.  Okay.

25        If you could, turn in your binder to what's marked --

81

Cross-Examination - A. Stewart

1   the tab that's marked DTX 1514.

2              THE COURT:  Are you moving that in?

3              MR. TESLICKO:  Yes, Your Honor.

4              THE COURT:  Any objection?

5              MS. SESSIONS:  No, Your Honor.

6              THE COURT:  All right.  It's in.

7   BY MR. TESLICKO:

8   Q    Now, if we look at the title of -- the title slide of

9   this presentation, it says, "Learn with ASAP, Google

10  Marketing Platform Foundations."

11       Do you see that?

12  A    I do.

13  Q    And Google marketing platform, is that what you and

14  your team sell?

15  A    DV360 is part of Google marketing platform.

16  Q    Sure.  And if we go to page 52 of the exhibit -- and

17  the page numbers are at the bottom of the DTX exhibits --

18  this slide shows that DV360 and Google differ in a number of

19  ways, right?

20  A    Yes.

21  Q    And in particular, this slide calls out that Google Ads

22  and Display & Video 360 have different fee structures,

23  correct?

24  A    That's correct.

25  Q    And they also have different measurement and tracking

1   capabilities based on this slide, right?

2   A    That's correct.

3   Q    And if you look down at management, DV360 typically

4   requires a trading desk, agency, or in-house team of

5   professionals to manage DV360, right?

6   A    I see that.

7   Q    And that's correct, right?

8   A    Yes.

9   Q    By contrast, Google Ads does not require a management

10  team of the type required by DV360?

11  A    That's correct.

12  Q    And you'd agree that Google markets the two tools to

13  different types of advertiser clients, right?

14  A    No.

15  Q    Okay.  DV360 is generally for enterprise-level clients,

16  such as ad agencies and large marketing organizations,

17  correct?

18  A    That's correct.

19  Q    And DV360 is better for clients that want more control

20  and customization in executing their media buys, right?

21  A    There's control and customization available through

22  both buying doors.

23  Q    You would agree there's more control and customization

24  for DV360 versus Google Ads, right?

25  A    Yes.

Cross-Examination - A. Stewart

1   Q     And DV360 is better for advertisers who want to

2   integrate with third-party tools, right?

3   A     That's correct.

4   Q     And that includes third-party exchanges?

5   A     I'm not sure what you mean by third-party exchanges.

6   Q     Non-Google exchanges, non-Google ad exchanges?

7   A     Yes.

8   Q     And that's also true for third-party measurement and

9   targeting tools, right?

10  A     Not exclusively true, no.  Because certain -- there are

11  third-party measurement tools.  There can be different

12  integrations with them.  Some are available to one.  Some

13  are available to the other.  Some are available to both.

14  Q     Okay.  Are there any measurement tools or targeting

15  tools available only to DV360 customers versus Google Ads

16  customers?

17  A     I'm not sure.

18  Q     Okay.  If we could, turn to Slide 57.

19        Now, this slide reflects Google's sales strategy to

20  sell Google Ads as a complementary tool to clients already

21  using DV360, right?

22  A     It does.

23  Q     Okay.  And features of DV360 that are listed on this

24  slide include some of the ones we just talked about, right?

25  A     That's correct.

1   Q    And looking at the very first items in features, in the

2   section called features of DV360, it highlights one of those

3   features below the cross-channel media buying section as,

4   "Including access to 3rd Party exchanges."

5        Do you see that?

6   A    I do.

7   Q    And Google markets DV360 -- one of the features of

8   DV360 that Google markets is integration with third-party ad

9   exchanges, right?

10  A    Yes.

11  Q    Okay.  And on the box to the right, there's a section

12  called Google Ads.  Do you see that?

13  A    I do.

14  Q    And these are distinct features of Google Ads as

15  compared to DV360, right?

16  A    That's correct.

17  Q    Okay.  And if you flip to page 58 -- it's the next

18  page -- this is kind of the flip side of the slide we just

19  looked at, right?  This is Google's sales strategy to sell

20  DV360 to certain Google Ads customers, right?

21  A    Yes.

22  Q    And if you look, again, at the cross-channel campaigns

23  box in the Google Ads features section of this slide, it

24  talks about optimizing spend across a O&O and display

25  networks.

Cross-Examination - A. Stewart

1       Do you see that?

2  A    I do.

3  Q    And O&O means Google owned-and-operated properties,

4  right?

5  A    That's correct.

6  Q    And display network is Google's network of partners,

7  correct?

8  A    Yes.

9  Q    There's no mention on this slide about access to

10 third-party exchanges or non-Google ad exchanges, right?

11 A    No.

12 Q    If you could, put that document to the side.

13      Now, on direct, Mr. Stewart, you talked about

14 DemandGen.  Do you remember that?

15 A    I do.

16 Q    Where does DemandGen allow advertisers to run

17 advertising?

18 A    Within the areas that I talked about, the Google feed

19 surfaces.

20 Q    And just to clarify, on your direct, you didn't mention

21 that DemandGen runs ads on third-party open-web websites; is

22 that right?

23 A    That's correct.

24 Q    Okay.  So an advertiser using DemandGen can't place a

25 display ad on washingtonpost.com, for example?

Cross-Examination - A. Stewart

1    A    No.

2    Q    Okay.  And Google developed DemandGen to target

3    advertisers that were buying media -- advertising on social

4    media websites, right?

5    A    I can't speak to the origin of the product.

6    Q    But you were -- you were involved in selling the

7    DemandGen product, right?

8    A    Yes.

9    Q    And you were around and part of the business when

10   DemandGen was created as a product?

11   A    Yes.

12   Q    Based on your understanding of the product, was it

13   originally developed, in part, to sell to advertisers that

14   were advertising on social media websites?

15   A    Yes.

16   Q    Okay.  Now, have you ever heard of the concept of

17   demand fulfillment?

18   A    No.

19   Q    Okay.  I'll skip that.

20        Now, if we could pull up the demonstrative that you

21   used during your testimony --

22        And I don't know if I need Mr. Spalding's help for

23   this.

24        So if we tick through these a bit in turn.  Just to

25   clarify, DemandGen and Discover, this is an ad that's

Cross-Examination - A. Stewart

 1   showing on a Google surface, right, a Google

 2   owned-and-operated property?

 3   A    That's correct.

 4   Q    Okay.  And the tool that advertisers have to use to

 5   place a DemandGen advertisement like this is Google Ads,

 6   right?

 7   A    That's correct.

 8   Q    Okay.  And if we look at the middle section, which is

 9   Instagram, what tool is used to sell advertising like this

10   one on Instagram?

11   A    Facebook's tool.

12   Q    Okay.  An advertiser can't use DV360 or Google Ads to

13   place the ad shown in the middle of this slide on Instagram,

14   right?

15   A    They cannot.

16   Q    Okay.  And then looking over to the right, just to

17   clarify, this is showing *The Washington Post* app, right?

18   A    Yes.

19   Q    Not the mobile website for the *Washington Post*?

20   A    I believe so.

21   Q    If we could, pull up DTX 486, which you were shown on

22   direct, and go to page 4.  It's going to be back in the

23   black binder that you had, or we will put it up on the

24   screen.

25   A    Where is it in the binder?

Cross-Examination - A. Stewart

1   Q    DTX 486.  It's also on the screen.

2   A    I'll use the screen.

3   Q    Okay.  And I wanted to direct your attention to the

4   Note 1 at the bottom of this slide that I don't think you

5   read before.  It says, "Here and throughout this document

6   GDN is defined solely as GDN sales, i.e., does not include

7   video sold via AdWords."

8        Do you see that?

9   A    I do.

10  Q    And that means that any video ads are not included in

11  the figures reported here?

12  A    Not that I'm aware of.

13  Q    Okay.  And this is an indication of Google separately

14  tracking video ad sales on Google Ads from other types of

15  display advertising, right?

16  A    In this document.

17  Q    Okay.  And then also on that same slide, staying there,

18  you were shown a statistic in the second bullet of the

19  second section about dual platform use.  Do you see that?

20  A    I do.

21  Q    And there's a reference here to this statistic relating

22  to LCS accounts.  Do you see that?

23  A    I do.

24  Q    Can you just clarify what is an LCS account?

25  A    Large customer sales.

Cross-Examination - A. Stewart

1    Q     And those are the customers that you work with, right?

2    A     They are.

3    Q     What makes somebody a large customer for purposes of

4    qualifying as an LCS account?

5    A     Generally, a threshold of spend coupled with other

6    aspects, like the sophistication and needs of the marketer.

7    Q     Roughly, how much does an advertiser need to spend to

8    be an LCS account?

9    A     Roughly, $25 million to $30 million annually.

10   Q     And you have no reason to believe that the statistics

11   shown on this slide would apply to non-LCS accounts, right?

12   A     I don't know that.

13   Q     Okay.  If we can go to page 7, I just want to clarify

14   one thing on here.  You were shown this slide earlier, and

15   this reported --

16   A     Sorry.  It's hard to see.

17         MR. TESLICKO:  Yeah, if we could, zoom in a

18   little.

19   BY MR. TESLICKO:

20   Q     -- the percent of clients that represent revenue.  If

21   we look at the client's column here, it says "N = 1,175."

22   What does that mean?

23   A     I'm assuming that's a reference to the number of

24   clients that were included in this data.

25   Q     And you're aware that well over 1,175 advertisers use

Cross-Examination - A. Stewart

1    GDN, right?

2    A    Yes.

3    Q    Is this limited to LCS advertisers or some other

4    limitation?

5    A    This would be an LCS representation.

6    Q    Okay.  I ask that just to clarify.  This statistic is

7    not reporting on the concentration of Google Ads' customers

8    overall in terms of their relative share of revenue, right?

9    A    This is a discussion -- it's a document from a

10   discussion with LCS.

11   Q    I'm sorry.  I want to go back to page 4.  I missed one

12   question there.  If we can, go back to Slide 4.

13        You were asked questions about the very first bullet

14   here which talked about significant competition, primarily

15   from Facebook, Criteo, and Amazon.  Do you remember that?

16   A    I do.

17   Q    And you're aware that Facebook exited the market for

18   open-web display advertising sales after this deck was

19   created, right?

20   A    I don't know the sequence of when they entered or

21   exited the market.

22   Q    You're aware that Facebook does not sell open-web

23   display advertising today, right?

24   A    They have an external app business, so a network.  But

25   I am aware of what you're speaking to.

Cross-Examination - A. Stewart

1   Q    Okay.  And just to be clear, when we're talking about

2   competition here, Facebook, Criteo, Amazon, none of them

3   offer an ad exchange to your knowledge, right?

4   A    Not that I'm aware of.

5   Q    Okay.  And you'd agree that Criteo is a highly

6   specialized advertiser ad network?

7   A    Not necessarily.

8   Q    You're aware that Criteo buys particular types of ads

9   on the open-web?

10  A    I don't follow all of Criteo's business.

11  Q    Do you have a general sense that Criteo has a

12  specialized business with respect to the types of ads that

13  it purchases?

14  A    I can't speak to that.

15  Q    Okay.  You were earlier asked about smaller advertisers

16  that buy in some manner through DV360.  Do you remember that

17  discussion?

18  A    I do.

19  Q    When you were talking about smaller advertisers, what

20  size advertisers were you referring to?

21  A    I think in the examples that I gave I was talking about

22  franchisees of quick-serve restaurants.  I was talking about

23  automotive dealer groups.  So that's the level that I'm

24  talking about.

25  Q    Just to clarify your testimony on direct, when those

Cross-Examination - A. Stewart

1    smaller franchisees or automotive dealers are buying on

2    DV360, are they buying through an agency or a group of

3    franchises or dealerships?

4    A    Yes, in some cases.

5    Q    They're not individually going out and buying

6    advertising on DV360, correct?  Let me ask a better

7    question.

8         An individual automobile dealership does not have its

9    own account on DV360, right?

10   A    Not that I'm aware of.

11   Q    The same thing with a one-off or a small number of

12   franchisees.  What you were describing on direct is not that

13   a franchisee has their own DV360 account that they can use

14   to buy online advertising?

15   A    I don't know that.

16   Q    And based on your knowledge of DV360, what is the --

17   when you were talking about smaller customers that buy on

18   DV360, approximately how much ad spend is purchased by a

19   smaller customer of the type you were describing?

20   A    I don't have that data.

21   Q    Do you have a rough ballpark?

22   A    I don't.

23   Q    On your direct testimony, you brought up Walmart

24   Connect.  Do you remember that discussion?

25   A    I do.

Cross-Examination - A. Stewart

1   Q    Does Walmart Connect have its own DSP?

2   A    Walmart has a DSP that's powered by The Trade Desk.

3   Q    And by that, you mean they're using The Trade Desk

4   technology to operate a DSP?

5   A    I believe so.

6   Q    Throughout your testimony today, you've talked about

7   LCS clients, smaller clients, and torso clients.  As part of

8   your role at Google, you separately track LCS clients, torso

9   clients, and smaller clients, right?

10  A    Can you clarify within LCS?

11  Q    Sure.  Within Google, does Google separately track LCS,

12  torso clients, and smaller advertising clients?

13  A    I don't think I can speak to the broader segmentation

14  of Google's customers.

15  Q    And then the last document I want to go to -- I just

16  want to pull up DTX 1132.  And if we can, go to page 9 of

17  this deck.  This is the ALCS planning deck.  And you were

18  shown this slide on direct.  Do you remember that?

19  A    I do.

20  Q    At the very top of this slide, it says, "Our market

21  position remains strong."

22       Do you see that?

23  A    I do.

24  Q    That's referring to Google's market position, right?

25  A    That's what it says on this slide.

94

Redirect Examination - A. Stewart

1   Q    And just looking at the box below it, for Amazon, which

2   is in the middle box, it says, "Amazon's strength in Search

3   Ads indicates they are taking market share."

4        Do you see that?

5   A    I do.

6   Q    And if we look at the graph below, it's comparing

7   Amazon, Microsoft search, and Google search, right?

8   A    Yes.

9   Q    This is not reporting display advertising spend, right?

10  A    I'm not sure.  I believe it's a representation of

11  search.

12           MR. TESLICKO:  No further questions, Your Honor.

13           THE COURT:  All right.  Any redirect?

14           MS. SESSIONS:  Yes, briefly, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MS. SESSIONS:

17  Q    Mr. Stewart, could you go back in the white binder to

18  DTX 1514, please.  This is the Google marketing platform

19  document you discussed on cross.

20  A    Yes.

21  Q    Could you please turn to page 43.  Mr. Stewart, you can

22  maybe see it on the screen.

