```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION

 3      --------------------------x
        UNITED STATES, et al.,     :    Civil Action No.:
 4                                 :    1:23-cv-108
                    Plaintiffs,    :
 5          versus                 :    Monday, November 25, 2024
                                   :    Alexandria, Virginia
 6      GOOGLE LLC,                :    Day 16
                                   :    Pages 1-125
 7                  Defendant.     :
        --------------------------x
 8

 9           The above-entitled bench trial was heard before the
        Honorable Leonie M. Brinkema, United States District Judge.
        This proceeding commenced at 9:56 a.m.
10

                        A P P E A R A N C E S:
11

        FOR THE PLAINTIFFS:   JULIA TARVER WOOD, ESQUIRE
12                            AARON TEITELBAUM, ESQUIRE
                              MICHAEL WOLIN, ESQUIRE
13                            JEFFREY VERNON, ESQUIRE
                              DAVID TESLICKO, ESQUIRE
14                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
15                            450 Fifth Street, NW
                              Washington, D.C.  20530
16                            (202) 894-4266

17      (State of VA)         TYLER HENRY, ESQUIRE
                              JONATHAN HARRISON, ESQUIRE
18                            OFFICE OF THE ATTORNEY GENERAL
                              OFFICE OF THE SOLICITOR GENERAL
19                            202 North Ninth Street
                              Richmond, Virginia  23219
20                            (804) 786-7704

21      (State of NY)         MORGAN FEDER, ESQUIRE
                              OFFICE OF THE NEW YORK
22                            ATTORNEY GENERAL
                              28 Liberty Street
23                            20th Floor
                              New York, New York  10005
24                            (212) 416-8262

25
```

1

```
 1                      A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             KAREN DUNN, ESQUIRE
 6                           JEANNIE RHEE, ESQUIRE
                             WILLIAM ISAACSON, ESQUIRE
 7                           ERICA SPEVACK, ESQUIRE
                             PAUL, WEISS, RIFKIND,
 8                           WHARTON & GARRISON LLP
                             2001 K Street, NW
 9                           Washington, D.C.  20006
                             (202) 223-7300
10
                             ERIC MAHR, ESQUIRE
11                           FRESHFIELDS BRUCKHAUS DERINGER, LLP
                             700 13th Street, NW
12                           10th Floor
                             Washington, D.C.  20005
13                           (202) 777-4500

14   COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
15                           United States District Court
                             401 Courthouse Square
16                           Alexandria, Virginia  22314
                             (607) 743-1894
17                           S.AustinReporting@gmail.com

18

19

20

21

22

23

24

25
                                                                    2
```

1                          MISCELLANY

2   Proceedings November 25, 2024 .............4
    Closing argument by Mr. Teitelbaum ........6
3   Closing argument by Ms. Dunn ..............55
    Closing argument by Ms. Wood .............115
4   Certificate of Court Reporter ............125

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE DEPUTY CLERK:  Civil Action Number |
| 3 | 1:23-cv-108, United States of America, et al. versus Google |
| 4 | LLC. |
| 5 | Counsel, will you please note your appearances for |
| 6 | the record. |
| 7 | MR. HENRY:  Good morning, Your Honor.  Ty Henry |
| 8 | from the Virginia Attorney General's Office on behalf of the |
| 9 | Commonwealth of Virginia and the other plaintiff states. |
| 10 | Your Honor, this morning I have with me my |
| 11 | colleague, Jonathan Harrison, from the Virginia Attorney |
| 12 | General's Office, and Morgan Feder from the New York |
| 13 | Attorney General's Office. |
| 14 | THE COURT:  Good morning. |
| 15 | Wait one second.  We're on.  Okay. |
| 16 | MS. WOOD:  Good morning, Your Honor.  Julia Tarver |
| 17 | Wood from the Department of Justice on behalf of the United |
| 18 | States plaintiffs.  With me are my colleagues |
| 19 | Aaron Teitelbaum, who will be conducting the first part of |
| 20 | plaintiffs' closing today; Jeff Vernon, Michael Wolin, David |
| 21 | Teslicko, and Mr. White will be running our equipment.  And |
| 22 | our wonderful team is here as well. |
| 23 | Thank you, Your Honor. |
| 24 | THE COURT:  Good morning. |
| 25 | MS. DUNN:  Good morning, Your Honor.  Karen Dunn |

4

```
 1   on behalf of Google.  With me today is Jeannie Rhee, Bill
 2   Isaacson, Eric Mahr, Erica Spevack, Craig Reilly, Mr. Matt
 3   Spalding, and obviously our wonderful team is here as well.
 4              THE COURT:  Good morning.
 5              MS. DUNN:  Good morning.
 6              THE COURT:  All right.  So today we're having the
 7   closing arguments of counsel.  We've allotted
 8   approximately -- and I say approximately -- 90 minutes per
 9   side.  My understanding is the plaintiff wants to break that
10   up 45 and 45.
11              Is that correct, or have you changed that?
12              MS. WOOD:  No, Your Honor.  It will be
13   approximately an hour to an hour ten minutes, reserving
14   approximately 20 minutes for rebuttal.
15              THE COURT:  Ah.  All right.  That changes that.
16   All right.
17              Then probably we'll take the morning break after
18   your opening closing, and then have the Google argument,
19   which is about an hour and a half, and it may not go the
20   whole thing, and then your rebuttal.  And whether or not I
21   do a lot of interrupting depends upon how you argue the
22   case.  All right.  Very good.
23              So then we will let the plaintiff get started.
24   And what we'll do is we'll let you know when you've done one
25   hour.  All right.  And then let us know at that point how
```

5

1    much more time you want.

2              CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

3              MR. TEITELBAUM:  Thank you, Your Honor.  That

4    sounds great.

5              For more than a decade, Google has rigged the

6    rules of auctions, restricted its own customers' freedom of

7    choice, and extinguished competition from better ad tech

8    products through acquisitions.  Why then have Google's

9    advertiser and publisher customers continued to do business

10   with Google rather than voting with their feet and taking

11   their business elsewhere?  And the answer is simple.

12             And if we could activate the slide, Mr. White.

13             Google is once, twice, three times a monopolist in

14   the markets for publisher ad servers, ad exchanges and

15   advertiser ad networks for open-web display advertising, and

16   as a result, Google's customers have no realistic

17   alternatives to doing business with Google and doing it on

18   terms that benefit Google rather than its publisher or

19   advertiser customers.

20             Google's own executive very aptly described

21   Google's dominance in these three markets in an ordinary

22   course of business communication when he said that the

23   analogy would be if Goldman or Citibank owned the New York

24   Stock Exchange.

25             Now, Google did not achieve its trifecta of

6

```
 1    monopolies by accident.  It did so through measures that

 2    strengthened its own dominance rather than making its

 3    products better or cheaper for its own customers.  So, in

 4    other words, what Google was doing was executing on a

 5    strategy to do to display what Google had already done to

 6    search.  And we already know what Google did to search

 7    because of what another district court across the river has

 8    already ruled.

 9              So, Your Honor, I'm going to spend the remainder

10    of my time addressing some key evidentiary points from the

11    trial in a bit more detail and also cover what we consider

12    to be Google's main arguments.  So the way I at least plan

13    to proceed is starting with why the plaintiffs' market

14    definition reflects commercial realities, and then I'll

15    address why Google has monopoly power in all three relevant

16    markets, and then why Google's conduct was anticompetitive.

17    And as I go, I'll also address Google's main

18    counterarguments.

19              And we've got the slides up on the screen, and

20    also I believe binders have been distributed, and if they

21    haven't been, we probably should take care of that.

22              THE COURT:  All right.  They have not been.

23              MR. TEITELBAUM:  And of course I'm happy to take

24    the Court's questions on any topic at any time as I go.

25              But before I start with market definition, I do
```

7

```
 1    want to make an overarching observation about the evidence
 2    that the Court heard at trial.  And I think we're
 3    approximately on Slide 4 or 5 right now.  On Slide 5.
 4              And so the observation that I would like to make
 5    about the evidence from the trial is that all evidence is
 6    not created equal, and what the plaintiffs brought to trial
 7    were a wide variety of live industry participant witnesses
 8    who testified based upon long experience in the business
 9    from ad tech companies to publishers to advertising
10    agencies, and they provided real-world insight into how the
11    markets at issue in this case actually worked.
12              THE COURT:  Well, you know, Google points out that
13    you actually did not call -- I don't believe you called an
14    actual advertiser.  Did you not just call agencies?
15              MR. TEITELBAUM:  That's correct, Your Honor.  We
16    called advertising agencies because those are the personnel
17    that actually have the most relevant experience working with
18    the tools that are at issue in the markets in this case.
19              THE COURT:  But aren't the advertisers themselves
20    the actual customers?
21              MR. TEITELBAUM:  The advertisers are ultimately
22    the customers, but they do work through the advertising
23    agencies to actually operate the tools at issue.
24              THE COURT:  But you don't think it would have been
25    relevant and valuable for the Court to get a sense --
```

8

1  because we certainly got a sense from publishers as to their

2  actual dissatisfaction and frustration with the stack.  But

3  we didn't hear any direct evidence from advertisers, the

4  ultimate consumers, as to their satisfaction or

5  dissatisfaction with the system.

6          MR. TEITELBAUM:  I think what was illustrative is

7  Google called a witness from the Census Bureau, as the Court

8  may recall.  And the issue with advertisers, who, of course,

9  are harmed by Google's conduct, but they don't have the

10  firsthand knowledge of what it's like to use Google's tools,

11  and so the marginal benefit from calling them, when really

12  the markets at issue are the tools that do these ad tech

13  transactions, I think we felt that the most effective use of

14  our time was to have the advertiser agencies speak to that.

15          THE COURT:  All right.

16          MR. TEITELBAUM:  And so, as I mentioned by

17  contrast, from Google, the only live witness that the Court

18  heard from Google that was not either on Google's payroll or

19  the recipient of a grant from Google in the case of Courtney

20  Caldwell was a witness from the Census Bureau.

21          And this evidentiary disparity is an important

22  framework and lens for evaluating the record in this case,

23  because it reflects an important truth, which is that while

24  Google may have control of the markets they've monopolized

25  here, they do not control the facts that govern the market

9

1    realities.  The facts speak for themselves.

2            And so I'll turn now and discuss market

3    definition.  And as a threshold matter, I do want to make an

4    important distinction about different types of competition

5    and how they are or aren't relevant for this case.  I'll

6    break it down into three different types of competition.

7            First there's overall competition between firms in

8    a sector of the economy.  Second, there's competition within

9    a single auction to buy an impression on the open web.  And

10   then third, there's competition between products in a

11   particular antitrust product market and geographic market.

12   And for the purpose of market definition in this case, the

13   only one of those three things that matters is the last one,

14   the third item, competition within a relevant antitrust

15   product market and geographic market.

16           At trial, Google made repeated efforts to conflate

17   these three concepts, and, in doing so, they're really

18   confusing the issues that the Court needs to decide here.

19           It does not matter, for purposes of this case,

20   whether Google views Meta or Amazon or TikTok as a worthy or

21   worrisome advertiser -- adversary in some broader macro

22   sense in the economy in terms of a rivalry between tech

23   companies.  And it also doesn't matter for market definition

24   whether a particular auction for a particular impression on

25   the open web is competitive.  Those are both entirely

1    different questions from whether or not the market for the

2    tools or for a particular tool is competitive in the sense

3    of whether or not the relevant antitrust market is

4    competitive.

5            And the D.C. District Court acknowledged this

6    contrast in the *FTC v. Staples* case when it said that the

7    mere fact that a firm may be termed a competitor in the

8    overall marketplace does not necessarily require that it be

9    included in the relevant product market for antitrust

10   purposes.  What we're concerned about here is competition

11   within relevant antitrust product markets, not overall

12   tech-sector rivalries that may be playing out in the

13   American economy.

14           So now with those overarching points out of the

15   way, I would like to focus on two key product market

16   definition issues in this case.  First of all, why there are

17   separate product markets for publisher ad servers, ad

18   exchanges and advertiser ad networks, the three tools that

19   we talked about at trial, and then also why open-web display

20   advertising is distinct from other forms of digital

21   advertising.  And I do think it's worth covering a few other

22   basic principles just briefly.

23           First of all, market definition is not intended to

24   be an abstract intellectual exercise; it is intended to be a

25   pragmatic one.  It's an analytic tool, and not an end unto

11

1    itself, as the District Court, once again in D.C., in the

2    *United States v. Bertelsmann* case said. And we have those

3    on the slides, too.

4            And, similarly, as the Supreme Court said in *Ohio*

5    *v. American Express*, what we're looking for in the product

6    market definition is the arena within which significant

7    substitution in consumption or production occurs. We're not

8    looking for extraordinary circumstances under which two

9    products might theoretically be substitutable in edge case.

10           And the plaintiffs don't have to, and we're not

11   trying to rule out every other conceivable way of looking at

12   product market definition in this case. What we have to

13   show and what we have shown is that the market definitions

14   we've put forward meet the requirements that I just laid

15   out.

16           And another observation from the Court in -- the

17   D.C. District Court. Within a broad market, well-defined

18   submarkets may exist, which, in themselves, constitute

19   product markets for antitrust purposes. And I think

20   paraphrased what that really means is that there is no one

21   true market definition that the Court has to divine from the

22   ether; the question is whether or not the product market

23   definition that we've put forward allows the Court to assess

24   competitive effects and market power and the like. And

25   we've done that.

                                                                    12

1          So starting with the tools that are at issue in

2    this case.  And I think this discussion can be relatively

3    brief because there's no real dispute from the trial

4    evidence that TikTok's ad tech tools or Meta's ad tech tools

5    cannot be used to buy or sell open-web display advertising.

6    So they're not reasonable substitutes for publisher ad

7    servers like DFP, ad exchanges like AdX, or advertiser ad

8    networks like Google Ads.

9          And, similarly, the tools that are used to

10   facilitate programmatic open-web display transactions are

11   not reasonably interchangeable with one another.  So a

12   publisher ad server like DFP is not a reasonable substitute

13   for an ad exchange or a demand-side platform.  And even, for

14   instance, Google's own witness, Adam Stewart, acknowledged

15   this when he admitted or agreed that a website publisher

16   cannot use DV360, Google's demand-side platform, to sell

17   advertising.

18         And sort of along those same lines, Mr. Mohan,

19   when he testified, acknowledged that competitors can vary

20   depending on the features or tools that they offer.  So it

21   matters whether or not what a publisher ad server is

22   actually used for.  It can't be interchanged with a buying

23   tool, for instance, because those two tools have completely

24   different purposes and completely different sets of

25   customers.

13

1          And thinking about the tools in this manner is

2     100 percent consistent with how Google's own internal

3     documents think about them as reflected, for instance, in a

4     defense exhibit, DTX 758, that we have up on the screen,

5     where Google, itself, is conducting a tool-by-tool

6     competitive analysis of its tools versus Facebook tools.

7     And so it's not breaking -- it's not looking at one giant

8     mega market for display advertising; it is looking at each

9     individual tool, like DoubleClick ad exchange, and asking

10    what does Facebook have that competes, for instance, with

11    our ad exchange.

12          And the fact that these tools have multiple

13    functions, for instance, the fact that DFP can also transact

14    in other types of digital advertising, does not undermine

15    our market definition.  Because, as Professor Lee explained,

16    for instance, gas stations may also sell potato chips, but

17    that doesn't mean we can't evaluate competition between gas

18    stations based on their sale of gas.  And the Seventh

19    Circuit acknowledged that when they said that the services

20    are not in the same product market merely because they have

21    a common provider.  And so we have that cite on the slides

22    as well for future reference.

23          And, finally, I'll just note that plaintiffs'

24    market definition has taken account of and is fully

25    consistent with -- we are not at odds with *Ohio v. American*

                                                              14

1    *Express*, as Google has suggested.  In fact, we correctly

2    acknowledge and agree that ad exchanges, like AdX, are

3    two-sided transaction platforms; it's just that the products

4    on either side of the ad exchange, publisher ad servers, and

5    advertiser ad networks are in separate product markets

6    because they have different sets of customers, they have

7    different functions, they have different competitors and the

8    like.

9         So moving on now to open-web display advertising

10    and why it's distinct from other types of digital

11    advertising.

12         I think an overarching point that is worth making

13    is that there is no confusion from the trial evidence or

14    uncertainty among the industry participants who testified at

15    the trial that open-web display advertising is very real and

16    distinct from other types of digital advertising.  We have

17    just a few examples of the live witnesses that we called

18    from various industry participants who agreed with that

19    proposition.  And that's also consistent with Google's own

20    internal documents, like PTX 764 that we have on the slide,

21    which makes reference to display web versus display app,

22    versus search, et cetera.

23         So this assertion that we've heard repeatedly from

24    Google that open-web display advertising is somehow a

25    made-for-litigation concept is sort of like a zombie; it

15

 1    seems to keep shuffling along through this case despite

 2    being repeatedly laid to rest by the trial evidence.

 3            So turning now to the question of substitution

 4    between open-web display advertising and other types of

 5    digital advertising.  Both live witnesses from trial and

 6    documents confirmed that social media, mobile app

 7    advertising, instream video, search advertising, none of

 8    those are reasonable substitutes for open-web display

 9    advertising.  And that's true both from the perspective of

10    the advertiser and also from the perspective of the

11    publisher.  So what the evidence actually showed is that

12    these different types of digital advertising are

13    complements, not reasonable substitutes.

14            So to provide a few examples just from the

15    advertiser's perspective.  Mr. Lowcock, he explained the

16    differences in pricing, creative considerations, audience

17    targeting considerations that exist among different types of

18    digital advertising and why open-web display advertising has

19    unique considerations in that regard.

20            And Mr. Lambert, for instance, one of the

21    advertising agency witnesses, he likened the different types

22    of digital advertising to different players on a baseball

23    team.  And just like the different players on a baseball

24    team are complementary to each other, so, too, are the

25    different types of digital advertising.

                                                              16

1            And to borrow and expand on Mr. Lambert's analogy,

2    when something's not going quite right with the pitcher on a

3    baseball team, the solution is not to take out the pitcher

4    and put in a second shortstop, for instance; the solution is

5    to maybe make some adjustments to what the pitcher is doing

6    to try of to right the ship.

7            Now, from the publisher's perspective, I think

8    it's even more clearcut that the lack of substitution among

9    different types of digital advertising.

