**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> GOOGLE LLC, <br><br> *Defendant*. | No. 1:23-cv-00108-LMB-JFA |

## GOOGLE'S INITIAL PROPOSAL FOR APPROPRIATE REMEDIES

Over the past two decades, Google has invested immensely in developing modern ad technology that matches advertisers and publishers in the digital world across channels and formats. This technology has fueled exponential growth in digital advertising and, as this Court's opinion recognized, "digital advertising has been the lifeblood of the Internet, funding much of its development while providing free access to an extraordinary quantity of content and services." Dkt. 1410 ("Op.") at 7. This Court has determined certain specified conduct in what it found to be markets for open-web display publisher ad servers and open-web display ad exchanges violated Sections 1 and 2 of the Sherman Act.[1] In deciding the remedy to address this conduct, the Court "must be 'careful to avoid constructions of § 2 which might chill competition, rather than foster it.'" *New York* v. *Microsoft Corp.* ("*Microsoft II*"), 224 F. Supp. 2d 76, 136 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004) (quoting *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 458 (1993)). "[A]ny dampening of technological innovation," the D.C. Circuit has warned, "would be

---

[1] Google submits these proposals to assist the Court in identifying appropriate remedies, but Google respectfully disagrees with this Court's liability decision and intends to appeal it. Google's proposals are not a forfeiture or waiver of objections to that decision.

at cross-purposes with antitrust law." *Id.* at 158 (quoting *United States* v. *Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998)). And, as the Supreme Court stated recently: "When it comes to fashioning an antitrust remedy, . . . caution is key," as "markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *NCAA* v. *Alston*, 594 U.S. 69, 106 (2021). Earlier in this case, Plaintiffs likewise told this Court that "the equitable remedy **must in all instances be narrowly tailored** to the precise harms found." Dkt. 277 ("Pls.' Mem. of Law In Support of Motion to Clarify Scheduling Order") at 5 (emphasis added).

Google submits this initial remedy proposal, having taken care to craft a proposal consistent with the Court's liability opinion. As discussed at the May 2 hearing, Google's submission explains why divestiture of Google's publisher ad server and/or its ad exchange is not available under governing law. And Google sets forth a specific remedy proposal that Plaintiffs conceded fully addresses the Court's liability findings. 5/2/25 Tr. 35:8-21 (Plaintiffs stating Google's proposal "**would absolutely address our concern about the prior illegal conduct**" (emphasis added)). Google proposes that the Court (1) require Google to make AdX real-time bids for open-web display ads available to all rival publisher ad servers; (2) require Google to deprecate Unified Pricing Rules ("UPR") and instead enable publishers to set different price floors for different bidders, including for different ad exchanges and different buying tools; (3) enjoin Google from rebuilding the auction effects known as "first look" and "last look" as well as UPR; and (4) appoint a trustee agreed upon by the parties to monitor compliance for a period of three years.

Google's proposed remedies would fulfill the Court's mandate "to redress the violations" found and "restore competition," *Ford Motor Co.* v. *United States*, 405 U.S. 562, 573 (1972), without disrupting markets well beyond the ones Plaintiffs argued for and the Court found.

Plaintiffs' proposed structural remedy, by contrast, reaches far beyond the liability found by the Court and would cause economic chaos and technological dysfunction resulting in harm to millions of advertisers and publishers, and in so doing, degrade the experience of Internet users. Plaintiffs' approach is not just foreclosed by law; it will be harmful to those relying on ad tech and ripe for unintended consequence given the degree to which ad tech (significantly impacted by AI) has already changed and will change in the days and years to come.

## I.    Divestiture Is Unwarranted in This Case Under Controlling Law.

### A.  Divestiture of AdX or DFP Is Legally Unavailable.

As discussed at the May 2 hearing, and further detailed below, Google is aware of no analogous case where divesture was a proper remedy. This is not a case where liability stemmed from an unlawful merger or acquisition or a corporate combination undertaken for an unlawful purpose. The only arguably analogous case was *Microsoft* and there, the district court's initial order of divestiture was reversed. In doing so, the D.C. Circuit emphasized that "divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain." *United States* v. *Microsoft* ("*Microsoft I*"), 253 F.3d 34, 80 (D.C. Cir. 2001) (en banc) (referring to divesture as "radical structural relief" and citing 3 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 653b (Areeda & Hovenkamp)). At the May 2 hearing, Plaintiffs pointed to decisions such as *International Salt Co.* v. *United States*, 332 U.S. 392 (1947), and *Ford Motor Co.*, the very cases the *Microsoft* plaintiffs relied upon on remand over two decades ago. 5/2/25 Tr. 8:23-9:8, 12:2-10. In declining to reimpose divestiture following remand, the district court acknowledged those cases but explained that a remedy "should be tailored to fit the wrong creating the occasion for the remedy." *Microsoft II*, 224 F. Supp. 2d at 100 (quoting *Microsoft I*, 253 F.3d at 107). Further,

