**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| UNITED STATES, *et al.*,<br><br>               *Plaintiffs*,<br><br>   vs.<br><br>GOOGLE LLC,<br><br>               *Defendant*. | No. 1:23-cv-00108-LMB-JFA |

## <u>GOOGLE'S RESPONSE TO PLAINTIFFS' NOTICE OF PROPOSED REMEDIES</u>

Plaintiffs' sweeping proposal for remedies attempts to dismantle the dynamic and rapidly evolving market for display advertising through multi-phased proceedings that would embroil the Court in over a decade of technical supervision.  Contrary to the Fourth Circuit's mandate that remedies must "flow from that conduct" that violated the antitrust laws, *Thompson Everett, Inc.* v. *Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995), what Plaintiffs put forward is unmoored from, and in places overtly contradicts, the Court's liability findings in addition to being unworkable.[1]  The result of implementing Plaintiffs' proposals would not be to remedy the harm to competition the Court found but instead to create brand-new harms to innovation and to consumers—advertisers, open-web and non-open web publishers, and Internet users—who benefit from this continually-evolving technology in a dynamic digital advertising ecosystem.

---

[1] Because the parties are only at the beginning of fact discovery for the remedies proceeding, any omission of an argument or the absence of a response to a particular proposal made by Plaintiffs shall not be construed as a waiver or forfeiture of any of Google's arguments, as additional facts and arguments will be developed.

Google's proposals, by contrast, are "tailored to fit the wrong creating the occasion for the remedy." *United States* v. *Microsoft* ("*Microsoft I*"), 253 F.3d 34, 107 (D.C. Cir. 2001) (en banc). They address the conduct that the Court found caused the central competitive injury in this case: publishers were unable to switch ad servers away from DFP without losing access to real-time bids from AdX. Dkt. 1410 ("Op.") 98. Specifically, Google has proposed to develop integrations that would submit real-time bids from AdX into rival publisher ad servers for open-web display ads. At trial, Plaintiffs' witnesses uniformly testified that those integrations between AdX and rival publisher ad servers are exactly what they have always wanted. Dkt. 1431 ("Google's Proposal") at 17-18 (collecting citations from trial testimony). The result of Google's proposal would be to enable more publisher ad servers to compete for publisher business and allow publishers to, for eligible impressions, use the ad server of their choice to put real-time bids from AdX in simultaneous competition with real-time bids from competitor ad exchanges. Creating those integrations would require significant engineering work, but likely could be completed within 9 to 12 months with sufficient resourcing. Beyond this, Google has proposed to address findings that certain aspects of DFP's auction logic "favored AdX" by deprecating UPR for open-web display ads, committing to not rebuilding so-called "First Look" or "Last Look" for open-web display ads, and committing to monitoring for three years to ensure compliance with the Court's order. Google's Proposal at 17. The sum total of these proposals, as even Plaintiffs acknowledged at the Court's May 2 hearing, "would *absolutely address* our concern about the prior illegal conduct." 5/2/25 Hr'g Tr. at 35:8-21 (emphasis added).

Comparing the parties' proposals, it is evident that Google has proposed a set of remedies that would promote competition for publishers. Google would (as Plaintiffs ask) enable AdX to "bid into non-Google publisher ad servers in the same manner in which it bids into DFP." Dkt.

1430 ("Pls.' Proposal") at 9.   To further facilitate the ease of switching and competition for publisher business, Google would also propose (similar to what Plaintiffs request) to provide publishers with data from DFP, which will enable them to provide that data to any rival publisher ad server of their choosing.[2]  *See id.* at 10, 14 (requesting Google "provide an API and export feature to assist publishers in transferring their data from DFP to another publisher ad server" and "allow publishers to access data generated in DFP or AdX from their inventory").  As Plaintiffs agreed, what Google has proposed and what Plaintiffs described as their first "phase" are "not that far apart."  5/2/25 Hr'g Tr. at 34:13-24.

But Plaintiffs demand far more, casting aside the Supreme Court's admonition that "[w]hen it comes to fashioning an antitrust remedy . . . caution is key."  *NCAA* v. *Alston*, 594 U.S. 69, 106 (2021).  The purpose of a remedy is to enhance competition; even an antitrust violator should not "be subject to an outright denial of the ability to continue to do business and to compete with other participants in the market and in other markets."  *New York* v. *Microsoft Corp. ("Microsoft II")*, 224 F. Supp. 2d 76, 108 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004).  Yet Plaintiffs seek the extraordinary consequence of forcing Google out of the markets for ad exchanges and publisher ad servers for open-web display advertising entirely.  And they insist on additional behavioral remedies that "interfere with ordinary commercial practices" rather than "unreasonable restraints of commerce."  *United States* v. *Bausch & Lomb Optical Co.*, 321 U.S. 707, 728 (1944).  These demands would disrupt publisher customers and make the ad technologies they rely on less efficient and more costly, all the while siphoning off resources that could be dedicated to

---

[2] Google proposes to provide Google Ad Manager publishers exportable data reflecting insertion orders, line items, creatives, and forecasting, as well as historical data, which is presently available on DFP, so that publishers who wish to switch from DFP to a rival ad server can easily pass on that data to their new non-Google publisher ad server.

innovating for the next-phase of this marketplace. They would also harm advertisers—even though the Court found a dynamic marketplace where advertisers have significant choice among buying-tools, Op. 58-59—by, among other things, disrupting ad transactions during a complex divestiture process and restricting advertiser choice among buying tools. Google respectfully submits that, rather than risking such serious damage to the display advertising ecosystem, the Court can fully address the liability findings in this matter by adopting Google's proposed remedies.

**I. Structural Remedies of Divestiture Remain Unavailable in This Case as a Matter of Law and Would Harm Competition and Consumers.**

Plaintiffs propose a divestiture of AdX, Pls.' Proposal at 8, and a divestiture of DFP in three phases that would require (1) building a Prebid-DFP integration on Plaintiffs' terms, (2) open-sourcing the final auction logic in DFP, and (3) divesting the entirety of the remainder of DFP, *id.* at 10-11. That structural relief is not a legally available remedy in this case. Moreover, it would be unwise and destructive. Instead of increasing competition in ways consistent with the Court's liability findings, divestiture would do just the opposite: impede legitimate competition and harm digital advertising overall.

**A. Divestiture Is Legally Unavailable Because This Case Does Not Involve Any Unlawful Acquisition or Combination or Control.**

As Google explained in its initial proposed remedies, Google's Proposal at 6, divestiture is not available as a matter of law in light of the Court's finding that "Plaintiffs have failed to show that the DoubleClick and Admeld acquisitions were anticompetitive," Op. 87.

