IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES, et al., )<br> )<br>      Plaintiffs, )<br> )<br>v. )<br> )<br>GOOGLE LLC, )<br> )<br>      Defendant. ) | No. 1:23-cv-00108-LMB-JFA |

### **PLAINTIFFS' RESPONSE TO GOOGLE'S PROPOSED REMEDIES**

The Court's findings show that Google's behavior in the markets it monopolized was calculated, pervasive, and ever-changing. Google has repeatedly used its ad tech assets to break the law, evaded attempts to circumscribe its power, and hidden evidence of its wrongdoing. That track record necessitates a meaningful remedy capable of accomplishing each of the four required objectives of an antitrust decree. *See*, *e.g.*, ECF No. 1430 (Pls.' Proposal) at 4.

Google's proposed remedies, however, fall well short of "measures effective to restore competition," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961), and do not "fit the exigencies of [this] particular case," *Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972), because they fail to remediate the lasting impact of "Google's decade-long campaign of exclusionary conduct" that Google used "to establish and protect its monopoly power." Op. at 111, 114. Google's proposal is carefully cabined to reach only "certain specified conduct" (that largely occurred in the past), ECF No. 1431 (Google Proposal) at 1, and ignores the long-term effects of its "complex . . . exclusionary campaign," Op. at 111 (quoting *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024)). Google's narrow proposal does not "unfetter [the] market from [Google's] anticompetitive conduct," "terminate [its] illegal monopol[ies]," or "deny to [Google] the fruits of its statutory violation[s]," much less "ensure

1

that there remain no practices likely to result in monopolization in the future." ECF No. 1430 at 4. Mandating only the cramped behavioral remedies Google proposes would amount to the antitrust equivalent of a slap on the wrist, and in effect would reward Google, allowing it to "preserve . . . intact" the ad tech "empire[]" that it "unlawfully built." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128 (1948).

This response proceeds in three parts. **Part I** explains why—contrary to Google's mischaracterizations of the law—structural relief is not only legally available but is the preferred remedy in a case like this one. **Part II** explains why Google's proposed remedies fail to accomplish any of the four required objectives of an antitrust decree. **Part III** explains why Google's claim that structural remedies are "unworkable" is not a valid reason to deny Plaintiffs the structural relief needed to restore competition.

I. **Structural Relief Is Legally Available and Appropriate to Remedy Google's Violations**

Plaintiffs' proposal cited a long line of Supreme Court cases upholding divestiture as a vital antitrust remedy that courts have used for more than 80 years to remedy monopoly violations. *See* ECF No. 1430 at 5-11. Notwithstanding that robust precedent, Google contends that "divestiture of [DFP] and/or [AdX] is not available under governing law." ECF No. 1431 at 2. Google's position cannot be squared with controlling precedent. In fact, Google gets the law exactly backwards. The Supreme Court has long held that "divestiture or dissolution is an essential feature of [antitrust] decrees," and therefore courts "start from the premise that an injunction against future violations," *i.e.*, the remedy Google proposes, "is not adequate to protect the public interest." *Schine Chain*, 334 U.S. at 128. Divestiture is also the preferred method for restoring competition in markets monopolized by entrenched recidivists like Google because, in that specific circumstance, a "remedy regulating conduct alone is likely to fail." *See*

2

ECF No. 1430 at 6; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) (choosing "conduct remedies" instead of "divestiture" is "disfavored" due to "risk [of] excessive government entanglement in the market").

As the "most important" and "most effective" of antitrust remedies, *du Pont*, 366 U.S. at 326, 330-31, divestiture and similar structural remedies are always an available option when a court must, in an antitrust decree, "break up or render impotent the monopoly power which violates the [Sherman] Act," *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 253 (1959). The Supreme Court has repeatedly ordered divestiture or similar structural relief in Sherman Act cases. *See*, *e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 576-80 (1966); *Int'l Boxing*, 358 U.S. at 253-59; *United States v. Paramount Pictures*, 334 U.S. 131, 151-53 (1948); *Schine Chain*, 334 U.S. at 128-29; *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189-90 (1944); *United States v. Am. Tobacco Co.*, 221 U.S. 106, 184-88 (1911).

