**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**
**GOOGLE'S INTERNAL ANALYSES OF REMEDY FEASIBILITY**

Since at least 2020, nonlegal employees at Google have analyzed the feasibility of making changes to the way Google operates its ad tech business, including analyses of the timeline and purported cost, burden, risks, or difficulties associated with divesting Google's publisher ad server (DFP) or ad exchange (AdX) products. Now that the Court is considering what remedies are appropriate to address Google's multiple violations of the Sherman Act, the relevance of these documents cannot reasonably be questioned. The Court is entitled to a complete and accurate factual record about the workability of the remedy proposals under consideration, and Google's assertions that Plaintiffs' proposed divestitures of AdX and DFP would be "unworkable and harmful," ECF No. 1434 at 12; *see* ECF No. 1431 at 11–14; ECF No. 1434 at 14–15, 19, clearly open the door to disclosing the documents at issue. Google seeks to shield this highly relevant factual material from discovery under the guise of blanket claims of attorney-client privilege and attorney work product. Because Google refuses to produce *any* of these internal, nonlegal analyses, Plaintiffs bring this motion to compel their production.

Neither attorney-client privilege nor attorney work-product doctrine is a reason to deny Plaintiffs and the Court access to these relevant documents, and Google should be required to produce them. The business and technical documents at issue in this motion go to the heart of

1

Google's disputed claims of "unworkability," and they are not protected from disclosure. To be clear, Plaintiffs do not seek privileged communications with counsel or documents revealing attorneys' mental impressions. Plaintiffs merely seek internal factual analyses prepared by nonlegal employees about Google's business and technology. To the extent these analyses qualify as attorney work product (as the Court concluded for certain of them during the liability phase), Plaintiffs now, in the remedies phase, have a substantial need for those documents sufficient to overcome that qualified protection. The documents are highly relevant to this remedies phase of the proceeding and are not available in substantially the same form from any other source without undue hardship. Moreover, it would be fundamentally unfair for Google to offer testimony at trial about the purported difficulties of divesting AdX or DFP while refusing to disclose Google's prior analyses of the same question, including material that may be contrary to the testimony Google offers.

## BACKGROUND

Plaintiffs have made clear since the filing of the Complaint that structural relief, including divestitures of DFP and AdX, would likely be necessary to remedy Google's anticompetitive conduct. *See* ECF No. 1 at 140. Pursuant to the Court's Order, ECF No. 1417, the parties appeared before the Court on May 2, 2025 to provide their preliminary positions on the equitable remedies to be imposed for Google's multiple violations of the Sherman Act. In response to Plaintiffs' contention that structural remedies were both appropriate and necessary in this case, Google's counsel responded that divestitures would "implicate all kinds of technological feasibility issues." Hr'g Tr. at 21:19–23 (May 2, 2025), ECF No. 1432; *see also id*. at 22:23–25 (claiming divestitures "would grow into . . . complete uncertainty and potential chaos"); *id*. at 31:11–14 (claiming divestitures "may not even be possible"). Google reiterated and refined those claims in its subsequent written submissions. In Google's initial remedy

proposal, it suggested that each of the divestitures Plaintiffs propose would be "cumbersome, disruptive, and unpredictable" for several reasons, including because they would be technically complex, would take as long as ten years to complete, and would "siphon[] [Google] resources" away from other projects. *See* ECF No. 1431 at 11–15. Google also suggested that "there is significant uncertainty about which company would want to and be capable of purchasing" AdX or DFP. *Id*. at 15. Google again reiterated many of these claims in its response to Plaintiffs' remedy proposal. *See* ECF No. 1434 at 12–19. For these reasons, the parties intend to disclose expert opinions related to the potential cost, burden, or difficulty associated with Plaintiffs' proposed divestitures. *See* Hr'g Tr. at 5:6–7, 15:13–16:3, 18:19–23, 19:7–10, ECF No. 1432.

The alleged cost, burden, and difficulty associated with divesting AdX and/or DFP are not new issues to Google. Rather, engineers and business executives at Google have considered these issues repeatedly over at least the past five years.[1] For example, as part of Project Sunday and Project Monday—projects over which Google asserted blanket work-product protection during the liability phase—Google analyzed the potential sale of certain of its ad tech products and consulted with an investment bank.[2] *See* Ex. 1 at -044 (█████████████████ ████████████████████████████████████████████████

---

[1] Google's current assertions regarding the "unworkability" of Plaintiffs' proposed divestitures are suspect, given that Google has reportedly already offered to divest AdX to resolve a separate antitrust inquiry by the European Commission. *See* Foo Yun Chee & Jody Godoy, *Google offered to sell part of ad tech business, not enough for EU publishers*, Reuters (Sept. 18, 2024), https://www.reuters.com/technology/google-offered-sell-advertisingmarketplace-adx-eu-antitrust-probe-sources-say-2024-09-18/.

