# Exhibit 3
# (redacted)

1    UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION, WASHINGTON, D.C.
2

3    PURSUANT TO CIVIL INVESTIGATION DEMAND NO. 30762

4

5                "HIGHLY CONFIDENTIAL"

6

7              30(b)(6) DEPOSITION OF

8                   ███████████

9            ON BEHALF OF ALPHABET, INC.

10                FEBRUARY 28, 2022

11

12   ORAL VIDEOTAPED DEPOSITION OF ███████████,

13 produced as a witness at the instance of the United

14 States Department of Justice and duly sworn, was taken

15 in the above-styled and numbered cause on the 28th day

16 of February, 2022, from 8:36 a.m. to 5:59 p.m. PST,

17 before Melinda Barre, Certified Shorthand Reporter in

18 and for the State of Texas, reported by computerized

19 stenotype machine, all parties appearing remotely via

20 web videoconference, pursuant to the rules of procedure

21 and the provisions stated on the record or attached

22 hereto.

23

24

25

Page 73

1 cautious of invading the work product doctrine or the
2 privilege. But to the extent that you can answer
3 without doing so, you may.
4   A.  Sure. You asked the objectives? Is that
5 right?
6   Q.  (By Mr. Nakamura) Yes. I'll just restate.
7       What were Alphabet's objectives as part of
8 Project Sunday?
9       MS. ELMER: Same instruction.
10  A.  To understand the implications of our potential
11 responses to regulatory actions.
12  Q.  (By Mr. Nakamura) Were there any other
13 objectives that Alphabet had as part of Project Sunday?
14  A.  No.
15  Q.  And do you say "no" because any other
16 objectives are protected in Alphabet's view by privilege
17 or because there were no other objectives?
18  A.  There were no other objectives.
19  Q.  And what are -- what in Alphabet's view were
20 the business implications of Alphabet's potential
21 responses to regulatory actions as a part of Project
22 Sunday?
23      MS. ELMER: I object to that question as
24 invading the work product doctrine and instruct the
25 witness not to answer.

Page 74

1   Q.  (By Mr. Nakamura) Will you follow Ms. Elmer's
2 instruction?
3   A.  Yes.
4   Q.  What outside counsel were involved with Project
5 Sunday?
6   A.  Outside counsel, for that, I'll need to look
7 through the letter.
8   Q.  And to be clear, if it helps you, I'm happy to
9 just work through the letter. I just need your sworn
10 testimony that what the letter says is or is not
11 accurate.
12      So we can go piece by piece through that
13 if that's a good starting point for you.
14  A.  Yeah. I would appreciate that, and I'll
15 reiterate that the letter is here to assist as well to
16 make sure that we have as correct a set of facts as
17 possible. So I'm happy to work through in conjunction
18 with that.
19  Q.  Okay. So on Exhibit 7, page 4 under the
20 heading Project Sunday, let me know when you have that
21 in front of you.
22  A.  I do.
23  Q.  Is this list on the second bullet point of
24 outside counsel a full, complete and accurate list of
25 all outside counsel who worked on Project Sunday?

Page 75

1   A.  Yes.
2   Q.  Is the third bullet point a full and complete
3 list of all Google in-house counsel who worked on
4 Project Sunday?
5   A.  Yes.
6   Q.  Is the fourth bullet point a full and complete
7 list of all Google employees who worked on Project
8 Sunday?
9   A.  Yes.
10  Q.  What was the role of --
11  A.  And can I just -- I want to make sure that
12 we're clear about semantics here. When you say "worked
13 on," there's a fairly large distinction between "worked
14 on" and "was made aware of." So I don't want to convey
15 that everyone on this list was an active working member
16 of this project.
17      I would say that a subset of these people
18 worked on it and a larger subset of this group were made
19 aware of the information here.
20  Q.  Okay. I appreciate that.
21      So on this fourth bullet point the first
22 name is                . What was that individual's
23 responsibility and work performed as to Project Sunday?
24  A.  So his responsibility was to designate his
25 direct report,            , to lead the corporate

Page 76

1 development aspects of the project; and that was his
2 entire responsibility.
3   Q.  Thank you.
4       And what was              responsibility
5 and what work did she do on Project Sunday?
6   A.  I can't speak to the work she did because I
7 think that would violate privilege, but her
8 responsibility was a combination of project manager and
9 representative in her corporate capacity.
10  Q.  So let me get this refusal on the record. What
11 work did            do for Project Sunday?
12  A.  Yeah. I think you're asking me to tell you
13 what we did in a project that was specifically directed
14 by legal to do. So I don't understand how I could do
15 that without violating the privilege of this project.
16  Q.  If you refuse to answer my question, I
17 understand that. Are you refusing to answer my question
18 as to what work Ms. Arora did for Project Sunday?
19  A.  Yes.
20  Q.  What department does           work in at
21 Google?
22  A.  Corporate development.
23  Q.  What was the work that            performed
24 for Project Sunday?
25  A.  He worked for           and provided analysis.

Page 77

1  Q.  And what department does ▓▓▓ work in?
2  A.  Corporate development. I'm sorry. Did you say
3  what does he work in or what did he work in?
4  Q.  At the time he worked on Project Sunday, what
5  department did ▓▓▓ work in?
6  A.  Corporate development.
7  Q.  And what work did ▓▓▓ do for Project
8  Sunday?
9  A.  As stated, analysis.
10 Q.  And what types of analysis did ▓▓▓ do?
11      MS. ELMER: Object and instruct the
12 witness not to answer to the extent it invades the work
13 product doctrine.
14 Q.  (By Mr. Nakamura) Will you follow that
15 instruction?
16 A.  Yes.
17 Q.  Other than privileged information, can you
18 describe any work ▓▓▓ did on Project Sunday?
19      MS. ELMER: Objection, asked and answered.
20 Q.  (By Mr. Nakamura) ▓▓▓, other than
21 privileged information, can you describe any work that
22 Mr. Oatis did on Project Sunday?
23 A.  Nope.
24 Q.  What work did Alon Bonder do on Project Sunday?
25      MS. ELMER: Same instruction, ▓▓▓. To

Page 78

1 the extent that answering would invade the work product
2 doctrine, I instruct you not to answer.
3  A.  Yes. The response is identical to what I gave
4  you for ▓▓▓.
5  Q.  (By Mr. Nakamura) And what department does
6  ▓▓▓ work in -- worked in at Alphabet at the time
7  of Project Sunday?
8  A.  Corporate development.
9  Q.  What work did ▓▓▓ do for Project Sunday?
10      MS. ELMER: Same instruction.
11 A.  She did no work on the project.
12 Q   (By Mr. Nakamura) What were her
13 responsibilities with respect to Project Sunday?
14 A.  To designate me to complete portions of the
15 project and to review the outcome.
16 Q.  What did ▓▓▓ do to review the outcome of
17 Project Sunday?
18 A.  She listened to a presentation.
19 Q.  And did ▓▓▓ make any decisions with
20 respect to Project Sunday based on the information
21 provided to her?
22 A.  No, no decisions were made.
23 Q.  And what were your responsibilities with
24 respect to Project Sunday?
25 A.  To provide analysis.

Page 79

1  Q.  What types of analysis were you to provide as
2  part of your job responsibilities with respect to
3  Project Sunday?
4  A.  That would invade privilege.
5  Q.  So are you refusing to answer my question about
6  your job responsibilities on Project Sunday on the basis
7  of privilege?
8  A.  Yes, of course.
9  Q.  What work did you do with respect to Project
10 Sunday?
11      MS. ELMER: Instruct the witness not to
12 answer to the extent that responding would invade the
13 work product doctrine.
14      ▓▓▓, if there is a way to respond that
15 would not invade the work product doctrine or the
16 privilege, you may do so.
17 A.  I provided an analysis and I gave a
18 presentation.
19 Q.  (By Mr. Nakamura) When did you give this
20 presentation?
21 A.  October -- either September or October, in that
22 time frame, of 2020.
23 Q.  And to whom did you present?
24 A.  To the list of Google employees included here.
25 Q.  Did you present to any Google employees who are

Page 80

1 not listed here?
2  A.  No.
3  Q.  What was the format of the presentation?
4  A.  There was a slides document, and it was
5  provided over a GVC videoconference.
6  Q.  Did anyone else give that presentation other
7  than you?
8  A.  Portions, yes.
9  Q.  And who were those other people who delivered
10 portions of that presentation?
11 A.  ▓▓▓ and ▓▓▓
12 Q.  Did anyone else present besides the people we
13 have just mentioned?
14 A.  No.
15 Q.  Is there any other work that you did for
16 Project Sunday other than the presentation given in
17 September or October of 2020?
18      MS. ELMER: Same instruction.
19      THE WITNESS: What's the instruction?
20      MS. ELMER: Which is to the extent that
21 you can answer without invading the work product
22 doctrine or privilege, you may do so.
23 A.  Sure. I believe the presentation was given --
24 when ▓▓▓ moved to a different role, I believe
25 the presentation was given as a -- for awareness to her

Page 81

1 successor, who was ▓▓▓▓▓.
2  Q. (By Mr. Nakamura) Thank you. And
3 approximately what was the date of that presentation?
4  A. Best guess, late April 2021.
5  Q. And what was ▓▓▓▓▓ set of
6 responsibilities with respect to Project Sunday?
7  A. Sure. He was responsible for providing
8 analysis.
9  Q. What kind of analysis was he in charge of
10 providing as part of Project Sunday?
11  A. Yeah. I can't answer that, you know, per
12 privilege.
13  Q. So to be clear, you're refusing to answer my
14 question on the basis of privilege. Is that correct?
15  A. Yes.
16   MS. ELMER: And the work product doctrine.
17   MR. NAKAMURA: Thank you. Obviously we
18 can have that as a continuing objection to speed this
19 along. That's fine with me.
20   MS. ELMER: All right. Great.
21  Q. (By Mr. Nakamura) What department does
22 ▓▓▓▓▓ work in at Google at the time of Project
23 Sunday?
24  A. In the -- he's in the Ads division.
25  Q. I'm sorry. Could you explain more about what

Page 82

1 you mean by the Ads division and what products he
2 covers?
3  A. He was responsible for buy-side products, not
4 including Google ads. So I believe he was in a
5 division -- I'm sorry. The divisions have changed names
6 over time, but he was responsible for DB360 and the
7 product DCM, the campaign manager.
8  Q. DoubleClick Campaign Manager. Is that correct?
9  A. Yes.
10  Q. Thank you. And what work did ▓▓▓▓▓ do
11 for Project Sunday?
12  A. He was a recipient or a listener to the
13 presentation.
14  Q. And by "the presentation," you mean the
15 presentation given in September/October of 2020. Is
16 that correct?
17  A. Yep.
18  Q. And what were ▓▓▓▓▓ job
19 responsibilities with respect to Project Sunday?
20  A. I can give you what his responsibilities were
21 in general; but I think with respect to the project, I
22 think that would invade privilege.
23  Q. Okay. And are you refusing to answer my
24 questions specifically with respect to Project Sunday on
25 the basis of privilege as to ▓▓▓▓▓ job

Page 83

1 responsibilities?
2  A. Yes.
3  Q. And what generally outside -- just generally at
4 Alphabet were ▓▓▓▓▓ job responsibilities at the
5 time of Project Sunday?
6  A. So he worked for the CFO, and his job was to
7 understand financial impact and provide guidance to the
8 businesses.
9  Q. I'm sorry for interrupting you.
10   And when you say "the CFO," do you mean
11 Ruth Porat?
12  A. Yes.
13  Q. Thank you.
14   What was ▓▓▓▓▓ job
15 responsibilities with respect to Project Sunday?
16  A. Yeah. He listened to the presentation.
17  Q. What work, if any, did ▓▓▓▓▓ produce
18 as part of Project Sunday?
19  A. Yeah. I think you're going to get a consistent
20 answer. So I don't know if you want to keep asking
21 every time.
22  Q. I must. So I'm just going to ask you. What
23 work product did ▓▓▓▓▓ produce as part of
24 Project Sunday?
25  A. He didn't produce any work.

Page 84

1  Q. Thank you.
2   And what were ▓▓▓▓▓ job
3 responsibilities at Alphabet at the time of Project
4 Sunday?
5  A. He was a director of finance in Ads.
6  Q. What work did ▓▓▓▓▓ do as part of
7 Project Sunday?
8  A. She provided analysis.
9  Q. And what kinds of analysis did she provide?
10   MS. ELMER: I instruct the witness not to
11 answer as it invades the work product doctrine and
12 attorney/client privilege.
13  A. I can't answer that.
14  Q. (By Mr. Nakamura) Thank you.
15   And what job responsibilities did ▓▓▓▓▓
16 have at the time of Project Sunday?
17  A. She was a --
18  Q. I apologize. With respect specifically to
19 Project Sunday.
20   MS. ELMER: Wait. Please ask the question
21 again, Brent. It got garbled.
22   MR. NAKAMURA: I appreciate that, Julie.
23  Q. (By Mr. Nakamura) So with respect specifically
24 to Project Sunday, what were ▓▓▓▓▓ job
25 responsibilities?

Page 85

1      MS. ELMER: Same instruction, ▮
2   A.  Yeah. To provide analysis.
3   Q.  (By Mr. Nakamura) And you are otherwise
4 refusing to answer on the basis of privilege. Is that
5 correct?
6   A.  Yes.
7   Q.  At the time of Project Sunday what were
8 ▮ job responsibilities at Google?
9   A.  She was a finance manager.
10  Q.  And to whom did she report?
11  A.  To ▮.
12  Q.  What work did ▮ do with
13 respect to Project Sunday?
14  A.  He listened to a presentation.
15  Q.  And is that only the presentation in September
16 or October of 2020?
17  A.  Yes.
18  Q.  What responsibilities did Mr. Raghavan have
19 with respect to Project Sunday?
20     MS. ELMER: Same instruction. To the
21 extent that you can answer without invading the
22 privilege, you may.
23  A.  Yeah. I can't answer.
24  Q.  (By Mr. Nakamura) Was ▮ a key
25 decision-maker with respect to Project Sunday?

Page 86

1   A.  So you're asking a speculative question that
2 assumes decisions would have been -- or decisions were
3 made. So I guess I don't know how to answer your
4 question.
5   Q.  And to be clear, I asked because in a previous
6 letter sent by Ms. Elmer, ▮ was described as
7 a key decision-maker. So I'm just seeking clarification
8 as to whether or not that's correct. Obviously, if it's
9 not correct and you've corrected it here in testimony,
10 I'm fine with that.
11     My question is simply was ▮ a
12 key decision-maker with respect to Project Sunday?
13  A.  No. I think that prior letter was incorrect.
14  Q.  Okay. What work did ▮ do with
15 respect to Project Sunday?
16  A.  He listened to the presentation.
17  Q.  Did he do any other work with respect to
18 Project Sunday?
19  A.  No.
20  Q.  What responsibilities did ▮ have
21 with respect to Project Sunday?
22  A.  I can't answer that.
23  Q.  And why not?
24  A.  Privilege and work product.
25  Q.  Okay. And did ▮ attend both the

Page 87

1 presentation in late April 2021 and the presentation in
2 September or October of 2020?
3   A.  I am -- I'm certain he attended the one in
4 October. I don't know if he would have attended given
5 it was materially the same presentation.
6   Q.  Okay. What work did ▮ do with
7 respect to Project Sunday?
8   A.  He listened to the presentation.
9   Q.  Did he produce any other work with respect to
10 Project Sunday?
11  A.  No.
12  Q.  What were ▮ responsibilities with
13 respect to Project Sunday?
14  A.  I can't answer that.
15  Q.  And why not?
16  A.  Privilege.
17  Q.  What were ▮ responsibilities with
18 respect to Project Sunday?
19  A.  She listened to the presentation.
20  Q.  Did she create any work product --
21  A.  No.
22  Q.  -- in response to Project Sunday?
23  A.  Did she create any work product?
24  Q.  Did she do any work? I apologize. Did she do
25 any work other than just listening to the presentation

Page 88

1 with respect to Project Sunday?
2   A.  No.
3   Q.  And, lastly, what did ▮ do with respect
4 to Project Sunday?
5   A.  He listened to the presentation.
6   Q.  Did he create any written work product or
7 anything else for Project Sunday?
8   A.  No.
9   Q.  And what were ▮ job responsibilities
10 with respect to Project Sunday?
11  A.  I can't answer that.
12  Q.  Why not?
13  A.  Privilege.
14  Q.  Who initiated Project Sunday?
15  A.  Ted Lazarus.
16  Q.  Did anyone else initiate Project Sunday?
17  A.  It likely -- or it may have been in conjunction
18 with one or more of the senior management folks, as he
19 would have spoken with them to advise on issues
20 happening.
21  Q.  What do you mean by "senior management folks"?
22 Who are those individuals?
23  A.  ▮ or ▮ or ▮
24  Q.  And are any of those individuals lawyers?
25  A.  Are you asking are they acting in the capacity

Page 109

1 page 2, Exhibit 7?
2   A.  I can offer -- as a corporate designee, I can
3 offer that Project SingleClick, which was the first in
4 the series of these projects, would never have been
5 undertaken if we did not anticipate litigation.  And
6 that project started in December 2019.
7       But I can't answer your other question the
8 specific way you phrased it because I think that -- in
9 my opinion, that violates -- like you're asking me to
10 tell you exactly my conversations with a lawyer or our
11 internal conversations as a corporate with our counsel
12 and our business leaders.
13   Q.  To be clear, _____, I'm not asking you
14 for what you told your lawyers or anything else like
15 that.  All I'm asking for is Alphabet's position on the
16 dates on which it anticipated litigation in response to
17 the investigations listed on page 2, Exhibit 7.  What
18 are those dates?
19       MS. ELMER:  Brent, he just told you what
20 the date was.  He has answered your question.
21   A.  I just don't understand how this would not be a
22 privileged conversation.  You're asking for our
23 combination of our general manager and legal analysis to
24 a regulatory situation.  I just don't get what you're
25 asking and how that would be fair.

Page 110

1   Q.  (By Mr. Nakamura)  Okay.  So just to confirm,
2 and, again, we can close this out and move on.  I am
3 simply asking, are you saying you are not going to give
4 me a response because you believe that it would be
5 privileged, _____?
6   A.  I gave you a response.
7       MS. ELMER:  He's already provided you a
8 response, Brent.  He answered your question.  He said
9 that SingleClick in December of 2019 would not have been
10 undertaken had litigation not been anticipated.  He's
11 answered your question.  Please stop badgering and
12 harassing the witness.
13       MR. NAKAMURA:  I am simply attempting to
14 just close out this line of questioning.  If he is not
15 prepared today to testify on it, that is perfectly fine.
16 I just have to know that.
17       If you think it's outside of the scope,
18 you can instruct him not to answer.  These are all
19 simple solutions.
20   Q   (By Mr. Nakamura)  My question -- I'm just
21 trying to close this out -- is, _____, on what
22 dates did Alphabet anticipate litigation for each
23 investigation listed on page 2 of Exhibit 7?
24       MS. ELMER:  Same scope objection.
25   Q.  (By Mr. Nakamura)  If you do not have an

Page 111

1 answer, that is okay.
2       MR. NAKAMURA:  And I would caution counsel
3 that objections are to be limited to protect the
4 privilege, preserve a Fifth Amendment right or otherwise
5 stated shortly and plainly.  If nothing else, we can
6 just move on.
7       MS. ELMER:  I'll remind the questioner not
8 to harass the witness.  Same scope objection, asked and
9 answered.  And I instruct the witness not to answer to
10 the extent that the answer would invade attorney/client
11 privilege or the work product doctrine.
12       MR. NAKAMURA:  To be clear, because
13 _____ brought this up himself, is it your
14 position, Ms. Elmer, today that the dates on which
15 Alphabet anticipated litigation are privileged?
16       MS. ELMER:  No.  It is my position that
17 this witness is not the corporate designee on that topic
18 and that that particular question invades attorney work
19 product, opinion work product.
20       The date on which counsel for a company
21 decides that a government investigation is likely to
22 lead to litigation is a matter of attorney opinion work
23 product.
24       So no, I have not brought a witness here
25 today to testify about opinion work product of

Page 112

1 attorneys.  So let's move on.
2   Q.  (By Mr. Nakamura)  _____, do you refuse
3 to answer my question on the basis of your counsel's
4 advice?
5   A.  I feel like I've answered your question four
6 times already.  So no, I believe I did answer your
7 question.
8   Q.  _____, do you refuse to provide any
9 additional information in response to my question based
10 on your counsel's advice?
11   A.  Yes.
12   Q.  Thank you.
13       As part of Project Sunday, is Alphabet
14 considering any divestitures?
15       MS. ELMER:  I instruct the witness not to
16 answer because the question invades the privilege and
17 work product.
18   Q.  (By Mr. Nakamura)  Will you follow your
19 counsel's instruction?
20   A.  Yes.
21   Q.  Prior to Project Sunday, since 2019, has
22 Alphabet considered divesting any of its AdTech
23 products?
24       MS. ELMER:  Same instruction.
25   Q.  (By Mr. Nakamura)  I'm sorry.  Outside of

Page 113

1 Project Sunday, since 2019, has Alphabet considered
2 divesting any of its AdTech products?
3        MS. ELMER: I instruct the witness not to
4 answer to the extent that the question invades the
5 privilege or attorney work product.
6        MR. NAKAMURA: I don't understand,
7 Ms. Elmer, the basis for your privilege instruction,
8 given that I said "outside of Project Sunday." Are you
9 saying that everything outside of Project Sunday is
10 privileged?
11        MS. ELMER: I think we're here about a lot
12 of projects, Brent, today. So why don't you ask a
13 better question.
14    Q. (By Mr. Nakamura) As part of any projects
15 outside of Project Sunday, did Alphabet consider any
16 divestitures of its AdTech products?
17        MS. ELMER: Same instruction.
18        MR. NAKAMURA: Is your privilege
19 instruction, Ms. Elmer, based on the notion that the
20 names of projects outside of Project Sunday are
21 privileged?
22        MS. ELMER: It is not.
23        And we've been going for quite some time,
24 and I think we've reached our lunch break time. So why
25 don't we take a lunch break, and then we can come back.

Page 114

1        MR. NAKAMURA: All right. Let's go off
2 the record.
3        THE VIDEOGRAPHER: Going off the record at
4 12:10 p.m.
5        (Luncheon recess)
6        THE VIDEOGRAPHER: Back on the record at
7 12:52 p.m.
8    Q. (By Mr. Nakamura) All right. Thanks for
9 returning, ▮▮▮▮▮▮▮. I'm just going to finish off
10 the question I had earlier.
11        As part of any projects outside of Project
12 Sunday, did Alphabet consider any divestitures of its
13 AdTech products?
14        MS. ELMER: Brent, do you mean the other
15 projects listed in the CID, or do you mean any other
16 projects at Google ever?
17        MR. NAKAMURA: Any other projects at
18 Google ever since 2019.
19        MS. ELMER: All right. So I object to
20 your question as being outside the scope of the CID, but
21 ▮▮▮▮ may answer in his personal capacity if he can to
22 the extent that such an answer would not invade the
23 privilege or work product.
24    A. So as the corporate designee relating to these
25 projects --

Page 115

1        MS. ELMER: Well, ▮▮▮▮ I'm sorry to
2 interrupt. I'm sorry to interrupt. But because this
3 question is going beyond the scope of the CID, I'm
4 instructing you to answer in your personal capacity
5 here.
6        THE WITNESS: Oh, okay.
7    A. Then I would say I can't answer due to
8 privilege.
9    Q. (By Mr. Nakamura) And is one of the -- and
10 what are the names of projects for which Alphabet was
11 considering divestitures of its AdTech products?
12        MS. ELMER: I instruct the witness not to
13 answer the question because the question invades the
14 attorney/client privilege and the work product doctrine.
15    Q. (By Mr. Nakamura) Will you follow your
16 counsel's instruction?
17    A. Yeah. Are you actually asking me, like, about
18 the privileged contents?
19        MS. ELMER: He is, and I instruct you not
20 to answer.
21        MR. NAKAMURA: And that's fine.
22    Q. (By Mr. Nakamura) As part of -- I'm sorry.
23 And are you going to follow your counsel's instruction
24 not to answer?
25    A. Yeah.

Page 116

1    Q. As part of Project Sunday, is Alphabet
2 considering any changes to the way its AdTech products
3 operate?
4        MS. ELMER: Same instruction.
5    Q. (By Mr. Nakamura) Are you going to follow your
6 counsel's instruction?
7    A. Yes.
8    Q. Did Project Sunday incorporate any business
9 analyses previously performed by Alphabet employees
10 before Project Sunday began?
11    A. I'm sorry, can you repeat it?
12    Q. Sure. Did Project Sunday incorporate any
13 business analyses performed by Alphabet employees before
14 Project Sunday began?
15    A. So my understanding is there was an industry
16 report that had been prepared in the general course of
17 normal business separate from the project and that
18 pieces of that, namely, facts, were taken and then
19 incorporated into the project.
20        Yeah. That's for a portion of the
21 project; and, yeah, that's the extent of my
22 understanding there.
23    Q. And who performed that -- or who created that
24 industry report that you just described?
25    A. And actually, I want to amend my last answer

Page 117

1 after I answer this.
2           So Lazard, the investment bank, was on a
3 general retainer for general industry trends. So they
4 had provided that report as part of a separate sort of
5 ongoing, what's going on in industry retainer. So they
6 were unaware of its use in this project.
7           And again I'll say that that was a
8 collection of facts that were then used. So that's
9 that.
10          I want to say also there were pieces of
11 analysis from other projects listed in the CID that
12 were -- that were used and incorporated in Project
13 Sunday.
14    Q.   And what are the names of those projects whose
15 pieces of analyses were included in Project Sunday?
16    A.   SingleClick and Stonehenge.
17    Q.   Okay. And other than work from Projects
18 SingleClick, Stonehenge and Lazard's work as you
19 previously described, was any other business analysis
20 performed by an Alphabet employee incorporated into
21 Project Sunday?
22          MS. ELMER: Object to the form as
23 mischaracterizing testimony and assuming facts.
24          But you may answer.
25    A.   I'm sorry. Can you repeat?

Page 118

1    Q.   (By Mr. Nakamura) Sure. And is there any
2 other business analysis other than from Project
3 SingleClick, Project Stonehenge and Lazard incorporated
4 into Project Sunday --
5           MS. ELMER: Object to the form -- go
6 ahead.
7    Q.   (By Mr. Nakamura) -- that was undertaken prior
8 to the beginning of Project Sunday?
9           MS. ELMER: Object to the form as
10 mischaracterizing testimony, assuming facts and
11 misleading.
12          But you may answer if you can.
13    A.   I'm sorry. I'm still not --
14    Q.   (By Mr. Nakamura) Other than what you've just
15 listed, were there any other business analyses performed
16 by Alphabet employees prior to the beginning of Project
17 Sunday that were incorporated into Project Sunday?
18          MS. ELMER: Object to the
19 mischaracterization of SingleClick and Stonehenge as
20 business analyses. Also object to the
21 mischaracterization of any work provided by Lazard as
22 being the work of a Google employee.
23          Other than that, you may answer if you
24 can,
25    A.   I'm not aware of any other prior work that had

Page 119

1 been done that was contributed to Project Sunday.
2    Q.   (By Mr. Nakamura) Okay. Thank you.
3           And what data sources did Alphabet
4 employees rely upon for any financial analyses prepared
5 for Project Sunday?
6           MS. ELMER: Object as invading the work
7 product doctrine and the attorney/client privilege.
8    A.   Okay. So I can't answer for those reasons.
9           MR. NAKAMURA: I'm sorry. To be clear,
10 are you instructing              not to answer?
11          MS. ELMER: Yes.
12    Q.   (By Mr. Nakamura) And will you follow your
13 counsel's instruction?
14    A.   Yes.
15    Q.   So if you turn to Exhibit 7, page 4 at the
16 bottom -- let me know if you need us to refresh that or
17 if you have it up.
18    A.   Is this the 225 -- oh, no, wait. That's
19 No. 20.
20    Q.   That's my internal tab number. That is
21 Exhibit 7. So it is the February 25th letter.
22    A.   Okay.
23    Q.   Let me know when you have that up.
24    A.   Page 4, yes. I have that up.
25    Q.   So I just want to make sure that in the last

Page 120

1 bullet point that spills over to the next page, does
2 that accurately summarize Lazard's involvement in
3 providing work that was used in Project Sunday?
4    A.   Yes. And --
5    Q.   I'm sorry. Go ahead.
6    A.   To be very specific, work not for Project
7 Sunday but work that was subsequently used in Project
8 Sunday, yes.
9    Q.   And who on Google's corporate development team
10 interfaced with Lazard?
11    A.              . He's the primary contact with
12 Lazard.
13   Q.   Did anyone else from Alphabet interact with
14 Lazard with respect to the project as described on
15 page 4 of Exhibit 7?
16   A.   With respect to the general retainer agreement,
17 I believe            likely interacts with them
18 occasionally.
19   Q.   And did Lazard make a presentation to any
20 Alphabet employee with respect to the general overview
21 of the AdTech industry as described at the top of page 5
22 of Exhibit 7?
23   A.   That, I don't know. At the very least they
24 provided a document.
25   Q.   Okay. I'll now turn to ask you about Project

Page 121

1 Monday, which is part of specifications 1b,
2 specification 2.
3      Q.   Who chose the name "Project Monday" for
4 the project?
5      A.   I did.
6      Q.   And what was the subject matter of Project
7 Monday?
8           MS. ELMER:  I instruct the witness not to
9 answer to the extent that it would invade the privilege;
10 but, otherwise, you may answer.
11     A.   Yeah.  It was an analysis for a particular
12 remedy to be undertaken due to the anticipated
13 litigation.
14     Q.   (By Mr. Nakamura)  And what was the particular
15 remedy to be undertaken?
16          MS. ELMER:  Same instruction.
17     A.   Yeah.  That's privileged.
18     Q.   (By Mr. Nakamura)  So will you follow your
19 counsel's instruction not to answer?
20     A.   Yes.
21     Q.   So turning to page 5 of Exhibit 7, is this a
22 complete list in bullet point 2 of all outside counsel
23 who worked on Project Monday?
24     A.   Yes.
25     Q.   And is this a complete list of all Google

Page 122

1 in-house counsel who worked on Project Monday?
2      A.   Yes, although, again, I want to distinguish
3 between "worked on" and "made aware of."
4      Q.   And what is that distinction?
5      A.   In that I don't know if all of them were
6 contributing to the document as much as possibly, you
7 know, this would have been provided to them but they
8 likely didn't do -- many of them likely didn't do work,
9 quote unquote, work.
10     Q.   Okay.  And who initiated Project Monday?
11     A.   I did.
12     Q.   Did Mr. Schindler initiate Project Monday?
13     A.   No.  I think I just told you I did.
14     Q.   And did anyone else initiate Project Monday?
15     A.   No.
16     Q.   What was -- what were your job responsibilities
17 with respect to Project Monday?
18     A.   To steward the business through regulatory --
19 potential regulatory action.
20     Q.   And what work did you do with respect to
21 Project Monday?
22          MS. ELMER:  And, ▅▅▅, I instruct you not
23 to answer to the extent that answering would invade the
24 work product doctrine or privilege.  But if there's a
25 way that you can answer with not invading the privilege,

Page 123

1 then you may do so.
2           THE WITNESS:  Sure.
3      A.   In conjunction with legal counsel, I authored a
4 potential remedy.
5      Q.   (By Mr. Nakamura)  And which legal counsel did
6 you author that in conjunction with?
7      A.   Ted Lazarus and ▅▅▅▅▅▅ and I believe
8 possibly ▅▅▅▅▅.
9      Q.   I'm sorry.  Could you spell that last name?
10     A.   It's a first name, ▅▅▅▅▅.
11     Q.   Yes.  Could you spell that for us, please.
12     A.   ▅▅▅▅▅▅▅.
13     Q.   I see now.  Okay.  And is his last name
14 ▅▅▅▅▅.
15     A.   Yes.
16     Q.   Okay.  Thank you.
17          And that's listed at the last line of
18 Google's in-house counsel included.  Is that correct?
19     A.   Yes.
20     Q.   And when did you author that legal remedy?
21     A.   So that was approximately -- it was early
22 March 2021.
23     Q.   And did you write that legal remedy down in a
24 document?
25     A.   Yes.

Page 124

1      Q.   What form did that document take?
2      A.   A written docs, document.
3      Q.   Did you make any presentations to anyone at
4 Alphabet with respect to that legal remedy?
5      A.   Yes.
6      Q.   And when did you make that presentation?
7      A.   In the April/May time frame.
8      Q.   And I'm sorry.  To be clear, do you mean
9 April/May 2021?
10     A.   Yes.
11     Q.   And who was at the presentation in April or
12 May 2021?
13     A.   Scott Spencer, ▅▅▅▅▅▅, Ted Lazarus,
14 possibly ▅▅▅▅▅▅.  And that would have been it.
15     Q.   And what was Mr. Lazarus' role in the
16 presentation?
17     A.   Audience and -- yeah, primarily audience, but
18 also, you know, had provided legal advice.
19     Q.   Did anyone else present the legal remedy that
20 you authored in the April or May 2021 presentation?
21     A.   I suspect that may have happened up the chain
22 that I wasn't personally aware of.  But yeah, I do
23 believe that the contents of this were presented up to
24 senior management without me.
25     Q.   And who did the presentation of that legal

Page 237

1  me know when you are there.
2  **A.  I am there.**
3  Q.  Looking at the first full bullet point on
4  page 4 of this PDF, did Project Stonehenge involve
5  Alphabet's consideration of ▮▮▮▮▮
▮▮▮▮▮
7       MS. ELMER:  And I instruct the witness not
8  to answer the question.  It's an improper question that
9  attempts to invade the privilege, the work product
10 doctrine, and on that basis instruct the witness not to
11 answer.
12 Q.  (By Mr. Nakamura)  Will you follow Ms. Elmer's
13 instruction, ▮▮▮▮▮?
14 **A.  Yes.**
15 Q.  And was the ▮▮▮▮▮ discussion
16 mentioned in this bullet point one that was done
17 separately from Project Stonehenge?
18 **A.  I don't know how to answer that with invading**
19 **the privilege.**
20      MR. NAKAMURA:  Ms. Elmer, are you
21 instructing ▮▮▮▮▮ then not to answer my question?
22      MS. ELMER:  Let's take a break to discuss
23 an issue of privilege.
24      MR. NAKAMURA:  All right.  Let's go off
25 the record.

Page 238

1       THE VIDEOGRAPHER:  Off the record at
2  5:47 p.m.
3       (Recess taken)
4       THE VIDEOGRAPHER:  Back on the record at
5  5:49 p.m.
6  Q.  (By Mr. Nakamura)  And, ▮▮▮▮▮, my
7  question was was the ▮▮▮▮▮ discussion
8  mentioned in this bullet point on Exhibit 13, one, a
9  discussion that was done separately from Project
10 Stonehenge?
11 **A.  I can't answer questions about what was part of**
12 **Stonehenge or not, as that would violate privilege.**
13      MS. ELMER:  Brent, I think if you were to
14 ask the witness whether there were ▮▮▮▮▮
15 discussions that were business discussions and not part
16 of a work product project, he might be able to answer
17 your question.
18      MR. NAKAMURA:  All right.  I will give
19 that a shot.
20 Q.  (By Mr. Nakamura)  Were there future ▮▮▮▮▮
21 ▮▮▮ discussions that were business discussions that
22 occurred that were not part of a work product project?
23 **A.  Yes.**
24 Q.  And when did those discussions take place?
25 **A.  All the time for as long as I can personally**

Page 239

1  **remember and from what I've seen over the past five to**
2  **ten years, quite regularly.**
3  Q.  And was Alphabet's consideration of ▮▮▮▮▮
▮▮▮▮▮
6       MS. ELMER:  And I'm going to object to
7  this question as exceeding the scope of the CID, but the
8  witness may answer in his individual capacity.
9  **A.  Yeah.  I'll go so far as to say yes.**
10 Q.  (By Mr. Nakamura)  And was the consideration of
11 ▮▮▮▮▮
13      MS. ELMER:  Same scope objection, but he
14 may answer in his individual capacity.
15 **A.  Yes.**
16 Q.  (By Mr. Nakamura)  And was ▮▮▮▮▮
17 was Alphabet's consideration of ▮▮▮▮▮
18 ▮▮▮ part of Project Stonehenge?
19      MS. ELMER:  I instruct the witness not to
20 answer the question because your question invades the
21 work product doctrine and the attorney/client privilege.
22      MR. NAKAMURA:  Thank you.
23 Q.  (By Mr. Nakamura)  Will you follow Ms. Elmer's
24 instruction?
25 **A.  Yes.**

Page 240

1       MR. NAKAMURA:  And before we put this
2  aside, I will register the Division's position that we
3  believe that privilege has been waived over this
4  document and the redactions that were made were not
5  appropriate.  So with that, ▮▮▮▮▮, you can put
6  that aside.
7       MS. ELMER:  And we dispute that position,
8  but that is not a discussion for this deposition.
9  Q.  (By Mr. Nakamura)  And -- I'm sorry.  Go ahead.
10 **A.  I just think it's --**
11      MS. ELMER:  ▮▮▮ that's okay.
12      **THE WITNESS:  Okay.**
13 Q.  (By Mr. Nakamura)  ▮▮▮▮▮, did you have
14 anything to add?
15 **A.  Well, I just think real briefly in a document**
16 **like this that starts to talk to smaller groups that are**
17 **cross-functional, there's -- it's very difficult to get**
18 **anything done in an organization this size without**
19 **talking to the cross-functional partners on any given**
20 **project.**
21      **So I just want -- like I know I had talked**
22 **about it at the VP level and the acknowledgments and**
23 **leadership as well, but it's also the case in these**
24 **types of projects and all the projects we've been**
25 **talking to, like you have to solicit all various**

Page 241

1 functions to get any sort of progress on those.
2          I get the feeling that a lot of the
3 questions are around, you know, why were there so many
4 people involved here.  And it's because like to get
5 anything done -- like legal can't answer these
6 questions.  These get pushed back to -- usually the
7 starting point, legal says, Hey, there's something
8 wrong.  And then I've got to go figure out how to solve
9 that; and to do that, it's going to have implications
10 across the entire company.
11          So that's just a pattern that I don't
12 think we really discussed, but I hope that sheds some
13 light into why you see the cross-functional teams as the
14 working groups in all of these areas.
15    Q.   Okay.  Thank you, ▮▮▮▮▮.  I appreciate
16 that.
17          MR. NAKAMURA:  Seumas, could you please
18 load into the Chat tab 31, please.
19    Q.   (By Mr. Nakamura) ▮▮▮▮▮, please let me
20 when you have that in front of you.
21          MR. NAKAMURA:  While that is downloading
22 for you, I will note that this is an -- could the court
23 reporter please mark this as Exhibit 14 for Alphabet.
24          (Exhibit 14 marked)
25          MR. NAKAMURA:  And this Exhibit 14 was a

Page 242

1 document that was clawed back by Alphabet's counsel
2 during this deposition and reproduced to us with
3 additional redactions applied.  This is a document that
4 begins with Bates No. GOOG-DOJ-AT-00660900 and ends in
5 Bates No. 0904.
6    Q.   (By Mr. Nakamura) ▮▮▮▮▮, I plan only to
7 ask you about the first page.  Please let me know when
8 you have reviewed that.
9    **A.   Yes.  I reviewed it.**
10    Q.   The first question is did Alphabet consider
11 ▮▮▮▮▮▮▮▮▮▮ as part of Project Stonehenge?
12          MS. ELMER:  I instruct the witness not to
13 answer the question because your question invades the
14 work product doctrine and the attorney/client privilege.
15    Q.   (By Mr. Nakamura)  All right.  And with respect
16 to ▮▮▮▮▮' question on May 13, 2020, to your
17 knowledge, is there a PRG or one-page document that was
18 produced as part of ▮▮▮▮▮▮▮▮?
19          MS. ELMER:  Go ahead, ▮▮.  I'm sorry.
20    **A.   Yes.**
21          MR. NAKAMURA:  Ms. Elmer, did you have
22 anything?
23          MS. ELMER:  No, I didn't.
24          MR. NAKAMURA:  Okay.  Thank you.  And with
25 that, I will note, again, that the Division believes

Page 243

1 that this document has been inappropriately clawed back
2 and that privilege has been waived and that I should
3 have been able to examine ▮▮▮▮▮ as the Alphabet
4 representative on what has now been redacted.  But with
5 that, I have no further questions on this document.
6          MS. ELMER:  We dispute your position, and
7 we're not going to argue about it here on the
8 deposition.
9          MR. NAKAMURA:  Fair enough.
10          Seumas, could you please put in the Chat
11 tab 32.
12          While this is being uploaded, this is --
13 if I can have the court reporter please mark this as
14 Alphabet Exhibit 15.
15          (Exhibit 15 marked)
16          MR. NAKAMURA:  This is a document that was
17 clawed back by Alphabet's counsel during this deposition
18 and had additional redactions applied.  It is a document
19 that begins in Bates No. GOOG-DOJ-AT-0030150, ending in
20 Bates No. 0159.
21          For the record, I'd like to point the
22 witness' attention to PDF page 4.  That is a page ending
23 in Bates No. 0152.  I will note that additional
24 redactions have been applied to several lines to a
25 bullet point that begins "Antitrust worked with ▮▮▮

Page 244

1 ▮▮▮ and ▮▮▮ to build up expertise on the team to
2 effectively work on regulation and antitrust inquiries."
3 The rest of that bullet point has now been redacted.
4          I had planned to examine ▮▮▮▮▮,
5 Alphabet's representative, on what has now been
6 redacted, and the Division believes that those
7 redactions are inappropriate as waiver has occurred and
8 that the redactions were in the first instance
9 inappropriate in any event with respect to work product
10 and attorney/client privilege.
11          With that and subject to anything
12 Ms. Elmer would like to add, I have no further questions
13 on this document.
14          MS. ELMER:  We dispute your position with
15 respect to waiver for all of the reasons that we've set
16 forth in prior correspondence with you, particularly
17 given the tremendous scope of the document production
18 that's been made in this matter; but we're not going to
19 argue about it here with you at the deposition.
20          MR. NAKAMURA:  I appreciate that.  And
21 with that, I have no further questions subject,
22 Ms. Elmer, to any questions you might ask ▮▮▮▮▮.
23          MS. ELMER:  I do not have any questions.
24          MR. NAKAMURA:  All right.  With that, no
25 further questions.