**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| **UNITED STATES,** *et al.*, | |
| Plaintiffs, | |
| **v.** | **Civil Action No. 1:23-cv-00108-LMB-JFA** |
| **GOOGLE LLC,** | |
| Defendant. | |

**GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**
**INTERNAL ANALYSES OF REMEDY FEASIBILITY**

### I.    Introduction

Two years ago, this Court denied Plaintiffs' demand during liability discovery that Google produce analyses it developed in direct response to government investigations with a view toward resolving those investigations and avoiding possible litigation.  In doing so, the Court held that those documents were protected by the work product doctrine because they "were all done as a result of government investigations and a concern of future litigation anticipation," June 15, 2023 Hr'g Tr., 46:23-47:3, Dkt. 272.  Undeterred, Plaintiffs again seek the very same categories of documents for the remedies phase, including some of the **exact same** documents.  *See* Pls.' Mot. to Compel Google's Internal Analyses of Remedy Feasibility, Dkt. 1438; Mem. of Law in Supp. of Pls.' Mot. to Compel Google's Internal Analyses of Remedy Feasibility ("Pls.' Mot."), Dkt. 1439.  In fact, Plaintiffs have doubled down by seeking not just analyses that Google created in connection with antitrust investigations by foreign regulators, but also analyses that Google performed specifically in connection with *this* case and at the direction of counsel.  These

documents are still protected work product under Fourth Circuit law, and a subset at issue is further protected by attorney-client privilege. Accordingly, the Court should once again deny Plaintiffs' request for internal analyses addressing the infeasibility of divesting its publisher ad server (DFP) or ad exchange (AdX) products.

In attempting to overcome the Court's prior order, Plaintiffs concede (as they must) that the documents at issue are entitled to work product protection but claim that they nonetheless have a "substantial need" for the material. Plaintiffs' assertions run into four separate obstacles.

First, the "substantial need-undue burden" exception to work product protection is relevant only to *fact* work product. By contrast, the work product Plaintiffs seek here is *opinion* work product reflecting an attorney's "mental impressions, conclusions, opinions, and legal theories concerning the litigation," which "is absolutely immune from discovery." *Nat'l Union Fire Ins. Co.* v. *Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992) (citation omitted). That is because "any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases.'" *Frank Betz Assocs., Inc.* v. *Jim Walter Homes, Inc.*, 226 F.R.D. 533, 535 (D.S.C. 2005) (citation omitted); *see also Paice, LLC* v. *Hyundai Motor Co.*, 302 F.R.D. 128, 134 (D. Md. 2014) ("opinion work product is carefully guarded from disclosure to an opposing party as revealing an attorney's thoughts and opinions to an opposing party contradicts the principles underlying the adversary process").

Second, while the "substantial need-undue burden" test is inapplicable, Plaintiffs cannot even meet that standard, which requires Plaintiffs to show both a "substantial need for the information" and "the unavailability of a 'substantial equivalent' of the information sought to be

discovered." *E.I. Dupont de Nemours & Co.* v. *Kolon Indus., Inc.*, 269 F.R.D. 600, 608 (E.D. Va. 2010) (quoting Fed. R. Civ. P. 26(b)(3)(A) and citing *Nat'l Union*, 967 F.2d at 983–84). Here, Plaintiffs can obtain all facts relating to the infeasibility of divestiture, or their substantial equivalent, through their numerous other discovery requests that can be addressed through non-privileged information.

For instance, Plaintiffs have already made at least six separate requests for production that will yield the very facts that would inform Google's arguments about the unworkability of divestiture. That includes requests for the source code of the tools at issue (which will show how the tools work and allow an expert to test Google's claims about workability), design documents outlining Google's system architecture and how the tools at issue are integrated, strategy documents setting out Google's plans for how the tools were developed and should operate, and financial documents about the tools' valuations that will inform how buyers may view the opportunity. Beyond this, Plaintiffs can depose fact witnesses about all these topics (including developing supposed "impeachment" points they claim are of particular interest) and they will have the opportunity to depose Google's experts on these topics as well. Plaintiffs have already noticed the depositions of four Google employees, including engineers. Plaintiffs have also propounded at least two interrogatories about the factual reasons divestiture is unworkable, to which Google will also respond. And, finally, Plaintiffs have noticed many of these topics for their Rule 30(b)(6) deposition. Plaintiffs insinuate there may be yet more to discover, but it is unclear what non-privileged information remains and their speculation is insufficient to overcome the substantial need standard.

Third, Plaintiffs cannot meet the "heightened or 'particularized' showing of need and relevance" that courts in the Fourth Circuit require before allowing a party to obtain documents

created in connection with settlement negotiations. *Wyeth* v. *Lupin Ltd.*, 2008 WL 11509482, at *3 (D. Md. 2008). Here, most of the analyses at issue were generated to help inform Google's approach to then-active government investigations, including whether settlement or another out-of-court resolution was appropriate. Plaintiffs have not, as they must, "demonstrated that injustice will result from non-disclosure," *id.* at *4.

Fourth, a subset of the analyses Plaintiffs seek was prepared in connection with this litigation, and at the direction of counsel, for the purpose of counsel providing Google legal advice. These documents are therefore also subject to the attorney-client privilege and are protected from disclosure.

For all of these reasons, the Court should deny Plaintiffs' motion.

## II.    Background

In 2023, Plaintiffs filed a motion challenging Google's privilege assertion over "documents relating to any plans of, interest in, or efforts undertaken by the Company or any other person for any acquisition, divestiture, joint venture, alliance, or merger of any kind involving the sale of any Relevant Product or Service." Dkt. 215 at 3-4. To the extent there were responsive ordinary course documents on these topics, Google produced them. As Google explained at the Court's June 15, 2023 hearing on Plaintiffs' motion, "there are certain topics that may have come up in the context of some of these Remedy Projects that also may have been addressed in ordinary course projects. In the ordinary course—any ordinary course document that addresses these topics, Google has produced or is in the process of producing." June 15, 2023 Hr'g Tr. 34:1-6. As to the documents Google withheld, the Court denied Plaintiffs' motion, holding that the documents were protected by the work product doctrine because they "were all done as a result of government investigations and a concern of future litigation anticipation." June 15, 2023 Tr. Hr'g at 47:1-3.

Two years later, Plaintiffs seek the same categories of information, and in some cases the *exact same documents*, that they unsuccessfully moved to compel in 2023.  *See* Dkt. 1439 at 4. In their Request for Production No. 1, Plaintiffs request:

> [A]ll internal and external-facing business, financial, or technical analyses, projections, and/or forecasts concerning (a) any actual or potential remedy for alleged anticompetitive conduct by Google related to its digital advertising business, (b) any potential sale or divestiture of any Relevant Product, including all data underlying all such analyses; (c) any cost, burden, challenge, complication, and/or difficulty related to the divestiture of any Relevant Product, including all data underlying such analyses. For the avoidance of doubt, this includes all documents related to Project Sunday and/or Project Monday, even to the extent they were previously withheld from production.

Ex. B at 7.

The focus of Plaintiffs' current request, as it was in 2023, is not documents created in the ordinary course of business, but rather documents that Google created to evaluate how to respond to government inquiries and potential litigation.  For example, Project Sunday and Project Monday, as well as other remedies projects, were overseen by Google's in-house counsel and conducted because of and in response to several active government investigations and in anticipation of possible litigation following those investigations.  Dkt. 284-30 ("Lazarus Decl.") ¶¶ 7-8.  Plaintiffs' current request takes this a step further by seeking not only the same sorts of analyses that the Court previously held were protected work product, but also analyses that Google prepared—at the direction of counsel—to advise Google in connection with *this* litigation.

Plaintiffs have availed themselves of multiple avenues to discover the relevant facts about the infeasibility of divestiture that do not require disclosing privileged analyses.  In addition to RFP No. 1, Plaintiffs served 22 other initial requests for production, such as requests for documents containing Google's source code; documents describing the system design and architecture of "GAM, DFP, and AdX" and the front-end and back-end systems to which they connect; and

financial statements dating back to 2015 for GAM. *See* Ex. B.[1]    Specifically, those requests include:

- RFP No. 6: "For each software system within in the most recently deployed version of GAM, including both front-end and back-end software, produce documents sufficient to show how each system currently communicates with other software systems within GAM and the nature of those communications, including but not limited to software design documents, internal and external dependency maps, architecture diagrams, presentations, data flow diagrams, API and RPC payloads, and communication protocols. For the avoidance of doubt, this includes such documents developed for prior versions of GAM, but which describe communications between systems in the most recently deployed version."

- RFP No. 12: "Produce or make available for inspection the most recent source code for GAM, DFP, and AdX and produce, from 2020 to the present, the commit histories and change logs for GAM, DFP, and AdX, including but not limited to: 1) the code bases for GAM, AdX, and DFP application source code, including front-end and back-end systems; 2) any relevant infrastructure and deployment source code, such as deployment scripts, project build or configuration files; 3) a written or diagrammatic description of the provided folder structure as it pertains to the location of files or folders relevant to the core features, systems, sub-systems, or modules within GAM, DFP, and AdX, for both application and deployment code; and 4) documents sufficient to identify any external dependencies of the aforementioned files/folders to any modules, services, databases, and code bases that fall outside of these code bases."

- RFP No. 13: "From 2020 to the present, produce all plans, roadmaps, and OKR documents for all GAM software systems, including future product and feature plans, strategy documents, engineering memos, and system integration documentation, as well as detailed OKRs for each system outlining objectives, key results, and progress tracking."

- RFP No. 14: "From 2020 to the present, produce comprehensive change logs sufficient to show all modifications to the GAM system over time, including feature updates, bug fixes, architectural changes, API modifications, and any other system changes."

- RFP No. 16: "Produce documentation sufficient to show Google's current software engineering coding standards, including without limitation guidelines, best practices, presentations, handbooks, and requirements for code development, review, testing, and deployment for engineering components and onboarding documents for new engineers, related to GAM, AdX, DFP, and/or related services that are required for their functions."

- RFP No. 20: "From 2015 to the present, to the extent not previously produced, produce documents sufficient to show profits and losses statements for GAM, including any component or system within GAM, documents should include projected revenues, costs, growth assumptions and forecasts, any supporting financial analyses or planning

---

[1] In total, Plaintiffs have served 26 Requests for Production and 6 Interrogatories.

documents and documents sufficient to show the methods of accounting used to develop such forecasts, for each year should they differ from year to year, and any planning documents and internal reporting decks (e.g., quarterly financial and business operations update packages delivered to GAM or Google leadership). For the avoidance of doubt, for the years when AdX and DFP profit and losses statements including projected revenues, costs, growth assumptions and forecasts were recorded separately, produce documents sufficient [to] show how these were recorded within Google."

*Id*. at 8-13. These are the same kinds of source material that Google engineers would consult to assess the technological feasibility of divestiture, including the interdependencies among GAM, DFP, and AdX; with other Google ad tech products; and with other Google systems and products. These are also materials and substantive topics that Google engineers can be asked about during depositions.

The same day that Plaintiffs served their document requests, they also served a set of interrogatories seeking similar factual information concerning the infeasibility of divestiture, including:

- Interrogatory No. 2: "List all reasons, including all facts underlying such reasons, that it would be technically infeasible or impractical for Google divest AdX and/or DFP to a separate company or companies."

- Interrogatory No. 3: "List all reasons, including all facts underlying such reasons, that it would be technically infeasible or impractical for Google to remove the final auction functionality (i.e., the functionality that determines which advertisement will serve as an impression, including choosing between direct-sold and indirect-sold opportunities) from DFP, provide the code for such functionality on an open source basis, and provide an API in DFP to allow the final auction functionality to be run outside of DFP."

Ex. C at 4-5.

Plaintiffs have further sought factual information relating to the infeasibility of divestiture in their request for 30(b)(6) testimony, including through the following topics:[2]

---

[2] Certain of the topics are overbroad, or seek privileged information, and Google will be serving appropriate objections, but Google will not decline to provide Plaintiffs relevant, non-privileged facts needed to assess whether divestiture is feasible.

- Topic 2: "Each and every reason Plaintiffs' proposed divestiture of AdX is "unworkable" or "harmful," and all information and analyses relating to each reason."

- Topic 5: "Each and every reason divesting parts or all of DFP 'would be logistically unworkable and damaging to DFP's publisher customers,' and the particular nature and details of any 'workability questions' that are raised by a divestiture of part or all of DFP, as well as all information and analyses relating to your contentions."

- Topic 8: "All information and analyses you relied upon to conclude that '[d]ivestiture of AdX and/or DFP would take a minimum of five years if not much longer,' . . . and details about each intermediate milestone or step related to divestiture encompassed by your estimate."

- Topic 9: "Any assessment you performed regarding the cost, burden, difficulty, and/or commercial impact of divesting, selling, or making any Relevant Product available for use by anyone other than Google, including but not limited to divesting, selling, or making a Relevant Product, or any of the functionality of a Relevant Product, available for use by anyone other than Google pursuant to a voluntary or court-ordered divestiture. This topic includes but is not limited to Project Sunday, Project Monday, and any information or analyses related to those projects and similar projects."

Ex. D at 4-7.

On May 5, 2025, Plaintiffs emailed Google stating that they would move to compel Google to produce documents "related to Google's own analyses of potential divestitures of portions of its ad tech businesses—in particular, the documents related to Google's Project Sunday and Project Monday." Ex. E. Google understands from the parties' meet-and-confers on May 7 and May 21 that Plaintiffs not only seek documents prepared as a part of Projects Sunday and Monday and other remedies projects unrelated to this litigation, but also more recent analyses prepared in connection with ongoing investigations and litigations, including this case. Google explained that those documents were properly withheld under the work product doctrine and were protected by the attorney-client privilege. Google also explained that Plaintiffs could not demonstrate a "substantial need" to overcome the work product protection because they could obtain the requested factual information through non-privileged means, as demonstrated by Plaintiffs' other document requests and interrogatories. On May 23, 2025, Plaintiffs nevertheless moved to compel.

### III.    Argument

This Court has already once held that the types of analyses that Plaintiffs seek are entitled to work product protection.  Plaintiffs concede that conclusion.  *See* Pls.' Mot. at 9-20.  As was the case then, the documents Plaintiffs now seek were "all done as a result of government investigations and the concern of future litigation anticipation," June 15, 2023 Hr'g Tr. 4646:23-47:3, and thus are appropriately treated as protected work product prepared in consultation with counsel to resolve ongoing investigations or litigation.  *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 6122012, at *3-4 (E.D. Va. 2019) (work product doctrine shields analysis of settlement proposal); *FTC* v. *Boehringer (Boehringer II)*, 892 F.3d 1264, 1268 (D.C. Cir. 2018) (holding that business analysis prepared to assist counsel in evaluating a settlement constituted work product even though evaluating the settlement "ultimately was a business decision as well as a legal decision").

Plaintiffs nonetheless claim they can overcome the work product protection because they have established a substantial need for the documents at issue.  This argument is unavailing where, as here, the work product is opinion work product so the "substantial need-undue burden" test is inapplicable, where the facts at issue can be discovered through non-privileged means, where Plaintiffs cannot meet the heightened standard for discovering analyses created in connection with settlement negotiations, and where a subset of the documents are also protected by attorney-client privilege.

### A.    The documents Plaintiffs seek are opinion work product and therefore not discoverable.

In the Fourth Circuit, opinion work product "is absolutely immune from discovery."  *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984 (citation omitted).  Materials reflecting an attorney's "mental impressions, conclusions, opinions, and legal theories concerning the litigation" qualify as opinion

work product.  *Id.*  This protection is not limited just to documents that are directly prepared by an attorney; rather, the protection also extends to documents that would tend to "indicate the focus" of the attorney's "investigation" and thus reveal an attorney's "thought processes and theories." *In re Allen*, 106 F. 3d 582, 608 (4th Cir. 1997) (noting opinion work product includes the "choice and arrangement" of a broader set of factual records that reflect the attorney's focus).

Here, the documents Plaintiffs seek indicate the focus of attorneys' investigations, and were prepared directly in response to litigation and at the direction, and under the supervision, of attorneys.  *See* Ex. A ("Boundy Decl.")  ¶¶ 6, 8-12.  A Google in-house attorney explained that the analyses include counsel's "strategies or thought processes concerning the investigations and litigations" about the investigations and litigations with antitrust regulators.  *Id.* ¶ 10.  Similarly, as Ted Lazarus, another Google in-house attorney, explained, he "initiated" Project Sunday "and provided legal supervision and guidance on the project."  Lazarus Decl. ¶ 7.  Outside counsel from multiple firms were also involved in providing legal guidance informed by  the analyses in Project Sunday as well as the analyses prepared in response to other regulators' investigations and litigation.  *Id.*; Boundy Decl. ¶ 9.  Similarly, Lazarus also provided legal supervision and guidance on Project Monday, with input and legal guidance from outside counsel from two separate firms.  Lazarus Decl. ¶ 8.  In denying Plaintiffs' previous motion to compel, Judge Anderson recognized the intimate involvement lawyers had with these projects and their corresponding analyses.  June 15, 2023 Hr'g Tr. 46:12-47:16 ("But it sounds to me in reading the record, that, at various points in time, lawyers were involved, thoughts were being made about how can we resolve certain things, and people were tasked with investigating that, and those were the specific projects.").

Judge Castel already ruled that a document concerning one of the related projects—Project SingleClick—was opinion work product because it analyzed actions undertaken in response to

active regulatory investigations and involved the "subject of liability avoidance," which reflected the "'mental impressions, conclusions, opinions, or legal theories of an attorney' prepared 'in anticipation of litigation.'" *In re Google Digit. Advert. Antitrust Litig.*, 2023 WL 196146, at *3 (S.D.N.Y. Jan. 17, 2023) (quoting Fed. R. Civ. P. 26(b)(3)). Judge Castel's decision is also consistent with how courts treat documents prepared in connection with potential settlement or resolution. For example, in *Zetia*, the defendant sought to clawback, in part, spreadsheet analyses that were prepared at the direction of in-house counsel to "evaluate a 'potential settlement'" of ongoing litigation. 2019 WL 6122012, at *3. Judge Miller found that all the materials qualified as "opinion work product" because they were "prepared at an attorney's request and reflect the attorney's input and judgment." *Id.* at *4.

This case closely resembles *Sher* v. *Barclays Cap. Inc.*, 2013 WL 3279801 (D. Md. June 26, 2013). In that case, the court held that a spreadsheet that was compiled at the direction of counsel and that contained analysis about whether the defendant "had any potential causes of action" was opinion work product. *Id.* at *2-4. The court reasoned that the spreadsheet was "not simply a collection of facts, but rather a comprehensive opinion work product that evolved out of [the defendant's] specific choices and thought processes concerning litigation." *Id.* at *4; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2018 WL 1162552, at *6-11 (E.D.N.Y. 2018) (holding that settlement workstream documents "created to assess business implications of the litigation or settlement" and drafted by nonlawyer at the direction of counsel were opinion work product). Other courts in the Fourth Circuit have reached similar conclusions. *E.g.*, *Paice LLC* v. *Hyundai Motor Co.*, 302 F.R.D. 128, 135 (D. Md. 2014) (holding that opinion work-product protection applies where "documents do not represent raw facts, but embody the

mental 'sorting,' selection, and analysis of the [defendant's] employees" and "the documents in question respond, *or at least relate*, to question posed by defense counsel" (emphasis added)).

Plaintiffs' cited cases, *see* Pls.' Mot. at 7, are not to the contrary.  In *FEC* v. *Christian Coalition* ("*Christian Coalition II*"), the court concluded that "tabular data" attached to an analysis was a "factual recitation," not opinion work product.   178 F.R.D. 456, 468 (E.D. Va. 1998).  The documents at issue here, in contrast, are not merely "factual recitation[s]"--they are *analyses* that build off of the underlying data to offer certain views.[3]   And even where an attorney did not specifically prepare a particular document, the focus of the analyses and the "choice" of relevant facts in the analyses in this case still "reveals [attorney] thought processes and theories."  *Allen*, 106 F.3d at 608.  Likewise, in *In re S3 Ltd.*, the court addressed whether an expert report was opinion work product and held that while "a great deal of the document consists of the mental impressions, conclusions, opinions, and legal theories that lead" the expert to arrive at his conclusions, only his "specific evidentiary findings, as well as his qualifications" were factual work product.  252 B.R. 355, 364 (Bankr. E.D. Va. 2000).  This reasoning is consistent with Google's position:  While the internal analyses contain "impressions, conclusions, opinions, and legal theories," Plaintiffs can use other tools of discovery to obtain the non-privileged factual basis underlying the analyses.

In *FTC* v. *Boehringer Ingelheim Pharms., Inc. ("Boehringer I")*, after noting that "it may be appropriate to treat [a] document as opinion work product, even though the document on its face contains only facts," the court explained that certain "general and routine" factual requests from counsel did not constitute opinion work product, including, for example, "counsel's general

---

[3] Notably, the Magistrate Judge had previously found that the *analysis* included both "opinion and non-opinion work product," but the underlying tabular data was not opinion work product. *Christian Coalition II*, 178 F.R.D. at 467-68.  Similarly, Google maintains that its analyses are opinion work product.

interest in the financials" of a possible deal and "time frames for requested financial data." 778
F.3d 142, 151-53 (D.C. Cir. 2015). On remand, the district court applied this framework and held
that "instructions to compile data on a wide number of possible factual scenarios" did not constitute
work product. *FTC* v. *Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 25-26 (D.D.C.
2016). As explained, the internal analyses at issue here do not just present possible factual
scenarios; rather, they directly informed Google's legal strategy for the then-ongoing
investigations and litigation.

### B.  Plaintiffs have not shown a "substantial need."

While the "substantial need-undue hardship" test does not apply here, it also has not been
met. Generally, fact work product is discoverable only if "the party shows that it has substantial
need for the materials to prepare its case and cannot, without undue hardship, obtain their
substantial equivalent by other means." *Smith* v. *Scottsdale Ins. Co.*, 40 F. Supp. 3d 704, 721
(N.D. W. Va. 2014) (quoting Fed. R. Civ. P. 26(b)(3)); *see also In re Grand Jury 2021 Subpoenas*,
87 F.4th 229, 252 (4th Cir. 2023) (setting forth "substantial need" standard). "This burden is a
difficult one and is satisfied only in rare situations, such as those involving witness unavailability."
*Smith*, 40 F. Supp. 3d at 721 (citation omitted); *see also Rivera* v. *Altec, Inc.*, 2023 WL 3097204,
at *5 (N.D. W. Va. 2023) ("A party seeking disclosure 'must demonstrate that its need is truly
substantial, and that there is no reasonable substitute for the documents.'" (quoting *Sanford* v.
*Virginia*, 2009 WL 2947377, at *2 (E.D. Va. 2009))). Here, Plaintiffs' burden is even higher
because many of the analyses at issue were created in connection with settlement negotiations,
which requires a "heightened or 'particularized' showing of need and relevance." *Wyeth*, 2008
WL 11509482, at *3.

13

Plaintiffs have not demonstrated any "substantial need," let alone met this heightened standard. Accordingly, the Court should uphold Google's assertion of work product protection over the requested documents.

### 1. Plaintiffs can obtain the "substantial equivalent" of Google's internal analyses from numerous other sources without undue hardship.

Plaintiffs have not demonstrated "substantial need" because they can obtain the "substantial equivalent" of information about the infeasibility of divestiture from multiple other non-privileged sources without undue hardship. *See, e.g.*, *Richards* v. *Octane Environmental, LLC*, 2020 WL 13111139, at *2 (N.D. W. Va. 2020) (denying motion to compel fact work product because "much of the information requested from ERG is available from other sources and obtaining the information from these other sources would not require an amount of effort that would rise to the level of 'undue hardship'"); *Felisberto* v. *Dumdey*, 541 F. Supp. 3d 142, 150 (D. Mass. 2021) (holding that party who could "easily obtain the 'substantial equivalent' of the information in those particular documents from non-privileged documents" did not demonstrate "substantial need"). Specifically, those sources include the following:

*i. Document Productions.* Google is providing Plaintiffs with the underlying source code of Google Ad Manager and certain dependencies on Google infrastructure, which provides the foundation for any feasibility analysis, as well as other documents relating to the software architecture, design and deployment of Google systems. Google is also providing Plaintiffs with the profit and loss statements for GAM and any component or system within GAM. Plaintiffs and their experts will have the opportunity to review that information. Because Plaintiffs will have the underlying documents, source code, and data forming the basis for any work product analyses, they cannot establish substantial need. *E.g.*, *Sher*, 2013 WL 3279801, at *5 ("In light of the fact that Barclays not only has the data used to compile the Petrush Spreadsheet, but also more than a

general idea of the calculation process Mr. Petrush used to prepare it for TMST's counsel, the Court finds that the substantial need factors do not favor Barclays."); *Rivera*, 2023 WL 3097204, at *6 (denying motion to compel where the requesting party had "the underlying facts and data necessary to obtain the substantial equivalent of the Reports by other means").

    ***ii. Fact Depositions.***  Plaintiffs will have the opportunity to depose Google engineers who will be able to address technical infeasibility of divestiture and respond to questions concerning the documents that Google has produced.

    ***iii. Expert Discovery.***  Plaintiffs will be able to obtain relevant facts through the disclosures of Google's expert opining on the technical feasibility of divestiture, Professor Jason Nieh, and depose him concerning those disclosures.

    ***iv. Interrogatory Responses.***  Google is responding to the interrogatories that Plaintiffs have served seeking the very same information.  *See Sicurelli* v. *Jeneric/Pentron Inc.*, 2006 WL 1329709, at *3 (E.D.N.Y. May 16, 2006) (explaining that a party can use other means to obtain the facts contained in work product "such as . . . interrogatories.").  The relevant interrogatories propounded by Plaintiffs include Interrogatory No. 2, which asks Google to "[l]ist all reasons, including all facts underlying such reasons, that it would be technically infeasible or impractical for Google divest AdX and/or DFP to a separate company or companies" and Interrogatory No. 3, which asks Google to "[l]ist all reasons, including all facts underlying such reasons, that it would be technically infeasible or impractical for Google to remove the final auction functionality (*i.e.*, the functionality that determines which advertisement will serve as an impression, including choosing between direct-sold and indirect-sold opportunities) from DFP, provide the code for such functionality on an open source basis, and provide an API in DFP to allow the final auction functionality to be run outside of DFP."  Ex. C at 4-5.

Notwithstanding the multiple non-privileged means Plaintiffs are already using to obtain relevant facts, Plaintiffs argue that they have no means of accessing the information because only Google possesses the internal analyses addressing feasibility of various remedies. Pls.' Mot. at 17-18. But Plaintiffs can obtain the underlying factual information through the non-privileged means described above, and they are free to conduct their own analyses to evaluate feasibility. And the sole case Plaintiffs rely on to establish that Google's numerous other sources of "substantial[ly] equivalent" information are inadequate is *FEC* v. *Christian Coalition ("Christian Coalition I")*, 178 F.R.D. 61 (E.D. Va. 1998), *see* Pls.' Mot. at 18-19, but that case arose in an entirely different posture. In that case, which involved a motion to enforce a subpoena in a separate action, the court *reaffirmed* the general rule that depositions provide a "substantial equivalent," but held the plaintiff met the substantial need standard because the judge in the *other* case had "limited" the number of depositions, and it was not possible to obtain the relevant facts through a deposition. *Id*. at 85-86. Here, in contrast, the parties are disclosing their potential trial witnesses in advance (primarily during the fact discovery period) and Plaintiffs will have the opportunity to depose all Google witnesses who will address technical infeasibility at trial.

Plaintiffs also make the unsubstantiated claim that the testimony of Google's witnesses "will inevitably be cumbersome and incomplete" and that Google's witnesses will be "hostile . . . to any deposition inquiry," Pls.' Mot. at 18-19. But they point only to prior deposition testimony in which Google witnesses declined to answer questions aimed squarely at Google's own work product and settlement discussions. *Id*. at 18. Those questions specifically related to remedies projects that the Court previously held were subject to work product protection. Had Plaintiffs correctly framed the questions to ask about relevant facts going to technical infeasibility, Plaintiffs would have been able to elicit responsive information. There is a difference between seeking

discovery of underlying facts and seeking information about privileged analyses of those facts. *See, e.g.*, *In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liability Litig.*, 2020 WL 3073316, at *3 (D. Md. 2020) (upholding work product assertions and explaining that "[t]he plaintiffs can still discover the underlying facts of the communications, even if they cannot discover the communications themselves").

### 2. Plaintiffs have not articulated any "substantial need" for the requested information.

Plaintiffs primarily assert that they seek the information to "test claims that Google's witnesses are likely to make about the alleged costs, burdens, and difficulty of divestiture because, if Google internally reached any conclusions that contradict those claims, the Court may give that testimony less weight," Pls.' Mot. at 16-17—in other words, for impeachment purposes.  But "a party must present more than speculative or conclusory statements" that the documents will contain "invaluable impeachment material," and the "impeachment value must be substantial because every prior statement has some impeachment value and otherwise the exception would swallow the rule." *Suggs* v. *Whitaker*, 152 F.R.D. 501, 508 (M.D.N.C. 1993); *see also Kintera, Inc.* v. *Convio, Inc.*, 219 F.R.D. 503, 510 (S.D. Cal. 2003) ("The mere possibility that these statements may have some impeachment value does not create a substantial need for their production.").

Plaintiffs do not come close to establishing that documents contain "invaluable" impeachment material—to the contrary, their claims are based on rank speculation. *See* Pls.' Mot. at 17 ("*if* Google internally reached any conclusions that contradict those claims, the Court *may* give that testimony less weight" (emphasis added)).  This Court should therefore follow the numerous other decisions in this Circuit where courts have held that information sought solely for impeachment purposes does not establish a "substantial need."  *See, e.g.*, *U.S. ex rel. Carter* v.

*Halliburton*, 266 F.R.D. 130, 133 (E.D. Va. 2010) (holding defendants failed to demonstrate a "substantial need" for information sought for impeachment purposes); *U.S. ex rel. Bunk* v. *Birkart Globistics GmbH*, 2010 WL 2483714, at *4 n.7 (E.D. Va. June 17, 2010) (acknowledging that "impeachment alone is not sufficient to show a substantial need"); *Wellin*, 2019 WL 470182, at *7 (holding party did not show substantial need when only proffered need was "to aid her in [] impeachment").

### 3.  For materials related to settlement discussions, Plaintiffs' burden of establishing "substantial need" is heightened.

Plaintiffs have a heightened of showing relevance and "substantial need" where, as here, the materials they seek include analyses prepared in connection with settlement negotiations with antitrust regulators, including in connection with Plaintiffs in this case.  Courts in the Fourth Circuit have held that a plaintiff must make "a heightened or 'particularized' showing of need and relevance to permit the discovery of settlement documents because of the significant policy considerations against discovery."  *Wyeth*, 2008 WL 11509482, at *3; *Food Lion, LLC* v. *Dairy Farmers of Am., Inc.*, 2020 WL 6947921, at *3-4 (M.D.N.C. Sept. 29, 2020); *CHS Inc.* v. ABM *Healthcare Support Servs., Inc.*, 2021 WL 149861, at *2-3 (W.D. Va. Jan. 15, 2021).  More specifically, a plaintiff must "demonstrate[] that injustice will result from non-disclosure."  *Wyeth*, 2008 WL 11509482, at *4.[4]  While the Fourth Circuit does not recognize an absolute bar to the discovery of settlement-related materials, "it has indicated that it would apply enhanced protections to settlement documents and communications sought in discovery."  *Id*. at *3.

These enhanced protections are warranted because in the sensitive context of settlement negotiations, courts must "balance the public interest in protecting the confidentiality of the

---

[4] Even though these cases do not arise in the context of the work product doctrine, they apply with even more force here.  As Plaintiffs concede, the documents are all work product, so they are *already* entitled to enhanced protections.

settlement process and countervailing interests, such as the right to every person's evidence." *In re Anonymous*, 283 F.3d 627, 637 (4th Cir. 2002). A party seeking settlement documents must "demonstrate that 'manifest injustice will result from non-disclosure.'" *Wyeth*, 2008 WL 11509482, at *3 (quoting *In re Anonymous*, 283 F.3d at 637). Moreover, "[b]ecause parties engaging in settlement negotiations may be motivated by a desire for peace rather than from a concession of the merits of the claim . . . [they] may assume disputed facts to be true for the unique purposes of settlement negotiations, the discovery of which would be highly misleading if used for" purposes other than settlement. *Food Lion, LLC*, 2020 WL 6947921, at *3 (citation omitted). The cases distinguish requests for documents surrounding settlement *negotiations* from executed settlement *agreements*, with the former entitled to greater protection. *See id.* (explaining that "once an agreement has been reached, there is a lesser interest in protecting the settlement agreement as opposed to the negotiations themselves" (citation omitted)); *cf. In re Camp Lejeune Water Litig.*, 2024 WL 2874287, at *2 (E.D.N.C. June 6, 2024) (permitting disclosure of executed settlement agreement).

Plaintiffs have not come close to "demonstrat[ing] that injustice will result from non-disclosure." *Wyeth*, 2008 WL 11509482, at *4. As previously discussed, *see supra* pp. 14-17, Plaintiffs have several avenues to obtain information about the workability of remedies proposals that are not sensitive documents created for negotiating a resolution of government inquiries or litigation. *See CHS*, 2021 WL 149861, at *3 (denying motion to compel because the party could obtain "any relevant information it would glean from reviewing ongoing settlement communications . . . through other, less concerning or burdensome, means"). In addition, Plaintiffs' supposed justification for needing the documents for a complete factual record is significantly undermined when considering that these documents "may assume disputed facts to

be true for the unique purpose of settlement negotiations," which "would be highly misleading if allowed to be used for purposes other than settlement." *Wyeth*, 2008 WL 11509482, at *4 (citation omitted).

As with their failure to show a "substantial need," Plaintiffs cannot meet the heightened standard by invoking a desire to use the documents for impeachment based on speculation that the settlement documents may be inconsistent with Google's litigating position. The courts in *Wyeth* and *CHS* both rejected identical arguments. *See Wyeth*, 2008 WL 11509482, at *4 (denying motion to compel when party sought documents to determine whether opposing party "took any factual positions concerning" one of its products that were "inconsistent with those taken in this litigation"); *CHS*, 2021 WL 149861, at *2 (rejecting party's argument that opposing party had "taken inconsistent positions" on certain topic and it "suspects that [opposing party] may take a position in a settlement agreement . . . that is contrary to its defenses in this case"). Plaintiffs also fail to explain how they would even be able to use any such "contrary" testimony (to the extent that it exists) at trial, because Rule 408 is clear that evidence from settlement negotiations is "not admissible . . . to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a).

Plaintiffs' own approach to discovery in the remedies phase demonstrates they know that the information they seek is privileged and non-discoverable. In responding to similar requests from Google, which Google patterned on Plaintiffs' requests, Plaintiffs objected on the basis of privilege.

> **Google's RFP 13**: "All analyses, projections, or forecasts related to the feasibility, effects, benefits, costs, burdens, challenges, complications, or difficulty of any Remedy."

> **United States' Objection to RFP 13**: "The United States objects to this request to the extent it seeks information covered by the attorney client privilege, attorney work product

protection, common interest doctrine, deliberative process privilege, and/or other applicable privileges and protections. . . ."

**Google's RFP 14:** All analyses, communications, and documents and/or data concerning potential acquirers for Google Ad Tech Products that You propose to divest, including communications with such potential acquirers.

**United States' Objection to RFP 14:** The United States objects to this request to the extent it seeks information covered by the attorney client privilege, attorney work product protection, common interest doctrine, deliberative process privilege, and/or other applicable privileges and protections. . . ."

Ex. F at 10.  If Plaintiffs' reasoning were correct, the arguments that Plaintiffs make regarding the discoverability of Google's analyses prepared in connection with settlement negotiations would apply equally to Plaintiffs' feasibility and workability analyses, so Plaintiffs must likewise disclose their analyses.  Plaintiffs cannot seek privileged information from Google, while at the same time stand on privilege objections for their own documents.  The applicable law is clear: analyses prepared in connection with settlement negotiations are not discoverable by either side.  Accordingly, unlike Plaintiffs, Google has not filed a cross-motion seeking privileged materials.

### 4. Allowing testimony on the infeasibility of divestiture would not waive work product protection.

Plaintiffs appear to argue that Google's making available witnesses to discuss the infeasibility of divestiture would waive its work product protection over internal analyses addressing this topic in response to regulatory inquiries.  Pls.' Mot. at 19-20.  But simply because Google's witnesses may be deposed about the infeasibility of specific remedies, including a full divestiture of AdX and a phased divestiture of DFP, does not mean that Google has waived work product protection over the contents of specific internal analyses.[5]  Google witnesses can testify

---

[5] For similar reasons, *United States* v. *Nobles*, 422 U.S. 225 (1975) does not apply.  In that case, one party invoked work product protection over an investigation report, but allowed the investigator to testify specifically about the contents of that report.  *Id*. at 239-40.  The work product privilege was waived only because "counsel attempt[ed] to make a testimonial use" of work product materials.  *Id*. at 239 n.14.  Google is not trying to "make testimonial use" at trial of

about facts, without regard to privileged analyses, based on their knowledge of GAM, DFP, and AdX—knowledge they would have from the work they do in the ordinary course at Google, and without reference to privileged analyses. Testimony about underlying facts does not waive work product as to any analyses performed based on the facts. *See Hohenwater* v. *Roberts Pharm. Corp.*, 152 F.R.D. 513, 517 (D.S.C. 1994) (holding the work product protection applied when plaintiffs could "depose all persons who participated in the preparation of the four-page memorandum" and "ask these persons questions about the contents of the memorandum and the witnesses can answer, even though the memorandum itself is not discoverable"). Plaintiffs' excessively broad view of subject matter waiver has no basis in the case law or the facts.[6] *See E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 607 (E.D. Va. 2010) ("A party cannot artificially expand the scope of the subject matter to create a waiver that is broader than that of the disclosure that waives the protection.").

Because Google intends to rely on only discoverable and disclosed evidence, Plaintiffs' assertion that Google is trying to use privileged information both as a sword and a shield is

_____

the contents of its work product. Instead, Google will rely on fact and expert testimony and documents to which Plaintiffs will have access during discovery.

[6] Plaintiffs also suggest that if Google disclosed the "substance of any such analysis" to antitrust enforcers—including through settlement discussions with Plaintiffs in this case—that constitutes a waiver. Mem. at 19 n.4. If that were the law, it would discourage any party from making good faith efforts to resolve litigation through settlement. Plaintiffs are once again attempting to use Google's good faith attempts to seek resolution with Plaintiffs or other government bodies against Google.

In any event, Plaintiffs' argument misunderstands the caselaw, as *Martin Marietta*, cited by Plaintiffs, does not hold otherwise. In that case, there was "no dispute" that the "privileged materials were disclosed" to the opposing party; here, in contrast, Google has never disclosed its internal analyses to Plaintiffs or anyone else, even during settlement negotiations. *In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988); *cf. In re Grand Jury Proc.*, 219 F.3d 175, 191 (2d Cir. 2000) (distinguishing *Martin Marietta* because "[i]n this case, however, there was no actual disclosure of any privileged documents").

baseless.  The purpose of the sword-shield doctrine is to protect against the use of "privileged information *both* offensively and defensively at the same time" in the same litigation.  *Willy* v. *Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) (emphasis added) (reviewing cases).  But in this case, Google is not seeking to use privileged information offensively because it is not presenting its case at trial based on privileged analyses.  In other words, Google is not selectively disclosing privileged facts or analyses in this case; it is disclosing all relevant facts that go to whether divestiture is feasible and its expert will offer opinions based on those facts.  The cases that Plaintiffs cite involve the opposite, with a party intending to use work product analyses offensively at trial, *see United States* v. *Duke Energy Corp.*, 208 F.R.D. 553, 557-58 (M.D.N.C. 2002) (holding emissions analyses were protected work product, and warning the defendant it could not rely on them at trial as part of its defense); or a party selectively disclosing only privileged information helpful to its case, *see People for Ethical Treatment of Animals, Inc.* v. *Tri-State Zoological Park of W. Maryland,* 2018 WL 3546725, at *4 (D. Md. 2018).  In contrast, here, Google is invoking privilege defensively over all of its internal work product, regardless of whether it is "helpful" or not.

## C.  Certain of the internal analyses are shielded by attorney-client privilege.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981) (citation omitted).  It "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Id*. at 390.  "[T]he attorney-client privilege protects from disclosure communications from a client to his attorney made in confidence and concerning legal advice sought from his attorney."  *United States* v. *Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986).

Certain of the documents Plaintiffs seek here—internal analyses evaluating the potential for resolution—fall squarely within the attorney-client privilege.[7] They were created at the request of counsel to assess the potential for resolutions to pending investigations and litigations. Boundy Decl. ¶¶ 9-11. *Zetia* is instructive. 2019 WL 6122012, at *3-4. There, the court confirmed that attorney-client privilege protected spreadsheets that included an analysis performed at the direction of in-house counsel to evaluate "a potential settlement of the patent litigation," and that "[t]he sole purpose of this analysis was for legal, not business, reasons." *Id*. at *3. "[H]ad counsel not requested this analysis in order to evaluate a potential settlement," the court reasoned, "the Excel spreadsheet and the analysis within it would not have been created." *Id*. (citation omitted). Similarly, here, the engineering analyses would not have been created but for the pending legal inquiries. *See* Boundy Decl. ¶ 12. Accordingly, attorney-client privilege shields these documents.

Even though attorneys may not have participated directly in every document at issue, that does not mean that the privilege does not apply. "[T]he ultimate touchstone for application of the privilege . . . is whether the communication revealed advice from, or a request for advice made to, an attorney in some fashion." *Townhouse Rest. of Oviedo, Inc.* v. *NuCO2, LLC*, 2020 WL 4923732, at *6 (S.D. Fla. June 24, 2020) (citation omitted); *Allen*, 106 F.3d at 603 (in the Fourth Circuit, the relevant question is "whether this investigation was related to the rendition of legal services"). And these analyses were created to obtain legal advice–specifically, to inform how Google should respond to the pending legal matters. *See Townhouse*, 2020 WL 4923732, at *6 ("Emails in which employees transmit legal advice received from counsel between themselves or

---

[7] Plaintiffs suggest that Google has somehow waived its right to invoke attorney-client privilege here because it did not raise this argument in response to Plaintiffs' 2023 motion to compel a narrower subset of documents. Although Google did not invoke attorney-client privilege in that motion, Plaintiffs' present document request is broader and does encompass others that are protected by the attorney-client privilege. Google has not waived any arguments as to any other documents.

request information from one another in order to seek legal advice remain privileged despite no lawyer being on the email thread.").

Contrary to Plaintiffs' assertions, Pls.' Mot. at 9, the internal analyses they seek are not "facts" that would fall outside of the attorney-client privilege. Plaintiffs' document request specifically targets "analyses, projections, and/or forecasts" about the feasibility of certain remedies—in other words, subjective evaluations of potential responses to legal inquiries that were created at the request of attorneys to allow them to provide legal advice. These documents would not have been created in the ordinary course outside of the requests made by counsel. The documents need not "on [their face] disclose that the client sought or an attorney rendered specific legal advice"—rather, documents are still protected even when they "recount[] facts so that [] counsel may continue to be apprised of the developing situation and [the client] may receive continued advice from its attorneys." *Banks* v. *Off. of Senate Sergeant-At-Arms*, 228 F.R.D. 24, 27 (D.D.C. 2005); *see also Allen*, 106 F.3d at 603 ("fact finding which pertains to legal advice counts as professional legal services"). As *Upjohn* explains, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." 449 U.S. at 390-91.

Plaintiffs' other cited cases are inapposite. Unlike in *In re Grand Jury Proc.*, which held that the privilege did not apply to an attorney's testimony about a business prospectus that was intended to be public, Google's internal analyses were never intended to be public. 727 F.2d 1352, 1353-58 (4th Cir. 1984). *E.I. Dupont de Nemours & Co.* also addresses whether a party waived privilege based on public disclosure of information, and no public disclosure has occurred here. 269 F.R.D. at 605-06. *In re Allen* held that the documents *were* protected by attorney-client privilege; the quote cited by Plaintiffs stands for the unremarkable proposition that an attorney

25

cannot be hired as an "after-the-fact, self-serving attempt to shield relevant, damaging facts from disclosure." 106 F.3d at 604. Google has done nothing of the sort, nor do Plaintiffs contend otherwise.

## IV. Conclusion

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Dated: May 28, 2025

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Justina K. Sessions (*pro hac vice*)
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ:
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, DC 20004-2637
Telephone: (202) 240-2900
kdunn@dirllp.com

Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
amauser@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com