# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition of Google on June 9, 2025. The deposition shall occur at the U.S. Attorney's Office for the Eastern District of Virginia, located at 2100 Jamieson Ave., Alexandria, VA 22314, or as otherwise agreed to by the parties. The deposition will be conducted by oral examination before a certified court reporter authorized to administer oaths and will continue from day to day until completed. The deposition will be recorded by stenographic means and by videotape.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant shall designate and produce for deposition one or more officers, directors, employees, agents, or other persons to testify on its behalf regarding the topics and subject areas set forth in Exhibit A attached hereto. If the designated representative or representatives do not have such knowledge, they are required under Rule 30(b)(6) to acquire such knowledge through whatever reasonable investigation may be necessary.

Dated: May 21, 2025

                                           *BY:* /s/ Julia Tarver Wood
JULIA TARVER WOOD
DAVID TESLICKO
United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

*Counsel for Plaintiff United States of America*

JASON S. MIYARES
Attorney General of Virginia

/s/ *Tyler Henry*
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

*Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia*

## EXHIBIT A

## DEFINITIONS

1. The term "Google" or "you" means Google LLC, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (25 percent or more) or total ownership or control between the company and any other person.

2. "Digital advertising tools" means the various technologies used to buy or sell digital advertising, as described in Section IV (pages 9-23) of the Court's Memorandum Opinion dated April 17, 2025.

3. "AdX" means Google's ad exchange (as referred to in Section V.C. (pages 28-29) of the Court's Memorandum Opinion dated April 17, 2025), including any prior or subsequent name used to designate this product or any offering containing this product.

4. "DFP" means Google's publisher ad server (as referred to in Section V.C. (pages 28-29) of the Court's Memorandum Opinion dated April 17, 2025), including any prior or subsequent name used to designate this product or any offering containing this product.

5. The term "GAM" refers to Google Ad Manager, including both AdX and DFP.

6. The term "Relevant Product" means Google's AdWords, AdX, and DFP products (as referred to in Section V.C. (pages 28-29) of the Court's Memorandum Opinion dated April 17, 2025), including any prior or subsequent name used to designate these products or any offering containing these products. For the avoidance of doubt, this term expressly includes Google Ads, Google Display Network (GDN), and Google Ad Manager (or GAM), including Google Ad Manager 360.

7. The term "API" means Application Programming Interface, which is an interface or connection that allows different software systems or applications to communicate with each other.

8. A "Transitional Service Agreement" is an agreement between a buyer and a seller in a divestiture, acquisition, or sale in which the seller provides specified services and support to the buyer in order to effectuate the transfer of the divested or acquired assets.

## TOPICS

1. Each and every "harm [to] advertisers, open web and non-open web publishers, and Internet users" that would arise from Plaintiffs' proposed remedies, and all information and analyses relating to your contention. *See* Google's Response to Plaintiffs' Notice of Proposed Remedies, ECF No. 1434 at 28.

2. Each and every reason Plaintiffs' proposed divestiture of AdX is "unworkable" or "harmful," and all information and analyses relating to each reason. *See id.* at 14.

3. The extent and nature of any "commingl[ing]" of AdX's code and the code of any other Google product. *See id.* at 14. A description of the process of separating AdX code from DFP code as well as code for other Google products and Google's propriety software infrastructure, and all information and analyses related to that process. *See id.*

4. The particular "AdX[] functionalities" that you contend "may not work as well" outside of Google's infrastructure and all information and analyses relating to your contention. *See id.* at 15.

5. Each and every reason divesting parts or all of DFP "would be logistically unworkable and damaging to DFP's publisher customers," and the particular nature and details of

any "workability questions" that are raised by a divestiture of part or all of DFP, as well as all information and analyses relating to your contentions. *See id.* at 19.

6. How and why Plaintiffs' proposed remedies would "degrade the quality" of Google's buying tools, and all information and analyses relating to your contention. *See id.* at 25.

7. The nature and details of any "privacy risks" and security risks that arise from Plaintiffs' proposed remedies, and all information and analyses relating to your contention. *See id.* at 26 n.9.

8. All information and analyses you relied upon to conclude that "[d]ivestiture of AdX and/or DFP would take a minimum of five years if not much longer," *see id.* at 27 n.11, and details about each intermediate milestone or step related to divestiture encompassed by your estimate. This topic includes but is not limited to:

   a. Each step you believe Google would need to take in order to divest AdX, as described in Plaintiffs' Notice of Proposed Remedies, ECF No. 1430 at 8-9, and the cost and time required to complete each step.

   b. Describe what a "viable buyer" of AdX would need to have in terms of "software and hardware infrastructure capable of supporting AdX's current traffic volume" and describe what "time and resources" would be required to "build[] new infrastructure." ECF No. 1434 at 14. Describe what "continued, significant investments in both . . . software and hardware infrastructure" would be necessary. *Id.* Explain why AdX "may be more expensive to run" outside of Google's integrated stack, and all information and analyses underlying your contention. *Id.* at 15.

5

    c. Each step you believe Google would need to take to provide an API and server-to-server connection for DFP to integrate with and receive bids from the open-source Prebid header-bidding wrapper in the same manner and on the same terms as DFP integrates and solicits bids from AdX, *see* ECF No. 1430 at 10, and the cost and time required to complete each step.

    d. Each step you believe Google would need to take (i) to modify DFP to separate out the code that performs the final auction within the publisher ad server (*i.e.*, the "auction logic" that determines which ad to render on the page from available direct-sold opportunities and bids from indirect sources); (ii) provide this auction-logic code under an open-source license to industry organizations or participants; and (iii) provide an API in DFP to transmit information about direct-sold opportunities and bids from indirect sources to allow a neutral, third-party industry organization (or another entity chosen by the publisher) to use the open-source code to host the final auction outside of DFP, *see id.* at 10-11, and the cost and time required to complete each step.

    e. Describe the qualities of a "viable buyer" of DFP, including what a buyer would need to have in terms of software and hardware infrastructure. *See* ECF No. 1434 at 14. Explain why "because DFP supports so much ad traffic, a buyer may not even be able to immediately operate the full volume of the divested functions of DFP . . . or may not be able to keep DFP operating at that volume over time for the same low price." *Id.* at 19.

    f. Describe any "disrupti[on]" and "risks [of] data loss or degradation" associated with the migration of DFP. *Id*.

    g. Each step you believe Google would need to take to divest the remainder of DFP, *see* ECF No. 1430 at 11, and the cost and time required to complete each step.

9. Any assessment you performed regarding the cost, burden, difficulty, and/or commercial impact of divesting, selling, or making any Relevant Product available for use by anyone other than Google, including but not limited to divesting, selling, or making a Relevant Product, or any of the functionality of a Relevant Product, available for use by anyone other than Google pursuant to a voluntary or court-ordered divestiture. This topic includes but is not limited to Project Sunday, Project Monday, and any information or analyses related to those projects and similar projects.

10. Any changes that you evaluated and/or made to Google's products and services in anticipation of having to comply or in order to comply with a remedy order in this matter or any other proceeding concerning Google's digital advertising tools, including but not limited to Google's agreement with the French Competition Authority (reflected in Decision 21-D-11 of June 7, 2021) or section 5.8 of the Digital Markets Act.

11. The infrastructure, engineering, and design architecture for all GAM software systems and all databases with which GAM communicates, the dependencies and shared infrastructure between or among any such systems and databases, and how each software and database communicates or interacts with each other and with any other Google software system (including but not limited to AdSense, AdWords, Search, and YouTube), cloud service or third-party service.

12. The infrastructure, engineering, and design architecture for all deployment systems involved in deploying GAM services, including system dependencies, operating assumptions, deployment schedules, deployment methodologies, monitoring and logging systems, and how

each deployment system communicates or interacts with each other and with any other Google software system, cloud service or third-party service.

13. Whether and how Google adheres to the software engineering and development principles of modularity, encapsulation, single responsibility, separation of concerns, abstraction, testability in the design of its software, code review, testing and debugging, and how those practices and principles are reflected in the structure, development, deployment and any modifications you have made to GAM software (including Project AURAS), with specific reference to any handbooks or guidelines presented to engineers when they begin working on GAM, DFP, AdX, or related systems (e.g., GOOG-AT-MDL-004076461).

14. All strategies, plans, actions, and assessments related to the deployment of GAM or related digital advertising tools from Google's internal cloud computing infrastructure to an external-facing cloud infrastructure or a cloud infrastructure operated by someone other than Google, including but not limited to (a) any scaling strategies or plans for GAM deployment; (b) any assessments of GAM deployment interoperability between Google's internal cloud infrastructure and alternative cloud providers; (c) any actual efforts undertaken to deploy or assess the deployment of GAM or related tools outside of Google's internal cloud computing infrastructure, including the reasons for such efforts (e.g., failure recovery or backup), and the results or findings from those efforts, such as server system health metrics, latency reports, or cost analyses; and (d) any future development or product plans involving software or server infrastructure changes relevant to GAM deployment.

15. Any analysis you have performed of the costs of deploying GAM at scale, including but not limited to the costs of (1) server infrastructure, (2) deploying GAM in new regions or

datacenters, and (3) server or deployment failures, and any tradeoffs between or among scale, latency, and cost.

16. The flow of data across all GAM systems, including user data and publisher and advertiser bidding data, and including how such data are collected, stored, processed, transmitted, and anonymized or otherwise protected.

17. The lifecycle of a bid request within Google's digital advertising tools, including how bid requests are received, processed, routed, aggregated, protected, analyzed, and executed across GAM and auction systems, including but not limited to processing by the "CAT2," "BOW," "Unified Supermixer," and other categories listed in the diagram GOOG-DOJ-AT-00095497 and GOOG-DOJ-AT-01009733.

18. Any Transitional Service Agreement you entered into in connection with a divestiture, acquisition, or sale that included any transfer of software in the last 10 years, including the terms of such agreements, and an identification of any Google employees involved in performing the services required by the Transitional Service Agreement.

19. The revenue, cost, and profitability in the Profit and Loss statements of GAM (including but not limited to AdX and DFP) and any related components that affect revenue and costs of GAM from 2015 to present, as well any managerial and financial accounting methodologies and reporting practices adopted, which line items these methods apply to, and the reasons for any changes in accounting methodology.

20. Your responses to Plaintiffs' interrogatories.