# EXHIBIT 2

1

UNITED STATES DEPARTMENT OF JUSTICE

ANTITRUST DIVISION, WASHINGTON, D.C.

---oOo---

PURSUANT TO CIVIL INVESTIGATION DEMAND NO. 30762

HIGHLY CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF ███████████████

THURSDAY, OCTOBER 28, 2021

STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

CSR LICENSE NO. 9830

JOB NO.  2021-816725

Page 237

A   I cannot recall, because I -- if I remember right -- if I remember right, I had already exited the board or was about to exit, so I was not an active member at that time.

Q   Did you ever discuss or hear discussed issues relating to antitrust at IAB during your time serving on their board?

A   I was in a couple of meetings, and I don't recall an antitrust discussion, per se.

Q   And were any of the other individuals on that IAB board concerned about antitrust issues that they discussed in your presence?

A   I'm trying to recall the other individuals who were in those meetings.

I don't recall the other individuals, who were a mix of publishers, advertisers, Facebook, Apple, Microsoft, surfacing antitrust as a concern.

MR. MAHR:  Brent -- Brent, I'll interrupt here just to identify that there appears to be some attorney-client privileged material on the first page of this exhibit relating to a response from a Google attorney, Ted Lazarus.

You haven't asked any questions about it, and the -- the material you have asked questions about doesn't involve privileged materials.  So I don't have

Page 238

any problem with the questions that are on the record.

But I wanted to flag that in case you do ask questions about the -- the -- Mr. Lazarus' e-mail.

MR. NAKAMURA:  That's fine, and I appreciate that.  I do not intend to ask questions about the material on the first page.

But I assume this is your claw back; is that correct?

MR. MAHR:  Yes, we will claw back, but just that portion will be redacted and reproduced.

MR. NAKAMURA:  Okay.  Thank you.

And I don't need that done today.  I'm not asking anymore questions about that.  You can put that aside.

MR. MAHR:  Thank you.

MR. NAKAMURA:  Q.  So ████████, in the last two years, which is to say between October of 2019 and today, has Google considered any potential acquisitions in the ad tech space?

A   Not to my knowledge.

Q   Who at Google would be knowledgeable about whether or not Google had been considering any potential acquisitions in the ad tech space?

A   All acquisitions, you know, really spend most of the cycle in the corporate development team.  If

Page 239

something reaches any serious stage of why we're in discussion, that's when product On Us.  Potentially, Jerry Dischler would get involved.

Q   Okay.  And to your knowledge, is Google -- strike that.

To your knowledge, since you became SVP of ads and commerce in late 2018, has Google considered divesting any of its ad tech -- ad tech products or services?

MR. MAHR:  I want to intervene here again to instruct ████████ not to respond to that question to the extent that it requires you to divulge any attorney-client privileged material or work product based on that attorney-client privileged material.

MR. NAKAMURA:  Q.  With that instruction, ████████, I will ask again:  To your knowledge, since you became SVP of ads and commerce in late 2018, has Google considered divesting any of its ad tech products or services?

A   I don't believe I can discuss that without breaching attorney privilege.

Q   To confirm, you are refusing to answer my question on the basis of Mr. Mahr's instruction; is that correct?

A   I confirm that.

Page 240

MR. NAKAMURA:  Okay.  Kacey, could you please upload into the Chat Tab 13.  All right.

I'd like the Court Reporter to please mark this document as ████████ Exhibit 15.

(Document remotely marked Exhibit 15 for identification.)

MR. NAKAMURA:  For the record, this is a letter, dated October 4th, 2021, sent from, as noted on page 12, an attorney named Julie Elmer, E-L-M-E-R, to Mr. Ryan Karr, an attorney who is present at this deposition.

Q   ████████, have you seen this letter before?

A   I have not.

Q   Before October 4th, 2021, did you ever speak to any attorneys at the Freshfields law firm regarding any of the projects listed on this letter?

A   It's a long letter, so -- so I don't know most of the -- I've heard of these -- any of these projects.

I have referenced this with attorneys -- with Google attorneys.

Q   And which Google attorneys have you spoken with or written to regarding the projects listed in this letter?

Page 241

MR. MAHR:  You can identify the attorney's name if -- to the extent you remember.

THE WITNESS:  Kent Walker.

MR. NAKAMURA:  Okay.

Q   Anyone else?

A   It's possible Ted Lazarus as well.

Q   And when, roughly, if you recall, did you speak to Mr. Walker or Mr. Lazarus regarding the projects listed in this letter?

A   I'd have to say I don't recall the dates because it wasn't one point in time.  Some of these were spread out over time.

Q   And spread out over what range of, say, months of the year did that happen?

A   So we are in October '21.  No.  Very roughly, it would be from the beginning of -- somewhere between the beginning of 2019 and, I don't know, second or third quarter of 2020 is -- is my best estimate I can give you.

Q   Okay.  Thank you.

And what is Project Sunday?

MR. MAHR:  And I'll instruct the witness to answer only at the highest level, but not go into any detail that required you to divulge attorney-client privileged information or work product material.

Page 242

THE WITNESS:  Okay.  With that instruction, it was a discussion.  We had an early discussion of what we would -- how we would proceed with our display advertising business in the light of an evolving regulatory and privacy landscape.

MR. NAKAMURA:  Q.  And ▇▇▇▇▇▇▇▇▇, to be clear, do you have other knowledge regarding what Project Sunday is that you are refusing to provide me based on the instruction of Mr. Mahr?

A   There is a little bit more detail I can recall, but that is discussion I've had with Kent Walker.

MR. MAHR:  So I'll instruct you -- for purposes of the record, I will instruct you formally, ▇▇▇▇▇▇▇▇, not to disclose any -- any communications you had with Mr. Walker or any other counsel concerning these subjects.

MR. NAKAMURA:  Q.  And to complete the record, are you going to follow Mr. Mahr's instruction?

A   I do plan to follow Mr. Mahr's instruction.

Q   Thank you.

And what specific global regulatory inquiries did Project Sunday seek to address?

MR. MAHR:  I will offer the same instruction,

Page 243

▇▇▇▇▇▇▇▇, not to respond to that question to the extent it requires you to reveal attorney-client privileged information.

MR. NAKAMURA:  Q.  ▇▇▇▇▇▇▇▇▇, what are the names of the global regulatory inquiries that Project Sunday sought to address?

A   I'm unable to answer that.  I'll -- I'm following Mr. Mahr's instruction in this case.

MR. NAKAMURA:  Mr. Mahr, are you taking the position that the names of these specific regulatory inquiries are privileged information for which ▇▇▇▇▇▇▇▇ has a right to refuse to answer my question?

MR. MAHR:  We are.

And I'll say, as I have said before, we are working with the Department of Justice to get you information on these topics that are not confidential, but we're not going to do that on the fly in a deposition.

MR. NAKAMURA:  Q.  Who at Google provided you with legal advice regarding Project Sunday, ▇▇▇▇▇▇▇▇?

MR. MAHR:  Again, you can provide the name of the lawyers, to the extent you recall.

THE WITNESS:  Kent Walker is the one whose

Page 244

name I really recall.

MR. NAKAMURA:  Q.  And did anyone -- any attorneys at any outside law firm provide you with legal advice regarding Project Sunday?

A   I don't recall engaging with any outside attorney on this matter.

Q   Were you one of the Google employees who initiated Project Sunday?

A   It's a small group of us that -- including Kent Walker that said we should look at this question.

Q   Did Mr. Dischler also initiate Project Sunday?

A   I'm unable to tell you, you know, who exactly initiated it.  But I had discussions with Kent for sure and a couple of other employees.  It's -- it's not like many people are involved, so I don't know what to make of initiating versus not.

Q   And were you one of the key decision makers on Project Sunday?

A   To my knowledge, there was no decision made.  So -- so I wouldn't call myself or anybody a decision maker.

Q   When you initiated the project, if there were to have been a decision, would you have been one of the individuals who would have made a decision as to

## Page 245

any recommendation stemming from Project Sunday?

A  I would have been.

Q  And who else would have been?

A  It would be Kent to -- to look at it from a legal aspect, and Jerry Dischler and likely Philipp Schindler as well.

Q  What about Don Harrison?

A  I don't recall if he was involved.  Don reports to Philipp.  So I -- I would look to Philipp as -- as one of the key players.

Q  Did you ever discuss Project Sunday with Mr. Schindler?

A  If we haven't -- yeah, I don't recall.  But if we discussed it -- if we haven't discussed it, then at some point we would have to.

Q  Is Project Sunday still an ongoing project?

A  To my knowledge, we never terminated it or arrived at a definitive outcome.  So in that sense, it's open.  But it's not like it's -- it's something we're working on every day.  It's open-ended at this point.

Q  And when was the last meeting you had that you can recall regarding Project Sunday?

A  I'm having to guess here, but it would be over a year ago.  That's just a guess.

## Page 246

Q  Okay.  How many meetings, roughly, did you attend regarding Project Sunday?

A  A couple.

Q  And by "a couple," is that more than five?  Less than five?

A  Less than five is my recollection.

Q  Okay.  And when did you come to understand that your work on Project Sunday was in response to global regulatory inquiries?

A  Early on in discussions with Kent Walker.

Q  Approximately when did you have those early discussions with Mr. Walker?

A  Oh.  As I said earlier, the rough time frame is between the beginning of 2019 and, you know, the middle -- the second half of 2020.  But that's just my rough recollection, because beyond that, I don't recall.

Q  And what role did you have on Project Sunday other than -- well, I guess you said you were not a key decision maker, which is interesting.

But what -- how would you describe your role on Project Sunday?

MR. MAHR:  Objection.

I'll instruct [redacted] not to respond to that question to the extent it requires him to reveal

## Page 247

attorney-client privileged or attorney work product.

THE WITNESS:  Okay.

MR. NAKAMURA:  Q.  [redacted], I'll ask again:  How would you describe your role on Project Sunday?

A  One of a small group of senior people looking at various factors at a high level of global trends.

Q  And is there information that you are not providing to me or refusing to provide to me based on Mr. Mahr's instruction?

A  In regard to which specific question?  If you could clarify, I'll answer that.

Q  Do you have any additional knowledge regarding your description of the role you played on Project Sunday that you are refusing to provide to me based on Mr. Mahr's instruction?

A  Not really.

Q  Well, let me just try it this way then:  What factors did you look at when determining how to proceed with Project Sunday?

MR. MAHR:  Objection.

I'll instruct the witness not to respond on the grounds of privilege and work product protection.

MR. NAKAMURA:  Q.  And are you going to follow Mr. Mahr's instruction?

## Page 248

A  I am.

Q  And did you understand the connection to global regulatory inquiries to Project Sunday -- I'm sorry.  Strike that.

Did you understand there to be a connection between global regulatory inquiries and Project Sunday when you initiated the project?

MR. MAHR:  Objection; asked and answered.

But you may answer if you're able.

THE WITNESS:  Did I understand -- sorry.  If you could repeat that.

MR. NAKAMURA:  Sure.

Q  Did you understand that Project Sunday was a response to global regulatory inquiries at the time you initiated the project?

A  The way I'd describe it, my best description is, looking across a spectrum of the global environment ranging from privacy concerns to regulations, how should we think about the future for our business?  That was really the -- the broad question we were addressing.

It -- it was later that, you know, we got to learn about specific regulations.  So my point is it's not like I understood a lot of regulations, and then decided to do anything here.

Page 249

Q   Okay.  Who was the day-to-day Google employee in charge of Project Sunday?

**A   Jerry Dischler was involved.  I'm trying to recall whether ████████ was involved.  Kent Walker and, I believe, Ted Lazarus were also involved.**

Q   As part of your work on Project Sunday, did you ever see any material prepared by the investment banking firm Lazard, L-A-Z-A-R-D?

**A   I don't recall seeing that.**

Q   Okay.  And I want to just confirm these things for the record.

Did Google consider any divestitures as part of Project Sunday?

MR. MAHR:  Same objection not to answer on the grounds of attorney-client privilege and attorney work product.

MR. NAKAMURA:  Q.  Will you follow that instruction, ████████?

**A   I will.**

Q   Did Google consider any acquisitions as part of Project Sunday?

MR. MAHR:  Same object- -- same instruction.  Objection and same instruction.  Sorry.

MR. NAKAMURA:  Thank you.

Q   Will you follow that instruction,

Page 250

Mr. Raghavan?

**A   I will.**

Q   And did Google consider making any changes to its ad tech products as a part of Project Sunday?

MR. MAHR:  Objection.

And I instruct the witness not to respond on the grounds of attorney-client privilege and attorney work product.

MR. NAKAMURA:  Q.  Will you follow that instruction, ████████?

**A   I will.**

Q   And last question on Project Sunday:  Other than law firms, did you -- did Google, to your knowledge, ever work with any other companies -- any other outside companies on Project Sunday?

MR. MAHR:  You may answer that question if you're able to.

**THE WITNESS:  Not to my knowledge.**

MR. NAKAMURA:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 4:11 p.m.  We are now off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 4:20 p.m.  We are now back on the record.

Page 251

MR. NAKAMURA:  Thank you for returning, ████████.

Q   Beginning where I left off, what is your understanding of what Project Monday is at Google?

MR. MAHR:  I'll object and direct the witness not to respond on the basis of attorney-client privilege and attorney work product, other than to provide a brief high-level description of your understanding of Project Monday, if you have one.

**THE WITNESS:  Okay.  With that instruction noted, my best recollection is Monday -- sort of the best way of looking at it is to base an evolution of Sunday in which, if I remember, it was primarily Kent Walker, maybe Ted Lazarus, saying, Hey, you know, the environment is changing.  You know, how should we think about making adjustments in our advertising business?**

**So that's the high-level discussion.**

MR. NAKAMURA:  Q.  And what -- let me try to parse that statement.

So did Mr. Walker and Mr. Lazarus' roles change between Projects Sunday and Monday?

**A   I don't think of it as changing.  In both cases, they -- they are the best sources of information on -- on the regulatory landscape and what**

Page 252

**is impending out there.  So as a fairly routine matter, they educate my colleagues and myself.**

**And in like fashion, here, too, they were doing that.  And, you know, we were looking at adjustments to the business in light of some of the things they saw coming.**

Q   And when you say "regulatory landscape," what do you mean?

MR. MAHR:  I'll object.

I re- -- and instruct him not to answer on the grounds of attorney-client privilege and attorney work product, for the reasons stated before.

MR. NAKAMURA:  Q.  Will you follow Mr. Mahr's instruction?

**A   I will.**

Q   Are there specific regulatory inquiries that related to Project Monday?

MR. MAHR:  I object.

I instruct the witness not to answer on the grounds of the attorney-client privilege and attorney work product.

MR. NAKAMURA:  Q.  Will you follow that instruction?

**A   I will.**

Q   And who initiated Project Monday?

*Privileged and Confidential*
*Attorney-Client Communication*

251:14          "Hey" should read "hey" (Transcription Error)

253:5           "Here" should read "here" (Transcription Error)

254:11          "Okay. Sunday is over." should read "okay, Sunday is over." (Transcription Error)

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: December 2, 2021          Signature: ████████████████