## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFFS' REVISED NOTICE OF PROPOSED REMEDIES

As the Court has found, digital advertising is "the lifeblood of the Internet," because it "fund[s] much of its development" and "provid[es] free access to an extraordinary quantity of content and services" to American consumers. (Op. at 7.[1]) As shown at trial, and reflected in the Court's opinion, Google has engaged in a "decade-long campaign of exclusionary conduct" to "acquire," "protect," and "entrench[]" monopoly power in two markets that are critical to digital advertising. (*Id*. at 111, 114.) Pursuant to the Scheduling Order (ECF No. 1428), Plaintiffs provide the following disclosure of remedies they seek to address Google's violations of the Sherman Act and restore competition to these markets.

In this disclosure, Plaintiffs first summarize the key factual findings from the Court's opinion that support the remedy Plaintiffs propose, then set forth relevant legal principles that bear on appropriate remedies, and finally describe the types of relief Plaintiffs believe are necessary to remedy Google's multiple violations of the Sherman Act. The remedies disclosed herein are based on Plaintiffs' investigation to date, and Plaintiffs reserve the right to alter or augment these remedies because of discovery and/or further investigation.

---

[1] "Op." refers to the Court's Memorandum Opinion, ECF No. 1410, issued on April 17, 2025.

**Summary of Factual Findings Relevant to Remedies**

Plaintiffs' proposed remedies flow from the Court's liability findings about the "series of anticompetitive acts" Google took "to acquire and maintain monopoly power in the publisher ad server and ad exchange markets for open-web display advertising." (Op. at 114.) In Google's multi-faceted and ever-evolving "campaign of exclusionary conduct," it calculated each of its actions to "enhance[]," "mutually reinforc[e]," and "exacerbate[]" the anticompetitive effects of its other actions. (*Id.* at 81, 94, 98-100, 108, 110.) And because "products in the ad tech stack work together," (*id.* at 17), Google leveraged its common control of assets across the ad tech stack to harm consumers and competition in multiple markets.

Specifically, the crux of Google's campaign was its common control of DFP, AdX, and AdWords, which began with the acquisition of DoubleClick that "helped [Google] establish a dominant position on both sides of the ad tech stack." (*Id.* at 27.) Once Google had DoubleClick's ad exchange and publisher ad server in hand, it "effectively restrict[ed] the unique advertising demand offered by AdWords advertisers to AdX," (*id.* at 96), and tied DFP to AdX, which both "helped Google maintain [its] power" in the ad exchange market, (*id.* at 81), and "expanded Google's dominance in the publisher ad server market," (*id.* at 97). Those anticompetitive connections among Google's assets also facilitated additional illegal acts, "enabl[ing] Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools [DFP and AdX] that were not in its publisher customers' best interests." (*Id.* at 98.)

Over the course of its exclusionary campaign, Google "used its control of DFP . . . to implement additional policies" that mutated over time as Google found new and creative ways to protect Google's monopoly power from the forces of competition. (*Id.* at 29.) The first of these

policies was First Look, which used DFP's auction logic to "exacerbate[] the anticompetitive effect of the unlawful AdX-DFP tie," (*id*. at 99), thereby harming publishers and "impeding" rival ad exchanges from entering, growing, or competing, (*id*. at 31). Publishers, however, eventually "sought to . . . negat[e] Google's First Look advantage" through header bidding. (*Id*. at 32-33). In response, Google did not reform its ways and compete on the merits but instead chose to transform First Look into Last Look, which similarly "entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process." (*Id*. at 99.) Google then "compounded" the harm of Last Look through sell-side dynamic revenue share. (*Id*. at 100.) Finally, in response to "increased regulatory and 'competition concerns,'" which was yet another opportunity for Google to embrace competition on the merits, Google instead once again chose illegality, "using its coercive monopoly power" to implement Unified Pricing Rules, which harmed competition by "restrict[ing] its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers." (*Id*. at 100-01.)

The fruits of Google's illegal conduct are many and fall into three primary categories. First, Google "acquir[ed] . . . monopoly power" in both relevant markets. (*Id*. at 1, 114.) Second, Google gained ill-gotten profits by "charg[ing] durable supracompetitive prices for AdX" for "well over a decade." (*Id*. at 76-77.) Third, Google's unlawful conduct yielded "unparalleled scale," which "has given it significant advantages over rival firms," including because of "the importance of big data analytics for optimizing ad tech services and the significant network effects that exist in programmatic advertising." (*Id*. at 40; *see also id*. at 31 (First Look "gave Google a data advantage").)

**Applicable Legal Principles**

"[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961). A government plaintiff gets this benefit of the doubt because "[a] Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004).

"[A] remedies decree in an antitrust case must seek to" accomplish four objectives: (1) "unfetter a market from anticompetitive conduct," (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972) and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). In satisfying these objectives, the Court "is clothed with 'large discretion' to fit the decree to the special needs of the individual case." *Ford*, 405 U.S. at 573.

Accomplishing all four objectives usually requires going beyond "a mere prohibition of the precise [unlawful] scheme" in which the defendant already participated because such a narrow approach is often "ineffectual." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 727 (1944). After all, "[i]f all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128 (1948). Without also "eliminating the consequences of the illegal conduct," *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978), and

4

"assur[ing]" that the monopolist can never again use the "instrument[s]" of its violation to break the law, *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189-90 (1944), "the Government has won a lawsuit and lost a cause." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). Thus, effective relief should include a "comprehensive" and "unitary framework" of remedies "intended to complement and reinforce each other." *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 170 (D.D.C. 2008).

Relief must account for alternative forms of monopolization because "advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market." *Int'l Salt*, 332 U.S. at 400. "[I]t is not necessary that all of the untraveled roads to [an anticompetitive] end be left open and that only the worn one be closed." *Id.*; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 132 (1969) (court may restrain forms of conduct that "may fairly be anticipated from the defendant's conduct in the past"). This may include "prohibition of the use of admittedly valid parts of an invalid whole." *Bausch & Lomb*, 321 U.S. at 724; *accord United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950) ("Acts entirely proper when viewed alone may be prohibited."); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 461 (1940) (trial court "rightly suppressed" practice that "had been or might continue to be used for some lawful purposes"); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215 (D.C. Cir. 2004) (court may require or prevent conduct that "played no role in [the] holding [that the defendant] violated the antitrust laws").

Divestiture is the "most important" and "most effective" of antitrust remedies, in large part because "[i]t is simple, relatively easy to administer, and sure." *du Pont*, 366 U.S. at 326, 331. Because "divestiture or dissolution is an essential feature of [antitrust] decrees," courts "start from the premise that an injunction against future violations is not adequate to protect the

5

public interest." *Schine*, 334 U.S. at 128. "There is no reason why the protection of the public interest should depend solely on" the "somewhat cumbersome procedure" of "an injunction against future violations" when divestiture "is available." *Crescent Amusement*, 323 U.S. at 190.

Divestiture is especially warranted when a monopolist has been found to have a "proclivity in the past to use" certain assets "for an unlawful end," regardless whether the defendant lawfully acquired those assets at the outset. *Crescent Amusement Co.*, 323 U.S. 173, 190; *id*. at 189 (relief "should not be . . . restricted" to divesting "the fruits of the conspiracy" alone); *accord Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 256 (1959) (affirming divestiture of defendants' stock in corporation that "was not the fruit of the conspiracy" because "even if lawfully acquired it may be utilized as part of the conspiracy to effect its ends"); *United States v. Paramount Pictures*, 334 U.S. 131, 152 (1948) (similar); *see also Schine*, 334 U.S. at 129-30 (divesting "unlawfully obtained" assets is "the starting point," but "the matter does not end there"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ("Areeda & Hovenkamp") ¶ 653c2 (dissolution may be the "best or perhaps even the only" effective remedy for "significant acts of monopolization by a clearly dominant firm" when "the acts are diverse or have been repeated over time"). When the defendant is a recidivist monopolist, broad relief is needed, "in order that the ground may be cleansed effectually from the vice of the former illegality." *Bausch & Lomb*, 321 U.S. at 724. A "remedy regulating conduct alone is likely to fail" when the defendant's "monopoly power is substantial and likely to be durable," and "the possible forms of anticompetitive conduct are varied and difficult to predict." Areeda & Hovenkamp ¶ 653c2.

Just as effective behavioral relief sometimes prohibits otherwise lawful conduct, *see supra*, effective structural relief can entail divesting an asset the defendant uses in markets

beyond the ones that it monopolized. *Int'l Boxing Club*, 358 U.S. at 244, 254–55 (after liability finding in market for "promotion, broadcasting, and television of professional world championship boxing contests," approving divestiture of Madison Square Garden, which hosted non-boxing events); *United States v. Grinnell Corp.*, 384 U.S. 563, 566, 580 (1966) (after liability finding in market for "accredited central station service," approving divestiture of holdings in companies that furnished products in other markets); *cf. Md. Baking Co. v. FTC*, 243 F.2d 716, 717–18 (4th Cir. 1957) (upholding breadth of antitrust decree that proscribed certain practices "in all areas in which [defendant] was doing business," even though violation was only found "in the limited area in which a small competitor operated" (citing *Int'l Salt*)). Any asset whose "strategic position [was] maintained, as a result of" unlawful conduct is "vulnerable" to divestiture. *Paramount Pictures*, 334 U.S. at 171.

The touchstone of an antitrust remedy is "the discovery of measures effective to restore competition," and the Court has a duty to order those effective measures "whatever the adverse effect of such a decree on private interests." *du Pont*, 366 U.S. at 326. Only if there are multiple "effective remedies" can "[e]conomic hardship" be permitted to "influence [the] choice" among effective remedies. *Id*. at 327. In other words, "the Government cannot be denied" a divestiture that is "a necessary element of effective relief" based on concerns of "economic hardship, however severe." *Id*.; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 722 (4th Cir. 2021) ("In both government and private suits, a court may order divestiture if it's needed to 'restore competition,' i.e., to 'protect the public interest.'") (quoting *du Pont*, 366 U.S. at 326).

## Plaintiffs' Proposed Remedies

Plaintiffs seek a mix of structural, behavioral, and administrative remedies, including divestiture of Google's AdX ad exchange and phased divestiture of its DFP publisher ad server.

## I.    ADX DIVESTITURE

The Court held that Google unlawfully acquired and maintained its monopoly power in the ad exchange market. (Op. at 1, 114.) The "primary source" of that power was Google "effectively restricting the unique advertising demand offered by AdWords advertisers to AdX." (*Id*. at 96.) That unlawful conduct has harmed competition in the ad exchange market by "mak[ing] it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges" (*id*. at 80), because it "ensured that publishers would lose significant revenue if they did not use AdX," (*id*. at 96). The AdX-AdWords exclusivity has also harmed competition in the publisher ad server market because it, in conjunction with the DFP-AdX tie, made AdX "the 'glue that seal[ed] DFP' inventory to AdWords demand." (*Id*. at 28 (quoting PTX41 at -006)). Having established AdX's monopoly power via AdWords exclusivity, Google then entrenched that power through series of other actions, including First Look, Last Look, and Unified Pricing Rules ("UPR"). (*Id.* at 30, 80, 98-101.) This durable monopoly power, acquired and maintained unlawfully, allowed Google to "charge[] durable supracompetitive prices for AdX." (*Id*. at 76-77.)

Plaintiffs submit that AdX is a critical "instrument[]" of Google's anticompetitive scheme that Google has demonstrated a "proclivity in the past to use . . . for an unlawful end," which "warrants effective assurance that no such opportunity will be available in the future." *Crescent Amusement*, 323 U.S. at 189-90. And because Google unlawfully acquired monopoly power in the ad exchange market, that power is also among the "fruits of its statutory violation" that Google must be "den[ied]." *United Shoe*, 391 U.S. at 250. Thus, in order to accomplish the four objectives of an antitrust decree, Plaintiffs seek an order requiring Google to divest AdX. Plaintiffs propose that this divestiture occur as soon as possible and be overseen by a divestiture trustee, appointed by the Court, who would solicit potential buyers for AdX. In keeping with

prior court-supervised divestitures and in light of the United States' experience evaluating divestiture buyers, Plaintiffs also seek the right to approve or disapprove the divestiture buyer.

Moreover, as an interim remedy designed to restore at least a modicum of competition to the ad exchange and publisher ad server markets while the AdX divestiture is effectuated, Plaintiffs propose that Google be required to (1) provide an application programming interface (API) through which AdX will bid into header-bidding wrappers, such as Prebid, and (2) have AdX bid into non-Google publisher ad servers in the same manner in which it bids into DFP. Further, once the divestiture is completed, Plaintiffs propose, subject to further discovery, that Google be enjoined for a period of ten years from operating an ad exchange, or any product with similar functionality that transacts any open web display advertising.

## II.    PHASED DIVESTITURE OF DFP

The Court held that Google unlawfully acquired and maintained monopoly power in the publisher ad server market. (Op. at 1, 114.) Google "establish[ed]" that power by tying DFP to AdX "through contractual policies and technological integration," (*id*. at 114.), which "had a substantial anticompetitive effect in the publisher ad server market" by "forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share," (*id*. at 98). As with AdX, Google "used its control of DFP" to "implement additional policies" that shielded DFP from competition and "were not in its publisher customers' best interests." (*Id*. at 29, 98-101.) "These changes," which weaponized DFP's auction logic to "benefit[] [Google's] ad tech products," "decreased product quality and harmed competition." (*Id*.; *see also id.* at 99, 100-01, 103, 114.)

DFP, like AdX, is an "instrument[]" of Google's anticompetitive campaign, *see Crescent Amusement*, 323 U.S. at 189-90, and Google's monopoly power in the publisher ad server market

is a "fruit[]" of Google's violation because Google amassed that monopoly power through illegal

conduct, *see United Shoe*, 391 U.S. at 250. Given DFP's dominant position and Google's

decimation of competition in the publisher ad server market over the past 15 years, Plaintiffs

submit that open-sourcing and divestiture of DFP is necessary to satisfy the four objectives of an

antitrust decree, "assure the complete extirpation of Google's illegal monopoly" in the publisher

ad server market, *id*. at 251, and "assure the public freedom from its continuance," *Gypsum*, 340

U.S. at 88; *see also Int'l Boxing*, 358 U.S. at 253 (antitrust "decree should," *inter alia*, "break up

or render impotent the monopoly power which violates the [Sherman] Act"). This open-sourcing

and divestiture would occur in three phases designed to decrease switching costs for publishers

and "pry open to competition" a publisher ad server market "that has been closed by" Google's

conduct. *Ford*, 405 U.S. at 577-78. Plaintiffs submit that a three-phase process would restore

competition more quickly, ensure that no single actor can reassert monopoly power in the

publisher ad server market, and minimize disruption to publishers' business operations.

In the *first phase*, Plaintiffs propose that Google be required to provide an API and

server-to-server connection for DFP to integrate with and receive bids from Prebid header-

bidding wrappers, including those implemented by non-Google ad exchanges, in the same

manner and on the same terms as DFP integrates and solicits bids from AdX. In addition, to

lessen barriers to entry and foster competition in the publisher ad server market, Plaintiffs

propose Google be required to provide an API and export feature to assist publishers in

transferring their data from DFP to another publisher ad server.

In the *second phase*, Plaintiffs propose Google be required to modify DFP to separate out

the functionality that performs the final auction within the publisher ad server (*i.e.*, the "auction

logic" that determines which ad to render on the page from available direct-sold opportunities

and bids from indirect sources). (*See* Op. at 17, 31, 99.) Plaintiffs propose that Google then be required to provide this auction-logic code under an open-source license to industry organizations or participants. Google would also be required to provide an API in DFP to transmit information about direct-sold opportunities and bids from indirect sources to allow a neutral, third-party industry organization (or another entity chosen by the publisher) to use the open-source code to administer the final auction outside of Google's control. Upon completion of this interim step, Plaintiffs propose that Google should be enjoined for a period of ten years from modifying the final auction logic, other than modifications Google may propose to the open-source version of the auction logic, which must be approved by the third-party organization that administers the open-source auction logic.

Finally, in the *third phase*, Plaintiffs propose that Google be required to divest the remainder of DFP. Similar to the AdX divestiture, Plaintiffs propose that the DFP divestiture be overseen by a divestiture trustee, appointed by the Court, who would solicit potential buyers for DFP and assess whether divesting more than one copy of DFP (resulting in multiple buyers) would be appropriate and beneficial. Plaintiffs propose that DFP not be divested to the same entity that purchases AdX, and that Plaintiffs be permitted the right to approve or disapprove the eventual buyer(s) of DFP. Importantly, subject to further discovery on this issue, Plaintiffs may propose a Court-supervised mechanism for evaluating competition in the publisher ad server market after the conclusion of the second phase, which could obviate the need for the third phase, if the first two phases, along with other complementary remedies, restore competition to the publisher ad server market by then.

## III.    PROHIBITIONS ON DISTORTING THE COMPETITIVE PROCESS

The Court held to be unlawful a variety of ever-changing conduct Google implemented over a decade to distort the competitive process in Google's favor. Google "effectively

restrict[ed] the unique advertising demand offered by [Google Ads]" to AdX and then, in turn, "restrict[ed] AdX's submission of real-time bids only to DFP" thereby creating a "glue that sealed" DFP, AdX, and Google Ads. (Op. at 28, 92, 96.) Google then implemented First Look, Last Look, Sell-side Dynamic Revenue Share, and UPR, all of which "benefited its ad tech products" at the expense of its customers and the competitive process. (*Id*. at 29, 98-101.)

A series of behavioral remedies are necessary, in conjunction with the structural relief proposed above, to prevent Google from engaging in this or similar conduct in the future and to ensure that competition is restored in the ad exchange and publisher ad server markets as quickly as possible. To those ends, Plaintiffs propose the following remedies:

(1)     Google's buyside tools (AdWords and DV360) should deal with all third-party ad tech tools (as well as AdX and DFP) on non-discriminatory terms with respect to bidding, matching, placement of ads, or provision of information, except at the express instruction of an advertiser;

(2)     Google should be prohibited from preferentially routing any buyside demand (from AdWords or DV360) to any ad exchange or publisher ad server, except at the express instruction of an advertiser;

(3)     Google should be prohibited from seeking, offering, or accepting any compensation or other remuneration for preferentially routing buyside demand (from AdWords or DV360);

(4)     During the time that Google still operates any portion of AdX or DFP, Google's buyside tools (AdWords and DV360) should be prohibited from receiving bid requests or providing bids directly into DFP and must instead access DFP inventory only through an ad exchange; and Google must bid into such third-party products on a nondiscriminatory basis without regard to whether the publisher is using any Google product, including AdX or DFP;

(5)     Google should be prohibited from tying products between or among markets for publisher ad servers, ad exchanges, or advertiser buying tools; and

(6)     Google should be enjoined from all conduct determined by the Court to be anticompetitive.

Plaintiffs propose that these provisions be in effect for at least ten years after the remedies decree becomes effective.

12

## IV.    ESCROW AND TECHNICAL ASSISTANCE

To ensure that Google does not continue to profit from its unlawfully obtained monopolies while the remedies take effect, Google should be required to place in escrow 50% of the net revenues from AdX and DFP from the date of the Court's opinion (*i.e.*, April 17, 2025) until the date Google has fully divested AdX and DFP, as described *supra* pp. 8–11. The funds in the escrow account may be used, at the discretion of the divestiture trustee, to (1) fund the ongoing operation of the industry organization administering the final publisher ad server auction using the open-source code provided by Google (as required above), or (2) to assist publishers in defraying the costs associated with transitioning away from DFP as their publisher ad server. Google should also be required to provide reasonable technical assistance to the industry organization administering the open-source auction logic software.

## V.    DATA AND TRANSPARENCY

As found by the Court, Google leveraged the data and scale it obtained through its unlawful monopolies both to improve its products and to gain significant advantages over its rivals. (Op. at 24 ("Google uses this data to improve the matching of advertisements to users"); *id*. at 31 ("First Look also gave Google a data advantage that helped the AdX team train its auction bidding models more effectively"); *id*. at 40 ("The unmatched scale that Google has achieved across the open-web ad tech stack helps the company test products more quickly and make higher-quality matches between advertisers and publishers."); *id*. ("As ad tech products continue to integrate artificial intelligence and machine learning capabilities, Google's vast repositories of data about advertisers, publishers and Internet users, combined with the company's scale and technical sophistication, will further benefits its open-web display advertising business.").) Those data and scale advantages are thus among the "fruits of its

13

statutory violation" that Google must be "den[ied]" in order to restore competition. *United Shoe*, 391 U.S. at 250.

A series of data and transparency provisions are required to remedy the data and scale advantages Google unlawfully acquired for its ad tech products. Plaintiffs propose the following such remedies, subject to privacy and data protection laws and opt-out by publishers or users:

(1)    Google should be required to share DFP data that improves auction logic with the industry organization administering the open-source final publisher ad server auction;

(2)    Google should be prohibited from using data signals generated by virtue of Google's ownership of DFP on a discriminatory basis or to preference any Google product over any competing product;

(3)    Google should be prohibited from utilizing first-party data, *i.e.*, data on users generated from any Google property (including but not limited to YouTube, Gmail, Google Search, Chrome, and Android), on a discriminatory basis or to preference any Google product over any competing product; and

(4)    Google should be required to allow publishers to access data generated in DFP or AdX from their inventory in the same format as Google can access said data.

Plaintiffs propose that these provisions be in effect for at least ten years after the remedies decree becomes effective.

## VI.    MONITORING, ANTI-RETALIATION, AND ADMINISTRATION

To effectuate the remedies described herein, Plaintiffs propose certain administrative and monitoring procedures. Specifically, Plaintiffs propose that the Court appoint a divestiture trustee selected by Plaintiffs to oversee the divestitures of AdX and DFP. Plaintiffs also propose the selection and appointment of a monitoring trustee to monitor Google's compliance with the provisions of the final judgment. Plaintiffs propose that Google be responsible for paying the costs of these monitors.

Plaintiffs also propose that Google be prohibited from retaliating, in any part of its business, against any party that cooperated with the Plaintiffs during their investigations or

during this litigation in any manner or took any other action to bring to light Google's unlawful

conduct. Plaintiffs propose that investigating and reporting on retaliatory behavior be included in

the monitoring trustee's remit.

## VII.    LEGAL AND ETHICAL COMPLIANCE

As found by the Court, Google's document retention policies and practices have for many

years been inappropriate and contrary to law. The Court determined that Google deleted relevant

evidence through its automatic chat deletion policy, and that Google did so even after the

Plaintiffs began their investigations and after document retention notices were issued to Google

employees, some of whom failed to abide by the instructions therein. (Op. at 113.) Further, the

Court determined that Google employees "misused the attorney client privilege" including

Google's President of Global Affairs, Kent Walker. (*Id*. at 113-14.)

The Court found that Google engaged in "systemic disregard of the evidentiary rules"

and that Google's conduct "may well be sanctionable." (*Id*. at 114.) While the Court found it did

not need to sanction Google "at this juncture" (*id*.), because Google demonstrated a wide-spread

culture of failing to comply with its legal and ethical obligations,[2] Plaintiffs propose additional

remedies to address these failures. In particular, Plaintiffs propose that Google be required to

implement mandatory compliance training for all employees on: (1) obligations to preserve and

produce materials for use in investigations, litigations, or regulatory filings; (2) appropriate use

of the attorney-client privilege; (3) the general purpose and substance of antitrust laws; and

(4) the Court's Judgment and Decree. To oversee these measures, Plaintiffs propose that the

Court appoint a compliance monitor, chosen by Plaintiffs, to ensure Google reforms its practices

---

[2] *See also In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993-94 (N.D. Cal. 2023);
*United States v. Google LLC*, 747 F. Supp. 3d 1, 187 (D.D.C. 2024).

with respect to document preservation and attorney-client privilege and make periodic reports on

Google's progress thereon to an independent committee of Alphabet Inc.'s Board of Directors,

the Plaintiffs, the monitoring trustee, and/or the Court.

## VIII.  ATTORNEYS FEES AND COSTS

The Plaintiff States intend to seek attorneys' fees and costs related to their investigations

in this matter and this litigation pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

\* \* \*

This comprehensive set of remedies—including divestiture of Google's unlawfully

obtained monopolies and the products that were the principal instruments of Google's illegal

scheme—is necessary to terminate Google's monopolies, deny Google the fruits of its violations,

reintroduce competition into the ad exchange and publisher ad server markets, and guard against

reoccurrence in the future. The broad sweep of these remedies is necessitated by the magnitude

of Google's violations—its "decade-long campaign of exclusionary conduct." (Op. at 111.)

Dated: June 13, 2025

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
CRAIG L. BRISKIN
MATTHEW R. HUPPERT
DAVID TESLICKO
MICHAEL E. WOLIN

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia