### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> GOOGLE LLC, <br><br> *Defendant*. | No: 1:23-cv-00108-LMB-JFA |

### GOOGLE'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE COURT'S MAY 30 ORDER AND TO COMPEL PRODUCTION OF GOOGLE'S REMEDY FEASIBILITY SUBMISSIONS TO THE EUROPEAN COMMISSION

At its May 30 hearing, this Court heard competing arguments about whether documents created in connection with remedies projects that are undisputedly protected work product are fact rather than opinion work product and, if so, whether Plaintiffs had demonstrated substantial need to pierce the protections ordinarily afforded such documents. The Court found Plaintiffs showed a substantial need for information about "the sophistication" of the ad tech tools at issue "and the interplay that they have with Google's internal proprietary software and hardware infrastructure." 5/30/25 Hr'g Tr. at 40:3-41:2. Plaintiffs insisted that their experts "would not be able to be in the same position that Google's technical people who have worked with that system for years, who fully understand the interplay between the systems and an understanding [of] how it is," would be. *Id.* Accordingly, the Court ***partially*** granted Plaintiffs' motion to compel, ordering Google to produce "internal reports and analyses prepared by non-lawyers at Google describing the nature and scope of work that would be required to modify Google's ad exchange (AdX) and Google's publisher ad server (DFP) to facilitate divestiture as requested by plaintiffs." Dkt. 1450.

Since the May 30 hearing, Google has sought to diligently comply with the Court's order. In addition to searching through the millions of documents provided in prior productions with expansive search terms, Google conducted an extensive search for additional responsive materials from 2023 to the present, including for all the Google employees identified as potential witnesses in this case. Google then reviewed tens of thousands of potentially responsive documents and, on a rolling basis, will produce or describe on a privilege log any responsive documents after applying tailored redactions to maintain attorney-client privilege and work product protections outside the scope of what it understood the Court compelled. For each deposition of a Google employee, Google produced in advance responsive analyses of the technical work required to facilitate divestiture such that Plaintiffs could review and examine witnesses about those documents. Indeed, on the very day they filed their motion, Plaintiffs did just that during an hours-long deposition of a Google employee. Plaintiffs examined the employee extensively about documents created in connection with remedies projects. And Google made no objection when Plaintiffs repeatedly pressed the employee about the precise issue that Plaintiffs claimed at the May 30 hearing animated their request for Google's work product: any discrepancies between current testimony about the unworkability of proposed remedies and prior analyses done of those same remedies. *Compare* 5/30/25 Hr'g Tr. at 10:23-11:2 (Plaintiffs complaining that they sought to ask "well, have you always thought that" divestiture would be unworkable; "have you ever conducted a previous analysis where you came to a different conclusion,"), *with* Ex. 1 (deposition transcript) at 131:21-132:7 █████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████

Despite the fact that in the two weeks since May 30 Google's productions have enabled Plaintiffs to do exactly what they told the Court they wanted to at the May 30 hearing, Plaintiffs bring a motion "to enforce the Court's May 30 order," casting aspersions that Google is trying to "frustrate" the Court's order and "slow-rolling" productions. Dkt. 1475 ("Mot.") at 1. But Plaintiffs' bluster obscures that the parties' dispute is simple: Plaintiffs disagree with Google about the proper interpretation of the Court's May 30 order. Plaintiffs assert that, on May 30, the Court *also* compelled production of (1) any non-legal analyses related to any remedies projects regardless of whether they pertain to Plaintiffs' proposed divestiture at all or whether they are based on information for which Google fact witnesses have unique knowledge, such as the interplay of Google's systems with its infrastructure that animated the Court's ruling; and (2) discussions of the scope of potential remedies, including possible technical changes to the products at issue, that explicitly contain, convey, or seek attorney impressions, opinion, or strategy and that have no relevance to Plaintiffs' arguments in this action, such as questions about whether a particular approach may be more or less likely to resolve a regulator's concerns.

Given the parties' disagreement, last week Google offered to Plaintiffs to promptly provide a privilege log that would enable the parties to sharpen the contours of their dispute, suggested the parties negotiate an agreed-upon production schedule for additional documents, and asked that the parties file a joint motion for clarification of the Court's May 30 order. Google also made clear that, should the Court determine with the benefit of a full privilege log that *in camera* review would be helpful, Google would be amenable to that approach. Unwilling to accept that the parties had a fair-minded disagreement or that there could be more collaborative, less burdensome ways to seek guidance on the Court's May 30 order, Plaintiffs proceeded with the instant motion.

Plaintiffs have taken the same approach to Google's submissions to the European Commission—again casting aspersions that Google is trying to "hide," Mot. at 2, even though, as Google also repeatedly explained to Plaintiffs, Google seeks only to ensure it acts in compliance with another sovereign's law. The European Commission has repeatedly represented in filings before U.S. courts that European law prevents the disclosure of materials related to an EC proceeding. To overcome that prohibition, Plaintiffs rely on a two-page letter from the EC case team that appears to be completely at odds with the relevant EU law and the EC's longstanding position thereon. Since it was unclear from this letter, which Google received from Plaintiffs with no context, whether the EC case team actually intended to reverse the EC's prior positions and permit Google to share "grey-listed" evidence, Google requested further clarification from the EC, which the EC case team declined to provide. Therefore, in light of the lack of clarity from the EC, Google has now sought review of the EC case team's letter to the European Commission's Hearing Officer, who is an independent arbiter specifically established by the EC to rule on disputes concerning procedural issues under EU competition law. Google must ensure that its actions do not run afoul of foreign law and, contrary to Plaintiffs' assertions, Google's response has been a good-faith attempt to do so. Moreover, while Plaintiffs claim they are not interested in "settlement proposals or negotiations about such proposals," Mot. at 14, the EC-related materials they seek include exactly that. As multiple courts in the Fourth Circuit have recognized, such "pre-settlement negotiations" are entitled to "enhanced protections." *Wyeth* v. *Lupin Ltd.*, 2008 WL 11509482, at *3 (D. Md. Mar. 28, 2008).

At bottom, despite Plaintiffs' insinuations, Google has endeavored to fully comply with the Court's prior rulings within the bounds of the privileges and protections Google is entitled to.

Google welcomes the Court's guidance on all the issues raised in Plaintiffs' motion, and is prepared to comply with the Court's directives.

## BACKGROUND

I.    **The Court Held that Documents Google Created in Connection with Remedies Projects Are Within the "Broad Umbrella" of Protected Fact Work Product.**

In June 2023, the Court held that documents—including ones created by non-lawyers—that were created because of "projects themselves . . . tied to particular issues having to do with trying to resolve, address some concerns with ongoing investigations or remedies" are attorney work product.  6/15/23 Hr'g Tr. at 46:8-48:18.  In reaching that conclusion, the Court did not decide whether the work product was fact or opinion work product.

Two years later, on May 30, 2025, the Court considered whether a particular category of work product prepared in connection with the remedies projects was fact or opinion work product and concluded:  "Reports and analyses prepared by nonlegal Google employees relating to the scope of work required to divest either AdX or DFP is really fact work product."  5/30/25 Hr'g Tr. at 38:15-39:14.  The Court confirmed that it continued to believe its "earlier ruling that these kinds of materials," i.e. remedies project documents, "fall within the broad umbrella of work product was appropriate."  *Id.*

Accordingly, the Court granted Plaintiffs' motion to compel in part and ordered Google to produce a particular category of fact work product documents: "any internal reports and analyses prepared by nonlawyers" that describe "the nature and scope of the work that would be required to modify Google's ad exchange, AdX, or Google's publisher ad server, DFP, to facilitate the divestiture as requested by the plaintiffs."  *Id.* at 40:16-41:2.  In light of the short fact discovery period, Google requested that the Court offer Google "some indulgence in order for us to get this rolling production underway."  *Id.* at 43:9-44:2.  The Court acknowledged that Plaintiffs' concern

was about having documents prior to taking depositions of Google's employees, and encouraged the parties to "at least take a stab at trying to get those [timing-related] things worked out" given that they previously "have gotten together and been able to work a lot of things out." *Id.* at 44:3-45:6.

## II.   Google Performed a Prompt and Exhaustive Document Collection, Search, and Review and Produced Responsive Documents in Advance of Depositions.

Following the Court's May 30 order, Google immediately started the process for making rolling productions responsive to the Court's order.  To identify responsive documents, Google applied expansive search terms designed to capture any memoranda, notes, agendas, reports, presentations, spreadsheets, and working documents that may have discussed relevant remedies-related projects and/or divestiture as proposed by Plaintiffs.  Google then reviewed the numerous documents captured by the broad search terms in order to identify any "internal reports and analyses prepared by non-lawyers at Google describing the nature and scope of work that would be required to modify Google's ad exchange (AdX) and Google's publisher ad server (DFP) to facilitate divestiture as requested by Plaintiffs."  Dkt. 1450.  Once Google identified responsive documents, it applied redactions in order to protect attorney-client privileged communications as well as work product not covered by the Court's May 30 order.

From that exhaustive review process, Google began rolling productions to Plaintiffs.  In advance of the first Google employee deposition on Monday, June 9, Google produced responsive documents from the employee's custodial files the morning of Thursday, June 5—just four business days after the Court's order.  In advance of the depositions of two additional Google employees on Friday, June 14, Google produced responsive documents from those employees' files the morning of Wednesday, June 12.  As Google assured Plaintiffs before the filing of their

motion, Google will produce documents on a rolling basis in advance of any relevant depositions of Google employees, and complete production prior to the close of fact discovery, if not earlier.

Despite Plaintiffs' grievances about the timing and scope of Google's productions, Plaintiffs extensively examined all three Google employees at their depositions on their involvement in relevant remedies projects, and had full opportunity to examine those witnesses on the documents Google produced in response to the Court's May 30 order. At one deposition, Google had produced responsive documents relating to technical work required to facilitate divestiture as requested by Plaintiffs, yet Plaintiffs did not ask the witness any questions about those documents. By contrast, Plaintiffs spent hours with another Google witness asking him about internal analyses—produced by Google in advance of his deposition—that he and other nonlawyers prepared at the direction of counsel to evaluate potential resolutions to ongoing investigations and litigation. *See* Ex. 1 (excerpts from deposition transcript). Moreover, consistent with the Court's May 30 order, Google did not object to Plaintiffs' hours of questioning regarding the work the witness did in connection with remedies projects, including questions about:

- What analyses of the technical work required to achieve certain proposals Google conducted;



  ○                Ex. 1 at 43:14-17.

  ○                *Id.* at 63:20-64:5.

  ○                *Id.* at 105:16-20.

- What facts those analyses were based on;

  ○                *Id.* at 55:18-57:1.

  ○                *Id.* at 110:9-111:10.

- Whether the witness or other nonlawyers spoke to publishers or other Google engineers about their analyses;

  

- Whether any final reports or analyses were generated or where analyses were documented;

  

- What conclusions the witness or other nonlawyers reached;

  - What were those conclusions?" *Id.* at 107:21-108:15.

  - "Did the Stonehenge team reach any conclusions ▮▮▮▮ *Id.* at 357:22-358:14.

- What conclusions the witness or other nonlawyers presented to more senior executives; and

  - *Id.* at 129:2-17.

  - "Did the Single Click working group present any findings ▮▮▮ . . . Who did it present the findings to?" *Id.* at 375:21-376:8.

- Whether those conclusions ever changed.

  - *Id.* at 131:13-20.

  - "Are you aware of the scoping team conducting any further analysis that would ▮▮▮▮ *Id.* at 132:9-21.

In response to those questions, the witness offered hundreds of pages of testimony, based on his work and experience at Google, that went right to the heart of what the Court found Plaintiffs

had a substantial need for—"the sophistication of" Google's "systems and the interplay that they

have with Google's internal proprietary software and hardware infrastructure," 5/30/25 Hr'g Tr.

40:3-15.  *See* Ex. 1 (excerpts from deposition transcript).

### III.   Google Has Explained Its Approach to Plaintiffs and Attempted To Work Out a Joint Solution with Plaintiffs that Would Address Their Concerns, But Plaintiffs Declined.

After receiving the first production of documents responsive to the Court's May 30 order

on Thursday, June 5, Plaintiffs did not raise any concerns about Google's production efforts until

Monday, June 9, the day of the first Google employee deposition.  Dkt. at 1475-1 at 13.  Even

then, Plaintiffs did not articulate any particular concerns for Google to address or make specific

demands relating to the timing of Google's productions.

On a Tuesday, June 10 meet and confer, Google explained to Plaintiffs in detail the

approach Google had taken to redactions in the produced documents in order to apply the Court's

May 30 order—an approach that is repeated in detail for the Court below, *infra* Section I

(Argument), and had previously been laid out in Google's production cover letter to Plaintiffs on

June 5.  In the June 10 meet and confer, Plaintiffs advanced a far broader reading of the Court's

May 30 order.  According to Plaintiffs, the Court found Plaintiffs demonstrated substantial need

for *any* reports or analyses by nonlawyers related to divestiture, including marketplace analyses of

potential buyers—regardless of whether those analyses were based on facts uniquely in the

possession of Google's fact witnesses.  Though Google disagreed, Google offered to revisit any

parts of the May 30 order and hearing transcript Plaintiffs believed supported their position.

Following the Tuesday, June 10 meet and confer, Google explained again its position on

the Court's May 30 order and requested that the parties meet and confer again given their

disagreement about the scope of the order.  *Id.* at 7-9.  During the Thursday, June 12 meet and

confer and in written correspondence following that meet and confer, the parties reached an

impasse regarding the breadth of the Court's finding of substantial need.  *Id.*  Google told Plaintiffs that it believed a mutual agreement would be an efficient and productive way to proceed, and offered to (1) promptly provide a privilege log that would sharpen the contours of the dispute, including accounting for any responsive documents that were fully withheld; (2) file a jointly submitted motion for clarification of the Court's order after Plaintiffs had the opportunity to review Google's privilege log; (3) agree to a timeline for Google to produce additional responsive documents; and (4) agree to an appropriate procedure for *in camera* review should the Court find that it would be helpful.  *Id.* at 1; Ex. 2 at 3.  The afternoon of Friday, June 13, hours before filing the present motion, Plaintiffs wrote back to decline Google's proposal and, at the same time, proposed a specific production schedule for the first time.  Ex. 2 at 2.  Plaintiffs then filed a motion demanding the Court "enforce" its May 30 order and unilaterally requesting *in camera* review.

## ARGUMENT

### I.    Google Has Taken a Good-Faith Approach to Producing and Redacting Documents Responsive to the Court's May 30 Order.

As Google explained in detail to Plaintiffs in its production cover letters of June 5, June 12, and June 18, as well as in the June 10 and June 12 meet and confers, Google has produced and redacted documents in accordance with what Google understands is the scope of the Court's May 30 order.  Google has transparently and repeatedly explained its interpretation to Plaintiffs, which is set forth below.

*First*, the Court stated in June 2023 and again in May 2025 that documents created by both lawyers and nonlawyers in connection with remedies projects fall under the "broad umbrella" of fact work product.  *Supra* Section I (Background).[1]

---

[1] Plaintiffs suggest Google has waived its fact work product claim as to some remedies documents because, in October 2023, Google did not update all prior privilege logs (including ones first provided to Plaintiffs during the investigation stage years ago) to specifically reflect that Google

*Second*, the Court's May 30 order compelled production of only *certain* fact work product for which the Court found that Plaintiffs had demonstrated substantial need. Specifically, the Court found substantial need for certain documents based on two factors:

> Google has also made in their papers a very aggressive argument that the unfeasible workability issues relate, in large part, to ***the sophistication of these systems and the interplay that they have with Google's internal proprietary software and hardware infrastructure.*** I think that any outside expert that the plaintiffs may be able to hire, spend time, do their analysis ***would not be able to be in the same position that Google's technical people who have worked with that system for years, who fully understand the interplay between the systems and understanding how it is,*** would be able to come up with an analysis of the same significance.
>
> So ***for those reasons***, I am going to grant the motion in part and require Google to provide any internal reports and analyses prepared by nonlawyers.

5/30/25 Hr'g Tr. at 40:3-18 (emphases added). Based on its substantial need finding, the Court's order compelled production only of "internal reports and analyses" of "the nature and scope of work that would be required to modify Google's ad exchange (AdX) and Google's publisher ad server (DFP) to facilitate divestiture as requested by plaintiffs." Dkt. 1450. As Google has argued in its briefs, the work required to modify AdX and/or DFP to facilitate divestiture is an unworkable

---

had prevailed on fact work product doctrine for remedies documents. Mot. at 7 n.11. Rule 26 imposes no such draconian formalisms. The purpose of a privilege log is to "allow[] the opposing party to assess the assertion of the privilege against the applicable tests and to challenge any claim thought to be wanting." *Rambus, Inc.* v. *Infineon Techs. AG*, 220 F.R.D. 264, 272 (E.D. Va. 2004). Here, remedies documents have already been assessed to be fact work product, and Plaintiffs have been on notice since at least June 2023 that Google considers documents relating to remedies projects to be protected work product.

Moreover, "[w]aiver is not automatic," *Smith* v. *James C. Hormel Sch. of Virginia Inst. of Autism*, 2010 WL 3702528, at *4 (W.D. Va. 2010) (collecting cases), and is an "exceedingly harsh sanction," *Rambus*, 220 F.R.D. at 274. The proper course would be to direct the production of a revised privilege log, as the court did in the case cited by Plaintiffs, *Williams* v. *Big Picture Loans, LLC*, 2019 WL 8107922, at *4 (E.D. Va. 2019); *see also H/S Wilson Outparcels, LLC* v. *Kroger Ltd. P'ship I*, 2018 WL 1528187, at *3 (E.D.N.C. 2018) (taking a similar approach). In its privilege logs pertaining to this phase of proceedings pursuant to the Court's May 30 order, Google will describe its privilege claims and documents "in a manner that . . . will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).

technical challenge because of the way that Google's systems are designed.  Dkt. 1431 at 12-15; Dkt. 1434 at 13-19.  Accordingly, the Court has compelled Google to produce documents about that system design and the technical work required to change it.

*Third*, the Court gave guidance that it was not compelling production of "legal opinions" and "analysis from lawyers and those kinds of things."  5/30/25 Hr'g Tr. at 40:3-41:2.

To comply with the Court's statements at the May 30 hearing and its May 30 order, Google is producing *any* internal reports or analyses of the technical work required to modify AdX or DFP to facilitate divestiture as proposed by Plaintiffs.  Indeed, though Plaintiffs do not mention them, Google produced multiple documents with virtually no redactions, even though they were prepared in connection with remedies projects, because they contain such technical analyses.  *See, e.g.*, Exs. 3 (GOOG-AT-MDL-B-009828834), 4 (GOOG-AT-MDL-B-009828829), 5 (GOOG-AT-MDL-B-009832007) (relating to various remedies projects initiated because of investigations and litigation).  The sole exception is narrow instances in which discussions of technical work or scope are protected by attorney-client privilege or opinion work product.  For example, as an *in camera* review would show, the redactions Plaintiffs describe as "selectively withholding some timelines . . . while producing others," Mot. at 10, actually draw a distinction between proposed timelines for *technical work* and timelines for *potential litigation or investigation deadlines*.

Moreover, in order to faithfully comply with the Court's May 30 order, Google has interpreted the meaning of "divestiture as requested by Plaintiffs" as expansively as possible. Google has produced any internal reports or analyses of technical work required to modify AdX or DFP ███████████████████████████████████████████████████████████ ████████████████████████████████████████████.  *See, e.g.*, Ex. 6 (GOOG-AT-MDL-B-009832916) (relating to a remedies project initiated in response to investigations and

litigation 

).

Consistent with the principles laid out above, and as will be reflected in Google's privilege log, Google has withheld or redacted remedies projects documents in the following categories:

- Fact work product for which Plaintiffs have not shown substantial need, including:

    ○ Marketplace analyses. At the May 30 hearing, the Court specifically observed that Plaintiffs would be required to make a different showing of substantial need to justify compelling such analyses:

    > How does that come into play? We're talking about business people who would be doing that analysis not having anything to do with engineers, right? . . .

    > Why is their analysis something that you can't get through other resources, that component? *That is a marketplace analysis, not one that Google has necessarily expertise in,* like they would with their engineers and coming up with, you know, how will we go about doing this divestiture and how much would it cost. I'm trying to get the substantial need component to this other aspect of, you know, who would buy it and would they be viable if they did buy it.

    5/30/25 Hr'g Tr. at 13:21-14:21 (emphasis added).

    ○ Analyses of how various scenarios might affect the financial performance of the tools at issue, including analyses of Google's Profit and Loss statements. Again, at the May 30 hearing, the Court explicitly told Plaintiffs they had not shown a "substantial need" for this type of information:

    > MR. HUPPERT: . . . . And the core relevance of these materials, Your Honor, is to see how Google's engineers and business people evaluated this question of remedies and feasibility and, of course, what they concluded as nonlawyers, as business people, and as engineers. For example, the degree of technological complexity they concluded would be involved or *the financial viability of divested business units*, you know, what they concluded about that.

13

THE COURT: What relevance does that have?  The technical aspect I understand fully.  They say it would take five years, or it could take even longer and very complicated, and it would cost Google a lot of money to do it.  That part I can understand, but the technical feasibility having to do with—if the Court orders divestiture, it's going to order divestiture.

And whether Google loses a lot of money or somebody gets a lot of money or those kinds of things are going to be part of that.  ***I'm not sure discovery on that issue is necessarily something that you have a substantial need for and can't get through other sources***.

5/30/25 Hr'g Tr. at 11:10-12:6 (emphases added).

○ Analyses of potential remedies that were not divestiture and did not entail any technical work that would be relevant to a divestiture as requested by Plaintiffs.

○ Forecasts and plans for Google's future business strategy if certain remedies were to be implemented.

○ Details of how Google may have implemented certain potential remedy scenarios that do not relate to technical work, ███████████████████ ████████████████████████████████████████ ███████████████

○ Google's public relations strategy concerning potential resolutions of ongoing investigations and litigation.

● Documents or portions of documents that are not only fact work product, but also protected by attorney-client privilege or opinion work product, including:

○ Information directly communicating, containing, conveying, or seeking the advice of lawyers regarding whether certain changes, if implemented, may be more or less likely to resolve ongoing investigations and litigation, or regarding the potential exposure to legal risks that might result from a particular product change under

consideration. That would include, as Google explained to Plaintiffs in a meet and confer and in written correspondence, Ex. 2 at 1, any discussions about what "technical scope" for a product change might be responsive to regulators' concerns.[2]

- ○ Descriptions of the specific allegations in investigations or litigation that motivated particular analyses.

- ○ Presentations or documents that were authored by attorneys for purposes of giving legal strategy and advice, even if they incorporated the opinions and work of nonlawyers or were reviewed in part by nonlawyers for accuracy. This includes, for example, attorneys' drafts of responses to various correspondences with regulators, draft litigation filings that were reviewed or commented on by nonlawyers, and draft talking points for meetings with regulators.

- ● Any information directly stating that any ████████████████████████ ████████████████████████████████████████████ ████████████████████████████. For example, Google would have redacted any parts of a hypothetical presentation explaining ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████ Such information may be not just fact work product, but also an attorney-client privileged communication or an attorney's opinion work product.

---

[2] Even if such discussions were not attorney-client privileged and/or opinion work product, they are also fact work product for which Plaintiffs have not shown substantial need. To make their arguments in this action, Plaintiffs have not shown, and cannot show, any need to know what remedies Google employees thought might address regulators' concerns.

**II.    Plaintiffs Disagree About the Proper Interpretation of the Court's May 30 Finding of Substantial Need.**

Unsatisfied with Google's approach, Plaintiffs advance the extreme position that Google should be required to "remove redactions from *any* material prepared by non-lawyers at Google." Mot. at 1, 15 (emphasis added).  Despite the Court's statements at the May 30 hearing, Plaintiffs seemingly believe that they have shown a substantial need for any non-lawyer's analysis that has anything to do with divestiture, or simply is in the same document as an analysis of divestiture— even if the analysis is not based on facts uniquely in the knowledge of Google's fact witnesses or about divestiture.  For example, on both the June 10 and 12 meet and confers, Plaintiffs demanded analyses of the financial viability of AdX and DFP, despite having propounded discovery requests for the precise facts that would inform such analyses, including updated profit-and-loss statements for Google Ad Manager.  (And Google is producing responsive materials.)  Plaintiffs also explicitly demanded that Google produce marketplace analyses of potential buyers.  Of course, information about the marketplace is not unique to Google.  Nor does Google plan to, as it would with engineering witnesses testifying about the technical workability of divestiture, put forward fact witness testimony about marketplace analyses.  Thus, even applying Plaintiffs' own substantial need arguments from the May 30 hearing, it is unclear how Plaintiffs have also shown substantial need for marketplace or financial viability analyses.  *Cf.* 5/30/25 Hr'g Tr. at 35:5-19 (Plaintiffs complaining on May 30 that "DOJ is not going to be" able to put up "any fact witnesses from the DOJ who will say, you know, I, Matt Huppert from the DOJ think that" AdX divestiture "would take six months").

Google agrees that the parties have reached very different understandings of the Court's May 30 finding of substantial need.  But Plaintiffs also go one step further, accusing Google of making "blunderbuss assertions of privilege" or "sweeping and conclusory claims of privilege."

Mot. at 8. Those accusations are inaccurate and unsupported by the law. For one, Plaintiffs fixate on the fact that Google has previously withheld and, in some instances, continues to withhold documents drafted by non-lawyers or containing technical or financial analysis. But the Court has already held that documents created by non-lawyers about such topics in connection with remedies projects can be fact work product. Indeed, fact work product, by definition, may contain a variety of information, depending on the issues raised in a legal proceeding, and may be created by non-lawyers. *Dunston* v. *Cecil Huang*, 2010 WL 11698098, at *1 (E.D. Va. May 5, 2010) (Anderson, M.J.) (holding that a surveillance video "created by a representative of the defendants" and obtained by counsel in anticipation of litigation was "protected by the work product protection" before assessing substantial need); *Williams* v. *AT&T Mobility*, 2022 WL 2821922, at *5 (E.D.N.C. July 19, 2022) (rejecting as "incorrect" argument that documents created by non-lawyers "cannot be privileged").[3]

Second, even though the remedies project documents fall under the "broad umbrella" of fact work product, Plaintiffs insinuate that Google has overly redacted documents by relying on attorney-client privilege and opinion work product. *See* Mot. at 7-8. Google is *not* asserting that every redacted page of every document is protected by either attorney-client privilege or opinion work product. Nor has Google ever taken that position. As explained above and laid out in Google's privilege log, among the documents at issue, many redactions have been applied or documents withheld because those portions contain fact work product for which the Court has made no finding of substantial need. Google has made other, tailored redactions on attorney-client

---

[3] Contrary to Plaintiffs' accusations, *see* Mot. at 8, in the prior stage of this litigation it was entirely appropriate for Google to withhold an engineering analysis prepared by a non-lawyer because that document was created at the direction of counsel to assist with resolving ongoing investigations and litigation. As Plaintiffs acknowledge, following the Court's May 30 order Google has produced the analysis of engineering work required.

privilege or opinion work product grounds to the extent that parts of the responsive documents are attorney-client communications or convey the opinions or strategy of attorneys. That parts of these documents contain attorney-client communications or opinion work product is unsurprising given the fact that, ultimately, these analyses were created at the direction of counsel to evaluate legal strategies and the potential for resolution of multiple ongoing regulatory investigations.

Finally, Plaintiffs also imply—based on sheer speculation—that Google must not have complied with the Court's order because Google has produced so few documents.[4] For one, in the absence of a full privilege log documenting any withheld documents, when they filed their motion Plaintiffs did not yet have sufficient information to evaluate the universe of documents Google has reviewed. Regardless, for the avoidance of any doubt, Google reiterates that it has performed an exhaustive collection and search for responsive documents, reviewed thousands of those documents to identify responsive ones, and will account on its privilege logs and through its productions for all responsive documents.

Plaintiffs ignore that the number of documents Google is producing corresponds to the relatively contained scope of the Court's order for "internal reports and analyses" of the technical work required to facilitate divestiture, which were created in connection with remedies projects directed by counsel. That a limited number of responsive remedies project documents—much less relevant analyses of divestiture in particular—exists at all is consistent with Google's practice, as

---

[4] Plaintiffs also complain about an inconsistency in redactions in the documents produced to Plaintiffs. Mot. at 12. As Google has explained to Plaintiffs, *see* Ex. 7, the inconsistency was an inadvertent mistake made while a team of reviewing attorneys was attempting to rapidly review and produce documents in advance of the deposition of the relevant Google witness, which occurred shortly after the Court's May 30 order. That mistake has since been corrected.

Prior to filing their motion, Plaintiffs never raised this inconsistency to Google, despite having received the relevant documents over a week prior. Had Plaintiffs identified this particular concern to Google, Google would have promptly resolved it, as Google did following the filing of Plaintiffs' brief.

testified to by multiple Google employees, for the remedy projects at issue.  As the Court observed in 2023, prior remedies projects "were modest in nature and seemed to be one-offs."  6/15/23 Hr'g Tr. at 47:17-48:2.  For example, taken together, *all* Google employees spent only 45 hours on Project Single Click, 50 hours on Project Stonehenge, 30 hours on Project Sunday, and 10 hours on Project Monday.  Ex. 8 (Google's 30(b)(6) witness deposition transcript) at 93:22-24, 131:6-12, 152:17-25, 189:22-24; *see also* Ex. 1 at 387:2-389:16 (██████████████████████████ ████████████████████████████████████████  As to more recent projects, one employee testified that, based on his role in the organization, he was consulted for a particular purpose and did not recall creating documents but "verbally reported back."  Ex. 9 at 81:16-82:14.  Another employee testified that, for a different project, Google did not put together ████████████████████████████████████████████████████████████ ███████████████████████████████████  Ex. 1 at 83:5-22, 92:16-93:3.  In light of this limited scope, the documents Google has produced, combined with the ones accounted for on the privilege log as withheld documents, account for the full universe of responsive remedies project documents.

### III.    If Google Has Misinterpreted the Court's May 30 Order, Google Will Faithfully Apply the Court's Direction, Including Any Order for *In Camera* Review.

As Google told Plaintiffs in a June 12 meet and confer, Google believes it has applied redactions and withheld documents according to the proper interpretation of the Court's May 30 order.  Google is not seeking in any way to "frustrate" the Court's May 30 order, Mot. at 1, but rather to apply that order carefully and draw the necessary lines between highly sensitive, protected material that would not have been produced but for investigations and litigation and material that Google is obligated to produce.  Given the parties' present disagreement about the May 30 order,

Google now seeks the Court's guidance on that order. If Google has misinterpreted the Court's prior order, it will comply with the Court's direction.

As to Plaintiffs' request for *in camera* review, Google already informed Plaintiffs that it would be amenable to reaching "agreement on a procedure for *in camera* review for the Court to consider if the Court determines that *in camera* review would be helpful in resolving the parties' dispute." Ex. 2 at 1. Google respectfully submits that, in light of the Court's prior finding of fact work product protection over remedies projects, Google's explanation of how it has applied the Court's findings, and Google's intent to re-review and reproduce documents if necessary to comply with any further order from the Court, *in camera* review is unnecessary and premature. But, should the Court determine that *in camera* review would be helpful to the Court, Google respectfully submits that the best procedure would be for both parties to make selections of a subset of documents for the Court's review after responsive documents and a complete privilege log are produced to Plaintiffs.

Finally, as to Plaintiffs' request for an expedited schedule, earlier on June 18, Google already produced to Plaintiffs documents in connection with depositions of the remaining Google employees that had been noticed prior to the filing of Plaintiffs' motion.[5] Google also intends to provide Plaintiffs with a revised privilege log for the documents that Google produced to Plaintiffs on June 5, June 11, and June 18 no later than June 20. In addition, Google will have produced to Plaintiffs all documents responsive to the Court's May 30 order by Wednesday, June 25, with a privilege log to follow by June 27. No further expedited schedule is necessary.

---

[5] On Monday, June 16, Plaintiffs noticed for the first time the deposition of an additional Google employee. To the extent relevant documents are not among the production already, Google will produce any documents in connection with that employee's deposition by June 25.

**IV.    Google Has Declined to Produce Its Submission to the EC Because Doing So Would Violate EU Law and Disclose Highly Sensitive Settlement Negotiations.**

Google has not produced its submissions to the European Commission ("EC" or "Commission") because of a serious concern, grounded in the EC's own prior practice, that doing so would both violate the law of the European Union ("EU") and would disclose the contents of highly sensitive settlement negotiations conducted as part of an ongoing investigation. Plaintiffs' claim that Google has resorted to "stalling tactic[s]," Mot. at 14, is a gross distortion that serves little purpose other than a gratuitous ad hominem attack.  While Google certainly appreciates the constraints of the expedited fact discovery period, it cannot simply violate another sovereign's laws or disclose settlement negotiations in a separate, ongoing investigation because Plaintiffs want it to.  For the reasons set out below, the Court should deny Plaintiffs' request.

**A.    The EC Has Consistently Taken the Position in U.S. Courts That EC-Related Materials Are Not Discoverable.**

Plaintiffs' brief accuses Google of advancing an incorrect argument that submissions to the EC in an ongoing investigation are not discoverable but fails to mention the EC's longstanding practice. Over the past twenty-five years, the EC has intervened or filed *amicus* briefs in multiple antitrust proceedings pending before United States courts "to present the Commission's position" that "the Commission's investigative materials" are barred from disclosure under EU law.  Ex. 10, *Amicus Curiae* Brief of the European Commission, *In re Farm-Raised Salmon & Salmon Prods Antitrust Litig.*, Case No. 1:19-cv-21551-CMA (S.D. Fla.), Dkt. 346 at 1-2 (collecting cases).  For example, in the *Farm-Raised Salmon* proceeding the EC filed an *amicus* brief against disclosure of certain documents, including "all documents produced . . . in connection with [the EC's] Statement of Objections" and "all draft and final responses provided to the European Commission's questionnaire(s)."  Ex. 10 at 8-9 n.2.  The EC explained that "EU competition law requires that certain documents related to the Commission's investigations not be disclosed under

certain circumstances," and that the EC's "competition enforcement ***depends on legal guarantees*** that certain types of information exchanged during the investigation ('black-listed' and 'grey-listed' evidence) will be ***accorded absolute and legally binding protection from disclosure*** orders." *Id.* at 9 (emphasis added). By contrast, "white-listed" evidence, i.e. "pre-existing documents that exist independently" from the EC's proceedings, can be disclosed at "any time, even while the investigation is ongoing." *Id.* at 7.

Deferring to the EC, U.S. courts have, in turn, denied parties' motions to compel the production of materials related to the EC's investigations. *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1084 (N.D. Cal. 2007) (denying motion to compel documents provided as part of EU's leniency program based on the "strong objection" in the Commission's letter); Ex. 11, Order, *In re Farm-Raised Salmon & Salmon Prods Antitrust Litig.*, Case No. 19-cv-21551-CMA (S.D. Fla. 2021), Dkt. 385 at 4-5 (denying motion to compel defendants' responses to EC's RFIs, after EC intervened as an *amicus*, finding that "Defendants and the EC have an interest in protecting these confidential documents"); *cf. In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 5919515, at *3 (S.D.N.Y. 2018) (denying motion to compel Statement of Objections because EC letter filed in parallel litigation, which put plaintiffs' counsel on notice that "European law did not permit or entitle plaintiffs to disclosure of the SO or other materials related to the EC's closed CDS investigation").

Plaintiffs' Request for Production No. 2 requests "all communications, briefs, white papers, presentations, expert declarations, expert reports, and any other advocacy or analysis submitted or referenced by Google" to the EC concerning any "actual or potential remedy for alleged anticompetitive conduct"—directly seeking materials prohibited from disclosure under Commission Regulation (EC) No 773/2004 and EU Directive 2014/104/EU on Antitrust Damages

Actions ("Damages Directive") (cited in Google's objections to Plaintiffs' request) and the EC's consistent past positions. The materials sought by Plaintiffs were prepared specifically for the EC proceedings and therefore qualify as "grey-listed" evidence, i.e. any "information that was prepared by a natural or legal person specifically for the proceedings of a competition authority." Ex. 10 at 6-7 ("Because 'grey-listed' documents were created specifically for the investigation, they must not be disclosed while the investigation is ongoing."). EU law "ensure[s] the unequivocal protection of 'grey-listed' documents against discovery until the Commission's proceedings are closed." *Id.* at 7 (noting protection found in the Damages Directive as well as Article 16a(3) of Regulation 773/2004).

In light of the foregoing, the letter from the EC case team, which Plaintiffs provided to counsel for Google on May 29, reflects a position that is inconsistent with both the letter of the relevant EU laws and appears to be inconsistent with of the Commission's long-standing position on the discoverability of materials part-and-parcel of an EC investigation.[6] The two-page letter vaguely concludes that several provisions of EU law, including the Damages Directive and Article 16a(3) of Commissions Regulation No. 773/2004, "do not prohibit a defendant from producing documents responsive to" RFP 2. Dkt. 1477-5 at 2. The letter is completely silent on what specific documents Google is permitted to produce, including whether Google can produce "grey-listed evidence" without violating EU law. The case team's letter also fails to reference any case law or

---

[6] In the *Salmon* proceeding, the EC provided a letter to defense counsel, stating that it had "serious concerns" that plaintiffs' RFPs sought settlement submissions and materials prepared specifically for the EC proceeding. *See* Ex. 12, Letter from C. Villarejo, Deputy Director General DG Competition, *In re Farm-Raised Salmon & Salmon Prods Antitrust Litig.*, Case No. 19-cv-21551-CMA (S.D. Fla.), Dkt. 221-1 at 5 ("The Commission's services at DG Competition have **serious concerns** regarding the disclosure of the Requested Documents in proceedings before the Court, in so far as, and subject to the meaning of 'documents *produced* to the European Commission, the Production Request: . . . relates to other documents that your Client would have specifically created" for the EC proceedings before "these proceedings are closed.").

interpretation of the relevant provisions of EU law that would legally allow Google to produce the requested documents.  Because counsel for Google was not copied on Plaintiffs' communications with the EC case team, Google had no understanding of what, if any, context Plaintiffs provided to the case team.  As it appears that the case team's position was completely at odds with the EC's prior positions—positions the EC had taken in multiple filings before U.S. courts—Google took the reasonable step of contacting the EC to obtain clarification and request reconsideration.  Counsel for Google spoke with the case team on June 5 and sent a follow-up letter on June 6.  However, since June 6 was the start of a holiday weekend as June 9 is a public holiday in Brussels, Google extended its requested response deadline to its letter to June 16.  Plaintiffs chose not to wait, filing this motion to compel instead.[7]

On June 16, counsel for Google spoke with the case team again regarding Google's June 6 letter.  The case team advised that it would not respond to Google's letter. As such, Google still lacks necessary guidance as to whether, for example, the case team's May 29 letter is simply affirming prior guidance that Google can produce "white-listed" materials or if it is now the EC's view that Google can produce "grey-listed" materials as part of U.S. civil discovery.  As explained, Google's production of "grey-listed" materials would be entirely inconsistent with the Damages Directive and the prior positions taken by the Commission in other U.S. courts.   Absent clarification, it remains unsettled whether Google can produce "grey-listed" evidence without violating EU law.  Google has sought this clarification from the Hearing Officer, an independent arbiter specifically established by the EC to rule on disputes between parties and the European

---

[7] After Plaintiffs indicated that they intended to move to compel, Google provided updates to the EC, but the EC did not give any indication that it was prepared to respond earlier than the June 16 deadline.  As a result, Google was unable to provide an updated position to Plaintiffs before they filed their motion.

Commission's Directorate-General for Competition[8] concerning the effective exercise of procedural rights in antitrust and merger proceedings,[9] with which the issue remains pending. The EC's Hearing Officer may overrule the position expressed in the letter.

### B. Plaintiffs Should Not Be Permitted to Force Google to Turn Over Materials from Highly Sensitive Settlement Negotiations That Are Part of an Ongoing Proceeding.

Setting aside that EU law prohibits the disclosure of these materials, the Court should separately decline Plaintiffs' request for settlement materials for an additional reason. In their motion, Plaintiffs claim that they do not "seek any settlement proposals or negotiations," but then claim in the same paragraph that they are entitled to documents that were provided to the EC "in connection with" settlement discussions. Mot. at 14. It is difficult to reconcile those contradictory positions.



As Google has repeatedly raised to Plaintiffs, "pre-settlement negotiations" are entitled to "enhanced protections."[10]  *Wyeth v. Lupin*, 2008 WL 11509482, at *3 (D. Md. 2008). Courts in

---

[8] The department of the EC responsible for enforcing EU competition rules.

[9] *See* https://competition-policy.ec.europa.eu/hearing-officers_en.

[10] The Court's May 30 Order did not address either the discoverability of pre-settlement materials exchanged between parties or the settlement proposals themselves. As Plaintiffs acknowledged in their Reply in Support of their Motion to Compel Internal Analyses, "The cases Google cites all dealt with discovery of settlement agreements, settlement communications, or similar material exchanged between parties engaged in compromise discussions." Dkt. 1447 at 13.

the Fourth Circuit recognize that they "must balance the public interest in protecting the confidentiality of the settlement process and countervailing interests," and have found that "public policy warrants judicial caution in exposing communications made during the negotiations leading up to a final settlement." *CHS Inc. v. ABM Healthcare Support Servs., Inc.*, 2021 WL 149861, at *2 (W.D. Va. 2021) (quoting *Food Lion LLC v. Dairy Farmers of Am. Inc.*, 2020 WL 6947921, *3 (W.D.N.C. 2020)). In pushing for these materials, Plaintiffs rely on factually inapposite cases involving the discovery of an executed settlement agreement or where discovery would not reveal existence of settlement negotiations. Dkt. 1447 at 14; *see also CHS Inc.*, 2021 WL 149861, at *2 ("courts distinguish between discovery of a settlement agreement once it is reached versus discovery into the settlement negotiations and process.").

Plaintiffs' insistence on piercing confidential settlement negotiations will certainly chill any future settlement negotiations between Google and competition regulators; it will likely chill settlement negotiations for other companies as well.  Ex. 10 at 13-14 ("The Commission's investigation procedures are designed to encourage private parties to provide sensitive material in complete reliance on the Commission's legally binding assurance of nondisclosure.").  Any company, including Google, would be extremely wary of ever entering into settlement negotiations with the EC or any other competition regulator if it knew it might be obligated to turn over those settlement negotiations in discovery to a third-party.  The consequences of turning over these materials is particularly acute in this case, as plaintiffs, including private plaintiffs, in pending parallel actions will likely insist on receiving these materials as well.  Therefore, Google's confidential settlement negotiations may be distributed across multiple jurisdictions and plaintiff groups, completely compromising the confidentiality and integrity of the EC settlement process.

Furthermore, Plaintiffs have no actual need for the settlement materials. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Plaintiffs' reasons for continuing to pursue these materials are unclear, especially when Federal Rule of Evidence 408 bars their admission into evidence. *See Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988) ("The public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions.").

Finally, Plaintiffs claim they have a heightened need for these materials. Pursuant to the Court's May 30 Order, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████. In other words, Plaintiffs can obtain the same relevant information through "other, *less concerning* or burdensome, means." *CHS*, 2021 WL 149861, at *2 (emphasis added). Plaintiffs therefore have not established why they also ████████████████████████

████████████████████████████ *See Wyeth*, 2008 WL 11509482, at *4 (denying motion to compel settlement communications where party had "not demonstrated that injustice will result from non-disclosure").

Dated: June 18, 2025

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Justina K. Sessions (*pro hac vice*)
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, DC 20004-2637
Telephone: (202) 240-2900
kdunn@dirllp.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com