# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

---

UNITED STATES, *et al.,*

        *Plaintiffs,*

    v.

GOOGLE LLC,

        *Defendant.*

No. 1:23-cv-00108-LMB-JFA

---

## MEMORANDUM OF LAW IN SUPPORT OF GOOGLE LLC'S
## <u>MOTION TO EXCLUDE THE TESTIMONY OF DR. GORANKA BJEDOV</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

RELEVANT BACKGROUND ................................................................................. 3

LEGAL STANDARD............................................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.     DR. BJEDOV'S OPINIONS FAR
            EXCEED THE SCOPE OF HER EXPERTISE ..................................... 8

    II.    DR. BJEDOV'S FEASIBILITY AND TIMELINE OPINIONS
           ARE IPSE DIXIT AND LACK A RELIABLE METHODOLOGY.................. 12

          A.     Dr. Bjedov Admits Reaching Her
                   Opinions Before Analyzing Record Evidence ........................................... 13

          B.     Dr. Bjedov Admits Her Opinions
                   Are Not Supported by Source Code Analysis........................................... 16

          C.     Dr. Bjedov's "Industry Examples" Are Cherry
                   Picked and Contradict Her Feasibility and Timeline Estimates .............. 19

          D.     Dr. Bjedov Improperly Assumes the Role of the Fact Finder By
                   Selectively Reading Certain Phrases From a Few ████████████ .... 21

    III.   PLAINTIFFS' FAILURE TO DISCLOSE
           MATERIALS DR. BJEDOV CLAIMS TO HAVE RELIED
           UPON EXACERBATES HER BLACK BOX APPROACH.............................. 23

CONCLUSION......................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmad v. Spinnaker Insurance Co.*,
    2025 WL 1732520 (E.D. Va. June 20, 2025) .........................................................16

*Brainchild Surgical Devices LLC v. CPA Glob. Ltd.*,
    144 F.4th 238 (4th Cir. 2025) .......................................................11, 24, 26

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
    2018 WL 4220674 (S.D.W. Va. Sept. 8, 2018) ....................................................21

*Conrad v. CSX Transp., Inc.*,
    2015 WL 3797873 (D. Md. June 17, 2015) .........................................................12

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) .........................................................................7

*Copeland v. Bieber*,
    2016 WL 7079569 (E.D. Va. Sept. 8, 2016).................................................12, 20

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).....................................................................................7

*Disney Enterprises, Inc. v. Kappos*,
    923 F. Supp. 2d 788 (E.D. Va. 2013) (Brinkema, J.) .............................................26

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*,
    2022 WL 433006 (E.D. Va. Feb. 11, 2022),
    *rev'd on other grounds*, 95 F.4th 181 (4th Cir. 2024).............................................11

*Garcia v. Volkswagen Grp. of Am., Inc.*,
    2022 WL 2542291 (E.D. Va. July 7, 2022)...............................................12, 14, 19

*Holesapple v. Barret*,
    5 Fed. Appx. 177 (4th Cir. 2001)........................................................................12

*JFJ Toys, Inc. v. Sears Holding Corp.*,
    237 F.Supp.3d 311 (D. Md. 2017).......................................................................9

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024),
    *rev'd on other grounds, Folwell v. Kadel,* 2025 WL 1787687 (2025) ......................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    145 F. Supp. 3d 573 (D.S.C. 2015)......................................................................13

*In re Lipitor (Atorvastatin Calcium) Mktg.,*
  *Sales Pracs. and Prods. Liab. Litig.,*
  174 F. Supp. 3d 911 (D.S.C. 2016) .......................................................19

*In re Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.,*
  892 F.3d 624 (4th Cir. 2018) .................................................7, 18, 19

*Peters-Martin v. Navistar Int's Transp. Corp.,*
  410 F. App'x 612 (4th Cir. 2011) ..........................................................18

*S. States Rack and Fixt're, Inc. v. Sherwin-Williams Co.,*
  318 F.3d 592 (4th Cir. 2003) .................................................................24

*Sardis v. Overhead Door Corp.,*
  10 F.4th 268 (4th Cir. 2021) ...................................................................7

*SAS Inst., Inc. v. World Programming Ltd.,*
  2015 WL 13878192 (E.D.N.C. Nov. 5, 2015) ........................................21

*Shreve v. Sears, Roebuck & Co.,*
  166 F. Supp. 2d 378 (D. Md. 2001) .........................................................8

*Silicon Knights, Inc. v. Epic Games, Inc.,*
  2011 WL 6748518 (E.D.N.C. Dec. 22, 2011) ........................................19

*Students for Fair Admissions v. United States Naval Acad.,*
  2024 WL 4135782 (D.Md. Sep. 10, 2024) ................................................8

*Stynchula v. Inova Health Care Servs.,*
  2024 WL 4830578 (E.D. Va. Nov. 19, 2024) ..........................................20

*Synopsys, Inc. v. Risk Based Security, Inc.,*
  2022 WL 3005990 (E.D. Va. July 28, 2022),
  *aff'd,* 70 F.4th 759 (4th Cir. 2023) .......................................................18

*Thorpe v. Va. Dep't of Corr.,*
  2024 WL 4298779 (W.D.Va. Sep. 26, 2024) .............................................8

*Trana Discovery, Inc. v. S. Research Inst.,*
  2017 WL 3709069 (E.D.N.C. Aug. 28, 2017) ...........................................8

*United States v. Wilson,*
  484 F.3d 267 (4th Cir. 2007) .................................................................12

*Vertullus Holdings LLC v. W.R. Grace & Co.-Conn.,*
  2021 WL 3883597 (D. Md. Aug. 12, 2021) ............................................21

*Wood v. Credit One Bank*,
    277 F.Supp.3d 821 (E.D. Va. 2017) ...................................................................8, 12

**Statues and Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) .........................................................................24

Fed. R. Civ. P. 37(c)(1).........................................................................................24

Fed. R. Evid. 702 ...................................................................................7, 8, 12, 26

## INTRODUCTION

Plaintiffs' software engineering expert – Professor Jon Weissman – █████████████████ ████ to provide an estimate of how long it might take to implement their proposed remedies, explaining that he would need to do more source code review and software engineering work to provide such estimates. Unable to secure a qualified expert willing to support their desired remedy timelines, Plaintiffs turned to Dr. Goranka Bjedov, who is willing but unqualified to render opinions on the full timelines, and who admits to reaching her opinions *before* considering any record evidence, and without doing any of the requisite source code analysis or engineering work. Dr. Bjedov's opinions regarding the feasibility and timelines of Plaintiffs' proposed remedies are impermissible ipse dixit and should be excluded for the following independent reasons.

First, Dr. Bjedov's opinions far exceed the scope of her expertise. To determine a timeline for the divestiture of AdX and DFP, she identifies decoupling AdX and DFP software code from Google's proprietary infrastructure and rewriting that code to operate elsewhere as the most complex and time-consuming step and assigns it ██████████. Yet, as a hardware-focused engineer, rather than a software engineer, she has no experience ██████████████████████████ ████████████████████ much less working on the decoupling and rewriting of large-scale software for a migration to new infrastructure.

Second, Dr. Bjedov admits she reached her feasibility and timeline opinions for Plaintiffs' remedies *before* considering any record evidence in this case, purely based on her experience and public information. That shows her opinions are ipse dixit, lacking any reliable methodology linking her opinions to the facts of the case. Importantly, Dr. Bjedov reached her opinions without any analysis of the extensive source code for AdX and DFP (and supporting systems) that has been continuously developed over the course of 15-plus years. That source code, and its reliance on

Google proprietary infrastructure, is a critical variable in assessing how much time a divestiture of AdX and DFP to a third party's infrastructure would take. As Prof. Weissman testified, you cannot reliably assess the feasibility, let alone the timeline, of such a software migration without analyzing the source code. Dr. Bjedov claims she reviewed Prof. Weissman's source code analysis, but admits she only did so *after* she reached her timeline opinions. Meanwhile, Prof. Weissman made clear his limited source code review could not, in his view, support timeline estimates for Plaintiffs' proposed remedies without more work.

Third, Dr. Bjedov's ex-post, ███████████ bases for her timeline and feasibility opinions are unreliable: her ███████████ are thin on facts and cherry-picked yet show that her timeline estimates are wildly optimistic and unfounded; █████████████████████ ███████████ that Dr. Bjedov cites are irrelevant to the question of decoupling DFP and AdX from Google's infrastructure, incomplete, and no replacement for actually analyzing the code; ████████████████████████████, by her own admission, adds nothing beyond a reading of the words on the page, assumes the role of the fact finder, and ████ ████████████████████████.

Finally, Dr. Bjedov's late-breaking yet unexplained change to one of her timeline estimates during her deposition is emblematic of her ipse dixit approach, as is her revelation during her deposition that she relied on materials to verify her opinions that Plaintiffs failed to disclose, including documents that support her position and documents that contradict them. This failure to disclose apparently includes ██████████████████████████ ████████████████████, but that was not disclosed by Plaintiffs because she ████ █████████████████████████.

2

Dr. Bjedov does not explain how any of the disclosed and undisclosed information she claims to have used to ███████ her pre-baked opinions translates to her timeline estimates for each of Plaintiffs' proposed remedies, which are conveniently all around ███████ for very different kinds of technical work. Instead, she provides an unreliable black box analysis, asking the Court to take her word for her timelines. Even putting aside that she lacks the relevant experience to provide such opinions, it is well established that such ipse dixit from an experiential expert should be excluded no matter how much an expert tries to dress it up as something more.

## RELEVANT BACKGROUND

Plaintiffs proffer two technical experts - Prof.Weissman and Dr. Bjedov - to provide testimony in support of their proposal that Google be required to divest AdX and to proceed with a phased divestiture of DFP, including creating an Open Source Auction.

Prof. Weissman is a professor of computer science with experience working as a software engineer ("SWE"). Expert Report of Professor Jon Weissman, Ex. 5 to the Declaration of Daniel S. Bitton ("Bitton Decl."), ¶¶ 8-10. Plaintiffs put him forward to opine on the technical feasibility of an AdX and DFP divestiture, among others, based on his review of some of the AdX and DFP source code. Based on that review, Prof. Weissman opines that it is ██████████████ to migrate AdX and DFP from Google's proprietary infrastructure to a third-party's environment. Ex. 5, ¶ 16. But he does not opine on whether AdX or DFP code would operate successfully in an acquirer's environment after that migration. Bitton Decl. Ex. 7, Deposition Transcript of Professor Jon Weissman, at 63:11-63:15; 67:5-13 (whether the █████████████ ████████████████████████). Nor does Prof. Weissman opine on how much time a divestiture of DFP or AdX would take. Indeed, he testified he ██████████████ ████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████. Ex. 7 at 94:19-96:3; 77:3-78:22;

87:16-88:4; 89:18-90:20. Nor could Prof. Weissman even offer an opinion about whether the

divestiture would constitute a █████████████████ based solely on his source code review

and review of materials. Ex. 7 at 90:6-91:6 ███████████████████████████

███████████████████████████████████.

　　　Plaintiffs turn to Dr. Bjedov for timeline estimates of their proposed remedies Prof.

Weissman could not endorse. Dr. Bjedov has never been qualified as a testifying expert. Bitton

Decl. Ex. 4, Deposition Transcript of Dr. Goranka Bjedov, at 46:20-22. And unlike Prof.

Weissman, Dr. Bjedov has long not been a professor or researcher, and has never been a

software engineer. Nor does she have industry experience writing or developing software. Ex. 4

at 461:6-463:4; 468:17-469:6. Dr. Bjedov has not worked for six years. Ex. 4 at 43:4-10. Prior to

her 2019 departure from Facebook, Dr. Bjedov's industry experience was primarily as a capacity

engineer focused on procuring hardware, storage, and bandwidth. Ex. 4 at 460:13-463:4, 466:14-

473:3, 473:4-478:14; Bitton Decl. Ex. 3, Expert Reply Report of Dr. Goranka Bjedov, ¶¶ 85, 12.

She was █████████████████████████████ Ex. 4 at 460:13- 463:4; 468:17-469:6.

Dr. Bjedov was an individual contributor, and did not hold a managerial role while at Facebook,

Ex. 4 at 41:21-42:5, and has never been a software engineer on any large-scale software

migrations. Ex. 4 at 460:13- 463:4, 466:14-473:3, 473:4-478:14.

　　　Nonetheless, Dr. Bjedov admitted in her deposition that she first formed her opinions

based on her experience and public information, Ex. 4 at 137:2-141:9, without any consideration

of the record in this case or Prof. Weissman's source code analysis. Ex. 4 at 286:11-288:13.

After she formed her opinions, she attempted to confirm whether the record and Prof.



Weissman's analysis contained anything she had ██████████████████ Ex. 4 at 136:22-141:9, 287:8-16, but she never reviewed source code nor performed software engineering work herself. In particular, Dr. Bjedov attempted to ████████ her opinions by searching for ████████████████████████ Ex. 4 at 147:10-12, 164:7-12. However, she admitted that, in that ████████ process, she did not attempt to account for or explain ████████████████, Ex. 4 at 156:14-159:5. Notably, Dr. Bjedov testified that though she ████████████████████ ████████████████ she would be ████████████████████ ████████████████████ Ex. 4 at 157:22-159:5. Dr. Bjedov also ████████████████████ she relied upon simply was ████████████ because her ████████████████████████████ Ex. 4 at 184:22-185:15. Her selective and result-oriented approach underscores why exclusion is warranted.

Dr. Bjedov opines that there are four ████████ steps that a migration of AdX and DFP from Google's proprietary infrastructure to a third-party's infrastructure would follow. According to Dr. Bjedov, each of these steps would be performed by software engineers, not performance or capacity engineers. Bitton Decl. Ex. 1, Expert Report of Dr. Goranka Bjedov, ¶¶ 137, 174, 178, 179, 207, 210 (████████████████████████ ████████████████████). Out of the four migration steps she identifies, Dr. Bjedov concedes that ████████████████ of AdX and DFP from Google's proprietary infrastructure is ████████████████████ of a divestiture of AdX and DFP to a third party's infrastructure. Ex. 1, ¶ 196. She accordingly allocates roughly ████ of her overall timelines to that ████████████ stage – far more than she allocates to any other stage within her proposed divestiture timelines.

In Dr. Bjedov's words, █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Ex. 1, ¶ 175. Prof. Weissman explains that this process of

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ ██████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ Ex. 5, ¶¶ 132, 135, 140; Ex. 7 at 55:5-21, 326:21-327:7,

215:20-216:22. But, according to Prof. Weissman, to figure out exactly all the software

engineering work required and to produce reliable timeline estimates for the AdX and DFP

divestitures would necessitate comprehensive source code review and additional software

engineering work. Ex. 7 at 90:6-20. Prof.Weissman did not do that work; more importantly,

neither did Dr. Bjedov.[2]

Dr. Bjedov's methodology–or lack thereof—led to highly specific, but shifting, timelines.

Ex. 4 at 132:9-17; Ex. 1, ¶ 3 and Figures IX.1, IX.2. Dr. Bjedov opines that the divestiture of

AdX and the creation of the Open Source Auction could each be completed in about ████████.

---

[1] Dependencies are the other portions of software, Google systems, and code libraries that the product relies upon. Ex. 5, ¶ 31.

[2] *See, e.g.*, Ex. 7 at 147:1-147:16 ██████████████████████

███████████████████████████████████████████ ; 326:21-327:7 (Prof. Weissman did not analyze ███████████████████████████████.

Ex. 1, at Figure III.1. Dr. Bjedov originally claimed divesting DFP would take ███████ in her Opening Report, but changed that timeline to ████████ in her deposition, without explanation or any prior disclosure. *Compare* Ex. 4 at 132:9-17 *with* Ex. 1 at Figure IX.2. She similarly changed her allocated time and resource estimate for the first step of her migration plan, ███████████████ which she claims includes all ████████████ required to divest AdX or DFP. Ex. 4 at 408:2-15. Her report opined that phase would take ████████ ███████████ to complete, but she changed that in her deposition to claim that ██████ ████████████████████████████ *Compare* Ex. 4 at 386:14-387:4 *with* Ex. 1, ¶ 174.

## LEGAL STANDARD

Plaintiffs must demonstrate by a preponderance of the evidence that Dr. Bjedov's opinion testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001). Federal Rule of Evidence 702 permits opinion testimony when the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the expert's opinion is "based on sufficient facts or data," "the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case." *In re Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702). Whether the expert has relied on sufficient facts or data and has applied a reliable methodology is a question of admissibility, not just weight or credibility; *see also Sardis v. Overhead Door Corp.,* 10 F.4th 268, 284 (4th Cir. 2021) ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology, are generally questions of weight and not admissibility.

These rulings are an incorrect application of Rules 702 and 104(a)") ((quoting Fed. R. Evid. 702 advisory committee's note (2021)); *Wood v. Credit One Bank,* 277 F.Supp.3d 821, 859 (E.D. Va. 2017) (excluding expert testimony "not based on sound methodology, and is therefore not sufficiently reliable"). That remains true regardless of whether the trier of fact is the court or a jury, and courts, including this Court in this case, have refused to even hear such testimony when it is clear that the expert has questionable methods or where the expert's "conclusions are [not] adequately supported by the analysis that he has provided." ECF No. 799 at 20 (refusing to hear testimony from Google's expert, Mr. Ferrante); *Students for Fair Admissions v. United States Naval Acad.,* 2024 WL 4135782, at \*4 (D.Md. Sep. 10, 2024) ("[E]ven in a bench trial case, it is necessary that expert testimony meet the fundamental admissibility requirements of Rule 702 and the decisions in *Daubert* and *Kumho*").

## **ARGUMENT**

### I.    **DR. BJEDOV'S OPINIONS FAR EXCEED THE SCOPE OF HER EXPERTISE**

Whether an expert possesses sufficient "knowledge, skills, and experience [] related to the issues" to be qualified to offer their opinions is a threshold issue under FRE 702. *Thorpe v. Va. Dep't of Corr.,* 2024 WL 4298779, at \*1, 3 (W.D.Va. Sep. 26, 2024) (excluding expert psychologist's opinion on cause of physical harm ahead of bench trial because "he is not a medical doctor"); *Trana Discovery, Inc. v. S. Research Inst.,* 2017 WL 3709069, at \*5 (E.D.N.C. Aug. 28, 2017). Experts may not opine on subject matter outside of "the specific technical areas in which they [have] expertise," even if the topic is closely related or similar to their expertise. *Kadel v. Folwell,* 100 F.4th 122, 158-159 (4th Cir. 2024), *rev'd on other grounds, Folwell v. Kadel,* 2025 WL 1787687 (2025)*; Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not ipso facto qualify

him to testify as an expert in all related areas."); *JFJ Toys, Inc. v. Sears Holding Corp.,* 237 F.Supp.3d 311, 322 (D. Md. 2017) ("[E]xpertise in one field does not qualify a witness as an expert in other fields."). Assessing the feasibility and timelines required to divest AdX and to implement all three phases of Plaintiffs' proposed DFP divestiture is far beyond the scope of Dr. Bjedov's experience. As she admits, she was an engineer focused on testing and hardware provisioning. As such, she lacks the software engineering experience that Plaintiffs' own technical expert, Prof. Weissman, recognizes is necessary to reach her opinions.

Dr. Bjedov has not worked for six years. Before she left Facebook in 2019, Dr. Bjedov's primary roles involved testing the performance of code and procuring hardware, storage, and bandwidth, not writing software code. Ex. 4 at 473:4-478:10 ██████████████████ ████████████████████████████████████ ██████████████████████████████ ██████████████, 466:14-473:3 ████████████████████ ████████████████████████████████ ████████████████████. For example, Dr. Bjedov's role during migrations at Facebook ████████████████████████████████ ████████████████ Ex. 4 at 487:16-494:21; *see also* Ex. 4 at 455:9-14 ████████████████████████████████ ████████████████████████████. In her roles, Dr. Bjedov has never herself developed software or coded an ████████ Ex. 4 at 460:13- 463:4 (Dr. Bjedov has not been a software engineer or been ██████████████████ ████████████████████); 468:17-469:6 ██████████ ████████████████████). She is not a software engineer, Ex. 3, ¶ 12 (

and she does not claim to have served as a software engineer during any migration.[3]

Dr. Bjedov's own testimony makes plain that her work on migration projects was limited to a narrow subset of hardware and testing work. Ex. 4 at 473:4-478:10; 466:14-473:3. Procuring hardware and testing software performance, even if part of a software migration process, is not software engineering experience and is far from the sum total of what needs to happen as part of a large-scale software migration as is contemplated by Plaintiffs' proposed divestitures of DFP or AdX. On the contrary, as Dr. Bjedov admits, the most complex and time-consuming of such a migration would be performing the software coding work of decoupling and reconfiguring DFP and AdX so that they could operate outside of Google's proprietary software infrastructure. Ex.



1, ¶ 175 ███████████████████████████████████████████████████████████████████████████████████████; Figures IX.1-IX.2 ████████████████████████████. Recognizing that, in her timelines, Dr. Bjedov allocates ███████████ (and no other type of engineer) to complete this ████████████ task.

As she admits, she is not a software engineer. Ex. 4 at 460:13- 463:4; 468:17-469:6.

---

[3] For example, Dr. Bjedov's description of her roles during various purported migrations focus on hardware and capacity, not rewriting software. Bitton Decl. Ex. 2, Expert Rebuttal Report of Dr. Goranka Bjedov, ¶¶ 58 ████████, 59, ████████████████████████████████████ 63 ████████████████ 67 ████████████████████████████ 67 ████████████████████████; Ex. 3, ¶ 107 & nn.166, 230, 245 (listing experience ████████████████████████████████████████████████████ (emphasis added).

Nor does Dr. Bjedov's experience involve managing software engineers or other engineers in a software migration. ███████████████████████████████████ ███████████████████████████. Ex. 4 at 41:20-42:5 ██████████████████████████; *see also* Ex. 4 at 482:15-483:10 ██████████████████████████████████ █████████████████████████████. That experience as an individual contributor and as an infrastructure engineer does not support offering opinions about either precise timelines for various stages of complex software engineering work or estimates for the precise number of software engineers that would be needed to complete them.[4]

While Dr. Bjedov has experience making some contributions to a migration, that experience is not sufficient to opine on comprehensive migration timelines, which involve domain knowledge outside of her scope of expertise. As such, her timelines should be excluded.[5] *See Brainchild Surgical Devices LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 254 (4th Cir. 2025) (excluding expert with "experience managing financial and credit risk in the IT space" due to lack of "expertise in patent renewals," the subject matter of the litigation); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 433006, at *8-10 (E.D. Va. Feb. 11, 2022),

---

[4] *See* Ex. 1, ¶¶ 174 ████████████████████████████████████████████████; 178 ████████████████████████████████████████████████████████████ 179 ██████████, 207 ████████████████████████████████████████████████████ 218 ████████████████.

[5] For the same reasons, she is not qualified to opine on the feasibility and timeline of Plaintiffs' Phase 1 proposal to create APIs integrating with header bidding wrappers or Plaintiffs' Phase 2 proposed open sourcing of Google's Ad Manager auction, since these too would require software engineering experience that Dr. Bjedov lacks. *See* Ex. 5, ¶¶ 152 ████████████████████████████████ 17 ████████████████████████████████ (emphasis added); *see also* Ex. 4 at 109:8-110:4 (claiming it is ███████████████████████████████████████████████████████ ██████████████.

*rev'd on other grounds*, 95 F.4th 181 (4th Cir. 2024) (excluding damages expert in insurance case with experience in "antitrust, corporate governance, corporate finance, and financial systems" but who lacked experience specifically with insurance claims); *Wood v. Credit One Bank,* 277 F. Supp. 3d 821, 857 (E.D. Va. Sep. 21, 2017) ("Even if Lynn were an expert in banking and finance matters, that "does not ipso facto qualify him to testify as an expert in all related areas," such as matters related to the [Fair Credit Reporting Act]") (internal citations omitted).

## II. DR. BJEDOV'S FEASIBILITY AND TIMELINE OPINIONS ARE IPSE DIXIT AND LACK A RELIABLE METHODOLOGY

"[E]xperiential witnesses," as Dr. Bjedov claims to be, Ex. 1, ¶ 5, must "explain how [their] experience leads to the conclusion reached, why [their] experience is a sufficient basis for the opinion, and how [their] experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note (2000)). Simply having experience and an opinion is insufficient; experiential experts must "connect the dots" between their qualifications, the specific facts of the case, and their conclusions. *Conrad v. CSX Transp., Inc.,* 2015 WL 3797873, at *5 (D. Md. June 17, 2015) ("Here, [Plaintiffs] would seek to have the Court accept [] expert opinion based on "[his] qualifications, [his] conclusions and [his] assurances of reliability. Under *Daubert*, that's not enough.") (internal citation omitted). Courts, in other words, are not required to accept ipse dixit that is tethered to nothing more than an expert's claimed expertise. *Holesapple v. Barret*, 5 Fed. Appx. 177, 179-180 (4th Cir. 2001) (excluding expert's "ipse dixit" opinion "based entirely on what he consider[ed] to be his experience" rather than "the facts of the particular incident"); *Copeland v. Bieber,* 2016 WL 7079569, at *5 (E.D. Va. Sept. 8, 2016) ("[N]othing [] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Garcia v.*

*Volkswagen Grp. of Am., Inc.,* 2022 WL 2542291, at *3 (E.D. Va. July 7, 2022) (excluding experiential expert whose opinion was "not founded upon any discernible methodology," and nothing more than "an unsupported conclusion that the Court is urged to accept only because of his related experience").

Dr. Bjedov's methodology fails this requirement in several ways. First, her timeline opinions are based purely on her niche experience and public information *before* considering any record evidence. That is the hallmark of an ipse dixit opinion, lacking reliable methodology. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.,* 145 F. Supp. 3d 573, 587 (D.S.C. 2015) (excluding expert who "formed an opinion first, sought statistical evidence that would support his opinion and chose to exclude his own contrary analyses from his report."). Second, Dr. Bjedov's methodology does not include an analysis of what Plaintiffs' expert Prof. Weissman testified is the most important variable in determining timelines for an AdX or DFP divestiture: GAM's source code and its reliance on Google's proprietary infrastructure. Third, Dr. Bjedov confirmed her pre-baked timeline opinions based on cherry-picked evidence in the record, but has not shown how the information she purports to rely on translates to her timelines.

### A. Dr. Bjedov Admits Reaching Her Opinions Before Analyzing Record Evidence

Dr. Bjedov made clear in her deposition testimony that she formed her opinions about the timelines to achieve Plaintiffs' remedy proposals based on █████████████ ████████████████████████████████████████████ rather than record evidence about the facts of this case. Ex. 4 at 138:5-11. Only after her opinions were formed, did she conduct what she called a ████████████ Ex. 4 at 147:11-14, where she considered

Prof. Weissman's analysis of Google's source code and its dependencies,[6] as well as ██████ ████████.[7] Under the *Daubert* standard, relying upon general experience and public information is not a reliable methodology for forming an opinion about the timeline for migrating proprietary software products. *See, e.g.*, *Garcia v. Volkswagen Grp. of Am., Inc.*, 2022 WL 2542291, at *3 (E.D. Va. July 7, 2022) (excluding the testimony of an appraiser who relied on his general "business experience" without "individually inspect[ing] any of the Plaintiffs' vehicles" or "evidence individually tied to the specific [] item at issue in the case.").

Although Dr. Bjedov concedes that ████████████████████████ Ex. 2, ¶ 22, she claims based on her ████████[8] that a divestiture of DFP and divestiture of AdX each would follow four phases that are ██████████ Ex. 1, at Section IX, and that each phase would follow what she refers to as a ██████ amount of time and number of SWEs.[9] Dr. Bjedov does not explain or show (1) what informs her view of what constitutes a ██████ case, (2) the conditions of a ██████ case, (3) why each phase ██████ requires a certain amount of time or engineers; or (4) why the migration of AdX or DFP to a third party infrastructure would fit what she considers a ██████ migration scenario.[10] All Dr. Bjedov offers is her

---

[6] *See, e.g.*, Ex. 4 at 286:11-289:4 ██████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

[7] *See* Ex. 4 at 164:7-12 ██████████████████████████████████
██████████████████

[8] *See also* Ex. 1, ¶¶ 18, 156.

[9] *See, e.g.,* Ex. 1, ¶ 174 ████████████████████████████████████
████████████████. Ex. 1, ¶¶ 174, 178-179, 207, 209, 210, 212, 217-218.

[10] She only makes a minor adjustment to two phases of the DFP migration – ██████████ – beyond what she calls typical to account for DFP coding complexities. Ex.1, ¶ 179.

assertion of what is ██████ based on her experience without any connection to the facts of this case. She asks the Court to take her word for it without explaining or showing why.

In her reports, Dr. Bjedov forecasted nearly identical timelines for each of the remedies proposed by Plaintiffs—█████████████████████████████████████████ ████████████████████████████████ That is, until her deposition, when she suddenly changed her time estimate for a ███████████████████, without any explanation for that change or any change in the underlying facts of this case.[11] During her deposition, Dr. Bjedov also changed the timeline for the first phase of her migration plan—the planning phase—███████████████████████████████████.[12] So while her black box analysis previously was producing the same result regardless of the particular facts at issue, it now seems to be producing different results where the facts have not changed. That only further demonstrates that Dr. Bjedov's timeline estimates are not tethered to any reliable, replicable methodology, and that the Court should not simply take her word for her opinions.

Dr. Bjedov's claims based on purported "experience," without showing in any way how the experience translates to the opinions based on the facts of the case, is protypical inadmissible ipse dixit testimony and should be excluded.[13]

---

[11] In her Opening Report, Dr. Bjedov opines that Phase 3 of the DFP divestiture would last ██████. Ex.1, Figure IX.2. But in her deposition, Dr. Bjedov testified that she now believes this same phase would take ████████. Ex. 4 at 132:9-15.

[12] Dr. Bjedov testified that the first step of her four step migration plan, █████████████ would take only ████ ██████████████████. Ex. 4 at 386:16-387:4. This is in stark contrast to her opinion in her Opening Report where she claimed this same step would take up to ████████████████████ Ex. 1, ¶ 174.

[13] This conclusion applies equally to Dr. Bjedov's timing estimates for Phases 1-2 of the DFP divestiture. ████████ ████████████████████████████████████████████████ ████████ Ex. 1, ¶ 140, without any further explanation.

### B. Dr. Bjedov Admits Her Opinions Are Not Supported by Source Code Analysis

To be admissible under FRE 702, an expert's opinions need to be "based on sufficient facts or data." *Ahmad v. Spinnaker Insurance Co.,* 2025 WL 1732520, at *3 (E.D. Va. June 20, 2025). Dr. Bjedov's opinions are inherently unreliable because she never analyzed critical evidence available in this case for an assessment of the feasibility and timing of Plaintiffs' proposed remedies: the extensive source code at the heart of this stage of this case.

Dr. Bjedov admits that the longest and most complicated stage of divesting AdX and DFP would involve decoupling DFP and AdX from Google's proprietary infrastructure and rewriting source code to enable DFP and AdX to operate in a new environment. *See supra* Section I. Consistent with that, Prof. Weissman testified that feasibility and timeline assessments of Plaintiffs' proposed remedies require comprehensive source code analysis. Ex. 5, ¶ 135; Ex. 7 at 60:8-14. Dr. Bjedov did not do any analysis of the AdX or DFP source code to arrive at her timeline estimates for Plaintiffs' proposed remedies.

Dr. Bjedov reviewed Prof. Weissman's partial source code analysis. But that is not the same as doing the source code analysis. Moreover, Dr. Bjedov made clear in her deposition that she only reviewed Prof. Weissman's source code analysis *after* she had reached her timeline conclusions. Ex. 4 at 286:21-289:9 █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████. So Prof. Weissman's source code analysis was not the basis for her opinions. In any event, Prof. Weissman testified that his limited source code analysis does not provide a sufficient basis for reliable timeline estimates because, among other reasons, he has not

attempted to identify all of GAM's dependencies,[14] how many would need to be replaced,[15] whether there are suitable third-party replacements for all of them,[16] or what software rewrite work would be involved to do that and how long that software work would take.[17] Neither Prof. Weissman or Dr. Bjedov have even begun to do the work to identify what exactly would be involved in carrying out all those steps, yet Dr. Bjedov has offered an opinion on how long those steps would take.[18]

Dr. Bjedov points to Prof. Weissman's ████████████ in her reports, Ex. 1, ¶ 156, Ex. 3, ¶ 30, but a review of those statistics is no replacement for reviewing the source code itself, nor an accepted methodology for forecasting software migration timelines.[19] Dr. Bjedov does not provide a single citation to literature (or any other source) that supports her interpretations of these code statistics or establishes typical baselines for such source code statistics. Nor does she

---

[14] *See, e.g.*, Ex. 7 at 147:1-147:16 ████████████████████████████████████████████████████████████████████████████████.

[15] *See* Ex. 7 at 95:15-17 ████████████████████████████████████████████████████.

[16] *See* Ex. 7 at 326:21-327:7, 215:20-216:22 (potential replacements ████████████████████████; 219:19-221:19 ████████████████████████████████████████.

[17] *See, e.g.*, Ex. 7 at 326:21-327:7 (Prof. Weissman did not analyze ████████████████; 95:15-17 ████████████████████████████████.

[18] Ex. 7 at 147:1-147:16 ████████████████████████████████████████████████████████████ 95:15-17 ████████████████████████████; Ex. 4 at 354:18-355:1 ████████████████████████; *see also* Ex. 7 at 94:19-95:6 ████████████████████████████. Bitton Decl. Ex. 6, Expert Rebuttal Report of Prof. Jon Weissman, ¶ 72.

[19] All Dr. Bjedov concludes based on these statistics is that the code bears ████████████████████████████ But she never explains why the absence of ████████ means that a migration of DFP or AdX to a third party infrastructure will take ████████. Ex. 1, ¶¶ 121, 127.

provide a single example of any software engineer ever using such code statistics to assess the technical difficulty or likely timelines of ███████████████████████ Ex. 1, ¶ 127; *see In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. and Prods. Liab. Litig.,* 892 F.3d 624, 643 (4th Cir. 2018) (excluding expert's causation opinion when expert "could not identify any organizations or peer-reviewed texts that contain[ed] this methodology," no colleagues who had "used the methodology," and herself had never "personally used the methodology" during her career). Indeed, Dr. Bjedov repeatedly acknowledges Prof. Weissman's statistics offer only a "high-level" perspective on GAM's code, Ex. 1, ¶¶ 121-122, are not a ████████████████████████ and ███████████████████████████████ *Id.* Notably, Dr. Bjedov also concedes that ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ . Ex. 7 at 278:8-279:9, 276:17-277:17.

Given her failure to analyze what Plaintiffs' own software engineering expert has said is critical evidence to assess feasibility and timelines for Plaintiffs' proposed remedies, Dr. Bjedov's opinions should be excluded. *See Synopsys, Inc. v. Risk Based Security, Inc.,* 2022 WL 3005990, at *6-7 (E.D. Va. July 28, 2022) (excluding expert who "lack[ed] the information necessary to perform complete analyses, but nevertheless provide[d] opinions that far exceed the scope of permissible expert testimony," and another expert who opined about the value of specific trade secrets yet never "individually evaluated" the trade secrets), *aff'd*, 70 F.4th 759 (4th Cir. 2023); *Peters-Martin v. Navistar Int's Transp. Corp.*, 410 F. App'x 612, 620-21 (4th

Cir. 2011) (excluding expert's testimony regarding a truck's braking system where expert had

not undertaken any "firsthand examination or testing," and "provided no evidence, based on

testing or otherwise," to support his conclusions about the product); *Garcia v. Volkswagen Grp.*

*of Am., Inc.*, 2022 WL 2542291, at \*3 (E.D. Va. July 7, 2022) (excluding the testimony of an

appraiser who neither "individually inspected any of the Plaintiffs' vehicles" nor reviewed any

other "data or evidence tied to the specific car or item at issue in the case").

### C.  Dr. Bjedov's ███████████ Are Cherry Picked and Contradict Her Feasibility and Timeline Estimates

Cherry picking case studies to give you the results you want is a hallmark of an unreliable

methodology. *In re Lipitor,* 892 F.3d at 634; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales*

*Pracs. and Prods. Liab. Litig.,* 174 F. Supp. 3d 911, 935 (D.S.C. 2016) (excluding expert who

"simply pick[ed] the articles that she happened to remember or that supported her views,

discuss[ed] them with a little commentary, and state[d] an opinion" and who "had no

methodology for determining what studies to consider and to disregard, apparently just choosing

those that she remembered or found supportive of her opinion"); *Silicon Knights, Inc. v. Epic*

*Games, Inc.,* 2011 WL 6748518, at \*7 (E.D.N.C. Dec. 22, 2011) (excluding an expert whose

comparables methodology "reveal[ed] a series of ad hoc decisions based on subjective

considerations, rather than identifiable (or principled) criteria").

Dr. Bjedov identifies ███████████ that she claims ███████████

███████████████████████████████████████ Ex. 1,

Section V; Ex. 2, Section IV.D. However, Dr. Bjedov applies no criteria at all to ensure she

selected industry examples that are actually comparable to a divestiture of DFP and AdX, Ex. 1,

¶ 156, whether it be in terms of similar types of software to be migrated, similar number or

complexity of dependencies on proprietary systems to be addressed, similar volume of data to be

managed and transferred, similar scale of customer transactions involved, similar type of migration from proprietary infrastructure to public cloud infrastructure, or any other criteria. Indeed, several of her so-called industry examples, by her own description, were not software migrations at all.[20] All Dr. Bjedov offers is the conclusory statement that she relied on ███████████████████████████████████████████████[21] Ex. 3, ¶ 130. Conspicuously absent from Dr. Bjedov's industry examples are well-known large-scale software migrations that failed, and the most obvious case study to evaluate—the migration of DFP and AdX from DoubleClick to Google.

Beyond using a flawed cherry-picking method of selecting her ██████████████ Dr. Bjedov fails to connect the dots between those examples and her timeline estimates for Plaintiffs' proposed remedies. Ex. 1, ¶ 156 and Section IV; *See Copeland v. Bieber,* 2016 WL 7079569, at *5 (E.D. Va. Sept. 8, 2016) (excluding expert's "ipse dixit" testimony that "two songs" hooks are "strikingly similar" "without offering any explanation"); *Stynchula v. Inova Health Care Servs.*, 2024 WL 4830578, at *17 (E.D. Va. Nov. 19, 2024) (excluding expert testimony where "the factual basis [was] so inadequate that it is connected to [the expert's] opinion only by his ipse dixit."). Indeed, Dr. Bjedov herself concedes that the timelines for several of her case studies are actually longer—and in some instances *five or more years longer*—than the ██████ timelines she has suggested for a migration of DFP and AdX, yet she does not reconcile those conflicts. *See,*

---

[20] *See, e.g.*, Ex. 1, ¶ 99 (describing ████████████████████████ ██████████████████████); Ex. 4 at 453:20-454:13 (acknowledging ████████████████████); Ex. 3, ¶ 97 (describing Facebook's ██████████████); Ex. 2, ¶¶ 66, 68 (Facebook ██████████████████████████████████████ of the project).

[21] Ex. 1, ¶¶ 77 (claiming her case studies are ████████████████████ but failing to discuss scale at the time of migration for several of her case studies), 81 (without any discussion of ██████████████████████████████████████████████████████████, 84 ██████████████████████████████████████████████████████████

*e.g.*, Ex. 1, ¶ 92 ███████████████████████████████████████████████

█████████████████████; Ex. 4 at 446:5-449:11 █████████████████████████

█████████. She either does not address the inconsistencies at all, or tries to resolve them with

more unsubstantiated ipse dixit.[22] Ipse dixit cannot be remedied with more ipse dixit, much less

explain five or six year discrepancies between Dr. Bjedov's timelines in her "industry examples"

and her timeline estimates for this case. *SAS Inst., Inc. v. World Programming Ltd.,* 2015 WL

13878192, at *9 (E.D.N.C. Nov. 5, 2015) (excluding expert's opinion that not having access to

plaintiff's software would have delayed development of defendant's software by 19 days because

a "highly specific" "experiential opinion" must be accompanied by a "a specific instance from

his experience, training, or education").

**D. Dr. Bjedov Improperly Assumes the Role of the Fact Finder By Selectively Reading Certain Phrases From a Few ███████████████**

Merely reading documents available to the fact finder is not the proper role of expert

testimony unless the expert "relies on her expertise to explain the context in which various

documents were created, to define specialized terminology appearing in the documents, or

otherwise to draw inferences requiring specialized expertise." *Vertullus Holdings LLC v. W.R.*

*Grace & Co.-Conn.,* 2021 WL 3883597, at *11 (D. Md. Aug. 12, 2021); *see also In re C.R.*

*Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2018 WL 4220674, at *4 (S.D.W. Va. Sept. 8,

2018) ("[S]imply reading a document into evidence does not require 'scientific, technical, or

---

[22] Dr. Bjedov claims ████████████████████████████████████████████████████████████████████ Ex. 1, ¶ 92.
She does not explain why that purported complexity and existence of new migration tools would reduce the time
needed for those migrations by ████████. Similarly, Dr. Bjedov continues to recognize ███████████████████
████████████████████████ Ex. 3, ¶¶ 19, 123, but then makes unexplained and unsupported claims that
████████████████████████████████████████████████████ Ex. 3, ¶ 123. How this justifies reducing the time needed for
the AdX and DFP migrations by ████████, she does not say.

other specialized knowledge.'" (quoting Fed. R. Evid. 702)). That is particularly true where fact witnesses could provide direct testimony concerning the subject matter the expert is opining on. ECF No. 799 at 9 (questioning the value of expert testimony where there would be overlapping fact witness testimony and ultimately excluding expert testimony).

Given her narrow experience as a testing and capacity engineer, Dr. Bjedov lacks the experience and expertise necessary to provide any special insight beyond the plain words that appear on the ██████████████████████ she disclosed as materials relied upon. She merely selectively quotes a few phrases from documents and then makes conclusory statements about their meaning. *See, e.g.*, Ex. 1, ¶ 162 (providing no reasoning why she interprets ████ ████████████████████████████████████████ ████████████████████████████████). She does this despite acknowledging that ██████████████████████████████ ██████ *Id.*; *see also* Ex. 4 at 169:7-10, 186:12-22 (admitting understanding the document ██████ and that she ██████████████████████████████ ██████). In her deposition, Dr. Bjedov explicitly admitted that, for one of the few ████████████████████████████████████ . Ex. 4 at 365:1-367:22. Yet Dr. Bjedov then summarily claims these ██████████████████████████████ . Ex. 1, Section IX.A.

To make matters worse, Dr. Bjedov selectively picks and chooses only ██████████ ████████████████████████████ . Ex. 4 at 179:14-16 ████████████████████████████ . For example, Dr. Bjedov admitted during her deposition that there were ██████████████████████

█████████████████████ but may not have been included in her report. Ex. 4 at 157:22-159:5.

████████████████████████████████████████████████

█████████████████████████, but summarily dismissed them as ████████████████

██████████████████[23] That self-fulfilling approach to her ████████████ document review

makes clear that Dr. Bjedov's opinions are based on what she has determined they should be, not

the evidence of this case. *See, e.g.*, Ex. 4 at 185:12-186:14 ████████████████████████

████████████████████████; Ex. 4 at 164:7-12, 139:21-140:6 ████████████████████████

████████████████████████████████████████████████

██████████████████████████████.

Since Dr. Bjedov's reading of ████████████████████████ is not a reliable

expert methodology and causes her to assume the role of the fact finder, it should not be

admissible.

### III.     PLAINTIFFS' FAILURE TO DISCLOSE MATERIALS DR. BJEDOV CLAIMS TO HAVE RELIED UPON EXACERBATES HER BLACK BOX APPROACH

Without Prof. Weissman, their proffered software engineering expert, to offer timeline

opinions, Plaintiffs asked Dr. Bjedov to fill the gap in their case, no matter how unreliable her

methodology might be. Dr. Bjedov, while experienced in her field, does not have the appropriate

expertise to offer a timeline opinion for the complicated software divestiture proposed here and

did not analyze Google's code or any other evidence in this case. Yet she nonetheless proffered

highly specific, but still-changing, timelines for Plaintiffs' proposals. According to Dr. Bjedov,

---

[23] Ex. 4 at 180:11-181:6. ████████████████████████████████████████



█████ 182:13-17 ████.

her methodology has been to start backwards, first settling on pre-set opinions on what her timelines should be based on public information, and then reviewing case studies and ██████ ████████████████████████████████████████████ while discarding those that do not. That is not a reliable methodology. Remarkably, Plaintiffs now appear to believe that Google and this Court are not even entitled to the ███████████████████████████ ████████████████████ in her ████████ stage, asking both Google and the Court to accept, on her say so, that Dr. Bjedov reviewed additional, undisclosed evidence supporting her opinions. But the Federal Rules are specifically designed to prevent exactly that kind of "ipse dixit" expert testimony.

Federal Rule of Civil Procedure 26 requires Plaintiffs to disclose "a complete statement of all opinions the witness will express," as well as the "facts or data considered by the witness in forming [their] opinions." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). Similarly, pursuant to the Parties' April 12, 2023 Stipulation and Order Regarding Expert Discovery, parties are required to produce all information referred to in their experts' reports "and/or relied on by the Testifying Expert in forming the Testifying Expert's Opinions." ECF Nos. 103, 106. It is "black letter law" that parties cannot "hid[e] the bases for an [expert's] opinion," because "without requiring disclosure of the bases for an expert's opinion, the expert might be effectively permitted to testify that his opinion is true simply 'because I say so.'" *Brainchild Surgical Devices LLC v. CPA Glob. Ltd.,* 144 F.4th 238, 256 (4th Cir. 2025). Accordingly, a failure to make these disclosures is grounds for exclusion. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii); Fed. R. Civ. P. 37(c)(1). Plaintiffs bear the burden of establishing that their "non-disclosure of evidence was substantially justified or harmless." *S. States Rack and Fixt're, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003).

While Dr. Bjedov has clearly testified that she reached her feasibility and timeline opinions without considering and before reviewing any record evidence in the case, she claimed during her deposition that ████████████████████████████████████ ███████████████. Ex. 4 at 64:21-66:19. For example, Dr. Bjedov testified regarding ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ And, if she "████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 4 at 64:21-71:12. Yet Plaintiffs chose not to include that document in ***any*** disclosure relating to Dr. Bjedov. Plaintiffs also chose to disclose around ██ total Google-produced documents as materials relied upon by Dr. Bjedov, yet chose not to disclose ████████████████ ████████████████████ that Dr. Bjedov claims to have reviewed to confirm her opinions, but that Plaintiffs did not inform her she ████████████████ Ex. 4 at 64:18-20, 70:14-73:10. At the same time, Plaintiffs also did not disclose documents Dr. Bjedov considered during her ████████████████████████████████████████████████████ ████████████████████████████ Ex. 4 at 156:11-159:5.

Incredibly, according to Dr. Bjedov, ████████████████████████ ████████████████████████ was not disclosed by Plaintiffs because, other than engineers, ████████████████████████████████████ Ex. 4 at 64:21-66:19. Dr. Bjedov ████████████████████████████████████ ████████████████████ Ex. 4 at 64:21-66:19.

Plaintiffs' omissions prevent evaluation of not only Dr. Bjedov's claims that undisclosed documents post-hoc confirm her opinions, but the reliability of Dr. Bjedov's methodology itself.

It is not proper for an expert witness to testify solely on the basis of her say so that she reviewed



. *Brainchild Surgical Devices LLC v. CPA Glob. Ltd.,* 144 F.4th 238, 256 (4th Cir. 2025). The inherent unreliability of attempting to "confirm" one's opinions by relying on undisclosed documents—that is, failing to show your work—is not just theoretical. By Dr. Bjedov's own words, her

Ex. 4 at 70:14-71:12. Because Plaintiffs have simply chosen not to disclose that document or others—i.e., to show Dr. Bjedov's work—neither Google nor the Court have any ability to                   whether the documents are            .

Dr. Bjedov's opinion should therefore be excluded. *Disney Enterprises, Inc. v. Kappos,* 923 F. Supp. 2d 788, 795-96 (E.D. Va. 2013) (Brinkema, J.) (excluding source code produced "after the deadlines for expert disclosures" when Defendant was "clearly surprised by this new evidence" and Plaintiff's "explanations for its failure to timely disclose the new opinions [were] not satisfactory").

## <u>CONCLUSION</u>

For the reasons stated above, Google respectively requests that the Court exclude Dr. Bjedov's opinions as inadmissible under FRE 702.

Dated: August 29, 2025

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
David Pearl (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Bryon P. Becker*
Bryon P. Becker (VSB # 93384)
Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Erica Spevack (*pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
Telephone: (202) 240-2900
kdunn@dirllp.com

Erin J. Morgan (*pro hac vice*)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
Telephone: (202) 240-2928
emorgan@dirllp.com