IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v.   ) | No. 1:23-cv-00108-LMB-JFA |
| ) | |
| GOOGLE LLC, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' NOTICE OF PROPOSED FINAL JUDGMENT**

Google engaged in a "decade-long campaign of exclusionary conduct" to "acquire," "establish," "protect," and "entrench[]" monopoly power in two markets that are critical to digital advertising: the publisher ad server and ad exchange markets for open-web display advertising. (Dkt. No. 1410 ("Op.") at 111, 114.) Plaintiffs now propose a final judgment that would carefully target Google's illegal conduct and the competitive harms that conduct has caused, and would terminate Google's monopolies and prevent Google from achieving the same illegal ends in the future through similar, equally harmful means. Plaintiffs' proposed final judgment would restore competition in the two relevant markets by accomplishing the four mandated goals of relief in a monopolization case.

**LEGAL PRINCIPLES**

"[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961). "[A] remedies decree in an antitrust case must seek to" accomplish four objectives: (1) "unfetter a market from anticompetitive conduct," (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices

1

likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972), and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)).

To remedy a long-running and complex violation of the Sherman Act like Google's, each of these objectives requires going beyond "a mere prohibition of the precise [unlawful] scheme" that Google already perpetrated because such a narrow approach would be "ineffectual." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 727 (1944). "If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact." *Schine Chain Theatres v. United States*, 334 U.S. 110, 128 (1948).[1] Without "eliminating the consequences of the illegal conduct," *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978), and "assur[ing]" that the monopolist can never again use the "instrument[s]" of its violation to break the law, *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189-90 (1944), "the Government has won a lawsuit and lost a cause," *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). Effective relief should include a "comprehensive" and "unitary framework" of remedies "intended to complement and reinforce each other." *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 170 (D.D.C. 2008).

Relief must account not only for past but also future forms of exclusionary conduct because "advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market." *Int'l Salt*, 332 U.S. at 400; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 132 (1969) ("In

---

[1] The *Schine* Court warned against precisely what Google asked the Court in May 2025 to do: impose narrow remedies that prohibit only some of the illegal conduct in which Google engaged while doing nothing to fully unfetter the markets from Google's conduct, terminate Google's unlawfully acquired and maintained monopolies, deny Google the fruits of its illegal monopolies, or prevent practices likely to lead to future monopolization. (Dkt. No. 1431 at 16–17.)

2

exercising its equitable jurisdiction, [a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.") (cleaned up)).

This consideration speaks to the importance of a phased divestiture of DFP, in addition to a divestiture of AdX. Google has used its control of DFP and its final auction logic to impose an evolving "series of anticompetitive policies," including First Look, Last Look (exacerbated by sell-side dynamic revenue share), and Unified Pricing Rules. (Op. at 98–101.) Although these policies also involved exclusionary use of AdX, divestiture of AdX alone is not enough to redress the anticompetitive risk because Google is adept at evolving and adapting its anticompetitive conduct, often for pretextual reasons. (*E.g.*, Op. at 37–39, 109–10.) As the Supreme Court has explained, "it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *Int'l Salt*, 332 U.S. at 400.

Because "divestiture or dissolution is an essential feature of [antitrust] decrees," courts "start from the premise that an injunction against future violations is not adequate to protect the public interest." *Schine*, 334 U.S. at 128. Divestiture is especially warranted when a monopolist has been found to have a "proclivity in the past to use" certain assets "for an unlawful end," regardless of whether the defendant lawfully acquired those assets at the outset. *Crescent Amusement Co.*, 323 U.S. 173, 190; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ("Areeda & Hovenkamp") ¶ 653c2 (dissolution may be the "best or perhaps even the only" effective remedy for "significant acts of monopolization by a clearly dominant firm" when "the acts are diverse or have been repeated over time"). When the defendant is a recidivist monopolist—as Google is here—broad relief is needed "in order that the ground may be

cleansed effectually from the vice of the former illegality." *Bausch & Lomb*, 321 U.S. at 724. A "remedy regulating conduct alone is likely to fail" when the defendant's "monopoly power is substantial and likely to be durable" and "the possible forms of anticompetitive conduct are varied and difficult to predict." Areeda & Hovenkamp ¶ 653c2.

The touchstone of an antitrust remedy is "the discovery of measures effective to restore competition," and the Court has a duty to order those effective measures "whatever the adverse effect of such a decree on private interests." *du Pont*, 366 U.S. at 326. Only if there are multiple "effective remedies" can any "[e]conomic hardship" to Google be permitted to "influence [the] choice" among effective remedies. *Id*. at 327. In other words, "the Government cannot be denied" a divestiture that is "a necessary element of effective relief" based on concerns of "economic hardship, however severe." *Id*.; *see also Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*, 395 U.S. 464, 472 (1969) (in government enforcement action, "the pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern" (citing *du Pont*, 366 U.S. at 326)); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 722 (4th Cir. 2021) ("In both government and private suits, a court may order divestiture if it's needed to 'restore competition,' i.e., to 'protect the public interest.'") (quoting *du Pont*, 366 U.S. at 326).

**Summary of Plaintiffs' Proposed Final Judgment**

Plaintiffs' proposed final judgment is organized as follows:

- **Sections I–V** set forth preliminary and overarching aspects of the final judgment, including the Court's jurisdiction, the purposes of the final judgment, definition of terms, and the duration of the various periods of the final judgment.

- **Sections VI–VIII** address the structural relief Plaintiffs propose: (1) the divestiture of AdX (Section VI), the separation and open-sourcing of DFP's Final Auction Logic (Section VII), and the contingent divestiture of DFP Remainder (Section VIII).

- **Sections IX–XII** address the primary categories of behavioral relief Plaintiffs propose: (1) interoperability and data sharing (Section IX), (2) prohibitions on distorting the competitive process (Section X), (3) limits governing Google's participation in the relevant markets following implementation of structural remedies (Section XI), and (4) the disgorgement of Google's ill-gotten profits and how they will be used to promote competition in the relevant markets (Section XII).

- **Sections XIII–XV** set forth the administrative, monitoring, and compliance provisions of the final judgment, including the appointment, duties, and powers of the Monitor (Section XIII(A)) and Divestiture Trustee (Section XIII(B)), the appointment and duties of an internal Google compliance officer (Section XIII(C)), provisions against retaliation, circumvention, and interference (Section XIII(D)), and other measures relating to compliance (Sections XIV and XV).

- **Sections XVI–XX** set forth other miscellaneous provisions, including provisions for enforcement of the judgment (Section XIX) and the Court's retention of jurisdiction to enforce, modify, or clarify the judgment (Section XVIII).

I. **Plaintiffs' Proposed Final Judgment Would Unfetter Both Relevant Markets From Google's Anticompetitive Conduct**

Google engaged in a "decade-long campaign of exclusionary conduct" with a "series of exclusionary and anticompetitive acts." (Op. at 111–12.) To unfetter both the ad exchange and publisher ad server markets from Google's anticompetitive acts, and commensurate with the harm Google has caused, Plaintiffs propose a set of comprehensive and complementary remedies designed to alleviate those harms and make the relevant markets contestable again. As set forth in Sections VI–VIII of the proposed final judgment (PFJ), Plaintiffs propose two forms of structural relief: a divestiture of AdX and a phased divestiture of DFP, including the separation of

5

DFP's Final Auction Logic[2] and its publication under an open-source license. A divestiture of AdX will break the "coercive power of the AdX-DFP tie." (Op. at 94.) A phased divestiture of DFP will ensure the elimination of the multiple forms of auction manipulation that Google uses or has used, including First Look, Last Look, sell-side dynamic revenue share, and UPR. (Op. at 99–101.)

To provide competitive relief during the divestiture process and in the future, Plaintiffs additionally propose behavioral relief. This behavioral relief complements, but cannot substitute for, the structural relief in resolving the harms that Google's illegal conduct caused. This is especially necessary for longer-lasting harms of Google's conduct, such as anticompetitively-enhanced barriers to entry and expansion and scale- and data-related disadvantages that Google imposed on its rivals. For example, Sections IX(A)–IX(B) require interoperability between AdX and both non-Google publisher ad servers and header bidding wrappers, providing partial interim relief from the unlawful tie between AdX and DFP. Section IX(C) requires interoperability between DFP and header bidding wrappers, and Sections IX(D)–IX(E) require measures that will make it easier for publishers to freely choose and switch to the publisher ad server of their choice. Section X(J) prohibits Google from engaging in the specific conduct the Court found illegal.

Plaintiffs' proposed structural remedies will significantly reduce or eliminate Google's ability and incentive to harm competition in the relevant markets, and Section XI complements those remedies. Specifically, Sections XI(A) and XI(D) restrict Google's ability to reenter the ad exchange and publisher ad server markets for open-web display ads following divestiture to provide "the divested company . . . time [to] obtain a foothold in the industry." *Ford*, 405 U.S. at

---

[2] Terms have the same meaning as defined in the PFJ.

575. Sections XI(B)–XI(C) prohibit Google from modifying or controlling the Open-Source Auction or redeveloping Final Auction Logic.

These structural and behavioral remedies will facilitate the return of the competitive process in each market and permit competition to flourish.

## II.      Plaintiffs' Proposed Final Judgment Will Terminate Both of Google's Illegally Acquired and Maintained Monopolies

Plaintiffs' proposed final judgment will terminate Google's illegally acquired monopolies in the ad exchange and publisher ad server markets for open-web display ads. (Op. at 115 ("Google has willfully engaged in a series of anticompetitive acts to *acquire and maintain* monopoly power in the publisher ad server and ad exchange markets for open-web display advertising." (emphasis added)).) Divestiture is key to terminating Google's illegal monopolies because divestiture structurally removes Google's ability and incentive to use AdX, the Final Auction Logic, and potentially the DFP Remainder to harm competition in the relevant markets. In particular, divestiture would break the connections Google unlawfully used among its jointly owned ad tech tools to create and maintain monopoly power, including its use of AdX as "the 'glue that sealed DFP' inventory to AdWords demand," (Op. at 28 (quoting PTX41) (cleaned)), and its use of the Final Auction Logic to distort competition in the ad exchange market, (*see, e.g.*, *id*. at 29–31 (First Look); *id*. at 34–35 (Last Look)). This is why divestiture is the "most important" and "most effective" of antitrust remedies, in large part because "[i]t is simple, relatively easy to administer, and sure." *du Pont*, 366 U.S. at 326, 331.

To that end, as outlined in Section VI of the PFJ, Plaintiffs propose a divestiture of AdX, in part to terminate Google's monopoly in the ad exchange market. In the publisher ad server market, as set forth in Sections VII–VIII of the PFJ, Plaintiffs propose a phased divestiture of DFP to terminate Google's illegal monopoly. Section VII outlines the required separation of

7

DFP's Final Auction Logic and its publication under an open-source license, and the selection of an Open-Source Auction Administrator. As outlined in Section XIII(A)(6), a Monitor will assess competition in the publisher ad server market and determine if a divestiture of DFP Remainder is necessary to achieve the purposes of the final judgment. Only if it is found necessary will a divestiture of the DFP Remainder proceed as outlined in Section VIII.

Certain of Plaintiffs' proposed behavioral remedies will also help to erode Google's illegal monopolies to provide a measure of interim relief before structural changes can be fully implemented. For example, Plaintiffs' proposals for interoperability and data sharing in Section IX will lower switching costs for publishers and facilitate more competitive pressure on Google. The behavioral restrictions in Section X will help to limit Google's ability to maintain its monopoly power. And the disgorgement and use of Google's ill-gotten profits set forth in Section XII will likewise make it easier for publishers to switch away from DFP to a competing publisher ad server.

### III. Plaintiffs' Proposed Final Judgment Will Deny Google the Fruits of Its Statutory Violations

Plaintiffs' proposed remedies work in concert to deny Google the fruits of its anticompetitive scheme. Because Google illegally acquired its monopolies in the relevant markets, the termination of those monopolies serves to deny Google the fruits of its violations. *See supra* Part II. Moreover, as laid out in Section VI of the PFJ, the divestiture of AdX will deny Google the benefit of being able to charge "durable supracompetitive prices," which Google has done for "over a decade." (Op. at 76–77.) As laid out in Section VII of the PFJ, the separation of the Final Auction Logic from DFP, and the publication and licensing of that logic in an Open-Source Auction, will deny Google control of the decision-making process for which ads will win, which will empower publishers to control how their ad inventory is sold, in line with their

particular business needs rather than in line with what benefits Google. The conditional divestiture of DFP Remainder, as set forth in Section VIII, would deny Google ownership over the publisher ad server market that it unlawfully "acquir[ed] and maintain[ed]." (Op. at 1.)

Additional behavioral relief will also help to deny Google other fruit of its unlawful monopolization. Specifically, as described in Section XII, the PFJ will require Google to disgorge profits from its operation of AdX and DFP. And per Sections IX(E), IX(F), and IX(G), Google will be required to share certain of the "vast repositories of data" that it has gained, which gave it "significant advantages over rival firms." (Op. at 40.)

### IV. Plaintiffs' Proposed Final Judgment Will Ensure That There Remain No Practices Likely to Result in Future Monopolization

Finally, the remedies must account for Google's ability and proven history of changing its products or business practices to foreclose or exclude rivals and thus to maintain its monopoly power. (*See* Op. at 94, 100, 110). Plaintiffs' proposed combination of structural and behavioral remedies will ensure that Google can no longer engage in practices that are likely to result in monopolization of the publisher ad server and ad exchange markets in open-web display. The divestiture of AdX structurally removes Google's ability to directly monopolize and profit from its conduct in the ad exchange market. The creation of an open-source license of the Final Auction Logic removes Google's control over the final decision-making process for serving open-web display ads, increases publishers' control over their business, and increases transparency for market participants. As outlined in Sections VIII(A) and XIII(A)(6), the conditional divestiture of the DFP Remainder would similarly remove Google's ability and incentive to monopolize the publisher ad server market.

Plaintiffs' additional behavioral remedies will work before and after the divestiture of AdX and phased divestiture of DFP are completed to, in tandem with the structural relief,

9

forestall any practices likely to result in future monopolization, such as a creative recreation of a tie between Google's "unique advertising demand," (Op. at 92–93), and its sell-side products.

First, Plaintiffs propose a series of prohibitions intended to prevent Google from circumventing the proposed structural relief. For example, Section X(A) prohibits Google from bidding directly from Google AdWords or DV360 into DFP to prevent Google from engineering a new link between its buy-side and sell-side. Sections X(B)–X(H) impose non-discrimination requirements on Google's ad tech products and Google's use of certain data, which will protect competition in the relevant markets from other, similar forms of foreclosure that Google may have the ability and incentive to implement. Sections X(I)–X(J) prohibit Google from engaging in any form of tying or similar conduct with its ad tech tools, and from engaging in the conduct that the Court has already found to be anticompetitive.

Second, to prevent Google from engaging in new practices to monopolize the publisher ad server and ad exchange markets, Sections XI(A) and XI(D) limit when Google can re-enter the ad exchange market and, as deemed necessary, the publisher ad server market. To prevent Google from once again manipulating the Open-Source Auction to harm competition in the relevant markets, Sections XI(B)–XI(C) prohibit Google from modifying the Open-Source Auction or obtaining any control over the Final Auction Logic.

Finally, to monitor Google's compliance with the PFJ, Plaintiffs propose in Section XIII a series of compliance steps. These include the appointment of a Monitor in Section XIII(A), the appointment of a Divestiture Trustee in Section XIII(B), and the appointment of an Internal Compliance Officer in Section XIII(C). Plaintiffs further propose a prohibition on Google taking action to retaliate against any person, or interfere with or circumvent the remedies, as set forth in Section XIII(D).

## CONCLUSION

Google's "decade-long campaign of exclusionary conduct," (Op. at 111), requires meaningful relief to restore competition in the impacted markets. Plaintiffs' proposed final judgment carefully crafts a combination of structural and behavioral relief to accomplish each of the four objectives mandated by the Supreme Court. The divestiture of AdX and phased divestiture of DFP, with accompanying behavioral relief, will free the publisher ad server and ad exchange markets for open-web display ads from the effects of Google's unlawful conduct, terminate Google's illegal monopolies, deny Google the fruit of its unlawful conduct, and prevent practices by Google likely to result in future monopolization.

Dated: September 5, 2025

Respectfully submitted,

| | |
|---|---|
| ERIK S. SIEBERT<br>United States Attorney | JASON S. MIYARES<br>Attorney General of Virginia |
| /s/ Gerard Mene<br>GERARD MENE<br>Assistant U.S. Attorney<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>Telephone: (703) 299-3777<br>Facsimile: (703) 299-3983<br>Email: Gerard.Mene@usdoj.gov | /s/ Tyler T. Henry<br>TYLER T. HENRY<br>Assistant Attorney General<br>Office of the Attorney General of Virginia<br>202 North Ninth Street<br>Richmond, VA 23219<br>Telephone: (804) 692-0485<br>Facsimile: (804) 786-0122<br>Email: thenry@oag.state.va.us |
| /s/ Julia Tarver Wood<br>JULIA TARVER WOOD<br>DAVID A. GEIGER<br>MATTHEW R. HUPPERT<br>DAVID M. TESLICKO<br>MICHAEL E. WOLIN<br><br>United States Department of Justice<br>Antitrust Division<br>450 Fifth Street NW, Suite 7100<br>Washington, DC 20530<br>Telephone: (202) 307-0077<br>Fax: (202) 616-8544<br>Email: Julia.Tarver.Wood@usdoj.gov<br><br>*Attorneys for the United States* | *Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia* |