**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO EXCLUDE THE**
**TESTIMONY OF DR. GORANKA BJEDOV**

Unhappy with the opinions she offers, Google seeks to exclude all testimony by one of Plaintiffs' technical experts, Dr. Goranka Bjedov. Dr. Bjedov is an accomplished, experienced, and well-credentialed computer scientist who spent much of her career working at the largest technology companies in the world, including Google and Facebook. Unlike Google's technical experts, Dr. Bjedov has been integrally involved in numerous large-scale software migration projects. Despite this practical experience, Google contends Dr. Bjedov lacks the expertise to render her opinions, and it distorts her deposition testimony beyond recognition to question her methodology.

None of these arguments hold water. They are contradicted by Dr. Bjedov's three expert reports disclosed in this case, amounting to nearly two hundred pages in total, and her deposition testimony. The Court should reject Google's mischaracterization of Dr. Bjedov's qualifications as well as Google's misleading quotations from the depositions of Dr. Bjedov and Plaintiffs' other technical expert, Prof. Jon Weissman. Especially where, as here, the Court will sit as the trier of fact, there is no basis to exclude Dr. Bjedov's testimony under Rule 702.

1

# BACKGROUND

**A. Dr. Bjedov Is a Highly Qualified Engineer and Computer Scientist with Substantial Experience on Software Migration and Deployment Projects.**

Dr. Bjedov began coding software as a child.[1] After attending a high school for informatics (computer science), she received her undergraduate degree in civil engineering from the University of Zagreb in 1986. Ex. 2, Bjedov Opening Rpt. App'x B at 1 (curriculum vitae); Ex. 1, Bjedov Tr. 12:5–6, 18:1–3. Dr. Bjedov then moved to the United States, where she obtained a master's degree in civil engineering and a Ph.D. in engineering science from Clarkson University, as well as a master's degree in computer science from Purdue University. Ex. 2, Bjedov Opening Rpt. App'x B at 1. As a graduate student at Clarkson University, Dr. Bjedov taught undergraduate programming and engineering classes; after receiving her Ph.D., she became a professor and later attained tenure at Purdue, teaching computer programming classes and publishing a textbook on software programming. *Id.* at 1–3.

Dr. Bjedov's experience is not limited to the theoretical work of academia. She moved to the private sector in 1998, joining AT&T Labs (formerly Bell Labs) as a technical manager, where she had responsibility for performance, security and API testing, evaluation and selection of testing tools, and supervising testing processes. *Id.* at 2. She joined Network Appliance in 2001 as a Senior Engineer, where she was technical lead of the "Test Automation, Development and Analysis" group. *Id.* Her responsibilities included designing reliability tests for product performance and creating "sanity test suites" to speed up the software release process. *Id.*

---

[1] Ex. 1, Bjedov Tr. 18:1–11 ("█████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████").

Dr. Bjedov joined Google in January 2005, as a Senior Performance Test Engineer. At Google, she was responsible, as a technical lead, for designing performance testing infrastructure, utilizing open-source software, and supporting all of Google's products and services, except Gmail. Ex. 2, Bjedov Opening Rpt. ¶ 11, App'x B at 1–2. In addition, Dr. Bjedov conducted performance testing for Google Search, productivity tools and digital ads, and new products. *Id.* Dr. Bjedov worked directly on Google's ad tech products, AdSense and AdWords, including improving and shortening the release cycle for AdSense 3.0, a software update. *Id.* App'x B at 2.

Dr. Bjedov joined Facebook in 2010, where she served as the Lead Engineer for the Performance and Capacity team. *Id.* ¶ 9, App'x B at 1. ████████████████████████

████████████████████ ████████████████████ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████.

### B. Dr. Bjedov's Assignment

In Google's Initial Proposal for Appropriate Remedies, it contended that "building the equivalent of AdX and/or DFP to operate outside the Google infrastructure for sale to a third party would require at the very minimum five years, but likely considerably more time—even as much as one-and-a-half times to twice as long—even with hundreds of qualified software engineers." ECF No. 1431 at 11–12. To rebut this contention, Plaintiffs asked Dr. Bjedov to "assess a technical process by which Google can migrate the software components necessary to replicate the functionality of Google's Publisher Ad Server (DFP) and Ad Exchange (AdX) products to an acquirer's environment, and of the Final Auction Logic to an open source environment." Ex. 2, Bjedov Opening Rpt. ¶ 2. Plaintiffs also asked Dr. Bjedov "to describe the technical effort and time required to complete the AdX divestiture and the three phases of DFP divestiture remedies. This includes the timeline and resource estimates for migrating AdX to an acquirer's environment, creating application programming interfaces (APIs) within DFP that facilitate integration of Header Bidding wrappers and data export (phase 1 of DFP Divestiture), migrating the Final Auction Logic to an open source environment (phase 2 of DFP Divestiture), and migrating the remainder of DFP to an acquirer's environment (phase 3 of DFP Divestiture)." *Id.* ¶ 3.

Dr. Bjedov issued three expert reports during the remedies proceeding, offering opinions tied to each area of her assignment. This included opining on the general process, resources, and timetables for migrating (i.e., moving) a copy of the software that runs AdX and DFP from Google's internal cloud environment to an acquirer's environment. In forming her opinions,

Dr. Bjedov relied not only upon her professional experience, Google-produced documents, academic literature, and public information sources, but also the analysis of another technical expert retained by Plaintiffs, Dr. Jon Weissman. Prof. Weissman is an accomplished computer scientist and software engineer with more than 25 years of academic and industry experience, "with a particular emphasis on distributed and parallel computing, cloud and edge systems, large-scale workload scheduling, and data-intensive systems." Ex. 3, Weissman Opening Rpt. ¶ 6, App'x B at 1–2. Dr. Bjedov reviewed and relied upon Prof. Weissman's work, in which he "analyzed the source code and data flow in AdX and DFP, how AdX and DFP are integrated with the rest of Google's products and services, how AdX and DFP are defined, and the technical feasibility of migrating the source code into an acquirer's software environment." Ex. 2, Bjedov Opening Rpt. ¶ 4. She found Prof. Weissman's analysis "to be sound and reasonable," and she "accept[ed] his analysis as true for purposes of estimating the timelines and resources discussed in [her] report." *Id.*

## LEGAL STANDARDS

Rule 702 permits an expert to offer opinion testimony when the proponent of the testimony has demonstrated to the court that it is more likely than not that: (1) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's opinion is "based on sufficient facts or data" and "is the product of reliable principles and methods"; and (3) the expert's opinion "has reliably applied the principles and methods to the facts of the case." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702).

The text of Rule 702 expressly states that an expert may be qualified based on experience. Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . ."). "'Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education.'" *Wiener v. AXA Equitable Life Ins. Co.*, 481 F. Supp. 3d 551, 558 (W.D.N.C. 2020) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)). In many instances, "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (expert witnesses testimony is given latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.").

Additionally, "[a] witness's qualifications under Rule 702 are judged liberally," *United States v. Contreras*, 2025 U.S. App. LEXIS 20709, at *9 (4th Cir. Aug. 14, 2025) (citing *Kopf*, 993 F.2d at 377), and "'the rejection of expert testimony is the exception rather than the rule.'" *Lipitor*, 892 F.3d at 631 (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013). The Court's decision regarding admissibility does not require an evaluation of the strength or weight of the testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); s*ee also E.E.O.C. v. Freeman,* 778 F.3d 463, 466 (4th Cir. 2015) ("The scope of the court's gatekeeping inquiry will depend upon the particular expert testimony and facts of the case.").

For a technical expert, the Supreme Court has explained that "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150. This requires the Court "to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the [factfinder] in deciding the particular issues in the case." *Id*. at 156

(citation modified). Moreover, given that "experiential expert testimony does not rely on anything like a scientific method," there are "meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (citation modified). Experiential expert testimony "is admissible under Rule 702 so long as an experiential witness explains how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States* v. *Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (citation modified); *see also United States* v. *Mallory*, 2018 WL 11438046, at *1 (E.D. Va. June 5, 2018) (denying *Daubert* challenge to experts' testimony as to the general document classification processes and classification decisions at issue in the case based on experts' "many years of experience in classifying information and documents within the U.S. Intelligence Community.").

In considering Google's multiple *Daubert* motions during the liability phase, which were summarily denied, the Court explained that because "this case is going to be a bench trial, so I ultimately will be the person deciding, you know, what evidence I find is credible, what I find is incredible, and I think it is premature for the Court to be doing that." June 14, 2024 Hr'g Tr. 5:8–6:7; *see also Nease v. Ford Motor Co*., 848 F.3d 219, 231 (4th Cir. 2017) ("The main purpose of Daubert exclusion is to protect juries from being swayed by dubious scientific testimony."); 29 *Wright & Miller's Federal Practice & Procedure* § 6270 (2d ed. 2025) (noting that there is "greater discretion" regarding "the stringency of gatekeeping" when the judge is the factfinder) (collecting cases at n.26). The same is true here, where "the real dispute is, in some respects, the assumptions, the methodologies, the particular market that's being looked at, and those are the types of factual . . . disputes that have to be resolved at trial." June 14, 2024 Hr'g Tr. 5:8–6:7

(commenting that the Court "need[s] to see and hear those witnesses in person. Reading a cold record is, in my view, not sufficient.").

## ARGUMENT

**I.   Dr. Bjedov's Extensive Education and Experience Qualifies Her to Offer Opinions in this Case**

As described above and in her opening report, Dr. Bjedov has substantial practical and academic experience in computer science. In particular, Dr. Bjedov has worked on numerous projects that involved the migration and deployment of software at scale at some of the largest tech companies in the world, including Facebook, and has personally worked within Google's code base and internal infrastructure. Dr. Bjedov holds multiple degrees in informatics, civil engineering, engineering science, and computer science. *See supra* § A. And Dr. Bjedov has taught courses in computer programming, computer tools, and engineering science, while also publishing a computer programming textbook. *Id.* Google critiques Dr. Bjedov's qualifications, contending she should be excluded because assessing the feasibility and timelines required to divest AdX and DFP "is far beyond the scope of Dr. Bjedov's experience." Mem. of Law in Supp. of Google LLC's Mot. to Exclude the Testimony of Dr. Goranka Bjedov, ECF No. 1590 ("Mot.") at 9. Google's argument appears to turn on (i) Dr. Bjedov's purported "lack[] [of] software engineering experience" as compared to Plaintiffs' other technical expert, Prof. Weissman, upon whom Dr. Bjedov relies, (ii) Dr. Bjedov's departure from Facebook in 2019 after more than 25 years of experience across industry and academia, and (iii) her professional focus on "testing the performance of code and procuring hardware, storage, and bandwidth" over writing software code. Mot. at 9. None of these arguments undercut Dr. Bjedov's qualifications to opine on potential migration plans and timelines for the divestitures of AdX and DFP.

First, Google ignores Dr. Bjedov's academic experience in computer science and computer programming, as well as her role on engineering teams (that often included software engineers) tasked with migrating software. Google's argument also appears to ignore Dr. Bjedov's reliance upon the work of Prof. Weissman, whose software engineering expertise Google does not contest. That Prof. Weissman did not also opine on a migration plan or timeline—because it was outside the scope of his assignment—does not undermine Dr. Bjedov's ability to do so based on her own qualifications and experience and informed by Prof. Weissman's analysis. Contrary to Google's suggestion, Prof. Weissman never testified that only someone who formally held a title of software engineer could form reliable opinions on these topics. Instead, Prof. Weissman testified that he " ███████████ " to opine on migration timelines and that he " ███████████████████████████████████████████████████ ███████████ " and that " █████████████████████████████████████████████████ ." Ex. 4, Weissman Tr. 77:7–78:19.

Second, Dr. Bjedov's decision to leave Facebook in 2019 does not diminish her expertise with software migration planning. Google has not cited to any changes in the industry that would render Dr. Bjedov's pre-2019 experience irrelevant or unhelpful here. If anything, developments in technology since 2019, including the growth of cloud computing, likely have made migrations easier. *See* Ex. 2, Bjedov Opening Rpt. ¶¶ 27, 45.

Third, Dr. Bjedov's relative strengths in performance and capacity testing and hardware provisioning are both relevant and helpful here, because both are key aspects of migration, as laid out in Dr. Bjedov's reports, and those of Google's expert Prof. Nieh. *See* Ex. 2, Bjedov Opening Rpt. ¶¶ 33, 165–66, 176–77, 195–96, 200; Ex. 5, Nieh Opening Rpt. ¶¶ 58, 168–75, 199–204. That Dr. Bjedov focused on these areas while at Google and Facebook only further

9

qualifies her to render her opinions here. Moreover, Dr. Bjedov never testified she lacked any experience with software engineering work. To the contrary, she testified about how she

█████████████████████████████████████████████████████████████

█████████████████████████████. *See* Ex. 1, Bjedov Tr. 488:4–489:19. These professional experiences were built upon Dr. Bjedov's academic studies in computer science and her academic career teaching students how to write software code. Ex. 2, Bjedov Opening Rpt. App'x B at 1–3.

　　　　To the extent Google has concerns over Dr. Bjedov's experience, those "concerns over . . . the specific experiences on which she relies can be addressed on cross-examination and with contrary evidence." *Trauernicht v. Genworth Fin., Inc.*, 2024 WL 3996019, at *8 (E.D. Va. Aug. 29, 2024). The court should consider Dr. Bjedov's "full range of experience and training," not just whether or how long she held the formal title of software engineer. *Belk, Inc. v. Meyer Corp.*, 69 F.3d 146, 162 (4th Cir. 2012) (cautioning not to construe "specialized knowledge . . . too narrowly"). Excluding Dr. Bjedov for not having held the title of software engineer and "[a]tempting to parse these computer issues and the experts allowed to discuss them into very narrow specialties would misapply the policies inculcated in Rule 702 and *Daubert*." *MGE UPS Sys. v. Fakouri Elec. Eng'g, Inc.*, 2006 WL 680513, at *3 (N.D. Tex. Mar. 14, 2006); *see also KBS Preowned Vehicles, LLC v. United Fin. Cas. Co.*, 2014 WL 4388294, at *4 (N.D.W. Va. Sept. 5, 2014) (an "expert need not necessarily have specific experience with a particular facet of his or her expertise in order to be competent to testify as to that facet, and a lack of specialization generally does not affect the admissibility of the opinion, only its weight."); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 4362166, at *6 (E.D. Va. Aug. 15, 2022) (rejecting argument to exclude a pharmaceutical expert for lack of experience with personal "responsibility

for decision-making with respect to an ANDA filing strategy" when the expert had "extensive experience within the pharmaceutical industry").

Additionally, none of the cases cited by Google support the relief it seeks. Each involve a proffered expert offering opinions in specialized fields for which they had *no* prior experience or expertise. In *Brainchild Surgical Devices, Ltd. Liab. Co. v. CPA Glob. Ltd.*, 144 F.4th 238 (4th Cir. 2025), the Fourth Circuit affirmed exclusion of an expert who opined on whether a company "overcharged" for patent renewal services despite the expert "never [having] worked in the patent renewal field or even seen patent renewal contracts until th[at] case." *Id.* at 254. Instead, the expert's experience there was limited to "managing financial and credit risk in the IT space," a wholly unrelated field. *Id.* Dr. Bjedov's experience here participating in and leading the planning for software migrations and deployments mirrors the scope of her opinions, even if she did not personally perform every function within the multi-disciplinary migration team.

The other cases Google cites are similarly distinguishable. *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, involved a proffered expert offering opinions on whether and how "it is possible by generalized proof to calculate class-wide damages for insurance business interruption claims" when he had "never taken a course on claims adjustment," authored no publications on insurance coverage or claims processing, and had never "previously calculated losses or damages for business interruption claims . . . for an insurer nor developed a methodology for calculating such losses for an insurer." 2022 WL 433006, at *8–9 (E.D. Va. Feb. 11, 2022) (determining that the economics of damages calculations in business interruption insurance cases was a *sui generis* area calling for more specific expertise), *rev'd and remanded*, 95 F.4th 181 (4th Cir. 2024). By contrast, Dr. Bjedov has extensive experience developing and implementing software migration and deployment plans and timelines, just as she did here.

Likewise, in *Wood v. Credit One Bank*, the court excluded a proffered expert whose opinions centered on the FCRA when "the bulk of Lynn's experience with matters involving the FCRA came from serving, not as a FCRA expert witness, but as a 'litigation consultant' for three to five cases involving the FCRA more than ten years ago." 277 F. Supp. 3d 821, 858 (E.D. Va. 2017). Again, Dr. Bjedov's experience with migration planning does not stem from one-off litigation consulting work, but rather from direct involvement in migration and deployment projects in the field, akin to those on which she opined in this case, informed by her academic background.

## II.    Dr. Bjedov Relied Upon Her Substantial, Relevant Experience—Informed by Record Evidence—to Develop Potential Migration and Open-Source Auction Timelines

Google's scattershot challenges to Dr. Bjedov's methodology should likewise be rejected, notwithstanding Google's use of the label "ipse dixit" sixteen times in its motion. As an experiential expert witness basing her opinions on professional skills and experience, Dr. Bjedov was only required to "explain how [her] experience leads to the conclusion reached, why [her] experience is a sufficient basis for the opinion, and how [her] experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274 (quoting Fed. R. Evid. 702). Dr. Bjedov easily satisfies that requirement.

### A.    Google Mischaracterizes Dr. Bjedov's Methodology

As Dr. Bjedov explained in her deposition, she employed a two-step process to develop the opinions she set forth in her expert reports. First, Dr. Bjedov considered her professional experience with large-scale software migrations and deployments, including migrating similar software to what Plaintiffs propose divesting here, as well as her familiarity with Google's code base and internal structure, to construct a high-level migration plan and an initial estimated timeline. In doing so, she "███████████████████████████████



████████"[2] to construct a plan and timeline based upon her professional experience, publicly accessible sources, and the general body of material she reviewed. Ex. 1, Bjedov Tr. 141:14–146:8. Dr. Bjedov referred to this initial step as "████████████████" to create her "████████" (*id.* at 288:2–8) or a "████████" (*id.* at 142:13–14). Second, as part of a "████████," Dr. Bjedov went on to search the record evidence available to her "████████████████." Ex. 1, Bjedov Tr. 139:8–10 ("████████████████████████████████ ████████████████████████"). Essentially, Dr. Bjedov's process involved proposing a reasonable hypothesis for her opinions and then interrogating whether that hypothesis was consistent or inconsistent with the additional record evidence, accounting along the way for any potential migration complications identified in Google's documents.

Dr. Bjedov properly sequenced these two stages to mitigate her concern that ████████ ██████████████████████████████████████████ might skew, or "████████," her initial estimates; instead she based those estimates on her professional experience and the particular circumstances of the proposed migrations. Ex. 1, Bjedov Tr. 137:13–16 ("████████████████████ ██████████████████████████████████████████") (emphasis added), 138:2–4 ("████████████████████████████████████████ ████████") (emphasis added). Contrary to Google's contention, at no time did Dr. Bjedov "admit" (Mot. at 4) to ignoring all record evidence prior to arriving at the estimates she ultimately put forth in her report.

---

[2] In her Opening Report, Dr. Bjedov cites to Google's own public guide, which puts forward a similar migration plan to move software from one environment to Google's public cloud platform. Ex. 2, Bjedov Opening Rpt. ¶ 165 n.221 ("Execute your migration," Google Cloud, last updated July 2, 2025, https://cloud.google.com/migration-center/ docs/migration-execution ("After you have completed the migration planning and preparation phase,…[1] Assess [2] Plan [3] Deploy [4] Optimize").

Google contends that Dr. Bjedov "formed her opinions based on her experience and public information . . . without any consideration of the record in this case or Prof. Weissman's source code analysis." Mot. at 4. But this contention mischaracterizes the two-step process Dr. Bjedov used to arrive at her opinions in this case, and it conflates her preliminary "███████" or "███████" of her opinion with the ultimate opinions she put forward in her three expert reports. Ex. 1, Bjedov Tr. 138:5–15, 142:13–14. Google's mischaracterization of Dr. Bjedov's methodology "based on [] limited deposition exchange" "does not override [her] expert report" or other deposition testimony where she clearly explained how she considered all relevant information available to her before reaching her ultimate opinions—the ones actually at issue in Google's motion. *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 4362166, at *16 (E.D. Va. Aug. 15, 2022). At base, it appears Google believes Dr. Bjedov needed to re-sequence her two-step analysis or collapse certain analytical steps. But Google has identified no precedent to support such a position, especially where there is no reason to believe such a reordering or rearrangement would have had any effect on Dr. Bjedov's ultimate opinions.

Google's contention that Dr. Bjedov should have relied upon Prof. Weissman's source code analysis earlier in her internal analytical process fares no better. Mot. at 4. Dr. Bjedov testified that her initial, step-one migration plan and associated timeline estimate were in part based on ████████████████████████████████████████ ████████████████████████████████████████████. Ex. 1, Bjedov Tr. 214:9–13. She then relied on Prof. Weissman's source code analysis as part of step two to confirm ████ ████████████████████████████████████████████ ████████████████████████████████████. *Id.* at 214:14–217:17. Both in her report and at deposition, Dr. Bjedov consistently made clear she relied upon

Prof. Weissman's source code review to reach her ultimate opinions in this case. Ex. 2, Bjedov Opening Rpt. ¶ 4 ("I have reviewed [Professor Weissman's] analysis and find it to be sound and reasonable. I accept his analysis as true for purposes of estimating the timelines and resources discussed in my report."); Ex. 6, Bjedov Reply Rpt. ¶ 99 ("Dr. Jon Weissman conducted a complexity analysis, which serves as the foundation for my migration assessment in my Opening Report.").

Google selectively quotes portions of Dr. Bjedov's deposition to quibble with when—but not whether—Dr. Bjedov incorporated various aspects of Prof. Weissman's work into her ultimate conclusions. But again, Google has failed to explain why the precise sequencing of Dr. Bjedov's analytical steps matters for purposes of assessing the reliability of her ultimate opinions. Ex. 1, Bjedov Tr. 115:6–9 ("███████████████████████████████████ ██████████████████████████), 208:22–209:5 ("███████████████████ ███████████████████████████████████████████████ ███████████████████████"). And although Google insinuates that Dr. Bjedov was separately required to personally review the underlying source code in order to form her opinions, Google never explains why Dr. Bjedov's reliance upon Prof. Weissman (whose opinions Google has not sought to exclude) was somehow unreasonable or improper. Indeed, one of Google's experts retained specifically to rebut Dr. Bjedov, David Maymudes, ███████████ █████████████████████████████████████████████ ███████████████████████████████████████████. Ex. 7, Maymudes Tr. 266:12–16, 304:10–20.[3]

---

[3] At his deposition, Mr. Maymudes ████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

Google appears to contend that Dr. Bjedov's testimony must be excluded in full because she did not combine her two-step analysis into a single step where she simultaneously considered every piece of relevant information available to her at the exact same time. Google cites no case law for its position. Putting aside the practical reality that some sequencing of analysis is always necessary, Google seeks to turn on its head Dr. Bjedov's laudable approach to forming and then testing an independent initial estimate.[4]

Google also points to Dr. Bjedov's unremarkable statement in her report that "every software migration is different" to fault her for utilizing a migration plan that would follow four stages that are "standard for migrations." Mot. at 14 (quoting Bjedov Opening Rpt. ¶ 22). But merely because every software migration has its own unique context and issues on the margins, that does not render unreliable the use of a standard migration plan or preclude estimates of time and resources based on the totality of Dr. Bjedov's significant experience with software migrations.[5] To the extent Google disagrees with the substance of Dr. Bjedov's plans or her stage-based time and effort estimates[6] (which Dr. Bjedov tuned to the particular characteristics of

_____

██████████████████████████████████████████████████. Ex. 7, Maymudes Tr. 11:1–4, 12:16–22, 255:5–266:16.

[4] Ironically, in its separate motion *in limine,* Google argues that the Court should exclude the very same internal Google "████████" documents that in this motion Google claims Dr. Bjedov should have considered earlier in the process of forming her opinions.

[5] In a footnote, Google contends that its argument also applies with respect to Dr. Bjedov's opinions on phases 1 and 2 of the DFP divestiture. But Dr. Bjedov explains in her report that her time estimates for phases 1 and 2 of the DFP divestiture are based primarily on an internal Google document, subject to adjustments to parallelize certain phases, rather than Dr. Bjedov's professional experience. Ex. 2, Bjedov Opening Rpt. ¶¶ 140, 146.

[6] Unlike Dr. Bjedov, who offered particularized time and effort estimates for each stage of her migration plan and for each phase of the proposed AdX and DFP divestitures, Google's technical experts either ██████████████████████████████████████████, in the case of Prof. Nieh (*see* Ex. 5, Nieh Opening Rpt. ¶ 234), or provided ████████████ ████████████, in the case of David Maymudes.

AdX and DFP), it is free to challenge those matters on cross-examination.[7] *See Trauernicht*, 2024 WL 3996019, at *8.

Tellingly, the migration steps put forward by Dr. Bjedov ███████ ███████ ███ outlined by Google's own expert, Prof. Nieh, and they are consistent with the plan outlined on Google's public cloud website.[8] This further confirms the reliability of Dr. Bjedov's approach. In his report, disclosed the same day as Dr. Bjedov's opening report, Prof. Nieh ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████" Ex. 5, Nieh Opening Rpt. ¶¶ 159–204. Although Prof. Nieh ██████████████████████

████████████████████████████████████████

███ proposed by Dr. Bjedov and Professor Nieh.

Google also speciously claims that Dr. Bjedov altered her proposed timelines at her deposition. Specifically, Google claims Dr. Bjedov "████████████████████

████████████████████████████████████████

██████████████" Mot. at 15. What actually transpired at the deposition was

---

[7] Google's argument proves too much. Had Dr. Bjedov proposed a *sui generis* migration plan, Google almost certainly would have contended that doing so constituted an unreliable or unsupported methodology in light of the other arguments raised in its motion.
[8] "Execute your migration," Google Cloud, last updated July 2, 2025, https://cloud.google.com/migration-center/ docs/migration-execution.

Google's counsel's insistence on conducting a "gotcha" memory test, asking Dr. Bjedov not to look at her reports in answering multiple detailed questions about the timelines included in nearly 200 pages of expert reports.[9] In answering questions about those many timelines and resource estimates in her reports, Dr. Bjedov consistently referred counsel back to her report for the most accurate timeline estimates. Ex. 1, Bjedov Tr. 77:6–78:8 ("███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████"), 79:6–14 ("███████████████

████████████████████████████████████████████████████████

███████████████"), 80:12–13 ("████████████████████████████."). To the extent there were any inconsistencies between the numbers in Dr. Bjedov's written report and her responses to counsel's questions, they clearly were not intended to be a "change" in Dr. Bjedov's opinions; rather, they merely reflected an understandable difficulty in recalling the precise details of each of the particularized estimates Dr. Bjedov created for each stage of each proposed phase of the AdX and DFP divestitures without the benefit of access to her written reports.

Similarly, at her deposition, Dr. Bjedov did not "change" her time estimates with respect to the deployment stage of her migration timelines. In her report, Dr. Bjedov explained that "assuming that no [prior] work has been completed," the stage would "███████████████████

████████████████████." Ex. 2, Bjedov Opening Rpt. ¶ 174 (emphasis added).

---

[9] *See, e.g.*, Ex. 1, Bjedov Tr. 77:6–19 ("███████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████").

In the deposition exchange cited by Google, Dr. Bjedov merely explained why her opinions about the time and effort required as part of the deployment stage were highly conservative, consistent with her report and her overall approach to creating time estimates. Ex. 1, Bjedov Tr. 391:22–392:10 ("



.").

### B. Dr. Bjedov Properly Relied upon Prof. Weissman's Source Code Analysis

Google contends that "Dr. Bjedov's opinions are inherently unreliable because she never analyzed critical evidence available in this case . . . the extensive source code at the heart of this stage of this case." Mot. at 16. Both in her reports and at deposition, however, Dr. Bjedov confirmed she relied upon the source code analysis performed by Prof. Weissman, whose opinions Google elected not to challenge in a *Daubert* motion. Ex. 6, Bjedov Reply Rpt. ¶ 99 ("Dr. Jon Weissman conducted a complexity analysis, which serves as the foundation for my migration assessment in my Opening Report."); Ex. 1, Bjedov Tr. 115:6–9 ("                    ), 208:22–209:5 ("                    "). Dr. Bjedov's decision to rely upon Prof. Weissman's expertise and work was both efficient and reasonable here. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) ("Of course, as a general matter, there is nothing objectionable about an expert relying upon the work of a colleague.").

Contrary to Google's motion, Prof. Weissman did not testify or write in his report that a comprehensive source code analysis was required to opine on the feasibility of a software migration or to develop a reasonable estimate of the time such a migration would take. *See* Mot. at 16. Instead, in his opening report, Prof. Weissman explained that as part of the *actual* decoupling work (Stage 2 of Dr. Bjedov's migration plan) engineers would need to perform a comprehensive inventory of the codebase. Ex. 3, Weissman Opening Rpt. ¶ 135. Of course, the actual migration process has not yet begun. Likewise, the testimony Google cites is inapposite. Mot. at 16 (citing Ex. 4, Weissman Tr. 60:8–14). That testimony related to a question about ███ ████████████████████████████████ (not a migration at issue here); Prof. Weissman unsurprisingly responded that he did not have enough details about that migration to be able to opine on it. Ex. 4, Weissman Tr. 59:20–60:14. In response to later follow-up questions, Prof. Weissman testified ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████. *Id.* at 60:8–61:12.

Likewise, as discussed above, the fact that Dr. Bjedov considered Prof. Weissman's source code analysis as part of "step 2" in forming her ultimate opinions does not undermine the reliability of those opinions. Google has not explained why Dr. Bjedov was required to incorporate Prof. Weissman's source code analysis into her initial estimate as part of "step 1," so long as she considered the source code analysis—as she did—before forming the opinions set forth in her reports.

Google further argues that Prof. Weissman's source code analysis does not provide a sufficient basis for reliable timeline estimates because, among other things, Prof. Weissman did

not identify all dependencies of AdX and DFP and all replacements that would be needed for them. Mot. at 16–17. However, Dr. Bjedov explained at length in her reply report how her migration plan properly accounted for Prof. Weissman's survey of AdX's and DFP's dependencies and how she accounted in her migration plan for ███████████████████ ████████████████████████████████████████ expected when replacing those dependencies. Ex. 6, Bjedov Reply Rpt. ¶¶ 15, 37–40, 47–50. At her deposition, Dr. Bjedov also explained that because ██████████████████████ ████████████████████████████████████████ ████████████████. Ex. 1, Bjedov Tr. 242:17–243:7. ████████████████ ████████████████████████████████

Finally, Google contends that Dr. Bjedov's review of Prof. Weissman's source code statistics is an unreliable methodology. Mot. at 17. However, Google's argument fails to put Dr. Bjedov's reliance upon those statistics in full context. First, Dr. Bjedov's review of the source code statistics was simply one of many inputs into her overall migration plans and timeline. Second, at her deposition, Dr. Bjedov explained how ████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████. Ex. 1, Bjedov Tr. 213:8–217:17. Third, Dr. Bjedov explained how █████████████████████ █████████████████████████. *Id.* Fourth, contrary to Google's argument, Dr. Bjedov testified that ██████████████████████████████████ █████████████████████. Ex. 1, Bjedov Tr. 262:22–264:12 (explaining that ████████████████████████████████████████

██████████████████████).[10] And as explained above, Prof. Weissman never testified

that an exhaustive analysis of all AdX and DFP source code was required—from his personal

perspective—to estimate a migration timeline.

While Dr. Bjedov acknowledged at her deposition that she ████████████████

████████████████████████████████████████████████████

████████████████████████████████████. Ex. 1, Bjedov Tr. 224:8–225:16

(describing ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████). That approach is consistent with standards imposed by courts on

experiential experts. *See Merritt* v. *Old Dominion Freight Line, Inc.*, 2011 WL 322885, at *5

(W.D. Va. Feb. 2, 2011) ("Where, as here, the expert's opinion is grounded in experience in a

particular field, courts will generally not preclude his testimony merely because it is not tested,

subject to peer review and publication, or has no known rate of error."); *see also Wiener*, 481 F.

Supp. 3d at 558–60 (rejecting argument that expert's testimony should be excluded because "he

did not use a recognized methodology in forming his opinions" where expert's opinions was

based on his underwriting experience).

---

[10] Google has not filed a motion challenging the completeness of Prof. Weissman's code review, and for good reason. Prof. Weissman's review was of source code Google was required to produce in response to Plaintiffs' RFP No. 12, which called for the production of "the most recent source code for GAM, DFP, and AdX . . . including but not limited to: 1) the code bases for GAM, AdX, and DFP application source code, including front-end and back-end systems; 2) any relevant infrastructure and deployment source code, such as deployment scripts, project build or configuration files." Google did not make available certain portions of that code until August 5, 2025, after opening and rebuttal expert reports were submitted; Prof. Weissman later confirmed these belated productions did not materially affect his source code analysis. Ex. 8, Weissman Reply Rpt. ¶ 31.

### C.  Dr. Bjedov's Examples of Other Migrations Are Relevant Data Points

Google argues Dr. Bjedov's methodology was unreliable because she "cherry picked" the software migration case studies that are included in her report and identified some migrations that potentially took longer than her estimated migration timelines for AdX and DFP. Mot. at 19–21. But Google's argument fails to account for the limited purpose for which Dr. Bjedov relied upon these case studies.

In her opening report, Dr. Bjedov made clear that she identified these industry examples of software migrations solely to "illustrate that complex, data-rich, high-availability applications can be migrated efficiently and reliably and that the separation of AdX and DFP would not be unprecedented migrations." Ex. 2, Bjedov Opening Rpt. ¶ 77. Nowhere has Dr. Bjedov contended these industry examples served as the basis for her migration plans or timelines for the divestitures of AdX and DFP. Properly contextualized, nothing about Dr. Bjedov's selection of a sample of successful industry examples of software migrations is unreliable. Dr. Bjedov has not contended the list was exhaustive in nature, nor was an exhaustive list necessary to establish the limited point Dr. Bjedov intended to make. As with many of the other arguments it raises, Google of course remains free to critique the industry examples identified by Dr. Bjedov during the course of cross-examination, as it has already begun to do through the reports of its own experts.

### D.  Dr. Bjedov Properly Considered Google-Produced Documents Related to Divestiture

Google contends that Dr. Bjedov's methodology was also unreliable because of her review and reliance upon documents produced by Google with ████████████████████████ ██████████████████████████████. Mot. at 21–23. Putting aside that this position seems contrary to Google's earlier argument that Dr. Bjedov should have considered

Google documents ████████████████ earlier in her analysis, Google fails to explain how Dr. Bjedov's review of these documents undermines, rather than corroborates, the opinions she reached. Google also mischaracterizes Dr. Bjedov's testimony to suggest incorrectly she cherry picked from among the documents Google produced.

As Dr. Bjedov explained in her reports and at deposition, she (apparently unlike Google's proffered technical experts)[11] "███████████████████████████████" and she considered ██████████████████████████████████████ —

███████████████████████████████████████████

███████████████████████. Ex. 1, Bjedov Tr. 57:14–58:6, 138:12–139:9

("█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████████"). Those documents were facially relevant to Dr. Bjedov's analysis, including one document that discussed ████████████████████████

███████. Ex. 10, GOOG-AT-MDL-B-009828652, at -674. By incorporating these documents into her analysis, Dr. Bjedov was not offering an expert opinion on "[m]erely reading

---

[11] *See* Ex. 7, Maymudes Tr. 255:13–20 ("███████████████████████████████████
██████████████████████."), 257:10–12 ("████
██████████████████████████████████████"); 255:22–256:12
("██████████████████████████████████████████
███████████") 258:17–259:2 ("███████████████████████████
██████████████████████████████") Dr. Nieh
testified only that he "█████████████████████████████████████
██████████████████████████████████████████████"
(emphasis added). Ex. 9, Nieh Tr. 183:22–184:12; 191:11–192:7; *see also* Ex. 9, Nieh Tr. 187:7–
18 ("██████████████████████████████████
███████████████████").

documents" as Google contends, Mot. at 21, but rather incorporating and addressing the complete factual record relevant to her analysis. None of the cases cited by Google stand for the proposition that an expert must ignore business documents produced by a party when offering an opinion on a related subject.

Google's cherry-picking arguments fair no better. Google construes Dr. Bjedov's testimony that she was "██████████████████████████████████████████," Mot. at 22 (emphasis added), to mean that Dr. Bjedov looked only for information supportive of her opinions. But that misstates the testimony. Rather, Dr. Bjedov made clear that she ██████ ████████████████████████████████████████████████████████████████████ ██████████████████████. Ex. 1, Bjedov Tr. 138:17–20 ("████████████████████ ███████████████████████████████████████████████████████████."), 139:10–18 ("████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████."). And contrary to Google's suggestion, Dr. Bjedov did not ignore contradictory testimony about the documents she cited; rather she explained at deposition that ███████ ███████████████████████████████████████████████████████████████ ██████████████████. Ex. 1, Bjedov Tr. 181:2–6. Again, to the extent Google believes the underlying documents should be interpreted differently or contradict Dr. Bjedov's opinions, those are issues for cross-examination, not a motion under Rule 702.

### III.    Dr. Bjedov Properly Disclosed the Materials She Relied Upon in Forming Her Opinions, Consistent with the Parties' Expert Stipulation

Finally, Google claims Dr. Bjedov failed to disclose materials she relied upon. Yet again, Google misstates the relevant testimony as well as the applicable standard. Mot. at 23–26.

Dr. Bjedov disclosed her materials relied upon consistent with the parties' expert stipulation in this matter, and in a manner consistent with Google's own experts.

The parties' expert stipulation dictated the scope of disclosures "[i]n lieu of the disclosures required under Federal Rule of Civil Procedure 26(a)(2)(B)(ii)-(vi)." ECF No. 106 at 4. With respect to documentary evidence, the stipulation required disclosure of "[a] list of all Documents referred to in the Testifying Expert's report or declaration and/or *relied upon* by the Testifying Expert in forming the Testifying Expert's opinions." *Id.* (emphasis added). The expert stipulation distinguishes these materials from those that the "expert reviewed, investigated or considered but did not rely on or otherwise use," which may be the subject of examination at deposition even though not required to be contained in the expert report disclosure itself. *Id.* at 8.

At her deposition, Dr. Bjedov confirmed the "Materials Relied Upon" appendices of each of her three reports included any document she used to form her opinion. Ex. 1, Bjedov Tr. 61:17–62:11 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████"). In doing so, Dr. Bjedov distinguished these documents from the much larger set of documents that she merely read. *Id.* at 62:13–16.

This is consistent with the approach taken by Google's expert witnesses. For example, Prof. Nieh explained at his deposition that ████████████████████████████████████████████████████████████████████████████████████" Ex. 9, Nieh Tr. 182:17–22, 186:2–8 ("████████████████████████████████████████████████████████████████████████████████████████████"); *see also* Ex. 9, Nieh Tr. 179:2–14 ("████████████████████████



”), 288:8–20 (“ ”). As Dr. Bjedov did,

Prof. Nieh did not cite to at least some of these additional materials, even when confirmatory of

his opinions. *Id.* at 191:20–192:4 (“ .”). At deposition, Prof. Nieh

explained that he ” *Id.*

Google's argument appears to rest on an incorrect premise that Dr. Bjedov was required

to disclose every document she ever reviewed that was consistent with the opinions contained in

her report, but that standard is inconsistent with the parties' expert stipulation and practice in this

case. To the extent Dr. Bjedov discussed at her deposition documents not cited in her report, it

was in response to questions from counsel about the universe of documents she reviewed. For

example, Dr. Bjedov explained in response to one of counsel's question that she came across one

such Google document that , but she ultimately

did not cite to it in her report (or rely upon it in forming her opinion) because “

, whereas Dr. Bjedov identified

. Ex. 1,

Bjedov Tr. 64:21–66:19 ( ). Google builds up this particular document, discussed in a few lines of

Dr. Bjedov's deposition, as "█████████████████████████████." Mot. at 25–26. But Dr. Bjedov clearly testified to the contrary. The referenced document did not even factor into her thinking about the case. Ex. 1, Bjedov Tr. 69:17–70:9 ("Q. ██████████████ ██████████████████████████."). Certainly, Dr. Bjedov did not testify, as Google suggests, that she intends to rely upon such a document to support her opinions at trial.

Google's suggestion that Dr. Bjedov failed to disclose documents she considered with ████████████████████ also misstates the relevant deposition testimony. Dr. Bjedov testified that as part of her analysis, she ████████████████████████ ██████████████████. However, once she analyzed them more closely, she realized ████████████████████████████████████ █████. Ex. 1, Bjedov Tr. 152:11–156:7. Dr. Bjedov testified these documents were ████████ █████████, *id.* at 157:10–19, and in fact, Dr. Bjedov's testimony aligns with the discussion of ████████████ in her opening report. Ex. 2, Bjedov Opening Rpt. ¶¶ 149–53.

## CONCLUSION

For all of the forgoing reasons, the Court should deny in full Google's motion to exclude the testimony of Dr. Bjedov.

Dated: September 5, 2025

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
CRAIG L. BRISKIN
DAVID A. GEIGER
MATTHEW R. HUPPERT
GRIFFIN S. KENNY
DAVID M. TESLICKO
MICHAEL E. WOLIN

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

*Attorneys for the United States*

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

*Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia*