# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

UNITED STATES, *et al.,*

          *Plaintiffs,*

   v.

GOOGLE LLC,

          *Defendant.*

No. 1:23-cv-00108-LMB-JFA

**REPLY MEMORANDUM OF LAW IN SUPPORT OF GOOGLE LLC'S
MOTION TO EXCLUDE THE TESTIMONY OF DR. GORANKA BJEDOV**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.   DR. BJEDOV'S EDUCATION AND
     INTERACTIONS WITH COLLEAGUES  DO NOT CONFER
     THE EXPERTISE NEEDED TO RENDER HER OPINIONS............................. 3

     A.   Dr. Bjedov's Educational History
          Cannot Qualify Her as an Experiential Expert ........................................... 3

     B.   The Experience of Dr. Bjedov's Former Software
          Engineer Colleagues Does Not Transfer to Her By Osmosis .................... 5

     C.   Plaintiffs' Assertion that Dr. Bjedov Has "Led"
          Large-Scale Software Migrations Is Belied by Her Own Testimony ......... 7

II.  DR. BJEDOV NEVER EXPLAINS HOW HER
     ████████████ ESTIMATES  ARE DERIVED FROM
     HER EXPERIENCE AND THE FACTS OF THIS CASE ................................... 7

     A.   Dr. Bjedov Does Not Explain How Her
          Experience, Public Sources, or ████████████
          ████████████ Translate to Her Timeline Estimates .............................. 9

     B.   Plaintiffs and Dr. Bjedov Fail to Connect the Dots Between
          Any Source Code Analysis and Her ████████ Timeline Estimates ........ 11

     C.   Dr. Bjedov's Selective and
          Confirmation-Driven Reading of Google Documents
          Also Does Not Explain the Basis of Her Timeline Estimates ................. 13

III. PLAINTIFFS' NON-DISCLOSURE OF
     PURPORTEDLY KEY DOCUMENTS UNDERSCORES
     THE UNRELIABILITY OF DR. BJEDOV'S OPINIONS................................... 17

CONCLUSION..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barber v. United Airlines, Inc.*,
    17 Fed. Appx. 433 (7th Cir. 2001)............................................................................16

*Belk, Inc. v. Meyer Corp.*,
    679 F.3d 146 (4th Cir. 2012) ..................................................................................6

*Brainchild Surgical Devices LLC v. CPA Glob. Ltd.*,
    144 F.4th 238 (4th Cir. 2025) ................................................................................19

*Brasko v. First Nat'l Bank of Pennsylvania*,
    700 F. Supp. 3d 354 (D. Md. 2023) ....................................................................5, 9

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
    2018 WL 4220674 (S.D.W. Va. Sept. 5, 2018)....................................................17

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    2021 WL 1436672 (S.D.W. Va. Apr. 15, 2021)...................................................17

*Copeland v. Bieber*,
    2016 WL 7079569 (E.D. Va. Sept. 8, 2016)..........................................................8

*ePlus, Inc. v. Lawson Software, Inc.*,
    764 F. Supp. 2d 807 (E.D. Va. 2011) ..................................................................11

*Holesapple v. Barrett*,
    5 Fed. Appx. 177 (4th Cir. 2001)............................................................................9

*Jackson v. United States*,
    2010 WL 2228378 (D.S.C. May 28, 2010).............................................................5

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024), *rev'd on other grounds sub nom. Folwell v. Kadel,*
    2025 WL 1787687 (2025)........................................................................................5

*KBS Preowned Vehicles, LLC v. United Fin. Cas. Co.*,
    2014 WL 4388294 (N.D.W. Va. Sept. 5, 2014) .....................................................6

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018)...................................................................16

*Modern Auto. Network, LLC v. E. All. Ins. Co.*,
    416 F. Supp. 3d 529 (M.D.N.C. 2019) .................................................................11

*Estate of Ravenell ex rel. Ravenell v. Pugmill Systems, Inc.*,
  2014 WL 7146848 (D.S.C. Dec. 15, 2014) ...............................................................6

*SAS Institute, Inc. v. World Programming Ltd.*,
  2015 WL 13878192 (E.D.N.C. Nov. 5, 2015) ..................................................8, 11, 12

*Shreve v. Sears, Roebuck & Co.*,
  166 F. Supp. 2d 378 (D. Md. 2001) ........................................................................6

*Synopsys, Inc. v. Risk Based Security, Inc.*,
  70 F.4th 759 (4th Cir. 2023) ....................................................................................8

*United States v. Wilson*,
  484 F.3d 267 (4th Cir. 2007) ...............................................................................8, 9

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2022 WL 4362166 (E.D. Va. Aug. 15, 2022) .........................................................6

## **INTRODUCTION**

Plaintiffs are asking the Court to rely on ████ divestiture timelines for complex and integrated software products solely from an expert who is admittedly not a software engineer, did not review any source code, reached her conclusions before looking at a scrap of evidence in this case, and who did not keep track of and disclose purportedly key documents used to "confirm" her opinions. The Court should exclude such unreliable evidence. Plaintiffs attempt to obfuscate the glaring Federal Rule of Evidence 702 problems with Dr. Bjedov's qualifications and opinions by using strawmen and false claims that Google misrepresented their experts' damning testimony. Her opinions far exceed her qualifications and amount to impermissible ipse dixit.

First, Plaintiffs make much of Dr. Bjedov's "coding software as a child" and education from more than a quarter century ago when Google did not even exist, her working at Google *15 years ago* (but not as a software engineer), and her having worked *with* software engineers on software migrations during her career. But none of that confronts or can make up for Dr. Bjedov's unequivocal agreement that she ████████████████████████████████ ████████████████████████████████ ████████████████ Dr. Bjedov has never performed—much less managed—software engineering work to decouple software from its existing infrastructure and rewrite it for an entirely different infrastructure. That she has worked on projects that involved other people with software engineering experience does not qualify *her* as an experiential expert in that field. Given her focus on hardware and testing, rather than software engineering, Dr. Bjedov simply is not qualified to opine on the feasibility and specific timelines of software migrations like an AdX or DFP divestiture.

Second, Plaintiffs' Opposition demonstrates that Dr. Bjedov failed to connect the dots between her experience, the facts of this case, and her specific ██████ timelines for each of Plaintiffs' proposed remedies. This renders her methodology not only unreliable, but impossible to replicate or even interrogate. Plaintiffs do not dispute that Dr. Bjedov reached her specific timeline estimates purely based on her claimed experience in hardware and testing, *before* reviewing any record evidence. And Plaintiffs concede that the "industry examples" Dr. Bjedov mentions are *not* the basis for her timeline estimates, which is not surprising since several of those examples involved much longer timelines. Plaintiffs claim that only after she reached her "hypothesis" did Dr. Bjedov confirm her timelines based on Prof. Weissman's limited source code analysis, but point to nothing in her reports or testimony that explains how Prof. Weissman's source code analysis translates to her ██████ timelines. Even accepting Plaintiffs' characterization, it is not proper expert methodology to reach a "hypothesis" timeline without knowing *anything* about the code underlying the product to be migrated, and then look around to see if there was anything "materially[] forgotten in [the] analysis."

Third, Plaintiffs fail to contend with Dr. Bjedov's concessions during her deposition that she did not fully understand the few ████████████████████████████████████, ignored or dismissed as "████████████" ████████████████████████████████ ████████, and dismissed ████████████████████████████████████████████. Dr. Bjedov's selective reading of Google documents is an unreliable methodology that improperly assumes the role of the fact finder, especially since she also conceded during her deposition not to have disclosed ████████████████████████████████████ ████████.

Plaintiffs tout that Dr. Bjedov's reports cover 200 pages, but quantity does not make quality. None of those 200 pages remediates the fatal FRE 702 deficiencies in Dr. Bjedov's qualifications and methodology. As Plaintiffs put it during the liability phase, experts who "purport to base their opinions on experience are not excused from the basic requirement of Rule 702 to reach their opinions based on reliable principles and methods. This is for good reason because, otherwise, the opinions of experiential experts would devolve into an inscrutable black box." ECF No. 700 at 2. The Court should exclude Dr. Bjedov's testimony in its entirety.

## ARGUMENT

### I. DR. BJEDOV'S EDUCATION AND INTERACTIONS WITH COLLEAGUES DO NOT CONFER THE EXPERTISE NEEDED TO RENDER HER OPINIONS

Plaintiffs point to Dr. Bjedov's education and her having worked with software engineer colleagues to attempt to fill important gaps in her experience and represent that, contrary to Dr. Bjedov's own testimony, Dr. Bjedov led software engineering migration projects. None of this can rehabilitate Dr. Bjedov as an expert qualified to offer precise timelines for Plaintiffs' proposed remedies.

#### A. Dr. Bjedov's Educational History Cannot Qualify Her as an Experiential Expert

Dr. Bjedov acknowledges that the most time-consuming and complex part of Plaintiffs' proposed divestitures is the *software engineering* work required to extract Google Ad Manager's software code from Google's proprietary infrastructure and rewrite that code to operate elsewhere. Ex. 1, Bjedov Opening,[1] ¶¶ 178-179 (███████████████████████████), 196; Ex. 3,

---

[1] All references to "Ex." refer to the Declaration of Daniel Bitton in Support of Google's Reply Memorandum of Law in Support of Its Motion to Exclude the Testimony of Dr. Goranka Bjedov. With respect to quoted material, unless otherwise indicated, all footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated.

Bjedov Tr. 387:5-17, 392:11-15; *see also* Mem. of Law in Supp. of Google LLC's Mot. to Exclude

the Testimony of Dr. Goranka Bjedov, ECF No. 1590 ("Mot.") at 5-6, 10-11. Plaintiffs do not

contend that Dr. Bjedov has *ever* performed that sort of work herself. Nor could they because she

testified her industry experience has generally focused on hardware (i.e., the computer servers in

a warehouse) rather than software. Ex. 3, Bjedov Tr. 461:6-478:10. To the extent she has been

involved with software, Dr. Bjedov has been focused on testing software developed by someone

else after the fact as opposed to having performed the coding work necessary to design or redesign

the software itself. Mem. of Law in Opp. to Google LLC's Mot. to Exclude the Testimony of Dr.

Goranka Bjedov, ECF No. 1666 ("Opp.") at 9; Ex. 3, Bjedov Tr. 461:6-478:10 (Dr. Bjedov

agreeing she is "████████████████," is "████████████████████████" has not

been "█████████████████████████████████████████████████████████████

██████████████" and it is "████████████" ████████████████████████████████

██████████████████████████████████).[2]

      Plaintiffs point to Dr. Bjedov's experience "coding software as a child," "attending a high

school for [] computer science," earning a "master's degree in computer science," teaching

"computer programming classes," and writing a "software programming" book. Opp. at 2.[3] All of

this experience occurred more than 25 years ago, before the software products at issue and public

cloud computing even existed; indeed, Google itself had not yet been founded. Software

---

[2] Plaintiffs criticize Google for citing cases where a "proferred expert offer[ed] opinions in specialized fields for which they had no prior experience or expertise." Opp. at 11-12. But that's the point. Dr. Bjedov's own testimony establishes she has no prior experience doing the specialized software engineering work that would be necessary to achieve Plaintiffs' remedies.

[3] ████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
████████████████ Ex. 3, Bjedov Tr. 13:9-15:22.

engineering has not stood still during the past 25 years. Dr. Bjedov's education and limited academic experience in computer science cannot make up for her lack of experience in software engineering, including in modern migrations. *See Brasko v. First Nat'l Bank of Pennsylvania,* 700 F. Supp. 3d 354, 368 (D. Md. 2023) (expert in commercial lending precluded from opining on residential lending practices when his experience with residential lending came "more than 20 years" ago).

**B. The Experience of Dr. Bjedov's Former Software Engineer Colleagues Does Not Transfer to Her By Osmosis**

Plaintiffs stress in their Opposition that Dr. Bjedov  Opp. at 10, was a *id.* at 3, *id.*, and had *id.* at 9.

The Fourth Circuit has recognized experts must be "constrained [] to the specific technical areas in which they had expertise." *Kadel v. Folwell*, 100 F.4th 122, 158 (4th Cir. 2024), *rev'd on other grounds sub nom. Folwell v. Kadel*, 2025 WL 1787687 (2025). Indeed, experts cannot be qualified merely by associating with subject matter experts on the issue before the court. *Jackson v. United States*, 2010 WL 2228378, at *6-7 (D.S.C. May 28, 2010) (disqualifying a neuropsychologist as an expert on the standard of care in pediatrics because he was not a pediatrician himself and instead relied on his daily interactions with pediatricians); *see Kadel*, 100 F.4th at 158-59 (affirming exclusion of expert's testimony on gender dysphoria where expert "did not demonstrate an expertise in treating gender dysphoria" and had merely "overseen two medical fellows who performed research on gender dysphoria"). Nor can an expert extend expertise from one field into an adjacent one, as Plaintiffs have attempted by arguing that Dr. Bjedov can opine

on the timelines for the software elements of a migration by dint of her having experience with the hardware aspects of such migrations. *See Estate of Ravenell ex rel. Ravenell v. Pugmill Systems, Inc.*, 2014 WL 7146848, at *6-7 (D.S.C. Dec. 15, 2014) (excluding civil engineer who opined on topics "more appropriately addressed by an electrical, mechanical, or industrial engineer"); *see also Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391, 393 (D. Md. 2001) (holding that "[being] an expert in one area, does not ipso facto qualify him to testify as an expert in all related areas," and excluding "qualified mechanical engineer['s]" testimony due to his lack of "professional experience" with the "outdoor power equipment" at issue in the case).

Plaintiffs' cited cases are inapposite; unlike Dr. Bjedov, each involved an expert with direct experience in the subject matter they were opining on. In *Belk*, the proffered expert had "designed, conducted, analyzed, and interpreted" consumer research surveys, and was asked to opine on the creation of a type of consumer survey. *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 162 (4th Cir. 2012). In *KBS*, the expert was qualified to opine on the causation of a truck fire because, during his decades as a truck driver, he had "direct experience with trucks that have electrical problems, fires and other issues." *KBS Preowned Vehicles, LLC v. United Fin. Cas. Co.,* 2014 WL 4388294, at *3 (N.D.W. Va. Sept. 5, 2014). Dr. Bjedov has no such "direct experience" with performing or forecasting the key phase of her software migration timelines—at best only experience by osmosis from her former colleagues who do have such experience. In *Zetia*, the expert had experience reviewing regulatory applications, so the court allowed him to opine on a "narrowly focused" issue *within* the scope of that experience but prohibited him from opining on general business strategy. *In re Zetia (Ezetimibe) Antitrust Litig.,* 2022 WL 4362166, at *6 (E.D. Va. Aug. 15, 2022). The opposite is true here: Dr. Bjedov is attempting to offer precise timelines across all the stages of a

proposed migration based on her narrow experience with a subset, but not all, of those steps, and without any experience in the one she admits is most complex and time-consuming.

**C. Plaintiffs' Assertion that Dr. Bjedov Has "Led" Large-Scale Software Migrations Is Belied by Her Own Testimony**

According to Plaintiffs' Opposition, Dr. Bjedov's experience includes "leading the planning for software migrations and deployments" and "developing and implementing software migration and deployment plans and timelines." Opp. at 11. But Dr. Bjedov made clear that ███ ████████████████████████████████████████████████████████ Ex. 3, Bjedov Tr. 41:20-42:5, and Plaintiffs do not point to any evidence that shows otherwise. In fact, Dr. Bjedov repeatedly testified that her role was limited to performance and testing and hardware procurement in the context of the "migrations" she was involved in. Ex. 1, Bjedov Opening, ¶ 99 ███████████ ████████████████████████████████████████████████ ); Ex. 2, Bjedov Rebuttal, ¶¶ 58-59 (███████████████████████████████████████████████████████ ███████ ), 62-63 (██████████████████████████████████████████████ ███████████████████████ ), 66-67 (██████████████████████████████████████ ███████████████ ); *see also* Mot. at 11. Thus, at most, Dr. Bjedov did hardware planning for software migrations; her testimony makes clear she did not lead or even participate in the planning of the most complex and time-consuming aspects of software migrations – the technical decoupling and software rewrites – much less the planning of the entire software migration.

**II. DR. BJEDOV NEVER EXPLAINS HOW HER ███████████ ESTIMATES ARE DERIVED FROM HER EXPERIENCE AND THE FACTS OF THIS CASE**

An experiential expert must explain "how [their] experience leads to the conclusion reached, why [their] experience is a sufficient basis for the opinion, and how [their] experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007); *see also*

Opp. at 7. That is, they must "connect the dots" between the facts of the case and their ultimate opinion. *Synopsys, Inc. v. Risk Based Security, Inc.*, 70 F.4th 759, 774 (4th Cir. 2023); *see also Copeland v. Bieber,* 2016 WL 7079569, at *5 (E.D. Va. Sept. 8, 2016). "The more specific the expert's proffered opinion, the more concrete that connection [has to] be." *SAS Institute, Inc. v. World Programming Ltd.,* 2015 WL 13878192, at *8 (E.D.N.C. Nov. 5, 2015). Dr. Bjedov's timelines are based on generic statements about her view of what's involved in a "typical" migration, not an application of expertise to the particular facts of this case. Mot. at 11, 14-15. In her deposition, Dr. Bjedov offered three bases for her estimated timelines: ███████████ ██████████████████████████████████████████████████████████[4] but does not connect the dots between any of these and her "particularized" timelines for Plaintiffs' proposed remedies. Opp. at 6. In their Opposition, Plaintiffs offer up Dr. Bjedov's post hoc review of Professor Weissman's source code analysis and cherrypicked Google documents but similarly do not explain how either of these provides insight into *how* she arrived at her timeline estimates in the first place, or confirmed them post hoc. Dr. Bjedov's opaque reasoning is the very "inscrutable black box" that Plaintiffs warned the Court about in the liability phase and should not be permitted. ECF No. 700 at 2.

---

[4] Ex. 3, Bjedov Tr. 141:11-142:14 ███████████████████████████████████████ ████████████████████████████ ; 138:5-11 ████████████████████████████████████████████████████████████ ███████ ; 136:22-141:9 (██████████████████████████████████████████ ██████████████████████████████ .

**A. Dr. Bjedov Does Not Explain How Her Experience, Public Sources, or ███████████████████████████ Translate to Her Timeline Estimates**

Dr. Bjedov was unequivocal that she reached her ██████ timeline estimates for each of Plaintiffs' proposed remedies based on her claimed "experience" *before* looking at any record evidence.[5] Ex. 3, Bjedov Tr. 138:5-11; 141:11-142:14. Not only did she not consider record evidence in coming up with her initial timelines, but she never explains how her experience led her to forecast ████████ timelines for each of Plaintiffs' proposed remedies. *See Wilson*, 484 F.3d at 274; *Holesapple v. Barrett*, 5 Fed. Appx. 177, 179-180 (4th Cir. 2001) (excluding expert's "ipse dixit" opinion "based entirely on what he consider[ed] to be his experience" rather than "the facts of the particular incident"); *Brasko,* 700 F. Supp. 3d at 366 (explaining that a "because I say so" approach is not reliable).

Plaintiffs now claim that Dr. Bjedov was able to offer proposed timelines without looking at record evidence in part because she has ███████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████ Opp. at 14; Bjedov Tr. 214:9-13. Even if that was true, that knowledge would be 15 years old ██████████████████████████████████████████████████████ ████████████ Like software engineering, software code in a dynamic technology has not stood still for 15 years. Dr. Bjedov also acknowledged she ███████████████████████████

---

[5] Dr. Bjedov testified that, to form her estimates, she first made an ███████████████████████ ██████████████████████ Ex. 3, Bjedov Tr. 283:13-284:2 (██████████████████████████████ ████████████████████████████████████████████████████████████████████████████)███ 286:11-287:2 ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ ).

9

█████████ and that the ████████████████████████████████████████████ Ex. 3, Bjedov Tr. 450:13-451:6. But even putting aside that her knowledge from working at Google 15 years ago would be both stale and irrelevant to the products at issue, Dr. Bjedov's key flaw is that she made no attempt to explain how ████████████████ (whatever that was) 15 years ago led her to her ██████ timelines (or explain why, when she had the actual present-day code available to review, she purportedly relied on 15-year old knowledge).

Second, Dr. Bjedov claimed to use publicly-available information to inform her timelines, but, if that was intended to refer to the "industry examples" described in Dr. Bjedov's reports, Plaintiffs have now specifically disavowed them as a basis for her timelines, Opp. at 23, perhaps because several took far longer than the ██████ Dr. Bjedov projects for Plaintiffs' remedies. Mot. at 19-21.

Third, Plaintiffs cite to Dr. Bjedov's testimony that she used "████████████ ██████" to come up with her initial timelines. Dr. Bjedov never explained in her deposition what those ██████████████ were, but Plaintiffs now claim that was a reference to a Google Cloud migration guide that qualitatively describes the steps one might follow to migrate to Google Cloud (with no mention of timelines). Plaintiffs' emphasis on the "████████████" and this guide is a red herring. Even if Dr. Bjedov's steps were consistent with that guide, it is beside the point. The issue is how she reached the timelines she placed on completing that process, or how she somehow reached almost exactly the same timelines for each of Plaintiffs' proposed AdX and DFP divestiture remedies.[6] Neither Dr. Bjedov, nor Plaintiffs, explain that.[7]

---

[6] As explained in Google's Opening Brief, Dr. Bjedov forecasted nearly identical timelines for each of the remedies proposed by Plaintiffs—██████ for divestiture of AdX, ██████ for the Open Source Auction, and ██████ for the final divestiture of DFP. Mot. at 15.

[7] Nor do Plaintiffs explain why, during her deposition, Dr. Bjedov inexplicably claimed for the first time that divesting DFP would take ██████████ Ex. 3, Bjedov Tr. 132:13-17, rather than

As such, her opinions should be excluded. *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 815 (E.D. Va. 2011) (excluding opinion as ipse dixit in part because expert "considered" several factors "without explaining at all how it was that the application of any one or all those factors would permit an increase in the base royalty rate of approximately 100%"); *Modern Auto. Network, LLC v. E. All. Ins. Co.,* 416 F. Supp. 3d 529, 538-39 (M.D.N.C. 2019) (excluding an expert's opinion where unclear "how [the expert's] experience led to certain conclusions reached").

### B. Plaintiffs and Dr. Bjedov Fail to Connect the Dots Between Any Source Code Analysis and Her ▮▮▮▮ Timeline Estimates

Plaintiffs concede that Dr. Bjedov did not do any source code analysis, Opp. at 5, but make much of Dr. Bjedov's claim that she reviewed Prof. Weissman's source code analysis and statistics to "confirm[ ]" her already-reached timeline estimates. Opp. at 14-15. That does not make Dr. Bjedov's opinions reliable.[8]

Neither Plaintiffs nor Dr. Bjedov explain how Prof. Weissman's analysis or source code statistics lead to Dr. Bjedov's precise ▮▮▮▮ estimates. *SAS Institute* is instructive. In that case,

---

the ▮▮▮ months articulated in her report. Ex. 1, Bjedov Opening, Figure III.1. Plaintiffs claim this was merely Dr. Bjedov having "understandable difficulty in recalling [ ] precise details" of her report. Opp. at 18. The timeline for DFP divestiture is not minutia from her report. It is one of Dr. Bjedov's four main opinions contained in her Summary of Opinions. Ex. 1, Bjedov Opening, Figure III.1. She either failed to remember a core conclusion, or changed it on the fly. Either way, it makes clear that her timelines are not tied to a rigorous analysis of the facts of this case. *Modern Auto. Network, LLC v. E. All. Ins. Co.,* 416 F. Supp. 3d 529, 539 (M.D.N.C. 2019) (excluding expert where his "inconsistent testimony demonstrates that his opinions on valuation—a subject about which he claims expertise—are unreliable and likely to confuse, rather than assist a finder of fact").

[8] Plaintiffs claim Google "never explains why Dr. Bjedov's reliance upon Prof. Weissman … was somehow unreasonable or improper." Opp. at 15. Google does not claim experts can never rely on other experts – but here, Prof. Weissman's analysis is incomplete in material ways necessary to achieve Dr. Bjedov's task and Dr. Bjedov does no source code analysis of her own to fill in the gaps.

defendant World Programming proffered an expert who opined that its new product would have been delayed by precisely 19 days if World Programming had lacked access to certain software. 2015 WL 13878192, at *1. The court rejected the expert's opinion because, while they reviewed "product source files," they "failed to meaningfully explain how the number of new product source code files . . . reasonably approximate the delay that would be incurred." *Id.* at *3-4. When asked to explain the connection, the expert provided "nothing more than a cursory reference to his experience at [his former employer]," and was unable to provide an explanation that was "similarly specific" as their estimate. *Id.* at *8. Dr. Bjedov's ███████ timeline estimates should be excluded on the same grounds. Plaintiffs claim Dr. Bjedov relied upon Prof. Weissman's source code analysis to confirm her ███████████████████████████████████████████████████████ Opp. at 21, but she provides no explanation why that supposed ███████ translates to ███████ for each proposed remedy. Similarly, Plaintiffs claim Dr. Bjedov relied on Prof. Weissman's source code statistics ████████████████████████████ Opp. at 21, but neither Plaintiffs nor Dr. Bjedov explain how the supposed ███████ of Google's systems translates to ███████ timelines.

Notably, Prof. Weissman testified ███████████████████████████████████████ ██████████████████████,[9] ████████████████████████████████████████ ████████████████,[10] and that to even say ██████████████████████████████████

---

[9] Ex. 4, Weissman Tr. 77:2-19 (████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████).

[10] Ex. 4, Weissman Tr. 63:11-15, 67:5-13.

██████████████████████████████████████████████████████.[11] In particular, he explained that ██

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 4, Weissman Tr. 94:19-95:3. But he has not

████████████████████████████████████████████ Ex. 4, Weissman Tr. 160:6-19; has

not confirmed whether candidate replacement dependencies are ███████████ alternatives even

though replacements ████████████████████████████ Ex. 4, Weissman Tr.

219:19-221:8; or determined ██████████████████████████ to switch to a

replacement. Ex. 4, Weissman Tr. 326:21-327:7. Dr. Bjedov does no source code analysis of her

own to compensate for any of these gaps in Prof. Weissman's analysis, yet opines on definitive

timelines for a ███████████ migration anyway. Ex. 1, Bjedov Opening, ¶ 154.

### C. Dr. Bjedov's Selective and Confirmation-Driven Reading of Google Documents Also Does Not Explain the Basis of Her Timeline Estimates

As discussed above, Plaintiffs concede Dr. Bjedov formed her timeline estimates before

reviewing any record evidence, including any Google documents.[12] Opp. at 13. As Plaintiffs tell

---

[11] Ex. 4, Weissman Tr. 90:6-91:6 .

[12] To be clear, Dr. Bjedov's methodology is inherently problematic because she failed to consider any record evidence—including any of the millions of documents Google has produced, many of which describe the relevant systems—*before* reaching her opinion. Contrary to Plaintiffs' insinuation, Google is not faulting Dr. Bjedov for failing to rely in particular on a small subset of ████████████████████████████████ Opp. at 16 n.4, that are inadmissible under Federal Rule of Evidence 408. *See* ECF No. 1579. Nor, as Google stated in its reply in support of its motion in

it, Dr. Bjedov used Google documents to "interrogat[e] whether [her] hypothesis was consistent or inconsistent with the additional record evidence" and "test whether she had missed any significant technical issues in developing her migration plans and timelines." Opp. at 13, 24. But what her testimony actually shows is that she made conclusions about these documents even though she felt she lacked relevant context and either did not seek out or actively ignored sworn deposition testimony, including by the authors of the documents themselves, explaining their contents. *See* Mot. at 21-23.

For example, Plaintiffs point to ███████████████████████████████ ████████ that was purportedly "facially relevant to Dr. Bjedov's analysis." Opp. at 24. Dr. Bjedov admits, however, that ████████████████████████████████████████ Ex. 1, Bjedov Opening ¶ 162, and that she is aware of ███████████████████████████████ ██████████████████████████████████ Ex. 3, Bjedov Tr. 369:2-16. She also admitted during her deposition that ███████████████████████████████████████████ Ex. 3, Bjedov Tr. 363:11-369:1, and that she ████████ ███████████ Ex. 3, Bjedov Tr. 370:22-371:15. Irrespective of this, Dr. Bjedov claims without explanation that this ████████████████████████████████████ ████████████████████████████████████████ , Ex. 3, Bjedov Tr. 170:15-171:16, Dr. Bjedov testified she was ████████████████████████████████████████████████ ██████████████████████ Ex. 3, Bjedov Tr. 174:10-186:22. Describing her methodology for reviewing record evidence to "verify" her opinions, she admitted

---

limine to exclude evidence protected by Rule 408, does Google intend to affirmatively rely on any inadmissible internal settlement analyses if the Court grants Google's motion to exclude.

that ████████████████████████████████████████████████████████████████████

████████████████████████ Ex. 3, Bjedov Tr. 178:17-179:11. The following excerpt from Dr.

Bjedov's deposition is illustrative of her approach to ignore relevant testimony about ████████

████████████████████████ :



Ex. 3, Bjedov Tr. 182:4-183:11.[13]

Plaintiffs do not mention it, but when presented with the ████████████████████

████████████████████, Dr. Bjedov conceded that ████████████████████████████████

████████████████████████. Ex. 3, Bjedov Tr. 185:6-186:22 (agreeing she might have

████████████████████████████████████████████████████████████████████████████

████████████████████████████. Curiously, despite Dr. Bjedov's own concessions,

Plaintiffs attempt to post hoc argue on Dr. Bjedov's behalf that the testimony was nonetheless

irrelevant because it did not ████████████████████████████████████████████████████

████████████████████████████. Opp. at 25. Plaintiffs' argument proves too

much. They are agreeing that discussion of a ████████████████████████████████████

████████████████████████; the natural conclusion is that Dr. Bjedov ignored testimony

---

[13] *See also* Ex. 3, Bjedov Tr. 184:22-186:22 ( ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ").

explaining that the ████████████████████████████████████████████ ████████████████ .

In sum, Plaintiffs claim that Dr. Bjedov looked for Google documents "to test whether she missed any significant technical issues," Opp. at 24, but she did so only by ignoring relevant (and inconvenient) context. This is an unreliable methodology, especially when it only serves to selectively reinforce the expert's pre-formed opinions.[14] *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion [the expert] cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'"); *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.").

Given that she did not fully understand Google documents she cited and did not seek out context to explain them, Dr. Bjedov's narrative recounting of those documents not only is unreliable but also does not add value as an expert witness for the fact finder. Google is not arguing an "expert must ignore business documents produced by a party when offering an opinion on a related subject." Opp. at 25. Experts can of course cite documents produced by parties in the litigation, but in reaching opinions about documents they must actually apply their expertise. Mot. at 21. By her own admission, Dr. Bjedov has not done so. Instead, she chose documents ██████████

---

[14] Plaintiffs claim Google misstates testimony to portray Dr. Bjedov as "look[ing] only for information supportive of her opinions." Opp. at 25. That is not Google's claim. Dr. Bjedov's testimony demonstrates that she selectively ████████████████████████████████ ██████████████████

16

███████████████████████, and arbitrarily ignored evidence that would have put those documents in context. In their opposition, Plaintiffs still have not shown how Dr. Bjedov's expertise makes these documents more intelligible than they would be to the fact finder.[15] Indeed, Plaintiffs specifically did *not* disclose or discuss documents that Dr. Bjedov claims to be able to understand as an engineer, but that she says the Court (and Google's counsel) could not.[16]

## III. PLAINTIFFS' NON-DISCLOSURE OF PURPORTEDLY KEY DOCUMENTS UNDERSCORES THE UNRELIABILITY OF DR. BJEDOV'S OPINIONS

Plaintiffs quibble with and distort Google's positions, but the central fact remains: Dr. Bjedov's invocation in her deposition of unknown documents not cited in her reports and not disclosed by Plaintiffs, including one that, in her words, ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████ underscores her black box methodology. Ex. 3, Bjedov Tr. 64:21-71:12; *see also* Mot. at 25.

---

[15] Plaintiffs acknowledge that "Dr. Bjedov explains in her report that her time estimates for phases 1 and 2 of the DFP divestiture are based primarily on an internal Google document, subject to adjustments to parallelize certain phases, *rather than Dr. Bjedov's professional experience*." Opp. at 16. Given Dr. Bjedov is not applying her experience to develop her Stage 1 and 2 timelines, by Plaintiffs' admission, those opinions are not expert opinions. *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2018 WL 4220674, at *4 (S.D.W. Va. Sept. 5, 2018) ("[S]imply reading a document into evidence does not require 'scientific, technical, or other specialized knowledge.'") (quoting Fed. R. Evid. 702); *City of Huntington v. AmerisourceBergen Drug Corp.*, 2021 WL 1436672, at *3 (S.D.W. Va. Apr. 15, 2021) ("Because the expert report shows that a factual narrative would be the end in itself, there is no need to wait for trial to exclude the proffered evidence as unhelpful."). Thus, these timeline opinions should be excluded for the reasons set out in Google's Opening Brief. Mot. at 21.

[16] Ex. 3, Bjedov Tr. 64:21-66:19 (testifying that there were █████████████████████

████████████████████████████████████████████████████████████

████████████████████ ); 151:20-152:10 ( █████████████████████████

███████████████████████████████████████████ ").

As discussed *supra*, a reliable methodology would be for Dr. Bjedov to discuss each

purportedly ██████████████████████████████████████████████████████

████████████████████████████████████████████. Not only does she

not do so with respect to these documents, but Plaintiffs saw fit not to instruct Dr. Bjedov to keep

track of those documents, Ex. 3, Bjedov Tr. 71:14-72:11, and she revealed for the first time at her

deposition a ████████████████████████████████████████████████████

████████████████████. Plaintiffs' basis for this nondisclosure? She did not think it ██████

██████████████████████████████████ and because it ██████████████████

████████████████████████████████████████████████████████████████

██████████████████ Ex. 3, Bjedov Tr. 64:21-66:19, 70:20-71:12. Dr. Bjedov specifically

stated that she did not disclose ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ Ex. 3, Bjedov Tr. 151:17-152:10. This explanation falls flat because, among other reasons,

Plaintiffs know perfectly well that Google, its experts, and its counsel have the knowledge needed

to make sense of such materials, leaving the question why Dr. Bjedov and Plaintiffs actually do

not want to share this ████████████████████ that can apparently be readily attacked on

cross.

In their opposition, Plaintiffs continue to defend their decision to disclose only documents

that "████████████████████████████████████." Opp. at 27. In other words,

instead of disclosing key documents and showing Dr. Bjedov's work for why these ██████████

██████████████████████████████████, Plaintiffs ask the Court to take her at her word that

these undisclosed documents say what she says they do and that ████████████████████████

████ Ex. 3, Bjedov Tr. 70:14-71:12. Appealing to authority—whether Dr. Bjedov's or that of

████████████████—is not a reliable methodology. *Brainchild Surgical Devices LLC v. CPA Glob.*

*Ltd.*, 144 F.4th 238, 256 (4th Cir. 2025) (it is "black letter law" that parties cannot "hid[e] the bases

for an [expert's] opinion," because "without requiring disclosure of the bases for an expert's

opinion, the expert might be effectively permitted to testify that his opinion is true simply 'because

I say so'").

Contrary to Plaintiffs' assertion, Google never argued that "Dr. Bjedov was required to

disclose every document she ever reviewed that was consistent with her opinions." Opp. at 27.

Rather, as laid out in Google's Opening Brief, by not disclosing ████████████████████

████████████████████████ Plaintiffs have failed to show the work of their expert, and

thereby robbed this Court and Google of the ability to question Dr. Bjedov's analysis of those

documents and verify the reliability of her opinions. Mot. at 26.

Plaintiffs also attempt to downplay the importance of the non-disclosed documents by

characterizing them as part of a "much larger set of documents that she [Bjedov] merely read."

Opp. at 26. But, in the same breath, Plaintiffs concede that Dr. Bjedov used these documents ███

██████████████████████████████████████████████████████████

████████ Opp. at 24. And Dr. Bjedov, for her part, █████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████, Ex. 3, Bjedov Tr. 138:16-140:18, though not all were disclosed

in her report. As just one example:

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

Ex. 3, Bjedov Tr. 150:20-151:14. Similarly, she also testified:



Ex. 3, Bjedov Tr. 157:20-159:5. Dr. Bjedov's failure to disclose and show her analysis for

these documents exacerbates her black box approach.

## CONCLUSION

For the reasons stated above, Google respectively requests that the Court exclude Dr.

Bjedov's opinions as inadmissible under FRE 702.

Dated: September 10, 2025

Respectfully submitted,

/s/ Craig C. Reilly
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ.
429 N. St. Asaph Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
55 Second Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bryon P. Becker (VSB # 93384)
Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica Phillips (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Erica Spevack (*pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street NW Washington,
DC 20004 Telephone: (202)
240-2900 kdunn@dirllp.com

Bradley Justus (VSB # 80533)
David Pearl (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

Erin J. Morgan (*pro hac vice*)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007 Telephone:
(202) 240-2928
emorgan@dirllp.com

*Counsel for Defendant Google LLC*