# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| UNITED STATES, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> GOOGLE LLC, <br><br> *Defendant*. | No. 1:23-cv-00108-LMB-JFA |

**BRIEF OF *AMICUS CURIAE* OPEN MARKETS INSTITUTE
IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**..................................................................................................................ii

**CORPORATE DISCLOSURE STATEMENT** ...........................................................................1

**CERTIFICATION OF COUNSEL** ............................................................................................1

**INTEREST OF THE *AMICUS CURIAE*** ..................................................................................1

**INTRODUCTION** ......................................................................................................................2

**ARGUMENT** ..............................................................................................................................3

    **I.    District courts have an obligation to fashion effective antitrust relief to remedy current monopolization and prevent recidivism by the offender.** ............................................................3

    **II.    Divestiture is a superior remedy to restore competition to the market.** ...............................5

    **III.    The Microsoft settlement reveals the shortcomings of a behavioral only approach to remedies and the importance of divestitures.** ..........................................................................7

**CONCLUSION**..........................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Associated Press v. United States*, 326 U.S. 1 (1945) ................................................................... 6
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......................................... 7
Final Judgment, *United States v. Microsoft Corp.*, 231 F.Supp.2d 144 (No. 98-1232), 2002 WL 32153514 (D.D.C. Nov. 12, 2002) ................................................................................ 8, 9
*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) .................................................................. 4
*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) .................................................. 2, 4
*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025) ......................................... 7
*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) ............................................................. 2, 3, 4, 5
*Loc. 167, Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of Am. v. United States*, 291 U. S. 293 (1934) ................................................................................................ 4
*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) .............................................. 8
*Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ................................................. 7
*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002) ................................................. 8
*Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110 (1948) .............................................. 5
*Steves & Sons, Inc. v. JELD-WEN*, Inc., 345 F. Supp. 3d 614 (E.D. Va. 2018) ............................. 5
*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) ................................... 3, 5, 6
*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317 (4th Cir. 1995) ....................... 6
*United States v. Am. Tobacco*, 221 U.S. 106 (1911) ..................................................................... 4
*United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) .................................................. 7
*United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ................................ passim
*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ......................................... 6, 7, 10
*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ....................................................... 2, 4
*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950) ............................................................. 3, 7
*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968) .............................................. 2, 4

**Other Authorities**

California Group's Report on Remedial Effectiveness, *New York*, 224 F.Supp.2d 76 (No. 98-1233) (D.D.C. Aug. 30, 2007) ........................................................................................... 10
Carl Shapiro, *Microsoft: A Remedial Failure*, 75 Antitrust L.J. 739 (2009) .................................. 9
Harry First & Andrew I. Gavil, *Re-framing Windows: The Durable Meaning of the Microsoft Antitrust Litigation*, 2006 Utah L. Rev. 641 ................................................................... 9
Herbert Hovenkamp, *The Antitrust Enterprise:Principle and Execution* (2005) ........................... 9
Kevin J. O'Connor, *The Divestiture Remedy in Sherman Act §2 Cases*, 13 Harv. J. on Legis. 687 (1976) ....................................................................................................................... 10, 11
Majority Staff of House Subcomm. on Antitrust, Commercial & Admin. L., 116th Cong., Investigation of Competition in Digital Markets (2022) (discussing Google's various unfair market practices) ............................................................................................................. 11

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7.1(A)(1)(a) and (b), *amicus curiae* states that Open Markets Institute is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## CERTIFICATION OF COUNSEL

In accordance with Federal Rule of Appellate Procedure 26.1 *amicus curiae* certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned actions, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from amicus curiae and its counsel, no other person contributed money to fund preparing or submitting this brief.

## INTEREST OF THE *AMICUS CURIAE*

The Open Markets Institute (OMI) is a non-profit organization dedicated to protecting democracy and individual liberties from concentrated economic power and control. OMI does so by promoting fair competition throughout our political economy, a broadly shared prosperity, and innovation that serves the public interest. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public. It does not accept any funding or donations from for-profit corporations. OMI has followed this case from the beginning. It has also closely followed *State of Texas, et al. v. Google LLC* (CIVIL NO. 4:20-CV-957-SDJ) in the Eastern District of Texas, which is based on similar facts and is seeking similar relief. Furthermore, it has studied the advertising technology industry and has written extensively on this case and related cases. As a result, it is respected by those in the industry as having deep knowledge and understanding of the advertising technology market.

1

## INTRODUCTION

A solution that fails to solve the problem is no solution at all. Earlier this year, this Court held that Google violated the Sherman Act by using exclusionary conduct to illegally monopolize two digital advertising markets ("Ad Tech"), specifically the ad exchange and the publisher ad servers markets. In addition to behavioral and administrative remedies, the government seeks structural relief to rectify the problem. Google, on the other hand, argues that divestiture is not an option. We submit this brief to explain that divestiture is not only a viable option, but is an essential part of the solution in this case because behavioral remedies alone will not restore competition to the Ad Tech market.

1.  In antitrust cases, district courts have a duty to fashion remedies to address both the current harms and the potential future harms that may result from a defendant's illegal conduct. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961). This duty "does not end with enjoining continuance of the unlawful restraints nor with dissolving the combination which launched the conspiracy," but rather, the court's responsibility "includes undoing what the conspiracy achieved." *United States v. Paramount Pictures*, 334 U.S. 131, 171 (1948). In carrying out their duty to fashion effective remedies, district courts have discretion over the specific provisions in their remedial orders. When a company is found liable for violating the Sherman Act, the court should seek to "pry open" the doors of competition in addition to undoing what the illegal practices achieved. *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), *overruled on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Often, an injunction and behavioral remedies are not sufficient by themselves because they are temporary in nature

and do not foster the return of competition. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021).

2. Divestiture is a traditional "remedy for Sherman Act violations whose heart is intercorporate combination and control." *du Pont*, 366 U. S. at 329. More effectively than any other option, it would restore competition to the Ad Tech market. *See id.* at 327. The government's proposed divestitures of AdX and DFP are essential to "assure the public freedom from [the] continuance" of Google's coercive and illegal practices. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 99 (1950). Anything less and Google will be free to continue to illegally take advantage of its monopoly power in Ad Tech. *Int'l Salt*, 332 U.S. at 401.

3. The Court should view the outcome in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) as a cautionary tale of what happens when remedies are weak and ineffective. Microsoft was not ordered to divest a portion of its business. Rather, the final judgment—which was based on a consent decree between Microsoft and the government—was limited to conduct remedies with a limited term. By the time the decree expired, nobody had emerged to challenge Microsoft's dominance in the operating system market. Moreover, competition was never restored. If Google is not forced to divest, history will repeat itself and we will have yet another example of the government winning the battle but losing the war.

## ARGUMENT

**I.    District courts have an obligation to fashion effective antitrust relief to remedy current monopolization and prevent recidivism by the offender.**

If a corporation has been found liable for violating the antitrust laws, district courts have a duty to construct remedies to address the current harms at issue as well as potential harms that may result in the future. District judges are "are authorized, *indeed required*, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private

3

interests." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) (emphasis added). This duty "does not end with enjoining continuance of the unlawful restraints nor with dissolving the combination which launched the conspiracy," but rather, the court's responsibility "includes undoing what the conspiracy achieved." *United States v. Paramount Pictures*, 334 U.S. 131, 171 (1948); *United States v. Am. Tobacco*, 221 U.S. 106, 185–86 (1911) (when fashioning remedies, courts have a "duty to destroy" the "ingredients" that resulted in the unlawful conduct).

In designing an antitrust remedy, courts are required to achieve the following goals: (1) "unfetter a market from anticompetitive conduct," (2) "terminate the illegal monopoly," (3) "deny to the defendant the fruits of its statutory violation," and (4) "ensure that there remain no practices likely to result in monopolization in the future." *Ford Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972); *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). An effective remedy must "pry open to competition" the relevant market which "has been closed by defendants' illegal restraints. If [the] decree accomplishes less than that, the Government has won a lawsuit and lost a cause." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), *overruled on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

In carrying out their duty to craft an effective remedy, district courts "are invested with large discretion to model their judgement to fit the exigencies of the particular case." *International Salt*, 332 U.S. at 400-01. They can fashion a decree featuring behavioral remedies, structural remedies, or a combination of the two. *United Shoe*, 391 U.S. at 250. However, to the extent courts err in one direction, it should be "in favor of the Government and against the conspirators." *Loc. 167, Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of Am. v. United States*, 291 U. S. 293, 299 (1934); *du Pont*, 366 U.S. at 334 (same).

4

An order barring a repeat of the misconduct is often not enough because directing the violator to "go forth and sin no more" will often preserve the monopoly and maintain the status quo. Behavioral injunctions alone do not "protect the public interest" because they allow "those who unlawfully built their empires" to "preserve them intact." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128–29 (1948). Courts should keep in mind that conduct remedies only provide temporary relief because once the injunction expires there are "no structure[s] in place to foster competition." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) (quoting *Steves & Sons, Inc. v. JELD-WEN*, Inc., 345 F. Supp. 3d 614, 668 (E.D. Va. 2018)).

When fashioning antitrust remedies, district courts should assume that the offending parties will only do what they are strictly ordered to do. As the Supreme Court explained:

> The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market. When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.

*Int'l Salt*, 332 U.S. at 400 (1947). Accordingly, courts must "start from the premise that an injunction against future violations is *not* adequate to protect the public interest." *Schine Chain Theatres*, 334 U.S. at 128 (emphasis added).

## II. Divestiture is a superior remedy to restore competition to the market.

Structural remedies are an effective way to achieve the remedial goals of antitrust law. Of all the antitrust remedies available, divestiture is one of the most important, if not the most important. *du Pont*, 366 U. S. at 329–31 (footnotes omitted). Indeed, "divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control," and accordingly has never been confined to merely undoing illegal

5

mergers. *Id.* at 329. The Fourth Circuit recognized as much and wrote that the "court may order divestiture if it's needed to 'restore competition,' i.e. to 'protect the public interest.'" *Steves & Sons*, 988 F.3d at 722 (quoting *du Pont*, 366 U.S. at 326).

Divestitures are also superior on administrability grounds. No other remedy more efficiently "prevent[s] future violations and eradicate[s the] existing evils" of the defendant's illegal scheme. *See Associated Press v. United States*, 326 U.S. 1, 22 (1945). "It is simple, relatively easy to administer, and sure." *du Pont*, 366 U.S. at 331. Compared to a complicated behavioral injunction that would "probably involve the courts and the Government in regulation of private affairs*,*" *id.* at 334, a divestiture order minimizes long-term judicial involvement.

Importantly, the government may not be denied structural relief just because it will cause Google economic hardship, no matter how "severe" the claimed hardship may be. *Id. at* 327. Hardship is no excuse and not a get of jail free card. A remedy that is ineffective "will not be saved [just] because an effective remedy would entail harsh consequences. This proposition is not novel; it is deeply rooted in antitrust law and has never been successfully challenged." *Id.* "[I]f courts were required to choose the remedy least burdensome to the defendant—rather than the one that best promotes competition—conduct remedies would be the norm because they generally burden defendants less." *Steves & Sons*, 988 F.3d at 720.

While the plaintiffs need to establish a nexus between the finding of liability and the proposed remedy, the burden on plaintiffs is not a heavy one. The D.C. Circuit held that the remedy must be based on a "significant causal connection between the conduct and creation or maintenance of the market power." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (citation omitted). This requirement of causal connection is true for all remedies. *See Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) ("[T]he

6

damages sought must flow from *that conduct* which is proscribed by the antitrust laws.") (emphasis in original). Nevertheless, the district court need only conclude that the proposed relief "is a reasonable method of eliminating the consequences of the illegal conduct." *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978). In a recent decision interpreting the precedent on antitrust remedies, the Ninth Circuit affirmed that the law "asks for a 'reasonable method' of redressing problems with a 'significant causal connection to that conduct.'" *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949 (9th Cir. 2025). Any higher burden on plaintiffs is contrary to controlling Supreme Court precedent and the district court's duty to craft an effective, administrable remedial orders.

Here, the heart of the liability decision involved Google's intercorporate combination: Google used the monopoly power of a subsidiary in one market as a competitive weapon to help a second subsidiary take over and monopolize a second market. This conduct is a well-established violation of the Sherman Act. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992). Unless Google's control over these subsidiaries is broken, the company will remain able and tempted to use its monopoly power to exclude rivals and to illegally favor itself. *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189–90 (1944). The plaintiffs' proposed divestitures in this case are essential to "assure the public freedom from [the] continuance" of Google's coercive and illegal practices. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 99 (1950).

III.  **The Microsoft settlement reveals the shortcomings of a behavioral only approach to remedies and the importance of divestitures.**

It has been nearly twenty-five years since a district court grappled with whether or not to break up a big-tech monopolist. The last time was when the government won its case against Microsoft. *See See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). Thus, it may

7

be tempting to turn to *Microsoft* when fashioning remedies. But because the remedy there completely failed to restore competition to the relevant market, this Court should treat that case as a cautionary tale of what can happen when we do too little rather than persuasive precedent on how to fashion an effective remedy.

The final judgment in *Microsoft* ("Final Judgment") was based on a consent decree that was entered into between the company and the DOJ. Final Judgment, *United States v. Microsoft Corp.*, 231 F.Supp.2d 144 (No. 98-1232), 2002 WL 32153514 (D.D.C. Nov. 12, 2002) [hereinafter Final Judgment].[1] After finding Microsoft liable for monopolizing the operating system market, the district court originally ordered structural relief. The D.C. Circuit, however, vacated some of the district court's findings and remanded the case for further proceedings. In the interim, a new president entered the White House and appointed a new Attorney General and Assistant Attorney General for the Antitrust Division. These new appointees were much less keen than their predecessors to seek structural relief. And thus, they entered into a settlement that many believed was far too lenient.

The critics of the settlement included several states who were plaintiffs in the case and who challenged the Final Judgment. *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom.*, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). They ultimately lost their appeal. *Massachusetts*, 373 F.3d 1199. Critics also included many of the more than 30,000 commentors who weighed in on the consent decree's terms.[2] Despite the

---

[1] *archived at* https://web.archive.org/web/20070221104725/http://www.usdoj.gov/atr/cases/f200400/200457.pdf

[2] "The Justice Department disregarded the overwhelming majority of the more than 30,000 Tunney Act comments that had been filed in response to the settlement on the ground that they were 'short and non-substantive,' focusing its response to the court on 47 comments that it

abundance of criticisms, the DOJ went forward with the agreement and the court issued the Final Judgment that was limited to conduct remedies and an injunction that was originally supposed to last a mere five years. Final Judgment, *supra*, § V.

Professor Herbert Hovenkamp was one prominent critic of the Final Judgment. He argued that "there [was] little reason to believe that the consent decree that the government negotiated with Microsoft [would] achieve any of the D.C. Circuit's] goals." Herbert Hovenkamp, *The Antitrust Enterprise:Principle and Execution* 298 (2005) (citations omitted). He went on to say that if this were so, "the Microsoft case may prove to be one of the great debacles in the history of public antitrust enforcement, snatching defeat from the jaws of victory." *Id.*

In the long run, the critics were proven correct because the Final Judgment's "narrow scope and weak provisions" did not hold "up well under the test of time." Carl Shapiro, *Microsoft: A Remedial Failure*, 75 Antitrust L.J. 739, 761 (2009). Ultimately, the Final Judgment "reflect[ed] a policy of protecting competitors—dominant ones—rather than competition." First & Gavil, *supra*, at 722.

As the injunction neared the end, it was deemed effective only in the narrow sense that Microsoft complied with its weak terms. But critically, it failed the broader purpose of antitrust remedies: breaking Microsoft's operating system monopoly. As one noted scholar deemed, "[T]he remedy in the most prominent antitrust case of [the] era has failed." Shapiro, *supra*, at 761. While the Final Judgement "prevent[ed] Microsoft from continuing to engage in the conduct that had been found to be illegal," it did "nothing significant to affirmatively restore competition." *Id.*

---

deemed 'major.'" Harry First & Andrew I. Gavil, *Re-framing Windows: The Durable Meaning of the Microsoft Antitrust Litigation*, 2006 Utah L. Rev. 641.

9

In 2007, a group of plaintiff states submitted a Report of Remedial Effectiveness ("the California Report") to the court. California Group's Report on Remedial Effectiveness, *New York*, 224 F.Supp.2d 76 (No. 98-1233) (D.D.C. Aug. 30, 2007).[3] According to the California Report, the proof of the Final Judgment's failure was in the pudding. In 1991, Microsoft had a 93% market share. *Id.* at 2. In 2006, after the Final Judgment had been in effect for five years, its market share dropped by one percentage point to 92%. *Id.* The states determined that "[t]he Final Judgment could not attain its intended remedial objectives … if no middleware product emerged during its limited five-year term that had a similar potential to threaten Microsoft's platform dominance – and none" did. *Id.* at 10. They further noted that

> It should not be surprising perhaps that the middleware-related provisions of the Final Judgment have been so ineffectual, especially given Microsoft's entrenched market power. It has long been recognized that conduct remedies in Sherman Act § 2 cases are notoriously difficult to calibrate correctly because their consequences are often "unpredictable" and the monopolist "can adopt alternative patterns of behavior to effectuate its market power."

*Id.* at 13. (quoting Kevin J. O'Connor, *The Divestiture Remedy in Sherman Act §2 Cases*, 13 Harv. J. on Legis. 687, 731–33 (1976)).

It is clear today that the conduct remedies in *Microsoft* not only failed to restore competition, they likewise failed to lower Microsoft's market power, reduce the barriers to entry that it had so carefully erected, or diminish the network effects that protected its dominance. Unfortunately, we will never know what the tech industry could have looked like if Microsoft had faced real competition and was "made to suffer the uncertain consequences of its own undesirable conduct." *Microsoft*, 253 F. 3d at 79 (quotation and citation omitted).

---

[3] *available at* https://oag.ca.gov/system/files/attachments/press_releases/N1458_Filed_CA_Group_Effectiveness_Report.pdf

10

Likewise, in the case at hand, competition will not be restored in the Ad Tech market so long as Google continues to control the entire stack. Behavioral injunctions alone are insufficient to overcome Google's ability to "adopt alternative patterns of behavior to effectuate its market power." O'Connor, *supra*, at 732. And as history has shown, Google will not hesitate to find new paths to continue its quest for domination. Majority Staff of House Subcomm. on Antitrust, Commercial & Admin. L., 116th Cong., Investigation of Competition in Digital Markets 144–207 (2022) (discussing Google's various unfair market practices). Moreover, weak remedies will embolden Google to pour its monopoly rents into further raising barriers to entry, particularly in the AI markets where it has the advantage over startups. Similar to Microsoft, when a monopolist has significant control over a particular market, divestiture is the only path available to eliminate the illegal monopoly and to restore competition to the market.

## CONCLUSION

For the reasons stated above, the Court should adopt the government's proposed remedies that include structural relief that will break Google's monopoly power in Ad Tech and deny Google the fruits of its illegal conduct.

Dated: September 12, 2025

                                                              Respectfully submitted,

                                                              */s/ Dianna Bardes*
                                                              Diana Bardes, Bar No. 81831
                                                              Mooney, Green, Saindon, Murphy & Welch, P.C.
                                                              1620 Eye Street, NW, Suite 700
                                                              Washington, DC 20006
                                                               (202) 783-0010

                                                              Tara Pincock
                                                              Sandeep Vaheesan
                                                              Open Markets Institute
                                                              655 15th Street NW, Suite 310
                                                              Washington, D.C. 20005