# EXHIBIT 1

# REDACTED

IN THE UNITED STATES DISTRICT COURT.
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

- - -

UNITED STATES, et al., :
: NO.
Plaintiffs, : 1:23-cv-00108
: -LMB-JFA
v. :
:
GOOGLE LLC, :
:
Defendants. :

- HIGHLY CONFIDENTIAL -

- - -

August 27, 2025

- - -

Videotaped deposition of GORANKA BJEDOV, Ph.D., taken pursuant to notice, was held at the Department of Justice, 450 9th Street, NW, Washington, D.C., beginning at 9:05 a.m., on the above date, before Michelle L. Ridgway, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, Certified Court Reporter, and Notary Public.

- - -

All counsel will be noted on the stenographic record.

The court reporter is Michelle Ridgway, also with Lexitas.

And would you please swear in the witness.

(Witness sworn.)

\- - -

... GORANKA BJEDOV, Ph.D., having been first duly sworn, was examined and testified as follows:

\- - -

EXAMINATION

\- - -

BY MS. RHEE:

Q. Good morning.

A. Good morning.

Q. I want to start off by asking whether or not you've ever been deposed before.

A. Never.

Q. Okay.

A. Sorry.

Q. Lucky you.

A. Yeah. Depends on how you look at it, but...

Q. Okay. Given that, just want to go over some basic ground rules. I'm sure they've already been covered, but just on the record --

A. Of course.

Q. -- I will be asking you questions.

A. Mm-hmm.

Q. I need you to wait for me to finish asking the question, and then I will wait for you to answer, then back and forth. Okay?

A. Makes sense. Yes.

Q. Okay. Let me begin by just asking about your background. Okay?

A. All right.

Q. Okay. So I think I understand your undergraduate degree is from Purdue University; is that right?

A. No, that is not correct.

My undergraduate degree is from University of Zagreb.

Q. Okay.

A. Z-A-G-R-E-B. Currently, the capital of Croatia. But it was obtained during the time of Yugoslavia.

Q. Okay. And that was a Bachelor of Science?

A. By American standard, it would be actually considered Bachelor's of Engineering.

Q. Okay.

A. But when it was translated, I didn't know, so it was translated as Bachelor's of Science. It was a five-year degree, basically.

Q. In engineering?

A. In engineering and with

thesis. Yes.

Q. Okay. And it was civil engineering; is that right?

A. That is correct. It was civil engineering, yes.

Q. For those of us who do not have an engineering background --

A. Mm-hmm.

Q. -- how would you describe what civil engineering is?

A. So civil engineering is an oldest area of engineering, and it concerns itself with things like -- you have several different subfields, so I'm going to go through those.

For example, you have probably the oldest one is the -- what we call the static subfield, and that one concerns itself with building structures, like buildings. To a lesser extent, bridges. But you're talking about large buildings.

You have fluid mechanics, which happens to be my subfield of specialization. And that one really concerns itself with everything related to not just, you know, water and sun, but also things like air, you know, basically fluid motion, fluid movement, and is highly computational field.

Then you have the third field that is -- depending on where you -- how you call it, but let's -- let's call it traffic engineering. These are the people that focus on roads, airports.

In my system, in my world, traffic engineering did not involve things like, you know, traffic lights and directing the traffic but just really building things that are related to that.

Then you have, for example, geotechnical engineering, which is also

highly computational, and that one is involved with all aspects of all of our structures, everything that we built stands on the ground.

And the ground is a fairly complex mix of many particulate and nonparticulate soils. And so geotechnical engineering, their job is to tell you what you're really standing on, what can you expect of your substrate to give you so that you can then build the appropriate foundation and things like that.

They also have a subspecialty, especially in California, earthquake engineering. So earthquake engineering would be a subfield of geotechnical engineering, and so those two fields obviously also highly computational.

I think that pretty much summarizes the whole field, yes.

Q. Okay. That's super helpful.

And after you received your undergraduate degree in Croatia, it looks like you came to the United States; is that right?

A. That is correct. I came to the United States.

Q. Okay. And you got a Master's of Science in civil engineering from Clarkson University?

A. That is correct.

Q. Okay. And, again, was your subspecialty at that time fluid mechanics --

A. Computational fluid mechanics, yes. Correct.

Q. Okay. Okay. And then you stayed at Clarkson, it looks like, and you got a Ph.D. in engineering science; is that right?

A. That is correct. Yes.

Q. Okay. And, again, was the specialty of fluid engineering?

A. It was computational fluid mechanics. Yes.

Q. Okay. And then after that it looks like you went to Purdue and got a Master's of Science; is that right?

A. That is also correct. Yes.

Q. Okay. And at that point, that's when you studied computer science?

A. No. That -- that is incorrect.

Q. Okay.

A. You started with my undergraduate degree.

Q. Yeah.

A. Prior to my undergraduate degree, my undergraduate -- sorry -- my high school education was in computer science, and in particular, in informatics.

Page 18

And so I started programming when I was 13. I went to the high school for informatics. By the time I was 18, I was a little bit burnt out of coding, and so I decided to study a different field of engineering.

And -- but throughout all of my studies, you really can't get a master's these days, or even a Ph.D., without coding. And so I'm continuing to code and program.

But during this time, also, the whole space develops tremendously. You start getting new programming languages and so on.

And so by the time that I get a job at Purdue as a faculty teaching program to engineering students, I have decided to basically take a formal look at the field that I've been in for a long time and, you know, bring my knowledge to the level

Page 19

that I felt it should be. And so that's when I get my master's in computer science.

You will note that that master's was not thesis master's. I was mostly interested in coursework.

Q. Okay. That's very helpful.

And that is the sum total of your educational background; is that right?

MR. TESLICKO: Object to form.

THE WITNESS: So, no, not really.

When you are faculty, you receive a lot of additional training. I'm not sure how much detail you want to go into.

BY MS. RHEE:

Q. Yeah. Let me -- let me rephrase the question, then.

Do you have any other

Page 20

degrees, other than the ones we covered?

A. No, I do not have any degrees, additional.

Q. Okay. Okay. And then your teaching experience, I take it, was when you were at Purdue; is that right?

A. I have teaching experience at Purdue, but I've actually been instructor in the last two years of my Ph.D. at Clarkson.

So as an instructor you also teach classes, and so I -- I've done that at Clarkson as well. So I have two years of teaching experience there and then seven years of teaching experience at Purdue.

Q. Okay. So let me just put some dates to that.

A. Sure.

Q. Your teaching experience at Clarkson was in the last two years of your Ph.D.?

Page 21

A. That is correct.

Q. Okay. So that's 1990 to 1992?

A. No. It is 1989 to 1991.

Q. Okay. Thank you.

And then your seven years of experience at Purdue, what are those years?

A. Those are 1991 to 1998.

Q. Okay. And what was your title when you were teaching at Purdue?

A. I was -- at Purdue I was -- for most of the time, I was assistant professor. But for the last year, I was associate professor. I don't remember the exact time on when I was promoted to associate, when I got tenure. But I -- probably '97 -- '97, most likely.

Q. Okay. And this was in the School of Civil Engineering?

A. No. This was in the department -- well, actually, yes, it

guess the middle of 2010 through February of 2019, you were at Facebook?

A. That is correct as well.

Q. Okay. And your title at Facebook was a performance and capacity engineer?

A. That is correct as well. Yes.

Q. Okay. And since February of 2019 --

A. Mm-hmm.

Q. -- where have you been working?

A. I haven't.

Q. Lucky you.

A. You know, I would like to invite all of you to join me.

Q. That sounds delightful.

A. So to answer your question, since February '19 I have been mostly hiking around the world. So I've hiked two different caminos. I've just

finished Tour du Mont Blanc. I've done the Inca Trail. I happen to spend a lot of my time hiking.

Q. What made you decide to leave Facebook in February of 2019?

A. So it was a very complex situation, internally. I wrote some things on internal boards that I probably shouldn't have, and...

Q. Well, now I'm intrigued. Like what?

A. I'm not sure how much of this -- I don't think any of this is public information, and so I want to make sure that what I say here does not reflect poorly on my -- on my previous employer, because I have nothing but gratitude towards Facebook. But I felt that they handled a particular situation involving a particular young woman incorrectly.

And -- well, I -- you'll

probably find this out anyways. I called for the people who did it to be fired. And the people involved were HR and their legal representative, and, you know, calling for your legal representatives to be fired usually does not end up very well for you, which I'm perfectly fine with.

Q. Okay. Got it.

So were you let go from Facebook, based on the post that you made?

A. I wish I could answer that question definitively. I believe I was. Facebook has always maintained that I resigned.

Not sure what to tell you, but we have agreed to amicably part ways. I hold no animosity, and there was no need for me to kind of drill that into it.

Q. Does that mean that you

left Facebook pursuant to a settlement agreement?

A. I am not sure what that question means. Could you explain?

Q. When you left Facebook --

A. Mm-hmm.

Q. -- was it pursuant to a legal agreement about the terms of your departure?

A. No.

Q. Okay. Well, when you say that Facebook says you resigned, do you believe you resigned?

A. I don't believe I resigned.

Q. Okay. So what do you believe happened?

A. I believe that Facebook did not want me to remain employed for them, and so I didn't.

Q. Do you believe you were pushed out?

A. Not really. You know, I

believe it was just one of those situations where -- I was a very high-level employee at Facebook. And as a high-level employee, you're really expected to understand some basic rules of behavior and observe them.

One of them is not to speak openly and publicly against your company and the decisions made on the higher level. I broke those rules.

I don't begrudge them. Their choice to say we cannot continue compensating you at this level if you're not going to be playing by the rules. That's reasonable.

At the same time, I can't change who I am as a human being.

My opinion is that the world that I have spent most of my career in is a really hard world for young women to start their career in, and if I'm not going to speak up for

them, as a person who is financially secure, has credibility, and so on, who will?

So I considered that part of my personal loyalty more important than my loyalty to the company.

I also completely understand and support the company saying, no, your loyalty to us. At this compensation level, your loyalty should be first to us.

We just disagreed that and decided to part ways.

Q. Okay. That's super helpful.

When you say that you were a high-level Facebook employee --

A. Mm-hmm.

Q. -- I think I have that right -- what do you mean by high level?

A. I -- at the time of my departure, I was Level 9. In the

engineering scale, Facebook has only ten levels. So the only higher level would have been fellow. And so I think there was maybe five people in the company at the time that were Level 9 and 10. So I would consider that a high level.

And also, as I said, there was only one level above the level I was at.

Q. Okay. I just want to understand.

You think there were only five people at Facebook who were senior to you at the time that you left?

A. No. No. I believe that there were only five people total on Levels 10 and 9. So I actually don't know if there was anybody who was Level 10, but there is one person that I suspect was Level 10.

These kinds of things were not public. So "I don't know" is the

answer.

Q. So I just want to make sure I understand.

You think that there were only five people total at Facebook in 2019 when you left who were either at Level 9 or 10?

A. Inside engineering. Very good question.

Q. Okay.

A. So you have two different tracks. You have an engineering IC track, which is the part that I am of, and inside that track, yes, I believe there was maybe five people.

Inside management, they may have had 2,000, for all I care. I have no idea how many managers were that level.

Q. Okay. That's helpful.

So you were not a manager at Facebook?

Page 42

A. No, I was not a manager at Facebook.
Q. All right. You were an individual contributor?
A. That is correct. Yes.
Q. Okay. And so you are only talking about seniority levels for individual contributors?
A. Very correct. For engineers.
Q. Okay. Well, but there are lots of engineers who are managers as well, correct?
A. There are a lot of engineers who make the transition to the management track, yes.
Q. Okay. Okay. So your testimony about being a Level 9 out of a 10-level scale --
A. Mm-hmm.
Q. -- for engineers are about individually contributing engineers?

Page 43

A. Yes.
Q. This is very helpful. I appreciate the clarification.
And since February of 2019, you have been -- is it fair to say retired?
A. Yes.
Q. Okay.
A. I consider myself retired. Yes.
Q. Okay. How did you come about being retained in this case?
MR. TESLICKO: I just remind the witness not to disclose the substance of any communications with Plaintiffs' counsel.
THE WITNESS: So I was contacted by the plaintiffs and asked if I felt that I could --
MR. TESLICKO: Just remind you not to disclose the

Page 44

substance of any communications with counsel.
THE WITNESS: Yeah. So, basically, I was contacted by the plaintiffs, and we discussed things, and I decided to accept their request to help them put together my -- my report.
BY MS. RHEE:
Q. Okay. And when was that?
A. First contact was about two years ago. Yes, two years ago. Summer 2023. But then nothing really happened until -- I think we finished all the paperwork in, like, January of 2024. Don't hold me on the -- but, roughly, that timeframe.
Q. Okay. Okay. At the time that Plaintiffs contacted you, you had not done any expert work before; is that right?
A. That is correct. Yes.

Page 45

Q. Okay. Do you know how Plaintiffs found you?
MR. TESLICKO: I just remind the witness again not to disclose the substance of any communications with counsel.
THE WITNESS: I actually don't, no.
BY MS. RHEE:
Q. So you got a call out of the blue, at least from your perspective?
A. From -- from my perspective. And I can even describe the situation. I got an e-mail while I was on one of my trips, and I'm --
Q. And you went to an internet cafe and got some Wi-Fi.
A. -- as you can imagine that it impacted that particular day, and --
Q. Where were you?
A. I was in Croatia at the

Page 46

time. I was, actually, after my trip, with my mom. That's why I remember the timing.

And -- and so I responded to that particular e-mail, and, you know, obviously this is your world. And for maybe for all of you, this would be like, well, you know, it's just DOJ. For me it's like, oh, my God, what did I do now.

And -- and so we set up the time to talk on the phone, time differences being what they are.

We ended up talking, and, obviously, that communication, my understanding is it's protected. And so --

Q. I got it. Okay.

A. Mm-hmm.

Q. Have you been retained in any other case to provide expert work?

A. No.

Page 47

Q. Okay. So this is the one and only?

A. This is my one and only, yes.

Q. Okay. Based on that, I take it you've never put yourself up as a testifying expert before?

A. So there was one situation where I was specifically requested by a congressperson from Indiana to be provided by Facebook to testify in Congress hearings.

Not sure whether you consider that or not, but there -- there was that particular experience as well.

Q. Okay. And did you actually testify before Congress?

A. I was present at the hearings.

Q. What does it mean to be "present at the hearings"?

A. So they had hearings --

Page 48

this is 2012, 2013. So I can tell you that Mr. Eric Cantor was the Speaker of the House at the time.

Q. Okay.

A. I -- whatever. He was Republican lead at the time.

Q. Okay.

A. So he was -- he was -- it was during his tenure.

Q. Okay.

A. And they were the Republican caucus. And I apologize, because all of these terms are very much outside of my normal vocabulary, so if I misuse some of them, I'm sorry.

They were having a hearing on, you know, status of women in technology and -- and in those fields. And in particular, I received a request from Facebook's office in Washington that I be present. That was very unusual. And the explanation was that

Page 49

there was a particular congressperson from Indiana who wanted me -- who wanted Facebook to provide me as a witness.

Again, in that kind of situation, you just do what your company wants you to do. And I was in Washington, D.C., present at the hearings.

Q. So physically present?

A. Physically present, yeah. I was in the room, sitting next to the congresswoman, and watched the whole thing sort of go around me.

Q. Okay. So you watched the hearing.

Did you talk at the hearing?

A. No.

Q. Okay.

A. I was instructed by our team to not say anything unless I was specifically asked a question. Nobody

Page 54

list of candidates in this field. Like -- no.
BY MS. RHEE:
Q. Okay.
A. This is completely outside of my area of expertise.
Q. Okay. So also safe to say you've never written an expert report before?
A. That is very correct. Yes.
Q. Okay. How many people from Keystone Strategy were assigned to help you?
A. I actually don't know the answer to that question.
Q. How do you not know?
A. I can only tell you, roughly, how many people I interacted with.
Q. Okay.
A. But were there people doing work that, you know, I am unaware of? I

Page 55

don't know. So I don't -- I honestly don't know the answer to your question.
I personally interacted with -- let me think -- maybe ten people. Again, order of magnitude.
Q. Okay.
A. So ten.
Q. Okay. How many hours have you personally spent in preparation of your reports in this case?
A. That is a very complex question. I -- let me think.
Approximately, couple of hundred hours, I would guess. Yeah, I would -- I would guess couple of hundred hours, maybe 300.
Q. Okay. Well, you're charging by the hour, right?
A. I am.
Q. Okay. And sitting here today, you don't know how much you've charged so far?

Page 56

A. I do know the answer to that question.
Q. Okay.
A. So I have -- so far I have charged about $150,000 --
Q. Okay.
A. -- total.
I have been paid out $80,000. So $80,000. That's 200 hours. Yeah. So a couple hundred hours. Like 500 hours or so.
Q. Okay. Yeah. Sorry. I can't do math, hence I took out my phone to pull out the calculator.
A. No, no. That's fine.
But I do remember -- as I said, I do remember the exact numbers for how much I have billed for and how much I have been -- received payment for, but I haven't billed for all of the hours yet.
Q. Okay. So sitting here

Page 57

today, your best approximation is about 500 hours; is that what I'm hearing?
MR. TESLICKO: Object to form.
THE WITNESS: I would guess 500 hours, yes, on preparation of reports. Yes, that sounds reasonable.
BY MS. RHEE:
Q. Okay. Do you know how many hours the staff at Keystone have worked on your report?
A. Not the slightest idea.
Q. Okay. How did you go about selecting what you reviewed in connection with your report?
A. So as I'm sure you're aware, there was a mountain of documents in this case.
Q. You don't say.
A. And so my strategy for -- when you get the mountain, there is no

way I can --

Q. Well, did you get a mountain?

A. Oh, yeah. I had access to everything that was produced in the case.

Q. Okay.

A. And so now I -- you know, I see all of these documents, and I see the timelines. And I'm going, like, all right.

Q. When you say "timelines," what do you mean? What are you referring to?

A. Oh, I'm talking about when my report needs to be written and then when the rebuttal report needs to be written --

Q. I see.

A. -- and then the reply report.

From my perspective, this

is all moving fairly quickly. But, again, I'm giving you a judgment on something that I really have no basis for comparison. So you may disagree and you may reasonably say no, no, no, this is a very slow one.

For me, personally, I felt that things were moving quickly.

Q. Okay. So when did you first get access to, as you put it, the mountain of documents in connection with when you thought your first report was due?

A. I really don't remember. I honestly don't remember. This was a long time ago. I would really hate to make a guess here. I don't remember. I'm sorry.

Q. Okay. Well --

A. A long time ago.

Q. -- what do you mean by "a long time ago"? In 2025?

A. I think I've had access to some of the stuff before 2025.

Q. Okay.

A. But definitely not all of the stuff.

Q. Okay.

A. But there was just a lot of documents.

Q. Okay. And can I ask -- because what we have, as I'm sure you know --

A. Mm-hmm.

Q. -- because they are your reports, the Appendix A for each one of your reports --

A. Mm-hmm.

Q. -- lists the materials that you relied upon for that report, right?

A. It lists a subset of materials that -- in particular, materials that I referred to and quoted in the report.

I've certainly reviewed a lot more things that I don't necessarily quote because I find them not relevant to the matter that I'm discussing.

Q. Okay. So I want to make sure I understand.

What you put in those appendices to your report --

A. Mm-hmm.

Q. -- is only what you cited?

A. That is correct. Yes.

Q. But that is not -- let me make sure I break this down.

It is not everything that you reviewed?

A. That is correct. Yes.

Q. Okay. And I take it, it is not everything you relied upon --

MR. TESLICKO: Object to form.

BY MS. RHEE:

Q. -- if you didn't actually

Page 62

cite it?
MR. TESLICKO: Object to form.
THE WITNESS: No. If I am using a document to form my opinion or if I'm using a document to -- let's put it this way -- to say, well -- and here is a document that confirms my opinion, then I'm going to cite it.
BY MS. RHEE:
Q. Okay.
A. But if I'm just reading a document -- for example, I've read transcripts of depositions, of -- number of them. And I apologize. I'm really terrible with names.
Q. Okay.
A. But I've read the transcripts from several Google witnesses in the case. I've read them

Page 63

for several reasons. Because I wanted to see what this process looks like, but also I wanted to understand, you know, what are they saying, what are they claiming. Are they saying things that I will strongly disagree with and say, well, no, that's just wrong, and I can prove it is wrong.
Or are they saying things that you can look at and go, like, well, I disagree with them, but, objectively, it's quibbling.
And so I read a lot of those depositions. I don't cite them in my report. They were completely irrelevant to it.
Q. Okay. I think I understand.
You cite, I think, 30 -- I think the count is something around 32 unique Google documents across your three reports.

Page 64

Does that sound roughly right to you?
A. Oh, I remember there was about 20, 21 in the first report, so the numbers, order of magnitude, certainly makes sense, yes.
Q. Okay.
A. And then there is a whole lot of other documents that I cite --
Q. I totally understand, but I just want to focus on the Google-produced documents for now.
A. All right.
Q. Okay. You're right. You cite -- or you list 20-some-odd Google documents in your opening report.
A. Mm-hmm.
Q. And then in total it's about 30. Sound about right?
A. Sounds fair. Yes.
Q. Okay. And based on your answer just now, that is the universe of

Page 65

Google-produced documents, out of the mountain of documents that you had access to, that you either cited in your reports or otherwise relied upon; is that right?
MR. TESLICKO: Object to form.
THE WITNESS: So there are other Google documents that I have read and thought, oh, they -- [redacted]
[redacted]
that I didn't cite because, honestly, the form that they were written in, I totally understand. They were engineers.
But I didn't think that in the legal sense it would be very helpful to either you or the judge to see [redacted]
[redacted]



Page 66

which makes perfect sense in my world, but I'm going to guess that anybody else will go, like, what in the world are these people talking about.

[REDACTED]

But how do you present to anybody else outside of the technology space what [REDACTED].

BY MS. RHEE:

Q. So you're referring to a document produced by Google that you

Page 67

read --

A. Mm-hmm.

Q. I think you need to just say yes or no on the record.

A. Oh. Yes.

Q. -- that you believe is [REDACTED]?

A. That is correct.

MR. TESLICKO: Object to form.

Sorry.

THE WITNESS: Sorry.

BY MS. RHEE:

Q. But you did not cite it?

MR. TESLICKO: Object to form.

THE WITNESS: Could you repeat the question, please. And sorry about that.

BY MS. RHEE:

Q. Yeah. I'm sure you've been instructed. Mr. Teslicko is doing his

Page 68

job, but regardless of his objection, unless he specifically instructs you not to answer, you need to answer my question.

A. And I hope, you know, that so far I haven't --

Q. You've been great. I'm really just talking to Mr. Teslicko.

MR. TESLICKO: If I could just say, can you please wait for counsel to finish her question full, because that's part of the problem. That would be great.

THE WITNESS: I'm really sorry for making this difficult for you.

BY MS. RHEE:

Q. You're fine. So let's just rewind.

You just talked about a document produced by Google that you

Page 69

reviewed, correct?

A. That is correct.

Q. Okay. You did not put it on any of your appendices, correct?

A. That is also correct, yes.

Q. Okay. But, nevertheless, you believe that document [REDACTED]?

MR. TESLICKO: Object to form.

THE WITNESS: I would say that -- that my evaluation was [REDACTED].

BY MS. RHEE:

Q. So it went into your thinking about this case?

MR. TESLICKO: Object to form.

THE WITNESS: Not really. Outside of, man, if I were

Page 70

presenting this to a bunch of engineers, [REDACTED]. But, unfortunately, that's not my audience, so, you know.

Outside of that, no, I -- you know, it's --

BY MS. RHEE:

Q. Okay. Let me try this again.

A. Mm-hmm. Mm-hmm.

Q. This is one example of a document that is on topic, related to your opinion, but you did not put it on any of the appendices. Yes?

MR. TESLICKO: Object to form.

THE WITNESS: This is one document that I believe -- and I really believe most engineers

Page 71

would agree with me on this -- [REDACTED].

And this is one document that I didn't include in the -- and I didn't cite and refer to because I felt it was maybe -- let's call it too informal and could be reasonably questioned by anybody who hasn't worked and lived in the world that I work in and live in, as to how is this even relevant.

BY MS. RHEE:

Q. Okay. And how many more documents did you review that Google had produced, that you had access to, that was topically related to the subject matter of your opinion but, for one reason or another, you decided not to put down in your appendices?

MR. TESLICKO: Object to form.

Page 72

THE WITNESS: Oh. Oh, wow. Really no idea.

BY MS. RHEE:

Q. Well, more than one?

A. More than one.

Q. Okay. More than ten?

A. You are asking me to estimate, in legal proceedings, something that I really -- if I had known that I should keep track of, you know.

Q. That's okay. I just want your best guess.

MR. TESLICKO: Object to form.

THE WITNESS: My best guess would be somewhere between 10 and 20, maybe.

And you did add a stipulation there that -- because some documents I would run into would be talking about

Page 73

business stuff or -- so on, and those -- those, I immediately dismiss because they don't -- they have nothing to do with work I'm doing and what I have been asked to opine on.

Do you count the document or not, and how many of those -- let's say somewhere between 10 and 20.

BY MS. RHEE:

Q. Okay. That's your best guess, sitting here today?

A. That is my best guess, yes.

Q. Okay. Your opinion goes through your timeline estimates for the various DOJ steps or phases of remedy; is that right?

MR. TESLICKO: Object to form.

THE WITNESS: So my opinion gives timelines for

Page 74

different parts of Plaintiffs' proposed remedies.

BY MS. RHEE:

Q. Yes. Okay. So let's just quickly go through those. Right?

A. Mm-hmm.

Q. DOJ's proposed remedies for what they refer to as DFP --

A. Mm-hmm.

Q. -- goes in three phases, right?

A. That is correct.

Q. Okay. And the first phase, which is a form of integration, right? The first phase is a Prebid integration, right?

MR. TESLICKO: Object to form.

THE WITNESS: Excuse me? You say form of integration? Could you tell me what you mean by that.

Page 75

BY MS. RHEE:

Q. Well, actually, maybe I should ask you.

What is the first phase that you opine upon?

A. So the first phase of DFP divestiture -- and you can see in my report -- is creation of the APIs. Those --

Q. APIs to what?

A. So you're looking at, basically, application program interfaces that would make Google participate on the same level as other exchanges in bidding process.

Q. Okay. So APIs to what?

A. So APIs to make Google participate on the same level to the bidding process.

Q. Well, do you know how APIs effectuate that?

At least as I understand

Page 76

APIs, they actually need to connect to something, right?

MR. TESLICKO: Object to form.

THE WITNESS: So in order for API to be useful, you typically are connecting to a system.

BY MS. RHEE:

Q. Mm-hmm.

A. And it's the system that exposes its API.

So you have exchanges, and inside those exchanges, there is a bidding process going on. Those exchanges have APIs.

And what we're saying is, Google needs to provide APIs that would level the playing field for the bidding -- during the bidding process.

Q. Mm-hmm. Okay.

And what is the timeframe

Page 77

that you estimate in order for those APIs to be created and confirmed to work as intended?

MR. TESLICKO: Object to form.

THE WITNESS: So I specify that in my report.

And I -- is it okay if I point out to where this is in my report?

BY MS. RHEE:

Q. We can get there.

But I just want to know, since this is your opinion --

A. Mm-hmm.

Q. -- it's less about your report, but just your opinion.

Do you know how long you estimated that step to take?

MR. TESLICKO: Object to form.

THE WITNESS: I can answer

the question. I do want to give you a caveat that there are many different parts, moving parts, in this particular case, and so, to the best of my recollection, which could be off in this case, if I remember correctly, it was 18 months.

It could go as high as 24, but I think 18 months is a reasonable amount of time for creation of APIs.

BY MS. RHEE:

Q. Okay. And then you opine about the next step in DOJ's proposal to divest DFP, right?

A. Mm-hmm. That is correct.

Q. Okay. And what is your understanding of what that Phase 2 is?

A. So as per Plaintiffs' proposed remedies, Phase 2 is open-sourcing of the final auction logic

and making it available in an open-source context.

Q. Okay. And what is your opinion about how long that's going to take?

A. Again, that has been defined in my -- in my report, so I'm not quite sure --

Q. Well, it's your opinion, right?

A. In my opinion, as defined in my report -- and I do want to say what is in the report should be taken as the accurate statement in this. You're, again, looking at a timeframe of 18 months to 24 months.

Q. Okay. And then you opine about how long it's going to take to achieve what DOJ calls Phase 3 of DFP divestiture, right?

A. That is correct. Yes.

Q. Okay. And what is your

understanding of what Phase 3 entails?

A. So my understanding of Phase 3 is that it involves what I would call cutting out and moving DFP and making it available for purchase to one or more buyers. Obviously, the DFP product that remains after Phase 1 and Phase 2 have been completed.

Q. Okay. And what is your opinion about how long that is going to take?

A. So, again, I would like to refer you to my report.

I estimate that DFP divestiture is going to take a little bit longer than the other two things, and there are specific reasons for it.

And I think my estimate is that DFP by itself should be somewhere -- let's call it in 24 to 30 months.

Q. Okay. And then, finally,

DOJ has a proposal to divest what it refers to as the Ad Exchange, or AdX, right?

A. That is correct.

Q. Okay. And you have an opinion about how long that would take?

A. Yes, I do.

Q. Okay. And how long would that take, in your opinion?

A. In my opinion -- and, again, I will point out to my report -- the AdX should take about 18 months.

And I should say this: A reasonable plan proposed in here should take 18 months. And I'm giving you just one reasonable approach to that divestiture.

Q. What do you mean you're giving "just one reasonable approach to that divestiture"?

A. So if you put five engineers into a room and say divest

AdX, you will get seven different opinions back on how that can be done.

I'm giving just one reasonable approach to doing this, which doesn't mean that somebody else may not come up with a different, equally reasonable approach.

Q. When you give these timeline estimates, is it fair to say it is your best guess, sitting here today, about how long something is going to take?

MR. TESLICKO: Object to form.

THE WITNESS: No, I -- I don't think that is fair to say.

BY MS. RHEE:

Q. Well, are you giving a guarantee that any one of these phases or projects can be completed within that timeframe?

MR. TESLICKO: Object to

form.

THE WITNESS: No, I'm not giving a guarantee on any of them.

BY MS. RHEE:

Q. Okay. And you would agree, in your experience working on projects in industry, every project has always slipped?

MR. TESLICKO: Object to form.

THE WITNESS: Actually, no. And I'm going to, again, refer to my -- my report and give you an example of a project that relates there.

That Facebook Look Back videos, that not only didn't slip, it came in two days ahead of schedule. Which, normally, you would go, like, who cares about two days, but we are

talking about three-week schedules, so two days is roughly 10 percent, which is big time -- big deal.

BY MS. RHEE:

Q. Mm-hmm.

A. And it was on a schedule that almost all of us senior people who started working on it felt like there is no way that we are going to get this done, but...

Q. Yeah. But we'll talk about your use of the Look Back video as a case study or example.

But -- but since you bring that up --

A. Mm-hmm.

Q. -- you remember filming a video in connection with that project, right?

MR. TESLICKO: Object to form.

THE WITNESS: I'm not sure if you're talking about me giving a conference presentation at XKL in Boston.

But I do remember that that is just one of the many talks, you know, technical talks, that are not listed in my résumé by, you know, line item and line item.

But, yeah, I do remember giving the talk.

BY MS. RHEE:

Q. And, in fact, you cite it in your report.

Do you know that?

A. Yes. Absolutely.

Q. Okay.

A. Because I kind of explain in detail what was going on, and I feel that, sitting here today, you can reasonably say, oh, you're making stuff

Page 110

up to them to decide.
Completely out of my area of expertise to -- to opine on this.
BY MS. RHEE:
Q. So your estimate of how long something like this would take --
A. Mm-hmm.
Q. -- isn't dependent on whether or not any of these steps that you're walking us through --
A. Mm-hmm.
Q. -- because they possibly are part of the final auction logic, also need to be open-sourced?
MR. TESLICKO: Object to form.
THE WITNESS: All of these steps are part of the code base.
My opinions are, hey, here is the code base. Do something with it.

Page 111

The process that I'm describing is agnostic to what the code base does.
BY MS. RHEE:
Q. I take it from your answer, your opinion is also agnostic as to how many items within that code base either need or do not need to be open-sourced?
MR. TESLICKO: Object to form.
THE WITNESS: Yes, and a no.
BY MS. RHEE:
Q. Okay.
A. You know, the answer to that is, it depends.
Q. What does it depend on?
A. It depends on how the code is organized.
So to give you a hypothetical that -- I think most of my colleagues at Google and probably most

Page 112

of my colleagues at Facebook would be horrified.
If all of these things were closely interacting with each other, coupled, looking at each other's private properties without any regard for computer standards or sort of computer coding standards, modern way of developing code, then it would make a difference, because then -- honestly, it would have to be rewritten and cleaned up before it could be outsourced.
But, at least in my part of the world, one of the things that Google is certainly held in high esteem for, and in my personal experience working there, is sticking to very good computer science methodology and being really strict about how the code is checked in.
And, as a matter of fact, in some of the documents that, you know, your client has presented in this

Page 113

case -- and I can't recall off the top of my head which ones -- they actually describe the process it goes through.
Code reviews. It has to be reviewed by the -- at least one other person.
But, for example, if I'm trying to do the code check-in into code base that doesn't even belong to my team, then it's going to be reviewed by one other person, and it's going to be reviewed by the owner of that particular code base or subdirectory. And those are clearly identified.
So Google is pretty strict about how they maintain their code base, and, in my opinion, rightfully so.
And so I've, you know, made my estimates with the understanding that that is the code base that I'm dealing with, and, therefore, I'm not going to have to rewrite it. I'm not going to

have to completely take it apart and spend three months figuring out, you know, why is this thing directly looking and pulling something from a memory, you know, at a particular location, because that is just not allowed at Google. You don't -- you know, you don't do that.

Q. Okay. For your assignment in this case --

A. Mm-hmm.

Q. -- you did not look at the actual source code with respect to any of these products, right?

A. That is correct. Yes.

Q. It was just not part of your assignment?

A. That is not part of my assignment. That is correct.

Q. Okay. So insofar as you talk about your assumptions --

A. Mm-hmm.

Q. -- about what the source

code looks like, that is either based on your work at Google from 2005 to 2010 or from Professor Weissman; is that right?

MR. TESLICKO: Object to form.

THE WITNESS: I do rely on my expertise, but it has been informed by Professor Weissman's opinions.

BY MS. RHEE:

Q. I see. Okay.

But with respect to Google source code, specifically --

A. Mm-hmm.

Q. -- you stopped working at Google some time ago?

A. Fifteen years ago, roughly. Yeah.

Q. Okay. And even when you were working at Google, you did not have any reason or occasion to look at the source code of these products, right?

MR. TESLICKO: Object to form.

THE WITNESS: That is actually incorrect.

Well, I -- I worked on both AdSense and I had an intern actually do some work for AdWords. And you could argue, you know, DFP gets integrated fully after I leave Google. So not exactly this code base.

However, it is a code base inside Google3. And while I was at Google, we completed integration from Google2 to Google3.

And so I'm familiar with the rules, in particular for C++ code base.

BY MS. RHEE:

Q. I just want to understand, though.

A. Mm-hmm.

Q. What you're talking about in terms of your familiarity is from your time at Google, right?

A. My personal familiarity, yes, it's from my time at Google.

Q. Okay. And that was 15 years ago?

A. That was, yes. End of my time there was 15 years ago.

Q. Okay. So going to this page ending in 501.

[REDACTED]

said.

You did rely on Mr. Levitte's testimony about GCP but not about DFP?

A. No, not really. So --

Q. Well, I just want to make sure, because --

A. Mm-hmm.

Q. -- just reading back your answer, "I relied a lot on what he was telling me about GCP, that he was confirming, basically, what I would expect about GCP."

A. So I misspoke.

Q. I just want --

A. That is absolutely fair. You're absolutely fairly calling me out. I misspoke. I relied.

I read his report and tried to sort of verify. I have public sources of information that tell me how GCP functions.

But here, I have a person that actually lives that every day of his life. This is his home.

And so I read his opinion to find out if everything I know about this is consistent. Is my understanding of the space that he's describing consistent with all the public information and so on.

Or, for example, if he brought up something that was completely different than the public documentation, my expectation, and so on, well, then that's material.

Then I have to say either I mistrust his opinion or -- you know, or, basically, everything I know is wrong, and I have to go and dig into it deeper.

But that hasn't happened. Everything he's saying is, basically, yeah, yes, yes, yes, yes, yes. Okay. Let's move on.

So there is nothing in his deposition that changed my opinion, that made me question or do additional research. It was just, like, all right. You know, put aside and move on.

Q. So your answer just now talked about a standard you applied in deciding whether or not you would add a source to your appendix, and you said, oh, well, is it material?

Have I got that right?

MR. TESLICKO: Object to form.

THE WITNESS: As long as you don't use "material" in some legal way that I don't know what it means.

BY MS. RHEE:

Q. I just really want to understand what's the standard --

A. What it means to me --

Q. -- what's the standard you

apply?

A. Oh, perfect.

So when I do my work, right, I come up -- at least my personal process and the one that a large number of the industry participants would agree with, but some tend to break -- is I want to arrive to my judgment independently.

People have a tendency to run into problems when they allow themselves to be anchored.

So, for example, before I start analyzing all of this, I don't want anybody telling me how long they think this should take, because as much as I deeply believe it wouldn't impact me, I'm also aware of all of the research in human psychology that says it would.

And while I would really like to believe that I would be that one

Page 138

exception, I don't need to take that chance. So I want to do my work and my analysis before I hear what anybody else thinks about this.

And then, obviously, using my experience, using access to any publicly available source, using the expertise, standard procedures, you know, and processes, what you would call good, you know, governance of the stuff, I come up with my estimate.

Once I have that, once I understand where I stand and I can explain why I stand there, I will look for what other people think about this.

In this, let's call it, second stage of the evaluation, I am trying to see is there something that I have possibly, and I'm going to say materially, forgotten in my analysis.

You know, you don't know what you don't know. So at this point

Page 139

in time, you are looking to other people to inform you did you completely miss the boat.

I would be surprised if I did, but I would also be unprofessional and careless if I didn't do that evaluation.

And at that stage, I start looking for things that have timelines. What are their timelines? Let's say I encounter a document that has a timeline that this is going to take 15 years.

I have to look at that document seriously, because it is a completely different order of magnitude than my analysis. I have to understand what has informed their decision, where is our disagreement. And in some cases, you find out -- that wasn't the case in this case.

Page 140

Frankly, I called my counsel and said, like --

MR. TESLICKO: Going to stop you, not to disclose any

Page 141

communications with counsel.

THE WITNESS:

BY MS. RHEE:

Q. Okay. I want to unpack what you just said. There's a lot of information here.

So in coming up with your initial timelines and your opinion, what you relied upon was your experience?

A. Absolutely.

Q. Access to publicly available sources?

A. Correct.

Q. And your expertise?

A. That is fair.

And I also deployed the standard processes and procedures used in this type of an analysis. Yes.

Q. Okay.

A. Mm-hmm.

Q. And that was the sum total so that you could stay pristine, as you put it, of what you actually relied upon in order to come up with your timelines?

MR. TESLICKO: Object to form.

THE WITNESS: Sorry.

At that point in time, you call that first draft, right.

BY MS. RHEE:

Q. Okay.

A. So that is the first step in the process. You kind of put your stake into the ground and say, here is what I think this should take.

Q. Okay. And so did you put all of those materials into your

appendices?

MR. TESLICKO: Object to form.

THE WITNESS: You have the list of all of the publicly available documents, yes?

BY MS. RHEE:

Q. No. I do. I'm asking is that --

A. Yes.

Q. -- everything you looked up, you looked at, to come up with your first draft, did you put in your appendices?

MR. TESLICKO: Object to form.

THE WITNESS: No. And allow me to explain.

BY MS. RHEE:

Q. Okay. Okay.

A. When you're looking for publicly available information, as you

will know, Google will return you millions of documents.

And you now sort through those documents. Typically, you sort by the validity, or let's call the engineering level of trust in the reporting source.

So I'm not going to look at anything that BuzzFeed puts out. But if, you know, IP Police putting it out, that is important.

Then I will look at, you know, maybe five or ten different documents, and what you find, a lot of times they overlap on, you know, 90 percent of the material.

I will quote you two or three documents, the minimal subset, that has all the information I relied on, packaged in the form that I relied on it.

But I may have seen another

five documents that had this bit, or that bit, that is already in these three documents, that I just don't quote.

You know, I have read -- I don't even know how to estimate -- probably -- or skimmed, in my whole career, hundreds and thousands of documents related to these things. I'm relying on all of them in some way. I'm not going to quote them all here because they are, in my opinion, an element to the case.

The parts that I quote are the sort of the minimal subset. Like, what is the highest-quality minimal subset that contains everything I have relied on.

So everything I relied on has to be in there, but it can also be seen in some other documents, because --

Q. Well, in documents you saw.

A. Correct.

Page 146

Q. Okay.
A. Because, as you see, in our field people tend to cut and paste, copy, and especially today, you have a whole ton of AI-generated documents.
You know, if you're going to quote all of them, like, that's going to be a lot of paper wasted.
Q. Okay. Then in the second stage --
A. Mm-hmm.
Q. -- of your evaluation --
A. Mm-hmm.
Q. -- in finalizing your opinion -- is that fair to say?
A. Yes.
Q. In finalizing your opinion, that's when you look for material. And I think your testimony was that you may have materially forgotten in your analysis; is that right?
MR. TESLICKO: Object to

Page 147

form.
THE WITNESS: No. No. I think --
BY MS. RHEE:
Q. Well, I think what you said was, "I'm trying to see if there's something that I have possibly, and I'm going to say materially, forgotten in my analysis."
A. Mm-hmm. That is correct.
That is the verification stage. And so in that stage, I actually start looking at other people's timelines. [REDACTED]
But as you can probably understand, you can't find -- if you go and do the public search and say how long would it take to divest the DFP, even if you say -- you know, among engineers, if you were to say how long would it take to migrate DFP to

Page 148

different known proprietary environment, let's search for that, you're not going to find any documents with the time estimate for that.
That type of work is typically done by the company that owns the product internally. It is not exactly available online.
And so, you know, that kind of information I'm hoping I'm going to find somewhere. But I'm not going to search for it online because I know it's not available online.
And so in my Stage II, I am trying to -- call it the testing stage. I'm trying to test my work and -- and look at it as if it's somebody else's work and say, did the person who did this work, did they do everything that needed to be done? Did they encounter everything? Did they do due diligence?
And so this is my testing

Page 149

due diligence stage of am I doing the work at a level that I believe I should be.
Q. Okay. And in this stage --
A. Mm-hmm.
Q. -- it looks like you roughly sorted the documents to be documents, as you put it, that [REDACTED]?
MR. TESLICKO: Object to --
THE WITNESS: No.
MR. TESLICKO: Object to form.
BY MS. RHEE:
Q. I'm -- but you testified, [REDACTED] right?
A. That is correct. I was --
Q. All right. So for that

Page 150

category set of documents, did you put each and every one of those documents in your appendices?
A. No.
Q. Okay.
A. And I wasn't -- I don't even know how I would issue a request.
[REDACTED]
So, no, that was never issued.
Q. Well, but I --
A. Mm-hmm.
Q. That's a different issue. I'm not asking for all the universe of hypothetical documents that are out there.
A. Mm-hmm.
Q. I'm saying, of the documents, as you testified to --
A. Mm-hmm.

Page 151

Q. -- that you looked at --
A. Mm-hmm.
Q. [REDACTED]
A. Mm-hmm.
Q. [REDACTED]
A. Mm-hmm.
Q. -- did you cite each and every one of those documents in your appendices?
MR. TESLICKO: Object to form.
THE WITNESS: No.
BY MS. RHEE:
Q. Okay.
A. There were some -- I've cited the ones that were, let's call, the most precise.
There were some documents that, you know, arguably, you could say, well, you know, how can you even make

Page 152

sense of this. And as an engineer, I can.
But I also understand that people outside of high-tech would just sort of shake their heads and -- and not know what to make of them. And so those I didn't cite because I didn't think they would be helpful.
But -- but, yeah, during that stage, that's what I do.
Q. Okay. That's helpful.
And then there was a category set of documents, and I believe your testimony is: [REDACTED]
A. I'm sorry --
MR. TESLICKO: Object to form.
THE WITNESS: That --

Page 153

what -- what are we talking about there?
BY MS. RHEE:
Q. Well, this is -- this is your testimony --
A. Yes. Yes.
Q. -- and you talked about looking at some documents, [REDACTED] -- I'm just going to read you your testimony.
[REDACTED]
MR. TESLICKO: Object to form.
THE WITNESS: That is kind of hard to unpack.
And I -- I want to answer your question and say I think --

Page 154

and that's my fault because I just talk a lot.

So there are two aspects over here.

I say that in Stage II, it is my job to do due diligence and look for any information that may point out there is something I have forgotten.

During that stage is the time when I look at all of the Google documents. [REDACTED] And you know, I'm happy hiking somewhere else.

But in that process, [REDACTED], and then I try to understand it.

Because it could be like

Page 155

what has happened, [REDACTED]

I would like to think that as an expert in this field, that wouldn't happen. And it didn't. But I cannot -- I should not

Page 156

avoid to do this step of due diligence, because I'm testifying here and I'm doing work for the plaintiffs as a professional, and there is certain code of behavior that describes that.

BY MS. RHEE:

Q. Okay. That's very helpful.

A. Mm-hmm.

Q. So I want to understand.

In this process, the second-stage --

A. The second stage, yeah.

Q. -- process, you acknowledge you did find some documents [REDACTED]

A. Yes. Correct.

Q. Okay. Now --

A. And this would be one of those documents that you referred to.

Page 157

Q. I totally get it.

A. Mm-hmm.

Q. I'm asking, for all of those documents --

A. Mm-hmm.

Q. [REDACTED]

A. Mm-hmm.

Q. -- did you include all of those documents in your appendices?

A. I think so. I think so. I think we did.

And especially -- like, if we referred to the document, I think so -- yeah. Sorry.

If we referred to the document, if I relied on the document, definitely yes.

Q. Yeah. But that's not my question.

[REDACTED]

Page 158

clearly saw in the way that you --

A. Mm-hmm.

Q. -- answered the question, it seems like it was more than one document. You clearly saw, as you put it, some documents where --

A. Mm-hmm.

Q. -- [REDACTED]

I am now asking you --

A. Mm-hmm.

Q. -- for that number of unknown documents -- or unknown number of documents [REDACTED].

Did you put them down, all of them down, in one of your appendices?

A. I --

MR. TESLICKO: Object to form.

[REDACTED]

Page 159

put most of them down -- or I put most of them down.

But I would be hesitant to tell you that I put all of them down.

However, if there is a document that I haven't put down [REDACTED], I would be very happy to look at it right now and analyze it and tell you why.

You know, I don't think there is a document like that. But if there is, I would be very happy to, you know, look through it and tell you why I didn't rely on it.

BY MS. RHEE:

Q. Okay.

MS. RHEE: Is it okay if we take another break, because I've had a lot of water.

Page 160

THE VIDEOGRAPHER: Off the record at 11:35.

(Short break.)

THE VIDEOGRAPHER: On the record at 11:48.

BY MS. RHEE:

Q. During all of these breaks --

A. Mm-hmm.

Q. -- I never want to actually know what, if anything, was said by counsel. So I -- before Mr. Teslicko jumps in and gives his warning like a broken record, I just want to be very clear, that is not what I'm asking.

A. Mm-hmm. Mm-hmm.

Q. But just for the record, want to be assured that during all of the breaks, are you talking about the substance of your answers?

A. No. We are talking about hiking.

Page 161

Q. Well, even there, I don't want to know what -- what, in fact, you're talking about, other than just making sure that the substance of your answers on the record are not the topic of discussion.

A. But before I answer your question, it was raised that I have confused the two names.

I told you, I'm really terrible with names. And if you look at my responses to your questions, I'm talking constantly about the GCP guy and his response. And I thought that his name was George Levitte.

And apparently that is not his name. His name is something else. Sam?

Q. Okay.

A. Let's go with Sam.

And so when you were asking all of those questions, I was thinking

Page 178

VP guy?
Q. Okay. That's --
A. All right?
Q. -- also on the product team.
A. On the product team. Yes. I do -- okay. Yeah. I do remember his -- I did read his deposition. Yes.
Q. Okay. You did read his deposition?
A. Yes. Mm-hmm.
Q. Okay. And if you read his deposition, were you aware that he also testified about this document?
A. Do I remember in detail that he talked about this document? No.
Q. How about just even generally?
MR. TESLICKO: Object to form.
THE WITNESS: No. I -- when I'm reading depositions,

Page 179

I -- I don't go and cross-reference all the documents that people are talking about.
There are things through the deposition -- well, I'm reading them for two reasons.
First of all, to figure out what is -- what is a deposition.
But, second -- but --
BY MS. RHEE:
Q. Fair.
A. -- second, I'm kind of looking for relevant information as it pertains to my decisions.
So, for example, in case of -- and I'm not going to ascribe it to Mr. Craycroft because I could be wrong about the name. But there is a VP of ads that basically estimates the size of his organization. And so that bit of

Page 180

information I remember because it is relevant.
MR. TESLICKO: Object to

Page 181

form.
BY MS. RHEE:
Q. Are you aware of an individual by the name of Glenn Berntson?
A. I have read Mr. Berntson's deposition.
Q. Okay. Yeah.
A. I am -- there is a reason why I remember Glenn's deposition. Yes.
Q. Okay. So you also know that he is on the product team?
A. He is on the product team, New York office, manager. Maybe director. But manager.
Q. And are you aware that he also testified about this document?

Page 182

A. I am -- I don't recall the part of his testimony as it pertains to this document.

MR. TESLICKO: Object to form.

Page 183

BY MS. RHEE:

Q. Okay. Are you familiar with an individual by the name of Noam Wolf?

A. I have heard the name Noam Wolf as well.

If -- if you could, again, put him in context, that would be fantastic.

Q. Also an engineer on the product team.

Page 184

A. On the product team. All right. All right.

Q. Do you remember reading his testimony?

A. Sitting here today, I don't remember anything specific about his testimony. Unlike Mr. Berntson -- Glenn, like, that one had a couple things that pop up at me.

But, no, I cannot recall specific parts of his testimony that would stand out to me.

Q. Okay. So, again, sitting here, you don't recall or know whether or not he also was shown this document and testified about it?

MR. TESLICKO: Object to form.

THE WITNESS: That is fair to say. Yes.

BY MS. RHEE:

Q. Okay.

Page 185

MR. TESLICKO: Object to form.

MR. TESLICKO: Object to form.

THE WITNESS: I have not analyzed the user consent to require user data.

I am -- I'll admit I'm slightly confused as how -- who is the user that you're talking about in this case and how it applies to the Ad Exchange.

And I'm not -- if you can clear up the context for me, I would be able to answer your question a little bit better, maybe.

BY MS. RHEE:

Q. Okay. But just sitting here today, you don't know about the role, if any, of a user in ad serving process?

MR. TESLICKO: Object to form.

THE WITNESS: No. I -- I would say that a "user" is a very loaded term here -- maybe loaded is a bad word.

But it can have multiple meanings.

When you say user, do you mean an advertiser? Do you mean a publisher? Who do you mean?

BY MS. RHEE:

Q. Okay. But you haven't come across the use of the term "user" in stat materials?

MR. TESLICKO: Object to form.

THE WITNESS: Sorry.

I have come across the use of that term, and I have used it -- I have found it in different contexts.

And so in different contexts, it was simply

referring to different user.

And -- and that's why I'm asking you for qualification -- for -- sorry -- for clarification, because it can mean a publisher.

You could reasonably say a publisher is a user of -- of DFP.

BY MS. RHEE:

Q. Okay.

A. But you could also reasonably say, no, that's not a user; it's the ad agency that the publisher is employing that is the user of DFP.

They are certainly not users of the -- of the buyer-side, right. So there you have advertisers, and they are the users.

And, unfortunately, the term "user" means different things in different contexts.

Q. Okay. You rely upon

Dr. Weissman's analysis, I think, as you put it, the analysis of the source code and data flow in AdX and DFP; is that right?

A. Yes. That is correct.

Q. Okay. What data flow do you believe Dr. Weissman reviewed in the source code?

A. So, genuinely, I would refer you to Dr. Weissman's document on this because he kind of defines the details.

But, for me, what was really important in his analysis were two things.

I've asked for specific information about the code base to verify that it still keeps the same characteristics that it had when I last worked in it, and that information was provided to me.

And --

Q. How was that provided to you when you didn't look at the source code yourself?

A. So it was provided to me -- I had access to Dr. Weissman's draft report before the first round of our report submittal.

So don't quote me on the date, but July.

MR. TESLICKO: Instruct you not to discuss drafts because they are carved out by the expert stipulation.

BY MS. RHEE:

Q. Are you going to follow counsel's instruction not to answer that question?

A. Yeah.

Q. Okay.

A. I'm sorry. But yeah.

Q. I had to ask.

Okay.

A. You're doing your job.

Q. I just want to make clear, since you did not look at the source code yourself, did you have access to anything that Dr. Weissman did that is not set forth in his final reports?

A. No. I have not relied on anything other than that -- other than Dr. Weissman's analysis and his report.

Q. Okay. So insofar as you make reference to relying upon Dr. Weissman's source code analysis --

A. Mm-hmm.

Q. -- that analysis is what Dr. Weissman sets out in his report and in his source code appendix; is that right?

A. That is correct.

MR. TESLICKO: Object to form.

BY MS. RHEE:

Q. Okay. And that's -- and

that's the total? There's nothing else?

A. I have also reviewed Dr. Weissman's reports themselves, in particular, portions that discuss what we have referred to -- that could be relevant to the things that we are talking about, Stage I and Stage II of DFP divestiture, because in those stages the -- he's discussing the ability to create APIs and the ability to cut out a code and open-source that portion of the code.

And I'm relying on his expert opinion that the code is -- it is possible to do those things.

Q. Okay. In particular, you seem to spend some time looking at what you referred to as Dr. Weissman's source code statistics; is that right?

A. That is correct.

Q. Okay. And what do you understand Dr. Weissman to have done to

put together his source code metrics that he sets out in his source code appendix?

A. So I have seen some of the statements that Dr. Weissman lists. He happens to use SQL to obtain this information.

For me, there are specific things that I have asked for about the code base, and I have obtained the information that I have asked for.

Q. Okay. Where do you set out what is the information that you asked for and the information you obtained?

A. Oh, in the table where I list the source code information. That's the information that I asked for. That's the information that I obtained.

Q. I see. So what you asked for were these source code metrics?

A. That is correct. Yes.

Q. Okay. I see. I see.

So what specifically did you ask for?

MR. TESLICKO: I'm just going to instruct you not to disclose the substance of any communications with Keystone or with counsel.

THE WITNESS: Mm-hmm.

So when I have worked at Google, I had an insight, and I was, you know, inside Google3, and I looked at some of the stuff.

And so what I'm looking for over here is, is the code base still what I would consider clean and healthy code base. And there are a couple of things that can tell you that.

Not a single line in that table by itself necessarily means much. But, in general,

you're looking at -- and, again, I make predictions about the code base before I get the confirmation.

So I would expect AdX to, for example, be smaller than all of the utilities.

Is that -- is that true? Yes, it is.

I would expect DFP, to a little bit, be -- be a little bit bigger than AdX but, again, smaller than utilities. Is that true? Yes.

So those kinds of things are consistent with my expectations.

But here are the other things that I want to see. Let's say you are talking about, as we are here, about C++ code base, and you find out that the

C++ code base has, I don't know, tens of thousands of files and they are all smaller than 25 to 30 lines of code. That would give me a pause.

What's going here. Like, why would anybody do this. And I would question what kind of code base I'm dealing with.

So these are sort of -- consider them health checks, right.

If you were to go to a doctor and they do a blood test and they look at the number of parameters, you look at it and say is this person healthy, and you basically make a decision that, yeah, this -- this is a healthy person.

Now, that really does not mean, necessarily, that the

person is not suffering from something you don't see.

But nine times out -- actually, I would say 99 times out of 100, it gives you a really clear insight in what you're dealing with.

And that is kind of -- the simple statistics can tell you how -- how clean is this code base.

And for me, it confirmed that Google has continued with their practice of being diligent and professional and strict about what they allow in and out of the code base.

BY MS. RHEE:

Q. Okay. We're going to go to the details of this --

A. Mm-hmm.

Q. -- table in a minute but --

A. All good.
Q. -- but based on your answer, I have some follow-ups for you.
A. Sure.
Q. You likened this to a health check.
A. I just did.
Q. Okay. Do you have either a textbook citation, a manual citation, an industry citation that lays out the kind of health check methodology that you just walked us through --
MR. TESLICKO: Objection.
BY MS. RHEE:
Q. -- where, you know, counting the number of files and lines of code is a way to do this kind of health check, where, as you put it, nine -- nine times out of ten it tells you helpful information about the person's health?
MR. TESLICKO: Object to form.

THE WITNESS: Understood.
So you can find tremendous number of discussions about this topic in particular lines of code.
I personally have totally objected when people have used lines of code in contexts that I felt were completely and utterly inappropriate for.
And you could also make an argument that, well, you're talking about roughly one-and-a-half-million lines of code for AdX. Can all of that code be rearranged so that the number of lines changes to be something a lot smaller? Absolutely.
You could rewrite all of the code probably

programatically so that the number of lines of code will be exactly the same as the number of -- number of files you're dealing with.
Because lines don't mean anything to the computers. They mean something to the programmers.
And so people can, and they do, make a very reasonable argument by saying, so lines of code are meaningless.
BY MS. RHEE:
Q. What -- do you cite to any of that literature?
A. No, I don't.
Q. Okay.
A. Because it's -- it's an ongoing discussion. And I think it's going to be -- I don't think it's ever going to be resolved. It is just one of

those philosophical topics where lines of code -- it depends on what you use the metric for.
You will find my work strongly objecting to industry benchmarks in performance testing.
And if you take it out of context, you would say, all right, so you're against benchmarks. Why did you then spend all of your time at Google wasting their money writing benchmarks. And, you know, it would feel that way.
I object to what people use benchmarks for. It -- benchmarks give you very useful information.
So in case of Google, benchmarks enabled my development partners to quickly find out. I write something that allows them early in the morning to look and say, did I make a giant performance blunder yesterday without realizing I was doing that.

That was the purpose of the benchmark. It was incredibly valuable.

Now, if you take that benchmark and you say, and this benchmark proves that the code for rightly is far better performed than the code for something else, I'm going to object to that. It wasn't written for that. That is not the purpose of that benchmark.

So in the discussion of lines of code, they can be both very useful and useless.

Okay. If a manager uses lines of code to promote people, like, I get hives. That is such a stupid statistic to use in that context. So if you use lines of code in that context, yeah, they are -- they are terrible.

But if you use lines of code and say, these are reasonable lines of code written by engineers who were

not trying to get promoted by just writing more lines and -- and roughly describe the size of the project, then that actually makes sense.

Q. I'm asking --

A. Mm-hmm.

Q. -- insofar as you think in this context --

A. Mmhmm.

Q. -- i.e., assessing timelines and complexity --

A. Mm-hmm.

Q. -- do you have any references to literature anywhere that says, looking at these kind of simple statistics --

A. Mm-hmm.

Q. -- is actually, as you put it, a good health check?

MR. TESLICKO: Object to form.

THE WITNESS: So I will

answer your question "no."

But I'm also not referencing GAM on the standards of C++ language. It's just C++, you know, so --

BY MS. RHEE:

Q. I know.

But I'm asking as a methodological matter, insofar as you're positing that this is a sound means --

A. Mm-hmm.

Q. -- to do a health check, can you cite to anything that supports that proposition?

MR. TESLICKO: Object to form.

THE WITNESS: I am certain I can find those references for you and would be happy to provide them for you.

BY MS. RHEE:

Q. Okay. But you don't have

it right now in any of your appendices?

A. No. I really didn't think we would be discussing such basic things that kind of a general agreement.

As I said, I also don't cite anything on the history and development of C++.

Those things are just, you know, building blocks. Let's call them building blocks of the whole process, so...

Q. Okay. Okay.

A. But if you would like me to, I will happily provide you with, you know, references for all of those things.

Q. Okay. Thank you.

MS. RHEE: Is now a good time to take a lunch break?

MR. TESLICKO: Sure. Let's go off the record.

THE VIDEOGRAPHER: Off the

Page 226

record at 12:44.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

A F T E R N O O N P R O C E E D I N G S

- - -

THE VIDEOGRAPHER: On the record at 1:23.

- - -

CONTINUED EXAMINATION

- - -

BY MS. RHEE:

Q. Okay. So we left off talking about this source code metric table.

Do you recall?

A. Yes, I do recall.

Q. Okay. So why don't we actually look at the -- no pun intended -- the source.

A. Mm-hmm.

Page 227

Q. I'm going to get what I hope is the Weissman Table 2, from his source code appendix.

MS. RHEE: Thank you so much, Anita.

(Document marked for identification as Bjedov Exhibit 3.)

THE WITNESS: Am I allowed to start looking at it?

BY MS. RHEE:

Q. Oh, yes, of course.

A. I wasn't sure.

Q. Of course.

What I'm directing your attention to, because I think you replicate it --

A. Mm-hmm.

Q. -- in your own report, is this Table 2 called "Source Code Metrics."

Do you see that?

Page 228

A. Mm-hmm. I do.

Q. Okay. And this is a running of a tool to basically do counts of each of these items, right?

A. Yeah. You can -- so Professor Weissman used the tools that he prefers.

I -- I would get the same numbers using standard Unix commands, provided that the repo is available through -- through Unix, which I think it is.

Q. It's a pretty simple -- you know, a tool or piece of code just to count.

A. Yeah. You count and grip, and -- yeah. But sure.

Q. Okay. And then what he's counting are the number of files --

A. Mm-hmm.

Q. -- classes, functions, and code lines for what he puts in these

Page 229

columns: Supermixer, BOW, AdX, and GFP. Fair?

A. That is -- that is correct. Yeah.

Q. Okay. And you see the count for this column titled "AdX" to be the complete count of source code associated with AdX?

MR. TESLICKO: Object to form.

THE WITNESS: I would say absolutely not.

This is really more of a -- you know, let's call it -- let's call it server-side stuff.

So I would not expect the front-end code to be written in C++.

And I would not expect to find it in this directory. It would be odd to do that.

BY MS. RHEE:

Page 238

pleasure of interacting with.

From the ability to just list files, which files are in this directory, ls, to the things like what is the name of the kernel that -- that you are running. You name ls-a.

All of those commands, they are a part of operating system, but they are -- let's say they are not the core part. They are not the kernel, but they are called utilities.

And so I'm talking about utilities of these things that you really need in order to provide the service you're providing. But they are not necessarily the part of your core.

So in case of AdX, you will say it's an exchange. Its core part is the exchange.

But, you know, it may realize -- so, for example, you can utilize in BOW for a lot of things. BOW

Page 239

is those utilities that basically removes some responsibility from AdX to allow AdX to be lean, mean, and operate cleanly. But AdX can call it and say, hey, give me this.

So a very, I would say, advanced or -- the right way to develop computer systems.

Q. Okay. But the upshot is, I think, based on your earlier testimony --

A. Mm-hmm. Mm-hmm.

Q. -- is it's your opinion that BOW and Supermixer need to be divested, along with what you're calling core AdX --

A. Mm-hmm.

Q. -- in order to provide the functionality that an acquirer would expect.

Is that -- have I got your testimony right?

Page 240

A. Very close.

I would say that there are certainly functions inside BOW and inside Supermixer. Supermixer is probably, again, most likely its own product. But certainly inside BOW, that the buyer would have to get the copy of.

All of them, I cannot tell you that, but certainly a fair number of it.

Because as you will see, BOW being the -- what's called the utility-type part of the code base, is larger than the rest of the stuff.

And so there could be parts in BOW that apply just to AdX. There could be parts that apply to just the DFP. There could be parts in BOW that support Supermixer itself. And there could be some parts that are used by all three.

But there could be other

Page 241

parts they use by one or two or -- there are probably even parts that are not used by anybody and haven't been removed from the code base for either historical or -- or, actually, strategic reasons.

So parts of it would have to certainly be provided to the purchaser to make AdX work.

The other parts, Google could reasonably say, well, this is not necessary to make AdX work, and, therefore, we are not going to be providing it.

Q. Okay. So would you consider BOW and Supermixer to be a dependency of AdX and DFP?

A. I would not use the term "dependency."

I would say that AdX relies on them, because they are really more -- they are kind of on the same level, if that makes sense.

And so they --

Q. It doesn't make sense.

A. All right.

Q. This is why I'm asking the question, because -- I mean, let's just level set.

You are familiar with, because you use it in your own report --

A. Mm-hmm.

Q. -- and certainly Dr. Weissman uses it in his, and you rely upon --

A. Mm-hmm.

Q. -- this notion of a dependency, right?

A. Absolutely. Yes.

Q. Okay. And how long a divestiture takes or your step of technical decoupling --

A. Mm-hmm.

Q. -- depends on both the number of dependencies and the

complexity of those dependencies, right?

MR. TESLICKO: Object to form.

THE WITNESS: Not exactly. That's a very -- because, again, the parallelization comes to the issue.

In the strictest technical term, you could really say that all four of these most likely depend on each other and call each other.

Now, do they call everything inside BOW? No --

BY MS. RHEE:

Q. No. Understood --

A. But some aspects of it, for sure.

Q. Right. But that's the reason why I'm asking.

What's the difference between how Dr. Weissman refers to, as a

dependency, and you refer to a dependency, and what you're describing here for Supermixer and BOW, which you do not call a dependency --

A. Mm-hmm.

Q. -- but instead call a related utility system?

A. So in my example, when I was describing UNIX, I wouldn't say that UNIX kernel depends on utilities. It's just they -- they are -- there is kernel, there is utilities, but they are one, right?

And even though you could separate them by code base, you compile them differently and separately and so on, they -- from the computer science standpoint and from the practitioner standpoint, you would never -- I don't think any engineer would say, oh, when I say UNIX, I mean UNIX kernel, and I think UNIX Utilities, right, is

dependencies.

We just say UNIX. It's the product. It's the kernel. It contains all of the utilities. We use it as one.

Q. Yeah. But when we're talking about UNIX here, we're talking about internal Google infrastructure and its product --

A. Product.

Q. -- source code.

A. Mm-hmm.

Q. So here I just want to be clear --

A. Mm-hmm.

Q. -- about what your testimony is.

Your view is that BOW and Supermixer, vis-à-vis AdX and DFP, are not dependencies.

MR. TESLICKO: Object to form.

THE WITNESS: I would call

missed it, personally, I would be absolutely stunned.

And based on Professor Weissman's credentials, expertise, and his work, I see no reason to even contemplate that hypothetical.

You are suggesting that he doesn't have the -- truly, the basic level of competence.

To give you an example of how easy it is, I literally would have to say, "Grab AdX recursively," and I'm going to get the whole thing.

And I personally cannot imagine scenario in which an expert of Professor Weissman's caliber would be unfamiliar with that.

But if you -- if you can show me that, obviously, it

would change how I look at the stuff, because, then, information that I have been relying on is inaccurate.

BY MS. RHEE:

Q. Okay. So if it turned out Professor Weissman did not do what you're suggesting, which is run the tool at the top level of each of these folders, but, instead, he actually went to each of those folder paths and then ran the count within each folder, what would be your response to that methodology?

A. My --

MR. TESLICKO: Object to form.

THE WITNESS: My response would be that I've seen parts of the tools that Professor Weissman is using and they are different than the ones I would

use.

I would say that this is his area of expertise and not mine, and so, frankly, I'm looking forward to the opportunity to find out why he wouldn't use the things that I would use. But it's also been six years since I last have done it.

But I would be -- between the two of us, I would trust his tools more than I would trust mine, and I know that my tools would answer this in, like, split second.

So on this topic, he is the expert, and I'm just, you know, a random person down the street.

BY MS. RHEE:

Q. So if it's Professor

Weissman's testimony that this Table 2 is not meant to represent all of the available files or directories associated with AdX or DFP, how useful is it to you in your health check?

A. Very useful, because keep in mind that I am not using this table to say, oh, there is 400 -- sorry -- 4,659,000 lines of code. That's not -- that number is irrelevant.

I'm looking for the patterns. I am -- these numbers inform my decision on is this code base what I would expect a Google3 code base to behave like and look like.

Q. I just want to pause --

A. Mm-hmm.

Q. -- because, at least in earlier testimony, you told us the reason why this was relevant to you --

A. Mm-hmm.

Q. -- is because the numbers

in the columns for BOW and Supermixer --
A. Mm-hmm.
Q. -- are bigger than the numbers in the columns for AdX and GFP.
MR. TESLICKO: Object to form.
BY MS. RHEE:
Q. Fair?
A. No. I told you that what I'm looking for -- those are some of the numbers that I'm looking for.
I'm looking to identify utilities, and I know that the utilities will be bigger than the other files and so on.
Q. Well, you're looking to see if they are going to be bigger --
A. Yes.
Q. -- than the files, as you put it, for AdX and DFP.
A. That is correct. Yes.
Q. Okay. So if it turns out

that, because what Dr. Weissman did in order to get to the counts for the columns associated with AdX and DFP are incomplete, and you don't actually know what those numbers are, how can you do the comparison of what those actual numbers are, to the numbers for the related utilities?
MR. TESLICKO: Object to form.
THE WITNESS: So Professor Weissman used a process and a methodology to obtain these numbers.
My starting assumption is that Professor Weissman did not intentionally try to deceive the court and has relied on his expertise, so he has used exactly the same process in all four of these directories.
And, you know, maybe you

have information that shows otherwise, but this is my working premise.
His analysis may have been incomplete, but it's going to be incomplete in that case.
And -- and I do want to say, this is your stipulation. The parameters that I disagree with, it's going to be incomplete in exactly the same way in all four of these --
BY MS. RHEE:
Q. Well, you don't know that, sitting here, right, because you don't know -- because you don't know what's contained underneath each of these top-line directories, or, I guess, they are referred to as top-level folders, how many folders are associated with BOW and Supermixer that are not part of these particular folder paths that

Dr. Weissman describes, right?
MR. TESLICKO: Object to form.
THE WITNESS: So the issue here is the process, right.
He is doing the process, trying to identify these files. Let's assume that that process -- and, again, I disagree with this hypothetical strongly.
And I am not trying to at all suggest that Professor Weissman would make this mistake, because I don't -- if you look at his credentials and so on, as far as I'm concerned, he is the expert in this area.
But, even, let's say, entertaining your hypothetical, he's using a process, and that process will produce the same

Page 266

type of an adder in all four of these columns.

And what I'm looking for is things between them and things even around the columns, ratios, total numbers, and so on, to inform my opinion.

So if you could give me any sort of description of what kind of mistake could you be thinking about that -- that we could do, even, you know, me, if I were doing this, that would somehow make the mistakes in AdX column but would leave the remaining three correct, or the other way around, I can't -- I cannot imagine what that would be.

You know, it's -- it's the same code. It's doing what you tell it to do, and it's doing it

Page 267

on all four of these, you know, at the same time.

BY MS. RHEE:

Q. Okay.

A. But I do want to say, he is the expert. I look at his credentials. And I go, like, this is a very low-level task. It would be impossible for an expert of his caliber to make -- you know, to make a mistake in that particular field.

Q. Okay. You can put that aside.

In your opening report, you conclude that Google's operational separation for DFP and AdX -- I'm sorry.

You talk about how AdX and DFP already have operational separation.

Do you recall that?

A. Yes, I do.

Q. Okay. I'm going to actually --

Page 268

MS. RHEE: Let's mark for this deposition Exhibit 4, which is your opening report.

THE WITNESS: All right. I have a copy of it, so --

BY MS. RHEE:

Q. Well, I'm going to give it to you.

A. All right.

Q. Because we have to have a marked copy.

A. No problem.

(Document marked for identification as Bjedov Exhibit 4.)

BY MS. RHEE:

Q. All right. So I'm going to direct your attention to Page 47, Paragraph 116.

And you can keep me honest. These are your words in your report.

"Google distinguishes

Page 269

between 'AdX Serving' and 'DFP Serving,' which reflects operational separation in service deployment and management."

Yes?

A. Yes.

Q. Okay. From your report?

A. Mm-hmm.

Q. And those are your words?

A. Yes.

Q. You wrote those?

A. My team and I worked together, but I proofread and approved every word in the -- in the whole report.

Q. Okay. So even if they aren't your words, you approved of them?

A. No, no, no. The words are mine with the exception of articles, which you have probably noticed all of those were more or less added by somebody else who English-proofread the paper.

form.

BY MS. RHEE:

Q. You -- you didn't look at, for example, internal Google documents at that time. Okay.

COURT REPORTER: You have to answer out loud. Sorry.

THE WITNESS: No, I didn't.

BY MS. RHEE:

Q. Okay. Just based on your answer, I want to understand, in your thinking about dependencies --

A. Mm-hmm.

Q. -- in your first stage of coming up with your expectation about the number of dependencies there would be and how long it would take to replace them.

A. Mm-hmm.

Q. Did you look at and/or rely on Professor Weissman in your Stage I

process?

A. No.

MR. TESLICKO: Object to form.

BY MS. RHEE:

Q. Okay. That's very helpful. I see.

So your reliance on Professor Weissman is in your, as I think you put it, pressure testing, or testing of your Stage I opinion?

MR. TESLICKO: Object to form.

THE WITNESS: I would say it is during the step where you refine your opinion.

Again, AdX is an Ad Exchange.

I have actually, firsthand, worked on complete migration, partially write and just a whole mess of an Ad

Exchange.

And so I have a reasonable starting point to say, I know how many dependencies I should be dealing with here.

And I make my own estimates around that, and I do my work related to that.

BY MS. RHEE:

Q. And you did all of that without looking at or relying on Professor Weissman or any of his work?

A. That is correct.

Q. I see. Okay.

And then I take it from your answer, when you got to the point where you looked at Professor Weissman's opinion and his work, it confirmed for you your initial assessment and your expectation.

Is that -- have I got that right?

A. That is fair to say. We were roughly talking about, let's say, the same -- certainly, the same order of magnitude.

Q. I see.

Okay. But you didn't need him or rely on him to get to your original estimates?

A. No.

MR. TESLICKO: Object to form.

BY MS. RHEE:

Q. Okay. And you got to your original estimates -- I just want to understand -- again, based on your own experience?

A. My personal experience with migrating a similar-type product or -- you can even call it the same, but probably not the same.

Q. Okay. Which product is that?

Page 290

A. That's the Facebook's ad exchange that, if you will see, in 2011, Facebook got to the point that the existing ad exchange product, indexers and finders, were no longer performing for the needs of the company.

And so we had a complete redesign and migration that had to be done in parallel, in order to be able to continue growing the ad revenue for the company.

And I was the only performance and capacity engineer involved in that whole product.

Q. Okay. And so that's the experience that you relied upon in making your original estimates?

MR. TESLICKO: Object to form.

THE WITNESS: That is the experience I called on. One of the things that I've done in the

Page 291

past but certainly not, you know, the only.

It's -- I would say it's the closest. But there are, you know, other things that you get involved with that you can reasonably say they may not be ad exchange but they will require the same dependencies.

BY MS. RHEE:

Q. Okay.

MS. RHEE: Why don't we take a quick break.

MR. TESLICKO: Great.

THE VIDEOGRAPHER: Off the record at 2:18.

(Short break.)

THE VIDEOGRAPHER: On the record at 2:32.

BY MS. RHEE:

Q. Okay. New topic.

Your migration plan assumes

Page 292

that AdX and DFP will be migrated first to the Google public cloud?

A. I am proposing what I would call one reasonable option, but I'm not saying that other people could not come up with other reasonable options that, you know, go to different destination and so on.

Just one reasonable option, and in my option, I propose going to Google public cloud, yes.

Q. Okay. And that option that you put forth --

A. Mm-hmm.

Q. -- which is that AdX and DFP first get migrated to the Google public cloud, that impacts your estimated timelines that you put forth for all of the downstream steps, right?

MR. TESLICKO: Object to form.

THE WITNESS: Yes and a

Page 293

no.

The reason why I suggest you should go -- you should consider going to Google public cloud is because I have guarantee that I will have expertise available on Google public cloud and, obviously, on Google public -- private cloud available to me at the time of divestiture.

If, for example, let's say Amazon were to decide and be a buyer -- and this is me just picking a person out of thin air. I have no idea if they are in any way, shape, or form, one -- but they are the owners of their own cloud, right. So they are the owners of AWS and S3.

And so if a potential

And --

BY MS. RHEE:

Q. You mean a software engineer?

A. Software engineer from the product team, yes.

And you should be able to get this done in a couple of days.

Q. Okay. I just want to --

A. Mm-hmm.

Q. Thank you for the clarification.

A. No problem.

Q. I am not an engineer, so I now want to just clarify.

Your testimony today is that you believe you really just need one performance engineer, one site reliability engineer, and one software engineer from the product team working over a couple of days?

A. Yeah. To get this done.

Q. Okay. And this is the first stage of your migration plan that you labeled "Deployment Analysis"?

A. "Deployment Analysis," yes.

Q. Okay. All right.

And the second stage of your --

A. Mm-hmm.

Q. -- four-stage migration plan you call "Technical Decoupling," correct?

A. Correct.

Q. Okay. And that's the stage of your migration plan that you believe will take the most amount of time, correct?

A. That is correct, yes.

Q. Okay. And that stage is evaluating the replacements for all of the dependencies for AdX and DFP and then choosing the best replacement options?

MR. TESLICKO: Object to form.

THE WITNESS: No. What -- what you're doing in that stage is -- so you have found the systems that you are relying on and you need to replace.

Not only are you picking a system that you will be eventually replacing it with, but you actually are doing the cuts.

You are -- in the first stage -- and how I would suggest that they do this -- is basically write a simple passthrough calls, and so you -- you kind of add a layer. You can call it a mock, if you like.

And in the first stage that thing does nothing but passes through the call that

will then go to whatever is still currently the system supporting AdX in a Google private cloud.

Once you have identified all of those, let's say, for database, because that is the one that I believe should start first, the -- the first thing that I would do is verify did we really identify all of those correctly.

And now because all of the calls are going through the mock, that is relatively easy to do.

I sort of disable the mock, and if the database is still getting calls from me, that means that there are places that I've missed them, and I have to go and find them as well

and redirect them to go to my mock implementation of the call, which is doing nothing but doing the passthrough.

At this point in time, I have all of the database calls listed in one place and available to me.

And, hopefully, by this point in time, we have decided to -- as to what is going to be our replacement.

But let's say we haven't. This would be a great place and opportunity to say, you know, let's -- let's speak to different replacement candidates. And we have all of this code in front of us. Let's just write substitute APIs for two different databases, if that's what we are choosing.

But this is also a place that, if you have a buyer already identified, you can get their input on what is the replacement system they would like.

And, fundamentally, you just have to rewrite those APIs.

BY MS. RHEE:

Q. Okay. And sitting here today --

A. Or API calls.

Q. Sitting here today, what is your opinion about how long this step or stage in the -- your four-step migration plan, it would take?

A. So I have given that stage eight months, and I -- when I make these kinds of determinations, in general -- I've been called a pessimist, so just so you know.

But the way I look at

making my time estimates is, honestly, how would I feel if somebody told me, do this in this amount of time. And if I would feel like, ooh, that's -- that's tight. It's possible but tight.

That is not going to be the estimate I'm going to give, because I don't think -- I don't think that's fair to the engineers who are tasked with the job.

And so the way I come up with something like eight months is, of all the systems that we have talked about, F1 is going to be the most complex replacement, in my opinion.

I would be surprised if I'm wrong about that.

You know, if there are some other databases that they are calling, they will be really small compared to the -- to the F1 stuff.

And so I look at it, and I

say, given the size that I have been told about the system, how much time would it take to migrate a database of that size into the new environment.

And luckily, I know exactly how long that's going to take, because I've done that, let's see, 2011, 2012, 2013, 2014, 2015, skip '16, '17 and '18. So I've done it seven times in my life.

And so I know -- and, actually, it's a bigger database than what we are talking here. And --

Q. For each one of those years, you've migrated a bigger database than what we are talking about here?

A. Yes. At the time of this stuff. I migrated -- each one of those years that I gave you, Facebook opened a brand-new data center region, and when you are opening a brand-new data center region, you have to migrate the whole database.

And Facebook, I'm assuming even today, has the largest MySQL database in the world. And it certainly had it during those years. And I had to make sure that that migration happened, and that when I said it was done, it actually was up and running, and the rest of the data center could come online.

Q. Okay. So I just want to make sure I understand.

A. Mm-hmm.

Q. In each of those years, the example that you're given --

A. Mm-hmm.

Q. -- giving as the basis for your opinion is, at Facebook, in each of those years, there was a new data center that came online?

MR. TESLICKO: Object to form.

THE WITNESS: A new data

center region. There were many data centers coming online. But in those years, a whole new region was coming online, and, therefore, you had to migrate.

When just the data center comes online, you don't necessarily migrate the database, because just when -- but when the whole new region, a new space that you weren't in before, then you actually have to move the database into that space.

BY MS. RHEE:

Q. Okay. And when you're using these examples of new regional data centers coming online --

A. Mm-hmm.

Q. -- are you talking about a software migration or a hardware migration?

A. Both.

Q. Okay.

A. I mean, that's -- so you're building -- you're building a new data center.

You are doing new power. You're doing new networking.

Q. I -- I --

A. Bringing the machines. Everything is new. All of the hardware is new.

And then once you have the hardware and the hardware has been energized, now you can start moving the different parts of the system.

And database is the first part that you start with because it takes the longest. And so --

Q. I just want to make sure I understand.

A. No problem.

Q. Yes, you are moving

software, because you're moving data?

A. Mm-hmm.

Q. But are you making any changes to the software that you are moving?

MR. TESLICKO: Object to form.

THE WITNESS: When you say -- so -- so you're making a lot of changes to the configuration files that we have been talking about earlier.

But you are not changing the database itself.

BY MS. RHEE:

Q. Okay. That's what I wanted to understand.

A. Yeah. No problem.

Q. And -- okay. So that's Stage II of your migration plan.

A. Mm-hmm.

Q. You think it will take no

very early stages of rolling out a bespoke replacement for Memcached called TAO. That was really a breakthrough cache for social network-type applications.

And so Instagram is using Memcached, and -- and basically comes into Facebook infrastructure. And I remember us provisioning them with servers to run Memcached.

But they immediately also decide that they wanted to switch to TAO. And one of the instructions that we had was to basically enable Instagram to be successful and to be happy, and we really wanted them to just feel welcome at Facebook.

And so they were what's called "speed line." And so

they start swapping to TAO.

I don't, as an infra engineer, consider that a part of migration. To me, that is a part of product upgrade.

And, yes, it does add some time to the whole thing. But I would consider that systems replacement made by the choice of the product team that were not necessary for the migration to be completed, but that they added time to the migration itself.

BY MS. RHEE:

Q. Okay. You talk about specific Facebook examples that you participated in, because the Instagram example, I take it, you did not participate in?

A. Oh, I --

MR. TESLICKO: Object to

form.

BY MS. RHEE:

Q. Oh, you did?

A. Oh, yeah. I mean, pretty much if it happened at Facebook between, let's say, 2011 and 2015, and it involved servers and hardware and the data centers, I was --

Q. You were involved?

A. Yeah. I was giving those servers out. They had to come through me.

Q. Okay. So -- so it was in that capacity you were involved in the Facebook AdTech stack improvement or upgrade?

A. So in both of these cases, and I'm -- honestly, I haven't verified, but lead PE for integration was a gentleman called Chris Bray.

And so, you know, I worked very closely with him during that time

to make sure that the whole thing happens.

Q. I just want to understand. What do you mean by "lead PE"?

A. So, you know, on something like migration, like Instagram migration, you will have multiple production engineers. They are the equivalent of Google SREs. And you're not going to have just one. You will have multiple ones working on it.

And Chris was, from my perspective, the main lead, let's call it SRE, to state it in the terminology, for Instagration. And he is the person that I work with during -- you know, during that time. I spent probably half of my work time working with him on just making sure that what he needs, he gets.

Q. Okay. So it was in Instagration, you were making sure Chris --

A. Mm-hmm.
Q. -- got what he needed?
A. Correct. To make Instagration happen.
Q. Okay. So the things he might need are things like servers?
A. Oh, absolutely. Servers. But also -- you'd be surprised, but -- because you were going to transition to ads. And ads is in particular about this.
With ads, it isn't just give me a thousand servers. Ads can be incredibly picky about, I want a thousand servers right here. And "right here" could be a place where all of my servers are gone and are doing other things.
It could be, you know, a data center that has been around for a while. It could be a place that I'm actually planning on completely

decommissioning.
And it is still my job to give ads whatever they ask for because, frankly, they pay my salary. So I -- I'm -- have a pretty good incentive to make sure that they continue doing what they are doing.
Q. Okay. So in the AdTech stack migration, it was a similar role, where whoever was the lead production engineer --
A. Yes. In that case, yeah, different person.
Q. Okay. Who was that?
A. Jack Pan-Chen, JPC.
Q. It was to give JPC what he specifically needed, for example, however many servers in the middle of Europe?
A. You know, you wouldn't go to middle of Europe. You would want to go north, where it's cold, but it's a

different story.
Q. Okay. Okay.
A. But yeah.
Q. A thousand servers in Norway?
A. You're very close. Sweden.
Q. Okay. Okay.
A. They're really close.
Q. Okay.
A. But, yeah, you know, if -- if -- so for Facebook, which is slightly different, obviously, than Google, but the structure is you have what we have called News Feed, which is the middle thing, why people come to Facebook. Or they used to. Now it's the ads feed, you know.
And so you give the machines to that. That is my Number 1 priority.
Second priority is ads, because we have to pay the bills for all

of this stuff.
And then after that, all the other projects come and go, and, you know, you have Instagram come in and suddenly Instagram becomes this, like, wow, you're really valuable property. And, you know, they start climbing up the stack. And I want Instagram to be roughly on the same level as the Big Blue. But you do have this priority.
At Google, that priority is search. You take the Search away, the -- you know, people are not just going to come to see ads. You have to put Search above everything else. And then you put ads.
And now you're looking at maybe Gmail as another, you know, viable thing that you have to watch out for.
You know, at Facebook there are other products. They also make some money and so on. But you have to take