# EXHIBIT 1

# REDACTED

1

```
1        IN THE UNITED STATES DISTRICT COURT.
        FOR THE EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION
                    -  -  -
3
    UNITED STATES, et al., :
4                         :  NO.
           Plaintiffs,    :  1:23-cv-00108
5                         :  -LMB-JFA
           v.             :
6                         :
    GOOGLE LLC,           :
7                         :
           Defendants.    :
8

9          - HIGHLY CONFIDENTIAL -

10               -  -  -

11          August 27, 2025

12               -  -  -

13          Videotaped deposition of
    GORANKA BJEDOV, Ph.D., taken pursuant to
14  notice, was held at the Department of
    Justice, 450 9th Street, NW, Washington,
15  D.C., beginning at 9:05 a.m., on the
    above date, before Michelle L. Ridgway, a
16  Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
17  Realtime Reporter, Certified Court
    Reporter, and Notary Public.

18

19               -  -  -

20

21

22
```

United States v.
Google

Case 1:23-cv-00108-LMB-JFA     Document 1735-1     Filed 09/12/25     Page 3 of 46

Goranka Bjedov
August 27, 2025

Highly Confidential
PageID# 119002

Page 10

1          All counsel will be noted
2   on the stenographic record.
3          The court reporter is
4   Michelle Ridgway, also with
5   Lexitas.
6          And would you please swear
7   in the witness.
8          (Witness sworn.)
9                 -  -  -
10          ... GORANKA BJEDOV, Ph.D.,
11   having been first duly sworn,
12   was examined and testified as
13   follows:
14                 -  -  -
15              EXAMINATION
16                 -  -  -
17   BY MS. RHEE:
18     Q.    Good morning.
19     A.    Good morning.
20     Q.    I want to start off by
21   asking whether or not you've ever been
22   deposed before.

Page 11

1     A.    Never.
2     Q.    Okay.
3     A.    Sorry.
4     Q.    Lucky you.
5     A.    Yeah.  Depends on how you
6   look at it, but...
7     Q.    Okay.  Given that, just
8   want to go over some basic ground rules.
9   I'm sure they've already been covered,
10   but just on the record --
11     A.    Of course.
12     Q.    -- I will be asking you
13   questions.
14     A.    Mm-hmm.
15     Q.    I need you to wait for me
16   to finish asking the question, and then
17   I will wait for you to answer, then back
18   and forth.  Okay?
19     A.    Makes sense.  Yes.
20     Q.    Okay.  Let me begin by just
21   asking about your background.  Okay?
22     A.    All right.

Page 12

1     Q.    Okay.  So I think I
2   understand your undergraduate degree is
3   from Purdue University; is that right?
4     A.    No, that is not correct.
5          My undergraduate degree is
6   from University of Zagreb.
7     Q.    Okay.
8     A.    Z-A-G-R-E-B.  Currently,
9   the capital of Croatia.  But it was
10   obtained during the time of Yugoslavia.
11     Q.    Okay.  And that was a
12   Bachelor of Science?
13     A.    By American standard, it
14   would be actually considered Bachelor's
15   of Engineering.
16     Q.    Okay.
17     A.    But when it was translated,
18   I didn't know, so it was translated as
19   Bachelor's of Science.  It was a
20   five-year degree, basically.
21     Q.    In engineering?
22     A.    In engineering and with

Page 13

1   thesis.  Yes.
2     Q.    Okay.  And it was civil
3   engineering; is that right?
4     A.    That is correct.  It was
5   civil engineering, yes.
6     Q.    For those of us who do not
7   have an engineering background --
8     A.    Mm-hmm.
9     Q.    -- how would you describe
10   what civil engineering is?
11     A.    So civil engineering is an
12   oldest area of engineering, and it
13   concerns itself with things like -- you
14   have several different subfields, so I'm
15   going to go through those.
16          For example, you have
17   probably the oldest one is the -- what
18   we call the static subfield, and that
19   one concerns itself with building
20   structures, like buildings.  To a lesser
21   extent, bridges.  But you're talking
22   about large buildings.

United States v. Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/12/25    Page 4 of 46
Highly Confidential
PageID# 119006
Goranka Bjedov
August 27, 2025

1    You have fluid mechanics,
2  which happens to be my subfield of
3  specialization.  And that one really
4  concerns itself with everything related
5  to not just, you know, water and sun,
6  but also things like air, you know,
7  basically fluid motion, fluid movement,
8  and is highly computational field.
9    Then you have the third
10  field that is -- depending on where you
11  -- how you call it, but let's -- let's
12  call it traffic engineering.  These are
13  the people that focus on roads,
14  airports.
15    In my system, in my world,
16  traffic engineering did not involve
17  things like, you know, traffic lights
18  and directing the traffic but just
19  really building things that are related
20  to that.
21    Then you have, for example,
22  geotechnical engineering, which is also

1  highly computational, and that one is
2  involved with all aspects of all of our
3  structures, everything that we built
4  stands on the ground.
5    And the ground is a fairly
6  complex mix of many particulate and
7  nonparticulate soils.  And so
8  geotechnical engineering, their job is
9  to tell you what you're really standing
10  on, what can you expect of your
11  substrate to give you so that you can
12  then build the appropriate foundation
13  and things like that.
14    They also have a
15  subspecialty, especially in California,
16  earthquake engineering.  So earthquake
17  engineering would be a subfield of
18  geotechnical engineering, and so those
19  two fields obviously also highly
20  computational.
21    I think that pretty much
22  summarizes the whole field, yes.

1    Q.    Okay.  That's super
2  helpful.
3    And after you received your
4  undergraduate degree in Croatia, it
5  looks like you came to the United
6  States; is that right?
7    A.    That is correct.  I came to
8  the United States.
9    Q.    Okay.  And you got a
10  Master's of Science in civil engineering
11  from Clarkson University?
12    A.    That is correct.
13    Q.    Okay.  And, again, was your
14  subspecialty at that time fluid
15  mechanics --
16    A.    Computational fluid
17  mechanics, yes.  Correct.
18    Q.    Okay.  Okay.  And then you
19  stayed at Clarkson, it looks like, and
20  you got a Ph.D. in engineering science;
21  is that right?
22    A.    That is correct.  Yes.

1    Q.    Okay.  And, again, was the
2  specialty of fluid engineering?
3    A.    It was computational fluid
4  mechanics.  Yes.
5    Q.    Okay.  And then after that
6  it looks like you went to Purdue and got
7  a Master's of Science; is that right?
8    A.    That is also correct.  Yes.
9    Q.    Okay.  And at that point,
10  that's when you studied computer
11  science?
12    A.    No.  That -- that is
13  incorrect.
14    Q.    Okay.
15    A.    You started with my
16  undergraduate degree.
17    Q.    Yeah.
18    A.    Prior to my undergraduate
19  degree, my undergraduate -- sorry -- my
20  high school education was in computer
21  science, and in particular, in
22  informatics.

| Page 18 |
|---|

1 And so I started
2 programming when I was 13.  I went to
3 the high school for informatics.  By the
4 time I was 18, I was a little bit burnt
5 out of coding, and so I decided to study
6 a different field of engineering.
7 And -- but throughout all
8 of my studies, you really can't get a
9 master's these days, or even a Ph.D.,
10 without coding.  And so I'm continuing
11 to code and program.
12 But during this time, also,
13 the whole space develops tremendously.
14 You start getting new programming
15 languages and so on.
16 And so by the time that I
17 get a job at Purdue as a faculty
18 teaching program to engineering
19 students, I have decided to basically
20 take a formal look at the field that
21 I've been in for a long time and, you
22 know, bring my knowledge to the level

| Page 19 |
|---|

1 that I felt it should be.  And so that's
2 when I get my master's in computer
3 science.
4 You will note that that
5 master's was not thesis master's.  I was
6 mostly interested in coursework.
7 Q.  Okay.  That's very helpful.
8 And that is the sum total
9 of your educational background; is that
10 right?
11 MR. TESLICKO:  Object to
12 form.
13 THE WITNESS:  So, no, not
14 really.
15 When you are faculty, you
16 receive a lot of additional
17 training.  I'm not sure how much
18 detail you want to go into.
19 BY MS. RHEE:
20 Q.  Yeah.  Let me -- let me
21 rephrase the question, then.
22 Do you have any other

| Page 20 |
|---|

1 degrees, other than the ones we covered?
2 A.  No, I do not have any
3 degrees, additional.
4 Q.  Okay.  Okay.  And then your
5 teaching experience, I take it, was when
6 you were at Purdue; is that right?
7 A.  I have teaching experience
8 at Purdue, but I've actually been
9 instructor in the last two years of my
10 Ph.D. at Clarkson.
11 So as an instructor you
12 also teach classes, and so I -- I've
13 done that at Clarkson as well.  So I
14 have two years of teaching experience
15 there and then seven years of teaching
16 experience at Purdue.
17 Q.  Okay.  So let me just put
18 some dates to that.
19 A.  Sure.
20 Q.  Your teaching experience at
21 Clarkson was in the last two years of
22 your Ph.D.?

| Page 21 |
|---|

1 A.  That is correct.
2 Q.  Okay.  So that's 1990 to
3 1992?
4 A.  No.  It is 1989 to 1991.
5 Q.  Okay.  Thank you.
6 And then your seven years
7 of experience at Purdue, what are those
8 years?
9 A.  Those are 1991 to 1998.
10 Q.  Okay.  And what was your
11 title when you were teaching at Purdue?
12 A.  I was -- at Purdue I was --
13 for most of the time, I was assistant
14 professor.  But for the last year, I was
15 associate professor.  I don't remember
16 the exact time on when I was promoted to
17 associate, when I got tenure.  But I --
18 probably '97 -- '97, most likely.
19 Q.  Okay.  And this was in the
20 School of Civil Engineering?
21 A.  No.  This was in the
22 department -- well, actually, yes, it

United States v. Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/12/25    Page 6 of 46
PageID# 119056

Highly Confidential

Gokranka Bjedov
August 27, 2025



Page 34

1    guess the middle of 2010 through
2    February of 2019, you were at Facebook?
3        A.    That is correct as well.
4        Q.    Okay.  And your title at
5    Facebook was a performance and capacity
6    engineer?
7        A.    That is correct as well.
8    Yes.
9        Q.    Okay.  And since February
10   of 2019 --
11       A.    Mm-hmm.
12       Q.    -- where have you been
13   working?
14       A.    I haven't.
15       Q.    Lucky you.
16       A.    You know, I would like to
17   invite all of you to join me.
18       Q.    That sounds delightful.
19       A.    So to answer your question,
20   since February '19 I have been mostly
21   hiking around the world.  So I've hiked
22   two different caminos.  I've just

Page 35

1    finished Tour du Mont Blanc.  I've done
2    the Inca Trail.  I happen to spend a lot
3    of my time hiking.

Page 36

Page 37



United States v.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/12/25    Page 8 of 46
PageID# 119056

Highly Confidential

Gordana Bjedov
August 27, 2025

Page 42



Page 44

```
1            substance of any communications
2            with counsel.
3                 THE WITNESS:  Yeah.  So,
4            basically, I was contacted by
5            the plaintiffs, and we discussed
6            things, and I decided to accept
7            their request to help them put
8            together my -- my report.
9   BY MS. RHEE:
10           Q.   Okay.  And when was that?
11           A.   First contact was about two
12  years ago.  Yes, two years ago.  Summer
13  2023.  But then nothing really happened
14  until -- I think we finished all the
15  paperwork in, like, January of 2024.
16  Don't hold me on the -- but, roughly,
17  that timeframe.
18           Q.   Okay.  Okay.  At the time
19  that Plaintiffs contacted you, you had
20  not done any expert work before; is that
21  right?
22           A.   That is correct.  Yes.
```

Page 43

```
2            Q.   This is very helpful.  I
3   appreciate the clarification.
4                 And since February of 2019,
5   you have been -- is it fair to say
6   retired?
7            A.   Yes.
8            Q.   Okay.
9            A.   I consider myself retired.
10  Yes.
11           Q.   Okay.  How did you come
12  about being retained in this case?
13                MR. TESLICKO:  I just
14           remind the witness not to
15           disclose the substance of any
16           communications with Plaintiffs'
17           counsel.
18                THE WITNESS:  So I was
19           contacted by the plaintiffs and
20           asked if I felt that I could --
21                MR. TESLICKO:  Just remind
22           you not to disclose the
```

Page 45

```
1            Q.   Okay.  Do you know how
2   Plaintiffs found you?
3                MR. TESLICKO:  I just
4            remind the witness again not to
5            disclose the substance of any
6            communications with counsel.
7                THE WITNESS:  I actually
8            don't, no.
9   BY MS. RHEE:
10           Q.   So you got a call out of
11  the blue, at least from your
12  perspective?
13           A.   From -- from my
14  perspective.  And I can even describe
15  the situation.  I got an e-mail while I
16  was on one of my trips, and I'm --
17           Q.   And you went to an internet
18  cafe and got some Wi-Fi.
19           A.   -- as you can imagine that
20  it impacted that particular day, and --
21           Q.   Where were you?
22           A.   I was in Croatia at the
```

Page 46

1  time.  I was, actually, after my trip,
2  with my mom.  That's why I remember the
3  timing.
4          And -- and so I responded
5  to that particular e-mail, and, you
6  know, obviously this is your world.  And
7  for maybe for all of you, this would be
8  like, well, you know, it's just DOJ.
9  For me it's like, oh, my God, what did I
10  do now.
11          And -- and so we set up the
12  time to talk on the phone, time
13  differences being what they are.
14          We ended up talking, and,
15  obviously, that communication, my
16  understanding is it's protected.  And
17  so --
18      Q.    I got it.  Okay.
19      A.    Mm-hmm.
20      Q.    Have you been retained in
21  any other case to provide expert work?
22      A.    No.

Page 47

1      Q.    Okay.  So this is the one
2  and only?
3      A.    This is my one and only,
4  yes.
5      Q.    Okay.  Based on that, I
6  take it you've never put yourself up as
7  a testifying expert before?
8      A.    So there was one situation
9  where I was specifically requested by a
10  congressperson from Indiana to be
11  provided by Facebook to testify in
12  Congress hearings.
13          Not sure whether you
14  consider that or not, but there -- there
15  was that particular experience as well.
16      Q.    Okay.  And did you actually
17  testify before Congress?
18      A.    I was present at the
19  hearings.
20      Q.    What does it mean to be
21  "present at the hearings"?
22      A.    So they had hearings --

Page 48

1  this is 2012, 2013.  So I can tell you
2  that Mr. Eric Cantor was the Speaker of
3  the House at the time.
4      Q.    Okay.
5      A.    I -- whatever.  He was
6  Republican lead at the time.
7      Q.    Okay.
8      A.    So he was -- he was -- it
9  was during his tenure.
10      Q.    Okay.
11      A.    And they were the
12  Republican caucus.  And I apologize,
13  because all of these terms are very much
14  outside of my normal vocabulary, so if I
15  misuse some of them, I'm sorry.
16          They were having a hearing
17  on, you know, status of women in
18  technology and -- and in those fields.
19  And in particular, I received a request
20  from Facebook's office in Washington
21  that I be present.  That was very
22  unusual.  And the explanation was that

Page 49

1  there was a particular congressperson
2  from Indiana who wanted me -- who wanted
3  Facebook to provide me as a witness.
4          Again, in that kind of
5  situation, you just do what your company
6  wants you to do.  And I was in
7  Washington, D.C., present at the
8  hearings.
9      Q.    So physically present?
10      A.    Physically present, yeah.
11  I was in the room, sitting next to the
12  congresswoman, and watched the whole
13  thing sort of go around me.
14      Q.    Okay.  So you watched the
15  hearing.
16          Did you talk at the
17  hearing?
18      A.    No.
19      Q.    Okay.
20      A.    I was instructed by our
21  team to not say anything unless I was
22  specifically asked a question.  Nobody

Page 54

1    list of candidates in this
2    field.  Like -- no.
3  BY MS. RHEE:
4    Q.    Okay.
5    A.    This is completely outside
6  of my area of expertise.
7    Q.    Okay.  So also safe to say
8  you've never written an expert report
9  before?
10    A.    That is very correct.  Yes.
11    Q.    Okay.  How many people from
12  Keystone Strategy were assigned to help
13  you?
14    A.    I actually don't know the
15  answer to that question.
16    Q.    How do you not know?
17    A.    I can only tell you,
18  roughly, how many people I interacted
19  with.
20    Q.    Okay.
21    A.    But were there people doing
22  work that, you know, I am unaware of?  I

Page 55

1  don't know.  So I don't -- I honestly
2  don't know the answer to your question.
3    I personally interacted
4  with -- let me think -- maybe ten
5  people.  Again, order of magnitude.
6    Q.    Okay.
7    A.    So ten.
8    Q.    Okay.  How many hours have
9  you personally spent in preparation of
10  your reports in this case?
11    A.    That is a very complex
12  question.  I -- let me think.
13    Approximately, couple of
14  hundred hours, I would guess.  Yeah, I
15  would -- I would guess couple of hundred
16  hours, maybe 300.
17    Q.    Okay.  Well, you're
18  charging by the hour, right?
19    A.    I am.
20    Q.    Okay.  And sitting here
21  today, you don't know how much you've
22  charged so far?

Page 56

1    A.    I do know the answer to
2  that question.
3    Q.    Okay.
4    A.    So I have -- so far I have
5  charged about $150,000 --
6    Q.    Okay.
7    A.    -- total.
8    I have been paid out
9  $80,000.  So $80,000.  That's 200 hours.
10  Yeah.  So a couple hundred hours.  Like
11  500 hours or so.
12    Q.    Okay.  Yeah.  Sorry.  I
13  can't do math, hence I took out my phone
14  to pull out the calculator.
15    A.    No, no.  That's fine.
16    But I do remember -- as I
17  said, I do remember the exact numbers
18  for how much I have billed for and how
19  much I have been -- received payment
20  for, but I haven't billed for all of the
21  hours yet.
22    Q.    Okay.  So sitting here

Page 57

1  today, your best approximation is about
2  500 hours; is that what I'm hearing?
3    MR. TESLICKO:  Object to
4    form.
5    THE WITNESS:  I would
6    guess 500 hours, yes, on
7    preparation of reports.  Yes,
8    that sounds reasonable.
9  BY MS. RHEE:
10    Q.    Okay.  Do you know how many
11  hours the staff at Keystone have worked
12  on your report?
13    A.    Not the slightest idea.
14    Q.    Okay.  How did you go about
15  selecting what you reviewed in
16  connection with your report?
17    A.    So as I'm sure you're
18  aware, there was a mountain of documents
19  in this case.
20    Q.    You don't say.
21    A.    And so my strategy for --
22  when you get the mountain, there is no

United States v.
Google
Document 1735-1    Filed 09/13/25    Page 11 of 46
Highly Confidential
Case 1:23-cv-00108-LMB-JFA
PageID# 119060
Sonka Bjedov
August 27, 2025

Page 58

1    way I can --
2        Q.    Well, did you get a
3    mountain?
4        A.    Oh, yeah.  I had access to
5    everything that was produced in the
6    case.
7        Q.    Okay.
8        A.    And so now I -- you know, I
9    see all of these documents, and I see
10   the timelines.  And I'm going, like, all
11   right.
12       Q.    When you say "timelines,"
13   what do you mean?  What are you
14   referring to?
15       A.    Oh, I'm talking about when
16   my report needs to be written and then
17   when the rebuttal report needs to be
18   written --
19       Q.    I see.
20       A.    -- and then the reply
21   report.
22             From my perspective, this

Page 59

1    is all moving fairly quickly.  But,
2    again, I'm giving you a judgment on
3    something that I really have no basis
4    for comparison.  So you may disagree and
5    you may reasonably say no, no, no, this
6    is a very slow one.
7             For me, personally, I felt
8    that things were moving quickly.
9        Q.    Okay.  So when did you
10   first get access to, as you put it, the
11   mountain of documents in connection with
12   when you thought your first report was
13   due?
14       A.    I really don't remember.  I
15   honestly don't remember.  This was a
16   long time ago.  I would really hate to
17   make a guess here.  I don't remember.
18   I'm sorry.
19       Q.    Okay.  Well --
20       A.    A long time ago.
21       Q.    -- what do you mean by "a
22   long time ago"?  In 2025?

Page 60

1        A.    I think I've had access to
2    some of the stuff before 2025.
3        Q.    Okay.
4        A.    But definitely not all of
5    the stuff.
6        Q.    Okay.
7        A.    But there was just a lot of
8    documents.
9        Q.    Okay.  And can I ask --
10   because what we have, as I'm sure you
11   know --
12       A.    Mm-hmm.
13       Q.    -- because they are your
14   reports, the Appendix A for each one of
15   your reports --
16       A.    Mm-hmm.
17       Q.    -- lists the materials that
18   you relied upon for that report, right?
19       A.    It lists a subset of
20   materials that -- in particular,
21   materials that I referred to and quoted
22   in the report.

Page 61

1             I've certainly reviewed a
2    lot more things that I don't necessarily
3    quote because I find them not relevant
4    to the matter that I'm discussing.
5        Q.    Okay.  So I want to make
6    sure I understand.
7             What you put in those
8    appendices to your report --
9        A.    Mm-hmm.
10       Q.    -- is only what you cited?
11       A.    That is correct.  Yes.
12       Q.    But that is not -- let me
13   make sure I break this down.
14             It is not everything that
15   you reviewed?
16       A.    That is correct.  Yes.
17       Q.    Okay.  And I take it, it is
18   not everything you relied upon --
19             MR. TESLICKO:  Object to
20       form.
21   BY MS. RHEE:
22       Q.    -- if you didn't actually

Page 62

1  cite it?
2         MR. TESLICKO:  Object to
3     form.
4         THE WITNESS:  No.  If I am
5     using a document to form my
6     opinion or if I'm using a
7     document to -- let's put it this
8     way -- to say, well -- and here
9     is a document that confirms my
10    opinion, then I'm going to cite
11    it.
12 BY MS. RHEE:
13    Q.    Okay.
14    A.    But if I'm just reading a
15 document -- for example, I've read
16 transcripts of depositions, of -- number
17 of them.  And I apologize.  I'm really
18 terrible with names.
19    Q.    Okay.
20    A.    But I've read the
21 transcripts from several Google
22 witnesses in the case.  I've read them

Page 63

1  for several reasons.  Because I wanted
2  to see what this process looks like, but
3  also I wanted to understand, you know,
4  what are they saying, what are they
5  claiming.  Are they saying things that I
6  will strongly disagree with and say,
7  well, no, that's just wrong, and I can
8  prove it is wrong.
9         Or are they saying things
10 that you can look at and go, like, well,
11 I disagree with them, but, objectively,
12 it's quibbling.
13        And so I read a lot of
14 those depositions.  I don't cite them in
15 my report.  They were completely
16 irrelevant to it.
17    Q.    Okay.  I think I
18 understand.
19        You cite, I think, 30 -- I
20 think the count is something around 32
21 unique Google documents across your
22 three reports.

Page 64

1         Does that sound roughly
2  right to you?
3     A.    Oh, I remember there was
4  about 20, 21 in the first report, so the
5  numbers, order of magnitude, certainly
6  makes sense, yes.
7     Q.    Okay.
8     A.    And then there is a whole
9  lot of other documents that I cite --
10    Q.    I totally understand, but I
11 just want to focus on the
12 Google-produced documents for now.
13    A.    All right.
14    Q.    Okay.  You're right.  You
15 cite -- or you list 20-some-odd Google
16 documents in your opening report.
17    A.    Mm-hmm.
18    Q.    And then in total it's
19 about 30.  Sound about right?
20    A.    Sounds fair.  Yes.
21    Q.    Okay.  And based on your
22 answer just now, that is the universe of

Page 65

1  Google-produced documents, out of the
2  mountain of documents that you had
3  access to, that you either cited in your
4  reports or otherwise relied upon; is
5  that right?
6         MR. TESLICKO:  Object to
7     form.
8         THE WITNESS:  So there are
9     other Google documents that I
10    have read and thought, oh,
11    they -- ███████████████
12    ███████████████
13    that I didn't cite because,
14    honestly, the form that they
15    were written in, I totally
16    understand.  They were
17    engineers.
18        But I didn't think that in
19    the legal sense it would be very
20    helpful to either you or the
21    judge to see ███████████████
22    ███████████████████

United States vs.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 13 of 46
PageID# 119002

Highly Confidential

Gordanka Bjedov
August 27, 2025



Page 66

1     which makes perfect sense in my
2     world, but I'm going to guess
3     that anybody else will go, like,
4     what in the world are these
5     people talking about.
6
13     But how do you present to
14     anybody else outside of the
15     technology space what
20  BY MS. RHEE:
21     Q.   So you're referring to a
22  document produced by Google that you

Page 67

1  read --
2     A.   Mm-hmm.
3     Q.   I think you need to just
4  say yes or no on the record.
5     A.   Oh.  Yes.
6     Q.   -- that you believe is
7
8     A.   That is correct.
9     MR. TESLICKO:  Object to
10     form.
11     Sorry.
12     THE WITNESS:  Sorry.
13  BY MS. RHEE:
14     Q.   But you did not cite it?
15     MR. TESLICKO:  Object to
16     form.
17     THE WITNESS:  Could you
18     repeat the question, please.
19     And sorry about that.
20  BY MS. RHEE:
21     Q.   Yeah.  I'm sure you've been
22  instructed.  Mr. Teslicko is doing his

Page 68

1  job, but regardless of his objection,
2  unless he specifically instructs you not
3  to answer, you need to answer my
4  question.
5     A.   And I hope, you know, that
6  so far I haven't --
7     Q.   You've been great.  I'm
8  really just talking to Mr. Teslicko.
9     MR. TESLICKO:  If I could
10     just say, can you please wait
11     for counsel to finish her
12     question full, because that's
13     part of the problem.  That would
14     be great.
15     THE WITNESS:  I'm really
16     sorry for making this difficult
17     for you.
18  BY MS. RHEE:
19     Q.   You're fine.  So let's just
20  rewind.
21     You just talked about a
22  document produced by Google that you

Page 69

1  reviewed, correct?
2     A.   That is correct.
3     Q.   Okay.  You did not put it
4  on any of your appendices, correct?
5     A.   That is also correct, yes.
6     Q.   Okay.  But, nevertheless,
7  you believe that document
9     MR. TESLICKO:  Object to
10     form.
11     THE WITNESS:  I would say
12     that -- that my evaluation was
13
16  BY MS. RHEE:
17     Q.   So it went into your
18  thinking about this case?
19     MR. TESLICKO:  Object to
20     form.
21     THE WITNESS:  Not really.
22     Outside of, man, if I were

United States vs.
Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 14 of 46
PageID# 113980
Highly Confidential
Sanja Bjedov
August 27, 2025

Page 70

```
 1        presenting this to a bunch of
 2        engineers, ███████████████
   ████  ████████████████████████████
   ████  ████████████████████████████
   ████  ████████████████████. But,
 6        unfortunately, that's not my
 7        audience, so, you know.
 8               Outside of that, no, I --
 9        you know, it's --
10   BY MS. RHEE:
11        Q.   Okay.  Let me try this
12   again.
13        A.   Mm-hmm.  Mm-hmm.
14        Q.   This is one example of a
15   document that is on topic, related to
16   your opinion, but you did not put it on
17   any of the appendices.  Yes?
18               MR. TESLICKO:  Object to
19        form.
20               THE WITNESS:  This is one
21        document that I believe -- and I
22        really believe most engineers
```

Page 71

```
 1        would agree with me on this --
 2        ██████████████████████████.
 3               And this is one document
 4        that I didn't include in the --
 5        and I didn't cite and refer to
 6        because I felt it was maybe --
 7        let's call it too informal and
 8        could be reasonably questioned
 9        by anybody who hasn't worked and
10        lived in the world that I work
11        in and live in, as to how is
12        this even relevant.
13   BY MS. RHEE:
14        Q.   Okay.  And how many more
15   documents did you review that Google had
16   produced, that you had access to, that
17   was topically related to the subject
18   matter of your opinion but, for one
19   reason or another, you decided not to
20   put down in your appendices?
21               MR. TESLICKO:  Object to
22        form.
```

Page 72

```
 1               THE WITNESS:  Oh.  Oh,
 2        wow.  Really no idea.
 3   BY MS. RHEE:
 4        Q.   Well, more than one?
 5        A.   More than one.
 6        Q.   Okay.  More than ten?
 7        A.   You are asking me to
 8   estimate, in legal proceedings,
 9   something that I really -- if I had
10   known that I should keep track of, you
11   know.
12        Q.   That's okay.  I just want
13   your best guess.
14               MR. TESLICKO:  Object to
15        form.
16               THE WITNESS:  My best
17        guess would be somewhere between
18        10 and 20, maybe.
19               And you did add a
20        stipulation there that --
21        because some documents I would
22        run into would be talking about
```

Page 73

```
 1   business stuff or -- so on, and
 2        those -- those, I immediately
 3        dismiss because they don't --
 4        they have nothing to do with
 5        work I'm doing and what I have
 6        been asked to opine on.
 7               Do you count the document
 8        or not, and how many of those --
 9        let's say somewhere between 10
10        and 20.
11   BY MS. RHEE:
12        Q.   Okay.  That's your best
13   guess, sitting here today?
14        A.   That is my best guess, yes.
15        Q.   Okay.  Your opinion goes
16   through your timeline estimates for the
17   various DOJ steps or phases of remedy;
18   is that right?
19               MR. TESLICKO:  Object to
20        form.
21               THE WITNESS:  So my
22        opinion gives timelines for
```

United States v.<br>
Google<br>
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 15 of 46<br>
PageID# 119984<br>
Highly Confidential<br>
Goranka Bjedov<br>
August 27, 2025

Page 74

1      different parts of Plaintiffs'
2      proposed remedies.
3    BY MS. RHEE:
4      Q.    Yes.   Okay.   So let's just
5    quickly go through those.   Right?
6      A.    Mm-hmm.
7      Q.    DOJ's proposed remedies for
8    what they refer to as DFP --
9      A.    Mm-hmm.
10     Q.    -- goes in three phases,
11   right?
12     A.    That is correct.
13     Q.    Okay.   And the first phase,
14   which is a form of integration, right?
15   The first phase is a Prebid integration,
16   right?
17          MR. TESLICKO:   Object to
18      form.
19          THE WITNESS:   Excuse me?
20      You say form of integration?
21      Could you tell me what you mean
22      by that.

Page 75

1    BY MS. RHEE:
2      Q.    Well, actually, maybe I
3    should ask you.
4          What is the first phase
5    that you opine upon?
6      A.    So the first phase of DFP
7    divestiture -- and you can see in my
8    report -- is creation of the APIs.
9    Those --
10     Q.    APIs to what?
11     A.    So you're looking at,
12   basically, application program
13   interfaces that would make Google
14   participate on the same level as other
15   exchanges in bidding process.
16     Q.    Okay.   So APIs to what?
17     A.    So APIs to make Google
18   participate on the same level to the
19   bidding process.
20     Q.    Well, do you know how APIs
21   effectuate that?
22          At least as I understand

Page 76

1    APIs, they actually need to connect to
2    something, right?
3          MR. TESLICKO:   Object to
4      form.
5          THE WITNESS:   So in order
6      for API to be useful, you
7      typically are connecting to a
8      system.
9    BY MS. RHEE:
10     Q.    Mm-hmm.
11     A.    And it's the system that
12   exposes its API.
13          So you have exchanges, and
14   inside those exchanges, there is a
15   bidding process going on.   Those
16   exchanges have APIs.
17          And what we're saying is,
18   Google needs to provide APIs that would
19   level the playing field for the
20   bidding -- during the bidding process.
21     Q.    Mm-hmm.   Okay.
22          And what is the timeframe

Page 77

1    that you estimate in order for those
2    APIs to be created and confirmed to work
3    as intended?
4          MR. TESLICKO:   Object to
5      form.
6          THE WITNESS:   So I specify
7      that in my report.
8          And I -- is it okay if I
9      point out to where this is in my
10     report?
11   BY MS. RHEE:
12     Q.    We can get there.
13          But I just want to know,
14   since this is your opinion --
15     A.    Mm-hmm.
16     Q.    -- it's less about your
17   report, but just your opinion.
18          Do you know how long you
19   estimated that step to take?
20          MR. TESLICKO:   Object to
21     form.
22          THE WITNESS:   I can answer

United States v. Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 16 of 46
PageID# 119686
Highly Confidential
Gordana Bjedov
August 27, 2025

Page 78

1  the question. I do want to give
2  you a caveat that there are many
3  different parts, moving parts,
4  in this particular case, and so,
5  to the best of my recollection,
6  which could be off in this case,
7  if I remember correctly, it was
8  18 months.
9      It could go as high as 24,
10 but I think 18 months is a
11 reasonable amount of time for
12 creation of APIs.
13 BY MS. RHEE:
14     Q.   Okay. And then you opine
15 about the next step in DOJ's proposal to
16 divest DFP, right?
17     A.   Mm-hmm. That is correct.
18     Q.   Okay. And what is your
19 understanding of what Phase 2 is?
20     A.   So as per Plaintiffs'
21 proposed remedies, Phase 2 is
22 open-sourcing of the final auction logic

Page 79

1  and making it available in an
2  open-source context.
3      Q.   Okay. And what is your
4  opinion about how long that's going to
5  take?
6      A.   Again, that has been
7  defined in my -- in my report, so I'm
8  not quite sure --
9      Q.   Well, it's your opinion,
10 right?
11     A.   In my opinion, as defined
12 in my report -- and I do want to say
13 what is in the report should be taken as
14 the accurate statement in this. You're,
15 again, looking at a timeframe of
16 18 months to 24 months.
17     Q.   Okay. And then you opine
18 about how long it's going to take to
19 achieve what DOJ calls Phase 3 of DFP
20 divestiture, right?
21     A.   That is correct. Yes.
22     Q.   Okay. And what is your

Page 80

1  understanding of what Phase 3 entails?
2      A.   So my understanding of
3  Phase 3 is that it involves what I would
4  call cutting out and moving DFP and
5  making it available for purchase to one
6  or more buyers. Obviously, the DFP
7  product that remains after Phase 1 and
8  Phase 2 have been completed.
9      Q.   Okay. And what is your
10 opinion about how long that is going to
11 take?
12     A.   So, again, I would like to
13 refer you to my report.
14     I estimate that DFP
15 divestiture is going to take a little
16 bit longer than the other two things,
17 and there are specific reasons for it.
18     And I think my estimate is
19 that DFP by itself should be
20 somewhere -- let's call it in 24 to
21 30 months.
22     Q.   Okay. And then, finally,

Page 81

1  DOJ has a proposal to divest what it
2  refers to as the Ad Exchange, or AdX,
3  right?
4      A.   That is correct.
5      Q.   Okay. And you have an
6  opinion about how long that would take?
7      A.   Yes, I do.
8      Q.   Okay. And how long would
9  that take, in your opinion?
10     A.   In my opinion -- and,
11 again, I will point out to my report --
12 the AdX should take about 18 months.
13     And I should say this: A
14 reasonable plan proposed in here should
15 take 18 months. And I'm giving you just
16 one reasonable approach to that
17 divestiture.
18     Q.   What do you mean you're
19 giving "just one reasonable approach to
20 that divestiture"?
21     A.   So if you put five
22 engineers into a room and say divest

Page 82

1  AdX, you will get seven different
2  opinions back on how that can be done.
3          I'm giving just one
4  reasonable approach to doing this, which
5  doesn't mean that somebody else may not
6  come up with a different, equally
7  reasonable approach.
8      Q.   When you give these
9  timeline estimates, is it fair to say it
10 is your best guess, sitting here today,
11 about how long something is going to
12 take?
13         MR. TESLICKO:  Object to
14     form.
15         THE WITNESS:  No, I -- I
16     don't think that is fair to say.
17 BY MS. RHEE:
18     Q.   Well, are you giving a
19 guarantee that any one of these phases
20 or projects can be completed within that
21 timeframe?
22         MR. TESLICKO:  Object to

Page 83

1      form.
2          THE WITNESS:  No, I'm not
3      giving a guarantee on any of
4      them.
5  BY MS. RHEE:
6      Q.   Okay.  And you would agree,
7  in your experience working on projects
8  in industry, every project has always
9  slipped?
10         MR. TESLICKO:  Object to
11     form.
12         THE WITNESS:  Actually,
13     no.  And I'm going to, again,
14     refer to my -- my report and
15     give you an example of a project
16     that relates there.

Page 84

Page 85



United States v. Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 18 of 46

Highly Confidential

Gordana Bjedov
August 27, 2025

PageID# 119060

Page 110

1        ████████████████████
2          Completely out of my area of
3        expertise to -- to opine on
4        this.
5   BY MS. RHEE:
6          Q.    So your estimate of how
7   long something like this would take --
8          A.    Mm-hmm.
9          Q.    -- isn't dependent on
10  whether or not any of these steps that
11  you're walking us through --
12         A.    Mm-hmm.
13         Q.    -- because they possibly
14  are part of the final auction logic,
15  also need to be open-sourced?
16         MR. TESLICKO:  Object to
17         form.
18         THE WITNESS:  All of these
19         steps are part of the code base.
20         My opinions are, hey, here
21         is the code base.  Do something
22         with it.

Page 111

1          The process that I'm
2          describing is agnostic to what
3          the code base does.
4   BY MS. RHEE:
5          Q.    I take it from your answer,
6   your opinion is also agnostic as to how
7   many items within that code base either
8   need or do not need to be open-sourced?
9          MR. TESLICKO:  Object to
10         form.
11         THE WITNESS:  Yes, and a
12         no.
13  BY MS. RHEE:
14         Q.    Okay.
15         A.    You know, the answer to
16  that is, it depends.
17         Q.    What does it depend on?
18         A.    It depends on how the code
19  is organized.
20         So to give you a
21  hypothetical that -- I think most of my
22  colleagues at Google and probably most

Page 112

1   of my colleagues at Facebook would be
2   horrified.
3          If all of these things were
4   closely interacting with each other,
5   coupled, looking at each other's private
6   properties without any regard for
7   computer standards or sort of computer
8   coding standards, modern way of
9   developing code, then it would make a
10  difference, because then -- honestly, it
11  would have to be rewritten and cleaned
12  up before it could be outsourced.
13         But, at least in my part of
14  the world, one of the things that Google
15  is certainly held in high esteem for,
16  and in my personal experience working
17  there, is sticking to very good computer
18  science methodology and being really
19  strict about how the code is checked in.
20         And, as a matter of fact,
21  in some of the documents that, you know,
22  your client has presented in this

Page 113

1   case -- and I can't recall off the top
2   of my head which ones -- they actually
3   describe the process it goes through.
4          Code reviews.  It has to be
5   reviewed by the -- at least one other
6   person.
7          But, for example, if I'm
8   trying to do the code check-in into code
9   base that doesn't even belong to my
10  team, then it's going to be reviewed by
11  one other person, and it's going to be
12  reviewed by the owner of that particular
13  code base or subdirectory.  And those
14  are clearly identified.
15         So Google is pretty strict
16  about how they maintain their code base,
17  and, in my opinion, rightfully so.
18         And so I've, you know, made
19  my estimates with the understanding that
20  that is the code base that I'm dealing
21  with, and, therefore, I'm not going to
22  have to rewrite it.  I'm not going to

Page 114

```
 1   have to completely take it apart and
 2   spend three months figuring out, you
 3   know, why is this thing directly looking
 4   and pulling something from a memory, you
 5   know, at a particular location, because
 6   that is just not allowed at Google.  You
 7   don't -- you know, you don't do that.
 8        Q.   Okay.  For your assignment
 9   in this case --
10        A.   Mm-hmm.
11        Q.   -- you did not look at the
12   actual source code with respect to any
13   of these products, right?
14        A.   That is correct.  Yes.
15        Q.   It was just not part of
16   your assignment?
17        A.   That is not part of my
18   assignment.  That is correct.
19        Q.   Okay.  So insofar as you
20   talk about your assumptions --
21        A.   Mm-hmm.
22        Q.   -- about what the source
```

Page 115

```
 1   code looks like, that is either based on
 2   your work at Google from 2005 to 2010 or
 3   from Professor Weissman; is that right?
 4             MR. TESLICKO:  Object to
 5        form.
 6             THE WITNESS:  I do rely on
 7        my expertise, but it has been
 8        informed by Professor Weissman's
 9        opinions.
10   BY MS. RHEE:
11        Q.   I see.  Okay.
12             But with respect to Google
13   source code, specifically --
14        A.   Mm-hmm.
15        Q.   -- you stopped working at
16   Google some time ago?
17        A.   Fifteen years ago, roughly.
18   Yeah.
19        Q.   Okay.  And even when you
20   were working at Google, you did not have
21   any reason or occasion to look at the
22   source code of these products, right?
```

Page 116

```
 1             MR. TESLICKO:  Object to
 2        form.
 3             THE WITNESS:  That is
 4        actually incorrect.
 5             Well, I -- I worked on
 6        both AdSense and I had an intern
 7        actually do some work for
 8        AdWords.  And you could argue,
 9        you know, DFP gets integrated
10        fully after I leave Google.  So
11        not exactly this code base.
12             However, it is a code base
13        inside Google3.  And while I was
14        at Google, we completed
15        integration from Google2 to
16        Google3.
17             And so I'm familiar with
18        the rules, in particular for C++
19        code base.
20   BY MS. RHEE:
21        Q.   I just want to understand,
22   though.
```

Page 117

```
 1        A.   Mm-hmm.
 2        Q.   What you're talking about
 3   in terms of your familiarity is from
 4   your time at Google, right?
 5        A.   My personal familiarity,
 6   yes, it's from my time at Google.
 7        Q.   Okay.  And that was
 8   15 years ago?
 9        A.   That was, yes.  End of my
10   time there was 15 years ago.
11        Q.   Okay.  So going to this
12   page ending in 501.
13        ███████████████████████
14   █ ███████████████████████████
15   █ ██████████████████████████
16   █ ████████████████████
17   █ ███████████████████████████████
18   █ █████████████████
19   █ █████████████████████████████████
20   █ ██████████████████████████
21   █ ███████  ████████
22   █ ████  ████  ███████  ██████████
```

Highly Confidential

Page 134

1    said.
2              You did rely on
3    Mr. Levitte's testimony about GCP but
4    not about DFP?
5         A.   No, not really.  So --
6         Q.   Well, I just want to make
7    sure, because --
8         A.   Mm-hmm.
9         Q.   -- just reading back your
10   answer, "I relied a lot on what he was
11   telling me about GCP, that he was
12   confirming, basically, what I would
13   expect about GCP."
14        A.   So I misspoke.
15        Q.   I just want --
16        A.   That is absolutely fair.
17   You're absolutely fairly calling me out.
18   I misspoke.  I relied.
19             I read his report and tried
20   to sort of verify.  I have public
21   sources of information that tell me how
22   GCP functions.

Page 135

1              But here, I have a person
2    that actually lives that every day of
3    his life.  This is his home.
4              And so I read his opinion
5    to find out if everything I know about
6    this is consistent.  Is my understanding
7    of the space that he's describing
8    consistent with all the public
9    information and so on.
10             Or, for example, if he
11   brought up something that was completely
12   different than the public documentation,
13   my expectation, and so on, well, then
14   that's material.
15             Then I have to say either I
16   mistrust his opinion or -- you know, or,
17   basically, everything I know is wrong,
18   and I have to go and dig into it deeper.
19             But that hasn't happened.
20   Everything he's saying is, basically,
21   yeah, yes, yes, yes, yes, yes.  Okay.
22   Let's move on.

Page 136

1              So there is nothing in his
2    deposition that changed my opinion, that
3    made me question or do additional
4    research.  It was just, like, all right.
5    You know, put aside and move on.
6         Q.   So your answer just now
7    talked about a standard you applied in
8    deciding whether or not you would add a
9    source to your appendix, and you said,
10   oh, well, is it material?
11             Have I got that right?
12             MR. TESLICKO:  Object to
13        form.
14             THE WITNESS:  As long as
15        you don't use "material" in some
16        legal way that I don't know what
17        it means.
18   BY MS. RHEE:
19        Q.   I just really want to
20   understand what's the standard --
21        A.   What it means to me --
22        Q.   -- what's the standard you

Page 137

1    apply?
2         A.   Oh, perfect.
3              So when I do my work,
4    right, I come up -- at least my personal
5    process and the one that a large number
6    of the industry participants would agree
7    with, but some tend to break -- is I
8    want to arrive to my judgment
9    independently.
10             People have a tendency to
11   run into problems when they allow
12   themselves to be anchored.
13             So, for example, before I
14   start analyzing all of this, I don't
15   want anybody telling me how long they
16   think this should take, because as much
17   as I deeply believe it wouldn't impact
18   me, I'm also aware of all of the
19   research in human psychology that says
20   it would.
21             And while I would really
22   like to believe that I would be that one



**Page 138**

1   exception, I don't need to take that
2   chance. So I want to do my work and my
3   analysis before I hear what anybody else
4   thinks about this.
5        And then, obviously, using
6   my experience, using access to any
7   publicly available source, using the
8   expertise, standard procedures, you
9   know, and processes, what you would call
10   good, you know, governance of the stuff,
11   I come up with my estimate.
12        Once I have that, once I
13   understand where I stand and I can
14   explain why I stand there, I will look
15   for what other people think about this.
16        In this, let's call it,
17   second stage of the evaluation, I am
18   trying to see is there something that I
19   have possibly, and I'm going to say
20   materially, forgotten in my analysis.
21        You know, you don't know
22   what you don't know. So at this point

**Page 139**

1   in time, you are looking to other people
2   to inform you did you completely miss
3   the boat.
4        I would be surprised if I
5   did, but I would also be unprofessional
6   and careless if I didn't do that
7   evaluation.
8        And at that stage, I start
9   looking for things that have timelines.
10   What are their timelines? Let's say I
11   encounter a document that has a timeline
12   that this is going to take 15 years.
13        I have to look at that
14   document seriously, because it is a
15   completely different order of magnitude
16   than my analysis. I have to understand
17   what has informed their decision, where
18   is our disagreement. And in some cases,
19   you find out -- that wasn't the case in
20   this case.
21

**Page 140**

19        Frankly, I called my
20   counsel and said, like --
21        MR. TESLICKO: Going to
22   stop you, not to disclose any

**Page 141**

1   communications with counsel.
2        THE WITNESS:
10   BY MS. RHEE:
11      Q. Okay. I want to unpack
12   what you just said. There's a lot of
13   information here.
14        So in coming up with your
15   initial timelines and your opinion, what
16   you relied upon was your experience?
17      A. Absolutely.
18      Q. Access to publicly
19   available sources?
20      A. Correct.
21      Q. And your expertise?
22      A. That is fair.

United States v.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 22 of 46

Highly Confidential
PageID# 119021

Gordana Bjedov
August 27, 2025

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    And I also deployed the
2 standard processes and procedures used
3 in this type of an analysis.  Yes.
4    Q.    Okay.
5    A.    Mm-hmm.
6    Q.    And that was the sum total
7 so that you could stay pristine, as you
8 put it, of what you actually relied upon
9 in order to come up with your timelines?
10    MR. TESLICKO:  Object to
11    form.
12    THE WITNESS:  Sorry.
13    At that point in time, you
14    call that first draft, right.
15 BY MS. RHEE:
16    Q.    Okay.
17    A.    So that is the first step
18 in the process.  You kind of put your
19 stake into the ground and say, here is
20 what I think this should take.
21    Q.    Okay.  And so did you put
22 all of those materials into your

**Page 143**

1 appendices?
2    MR. TESLICKO:  Object to
3    form.
4    THE WITNESS:  You have the
5    list of all of the publicly
6    available documents, yes?
7 BY MS. RHEE:
8    Q.    No.  I do.  I'm asking is
9 that --
10    A.    Yes.
11    Q.    -- everything you looked
12 up, you looked at, to come up with your
13 first draft, did you put in your
14 appendices?
15    MR. TESLICKO:  Object to
16    form.
17    THE WITNESS:  No.  And
18    allow me to explain.
19 BY MS. RHEE:
20    Q.    Okay.  Okay.
21    A.    When you're looking for
22 publicly available information, as you

**Page 144**

1 will know, Google will return you
2 millions of documents.
3    And you now sort through
4 those documents.  Typically, you sort by
5 the validity, or let's call the
6 engineering level of trust in the
7 reporting source.
8    So I'm not going to look at
9 anything that BuzzFeed puts out.  But
10 if, you know, IP Police putting it out,
11 that is important.
12    Then I will look at, you
13 know, maybe five or ten different
14 documents, and what you find, a lot of
15 times they overlap on, you know,
16 90 percent of the material.
17    I will quote you two or
18 three documents, the minimal subset,
19 that has all the information I relied
20 on, packaged in the form that I relied
21 on it.
22    But I may have seen another

**Page 145**

1 five documents that had this bit, or
2 that bit, that is already in these three
3 documents, that I just don't quote.
4    You know, I have read -- I
5 don't even know how to estimate --
6 probably -- or skimmed, in my whole
7 career, hundreds and thousands of
8 documents related to these things.  I'm
9 relying on all of them in some way.  I'm
10 not going to quote them all here because
11 they are, in my opinion, an element to
12 the case.
13    The parts that I quote are
14 the sort of the minimal subset.  Like,
15 what is the highest-quality minimal
16 subset that contains everything I have
17 relied on.
18    So everything I relied on
19 has to be in there, but it can also be
20 seen in some other documents, because --
21    Q.    Well, in documents you saw.
22    A.    Correct.

| Page 146 | Page 148 |
|---|---|

**Page 146**

1    Q.    Okay.

2    A.    Because, as you see, in our
3 field people tend to cut and paste,
4 copy, and especially today, you have a
5 whole ton of AI-generated documents.

6        You know, if you're going
7 to quote all of them, like, that's going
8 to be a lot of paper wasted.

9    Q.    Okay.  Then in the second
10 stage --

11    A.    Mm-hmm.

12    Q.    -- of your evaluation --

13    A.    Mm-hmm.

14    Q.    -- in finalizing your
15 opinion -- is that fair to say?

16    A.    Yes.

17    Q.    In finalizing your opinion,
18 that's when you look for material.  And
19 I think your testimony was that you may
20 have materially forgotten in your
21 analysis; is that right?

22        MR. TESLICKO:  Object to

**Page 147**

1    form.

2        THE WITNESS:  No.  No.  I
3    think --

4 BY MS. RHEE:

5    Q.    Well, I think what you said
6 was, "I'm trying to see if there's
7 something that I have possibly, and I'm
8 going to say materially, forgotten in my
9 analysis."

10    A.    Mm-hmm.  That is correct.

11        That is the verification
12 stage.  And so in that stage, I actually
13 start looking at other people's
14 timelines.  ████████████████████
███ ████████████████████

16        But as you can probably
17 understand, you can't find -- if you go
18 and do the public search and say how
19 long would it take to divest the DFP,
20 even if you say -- you know, among
21 engineers, if you were to say how long
22 would it take to migrate DFP to

**Page 148**

1 different known proprietary environment,
2 let's search for that, you're not going
3 to find any documents with the time
4 estimate for that.

5        That type of work is
6 typically done by the company that owns
7 the product internally.  It is not
8 exactly available online.

9        And so, you know, that kind
10 of information I'm hoping I'm going to
11 find somewhere.  But I'm not going to
12 search for it online because I know it's
13 not available online.

14        And so in my Stage II, I am
15 trying to -- call it the testing stage.
16 I'm trying to test my work and -- and
17 look at it as if it's somebody else's
18 work and say, did the person who did
19 this work, did they do everything that
20 needed to be done?  Did they encounter
21 everything?  Did they do due diligence?

22        And so this is my testing

**Page 149**

1 due diligence stage of am I doing the
2 work at a level that I believe I should
3 be.

4    Q.    Okay.  And in this stage --

5    A.    Mm-hmm.

6    Q.    -- it looks like you
7 roughly sorted the documents to be
8 documents, as you put it, that
9 ████████████████████████?

10        MR. TESLICKO:  Object
11    to --

12        THE WITNESS:  No.

13        MR. TESLICKO:  Object to
14    form.

15 BY MS. RHEE:

16    Q.    I'm -- but you testified,
17 ██████████████████████████████
██ █████████████████████████
██ ███████████████████████
20 right?

21    A.    That is correct.  I was --

22    Q.    All right.  So for that

United States
Google

Case 1:23-cv-00108-LMB-JFA     Document 1735-1     Filed 09/13/25     Page 24 of 46
Highly Confidential
PageID# 116926

Gordan Bjedov
August 27, 2025

| Page 150 |
| --- |

1    category set of documents, did you put
2    each and every one of those documents in
3    your appendices?
4        A.    No.
5        Q.    Okay.
6        A.    And I wasn't -- I don't
7    even know how I would issue a request.
8    ████████████████████
      ██████████████████████
      ██████████
11        So, no, that was never
12   issued.
13        Q.    Well, but I --
14        A.    Mm-hmm.
15        Q.    That's a different issue.
16   I'm not asking for all the universe of
17   hypothetical documents that are out
18   there.
19        A.    Mm-hmm.
20        Q.    I'm saying, of the
21   documents, as you testified to --
22        A.    Mm-hmm.

| Page 151 |
| --- |

1        Q.    -- that you looked at --
2        A.    Mm-hmm.
3        Q.    ██████████████████
      ██ ██████████████████
5        A.    Mm-hmm.
6        Q.    ████████████████████
      ██ ████████████████
8        A.    Mm-hmm.
9        Q.    -- did you cite each and
10   every one of those documents in your
11   appendices?
12        MR. TESLICKO:  Object to
13     form.
14        THE WITNESS:  No.
15   BY MS. RHEE:
16        Q.    Okay.
17        A.    There were some -- I've
18   cited the ones that were, let's call,
19   the most precise.
20        There were some documents
21   that, you know, arguably, you could say,
22   well, you know, how can you even make

| Page 152 |
| --- |

1    sense of this.  And as an engineer, I
2   can.
3        But I also understand that
4   people outside of high-tech would just
5   sort of shake their heads and -- and not
6   know what to make of them.  And so those
7   I didn't cite because I didn't think
8   they would be helpful.
9        But -- but, yeah, during
10   that stage, that's what I do.
11        Q.    Okay.  That's helpful.
12        And then there was a
13   category set of documents, and I believe
14   your testimony is:  ████████████████
      ██ ██████████████████████████
      ██ ██████████████████████
      ██ ████
19        A.    I'm sorry --
20        MR. TESLICKO:  Object to
21     form.
22        THE WITNESS:  That --

| Page 153 |
| --- |

1    what -- what are we talking
2   about there?
3   BY MS. RHEE:
4        Q.    Well, this is -- this is
5   your testimony --
6        A.    Yes.  Yes.
7        Q.    -- and you talked about
8   looking at some documents, ████████████
      ████ -- I'm just going to read you
10   your testimony.
11        ████████████████████████
      ██ ████████████ ██████████████
      ██ ██████████ ██████████
      ██ ██████████████████████
      ██ ████████████████████
      ██ ████████████
17        MR. TESLICKO:  Object to
18     form.
19        THE WITNESS:  That is kind
20    of hard to unpack.
21        And I -- I want to answer
22    your question and say I think --

United States vs.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 25 of 46
PageID# 119024

Highly Confidential

Gordana Bjedov
August 27, 2025



Page 154

```
 1   and that's my fault because I
 2   just talk a lot.
 3        So there are two aspects
 4   over here.
 5        I say that in Stage II, it
 6   is my job to do due diligence
 7   and look for any information
 8   that may point out there is
 9   something I have forgotten.
10        During that stage is the
11   time when I look at all of the
12   Google documents. ██████████
██  ████████████████████████████
██  █████████████████   And
16   you know, I'm happy hiking
17   somewhere else.
18        But in that process, █
██  ████████████, and then I try
21   to understand it.
22        Because it could be like
```

Page 155

```
 1   what has happened, ████████████
██  ████████████████████████████
██  ████████████████████████████
██  ████████████████████████████████
██  █████████████████████
██  ███████████████████
██  ████████████████████████████████
██  ████████████████████████████
██  ████████████████████████████
██  ████████████████████████
██  ████████████████████████████████
██  █████████████████████████
██  ██████████████████████████
██  ████████████████████████
██  ██████████████████████████████
██  █████████████████████████
██  ████████████████████████████
██  █████████████████████
19        I would like to think that
20   as an expert in this field, that
21   wouldn't happen.  And it didn't.
22   But I cannot -- I should not
```

Page 156

```
 1        avoid to do this step of due
 2   diligence, because I'm
 3   testifying here and I'm doing
 4   work for the plaintiffs as a
 5   professional, and there is
 6   certain code of behavior that
 7   describes that.
 8   BY MS. RHEE:
 9   Q.   Okay.  That's very helpful.
10   A.   Mm-hmm.
11   Q.   So I want to understand.
12        In this process, the
13   second-stage --
14   A.   The second stage, yeah.
15   Q.   -- process, you acknowledge
16   you did find some documents █████
██  ██████████████████████████████
██  ███████████████
19   A.   Yes.  Correct.
20   Q.   Okay.  Now --
21   A.   And this would be one of
22   those documents that you referred to.
```

Page 157

```
 1   Q.   I totally get it.
 2   A.   Mm-hmm.
 3   Q.   I'm asking, for all of
 4   those documents --
 5   A.   Mm-hmm.
 6   Q.        ██████████████████████
██  ████████████████████████████████
 9   A.   Mm-hmm.
10   Q.   -- did you include all of
11   those documents in your appendices?
12   A.   I think so.  I think so.  I
13   think we did.
14        And especially -- like, if
15   we referred to the document, I think
16   so -- yeah.  Sorry.
17        If we referred to the
18   document, if I relied on the document,
19   definitely yes.
20   Q.   Yeah.  But that's not my
21   question.
22        ██████████████████   ██████
```

United States v. Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 26 of 46
Highly Confidential
PageID# 119026
Gordana Bjedov
August 27, 2025

Page 158

1    clearly saw in the way that you --
2          A.    Mm-hmm.
3          Q.    -- answered the question,
4    it seems like it was more than one
5    document.  You clearly saw, as you put
6    it, some documents where --
7          A.    Mm-hmm.
8          Q.    -- ██████████████████
██████████████████████████████████
██████████████████
11          I am now asking you --
12          A.    Mm-hmm.
13          Q.    -- for that number of
14    unknown documents -- or unknown number
15    of documents ██████████████████████
██ ██████████████████████████████.
17          Did you put them down, all
18    of them down, in one of your appendices?
19          A.    I --
20          MR. TESLICKO:  Object to
21    form.
22    ████████████      ████████████

Page 159

1    put most of them down -- or I
2    put most of them down.
3          But I would be hesitant to
4    tell you that I put all of them
5    down.
6          However, if there is a
7    document that I haven't put down
8    ████████████████████████, I
9    would be very happy to look at
10    it right now and analyze it and
11    tell you why.
12          You know, I don't think
13    there is a document like that.
14    But if there is, I would be very
15    happy to, you know, look through
16    it and tell you why I didn't
17    rely on it.
18    BY MS. RHEE:
19          Q.    Okay.
20          MS. RHEE:  Is it okay if
21    we take another break, because
22    I've had a lot of water.

Page 160

1          THE VIDEOGRAPHER:  Off the
2    record at 11:35.
3          (Short break.)
4          THE VIDEOGRAPHER:  On the
5    record at 11:48.
6    BY MS. RHEE:
7          Q.    During all of these
8    breaks --
9          A.    Mm-hmm.
10          Q.    -- I never want to actually
11    know what, if anything, was said by
12    counsel.  So I -- before Mr. Teslicko
13    jumps in and gives his warning like a
14    broken record, I just want to be very
15    clear, that is not what I'm asking.
16          A.    Mm-hmm.  Mm-hmm.
17          Q.    But just for the record,
18    want to be assured that during all of
19    the breaks, are you talking about the
20    substance of your answers?
21          A.    No.  We are talking about
22    hiking.

Page 161

1          Q.    Well, even there, I don't
2    want to know what -- what, in fact,
3    you're talking about, other than just
4    making sure that the substance of your
5    answers on the record are not the topic
6    of discussion.
7          A.    But before I answer your
8    question, it was raised that I have
9    confused the two names.
10          I told you, I'm really
11    terrible with names.  And if you look at
12    my responses to your questions, I'm
13    talking constantly about the GCP guy and
14    his response.  And I thought that his
15    name was George Levitte.
16          And apparently that is not
17    his name.  His name is something else.
18    Sam?
19          Q.    Okay.
20          A.    Let's go with Sam.
21          And so when you were asking
22    all of those questions, I was thinking

Page 178

1  VP guy?
2      Q.   Okay.  That's --
3      A.   All right?
4      Q.   -- also on the product
5  team.
6      A.   On the product team.  Yes.
7  I do -- okay.  Yeah.  I do remember
8  his -- I did read his deposition.  Yes.
9      Q.   Okay.  You did read his
10 deposition?
11     A.   Yes.  Mm-hmm.
12     Q.   Okay.  And if you read his
13 deposition, were you aware that he also
14 testified about this document?
15     A.   Do I remember in detail
16 that he talked about this document?  No.
17     Q.   How about just even
18 generally?
19          MR. TESLICKO:  Object to
20     form.
21          THE WITNESS:  No.  I --
22     when I'm reading depositions,

Page 180

1  information I remember because it is
2  relevant.
3  [redacted]
...
22          MR. TESLICKO:  Object to

Page 179

1      I -- I don't go and
2  cross-reference all the
3  documents that people are
4  talking about.
5          There are things through
6  the deposition -- well, I'm
7  reading them for two reasons.
8          First of all, to figure
9  out what is -- what is a
10 deposition.
11         But, second -- but --
12 BY MS. RHEE:
13     Q.   Fair.
14     A.   -- second, I'm kind of
15 looking for relevant information as it
16 pertains to my decisions.
17         So, for example, in case
18 of -- and I'm not going to ascribe it to
19 Mr. Craycroft because I could be wrong
20 about the name.  But there is a VP of
21 ads that basically estimates the size of
22 his organization.  And so that bit of

Page 181

1      form.
2  [redacted]
...
7  BY MS. RHEE:
8      Q.   Are you aware of an
9  individual by the name of Glenn
10 Berntson?
11     A.   I have read Mr. Berntson's
12 deposition.
13     Q.   Okay.  Yeah.
14     A.   I am -- there is a reason
15 why I remember Glenn's deposition.  Yes.
16     Q.   Okay.  So you also know
17 that he is on the product team?
18     A.   He is on the product team,
19 New York office, manager.  Maybe
20 director.  But manager.
21     Q.   And are you aware that he
22 also testified about this document?



Page 182

1    A.    I am -- I don't recall the
2    part of his testimony as it pertains to
3    this document.
4    ███ ███████ ███ ██████████
     ██ ██████████████████████████████
     ██ ████████████████████████████████
     ██ ██████████████████████████████
     ██ ██████████████
11    MR. TESLICKO:  Object to
12    form.
13    ███████ ████████
     ██ ████████████████████████████
     ██ ██████████████████████████
     ██ ██████████████████████████
     ██ ████████
     ██ ██████████████████
     ██ ████████████████████████
     ██ ██████████████████████████
     ██ ██████████████████████████

Page 183

1    ██████████████████████████████
     ██ ████████████████████████████
     ██ ██████████████████ ██████
     ██ ████████████████████████████
     ██ ████████████████████████████
     ██ ████████████████
     ██ ████████████████████████████
     ██ ██████████████████████████
     ██ ████████████████████████
12    BY MS. RHEE:
13    Q.    Okay.  Are you familiar
14    with an individual by the name of Noam
15    Wolf?
16    A.    I have heard the name Noam
17    Wolf as well.
18    If -- if you could, again,
19    put him in context, that would be
20    fantastic.
21    Q.    Also an engineer on the
22    product team.

Page 184

1    A.    On the product team.  All
2    right.  All right.
3    Q.    Do you remember reading his
4    testimony?
5    A.    Sitting here today, I don't
6    remember anything specific about his
7    testimony.  Unlike Mr. Berntson --
8    Glenn, like, that one had a couple
9    things that pop up at me.
10    But, no, I cannot recall
11    specific parts of his testimony that
12    would stand out to me.
13    Q.    Okay.  So, again, sitting
14    here, you don't recall or know whether
15    or not he also was shown this document
16    and testified about it?
17    MR. TESLICKO:  Object to
18    form.
19    THE WITNESS:  That is fair
20    to say.  Yes.
21    BY MS. RHEE:
22    Q.    Okay.  ███████████████

Page 185

1    ████████████████████████████████
     ██ ██████████████████████████████
     ██ ████████████████████████████
     ██ ████ ██████████████████
     ██ ████████████████████████
8    MR. TESLICKO:  Object to
9    form.
10    ██████ ██████████ ██████████
     ██ ██████████████████████████████
     ██ ██████████████████████████
     ██ ████████████████████
     ██ ██████████████████████
     ██ ██████████████████████████
     ██ ████████████████████████
     ██ ████████████████
     ██ ████████████████████████
     ██ ██████████████████████████
     ██ ████████████
     ██ ████████████████████████████
     ██ ██████████████████████

United States v. Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 29 of 46
Highly Confidential
PageID# 119098
Gordana Bjedov
August 27, 2025

Page 206

1           MR. TESLICKO:  Object to
2       form.
3           THE WITNESS:  I have not
4       analyzed the user consent to
5       require user data.
6           I am -- I'll admit I'm
7       slightly confused as how -- who
8       is the user that you're talking
9       about in this case and how it
10      applies to the Ad Exchange.
11          And I'm not -- if you can
12      clear up the context for me, I
13      would be able to answer your
14      question a little bit better,
15      maybe.
16  BY MS. RHEE:
17      Q.    Okay.  But just sitting
18  here today, you don't know about the
19  role, if any, of a user in ad serving
20  process?
21          MR. TESLICKO:  Object to
22      form.

Page 207

1           THE WITNESS:  No.  I -- I
2       would say that a "user" is a
3       very loaded term here -- maybe
4       loaded is a bad word.
5           But it can have multiple
6       meanings.
7           When you say user, do you
8       mean an advertiser?  Do you mean
9       a publisher?  Who do you mean?
10  BY MS. RHEE:
11      Q.    Okay.  But you haven't come
12  across the use of the term "user" in
13  stat materials?
14          MR. TESLICKO:  Object to
15      form.
16          THE WITNESS:  Sorry.
17          I have come across the use
18      of that term, and I have used it
19      -- I have found it in different
20      contexts.
21          And so in different
22      contexts, it was simply

Page 208

1       referring to different user.
2           And -- and that's why I'm asking
3       you for qualification -- for --
4       sorry -- for clarification,
5       because it can mean a publisher.
6           You could reasonably say a
7       publisher is a user of -- of
8       DFP.
9   BY MS. RHEE:
10      Q.    Okay.
11      A.    But you could also
12  reasonably say, no, that's not a user;
13  it's the ad agency that the publisher is
14  employing that is the user of DFP.
15          They are certainly not
16  users of the -- of the buyer-side,
17  right.  So there you have advertisers,
18  and they are the users.
19          And, unfortunately, the
20  term "user" means different things in
21  different contexts.
22      Q.    Okay.  You rely upon

Page 209

1   Dr. Weissman's analysis, I think, as you
2   put it, the analysis of the source code
3   and data flow in AdX and DFP; is that
4   right?
5       A.    Yes.  That is correct.
6       Q.    Okay.  What data flow do
7   you believe Dr. Weissman reviewed in the
8   source code?
9       A.    So, genuinely, I would
10  refer you to Dr. Weissman's document on
11  this because he kind of defines the
12  details.
13          But, for me, what was
14  really important in his analysis were
15  two things.
16          I've asked for specific
17  information about the code base to
18  verify that it still keeps the same
19  characteristics that it had when I last
20  worked in it, and that information was
21  provided to me.
22          And --

United States v.
Google
Document 1735-1   Filed 09/13/25   Page 30 of 46
Case 1:23-cv-00108-LMB-JFA
Highly Confidential
PageID# 113973
Gordanka Bjedov
August 27, 2025

Page 210

1      Q.    How was that provided to
2  you when you didn't look at the source
3  code yourself?
4      A.    So it was provided to me --
5  I had access to Dr. Weissman's draft
6  report before the first round of our
7  report submittal.
8           So don't quote me on the
9  date, but July.
10          MR. TESLICKO:  Instruct
11      you not to discuss drafts
12      because they are carved out by
13      the expert stipulation.
14  BY MS. RHEE:
15      Q.    Are you going to follow
16  counsel's instruction not to answer that
17  question?
18      A.    Yeah.
19      Q.    Okay.
20      A.    I'm sorry.  But yeah.
21      Q.    I had to ask.
22          Okay.

Page 211

1      A.    You're doing your job.
2      Q.    I just want to make clear,
3  since you did not look at the source
4  code yourself, did you have access to
5  anything that Dr. Weissman did that is
6  not set forth in his final reports?
7      A.    No.  I have not relied on
8  anything other than that -- other than
9  Dr. Weissman's analysis and his report.
10     Q.    Okay.  So insofar as you
11  make reference to relying upon
12  Dr. Weissman's source code analysis --
13     A.    Mm-hmm.
14     Q.    -- that analysis is what
15  Dr. Weissman sets out in his report and
16  in his source code appendix; is that
17  right?
18     A.    That is correct.
19          MR. TESLICKO:  Object to
20      form.
21  BY MS. RHEE:
22     Q.    Okay.  And that's -- and

Page 212

1  that's the total?  There's nothing else?
2      A.    I have also reviewed
3  Dr. Weissman's reports themselves, in
4  particular, portions that discuss what
5  we have referred to -- that could be
6  relevant to the things that we are
7  talking about, Stage I and Stage II of
8  DFP divestiture, because in those stages
9  the -- he's discussing the ability to
10  create APIs and the ability to cut out a
11  code and open-source that portion of the
12  code.
13          And I'm relying on his
14  expert opinion that the code is -- it is
15  possible to do those things.
16     Q.    Okay.  In particular, you
17  seem to spend some time looking at what
18  you referred to as Dr. Weissman's source
19  code statistics; is that right?
20     A.    That is correct.
21     Q.    Okay.  And what do you
22  understand Dr. Weissman to have done to

Page 213

1  put together his source code metrics
2  that he sets out in his source code
3  appendix?
4      A.    So I have seen some of the
5  statements that Dr. Weissman lists.  He
6  happens to use SQL to obtain this
7  information.
8           For me, there are specific
9  things that I have asked for about the
10  code base, and I have obtained the
11  information that I have asked for.
12     Q.    Okay.  Where do you set out
13  what is the information that you asked
14  for and the information you obtained?
15     A.    Oh, in the table where I
16  list the source code information.
17  That's the information that I asked for.
18  That's the information that I obtained.
19     Q.    I see.  So what you asked
20  for were these source code metrics?
21     A.    That is correct.  Yes.
22     Q.    Okay.  I see.  I see.

United States v.
Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 31 of 46
Highly Confidential
PageID# 119080
Goranka Bjedov
August 27, 2025

Page 214

1        So what specifically did
2  you ask for?
3        MR. TESLICKO:  I'm just
4     going to instruct you not to
5     disclose the substance of any
6     communications with Keystone or
7     with counsel.
8        THE WITNESS:  Mm-hmm.
9        So when I have worked at
10    Google, I had an insight, and I
11    was, you know, inside Google3,
12    and I looked at some of the
13    stuff.
14        And so what I'm looking
15    for over here is, is the code
16    base still what I would consider
17    clean and healthy code base.
18    And there are a couple of things
19    that can tell you that.
20        Not a single line in that
21    table by itself necessarily
22    means much.  But, in general,

Page 215

1  you're looking at -- and, again,
2  I make predictions about the
3  code base before I get the
4  confirmation.
5        So I would expect AdX to,
6  for example, be smaller than all
7  of the utilities.
8        Is that -- is that true?
9  Yes, it is.
10        I would expect DFP, to a
11  little bit, be -- be a little
12  bit bigger than AdX but, again,
13  smaller than utilities.  Is that
14  true?  Yes.
15        So those kinds of things
16  are consistent with my
17  expectations.
18        But here are the other
19  things that I want to see.
20  Let's say you are talking about,
21  as we are here, about C++ code
22  base, and you find out that the

Page 216

1  C++ code base has, I don't know,
2  tens of thousands of files and
3  they are all smaller than 25 to
4  30 lines of code.  That would
5  give me a pause.
6        What's going here.  Like,
7  why would anybody do this.  And
8  I would question what kind of
9  code base I'm dealing with.
10        So these are sort of --
11  consider them health checks,
12  right.
13        If you were to go to a
14  doctor and they do a blood test
15  and they look at the number of
16  parameters, you look at it and
17  say is this person healthy, and
18  you basically make a decision
19  that, yeah, this -- this is a
20  healthy person.
21        Now, that really does not
22  mean, necessarily, that the

Page 217

1        person is not suffering from
2        something you don't see.
3        But nine times out --
4        actually, I would say 99 times
5        out of 100, it gives you a
6        really clear insight in what
7        you're dealing with.
8        And that is kind of -- the
9        simple statistics can tell you
10       how -- how clean is this code
11       base.
12        And for me, it confirmed
13       that Google has continued with
14       their practice of being diligent
15       and professional and strict
16       about what they allow in and out
17       of the code base.
18  BY MS. RHEE:
19        Q.   Okay.  We're going to go to
20  the details of this --
21        A.   Mm-hmm.
22        Q.   -- table in a minute but --

United States vs.
Google
Document 1735-1    Filed 09/13/25    Page 32 of 46
Highly Confidential
Slonka Bjedov
August 27, 2025

Page 218

1        A.    All good.
2        Q.    -- but based on your
3   answer, I have some follow-ups for you.
4        A.    Sure.
5        Q.    You likened this to a
6   health check.
7        A.    I just did.
8        Q.    Okay.  Do you have either a
9   textbook citation, a manual citation, an
10  industry citation that lays out the kind
11  of health check methodology that you
12  just walked us through --
13            MR. TESLICKO:  Objection.
14  BY MS. RHEE:
15        Q.    -- where, you know,
16  counting the number of files and lines
17  of code is a way to do this kind of
18  health check, where, as you put it,
19  nine -- nine times out of ten it tells
20  you helpful information about the
21  person's health?
22            MR. TESLICKO:  Object to

Page 219

1   form.
2            THE WITNESS:  Understood.
3        So you can find tremendous
4   number of discussions about this
5   topic in particular lines of
6   code.
7        I personally have totally
8   objected when people have used
9   lines of code in contexts that I
10  felt were completely and utterly
11  inappropriate for.
12       And you could also make an
13  argument that, well, you're
14  talking about roughly
15  one-and-a-half-million lines of
16  code for AdX.  Can all of that
17  code be rearranged so that the
18  number of lines changes to be
19  something a lot smaller?
20  Absolutely.
21       You could rewrite all of
22  the code probably

Page 220

1        programatically so that the
2        number of lines of code will be
3        exactly the same as the number
4        of -- number of files you're
5        dealing with.
6            Because lines don't mean
7        anything to the computers.  They
8        mean something to the
9        programmers.
10            And so people can, and
11       they do, make a very reasonable
12       argument by saying, so lines of
13       code are meaningless.
14  BY MS. RHEE:
15       Q.    What -- do you cite to any
16  of that literature?
17       A.    No, I don't.
18       Q.    Okay.
19       A.    Because it's -- it's an
20  ongoing discussion.  And I think it's
21  going to be -- I don't think it's ever
22  going to be resolved.  It is just one of

Page 221

1   those philosophical topics where lines
2   of code -- it depends on what you use
3   the metric for.
4            You will find my work
5   strongly objecting to industry
6   benchmarks in performance testing.
7            And if you take it out of
8   context, you would say, all right, so
9   you're against benchmarks.  Why did you
10  then spend all of your time at Google
11  wasting their money writing benchmarks.
12  And, you know, it would feel that way.
13            I object to what people use
14  benchmarks for.  It -- benchmarks give
15  you very useful information.
16            So in case of Google,
17  benchmarks enabled my development
18  partners to quickly find out.  I write
19  something that allows them early in the
20  morning to look and say, did I make a
21  giant performance blunder yesterday
22  without realizing I was doing that.

United States v.
Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 33 of 46
Highly Confidential    PageID# 116082
Goranka Bjedov
August 27, 2025

1       That was the purpose of the
2  benchmark. It was incredibly valuable.
3       Now, if you take that
4  benchmark and you say, and this
5  benchmark proves that the code for
6  rightly is far better performed than the
7  code for something else, I'm going to
8  object to that. It wasn't written for
9  that. That is not the purpose of that
10  benchmark.
11       So in the discussion of
12  lines of code, they can be both very
13  useful and useless.
14       Okay. If a manager uses
15  lines of code to promote people, like, I
16  get hives. That is such a stupid
17  statistic to use in that context. So if
18  you use lines of code in that context,
19  yeah, they are -- they are terrible.
20       But if you use lines of
21  code and say, these are reasonable lines
22  of code written by engineers who were

1  not trying to get promoted by just
2  writing more lines and -- and roughly
3  describe the size of the project, then
4  that actually makes sense.
5       Q.    I'm asking --
6       A.    Mm-hmm.
7       Q.    -- insofar as you think in
8  this context --
9       A.    Mmhmm.
10       Q.    -- i.e., assessing
11  timelines and complexity --
12       A.    Mm-hmm.
13       Q.    -- do you have any
14  references to literature anywhere that
15  says, looking at these kind of simple
16  statistics --
17       A.    Mm-hmm.
18       Q.    -- is actually, as you put
19  it, a good health check?
20       MR. TESLICKO: Object to
21       form.
22       THE WITNESS: So I will

1       answer your question "no."
2       But I'm also not
3  referencing GAM on the standards
4  of C++ language. It's just C++,
5  you know, so --
6  BY MS. RHEE:
7       Q.    I know.
8       But I'm asking as a
9  methodological matter, insofar as you're
10  positing that this is a sound means --
11       A.    Mm-hmm.
12       Q.    -- to do a health check,
13  can you cite to anything that supports
14  that proposition?
15       MR. TESLICKO: Object to
16       form.
17       THE WITNESS: I am certain
18       I can find those references for
19       you and would be happy to
20       provide them for you.
21  BY MS. RHEE:
22       Q.    Okay. But you don't have

1  it right now in any of your appendices?
2       A.    No. I really didn't think
3  we would be discussing such basic things
4  that kind of a general agreement.
5       As I said, I also don't
6  cite anything on the history and
7  development of C++.
8       Those things are just, you
9  know, building blocks. Let's call them
10  building blocks of the whole process,
11  so...
12       Q.    Okay. Okay.
13       A.    But if you would like me
14  to, I will happily provide you with, you
15  know, references for all of those
16  things.
17       Q.    Okay. Thank you.
18       MS. RHEE: Is now a good
19       time to take a lunch break?
20       MR. TESLICKO: Sure.
21       Let's go off the record.
22       THE VIDEOGRAPHER: Off the

United States v.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 34 of 46

Highly Confidential

Gordana Bjedov
August 27, 2025

Page 226

1         record at 12:44.

2

3              (Whereupon, a luncheon

4         recess was taken.)

5              -  -  -

6    A F T E R N O O N   P R O C E E D I N G S

7              -  -  -

8              THE VIDEOGRAPHER:  On the

9         record at 1:23.

10             -  -  -

11             CONTINUED EXAMINATION

12             -  -  -

13   BY MS. RHEE:

14        Q.   Okay.  So we left off

15   talking about this source code metric

16   table.

17             Do you recall?

18        A.   Yes, I do recall.

19        Q.   Okay.  So why don't we

20   actually look at the -- no pun

21   intended -- the source.

22        A.   Mm-hmm.

Page 227

1         Q.   I'm going to get what I

2    hope is the Weissman Table 2, from his

3    source code appendix.

4              MS. RHEE:  Thank you so

5         much, Anita.

6              (Document marked for

7         identification as Bjedov

8         Exhibit 3.)

9              THE WITNESS:  Am I allowed

10        to start looking at it?

11   BY MS. RHEE:

12        Q.   Oh, yes, of course.

13        A.   I wasn't sure.

14        Q.   Of course.

15             What I'm directing your

16   attention to, because I think you

17   replicate it --

18        A.   Mm-hmm.

19        Q.   -- in your own report, is

20   this Table 2 called "Source Code

21   Metrics."

22             Do you see that?

Page 228

1         A.   Mm-hmm.  I do.

2         Q.   Okay.  And this is a

3    running of a tool to basically do counts

4    of each of these items, right?

5         A.   Yeah.  You can -- so

6    Professor Weissman used the tools that

7    he prefers.

8              I -- I would get the same

9    numbers using standard Unix commands,

10   provided that the repo is available

11   through -- through Unix, which I think

12   it is.

13        Q.   It's a pretty simple -- you

14   know, a tool or piece of code just to

15   count.

16        A.   Yeah.  You count and grip,

17   and -- yeah.  But sure.

18        Q.   Okay.  And then what he's

19   counting are the number of files --

20        A.   Mm-hmm.

21        Q.   -- classes, functions, and

22   code lines for what he puts in these

Page 229

1    columns: Supermixer, BOW, AdX, and GFP.

2    Fair?

3         A.   That is -- that is correct.

4    Yeah.

5         Q.   Okay.  And you see the

6    count for this column titled "AdX" to be

7    the complete count of source code

8    associated with AdX?

9              MR. TESLICKO:  Object to

10        form.

11             THE WITNESS:  I would say

12        absolutely not.

13             This is really more of

14        a -- you know, let's call it --

15        let's call it server-side stuff.

16             So I would not expect the

17        front-end code to be written in

18        C++.

19             And I would not expect to

20        find it in this directory.  It

21        would be odd to do that.

22   BY MS. RHEE:

United States vs. Google

Document 1735-1    Filed 09/13/25    Page 35 of 46

Case 1:23-cv-00108-LMB-JFA

Highly Confidential

PageID# 119034

Gorenka Bjedov

August 27, 2025

Page 238

1  pleasure of interacting with.

2         From the ability to just

3  list files, which files are in this

4  directory, ls, to the things like what

5  is the name of the kernel that -- that

6  you are running.  You name ls-a.

7         All of those commands, they

8  are a part of operating system, but they

9  are -- let's say they are not the core

10  part.  They are not the kernel, but they

11  are called utilities.

12         And so I'm talking about

13  utilities of these things that you

14  really need in order to provide the

15  service you're providing.  But they are

16  not necessarily the part of your core.

17         So in case of AdX, you will

18  say it's an exchange.  Its core part is

19  the exchange.

20         But, you know, it may

21  realize -- so, for example, you can

22  utilize in BOW for a lot of things.  BOW

Page 239

1  is those utilities that basically

2  removes some responsibility from AdX to

3  allow AdX to be lean, mean, and operate

4  cleanly.  But AdX can call it and say,

5  hey, give me this.

6         So a very, I would say,

7  advanced or -- the right way to develop

8  computer systems.

9     Q.    Okay.  But the upshot is, I

10  think, based on your earlier

11  testimony --

12     A.    Mm-hmm.  Mm-hmm.

13     Q.    -- is it's your opinion

14  that BOW and Supermixer need to be

15  divested, along with what you're calling

16  core AdX --

17     A.    Mm-hmm.

18     Q.    -- in order to provide the

19  functionality that an acquirer would

20  expect.

21         Is that -- have I got your

22  testimony right?

Page 240

1     A.    Very close.

2         I would say that there are

3  certainly functions inside BOW and

4  inside Supermixer.  Supermixer is

5  probably, again, most likely its own

6  product.  But certainly inside BOW, that

7  the buyer would have to get the copy of.

8         All of them, I cannot tell

9  you that, but certainly a fair number of

10  it.

11         Because as you will see,

12  BOW being the -- what's called the

13  utility-type part of the code base, is

14  larger than the rest of the stuff.

15         And so there could be parts

16  in BOW that apply just to AdX.  There

17  could be parts that apply to just the

18  DFP.  There could be parts in BOW that

19  support Supermixer itself.  And there

20  could be some parts that are used by all

21  three.

22         But there could be other

Page 241

1  parts they use by one or two or -- there

2  are probably even parts that are not

3  used by anybody and haven't been removed

4  from the code base for either historical

5  or -- or, actually, strategic reasons.

6         So parts of it would have

7  to certainly be provided to the

8  purchaser to make AdX work.

9         The other parts, Google

10  could reasonably say, well, this is not

11  necessary to make AdX work, and,

12  therefore, we are not going to be

13  providing it.

14     Q.    Okay.  So would you

15  consider BOW and Supermixer to be a

16  dependency of AdX and DFP?

17     A.    I would not use the term

18  "dependency."

19         I would say that AdX relies

20  on them, because they are really more --

21  they are kind of on the same level, if

22  that makes sense.

United States v.
Google
Document 1735-1    Filed 09/13/25    Page 36 of 46
Case 1:23-cv-00108-LMB-JFA
Highly Confidential
Goranka Bjedov
August 27, 2025
PageID# 119088

Page 242

1      And so they --
2      Q.    It doesn't make sense.
3      A.    All right.
4      Q.    This is why I'm asking the
5  question, because -- I mean, let's just
6  level set.
7            You are familiar with,
8  because you use it in your own report --
9      A.    Mm-hmm.
10      Q.    -- and certainly
11  Dr. Weissman uses it in his, and you
12  rely upon --
13      A.    Mm-hmm.
14      Q.    -- this notion of a
15  dependency, right?
16      A.    Absolutely.  Yes.
17      Q.    Okay.  And how long a
18  divestiture takes or your step of
19  technical decoupling --
20      A.    Mm-hmm.
21      Q.    -- depends on both the
22  number of dependencies and the

Page 243

1  complexity of those dependencies, right?
2            MR. TESLICKO:  Object to
3      form.
4            THE WITNESS:  Not exactly.
5      That's a very -- because, again,
6      the parallelization comes to the
7      issue.
8            In the strictest technical
9      term, you could really say that
10      all four of these most likely
11      depend on each other and call
12      each other.
13            Now, do they call
14      everything inside BOW?  No --
15  BY MS. RHEE:
16      Q.    No.  Understood --
17      A.    But some aspects of it, for
18  sure.
19      Q.    Right.  But that's the
20  reason why I'm asking.
21            What's the difference
22  between how Dr. Weissman refers to, as a

Page 244

1  dependency, and you refer to a
2  dependency, and what you're describing
3  here for Supermixer and BOW, which you
4  do not call a dependency --
5      A.    Mm-hmm.
6      Q.    -- but instead call a
7  related utility system?
8      A.    So in my example, when I
9  was describing UNIX, I wouldn't say that
10  UNIX kernel depends on utilities.  It's
11  just they -- they are -- there is
12  kernel, there is utilities, but they are
13  one, right?
14            And even though you could
15  separate them by code base, you compile
16  them differently and separately and so
17  on, they -- from the computer science
18  standpoint and from the practitioner
19  standpoint, you would never -- I don't
20  think any engineer would say, oh, when I
21  say UNIX, I mean UNIX kernel, and I
22  think UNIX Utilities, right, is

Page 245

1  dependencies.
2            We just say UNIX.  It's the
3  product.  It's the kernel.  It contains
4  all of the utilities.  We use it as one.
5      Q.    Yeah.  But when we're
6  talking about UNIX here, we're talking
7  about internal Google infrastructure and
8  its product --
9      A.    Product.
10      Q.    -- source code.
11      A.    Mm-hmm.
12      Q.    So here I just want to be
13  clear --
14      A.    Mm-hmm.
15      Q.    -- about what your
16  testimony is.
17            Your view is that BOW and
18  Supermixer, vis-à-vis AdX and DFP, are
19  not dependencies.
20            MR. TESLICKO:  Object to
21      form.
22            THE WITNESS:  I would call

Page 258

1 missed it, personally, I would
2 be absolutely stunned.
3     And based on Professor
4 Weissman's credentials,
5 expertise, and his work, I see
6 no reason to even contemplate
7 that hypothetical.
8     You are suggesting that he
9 doesn't have the -- truly, the
10 basic level of competence.
11     To give you an example of
12 how easy it is, I literally
13 would have to say, "Grab AdX
14 recursively," and I'm going to
15 get the whole thing.
16     And I personally cannot
17 imagine scenario in which an
18 expert of Professor Weissman's
19 caliber would be unfamiliar with
20 that.
21     But if you -- if you can
22 show me that, obviously, it

Page 259

1         would change how I look at the
2         stuff, because, then,
3         information that I have been
4         relying on is inaccurate.
5 BY MS. RHEE:
6     Q.    Okay.  So if it turned out
7 Professor Weissman did not do what
8 you're suggesting, which is run the tool
9 at the top level of each of these
10 folders, but, instead, he actually went
11 to each of those folder paths and then
12 ran the count within each folder, what
13 would be your response to that
14 methodology?
15     A.    My --
16         MR. TESLICKO:  Object to
17         form.
18         THE WITNESS:  My response
19         would be that I've seen parts of
20         the tools that Professor
21         Weissman is using and they are
22         different than the ones I would

Page 260

1     use.
2         I would say that this is
3 his area of expertise and not
4 mine, and so, frankly, I'm
5 looking forward to the
6 opportunity to find out why he
7 wouldn't use the things that I
8 would use.  But it's also been
9 six years since I last have done
10 it.
11         But I would be -- between
12 the two of us, I would trust his
13 tools more than I would trust
14 mine, and I know that my tools
15 would answer this in, like,
16 split second.
17         So on this topic, he is
18 the expert, and I'm just, you
19 know, a random person down the
20 street.
21 BY MS. RHEE:
22     Q.    So if it's Professor

Page 261

1 Weissman's testimony that this Table 2
2 is not meant to represent all of the
3 available files or directories
4 associated with AdX or DFP, how useful
5 is it to you in your health check?
6     A.    Very useful, because keep
7 in mind that I am not using this table
8 to say, oh, there is 400 -- sorry --
9 4,659,000 lines of code.  That's not --
10 that number is irrelevant.
11         I'm looking for the
12 patterns.  I am -- these numbers inform
13 my decision on is this code base what I
14 would expect a Google3 code base to
15 behave like and look like.
16     Q.    I just want to pause --
17     A.    Mm-hmm.
18     Q.    -- because, at least in
19 earlier testimony, you told us the
20 reason why this was relevant to you --
21     A.    Mm-hmm.
22     Q.    -- is because the numbers

United States vs.
Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 38 of 46
PageID# 119090
Highly Confidential
Srđanka Bjedov
August 27, 2025

Page 262

1  in the columns for BOW and Supermixer --
2       A.    Mm-hmm.
3       Q.    -- are bigger than the
4  numbers in the columns for AdX and GFP.
5            MR. TESLICKO:  Object to
6       form.
7  BY MS. RHEE:
8       Q.    Fair?
9       A.    No.  I told you that what
10 I'm looking for -- those are some of the
11 numbers that I'm looking for.
12           I'm looking to identify
13 utilities, and I know that the utilities
14 will be bigger than the other files and
15 so on.
16      Q.    Well, you're looking to see
17 if they are going to be bigger --
18      A.    Yes.
19      Q.    -- than the files, as you
20 put it, for AdX and DFP.
21      A.    That is correct.  Yes.
22      Q.    Okay.  So if it turns out

Page 263

1  that, because what Dr. Weissman did in
2  order to get to the counts for the
3  columns associated with AdX and DFP are
4  incomplete, and you don't actually know
5  what those numbers are, how can you do
6  the comparison of what those actual
7  numbers are, to the numbers for the
8  related utilities?
9            MR. TESLICKO:  Object to
10      form.
11           THE WITNESS:  So Professor
12      Weissman used a process and a
13      methodology to obtain these
14      numbers.
15           My starting assumption is
16      that Professor Weissman did not
17      intentionally try to deceive the
18      court and has relied on his
19      expertise, so he has used
20      exactly the same process in all
21      four of these directories.
22           And, you know, maybe you

Page 264

1       have information that shows
2       otherwise, but this is my
3       working premise.
4            His analysis may have been
5       incomplete, but it's going to be
6       incomplete in that case.
7            And -- and I do want to
8       say, this is your stipulation.
9       The parameters that I disagree
10      with, it's going to be
11      incomplete in exactly the same
12      way in all four of these --
13 BY MS. RHEE:
14      Q.    Well, you don't know that,
15 sitting here, right, because you don't
16 know -- because you don't know what's
17 contained underneath each of these
18 top-line directories, or, I guess, they
19 are referred to as top-level folders,
20 how many folders that are associated with BOW
21 and Supermixer that are not part of
22 these particular folder paths that

Page 265

1  Dr. Weissman describes, right?
2            MR. TESLICKO:  Object to
3       form.
4            THE WITNESS:  So the issue
5       here is the process, right.
6            He is doing the process,
7       trying to identify these files.
8       Let's assume that that
9       process -- and, again, I
10      disagree with this hypothetical
11      strongly.
12           And I am not trying to at
13      all suggest that Professor
14      Weissman would make this
15      mistake, because I don't -- if
16      you look at his credentials and
17      so on, as far as I'm concerned,
18      he is the expert in this area.
19           But, even, let's say,
20      entertaining your hypothetical,
21      he's using a process, and that
22      process will produce the same

United States v.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 39 of 46

Highly Confidential    PageID# 133980

Gordana Bjedov
August 27, 2025

Page 266

```
 1    type of an adder in all four of
 2    these columns.
 3         And what I'm looking for
 4    is things between them and
 5    things even around the columns,
 6    ratios, total numbers, and so
 7    on, to inform my opinion.
 8         So if you could give me
 9    any sort of description of what
10    kind of mistake could you be
11    thinking about that -- that we
12    could do, even, you know, me, if
13    I were doing this, that would
14    somehow make the mistakes in AdX
15    column but would leave the
16    remaining three correct, or the
17    other way around, I can't -- I
18    cannot imagine what that would
19    be.
20         You know, it's -- it's the
21    same code.  It's doing what you
22    tell it to do, and it's doing it
```

Page 267

```
 1         on all four of these, you know,
 2         at the same time.
 3    BY MS. RHEE:
 4         Q.    Okay.
 5         A.    But I do want to say, he is
 6    the expert.  I look at his credentials.
 7    And I go, like, this is a very low-level
 8    task.  It would be impossible for an
 9    expert of his caliber to make -- you
10    know, to make a mistake in that
11    particular field.
12         Q.    Okay.  You can put that
13    aside.
14              In your opening report, you
15    conclude that Google's operational
16    separation for DFP and AdX -- I'm sorry.
17              You talk about how AdX and
18    DFP already have operational separation.
19              Do you recall that?
20         A.    Yes, I do.
21         Q.    Okay.  I'm going to
22    actually --
```

Page 268

```
 1              MS. RHEE:  Let's mark for
 2    this deposition Exhibit 4, which
 3    is your opening report.
 4              THE WITNESS:  All right.
 5         I have a copy of it, so --
 6    BY MS. RHEE:
 7         Q.    Well, I'm going to give it
 8    to you.
 9         A.    All right.
10         Q.    Because we have to have a
11    marked copy.
12         A.    No problem.
13              (Document marked for
14              identification as Bjedov
15              Exhibit 4.)
16    BY MS. RHEE:
17         Q.    All right.  So I'm going to
18    direct your attention to Page 47,
19    Paragraph 116.
20              And you can keep me honest.
21    These are your words in your report.
22              "Google distinguishes
```

Page 269

```
 1    between 'AdX Serving' and 'DFP Serving,'
 2    which reflects operational separation in
 3    service deployment and management."
 4              Yes?
 5         A.    Yes.
 6         Q.    Okay.  From your report?
 7         A.    Mm-hmm.
 8         Q.    And those are your words?
 9         A.    Yes.
10         Q.    You wrote those?
11         A.    My team and I worked
12    together, but I proofread and approved
13    every word in the -- in the whole
14    report.
15         Q.    Okay.  So even if they
16    aren't your words, you approved of them?
17         A.    No, no, no.  The words are
18    mine with the exception of articles,
19    which you have probably noticed all of
20    those were more or less added by
21    somebody else who English-proofread the
22    paper.
```

United States v.
Google
Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 40 of 46
PageID# 116988
Highly Confidential
Goran Bjedov
August 27, 2025

Page 286

```
 1        form.
 2   BY MS. RHEE:
 3        Q.    You -- you didn't look at,
 4   for example, internal Google documents
 5   at that time.  Okay.
 6             COURT REPORTER:  You have
 7        to answer out loud.  Sorry.
 8             THE WITNESS:  No, I
 9        didn't.
10   BY MS. RHEE:
11        Q.    Okay.  Just based on your
12   answer, I want to understand, in your
13   thinking about dependencies --
14        A.    Mm-hmm.
15        Q.    -- in your first stage of
16   coming up with your expectation about
17   the number of dependencies there would
18   be and how long it would take to replace
19   them.
20        A.    Mm-hmm.
21        Q.    Did you look at and/or rely
22   on Professor Weissman in your Stage I
```

Page 287

```
 1   process?
 2        A.    No.
 3             MR. TESLICKO:  Object to
 4        form.
 5   BY MS. RHEE:
 6        Q.    Okay.  That's very helpful.
 7   I see.
 8             So your reliance on
 9   Professor Weissman is in your, as I
10   think you put it, pressure testing, or
11   testing of your Stage I opinion?
12             MR. TESLICKO:  Object to
13        form.
14             THE WITNESS:  I would say
15        it is during the step where you
16        refine your opinion.
17             Again, AdX is an Ad
18        Exchange.
19             I have actually,
20        firsthand, worked on complete
21        migration, partially write and
22        just a whole mess of an Ad
```

Page 288

```
 1        Exchange.
 2             And so I have a reasonable
 3        starting point to say, I know
 4        how many dependencies I should
 5        be dealing with here.
 6             And I make my own
 7        estimates around that, and I do
 8        my work related to that.
 9   BY MS. RHEE:
10        Q.    And you did all of that
11   without looking at or relying on
12   Professor Weissman or any of his work?
13        A.    That is correct.
14        Q.    I see.  Okay.
15             And then I take it from
16   your answer, when you got to the point
17   where you looked at Professor Weissman's
18   opinion and his work, it confirmed for
19   you your initial assessment and your
20   expectation.
21             Is that -- have I got that
22   right?
```

Page 289

```
 1        A.    That is fair to say.  We
 2   were roughly talking about, let's say,
 3   the same -- certainly, the same order of
 4   magnitude.
 5        Q.    I see.
 6             Okay.  But you didn't need
 7   him or rely on him to get to your
 8   original estimates?
 9        A.    No.
10             MR. TESLICKO:  Object to
11        form.
12   BY MS. RHEE:
13        Q.    Okay.  And you got to your
14   original estimates -- I just want to
15   understand -- again, based on your own
16   experience?
17        A.    My personal experience with
18   migrating a similar-type product or --
19   you can even call it the same, but
20   probably not the same.
21        Q.    Okay.  Which product is
22   that?
```

United States v.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 41 of 46
PageID# 119038

Highly Confidential

Gsenka Bjedov
August 27, 2025

Page 290



15 Q. Okay.  And so that's the
16 experience that you relied upon in
17 making your original estimates?
18  MR. TESLICKO:  Object to
19 form.
20  THE WITNESS:  That is the
21 experience I called on.  One of
22 the things that I've done in the

Page 291

1 past but certainly not, you
2 know, the only.
3  It's -- I would say it's
4 the closest.  But there are, you
5 know, other things that you get
6 involved with that you can
7 reasonably say they may not be
8 ad exchange but they will
9 require the same dependencies.
10 BY MS. RHEE:
11 Q. Okay.
12  MS. RHEE:  Why don't we
13 take a quick break.
14  MR. TESLICKO:  Great.
15  THE VIDEOGRAPHER:  Off the
16 record at 2:18.
17  (Short break.)
18  THE VIDEOGRAPHER:  On the
19 record at 2:32.
20 BY MS. RHEE:
21 Q. Okay.  New topic.
22  Your migration plan assumes

Page 292

1 that AdX and DFP will be migrated first
2 to the Google public cloud?
3 A. I am proposing what I would
4 call one reasonable option, but I'm not
5 saying that other people could not come
6 up with other reasonable options that,
7 you know, go to different destination
8 and so on.
9  Just one reasonable option,
10 and in my option, I propose going to
11 Google public cloud, yes.
12 Q. Okay.  And that option that
13 you put forth --
14 A. Mm-hmm.
15 Q. -- which is that AdX and
16 DFP first get migrated to the Google
17 public cloud, that impacts your
18 estimated timelines that you put forth
19 for all of the downstream steps, right?
20  MR. TESLICKO:  Object to
21 form.
22  THE WITNESS:  Yes and a

Page 293

1 no.
2  The reason why I suggest
3 you should go -- you should
4 consider going to Google public
5 cloud is because I have
6 guarantee that I will have
7 expertise available on Google
8 public cloud and, obviously, on
9 Google public -- private cloud
10 available to me at the time of
11 divestiture.
12  If, for example, let's say
13 Amazon were to decide and be a
14 buyer -- and this is me just
15 picking a person out of thin
16 air.  I have no idea if they are
17 in any way, shape, or form,
18 one -- but they are the owners
19 of their own cloud, right.  So
20 they are the owners of AWS and
21 S3.
22  And so if a potential

Page 386

```
1              And --
2   BY MS. RHEE:
3         Q.    You mean a software
4   engineer?
5         A.    Software engineer from the
6   product team, yes.
7               And you should be able to
8   get this done in a couple of days.
9         Q.    Okay.  I just want to --
10        A.    Mm-hmm.
11        Q.    Thank you for the
12  clarification.
13        A.    No problem.
14        Q.    I am not an engineer, so I
15  now want to just clarify.
16              Your testimony today is
17  that you believe you really just need
18  one performance engineer, one site
19  reliability engineer, and one software
20  engineer from the product team working
21  over a couple of days?
22        A.    Yeah.  To get this done.
```

Page 387

```
1         Q.    Okay.  And this is the
2   first stage of your migration plan that
3   you labeled "Deployment Analysis"?
4         A.    "Deployment Analysis," yes.
5         Q.    Okay.  All right.
6               And the second stage of
7   your --
8         A.    Mm-hmm.
9         Q.    -- four-stage migration
10  plan you call "Technical Decoupling,"
11  correct?
12        A.    Correct.
13        Q.    Okay.  And that's the stage
14  of your migration plan that you believe
15  will take the most amount of time,
16  correct?
17        A.    That is correct, yes.
18        Q.    Okay.  And that stage is
19  evaluating the replacements for all of
20  the dependencies for AdX and DFP and
21  then choosing the best replacement
22  options?
```

Page 388

```
1         MR. TESLICKO:  Object to
2   form.
3         THE WITNESS:  No.  What --
4   what you're doing in that stage
5   is -- so you have found the
6   systems that you are relying on
7   and you need to replace.
8         Not only are you picking a
9   system that you will be
10  eventually replacing it with,
11  but you actually are doing the
12  cuts.
13        You are -- in the first
14  stage -- and how I would suggest
15  that they do this -- is
16  basically write a simple
17  passthrough calls, and so you --
18  you kind of add a layer.  You
19  can call it a mock, if you like.
20        And in the first stage
21  that thing does nothing but
22  passes through the call that
```

Page 389

```
1   will then go to whatever is
2   still currently the system
3   supporting AdX in a Google
4   private cloud.
5         Once you have identified
6   all of those, let's say, for
7   database, because that is the
8   one that I believe should start
9   first, the -- the first thing
10  that I would do is verify did we
11  really identify all of those
12  correctly.
13        And now because all of the
14  calls are going through the
15  mock, that is relatively easy to
16  do.
17        I sort of disable the
18  mock, and if the database is
19  still getting calls from me,
20  that means that there are places
21  that I've missed them, and I
22  have to go and find them as well
```

United States vs.
Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 43 of 46
Highly Confidential
PageID# 119082

Gordana Bjedov
August 27, 2025

Page 390

1  and redirect them to go to my
2  mock implementation of the call,
3  which is doing nothing but doing
4  the passthrough.
5      At this point in time, I
6  have all of the database calls
7  listed in one place and
8  available to me.
9      And, hopefully, by this
10  point in time, we have decided
11  to -- as to what is going to be
12  our replacement.
13      But let's say we haven't.
14  This would be a great place and
15  opportunity to say, you know,
16  let's -- let's speak to
17  different replacement
18  candidates.  And we have all of
19  this code in front of us.  Let's
20  just write substitute APIs for
21  two different databases, if
22  that's what we are choosing.

Page 391

1      But this is also a place
2    that, if you have a buyer
3    already identified, you can get
4    their input on what is the
5    replacement system they would
6    like.
7      And, fundamentally, you
8    just have to rewrite those APIs.
9 BY MS. RHEE:
10    Q.  Okay.  And sitting here
11 today --
12    A.  Or API calls.
13    Q.  Sitting here today, what is
14 your opinion about how long this step or
15 stage in the -- your four-step migration
16 plan, it would take?
17    A.  So I have given that stage
18 eight months, and I -- when I make these
19 kinds of determinations, in general --
20 I've been called a pessimist, so just so
21 you know.
22      But the way I look at

Page 392

1  making my time estimates is, honestly,
2  how would I feel if somebody told me, do
3  this in this amount of time.  And if I
4  would feel like, ooh, that's -- that's
5  tight.  It's possible but tight.
6      That is not going to be the
7  estimate I'm going to give, because I
8  don't think -- I don't think that's fair
9  to the engineers who are tasked with the
10  job.
11      And so the way I come up
12  with something like eight months is, of
13  all the systems that we have talked
14  about, F1 is going to be the most
15  complex replacement, in my opinion.
16      I would be surprised if I'm
17  wrong about that.
18      You know, if there are some
19  other databases that they are calling,
20  they will be really small compared to
21  the -- to the F1 stuff.
22

Page 393

United States v. Google

Case 1:23-cv-00108-LMB-JFA    Document 1735-1    Filed 09/13/25    Page 44 of 46

Highly Confidential

PageID# 130886

Gorenka Bjedov
August 27, 2025



Page 394

Page 396

Page 395

Page 397

United States v. Google
Case 1:23-cv-00108-LMB-JFA   Document 1735-1   Filed 09/13/25   Page 45 of 46
Highly Confidential
PageID# 1.00##
Gordana Bjedov
August 27, 2025



United States v.
Google

Document 1735-1    Filed 09/13/25    Page 46 of 46
Highly Confidential

Gordana Bjedov
August 27, 2025

Case 1:23-cv-00108-LMB-JFA
PageID# 11086



11        At Google, that priority is
12  search.  You take the Search away,
13  the -- you know, people are not just
14  going to come to see ads.  You have to
15  put Search above everything else.  And
16  then you put ads.
17        And now you're looking at
18  maybe Gmail as another, you know, viable
19  thing that you have to watch out for.