23       Could you read the speaker notes under the platform

24  value props slide here?

25  A    Sure.  "Now that I've told you how similar Google Ads

1   and DV360 are -- why would someone use one or the other?

2   Both?  Like so many situations, it totally depends on a

3   variety of factors, including client preference.  There is

4   no set formula but I'll attempt to overview how we think

5   about it as sellers and how clients may think about it."

6   Q   Do you agree that whether a customer would use Google

7   Ads, DV360, or both depends on a variety of factors,

8   including client preference?

9   A   Yes.

10  Q   Do you agree that there's no set formula for whether a

11  client would use Google Ads, DV36o, or both?

12  A   Yes.

13  Q   Okay.  If you could, go to page 51 of this document,

14  please.

15      What stages of the funnel, at least according to this

16  slide, does DV360 offer advertising for?

17  A   From the top of the funnel to the bottom of the funnel,

18  awareness to conversion.

19  Q   Could you turn to page 74, please.

20      And this page shows a Google Ads versus Google

21  marketing platform product mapping, right?

22  A   That's correct.

23  Q   Do Google Ads and the Google marketing platform share

24  certain common features?

25  A   They do.

1   Q    Are many of them listed here?

2   A    They are.

3   Q    All right.  You can put that document aside.

4        Mr. Stewart, you were asked some questions about the

5   description of competition with Facebook, and then you were

6   asked whether Facebook exited the open-web display business.

7   Do you recall that?

8   A    Yes.

9   Q    Okay.  If you could, now turn to page 11 in the black

10  binder -- or Tab 11 in the black binder, please.

11            THE COURT:  What page?

12            MS. SESSIONS:  I'm going to just ask Mr. Stewart,

13  first, if he recognizes this document which has been marked

14  as Defense Exhibit 494.

15            THE WITNESS:  I do.

16  BY MS. SESSIONS:

17  Q    Okay.  What is it?

18  A    Competitive analysis from November of '17 looking at

19  case studies between Facebook and Google.

20  Q    And was this competitive analysis prepared in the

21  ordinary course of Google's business?

22  A    Yes.

23  Q    And this competitive analysis is from -- I think you

24  said 2017.

25  A    Correct.

1    Q    And is that a similar time period to the document that

2    you were discussing with my colleague on cross-examination?

3    A    I'm sorry.  Which document?

4    Q    We can go back to it if I can find it.

5         The one at Tab 5, which is DTX 486.

6    A    Yes.

7    Q    What's the date of this document?

8    A    This is November of '17.

9    Q    Okay.  And so you recall when being asked about that

10   document, you were asked whether Facebook had exited the

11   open-web display --

12   A    I recall the question.

13   Q    Okay.  Now, if you can, turn back to Tab 11, Defense

14   Exhibit 494.

15            THE COURT:  Are you moving that in?

16            MS. SESSIONS:  I will, Your Honor, yes.

17            MR. TESLICKO:  I just don't think counsel has laid

18   a foundation about Mr. Stewart's connection with this

19   document, if any.

20            MS. SESSIONS:  Your Honor, he testified it was a

21   competitive analysis prepared in the ordinary course of

22   business, and this is now being offered to show the way in

23   which Google was thinking about competition with Facebook at

24   the very same time.

25            THE COURT:  I'm permitting it.

Redirect Examination - A. Stewart

1           MS. SESSIONS:  Thank you, Your Honor.

2     BY MS. SESSIONS:

3     Q    Mr. Stewart, just quickly on this document, does -- is

4     this document analyzing competition with Facebook for -- in

5     tools to purchase open-web display advertising?

6           MR. TESLICKO:  Objection, Your Honor.  Leading.

7           THE COURT:  Sustained.

8     BY MS. SESSIONS:

9     Q    Okay.  What Facebook products are being assessed in the

10    document at Tab 11?

11          THE COURT:  The witness shouldn't have to sit here

12    and read this.  Is there a page you want him to look at?

13          MS. SESSIONS:  Sure, Your Honor.

14    BY MS. SESSIONS:

15    Q    If you go to page 7 --

16    A    Yes.

17    Q    -- Mr. Stewart, what Facebook product is being -- oh,

18    this is page 4 of the one that you are looking at.  Sorry.

19    There we go.

20        What Facebook product is being analyzed on this page?

21    A    We are looking at Instagram.  We're looking at the

22    Facebook page, and we're looking at what looks like a

23    third-party page in Hubble.

24    Q    So the ads shown on Facebook and Instagram properties?

25    A    I believe so.

Direct Examination - A. Borgia

1  Q    Okay.  You can put that document aside.

2            MS. SESSIONS:  No further questions, Your Honor.

3            THE COURT:  Any recross?

4            MR. TESLICKO:  No recross, Your Honor.

5            THE COURT:  I assume since we're getting so late

6  in the trial that Mr. Stewart will not be called again.

7            MS. SESSIONS:  That's correct.

8            MR. TESLICKO:  Not by us.

9            THE COURT:  All right.  Mr. Stewart, then you're

10 excused as a witness.  That means you can stay in court and

11 watch the proceedings or leave, but you're not to discuss

12 your testimony with any witness who has not yet testified.

13           THE WITNESS:  I understand.  Thank you, Your

14 Honor.

15           THE COURT:  Since we've been in session for two

16 hours, I do want to give the staff a chance to take a break.

17 All right.  We'll probably have one more short break before

18 6:00.

19           All right.  We're at 15 minutes.  So be back at

20 3:15.

21       (Brief recess taken.)

22           THE COURT:  All right.  Your next witness.

23           MS. MORGAN:  Yes.  Google calls Alejandro Borgia.

24           THE COURT:  All right.  You may proceed.

25           MS. MORGAN:  Good afternoon, Your Honor.

1        ALEJANDRO BORGIA, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MS. MORGAN:

4    Q    Good afternoon, Mr. Borgia.

5    A    Good afternoon.

6    Q    Please introduce yourself and spell your name for the

7    court reporter.

8    A    Hi.  I'm Alejandro Borgia, A-L-E-J-A-N-D-R-O.  Last

9    name is B-O-R-G-I-A.

10            THE COURT:  I'm not sure we're going to need the

11   microphone for you.  On a gray afternoon, probably it's

12   good, but let's see.

13            MS. MORGAN:  I told you to speak up, and you're

14   doing great.

15   BY MS. MORGAN:

16   Q    Where do you work, Mr. Borgia?

17   A    At Google.

18   Q    And what has been your title at Google?

19   A    I've been director of product management leading the

20   AdSafety team.

21   Q    Okay.  How long have you worked for Google?

22   A    It's been about four-and-a-half years.

23   Q    And while you've been at Google, have you always been

24   on the AdSafety team?

25   A    Yes.

Direct Examination - A. Borgia

1  Q    Is the AdSafety team part of the ads privacy and safety

2  group?

3  A    Yes.

4  Q    Okay.  We'll just briefly show you Borgia Demonstrative

5  No. 2.

6          MS. MORGAN:  If we can, show that.

7  BY MS. MORGAN:

8  Q    What is this chart showing?

9  A    This shows an organizational chart of the ads privacy

10  and safety team, and you can see AdSafety right in the

11  middle.

12  Q    Okay.  I just want to focus on two of these little

13  boxes at the bottom, AdSafety and Ads Traffic Quality or

14  AdSpam.

15      How are those two groups different?

16  A    They are very different.  AdSpam deals specifically

17  with invalid traffic, which is mostly when a user is not

18  actually looking at an ad.  AdSafety deals with all other

19  aspects of safety, which includes the ad itself and the

20  content that the ad is placed next to involving safety for

21  the user, the advertiser, and the publisher.

22  Q    Are you familiar with a Google employee named Per

23  Bjorke?

24  A    Yes.  He's a colleague of mine on the AdSpam team.

25  We're on partner teams, but we work in different areas.

102

1   Q    We can take that down.

2        And I want to now ask you specifically about your work

3   in AdSafety.  What's the goal of the AdSafety team?

4   A    The goal of the AdSafety team is to keep the ads

5   ecosystem safe.  In order for Google to function and to

6   complete the mission of enabling universal access of

7   information, you need an ads ecosystem that is safe and

8   trustworthy.  When a user interacts with an ad, if they are

9   in any way harmed, they will not want to interact with ads

10  again.

11       It would be the equivalent of walking into a grocery

12  store and being mugged on the way.  You're not going to want

13  to go back to that store.  So if an ad harms a user, they

14  will not interact with ads in the future.  That's why Google

15  invests so much to make ads safe.

16  Q    So you've talked a little bit about how users benefit

17  from an ad safe ecosystem.  How do advertisers benefit from

18  the safety in the ecosystem, if at all?

19  A    It's also critical for advertisers.  Advertisers are

20  looking to get a return on their investment.  And if the ads

21  ecosystem is unsafe, if users are unwilling to click on

22  their ads, then advertisers are unable to reach the users

23  that they wish to reach, and their ROI goes down.

24  Q    What about publishers?  Do publishers benefit from a

25  safe ecosystem?

Direct Examination - A. Borgia

1   A    Absolutely.  Publishers and advertisers are partners in

2   this equation.  And if an advertiser is unable to get a

3   return on their investment, then the publisher is not going

4   to be able to monetize their site successfully.  So they

5   won't be able to make the content that they're making.

6   Q    Is part of your job to manage the quality of the match

7   between an advertiser and a publisher?

8   A    Yes, absolutely.  So there's a huge range of what

9   safety implies, everything from the ad not having harmful

10  content to not creating a problem where they actually steal

11  from users.  But they're also important cases of pairings

12  between ads and content.

13       As a simple example, imagine if you were looking at an

14  article reporting on a plane crash and you were to see an ad

15  for an airline next to that article.  That would be an

16  unpleasant experience for the user.  It would be an

17  unrewarding experience for the advertiser and the publisher.

18  Q    You mentioned a couple of different types of safety

19  threats with ads.  What are some examples of threats that

20  bad ads post?

21  A    So there's a broad range, everything from seeing

22  harmful content that could be offensive conduct or

23  distasteful images.  It could be misleading content,

24  misleading claims, or unreliable claims, such as a

25  get-rich-quick scheme or an ad that promises that you'll

Direct Examination - A. Borgia

1   lose a certain amount of weight in a certain amount of time.

2   Those are unrealistic claims.  Or they could be potentially

3   outright scams where they're out to steal your money or

4   potentially even malware where they will install malicious

5   software on your machine to steal your banking log-ins or

6   any other credentials or information they would want to

7   steal.

8   Q    So those are some threats that come from ads.

9        Do you deal also with safety and quality issues on the

10  publisher's side?

11  A    Yes.  And in fact, again, they're two sides of the same

12  coin.  Many times ads point to publisher sites, and we need

13  to make sure that the publisher site is safe.  And also,

14  when you place an ad next to content, the site itself might

15  have harmful content or might be initiating a download in

16  the background that can harm your machine.  So the publisher

17  has just as many risks as the advertiser.

18  Q    So why does your team work on policies for both

19  advertisers and publishers rather than focusing on one or

20  the other?

21  A    Because, again, they're two sides of the same coin and

22  the visibility that we have by seeing both sides enables us

23  to make the ecosystem safer.

24       So, for example, an ad that points to a website, that

25  website is content that we're reviewing.  And by having the

105

1    same underlying content understanding technologies, we're

2    able to achieve the scale that is necessary to stay ahead of

3    advanced attackers.

4    Q    Which ad tech tools do Google's safety policies apply

5    to?

6    A    They apply to all of them.  That includes products like

7    Google Ads, DV360, AdSense, AdMob, GAM, and so forth.

8    Q    To what extent, if any, is it easier for your team to

9    serve advertisers and publishers because Google has an

10   integrated end-to-end stack?

11   A    It makes it a lot easier for us to deliver the safety

12   that's required to keep the ecosystem safe.

13   Q    Before an advertiser uses one of Google's platforms, is

14   there a screening process they have to go through to sign up

15   to use Google's tools?

16            THE COURT:  Now, some of this is cumulative.

17            MS. MORGAN:  I am going to focus only on aspects

18   that weren't covered yesterday, Your Honor.

19            THE COURT:  All right.

20            THE WITNESS:  So yes, there is a detailed

21   verification process that goes on as the advertiser starts

22   to use the Google system, as well as throughout the process

23   as they change over time what they do in the ecosystem.  And

24   that process varies depending on what the advertiser is

25   seeking to do, how detailed we go in terms of verification

1    processes and even certifications.

2    BY MS. MORGAN:

3    Q    And which of Google's advertising tools requires this

4    process?

5    A    All of them.

6    Q    How many advertisers are prevented from using Google's

7    buying tools as a result of the screening on the advertiser

8    side?

9    A    Because there's so many scammers out there, it's every

10   year millions of advertisers that we are blocking from using

11   the ad systems when they demonstrate malicious intent.

12   Q    Okay.  I'd now like to introduce Defense Trial

13   Exhibit 1186 if you want to look at that in your binder.

14            THE COURT:  Any objection to 1186?

15            MR. FREEMAN:  No objection, Your Honor.

16            THE COURT:  All right.  It's in.

17            MS. MORGAN:  Great.

18   BY MS. MORGAN:

19   Q    What is this document?

20   A    So this is the AdSafety report companion document.  It

21   was a presentation that I delivered jointly with Dan Taylor

22   to various members of the media to explain our annual

23   AdSafety report.

24   Q    And what is the AdSafety report?

25   A    So every year we publish a report giving transparency

1    about the efficacy of our systems, how we perform in

2    enforcing, and also providing a breakdown of the threats

3    that we see on the Internet so that users, advertisers, and

4    publishers can be more informed at the risks that are on the

5    ecosystem.

6    Q    Okay.  I'm going to direct your attention to Slide 3.

7         What does this slide show?

8    A    This is effectively like a 100,000-foot view that we

9    gave to the media to explain how we deliver safety on our

10   platforms.  We cover policy, enforcement, and transparency,

11   three key parts of that puzzle.

12   Q    Okay.  Let's walk through each one of the topics.

13        So let's start with safety policies.  What kind of

14   policies does Google have?

15   A    So we have hundreds of policies that apply to

16   advertisers and to publishers alike.  They generally fall

17   into a few big buckets.  There are content policies that

18   refer to what's actually displayed in an ad or on a website,

19   and that content might be nefarious, harmful, distasteful,

20   objectionable.  There's any of a variety of threats that can

21   happen.  So we have policies for all of these to ensure that

22   we're keeping the ecosystem safe.  And those policies are

23   published on our website so that all can understand

24   transparently what it is that we are enforcing against.

25   Q    Okay.  And who do the policies apply to?

Direct Examination - A. Borgia

1  A    To all advertiser and all publishers that interact with

2  our systems.

3  Q    How often does Google update its safety policies, if

4  ever?

5  A    We are always updating our policies because the threats

6  on the Internet emerge -- are always evolving.  And so every

7  year we make about 30 or so changes.

8  Q    Let's go back to this page and talk about the middle

9  column, enforcement.  What does enforcement refer to?

10  A    So enforcement refers to how we make sure that our

11  policies are adhered to.  And so our policies are public,

12  but without enforcement, we can't guarantee that they're

13  actually being followed.

14      Many well-intentioned advertisers and publishers alike

15  will typically try to stay within the boundaries of policy

16  but occasionally will make a mistake.  Our enforcement

17  enables us to make sure that they stay within those

18  boundaries.

19      However, nefarious actors will intentionally circumvent

20  our policies, and enforcement is critical to keeping the

21  ecosystem safe.

22  Q    Okay.  And what does transparency, the last column,

23  refer to?

24  A    Transparency is also part of enabling trust for our

25  users, advertisers, and publishers.  This is how we go about

Direct Examination - A. Borgia

1   showing accountability.  We give a lot of information

2   about -- including the AdSafety report itself -- the threats

3   that are out there, how we're enforcing against them.  Our

4   publication of our policies is part of transparency.  And

5   even our Ads Transparency Center gives plenty of information

6   so that all can understand how we're keeping the ecosystem

7   safe.

8   Q    Okay.  Now, I want to direct your attention to page 10.

9        Which one of those three buckets does this slide fall

10  into, policy, enforcement, or transparency?

11  A    This is an overview of enforcement.

12  Q    Okay.  So what's shown on this slide?

13  A    This is basically saying that as we see new threats

14  emerge on the Internet, we get feedback and notices from a

15  variety of sources.  It could be users.  It could be

16  government agencies.  It could be third-party threat intel

17  feeds.  All of these give us information as to the latest

18  threats that are emerging, and we use that information to

19  train our machine learning so that we can enforce its scale.

20       Then, of course, we use trained reviewers to check and

21  make sure that our systems are working as expected.  And

22  whenever there is a miss, we feed that back into our machine

23  learning so we can continually improve.

24  Q    Okay.  Now I'm going to direct your attention to

25  Slide 11.  This slide is called implementing checks and

1    controls.  Can you walk us through the advertiser checks and

2    controls that are listed here?

3    A    Sure.  So if an advertiser wants to advertise through

4    Google, they will create a campaign and upload creatives to

5    our Google servers and ad systems.  And at that point in

6    time, we go through rigorous policy checks to make sure that

7    those ads comply with all of our hundreds of policies that

8    are published on our website.  And then in addition to

9    policy checks, we also have advertiser controls that enable

10   advertisers to fine-tune their settings for brand safety

11   needs.

12   Q    When you say advertiser controls, what are you

13   describing?

14   A    We have for both advertisers and publishers controls

15   that allow them to select where their ads appear or which

16   ads appear on their sites depending on whether it's an

17   advertiser or a publisher.  So this allows them to protect

18   their brand identity above and beyond the checks that are

19   related to policy.

20   Q    Okay.  And when does Google actually go through the

21   process of screening ads?

22   A    It's continuously going through that process.  So as

23   the ads are uploaded to the system -- and actually, over

24   time because many malicious actors will change the content

25   of an ad.  Even after it's been submitted and it's live on a

Direct Examination - A. Borgia

1    site, they will actually change where the ad points to

2    initially making them point to simple things that are

3    innocuous.  And then when they think that they can get away

4    with it, they will cloak it or change it and point to

5    something nefarious.  So it's a constant check that we're

6    doing.

7    Q    Okay.  Below the advertiser checks and controls,

8    there's a list of publisher checks and controls.  How, if at

9    all, are those different?

10   A    They're very similar.  It's just a mirror image.  In

11   this case, the publisher would be initiating an ad request

12   to our systems or a bid request.  And in that bid request,

13   it would be saying, I want to put an ad next to this

14   content.  And then we would initiate the policy checks on

15   the content to make sure that that content is safe to put an

16   ad next to.  That's the policy check column.

17        And then, similarly, we have controls, again, for both

18   publishers and advertisers to enable their brand safety

19   needs.

20   Q    What kind of machinery do you use to manage the checks

21   and controls that you just described?

22   A    Because of the scale at which we operate, which is at

23   the scale of trillions of ads, we need to use extensive

24   machine learning because there aren't enough people that we

25   could hire in the world to review all of these ads manually.

1    So it's extensive machine learning machinery.

2    Q    Is the machine learning that you described built by

3    Google?

4    A    Yes.

5    Q    What other means does Google use to catch potential bad

6    actors?

7    A    Well, because we're so dedicated to safety -- our

8    mission and my team is safety -- we look at any means that

9    we can.  And so including the information that we have about

10   the advertiser as we're doing the verification processes and

11   even using third-party threat intelligence feeds in case

12   they might see some indicator that we're not aware of of

13   some new threat on the Internet.

14   Q    What happens when a security issue is brought to

15   Google's attention?

16   A    So the first thing we do -- in our language, we like to

17   stay stop the bleeding.  There's a live threat out there,

18   and we need to stop it.  It somehow got past our systems.

19   Our systems strive to be perfect, but they will never be

20   100 percent perfect.  So occasionally, we'll have something

21   get through.  So the first thing we do is we stop that ad or

22   stop that content from receiving ads.

23        And then we also say, well, is there anything like

24   that?  Is this a new type of threat we haven't seen before?

25   So we do what we call a sweep.  We sweep our systems to see

1    if there's anything similar to that harm.  And then,

2    finally, we do a full feedback loop to say, okay, let's be

3    now proactive and see are there going to be new threats like

4    this coming in the future.  Can we build extra checks so

5    that we will protect against this type of threat in the

6    future?

7    Q    Does Google's scale benefit its ability to promote

8    AdSafety?

9    A    Absolutely.  Without it, it would be very difficult to

10   do our job.

11   Q    To what extent, if any, does Google work with

12   third-party vendors to manage ads quality and fight bad

13   acts?

14   A    Extensively.  We're willing to work with anyone who

15   will augment our safety.  And we do actually license threat

16   feeds, for example, from a number of vendors out in the

17   industry.  Even if they give us just a little bit of extra

18   visibility, it's worth it for us to drive extra safety.

19   Q    To what extent do third-party vendors do the same thing

20   that your team does?

21   A    Well, they're very different.  They're kind of like

22   counting instances, almost like counting crimes happening in

23   a store versus actually stopping the crime from happening.

24   Q    Could the work that you do at Google be performed by a

25   third-party vendor?

114

Direct Examination - A. Borgia

1    A     Not as effectively as we do it.

2    Q     And why is that?

3    A     Because we have a unique point of visibility on both

4    the ad and the content to be able to, at the time of serving

5    the ad, deliver safety.

6    Q     Okay.  We can take this document down.

7          And the next document I want to show you is Defense

8    Trial Exhibit 1182.  So you can turn to that in your binder.

9              THE COURT:  Any objection to 1182?

10             MR. FREEMAN:  No objection, Your Honor.

11             THE COURT:  All right.  It's in.

12   BY MS. MORGAN:

13   Q     What is this document?

14   A     So this is our 2022 AdSafety report.  Remember, a

15   moment ago I shared -- I talked about the companion

16   document, a presentation we gave to media.  This is the

17   report itself publicly available on our Internet site.

18   Q     Okay.  How frequently do you issue these reports?

19   A     We publish this every year.

20   Q     I'm going to direct your attention to the second page

21   of the report, and I want to talk about what's at the very

22   top where it says, "A look back at what we did in 2022 to

23   keep our platforms safe for users, advertisers and

24   publishers."

25         Why do you start the report this way?

Direct Examination - A. Borgia

1   A    Well, I think it's helpful to readers of the report to

2   understand why it is that we do the work that we do.

3   Ultimately, again, in order for Google to accomplish its

4   mission of universal access to information, we need to have

5   a safe ecosystem.  And it starts with the user, keeping the

6   user safe followed by advertisers and publishers.  All three

7   of those are participants in every ad transaction.  There

8   are other stakeholders as well, regulators and so forth, but

9   those are the three most important that we pay attention to.

10  Q    Okay.  Now, I want to direct your attention to the

11  third page of the document, and I want to look at this blue

12  line chart.  What is this showing?

13  A    So this is a graph showing the breakdown of ads that we

14  blocked in 2022.  So right above this was a 5.2 billion

15  number and then the zoomed-in version.  You're looking at

16  just the chart, so 5.2 billion at the top.  Ads were stopped

17  in 2022.  The chart below shows the breakdown of policy

18  topics that ad up to the 5.2 billion.

19  Q    Okay.  Does this apply to all ads or only ads on the

20  Google system?

21  A    Well, this is only ads that run through Google.

22  Q    Right below this on the page, there's a section called

23  "Restricted Ads."  What are restricted ads?

24  A    So it's easiest to understand a restricted ad in the

25  context of what a blocked ad is.  So a blocked ad, which you

116

Direct Examination - A. Borgia

1    just saw above, is an ad that's inappropriate for any user

2    to see.  It's unsafe inherently.  Whereas restricted ads are

3    inappropriate for certain users to see.  They might be

4    sensitive areas that have specific legal requirements and

5    different geographies, like gambling or alcohol or certain

6    financial instruments.

7         So in this case, we restrict the ads to only those

8    users or areas or geographies where they are okay to

9    present.  So above and beyond the 5.2 billion bad ads that

10   we stopped entirely, we also restricted -- meaning we only

11   showed those ads in certain environments -- 4.3 billion of

12   those in 2022.

13             THE COURT:  When you say environments, do you mean

14   websites or apps, or what do mean by environment?

15             THE WITNESS:  All of the above.  In particular,

16   often it's by geographic location where different laws

17   apply.

18   BY MS. MORGAN:

19   Q    Does Google notify an advertiser when it blocks or

20   restricts an ad?

21   A    Yes, absolutely.  That's inherent to our transparency.

22   We need to make sure that advertisers understand when

23   they've had a policy violation.  So we immediately email

24   them and also put the information in the policy center

25   indicating what ad was blocked, as well as what policy was

1    violated, so that they can actually fix the mistake and

2    prevent the ad from violating policy in the future.

3    Q    Does Google ever suspend advertiser accounts entirely?

4    A    Yes, we do.  And so what I was describing just a moment

5    ago, if an advertiser has a particular ad that has a

6    problem, if that ad is a generic problem, they can fix it

7    and move on.  If it's an egregious problem -- for instance,

8    actually harming the user directly -- or if there's a

9    repeated pattern of the same advertiser providing policy

10   violating ads, we will suspend the account entirely.

11   Q    How many advertiser accounts were suspended in 2022?

12   A    In 2022, we suspended 6.7 million advertiser accounts.

13   Q    Let's go to the next page where there's another

14   chart -- this time green -- that's titled "Publisher

15   Enforcement."

16       What is this chart showing?

17   A    So this is the mirror image or other side of the coin.

18   I mentioned that we have policies for advertisers and

19   publishers.  This is reporting the publisher-side

20   violations.  So 1.57 million pages -- meaning web pages or

21   other spots on the Internet that were requesting ads from

22   our servers -- that we stopped those locations from

23   receiving Google ads because those pages violated our

24   policies in some way.  And the chart below shows the

25   breakdown of types of violations that occurred.

Direct Examination - A. Borgia

1    Q    Why is action taken at a page level rather than at a

2    site level?

3    A    Because most publishers are actually well-intentioned

4    and they occasionally will have a page or two or some small

5    number of pages that violate policy.  And so in those cases,

6    we only want to restrict ads against those pages.

7         Now, when a publisher has more extensive or pervasive

8    violations or egregious violations, then we take action

9    against the site entirely and prevent the entire site from

10   receiving ads from Google.

11   Q    Do you have an understanding of whether publishers can

12   serve advertisements from exchanges other than AdX?

13   A    Yes, they certainly can.

14   Q    When they do that, does Google know where the ads come

15   from?

16   A    No.

17   Q    So how, if at all, is your ability to enforce Google's

18   safety policies affected when the ad is served from a

19   third-party exchange?

20   A    Significantly.  We have much more visibility when we're

21   serving the ad.

22   Q    You also said earlier that Google has visibility into

23   both the buy-side and the sell-side.  Why is that

24   beneficial?

25   A    Well, again, every ad transaction involves both a buyer

Direct Examination - A. Borgia

1   and a seller.  And so the ad itself and the content that

2   it's next to have often very close relationships.  Being

3   able to see that connection helps us to deliver safety more.

4   Q    And in this document, you described the safety

5   activities that Google took over the course of a year, 2022.

6   Does Google charge extra for those safety services?

7   A    No.

8   Q    We can go ahead and take this document down.

9        The next document I want to show is in your binder as

10  Defense Trial Exhibit 1788.

11           THE COURT:  Any objection to 1788?

12           MR. FREEMAN:  We do object, Your Honor.  At the

13  time that this was given to plaintiffs, they said it was a

14  demonstrative only.  It was not on the exhibit list.

15           MS. MORGAN:  No.  It's been on the exhibit list

16  from the beginning.  It's a summary exhibit, Your Honor.

17  It's a summary of the safety reports from 2020, 2021, and

18  2022, which we have for the Court and for the Department of

19  Justice.

20           MR. FREEMAN:  Your Honor, I object in terms of we

21  do not have the underlying data to support this summary

22  graph and, therefore, do object to it.

23           MS. MORGAN:  I just handed the data to you.  It's

24  in the safety reports that are summarized.  There's one in

25  2020, one in 2021, and one in 2022.

1    MR. FREEMAN:  It's not the underlying data.  It's

2 a summary.

3    THE COURT:  Well, we don't have to fight about

4 this.  I don't need the exhibit.

5    MS. MORGAN:  That's fine.

6    Can I use it as a demonstrative, Your Honor?

7    THE COURT:  Yes.

8    MS. MORGAN:  Okay.  Great.

9 BY MS. MORGAN:

10 Q    Mr. Borgia, what does this chart show?

11 A    This is simply a summary chart of three annual AdSafety

12 reports.  We just talked about the 2022 AdSafety report

13 where 5.2 billion bad ads were blocked by Google.  This is

14 only pulling the numbers from the prior two years of reports

15 that are similarly published on our website.  In 2020, there

16 are 3.1 billion bad ads blocked by Google, and in 2021, 3.4

17 billion bad ads blocked by Google.

18 Q    It looks like there's a spike in ads blocked or removed

19 between 2021 and 2022.  Do you know what does that?

20 A    Yes.  There are a number of reasons that drive that

21 spike, but I'd say the most important are the increased use

22 of automation by attackers or adversaries that are using

23 automation tools to scale their attacks.

24 Q    This ends in 2022.  Do you know if this trend changed

25 in 2023?

Direct Examination - A. Borgia

1   A     The trend of growth continues beyond 2022 and into

2   2023.

3   Q     Based on your experience, how do you expect this trend

4   to act in the future?

5   A     I expect it to continue.

6         (Mr. Freeman stands.)

7             THE COURT:  Well, he answered, but I sustain the

8   objection.

9             MS. MORGAN:  Okay.  You can take that down.

10            Thank you.

11  BY MS. MORGAN:

12  Q     Are you familiar with something called the Ads

13  Transparency Center?

14  A     Yes.  My team creates it.

15  Q     What is the Ads Transparency Center?

16  A     So the Ads Transparency Center is a site on our website

17  that anyone -- users, advertisers, publishers, regulators,

18  anyone -- can come and see information about the safety of

19  our ecosystem and also information about the ads that we're

20  placing on the ecosystem.

21  Q     How, if at all, does the Ads Transparency Center make

22  Google's tools more effective?

23  A     Well, it comes back to trust.  For the ecosystem to

24  work, users, advertisers, and publishers need to understand

25  how we're keeping the ecosystem safe.

Direct Examination - A. Borgia

1      And in fact, advertisers who are reaching new users

2  that are unfamiliar with their brand want to have a way to

3  build trust with users.  The Ads Transparency Center enables

4  that because it gives the user a visibility as to who those

5  advertisers are, where they're located, what other ads

6  they're serving, a wealth of information that can help users

7  decide whether those advertisers are trustworthy or not.

8  Q    Are you able to provide information in the Ads

9  Transparency Center for all ads on the Internet?

10 A    No, just the ones placed by Google.

11 Q    I'd now like to show you Borgia Demonstrative No. 7,

12 and I want to talk about how the Ads Transparency Center

13 works in practice.

14      What am I looking at here?

15 A    So this is a website.  It's a page on the Staunton News

16 Leader.

17 Q    Okay.  And can you access the Ads Transparency Center

18 from this page?

19 A    Yeah.  So you see a banner ad at the top.  There's an

20 ad with a little ad choices blue triangle in the upper right

21 that's circled in yellow.  If the user were to click on

22 that, they would get a page called "about this ad" that

23 gives more information about the ad.  And from there, they

24 can go straight into the Ads Transparency Center.

25 Q    Okay.  Let's look at Borgia Demonstrative No. 8.  What

123

Direct Examination - A. Borgia

1    is this demonstrative showing?

2    A     So this page is the page that comes up when the user

3    clicks on that blue triangle that we saw on the Staunton

4    News Leader site.  So they get this page explaining -- and

5    actually, the zoomed-in version doesn't show this, but at

6    the very top, they can block the ad.  They can report the ad

7    if the ad is inappropriate.

8          And then they can go and learn about the advertiser --

9    this advertiser is T-Mobile -- and where are they located.

10   And then the circle in red shows a link to see more ads that

11   this advertiser has shown using Google.

12         And below it, you see why this ad -- why was this ad

13   presented to this user in this spot.  When the user clicks

14   on the "see more ads," they go straight into the Ads

15   Transparency Center.

16   Q     Okay.  So let's go now to Demonstrative No. 9.

17         And what is this showing?

18   A     So this is inside the Ads Transparency Center, the page

19   for T-Mobile USA showing where the advertiser is, as well as

20   the other ads -- it says they're about 500 ads -- that this

21   advertiser is showing through Google.  And you can actually

22   look at all of those ads, and you can filter by different

23   formats and different knobs to be able to zero in on

24   whatever ad you're interested in.

25              MS. MORGAN:  We can take this down.

124

Direct Examination - A. Borgia

1   BY MS. MORGAN:

2   Q    Does the availability of the Ads Transparency Center

3   help advertisers?

4   A    Yes.  Again, advertisers want to establish legitimacy

5   and trust with users.  And so this is another tool that they

6   can use to demonstrate who they are, that they've been

7   verified by Google.  Especially for lesser-known brands,

8   that's particularly relevant.

9   Q    Does it help publishers?

10  A    It also helps publishers.  Every time the advertisers

11  get a better return on their investment, publishers are

12  better able to monetize their content.

13  Q    And does it help users?

14  A    Absolutely.  Users can actually feel safer when they

15  understand who's advertising to them.

16  Q    So we've talked today a lot about safety.  I want to

17  briefly ask you about privacy in ads.

18       Is there a difference between privacy and safety?

19  A    Yes.

20  Q    What is the difference?

21  A    Simply put, privacy refers to a user's information, a

22  particular user's information and keeping it safe or

23  private.  Safety refers to the ad and the content that the

24  ad is next to independent of the user.

25  Q    How does user information come into play in digital

Direct Examination - A. Borgia

1  advertising?

2  A    Well, user information is important for presenting

3  users with relevant ads.  For example, if a user were to get

4  an ad for a pizza shop that's 3,000 miles away, that

5  wouldn't be useful for them.  So at the time of an ad

6  request, a publisher will send a packet of information that

7  includes information about the user, their location, their

8  language, potentially demographic information, potentially

9  other information, like unique identifiers of their machine,

10  machine IDs, IP address, even usage history.  All of that

11  information can be used for positive or negative purposes.

12  Q    How is user information shared?

13  A    As I was beginning to mention, it's mostly shared when

14  the publisher initiates an ad request to an ad exchange or

15  an ad server.  They will send a bid request or an ad

16  request.  And in that request is included information about

17  the user.

18  Q    And in that example you just gave, the entity sending

19  the user information is the publisher; is that right?

20  A    Yes.

21  Q    And it's shared with the exchange?

22  A    Correct.

23  Q    What are the kinds of user data that publishers share

24  in that context?

25  A    It could be demographic information.  It could be

Direct Examination - A. Borgia

1    unique identifiers of the machine.  It could be usage

2    patterns.  Frankly, it could be any information that the

3    publisher has about the user.

4    Q    Does Google have limits on what kinds of user

5    information it will accept from publishers?

6    A    Yes.  We have strict limits published in our privacy

7    policy that outline what information from users we use.  We

8    also have strict time frames of when we delete the data, and

9    we also have a center that allows a user to control which

10   information is being used.  So we have strict limits on what

11   we collect, and we give the user control over that

12   information as well.

13   Q    Do you know if other exchanges limit the user

14   information they will accept from publishers?

15   A    We don't have direct visibility to it, so they have a

16   different approach.

17   Q    If a publisher using Google's tools make a bid request

18   from a third-party exchange, does Google know what user

19   information is being shared with that third-party exchange?

20   A    No.

21   Q    And in that same scenario, can Google control what user

22   information is being shared with that third-party exchange?

23   A    No.

24   Q    Has Google taken other steps to try to give users

25   greater control of their Internet privacy?

Direct Examination - A. Borgia

1    A    Yes.  I mentioned that transparency and control are key

2    elements of trust.  So not only are we transparent with what

3    information we collect and how we use that information, but

4    we have a My Ad Center where the user can control details

5    about how that information is used and can even turn off

6    access to that information or delete the information

7    entirely.

8    Q    Why did Google create My Ad Center?

9    A    Fundamentally, to increase trust.  We believe that

10   transparency and control are two key elements to enable

11   users to feel more trust in the ads ecosystem.

12   Q    To what extent does My Ad Center make Google's ad tech

13   tools more effective for advertisers and publishers?

14   A    They also do because My Ad Center also provides

15   controls for users to specify what categories of ads they'd

16   like to see more or less of.  And so if a user is saying

17   they're not interested in a particular set of products, the

18   advertiser can be wise to maximize their investment and not

19   waste advertising spend on those users.  And so it helps

20   advertisers be more effective in their spend, get a better

21   ROI, which, as we talked about earlier, in turn makes

22   publishers more profitable.

23   Q    I'm going to now show you Borgia Demonstrative 10.

24        What is this demonstrative showing?

25   A    This is a page from the My Ad Center that I just

1    referred to.  It's a site available on our website and

2    easily accessible from any ad displayed by Google.  Shown in

3    the circle in the upper right, you see personalized ads on

4    or off.  The user has the option to turn on personalization

5    entirely, in which case we do not use any information of the

6    user in order to deliver an ad.  If the personalization is

7    turned on, then we can customize the experience to the user.

8    And you see below "your recent ad topics."  There are a

9    variety of topics the user can choose to see more or less of

10   those ads.

11        MS. MORGAN:  Let's take that down and go to Borgia

12   Demonstrative 11.

13   BY MS. MORGAN:

14   Q    What is this demonstrative showing?

15   A    So this is another page within the My Ad Center showing

16   additional detail beyond what was on the top front page.

17   This shows a bunch of different topics.  There's an

18   extensive list of topics that the user can choose to see

19   more or less of.  You also see "brands" and "sensitive" as

20   different categories.  So they can choose to see more or

21   less ads of different brands.  They also have sensitive

22   categories that they can choose to exclude.

23   Q    Okay.  And let's go to Borgia Demonstrative 12.

24        What's this page showing?

25   A    This is showing the sensitive tab that I just

1    mentioned, and basically, there are categories, like

2    alcohol, dating, gambling.  Some users might be fighting an

3    addiction problem, or for whatever reason they choose to

4    tell us, we do not want any ads in this category.  And so

5    they can turn that off and make that setting apply to them.

6    Q    Can users use My Ad Center when ads are not served by

7    Google's ad tech tools?

8    A    It wouldn't apply to those ads.  It only applies to ads

9    served by Google.

10   Q    Okay.  Does it apply to Google's owned-and-operated

11   properties only, like YouTube and Search?

12   A    No.  It applies across the board to ads served by

13   Google.

14           MS. MORGAN:  Okay.  We can that take demonstrative

15   back down.

16           Thanks, Matt.

17   BY MS. MORGAN:

18   Q    Do you or your team have a revenue target associated

19   with your work?

20   A    No, we do not.

21   Q    If there's no revenue target, why does Google invest in

22   AdSafety?

23   A    It goes back to what I mentioned earlier.  If users

24   feel unsafe with ads, they will not click on ads.  They will

25   turn on ad blockers and stay away from ads.  It's like not

1    going into the grocery store where you're going to get

2    mugged.  So in order for Google to remain profitable and

3    continue to grow in the future, Google invests billions of

4    dollars to keep the ecosystem safe.  It helps users get

5    value out of ads, advertisers get a return on their

6    investments, and publishers to make money as well.  That's

7    why my team is so passionate about making the ecosystem

8    safe.

9            MS. MORGAN:  I pass the witness.

10           THE COURT:  All right.

11                     CROSS-EXAMINATION

12   BY MR. FREEMAN:

13   Q    Good afternoon.

14   A    Good afternoon.

15   Q    My name is Michael Freeman.  I work with the Department

16   of Justice, so I have some questions for you.  Okay?

17   A    Pleased to meet you, Mike.

18   Q    Pleased to meet you.

19        So I'd like to start with just your involvement in this

20   case.  Were you aware what Google didn't disclose you as a

21   possible person who would have relevant information until

22   August 11, 2023, less than a month before the fact discovery

23   cutoff?

24   A    No.

25   Q    Were you aware that you were put on a litigation hold

Cross-Examination - A. Borgia

1    for this particular case not until September 20, 2023, after

2    the close of fact discovery?

3    A    I was aware that I was on a litigation hold.  I

4    couldn't cite the exact date.

5    Q    All right.  I'd like to go just a little bit into what

6    areas you don't work on as opposed to the areas you work on,

7    right.

8         So due to your job with brand safety, trust and safety,

9    that you weren't involved in the DoubleClick or AdMeld

10   acquisition, right?

11   A    Correct.

12   Q    You weren't involved when Google had a first look ad

13   impression coming through its publisher ad server and ad

14   exchange?

15   A    We deliver safety for those impressions, yes.

16   Q    But you weren't involved in terms of the auction logic,

17   what I'm referring to?

18   A    Not the auction logic.

19   Q    Or how a particular advertiser should bid into a

20   particular auction?

21   A    No.

22   Q    Were you involved in decisions about how publishers can

23   set floors for particular ad exchanges?

24   A    No.

25   Q    All right.  You talked about on direct -- and I've

132

1    heard you say previously -- that the three core pillars of

2    safety in a digital advertising ecosystem are policies,

3    enforcement, and transparency.  Right?

4    A    Yes.

5    Q    And you agree that those are three core pillars to the

6    safety of digital advertising?

7    A    Yes.

8    Q    I want to talk a little bit about each of those

9    particular core pillars with you that you talked about on

10   direct.

11        Starting with the policies, so you have specific

12   policies.  You showed a graph, and it had different labels

13   for each bar, right.  And so you have policies for

14   inappropriate or potentially harmful to the ecosystem

15   policies?

16   A    Yes.

17   Q    Another bucket would be abusing the network?

18   A    Yes.

19   Q    Scam risks?

20   A    Yes.

21   Q    You talked a little bit more about privacy.  So there

22   are policies about privacy?

23   A    Yes.

24   Q    Legal risks?

25   A    Yes.

133

1   Q    And basic baseline expectation in fairness?

2   A    Can you repeat the last word?  I could not hear it.

3   Q    Fairness was the last word, but I'll repeat the whole

4   thing:  Was basic baseline expectation in fairness?

5   A    Yes.

6   Q    Okay.  In these types of policies, Google informs

7   everyone involved about Google having these policies.  What

8   I mean is you tell publishers that you have these policies,

9   right?

10  A    Yes.

11  Q    You tell advertisers you have these policies?

12  A    Yes.

13  Q    And then you tell the general public or Internet users

14  that you have these policies?

15  A    Yes.  They're posted on our website.

16  Q    So I want to talk specifically about policies.  So

17  Google has around 313 policies for ad privacy and safety; is

18  that right?

19  A    That's about right.  It's probably more than that, but

20  it's in the ballpark.

21  Q    And in particular, at least in July of 2021, Google

22  actively managed 10 percent of those policies, right?

23  A    "Actively managed" is a term that means something

24  specific inside Google.

25  Q    Right.  What I'm asking you is Google's definition,

Cross-Examination - A. Borgia

1   meaning Google only -- of the 313 policies only actively

2   managed by Google's definition 10 percent of those policies?

3   A    Yes.

4   Q    All right.  And you and your team of trust and safety

5   believed that there were a significant higher portion that

6   required or mandated active monitoring enforcement, right?

7   A    It's -- one of the options is to continue to increase

8   active management, but there are other ways of protecting

9   the ecosystem beyond active management.

10          THE COURT:  Well, for my understanding, what do

11   you understand active management means?

12          THE WITNESS:  Active management specifically in

13   our team means when there's a dedicated model for a

14   particular set of policies, as opposed to general models.

15   So we have certain sets of policies where we build a custom

16   model, and we have a team monitoring that policy.  And we

17   have other policies that are modeled with generic models

18   across the board.

19          THE COURT:  Can you be more specific?  Give me an

20   example.

21          THE WITNESS:  Oh, so I would fail to remember

22   which specific policies, but there are policies -- actually,

23   I'll pick like adult content because I know one of the areas

24   that have specific tailored models.  So that means that we

25   built a custom machine learning model for that policy, and

135

Cross-Examination - A. Borgia

1   we have a team that's managing that set of policies versus

2   using a general purpose machine learning model that's

3   trained across a broad set of policies.

4           THE COURT:  Okay.

5           MR. FREEMAN:  Maybe I can help this, Your Honor.

6   BY MR. FREEMAN:

7   Q    Would you agree that something in need of active

8   management meaned it lacked metrics, owners, or effort but

9   has significant user reports, escalation, or legal,

10  regulatory, or PR risks, right?

11  A    No.

12  Q    No, that's not correct?

13  A    I would say that there are many ways to provide safety.

14  That's only one of them.

15  Q    Okay.  So in your binder in front of you would be --

16  it's under Google and then with the last numbers 663.  Do

17  you see that?

18          THE COURT:  It's towards the back of the book.

19  BY MR. FREEMAN:

20  Q    I can represent that this document came from your

21  custodial files.

22  A    Yes.

23  Q    And in particular, just to orient the Court, that this

24  is a slide deck created by ads privacy and safety and also

25  trust and safety.  Do you see that?

 1  A     Yes.

 2  Q     And it is Ads Policy Enforcement Step Change Investment

 3  Proposal, right?

 4  A     Yes, that's correct.

 5  Q     So it is a proposal to the decision-makers eventually

 6  to invest more into ads privacy and safety, right?

 7  A     Yes.

 8  Q     And one of the reasons why Google felt a need to do

 9  that is because there's increasing pressure from regulatory

10  authorities, right?

11  A     Well, it's to keep the ecosystem safe, which includes

12  regulatory and many other pressures.

13  Q     So if you go then to the fifth slide of this, the sixth

14  of the actual PDF, you see expectations are increasing,

15  right?

16  A     Yes.

17  Q     And on the left, from outside stakeholders, increased

18  regulatory scrutiny from both consumer protections and

19  competition authorities, right?

20  A     Yes.

21  Q     So one of the reasons why ad privacy and safety was

22  asking for more money was because there was increasing

23  regulatory scrutiny, right?

24  A     Yes, it is one of the reasons.

25  Q     Okay.  If we go back one page then, you can see where I

1    got my questions at the top where it says, "Out of 313

2    policies, only able to actively manage 32 policies,

3    10 percent."

4    A    Yes, that's what I explained earlier.

5    Q    Right.  And the ad privacy and safety team believed

6    that 148 additional policies merited active management,

7    right?

8    A    This was a proposal in 2021.  I don't --

9    Q    Is that yes or no?

10   A    No.

11   Q    No.  You're saying that in 2021, ads privacy and safety

12   was not asking for more money because they believed 148

13   additional policies, 47 percent, merited active management?

14   A    Yes.  At the time, yes.

15   Q    Okay.  And if you go, then, to the back of this, to put

16   in more context of what active management means, to --

17   ending in 681 on the bottom right, which would be page 20.

18   Yeah.  And do you see here this chart says only 10 percent

19   of policies are actively managed, right?

20   A    Yes.

21   Q    And then in the bottom, it defines exactly what

22   actively managed means, right?

23   A    Yes.

24   Q    It says needs active management, means it lacks

25   metrics, owners, effort, but has significant user reports,

Cross-Examination - A. Borgia

1  escalations, or legal or regulatory PR risks, right?

2  A     Yes.

3  Q     So that's the definition of needing active management

4  within Google and the ads privacy safety team, right?

5  A     Yes.

6  Q     So the definition that I asked you, that is the

7  definition that Google used in determining whether something

8  needed active management --

9  A     This is a summary slide that gives very little detail.

10  It's a summary of the definition.

11  Q     Right.  If you look at it, there's actual details of

12  what policies were being actively managed.

13  A     Yes.

14  Q     And do you see privacy, that there was only one policy

15  that was actively managed even though Google themselves

16  believed that there should be 28 additional policies

17  actively managed, right?

18  A     It was a proposal, yes.

19  Q     And Google also was actively monitoring zero policies

20  that had to do with legal risks, right?

21  A     Yes.  Again, active management is only one form of

22  enforcement.

23  Q     And Google believed that 22 deserved active management,

24  right?

25  A     That was a proposal, yes.

139

1   Q    A proposal because Google Ads' safety and privacy

2   believed it was necessary for the clean ecosystem, right?

3   A    Yes.

4   Q    Ecosystem cleanliness and fairness policies, actively

5   managed zero, right?

6   A    Yes.

7   Q    Even though Google believed that 15 were required to

8   be -- or merited active management, right?

9   A    Yes, merited, not necessarily required.

10  Q    Baseline ad expectations, actively managed policies,

11  zero, right?

12  A    Yes.

13  Q    Even though Google's ad privacy and safety team

14  believed that four merited, right?

15  A    Yes.

16  Q    And even in inappropriate or potentially harmful,

17  Google actively managed 19, but Google's team believe 49

18  merited active management, right?

19  A    Yes.

20  Q    Scam risks.  Google actively managed 2 despite ads

21  privacy and safety saying that 14 merited active management,

22  right?

23  A    Yes.

24  Q    Ultimately, this proposal that was made was only

25  partially funded, right?

Cross-Examination - A. Borgia

1    A    Yes.

2    Q    And then ultimately was deprioritized the next year,

3    right?

4    A    I don't believe that that's an accurate representation.

5    Q    You don't believe that's an accurate representation.

6         Okay.  Go to your -- the very next tab with the Bates

7    number ending in 1108.

8         Do you see that?

9    A    Yes, I do.

10   Q    Just to orient, this is last updated September 30,

11   2022?

12   A    Yes.

13   Q    Owner author, there's three people listed, Scott

14   Spencer, and then the next person is you, right?

15   A    Yes.

16   Q    And then Don Burton?

17   A    Yes.

18   Q    Okay.  If you go to page 7 of this particular document

19   that you were an author of -- and you can see at the very

20   top, "Last year we proposed to dramatically reduce user harm

21   and regulatory risk requiring a substantial multiyear

22   investment," right?

23   A    Yes.

24   Q    Okay.  And then it says, "While we were only partially

25   funded" -- do you see that?

1   A     Yes.

2   Q     -- "we made significant process [sic]."

3         And if you go to the next sentence, "However the

4   landscape has changed over the last year," right, "including

5   large new regulatory requirements, new product services."

6         Do you see that?

7   A     I do.

8   Q     And then if you go to the middle of the page, "Until

9   the investment landscape exchanges, meeting these priorities

10  will come at the expense of difficult trade-offs," right?

11  A     Yes.

12  Q     "We are currently planning to deprioritize" -- and then

13  the first one, "We will pause our step change ambition to

14  drive dramatically better decision quality and scalability,

15  including the push to increase our actively managed policies

16  to 50 percent," right?

17  A     Yes.

18  Q     So when I asked my question about this was only

19  partially funded and then later deprioritized, that is

20  correct, right?

21  A     That initiative but not the safety that's implied by

22  the -- or the goal of the initiative because the safety

23  increased.

24  Q     So even by your own account, even despite the ads

25  privacy team recommended more actively managed funding, it

Cross-Examination - A. Borgia

1  was only partially granted, not completely granted?

2  A    Yes, because it's only one way of providing safety.

3  And so we went a different direction and provided more

4  safety in a different way.

5  Q    By not actively managing policies that include scam

6  risks?

7  A    Correct.  We actually provide safety through different

8  means for those same policies.

9  Q    So you said one of the other core pillars is

10 transparency, right?

11 A    Yes.

12 Q    And you were shown some of your AdSafety reports,

13 right?

14 A    Yes.

15 Q    So in your AdSafety reports for transparency sake, do

16 you disclose that Google only actively managed 10 percent of

17 your policies?

18 A    No.

19 Q    Was Google transparent in those annual reports that

20 they had zero active management for policies, including

21 legal risks, cleanliness, and fairness and baseline ad

22 expectation?  Were you transparent about that?

23 A    No, because it's irrelevant.

24 Q    It's irrelevant for that to be known to the public, to

25 be transparent that you were not actively managing those

Cross-Examination - A. Borgia

1   policies?

2   A     Yes, because we provide safety for those policies

3   through other means.

4   Q     But wasn't the AdSafety -- ads privacy and safety team

5   recommending -- it being -- it was merited that those

6   policies deserve active management.  So it was the

7   recommendation of the ads privacy and safety team, right?

8   A     One of many recommendations that we do to increase

9   safety.

10  Q     Right.  So were you transparent that the ads privacy

11  and safety team was only actively monitoring 10 percent of

12  the policies?

13  A     No, because it wouldn't be useful information for

14  anyone outside of Google.

15  Q     You don't think that would be useful information for

16  publishers to know that you're only actively managing 10

17  percent of your policies?

18  A     No, because we're providing safety on all of the

19  policies through other means.

20          THE COURT:  Why don't you specify?  What are the

21  other means?

22          THE WITNESS:  So I mentioned that we have general

23  purpose models and custom models.  General purpose models

24  have been improving in quality over the last several years,

25  especially with the advent of large language models.

                                                        144

Cross-Examination - A. Borgia

1          Additionally, we have protections that are at the

2     front door checking the advertisers that come into the

3     ecosystem and the publishers that come into the ecosystem.

4          As we've increased those protections, we've seen

5     safety increase in the overall ecosystem even without

6     requiring active management, and we scale more effectively.

7     So it's actually a better approach that we're pursuing

8     today.  We're not seeking to increase active management of

9     any policy today because we're increasing safety through

10    these other means, large language models and advertiser

11    models.

12         THE COURT:  Would a language model be like word

13    searches, certain keywords like "sexually explicit

14    material"?  Is that the kind of thing you're talking about?

15         THE WITNESS:  Not just keywords.  You're looking

16    at the full context of entire images.  It's multi-model.  So

17    it can look at images, video, text and analyze the content

18    and even understand whether --

19         As an example -- we saw examples of a child in an

20    advertisement without a helmet on a motorcycle, and the

21    large language model is able to detect that without having a

22    custom model.  So the advances in our large language models

23    and other machine learning technologies mean that it's not

24    necessary for us to actively manage policies.

25         THE COURT:  Thank you.

Cross-Examination - A. Borgia

1   BY MR. FREEMAN:

2   Q    In 2021, before those things took off, the ads privacy

3   and safety team believed that they deserved to be actively

4   managed, right?

5   A    We did at the time believe that was an approach we

6   could follow.

7   Q    And in the 2021 AdSafety report, were you transparent

8   before these other things came into existence, that you were

9   only actively managing 10 percent of your policies in 2021?

10  A    No.  Because to be clear, we still did provide safety

11  on all of those policies through other means.

12  Q    Were you being transparent that the AdSafety and

13  privacy team requested more money that was only partially

14  funded?

15  A    No.  We're always requesting more money.  That's a

16  constant state of affairs in every business.  Every team

17  asks for more investment.

18  Q    Did you release the data associated with the numbers in

19  the AdSafety report?

20  A    I don't understand the question.

21  Q    Well, you just have a summary chart.  Did you release

22  the data that supports those charts to the public for

23  transparency purposes?

24  A    That is the data that we use.

25  Q    Sir --

1          (Ms. Morgan stands.)

2     A    So I'm not following the question because it is the

3     data.

4               THE COURT:  Wait.

5               MS. MORGAN:  You know what?  Never mind.  It's

6     fine.  Go ahead.

7     BY MR. FREEMAN:

8     Q    You're saying there's no underlying data to those

9     summary charts?

10    A    Well, there's specific counts of each and every

11    instance that added up to that bar, yes.

12    Q    Right.  So the underlying data, like this ad at this

13    time, was prevented.  Did you release that data as part of

14    your transparency?

15    A    Well, in the Ads Transparency Center, we do show ads

16    that are --

17    Q    That's not my question.  My question was, during the

18    annual safety report, did you release the data?

19    A    The data is the data.  So I guess I'm not understanding

20    the question because that is the data.  Showing like the

21    individual account that adds up to the total number does not

22    ad any additional information.

23    Q    There's nothing that the public can do to verify that

24    those numbers are accurate, right?

25    A    Correct.

1  Q    Did you release the names or identities of the

2  publishers or advertisers you took actions against in the

3  AdSafety report?

4  A    No.  We have confidentiality agreements with our

5  advertisers and publishers.

6  Q    Did you indicate the countries or languages these

7  publishers or advertisers used?

8  A    In the AdSafety report?

9  Q    That's right.

10 A    No, we do not.  We do not currently have a breakdown by

11 country.  That is something we're considering for the

12 future.  We do not have it today.

13 Q    The fact that Google is taking down more ads each year

14 doesn't necessarily mean that you're seeing more badness,

15 right?

16 A    If we're taking down more ads, there's more badness.

17 So I'm not understanding the question.

18 Q    Let's go to DTX 1490 in that.

19       THE COURT:  Any objection to 1490?

20       MS. MORGAN:  No objection, Your Honor.

21       THE COURT:  All right.  It's in.

22 BY MR. FREEMAN:

23 Q    So this is an AdSafety report turned in by you, right?

24 A    Yes, that appears to be the case.

25 Q    Okay.  And if you go to page 11 of DTX 1490, the third

Redirect Examination - A. Borgia

1  question down from your own training says, "Each year, more

2  ads are taken down, is that because you're seeing more

3  badness?"

4       Your answer is, "Not necessarily," right?

5  A    Yes.   There are several factors that play into changes

6  in data.

7  Q    That was different than your answer that you gave me 30

8  seconds ago, right?

9  A    I wasn't following your line of thought.  Now that I

10 see it on paper, it helps me to understand it.

11 Q    You said that user data can be used for positive or

12 negative on direct examination.  Is that right?

13 A    Yes, that's correct.

14 Q    Is it true that Google paid the FTC over a $100 million

15 fine for collecting children's data unlawfully for ads?

16 A    I'm not aware of that.

17 Q    You're unaware of that as the AdSafety -- on the

18 AdSafety team?

19 A    I am not aware of that.

20            MR. FREEMAN:  Nothing further, Your Honor.

21            THE COURT:  All right.  Any redirect?

22                     REDIRECT EXAMINATION

23 BY MS. MORGAN:

24 Q    I'm going to be brief, Mr. Borgia.

25       The first document I want you to look at is a document

149

1   that I'm hoping Mr. Klein can help me with.  It was the MDL

2   Document 019789663 that was shown to you on your cross.

3   A   The step change proposal investment?

4   Q   It is the Ads Policy Enforcement Step Change Investment

5   Proposal.

6   A   Yes.

7   Q   Yes.  Do you remember being asked questions about this

8   document?

9   A   Yes, I do.

10   Q   Okay.  When was this document written?

11   A   July of 2021.

12   Q   Were you an author on this document?

13   A   No.

14   Q   Okay.  Let's go to the page that is marked with the

15   Bates No. 89681 at the end, which is one of the charts that

16   you were shown.

17       Do you remember being shown this page?

18   A   Yes.  If you can zoom in and --

19   Q   Oh, wrong document, wrong page.  He'll put it up in a

20   minute.  I don't want to make you flip all the way through

21   the document.

22   A   No problem.  Thank you.

23   Q   Okay.  Do you remember being asked about this slide?

24   A   Yes, I do.

25   Q   Okay.  And at the top, it says only 10 percent of

1   policies are actively managed.

2       Do you see that?

3   A   Yes, I see that.

4   Q   In 2021, was Google only enforcing 10 percent of its

5   policies?

6   A   No.

7   Q   Has Google ever only enforced 10 percent of its

8   policies?

9   A   No.

10  Q   And does active management -- is active management

11  synonymous with enforcement in any way?

12  A   No.  It's one form of enforcement.

13          MS. MORGAN:  Okay.  You can go ahead and take that

14  document down.

15  BY MS. MORGAN:

16  Q   The next document I want to show you is another

17  document that you were shown on cross.

18          MS. MORGAN:  I'm also going to ask Mr. Klein to

19  help me.  So let me show him the document, which is Bates

20  stamped 6861108.

21  BY MS. MORGAN:

22  Q   Do you remember being asked about this document?

23  A   Yes, I do.

24  Q   Okay.  What is this document?

25  A   This is an investment proposal.  Every year we ask for

1    more resources.  So we put together a proposal that

2    describes what we would do with those resources, and so it's

3    just another way of asking for more resources to get more

4    funding.

5    Q    Okay.  What was the decision that was made after you

6    made this proposal?

7    A    Actually, the decision was go back and sharpen your

8    pencil.  It is unacceptable for safety to be impacted in any

9    way.  You need to make sure that you meet all regulatory

10   requirements and also increase safety at the same time.

11   Q    Was your team able to do that?

12   A    Yes, we successfully did that.

13   Q    How did you do it?

14   A    Well, for one thing, the regulatory requirements that

15   we had at the time of this document were unclear.  And in

16   the ensuing months, we got more clarity, and it became

17   easier to meet those requirements.

18        And at the same time, we continued to invest in other

19   mechanisms, like safety by design, which is a mechanism to

20   make the ads ecosystem inherently safer.  For instance, by

21   leveraging information about the advertiser, as I mentioned

22   earlier, stopping more advertisers at the door.  Net, net.

23   We actually increased our safety by 70 percent over the

24   following year.

25   Q    Okay.  I want you to now go to page 7 of the document,

1    which has the Bates stamp 6861114.  And we can just focus on

2    the first paragraph.

3         Do you remember being shown this paragraph during the

4    cross-examination?

5    A    Yes.

6    Q    In the first sentence, it says, "Last year we proposed

7    to dramatically reduce user harm and regulatory risk

8    requiring a substantial multiyear investment."

9         What does the sentence after that say?

10   A    It says, "While we were only partially funded, we made

11   significant progress, reinforcing our belief that it is

12   still the right long-term strategy to increase safety and

13   trust in the ads ecosystem."

14   Q    Do you remember that on cross-examination this was read

15   to you as we made significant process, not progress?

16   A    I did not catch that.

17   Q    Do you agree that you made significant progress?

18   A    We did indeed make significant progress.  I do agree.

19            MS. MORGAN:  Okay.  We can take that document

20   down, and I will go to DTX 1490.

21   BY MS. MORGAN:

22   Q    You were also shown this document during your

23   cross-examination, right?

24   A    Yes.

25   Q    I want to focus first on the first paragraph where it

                                                                153

1   says "review key messages" and the bullets under that.  What

2   are the key messages for AdSafety that were shared by you in

3   this document?

4   A    At the very top, it starts by saying, "It's our

5   responsibility to develop and enforce policies that help

6   keep people and our partners safe while using our

7   advertising products."

8        It talks about transparency breeding trust with people

9   and our partners, that digital advertising has been a

10   positive force for decades, and that we think our approach

11   to safety and transparency is a model for our entire

12   industry and is a crucial point to preserving the economic

13   model that has powered the open Internet for decades.

14        We work incredibly hard -- I can personally attest to

15   that -- to stay nimble and to use all of the tools at our

16   disposal to prevent bad actors who seek to take advantage of

17   or misinform people.

18   Q    Okay.  Let's go -- do you agree with those statements?

19   A    100 percent.

20   Q    Let's go to page 11.  You were asked a question about

21   the statement here, "Each year more ads are taken down.  Is

22   that because you're seeing more badness?"

23        Do you remember being asked about that?

24   A    Yes.

25   Q    I want to direct you to the second paragraph under that

154

1  that starts with the words, "We have also."

2     What does that sentence say?

3  A    It's saying that we've seen an increase in fraudulent

4  activity by adversarial actors during the pandemic.

5  Advertisers -- bad actors are becoming more sophisticated.

6  So it says their techniques have become more sophisticated,

7  and the scale in which they operate has increased often

8  running entire networks of accounts.  That's why we've

9  heavily invested in our technology, to detect coordinated

10 activity.  We look at many factors, IP address, billing

11 information, and general patterns to take broader action,

12 not just at the ad level but suspending multiple accounts

13 that are linked to the same bad actor.

14 Q    When you said we've also seen an increase in fraudulent

15 advertising, is that consistent with the notion of seeing

16 more badness?

17 A    Yes, we have seen more badness.

18            MS. MORGAN:  Okay.  I have no further questions.

19            THE COURT:  Any recross?

20            MR. FREEMAN:  No, Your Honor.

21            THE COURT:  I assume no one is going to call this

22 witness again.

23            MS. MORGAN:  We are not, Your Honor.

24            MR. FREEMAN:  No, Your Honor.

25            THE COURT:  Then you are now released as a

Video Deposition - K. Blom

1   witness.  You can stay and watch the proceedings or leave,

2   but you're not to discuss your testimony with any witness

3   who has not yet testified.

4           Thank you.

5           THE WITNESS:  Yes, Your Honor.  Thank you.

6           THE COURT:  Your next witness.

7           MS. DUNN:  Your Honor, so we had planned on

8   calling additional small business witnesses, but having

9   heard the Court's feelings on cumulative testimony and in a

10  concession to the shortness of life, we are going to move,

11  with the Court's permission, to the video and read-in

12  portion of our day.  And we'd like to finish the video we

13  started yesterday with Kenneth Blom from BuzzFeed.

14          THE COURT:  All right.  That's fine.  I think I

15  need his --

16          MS. DUNN:  Do you need an additional binder?

17          THE COURT:  I'm not sure.

18          Okay.  I've got it.

19          MS. DUNN:  Thank you, Your Honor.

20          THE COURT:  Wait.  What page are we on?

21          MS. DUNN:  I'm told we're at page 81, line 12.

22          THE COURT:  Thank you.

23      (Video played.)

24          MS. DUNN:  All right.  Your Honor, this part is

25  sealed, so we will give Your Honor a moment.

156

1           THE COURT:  You know, I have to tell you.  The

2  version I have does not have any indication -- if you've got

3  one with the red lines, that's what I should be looking at.

4           MS. WOOD:  It should be the first tab in your

5  binder, Your Honor.  It says Blom Designation Digest.

6           THE COURT:  I've got it now.  All right.  Thank

7  you.

8           MS. DUNN:  Thank you.

9           MS. WOOD:  We're on page 11 of 23.

10          THE COURT:  I've got it now.  All right.  Thank

11  you.

12       (Video played.)

13          MS. DUNN:  Your Honor, we move to admit 1616.

14          MS. WOOD:  No objection.

15          THE COURT:  Hold on a second.

16          MS. DUNN:  PTX 1616.

17          THE COURT:  We need to take a break right now.

18  This will be the last break for the day.  Fifteen minutes

19  until five of.

20       (Brief recess taken.)

21          THE COURT:  How much longer?  I'm just trying to

22  get an estimate for the afternoon.

23          MS. DUNN:  Yeah.  So this video has seven minutes

24  remaining.

25          THE COURT:  Great.  Then what are we doing?

Video - Todd Parsons

1          MS. DUNN:  And then we plan to play the Criteo

2     video.  It's 22 minutes.

3          THE COURT:  All right.

4          MS. DUNN:  And then with the time remaining, we

5     would like to do a read-in of Eric Hochberger, who is CEO of

6     Mediavine.

7          THE COURT:  So we have everything lined up.  So

8     we're all set.

9          MS. DUNN:  I think, Your Honor, just before we

10    broke, I moved to admit 1616.

11         THE COURT:  1616, any objection?

12         MS. WOOD:  No objection.

13         THE COURT:  All right.  It's in.

14         MS. DUNN:  Thank you, Your Honor.

15       (Video played.)

16         THE COURT:  All right.

17         MS. DUNN:  Your Honor, Google calls Todd Parsons

18    from Criteo via video, and we have binders to hand out.

19         THE COURT:  All right.  Ready.

20       (Video played.)

21         MS. DUNN:  Your Honor, move to admit DTX 1257.

22         MS. WOOD:  No objection.

23         THE COURT:  All right.  1257 is in.

24       (Video played.)

25         MS. DUNN:  Your Honor, we move to admit DTX 1179.

Video - Todd Parsons

 1          MS. WOOD:  No objection.

 2          THE COURT:  All right.  1179 is in.

 3      (Video played.)

 4          MS. DUNN:  Your Honor, move to admit DTX 1544.

 5          MS. WOOD:  No objection.

 6          THE COURT:  All right.  1544 is in.

 7      (Video played.)

 8          MS. DUNN:  Your Honor, with respect to DTX 1544

 9  that was admitted, there is a redacted portion.  So we'd

10  like to also admit 1544A.

11          THE COURT:  Okay.

12          MS. DUNN:  And then with respect to the Criteo

13  10-K, which is DTX 1071, we move to admit, consistent with

14  the past practice of this trial, only the pages that were

15  referenced in the deposition.

16          MS. WOOD:  No objection.

17          THE COURT:  All right.  Hold on a second.  What

18  are those pages just for the record?

19          MS. DUNN:  So with the Court's indulgence,

20  pages 14 and 22 were identified in the transcript.  So I was

21  able to identify those.  But I think there are two other

22  pages that were just referred to as this document.  So with

23  the Court's indulgence, I'd like to get back to the Court

24  those other pages.

25          THE COURT:  Okay.

159

Read-In - E. Hochberger

1              MS. DUNN:  Thank you.

2              And with the Court's permission, we would like to

3    call Eric Hochberger of Mediavine as a read-in.

4              THE COURT:  All right.

5              MS. DUNN:  And we have binders to hand up.

6              And just for the record, Your Honor, Eric

7    Hochberger is founder and CEO of Mediavine.  And I say that

8    because I do not believe the deposition establishes his

9    title, but I don't think plaintiffs will object.

10             MS. WOOD:  No objection.

11             THE COURT:  All right.  That's fine.

12             MS. DUNN:  May I proceed?

13             THE COURT:  Yes.

14        (The deposition of Eric Hochberger is read as follows:)

15   Q    So, roughly, how many employees are at Mediavine?

16   A    Roughly, about 200.

17   Q    And how has that number changed throughout the years?

18   A    Most of that growth has been in the last eight years

19   where like eight years ago it was just the cofounders and

20   one employee.

21   Q    Just at a high level, what does Mediavine do?

22   A    At a high level, we help independent publishers

23   monetize their websites through advertising.

24   Q    Do you also own and operate your own websites, which in

25   this world would be publishers?

                                                              160

Read-In - E. Hochberger

1   A     Yes.  We own and operate a few of our own properties as

2   well.

3   Q     Do you have an approximation of how much your annual

4   revenue comes from dealing with Google?

5                MS. DUNN:  And this part is sealed.  I'll let the

6   Court read.

7                THE COURT:  Go ahead.

8   Q     Okay.  Switching gears a little bit, back to Mediavine

9   and your business, who are your pool of customers for

10  clients?

11  A     So it's independent content creators.  So smaller

12  publishers you can say, things such as blogs.

13  Q     When you use the term "smaller publishers", can you

14  define that in any metric?

15  A     So our industry uses Comscore generally for metrics of

16  size and sight.  And I would say they're not in the top

17  Comscore 500 properties.  So they would be considered by our

18  industry standard small.

19  Q     So what products does Mediavine have to help service

20  your clients?

21  A     Primarily, we offer what we call full-service ad

22  management.  So that would be the full monetization of their

23  website and the associated technology and support staff and

24  sales.

25  Q     Does Mediavine have any internal platforms or products

Read-In - E. Hochberger

1  that they use?

2  A    We do.  We offer other tools to help publishers, like,

3  run their website.  So we have a product, for example,

4  called Trellis that is -- helps them run their day-to-day

5  site by being a word press theme.

6  Q    When you say run their day-to-day, does that include

7  managing ads on their website?

8  A    Not that technology, no.  That is more for maintaining

9  the site speed and controlling the look and feel of the

10 site.  So helping them not with the ad side of it.

11 Q    Do you have any proprietary platform or product about

12 managing ads?

13 A    Yes.

14 Q    What are those products?

15 A    So a lot of these don't have, like, formal names.  But

16 I'll just call them, like, our script wrapper or our on-page

17 code that helps kind of serve up the ads and manage things

18 like the auctions.

19     And then we have back-end technology called the

20 Mediavine exchange, our S-to-S solution that does the actual

21 auction of the bids.  Those would be our proprietary

22 technologies.

23 Q    And then does Mediavine use any other external

24 platforms or products in servicing ad management for your

25 clients?  What platforms do you use the most?

162

1        Let's -- let's start there, outside platforms this is.

2            MS. DUNN:  This part is sealed.

3            THE COURT:  Okay.  Go ahead.

4   Q    Okay.  Lets start the list then.  Okay.

5            MS. DUNN:  And this part is also sealed.

6            THE COURT:  I don't know why this is sealed.

7            MS. DUNN:  I don't know either, Your Honor.  I'm

8   happy to read it, or you are happy to read it.

9            THE COURT:  I'm reading it.

10           MS. DUNN:  Okay.

11           THE COURT:  All right.  Go ahead.

12  Q    Does Mediavine have its own publisher ad server?

13  A    We do not.

14  Q    What publisher ad server or servers, plural, does

15  Mediavine use?

16  A    For ad serving itself, we either use Google Ad

17  Manager -- and that does a lot of the ad serving -- or we

18  can serve directly on page without an ad server involved --

19  without a third-party ad server involved, I should say.

20  Q    So are you familiar, then, with the term "DFP" or

21  "DoubleClick for Publishers"?

22  A    Yes.

23  Q    And so when you use the term "Google Ad Manager," does

24  that include what I think most people call DFP?

25  A    Yes, that's the former name.  DFP was rebranded to

1    Google Ad Manager.

2    Q    Do you ever refer to Google Ad Manager ever as GAM,

3    G-A-M?

4    A    We do.

5    Q    Just approximately when did Google rebrand DFP as GAM?

6    A    I don't recall the exact date, probably within the last

7    five years.

8    Q    Did you -- by you, I really mean Mediavine is what I

9    mean.  Did Mediavine use DFP prior to being rebranded as

10   GAM?

11   A    Yes.

12   Q    Approximately how long ago did Mediavine start using

13   DFP?

14   A    In some form, we have used Google's ad serving products

15   probably over a decade, maybe longer.

16   Q    So I want to talk about the time frame before it was

17   all part of GAM.

18   A    Uh-huh.

19   Q    What was the fee or take rate of using DFP?

20   A    I mean, at the very beginning of when we were using it,

21   I believe we were using a small business product that was

22   free.

23   Q    And then that changed, obviously, over time?

24   A    Based on size, yeah.  As we grew -- outgrew the free

25   impression tier.

1   Q    What's the largest publisher ad server in today's

2   market?

3   A    To the best of my knowledge, I would say it would be

4   Google Ad Manager.

5   Q    Do you have an approximation of how much market share

6   that Google Ad Manager has?

7   A    I do not.

8   Q    Do you know of the other publisher ad servers in the

9   market today?

10  A    We have not been actively exploring other ad servers in

11  a long time.  So I would not be an expert on that.

12  Q    Are you aware of any other competitors of Mediavine

13  using a different publisher ad server?

14  A    I am not aware of the ad servers of all of our

15  competition.

16  Q    Does Mediavine have its own ad exchange?

17  A    We do have some direct integrations with demand-side

18  platforms.  So you could look at it as an exchange, but it's

19  exclusively for or own publishers.  So I don't think that

20  term would commonly be used.

21  Q    What ad exchange does Mediavine use?

22  A    We use several.  Some of t he names I mentioned before,

23  Magnite, PubMatic, in addition to, obviously, Google ad

24  exchange.

25  Q    I think the last question I asked before we took a

Read-In - E. Hochberger

1    break is what was AdX's take rate for Mediavine?

2    A    It's a variable take rate.

3    Q    Okay.  Can you give me the bookends?

4    A    I think it can go as high as 20 percent in AdX's favor.

5    Q    And as low as?

6    A    I don't know, zero, negative.  That's up to them.

7    Q    Well, I guess I'm confused by that a little bit.  In

8    terms of its variable depending on what point, what year did

9    Mediavine has had with AdX?

10   A    I believe on a per request basis was --

11   Q    Has that changed throughout the years that you've been

12   dealing with Google?

13   A    So, yeah.  The feature I'm describing right now is an

14   optional feature that we enabled that variable.

15   Q    Prior to taking this optional feature, what was the

16   take rate of AdX?

17   A    And that's where I believe I'm getting the 80/20 from,

18   would be the original agreement, and then we agreed to a

19   variable to make AdX more competitive.  At the end of the

20   day, we won, obviously, the most competitive product.

21   Q    What are the other competitors to AdX?

22   A    So to AdX would be other SSPs.  So that would be some

23   of the names I mentioned, again, before, Magnite, PubMatic,

24   OpenX.

25   Q    Are you familiar with the take rate of those particular

Read-In - E. Hochberger

1    platforms?

2    A    Not the exact take rate, no.

3    Q    Do you have an estimate of what the take rate is?

4    A    I mean, I would be -- again, speculating.  So...

5    Q    Are you aware of whether any of those charge higher

6    than 20 percent?

7    A    Potentially, yes.

8    Q    When you say potentially, you're aware that other --

9    A    I am aware that in some agreements -- again, I'm not a

10   100 percent into the specifics.  But there are different

11   rates based upon different types of deals.  And some of them

12   may exceed 20, and some may be lower.

13   Q    When you talk about some agreements, are you talking

14   about Mediavine agreements?

15   A    Mediavine's agreements.

16   Q    Do you know which ad exchange has a take rate with

17   Mediavine of more than 20 percent?

18   A    So some of the agreements are confidential, and I am

19   not always a party to those contracts.  So I could not tell

20   you exactly which ones are above that 20 percent or below.

21   I would not be the best source for that.

22   Q    Are you sure, then, that there are other agreements

23   with other ad exchanges that take rates exceed 20 percent?

24   A    I am positive there's at least one agreement between

25   Mediavine and another exchange where there are types of

1    deals that will exceed 20 percent, yes.

2    Q    Why would Mediavine agree to take a rate higher than

3    AdX?

4    A    Our goal at Mediavine at the end of the day is to get

5    the highest yield or the highest dollar amount per

6    impression.  And if someone is going to take a higher take

7    rate but still bid more money for that impression, Mediavine

8    will -- ultimately, will make more money.  So that is why.

9    Q    But does Mediavine use header bidding?

10   A    We do.

11   Q    What is header bidding?

12   A    That was what I previously referred to as prebids, what

13   we use for this.  But header bidding is that action taking

14   bid requests from multiple exchanges before sending the bid

15   into the ad server.  So it participates inside the header.

16   Q    So approximately when did Mediavine start using header

17   bidding?

18   A    Since we got into ad management.  I don't recall the

19   exact date but before it was called header bidding.  So

20   probably eight years ago.

21   Q    Do you still use header bidding?

22   A    We do.

23   Q    Does header bidding have any effect on latency of

24   websites?

25   A    Technically, all bid requests have a latency impact.

Read-In - E. Hochberger

1    Q    But compare that to running an impression through GAM.

2    Is one faster or slower?

3    A    I mean, it's going to depend on so many factors.  So I

4    don't think I can answer which ones would be faster.

5    Q    Have you ever indicated that you believed header

6    bidding did not cause any latency issues?

7    A    I believe the way that we run header bidding, we

8    optimize the non-cause latency to the user.  I probably

9    would have said to that effect.

10   Q    Can you explain as high level as you can exactly what

11   is a waterfall?

12   A    So a waterfall in the simplest terms would -- you go to

13   each partner one at a time, so each ad exchange, and say, Do

14   you want to bid for this impression?

15        And then if they say no, you move on to next one, which

16   is where it gets its name waterfall.  So it cascades down

17   until you get a bid.

18   Q    And again, this is kind of in the old world of it.

19   A    Right.

20   Q    Was there any determination of who was called first?

21   A    Traditionally, in a waterfall, you would use historical

22   data to determine who you would place at the top of the

23   waterfall.  So historically, it would be your top performer

24   would go to the top of the waterfall.

25   Q    What was the issue or concern of conducting the

                                                              169

Read-In - E. Hochberger

1  impressions in this manner, selling of the impressions in

2  this manner?

3  A    So the issue with the traditional waterfall setup is

4  that you are not getting real-time bids.  You're using

5  historical averages of bids from different exchanges.

6  Q    How did header bidding change this particular dynamic?

7  A    It would allow all networks to submit a real-time bid

8  to compete in real-time.

9  Q    When Mediavine started this concept, were you relying

10 on any product or platform from Google to do it?

11 A    To do header bidding, no.  But we were using Google to

12 record impressions.

13 Q    And you testified, I think, that you were still using

14 DFP or GAM today.

15 A    We are.

16 Q    And are you still using header bidding today?

17 A    We are.

18 Q    Well, I guess let's talk about the dynamics of header

19 bidding.  Again, high level, what are the dynamics of header

20 bidding in today's world?

21 A    In today's world, you would take the bid from all your

22 different partners in header bidding, and they would submit

23 all of their bids.  You would make the choice of which bid,

24 as the publisher, you wish to take.  And you could either,

25 if you wish to -- as I was saying, you could technically

170

Read-In - E. Hochberger

1    render to page.

2        But we choose to render it through or record the

3    impression through Google Ad Manager so we have a record of

4    the auction.  So we choose to interact with Google Ad

5    Manager as our record of ad serving.

6    Q    Going back to what I'll call the old world, did you

7    believe that header bidding was good for publishers?

8    A    Yes.  That's why we offered it to our publishers.

9    Q    Why did you believe it to be good for publishers?

10   A    We could obtain a higher yield or revenue.

11   Q    Well, in what context have you heard those phrases?

12   And let's start -- we'll get to first look, but let's focus

13   on last look like right now.  In what context have you heard

14   the phrase last look?

15   A    Last look would simply be you get a last look at an

16   impression, so after other people in terms of the industry.

17   Q    Where have you heard that phrase or concept?

18   A    I mean, people using that term, like, informally to

19   describe things like Google Ad Manager if -- at the end of

20   an auction.

21   Q    People within Mediavine?

22   A    I don't recall.

23   Q    I mean, has anyone in Mediavine used the phrase "last

24   look" when talking about Google Ad Manager?

25   A    I really don't recall.

Read-In - E. Hochberger

1   Q    Prior to today, have you used the phrase "last look"

2   talking about Google Ad Manager?

3   A    I can't recall a specific time.

4   Q    But have you used that phrase?

5   A    Likely.

6   Q    When you used that phrase, what were you referring to?

7   A    So, again, one of the reasons we implemented header

8   bidding was to get everyone a chance to bid.  Google would

9   participate in that same auction.  And in slang, you could

10  say that they would have last look because they would be

11  submitted after header bidding.

12  Q    Did you review last look in GAM to be unfair?

13  A    Again, I am looking at things from a publisher

14  perspective.  And fairness to me doesn't matter.  It's yield

15  optimization is the reason I would implement header bidding

16  or the reason I would put Google into that mix would be to

17  increase revenue.  I don't care.  I guess, again, the peer

18  definition of fair does not matter to a publisher.  Yield is

19  all that matters.

20  Q    Were you aware that Google was doing last look within

21  Google Ad Manager?

22  A    Yeah.  That's the setup we set up on purpose as a

23  publisher.

24  Q    Are you familiar with the term "Unified Pricing Rules"

25  or sometimes referred to as UPR?

1   A     I am.

2   Q     What is your understanding of UPR?

3   A     They're a single set of pricing rules that we put into

4   Google Ad Manager that set the floor across the board.  So

5   whether it would be Google bids, Google ad exchange bids, or

6   the bids that we are putting into ad manager or direct line

7   items or other such, just one set of pricing rules.

8   Q     Are you familiar with the term "exchange bidding"?

9   A     I am.

10  Q     What is exchange bidding?

11  A     So referring to the Google product, it is -- Google

12  performs a server side kind of version of header bidding

13  where they get bids in real-time from the exchanges.

14  Q     Was exchange bidding implemented after you started

15  using the concept of header bidding?

16  A     Yes.

17  Q     Once Google implemented exchange bidding, did you see

18  any effect that had on the use of header bidding?

19  A     I -- no, I guess.  No.  Actually, let me better define

20  that.  So I would say, as a publisher, that actually gave us

21  the option to choose whether you want to put an exchange

22  through header bidding or through exchange bidding.  So we

23  may have moved a partner or two from header bidding off

24  of -- into exchange bidding.

25  Q     Do you know the largest buy-side source demand?

173

1    A    Again, from what perspective?  From Mediavine's or from

2    an industry?

3    Q    Let's use both.  Let's start with Mediavine.

4    A    Well, from Mediavine's perspective, our largest --

5    sorry, our largest DSPs either going to be The Trade Desk or

6    Google, and that will vary.  So DV360 or Trade Desk are the

7    two largest buyers of Mediavine inventory.

8    Q    Do you know of a company that offers a publisher ad

9    server, ad exchange, and demand-side platform?

10   A    Do I know of a company that offers all three?

11   Q    Other than Google.

12   A    Oh, other than Google?  Yeah, I believe there were

13   others over the years that had offered all three.

14   Q    Like who?

15   A    Xandr.  They've been through so many acquisitions.  I'm

16   trying to remember what they're called now.  Whatever Xandr

17   was -- has become.  They were previously AppNexus and then

18   Xandr.  Then I don't know their name.  Had offered all

19   three.  I believe -- sorry, there's so many name exchanges.

20   Admeld, Oath (phonetic), Yahoo offered all three.  There

21   were other platforms over the years.

22            MS. DUNN:  Your Honor, move to admit DTX 1733.

23            MS. WOOD:  No objection.

24            THE COURT:  All right.  It's in.

25   Q    I want to talk to you a little bit about the different

Read-In - E. Hochberger

1    SSP that Mediavine uses.  I'd like to show you a document

2    that's been marked as Hochberger Defendant's Exhibit 1.  Do

3    you recognize this document?

4    A     I do.

5    Q     What is it?

6    A     I believe this is part of the privacy policy that

7    describes our partners and sharing of data and such.

8    Q     Do you believe that this Defendant's Exhibit 1 is a

9    true and accurate copy of a printout of the Mediavine

10   website entitled Ad Management Partners?

11   A     I believe, yes.

12   Q     Was the website for the ad management partners on

13   Mediavine's website prepared in the ordinary course of

14   Mediavine's business?

15   A     Yes.

16   Q     Do the entities listed here under supply-side partners

17   accurately reflect all of the SSPs that Mediavine works with

18   to sell its publisher companies customers' inventory group?

19   A     To the best of my knowledge, this is an accurate

20   listing of all of them.

21   Q     Who is Amazon Publisher Services?

22   A     That would be Amazon's supply-side integration with

23   publishers.

24   Q     And does Mediavine sell ads on its publishers'

25   customers' inventory through Amazon Publisher Services?

1    A    We do.

2    Q    Does Mediavine sell ads on it's owned-and-operated

3    inventory through Amazon Publisher Services?

4    A    We do.

5    Q    The next is Chicory.  What's Chicory?

6    A    Chicory is a unique partner that -- so we represent a

7    lot of food bloggers and Chicory helps kind of sell

8    sponsored ingredients on food bloggers' websites.

9    Q    And so they are also an SSP; is that right?

10   A    There are a source of supply, yes.

11   Q    Does Mediavine sell ads on its publishers' customers'

12   inventory through Chicory?

13   A    Yes.

14   Q    Does Mediavine sell ads on its owned-and-operated sites

15   through Chicory?

16   A    Yes.

17   Q    What is Colossus?

18   A    So Colossus would be another SSP or exchange.

19   Q    And does Mediavine sell ads on its publisher customers'

20   inventory through Colossus?

21   A    Yes.

22   Q    Does Mediavine sell ads on its owned-and-operated

23   inventory through Colossus?

24   A    Yes.

25   Q    The next is we talked about Google already today.  So

1  the next one is GumGum.  What is GumGum?

2  A    Again, GumGum would be an SSP.

3  Q    And does Mediavine sell ads on its publisher customers'

4  inventory through GumGum?

5  A    We do.

6  Q    Does Mediavine sell ads on its owned-and-operated

7  inventory through GumGum?

8  A    We do.

9  Q    And are there any other SSPs that Mediavine sells its

10 publisher customers' ad inventory through that are not

11 listed here on Defendant's Exhibit 1?

12 A    The only one that I can see it -- I'm trying to see

13 where PubMatic is on here.  Did that get cut off?  Oh, no.

14 It's right here.  This is pretty exhaustive.  This appears

15 to be all of them.

16 Q    Moving on to the next section, which unfortunately

17 there are no page numbers.  But there is a section that is

18 entitled Demand Side Partners.  I think it's the

19 third-to-last page.  Do you see that?

20 A    Yes.

21 Q    So I'd like to -- it's a more manageable list.  I'd

22 like to go through them.  What is Basis Technologies or

23 Centro?

24 A    They would be a demand-side platform.  So -- but we are

25 integrated with them as a partner.

Read-In - E. Hochberger

1  Q    And what does that mean, that Mediavine is integrated
2  with them?
3  A    Through our Mediavine exchange that I previously
4  referenced, we do have some direct connections to
5  demand-side partners in addition to supply-side.  So bidders
6  are able to bid into the inventory.
7  Q    So when you say a direct connection to a demand-side
8  partner, do you mean as an alternative to going through an
9  SSP?
10  A    Correct.
11  Q    And can ads be purchased through Basis for Mediavine's
12  owned-and-operated inventory?
13  A    Yes.
14  Q    What about the next one, Conversant LLC/Epsilon?  What
15  is that?
16  A    So it's almost a hybrid, both an SSP and a DSP.  It's
17  owned by Epsilon, which is a large part of an agency.  But,
18  yes, I would say for all intents and purposes, it's an
19  exchange similar in nature to the rest.
20  Q    So can advertisers through Conversant place ads on
21  Mediavine's publisher customer inventory?
22  A    Yes.
23  Q    And can advertisers through Conversant place ads on
24  Mediavine's owned-and-operated inventory?
25  A    Yes.

178

Read-In - E. Hochberger

1  Q    What is Criteo?

2  A    Our industry is so confusing.  Criteo also now merged

3  with MediaGrid from the previous.  It could be seen as now

4  both an SSP and a DSP or a demand-side partner.  In this

5  particular thing, we're looking at Criteo as a DSP, which we

6  have a connection with.

7  Q    Do you also -- strike that.

8       Does Mediavine also use Criteo as an SSP?

9  A    Yes, through their acquisition of the MediaGrid.

10 Q    Can advertisers through Criteo place ads on Mediavine's

11 publisher customers' inventory?

12 A    Yes.

13 Q    Can advertisers through Criteo place ads on Mediavine's

14 owned-and-operated inventory?

15 A    Yes.

16 Q    What is Open Path/The Trade Desk?

17 A    So The Trade Desk is a DSP, and they have a direct

18 connection with publishers.  And that's the product known as

19 Open Path.

20 Q    So is the Open Path similar to Basis Technologies when

21 we were talking about the direct connection?

22 A    Of the four, these would be most similar to Basis.

23 Q    So can advertisers through Open Path place ads on

24 Mediavine's publisher customers' inventory?

25 A    Yes.

179

Read-In - E. Hochberger

1    Q    And can advertisers through Open Path place ads on

2    Mediavine's owned-and-operated inventory?

3    A    Yes.

4    Q    Let's shift to Mediavine's publisher customers.

5         Are Mediavine's publisher customers properties

6    accessible through Desktop Web.

7    A    Yes.

8    Q    And do Mediavine's publisher customers sell ads on

9    their Desktop Web properties?

10   A    Through Mediavine, yes.

11   Q    Are Mediavine's publisher customer properties

12   accessible through web browsers on mobile phones?

13   A    Yes.

14   Q    And do Mediavine's publisher customers use Mediavine to

15   sell ads that are accessible through web browsers on mobile

16   phones?

17   A    Yes.

18   Q    Are Mediavine's publisher customer properties

19   accessible through web browsers on tablets?

20   A    Yes.

21   Q    Do Mediavine's publisher customers use Mediavine to

22   sell ads on web browsers that are accessible by tablets?

23   A    Yes.

24   Q    Let's switch to publisher customer properties.  Wait.

25   What type of ad formats can advertisers purchase on

1    Mediavine's publisher customers' properties?

2    A    We make the same formats available for both publisher

3    and owned-and-operated.

4    Q    So, again, just so we're clear, those would be banner,

5    native, in-stream video, and outstream video ads; did I get

6    that correct?

7    A    Correct.

8    Q    And do Mediavine's publisher customers sell ads through

9    different ad formats at the same time?

10   A    Yes.  Again, we make sure our publisher inventory is

11   available in multiple format.

12   Q    And why does Mediavine do that?

13   A    Increased yield.  If a bidder is willing to pay more

14   money for a banner ad than a video ad, we will show the

15   banner ad.  The same concept with native or video.  Our sole

16   goal is to increase yield.  That's what I keep saying.

17   That's our job.

18   Q    And to increase yield, you give the advertisers more

19   options to choose from; is that fair to say?

20   A    Yes.

21   Q    Would you agree that Mediavine's publisher customers

22   sell more ads to the ad format that have a better rate of

23   return?

24   A    I think publisher -- yeah, I think it's -- there's a

25   variety.  It's sold across all four.  It's not -- yeah,

1    whatever.  At the time of auction, whatever the highest bid

2    is what we take, whatever the format.

3    Q    I'd like to show you a document marked Hochberger is

4    Defendant's Exhibit 2.

5              MS. DUNN:  Your Honor, move to admit 1734.

6              MS. WOOD:  No objection.

7              THE COURT:  All right.  1734 is in.

8    Q    Mr. Hochberger, do you recognize this document?

9    A    It appears to be a page from our website.

10   Q    And would you agree that it is a page from Mediavine's

11   website that is entitled Ad Capabilities?

12   A    Yes.

13   Q    Do you recognize Defendant's Exhibit 2 or DTX 1734 to

14   be a true and accurate copy of a website from Mediavine's

15   website called ad capabilities?

16   A    Yes.

17   Q    And was the ads capability website reflected in

18   Defendant's Exhibit 2 maintained in the ordinary course of

19   Mediavine's business?

20   A    Yes.

21   Q    I'd like to direct your attention to page 2 of

22   Defendant's Exhibit 2.  And on page 2, there is a second box

23   above the picture where it says, as read, We also utilize a

24   super auction which allows multiple formats to compete

25   within the same slot.

1      Do you see that?

2  A    Yes.

3  Q    What does that mean?

4  A    That's what I was trying to describe before, where we

5  will offer an advertiser to purchase either outstream,

6  native, or banner in the format they wish.  And the one that

7  pays the most will be the one that will win the spot.

8  Q    In other words, a super auction puts multiple formats

9  in competition for the same impression?

10  A    Yeah, for the same ad slot.

11  Q    And how would you define preferred deal transaction to

12  make sure we're on the same page?

13  A    So you would generally have a PMP, as we described

14  before, which is an agreed upon, like, private marketplace.

15  A preferred deal is similar, but it has kind of a fixed

16  price associated with it.  So instead of being submitted

17  into an auction, they are submitting a bid with a fixed that

18  both parties can agree upon.

19  Q    And how would you define a programmatic guaranteed

20  transaction?

21  A    Again, similar.  The private marketplace deal is a

22  direct relationship but with preferred -- sorry, with

23  programmatic guaranteed, they are guaranteed to win a

24  certain number of impressions.  So it's like a guaranteed

25  budget in exchange for a certain number of guaranteed wins.

Read-In - E. Hochberger

1    Q    And I think we didn't cover this earlier, but how would

2    you define an open auction?

3    A    An open auction is one in which we do have a --

4    necessarily a direct relationship with the advertiser and

5    that particular transaction.  So they just purchase the

6    inventory.

7    Q    So you were shown Defense Exhibit 2 deemed ad

8    capabilities.  Do you have a date when this was published by

9    Mediavine?

10   A    I do not, and I believe it's continuously updated as we

11   add new capabilities.

12   Q    Is there anything that you can determine from looking

13   at Defense Exhibit 2 that gives you a date of this

14   particular version of it?

15   A    You're testing how good my glasses are right now.  Let

16   me see if I can find a date in any of those blog posts that

17   are in the screenshots.

18        No, there does hot -- no, there does seem to be any

19   indication of a date that I can give you.

20   Q    And then you were shown Defense Exhibit 1 which was

21   titled Ad Management Partners.  Do you have that in front of

22   you?

23   A    I do.

24   Q    Same question of do you have a date of when this will

25   be -- this would have been published?

Read-In - E. Hochberger

1   A    I mean, this is, again, another living, breathing

2   document that is continuously updated.  So I don't have an

3   exact date.

4   Q    The same question:  Is there anything from looking at

5   Defense Exhibit 1 which would indicate to you a date?

6   A    From only that, I would personally know that some of

7   these partners are added recently.  So it has been updated

8   recently.  But no, no dates appear to be anywhere in there.

9   Q    Google's counsel asked you and kind of went one by one

10  through your SSP partners; is that right?

11  A    Yes.

12  Q    Which SSP does Mediavine use the most?

13  A    How you would define using the most?

14  Q    Well, who do you think is your largest supply-side

15  partner?

16  A    Again, I think we had mentioned after Google, it would

17  be either Magnite or PubMatic depending on the month.

18  Q    But Google is first; is that right?

19  A    By pure revenue, yes.

20  Q    If you use an alternative SSP other than Google, do you

21  still have an ad option occur?

22  A    Yes.  We choose to have an ad auction because, again,

23  to increase yield, we want everyone bidding.

24  Q    So these SSPs that were listed, would they replace AdX

25  as a platform or a product.

185

```
 1   A     I would say these are -- yeah, these compete alongside
 2   AdX.
 3            THE COURT:  All right.  Good timing.
 4            All right.  Let's read very quickly the exhibits
 5   that went in today, and then we will be finished for the
 6   evening.
 7            THE COURTROOM DEPUTY:  DTX 2535; DTX 2071; DTX
 8   2069 and 2069A; DTX 2043 and 2043A; PTX 1373; PTX 1362; PTX
 9   1860; DTX 1248; DTX 486; DTX 1214; DTX 1429; DTX 733; DTX
10   1132; DTX 1053; DTX 1514; DTX 494; DTX 1186; DTX 1182; DTX
11   1490; DTX 1616; DTX 1257; DTX 1179; DTX 1544 and 1544A; DTX
12   1071, pages to be determined; DTX 1733; and DTX 1734.
13            MS. DUNN:  Your Honor, I just want to make sure on
14   DTX 1788.  Because we had it on our list, but it was not
15   read.
16            MS. WOOD:  And I have DTX 1788 was the one that
17   started to be in and then Your Honor said, no, we're not
18   going to have that.
19            THE COURT:  Which witness was that again?
20            MS. WOOD:  Borgia.
21            MS. DUNN:  I think it was the competitive
22   intelligence document.
23            MS. WOOD:  It's on the screen.
24            THE COURT:  That's not in, no.
25            MS. DUNN:  Okay.  Got it.
```

1          THE COURT:  Ms. Wood, did you have any problems?

2          MS. WOOD:  No.

3          THE COURT:  All right.  So tomorrow is Thursday.

4   You don't have to lean your desks.  We will start at 9:00, I

5   assume, with your expert.  Is that the next witness?

6          MS. DUNN:  Yeah.  So, Your Honor, our first

7   witness is actually going to be a very short Google witness

8   due to scheduling.  Her name is Jessica Mok.

9          THE COURT:  All right.

10          MS. DUNN:  And then we will move on with expert

11   testimony.

12          THE COURT:  And you have doctor?

13          MS. DUNN:  Professor Israel.

14          THE COURT:  Is he the only expert?

15          MS. DUNN:  So we are about -- we have to go back

16   and make a final decision about whether or not to jettison

17   the remaining two experts at this point given how much

18   evidence the Court has already heard.  But Professor Israel

19   will certainly testify.  And then we will also tomorrow seek

20   to complete the remaining deposition designations, which I

21   haven't worked on all day.

22          THE COURT:  Right.

23          MS. DUNN:  We're really trying to bring this in

24   tomorrow depending, of course, on the length of plaintiffs'

25   cross-examination.

                                                            187

1      THE COURT:  Right.  And then, Ms. Wood, you're

2  going to try to give the defense as good an idea as you can

3  as to what, if any, rebuttal case the government plans.

4      MS. WOOD:  Yes, Your Honor.  I mean, obviously, to

5  the extent we have anywhere from one to three more experts,

6  that will be difficult for us to say tonight.  But we'll

7  tell them as much as we can tell them tonight.  And more

8  likely we'll have a better view tomorrow night once we've

9  heard all the evidence.

10      THE COURT:  All right.  You've done a good job,

11  both of you, both teams of moving this case.

12      So we're finished for this evening, and we'll

13  recess court until 9:00 tomorrow morning.

14      MS. DUNN:  Thank you, Your Honor.

15      (Proceedings adjourned at 6:05 p.m.)

16      ----------------------------------

17

18

19

20

21

22

23

24

25

    I certify that the foregoing is a true and

  accurate transcription of my stenographic notes.

                          _____
                                  /s/
                          Rhonda F. Montgomery, CCR, RPR

                                                    188