10           As Mr. Wolfe explained at trial when we were

11   talking about the example of the Staunton News Leader, an

12   open-web publisher like the Staunton News Leader has Adspace

13   on its web page as reflected on the slide, but also Adspace

14   on its mobile app.  And those are two completely different

15   pieces of real estate, both of which the Staunton News

16   Leader needs to sell at any particular time.  And so from

17   the perspective of a publisher like at Staunton News Leader,

18   it's not an either/or proposition, either I'll sell the

19   space on my app or I'll sell the space on my website, they

20   really have to do both.  The same as if you have two parcels

21   of land that are for sale, selling one of those parcels

22   isn't a substitute for selling the other.

23           Google has suggested that substitution by

24   advertisers alone might be sufficient to discipline a

25   monopolist even if publishers can't substitute, but that

17

1    argument is unsupported by the actual trial record, because

2    what the evidence showed is that open-web publishers have

3    inventory that they need to sell each time a user opens a

4    web page, and that inventory does not go away or decrease

5    even if some particular advertisers might decide that

6    they're going to spend money on social advertising instead

7    of open-web display advertising.  Those open-web publishers

8    are stuck with that inventory that we need to sell no matter

9    what.

10           I'll just briefly touch on programmatic versus

11   direct deals, because I think the trial evidence was

12   relatively clear on that.

13           But both advertiser and publisher customers

14   explain -- witnesses explain that there are sales force

15   considerations and overall demand and market considerations

16   that place more or less a cap on the number of direct deals

17   that particular advertisers or publishers are going to be

18   able to do.  And there really isn't really a magic lever

19   that they can pull to increase the quantity of direct deals

20   that they're doing; they're basically doing as many as they

21   can.  And so contrary to what Dr. Israel suggested,

22   publishers cannot simply work harder to generate more direct

23   deals than they're already generating; they're doing the

24   best that they can.

25           And speaking of Dr. Israel, what Google has

18

 1    proposed with respect to its arguments on market definition

 2    is essentially an amorphous two-sided ad tech market that

 3    they didn't quite define, but that they at least suggested

 4    might be out there.  And that suggestion rests pretty much

 5    entirely on Dr. Israel's testimony as opposed to on the

 6    testimony of any fact witnesses.

 7            And so that proposal for market definition is a

 8    raid against all of the fact witnesses that the plaintiffs

 9    called at trial.  And it's frankly pretty unsurprising that

10    Dr. Israel does not have more factual support for that

11    proposed market definition because, as we discussed on

12    cross-examination, his track record in recent courts is

13    consistent with that.

14            And here's just a few other examples of why that

15    single two-sided market just is not correct and can't be

16    viable.  If it's a single two-sided market, for instance,

17    why did we read in Neal Mohan's internal emails about a

18    "three pillar" strategy to control the platform which is

19    DFP, and the buying tool, which is Google Ads, and the

20    exchange in between?  And that's reflected on the slide for

21    future reference if the Court wants to look at it.  And he

22    was talking about three pillars, not one giant pillar.

23    Google's own internal documents make clear it's three

24    markets; not one.

25            Google's all digital advertising market also fails

                                                              19

```
 1   to grapple with the fundamental reality that open-web
 2   publishers like the Daily Mail, for instance, or the
 3   Staunton News Leader, they have to use a publisher ad server
 4   to sell their open-web display ads.  So how is it that there
 5   can be a valid market definition that suggests that TikTok's
 6   or Meta's ad tech tools, which have no ability whatsoever to
 7   transact in open-web display advertising at all, can be a
 8   reasonable substitute for a publisher ad server?  But that
 9   is essentially what Dr. Israel is proposing in his proffered
10   two-sided market.
11          And we also heard from Dr. Israel that many
12   advertisers use more than one form of advertising at once,
13   and that information on its own is really just not
14   informative.  The Court asked Dr. Israel during his
15   testimony about the analogy of stoves and microwaves.  And I
16   think that's illustrative, because many families are going
17   to have both stoves and microwaves, and even though both of
18   those two items cook food, just because a family has both
19   doesn't mean that a microwave and a stove are reasonable
20   substitutes.  In fact, when a family has both, that tends to
21   indicate that those two items are complements; not
22   substitutes.
23          I'll just briefly touch on the fact that Google's
24   position on market definition is also directly at odds with
25   the position it took before another federal court.  And I
```

                                                              20

1    know that the Court has heard this before and seen it in the

2    papers.  But I do think it speaks to the credibility of

3    Google's proposed market definition that it has completely

4    done a 180-degree turn from what it argued in the Northern

5    District of California.  And what Google's market definition

6    litigation strategy appears to be is that when the

7    plaintiffs say it's one market, Google says it's three; and

8    when -- and then when we say it's three markets, Google says

9    it's one.  And so I do think that that's an important

10   consideration for the Court to take into account when

11   evaluating Google's arguments on market definition, even if

12   the Court's not inclined to formally grant our motion for

13   judicial estoppel.

14          And so while we're on the subject of

15   inconsistency, I also just want to make one brief comment

16   about Google's post-trial papers in general, which is just

17   to ask that the Court use caution in taking some of the

18   factual assertions there at face value, because they do not

19   necessarily line up with the evidence that's cited in

20   support.

21          So just taking one example.  On page 7 of Google's

22   post-trial proposed findings of fact, Google asserts that

23   multiple witnesses describe the marketplace as

24   "hyper-competitive" after header bidding, but the citations

25   make clear that the market was described in that fashion

                                                              21

1    only relative to the previous waterfall setup in which

2    exchanges weren't allowed to compete at all.  And then the

3    rest of the quotes generally describe the growth of header

4    bidding in general.  So this is just a general caveat that,

5    consistent with what I said before, the evidence really

6    speaks for itself in this case, and it's not the

7    characterizations of that evidence that should control.

8             On geographic market definition, I'll be extremely

9    brief.  Both sides agree that a U.S. market in terms of

10   geography is appropriate.  A worldwide market is also

11   appropriate, because even as Google's own witnesses agreed,

12   there is a single AdX, a single DFP, a single Google Ads for

13   the whole world.  We don't have AdX United States and AdX

14   Europe, for instance.  So the products function worldwide,

15   and so a worldwide market is an appropriate way of looking

16   at them.

17            THE COURT:  You've spent a fair amount of time in

18   both your papers and so far in the argument trying to

19   distinguish one of the basic differences between your

20   approaches to the case, and that is, you're arguing that

21   there are these three separate tools, and in each one of

22   which, the Court should consider a separate market; right?

23   Whereas Google has taken the position that the ad stack is

24   really one entity that has to be looked at as basically

25   using the AmEx type of model.  All right.

1              But I think it's on paragraph 78 of your proposed

2    findings, there's an interesting statement there.  You say:

3    Even in a market comprised of an entire ad stack -- which

4    would be the Google's theory -- that you still believe that

5    the evidence would show that there's direct evidence of

6    monopoly even if we look at this as a two-sided

7    transactional market.

8              I want you to address that point.

9              MR. TEITELBAUM:  Absolutely, Your Honor.

10              And so that actually does get to the next thing

11    that I was going to address anyway, but I'm going to respond

12    directly to the Court's question.  Which is that ultimately

13    direct evidence of monopoly power is, as the Supreme Court

14    has said, the power to control prices and exclude

15    competition.  So we typically have to engage in a market

16    definition analysis in order to be able to appropriately

17    evaluate those effects.  But in this particular case, we

18    have compelling direct evidence that Google is doing things

19    like saddling its own customers with product features that

20    they do not want.

21              For instance, in the context of UPR, the Unified

22    Pricing Rules, taking away Google's own publisher customers'

23    ability to set differential floors between different ad

24    exchanges.  That's something that literally decreases the

25    freedom of choice of its own customers.  And the fact that

23

```
 1    Google is able to do that without fearing the consequence
 2    that all of its publisher customers are going to say that's
 3    not acceptable to us, we're going to go use a different
 4    tool, is direct evidence that Google has market power in a
 5    particular market.  And specifically because Google's
 6    publisher customers are stuck using DFP, they can't go
 7    anywhere else.
 8            Similarly, when Google --
 9            THE COURT:  Well, they can't go anyplace else
10    because they want access to that great mass of advertisers
11    that are on the other end of the exchange.  Which, again,
12    you're not directly answering my question.
13            Basically what I'm asking is, does it make any
14    difference in the long run, given these other factors that
15    you've pressed, does it truly make any difference whether
16    the Court ultimately decides that we have three separate
17    tools, three separate markets, or just the one ad stack, if
18    the whole ad stack, as it operates, is resulting in this
19    anticompetitive monopolistic result, does it make any
20    difference how I've defined it?
21            MR. TEITELBAUM:  Ultimately the plaintiffs can
22    prevail regardless for the reasons that I've outlined, but I
23    do think that it makes more analytical sense to think about
24    it in terms of three different products because those
25    products are not fungible, and they're not reasonable
```

24

1    substitutes, and Google's own documents reflect that.

2            But nonetheless, I do think that direct evidence

3    of monopoly power that we've seen from Google where it does

4    things that it knows its customers are not going to like,

5    but it does them anyway is an indication that it knows that

6    it has monopoly power, however the Court ultimately wants to

7    characterize what that market is.

8            And so I'll just touch on a few additional points

9    about monopoly power -- and this does also go to what the

10   Court was getting at -- which is that Google recognizes that

11   one of its major sources of monopoly power is the connection

12   across these different products, from Google Ads, to the ad

13   exchange, to DFP.  And that's something that's reflected

14   here in PTX 551, for instance, an internal on Google

15   communication, the value of Google's ad tech stack is less

16   in each individual product, but the connection's across all

17   of them.

18           And so what the evidence has shown in this case is

19   that Google freely pulls levers in different parts, in

20   different tools to strengthen its dominance in other tools.

21   So, for instance, it uses its control over DFP to give

22   advantages to AdX.  It uses its control over Google Ads to

23   give advantages to AdX.  It uses AdX to give advantages to

24   DFP.  And so that is also a meaningful source of Google's

25   monopoly power in all three markets as we've characterized

25

1    it, but also just more generally is a source of Google's

2    monopoly power.

3            I'll just make a few specific points about the

4    individual products.

5            So Google's publisher customers recognize that

6    they are stuck with DFP as reflected in these two trial

7    exhibits here, and Google recognizes the same thing.  For

8    instance, Google recognized that it would take an act of God

9    to switch publisher ad servers.  So that's also an excellent

10   example of direct evidence of monopoly power.  And that's

11   PTX 1814.

12           Similarly, Google has spent a lot of trial time

13   talking about companies like Facebook.  And I think it's

14   quite telling that, as reflected in Mr. Boland, from

15   Facebook's testimony, that Facebook tried and failed to

16   build its own publisher ad server.  And they determined that

17   it would be infeasible for them to succeed with their

18   publisher ad server because of Google's control across the

19   technology stack as reflected in the slide that we have

20   here.

21           In advertiser ad networks, Google Ads has the

22   advantage of a tremendous pool of search advertisers that it

23   can port over and use to strengthen its monopoly power in

24   open-web display advertising.

25           Ad exchanges.  The fact that Google also spent a

26

```
 1    lot of trial time talking with how dynamic and changing this
 2    marketplace is, but I think it's worth contrasting what
 3    they're saying about this market with -- in PTX 1199A here,
 4    the remarkable stability of that orangish/red line there in
 5    the center, that through all of the things that have
 6    happened over more than a decade, the entry and exit of
 7    Facebook into its attempt to build an advertiser ad network,
 8    all the other technological developments, Google has stayed
 9    steady at almost exactly 20 percent.  That is extremely
10    powerful evidence -- direct evidence of monopoly power.
11            I'll just also touch briefly on market shares.
12    Google dominates the publisher ad server market with market
13    shares in the high 80s to low 90s, depending on whether
14    we're looking at the U.S. or worldwide.  Similarly, Google
15    Ads is in the same general range.  And even AdX, while its
16    percentage in absolute terms is lower, PTX 1237 here on the
17    slide reflects that AdX dwarfs all of the other competitors,
18    and, in fact, is -- it dwarfed its next largest competitor
19    by more than a factor of nine, and it's almost twice the
20    size of all of the other ad exchanges on this graph
21    combined.
22            So I don't think it is really responsive to AdX's
23    incredible disparity in size here to say that, for instance,
24    in the *Kolon Industries* cases in the Fourth Circuit, that
25    when there was one firm with 60 percent market share and one
```

27

```
 1   firm with 40 percent market share, that that somehow

 2   undermines the notion that AdX can have monopoly power with

 3   56 percent market share in this particular context.

 4          We've addressed intent to monopolization in our

 5   papers.  I'm not going to belabor that here.  I'll just note

 6   that even if the Court isn't persuaded that AdX has monopoly

 7   power, this type of market share is still dangerously close

 8   to showing monopoly power, especially if the Court considers

 9   the flanking monopolies on either side, the monopoly in DFP

10   and also the monopoly in Google Ads.

11          And as far as specific intent to monopolize, which

12   is also an element for attempted monopolization not present

13   in the other elements, we'll talk about this a bit later,

14   but Google's documents that we displayed throughout the

15   trial reflect a lot of employees saying the quiet part out

16   loud, essentially that what we are trying to do is

17   strengthen Google's dominance.  So the Court can see that

18   there is specific intent to strengthen Google's dominance

19   throughout the trial exhibits.

20          One last observation about monopoly power more

21   generally, and this is an observation that the D.C. Circuit

22   made in the *Microsoft* case.

23          That as we were talking about earlier in response

24   to the Court's question, Google's behavior is only rational

25   for a firm that knows that it has monopoly power, because it
```

28

1    does things that it knows that its customers are not going

2    to like, but it does them because it knows that its

3    customers have nowhere else to go.  And so that's consistent

4    with what the D.C. Circuit observed, conduct that could only

5    be rational if the firm knew that it possessed monopoly

6    power.

7            So now as I'll turn and spend most of the

8    remainder of my time talking about Google's conduct, and so

9    my goal here, especially mindful of the time, is not to

10   rehash what we've said in our papers, but to try to hit some

11   key points.

12           First of all, I think it's worth remembering that

13   there is no element of any of the claims here that are

14   asking the Court to determine whether first look or last

15   look or the AdMeld acquisition or any of the other specific

16   instances of conduct in this case standing alone violated

17   the Sherman Act.  The question is whether Google's course of

18   conduct as a whole was exclusionary.  And the Fourth

19   Circuit's recent opinion in the *Duke Energy* case reflects

20   that analysis.  And *Duke Energy*'s not an outlier, but it is

21   just worth mentioning for its recency.

22           And before I turn to Google's conduct more

23   specifically, I think there's also another observation

24   that's worth making from a Third Circuit case, *LePage's v.*

25   *3M.*  Which is that there are some things that a monopolist

29

```
 1    cannot do, even if those things might be acceptable for a

 2    smaller upstart competitor.  And that's reflected in the

 3    Third Circuit's opinion here because a monopolist doesn't

 4    have the same market constraints on its behavior.  That's

 5    why the Sherman Act has elements of both monopoly power and

 6    exclusionary conduct.

 7              So if there's sometimes a temptation to look at

 8    some of the things that Google did and think, well, it's the

 9    free market, sometimes you need sharp elbows to get ahead,

10    well, it's worth remembering that the standards are

11    different for a monopolist because when a monopolist has

12    market power, its conduct can be a lot more damaging than a

13    firm that has 2 percent market share, for instance.

14              So now with those overarching principles in mind,

15    I am just going to touch on some of the Google's conduct.

16    And I think Ms. Wood's analogy from her opening is apt.

17    It's the monopolist's playbook dividing the conduct in sort

18    of three broad categories:  Controlling the competition,

19    controlling customers, and then controlling the rules of

20    auctions.

21              So very briefly, just the DoubleClick acquisition

22    is how Google came into possession of AdX and DFP, and that

23    is what enabled all of Google's conduct that came after.

24    And even as early as 2009, Mr. Mohan realized that control

25    of the publisher ad server was going to be key to the
```

30

```
 1    remainder of Google's strategy, because he noted in the
 2    highlighted text that if we lose platform share, we can
 3    build the best GCN in the world -- that's the reference to
 4    what became Google Ads -- but we will still be at a severe
 5    risk of being disintermediated if Yahoo or Microsoft owned
 6    the ad tag on the publisher page.
 7            So, to paraphrase that, he knew that controlling
 8    the publisher ad server and controlling publisher inventory
 9    was going to be key, and it was the DoubleClick acquisition
10    that enabled the crucial part of Google's strategy.
11            Moving on to AdMeld just briefly.  AdMeld was a
12    threat to Google really in two main ways.  First of all, it
13    offered real-time bidding technology, which put it as a
14    direct threat to Google's AdX tool, and it also provided a
15    different way for publishers to manage their indirect or
16    programmatic inventory that was different than Google's tied
17    together AdX and DFP option.  And so that's why Google
18    bought it and parked it somewhere in the words of
19    Mr. Mohan's contemporaneous email.  And he tried to provide
20    sort of a post-hoc rationalization for what that means, but
21    I do think that the document speaks for itself when it's
22    read in the appropriate context.
23            The next general category of conduct are the ties
24    and exclusivity arrangements between Google Ads, AdX and
25    DFP.  And so what Google did was it placed two intertwined
```

31

```
 1    conditions on its publisher customers.  The first condition
 2    was, as reflected in the slide, if you want access to Google
 3    Ads unique demand, you must use AdX.  And then the second
 4    condition was if you want real-time bids from AdX, you must
 5    use DFP.  And the combined effect of these two conditions
 6    was to require Google's publisher customers to use DFP as
 7    the publisher ad server if they wanted to meaningfully
 8    access Google Ads demand.
 9            And I think it's important to note that this
10    conduct stretches basically throughout the entire time
11    period that we talked about at trial.  So it's a background
12    reality that Google's publisher customers had to deal with
13    when they were confronted with Google's other conduct like,
14    for instance, first look or UPR, they are stuck within
15    Google's tools because of those ties and because, as the
16    Court said, they want access and need access to Google Ads
17    unique demand.
18            And so just a little bit more on the exclusivity
19    between Google Ads and AdX.  Google's own employee,
20    Mr. Rowley, acknowledged that it compelled publishers to
21    work with Google's products, and that the reason that this
22    condition existed was, in the words of Google's own
23    employee, was an all-or-nothing proposition.  And that's
24    PTX 124 at the bottom of this slide.  Use AdX as your SSP or
25    ad exchange, or you don't get access to our demand.  And
```

                                                                    32

```
 1   that's very effective, because as the Court heard from our

 2   publisher witnesses, they felt that they could not turn off

 3   AdX or go somewhere else other than AdX because of what a

 4   significant portion of their revenue would be lost if they

 5   did that.

 6           And contrary to what Google suggested at trial,

 7   Google Ads does, in fact, have unique demand.  We provided a

 8   few examples on the slide here, but it's Google's own

 9   employees in internal documents, as well as industry

10   participants, that are recognizing that fact in the context

11   of their ordinary business communications.  It's not a

12   circumstance where these are external-facing advertising

13   documents where Google is saying to prospective customers,

14   oh, we have unique demand.  They may very well do that, too,

15   but it's crucial that the evidence at trial showed that even

16   during ordinary business operations, Google was

17   acknowledging that they -- that Google Ads represented

18   unique demand.

19           And another important ramification of the Google

20   Ads exclusivity to AdX, is that this is an example of Google

21   Ads making one of its products literally worse from the

22   perspective of its advertiser customers in order to serve

23   its broader aim of maintaining its dominance in the ad

24   exchange market.  And that's reflected, for instance, in

25   PTX 198 on the slide because Google's employees in charge of
```

33

```
1    Google Ads knew that it would be better for Google's

2    advertiser customers if Google Ads bid into a wide variety

3    of exchanges on an unrestricted basis as opposed to

4    primarily and predominately bidding into Google Ads.

5             THE COURT:  Wasn't one of the issues at trial,

6    though, the latency problem, if, in fact, you have multiple

7    auctions into which one can bid that would necessarily slow

8    down the process?

9             MR. TEITELBAUM:  So I don't actually think that

10   Google has even asserted with respect to this particular

11   issue that latency was the concern.  They did attempt to at

12   least suggest that header bidding posed a latency concern.

13   But ultimately the evidence just didn't bear that out.

14             For instance, we heard from several witnesses that

15   the waterfall setup, for instance, that existed before

16   header bidding also had latency problems, but that really

17   header bidding was no better or worse from a latency

18   perspective than any of the other setups.

19             As I will talk about a little bit later, and I can

20   address it briefly now, Google has suggested that there were

21   cybersecurity considerations that meant that it was better

22   or that they needed to only bid into AdX instead of other

23   exchanges in order to properly account for cybersecurity,

24   but the evidence just never bore that out because we have

25   the benefit of documents like PTX 198 where Google employees
```

34

```
 1    are expressly saying the reason that we're engaging in this

 2    product is to prop up AdX's dominance.  They're not saying

 3    the reason we engaged in this conduct is because we're

 4    concerned about cybersecurity.

 5              I'll also just note more generally that it's

 6    undisputed that Google, as a tech company, is going to think

 7    about cybersecurity to some degree.  But this notion that,

 8    writ large, Google is concerned about cybersecurity is not a

 9    valid pro-competitive justification for taking the actions

10    that it actually took in this case.  It would have to

11    actually show -- which it hasn't done -- that cybersecurity

12    considerations required them to take the actions in this

13    case as opposed to doing something that would not have been

14    exclusionary, and they just haven't carried their burden of

15    doing that.

16              And so I'll just briefly just return to the second

17    condition that Google placed on its publisher customers,

18    which was if you want access to real-time bids from AdX,

19    then you must use DFP, and that's the way that Google forced

20    all of these publisher customers to use DFP as their

21    publisher ad server and to stay with DFP as their publisher

22    ad server.

23              And the reason that this tie, which is also a

24    standalone Section 1 and 2 claim in our complaint was

25    effective was because AdX was the only place that publishers
```

                                                              35

1    could get that unique Google Ads demand since Google Ads

2    primarily and predominately only bid into AdX and not into

3    other exchanges.  That's also, by the same token, the reason

4    why Google's own employees acknowledged that Google was able

5    to sustain the 20 percent AdX take rate.  Because as

6    Google's own employees recognized in internal

7    communications, there wasn't otherwise a persuasive value

8    proposition from AdX other than that it was connected up to

9    this Google Ads unique demand in this way.

10           Google has suggested that AdX direct, which was a

11   way of receiving sort of a substandard connection between

12   AdX and other publisher ad servers, is somehow a reason why

13   that tie actually isn't present.  But this is just an

14   example of Google's arguments in court being at war with

15   their own internal documents and with what their own

16   witnesses have said previously.  Because as we have here,

17   for instance, in PTX 933, in a chat communication no less,

18   that AdX direct is a concept for antitrust.

19           And so Google recognized at the time that it was

20   creating AdX direct so that it would potentially have an

21   argument in court, that, no, we're, in fact, not engaging in

22   this tying conduct.  But the market realities actually

23   reflect, as we noted in paragraph 163 of our post-trial

24   proposed findings, that only about 1 percent of the

25   advertising spend on AdX flows through AdX direct.  And that

36

1    was as of 2023.  And that's fairly persuasive evidence just

2    as a practical matter that the -- that AdX direct is just

3    not a meaningful alternative.

4            As I mentioned, Google's also separately liable

5    for tying as a result of this conduct.  And I'll just note

6    about that that because we've brought a Section 1 and

7    Section 2 tying claim, we actually don't have to show

8    monopoly power in the ad exchange market in order to prevail

9    on that claim.  Market power, short of monopoly power, is

10   also sufficient.  So if the Court determines that, for

11   instance, a 56 percent market share is not sufficient to

12   show monopoly power, it's still more than enough to show

13   market power and would be sufficient for us to prevail on

14   the tying claim.

15           I already touched on first look and UPR for a bit,

16   so I'm not going to return to those and repeat myself unless

17   the Court has questions about either of those.

18           I do think that last look is worth mentioning

19   here.  And as the Court I'm sure recalls from the trial

20   evidence, this was a circumstance where because of Google's

21   control over the publisher ad server, it was able to give

22   itself essentially a last bite at the apple for any result

23   of a header bidding auction, and so it could decide whether

24   or not it wanted to bid just a tiny bit more in order to win

25   an impression after the auction had already taken place.

                                                              37

1              And Google's own employees recognized that last

2     look gave AdX a significant informational advantage, and

3     that this was a very powerful advantage that Google was able

4     to grant to itself because of its control of these products.

5              Sell-side Dynamic Revenue Share, as reflected in

6     the bottom exhibit, for instance, was just another way for

7     Google to exploit the fact that it had this last-look

8     advantage, because it could also choose to modulate its take

9     rate to try to win even more impressions.  And this was

10    something that only it was able to do because it was able to

11    give itself the privilege of going last.

12             And Google has suggested, both with respect to

13    first look and last look, that there were a variety of

14    obscure or poorly understood work-arounds for publishers to

15    try to get around first look or last look.  And the evidence

16    showed that for a variety -- and that's essentially what

17    their responses boil down to in their papers.

18             And the evidence showed, first of all, that

19    Google's publisher customers either weren't aware of those

20    work-arounds or did not view them as viable alternatives,

21    but I think a broader point that's worth making is that the

22    fact that we're even having this conversation about Google

23    saying, well, maybe our customers didn't like this conduct

24    but there were a variety of complicated and convoluted

25    work-arounds that they could have used to get around the

                                                              38

1    things that we're doing to our own customers is illustrative

2    of sort of the heart of the problem in this case, which is

3    that Google is knowingly taking actions that it knows that

4    its customers do not want and do not like in order to

5    benefit the dominance of its own tools.

6        And just one sort of closing comment about first

7    look and last look. With respect to Professor Milgrom's

8    testimony, first of all, Professor Milgrom recognized that

9    it was better for publishers through header bidding to get

10    more real-time bids. He acknowledged that during his

11    testimony when discussing whether header bidding was a good

12    idea. And Google's conduct was in many ways aimed at trying

13    to frustrate the results of header bidding auctions. I'll

14    also note that Professor Milgrom's testimony, he expressly

15    did not offer an opinion one way or another about whether

16    first look or last look harmed competition.

17        So I do think it's worth remembering that

18    despite -- you know, he testified about first look and last

19    look, but he doesn't have an opinion about whether or not

20    they're anticompetitive, and the facts bear out that they

21    were, in fact, anticompetitive.

22        And I'll just pause briefly on Project Poirot.

23    There was a lot of evidence at trial indicating that

24    Google -- one of Google's goals was to "dry out" header

25    bidding exchanges, and that's reflected in PTX 426.

1           And so what we saw in Project Poirot, as well as

2    their other conduct, is that they used their control of a

3    variety of different tools to take actions wherever they

4    could to try to reduce the scale and revenue of exchanges

5    that were participating in header bidding.  And Google

6    acknowledged that Project Poirot was actually quite

7    effective by increasing spending on AdX by 7 percent and

8    reducing spend on most other exchanges.  And we've addressed

9    in our papers at paragraphs 342 to 345 some of Google's

10   counterarguments on Project Poirot, and in the interest of

11   time, I'll move on for now.

12          And the only thing that I want to mention about

13   UPR that I didn't cover before when we were discussing it is

14   Google has suggested somehow that by taking away its own

15   customers' freedom of choice to set different floors for

16   different ad exchanges, that that was somehow better because

17   it was simpler for its publisher customers.  But that is

18   essentially Google saying to its own customers Google knows

19   best.  But that is not accurate.  Competition knows best.

20   Freedom of choice knows best.  And so it's actually

21   illustrative, I think of Google's approach to its conduct in

22   these markets, that it is suggesting that simplicity is an

23   end in and of itself when it's taking away its own

24   customers' freedom of choice.  Certainly eliminating all

25   options and all competitors would also be simpler, but

                                                              40

 1    that's not something that would be tolerable under the

 2    Sherman Act.

 3            One of Google's main legal arguments is that

 4    virtually everything that they have done in this case is a

 5    refusal to deal under *Verizon Communications v. Trinko*.  So

 6    I do want to spend a little bit of time addressing that

 7    argument in some more detail.

 8            And the first reason why Google is not correct is,

 9    to go back to the *Duke Energy* case, which specifically said

10    that when you have an atypical complex exclusionary campaign

11    like we have here, it's not appropriate to break up conduct

12    into little pieces and examine it in isolation under these

13    categories of refusal to deal or product design or what have

14    you.  So that's reason Number 1 why we don't even get to

15    this refusal to deal analysis that Google is trying to

16    persuade the Court to engage in.

17            But even if the Court were to look at the conduct

18    piece by piece, I think it's essential to look at what

19    *Trinko* was actually about.  What were the actual facts of

20    that case.  And what it was about was Verizon

21    Communications' unilateral refusal to build infrastructure

22    to connect up to one of its rivals in a particular market,

23    in that instance it was a telephone company.  And the

24    conduct in *Trinko*, none of it was customer-facing.

25            The conduct here is customer-facing, and that's

                                                                    41

1  why it matters that the doctrine is properly referred to as

2  a refusal to deal with rivals.  There's no doctrine of

3  lawful refusal to deal with customers, for instance.  And

4  all of the conduct that we've talked about in this case from

5  Google is customer-facing.  In UPR, it took away its own

6  customers' freedom of choice to set different price floors

7  among different ad exchanges.

8          In first look, it prevented its own publisher

9  customers from choosing to give a different ad exchange the

10  ability to bid first before Google.  Similarly, with last

11  look, taking away its own customers' ability to conduct a

12  header bidding auction and then have the winner of that

13  auction be the advertiser that actually wins that

14  impression.  Every single instance of conduct is Google

15  versus its customers.  We are not talking about Google's

16  conduct versus its rivals.

17          I think where Google really gets into trouble is

18  what it suggested is any conduct whatsoever that has some

19  kind of downstream effect on Google's relationship to its

20  competitors is necessarily a refusal to deal, and,

21  therefore, is per se lawful.  But if Google were correct

22  about that, then virtually all conduct would be a refusal to

23  deal because anything that a firm does that affects

24  competition is going to have a bearing in some manner on its

25  interactions with its competitors.  But really the question

42

```
 1    for the Court to answer is, is the conduct customer-facing?

 2    And in each instance, the answer is yes, and that's where

 3    the refusal to deal analysis is --

 4            THE COURT:  Well, don't you think with the

 5    exchange, there it would seem to the Court that there

 6    definitely is competition with the rivals.  There were other

 7    attempts to bring in exchanges, and that would be a key fact

 8    in this whole ad stack.  I mean, that's the connector.

 9    That's where the fees are collected, it's at that point.

10    And I think it's hard to say that that is actually addressed

11    at customers; that's addressed at rivals.

12            MR. TEITELBAUM:  I would respectfully disagree

13    with that, because what the conduct actually is is a --

14    another way of looking at this, and this was something that

15    I was going to say momentarily anyway, which is that a

16    conditional refusal to deal, which -- also known as a tie,

17    is definitionally not a lawful refusal to deal under Trinko.

18    And the conduct that's relevant -- most relevant for the ad

19    exchange is Google is saying to its publisher customers, not

20    to any competitors, it's not talking to its competitors,

21    it's saying to its own publisher customers, if you want

22    access to our ad exchange with real-time bids, then you must

23    use our other product, publisher ad servers in DFP.  And so

24    that is not a unilateral refusal to deal with a rival; that

25    is a tying restriction being placed on a customer.
```

43

1          And, I'm sorry.  I didn't mean to interrupt.

2          THE COURT:  No, that's all right.  Go ahead.

3          MR. TEITELBAUM:  And Footnote 8 of the *Kodak* case

4   that we cited, the Supreme Court *Kodak* case also gets at

5   this, which is it's always possible as a matter of semantics

6   to rephrase a refusal -- a tie as a refusal to deal, because

7   you could say I'm not going to deal with anyone who doesn't

8   also -- in Product A who doesn't also buy Product B from me.

9   But that's just a semantic game that's rephrasing a

10  conditional refusal to deal to make it sound unilateral.

11  And so I'm not going to be as articulate as the Supreme

12  Court was in Footnote 8, but I would just commend that

13  particular portion of *Kodak* to the Court because they

14  address that argument spot on.

15         And then I think even if we get to a point where

16  the Court thinks that we might be dealing with some conduct

17  that might properly be considered a unilateral refusal to

18  deal, that's not the end of the analysis, because predatory

19  conduct or conduct that's taken with anticompetitive malice,

20  even if it is a refusal to deal still violates the Sherman

21  Act.  And so that's a holding that's reflected in the *Aspen*

22  *Skiing* case, for instance.  It's reflected in the *Viamedia*

23  case from the Seventh Circuit more recently.  And also

24  within *Trinko* itself that talks about a firm having dreams

25  of monopoly as being an exception to some sort of immunity

44

1    or ability to not be held accountable under the Sherman Act.

2    And what we have here is a tremendous amount of evidence

3    through Google's own internal documents -- and I see that

4    I'm at roughly 60 minutes, so I'll be cognizant of that.

5                THE COURT:  Yes.

6                MR. TEITELBAUM:  The documents are rife with

7    evidence of anticompetitive malice.

8                And so I have three slides here I'm not going to

9    read to the Court in the interest of time.  But as I said

10   before, Google's employees had a tendency to say the quiet

11   part out loud in terms of what their intent was.  And so

12   will do to display to what Google did to search is an

13   example of anticompetitive malice.

14               This recognition that UPR, by itself, makes it

15   look extremely self-serving, at the bottom there, PTX 762,

16   is an acknowledgment of anticompetitive malice.  This

17   all-or-nothing proposition in PTX 124 is an example of

18   anticompetitive malice.  Parking a competitor, AdMeld, once

19   again, an example of anticompetitive malice.

20               And so even if we get to a point where the Court's

21   analyzing this conduct under the refusal to deal framework,

22   the plaintiffs still prevail, especially when you consider

23   that under specific *Aspen Skiing* factors, for instance, the

24   *Aspen Skiing* case talks about breaking off a prior course of

25   dealing as being particularly illustrative or probative of

                                                              45

```
 1    anticompetitive malice.  And that's exactly what we have

 2    with UPR, where Google took a freedom of choice that its

 3    customers once had in being able to set different price

 4    floors, and it took that away in 2019.  And so that would

 5    be, for instance, directly responsive to some factors that

 6    the Supreme Court has set forth.

 7            Mindful of the time, I'll also just briefly cover

 8    Google's suggestion that its conduct is properly considered

 9    a product design.  But the cases that we cited in our papers

10    explain that the standard is essentially the same for

11    evaluating a product design versus any other type of

12    conduct.  The question is whether it harmed competition and

13    whether it coerced consumers and impeded competition, and

14    then whether or not there's a valid pro-competitive

15    justification.  And for all the reasons that we've already

16    covered, all of Google's conduct has done those things.

17            And there is not a computer code exception to the

18    antitrust laws where Google can say, well, it would require

19    technical work for us to do something different, and,

20    therefore, it can't be a violation of the Sherman Act, but

21    that's just not how the law can work.  Because of course

22    Google expended technical work to harm competition in the

23    first place.  So whether it's going to take work to undue

24    the harm that we've done is just not the right question to

25    ask.
```

46

 1              As far as pro-competitive justifications, I'll

 2    just touch on a few things.  First of all, Google has

 3    suggested in its papers that we might bear the burden to

 4    disprove a valid business reason under Fourth Circuit

 5    precedent.  And we've covered that to some degree in our

 6    papers, but I'll also just note, this is a case that we did

 7    not cite in our papers, but it's worth noting.  The *Dickson*

 8    *v. Microsoft Corporation* case from the Fourth Circuit

 9    expressly cited the D.C. Circuit *Microsoft* case in

10    Footnote 16 for the proposition that the burden shifts to

11    the defendant to proffer a pro-competitive justification for

12    its conduct.  So that's just further confirmation that the

13    burden that lies in the first instance with Google to

14    support its pro-competitive justifications.

15              And just turning briefly to its cybersecurity --

16    general cybersecurity arguments.  We covered this a bit

17    before.  Google suggested, well, we had to do this stuff

18    because of cybersecurity.  But the problem with that

19    argument is that Google's own documents, like PTX 198, where

20    they actually talk about their decision-making process for

21    why Google Ads does not bid unrestricted into other

22    exchanges, they're not talking about cybersecurity; they're

23    explaining that the reason that they're taking these actions

24    is because they are concerned about propping up AdX's

25    dominance.  And so the documents speak for themselves in

                                                              47

```
 1    that regard, and I won't belabor that point.

 2             I will just also note that we have, in PTX 199 and

 3    835, that even Google itself considered spam from

 4    third-party exchanges to be at acceptable levels and

 5    comparable to AdX.  So even on its own terms, this notion

 6    that Google had to somehow restrict bidding activity into

 7    third parties because of spam is just at odds with their own

 8    documents.

 9             Dr. Israel also primarily suggested that there's a

10    separate pro-competitive benefit of just more generally

11    integrating products together is, in and of itself, a

12    pro-competitive justification.

13             And I would just once again in the interest of

14    time commend to the Court, the *Microsoft* court in the D.C.

15    Circuit confronted virtually an identical argument from

16    *Microsoft* that there's just sort of a writ large, a

17    generalized benefit from binding products together and

18    providing an integrated experience.  But the D.C. Circuit

19    expressly rejected that argument because *Microsoft* neither

20    specified nor substantiated exactly what those benefits are.

21    Just saying it's nice to have integrated products is not

22    good enough.  And --

23             THE COURT:  I'm sorry.  But would you agree that

24    if there were evidence that there were significant

25    advantages to having such an integrated setup, that that
```

1    would be a significant factor for a Court to look at in

2    terms of deciding whether or not to find the defendant a

3    monopolist?

4              MR. TEITELBAUM:  So while that evidence is not

5    present in the record, I think if Google -- Google would

6    have to show that there are sufficient benefits of

7    integration to competition that outweigh the anticompetitive

8    effects of that conduct.  And if they could do that, that

9    would be a relevant consideration for the Court.  But it's

10   not sufficient just to say that integration is nice for a

11   variety of reasons; it has to be responsive to the

12   competitive harms that Google has worked through its

13   conduct.

14             THE COURT:  But let's say that an entity creates

15   the very best widget out there, there's no other widget that

16   comes close to performing like that widget, and as a result

17   of that, consumers want to buy that widget, and they'll pay

18   almost any price to get it because it is absolutely bar none

19   the best.

20             How do you handle that when the argument is made

21   that that somehow is monopolistic behavior?  It's

22   anticompetitive in the sense that, you know, no one's

23   looking at any other type of widget, this is the widget they

24   want.

25             MR. TEITELBAUM:  So I would respectfully disagree

49

```
 1   that that would be anticompetitive.  I think what the Court

 2   just described is competition on the merits, because it's

 3   building the best product on its own merits and having that

 4   be the reason that people want to buy it.

 5           The problem is, Google hasn't done that.  Instead

 6   of trying to build the best widget, they've pulled a variety

 7   of levers to force people to buy a widget that they don't

 8   even like that much.  For instance, Ms. Layser from News

 9   Corp explained that DFP is a 25- or 30-year-old clunky piece

10   of technology, but she's stuck with it because of the tie

11   between AdX and DFP.

12           THE COURT:  You know, in the very opening, I think

13   in the first two or three sentences, you mentioned that

14   there are better ad tech products out there.  And a note to

15   myself, what are they?

16           So in the record of this case, I'm just curious,

17   can you point to what you would describe as the better

18   products that are out there?

19           MR. TEITELBAUM:  So I think there's a variety of

20   different examples.  For instance -- well, part of the

21   problem is that a lot of products that might have been

22   better died out because of their inability to compete with

23   Google.  But I think examples of that would include Kevel.

24   For instance, we had a witness from Kevel here testify about

25   his efforts to compete with Google in the publisher ad
```

                                                              50

server market and to provide a variety of functionality to
publisher customers that Google wasn't offering.  But what
he explained was he wasn't able to succeed.  Because of the
tie between AdX and DFP, he's not able to persuade customers
not because his product isn't better, but because of other
anticompetitive conduct that Google is engaging in, he
cannot bring those customers over to him.  And we had
similar testimony, for instance, from Equativ, another
publisher ad server.  It was deposition testimony who
explained the very same thing.  Or just from the perspective
of a publisher, for instance, that Mr. Wolfe or other
publishers talked about the possible decision-making process
of we would like to use a different publisher ad server, but
we just can't get out of this tie that Google has imposed on
us.

          And I think it's also notable that the Court asked
about better ad exchanges.  Almost all of the other ad
exchanges, with the exception of that one niche player with
1 percent market share, charged less than AdX.  And so
that's an example of a better product because it's cheaper
than AdX.  Cheaper than that 20 percent take rate.  And
so -- but publishers are nonetheless stuck using AdX because
it's the only way that they can get Google Ads.  So, for
instance, Rubicon, Magnite, Exchange, PubMatic, all of those
would be examples of competitors that customers might like

51

1    to use because they're better, but they just can't.

2         THE COURT:  You know, if one looks at the totality

3    of the evidence in the case and the totality of the

4    witnesses called, certainly by the plaintiff, it does look

5    as though the heavier emphasis is on the exchange publisher

6    side of the stack.  And, you know, your argument has been

7    that you feel we are dealing with three separate tools.  But

8    only two of those tools have really, really been, it seems

9    to the Court, the main focus of this case.

10        Do you want to talk a little bit more about the

11   ad -- Google Ad aspect and why you think that that also is

12   so detrimental to the consumers in that group?

13        MR. TEITELBAUM:  Absolutely, Your Honor.

14        So there's a couple of reasons.  So first, Google

15   Ads is a critical part or a critical contributor to why the

16   tie between AdX and DFP is so devastating.  So I know that's

17   a publisher issue, so I'm not trying to get us back to

18   publishers.

19        But also from the perspective of advertisers, they

20   would, for instance, like to have a product that bids

21   unrestricted into a variety of different exchanges.  But

22   instead with Google Ads, as Google's own employees

23   recognized, they are restricting Google Ads' bidding

24   activity purely in order to support AdX's dominance, even

25   though they, themselves, recognize that they would be

                                                          52

```
 1    providing a better product for their advertiser customers if

 2    they bid into all exchanges on an unrestricted basis similar

 3    to the way other tools do.  So I think that's one example.

 4            The other example that I would point to the Court

 5    is Unified Pricing Rules, which is that when Google took

 6    away from its publisher customers the ability to set

 7    different floors for different exchanges, it also -- well,

 8    or at least took away their ability to floor AdX higher than

 9    other exchanges, they also took away their ability to floor

10    Google Ads higher than other advertiser buying tools.  And

11    what that meant is it took away some of advertisers' freedom

12    also to be able to make better deals with some of Google's

13    competitor ad exchanges or competitor publisher tools.  And

14    so that also -- UPR is a good example of conduct that very

15    directly harmed both publishers and advertisers.

16            And I would also just briefly -- just commend to

17    the Court also Mr. Simcoe's -- Professor Simcoe's testimony

18    that the harm generally from the overcharge from AdX does

19    fall both on publishers and advertisers.  And even Professor

20    Chevalier agreed that an overcharge would be borne at least

21    partially by advertisers and publishers.

22            So mindful of the time, I would like to reserve

23    the balance of my time for Ms. Wood on rebuttal.

24            But I'll just close by saying that Google is not

25    the defendant in this case because of its size, and we are
```

53

```
 1   not here to enlist the Court in some sort of forced sharing
 2   or central planning function with respect to the ad tech
 3   ecosystem.  We are here to hold Google to account for its
 4   rapacious anticompetitive conduct spanning over a decade in
 5   the markets that we've been discussing.  And the result of
 6   Google's conduct has been less innovation, less consumer
 7   choice, and higher prices in these markets, and these are
 8   the markets that make the free and open Internet possible.
 9          And so on behalf of the United States and the
10   plaintiff states, I'd ask that the Court hold Google
11   accountable for the harm that it has caused to the
12   competitive process in these markets and find Google liable
13   on all of the Sherman Act claims in the amended complaint.
14   Thank you.
15          THE COURT:  Thank you.
16          Well, we're almost on the same pattern that we
17   were during the trial.  So we're going to take a mid-morning
18   break until 11:30, and we'll hear Google's entire argument.
19              (A brief recess was taken.)
20          THE COURT:  All right.  Ms. Dunn.
21          MS. DUNN:  Thank you, Your Honor.  And with the
22   Court's permission, we would like to hand out binders.
23          THE COURT:  Of course.
24          MS. DUNN:  Thank you.
25          THE COURT:  Are the folks on the right side of the
```

54

1    courtroom, are you all having trouble hearing the lawyers as

2    well or just the Court?  I understand some of you are having

3    trouble hearing.  You're okay now?  All right.

4            MS. DUNN:  I can try to be loud also.

5            May I proceed?

6            THE COURT:  Yes, ma'am.

7            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

8            MS. DUNN:  May it please the Court.

9            I will start with where I think the antitrust laws

10   require us to start.  To rule for the plaintiffs in this

11   case, the Court would have to overrule not one but two

12   important controlling lines of Supreme Court precedent, the

13   law of two-sided transaction platforms as articulated in

14   *Ohio v. AmEx*, and the law of refusal to deal as set forth in

15   *Trinko* and *linkLine*.

16           The law recognized two-sided transaction platforms

17   and protects integrated systems because they help encourage

18   investment, integration, innovation and the network affects

19   fuel economic growth.

20           In opening statement, this is what the plaintiff

21   said their case was going to be about.  They said when one

22   company controls an entire marketplace, no one wins except

23   the monopolist.  Prices go up, innovation goes down, and the

24   industry as a whole suffers.

25           Well, you have to ask, what happens when prices go

                                                              55

1  down?  Innovation goes up, and the industry as a whole

2  benefits, because that's certainly what happened here.

3  Because of the investments by Google and its competitors,

4  digital ad spend grew 18-fold between 2008 and 2022.

5  Google's prices went down, and the number of quality of

6  transactions went through the roof.

7          This is the exact opposite of proof in a

8  monopolization case.  And even though Google didn't have to,

9  even though the law would have expressly protected a

10  decision not to do this, Google spent billions of dollars

11  and countless software engineer hours making its products

12  interoperable with rivals, which grew the pie for everyone.

13          Now, plaintiffs admit that they want access to

14  Google's customers and technology that is comparable --

15  that's their word -- to Google's own access.  And in the

16  words of plaintiffs' witnesses on the slide, they want the

17  technology and the customer base that Google built to be

18  community property.  Those are their words.

19          But to turn Google's innovations and customers

20  into community property, plaintiffs would need to convince

21  this Court to dispense with an approach to antitrust that

22  has been a fixture of the American legal system for years.

23  DOJ antitrust officials have publicly stated that that's

24  their intent, and they bring to this Court arguments that

25  have been rejected elsewhere.

56

1              Over the course of this trial, plaintiffs

2    presented no testimony from any small business, either

3    publisher or advertiser.  They demonstrated no products,

4    either Google's or anyone else's.  They intentionally

5    avoided calling as witnesses Google's biggest ad tech

6    competitors, including Microsoft, Amazon, Meta's corporate

7    representative, and Criteo.  And they failed to rebut the

8    testimony of a Nobel Prize winner in auction design.  The

9    law simply does not permit, and the evidence does not

10   support, what the plaintiffs are seeking in this case.

11             Google's conduct in this case is a story of

12   innovation in response to competitive forces.  Out of nearly

13   1,000 product launches a year, we've put on this timeline

14   just the few product designs and events that plaintiffs have

15   focused on.  And many of the challenged acts in this case

16   are no longer in effect, and the most recent occurred in

17   2019.

18             So first let's start with the DoubleClick

19   acquisition in 2008.  Here's how the plaintiffs talk about

20   it in their findings of fact.  The acquisition allowed

21   Google to further enhance the market power of the

22   DoubleClick ad server over its pool of publisher customers

23   by connecting those publisher customers to Google's

24   substantial advertiser base.

25             So this, in plaintiffs' view, was the original

                                                              57

1  sin, connecting Google's existing advertiser customers to

2  third-party publishers because it was in the customer's

3  interests.  And, notably, plaintiffs are complaining about

4  Google's decision to open up its system to third parties to

5  benefit its customers.

6          Plaintiffs next complain about Dynamic Allocation,

7  which they say gave Google a first look.  Well, as Professor

8  Milgrom pointed out, one of plaintiffs' biggest problems in

9  this case is that they ignore historical context.

10          Dynamic Allocation -- invented by DoubleClick, not

11  Google -- put competitive pressure on the existing

12  waterfall.  It was so innovative that at first, as Mr. Mohan

13  told the Court, they had to go around to conferences and

14  persuade people to use the technology.  And he said that

15  Dynamic Allocation made inventory 136 percent more valuable.

16  He described it as kind of a watershed moment for the

17  industry.

18          An even bigger improvement is what came next,

19  which Mr. Mohan described as flying the plane while putting

20  on the engines.  In other words, when Google rebuilt the

21  nascent AdX exchange with real-time bidding while continuing

22  to operate it.  With the benefit of real-time information,

23  Google was able to help publishers increase their yield by a

24  whooping 188 percent.

25          Now, as real-time bidding exploded in popularity,

58

1    Google built out a DSP called DV360.  And now Google was

2    offering two different options to its customers, one, a

3    curated and heavily-vetted ad network called Google Ads; and

4    a DSP, which gave Google's advertiser customers access to

5    over 100 rival exchanges.  That's called choice, and it's a

6    good thing.

7           Brad Bender, who was at the time in charge of

8    Google's display business, explained some customers choose

9    to use Google Ads, some choose to use DV360, and some choose

10   to multi-home.  And what Google wanted was to find the best

11   way for its customers to achieve their goal.  And so this is

12   an example of Google increasing customer choice in response

13   to competition.  Plaintiffs say this is not a good thing and

14   that the products should be similar.

15          Then, as the Court well knows, in 2014, header

16   bidding transformed the industry by allowing multiple

17   exchanges to compete head to head in real time.  Publishers

18   quickly figured out that they could choose to use Dynamic

19   Allocation to run an auction in AdX after the header bidding

20   auction.  And Google had a competitive response to header

21   bidding, which was called open bidding, which allowed

22   exchanges to compete head to head in real time.

23          As Jonathan Bellack testified, Google responded

24   competitively because our customers were reporting that this

25   technology that they were finding valuable.  For us to not

                                                              59

1    respond by trying to deliver value would give them more

2    reasons to try other things.

3            And Google witnesses Sarah Stefaniu and Nitish

4    Korula demonstrated for the Court the actual products, and

5    we all saw how Google, this allegedly terrible and

6    exclusionary monopolist, actually facilitates Prebid and

7    Amazon header bidding on its own platform.

8            Now, by 2019, things had become so complicated

9    that Google addressed the chaos on its own platform and

10   launched the Unified First Price Auction and the Unified

11   Pricing Rules, which some publishers didn't like, but many

12   actually embraced because they made sure that the highest

13   bidder won.  Now, again here, output expanded and publishers

14   made more money.

15           Now plaintiffs say that the UFPA is what we should

16   have been doing earlier, but they don't say when.  And the

17   problem is, Your Honor, is this is not how innovation works.

18   You can't just skip to the end.  The ideas of the past are

19   what lay the groundwork for the improvements of today, which

20   in turn creates the opportunity for the innovations of

21   tomorrow.

22           And as Professor Milgrom said, at the time that

23   each of these changes occurred, they were improvements, and

24   he said they benefited Google's own customers, either

25   advertisers or publishers or both.

                                                            60

```
 1              And the Court has seen this chart before.  For all

 2    its innovation and billions invested every year, only a

 3    small share of the exponential growth in U.S. display

 4    advertising spend accrues to Google.  And that's 10 percent,

 5    and the 10 percent includes YouTube, which plaintiffs

 6    exclude from their markets.

 7              And as output has dramatically increased, prices

 8    have fallen.  On this slide is public data that shows ad

 9    tech fees as a percentage of ad spending, which has been

10    declining since 2014.  In 2022, the industry average was

11    42.3 percent.  And the evidence showed that Google's

12    end-to-end take rate, which has also been declining, is much

13    lower than the industry average, around 31 percent.

14              And as output increased and prices have fallen,

15    quality has improved.  Click-through rates have gone up,

16    cost-per-click has gone down, and that means advertisers,

17    who everyone agrees care about getting a great -- greatest

18    return on their investment, have been able to do that.  And

19    the data has shown also that publishers are making more

20    money per ad.  And because output has gone up, they're

21    selling more ads, and that makes them even more money, and

22    they increase their yield.  So output up, prices down,

23    quality increased, the plaintiffs cannot make a case -- the

24    exceptional case for governmental interference by declaring

25    an antitrust violation in this market.
```

1          And even though it was a long time ago, the Court

2     will recall that in opening, we told the Court that the

3     evidence would show plaintiffs' case fails for these three

4     independent reasons.  And, today, we are here to confirm

5     that the evidence did just that.

6          We are -- I'm going to spend my time this morning

7     talking about, first, plaintiffs did not prove their markets

8     or market power, including because their markets are

9     foreclosed by *AmEx v. Ohio*.

10         Second, that plaintiffs did not prove

11    anticompetitive conduct, including because Google's conduct

12    was per se lawful under *Trinko, linkLine* and other cases in

13    that line.

14         And third, that plaintiffs did not prove

15    anticompetitive effects, and there were pro-competitive

16    effects of Google's conduct.

17         Now, before I do all of that, I just want to say,

18    as we saw this morning, plaintiffs do rely a lot on picking

19    sentences out of documents, and all of these have been

20    addressed in our findings of fact.  So today, I'm just going

21    to make the point by looking at what is probably plaintiffs'

22    favorite document, the one about the stock exchange.

23         Elsewhere in that document, Jonathan Bellack, who

24    wrote that sentence that the plaintiffs like so much, says

25    his thoughts are late night jetlag ramblings that might not

                                                              62

```
1    make the sense in the light of day.  He also says he's in

2    active ideation mode, so all kinds of ideas are flying

3    around.

4            In another document that the plaintiffs like, they

5    pick out the statement of Mr. Blais, who says here that he

6    has basically zero experience and is an engineer who knows

7    very little about anything.

8            They showed you today not one but two documents

9    from a speech by David Rosenblatt.  He was at DoubleClick,

10   came over to Google and left three months later.  So he was

11   at Google for all of three months.  And if you looked at the

12   next sentence that he said after he talked about search, he

13   said they wanted to emulate search in that they wanted to

14   make things easy to buy and standardized metrics and

15   definitions so they're not reinventing the wheel.

16           We saw through this trial that, at Google, anyone

17   was welcome to share their thoughts at any time over email,

18   and there were robust debates and idea sessions.  And that

19   doesn't mean that these things actually happened,

20   necessarily; sometimes it didn't mean that they were

21   considered.  So --

22           THE COURT:  Well, you know, now you're getting

23   close to the very significant argument the plaintiffs' made

24   that they did not rise in their opening statement today

25   about the problem with the way in which the history was
```

63

1    encouraged to be shut off.  And as you know, you're into now

2    an area where I know Judge Mehta sort of punted that issue,

3    acknowledged the problem, and did not feel it made a

4    significant difference in his analysis.  But it's out there.

5    And so I think you're a little bit on dangerous territory

6    when you start talking about what the folks at Google were

7    thinking or saying because we don't know all of what they

8    were thinking or saying.

9            MS. DUNN:  Understood, Your Honor.

10           And I will just say -- and you raised Judge

11   Mehta's view.  In this case -- part of my point to the Court

12   is we're going to show the full context.  We're going to

13   show the competitive analysis, we're going to show witness

14   testimony, we're going to show the competition landscape,

15   we're going to show data.  This is a huge monopolization

16   case, and there's Supreme Court precedent that's on point,

17   there's data that's on point, there's analyses that's on

18   point.  And I think my point to the Court is that in the

19   full context of everything to decide the monopolization

20   case, we believe that there is ample evidence to do that.  I

21   will not belabor this issue.  Your Honor has seen the legal

22   hold and has commented on that and heard from the witnesses,

23   and the Court has everything the Court needs to make a

24   judgment in that regard.

25           So moving on to the plaintiffs' failure to prove

64

```
 1    their markets or market power.  So as I mentioned,

 2    plaintiffs' case is foreclosed by Supreme Court precedent

 3    about two-sided transaction platforms.

 4              THE COURT:  Well, let's talk about that.

 5              I mean, I've read that AmEx case more times than I

 6    probably should have.  But it's an interesting case because

 7    it's not dealing with any type of dynamic programmatic

 8    purchasing; it's looking at the one-on-one transaction when

 9    somebody who has an AmEx credit card goes to a merchant and,

10    you know, engages in a transaction.  It's one-on-one.

11              We're dealing with a completely different setup

12    here, it seems to me when you're dealing -- I understand

13    there's a certain attraction, and frankly earlier on in the

14    case, I thought that that was a very attractive argument.

15    But the more I've looked at the case and compared it to the

16    facts and the realities of this case, the more problems I

17    have in saying how it really does map onto the -- the way

18    this -- the way these transactions operate.  All right.

19              So I want you to really try to explain to me why

20    you think that that is the correct legal way of looking at

21    this case.

22              MS. DUNN:  Your Honor, I would love to do that,

23    and I hope that -- we actually have prepared slides that

24    hopefully will help the Court, and I will also answer any

25    other questions that the Court has.  We think AmEx is
```

1    completely on point.  And a key issue, and what *AmEx* itself
2    is a distinguishing feature and an important distinction is
3    indirect network effects, which nobody disagrees are present
4    here, and that the jointly-consumed transaction, which
5    there's expert testimony on both sides, is between the
6    advertiser and the publishers.
7          So the other thing that's happening is I would beg
8    to differ with the idea that there's really one-on-one
9    transactions, necessarily, in the credit card industry.  I
10   think it's a very -- in both cases there are tools, and the
11   point of the tools and the setup, including the cards, the
12   merchant readers, all of that, the point of the tools and
13   the tool pathway is to facilitate a transaction between the
14   buyer and the seller.  And without -- the point that *AmEx* is
15   making is that if you have a tool on one side but nobody's
16   willing to make a sale on the other side, then it's useless
17   to have a tool on the one side.  And I -- you know,
18   hopefully as we go along, I'll answer the Court's questions.
19          But what I read as the animating feature of *AmEx*
20   is this idea that you can't look at a two-sided market at
21   one side in isolation when the success of the one side, the
22   buyer, depends on the success of the seller, and the key
23   thing was the indirect network effects, but we can talk
24   about that as we go along.
25          So *AmEx* itself -- and I've read it maybe not as

66

1   much as Your Honor, but also quite a lot -- says that

2   two-sided transaction platforms facilitate a single

3   simultaneous transaction jointly consumed.  And, in this

4   case, virtually every witness talked about buy-side and

5   sell-side facilitating a single simultaneous transaction

6   between buy-side and sell-side.

7        So if you -- in the way that Your Honor raised the

8   question, you know, you have a merchant and a credit card

9   holder, and they are making a connection through these

10  tools.  Here, you have a publisher selling inventory and an

11  advertiser who wants to buy inventory, and they're making a

12  connection through the tools.  And the evidence really

13  supported that description.

14       So the experts, including plaintiffs' experts,

15  uniformly agreed -- and I think this is key to Your Honor's

16  question -- that the jointly consumed transaction is the

17  match between publishers and advertisers.  And we put

18  Professor Weintraub, Professor Lee, and Professor Simcoe on

19  this slide so that the Court could see that they are talking

20  about the jointly-consumed transaction being the match.

21       So the point is that when the transaction is the

22  match and the success of one side depends on the other,

23  because if you lose customers on one side, the other side is

24  unhappy because they're losing quality matches, that is

25  indirect network effects, as I'm sure the Court knows.  And

67

 1    the Supreme Court says that is one of the important ways

 2    that these kinds of platforms are distinguished.  And

 3    there's also no dispute in this case -- plaintiffs' experts

 4    also say -- and this is at our findings of fact, 285 -- that

 5    ad tech is characterized by these indirect network effects.

 6            So you have the plaintiffs' own experts agreeing

 7    they're indirect network effects, and the jointly-consumed

 8    transaction is the match between publisher and advertiser

 9    facilitated by the tools.

10            And what I understand the plaintiffs to be saying

11    is that, okay, well, the ad exchange is two-sided, but the

12    place where we go wrong is that the ad server and the buying

13    tool -- and they focus only on Google Ads -- those are

14    one-sided.  And there's no expert support for that.  And the

15    reason is that that doesn't make any sense.  Because if

16    everyone agrees that the jointly-consumed transaction is the

17    match, all of these tools are being used to facilitate that

18    match.

19            And maybe it will assist the Court.  We put on

20    this slide an illustration that *AmEx* rejected the argument

21    that the plaintiffs make in this case that I heard them make

22    again this morning, which is they're saying, well, on one

23    side, there are these services offered only to publishers,

24    and on the other, there are services offered only to

25    advertisers.

68

1          And this was the exact same argument that was made

2    in *AmEx* where the petitioners argued that card holders were

3    offered certain services, and merchants were offered certain

4    services, but the *AmEx* Court says these separate services

5    are provided to the cardholders and the merchants for the

6    purposes of bringing them together on the two-sided

7    transaction platform, and so they reject this exact

8    argument.  And we helpfully, I hope, plugged the words of

9    this case directly into *AmEx* so the Court could see how

10   exactly on point *AmEx* is to this case.  So in each

11   circumstance, you have one side trying to transact with the

12   second side through the tools.

13          Now, the Supreme Court also rejected the other

14   argument that plaintiffs have made, which I didn't really

15   hear them make this morning, so I won't belabor it, which is

16   that buy-side and sell-side tools are complements, not

17   substitutes.  And that, again, was an argument made by the

18   petitioners in *Ohio v. AmEx*, and the Supreme Court rejects

19   it.

20          And I think this may also help shed some light on

21   what's going on, the next slide, so I'm going to spend a

22   little bit of time on this slide.

23          So what we saw in this case is that Google and its

24   competitors are all talking about the single-sided market in

25   the same way.  And if you look at the top of the slide,

                                                              69

1    there's a quote from Ben John.  He's the Microsoft corporate

2    representative.  And what he says is -- he doesn't start

3    with a few large publishers like the plaintiffs do.  He says

4    you start with the advertisers because they're the ones who

5    are paying the check.  They're paying the money.  And he

6    says you need to have demand to fuel the ecosystem and that

7    is what has the effect of scaling the rest of the platform,

8    including the publisher side.

9         And Mr. Farber, who's Meta's corporate

10   representative, said the Meta Audience Network considers any

11   player who will consolidate demand from different

12   advertisers to be a competitor, and he says if Meta can

13   provide better value, meaning that users are going to see

14   their ads -- see the ads of the advertisers because of

15   Meta's platform, advertisers will come to them.  And if

16   Google can, the advertisers go to Google.

17        And you can see that Scott Sheffer is saying

18   essentially the same thing.  If advertising money is flowing

19   to Meta or Amazon or Yahoo, that is money that's not coming

20   to Google and Google's publishers.

21        And so when the players in the industry talk about

22   the field of competition, they're talking about a two-sided

23   market where the fuel is coming from the demand side in the

24   form of the money, and that feeds the sell-side.  And that,

25   in turn, grows the demand side and so on and so on in the

70

1    feedback loop that all experts in this case agreed existed.

2            And all these companies are doing, including Meta,

3    including Amazon, including Microsoft, and others, is

4    they're all competing for the spend because that is what

5    powers the platforms from the advertisers on one side, who

6    want to connect to the publishers on the other, because that

7    is how people are going to see the ads.

8            And I don't know, Your Honor, if that assisted the

9    Court, but I think looking at how these market participants

10   describe this makes it clear that what they're really

11   talking about is a two-sided platform.  There's nobody

12   saying Google's a monopolist in the exchange.  Like,

13   nobody's saying that.  There's not an expert that said that

14   or fact -- the experts said that.  But there's no fact

15   witness that thinks about it that way.  This is how the fact

16   witnesses talk about the competition and what they're

17   competing for.

18           Does the Court have additional questions on --

19           THE COURT:  Go ahead.

20           MS. DUNN:  Okay.  All right.  And so to wit,

21   Microsoft's ecosystem looks almost exactly the same as

22   Google's does, except Microsoft's has advantages that

23   Google's does not, gaming in the form of Xbox, streaming in

24   the form of Netflix where Google actually lost the deal to

25   Microsoft -- the Court heard that -- social in the form of

71

```
 1    LinkedIn.  And this diagram was authenticated by Microsoft's

 2    corporate representative in his deposition, and it clearly

 3    has a buy-side and a sell-side and tons of inventory, and

 4    they are competing with Google to attract those advertisers

 5    into this ecosystem.

 6           And I think there are a few slides in this case

 7    where we look at them and say what are we doing here?

 8    Google is competing with one of the largest companies in the

 9    world, which has an ecosystem that looks pretty much the

10    same, except that company has advantages that Google doesn't

11    have.  And notably, I don't think Microsoft was mentioned

12    once this morning by the plaintiffs, and they, obviously,

13    did not call Microsoft as a witness in this case.

14           Now, Criteo -- which probably no one here had ever

15    heard of before this case -- has proprietary user commerce

16    data from over $1 trillion in online sales annually.  It has

17    an enormous amount of data.  It's another major competitor

18    with a huge pool of advertisers and an end-to-end platform.

19    And this is Criteo's own document showing that it has an

20    integrated platform with a buy-side and a sell-side.  And

21    just like those other companies we all know about, it is

22    competing for the advertiser demand.

23           And Criteo is another what-are-we-doing-here

24    moment because plaintiffs are saying that Google and Criteo

25    are the only two competitors in what plaintiffs call an
```

                                                              72

```
 1    advertiser ad network market.  And no one else thinks that
 2    market exists, including Criteo.
 3            This is Criteo's 10-K filing where it tells the
 4    SEC that it is part of one complex, rapidly evolving, highly
 5    competitive market where it competes on both the buy-side
 6    and the sell-side against Google, Amazon, Meta, Microsoft,
 7    and any others -- many others.
 8            And so the plaintiffs say, well, we just rely on
 9    Dr. Israel, but that's not true.  We relied on testimony of
10    witnesses, SEC filings, internal documents not just from
11    Google but elsewhere, and we relied on data of substitution.
12            We also rely on their expert, Professor Lee.
13    Professor Lee acknowledged that Meta and Amazon have ad tech
14    that includes all the functionalities of the tools at issue
15    in this case.  And they use the tools to attract advertisers
16    away from competitor platforms, including Google.  The tools
17    then enable advertisers to buy, in the case of Meta and
18    Amazon, on Meta's and Amazon's owned-and-operated
19    properties.  And Google also does this.
20            And also like Google, Meta and Amazon enable
21    advertisers to buy on third-party properties.  So in Meta's
22    case, they're buying on third-party apps; and Amazon, as the
23    Court knows, has a DSP that buys on third-party exchanges
24    that the plaintiffs don't mention, as well as a header
25    bidding wrapper called TAM.
```

73

1           And so plaintiffs are ignoring all of this

2     competition that these companies are recognizing and that

3     their expert recognized of these huge companies that Google

4     is competing against.

5           We also had heard a lot of evidence that

6     underscored the two-sided market that many companies with

7     these huge pools of advertisers, like The Trade Desk and

8     Yahoo and Criteo and Magnite and PubMatic, are all moving

9     and have already started this toward an end-to-end stack

10    that bypasses these individual components, and that is

11    called supply path optimization.

12          And plaintiffs' answer to supply path

13    optimization, which so clearly illustrates that there is a

14    two-sided market between publisher and advertiser, is to

15    say, well, that's very limited.  But their own witnesses --

16    this is one example.  PubMatic, the CEO says right now SPO

17    is 35 to 50 percent of their platform activity and in the

18    next several years will be 75 percent.  And you can see this

19    picture on their -- in their own document that shows their

20    tools.  Their pathway is connecting the publisher to the

21    advertiser to make the match, the jointly-consumed

22    transaction.

23          The Trade Desk similarly testified their tool is

24    called OpenPath, and it's integrated with some of the

25    biggest publishers, including Reutters, The Washington Post,

74

```
 1    Gannett, USA Today, Condé Nast, BuzzFeed, The LA Times, and

 2    Forbes.

 3              So this slide shows why the plaintiffs want to run

 4    away from AmEx, and that is because, based on the data,

 5    Google's share in a two-sided market is decreasing and has

 6    been steadily decreasing.  And this is just not what

 7    monopolization looks like.

 8              And the other thing that was pointed out in this

 9    trial is that as Google's share is going down, its revenue

10    is going up, meaning that the industry is growing much

11    faster than Google's piece.

12              Now, also on the topic of two-sided markets,

13    plaintiffs' case relies very heavily on their assertion that

14    Google charges super competitive fees.  But as the Supreme

15    Court says, that a two-sided market requires consideration

16    of the market as a whole and fees must be assessed end to

17    end.

18              And when fees are assessed end to end, Google's

19    fees are among the lowest in the industry.  So Google's fees

20    are the darker blue bars towards the bottom.  And that's

21    because when you have an integrated system, one of the

22    benefits is lower prices because you don't have multiple

23    companies coming in to take a cut.  And so this chart and

24    data were not disputed by the plaintiffs.

25              Now if the Court would like, I can address the
```

1    estoppel argument.  First of all, none of the prongs of the

2    Fourth Circuit's test for estoppel were met.  This was a

3    motion to dismiss where Google made legal arguments, and we

4    cite in our papers that it is -- motions to dismiss are

5    decided, as the Court is aware, on legal arguments.

6          Also, the arguments that are made in the motion to

7    dismiss brief say "absent other allegations not made here."

8    But I think more importantly, with respect to the prongs,

9    the court never ruled in N.D. Cal. on this.  There was a

10   case management conference where there was an agreement by

11   the plaintiffs to pursue only a single-sided market.  And so

12   this argument, which was a legal argument, was never adopted

13   by the court.

14          But, in any event, regardless, Google would not be

15   estopped from arguing that plaintiffs' market is fatally

16   narrow and gerrymandered, and *AmEx* would still bind this

17   Court.  So we don't think estoppel should hold up the Court

18   from ruling on this.

19          And having talked about the two-sided market,

20   which I think will come up again, I'd like to address a

21   couple of reasons why all of plaintiffs' market fails

22   because there are a couple of overarching reasons, and then

23   I'd like to address the individual alleged markets.

24          So the first overarching reason that all of

25   plaintiffs' markets fail is that they gerrymander out

                                                              76

 1    substitutes.  And Professor Lee, plaintiffs' expert,

 2    recognized substitution, including with Meta and Amazon.

 3    That's what he says here in his testimony.  But he chose not

 4    to analyze it, as he also concedes.

 5         And in the *Satellite Television* case, the Fourth

 6    Circuit said it's the plaintiffs' burden to show that

 7    substitutes should be excluded from the market.  And so

 8    Professor Lee's concession that he recognized substitution

 9    but did not analyze it is going to be very damaging under

10    that Fourth Circuit law.

11         So Professor Lee's answer to this is, well, he

12    meets that burden with the cellophane fallacy.  But we think

13    the Court should reject this reference to the cellophane

14    fallacy for the same reason that Judge Mehta in search

15    rejected it as applied to Amazon.  Amazon is not a poor

16    substitute.  It's not like wrapping your sandwich in a

17    newspaper.  And neither is Microsoft or Meta or The Trade

18    Desk or Criteo or any of these other enormous companies

19    against whom we compete.

20         Now, there was an enormous amount of data that we

21    showed the Court in this case about substitution, and it all

22    went unrebutted.  Here's a chart that shows that even before

23    Google was alleged to have monopoly power, people were

24    substituting from web to apps and then later to connected

25    television.  And advertiser dollars, which the companies are

                                                              77

1    competing for, have all followed these user eyeballs.

2          We also saw dramatic substitution to social media,

3    also beginning before Google allegedly had market power.

4    And we presented at this trial the same marketing funnel

5    that Judge Mehta relied on in the search case when he was

6    talking about interchangeability.  That is Lowcock

7    Demonstrative 2.  And that marketing funnel that the search

8    case relied on shows social and display are substitutes

9    because they have the same purpose, upper funnel purpose of

10   getting -- of increasing awareness.

11         And the plaintiffs in this case have showed you no

12   data on substitution at all, which is truly unheard of in an

13   antitrust case.  They showed you this morning testimony of a

14   witness that referenced the funnel, but they didn't show you

15   the funnel or note that the funnel puts social and display

16   in the same place.  And I won't go through all of this

17   today, but at 425 and 432 of our findings of fact, the

18   witnesses that they quote today as not talking about

19   substitution do, in fact, talk about this very substitution.

20   And that also was not shown to you this morning.

21         We also saw substitution evidence with respect to

22   particular competitors.  So we saw substitution with respect

23   to Meta, which is the largest advertising platform in the

24   world.  And its share went up, up, up, up, up and started to

25   decrease in recent years.

```
 1              TikTok, also a new market entrant with a huge pool

 2    of advertiser demand, and they didn't enter the market in

 3    2008; they entered in 2018.  And the growth is astronomical,

 4    and we also saw substitution to retail, which, of course,

 5    includes Amazon.

 6              Now, in the search case, the court included Amazon

 7    in the search ads market and called Amazon a well-resourced

 8    market entrant with demonstrated growth.  The same is true

 9    here.  And I didn't hear plaintiffs talk about Amazon, but

10    they did put up this diagram that we've seen throughout this

11    trial, which is both simplistic and inaccurate of these

12    three little boxes.  And you can see.  This is just a visual

13    depiction of all the ways where, for example, they tried to

14    gerrymander Amazon out.  And we could have made slides like

15    this for the other companies too.

16              But all of Amazons' tools appear just outside of

17    plaintiffs' markets, like somehow Amazon, one of the largest

18    companies on earth, is just on the outside of all of this

19    looking in.  But this is not commercial reality, and that is

20    corroborated by the many documents we saw talking about

21    competition between Google and these other companies

22    reflecting industry recognition.

23              This is an example from May of 2018, and the

24    plaintiff said, you know, we don't show any evidence that

25    these are competitors and product markets.  This is
```

1    recognizing that Amazon is encroaching on Google's core

2    business, the business of connecting advertisers and

3    publishers.  This is -- and we've listed the series of other

4    documents that we don't have time to show you on the side of

5    the slide.  This is one of many documents talking about Meta

6    as a competitor.  This says Google is number two and has

7    been since 2014.

8              And this Microsoft document I'm going to spend a

9    minute on because it, I think, gives a real understanding of

10   how competition was being viewed internally as early as

11   2017.  So this is a memo written by Brian O'Kelley of

12   AppNexus -- he's the CEO and founder of AppNexus -- writing

13   to the CEO of Microsoft, Satya Nadella, about the

14   competitive landscape in 2017.  And he says, "This is an

15   ideal time to make a big play.  Amazon is stealthy,

16   aggressive, and winning.  Google is on the ropes and

17   surprisingly vulnerable.  Facebook and Apple have

18   retrenched."

19             And the evidence showed after this, Microsoft did

20   make a big play, as Brian O'Kelley recommended, including

21   acquiring AppNexus's end-to-end stack, so that it could more

22   intensely compete with Amazon, Facebook, Google, and others.

23             Now, the second overarching failure of plaintiffs'

24   markets is that they gerrymander out other obvious

25   substitutes, like header bidding and direct deals.  And if

80

```
1   there was one thing we knew for sure when trial ended, it
2   was that header bidding was a serious competitive threat.
3   And plaintiffs hammered this during trial, but they didn't
4   mention it at all this morning.
5            This is a Google document saying that Facebook or
6   Amazon getting into header bidding was Google's nightmare
7   scenario.  And as the evidence showed, the nightmare
8   scenario happened.  Amazon and Prebid header bidding compete
9   with Google.  And this is testimony of Tom Kershaw of
10  Magnite.  He helped cofound Prebid, which is a consortium of
11  competitors with a header bidding tool.  And we talked --
12  plaintiffs raised witnesses at trial.  Well, the Prebid
13  board of companies that compete with Google was actually the
14  largest source of witnesses for plaintiffs in this case.
15  And they for some reason discount when we played major
16  competitor depositions, but the Court is undoubtedly used to
17  playing deposition testimony, particularly for third
18  parties, rather than having them come to court live.
19           Now Mr. Kershaw in his testimony explained that
20  header bidding competed with Google and thrived.  He said it
21  is alive and well today.  And plaintiffs pointed to a 2009
22  document from Neal Mohan that talked about disintermediating
23  the ad server.  Well, that's what header bidding did.
24  Header bidding did disintermediate the ad server, and it did
25  that in the time even before plaintiffs allege that Google
```

81

1   had market power.

2         And if you look at Mr. Kershaw's testimony, he

3   said, "It took control over the auction process that

4   previously had been determined by what was called the ad

5   server."

6         Now, in response to header bidding's competitive

7   threat, Google did exactly what the antitrust laws would

8   want it to do.  It innovated a competitor product.  And here

9   are various witnesses, Mr. Kershaw, Mr. Farber, and

10   Mr. Glogovsky of The New York Times talking about the

11   benefits of open bidding.  And plaintiffs said nobody said

12   nice things about our products, but that's not true.  Here

13   they're talking about how easy it is to use and how it was

14   faster and more efficient.

15         Now, plaintiffs are complaining about Google's

16   competitive response to the competition from header bidding,

17   but that is an amazing approach to an antitrust case, that

18   they are objecting to competition and innovation in response

19   to what everybody agreed was a competitive threat.  And this

20   chart shows that header bidding is winning more on DFP every

21   year.  It's percentage as of 2022 is over 40 percent.  That

22   is within DFP.

23         And we also saw that since header bidding became

24   popular, AdX's win rate went down dramatically.  This is

25   plaintiffs' expert, Professor Weintraub.  He says, "AdX is

82

1 only winning 15 percent of the impressions it bids on."

2    Now, Professor Lee never conducted a hypothetical

3 monopolist test, but this is a real-world hypothetical

4 monopolist test.  And there's a lot of these in this case

5 where if we had the power that plaintiffs say we had, we

6 would be winning and not losing.  So this is the exact

7 opposite of proof of a monopolization case, and it is

8 actually what the antitrust laws want to encourage.

9    Now, plaintiffs also gerrymander out direct deals.

10 They are 77 percent of U.S. display ad spend.  That's our

11 findings of fact, 496.  And they compete programmatically

12 head to head with indirect deals for every impression.

13    This is a document from OpenX in 2017, which

14 expressly says that RTB revenue -- meaning indirect -- is

15 threatened by programmatic direct.  And there was witness

16 testimony from plaintiffs' first witness, Tim Wolfe of

17 Gannett, that supports this.  He says, "On the USA Today

18 network, direct sales fluctuate from 25 to 45 percent of ad

19 sales each year."  And he says, "As direct sales go up,

20 indirect sales go down."  That is direct evidence of

21 substitution.

22    Now, finally, in addition to gerrymandering out

23 obvious substitutes, plaintiffs' markets all fail because

24 their expert did not actually analyze competition in the

25 markets that he defines.  And I'll take a minute to explain

83

1    that.

2            So first, Professor Lee says his markets are for

3    tools, not ad transactions.  But then when he calculates

4    market share, he calculates market share by ad transactions,

5    specifically open-web display.  In other words, his market

6    share is not actually for the markets that he has defined.

7    And plaintiffs stressed again this morning that the markets

8    are for tools, but that's not counted in the market share.

9            And as we assured this Court in opening would

10   happen, there wasn't a single witness in this case that

11   defined open-web display in the way that plaintiffs are

12   urging on this Court.  So just to do a quick review, out of

13   the agency witnesses, one said, "This is just semantics; it

14   just means display."  Another included native ads and

15   instream video, which plaintiffs do not, and a third

16   included apps.

17           With respect to the experts, Dr. Abrantes-Metz

18   said, "Well, this was just a name for the markets that

19   Professor Lee delineated in this case," but Professor Lee

20   had never heard the term before.  And Professor Ravi, who

21   actually teaches and writes about digital ads, said that

22   term distinguished between open and closed auctions to

23   private buyers, which is not a definition we heard at any

24   other time in trial and is not plaintiffs' definition.

25           So this is an industry where companies are doing

                                                              84

```
1    constant competitive analyses with charts and graphs, and

2    plaintiffs are asking this Court to accept a contradictory

3    computation that has never been heard of anywhere before.

4    And that is problematic, but the underlying problem for

5    plaintiffs is that every tool in this case is

6    multifunctional, including the tools that the plaintiffs

7    themselves identify, which we listed on this slide.

8              Now, when Professor Lee was asked about this, he

9    said he never analyzed competition for multifunctional ad

10   tech tools, but those are the only tools in this case.  And

11   he conceded in his testimony on the screen that he did not

12   analyze the ability to monetize inventory other than

13   open-web display and he did not analyze how customers make

14   choices to use these tools, including the degree to which

15   anyone makes choices based on open-web display.  So it's an

16   antitrust case without an expert analyzing how competition

17   works in the markets that he defines.

18             And instead, when Mr. Isaacson asked about the

19   failure to consider these other functions, like apps and

20   CTV, which are very popular, he said, well, this is like an

21   open-web display is a gas station and in-app ads are the

22   chips.  But at any time after at least 2010 or 2012, it

23   can't possibly be that open-web display is the main event,

24   the gas station, and in-app ads are the chips.

25             And just to put it another way, which is more
```

85

1    antitrust oriented, plaintiffs never complained -- explained
2    to the Court why open-web display ads are characterized by
3    anticompetitive conduct but app ads are not when the two are
4    subject to the same pricing and the same conduct, where the
5    same tools are used to buy and sell the same ads between the
6    same publishers and the same advertisers for the same user
7    to see.  In other words, if open-web display is the gas
8    station, so is apps because they are the exact same.
9         And apps are important, and so is connected TV.
10   And what the evidence actually showed was that companies
11   compete on the basis of multifunctionality and that multiple
12   formats of ads, as stated here in this document, can even
13   compete for the same ad slot.  And we listed the other
14   companies where the record shows that that's true, and this
15   is competition that the plaintiffs' expert never analyzed
16   despite defining markets based on multifunctional tools.
17        All right.  So that brings us to the individual
18   markets, and we'll start with advertiser ad networks.  So
19   this is another instance where Professor Lee had never heard
20   these words strung together but used them to define a
21   market.  And just at the start, this makes no sense.
22   Advertiser ad network makes no sense.  A network has two
23   sides, and we'll talk a little bit more about that.
24        But there are hundreds of authorized buyers on AdX
25   that compete in an auction against Google Ads, and this

86

 1    includes demand-side platforms, like DSP -- or DV360, The

 2    Trade Desk, Amazon, and Yahoo.  All of that -- all of those

 3    authorized buyers are excluded, and that includes The Trade

 4    Desk even though The Trade Desk is a billion-dollar company

 5    and even though it is bidding into the same auction as

 6    Google Ads for impressions, as the Trade Desk witness told

 7    us on the stand.

 8         Now, this is plaintiffs' expert Professor

 9    Weintraub's chart, and even Professor Weintraub's chart

10    undermines plaintiffs' argument.  So to begin with, it

11    includes DSPs, and it also includes the publisher side of

12    the ad network that plaintiffs lopped off in their market

13    definition.

14         And importantly, the evidence showed that the vast

15    majority of revenue from Google Ads comes from very large

16    advertisers.  These are the advertisers most capable of

17    substituting to DSPs, which puts economic pressure on

18    Google.  And so, as Dr. Israel said, it doesn't make any

19    sense to leave DSPs out of the market.

20         Now, plaintiffs' response to this is to focus

21    instead on the number of advertisers who use Google Ads

22    rather than on how much the advertisers are spending.  But

23    it is the spend that is the competitive constraint.  And

24    Google Ads has no minimum spend requirement.  So what's

25    happening here is plaintiffs are counting a lot of people

                                                              87

```
 1    who spend very little, maybe even under $1, who are not
 2    going to put competitive pressure on Google and on that
 3    basis are leaving out DV360 and other DFPs.
 4            And so what they're left with is their alleged
 5    advertiser ad network market which includes just two
 6    companies, Google and Criteo.  And remember, Criteo itself
 7    does not agree with this.  Google is the discount provider
 8    in that two-company market with prices half off or more.
 9    And so this, again, is the exact opposite of proof in a
10    monopolization case.
11            Now, moving on to ad exchanges, the Supreme Court
12    never found a party with less than 75 percent market share
13    to have monopoly power, and the Fourth Circuit says
14    70 percent is the bottom of the range.  And for their ad
15    exchange market -- this is Professor Lee's chart --
16    plaintiffs don't allege market shares anywhere near these
17    thresholds.
18            So looking at spend, U.S. market share was never
19    more than 43 percent and has declined to 34 percent.  So
20    even worldwide, which plaintiffs believe is the right
21    measure -- we do not -- it was never more than 49 percent
22    and has declined to 40 percent.  It's very important to note
23    that the share is declining, which Kolon Industries and the
24    Fourth Circuit believes is important.
25            And this is the exact opposite of proof of
```

88

1    monopolization.  Andrew Casale from Index Exchange says

2    businesses are entering and leaving all the time, and

3    plaintiffs' response is that many of the competitors are

4    smaller than Google.  But that's the sign of a healthy

5    market, as is also recognized in the Fourth Circuit case

6    *It's My Party* where they talk about the Davids of the

7    market.  Small is not necessarily weak.

8           But another important point, looking at this in

9    the context of a Section 2 case, is that it would be

10   inconsistent with monopolization to charge the highest take

11   rate in the market with the lowest alleged market share.

12          Now, plaintiffs talked a little bit about this

13   quote from Mr. Casale where he said the exchange market is

14   hypercompetitive.  We do think that that is extraordinarily

15   strong evidence against the plaintiff.  But I'll also note

16   that it's hypercompetitive today, and he's saying it was

17   hypercompetitive with header bidding, which came on the

18   scene in 2014 and 2015 before Google had what plaintiffs

19   allege to be market power.

20          All right.  Let's talk a little bit about pricing.

21   So as the Court already knows, plaintiffs allege super

22   competitive prices only as to AdX and not for their other

23   two alleged markets.  Now, just looking at this chart, which

24   we've seen many times, you can tell there are some issues.

25   First of all, AdX never had the highest price, and six out

89

```
 1    of the other seven exchanges that Professor Simcoe looked at
 2    charge take rates above Professor Simcoe's but-for take
 3    rate.
 4              Now, even more glaring is that Google's take rate
 5    has been the same since the DoubleClick days, and there's no
 6    dispute about that.  And after rebuilding a nascent ad
 7    exchange growing its customer base -- which, by the way,
 8    plaintiffs agree that scale has procompetitive benefits and
 9    can be an indicator of quality.  So after improving the
10    quality and the customer base and the technology, the price
11    never went up.  So plaintiffs say the price didn't get
12    better.  That's not true.
13              Finally, even though Professor Simcoe agreed that
14    quality affects price, no expert in this case, including
15    him, did a quality-adjusted analysis.  And the Court heard a
16    lot actually about Google's quality differentiation, things
17    like spam controls and security from bad actors and brand
18    safety and making quality matches.  And none of that is
19    accounted for in this pricing analysis.  And this pricing
20    analysis is the only pricing analysis in this entire case.
21    We submit it was discredited at trial, and there's no
22    pricing analysis with respect to the other two alleged
23    markets.  And, in fact, at the end of the day, Professor
24    Simcoe had to concede that even if the price is higher, it's
25    not an overcharge.
```

90

1          All right.  So what's plaintiffs' response?

2    Plaintiffs' response is to say, okay, well, your prices

3    didn't go up, but they're basically flat.  And this is --

4    this is a chart that uses -- this is Professor Lee's own

5    chart, and this is an extremely telling chart.  So it shows

6    that keeping our prices basically flat is costing us

7    share -- that's what you see in gray; you see our share

8    going down -- as are competitors -- which is the green

9    line -- are cutting prices.  So, again, this is the exact

10   opposite of proof in a monopolization case.

11          All right.  Moving on quickly to publisher ad

12   servers.  There's no super competitive price for DFP.  It's

13   free for most publishers.  You get 90 million impressions

14   per month for free, and businesses of any size can take

15   advantage of that.

16          When the Court asks plaintiffs, well, what are the

17   better products on the market, plaintiffs cited James Avery.

18   Well, James Avery of Kevel actually said in this trial about

19   DFP:  "No other vendor offers such a deal."  This person is

20   potentially the best commercial for how good DFP is when it

21   comes to value.

22          And for those who do pay, prices have gone from

23   extremely low to lower.  And that's reflected in this

24   pricing chart where in 2022, it was 1.3 percent.  And as

25   this is happening, publisher output has increased across the

                                                              91

```
 1   industry, almost a 50 percent increase.  That's reflected in
 2   PTX 1277A.  And so what you have is low prices and a huge
 3   increase in output.
 4            So even if the Court were to find this to be its
 5   own market -- and we hope you won't -- it would a healthy
 6   one.
 7            And for all the talk about how sticky DFP is,
 8   there's no evidence that DFP used its market power to
 9   create -- to increase prices in other parts of the ad tech
10   stack, which, again, is not consistent with monopolization.
11            Similarly, we learned at trial from Mr. Wolfe at
12   Gannett that DFP makes every single impression for which a
13   unified auction is being run available to Amazon and Prebid.
14   So we are here in an antitrust case where the first witness
15   says Google enabled publishers to use its platform to offer
16   every impression to its competitors.
17            And we also saw this.  Google facilitates
18   contracts with its rivals through its own platform.  Here's
19   the pop-up box that we showed the Court in the product
20   demonstration.  And Mr. Korula said Google does this because
21   it's publisher customers want it, and the plaintiffs never
22   took this on.
23            Now, again, in the publisher ad server market,
24   substitution to apps is a major problem for plaintiffs
25   because 90 percent of advertisers who buy on the web also
```

92

```
 1    buy on apps and because many more people use apps than the
 2    web.  We saw evidence that publishers are driving users to
 3    apps.  And so, of course, publishers are not shifting all
 4    their ad space to apps, but they can shift a lot.  And that
 5    constrains market power.
 6          And significantly, what Dr. Israel said is that
 7    the question is not is every single publisher or
 8    advertiser -- or is every single publisher or advertiser
 9    going to switch or even if advertisers or publishers shift
10    100 percent of their spend, the question is, is there enough
11    shifting if Google were to raise its prices?  No SSNIP test
12    done here, but if Google were to raise its prices by a large
13    amount, would it lose revenue?  Would people shift?  And we
14    did see evidence of shifting.
15          We also saw evidence of switching to in-house ad
16    servers, and this, too, is gerrymandered out of the market.
17    So we heard from multiple witnesses about very large
18    companies that build their own ad servers, and we heard
19    concrete evidence of switching, which is substitution.  And
20    we saw that some of these companies have gone back and forth
21    and -- including Amazon.  So Amazon used to use Google's ad
22    server and switched to use its own and yet gerrymandered out
23    as a substitute.  And plaintiffs have no response to this.
24          But here's what happens when you put in the
25    concrete evidence of switching.  When you add back in
```

1    publisher ad servers -- in-house ad servers, Google is at

2    38 percent in 2022 and the others are at 62 percent.

3            And so plaintiffs' markets are so gerrymandered

4    that we wanted to give the Court a sense of what would

5    happen if we just add back in some but not all of the

6    competitive constraints.  And even that dramatically reduces

7    market share well below the Supreme Court and Fourth Circuit

8    threshold.

9            So if you look at -- if you just put back

10   demand-side platforms into the advertiser ad network market,

11   as Professor Weintraub did, it's 40 percent.  And if you add

12   nothing back into the ad exchange market, 34 percent.  And

13   if you add in just the in-house publisher ad servers where

14   we've seen concrete evidence of switching, that's

15   38 percent.  And then if you add all of the competitive

16   constraints that we've talked about this morning, the

17   numbers are even lower.

18           All right.  So let's move on to anticompetitive

19   conduct, and the first argument is going to be that

20   plaintiffs' claims all fail because they challenge lawful

21   refusals to deal.  And this is, obviously, a very important

22   argument for us.

23           So in describing each of the challenged acts,

24   plaintiffs themselves used the language of refusals to deal,

25   and we put that on the slide for the Court.  So their

94

```
 1  paragraph 105, which talks about exclusivity, they say
 2  Google controls a vital input by which they say demand from
 3  Google Ads advertisers -- that's our customers -- and that
 4  Google foreclosed this vital input from our rivals.  So it's
 5  hard to imagine a clearer statement of a duty to deal.
 6            195, they talk about AdMeld.  So the problem with
 7  AdMeld is that we did not submit real-time bids, which would
 8  have required integration of our technology to rival ad
 9  servers.
10            Their paragraph 170 about Dynamic Allocation says
11  that AdX benefited from real-time information, which was as
12  a result of the integration of our ad server and our
13  exchange, but the other exchanges, our rivals, could not.
14            215, which is about last look, says -- this is
15  talking about connecting rival exchanges to DFP so
16  publishers could use Google's real-time bidding with those
17  exchanges.
18            And paragraph 307, which talks about UPR, is
19  talking about the terms and conditions that Google applies
20  to its own platform.
21            Now, under *Trinko* and *linkLine*, a court cannot
22  compel access to Google Ad demand, which is our customers,
23  and RTBs, real-time bids, from AdX into third-party ad
24  servers as a means of getting Google Ad demand.  Because
25  that requires integration of our technology, and it cannot
```

95

 1    compel, in the case of UPR, a change in our platform terms

 2    and conditions.

 3          Now, refusals to deal are legal -- per se legal

 4    and competitive.  Because, as the Supreme Court has said,

 5    they incentivize investment and innovation.  And, Your

 6    Honor, we submit that -- like *AmEx, Trinko*, and *linkLine* --

 7    resolve this case.  And, in fact, this case, which is about

 8    real-time bidding access, mirrors the claims about

 9    auction-time bidding that Judge Mehta found were foreclosed

10    by *Trinko* in the search case.  And we've done the same thing

11    here more or less that we did with *AmEx*.

12          So plaintiffs' argument is that *Trinko* doesn't

13    apply because this isn't a refusal to deal; it's a

14    conditional dealing arrangement.  But this exact same

15    argument was made by the Antitrust Division in the *Facebook*

16    case before Judge Boasberg just a couple of years ago.  And

17    we put on the slide the words of DOJ's amicus brief in that

18    case, which makes the exact same argument plaintiffs are

19    urging on this Court.  And as you can see, both the district

20    court and the D.C. Circuit expressly rejected what they

21    called, quote, this conditional dealing argument.  And they

22    saw this conditional dealing label for what it is, which is

23    a way to avoid controlling Supreme Court precedent.

24          Now, plaintiffs only other response to *Trinko*,

25    which you also heard this morning, is that it imposes

                                                              96

1    conditions on customers.  Now, on this slide, we're showing

2    every single refusal-to-deal case, including *Trinko*,

3    affected customers.  And actually, sometimes it's the

4    customer who is bringing the case, including in *Trinko*.

5    Trinko was the customer.  That -- like the whole case

6    existed because the customer brought the case.  So that is

7    not -- that is no response.

8         I'm going to skip over Lorain Journal because

9    plaintiffs have not mentioned it and that's in our briefing.

10   But I will talk about *Duke Energy*.  Now, *Duke Energy* also

11   supports Google's case and not the plaintiffs.  So in *Duke*

12   *Energy*, in that case, the Fourth Circuit expressly applied

13   the Supreme Court's refusal-to-deal precedence in *Trinko*,

14   *linkLine*, and Justice Gorsuch's Tenth Circuit decision in

15   *Novell*.  And on the right of the slide, we put what *Duke*

16   *Energy* actually says, which is different from what

17   plaintiffs say it says.

18        And the Fourth Circuit in *Duke Energy* says

19   refusals to deal are one place where the law has developed a

20   clear test to apply, and zero plus zero plus zero is the

21   correct approach, including where there is an alleged course

22   of conduct.  And so here where plaintiffs allege five

23   anticompetitive acts, all refusals to deal, we believe that

24   five zeros is the correct approach.

25        But what plaintiffs seem to be arguing is that

                                                            97

1    *Duke Energy* expanded refusal-to-deal liability beyond *Aspen*

2    *Skiing*, which the Supreme Court recognized was the outer

3    bound of Section 2 liability.  And this, Your Honor, is

4    completely wrong.  So to begin with, *Duke Energy* applied

5    *Aspen Skiing* and expressly recognizes that it's a limited

6    exception as every other court to have applied *Aspen Skiing*

7    has done.

8                And the Fourth Circuit cited with approval not

9    just *Trinko* and *linkLine*, which obviously control, but also

10   *Novell* where Justice Gorsuch refers to the *Aspen Skiing*

11   exception as a narrow-eyed needle.

12               And in this case, there's not been any serious

13   argument that *Aspen Skiing* applies and that the narrow-eyed

14   needle has been threaded, and there's nothing in the Supreme

15   Court precedent or in the Fourth Circuit decision that would

16   permit going beyond what the Supreme Court has already said

17   is the outer bound.

18               And, in fact, the Fourth Circuit in *Duke Energy*

19   says that care must be taken lest illegality be inferred

20   from procompetitive conduct.

21               Now, I heard plaintiffs talk about dreams of a

22   monopoly, but what *Trinko* says is that every firm should

23   dream of becoming a monopoly and that that's what the

24   antitrust laws want.

25               And so it's not -- it does not mean you have

98

predatory intent, as Justice Gorsuch says in *Novell*.   If

there are documents that say we want to win the competition,

that does not suffice to show predatory intent and certainly

does not suffice to get around the long-standing Supreme

Court precedent in *Trinko* and *linkLine*.

        Now, plaintiffs also reference *Via Media*.  Well,

*Via Media* also applied *Aspen Skiing*.  And when I looked at

it the other day, I noticed -- that I hadn't before -- it

includes a side-by-side chart of things that are true in *Via

Media* and that were true in *Aspen Skiing*.  And like *Duke

Energy*, what *Via Media* is saying is that if the Court

concludes that the claim meets the *Aspen Skiing* standard, it

can still move forward.  And there's nothing in any of these

cases that say you can dispense with having a preexisting,

presumably profitable course of dealing.  That's not what

these cases stand for, and in any event, none of those

arguments have been made here.

        So *Trinko* and *linkLine*, we think, decide this

case, but we will go through the acts anyway and -- starting

with plaintiffs two exclusivity claims.  Now, this, I think,

was -- the Court was getting to this in the Court's

questions.  Plaintiffs are saying that customers need AdX to

get to Google Ads advertiser demand and DFP, in turn, is

needed to get to AdX.  So in other words, both of these

exclusivity claims depend on Google Ads' advertisers being

99

 1  unique demand, demand that can't be found anywhere else with

 2  revenue that can't be generated anywhere else.

 3          Now -- so what that means is we're going to talk

 4  about unique demand, but both of the exclusivity claims are

 5  implicated by plaintiffs' failure to show unique demand.

 6          Now, this is Dr. Israel's chart based on Professor

 7  Lee's data, and what it shows is that the top 1 percent of

 8  Google Ads' advertisers, the very large advertisers who

 9  multi-home and have the most economic power, are responsible

10  for more than 90 percent of impressions purchased by Google

11  Ads' advertisers.  So at most, even if plaintiffs can claim

12  that there's unique demand, that would be less than

13  5 percent of Google's ad demand.

14          Second, plaintiffs rely very heavily on Google

15  saying it has unique demand, but we turn -- we put on this

16  chart every place where everybody else says that they have

17  unique demand too.  So talking about unique demand is not,

18  in fact, unique.

19          THE COURT:  But isn't, in fact, the evidence in

20  the case because the publishers feel so locked into using

21  the Google Ad tech, isn't that by itself proof that, in

22  fact, there is unique demand generated by Google Ads?

23          MS. DUNN:  No, Your Honor, because here's why.

24  There's no -- there's no dispute that there are things that

25  a certain small group of publishers want that they are not

100

1    getting, and the way that they articulated that was access

2    to real-time bids so that they could have Google Ads' demand

3    compete against all other demand at the same time.

4            But the truth is that these publishers have access

5    to Google Ads' demand in other ways.  So, first of all, they

6    can use AdSense, which we'll talk about, which connects to

7    an ad server.  They can -- Google Ads' demand connects to

8    DV360 and, therefore, other rival exchanges that the

9    publishers can access.

10           So what they're really saying is that they can't

11   have access to Google Ads' demand in the exact way that they

12   would prefer, but there are many other ways to get access to

13   Google Ads' demand that we've discussed in this trial.  So

14   we're not here to argue that there's not a small collection

15   of large publishers, like News Corp and The Daily Mail, who

16   are unhappy.  That was certainly true at trial.

17           But the question under the antitrust laws is not

18   how can we provide access to our own customer base in

19   exactly the way that these companies want or that our rivals

20   want.  In fact, *linkLine* says that that -- that's completely

21   protected to not do that.

22           So there are really two things going on.  One is

23   these customers, these Google Ads' customers who multi-home

24   across all of these DSPs, right.  These are the large

25   advertisers and agencies who have 95 percent of the revenue.

101

1    They are accessible to the publishers.  They do have access.

2    They just don't have access in the precise way that they

3    would like, which is to put -- to put that group of

4    advertisers in competition with all other demand sources at

5    the same time with real-time bids through AdX.  And that is

6    what this case is actually about, and that is what they said

7    that they want to be community property.

8            I'll also say, now that we're on this topic, that,

9    you know, there wasn't -- you know, the publishers who

10   testified here, News Corp, Daily Mail, and Gannett, those

11   are three publishers.  There are millions of publishers who

12   interact with Google's ecosystem.  And so the Court never

13   heard from the many publishers who are, you know, happy with

14   what they're getting from the plaintiffs.  They never put

15   that evidence on.

16           So this is -- you know, most of those witnesses

17   that testified in this case are literally on the board of

18   something called Prebid, which is an open-source consortium,

19   and their view of the world is just entirely different, not

20   just for -- you know, Google has made its products

21   interoperable.  So sort of different than Google's view of

22   the world but definitely different from the way that the

23   antitrust laws work.  They do not say that you have to share

24   your technology, your real-time bidding, or your customer

25   base on terms that other people want.

                                                            102

1              So I will also say that -- because I think it's

2     responsive to Your Honor's question -- if you look closely

3     at the testimony -- Mr. Kershaw's testimony, for example,

4     when he says we want access to this demand, he doesn't say

5     they don't have access to the demand.  What he says is we

6     want access to as much as we can get, as much as possible.

7              And with -- and so the issue really is this.  You

8     know, the real-time bids into AdX which is made possible on

9     the Google system by the integration between DFP and AdX.

10    So what they're really asking for and what this entire case

11    is really about is this demand to integrate rival ad

12    exchanges with DFP as closely as Google's own software is

13    integrated as a means to get Google Ads' demand, which they

14    can get in a variety of other ways.

15             Does that help?  Okay.

16             So one thing I -- item I just mentioned is AdSense

17    and --

18             Let's hold on.  Okay.

19             So at the beginning of this trial, plaintiffs seem

20    to be pressing the case that if you're The Staunton News

21    Leader, you had no way to get Google Ads' demand.  And on

22    the first day of Google's case, it became clear that Google

23    does have a tool for that.  It's called AdSense for Content,

24    and it is the other half of Google's ad network.  And

25    AdSense has complete access to Google Ads' demand.  It can

103

1    be used with Google's ad server or anyone else's ad server

2    or no ad server at all.  And this is why this tool, which

3    gives complete access to Google Ads' demand and can be used

4    with any other ad server, like Scott Sheffer said with

5    Microsoft Monetize, has been completely excluded from

6    plaintiffs' case.  And instead, what they did was make up

7    something called an advertiser ad network.

8            But this is a big hole in their case and kind of

9    gives away what's going on here because if they really cared

10   about getting access to Google Ads' demand using any ad

11   server or no ad server at all, there is actually a tool for

12   that.

13           Now, fourth -- and I should have mentioned this

14   before in response to the Court's question -- is Google

15   built something called AWBid, which did connect Google Ads'

16   advertisers to rival exchanges under certain circumstances.

17   And the AWBid story illustrated how difficult it is to make

18   these integrations safe.

19           And per Bjorke, who worked on Google's ad spam

20   team for 11 years, he testified that when they first started

21   to run experiments on AWBid, he saw an exceptionally high

22   level of invalid traffic because other ad exchanges did not

23   do a good enough job of keeping bad actors out of the

24   system.

25           And Google, as the Court heard from the very

```
 1    beginning, is very concerned about vetting publishers and

 2    advertisers on both sides of the network.  And so this is a

 3    document that shows 70 percent of spam, 98 percent of clicks

 4    or spam in the other exchanges.

 5             Now, the Court asked about latency.  Mr. Jayaram

 6    and Mr. Bjorke and contemporaneous documents all talk about

 7    latency, and that's one reason it is hard to do these

 8    integrations in a way that don't disturb the service that

 9    the customers are used to.  That's paragraph 831 of our

10    findings of fact.

11             And I also heard plaintiffs say that security is

12    not a procompetitive justification, and that has been --

13    there's no court that has ever said that.  Security is, of

14    course, a procompetitive justification and was illustrated

15    by Mr. Bjorke's testimony that when there was the methbot

16    scam, they got in through DV360, not Google Ads because

17    Google Ads is much more secure because it's not as

18    integrated.

19             Now, to the Court's question from before, to the

20    extent that plaintiffs are looking for a Google buying tool

21    that fully connects Google advertisers with publishers who

22    sell on rival exchanges, that's DV360.  Now, it is more

23    vulnerable to ad fraud scams; although, Google works on that

24    too.  So -- but it's more open.  There are trade-offs, and

25    Google is allowed to make products that suit different
```

105

 1    customers' needs in different ways.

 2            Now, this also goes to Your Honor's question,

 3    which is if you look closely, when the industry participants

 4    are complaining about losing Google demand, they are talking

 5    about losing AdX demand.  And that includes DV360 and many

 6    other authorized buyers, like The Trade Desk and Yahoo and

 7    Criteo.  Okay.

 8            So if you -- so we put some of this on the slide,

 9    but The Daily Mail and Gannett and Kevel all explain that

10    they're losing access to ads -- that ads demand that comes

11    through AdX, which includes all of these other things.

12            So there is not evidence in this case that

13    measures the loss of unique Google Ads' advertisers.  And in

14    any event, that number would be extremely small because the

15    vast majority of Google Ads' advertisers are these companies

16    who are multi-homing.

17            So just to put a fine point on this, there's no

18    evidence that advertisers who use Google Ads use it

19    exclusively.  In fact, there's infinite -- not infinite, but

20    quite a lot of evidence to the contrary, and Google Ads'

21    demand is not only available via AdX.

22            Now, plaintiffs' second exclusivity claim fails

23    for the same reason -- which is the reason they care about

24    DFP AdX integration -- is because they want Google Ads'

25    demand.  So all of that argument about unique demand applies

```
 1    to the second exclusivity claim.

 2             But the second exclusivity claim also fails

 3    because they say it's a tying claim, and it's not really a

 4    tying claim.  And we put this up on the screen.  This is

 5    from the plaintiffs' conclusions of law.  And basically,

 6    what it says is you could disaggregate the products and

 7    offer the publisher companies' customers AdX's real-time

 8    bids and pricing information through rivals.

 9             So what they're saying -- and they've not really

10    challenged in this case the integration of the products --

11    is that you could separate the products and that wouldn't be

12    enough.  Like, what they're really asking for is the second

13    part.  And the second part is not something under Trinko and

14    linkLine that can be compelled.  Neither is the first part.

15             In any event, AdMeld also falls into the same

16    bucket.  What the plaintiffs actual complaint is is that

17    AdMeld had nascent RTB functionality, and when Google

18    acquired AdMeld, as the evidence showed, its focus was on

19    acquiring a company for traditional network yield

20    management, not real-time bidding.

21             And so what plaintiffs are really complaining

22    about is that when we acquired AdMeld, we didn't do this

23    thing that we have never done, which is to integrate AdX

24    with rival publisher ad servers to give real-time bids into

25    rivals.  And we'll talk in a little bit about the legitimate
```

107

1    business reasons for not doing that, which were reinforced

2    by the experience of the CEO who came from AdMeld who talked

3    about how difficult it is to do such a thing.

4            So that's this document.  And what this document

5    shows is that Brian Adams, he was the co-founder and CTO at

6    AdMeld.  And he had experience with trying to do these kind

7    of server-side integrations, and he said these integrations

8    were plagued with ongoing issues.  And you can see there was

9    some discussion in this document, and at the end, Google

10   concluded the business case does not justify the

11   development, including because of the spam and other issues

12   that the engineers had flagged.  DTX 150, not on this slide,

13   that document shows that third parties were unwilling to do

14   the technical work to integrate without a rev share.  That

15   document actually has a Google employee saying, "I would

16   love to be in touch with these third parties, but they're

17   not willing to do the work."

18           And so deciding not to integrate your products

19   because of spam and engineering issues is not an antitrust

20   violation even if some of the large publishers don't think

21   it is their optimal choice.  That is a legitimate business

22   justification.

23           Now, various witnesses inside and outside of

24   Google talked about how difficult it is to achieve these

25   technical integrations.  And this, quote, is very

                                                              108

1    significant.  Because here Mr. Korula was asked, "Why don't

2    you do this?"  And he said, "We'd have to rework AdX's core

3    code, which would take a team of engineers years to do."

4            And none of plaintiffs' witnesses, fact or expert,

5    understood the massive amount of work that this would take

6    and that essentially what they're really asking for when

7    they complain that they can't have real-time bids into AdX

8    in the exact way they want is that they're really asking

9    Google to build a whole new product.  And it's a valid

10   business decision to decide not to do that.  Google gets to

11   decide that.

12           And why does this matter?  Well, *Trinko*, *Novell*,

13   and the court in search all talk about why this matters.

14   Judge Mehta says, "How's the Court supposed to say when and

15   how Google should have integrated?"  Justice Gorsuch worried

16   that this would risk judicial complicity and collusion and

17   dampen price competition.

18           And by the way, that was illustrated when Andrew

19   Casale of Index Exchange said his strategic partnership with

20   Amazon reduced Index Exchange's competition with Amazon by

21   50 percent.  And that's what Justice Gorsuch was worried

22   about, and that's why courts don't compel this.

23           All of the courts worried that enforced sharing

24   requires courts to act as central planners and says that

25   that's a role for which they are ill-equipped.  And if

                                                          109

1    Google or any other company is required to share its

2    customers or technology or data with competitors to comply

3    with the antitrust laws, how are they supposed to know how

4    much sharing those laws require?  Everything?  Something?

5    How much is enough?  When should they do it?  Plaintiffs

6    don't have any answers to these questions.  They're coming

7    to ask this Court to do this, which is precluded by law,

8    with no answers to any of those questions.

9            And I also will say -- plaintiffs have said in

10   their briefing this is not a liability issue.  Well, in

11   every court that has decided this and applied these

12   refusal-to-deal precedents, it has been a liability issue.

13   And it's ironic because the plaintiffs are arguing the exact

14   opposite in the play case in the Ninth Circuit where they

15   say, actually, *Trinko* is about liability, not about

16   remedies.  And it is about liability.  Okay.

17           So the last problem with the plaintiffs' tying

18   claims that's in our papers is that if you -- these

19   aren't -- as we've said, they're not actual tying claims.

20   But even if they were, they would fail because the

21   plaintiffs haven't proved market power in the tying product,

22   which here is Google Ads' demand.  And Professor Lee

23   admitted he had defined no market for advertising or ads.

24   So legally, that claim fails anyhow.

25           Now, plaintiffs are saying, well, AdX and DFP --

110

1    AdX is the tying market.  It's not.  But even so,

2    40 percent -- they're saying 40 percent is sufficient market

3    power.  Well, that's not true because the power, as they're

4    saying, is coming from Google Ads.  But in any event, AdX --

5              THE COURT:  That was the five-minute warning.

6              MS. DUNN:  Understood, Your Honor.

7              AdX has no power to create a tie with DFP because

8    you do not have to use AdX with DFP.  The vast majority of

9    people who use DFP do not use AdX.

10             So there are so many reasons that this tying claim

11   doesn't exist, and then the last is there's no competitive

12   effects shown from the AdX-DFP tie.

13             So I do probably have more than five minutes left,

14   Your Honor, and I think it's a good time for me to ask if I

15   will get a little bit of grace from the Court.

16             THE COURT:  Five minutes.

17             MS. DUNN:  Okay.  So first look and last look are

18   also challenges to a refusal to deal.  Plaintiffs demand

19   that Google build interoperability between rival exchanges

20   and DFP in order to extend Dynamic Allocation to rival

21   exchanges.

22             Now, the reason this quote is up here is because

23   Scott Spencer, who worked on DFP at DoubleClick and knows

24   Dynamic Allocation, is talking about how Dynamic Allocation

25   is made possible by the integration between the ad server

                                                        111

 1    and the exchange.  And that is critical.

 2              It also was procompetitive.  Their experts

 3    illustrate -- or admit that this made the products more

 4    attractive.

 5              And given Your Honor's five-minute warning, I'm

 6    now going to skip like all the way to the end because I feel

 7    like the end is very important.  Okay.  It's close to the

 8    end.  Hang on.

 9              All right.  So this is where I want to end, Your

10    Honor.  I want to end with the plaintiffs' own chart.  Now,

11    I'd be surprised if we didn't see this chart again today.

12    But this is our output chart, and I was happy to see the

13    plaintiffs use it at trial because I think it dooms their

14    case.  And even more importantly, this slide illustrates why

15    this case was misconceived in the first place.

16              So all four of these graphs represent legal cases,

17    *Standard Oil* in 1909, *AT&T* in 1982, *Microsoft* in 1999, and

18    this one right now.  And in every one of the others, the

19    court assessed the defendant's share of the market,

20    75 percent, 77 to 90 percent, and 80 percent.  And that is

21    what these cases said.  Here, Google is at 10 percent, and

22    that blue line represents extraordinary market-wide growth.

23    So this is like that sold song, Which of These Things is Not

24    Like the Other.

25              And this -- Your Honor, this is the basis upon

```
 1    which plaintiffs come to this Court and ask it to overturn

 2    AmEx and Trinko and linkLine, and this is the basis upon

 3    which they're bringing this Court arguments that other

 4    courts have rejected.  And this is the basis they offer for

 5    the extraordinary step of governmental interference in a

 6    rapidly evolving technology market.

 7              THE COURT:  Wait.  I'm going to give you an extra

 8    minute or two because I have a question for you on this.

 9              MS. DUNN:  Great.

10              THE COURT:  On the far left side, it says U.S.

11    display ad spending, so many billions of dollars.  Over what

12    form of media?  Are we talking about open web?  Are we

13    talking apps?  What do you have on that side?

14              MS. DUNN:  Yeah.  So this is -- so this data comes

15    from eMarketer, which Professor Lee also agreed was a good

16    measure.

17              THE COURT:  Okay.

18              MS. DUNN:  And it does include apps and CTV, and

19    it also includes social media.

20              THE COURT:  Do you have a similar chart just using

21    the proposed market, which the government has been arguing

22    throughout this case, which is that we would be limiting

23    this to open-web display?  We're not including apps.  We're

24    not including video.  I'd like to see the same chart.  Do

25    you have that?
```
                                                               113

1            MS. DUNN:  Also, tellingly, there's no data for

2    that.  That is not how the data is broken out.  So you

3    can't -- this goes to our gerrymandering point.  There's

4    nobody that has created the possibility of having the data

5    that you talk about because nobody thinks about the market

6    in this way.  So that's the --

7            THE COURT:  You've got two extra minutes.

8            MS. DUNN:  The other thing I would say, though,

9    Your Honor, is that the Google line also reflects that.  So

10   the Google line here reflects all of those things, including

11   Google's owned and operated, like YouTube.

12           Okay.  So in conclusion, Your Honor, and since

13   this is our last word here, we want to very much thank the

14   Court and the Court's staff four your time and attention

15   and, of course, for the trial, which was I think for

16   everybody an extremely positive experience thanks to Your

17   Honor.

18           So we are leaving for the Court this list of

19   principals of antitrust law that would need to be

20   disregarded in order to find for the plaintiffs.  And in

21   closing, we just note that this list is underinclusive, much

22   like plaintiffs' market.

23           Thank you, Your Honor.

24           THE COURT:  All right.  Ms. Wood.

25           And, Ms. Wood, I want you to start with the thing

114

1    we just left off with, with Ms. Dunn's statement that there

2    is actually no actual evidence in the record that would

3    support an analysis of the degree to which Google actually

4    dominates that particular market that you've described as

5    the market that's at issue in this case, the open-web

6    display.

7              CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

8              MS. WOOD:  Sure, Your Honor.

9              So let me start with that.  Obviously, this case

10   included lots of evidence.  You heard references repeatedly

11   from Dr. Lee and others to terabytes of data, including

12   log-level data that was produced by Google and multiple

13   market participants.  It is that log-level data that was

14   produced not only by Google but other market participants

15   that allowed Professor Lee to calculate the market shares

16   for open-web display where we do see in each of the markets

17   numbers like 80 to 90 percent in DFP, 80 to 90 percent in

18   the advertiser ad network, and 50 to 60 percent for the ad

19   exchange, again, relative to the next largest competitor

20   that is a fraction of that amount.

21             As I was sitting here listening to defense

22   counsel's closing, I was actually reminded of Dickens' *A*

23   *Tale of Two Cities*.  Is this the best of times, or is this

24   the worst of times?  This trial was really about two

25   different tales, and it's up to this Court to decide, based

115

1    on the law and based on the evidence, which of those tales

2    is consistent with what you heard from that witness stand.

3          One tale was told almost exclusively by the market

4    participants themselves, individuals who live and breathe

5    these markets every day and who were not paid to come here

6    and testify.

7          Another story, a very different story, was told by

8    the defendant's witnesses, all but one of which received

9    money from Google.  And what did you hear from them?  You

10   heard from them mostly theory and very little fact.

11         What did you hear from Professor Milgrom, a man

12   with obviously commendable and impressive credentials, a

13   Nobel Prize?  But his opinions, Your Honor, were at war with

14   the facts here.  Despite the repeated evidence heard from

15   multiple market participants, Mr. Milgrom -- Professor

16   Milgrom testified that, actually, first look is a

17   disadvantage, not an advantage at all to go first in the

18   auction and have the opportunity to actually bid.  Whereas

19   other market participants don't.  That's a nice problem to

20   have if you can get it.

21         You heard Professor Milgrom also say that last

22   look -- he couldn't say for sure whether that was actually

23   an inherent advantage.  Again, a theory offered in

24   contradiction to the hard commercial reality of facts.

25         And what did you hear from Dr. Israel, defendant's

116

 1    economic expert?  Essentially, let them eat cake.  These
 2    publishers, if they're unhappy, all they need to do is build
 3    their own in-house $100 million publisher ad server.  All
 4    they need to do is work harder.  Sure, they testified they
 5    do all they can to sell business directly, but just work a
 6    little harder and sell more directly.  Or why don't you just
 7    switch to app?  Take those websites that you've created and
 8    just convert all your users over to app.  How easy could
 9    that be?
10         Well, the Court heard directly how challenging
11    that was from, again, a fact witness, someone with real
12    experience in these markets, Mr. Wheatland, who testified it
13    ain't so simple.
14         This case is about two different versions of
15    reality, and I will say I find it a bit rich being accused
16    of gerrymandering or manufacturing for litigation market
17    definition when this is the company who issued mandatory
18    communicate-with-care policies to its employees instructing
19    them to use preferred vocabulary when talking about
20    antitrust matters, to stamp their documents privileged and
21    confidential, and to speak freely only in off-the-record
22    chats that are deleted after 24 hours.
23         We don't need that missing evidence to prove the
24    facts of this case.  The facts of this case are
25    overwhelming.  But we still do very much believe that that

117

```
 1    destruction of material evidence does qualify for an adverse

 2    inference here.  And if there's any fact about which this

 3    Court has any level of doubt, we believe inferences could be

 4    drawn against this defendant for that reason.

 5            And I'll also add, while we're talking about

 6    making up points for litigation, that it's not the

 7    plaintiffs but the defendant who, in fact, switched

 8    positions about how to define the relevant marketplace in

 9    one court on the other side of the country and in this court

10    here.

11            So is this, in fact, a vibrant marketplace?  I'm

12    glad my colleague showed you Demonstrative AG because I do

13    think it's important to show.  Because it puts the lie to

14    the notion that output expansion is indicia of the absence

15    of monopoly behavior.  That is not the case.  Standard Oil,

16    Microsoft, and AT&T all involved markets that were thriving

17    and yet also had monopolists behaving in inappropriate ways

18    in those markets.

19            So the general growth of the Internet tells us

20    very little about the markets that we're talking about here,

21    and the fact that TikTok, Amazon, and Facebook are all

22    household names doesn't mean that publishers or advertisers

23    can use them to buy or sell open-web display ads.

24            Not once in counsel's closing did you hear an

25    explanation of how those companies are competing against
```

1   Google in the market for publisher ad servers that are

2   capable of selling open-web display or ad exchanges or ad

3   networks that are capable of facilitating open-web display.

4   And that's for one simple reason.  TikTok, Amazon, and

5   Facebook don't offer those services outside of their walled

6   gardens.  And the reality, again, is that nine out of ten,

7   nine out of ten open-web display transactions fall or are

8   transacted through the hands of one market participant, the

9   defendant, Google.

10          So counsel talked about how Google was really on

11  the ropes according to this one Microsoft document from

12  2017.  On the ropes.  Well, again, what Google faced in the

13  years 2015 to 2017 was, in its own words, an existential

14  threat.  What was that existential threat?  Header bidding.

15  And what was header bidding?  Header bidding was an

16  industry-contrived hack to get around the dominance of a

17  publisher ad server that wasn't serving its customers.

18          Header bidding did not disintermediate the

19  publisher ad server.  Why?  Because as you heard, all roads

20  lead back to Google at the end of the day.  Google -- after

21  the header bidding auction takes place, that number is given

22  back to Google's publisher ad server, DFP, and they, and

23  they alone, are offered a last look.  So they're not

24  disintermediated.

25          Did they face more challenging times after header

119

1    bidding?  Absolutely.  Is that why Mr. Casale called header

2    bidding hypercompetitive relative to the waterfall setup in

3    which he didn't even get a chance to bid?  Sure, he did, but

4    all things are relative.

5           And do remember that while header bidding is alive

6    and well today, every single open-web display ad that is

7    transacted through header bidding is included in the market

8    shares the Court has in evidence.  So header bidding is not

9    excluded from this market.  Every bit of those shares are

10   included in the fraction of 5 percent or 4 percent or

11   2 percent of market share of other rival ad exchanges.

12          Now, there's a lot of talk about substitution and,

13   in particular, advertisers ability to substitute.  But what

14   the antitrust law requires is that you look at the purpose

15   of the substitution.  Is the substitution sufficient to

16   chasten a hypothetical monopolist?  That means, are the

17   tools involved reasonable substitutes such that a

18   hypothetical monopolist would not be emboldened to raise

19   prices or degrade quality because they fear that kind of

20   substitution?  That is not the substitution we have here,

21   Your Honor.

22          Because one set of publishers have no other

23   choice.  Even if there were meaningful substitution on the

24   advertiser's side of the market, which there is not, the

25   fact that publishers can't substitute a way means that a

1    hypothetical monopolist is not chastened.

2            And how do we know that?  How do we know that

3    Google is, in fact, not facing fierce competition?  In the

4    words of plaintiffs' -- defendant's proposed findings of

5    fact, we know that defendant is not facing fierce

6    competition because the defendant is still maintaining a

7    20 percent take rate for AdX impervious to the fact that the

8    majority of its rivals charge half that amount.

9            And you don't have to take that from me.  Take

10   that from defendant's own witnesses who acknowledge that the

11   AdX take rate is double the competition and that it can only

12   be justified because of the ties, which are illegal.

13           Was it fierce competition that Google faced that

14   allowed it, in the words of PTX 183, to literally "holdback"

15   its Google Ads' advertisers from building on rivals in order

16   to do what?  To promote AdX.  That's not fierce competition.

17           Was it fierce competition that emboldened Google

18   to impose widely disfavored Unified Pricing Rules that

19   prevented publishers from making better deals with rivals?

20   Is that the kind of fierce competition the antitrust laws

21   are here to protect?  Of course not.  Fears competition is

22   about making better products at better prices and, most of

23   all, allowing your customers to choose who they want to work

24   with.

25           Here, the evidence showed the opposite, that

121

1    Google degraded its products and charged its customers

2    "irrationally" high rent.  Those aren't my words; those are

3    the words from Google's own Chris LaSala.

4            Those are not the practices you see from a market

5    participant who faces stiff competition.  Those are the

6    actions you see from a "authoritarian intermediary," which

7    is, frankly, a pretty apt description in the words of

8    PTX 284 for how the market rightly views Google.

9            Now, against the weight of this evidence, what is

10   Google doing to try to persuade you that it's not a

11   monopolist?  It's doing very simple math, a slight of hand

12   that monopolists have used for a century.  Just change the

13   lens.  Step back a few steps.  Once you change the aperture

14   of the lens and you zoom out, all the detail and the closeup

15   facts become obscured.  And when you step back out that far,

16   maybe all that matters are buyers and sellers.  Maybe all

17   ads do compete with each other because they all vie for the

18   customer's attention.  Maybe gaming is in the same

19   marketplace as open-web display ads.

20           But that level of a zoomed-out perspective

21   obscures the very purpose of looking at market definition

22   under the antitrust laws, which is to look at the arena of

23   competition and determine if there's a problem.

24           And counsel tried to argue that *AmEx* somehow

25   requires -- because this is a situation where there are

                                                      122

1   buyers and sellers, *AmEx* somehow requires you to collapse a
2   number of different ad tech tools into one market with each
3   other.  That's not what *AmEx* requires.  Let me quote *AmEx*
4   specifically, "The relevant market is defined as 'the area
5   of effective competition,"' the arena within which
6   significant substitution in consumption or production
7   occurs."
8           You didn't hear about significant substitution
9   between ad servers and ad networks.  You didn't hear about
10  significant substitution between Facebook and DSP.  No.  So,
11  again, *AmEx* talks about the fact when both sides
12  simultaneously choose to use the same tool.  That's not what
13  we have here.  We have a marketplace that has three distinct
14  tools.
15          THE COURT:  Ms. Wood, you started with Dickens,
16  and you know, there's a guillotine in *A Tale of Two Cities*.
17  I'm about to use it.  All right.  Your time is about up.
18          MS. WOOD:  May I make one point, Your Honor?
19          THE COURT:  One point.
20          MS. WOOD:  Thank you, Your Honor.
21          Just on *Trinko*, let me emphasize that with respect
22  to *Trinko*, *Trinko* did not involve tying claims as this case
23  does.  And in fact, the court's decision in *Kodak* makes
24  abundantly clear that tying claims are still illegal under
25  the Sherman Act.

                                                              123

1          And with that, let me just say that all we ask in

2    this case, Your Honor, is that you apply the facts exactly

3    as you heard them from the people who participated in these

4    markets and that you apply the law exactly as written.

5          Thank you very much.  And we, too, sincerely

6    appreciate all the time and effort and resources that the

7    Court and this incredible staff has put in to a trial of

8    this magnitude, and we sincerely appreciate the experience.

9          Thank you very much.

10          THE COURT:  Well, as I said at the end of the

11    trial -- and I'll repeat it again -- this was one of the

12    best -- it is probably the best tried case I've had in the

13    years I've been on the bench, and I've had a couple of very

14    good trials.  But both of you, both teams really did a

15    suburb job of being, first of all, well prepared, incredibly

16    courteous to each other even though you both, you know, very

17    vigorously, you know, believe in your positions.  Obviously,

18    I'll have to make the final decision in this case, but it

19    was, again, a pleasure to also hear from you.

20          No rebuttal.  I know you're on your feet,

21    Ms. Dunn.

22          MS. DUNN:  Well, Your Honor, there's one citation

23    that directly responds to the Court's question of is there

24    data.  So I'm happy to give that to you or not if you

25    prefer, and then there's one thing we would like to hand up.

124

1             THE COURT:  No.  I think it's done.  We've got

2   thousands of pages.

3             MS. DUNN:  Okay.

4             THE COURT:  That is enough.

5             Thank you.  We'll recess court for the day.

6             MS. WOOD:  Thank you, Your Honor.

7             MS. DUNN:  Thank you, Your Honor.

8             (Proceedings adjourned at 1:19 p.m.)

9             ----------------------------------

10      I certify that the foregoing is a true and accurate

11   transcription of my stenographic notes.

12

13                        _Stephanie Austin_____
                           Stephanie M. Austin, RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

                                                              125