"[e]quitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do.'" *Id.* (quoting 2 Areeda & Hovenkamp ¶ 325a).  The considerations that counseled against divestiture in the *Microsoft* case demonstrate why that remedy is also unavailable here.

**First**, divestiture is ordered "[b]y and large" in cases that "involved the dissolution of entities formed by mergers and acquisitions." *Microsoft I*, 253 F.3d at 105.  For the D.C. Circuit, this principle was grounded in the Supreme Court's observations that divestiture "has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control," *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 329 (1961), and that "[c]omplete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws," *Ford Motor Co.*, 405 U.S. at 573.  *See also* 2 Areeda & Hovenkamp ¶ 303f ("Historically most cases in which courts have authorized divestiture as a remedy have been for violations of § 7 of the Clayton Act").[2]

Notwithstanding Plaintiffs' assertion before the Court on May 2 that "there are tons of cases, Supreme Court cases that talk about the need for divesture," 5/2/25 Tr. 33:8-10, Google has been able to identify only 38 federal court cases over the past 120 years that have ever ordered divestiture.  *Cf. Microsoft I*, 253 F.3d at 80 (describing divestiture as "radical structural relief" and

---

[2] Numerous other Supreme Court cases reflect this principle dating back to the decision in *Standard Oil Co. of New Jersey* v. *United States*, 221 U.S. 1 (1911), where the Court determined that it should adopt a "measure of relief as will effectually dissolve the combination found to exist in violation of the statute" given "the ownership of the stock of the New Jersey corporation constituted a combination in violation of the 1st section" of the Sherman Act, *id.* at 78-79.  Over the ensuing decades, the Court applied this in various permutations.  *E.g.*, *United States* v. *Union Pac. R. Co.*, 226 U.S. 61 (1912) (ordering stock divestiture because "since the acquisition of the stock in question the dominating power of the Union Pacific has eliminated competition between these two systems"); *United States* v. *Reading Co.*, 226 U.S. 324, 353 (1912), *modified on other grounds by* 228 U.S. 158 (1913) (similar relief where "[t]he evil is in the combination"); *United States* v. *Crescent Amusement Co.*, 323 U.S. 173, 189 (1944) ("Dissolution of the combination will be ordered where the creation of the combination is itself the violation").

4

citing 3 Areeda & Hovenkamp, Antitrust Law ¶ 653b). All fit into the "combination and control" for an unlawful purpose framework observed in *Microsoft I*, including the one Fourth Circuit decision. *Steves &Sons, Inc.* v. *JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) ("[D]ivestiture is the 'remedy best suited to redress the ills of an anticompetitive merger.'" (quoting *California* v. *Am. Stores Co.*, 495 U.S. 271, 285 (1990))).

Plaintiffs counter that "the law permits and allows [the Court] to order a divestiture even when that asset may have been lawfully acquired to begin with. There are multiple Supreme Court cases." 5/2/25 Tr. 33:20-34:1. Yet the only case Plaintiffs invoke, *Schine Chain Theatres* v. *United States*, 334 U.S. 110 (1948), *overruled on other grounds by Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752 (1984), proves the exact opposite.

In *Schine*, the Supreme Court considered Sherman Act claims against the owner of a chain of movie theatres that had been acquired over two decades where the chain's "large buying power gave Schine the opportunity to exert pressure . . . to obtain preferences." *Id.* at 115 (internal quotation marks omitted). As Plaintiffs quoted at the hearing, the Supreme Court said: "In this type of case we start from the premise that an injunction against future violations is not adequate to protect the public interest." 5/2/25 Tr. 32:16-33:10 (quoting *Schine*, 334 U.S. at 128). Plaintiffs neglected to explain what "this type of case" refers to. In the very next lines that follow what Plaintiffs quoted at the May 2 hearing, the *Schine* Court explains that its comments pertain to an anticompetitive acquisition: "To require divestiture of theatres *unlawfully acquired* is not to add to the penalties that Congress has provided in the antitrust laws." *Schine*, 334 U.S. at 128 (emphasis added). After explaining this, the Court then proceeded to *reverse* the divestiture order in that case because it found that the district court failed to "determine what dividends Schine had obtained from the conspiracy." *Id.* at 129. Contradicting Plaintiffs' claim that *Schine* endorses

divestiture of *lawfully* acquired assets, the Supreme Court explained that an appropriate remedy could be requiring defendants "to dispose of theatres *obtained by practices which violate the antitrust acts*." *Id.* (emphasis added).[3]

Applying the lesson of these cases, divestiture is unavailable here. As this Court expressly found, "Plaintiffs have failed to show that the DoubleClick and Admeld acquisitions were anticompetitive." Op. at 87; *see also id.* at 90. To the contrary, in discussing the Admeld acquisition for instance, the Court noted that Google "rebuil[t] some of Admeld's capabilities within AdX and other aspects of Google's ad tech architecture" and, "[i]n doing so, Google at least partially improved the effectiveness of AdX." *Id.* at 89. The result was "[a]cquiring technology and talent to offer customers a more flexible, affordable, and effective product." *Id.* Plaintiffs' proposed divestiture here would in no way be limited to requiring Google "to dispose of [assets] obtained by practices which violate the antitrust acts." *Schine*, 334 U.S. at 129.

**Second**, Plaintiffs' proposal to divest AdX, divest the "auction logic" of DFP, and eventually divest "the lump of the publisher ad server," 5/2/25 Tr. 13:5-14:4, runs afoul of the rule that remedies should be of the "same type or class" as the violations. *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 395 U.S. 100, 132-33 (1969) (internal quotations omitted); *Microsoft*, 253 F.3d at 107 (relief "should be tailored to fit the wrong creating the occasion for the remedy").

---

[3] Google has identified one case from over 75 years ago that contemplated ordering divestiture of lawfully acquired assets, but only where the lawful acquisition was "part of the conspiracy to eliminate or suppress competition in furtherance of the ends of the conspiracy." *United States* v. *Paramount Pictures*, 334 U.S. 131, 152 (1948). And even there, the Court ultimately *reversed* the divestiture order. *Id.* Likewise, the *Microsoft II* district court rejected the government's invocation of *Paramount Pictures* when denying a divestiture remedy. 224 F. Supp. 2d at 108. Given that this Court nowhere found that the Admeld and DoubleClick acquisitions were part of some unlawful conspiracy (indeed, it found neither anticompetitive at all), *Paramount Pictures* provides no basis for ordering divestiture.

The Court's liability determinations here are based on finding a "series of anticompetitive acts to acquire and maintain monopoly power in the publisher ad server and ad exchange markets *for open-web display advertising*." Op. at 114 (emphasis added). Yet, after building an entire case on the premise "that open-web display advertising is a distinct form of digital advertising that is not reasonably interchangeable with other forms of advertising," Dkt. 1380 ("Pls.' Post-Trial Proposed Findings of Fact and Conclusion of Law") at ii, Plaintiffs abandon that distinction to now improperly argue for a remedy that applies across all ad formats, ad channels, and, by the government's own admission, transaction types, 5/2/25 Tr. 13:6-8 (seeking to divest "the logic that determines which ad to serve between direct and indirect").

As the Court's opinion confirms, Google's tools do much more than transact open-web display ads. For example, undisputed evidence confirms that "DFP helps publishers manage not only display ads shown on the open web, but also mobile app ads and instream video ads." Op. at 46. While remedies here can be directed at increasing competition in the marketplace for selling open-web display advertising, there are no findings that would justify relief beyond that market. To the contrary, the Court's opinion found competition outside the realm of open-web display advertising but rejects those other channels as irrelevant to open-web publishers: the monopolized markets "are each properly limited to tools that facilitate open-web display transactions," as "the publisher is the primary consumer of the ad tech tools and is focused on monetizing channel-specific inventory." Op. at 59. The Court also emphasized that facilitating the sale of "instream video, mobile app, or social media ads" is "not helpful for publishers seeking to monetize their open-web display inventory" and therefore outside the scope of Plaintiffs' case. Op. at 54. Divestiture would go well beyond the "type or class" of the violation by requiring Google to sell off products where, trial evidence confirms and additional evidence at the remedies stage would

show, a significant amount of business has nothing to do with open-web display advertising. *See, e.g.*, 9/26/24 AM Tr. 19:3-20 (Mok) (reviewing data and testifying that "a material portion of revenue and profit" for Google Ad Manager comes from "apps").

Here, too, Plaintiffs assert that "multiple Supreme Court cases require the divestiture of an asset even when that asset may operate in markets outside the monopolistic market that the Court has found." 5/2/25 Tr. 34:2-5. But Plaintiffs' approach is wrong on the law and defeats the purpose of defining a market at the liability stage. *See Ohio* v. *Am. Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."). After narrowly focusing the Court's competition inquiry on open-web display advertising for purposes of liability, Plaintiffs cannot now demand a remedy that would prevent Google from competing for multiple other channels of ad transactions that Plaintiffs insisted were not relevant to this case. As the *Microsoft II* court observed, although it "may address conduct beyond the precise parameters of that found to violate the antitrust laws," there was "nothing" in the Supreme Court cases cited by the government there that "indicates that an antitrust violator should be subject to an outright denial of the ability to continue to do business and to compete with other participants in the market and in other markets." *Id.* at 108. To the contrary, "[i]n each of the cases relied upon by Plaintiffs, to the extent that the remedy imposed exceeded the specific anticompetitive conduct, the restrictions were closely related to the anticompetitive conduct." *Id.* at 110.[4] There, as here, the cases cannot "withstand the heavy burden heaped upon it by Plaintiffs." *Id.* The remedy proposed by Plaintiffs is anything but closely related; it reaches far beyond the specific anticompetitive conduct to markets never proffered or proven and to tools

---

[4] As context, the cases included in the court's discussion there were *Nat'l Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679 (1978); *Ford Motor Co.*, 405 U.S. 562; *Zenith Radio Corp.*, 395 U.S. 100; *International Salt Co.*, 332 U.S. 392; and *Paramount Pictures*, 334 U.S. 131.

not previously part of Plaintiffs' theory of liability[5]; it would disrupt technology the Court has already found to benefit advertisers and publishers; and it would entirely deprive Google of the ability to compete outside the markets the Court found here.

**Third**, structural remedies like divestiture are subject to a heightened standard that Plaintiffs cannot meet.  As the D.C. Circuit explained, "In devising an appropriate remedy, the District Court also should consider whether plaintiffs have established a sufficient causal connection between [defendant's] anticompetitive conduct and its dominant position in the [relevant] market."  *Microsoft I*, 253 F.3d at 106.  Thus, "structural relief . . . require[s] a *clearer indication of a significant causal connection* between the conduct and creation or maintenance of the market power.  Absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct."  *Id.* (emphasis added) (internal quotations omitted); *Microsoft II*, 224 F. Supp. 2d at 102 (explaining that "the appellate court appears to have identified a proportionality between the strength of the evidence of the causal connection and the severity of the remedy").  In *Microsoft*, where there was no explicit finding that Microsoft "would have lost its position in the OS market *but for* its anticompetitive behavior," 253 F.3d at 107 (emphasis added), the court found that causal link insufficient to support divestiture.

Plaintiffs cannot establish the requisite level of causation in this case because the Court's findings reflect several factors significantly contributed to Google's market power apart from any

---

[5] Plaintiffs' proposed remedy would also impact advertiser customers of AdWords, a product that the Court did not find to have monopoly power in any market and that did not form the basis for any finding of anticompetitive conduct.  5/2/25 Tr. 7:24-8:5 (the Court stating about AdWords, "I haven't touched that"); *see infra* p. 16.  AdWords offers advertiser customers access to a "vast multitude" of inventory curated by Google, Op. at 24-26, 57, accompanied by the safety protections offered by Google.  As Google will demonstrate, a forced divestiture of AdX would jeopardize that value proposition.

anticompetitive behavior.  First, the Court found a primary cause of Google's power across the relevant markets was its "powerful source of digital advertising demand."  Op. at 28.  This demand is made up of advertising customers that Google cultivated not through any anticompetitive behavior but by offering an ad-buying product that excelled in "ease of use" and "ability to place targeted advertisements."  *Id.* at 29.  Second, as to Google's publisher ad server, "high switching costs" for publisher ad servers and a "lack of competitive alternatives" contributed to DFP's market power.  *Id.* at 31.  The Court found it is relatively "infeasible" "to develop a publisher ad server" given the high costs of building and maintaining one, *id.* at 49, weighed against the low fees charged by publisher ad servers, *id.* at 44-45.   Google's willingness to make significant investments in its publisher ad server and maintain low prices contributed to DFP's widespread usage even apart from the Court's finding of "anticompetitive tying to maintain its monopoly power."  *Id.* at 104.  Third, as to the ad exchange, the Court's finding that AdX is a two-sided platform, *id.* at 63, 81, is fatal to any proposal to divest that product in particular.  As to AdX's power on the buy-side, the Court recognized that "the unique advertising demand that AdX receives" comes "from the millions of advertisers who exclusively use AdWords," *id.* at 92, and who choose to do so, as just noted, for its superior advertiser offering.  Well short of the "but for" threshold discussed in *Microsoft*, Google's power on an entire half of the ad exchange market is unconnected to any anticompetitive findings by the Court.   The "[m]ere existence of an exclusionary act does not itself justify full feasible relief," *Microsoft I*, 253 F.3d at 106 (quoting 3 Areeda & Hovenkamp ¶ 650a), and, as discussed in the following section, competition can be restored by a conduct remedy that addresses the Court's specific findings, *infra* pp. 15-20.

**Fourth**, divestiture is unavailable where behavioral remedies are sufficient to achieve the goals of antitrust remedies.  In *Microsoft II*, the district court on remand declined to enter "harsh

measures" such as divestiture because "less severe ones will do."  224 F. Supp. 2d at 100.  The same principle governs here.  As explained below, *infra* pp. 15-20, Google's proposed behavioral remedies are "carefully tailored" to redress the Court's findings of anticompetitive harm to the monopolized markets in this case and to ensure compliance through Google's proposal for a monitor.  *Microsoft II*, 224 F. Supp. 2d at 193.  Some of Google's proposals even extend beyond what was ordered on remand and affirmed in *Microsoft*.  *Infra* p. 17.  In light of Google's proposal, the law does not permit, nor does it make sense, for the Court to resort to more "radical," "harsh," "severe," and unpredictable structural remedies like divestiture.

### B.  Divestiture of AdX or DFP Is Unworkable.

Divestiture of either AdX or DFP is not only legally unavailable, but, as Google will establish, logistically unworkable.  As the D.C. Circuit recognized in *Microsoft*, "One apparent reason why courts have not ordered the dissolution of unitary companies is logistical difficulty." 253 F.3d at 106.  That obstacle is readily apparent here.

Though the concept of "divestiture" may sound straightforward, divestiture is not as simple as selling either the AdX or DFP source code to a willing buyer.  Because that code will not work outside of Google, even just the technical project of divesting would require developing and creating *fully new* versions of AdX and/or DFP capable of working (for all display ads, not just open-web display ads) outside Google's proprietary software and hardware infrastructure and *within* the buyer's software and hardware infrastructure.  Though Google is still developing the evidentiary record, Google submits that, based on preliminary crude estimates, building the equivalent of AdX and/or DFP to operate outside the Google infrastructure for sale to a third party would require at the very minimum five years, but likely considerably more time—even as much

as one-and-a-half times to twice as long—even with hundreds of qualified software engineers.[6] And, during this effort, resources must be devoted to building new versions of the existing AdX and DFP and not to innovating or keeping pace with shifts in the larger ecosystem. In the meantime, the surrounding ad tech landscape is likely to continue changing "significantly" due to developments such as AI. 5/2/25 Tr. at 47:8-13. Thus, by the time the new versions are created, the place and competitiveness of those tools in the highly dynamic ad tech industry may well be completely different than when divestiture was first ordered.

As a starting reference point, recall Google witness Neal Mohan's testimony about the DoubleClick acquisition nearly two decades ago, when Google first acquired nascent, standalone versions of AdX and DFP that had been built by DoubleClick. Google spent years rebuilding those early versions of AdX and DFP "from scratch" to work on Google's internal infrastructure. 9/16/24 AM Tr. 58:9-59:13, 69:13-71:4 (Mohan); DTX-189 at 5. Divestiture would require a similar process of rebuilding "from scratch" AdX and/or DFP today. But both AdX and DFP have become far more sophisticated and serve not just many more customers, but also orders of magnitude more ad traffic. To support the innovations in product features for the vastly expanded traffic they serve, AdX and DFP's code bases are now multiple factors larger. The work required by the DoubleClick acquisition therefore reflects a fraction of the work that would be required for a divestiture today.

One reason creating either a new AdX or a new DFP for a buyer would be so much more difficult today is that the code for both AdX and DFP has been closely integrated with—and entirely dependent on—Google's internal proprietary software and hardware infrastructure for

---

[6] However, given the complexities (explained below) of achieving a technical and logistical project of the magnitude required for divestiture, any prediction at this time about how long the task would realistically require is inherently uncertain and subject to change.

nearly two decades. The backbone for these products is software infrastructure underlying the rest of Google's systems—including other Google ad tech products like AdSense and AdMob, as well as products like Search, Google Maps, Gmail, and Google Play—that has enabled substantial operational efficiencies for Google's ad tech products. That infrastructure requires significant resources and performs critical functions for Google software, such as database lookups or task assignment. That infrastructure is also unique to Google's internal products; no other commercially available or proprietary software infrastructure functions the exact same way. Thus, for AdX or DFP to work outside of Google's internal infrastructure (for both a third-party buyer and for customers), the products must be rebuilt to work within a new software infrastructure that can perform the essential functions that Google's proprietary, company-wide software infrastructure currently does, as reliably and efficiently as Google currently operates.

Given the scale and complexity of these systems, the task of designing and creating a new AdX and/or DFP for that third-party infrastructure would be unprecedented and not easily administered. For one, the process could not even begin until a buyer is selected because the specifications of new code would necessarily depend on the particular buyer's unique software infrastructure. Google's engineers are experts in Google's systems, and may not be best suited to the task of efficiently creating AdX and/or DFP in another system. But, given the highly customized nature of the existing AdX and DFP code and the underlying infrastructure, a buyer may not have the capacity to build its own infrastructure and fully rebuild AdX and/or DFP "from scratch." Even so, the buyer may not be willing for Google engineers to perform the task, as that would potentially require teaching Google engineers the details of how a buyer's proprietary software infrastructure works. Regardless of who takes on the rebuilding, the engineers would then need to write millions of lines of *new* code to work with the buyer's software infrastructure.

Put another way, divestiture would require coding entirely new versions of these products tailored to the buyer's infrastructure.

In the meantime, this process would significantly harm the customers of AdX and DFP. Beyond "logistical difficulty," *Microsoft* also cautioned against divestiture because a unitary company "cannot readily be dismembered of parts of its various operations without a marked loss of efficiency." 253 F.3d at 106 (quoting *United States* v. *ALCOA*, 91 F.Supp. 333, 416 (S.D.N.Y. 1950)). During the years of rebuilding either or both of AdX and DFP, coding new versions of the tools would conscript precious resources, including the limited universe of software engineers familiar with these tools, that are currently devoted to maintaining and improving AdX and DFP. What is more, any divestiture that requires separating AdX and DFP (for example, an order to sell each to a different buyer) would divert even more resources, further disrupt the operation of the tools in the meantime, and stall innovation on the products. Separation of AdX and DFP would be highly complex because, among other reasons, AdX and DFP share much of their code.

The disruption caused by siphoning resources to divestiture would be felt by the advertisers who buy ads on AdX and rely on programmatic advertising to reach their target audiences, Op. at 11; by AdX's and DFP's publisher customers who generate revenue from display ads sales across channels, *id.* at 6-7; and by other industry participants, such as the third-party tools that connect to AdX and/or DFP and rely on them to facilitate ad transactions. Even customers excluded entirely by Plaintiffs' theory of this case at the liability stage would be harmed, such as advertisers who purchase from AdX and publisher customers of AdX and/or DFP who transact non-open web display advertising, such as in-app ads, instream video ads, and native ads.

Moreover, even were the software aspects of divestiture workable, there is no guarantee that the buyer would have the hardware resources to run AdX and DFP as reliably and efficiently

as Google does.  Google has invested multiple billions of dollars into hardware infrastructure around the world that supports not just AdX and DFP, but other Google products like Search and Maps.  A buyer seeking to replicate the efficiency of these systems would need to set up or expand its own hardware infrastructure, including localized data centers around the world, to be capable of supporting the enormous volume of transactions that each of AdX and DFP processes every second of every day.

Finally, compounding the technological unworkability of a divestiture remedy, there is significant uncertainty about which company would want to and be capable of purchasing and recreating the AdX or DFP code base.  Witnesses did not testify at trial that rivals are interested in running AdX or DFP, much less in expending considerable resources to build AdX or DFP from scratch for their own infrastructure.  To the contrary, as the Court found, witnesses testified that maintaining publisher ad servers demands "extremely major investment" and "significant operational support, infrastructure, and capital resources."  Op. at 49.  What rivals wanted was access to Google's valuable base of advertiser demand, available through AdX, 5/2/25 Tr. at 9:9-19; *infra* pp. 17-18, and additional ability to compete for publisher business.  As explained below, behavioral remedies are able to achieve that goal without forcing a cumbersome, disruptive, and unpredictable sale of products that currently provide advertisers and publishers immense value.

II.    **Google's Proposed Conduct Remedies Would Address the Violations the Court Found and Would Restore Competition.**

Google's proposed conduct remedies would provide relief "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107.  Google's remedies are grounded in this Court's liability finding, and they would satisfy the Court's obligation to "redress the violations" found and "restore the competition." *Ford Motor*, 405 U.S. at 573.

The Court found that Google willfully acquired and maintained monopoly power through "a series of anticompetitive acts" in the "publisher ad server and ad exchange markets for open-web display advertising": (1) "technical and policy restrictions that prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used DFP (the tied product"; (2) "First Look"; (3) "Last Look"; and (4) the Unified Pricing Rules.  Op. at 91, 99-101, 114.  Because a remedy must be "tailored to fit the wrong," it is also critical to consider what the Court did not find.  *Microsoft II*, 224 F. Supp. 2d at 192 (declining to enter remedial suggestions that conflicted with the Court's "rejection of liability").  The Court did not find that Google has monopoly power—much less acquired or maintained monopoly power via anticompetitive acts—in any market for advertiser buying tools.  Op. at 59-60.  As the Court concluded, advertisers have many choices outside of Google.  They "reallocate resources among different digital advertising channels," including social media (including Instagram) and instream video ads.  *Id.* at 58-59.  The advertisers who choose to use Google's AdWords do so because AdWords offers improved audience targeting, user click prediction, and the ability to manage diverse ad campaigns.  *Id.* at 56 n.21.  Google has therefore amassed "AdWords' uniquely large and diverse array of advertising demand" by competing on the merits.  *Id.* at 96.  And, in turn, that legitimate advertiser demand has been "a primary source of Google's monopoly power in the ad exchange market."  *Id.* at 96.  The Court did not find either AdWords' legitimate competition for advertiser demand or the relationship between AdWords and AdX to be anticompetitive.

Google proposes conduct remedies appropriately tailored to the conduct the Court did find anticompetitive—what the Court described as a mutually reinforcing relationship between AdX and DFP for publisher customers selling open-web display ad inventory.  To remedy the "tie" that the Court found between AdX and DFP based on the restriction of real-time bids from AdX to

16

DFP, Google would (1) make real-time bids for open-web display ads from AdX available to all rival publisher ad servers, and (2) remove any Google Ad Manager policies that restrict the sharing of such bids from AdX with a rival publisher ad server.

To remedy the Court's concerns that DFP publishers cannot diversify revenue away from AdX, *id.* at 100-01, Google would deprecate UPR for open-web display ads, allowing DFP publishers to set different price floors for different bidders (which includes different ad exchanges and different buying tools) and thereby restore their ability to set higher price floors on AdX than on third-party exchanges.

As to First Look and Last Look, neither has existed since at least 2019. *Id.* at 33, 37. As the D.C. Circuit affirmed, no remedy is required for "unlawful but now terminated conduct" that is unlikely to recur. *Massachusetts* v. *Microsoft*, 373 F.3d 1199, 1213 (D.C. Cir. 2004). Even so, Google's proposal would go above and beyond what was required in *Microsoft* and commit to not rebuilding First Look or Last Look for open-web display ads.

Finally, Google is amenable to the Court's suggestion of the appointment of a trustee to monitor compliance with these proposed remedies for a reasonable period of three years.

Google's proposed remedies are "crafted to foster competition in the monopolized market in a manner consistent with the theory of liability in this case." *Microsoft II*, 224 F. Supp. 2d at 193. They would promote competition on the merits between Google and its rivals for publisher business. Plaintiffs' witnesses, including publishers and rival publisher ad servers, uniformly testified at trial that their central complaint is the inability to obtain real-time bids from AdX using other publisher ad servers:

- **Layser, News Corp (publisher):** "I would like Google to pass the publisher a real-time price." 9/10/24 AM Tr. 100:12-13.

- **Wolfe, Gannett (publisher):** Gannett did not switch to another publisher ad server because "it was not going to offset the revenue loss of not having direct access to the Google ad exchange" "from a real-time bidding perspective." 9/9/24 AM Tr. 75:23-76:8, 77:8-13.

- **Wheatland, Daily Mail (publisher):** Despite being dissatisfied with DFP, Daily Mail could not switch to other publisher ad servers because "we still needed to access AdX demand, so we still had to use Google's publisher ad server." 9/27/24 AM Tr. 71:9-24.

- **Cadogan, OpenX (former publisher ad server):** OpenX struggled to compete with DFP because it "didn't have any access on a real-time basis to the AdX ad exchange, which is really what publishers wanted." 9/17/24 PM Tr. 50:4-11.

- **Boland, Facebook (former publisher ad server):** Facebook's publisher ad server was unsuccessful because it could not replicate Google's ability "to bring their own demand through AdX into their ad server," and "we feared we would not be able to get access to" that demand. 9/13/24 PM Tr. 129:14-21.

- **Creput, Equativ (existing publisher ad server):** Publishers left Equativ because they "didn't have access to Google AdX." 9/13/24 PM Tr. 65:7-25.

- **Avery, Kevel (existing publisher ad server):** Kevel lost customers to DFP because "they needed that demand from AdX." One customer asked "how do we get AdX demand? We kind of said there wasn't a way, and that was the end of the conversation . . . ." 9/9/24 PM Tr. 125:10-18.

- **John, Microsoft Xandr (existing publisher ad server):** Publishers switched from Xandr to DFP "specifically" because of "the AdX demand that they were not—that they were losing, and they were able to get that demand when they migrated to Google." 9/20/24 PM Tr. 152:23-153:3.

Google's proposal would introduce the exact competition Plaintiffs' witnesses sought. In fact, at the May 2 hearing, Plaintiffs told the Court that they agree Google's proposal "would *absolutely address* our concern about the prior illegal conduct." 5/2/25 Tr. 35:8-21 (emphasis added). Under Google's proposal, according to the evidence and witnesses presented by Plaintiffs themselves, rivals would be incentivized to enter the publisher ad server market and gain publisher business—thereby eroding DFP's market share—as they attract publishers who have already expressed interest in using a different publisher ad server to access AdX demand. And, also according to Plaintiffs' evidence, publishers would be free to choose to use DFP or any other publisher ad server to discriminate against AdX in favor of rival exchanges. As the Court

recognized, since as early as 2015, rival ad exchanges have successfully competed for publisher business through header bidding. Op. at 33 (finding header bidding "rapidly gained popularity and achieved widespread adoption by large publishers"). Thus, under the theory of Plaintiffs' case, that competition will continue to flourish and challenge AdX's market position following Google's proposed conduct remedies. In addition, Google's proposal would preserve the healthy competition on the merits for advertiser business that the Court has recognized already exists. In other words, Google's proposal would preserve advertisers' choice of buying tools based on their advertising needs, including advertisers' ability to choose Google's AdWords and AdX.

Applying the Court's findings, Google's proposal would—unlike divestiture—restore competition in an efficient, predictable manner. The efficiency of Google's proposal is particularly important in ad tech markets, which both witnesses and the Court have observed are dynamic and rapidly changing. Dkt. 1375 ("Google LLC's Proposed Findings of Fact") ¶¶ 1206-1207; 5/2/25 Tr. at 47:8-13. The Supreme Court has cautioned that, at the remedies stage, judges "should never aspire to the role" of "central planners," especially in markets with "changing market dynamics." *Alston*, 594 U.S. at 102-03 (citing *Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 415 (2004)). To respect "the practical limits for judicial administration," courts should therefore avoid remedies that superintend or specify a defendant's "terms of dealing" with its competitors. *Id.* at 102 (citing *Trinko*, 540 U.S. at 408). And "judges must be open to" adapting remedies to "changing market realities, for what we see may vary over time." *Id.*

Google's proposal follows those principles within the limits of the Court's findings. Remedying the actionable conduct as Google proposes could likely be achieved in just nine to twelve months, and would avoid disrupting the millions of advertisers and publishers that rely on AdX and DFP during the many more years required for divestiture. Continued monitoring for a

19

reasonable period of three years would further enable the Court to assess rapidly shifting market conditions—including a likely acceleration of the continued decline in open-web display advertising—as well as the remedy's effects on competition.  By contrast, more drastic structural remedies like divestiture would require the Court to oversee an undertaking of unprecedented and far-reaching complexity and uncertainty for years, all amidst ever-changing markets.

Dated: May 5, 2025

Respectfully submitted,

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ:
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Justina K. Sessions (*pro hac vice*)
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*