Divestiture is a form of "radical structural relief" that is "imposed only with great caution." *Microsoft I*, 253 F.3d at 80 (citing 3 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 653b (Areeda & Hovenkamp)). Among other limitations, divestiture is ordered "[b]y and large" in cases that "involved the dissolution of

entities formed by mergers and acquisitions." *Microsoft I*, 253 F.3d at 105; *see also Steves & Sons, Inc.* v. *JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) ("[D]ivestiture is the remedy best suited to redress the ills of an anticompetitive merger." (internal quotations omitted)).

Plaintiffs' proposal identifies no authority to the contrary that would justify divestiture in a case such as this—where there was no finding of an unlawful merger or acquisition or a corporate combination undertaken for an unlawful purpose—much less one where there was an affirmative finding that an acquisition was "motivated by valid business reasons." Op. 89 (explaining that Google acquired Admeld for "technology and talent to offer customers a more flexible, affordable, and effective product"); *see also id.* at 87 ("Plaintiffs have failed to show that the DoubleClick and Admeld acquisitions were anticompetitive.").

The very first case Plaintiffs cite in support of their divestiture claim, *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961), underscores the limited context in which divestiture is considered to be an appropriate remedy. Plaintiffs invoke *du Pont* to assert that divestiture is "simple, relatively easy to administer, and sure." Pls.' Proposal at 5 (quoting *du Pont*, 366 U.S. at 331). Setting aside that the contemplated divestiture here is, as is explained in Section I.C below, quite the opposite, Plaintiffs omit that *du Pont* was addressing divestiture only in the context of cases where the antitrust violation was *stock acquisitions* in violation of Section 7 of the Clayton Act, not a complex disintegration of complicated technology systems that took computer scientists and engineers over a decade to develop and integrate. 366 U.S. at 328-31. The other cases Plaintiffs invoke—also from over sixty years ago—fare no better because they similarly involved situations where acquisitions were a core element of the unlawful conspiracy.

Google addressed two of those cases in its initial filing and incorporates its responses here. Google's Proposal at 5-6 & n.3.[3]  The others are inapplicable for similar reasons.

In *United States* v. *Crescent Amusement Co.*, 323 U.S. 173 (1944), the Court considered an anticompetitive conspiracy carried out by a consortium of theatre companies who had acquired stock in each other's theatres, *id.* at 178, and the "violations were effected," by among other means, "combining with each other and with certain major distributors in making franchises," *id.* at 179. The Court affirmed that "[d]issolution of the combination will be ordered *where the creation of the combination is itself the violation*." *Id.* at 189 (emphasis added).  Plaintiffs quote *Crescent Amusement* for the proposition that "relief 'should not be . . . restricted' to divesting 'the fruits of the conspiracy' alone," Pls.' Proposal at 6 (quoting *Crescent Amusement*, 323 U.S. at 189), but again omit key context.  The broader relief the Court found warranted there was not the divestiture of lawfully acquired entities but instead a forward-looking prohibition "from acquiring any interest in those companies" that were *unlawfully acquired* in the first instance.  *Crescent Amusement*, 323 U.S. at 189-90.  *Crescent Amusement* nowhere endorses the divestiture of lawfully acquired assets.

Plaintiffs' invocation of *Int'l Boxing Club of N.Y., Inc. v. United States* ("*I.B.C.*"), 358 U.S. 242 (1959), is similarly unavailing.  In *I.B.C.*, defendants were charged "with a combination and conspiracy" that was carried out through a series of acquisitions and exclusive contracts entered into with boxers and venues to monopolize the market for promoting and broadcasting professional boxing championships.  *Id.* at 244, 252.  One element of the conspiracy was defendants' control

---

[3] Those cases were *United States* v. *Paramount Pictures*, 334 U.S. 131 (1948), and *Schine Chain Theatres* v. *United States*, 334 U.S. 110 (1948).  As discussed in greater detail in Google's initial filing, both cases involved conspiracies where acquisitions were a key part of the anticompetitive conduct; both actually *reversed* lower court divestiture orders; and in *Schine*, the Court faulted the district court for, among other things, failing to limit relief to the "theatres obtained by practices which violate the antitrust acts," 334 U.S. at 129.

over Madison Square Garden, which resulted in the Court ordering defendants to divest the stock it owned in that venue. *Id.* at 254-55. While the Court acknowledged that the stock would have to be divested "even if lawfully acquired," the remainder of that discussion made clear this was because the overall conspiracy consisted of several unlawful acquisitions. *Id.* at 256. The Court noted that "since the inception of the conspiracy [defendants] have increased their holdings" in Madison Square Garden (noting a more than three-fold increase in defendants' stock holdings) and emphasized that the lower court found "The great evil . . . was the combination that [defendants] caused and created by joining up with Madison Square Garden. . . . The evil primarily sprung from their combination, their concerted efforts and action." *Id.* at 256-57.

Contrary to Plaintiffs' selective citations, the upshot of these cases is that divestiture may be warranted where anticompetitive acquisitions are one of the tools of an unlawful monopolist. *See du Pont*, 366 U.S. at 329 ("Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control"). Plaintiffs have cited no case, and Google has not found one, that endorses divestiture where not a single acquisition at issue was found to be unlawful.

The case against divestiture here is not just about who has the better of one citation or another. It is about the collective wisdom of over a century of Sherman Act jurisprudence. Divestiture is a "radical" remedy, *Microsoft I*, 253 F.3d at 80, to which courts rarely resort. To be sure, there are well-known cases from long ago that resulted in divestiture (all consisting of unlawful campaigns of combination and control). *E.g.*, *Standard Oil Co. of N.J.* v. *United States*, 221 U.S. 1 (1911); *United States* v. *Am. Tobacco Co.*, 221 U.S. 106, 187 (1911). But these are the rare exceptions, and, as the D.C. Circuit cautioned, their "long-term efficacy is rarely certain." *Microsoft I*, 253 F.3d at 80. As a comprehensive review of major Section 2 cases won by the

government found, there is "little evidence" that divestiture "had a positive effect on competition and consumer welfare." Robert W. Crandall, *The Failure of Structural Remedies in Sherman Act Monopolization Cases*, 80 Or. L. Rev. 109, 197 (2001). Among other reasons, the study noted this was often because the government "failed to grasp the essentials of the market" and because the relief failed to keep up with the rapidly changing market forces. *Id.* at 198.[4]

This latter point is acutely a concern in dynamic technological markets. Even when the parties consent to divestiture, it can take years for the court to design the remedy and supervise the divestiture. All the while, markets—especially constantly evolving markets like digital advertising—can shift multiple times over, rendering the court's remedial efforts obsolete.[5] As then-Judge Gorusch wrote in *Novell, Inc.* v. *Microsoft Corp.*: "Not infrequently, the quickly shifting gears of market innovation outstrip the slowly grinding gears of the law." 731 F.3d 1064, 1071 (10th Cir. 2013).[6] Courts are not suited to superintending competition in rapidly evolving

---

[4] Former Federal Trade Commissioner Noah Phillips came to a similar conclusion in his recent review of the topic, *We Need to Talk: Toward a Serious Conversation About Breakups* 13-14 (Apr. 30, 2019) ("evidence suggests that structural relief has not in general fared well"), and older scholarship concludes much the same, *see, e.g.*, D. Dewey, *Monopoly in Economics and Law* 247 (1959) ("Taken together the so-called big cases fought by the antitrust agencies in the last twenty years reveal a pattern of 'legal victory-economic defeat.'"); K. Elzinga & W. Breit, *The Antitrust Penalties: A Study in Law and Economics* 47 (1976) ("the consensus so far is that structural relief has been attempted in only a few cases, and that it has been performed rather badly in those").

[5] Judge Easterbrook describes this phenomenon in an article assessing the track record of structural remedies. Frank H. Easterbrook, *Breaking Up Is Hard to Do*, 5 REGULATION 25, 30-31 (Nov.-Dec. 1981). He notes that in the more than a decade the government spent litigating against IBM, "the industry has gone through two generations of computers, foreign competition has increased, and minicomputers able to handle almost all computing tasks have been developed. New vendors compete in swarms to supply the new equipment." And while the AT&T consent decree came together, the "telecommunications technology has changed" with the emergence of cellular technology, "[c]ommunications satellites [winning] a large share of the market," and multiple Congressional reviews of the industry's structure.

[6] The challenge of using judicial oversight to regulate a fast-moving technology market has already been concretely demonstrated in this case: some of the anticompetitive conduct at issue—First Look and Last Look—ended at least 5 years ago in response to advances in the technology and

markets.  *Id.* at 1073 (judges "lack many comparative advantages" as "central planners," which is "a role in which we haven't always excelled in the past").

It is no surprise then that the major cases that informed Plaintiffs' arguments during the liability stage did not result in divestiture even when plaintiffs prevailed on liability.  The Court is well aware that *Microsoft*, heavily relied on by Plaintiffs, did not result in divestiture.  *See Microsoft I*, 253 F.3d at 103 (reversing divestiture); *Microsoft II*, 224 F. Supp. 2d at 177-78, 186 (denying divestiture on remand).  Nor did *Aspen Skiing*, 472 U.S. 585, 598 n.23 (1985) (ordering defendant to resume a joint ski pass), or *Lorain Journal*, 342 U.S. 143, 145 (1951) (ordering the Journal to print the advertisements of the customers of its small competitor), or *Otter Tail*, 410 U.S. 366, 375 (1973) (requiring defendant to supply power at compensatory rates), or *Eastman Kodak*, *see Image Tech. Servs., Inc*. v. *Eastman Kodak Co*., 125 F.3d 1195, 1224-26 (9th Cir. 1997) (affirming injunction with certain modifications for "Kodak to sell all parts to all ISOs at reasonable prices").  Applying Plaintiffs' approach here, the result in those cases might have been for the Aspen Skiing Company to sell off one or more of its mountain ski facilities; for Lorain Journal to sell off its advertising department (and perhaps its news room or sales department too because those are what allowed the paper to amass its "commanding" daily circulation); for Otter Tail to sell off its power generation facilities; and for Eastman Kodak to sell off its service business (and perhaps turn over its plans for how to manufacture all its machines and replacement parts).  But those courts all recognized what Plaintiffs ask the Court here to overlook:  Divestiture must be deployed with caution to remedy specific findings of an unlawful merger or acquisition or a corporate combination undertaken for an unlawful purpose.

---

marketplace.  *See also Microsoft II*, 224 F. Supp. 2d at 184 (rejecting ten-year term for remedy where "there is little dispute that many of the acts which gave rise to the imposition of liability in this case have long since ceased").

**B. Divestiture Is Legally Unavailable Because Structural Remedies Are Not Tailored to The Violations.**

Plaintiffs' overall remedial approach should also be rejected because it is at odds with the requirement that "a remedy must be tailored to a violation." *Bacon* v. *City of Richmond, Virginia*, 475 F.3d 633, 638 (4th Cir. 2007). This is not just a requirement of antitrust law, *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 533 (4th Cir. 2003); *Microsoft I*, 253 F.3d at 107, but of equity itself, *Off. of United States Tr.* v. *John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 494 (2024) ("Across remedial contexts, the nature of the violation determines the scope of the remedy.") (internal quotations omitted)); *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

Plaintiffs' proposals ignore these constraints and instead, under the veil of the Court's "large discretion," Pls.' Proposal at 4 (quoting *Ford Motor Co.* v. *United States*, 405 U.S. 562, 573 (1972)), ask the Court to sell off major components of Google's display advertising business, whether or not they are connected to specific proven harms to competition. But as the D.C. Circuit made clear in *Microsoft I* after reversing the first remedial order, the district court must ensure the remedy is "tailored to fit the wrong creating the occasion for the remedy." 253 F.3d at 107. The Fourth Circuit made a similar point in *In re Microsoft Corp. Antitrust Litig.*, when it reversed the grant of a preliminary injunction where Plaintiffs claimed "Microsoft monopolized the market defined by the worldwide licensing of Intel-compatible PC operating systems" but the remedy extended to "the middleware market [that] was distinct from the relevant market alleged in the complaint." 333 F.3d at 532. In explaining the reversal, the Fourth Circuit reiterated the settled principle that "relief under the anti-trust laws 'must flow from that conduct which is proscribed by the antitrust laws.'" *Id.* (quoting *Thompson Everett*, 57 F.3d at 1325).

What the law requires is for Plaintiffs to examine—as Google has—the Court's liability findings, assess what harm to competition Google's conduct has caused, and then determine how to "eliminat[e] the consequences of the illegal conduct," *Microsoft III*, 373 F.3d at 1216, while not "interfer[ing] with ordinary and legitimate commercial practices" simply to benefit competitors, *Microsoft II*, 224 F. Supp. 2d at 137.  It does not condone, as Plaintiffs attempt, "full feasible relief against the monopolist to create maximum competition" due to the "[m]ere existence of an exclusionary act." *Microsoft I*, 253 F.3d at 106 (quoting Areeda & Hovenkamp ¶ 650a).  Or as a former head of the Department of Justice's Antitrust Division put it:  "A finding that section 2 has been violated does not open the door to wholesale restructuring of a market. Instead, the remedy needs to be tied closely to the anticompetitive conduct occasioning it."  Thomas O. Barnett, "Section 2 Remedies: What to Do After Catching the Tiger by the Tail," *Presentation at the American Bar Association Conference on Monopolization Remedies* (June 4, 2008), available at https://www.justice.gov/atr/file/519591/dl.

This requirement of a casual link between conduct and remedy is heightened when it comes to divestiture.  *Microsoft I*, 253 F.3d at 106-107 ("structural relief . . . require[s] a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power" and that standard was not met where defendant's anticompetitive conduct was not the "but for" cause of monopoly power).  As Google explained in its initial filing, Plaintiffs cannot meet this heightened standard because there are significant other, *lawful* sources of Google's power here aside from the anticompetitive conduct.  Google's Proposal at 9-10.  Indeed, Plaintiffs essentially concede that one such significant source was Google's advertiser base, Pls.' Proposal at 8, which Plaintiffs failed to prove was acquired through anticompetitive means.  Moreover, much of AdX and DFP's business transacts non-open web display ads, which is another lawful source of

Google's market power. But Plaintiffs seek to divest the entirety of AdX and DFP, including both open-web display and non-open web display transactions.

This principle applies not just to Plaintiffs' proposed divestiture of AdX and DFP, but also its interim step of imposing upon Google to develop an open-source version of its final DFP auction logic. Courts have recognized that forced open-sourcing of software code, *see* Pls.' Proposal at 10-11 (proposing to require Google to provide its "auction-logic code under an open-source license"), is a "'de facto divestiture' and therefore should be analyzed as a structural remedy," *Microsoft III*, 373 F.3d at 1228-31 (discussing the proposal for Microsoft to "disclose and license all source code for all Browser software" and finding the remedy was unwarranted under the heightened standard). This demand also goes beyond the conduct Plaintiffs highlighted and the Court found anticompetitive in this case. As Plaintiffs define it, DFP's "auction logic" includes code that makes the choice between "available direct-sold opportunities and bids from indirect sources." Pls.' Proposal at 10. Yet none of the Court's liability findings based on DFP logic—findings related to First Look, Last Look, or UPR—concerned the choice between direct and indirect demand. As the Court heard at trial, DFP's ability to support both direct and indirect transactions, and to choose between them, is the precise value proposition that DFP offers publishers. *See, e.g.*, 9/20/24 PM Tr. 78:4-25 (Sheffer). In essence, Plaintiffs are seeking *de facto* divestiture of some of the most valuable parts of DFP's functionality absent any relevant liability finding.

### C. Divestiture Is At Cross Purposes with Antitrust Law Because It Would Be Unworkable and Harmful.

Finally, the Court should reject divestiture because it would contravene the purpose of antitrust laws—to promote competition and benefit consumers. To promote competition and "enhanc[e] consumer welfare," "markets are often more effective than the heavy hand of judicial

power." *Alston*, 594 U.S. at 106-07.  And courts must avoid "interfer[ing] with ordinary and legitimate commercial practices" to benefit competitors. *Microsoft II*, 224 F. Supp. 2d at 137.  To that end, courts "treat[] every expansion of protection with great caution and make[] every attempt to craft a remedy *which is no more expansive than necessary*." *Id.* at 135 (emphasis added).  By seeking to divest Google of the entirety of both AdX and DFP, Plaintiffs instead ask this Court to throw all caution aside.

**AdX divestiture.**  Plaintiffs' request for a wholesale divestiture of AdX would not benefit competition in the ad exchange market.  The purpose of an antitrust remedy is to introduce competition, not simply to wipe a competitor off the map and shift market power to another company. *Microsoft II*, 224 F. Supp. 2d at 108 (reviewing Supreme Court case law and rejecting the argument that "an antitrust violator should be subject to an outright denial of the ability to continue to do business").  Following divestiture, AdX would remain a single competitor with the same initial market shares, but with a new owner.  Based on the Court's finding that Google currently has monopoly power in a market for ad exchanges for open-web display advertising, all that would change after divestiture is who owns that monopoly power.  The buyer could be another large technology company integrated across the ad tech stack like Google, or a smaller buyer with no track record of successfully operating a business of this size.  Neither result would benefit competition or consumers.

At the same time, divestiture would take a significant toll well outside of the relevant markets and anticompetitive effects found in this case.  Plaintiffs alleged, and the Court found, a market for ad exchanges for open-web display advertising, yet Plaintiffs seek to divest all of AdX, which serves far more than open-web display advertising, including multiple ad formats that Plaintiffs argued and the Court found are outside of the relevant markets for publishers.  And, even

though AdX is a two-sided product that serves both advertisers and publishers, Op. 63-64, Plaintiffs seek wholesale divestiture based solely on a purported need to restore competition on one side, the sell-side, while ignoring potential harms to other, the buy-side.

Advertisers and publishers for all ad formats would feel the negative consequences of an unworkable and harmful divestiture remedy. As to workability, divestiture first assumes any willing and capable buyer exists. From a technical standpoint, much of the challenge of operating AdX comes from the difficulty of running a staggering volume of auctions within mere fractions of a second. A viable buyer would need to already have a software and hardware infrastructure capable of supporting AdX's current traffic volume or be willing to invest significant time and resources into building new infrastructure. And, to keep operating AdX competitively, the buyer would need to make continued, significant investments in both its software and hardware infrastructure.

Even if such a buyer exists and is willing to acquire AdX, divestiture would then require creating a new version of AdX customized for the buyer's infrastructure. Google's Proposal at 12-13. Before that process could begin, "AdX" code would first need to be separated from "DFP" code as well as code for other Google ad tech products and Google's proprietary software infrastructure. The code that enables AdX to run is commingled with other Google code, and in some cases directly shared with other products. Divesting AdX would require classifying what code counts as "AdX" and either redesigning other Google ad tech tools to work without that "AdX" code or rebuilding required functionality entirely. As Google expects to show, there is an "absence of clear definitions between the items to be separated," as well as clear evidence that "separation would not only degrade whatever remains, but would be a significant undertaking." *Microsoft II*, 224 F. Supp.2d at 157. Those factors caution against divestiture. When faced with

an analogous proposal to mandate code separation, the *Microsoft* district court declined to order separation, citing its reluctance to oversee a "redesign" of software products that would put "the Court in the role of scrutinizing" whether code has been separated "without degradation of the ultimate product." *Id.* at 158.

Even assuming workability, divestiture would significantly disrupt market participants, including both advertisers and publishers who rely on AdX. During the years-long process of separating and creating a new AdX, resources would be taken away from the important task of supporting the existing product. That would in turn disrupt ongoing transactions and bring to a halt any improvements to respond to the ever-changing marketplace. Such "dampening of technological innovation would be at cross-purposes with antitrust law." *United States* v. *Microsoft*, 147 F.3d 935, 948 (D.C. Cir. 1998).

Even worse, an ultimately divested version of AdX might well be inferior to today's Google-owned AdX. The quality and pricing of AdX benefits significantly from the decades of investment Google has made in improving the efficiency of its technical infrastructure, as well as AdX's integration with other parts of Google's integrated tech stack. Outside Google's infrastructure, AdX's functionalities may not work as well, and prices may increase because AdX may be more expensive to run. A decline in AdX quality or increase in pricing for any reason would affect *all* of AdX's existing publishers, which includes open-web publishers—the customers at the core of the Court's liability findings. That is because, if AdX quality declines for any reason, advertisers, including any "unique" AdWords advertisers publishers are seeking to access through AdX, are likely to shift digital ad spend to other advertising channels with a higher return on investment. Shift in advertiser spend could very likely result in a shift in spend towards instream video or in-app ads. Op. 58-59. Indeed, a purchaser of AdX may favor those ad formats

over open-web ads, and it is unclear what ability the Court would have to protect against this. In these ways, an AdX divestiture might expedite the already accelerating decline in spend on open-web display ads. And it might break tools working for buyers and sellers of other ad formats, including app and video publishers whom Plaintiffs took pains to exclude from this case. Such potential disruptions to the entire display advertising industry demonstrate that, unlike unwinding a stock merger where "undoing of the acquisition is a natural remedy," *du Pont*, 366 U.S. at 329, Plaintiffs' AdX divestiture proposal is neither "workable in practice or beneficial to competition and the market as a whole" and should therefore be rejected, *Microsoft II*, 224 F. Supp. 2d at 158.

**Divestiture of DFP.** As explained above, Plaintiffs propose a three-phase approach to divesting DFP. Their proposed *first* phase is not the same as what they presented to the Court at the May 2 hearing. On May 2, Plaintiffs stated that the first phase would occur "while we're waiting for the *AdX* divestiture to happen": Google would create "automatic bidding" of AdX "into Prebid," which "Google always refused to use in favor of its own Open Bidding product." 5/2/25 Hr'g Tr. at 12:24-13:4. In their written proposal, Plaintiffs repeat that request not as the first phase of DFP divestiture, but rather as a transitional phase in their AdX divestiture proposal. Pls.' Proposal at 9 (proposing to order Google to create an application programming interface "through which AdX will bid into header-bidding wrappers, such as Prebid"). Google has already offered a proposal that better accomplishes the same goal, namely to provide publishers access to AdX real-time bids without using DFP. Compared to Google's proposal to submit real-time bids from AdX into rival publisher ad servers, Plaintiffs' proposal that Google develop a means for AdX to submit real-time bids into header-bidding wrappers is less directly responsive to the testimony of witnesses at trial, Google's Proposal at 17-18; more vulnerable to security and privacy risks that may result from bidding into all header-bidding wrappers; and importantly, more

16

cumbersome and protracted to implement.[7]  Moreover, Plaintiffs' proposal is contrary to the purpose of antitrust law: it benefits particular Google rivals, i.e., the Prebid header-bidding wrapper (specifically called out by Plaintiffs), instead of efficiently addressing the actual competitive harm the Court identified and increasing publisher choice.  *See Thompson Everett*, 57 F.3d at 1325 (4th Cir. 1995) ("antitrust laws are intended to protect competition, and not simply competitors").

In their written proposal, Plaintiffs now describe their first phase as building an integration between *DFP*—not AdX—and "the open-source Prebid header-bidding wrapper" on terms specified by Plaintiffs.  Pls.' Proposal at 10.  It is not clear how Plaintiffs' new request bears any relation to their theory of the case, which has always been about providing AdX real-time bids to *non-DFP* publishers and which Google has addressed.  Nor is it clear what exactly Plaintiffs are requesting.  Publishers using DFP can already choose to integrate with and receive demand from Prebid.  At trial, witnesses testified that publishers already use DFP to sell impressions—or even every single impression—to other exchanges through header bidding, including through Prebid.  *See, e.g.*, 9/9/24 AM Tr. 79:1-80:22 (Wolfe).  To the extent that Plaintiffs are seeking to prescribe the terms of how publishers use DFP to connect to Prebid, antitrust remedies are not a proper vehicle for Plaintiffs to advance "the benefit of particular competitors"—i.e., the collection of Google rivals who created and govern Prebid—and "annoint[] them with special treatment" by asking for integration on Plaintiffs' preferred terms.  *Microsoft II*, 224 F. Supp. 2d at 153, 189 (rejecting "favoritism of one market participant over another"); *see also Microsoft III*, 373 F.3d at 1230 (provisions addressed "narrowly to aiding specific competitors" "could well have put the

---

[7] As Google will explain, creating integrations between AdX and proprietary header bidding wrappers would require building bespoke integrations for each wrapper, which would be complex and inefficient.

remedy in opposition to the purpose of the antitrust laws").

In the *second* phase, Plaintiffs propose that Google "separate out" from DFP the final auction code and make it available on an open-source basis. Pls.' Proposal at 10-11. As explained above, *supra* p. 12, Plaintiffs' second phase is a legally unavailable request for *de facto* divestiture, including of parts of DFP's functionality that contribute to DFP's core value proposition for publishers. Their proposal also limits customer choice by asking the Court to dictate the design of Google's system, which competes against non-open source systems. In addition, implementing Plaintiffs' full proposal carefully and properly to avoid disruption to publishers would conscript engineers for years to create an entirely new auction product for the benefit of Google's competitors.[8] The expenditure of resources on creating a new open-source auction would detract from maintaining the existing DFP product and stall innovation amidst changing market conditions. Implementing this process would also require judicial oversight of thorny questions about technical implementation, standard setting, and governance. Again, both open-web and non-open web publisher customers would suffer as a result.

Finally, in the *third* phase, Plaintiffs propose that "Google be required to divest the remainder of DFP." Pls.' Proposal at 11. Plaintiffs ask to sell off the parts of DFP—like serving the winning ad, providing publisher controls for brand safety, and updating performance reporting—that are important to publisher monetization and that had nothing to do with the demand-sequencing aspects of DFP (First Look, Last Look) or policy about setting price floors

---

[8] Similarly, Plaintiffs propose that Google be required to share "DFP data that improves auction logic" with the industry organization responsible for the open-source auction. Pls.' Proposal at 14. What Plaintiffs mean by "DFP data that improves auction logic" is unclear. Regardless, Google objects to the proposal, which assumes an open-source auction, for the same reasons it objects to Plaintiffs' open-sourcing proposal. Further, Plaintiffs' proposal might increase user privacy risks, as well as harm advertisers and publishers whose proprietary information could be implicated by the ambiguously broad category of "DFP data" and end up being shared against their wishes.

(UPR) found to be anticompetitive.

Like divestiture of AdX, DFP divestiture would not necessarily introduce more competition into the publisher ad server market, as Plaintiffs improperly seek to simply eliminate Google as a competitor in the market. *Supra* p. 13. Nor would divestiture benefit either open-web or non-open web publishers. Divesting those parts of DFP would be logistically unworkable and damaging to DFP's publisher customers. For one, because of the immense complexities and significant uncertainties inherent to the technical process of divesting DFP, DFP divestiture raises even greater workability questions than AdX divestiture. Even if a willing and capable buyer exists, a likely buyer might be one of the other household name technology companies operating in this marketplace, like Microsoft or Amazon—in which case Plaintiffs' remedy would merely seek to shift the monopoly power found by the Court from one large company to another.

Further, even if divestiture could successfully be executed, the process would wreak significant havoc during the years required to build a new DFP. Resources would be diverted to building a new version (or multiple new versions, as Plaintiffs request) of DFP instead of ongoing operations and innovation on the product. And, after creation of the new DFP(s), publisher customers would be forced to go through a disruptive and uncertain migration process that risks data loss or degradation. Making matters worse, because DFP supports so much ad traffic, a buyer may not even be able to immediately operate the full volume of the divested functions of DFP— all of which enable the actual ad serving that makes publishers money—or may not be able keep DFP operating at that volume over time for the same low price. In sum, DFP's existing publisher customers might be forced to migrate to a potentially worse-performing and more expensive version of DFP that is reliant on a second software product in order to achieve the "mission-critical" objective of monetizing their inventory. Op. 16.

## II.     Plaintiffs' Proposed Behavioral Remedies Are Also Unavailable as a Matter of Law and Harmful to Competition.

In addition to requesting divestiture of AdX and DFP, Plaintiffs propose a number of expansive "behavioral remedies," Pls.' Proposal at 12; "data and transparency" provisions, *id.* at 14; and various other conduct remedies.  Five of Plaintiffs' proposed behavioral commitments would restrict the conduct of buying tools, AdWords and DV360, that are not part of the Court's findings or, in the case of DV360, even part of Plaintiffs' claimed relevant markets.  *Id.* at 12. Similarly, Plaintiffs' requests that Google "share data signals generated by virtue of Google's ownership of DFP with all advertiser buying tools" and "be prohibited from utilizing first-party data" to "inform AdWords' or DV360's bidding," *id.* at 14, directly interfere with competition in the advertiser buying tool market.  As explained below, those proposals are legally unavailable because they do not flow from the Court's findings, and they are improper because they would indiscriminately harm competition, including in markets the Court found are healthy and not in need of intervention.

### A.     Plaintiffs' Proposed Behavioral Remedies Are Legally Unavailable Because They Are Not Tailored to the Court's Findings.

As with their structural requests, Plaintiffs also make no attempt to limit their proposed behavioral remedies to the Court's actual liability findings.  This is evident from the very first pages of their proposal.  In framing their remedial demands, Plaintiffs claim that the "crux" of the liability in this case was Google's "common control" of DFP, AdX, and AdWords/Google Ads. Pls.' Proposal at 2.  This accords with Plaintiffs' claim throughout this case that Google has engaged in anticompetitive conduct in three distinct markets through two anticompetitive ties across them: one between AdX and DFP, Dkt. 120 ("FAC") ¶ 312(3) ("Google's restriction of effective real-time access to AdX exclusively to DFP"), and one between Google Ads and AdX, FAC ¶ 319(2) ("Google's restriction of Google Ads' advertiser demand exclusively to AdX"); *see*

20

*also* Dkt. 656 ("Pls.' Opp'n to Summ. J") at 21-22, 24.  The challenge for Plaintiffs is that they lost the advertising side of their case, Op. 115 (dismissing Count III as to AdWords / Google Ads), failing to prove there was even a relevant market that encompassed AdWords, Op. 54, much less a tie that originated from it.  Moreover, while Plaintiffs deliberately argued against the existence of a single overarching ad tech market, Dkt. 1380 ("Pls.' Post-Trial Findings of Fact") ¶¶ 52-63, they now shift position and insist the remedies must cover the entirety of this market.

The law does not permit Plaintiffs to demand relief for conduct they tried and failed to prove was anticompetitive.  This includes all behavioral remedies that would dictate how Google's ad-buying tools like AdWords and DV360 should operate, Pls.' Proposal at 12, or a proposed restriction on how Google uses "first-party data" to inform the operation of those tools, *id.* at 14. These are all improper remedies as a matter of law because they are directed at buying tool markets, which are characterized by healthy competition and do not require intervention.  Op. 58-59 (noting advertisers have choice to substitute away from Google's open-web display buying tools); *see also Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 395 U.S. 100, 132-33 (1969) (requiring that remedies be of the "same type or class" as the violations); *Microsoft II*, 224 F. Supp. 2d at 133, 152 (rejecting proposed "[i]ntervention into a market outside of and unrelated to the monopoly market" and illegal conduct in the case).

Plaintiffs also seek to regulate the conduct of DV360, Pls.' Proposal at 12, 14, after expressly carving out DV360 from their relevant markets to bolster their market power and other claims, *cf.* Op. 57, 100 n.29 (DV360 "is not within any of the relevant antitrust markets"). Moreover, it was undisputed at trial that DV360 already broadly submits bids into rival exchanges. Pls.' Post-Trial Findings of Fact ¶ 127.  Yet Plaintiffs now seek to further regulate the terms on which DV360 shares its advertiser customers with rival exchanges.

Plaintiffs' rejoinder to all this is to assert anything that might be an "instrument[]" of a hypothetical future violation is an appropriate target for an injunction. Pls. Proposal at 5 (quoting *Crescent Amusement Co.*, 323 U.S. at 188). But here, too, context makes clear that *Crescent Amusement* was not authorizing broad prophylactic measures for anything that could conceivably lead to a future antitrust violation but instead ordering relief directly linked to the violation at hand. In full, the Court held: "The chief weapons used by this combination in its unlawful warfare were the franchise agreements and the licensing system. The fact that those instruments could be lawfully used does not mean that the defendants may leave the court unfettered." *Id.* Applying that reasoning, the key "instrument" here is the tie the Court found restricted AdX real-time bid amounts to DFP and it is that instrument Google appropriately proposes to remedy. By contrast, Plaintiffs seek to enjoin so-called "instruments" that this Court did not find were used anticompetitively, including the operation of Google's buy-side tools like AdWords and DV360 (where Plaintiffs failed to prove a market, much less anticompetitive conduct) and the use of data (which Plaintiffs acknowledge the Court found Google used to "improve its products," Pls.' Proposal at 13)—the kind of procompetitive conduct the antitrust laws are designed to foster, not ban.

Even if a given "instrument" was not used unlawfully, Plaintiffs nonetheless claim that the law permits them to go after "valid parts of an invalid whole." Pls.' Proposal at 5 (quoting *Bausch & Lomb*, 321 U.S. at 724). But the string of cases Plaintiffs cite endorse nothing so standardless. In *Bausch & Lomb*, the Court found that certain price maintenance contracts could be enjoined because they "came into existence as a patch upon an *illegal* system of distribution and *as an integral part* of that system." 321 U.S. at 724 (internal citations omitted and emphases added). Though the Court acknowledged that there could be lawful uses of price maintenance contracts, it

invalidated the contracts in that case because the "illegality" of the defendant's distribution system "necessarily persists" because of those contracts. *Id.* Likewise, in *United States* v. *Ethyl Gasoline Corp.*, 309 U.S. 436 (1940), the Court found that the defendant's plausible public health rationale for a licensing scheme could not save the scheme where "unlawful control . . . was established and maintained by resort to the licensing device," *id.* at 461. And in *United States* v. *United States Gypsum Co.*, 340 U.S. 76 (1950), the Court concluded that an injunction against an unlawful licensing scheme for "patented gypsum board" could extend to other gypsum products where the unlawful licenses at issue covered those products and "price evasion" was facilitated through those related products, *id.* at 90-91.

The upshot of these cases is that a court may enjoin conduct that expressly furthers an anticompetitive scheme, even if that conduct might in other contexts be lawful. That is consistent with the settled wisdom that an antitrust case should not "be used as a vehicle by which to fight every potential future violation of the antitrust laws . . . envisioned by [the defendant's] competitors." *Microsoft III*, 373 F.3d at 1218 n.9 (internal quotation marks and citation omitted). Applying those teachings to this case, the Court could enjoin, as Google proposes, something like First Look, which the Court acknowledged "might have been a permissible design choice" in another context but was not found to be here. Op. 99. It should not enjoin what Plaintiffs propose: sweeping changes untethered from findings of antitrust violations, going well outside the evidence presented at trial, and risking significant unanticipated consequences.

**B. Plaintiffs' Proposed Behavioral Remedies Are So Ill-Defined That They Sweep In Lawful Conduct and Stifle Legitimate Competition.**

In addition to lacking the requisite legal connection to the Court's findings, Plaintiffs' vague behavioral remedies would also harm competition and consumers, including by prohibiting conduct the Court explicitly found was lawful.

***Behavioral commitments.*** For example, Plaintiffs propose that "Google be enjoined for a period of ten years from operating an ad exchange, or any product with similar functionality that transacts any open web display advertising." Pls.' Proposal at 9. Remedial decrees should be "as specific as possible, not only in the core of its relief, but in its outward limits, so that parties may know their duties and unintended contempts may not occur." *Int'l Salt Co.* v. *United States*, 332 U.S. 392, 400 (1947), *abrogated on other grounds by Illinois Tool Works Inc.* v. *Indep. Ink, Inc.*, 547 U.S. 28 (2006). The proposed prohibition on Google owning "any product with similar functionality" lacks specificity. Its expansiveness sweeps in Google products that played no part in the Court's liability findings. For example, AdSense—an important monetization tool relied on by over one million publishers worldwide—shares "similar functionality" with AdX, such as running first-price auctions. Plaintiffs strenuously argued at trial that AdSense was not in their relevant markets and had no relevance to their allegations about harms in the ad exchange and publisher ad server markets. Op. 50, 52. But now, Plaintiffs' proposed remedy appears to encompass AdSense.

Plaintiffs also ask that AdWords and DV360 "deal with all third-party ad tech tools" on "non-discriminatory terms," and seek to enjoin AdWords and DV360 from "preferentially routing any buyside demand" to "any ad exchange or publisher ad server." Pls.' Proposal at 12. Though these proposals are somewhat opaque, Plaintiffs' arguments at the liability stage may be instructive of what exactly they hope to prohibit. For example, Plaintiffs complained that Project Poirot unlawfully "preferenced AdX over third-party ad exchanges." Op. 100 n.29; *see also* Pls.' Post-Trial Findings of Fact ¶ 127 (Plaintiffs complaining that Poirot "skewed the spend of DV360 advertisers away from rival ad exchanges"); Dkt. 1380 ("Pls.' Post-Trial Conclusions of Law") ¶¶ 134-135 (Plaintiffs complaining that Poirot "artificially caused DV360 to bid shade on rivals

(without doing so for AdX)").  By that token, Plaintiffs may now be seeking to preclude both AdWords and DV360 from operating a bid-shading algorithm like Poirot that benefits Google's advertising customers, as Plaintiffs might contend the algorithm "discriminates" against or "preferences" certain third-party tools.  But the Court squarely rejected that argument and held that Project Poirot's "preferencing" is a form of *lawful* competition—"a reasonable method for protecting Google's advertiser customers from third-party ad exchanges that were running unfair auctions."  Op. 100 n.29.  Plaintiffs therefore appear to now propose enjoining Google practices that they tried ***and failed*** to show were anticompetitive.  Such proposals are not only legally unavailable, but harmful to competition.  They would degrade the quality of and hamstring the ability of Google's buying tools to compete in the broader marketplace, where rival buying tools operate the very same sorts of "discriminatory" algorithms, Dkt. 1375 ("Google's Post-Trial Findings of Fact") ¶ 243 (collecting testimony and evidence).  And Plaintiffs' proposals would ultimately reduce customer choice among advertiser buying tools.

***Data-sharing commitments.***  Plaintiffs advance four proposed "data and transparency provisions."  All four are directed at seemingly broad categories of data that are identified only by inscrutable descriptions.  Pls.' Proposal at 14 (referring to "DFP data that improves auction logic," "data signals generated by virtue of Google's ownership of DFP," "first-party data," and "data generated in DFP or AdX").  Even Plaintiffs' position at the liability stage offers little to no guidance on how to interpret these proposals, which appear to be aimed at categories of data that were not the subject of Plaintiffs' theory of anticompetitive conduct at the liability stage.

Furthermore, a subset of Plaintiffs' proposed data-sharing commitments would interfere with competition among *advertiser buying tools*.  Plaintiffs request Google be "prohibited from utilizing first-party data" to inform AdWords or DV360 bidding, and that Google be "required to

share data signals generated by virtue of Google's ownership of DFP with all advertiser buying tools on an equal and non-discriminatory basis." Pls.' Proposal at 14. Such proposals are not available as a matter of law. *Supra* pp. 20-23; *Microsoft II*, 224 F. Supp. 2d at 175 (rejecting remedies "substantially more far reaching" than liability findings). And, as a practical matter, they would harm competition instead of advancing it.[9] Consistent with the Court's liability findings rejecting Plaintiffs' claims of anticompetitive harm on the buy-side, Google's advertiser buying tools have the right to compete on the merits without intervention.[10] Enjoining that ability only restricts consumer choice by putting a thumb on the scale against Google's ability to lawfully compete for advertiser business.

*Anti-retaliation provision.* Plaintiffs propose that "Google be prohibited from retaliating, in any part of its business, against any party that cooperated with the Plaintiffs during their investigations or during this litigation in any manner or took any other action to bring to light Google's unlawful conduct." Pls.' Proposal at 14-15. This overbroad provision parallels one squarely rejected by the *Microsoft* district court, which wrote: "Undoubtedly, competitors regularly engage in action adverse to one another without violating the law, or even widely accepted norms of business ethics. Given the breadth of conduct implicated in Plaintiffs' proposed provision, the Court has little doubt that such a ban would curtail significant amounts of legitimate conduct." *Microsoft II*, 224 F. Supp. 2d at 187-88.

---

[9] Plaintiffs' proposal to more broadly share data signals generated by DFP risks additional harm to the ecosystem by exposing Internet users to increased privacy risks. Further, the broadly-worded proposal might mandate sharing data that could reveal the confidential information of advertisers, publishers, or third-party ad tech tools and that they would not want shared with Google's competitor buying tools.

[10] AdWords and DV360 do not currently use any first-party data "to preference any Google product over any competing product," Pls.' Proposal at 14, for open-web display ads.

### III. Taken Together, Plaintiffs' Proposals Would Damage a Rapidly Changing Industry.

As a whole, Plaintiffs' proposals would embroil the Court in complex technical and business questions for a significantly longer time—up to 10 years[11]—than Google's proposals. Plaintiffs' proposals do not honor the basic principle that "an antitrust decree should endure only so long as necessary to ensure competition," not regulate "the needs of a rapidly changing industry" like ad tech far in the future. *Microsoft II*, 224 F. Supp. 2d at 184. Particularly in this case, "imposing a remedy" "is not unlike trying to shoe a galloping horse." *Id.* In just the short time since display advertising first gained traction in the 2000s, ad tech tools have shifted from the traditional ad network model to other kinds of programmatic ad tech tools. Op. 12, 14, 56. And artificial intelligence is only accelerating that rapid evolution. 5/2/25 Hr'g Tr. at 47:8-13. By the time the complicated divestitures of AdX and/or DFP would be completed in 2030 or 2035, the competitiveness—and even relevance—of the original products will likely be completely different. And, "were the Court to impose a ten-year term, it is likely that, by the latter half of the term, the market will have long since sent the horse to pasture in favor of more advanced technology." *Microsoft II*, 224 F. Supp. 2d at 184. The Court should therefore reject Plaintiffs' attempt to regulate competition and impede innovation for a decade, well into a future that is "beyond the capacity of this Court, counsel, or any witness" to predict today. *Id.*

Moreover, virtually every aspect of Plaintiffs' proposals would demand the Court superintend forced sharing of technology, intellectual property, data, and customers untethered to the Court's liability findings—a task in which courts do not have particular expertise.[12] Courts

---

[11] Divestiture of AdX and/or DFP would take a minimum of five years if not much longer, Google's Proposal at 11-12, and Plaintiffs request behavioral commitments of "at least ten years after the remedies decree becomes effective," Pls.' Proposal at 9, 12.

[12] *Trinko*'s warning against judicially ordered forced sharing applies at both the liability and the remedies stages. *Alston*, 594 U.S. at 102-03. In this case, Plaintiffs agreed that the issue of "forced

are cautioned to be "wary" of adopting such proposals, as courts are ill-suited to act as "central planners" amidst "changing market dynamics." *Alston*, 594 U.S. at 102-03.

Ultimately, while Plaintiffs' requests to eliminate Google from the publisher ad server and exchange businesses are in purported service of spurring competition for open-web display ads, they are so overbroad that the result would be to wipe a competitor off the map and cut off investment and innovation for open-web display.  Divestiture would be an unnecessary undertaking of unprecedented complexity, with no precedent in the law, that would create major disruptions due to its fundamental unworkability.  And rather than restore competition to the benefit of customers, Plaintiffs' sweeping, decade-long behavioral remedies would harm advertisers, open-web and non-open web publishers, and Internet users.  The Court should decline Plaintiffs' invitation to go down this unprecedented, uncertain, and risky path.

---

sharing or interoperability" infringing on Google's right "to deal with competitors on terms of its own choosing" is relevant at the remedies phase. Pls.' Post-Trial Conclusions of Law ¶¶ 233-234. As the United States itself argued in *Trinko*, forced sharing "would rarely enhance consumer welfare and would threaten to impair the competition the antitrust laws are designed to promote." Brief for the United States and FTC as Amici Curiae Supporting Petitioner, *Trinko*, Dkt. No. 02-682, at 7.

Dated: May 19, 2025

Respectfully submitted,

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Justina K. Sessions (*pro hac vice*)
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ:
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com