Google acknowledges that dozens of "federal court cases" have "ordered divestiture" as an antitrust remedy, but it nonetheless contends that divestiture is somehow "unavailable here." ECF No. 1431 at 4. Google identifies no case in the 135-year history of the Sherman Act that has ever held divestiture is "legally unavailable" to remedy a violation. *See id*. at 11. Indeed, even the case on which Google principally relies, *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), clearly undermines Google's novel view of the law. The court there acknowledged the trial court's "broad discretion" to require divestiture as a Sherman Act remedy, if warranted by the specific facts and circumstances of the case, and it reiterated that "divestiture is a common form of relief in successful antitrust prosecutions." *Id*. at 105. It also left open the possibility of divestiture, ordering the court on remand to determine "whether the use of the structural remedy of divestiture is appropriate with respect to Microsoft." *Id*. In all events, if

3

there were any doubt that divestiture is an option here (there should not be), that doubt must "be resolved in [Plaintiffs'] favor." *du Pont*, 366 U.S. at 334.

More specifically, Google's proposal misstates: (1) how courts evaluate prior acquisition conduct in considering a divestiture remedy, (2) the role divestiture plays in serving the purposes of a Sherman Act decree, and (3) the standard for evaluating the nexus between illegal conduct and divested assets.

### A. The Court May Order Divestiture of Assets Google Lawfully Acquired in the First Instance

Divestitures are appropriate remedies in Sherman Act cases regardless of whether the monopolist's acquisition of the divested assets was lawful in the first instance. *See* ECF No. 1430 at 6-7. Of course, when an acquisition itself was illegal, divestiture of those illegally acquired assets is *also* appropriate. This is why, for example, divestiture "should always be in the forefront of a court's mind when a violation of [Clayton Act Section] 7 has been found." *du Pont*, 366 U.S. at 331; *see* 15 U.S.C. § 18 (prohibiting "acquisition[s]" whose "effect . . . may be substantially to lessen competition, or tend to create a monopoly"). But the availability of divestiture to remedy an illegal acquisition of assets does not reduce, let alone foreclose, its availability to remedy other antitrust violations. Sherman Act "relief need not" and "should not be . . . restricted" to divestiture of assets unlawfully acquired in the first instance. *Crescent Amusement*, 323 U.S. at 189. Rather, divesting "unlawfully obtained" assets is merely "the starting point," *Schine Chain*, 334 U.S. at 129-30, because assets "lawfully acquired [that] may be utilized as part of the [illegal conduct] to effect its ends" also may be divested to restore competition, *Int'l Boxing*, 358 U.S. at 256. *See also Paramount Pictures*, 334 U.S. at 148 ("[E]quity has the power to uproot all parts of an illegal scheme—the valid as well as the invalid—in order to rid the trade or commerce of all taint of the [illegality]."); ECF No. 1430 at 6-7.

4

On the issue of divesting lawfully acquired assets, Google's proposal misstates the law. Google cites *Crescent Amusement*, *Schine Chain*, and *Paramount Pictures* in its proposal but omits controlling portions of those opinions that undermine Google's position.[1] For example, Google quotes a sentence from *Crescent Amusement*, ECF No. 1431 at 4 n.2, but neglects other parts of that same paragraph that establish the availability of divestiture here. *See Crescent Amusement*, 323 U.S. at 189-90 (relief "not . . . restricted" to divesting "the fruits of the conspiracy," especially when "[c]ommon control was one of the instruments" of the violation, and monopolist has shown "proclivity in the past to use" acquired assets "for an unlawful end").

Google also mischaracterizes *Schine Chain* and *Paramount Pictures*, which both hold that a monopolist may be required to divest lawfully acquired assets. Google contends that *Schine Chain* requires divestiture to be limited to unlawfully acquired assets, ECF No. 1431 at 5-6, but the Supreme Court said that determining which assets "were products of the conspiracy" was only "the starting point for determining to what extent divestiture should be ordered," 334 U.S. at 129. "[T]he matter does not end" at divesting unlawfully acquired assets, the Court explained, because "it may be that even after [monopolists] are deprived of the fruits of their conspiracy, the [remaining assets] might still constitute a monopoly power of the kind which the [Sherman] Act condemns." *Id*. Similarly, Google says that *Paramount Pictures* merely "contemplated ordering a divestiture of lawfully acquired assets" and then "ultimately reversed the divestiture order," ECF No. 1431 at 6 n.3, but that is only partially true. *Paramount Pictures* held that divestiture of "lawfully acquired" assets could also be "justified" when a monopolist "may have . . . utilized" those assets "to eliminate or suppress competition" or otherwise to

---

[1] Google's submission also omits other controlling authority adverse to Google's position about the availability of divestiture as a Sherman Act remedy, including *International Boxing* and *Grinnell*.

"further[]" a course of conduct that violates the Sherman Act. 334 U.S. at 152. Consistent with Plaintiffs' proposal, the Supreme Court reversed only the part of the trial court's divestiture order that compelled the sale of "innocent investments" that were "not improperly used in furtherance of" the defendants' violations. *Id*. at 153.

## B. The Court May Order Divestiture of Assets That Google Uses Outside the Relevant, Monopolized Markets

Plaintiffs have already explained the Court's ample authority to divest any Google asset whose "strategic position [was] maintained, as a result of" unlawful conduct, including assets Google uses in markets beyond the ones that it monopolized. *Paramount Pictures*, 334 U.S. at 171; *see also* ECF No. 1430 at 6-7. Google cites no case to the contrary. Its primary authority on this point, *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969), undermines its contention that relief in this case must not affect advertising other than open-web display. *See* ECF No. 1431 at 6-9. In *Zenith Radio*, the plaintiff established a Sherman Act violation only in "the Canadian market," but the Supreme Court held that the proper remedy needed to reach well beyond just Canada to "any other foreign market" because the defendant had demonstrated a "propensity" to engage in unlawful conduct. 395 U.S. at 132. *Zenith Radio* did not involve a divestiture order, but the Supreme Court has applied similar principles to approve divestitures that reach beyond the monopolized markets alone. *See* ECF No. 1430 at 6-7.

A remedy that affects assets used in both the monopolized markets and adjacent markets (or reaches the monopolist's conduct in adjacent markets) neither undermines the valid economic boundaries of those markets nor "defeats the purpose of defining a market," as Google contends. ECF No. 1431 at 7-8. In assessing liability, defining a market helps courts ascertain whether an "area of effective competition" has been affected by the monopolist's conduct. *See, e.g., Ohio v. Am. Express Co.*, 585 U.S. 529, 543–44 (2018); *see also Geneva Pharms. Tech. Corp. v. Barr*

6

*Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (market definition "provides the context against which to measure the competitive effects" of the challenged conduct). However, that "analytical tool" for ascertaining the competitive effects of conduct, *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 24 (D.D.C. 2022), does not circumscribe the Court's power to remedy that conduct. As *Zenith Radio* acknowledged, "it is not necessary that all of the untraveled roads to [an illegal] end be left open and that only the worn one be closed." 395 U.S. at 133 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947)); *see also* ECF No. 1430 at 5.

Nor would Plaintiffs' proposal to divest Google assets used in both monopolized and adjacent markets "entirely deprive Google of the ability to compete" in other markets, as Google claims. ECF No. 1431 at 9. Google can compete on the merits once "the ground" has been "cleansed effectually from the vice of the former illegality." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944). Similarly, Plaintiffs' proposal to temporarily limit Google's conduct in both monopolized and adjacent markets, *see* ECF No. 1430 at 10-14, is needed to prevent future violations of the antitrust laws, including through "methods more subtle and informed, and more difficult to prove, than those" already found illegal. *Int'l Salt*, 332 U.S. at 400; *see also Ford*, 405 U.S. at 577-78 (affirming 10-year "elimination of [monopolist] as a manufacturer" in monopolized market). For example, precluding Google from preferentially routing demand from AdWords or DV360 to an ad exchange or publisher ad server, except at the instruction of an advertiser, is needed to prevent Google from recreating the anticompetitive effects of the tying arrangements that it has used in the past. *See* ECF No. 1430 at 12.

### C. There Is a Sufficient Connection Between Google's Illegal Conduct and the Assets Plaintiffs Propose to Divest

When there is a nexus between assets of the monopolist and the conduct found to be illegal, divestiture is appropriate. That connection can be shown in many different ways because

7

divestiture can "serve[] several functions," including to (1) "put[] an end to . . . the violation," (2) "deprive[] the antitrust defendants of the benefits of their [violation]," or (3) "break up or render impotent the monopoly power which violates the [Sherman] Act." *Schine Chain*, 334 U.S. at 128-29. Divestiture need only be a "reasonable measure[]" of accomplishing one or more of those objectives. *Crescent Amusement*, 323 U.S. at 188.

One way to establish a nexus between illegal conduct and divested assets is to show that the monopolist has a track record of using the divested assets to violate the Sherman Act or that the monopolist is likely to do so in the future. *See*, *e.g.*, *Int'l Boxing*, 358 U.S. at 256; *Paramount Pictures*, 334 U.S. at 152; *Crescent Amusement*, 323 U.S. at 189-90. The Supreme Court has explained that, if an asset "may have been utilized" to "eliminate or suppress competition" or otherwise to "further[]" an illegal course of conduct, the divestiture of that asset is "justified." *Paramount Pictures*, 334 U.S. at 152; *see also Crescent Amusement*, 323 U.S. at 189-90 (divestiture warranted where "[c]ommon control was one of the instruments" of illegal conduct). Likewise, if a monopolist has demonstrated a "proclivity to unlawful conduct," *Paramount Pictures*, 334 U.S. at 147, and specifically a "proclivity in the past to use" particular assets "for an unlawful end," *Crescent Amusement*, 323 U.S. at 190, divestiture of those assets is warranted.

Plaintiffs have demonstrated a relationship between illegal conduct and divested assets here because the record shows that Google repeatedly used both DFP and AdX to effectuate its anticompetitive campaign for more than a decade. *See* ECF No. 1430 at 2-3. Google cannot be trusted to retain these assets, lest it retain the incentive to "artificially handicap[]" its products to "boost the attractiveness" of AdX or DFP. Op. at 97. The Court's findings demonstrate that AdX and DFP are "too potent a weapon to leave in the hands of those whose proclivity to unlawful conduct has been so marked." *Paramount Pictures*, 334 U.S. at 147. Restoring competition in the

monopolized markets requires separating Google from the "instruments" of its unlawful scheme, thereby neutralizing any ability or incentive for Google to use them unlawfully, even if "those instruments could be lawfully used." *Crescent Amusement*, 323 U.S. at 188-89; *see also United States v. Aluminum Co. of Am.*, 91 F. Supp. 333, 343 (S.D.N.Y. 1950) ("strong measures are required to restrain a tendency to recidivism," because of "the possibility of the return to improper conduct on the part of the monopolist" (citing *Crescent Amusement*)).

The D.C. Circuit has articulated the standard slightly differently, but Plaintiffs satisfy that articulation as well. For "structural relief, which is designed to eliminate the monopoly altogether," *Microsoft* required a "clearer indication of a significant causal connection" between the monopolist's illegal conduct "and its continuing position" in the monopolized market(s) than was required to show liability. 253 F.3d at 106-07; *see also id*. at 79 (for liability, need only show that "a defendant engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power" (cleaned up)). That standard is satisfied here. Among other things, the Court has already found that Google both "acquire[d] and maintain[ed] monopoly power" in both relevant markets through illegal conduct involving both AdX and DFP. Op. at 1, 114. Google's unlawful conduct, among other things, "compelled publishers to use DFP" and made customers "unable to switch from AdX," despite Google degrading the quality of or charging a supracompetitive price for each product. *Id*. at 29, 80, 91.

Although Google implies that *Microsoft* adopted a but-for causation standard, *see* ECF No. 1431 at 9, it did not. The district court had expressly found but-for causation lacking, yet the D.C. Circuit still remanded to determine if divestiture was appropriate. *See Microsoft*, 253 F.3d at 105, 107. Moreover, *Microsoft* identified the "proof problem" inherent in imposing any but-for causation standard: "[N]either the plaintiffs nor the court can confidently reconstruct . . . a world

9

absent the defendant's exclusionary conduct." *Id*. at 79. Reconstructing that but-for world would be even more challenging here due to Google's "systematic disregard of the evidentiary rules regarding spoliation of evidence." Op. at 114.

## II. Google's Proposed Remedies Do Not Satisfy the Objectives of an Antitrust Decree

Google's proposal fails to accomplish any of the four distinct but overlapping objectives of a remedy decree: to (1) "unfetter a market from anticompetitive conduct," (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103; *see* ECF No. 1430 at 4.

### A. Google's Proposal Fails to Prohibit All of Google's Illegal Conduct

A Sherman Act remedy must, at a minimum, stop all anticompetitive conduct because "[c]ivil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance or resumption of the unlawful practice." *Crescent Amusement Co.*, 323 U.S. at 188. Yet, Google's proposal fails even this most basic test.

Google's proposal does not prohibit Google from "effectively restricting the unique advertising demand offered by AdWords advertisers to AdX," which the Court found "helped Google maintain the power to keep charging AdX publishers a 20% take rate," *i.e.*, a "supracompetitive price[]." Op. at 76-77, 81, 96. This exclusivity allowed Google to harm publishers and the competitive process because "limiting access to AdWords demand in this way 'compel[led] publishers' to use AdX and DFP," *id*. at 29, and "ensured that publishers would lose significant revenue if they did not use AdX," *id*. at 96.[2] The Court confirmed this view at the May 2 hearing, noting that "the whole reason" that Google's anticompetitive campaign "works

---

[2] Given these findings, there is no support for Google's claim that "[t]he Court did not find . . . the relationship between AdWords and AdX to be anticompetitive." ECF No. 1431 at 16.

10

so well" is "the golden goose" of AdWords and "the way in which [publishers] could get it." Hr'g Tr. at 9:9-18. In other words, the Court's findings show that the AdWords-AdX exclusivity harmed competition in the ad exchange market in the same way a tie does, *i.e.*, using power in one market (ad buying tools) to coerce purchases and thereby harm competition in an adjacent market (ad exchanges). *See*, *e.g.*, Op. at 90-97. Google's failure to propose any remedy for this conduct is a yawning gap in its submission.

Moreover, Google's proposal to wait "nine to twelve months" after a final judgment to stop its illegal conduct, *see* ECF No. 1431 at 19, is both alarming and indicative of Google's state of mind. Although waiting nine to twelve months to stop breaking the law is an improvement on the "one to two years" Google proposed at the May 2 hearing, Hr'g Tr. at 38:6-7, it still encapsulates Google's dismissive attitude toward the Court's liability ruling and Google's casual approach to remedying its illegality. Google should stop breaking the law immediately.

**B.     Google's Proposal Fails to Terminate Google's Illegal Monopolies**

The Court found that Google illegally acquired and illegally maintained monopoly power in two separate markets: ad exchanges and publisher ad servers. *See* Op. at 1, 114. Google's proposal fails to put forth any measures that would "assure the complete extirpation of" these two "illegal monopol[ies]," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 251 (1968), or "break up or render impotent [Google's] monopoly power" in both markets, *Int'l Boxing*, 358 U.S. at 253. Without terminating Google's monopolies, the Court's remedy would not, as it must, "eliminat[e] the consequences of the illegal conduct." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978).

*1.     Google's Proposal Fails to Terminate Google's Ad Exchange Monopoly*

Google's proposal neither restores competition in the ad exchange market nor eliminates Google's "dominant" position in that market, which "has been fortified by high barriers to entry

11

that resulted from Google's scale and network effects across the open-web display ecosystem." Op. at 76-77. Tellingly, Google proposes to do nothing about Google's use of AdWords to force publishers to use AdX, which has suppressed competition in the ad exchange market for many years. *See supra* at 10-11. The connection between AdWords and AdX is "the keystone of [Google's] monopoly power" in the ad exchange market and thus "the root of the evil" that must be addressed if competition is to be restored to that market. *See Grinnell*, 384 U.S. at 577-78; *see also* Op. at 96 ("A primary source of Google's monopoly power in the ad exchange market is AdWords' uniquely large and diverse array of advertising demand.").

The measures Google proposes would not terminate its ad exchange monopoly. Google proposes to allow publishers to (1) put AdX in competition with header bidding and (2) set different price floors for different ad exchanges, but publishers' historical ability to do both of those things did not erode, let alone eliminate, Google's monopoly power in the ad exchange market. This is due in part to Google's "unparalleled scale," Op. at 40, and AdX's exclusive access to AdWords demand. There is no reason to expect that ordering the measures Google proposes would be any more effective than they have been in the past. This is especially so if Google can continue to tether AdWords to AdX because "it [is] not financially viable for large publishers to forgo using AdX" when it is the only place for a publisher to "access . . . the unique advertising demand from AdWords." *Id*. at 109. Under Google's proposal, Google would continue to enjoy monopoly power in the ad exchange market indefinitely.

### 2. *Google's Proposal Fails to Eliminate Google's Publisher Ad Server Monopoly*

Google's proposal fails to include measures that would terminate its "durable" monopoly in the publisher ad server market as well. *See* Op. at 73. When a company controls more than 90% of a market, as Google does in the publisher ad server market, tinkering around the edges of the problem, as Google proposes, cannot restore competition. The half-measures Google

proposes cannot be counted on to terminate a monopoly like Google's that is "protected by high barriers both to entry and expansion," including the fact that it is currently "very challenging to gain publisher ad server customers" because of "high switching costs." *See id*. at 73-74. Google proposes no measures to lower barriers to entry and expansion or make it easier for publishers to switch away from DFP. Therefore, Google's proposal cannot give the Court any confidence that rivals would be able to "erod[e] DFP's market share," ECF No. 1431 at 18, let alone terminate Google's monopoly power entirely, as the governing legal standard requires. This is especially true because Google's proposal would also allow Google to keep all the fruits of its illegal behavior, including its unmatched scale and data advantage, and would do nothing to prevent Google from discovering new ways to harm competition in the future. *See infra* at 14-15.

The parties appear to agree on one significant, albeit narrow, part of the problem in the publisher ad server market, which is that Google must stop tying DFP to AdX and thus must allow non-Google publisher ad servers to get real-time bids from AdX. *See* ECF No. 1430 at 12 (proposing Google be "prohibited from tying products"); ECF No. 1431 at 16-17. That sliver of agreement is why Plaintiffs' counsel stated at the May 2 hearing that Google's proposal "would absolutely address our concern about [one part of] the prior illegal conduct," *i.e.*, the DFP-AdX tie, but "does not address" several other aspects of the problem, including "the fact that by virtue of that illegal behavior, the defendant built up a 90 percent market share." Hr'g Tr. at 35:14-21. To be clear, Google does not propose any remedy comparable to the "first phase" of Plaintiffs' proposed divestiture of DFP because Google does not propose any measures requiring DFP to interoperate with non-Google ad exchanges or industry tools such as Prebid. *See* ECF No. 1430 at 10. That kind of interoperability is needed to begin restoring competition and shifting control away from Google and toward publishers, since it will take time for publishers to migrate from

13

DFP to non-Google publisher ad servers. Nor does Google propose any remedy that would prevent it from funneling AdWords demand to DFP by other "untraveled roads" (*i.e.*, by means other than an ad exchange) to maintain DFP's monopoly. *Int'l Salt*, 332 U.S. at 400.

### C. Google's Proposal Fails to Deny Google the Fruits of Its Violations

Google's proposal allows it to "retain the full dividends of [its] monopolistic practices" and thereby "profit from" its illegal conduct. *Schine Chain*, 334 U.S. at 128. Doing so "would make enforcement of the [Sherman] Act a futile thing" and reward monopolists by allowing them to "preserve" their "unlawfully built . . . empires . . . intact." *Id*. Google's proposal thus fails to "deny to [Google] the fruits of its statutory violation[s]," *United Shoe*, 391 U.S. at 250, which is a necessary part of an antitrust decree because "[t]hose who violate the [Sherman] Act may not reap the benefits of their violations." *Crescent Amusement*, 323 U.S. at 189.

As Plaintiffs set forth in their remedy proposal, the fruits of Google's illegal conduct are threefold: (1) ill-gotten monopoly power in both the ad exchange and publisher ad server markets, (2) ill-gotten profits, and (3) ill-gotten scale advantages, including data advantages. *See* ECF No. 1430 at 3. Google proposes to keep all three of these categories of benefits, without explaining why it thinks it should be permitted to do so. Thus, for example, Google's proposal would allow it to continue to leverage its unmatched "[s]cale and network effects" to "protect AdX's dominant position in the open-web display ad exchange market," Op. at 83-84, and to use its "vast repositories of data about advertisers, publishers, and Internet users" to "benefit its open-web display advertising business," *id*. at 40. Any effective remedy must disgorge those ill-gotten gains from Google, and the Court "is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do." *Int'l Salt*, 332 U.S. at 400.

14

D. **Google's Proposal Fails to Ensure That Google Will Likely Comply With the Sherman Act in the Future**

Google's proposal also fails to account for the alternative methods it could use in the future to harm competition, and therefore it does not "ensure that there remain no practices likely to result in monopolization in the future." *United Shoe*, 391 U.S. at 250. Instead, Google's proposal is narrowly focused on "the proven means by which the evil was accomplished," but fails to address the myriad additional ways that Google could harm competition again in the future. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950); *see also* ECF No. 1430 at 5 (collecting cases).

A monopolist can be expected to try to hold onto its monopoly through "methods more subtle and informed, and more difficult to prove," than the methods already found illegal, and "it is not necessary that all of [those] untraveled roads . . . be left open and that only the worn one be closed." *Int'l Salt*, 332 U.S. at 400. It is in part for this reason that a divestiture of only AdX would be insufficient because Google is likely to find ways to use AdWords to entrench DFP's dominant position without an ad exchange in between. It is also for this reason that Plaintiffs proposed not only divestitures but also complementary behavioral remedies that are designed to close off the "untraveled roads," *id.*, to the illegal ends Google has already reached. *See* ECF No. 1430 at 11-14. These measures include multiple forward-looking provisions designed to prevent Google from distorting the competitive process in new ways or using its data and scale advantages in new ways to harm competition. *See id*. Google has inexplicably left all of those "untraveled roads" available as means for Google's future illegality.

III. **Google's Claims of Infeasibility Are Not A Valid Basis to Deny Plaintiffs the Structural Relief That Is Necessary to Restore Competition**

"[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree is on private interests." *du Pont*, 366 U.S.

15

at 326. Thus, "the Government cannot be denied" a divestiture that is "a necessary element of effective relief" based on concerns of "economic hardship, however severe," and only if there are multiple "effective remedies" can "[e]conomic hardship" be permitted to "influence [the] choice" among effective remedies. *Id.*; *see also Steves & Sons*, 988 F.3d at 720 (court should choose remedy "that best promotes competition," not "the remedy least burdensome to the defendant").

The duty of the Court to issue effective relief is in keeping with the general "scope of [its] equitable powers," which "is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011). Moreover, because this case implicates the public interest, the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also F. Hoffman-La Roche Ltd. V. Empagran S.A.*, 542 U.S. 155, 170 (2004) ("A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm."); *Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*, 395 U.S. 464, 472 (1969) (in government enforcement action, "the pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern" (citing *du Pont*, 366 U.S. at 326)); *Va. Ry. Co. v. Sys. Federation No. 40*, 300 U.S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.").

Plaintiffs intend to test during discovery and at trial the factual accuracy of Google's claims that divesting AdX or DFP would be "logistically unworkable." *See* ECF No. 1431 at 11-

16

15.[3] Regardless of these claims' accuracy, difficulty and hardship are not valid bases to deny Plaintiffs divestitures that are "a necessary element of effective relief." *du Pont*, 366 U.S. at 327. Thus, although the "logistical difficulty" of a divestiture may be a relevant consideration, *see Microsoft*, 253 F.3d at 106, it is ultimately collateral to whether and to what extent structural relief is needed to restore competition to the markets Google has monopolized. Only if there are multiple "effective remedies" can "[e]conomic hardship" be permitted to "influence [the] choice" among effective remedies. *du Pont*, 366 U.S. at 327. But Google's proposals are not "effective remedies," for the reasons described above.

## Conclusion

For the foregoing reasons, Plaintiffs submit that Google's proposed remedies are inadequate to restore competition. They fail to stop all of Google's illegal conduct, they do not cure the myriad harms caused by that conduct, they would not terminate the two monopolies that Google illegally acquired and maintained, and they fail to prevent future antitrust violations.

---

[3] These claims are suspect, given that Google has reportedly already offered to divest AdX to resolve a separate antitrust inquiry by the European Commission. *See* Foo Yun Chee & Jody Godoy, *Google offered to sell part of ad tech business, not enough for EU publishers*, Reuters (Sept. 18, 2024), https://www.reuters.com/technology/google-offered-sell-advertising-marketplace-adx-eu-antitrust-probe-sources-say-2024-09-18/.

Dated: May 19, 2025

Respectfully submitted,

| | |
|---|---|
| ERIK S. SIEBERT<br>United States Attorney | JASON S. MIYARES<br>Attorney General of Virginia |
| /s/ Gerard Mene<br>GERARD MENE<br>Assistant U.S. Attorney<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>Telephone: (703) 299-3777<br>Facsimile: (703) 299-3983<br>Email: Gerard.Mene@usdoj.gov | /s/ Tyler T. Henry<br>TYLER T. HENRY<br>Assistant Attorney General<br>Office of the Attorney General of Virginia<br>202 North Ninth Street<br>Richmond, VA 23219<br>Telephone: (804) 692-0485<br>Facsimile: (804) 786-0122<br>Email: thenry@oag.state.va.us |
| /s/ Julia Tarver Wood<br>JULIA TARVER WOOD<br>MATTHEW R. HUPPERT<br>MICHAEL E. WOLIN<br><br>United States Department of Justice<br>Antitrust Division<br>450 Fifth Street NW, Suite 7100<br>Washington, DC 20530<br>Telephone: (202) 307-0077<br>Fax: (202) 616-8544<br>Email: Julia.Tarver.Wood@usdoj.gov<br><br>*Attorneys for the United States* | *Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia* |