[2] Some documents related to these particular code-named projects were included in the 21-document sample at issue in Plaintiffs' May 19, 2023 Motion to Compel. However, that motion, unlike the present motion, did not seek disclosure of those documents based on the "substantial need" exception for fact work product documents. Furthermore, now that the Court has found Google liable, and the purported cost, burden, or difficulty of effectuating remedies for Google's violations has become a ripe area of live factual dispute, Plaintiffs now have a substantial need for these documents, for the reasons discussed below. *See infra* pp. 14-19.

██████). Given the ongoing scrutiny of Google's conduct in ad tech markets, it is likely that Google has updated or revisited its analysis of divesting AdX and/or DFP since completing Projects Sunday and Monday.

On May 2, Plaintiffs served Google with a targeted set of requests for production focused on proposed remedies, the first of which sought the documents at issue in this motion:

> **REQUEST NO. 1.** Produce all internal and external-facing business, financial, or technical analyses, projections, and/or forecasts concerning (a) any actual or potential remedy for alleged anticompetitive conduct by Google related to its digital advertising business, (b) any potential sale or divestiture of any Relevant Product, including all data underlying all such analyses; (c) any cost, burden, challenge, complication, and/or difficulty related to the divestiture of any Relevant Product, including all data underlying such analyses. For the avoidance of doubt, this includes all documents related to Project Sunday and/or Project Monday, even to the extent they were previously withheld from production.

Plaintiffs met and conferred with Google on May 7 and May 21 (and exchanged correspondence with Google in between those dates) to determine whether Google intended to withhold internal documents responsive to RFP No. 1 under the auspices of the attorney work-product doctrine, or any other privilege, given that it withheld at least some such documents during the liability phase.[3] Google's counsel confirmed that such internal analyses exist and that Google intends to withhold all of them on the basis of attorney work product and attorney-client privilege.

Given that fact discovery is set to close on June 30, 2025, *see* ECF No. 1428, and mindful of this Court's directive to raise discovery disputes promptly, Plaintiffs submit that this dispute is sufficiently ripe for resolution. Although Google has not yet completed its document productions or provided any privilege log as part of this phase of litigation, the parties dispute whether a definable set of documents—engineering and business analyses related to potential remedies, including divestiture or sale of AdX or DFP—must be produced, notwithstanding Google's

---

[3] During the liability phase, Google dropped any claims that its code-named, remedy-related documents were protected by attorney-client privilege. ECF No. 245.

categorical withholding of those documents. Delaying this motion until Google has completed its document productions and produced a full privilege log—or until it has provided all materials or testimony it claims would be a "substantial equivalent" of the analyses at issue—would risk this issue either being resolved too late to provide meaningful relief or never being resolved at all.

## LEGAL STANDARDS

### I.    The Attorney-Client Privilege Is Narrowly Construed

Because the attorney-client privilege "impedes the full and free discovery of the truth, and is in derogation of the public's right to every man's evidence, it is not favored by federal courts." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984) (cleaned up). Thus, "the privilege is to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id*. "The burden is on the proponent of the attorney-client privilege to demonstrate its applicability." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998).

The attorney-client privilege "applies only when the person claiming [it] has as a client consulted an attorney for the purpose of securing a legal opinion or services . . . and in connection with that consultation has communicated information which was intended to be kept confidential." *Grand Jury Proceedings*, 727 F.2d at 1355. Therefore, the attorney-client privilege "extends only to *communications* and not to facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) (emphasis in original); *accord, e.g., In re Allen*, 106 F.3d 582, 604 (4th Cir. 1997) ("Since attorney-client privilege protects only the disclosure of client communications, and not the disclosure of any underlying facts, a client cannot possibly hide information simply by communicating it to his lawyer . . . ." (citing *Upjohn*)); *E.I. Dupont de Nemours & Co. v Kolon Indus., Inc.*, 269 F.R.D. 600, 605 n.2 (E.D. Va. 2010) (attorney-client privilege "has limits," including that "[it] does not shield from discovery the facts underlying the communication"); *X Corp. v. Doe*, 805 F. Supp. 1298, 1305 n.13 (E.D. Va. 1992) ("[T]he privilege protects only the

5

communications themselves, not underlying facts, the disclosure of which may be compelled from those who communicated them to the attorney.").

## II.    Fact Work Product Enjoys Only Qualified Immunity

Attorney work product is either (1) opinion work product, or (2) fact work product. *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992). The party claiming work-product protection bears the burden of proving that a document contains opinion work product. *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988). Opinion work product is "the pure work product of an attorney insofar as it involves mental impressions, conclusions, opinions, or legal theories concerning the litigation" and "is immune to the same extent as an attorney-client communication." *Nat'l Union Fire*, 967 F.2d at 984; *see also In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) ("[o]pinion work product . . . represents the actual thoughts and impressions of the attorney").

"All other [materials] prepared in anticipation of litigation" qualify as fact work product and are "only qualifiedly immune." *Nat'l Union Fire*, 967 F.2d at 984. The qualified immunity for fact work product "is little more than an 'anti-freeloader' rule designed to prohibit one adverse party from riding into court on the enterprise of another." *Id.* at 985; *see also FTC v. Boehringer Ingelheim Pharms., Inc.* ("*Boehringer I*"), 778 F.3d 142, 156 (D.C. Cir. 2015) ("the key goal underlying the protection for fact work product" is "that each side must undertake its own investigation of the relevant facts and not simply freeload on opposing counsel"). Such concerns are not present "when unique, relevant information is withheld from a party that never had an opportunity to obtain the information on its own." *Boehringer I*, 778 F.3d at 156. Thus, fact work product "may be discoverable on a showing of substantial need." *Nat'l Union Fire*, 967 F.2d at 984–85; *accord* Fed. R. Civ. P. 26(b)(3)(A).

### III.    Documents That Do Not Reveal an Attorney's Mental Impressions Are, At Best, Fact Work Product

Documents containing only non-legal analysis are fact, not opinion, work product because they do not contain "the fruits of the attorney's mental processes." *In re Doe*, 662 F.2d 1073, 1076 n.2 (4th Cir. 1981); *FEC v. Christian Coalition*, 178 F.R.D. 456, 468 (E.D. Va. 1998) ("*Christian Coalition II*") ("factual recitation" that "does not reveal the attorney's litigation strategy, thoughts or mental impressions" is not opinion work product); *In re S3 Ltd.*, 252 B.R. 355, 364 (Bankr. E.D. Va. 2000) (non-testifying litigation consultant's "specific evidentiary findings" constituted "nonopinion work product" because they did not contain the consultant's "mental impressions, conclusions, opinions, or legal theories" concerning the litigation).

An attorney providing "information and frameworks" for analyses, or an attorney using analyses to provide legal advice, does not render those analyses opinion work product. *Boehringer I*, 778 F.3d at 152–53; *see also FTC v. Boehringer Ingelheim Pharms., Inc.* ("*Boehringer II*"), 180 F. Supp. 3d 1, 25 (D.D.C. 2016) ("broad-ranging factual analysis of many possible litigation and settlement outcomes" that was "created at [counsel's] behest and analyze variables she identified," were not opinion work product). Moreover, "[w]here it appears that the focus or framework provided by counsel is obvious or non-legal in nature, it is incumbent upon the party claiming opinion work product protection to explain specifically how disclosure would reveal the attorney's legal impressions and thought processes." *Boehringer I*, 778 F.3d at 153.

### IV.    Fact Work Product Is Discoverable upon a Showing of Substantial Need and Undue Hardship in Obtaining Substantially Equivalent Information

A requesting party may demonstrate "substantial need" for a document by "a showing based on the document's relevance and importance to the issues in the litigation and the unavailability of the facts in the documents from other sources." *Nat'l Union Fire*, 967 F.2d at 984–85; *accord* Fed. R. Civ. P. 26(b)(3)(A). Relevance to "the general allegations in the

Complaint" is enough to satisfy the burden of "relevance and importance." *Christian Coalition II*, 178 F.R.D. at 464–65; *see also Schlossberg v. B.F. Saul Ins. Agency of Md., Inc.*, 2015 WL 1522879, at *8 (D. Md. Apr. 1, 2015) (finding "substantial need" because material was "relevant" to defendants' defenses); *S3 Ltd.*, 252 B.R. at 364–65 (finding "substantial need" where document was "relevant to the dispute at hand" and "may enlighten any number of issues"). The "relevance and importance of a document" can also be "established by showing that the document is necessary for impeachment purposes," *Suggs v. Whitaker*, 152 F.R.D. 501, 507-08 (M.D.N.C. 1993), including to rebut an adversary's contentions, *FEC v. Christian Coalition*, 178 F.R.D. 61, 85 (E.D. Va. 1998) ("*Christian Coalition I*"). "A moving party need not show . . . that the requested documents are critical to, or dispositive of, the issues to be litigated." *Boehringer I*, 778 F.3d at 156.

Google has suggested that similar information may be available through depositions, but depositions are not the "substantial equivalent" of fact work product when factors such as "lapses of time between the information being recorded in the document and the litigation" and "forgetfulness of witnesses" are present. *Christian Coalition I*, 178 F.R.D. at 86. In these circumstances, it is unlikely that a witness would be able to recall the "substantial equivalent" of what was contained in the documents. Moreover, even if a deposition could be the "substantial equivalent" of fact work product, obtaining the information via deposition presents "undue hardship" when the requesting party "is limited in the number of depositions it may take" or the deponents "would be hostile witnesses to any deposition inquiry." *Id.* at 86–87; *see also Uhlig LLC v. Shirley*, 2011 WL 2145170, at *4 (D.S.C. June 1, 2011) (Childs, J.) (depositions are undue hardship "where the witness may be reluctant or hostile or where the witness may probably be deviating from his prior statement" (cleaned up)).

**ARGUMENT**

**I.      The Attorney-Client Privilege Does Not Apply Because Plaintiffs Do Not Seek Attorney–Client Communications**

The attorney–client privilege is not a valid basis to withhold the documents at issue because Plaintiffs seek only business analyses and reports prepared by non-lawyers at Google. Plaintiffs do not seek any attorney–client communications, let alone communications "for the purpose of securing a legal opinion or services." *Grand Jury Proceedings*, 727 F.2d at 1355. While it is possible that some of the documents responsive to RFP No. 1 were communicated to counsel at some point, such subsequent communication does not shield the underlying analyses from disclosure because "a client cannot possibly hide information simply by communicating it to his lawyer." *Allen*, 106 F.3d at 604. The analyses Plaintiffs seek are "the facts underlying" any communication to counsel, and therefore the privilege "does not shield" those analyses "from discovery." *Kolon Indus.*, 269 F.R.D. at 605 n.2. Tellingly, Google previously dropped any claims that documents associated with Project Sunday or Project Monday were privileged, relying only upon attorney work-product protection. ECF No. 245 at 9 & n.9.

**II.     Google Cannot Satisfy Its Burden to Show that Technical and Business Documents Analyzing Potential Remedies Reflect Its Lawyers' Legal Impressions**

Google cannot establish that the documents Plaintiffs seek qualify as opinion work product. *First*, Plaintiffs seek only factual assessments of potential remedies, such as their cost, technical complexity, and impact on Google's business, which are factual matters unlikely to reveal mental impressions of a legal nature. *Second*, any supervision and guidance Google's counsel may have provided for the category of documents Plaintiffs seek would have been obvious, non-legal, or disclosed to adversaries. As a result, Google cannot show "specifically how disclosure would reveal the attorney's [undisclosed] legal impressions and thought processes." *Boehringer I*, 778 F.3d at 153.

9

**A.    The Documents at Issue Are Factual Assessments That Do Not Reveal Attorney Mental Impressions**

To qualify as opinion work product, "a factual document selected or requested by counsel" must expose "the attorney's thought processes and theories" concerning the litigation. *Boehringer I*, 778 F.3d at 151. A document that merely "reveal[s] some inkling of a lawyer's mental impressions" is not enough. *Id*. Rather, an attorney's "selection or request" must "reflect[] the attorney's focus in a meaningful way," or there "must be some indication that the lawyer sharply focused or weeded the materials." *Id*. at 151–52. In other words, a document qualifies as opinion work product only if its "disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts." *Id*. at 152.

It is Google's burden to establish that the documents it seeks to withhold are opinion work product, *see Martin Marietta*, 856 F.2d at 626, but Google cannot show that the documents at issue satisfy this demanding standard. The analyses created by non-lawyers at Google to assess the purported cost, burden, or difficulty of actual or potential remedies, including divestiture of AdX and/or DFP, would not reveal any attorney mental impressions concerning the litigation. Rather, the documents Plaintiffs seek are limited to *factual* analysis about the nature of Google's technology systems, the nature of the technical work required to modify those systems to facilitate divestiture, and the business prospects for selling certain Google assets. Questions of a legal nature are simply not implicated by the subject matter of these documents.

***First***, the documents at issue relate to technical and business considerations, not legal ones. For example, Projects Sunday and Monday focused on "the future of [Google's] business" and "█████████████████████████████████" Ex. 2 (██████ Dep.) at 248:13–25, 251:3–17. Project Monday was not even initiated by an attorney. Ex. 3 (Google 30(b)(6) Dep.) at 122:10–15. How Google should adjust its advertising business is "a matter of business

10

judgment, not legal counsel," and does not constitute opinion work product. *Boehringer I*, 778 F.3d at 152; *see also LaBudde v. Phoenix Ins. Co.*, 2025 WL 52010, at *11 (E.D.N.C. Jan. 8, 2025) (judgment that "it would be financially illogical to repair a property for more money than it would cost to rebuild the same property is a financial reality rather than a 'legal theory'").

Many of the documents previously withheld concern assessment of the costs of potential remedies, rather than any legal analysis. *See*, *e.g.*, Ex. 4 at GGPL-AT-0027272 ("████████ ████████████████████████████████████████████"); *id*. at GGPL-AT-0026493 ("████████████████████████████████████████[.]"). Such factual information, even if "requested or selected by counsel," is not opinion work product because it reflects "the sort of financial analyses one would expect a company exercising due diligence to prepare when contemplating settlement options." *Boehringer I*, 778 F.3d at 152. A lawyer's "general interest in the financials of" a potential settlement does not transform financial analyses into opinion work product because any "competent negotiator" would "request financial analyses." *Id*. Similarly, although Google previously withheld "spreadsheets" that reflected "██████████████████████," *e.g.*, Ex. 4 (GOOG-DOJ-AT-01438099), it has not shown that this "tabular data" "reflect a special arrangement of data by counsel" or "divulge thought processes or theories regarding the litigation," *Christian Coalition II*, 178 F.R.D. at 468. Even if the data were selected by counsel, which Google often does not claim, Google has not shown that any selections were legal in nature, as opposed to "a matter of business judgment." *Boehringer I*, 778 F.3d at 152.

**Second**, the analyses at issue could not have been done by attorneys. Projects like Sunday and Monday "have implications across the entire company" and require "cross-functional" teams because "legal can't answer these questions." Ex. 3 (Google 30(b)(6) Dep.) at 240:13–241:14.

By definition, documents containing the answers to questions that "legal can't answer" do not contain an attorney's "mental impressions, conclusions, opinions, or legal theories . . . concerning the litigation." *Nat'l Union Fire*, 967 F.2d at 983–84.

*Third*, any glimmer of attorney involvement in these documents is, at best, an "inkling of a lawyer's mental impressions." *Boehringer I*, 778 F.3d at 151. For example, Google's prior assertions of work product over remedies-related documents hinge on those documents purportedly "reveal[ing] the nature of the remedy being assessed." *See*, *e.g.*, ECF No. 259 at A-1, A-2 (GOOG-DOJ-AT-01106088 and GOOG-DOJ-AT-01498627). However, a reference in a document to a potential remedy or settlement does not transform the entire document into opinion work product. *Boehringer I*, 778 F.3d at 152–153 (financial analyses of settlement options were only fact work product); *Boehringer II*, 180 F. Supp. 3d at 25 ("broad-ranging factual analysis of many possible litigation and settlement outcomes" were discoverable). And, of course, insofar as Google voluntarily disclosed "the nature of the remedy being assessed," ECF No. 259 at A-2, to "someone with interests adverse to [it]," such as an antitrust enforcer, any work-product protection these materials might otherwise have would be "waived." *See*, *e.g.*, *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981).

### B.    Google Cannot Establish that Its Counsel's Guidance Was Anything Other than Obvious, Non-Legal, or Disclosed to Adversaries

Insofar as lawyers were involved in the remedy-related projects at issue, the record indicates their guidance was "obvious or non-legal in nature," and thus "it is incumbent upon" Google "to explain specifically how disclosure would reveal the attorney's legal impressions and thought processes." *Boehringer I*, 778 F.3d at 153. Google has failed to meet that burden because it has only claimed, in conclusory fashion, that its counsel " ██████████████████████ ██████" over such remedy projects. ECF No. 245-1 ¶¶ 7, 8 (Decl. of T. Lazarus). Google has

not "explained[ed] specifically" how that ███████████████ had any "legal significance," *Boehringer I*, 778 F.3d at 153.

Google's prior privilege log entries are similarly generic and ambiguous, stating that Google withheld many documents because they "███████████████████████████ ██████████████████████████" Google's counsel. Ex. 4 (GOOG-AT-MDL-007412833); *see also*, *e.g.*, *id*. (GOOG-AT-MDL-007398364, GOOG-AT-MDL-007412849, GOOG-AT-MDL-007423160). These descriptions likewise do not "explain specifically," *Boehringer I*, 778 F.3d at 153, how the "████" reflected in these documents were legal in nature. That the withheld documents concerned a "██████████████" is not sufficient because a lawyer's involvement in a potential settlement, for example, does not necessarily reveal legal thinking about the settlement, particularly when the documents concern technical or financial evaluations that more likely reflect "business judgment, not legal counsel." *See id*. at 152–53.

Just as a lawyer's mere involvement in the preparation of a document does not necessarily make that document opinion work product, a lawyer's subsequent use of a document to provide legal advice does not render that document opinion work product either. Documents that were not drafted by counsel do not "reveal[]" counsel's "analysis of the legal issues at hand, even if [counsel] used those documents in [their] ultimate analysis." *Boehringer II*, 180 F. Supp. 3d at 25; *see also id*. at 26 (document that lawyer "used . . . to assist her in providing legal advice" was not opinion work product because "the actual advice she gave is nowhere to be found in that document"). Here, Google incorrectly claims that certain documents are opinion work product just because its counsel used them to provide legal advice. For example, Google describes a "██████████████" that Google withheld as "██████████████" because it was

13

prepared "███████" its counsel "████████████████████." *See* Ex. 4 (GGPL-AT-0034603). Because such documents do not "reflect[] the attorney's focus in a meaningful way," they are not opinion work product. *Boehringer I*, 778 F.3d at 151.

Google's ability to satisfy its burden to show that its lawyers were genuinely providing legal guidance for the documents at issue, rather than analyzing technical and business considerations, should also be viewed against the backdrop of Google's established "misuse of the attorney-client privilege," whereby "Google executives and employees routinely labeled emails as attorney-client privileged even though the emails clearly did not involve privileged communications." ECF No. 1410 at 113–14. The Court has already observed that Google's "track record" of misconduct, including its "policy about hiding e-mails and that sort of thing" has generated "a great deal of distrust," and therefore the Court should view with skepticism Google's present attempts to shield yet more documents from the evidentiary record. Hr'g Tr. at 29:11–15, ECF No. 1432.

## III.   Plaintiffs Have Substantial Need for Google's Remedy-Related Documents and Cannot Obtain Their Substantial Equivalent Without Undue Hardship

Plaintiffs have a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). *First*, because Google's primary factual defense in this remedies phase is that the remedies proposed by Plaintiffs are "cumbersome, disruptive, and unpredictable," ECF No. 1431 at 15, Google's internal evaluation of the purported costs, burdens, or difficulties associated with those or similar remedies are highly relevant. Such documents would not only inform Plaintiffs' final remedy proposal and allow Plaintiffs to test Google's claims of burden and disruption, but these documents would also assist the Court in discerning "what would be an intelligent, feasible remedy in this case," Hr'g Tr. at 6:16–17, ECF No. 1432. *Second*, Google's internal analysis of

potential remedies is available only from Google because they reflect Google's unique knowledge of its ad tech business. The documents at issue also include the inputs and assumptions underlying Google's analyses, which Plaintiffs cannot recreate through other means. *Third*, depositions or other discovery mechanisms would not provide the "substantial equivalent" of the documents at issue, at least not without "undue hardship."

### A. Documents Reflecting Google's Analysis of the Purported Cost, Burden, or Difficulty of the Remedies Proposed in This Case Are Highly Relevant

Google's documents analyzing the purported cost, burden, or difficulty of potential remedies, including divestitures that it now claims would be "cumbersome, disruptive, and unpredictable," ECF No. 1431 at 15, are "relevan[t] and important[t]" to the issues in the remedy phase of this litigation. *Nat'l Union Fire*, 967 F.2d at 984–85. Although "the Government cannot be denied" a divestiture that is "a necessary element of effective relief" based on concerns of "economic hardship, however severe," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327 (1961), Google intends to rely on the purported "logistical difficulty" of divestiture in resisting that remedy here, *see* ECF No. 1431 at 11 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001)). Plaintiffs dispute, as a legal matter, that "logistical difficulty" is an appropriate basis for denying the Plaintiffs an effective remedy. *See du Pont*, 366 U.S. at 327; *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 650 (E.D. Va. 2018) (in government antitrust actions, "hardships do not need to be balanced" (citing *du Pont*)). Even so, Google's position puts at issue factual questions about the alleged costs, burdens, and difficulty of divesting AdX and DFP, and Google's analysis of those questions and related questions is therefore highly probative.

Google's privilege log from the liability phase shows that several documents Google previously withheld relate to the financial impact on Google's business of potential remedies for

the same anticompetitive campaign the Court has found unlawful. *See*, *e.g.*, Ex. 4 at GGPL-AT-0027272 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id*. at GGPL-AT-0026493 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id*. at GGPL-AT-0026596 (same); *id*. at GGPL-AT-0027071 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [.]"); *id*. at GGPL-AT-0034603 (similar)).



Many other privilege log entries are more generic but still indicate that withheld documents contain factual assessments of remedies—all prepared by non-attorneys—that likely either relate to the purported cost, burden, or difficulty of potential remedies or to the discovery of other relevant evidence on that topic. *See*, *e.g.*, Ex. 4 at GGPL-AT-0034781 (spreadsheet related to the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id*. at GGPL-AT-000752846 (document "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id*. at GGPL-AT-000625512 (document "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id*. at GGPL-AT-000625587 (same), GGPL-AT-000625588 (same), GGPL-AT-000722916 (same), GGPL-AT-000722922 (same), GGPL-AT-000722931 (same), GGPL-AT-000748005 (same), GGPL-AT-000748006 (same), GGPL-AT-000748013 (same), GGPL-AT-000660040 (same) GGPL-AT-000709912 (same), GGPL-AT-000735071 (same).

These examples are by no means intended to be exhaustive but illustrate that Google possesses, and is withholding, documents that are relevant to its central factual defense in this phase of the proceeding. They are thus "relevan[t] and important[t]" to the issues in the remedy phase, *Nat'l Union Fire*, 967 F.2d at 984–85, and they would be useful to both Plaintiffs and the Court. Such documents are especially important to test claims that Google's witnesses are likely

to make about the alleged costs, burdens, and difficulty of divestiture because, if Google

internally reached any conclusions that contradict those claims, the Court may give that

testimony less weight. *See*, *e.g.*, ECF No. 1410 at 105 ("[C]ourts may give 'greater weight to the

contemporaneous statements contained in the company's internal records, than to later trial

testimony in which its employees declined to ratify those statements.'" (quoting *United States v.*

*Google LLC*, 747 F. Supp. 3d 1, 77 n.2 (D.D.C. 2024)); *see also Christian Coalition I*, 178

F.R.D. at 85-86 (documents may be relevant and important for impeachment); *Suggs v.*

*Whitaker*, 152 F.R.D. 501, 507–08 (same).

### B.    The Information Contained in Google's Internal Analyses Is Available Only from Google

Google is the only source for the information contained in the internal analyses that

Plaintiffs seek. Google's business and product team employees produced the analyses and

information contained in those documents. *See*, *e.g.*, Ex. 3 (Google 30(b)(6) Dep.) at 75:20–85:2

(Project Sunday involved "analysis" from Google's corporate development department, product

team, and finance team). Not even Google's own legal department could recreate these analyses.

*Id*. at 240:13–241:14. Thus, Google's files provide "unique information" about the company's

operations and the business and financial impacts of structural remedies like divestiture, as well

as the factors Google believes most important to assess such impacts. *See Boehringer I*, 778 F.3d

at 157–158; *see also*, *e.g.*, ECF No. 1431 at 13 ("Google's engineers are experts in Google's

systems"). Indeed, it is because facts about Google's purported cost, burden, or difficulty in

implementing a remedy are "peculiarly in its knowledge" that Google "bear[s] the burden of

proving *its own* hardships." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 721 (4th Cir.

2021) (emphasis in original). Without access to the documents at issue, Plaintiffs would be

hobbled in trying to examine Google's employees about their analyses of alleged cost, burden, or

difficulty and the inputs and assumptions used for those analyses. And because Plaintiffs "never had an opportunity to obtain th[is] information on [their] own," the "anti-freeloader" rationale for the work-product doctrine has no application here. *Boehringer I*, 778 F.3d at 156.

### C.    Plaintiffs Are Unable to Obtain Information that Is Substantially Equivalent to the Technical and Financial Analyses at Issue

Depositions would not provide the "substantial equivalent" of contemporaneous analyses of the purported cost, burden, or difficulty of remedies, at least not "without undue hardship." Fed. R. Civ. P. 26(b)(3). Google employees previously have refused to testify, not only about Projects Sunday and Monday, specifically, but about the divestiture of ad tech products in the relevant markets in general. *See*, *e.g.*, Ex. 2 (█████ Dep.) at 239:4–25 (████████████████████████████████████████████████████████████████); Ex. 3 (Google 30(b)(6) Dep.) at 112:21–115:25 (whether "Alphabet consider[ed] any divestitures of its AdTech products" "outside of Project Sunday" and "the names of projects for which Alphabet was considering divestitures of its AdTech products"); Ex. 5 (█████ Dep.) at 234:24–236:8 (whether Google was "███████████████████████████████████████████████████████████ ████████████████████████"); *id*. at 236:20–237:9 (similar, regarding consideration "████████████████████"); Ex. 6 (█████ Dep.) at 99:2–100:7 (similar).

Even if Google employees now agree to answer questions about prior remedy analyses, any such questioning will inevitably be cumbersome and incomplete, rather than provide the "substantial equivalent" of those analyses "without undue hardship." Even assuming witnesses could recall the specifics of technical and financial analyses without reviewing them, eliciting such complex and detailed information solely through the oral examination of hostile witnesses would almost certainly yield information that falls short of being "substantial[ly] equivalent." *See Christian Coalition I*, 178 F.R.D. at 86–87. And it would be an "undue hardship" to require

18

Plaintiffs to use their "limited . . . number of depositions" to examine Google witnesses "hostile . . . to any deposition inquiry" without contemporaneous documents to test and impeach those witnesses' testimony. *See id*. The same is true for Google's experts, who are a further step removed from the remedy analyses in question.

D.    **Fundamental Fairness Requires Google to Produce Documents About Divestiture "Unworkability," Which It Has Put at Issue**

Allowing only testimony about or based on analyses of purported cost, burden, or difficulty of divestiture in lieu of disclosing analyses themselves would also be self-defeating for Google because such "unilateral testimonial use of work-product materials," either in depositions or at trial, would "waive[]" the work-product protection "with respect to matters covered in [the] testimony." *United States v. Nobles*, 422 U.S. 225, 239–40 (1975). In other words, Google intentionally offering testimony based on or about its analysis of divestitures in an effort to preserve work-product protection over that or other analyses would instead waive that very protection. This is because Google "may not use a privilege (or work product) as a shield during discovery and then hammer it into a sword for use at the trial." *United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002). Such a subject-matter waiver would cover not just analyses prepared by "witnesses upon whose testimony [Google] intends to rely upon at trial," but also any other analyses Google possesses that "concern[] the same subject matter," including those prepared by "witnesses upon whose testimony [Google] does not intend to rely" or "third-party witnesses." *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 2018 WL 3546725, at *3–4 (D. Md. July 24, 2018).[4]

---

[4] Similarly, insofar as the analyses at issue are work product, any intentional disclosure by Google of the substance of any such analysis to antitrust enforcers when those enforcers "were adversaries" of Google would constitute testimonial use that "impliedly waive[s] the work product privilege as to all non-opinion work product on the same subject matter as that disclosed." *Martin Marietta*, 856 F.2d at 625.

A similar sword-shield problem and a similar subject-matter waiver would arise if Google were to produce certain internal analyses of potential remedies, but not others, because such a "[s]elective disclosure for tactical purposes waives the privilege," and "fact work product . . . may be waived through disclosure of but one document on the subject." *Kolon Indus.*, 269 F.R.D. at 605–06. Such "selective disclosure" occurs when a party produces only "part of" a protected document or "reveals one beneficial" document "but fails to reveal another, less helpful" document. *Id*. Allowing Google to cherry-pick documents supportive of its litigation position, while shrouding in work-product protection other documents contrary to its position, would also be yet another example of Google trying to unfairly skew the evidentiary record in its favor, contrary to the truth-seeking function of the judicial process. *See* ECF No. 1410 at 114 ("Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable.").

## CONCLUSION

For the foregoing reasons, the Court should compel Google to produce documents reflecting internal business, financial, or technical analyses of the remedies proposed by Plaintiffs in this matter (or similar remedies), which are responsive to Plaintiffs' RFP No. 1.

Dated: May 23, 2025

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
MATTHEW R. HUPPERT
DAVID TESLICKO
MICHAEL E. WOLIN

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

*Attorneys for the United States*

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

*Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia*