**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES, *et al.*, <br><br> *Plaintiffs*, <br><br> vs. <br><br> GOOGLE LLC, <br><br> *Defendant*. | No. 1:23-cv-00108-LMB-JFA |

**<u>GOOGLE LLC'S RESPONSE TO PLAINTIFFS' PROPOSED FINAL JUDGMENT</u>**

**INTRODUCTION**..........................................................................................................................1

**I.    GOOGLE PROPOSES REMEDIES TO RESTORE COMPETITION THAT EXTEND BEYOND THE SPECIFIC ANTICOMPETITIVE CONDUCT FOUND BY THE COURT.** 5

A. To Restore Competition in the Publisher Ad Server Market, Google Proposes To Break the AdX-DFP Tie and Facilitate Switching to Rival Publisher Ad Servers. ...................................6

B. To Restore Competition in the Ad Exchange Market the Court Found, Google Proposes To Give Publishers Additional Means To Disfavor AdX, Additional Means to Put AdX in Head-to-Head Competition with Other Exchanges, and the Ability To Separate DFP and AdX with Prebid. 8

1. Google's Proposal Extends Beyond the Specific Illegal Conduct Found by the Court to Favor AdX ..........................................................................................................................9

C. Google's Proposed Remedies Will Restore Competition in an Efficient, Workable, and Administrable Manner. ...................................................................................................12

**II.   PLAINTIFFS PROPOSE REMEDIES THAT RELITIGATE CASES PLAINTIFFS LOST AND ADDRESS MARKETS PLAINTIFFS DID NOT ALLEGE.............................13**

A. Plaintiffs Propose Remedies that Go Beyond Open-Web Display Advertising. ...............14

B. Plaintiffs Propose Remedies that Interfere with Competition on the Buy Side. ................15

C. Plaintiffs Propose Remedies To Regulate Lawful Conduct. ..............................................16

**III.  PLAINTIFFS PROPOSE REMEDIES THAT ARE RECKLESS, IRREVERSIBLE, AND DAMAGING TO COMPETITION AND CONSUMERS. ...........................................17**

A. A Technical Divestiture of AdX or DFP Would Be a Technological Challenge of Unprecedented Complexity with Significant Uncertainty.....................................................18

B. Plaintiffs' Proposed Steps for Technical Divestiture Are Unsupported by Expert Testimony, and Are Not Administrable or Workable...............................................................21

C. Plaintiffs' Proposed Divestiture Transactions May Never Succeed. ................................22

D. Plaintiffs' Proposal to Open-Source the "Final Auction Logic" Is Undefined and Risks Harm to Publishers...............................................................................................................23

E. Plaintiffs' Proposal Threatens to Disrupt an Already Rapidly Changing Display Advertising Ecosystem. ...............................................................................................................25

F. Taken Together, Plaintiffs' Proposals Will Harm Publishers, Advertisers, and the Open-Web Display Advertising Ecosystem. ...................................................................................27

**IV.   GOOGLE'S PROPOSAL WILL FULFILL THE GOALS OF ANTITRUST REMEDIES, WHEREAS PLAINTIFFS' PROPOSAL SHOULD BE REJECTED UNDER ANTITRUST LAW............................................................................................................30**

A. As in *Search*, the Court Should Reject Plaintiffs' Request for Divestiture of AdX and DFP 31

B. Google's Proposal Adheres to Principles of Antitrust Law and Addresses the Court's Liability Finding. ...............................................................................................................39

C. Plaintiffs' Proposal Is Untethered from the Court's Liability Opinion and Would Be Legally Unprecedented. .................................................................................................................. 41

D. The Court Should Also Reject Plaintiffs' Proposal Because It Will Harm Consumers and Competition.................................................................................................................................. 49

**INTRODUCTION**

The Supreme Court's guidance "when it comes to fashioning an antitrust remedy" is that "caution is key."[1] *NCAA v. Alston*, 594 U.S. 69, 106 (2021); *cf. United States v. Google LLC* ("*Search*"), 2025 WL 2523010, at *2, *31 (D.D.C. Sept. 2, 2025) ("courts must approach the task of crafting remedies with a healthy dose of humility" given that "caution is key"). Consistent with this principle, courts have generally understood that "equitable relief in an antitrust case should not embody harsh measures when less severe ones will do." *New York v. Microsoft Corp.* ("*Microsoft II*"), 224 F. Supp. 2d 76, 100 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.* ("*Microsoft III*"), 373 F.3d 1199 (D.C. Cir. 2004) (en banc). Divestiture is the harshest of remedies, described by courts as "most drastic," "radical," "extreme," and "severe." And no court has ever used divestiture to deny a defendant the ability to continue to compete in a market found by the court. Divestiture has instead been reserved for cases that stem from an unlawful corporate combination or acquisition. Ordering divestiture here—as reflected in Plaintiffs' unrealistic and unworkable 61-page proposal—would be an unprecedented and erroneous imposition of this "radical" and "extreme" remedy.

At the May 2 hearing, Plaintiffs acknowledged that Google's initial remedies proposal "would absolutely address our concern about the prior illegal conduct." ECF No. 1432 at 35:8-21. That proposal went further than enjoining conduct found anticompetitive, including proposing to build brand new connections to give ad server competitors access to Google's "incredible trove" of advertiser demand, *id.* at 9:9-10:1. But Google's final proposal goes even further, consistent with the Court's liability ruling and antitrust remedy principles, to address concerns open-web

---

[1] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated.

publishers and Plaintiffs' experts identified in remedies discovery. For example, Google's proposal gives publishers the choice to put Prebid, an industry consortium and competitor, in between AdX and DFP. Google's remedy is thorough, workable, subject to effective oversight, and addresses concerns about circumvention. And it is sufficient to achieve the goal of antitrust remedies: to restore the competitive conditions that would have existed absent the conduct the Court found anticompetitive, in which "any number of competitors may flourish (or not) based upon the merits of their offerings." *Microsoft III*, 373 F.3d at 1231.

Plaintiffs, by contrast, ask this Court to abandon Supreme Court guidance and legal precedent, go far beyond the bounds of the Court's liability opinion, and invite disruption and damage to consumers and competition in a rapidly changing technology ecosystem. Rather than offering the Court anything resembling a workable plan, Plaintiffs' 61-page filing presents a series of proposed remedies that are complicated, woefully lacking in relevant detail, internally inconsistent, and unsupported by their own experts' testimony. To name just a few examples, Plaintiffs refuse to provide a meaningful definition of the assets they propose be divested, and instead propose that the Court delegate to Plaintiffs the sole discretion to decide the scope of what is included in the divested assets. Nor do Plaintiffs engage with the reality that AdX and DFP have been merged into one product—Google Ad Manager—since at least 2018.

While Plaintiffs describe their divestiture remedy as "simple, relatively easy to administer, and sure," their proposal is anything but. Plaintiffs conspicuously fail to mention in their cover filing that their own proposal contemplates the Court supervising complicated technical processes for worldwide products for up to *13.5 years* after final judgment. Stunningly, part of Plaintiffs' "solution" to that problem appears to be to delegate authority to themselves (and their successors) to make difficult administration calls after the Court has already entered final judgment. Their

proposed order leaves decisions to Plaintiffs' sole judgment or discretion 67 times, including for critical questions such as what functionality is included in the AdX or DFP divestiture assets, approval of the AdX and DFP acquirers, time required to migrate AdX and DFP and their customers, what is included in "Final Auction Logic," and identification of the Open-Source Auction Administrator. Plaintiffs do not explain how the Court, the parties, or anyone else can conceivably know how their remedies will be administered or affect consumers and competition for up to 13.5 years into the future given that these questions remain unanswered *ex ante*.

Plaintiffs clearly are not swayed by practical realities; nor are they moved by black-letter antitrust remedies law. There is no principle of antitrust law that a competitor should be wholesale excised from a market once it has been found to be a monopolist. Yet, in their accompanying Notice, Plaintiffs persist in arguing for such a legally unprecedented remedy on the basis of short, one- or two-sentence quotes lifted out of context from Supreme Court antitrust cases. They ignore recent and relevant case law, like the Supreme Court's decision in *Alston*, or rulings in *Search* and *Microsoft* that applied the same Supreme Court cases to reject proposed remedies similar to the ones that Plaintiffs have proposed here. When examined more closely, not a single one of Plaintiffs' oft-cited cases supports their proposal to completely eliminate a competitor from relevant markets, to divest where there has been no unlawful combination, to divest based on an anticompetitive tie, or to adopt remedies guaranteed to harm consumers and competition. Instead, Plaintiffs' own cases demonstrate that courts carefully tailor antitrust remedies to address the conduct found anticompetitive.

None of Plaintiffs' experts have meaningfully analyzed Plaintiffs' proposals. Multiple of Plaintiffs' experts admit to having reached opinions about divestiture of AdX and DFP based on publicly available materials instead of evidence in this case, including without looking at the

source code underlying AdX and DFP. Plaintiffs' one technical expert who did review the source code did not review enough code to have an opinion on whether divestiture would succeed or how long it would take. Plaintiffs' non-technical experts have simply assumed that an unprecedented divestiture of exceedingly complex technological tools would work. Furthermore, none of Plaintiffs' experts have been able to authoritatively explain the details of Plaintiffs' remedies, including what functionalities or assets would be divested; how the remedies would be implemented in practice; how long accomplishing the remedies would take; how disruption to customers and the ecosystem would be avoided; or whether, if there are delays or challenges, the remedies will nonetheless benefit consumers, competition, or open-web display publishers.

Relying on precedent, the *Search* decision makes clear, it is the Court's responsibility to balance harms, or "substantial risk of harm," that would be caused by proposed remedies. *Search*, 2025 WL 2523010, at *58. Although Plaintiffs would prefer to resolve the details down the road, the time to do this is now, before consequences are irrevocable and tools relied upon by millions of consumers are broken. The evidence will show that Plaintiffs' remedies would be "incredibly messy and highly risky," *id.* at *56, harming publishers, advertisers, and Internet users. As Professor Nieh will testify, like the rejected divestiture of Google Chrome in the *Search* case earlier this year, divestiture of either "AdX" or "DFP" is uncertain to succeed; would require tearing Google Ad Manager's ad serving and exchange capabilities from the Google infrastructure that currently enables Google Ad Manager to process hundreds of billions of ad requests a day; and, even if it could be successful–"and that is a big 'if,'" *id.* at *56, would create an imitation of the existing functionality that performs worse at higher cost.

Finally, Plaintiffs' filing puts forth remedies as if the incredibly dynamic ad tech ecosystem had stood still while these judicial proceedings continued. But the changes have been many: AI

will introduce dramatic changes to the industry; non-open web display ad formats like connected TV (streaming) and retail media are exploding in popularity; and Google's competitors are directing their investments to these new growth areas. In *Search*, Judge Mehta recognized that courts "must be sensitive to remedies that risk substantially stifling technological innovation or impairing consumer welfare." 2025 WL 2523010, at *31. As the law makes clear, the last thing a court should do is intervene to reshape an industry that is already in the midst of being reshaped by market forces.

Below, Google lays out an overview of the evidence it will present at trial showing that Plaintiffs' proposal would cause serious damage to the display advertising ecosystem, and particularly open-web display advertising, in a fast-moving, complex industry already being completely reshaped by technological transformation. In contrast, as Google will also show, Google's proposed final judgment is workable, responds to the Court's liability findings and witness testimony in this case, will demonstrably increase competition in the very ways industry stakeholders have requested, and will be administrable and verifiable by the Court. The Court should decline Plaintiffs' invitation to "set sail on a sea of doubt," *Alston*, 594 U.S. at 107—or, in the case of Plaintiffs' latest proposal, to set sail into certain havoc for customers and for the ad tech ecosystem.

## I.    GOOGLE PROPOSES REMEDIES TO RESTORE COMPETITION THAT EXTEND BEYOND THE SPECIFIC ANTICOMPETITIVE CONDUCT FOUND BY THE COURT.

1.      Google has not only proposed remedies that will remedy past harms and restore competition but also gone further than the Court's specific liability findings, addressing testimony from Plaintiffs' fact and expert witnesses, where changes would promote competition without harming consumers who rely upon the complex technology at issue.

5

2.      Google's proposed remedies satisfy the goals of the antitrust laws, as set forth by the Supreme Court and other courts. *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) (the goal of antitrust remedies is to "restore competition" so that firms can compete on the merits); *Microsoft III*, 373 F.3d at 1231 (an appropriate remedy should "restor[e] conditions in which the competitive process is revived and any number of competitors may flourish (or not) based upon the merits of their offerings," not "provid[e] aid to a particular competitor"); *Search*, 2025 WL 2523010, at *29 (antitrust remedies should restore competitive conditions and be "tailored to fit the wrong creating the occasion for the remedy").

### A. To Restore Competition in the Publisher Ad Server Market, Google Proposes To Break the AdX-DFP Tie and Facilitate Switching to Rival Publisher Ad Servers.

3.      At the core of the Court's finding in this case was the tie of DFP to AdX, which the Court concluded enabled Google to "use[] its power in the products' two adjacent markets to harm competition." Memorandum Opinion, ECF No. 1410 ("Mem. Op.") at 90. The Court concluded that "the policy and technology restrictions that Google has placed within AdX conditioned purchase of the tying product [AdX] upon purchase of the tied product [DFP]." *Id.* at 92.

4.      At the liability trial, Plaintiffs' publisher witnesses uniformly testified that they would contemplate switching to rival publisher ad servers if rivals had access to AdX real-time bids. 9/10/24 AM Tr. 11:3-12:10 (Layser) (testifying that News Corp decided not to switch ad servers because it was concerned about losing access to AdX real-time prices); 9/9/24 AM Tr. 75:23-76:8, 77:8-13 (Wolfe) (Gannett did not switch to a rival publisher ad server because it wanted "direct access to the Google ad exchange" "from a real-time bidding perspective"); 9/27/24 AM Tr. 71:9-24 (Wheatland) (Daily Mail did not switch to a rival publisher ad server because "we still needed to access AdX demand").

5.      And rival publisher ad server witnesses testified that rival publisher ad servers lost

customers because they could not offer publisher customers access to AdX real-time bids. 9/17/24 PM Tr. 50:4-11 (Cadogan) (OpenX ad server shut down because it "didn't have any access on a real-time basis to the AdX ad exchange); 9/13/24 PM Tr. 129:14-21 (Boland) (Facebook ad server unsuccessful because it could not replicate Google's ability "to bring their own demand through AdX"); 9/9/24 PM Tr. 125:10-18 (Avery) (Kevel lost customers because "they needed that demand from AdX"); 9/20/24 PM Tr. 152:23-153:3 (John) (Xandr lost customers "specifically" because they were losing "AdX demand" on Microsoft's ad server).

6.      Google is therefore proposing not only to remove the policy (including contracts) and technology restrictions that the Court found had created the AdX-DFP tie, but to go further by engineering new technological integrations that will facilitate publisher switching away from DFP to rival publisher ad servers.

6.1.    Publishers will be able to contract separately for AdX and DFP.

6.2.    Google will create a technical integration to provide AdX real-time bids to rival publisher ad servers.

6.3.    Google will also create a technical integration to provide AdX real-time bids to Prebid.

6.4.    To facilitate switching, Google will provide publishers the ability to share data currently within Google tools with rival publisher ad servers, specifically (1) AdX bid data and (2) the publisher's data in DFP.   Publisher ad servers will be able to use data to further improve their products, such as by creating optimization algorithms for floor prices.

6.5.    And, to address claims that the AdX-DFP tie could be recreated in indirect ways, Google will charge the same AdX revenue share regardless of whether the publisher

uses DFP.

6.6.    In addition, Google proposes a Monitoring Trustee to oversee compliance, including receiving complaints or inquiries about Google's compliance, with the Court's order.

6.7.    As a result, publishers will be able to use rival publisher ad servers while maintaining the same access to AdX demand that they had using DFP.

7.    As the evidence presented will show, Google's proposal will ensure competition in the ad server market that the Court found; promote increased competition on the merits between DFP and other ad servers in an ad server market the Court found that is already growing today; erode DFP's market share as publishers switch away; and prevent Google from using access to AdX to coerce publishers to use DFP in the future.

**B. To Restore Competition in the Ad Exchange Market the Court Found, Google Proposes To Give Publishers Additional Means To Disfavor AdX, Additional Means to Put AdX in Head-to-Head Competition with Other Exchanges, and the Ability To Separate DFP and AdX with Prebid.**

8.    The Court also found that Google used its market power in DFP to introduce "anticompetitive policies, practices, and technology changes" that "enhanced AdX's market power at the expense of rivals." Mem. Op. at 98-101. In particular, the Court found that First Look "artificially advantag[ed] AdX within DFP's auction logic," *id.* at 99; Last Look and sell-side dynamic revenue share combined enabled AdX to "win impressions that it would have lost in a fair auction," *id.* at 99-100; and Unified Pricing Rules "took away publishers' ability to set higher price floors on AdX than on third-party exchanges," *id.* at 100.

9.    Google proposes that it will not reimplement First Look or Last Look and that it will deprecate the Unified Pricing Rules. In addition, to guarantee that publishers retain unimpeded choice to set higher price floors on AdX, Google proposes that it will charge the same DFP fee

8

regardless of whether the publisher sets a higher floor price for AdX.

10.    Those measures alone would restore competition in the ad exchange market the Court found. As the Court found, publishers already previously used higher pricing floors against AdX as a "primary tool" "to maintain revenue diversity" among ad exchanges. *Id.* at 100. After deprecation of UPR, publishers can choose to use DFP (or any other ad server) to direct revenue away from AdX and toward other exchanges. As Plaintiffs' own liability expert estimated, removing UPR alone would reduce AdX's take rate from 20% to one in line with six of its competitors, approximately 16%. PTX-1199B; 9/18/24 PM Tr. 16:23-17:11, 32:16-20.

### 1. Google's Proposal Extends Beyond the Specific Illegal Conduct Found by the Court to Favor AdX

11.    Google is also proposing to go beyond directly addressing the specific illegal conduct found by the Court to favor AdX. Google proposes remedies that will increase competition in the ad exchange market found by the Court by expanding publishers' ability to put AdX in head-to-head competition with other exchanges *outside* Google, via header bidding.

12.    In order to further restore ad exchange competition, Google proposes to expand customers' optionality to rely on header bidding. Google will not just expand the availability of an existing header bidding solution, but build entirely new technological integrations with header bidding software published and promoted by Prebid, an organization that consists of "non-Google industry members and open-source advocates." Mem. Op. at 33.

    12.1.    Google will provide Header Bidding Trafficking, a DFP tool that facilitates the use of header bidding, to nearly 100,000 additional small publishers who use Google Ad Manager.

    12.2.    Google will provide AdX real-time bids to Prebid wrappers.

    12.3.    Google will build a server-to-server integration between DFP and Prebid Server

that supports receiving bids from ad exchanges, including AdX, through Prebid as well.

13.    Consistent with the Court's liability opinion, Google's added header bidding proposals will allow competition to flourish in the ad exchange market found by the Court. According to the Court, Google's prior efforts to "mitigate the risk that header bidding posed" were part of what "enabled AdX to remain the world's largest ad exchange." Mem. Op. at 36. The Court concluded that Google saw a risk to its revenue model from Header Bidding and declined to have AdX participate in header bidding, thereby avoiding direct head-to-head competition between AdX and other ad exchanges, such as Index Exchange, Magnite, OpenX, and PubMatic. *Id.* at 33-34. Instead, the Court found, Google developed Open Bidding to create a "slightly better" version of header bidding, so that rival exchanges would conduct their bidding within Google's ad tech ecosystem. *Id.* The Court found that in moving rival ad exchanges' bidding to Open Bidding, although not defining this as anticompetitive conduct, Google sought to mitigate the competitive pressure those rival exchanges could exert on AdX and DFP. *Id.* at 34.

14.    Google's proposal will now give publishers the choice to use Prebid—which is completely outside of Google and Open Bidding—to run an auction of auctions for indirect open-web display impressions, pitting AdX against other exchanges in head-to-head competition. Under this proposal, Prebid will offer publishers another choice outside of Open Bidding for AdX to compete with other exchanges. This flexibility would provide publishers greater control, as the Prebid auction is viewed by some industry participants as a more transparent auction that connects with third parties in a way that publishers control.

15.    What is more, Google's proposal would give publishers the new ability to separate DFP and AdX with a systematic, non-Google barrier: a Prebid Server entirely outside Google's

control. In remedies discovery, witnesses expressed concern that even after deprecating UPR, there could be other unidentified ways that Google could use DFP to preference AdX over other exchanges. To address this concern, Google's proposal enables publishers to ask Prebid to call all exchanges, including AdX and its rivals; have Prebid select the winning bid from all of those exchanges; and then provide the winning bid selected by Prebid to DFP (or another ad server of its choosing). The new integrations could thereby eliminate any Google involvement in the process of selecting a winning bid from amongst the indirect open-web display demand provided by ad exchanges.

16.    Google's proposals will be more than sufficient to ensure competition in the ad exchange market found by the Court; promote increased competition on the merits between AdX and its rivals; continue to diminish AdX's market share as publishers direct business away from AdX; prevent Google from using DFP to favor AdX in the future; and allow rival ad servers and ad exchanges to generate revenue and scale. Google's proposal will increase publisher choice and ensure a level playing field of ad exchange competition. And the structural addition of Prebid as an intermediary between AdX and DFP will enable publishers to prevent Google from using any remaining power in DFP (as DFP's own market share decreases due to Google's remedies) to favor AdX.

17.    Google's proposed changes will be particularly impactful in an ad exchange market that industry participants described as crowded by numerous competitors—including many who have relationships with a lot of publishers. Advertiser and publisher multi-homing on competitor exchanges will facilitate continued shift of market share away from Google after Google's proposal is implemented. The continuing decrease in AdX's market share relative to its rivals demonstrates the fluidity of market outcomes in the ad exchange market that the Court found.

Competitive positions, including AdX's, are not entrenched.

**C. Google's Proposed Remedies Will Restore Competition in an Efficient, Workable, and Administrable Manner.**

18.    Google has crafted remedies that will restore competition efficiently and on a predictable timeline. Each of Google's proposals can be achieved in 1 year or less. Unlike Plaintiffs' proposals, Google's proposals do not engender significant uncertainties about how long execution would take, disrupting customers in the interim; how other industry participants (such as a potential divestiture acquirer) may change the current investments in the ecosystem; and how the rapidly evolving ad tech industry will change while the remedies are being implemented. Google's proposals emphasize publisher choice and thereby preserve the ability and incentives of all market participants, including both Google and its rivals, to continue competing and innovating to the benefit of publishers and advertisers.

19.    Perhaps because Google's proposals are sound ways to increase competition in an efficient manner, Google's proposals overlap in large part with the only section of Plaintiffs' proposed remedies setting forth behavioral remedies that are targeted to AdX and DFP, titled "Interoperability and Data Sharing." ECF No. 1663-1 at 31-33.

19.1.    Like Plaintiffs propose, Google proposes to build integrations between AdX and Prebid, and AdX and rival publisher ad servers. ECF No. 1663-1 §§ IX.A, IX.B.

19.2.    Also like Plaintiffs propose, Google proposes to build a server-to-server integration between DFP and Prebid server. ECF No. 1663-1 § IX.C.

19.3.    And, like Plaintiffs propose, Google proposes to provide publishers with "data portability" so that they can move their DFP data and AdX bid data to a rival publisher ad server. ECF No. 1663-1 § IX.D.

19.4.    Plaintiffs also propose that Google facilitate interoperability between the remainder

12

of DFP and the Open-Source Auction called for by Plaintiffs' remedy, ECF No. 1663-1 §§ IX.E, F. Rather than implement a new Open Source Auction, Google achieves the same purpose by building an integration between DFP and Prebid server, through which Prebid can host an auction of auctions for indirect open-web display impressions.

20.     To assure customers, competitors, and the Court of Google's compliance with its proposed remedies, Google also proposes the appointment of a Monitoring Trustee with powers to interview Google employees; inspect documents, source code, systems, and physical buildings; and request information from Google employees.

21.     The supervision required to verify Google's proposed remedies would be comparatively straightforward and administrable. Google proposes technological integrations with other market participants that will be transparent to and easily verified by others in the industry, the Monitoring Trustee, and therefore the Court. Google's various behavioral commitments relating to licensing, non-discriminatory pricing, and provision of data would be similarly verifiable by customers, the Monitoring Trustee, and the Court.

22.     The combined effect of Google's proposals, which can be implemented within a year, will be to restore competitive conditions in the publisher ad server and ad exchange markets, in ways that industry participants have already agreed will promote competition on the merits, that will not threaten unpredictable and devastating harms to consumers and competition, and that will be auditable and verifiable by the Court and its Monitoring Trustee.

## II.     PLAINTIFFS PROPOSE REMEDIES THAT RELITIGATE CASES PLAINTIFFS LOST AND ADDRESS MARKETS PLAINTIFFS DID NOT ALLEGE.

23.     In contrast to Google's proposed remedies, which are tailored to address the Court's liability findings, Plaintiffs' proposals seek to regulate far beyond the case that Plaintiffs chose to

bring, far beyond the Court's liability findings and far beyond what is necessary to restore competition.

### A.  Plaintiffs Propose Remedies that Go Beyond Open-Web Display Advertising.

24.      In this case, Plaintiffs contended that Google monopolized three markets "within the open-web display advertising technology ecosystem." Mem. Op. at 41. At the liability trial, they strenuously argued that "open-web display ads" are distinct from other ad formats, and that the relevant markets are properly cabined to tools for open-web display advertising and market power assessed based on transactions in open-web display advertising. *Id.* at 42. Accordingly, the Court found relevant markets in publisher ad servers for open-web display advertising and in ad exchanges for open-web display advertising, and that Google had monopoly power in those markets found by the Court. *Id.* at 43, 50, 73, 76. The Court also declined to find Plaintiffs' requested market for advertiser ad networks of open-web display advertising. *Id.* at 54.

25.      Nonetheless, in their Proposed Final Judgment, none of the divested assets are limited to open-web display advertising. Plaintiffs' remedies are also indistinguishable from remedies that would be proposed if the Court had agreed to their market for advertiser ad networks.

26.      Plaintiffs propose that Google divest the entirety of AdX and what they refer to as the "DFP Remainder," even though those tools serve or transact far more than just open-web display advertising.

27.      None of Plaintiffs' proposed behavioral remedies (with the exception of provisions eliminating Google from certain markets entirely) are limited to open-web display advertising. ECF No. 1663-1 §§ IX, X.

28.      Plaintiffs' approach is particularly problematic because Plaintiffs are seeking remedies that reach into other ad formats—formats that are growth areas and will shape the future

of display advertising—based on liability findings limited to past conduct concerning a different ad format that is declining in relative importance. As witnesses will reaffirm at trial, non-open web display advertising formats, such as in-app, connected TV, and native ads, have continued to explode in popularity relative to open-web display advertising. Google's market power is not the same in these other ad formats as the Court found it was in open-web display advertising. But Plaintiffs would take the opportunity to regulate Google's conduct in those other ad formats without any liability finding that applies to them.

**B.  Plaintiffs Propose Remedies that Interfere with Competition on the Buy Side.**

29.      Plaintiffs unsuccessfully alleged at trial a buy-side market in "advertiser ad networks for open-web display advertising" that was limited to AdWords, and from which Plaintiffs took pains to exclude Google's other buy-side tool, DV360. Mem. Op. 53-57. But "substantial trial evidence showed that advertisers reallocate resources among different digital advertising channels," including not just open-web display ads on AdWords and DV360, but also other ad formats like social media advertising, ads on Google's owned-and-operated properties, in-app ads, and instream video ads. *Id.* at 58-60. That shift in spend has only accelerated, for both large and small advertisers, due to use of AI tools that buy across channels. *Id.* Accordingly, "given the ease and benefits of allocating advertising spending across channels," the Court rejected Plaintiffs' artificially constrained market. *Id.* at 59.

30.      In spite of their own decision to exclude DV360 from their case and their loss on the buy side, Plaintiffs continue to seek behavioral remedies that directly interfere with the ability of Google's buying tools, AdWords and DV360, to compete with other buying tools, including social media buying tools like Meta's and TikTok's, buying tools for in-app ads, and more. ECF No. 1663-1 §§ X.A-D, X.H, X.I.

### C.  Plaintiffs Propose Remedies To Regulate Lawful Conduct.

31.      Plaintiffs propose the divestitures of AdX and DFP, including a *de facto* divestiture of much of DFP in the form of a forced separation and open-sourcing of what Plaintiffs refer to as the "Final Auction Logic" in DFP. ECF No. 1663-1 §§ VI-VIII. Because much of Google's market position in both AdX and DFP are attributed to lawful conduct, however, Plaintiffs' proposal essentially seeks to force Google to unwind lawful conduct.

32.      As an initial matter, the effect of Plaintiffs' proposal would be to return Google to a pre-DoubleClick acquisition state, even though the Court did not find any unlawful combination in this case. The two acquisitions Plaintiffs challenged—of DoubleClick and of Admeld—were not anticompetitive. Mem. Op. 85. Yet Plaintiffs press forward with the same divestiture remedies they sought in their Complaint, before they failed to show that Google made any unlawful acquisitions.

33.      Further, the evidence introduced at the liability trial showed and introduced at the remedies trial will show that lawful conduct has contributed to the popularity of AdX and DFP.

34.      Further, the Final Auction Logic is not solely the decision making logic for an auction of auctions of ad exchanges for indirect open-web display impressions. The Final Auction Logic also involves the competition between indirect and direct transactions. The Court made no findings with respect to the fairness of DFP's so-called "Final Auction Logic," did not question DFP's decision making logic with respect to direct and indirect transactions, and instead dealt with conduct relating to indirect open-web display transactions. To defend their glaringly overbroad proposal, Plaintiffs claim their open-sourcing proposal is necessary to "deny Google control of the decision-making process for which ads will win, which will empower publishers to control how their ad inventory is sold." ECF No. 1663 at 8. But even assuming that goal was justified by the

Court's liability decision, Google's proposal will do that in a way that is proportionate and tailored to the Court's findings.

35.     Further, Plaintiffs also seek disgorgement of AdX profits and DFP profits in the amount of 50% of the net revenues Google obtains from its ownership of AdX and DFP. ECF No. 1663-1 §§ XII.B-C. Plaintiffs offer no rationale to explain the connection between the disgorgement amounts sought and any finding from the Court concerning supracompetitive fees. Nor do Plaintiffs explain how disgorgement of future revenue is supported by traditional principles of equity. Notably, the Court did not make any finding with respect to DFP's fees. Rather, the Court found that Google "has not exercised its monopoly power to raise DFP prices," Mem. Op. at 76, observing that DFP's revenue share "equate[s] to" below 2%, *id.* at 45.

## III.    PLAINTIFFS PROPOSE REMEDIES THAT ARE RECKLESS, IRREVERSIBLE, AND DAMAGING TO COMPETITION AND CONSUMERS.

36.     Plaintiffs' proposed final judgment not only fails to grapple with the liability litigation and the Court's findings in this case, but also fails to present a workable proposal that can be achieved with any degree of certainty, in a practical amount of time, and without enormous disruptions to customers and competition and degradation of the products.

37.     If implemented, Plaintiffs' proposal would embroil the Court in superintending a highly uncertain and technically complex divestiture process in a dynamic technology market. Plaintiffs' proposed final judgment contemplates judicial supervision over a series of complicated technical steps for potentially more than a decade. Plaintiffs' proposed timelines in their proposed final judgment now bear minimal resemblance to the estimates of their own technical expert proffering a timeline estimate, Dr. Bjedov.

38.     As explained below, Plaintiffs' proposed judgment fails to engage with the unavoidable technical challenges of divesting AdX or DFP. Their proposed final judgment lays

17

out a plan for divestiture consisting of ambiguous, sometimes internally contradictory steps with risks of unintended consequences, including breaking the tools customers rely on. Plaintiffs' experts, who have at best a shallow understanding of the systems being divested, are of little help. The lack of understanding of ad tech systems in Plaintiffs' approach are on full display in their Proposed Final Judgment. Nor do Plaintiffs and their experts sufficiently account for the possibility that the divestiture transaction may never succeed. Following all of this uncertainty, at the end of Plaintiffs' proposal, years-long process would be an outcome that is worse for consumers and competition, in a landscape that will have changed dramatically since the Court's final judgment.

### A. A Technical Divestiture of AdX or DFP Would Be a Technological Challenge of Unprecedented Complexity with Significant Uncertainty.

39.    Plaintiffs' proposed technical divestitures of AdX and/or the DFP Remainder would pose technical challenges of unprecedented complexity. The Court will hear about the steps required for a technical divestiture from Prof. Jason Nieh, a Columbia professor of computer science whose work has served as the basis for technologies now widely used in cloud infrastructure and whose testimony about the proposed divestitures of Google products in the *Search* case formed the basis for the district court's findings about divestiture. As Prof. Nieh will explain, technical divestiture of AdX or DFP requires numerous steps, including complicated decisions about how to separate commingled code (including the commingled code that provides ad serving and exchange functionality, as well as functionality utilized by other Google ad tech tools), find or build suitable replacements for the Google proprietary infrastructure systems that are necessary for AdX and DFP to run (if such replacements even exist), and rewrite or modify AdX or DFP code to run outside Google infrastructure and to utilize the new infrastructure.

40.    As an initial matter, since at least 2018, ad exchange functionality and ad serving functionality have been offered as one unified product, Google Ad Manager. Google engineers

18

have also undertaken efforts to combine the codebases for AdX and DFP. As a result, divestiture of one set of functionality would require creating entirely new products that do not exist today by identifying, separating, and rewriting commingled code for both ad exchange and ad serving functionalities.

41.        Even if separate versions of AdX of DFP were created for divestiture, today the unified product Google Ad Manager relies on numerous proprietary Google infrastructure systems, including systems like Borg and Spanner, to support every Google Ad Manager functionality, including low latency, fast and comprehensive reporting, accurate and reliable billing, ad security, user privacy, scanning ad creatives for inappropriate content, and more. The proprietary systems relied on are referred to as Google Ad Manager's "dependencies." Without those dependencies, Google Ad Manager, including its exchange and ad serving functionalities, would not function. Importantly, these proprietary Google systems do not just support Google Ad Manager, but many other Google products–including not just other display ad tech products like AdSense or AdMob, but also products across Google like Search, YouTube, or Chrome.

42.        In order to divest AdX or DFP, all of their current dependencies on Google infrastructure would need to be replaced with systems that are in the buyer's infrastructure. That is a significant task, and one that has never been attempted at this complexity.

43.        Aside from replacing software dependencies, divestiture would also require obtaining sufficient hardware infrastructure in the buyer's environment, such as data centers and a global Internet network. Because AdX and DFP need to serve ads very quickly to globally distributed customers, the hardware infrastructure must be globally distributed and operate efficiently on a large scale.

44.        Even assuming that suitable software and hardware infrastructures are set up in the

buyer's environment, divestiture would then require testing, debugging, scaling, and optimizing the new system in order to minimize, as much as possible, differences between the new and old systems.

45.    Customers would also need to be migrated to the new system. Migration of customers while minimizing disruption to their ongoing use of the product is a daunting technical challenge. Just one reason is that customers cannot be migrated in one fell swoop. They are migrated in cohorts, so that the new system can continuously be tested to ensure it is working as expected before additional customers with more complex needs are migrated from the old one. As a result, during customer migration, two live systems must be maintained, the old Google version and the new system set up by the buyer. Engineers may have to create complex new systems to maintain consistency across the two versions of AdX or DFP, all on top of the ongoing engineering work to migrate systems and customers.

46.    Taking all of these steps together, the divestiture process would be long; demand nuanced technical decisions, including about trade-offs between different replacement systems or optimization; is filled with uncertainty at each step; and ultimately may never succeed. The risk of unintended consequences is high from divestments of this size, and risks breaking technology on which publishers and advertisers rely. It also risks transferring products to unknown buyers and auction hosts providing unknown quality of products and technology.

47.    As Prof. Nieh will testify, given the magnitude and complexity of the proposed project, it is impossible to predict with certainty how long divestiture could take, but even in a best-case scenario divestiture of either AdX or DFP would require at the very minimum 5 years. And it may well take much longer, including up to twice as long. And even if divestiture succeeded, because Google's proprietary systems that Google Ad Manager is built on must be replaced by

systems in the buyer's infrastructure, divestiture may only result in a divested version of AdX or DFP that does not work as well as it does today.

48.        As Prof. Nieh will explain, requiring migration within artificially short timelines would mean that, when the dependencies cannot be sufficiently and properly replaced in an abbreviated time frame, the divested product will be degraded (if it can function at all). That is because the divested product will need to operate without the full benefit of the systems it previously relied on to perform critical functions, like database storage or job scheduling, quickly and at large scale.

49.        Even if it were eventually completed, such a large-scale migration as the divestiture of AdX or DFP would inevitably disrupt the customers and other ad tech tools that rely on AdX and DFP during the process. As Google's expert and fact witnesses will explain, every large-scale software project, including the examples described above, risks bugs, outages, data loss, unsuccessful migrations, and the possibility that migrated customers will need to be rolled back to the older product. The migration process itself will be disruptive.

## B. Plaintiffs' Proposed Steps for Technical Divestiture Are Unsupported by Expert Testimony, and Are Not Administrable or Workable.

50.        In the face of these technical challenges, Plaintiffs' proposed final judgment does not set forth a workable plan for achieving technical divestiture, and instead lays out a series of steps with artificially constrained timelines that will result in product degradation and customer disruption. Even worse, parts of Plaintiffs' proposal diverges from what their own experts have opined on, leaving the Court with a series of vague provisions with no guardrails for how the proposal would be implemented in practice.

51.        For example, Plaintiffs' own proposal for the scope of what would be divested is ambiguous in important ways. The vagueness of Plaintiffs' proposal poses a problem not just

because it renders administration and compliance challenging, but because the scope of vague provisions can have a significant effect on how the judgment, once ordered, will impact existing customers, the acquirer, and other products. Because Plaintiffs' proposal is written in such sweeping, non-specific terms, the potential for unintended consequences is even greater.

52.     Although AdX and DFP have been completely integrated into one product since 2018, Plaintiffs treat "AdX" and "DFP" as artificially divided without offering a specific enough definition to delineate which category each Google Ad Manager functionality would fall into.

53.     Additionally, Plaintiffs' definitions of "AdX" and "DFP" also are not limited in geographic scope in any way. Because Google Ad Manager, including AdX and DFP, operates worldwide, with facilities in many countries, Plaintiffs' divestiture proposals would necessarily have global effect.

54.     With such an impenetrable set of definitions in the final judgment, a buyer would have significant questions about what is included in the divestiture assets.

55.     Beyond the definitional problems in Plaintiffs' proposal, the steps Plaintiffs lay out for divestiture will cause disruptions and harms to customers in practice.

56.     For example, though Plaintiffs propose that the DFP Remainder might be divested to multiple acquirers, ECF No. 1663-1 § VIII.A, they do not explain anywhere in their proposal how the assets or customers of the DFP Remainder would be split up amongst multiple acquirers. Nor do they even adjust the proposed divestiture steps or timelines from the AdX divestiture steps to account for the work that would be required to divest to multiple buyers.

**C.  Plaintiffs' Proposed Divestiture Transactions May Never Succeed.**

57.     Plaintiffs' investment banking expert, Mr. Paul Crisci, offers the opinion that divestiture of AdX and DFP outside of Google will attract interest from a credible group of buyers,

whether divested today or years from now.

58.     Mr. Crisci recognizes that the technical challenges of divesting AdX or DFP may in turn put the commercial transaction at risk of failure. But, because he has only a cursory understanding of the relevant products, he also offers no solutions to that uncertainty. Even though logistical workability would bear directly on his opinions, Mr. Crisci never himself conducted an independent investigation into whether technical separation would be workable, how long the separation would take, or even what a separation plan might be.

59.     Plaintiffs also acknowledge that a buyer must have "the necessary managerial, operational, technical, and financial capability" to operate AdX and DFP. ECF No. 1663-1 §§ VI.E, VIII.E. Those are meaningful constraints: as industry participants will explain, not all existing ad tech providers might be able to successfully operate AdX or DFP if purchased. Plaintiffs' experts have not presented any serious investigation of what potential buyers exist with those capabilities and whether those buyers would be interested or viable candidates.

### D. Plaintiffs' Proposal to Open-Source the "Final Auction Logic" Is Undefined and Risks Harm to Publishers.

60.     Plaintiffs propose, before DFP Remainder divestiture, that Google open-source what they call the "Final Auction Logic."

61.     At the start of the remedies phase, Plaintiffs defined the final auction logic as the "auction logic that determines which ad to render on the page from direct-sold opportunities and bids from indirect sources." ECF No. 1430 at 10. Plaintiffs now define "Final Auction Logic" as "any mechanism, functionality, computation, or logical process used by DFP to determine concurrently which advertisement(s) will serve (or 'win') an Impression or Impressions and at what price." ECF No. 1663-1 § IV.33. That definition is not limited to open-web display advertising or indirect transactions.

23

62.     Although Plaintiffs frame their open-source auction proposal as a more moderate step before divestiture, their proposal would in practice be a significant redesign of the existing publisher ad server product.

63.     Plaintiffs' proposal that Google disable the Final Auction Logic on its own servers is not limited to open-web display advertising or indirect impressions. Even publishers who do not transact *any* indirect open-web display advertising would still be forced to use a separate instance of the "Final Auction Logic" instead of the previously integrated product.

64.     Further complicating Plaintiffs' proposal is the fact that, for the open-source version of the "Final Auction Logic" to be of any use to products other than Google's, industry collaboration would be required. As the Google employees with relevant experience will explain, collaborating with ad tech industry participants to design a tool and communication protocols that are acceptable and standardized can take years.

65.     Even if Plaintiffs' Open-Source Auction proposal were eventually implemented and Google's publisher customers successfully migrated, the end result of Plaintiffs' proposal is likely worse for customers. For example, communicating between what remains of the ad server and the Open-Source Auction may add latency to ad serving, which affects publisher revenue and user experience. Plaintiffs' proposal could also introduce security risks because users can modify open-source code. An administrator of open-source code lacks visibility and oversight into modifications by third parties, so security interventions can only happen once violations are raised.

66.     At least in a divestiture, Google would be compensated for the sale of its assets and innovations in the ad serving logic. Here, Plaintiffs propose that Google be required to build a completely new product that replicates its ad serving logic; make that product available on an open-source basis and license it for free; and leave the remainder of its publisher ad server gutted

24

of any business logic. In addition, Plaintiffs propose that Google be required to provide an undefined amount of "technical assistance" to the Open-Source Auction Administrator for an indeterminate amount of time. ECF No. 1663-1 § VII.G.

**E. Plaintiffs' Proposal Threatens to Disrupt an Already Rapidly Changing Display Advertising Ecosystem.**

67.        Though Plaintiffs ostensibly brought their case in order to benefit the open-web display advertising ecosystem, the combined result of their proposals would actually be to accelerate the decline in open-web display advertising, at a time when revenue from open-web display ads is already shifting. As the Court found, advertisers are often agnostic as to particular platforms or channels, focusing much more on return on investment and engagement with the targeted audience rather than on the method or format of the ad. Mem. Op. at 58. When one ad format or channel shows better return on investment, advertisers and the ad agencies that represent them will shift their spend to that different format or channel to optimize performance. *Id.* This includes substitution away from open-web display ads to other types of ads, including in-app and social media ads. Mem. Op. at 55.

68.        As explained at the previous trial, *e.g.*, 9/26/24 AM Tr. 46:5-47:8 (Israel); 9/13/24 PM Tr. 143:18-24 (Boland), and as referenced in Google's Initial Notice, ECF No. 1664 at 16-18, the industry trends are already moving away from open-web display advertising. The display ad industry is being transformed by significant disruptions that will only proliferate. One particular development that is already changing the industry but will likely have magnified effects in the future impossible to predict today is AI. Even at the liability stage a year ago, the Court heard about ad tech products that are continuing "to integrate artificial intelligence and machine learning capabilities," including tools that facilitate ad purchasing across channels. Mem. Op. at 40, 59. In the time since, the changes wrought by AI have only come faster.

69.     The divestitures of AdX and DFP risk accelerating the ongoing shift in spending away from open-web display ad inventory into different formats which provide advertisers a higher return on investment. Because Plaintiffs propose to prevent Google from re-entering the ad exchange market found by the Court or publisher ad server market found by the Court for open-web display only, ECF No. 1663-1 § XI, the outcome will be to shift all of Google's investments into serving publishers who prioritize other formats or its owned-and-operated properties. Divestiture will also eliminate the efficiencies and benefits of integration within Google's ad tech stack, so that Google's advertiser customers are likely to see a further decline in their return on investment from open-web display ads.

70.     In addition, though Plaintiffs propose that they will vet whether the AdX and DFP Remainder acquirers will have "the intent and capability" "to compete effectively" in the markets for open-web display, ECF No. 1663-1 §§ VI.E, VIII.E, following Plaintiffs' review there will be no guarantee that the acquirers will continue to invest in supporting open-web display—particularly if it continues to decline in relative importance as a source of monetization.

71.     Moreover, if Google's advertiser customers see a further decline in their return on investment from open-web display ads, they would continue to shift spend toward ad formats with high return on investment. Automated AI tools would accelerate that trend. As a result, advertising spend by Google's advertiser customers—who are the "uniquely large and diverse" base of advertiser demand the Court found open-web display-focused publishers want to access, Mem. Op. at 96—may shift away from those very same open-web display-focused publishers. In other words, an AdX or DFP divestiture may have the perverse effect of depriving open-web display-focused publishers of the very advertisers that they wanted access to, and that would be provided to them by Google's proposals.

**F. Taken Together, Plaintiffs' Proposals Will Harm Publishers, Advertisers, and the Open-Web Display Advertising Ecosystem.**

72.      Taken together, even if successfully implemented, Plaintiffs' proposals would harm customers and competition in both predictable and unpredictable ways. Some of those harms are discussed within, but given the broad and vague language in Plaintiffs' proposed final judgment it is impossible to predict today the full set of harms that may be wrought later.

73.      As explained, engineering projects of the magnitude and complexity of divesting AdX or DFP, or open-sourcing the "Final Auction Logic," will inevitably cause additional outages, bugs, and other disruptions for customers during the years required to accomplish any of Plaintiffs' proposals. For publishers, any downtime can be detrimental for monetization.

74.      Even if the technical proposals are eventually successful, Plaintiffs propose to force publisher customers of Google Ad Manager to undergo involuntary migrations up to three times, from the existing Google Ad Manager to the divested AdX, to the divested Open-Source Auction, and to the divested DFP Remainder. As the Court previously recognized, forced switching of publisher ad servers can be disruptive for publishers who have already "invested so much" in their ad server set-ups. 5/2/25 Hr'g Tr. at 6:1-13. A migration to a divested DFP could impose many of the same switching costs. Each of the forced migrations will siphon time and resources publishers could spend on monetization to retraining ad operations teams, learning new tools, and migrating existing set-ups to a new system.

75.      After migrating, publishers will be left with three different systems, AdX, the Open-Source Auction, and DFP Remainder, to log into, learn, operate, and coordinate with each other as opposed to the one integrated product. The end state of Plaintiffs' proposal would be to destroy any efficiencies of having the option to use one integrated product, such as reduced latency and reduced prices.

76.    The existing Google Ad Manager may well be replaced with divested versions of AdX, the Open-Source Auction, and DFP Remainder that work worse than they did before.

    76.1.    Without access to Google's bespoke proprietary infrastructure developed over many years, a buyer may never succeed in replicating the feature set, performance, security, and scale of Google Ad Manager in Google's infrastructure.

    76.2.    As Prof. Nieh will explain, even if Google infrastructure's performance could be replicated, the divested products may incur higher costs from running on other cloud infrastructures outside of Google. The result of increased costs for operating AdX, the Open-Source Auction, or DFP Remainder as they currently operate today may lead a buyer to increase prices for customers. In particular, the integrated ad serving functionality (that includes both the Open-Source Auction and DFP Remainder) costs publishers minimal amounts today, which could well increase once two different providers are both operating pieces of the former functionality.

    76.3.    In addition, once AdX and DFP are separated and divested, prices may increase due to the loss of the efficiencies of an integrated tech stack.

    76.4.    During the years invested to divest, the divested products will likely also fall behind their competitors because resources will be diverted away from innovation to the resource-intensive project of divestiture.

77.    The divested products may also be worse for Internet users. In particular, today Google Ad Manager relies on sophisticated internal Google systems to screen for invalid traffic, protect against malware, and protect user privacy. True equivalents to those systems are not readily available outside Google infrastructure. Divestiture outside Google would require replicating those parts of Google's infrastructure; if they are replaced with inferior systems, user privacy risks will

increase and users may have worse experiences on websites from seeing fraudulent and harmful ad content.

78.     To opine that Plaintiffs' proposed remedies would benefit consumers and competition, Plaintiffs' economics expert Prof. Lee assumed that AdX and DFP can be divested as a technical matter and operate apart from Google while retaining substantially similar functionality. If any of the operational challenges described above come to light or the divested products are worse, Plaintiffs' economics expert has no opinion on what the impact of Plaintiffs' proposals would be.

79.     Even if it were workable to perfectly replicate Google's infrastructure performance and cost in a practicable amount of time, there would still be the question whether the buyer would invest in the divested versions of the product and keep them operating at the same level.

80.     Breaking apart Google Ad Manager and separating it from Google's integrated ad tech stack will harm Google's advertiser customers, too. Those advertisers currently benefit from the existing integration of Google's buying tools with Google Ad Manager in the form of better signals, which translates to a better match to interested users; better inventory quality, which translates to improved performance; better security and safety from invalid traffic and fraud; lower latency; reduced billing discrepancies; and fewer machine resources, which translates to lower costs. After Plaintiffs' proposals, advertisers will lose those benefits and see a decline in their return on investment as a result.

81.     Plaintiffs' proposals also distort competition both in the relevant markets found by the Court and outside those markets.

81.1.     Within the markets, Plaintiffs' proposals eliminate the value of competitive pressure from Google by removing it as a competitor, and eliminating any incentive

to innovate.

81.2.    And outside those open-web display advertising markets, Plaintiffs' proposals distort competition by forcing divestiture of tools that operate outside the markets found by the Court.

81.3.    In addition, by proposing that Google disable the "Final Auction Logic" on its servers without limitation to open-web display advertising, ECF No. 1663-1 § VII.H, Plaintiffs' proposal would severely hinder DFP Remainder's ability to compete in markets for other ad formats after the open-sourcing of the "Final Auction Logic."

82.    Plaintiffs' proposed behavioral commitments would handicap the ability of Google's buying tools, AdWords and DV360, to offer their advertiser customers benefits by competing with social media buying tools, in-app buying tools, and more.

## IV.    GOOGLE'S PROPOSAL WILL FULFILL THE GOALS OF ANTITRUST REMEDIES, WHEREAS PLAINTIFFS' PROPOSAL SHOULD BE REJECTED UNDER ANTITRUST LAW.

83.    Plaintiffs' proposed final judgment must be rejected under antitrust law. In their accompanying notice, Plaintiffs do not offer a legal framework for antitrust remedies that reflects the caselaw, or that even attempts to grapple with the state of the law today. Plaintiffs ignore the Supreme Court's recent guidance that "when it comes to fashioning an antitrust remedy," "caution is key." *Alston*, 594 U.S. at 106. The most recent Supreme Court case cited in their Notice dates from 1978. Nor do they cite other highly relevant, recent case law addressing the very same issues present in this case, such as the *Search* opinion reviewing basic principles of antitrust remedies and applying them to a complex software product. And Plaintiffs barely even engage with— beyond referencing generic statements of law—the extensive discussion of the prerequisites for

structural relief in *Microsoft*, a seminal antitrust remedies case that also involved software products.

84.     Instead, Plaintiffs build their legal defense of their proposal on out-of-context quotations taken from older Supreme Court case law. As explained below, read in their entirety those cases support Google's proposal. Those cases were also reviewed by the courts in *Microsoft* and *Search*, which then rejected divestitures, including ones less drastic than what Plaintiffs propose in this case. Unsurprisingly, even in the handful of quotes Plaintiffs have repeated in their Notice, Plaintiffs have yet to point the Court to a single case that is analogous to their remedy proposal here.

85.     Many of the legal arguments Google presented in its initial Notice apply in equal measure, or even more so, to Plaintiffs' Notice and proposed final judgment.  In their most recent proposal, Plaintiffs not only continue to seek the same drastic and unjustified remedies they have requested since the beginning of this case, but have set forth a more detailed implementation that would be even more harmful and improper under antitrust law than what they previously described.

86.     Below, Google explains how the recent decision in *Search* provides an appropriate analogue and framework to the issues presented in this case, and responds to additional arguments set forth in Plaintiffs' Notice and proposal.

### A.  As in *Search*, the Court Should Reject Plaintiffs' Request for Divestiture of AdX and DFP

87.     Plaintiffs refuse to grapple with Judge Mehta's decision in *Search* and its immediate application to this case. The *Search* case provides an analogue to the issues presented here and applies the appropriate legal framework with which to assess Plaintiffs' drastic proposal.

88.     ***Courts Should Exercise Caution When Crafting Antitrust Remedies.*** Judge Mehta cautioned that "courts must approach the task of crafting remedies with a healthy dose of humility,"

given that "caution is key." *Search,* 2025 WL 2523010, at *2, *31, *55, *84. As he noted, that is especially true where the court is contemplating divestiture. *Id.* at *55. Judge Mehta's approach took caution to heart, noting that judges must approach the crafting of a remedial decree with humility, especially in a rapidly changing technological market, like the one at issue here, where it is impossible to predict in the future. *Id.* at *2, *31, *84.

89.     As in *Search,* the evidence presented at trial will show that the ad tech industry remains rapidly evolving. Faced with the rapid pace of change and innovation, the Court should approach the task of crafting a remedy "humility" and "caution."

90.     ***Divestiture Has Traditionally Been Reserved for Cases Involving Mergers and Acquisitions.*** As Google has explained, courts recognize that divestiture is the traditional remedy in cases involving entities formed by anticompetitive mergers and acquisitions, which is not the case here. ECF No. 1674-1 at 9-10. Likewise, Judge Mehta found that divestiture was a "poor fit" for the *Search* case in part because "cases, like this one," do not "implicate the traditional and particularly appropriate justifications for divestiture (terminating monopolies formed by mergers and acquisitions)." *Search,* 2025 WL 2523010, at *55 (citing *Microsoft I,* 253 F.3d at 105).

91.     ***Divestiture Is Inappropriate in a Market of Rapid Innovation.*** The *Search* decision instructs that remedies should not stifle innovation and market forces in a rapidly changing technology market. *Search,* 2025 WL 2523010, at *2, *31, *62. Even though new AI products were still "not yet close to replacing" traditional search engines, they were enough of a nascent competitive threat that the Court crafted remedies with changing market conditions in mind. *Id.* at *2. Judge Mehta warned that "the court must be sensitive to remedies that risk substantially stifling technological innovation or impairing consumer welfare." *Id.* at *31.

92.     The markets in this case, just like in *Search,* are being rapidly reshaped. Much has

already happened since the close of fact discovery in the liabilities phase. The Court should be sensitive to risks of stifling innovation or interfering in natural market forces.

93.      ***"The more drastic the remedy, the greater the causal connection required to support it."*** Reviewing the case law, Judge Mehta explained that the relief granted "should not exceed evidence of a causal connection between the defendant's anticompetitive behavior and its dominant position in the relevant market." *Search*, 2025 WL 2523010, at *31 (quoting *Microsoft III*, 373 F.3d at 1234). He applied a proportionality test whereby the court considers the proportionality between the strength of the causal connection and the severity of the remedy. *Id.* at *36. Remedies are viewed "along a spectrum, with an injunction against the unlawful conduct on one end (the least severe) and structural remedies such as divestiture on the other (the most severe)." *Id.* at *35.  He found that, even after "two complete trials," Google's market dominance in search was not "sufficiently attributable to its illegal conduct to justify divestiture."  *Id.* at *55.

94.      Judge Mehta's findings about causation have direct relevance to this case. Judge Mehta concluded that "the record also contains ample evidence that lawful conduct played an important role in Google's maintenance of its monopoly."  *Id.* This same lawful conduct is at the root of what the Court has found was Google's monopoly power in the relevant markets here.  In this Court's words: "Google has been able to amass this unparalleled group of mostly small and medium-sized advertisers in large part due to the dominance of Search, which another district court has found to be the source of Google's monopoly power in the markets for general search services and general search text ads."  Mem. Op. at 96.

95.      Other lawful conduct is also at the heart of the monopoly power found by the Court. The Court found Google initially acquired its positions in the relevant markets in acquisitions the Court declined to rule were anticompetitive. The Court also found that a "primary source" of

Google's market power in AdX came from its "powerful source of digital advertising demand" in AdWords, advertising customers from a market where the Court did not find monopoly power or anticompetitive conduct. Mem. Op. at 28-29, 96. And again, because Judge Mehta found that lawful conduct played an important role in Google's dominance in *Search*, that means lawful conduct played an important role in Google's accumulation of a valuable AdWords advertiser base. Based on Judge Mehta's findings, a "primary source" of Google's market power in AdX is attributed to lawful conduct. In addition, the evidence has shown and will show that Google's market power is attributable to investments in the product quality and innovation of AdX and DFP. Moreover, this Court's finding that AdX is a two-sided platform is fatal to establishing causation because Google's power on an entire half of the ad exchange market–the advertiser half–is in no way connected to any anticompetitive findings by the Court.

96.     ***Courts Disfavor Remedies Requiring Product Design***. "A compelled product design is not an appropriate use of the court's equitable powers." *Search*, 2025 WL 2523010, at *90. Judge Mehta rejected one of the government's proposed remedies which would have required Google to add choice screens to its products to allow users to select the general search engine that they wished to use because he did not believe it was appropriate for a court to compel product redesign by judicial fiat. *Id.* at *90-*91. As Judge Mehta stated: "The case law is unwavering in the admonition that it is not a proper task for the Court to undertake to redesign products. Antitrust scholars have long recognized the undesirability of having courts oversee product design." *Id.* at *90. He declined to compel Google to redesign its own products, and noted that the request had nothing to do with the anticompetitive conduct in the case.  In *Search*, Plaintiffs never asserted that Google's design of its own products "violates the Sherman Act." *Id.* at *90.

97.     Here, even more so than *Search*, Plaintiffs ask this Court in multiple instances for

judicial product design.  For example, Plaintiffs request for the Open-Source Auction would require extensive judicial oversight of the transformation of an existing ad server into two new, separate products that have never existed in the market before. The proposed divestitures, too, require product redesign. AdX and DFP are currently part of one integrated product, Google Ad Manager, and integrated with Google's proprietary infrastructure. Divesting one product into two would require product design and significant engineering work over many years to split out AdX and DFP and rebuild those  tools to work outside of Google's proprietary infrastructure. All of those product design decisions would also have nothing to do with the anticompetitive conduct in this case.

98.      ***Courts Can Address the Fruits of Anticompetitive Conduct with Behavioral Remedies***. Behavioral remedies like data sharing deprived Google of the fruits of its anticompetitive conduct, including scale. *Search,* 2025 WL 2523010, at  *40-*46, *62-*64. Judge Mehta found three fruits of Google's anticompetitive conduct: freedom from threats, scale, and revenue. *Id.* at *40-*46. After identifying those fruits, the Court declined to order structural relief. Instead, he ordered data-sharing remedies compelling Google to share certain sets of accumulated Search data with Google's competitors. *Id.* at *65. According to the Court, these remedies were "designed primarily to deny Google a key fruit of its anticompetitive conduct—scale—and to help rivals overcome that deficit." *Id.* at *62. He concluded that data sharing was appropriate based on his liability findings that competitors needed "access to scale" in order to compete effectively. *Id.* at *64. Data sharing would "enhance other companies' ability to compete" by "enabling them to improve their quality and monetization and thereby take advantage of the network effects phenomenon that has been pivotal to Google's success." *Id*.  It was important to Judge Mehta that the remedies were "directly tied to the theory of liability in this case." *Id.*

99.    There are clear analogues to the data in *Search* in this case: access to AdX real-time bids for third-party ad servers and access to a Prebid auction of auctions for ad exchanges. Giving ad server competitors access to AdX real-time bids and ad exchanges access to the auction of auctions so they can access and grow scale is "directly tied to the theory of liability in this case." To further facilitate rivals' access to scale, Google will also guarantee that publishers can provide AdX's own historical bid data to rivals so that rivals can improve quality and monetization. Rivals will thereby have the "access to scale" needed to compete on the merits and grow. These remedies will efficiently and reliably provide Google's scale to its rivals and thereby deny Google of the fruits of its anticompetitive conduct, without resorting to the drastic remedy of divestiture.

100.    ***The Court Must Address the Harms that Would Result from the Government's Proposed Remedies.*** It is the Court's responsibility to balance harms, or "substantial risk of harm," that would be caused by proposed remedies. *Search*, 2025 WL 2523010, at *58. Judge Mehta carefully assessed and weighed what harms would result from the government's proposed remedies. He said that even if "the court cannot predict to any degree of certainty that one or more of" potential harms "will in fact occur," if "the risk is far from small," that "is reason enough not to proceed with the remedy." *Id.* at *60. Citing the Supreme Court's decision in *Alston*, Judge Mehta observed, "Courts reviewing complex business arrangements should be wary about invitations to set sail on a sea of doubt," as well as an antitrust expert's article stating that "no antitrust remedy should be compelled without a relatively clear appreciation of the likely effects." *Id.* at *60.

101.    Judge Mehta concretely applied that principle when he rejected a proposed payment ban remedy, even though it could increase competition, because it would also harm consumer welfare. Judge Mehta cautioned that the court cannot be "myopic" about what harms result from

36

potential remedies—"even if that means, as here, forgoing a remedy that could help restore competition." *Search,* 2025 WL 2523010, at *60. As he wrote, "courts must exercise care to ensure that the cost of correcting the market failure does not exceed the anticompetitive injury visited on consumers." *Id.* at *61. Because Plaintiffs' expert could "not give the court that assurance" that injury to consumers could be avoided, Judge Mehta rejected the government's proposal. *Id.*

102.    At trial, Plaintiffs and their experts will provide no assurance that their remedies can avoid harm to consumers. To name one example, their lead economics expert, Prof. Lee, opining on impacts on the market simply assumes that technical divestiture is workable and that the products can stay the same for customers after divestiture. By contrast, Google will show those are not justified or accurate assumptions. Instead, the evidence will demonstrate that Plaintiffs' proposed remedies will harm consumer welfare, including in both predictable and unpredictable ways. The Court should be cautious about ordering remedies that risk such harms.

103.    ***A Divestiture Would Result In Drastic Overreach***. Judge Mehta observed that "Plaintiffs overreached in seeking forced divestiture" of Chrome and Android. *Search*, 2025 WL 2523010, at *3, *54, *56. Judge Mehta in discussing "divestiture" in *Search*, used the known definition of divestiture where the defendant divested or split up parts of its business but remained in the market. By contrast here, without legal precedent, Plaintiffs want to eliminate 100% of Google's share in AdX and eventually in DFP and to bar Google from competing in the relevant market for at least five years. ECF No. 1663-1 § XI. In *Search*, the government never sought to divest 100% of Google's share in Google Search, or to enjoin Google from competing in the Search market. Search Plaintiffs' own economics expert calculated that the proposed Chrome divestiture would shift only 7% share from Google to its rivals. *Id.* at *54.

104.    Also, in *Search*, Judge Mehta rejected the Chrome divestiture because the

divestiture was not "tailored to fit the wrong creating the occasion for the remedy." *Id.* at *56. He agreed that Google had used an aspect of Chrome—"Google's control of the Chrome default"—to monopolize the search market, but recognized that "Chrome as a whole" had not been used anticompetitively. *Id.* Here, the Court found that parts of Google's tools were used anticompetitively, i.e., the parts of AdX and DFP and transact open-web display advertising. But both of those tools serve many more ad formats and transaction types than what the Court's liability findings were about. Forcing Google to sell the entirety of AdX and DFP on the basis of liability findings about open-web display advertising is also an overreach. In the words of Judge Mehta: "Ordering Google to sell one of its most popular products, one that it has built 'from the ground up' and in which it has invested (and continues to invest) billions of dollars, in the hope of opening a single channel of distribution to competition—and not even one that was unlawfully foreclosed by the challenged contracts—cannot reasonably be described" as an appropriate remedy. *Id.*

105.    In fashioning his remedy regarding Search index data, Judge Mehta was also careful to note his remedy would not require Google "to produce data that is largely the product of engineering and innovation." *Search*, 2025 WL 2523010, at *70. Further, Judge Mehta admonished that "rivals still will have to invest considerable resources in building out their own search index." *Id.* Google's competitors would need to "build the crawlers, crawl the web pages, extract the web page information, and process the data to create a competitive search index." *Id.* In other words, Google's competitors would "still have to invest and innovate to compete with Google." *Id.*

106.    Google's remedies proposal here strikes a similar balance. Access to AdX real-time bids for third-party ad servers and access to a Prebid auction of auctions for ad exchanges will thereby give rivals the "access to scale" needed to compete on the merits and grow. AdX and DFP–

two Google products "of engineering and innovation," *id.*–need not be divested and given to a competitor to restore competition when less drastic intervention will do.

107.     ***A Divestiture of a Deeply Integrated Software Product Is Logistically Unworkable.*** In *Search,* Professor Nieh testified that a Chrome divestiture would be logistically unworkable because Chrome is "deeply reliant" on Google's proprietary, hyperscale infrastructure. Judge Mehta, citing Professor Nieh's testimony, concluded that "there would be nothing natural about a Chrome divestiture" that would require separating from Google's infrastructure, and that he was "highly skeptical that a Chrome divestiture would not come at the expense of a substantial product degradation and a loss of consumer welfare." *Id.* at *56.

108.     Judge Mehta concluded with respect to Google's integrations with these dependencies: "Even if, as Plaintiffs suggest, these dependencies could somehow be re-created or made available to a new owner—and that is a big 'if'—the court is highly skeptical that a Chrome divestiture would not come at the expense of substantial product degradation and a loss of consumer welfare." *Id.* at *56. As discussed above, the same problems with reliance on proprietary infrastructure plague Plaintiffs' proposals for technical divestiture of AdX and DFP.  Divestiture would require replacing all of AdX's or DFP's dependencies on Google's hardware and software infrastructure, and somehow replicating those systems somewhere else.  As a result, divestiture will be uncertain to succeed and will harm consumer welfare.

### B.  Google's Proposal Adheres to Principles of Antitrust Law and Addresses the Court's Liability Finding.

109.     As explained in Google's Notice of Proposed Final Judgment, Google's proposal achieves the goals of antitrust remedies. ECF No. 1664 at 5-7. To reiterate, Google's proposal appropriately addresses both past and future forms of exclusionary conduct. The proposal enjoins the conduct the Court deemed anticompetitive and goes further to prevent any future conduct "of

the 'same type or class' as the violations." *Microsoft II*, 224 F. Supp. 2d at 109. And it is "tailored to fit the wrong creating the occasion for the remedy." *Microsoft I*, 253 F.3d at 107; *see also* ECF No. 277 at 5 (Plaintiffs previously telling the Court that "the equitable remedy must in all instances be narrowly tailored to the precise harms found").

110.    As detailed above, Google proposes to enjoin the policy and technical restrictions that made up the AdX-DFP tie, as well as specific aspects of DFP the Court found anticompetitively favored AdX. Google's proposal also goes far beyond just enjoining those particular forms of anticompetitive conduct. Google proposes measures to facilitate publisher switching to rival ad servers by providing publisher and AdX bid data; to guarantee publishers that they will be treated the same whether they use DFP or another publisher ad server and whether they use price floors to discriminate against AdX; and to give publishers the choice to put a structural barrier between AdX and DFP in the form of Prebid in order to prevent any use of DFP to favor AdX, or vice versa.

111.    Google's remedy will "restor[e] conditions in which the competitive process is revived and any number of competitors may flourish (or not) based upon the merits of their offerings." *Microsoft III*, 373 F.3d at 1231. As customers and rivals alike testified, Google's proposed measures will restore competition in both the publisher ad server and ad exchange markets. They will "level the playing field" for ad exchanges, and "reopen doors for competitors" in the publisher ad server market.

112.    At the same time, Google's proposal is "no more expansive than necessary" to restore competition. *Microsoft II*, 224 F. Supp. 2d at 135. Unlike Plaintiffs' proposal, Google proposes measures that will work within one year and will have predictable implementation and effects. Because "Plaintiffs have not shown that" these "behavioral remedies will be ineffective

without" more drastic structural remedies, *Search*, 2025 WL 2523010, at *55, the Court should go no further beyond Google's proposed remedies.

### C. Plaintiffs' Proposal Is Untethered from the Court's Liability Opinion and Would Be Legally Unprecedented.

113.        As Google has explained, the remedies Plaintiffs seek are unsupported by the case law and extend far beyond the Court's liability opinions. ECF No. 1664 at 9-12. In their Proposed Final Judgment, Plaintiffs have not addressed any of those legal flaws: They continue to seek divestiture of tools that transact in far more than open-web display advertising and to regulate in markets outside of open-web display advertising; to interfere with competition on the buy side; and to unwind or enjoin lawful conduct.

114.        Plaintiffs also continue to seek to force Google out of the markets found by the Court entirely by requiring wholesale divestiture of Google's tools and that Google not re-enter the relevant markets for at least five years after divestiture. ECF No. 1663-1 § XI. In essence, Plaintiffs seek to reduce Google's market position in publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising to zero for the near future.

115.        Plaintiffs have cited no authority—even in cases that did order divestiture—to support such an extreme remedy. Divestiture cases have at best ordered a *partial* divestiture, i.e., divestiture of the part of a competitor's business that was unlawfully acquired or combined. *See, e.g.*, *Schine Chain Theatres v. United States*, 334 U.S. 110,130 (1948) (no restriction on continuing to operate any theatres); *United States v. Crescent Amusement*, 323 U.S. 173, 187 (1944) (same); *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242,260 (1959) (dissolving combination but leaving parent companies "free to organize new corporations to handle their respective boxing promotions"); *United States v. Grinnell Corp.*, 384 U.S. 563, 578-79 (1966) (divestiture of some central stations but not all). Even the proposed Chrome divestiture in *Search*

41

referred to Judge Mehta as an "overreach" would have resulted in just a "7% share shift from Google to rivals." *Search*, 2025 WL 2523010, at *54. Plaintiffs in *Search* never proposed to eliminate Google from the Search market entirely, as Plaintiffs boldly seek to do in this case for ad tech.

116.    The same is true for the Plaintiffs' novel and sweeping definition of the "Final Auction Logic." Plaintiffs' open-sourcing proposal is a "structural," "*de facto* divestiture" because Plaintiffs seek to force Google to eliminate its own "Final Auction Logic," publish it, and offer it under a "no-charge" license. *Microsoft III*, 373 F.3d at 1228-31 (treating open-source Internet Explorer proposal as "an analogous form of structural relief" to divestiture because it "would confiscate much of the value of Microsoft's investment" in Internet Explorer). Plaintiffs must therefore make the same showing of "significant causal connection" between anticompetitive conduct and the open-sourcing proposal. *Id.* at 1230. But, as explained, none of the components Plaintiffs call out as part of the "Final Auction Logic" were found to be anticompetitive in this case. Plaintiffs' proposal would *de facto* divest innovations that are not just attributable in part to lawful conduct, but consist *solely* of lawful innovations to DFP's ad serving logic.

117.    Further, Plaintiffs' remedies are not limited in geographic scope.  Because Google Ad Manager operates worldwide, with data centers in many countries, Plaintiffs' divestiture proposals would necessarily have global effect and would require Court supervision around the world.  Plaintiffs' proposal invites this Court to violate the principles of international comity and deference to the rights of other countries. The Court should not interfere with the administration of antitrust laws outside of the United States by imposing an injunction that would operate across foreign borders. *See Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("International comity is a doctrine of prudential abstention, one that counsels voluntary forbearance when a

sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.").

118.    The few legal arguments Plaintiffs have reasserted in support of their proposals in their Notice of Proposed Remedies fall flat.

119.    *First*, Plaintiffs argue that "divestiture is key" to this case "because divestiture structurally removes Google's ability and incentive to use AdX, the Final Auction Logic, and potentially the DFP Remainder to harm competition in the relevant markets." ECF No. 1663 at 7. Plaintiffs cite no legal authority for their suggestion that divestiture is "key" if a company offers two products in adjacent markets and thereby conceivably retains the "ability and incentive to use" those products to gain market share. And for good reason: if that were the law, divestiture would be a "key" remedy in every tying case. Quite to the contrary, Plaintiffs have not cited a single case ordering divestiture where the gravamen of the violation was an unlawful refusal to deal with competitors, or an unlawful tie. The cases relied upon by Plaintiffs and this Court at the liability stage demonstrate that the proper remedy is instead a behavioral injunction targeted at the forms of conduct found anticompetitive.

119.1.    As the Court is well aware, divestiture was not ordered in *Microsoft*, which involved a tying claim and Microsoft's market position in multiple markets. *Microsoft I*, 253 F.3d at 103 (reversing divestiture); *Microsoft II*, 224 F. Supp. 2d at 177-78, 186 (denying divestiture on remand). On remand, the district court considered the very same cases Plaintiffs have repeatedly cited in their remedies filings and still declined to order divestiture. *Id.* at 110 (reviewing *Ford Motor Co.*, 405 U.S. 562; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969); *Int'l Salt. Co. v. United States*, 332 U.S. 392, 401 (1947); and *United States*

43

*v. Paramount Pictures*, 334 U.S. 131, 163 (1948)).

119.2.　In another case involving monopolies in adjacent markets, *Image Tech. Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1200 (9th Cir. 1997), "Kodak used its monopoly in the market for Kodak photocopier and micrographic parts to create a second monopoly in the equipment service markets." Under Plaintiffs' logic, the court should have reasoned that Kodak must be forced out of the photocopier and micrographic parts markets *and* the equipment service markets entirely because, otherwise, Kodak might retain some "ability and incentive to use" its position in one market to benefit another. Far from entering such an order, the district court instead entered an injunction "requiring Kodak to sell all parts to all ISOs at reasonable prices," which was affirmed by the Ninth Circuit. *Id.* at 1224-28.

119.3.　Similarly, in other cases cited by the Court in its liability opinion as analogous to Google's anticompetitive conduct here, no divestiture was ordered. In *Lorain Journal v. United States*, 342 U.S. 143, 145 (1951), the court ordered the defendant Journal to accept and print advertisements of the customers of its small competitor after it had refused to accept advertising from its competitors' customers.

119.4.　At the remedies phase, Plaintiffs have cited repeatedly to language from *International Salt Co.* in an effort to justify maximal relief, suggesting that otherwise "the Government has won a lawsuit and lost a cause." ECF No. 1663 at 2-3. As previously set out in Google's initial Notice, the law is that, even where antitrust plaintiffs have prevailed, antitrust remedies are not an opportunity for "full feasible relief," *Microsoft I*, 253 F.3d at 106, or "a blanket prohibition on all future anticompetitive conduct," *Microsoft III*, 373 F.3d at 1215-16. ECF No. 1664 at 8.

119.5.    Moreover, Plaintiffs fail to mention that *International Salt* did not result in a divestiture. *International Salt*, too, needed to address the defendant's market position in two related markets. The defendant had added provisions to its salt machine leases requiring lessees to use only the defendant's salt products. *Int'l Salt*, 332 U.S. at 393. The court did not order International Salt to divest both its salt machines and its salt products, as Plaintiffs' approach would require.  Instead, the remedial provision at issue required the defendant to "offer to lease or sell or license the use of" certain machines "to any applicant on non-discriminatory terms and conditions." *Id.* at 398 n.7. The Supreme Court affirmed that remedy on appeal, observing that an anti-discrimination provision was a reasonable means to "pry open to competition a market that has been closed by defendants' illegal restraints." *Id.* at 401. If anything, the remedies in that case are more consistent with Google's measured proposal.

120.    *Second*, Plaintiffs claim that divestiture is necessary "to deny Google the fruits of its anticompetitive scheme," including to deny Google ownership of its monopolies. ECF No. 1663 at 8.

120.1.    Merely invoking the objective of denying a defendant the "fruits" of its violations, or referring to denying a monopolist its monopoly power, is not enough to justify divestiture. As Google has previously explained, ECF No. 1664 at 8-9, in *Microsoft* the illegally obtained "fruits" were freedom from threats of competition, which were appropriately addressed through behavioral remedies.  *Microsoft III*, 373 F.3d at 1233. As the *Microsoft* district court wrote after reviewing the very same case cited by Plaintiffs, *International Salt*, in that case "***despite the language regarding***

45

*'relinquishment' of illegally obtained 'fruits,' the remedy affirmed by the Court*"
"***did not mandate a divestiture of the defendant's assets or a structural division of the defendant***, but merely regulated the terms pursuant to which the defendant could engage in its business of leasing or selling the salt machines." *Microsoft II*, 224 F. Supp. 2d at 108. Similarly, in *Search*, the district court identified three fruits of Google's anticompetitive conduct: "(1) freedom from threats; (2) scale; and (3) revenue." 2025 WL 2523010, at *40-46.  Again, the court did not order divestiture.

121.     Plaintiffs' have alleged specific "fruits" of the violations found by the Court. Google has set forth a proposal that denies Google those fruits without expanding the remedy beyond what is necessary to restore competition.

121.1.     Plaintiffs argue that one "fruit" is Google's "vast repositories of data that it has gained."  ECF No. 1663 at 9. Plaintiffs' maintain that its information sharing and interoperability remedies, ECF No. 1663-1 §§ IX.D, E, F, will mean that "Google will be required to certain of the 'vast repositories of data' that it has gained, which gave it 'significant advantages over rival firms.'" ECF 1663 at 9 (citing Mem. Op. at 40). Google's remedies do all of that and more. Google also proposes to make data available to rivals. It will enable publishers to port their data from DFP to another ad server to facilitate switching, and it will give publishers the ability to send rival ad servers historical AdX bid data that will enable those ad servers to perform optimizations.

121.2.     Plaintiffs also identify as a "fruit" AdX's ability to "charge durable supracompetitive prices." ECF No. 1663 8. Google's proposal to deprecate UPR, which alone would reduce AdX's revenue share to one comparable to its rivals',

and to facilitate head-to-head competition between AdX and other exchanges in Prebid, which will in turn "lower overall take rates."

121.3.    Without citation to the Court's opinion, Plaintiffs identify as a third "fruit" "control of the decision-making process for which ads will win." ECF No. 1663 8. Nothing in the Court's decision describes the "Final Auction Logic" as the result of anticompetitive conduct that must therefore be denied from Google. Regardless, as explained, Google is building integrations that will give publishers the choice to put that "decision-making process" between winning bids from AdX and winning bids from other exchanges directly in the hands of Prebid, outside Google's control.

121.4.    Plaintiffs also identify monopoly power as a fruit that needs to be addressed, a circular point given that the Court is to consider the fruits of monopoly power that Google acquired through anticompetitive conduct. Plaintiffs also assert that "Google illegally acquired its monopolies in the relevant market," ECF No. 1663 at 8, whereas the Court has found that Google made lawful acquisitions in the relevant markets, Mem. Op. 87-90, not that Google established its power in the relevant markets through anticompetitive conduct. To the contrary, the Court found that Google's acquisition of DFP and AdX was not anticompetitive. *Id.* In any event, Google's remedy directly addresses market power that the Court has found that Google acquired and maintained by actions that will substantially increase ad exchanges and ad server competition.

122.    *Third*, Plaintiffs suggest that divestiture is required here because, in essence, Google cannot be trusted not to violate antitrust laws again in the future. Even setting aside Plaintiffs' rhetorical attacks, that is not a justification for divestiture. Google has proposed

measures that will be verifiable by not just the Court but other market participants, as well as a monitor to verify that Google is complying with its obligations. More drastic measures are not necessary to guarantee continued compliance. Plaintiffs' cited case law does not support their asserted principle—which Plaintiffs seemingly attempt to import from criminal law into the civil antitrust context—that a monopolist must be eliminated from the markets in which it competes because it has engaged in anticompetitive conduct in the past and may offend again.  Rather, the cited cases demonstrate that antitrust remedies should be tailored to the particular conduct found anticompetitive, not eliminate the monopoly wholesale.

122.1.   In *United States v. Bausch & Lomb Co.*, 321 U.S. 707,724 (1944), cited by Plaintiffs, the Court enjoined certain price maintenance *contracts* (not eliminating the monopolist from a market) even though there could be lawful uses of those contracts because the contracts "came into existence as a patch upon an illegal system of distribution and as an integral part of that system."  Without enjoining the contracts, the "illegality" of the previously unlawful scheme "necessarily persists." *Id.* Here, no prior "illegality" "necessarily persists" under Google's proposal.  The *Bausch & Lomb* Court went on to reject the government's proposal to add another behavioral remedy provision requiring the defendant to sell its product "without discrimination" because that provision would "interfere with ordinary commercial practices." *Id.* at 728-29.

122.2.   Similarly, in another case cited by Plaintiffs, *Crescent Amusement Co.*, the Supreme Court affirmed a provision requiring pre-clearance for "future acquisitions of a financial interest in additional theatres" because the very "object of the conspiracy" at issue "was the destruction or absorption of competitors."  323 U.S. at 186. It was

in that context that the Court observed that a forward-looking injunction of additional acquisitions would be appropriate given the defendant's "proclivity for unlawful activity" in the form of acquisitions. *Id.* At the same time, the Court observed that any remedy should "not stand as a barrier to healthy growth on a competitive basis." *Id.*

**D. The Court Should Also Reject Plaintiffs' Proposal Because It Will Harm Consumers and Competition.**

123.    Plaintiffs' proposed remedies must be rejected for the reasons detailed above: they would cause both predictable and unpredictable harms to consumers and competition. "Not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers." *Microsoft III*, 373 F.3d at 1219.

124.    Plaintiffs do not, and cannot, argue that the choice of remedies should not take into consideration "harms that might befall other market actors." *Search*, 2025 WL 2523010, at *60. Instead, their sole response in their Notice is to argue that "economic hardship to Google" should not "influence the choice among effective remedies." ECF No. 1663 at 4. To be clear, Google has never argued and is not arguing that any hardship to Google cautions against Plaintiffs' proposed remedies. It is the "hardship" and uncertainties to publisher customers, including the very open-web publishers who are the subject of this case; advertiser customers; third-party ad tech participants in the ecosystem; and Internet users that weighs against Plaintiffs' remedies, not any consequence to Google.

125.    Plaintiffs' proposal is additionally problematic because Plaintiffs' proposals are impermissibly vague.

125.1.    "When it comes to the remedy" for an antitrust violation, courts "must have a healthy respect for the practical limits of judicial administration," and should never

"impose a duty that the court cannot explain or adequately and reasonably supervise." *Alston*, 594 U.S. at 102-03; *see also Microsoft II*, 224 F. Supp. 2d at 248 ("vagueness renders" the provision of a proposed decree "unenforceable" to the extent that "there is no clear path for Microsoft to follow in order to comply").

125.2.    Plaintiffs' proposed remedies implicate significant questions about the scope of their remedies, how to execute divestiture, and whether it would work at all—none of which Plaintiffs have offered *ex ante* answers to and none of which are matters that a court is suited to resolve after entering the decree. ECF No. 1664 at 15.

125.3.    The same is true for a number of Plaintiffs' proposed behavioral remedies, which refer to vague, undefined concepts that have not been discussed thus far in the presentation of evidence in this case:  "data generated by DFP that improves the Open-Source Auction," ECF No. 1663-1 § IX.G; "Data Signals generated by virtue of its ownership and control of DFP," ECF No. 1663-1 § X.E; and "uses or disseminates Google First-Party Data in connection with buying or evaluating Open-Web Display Ad Inventory," ECF No. 1663-1 § X.H.

125.4.    Plaintiffs' proposed "anti-retaliation, non-interference, and non-circumvention" provisions are also impermissibly vague. Even though virtually identical provisions were already rejected in *Search*, Plaintiffs' proposed provisions that do not "provide any specifics about what type of conduct might constitute a retaliatory act," would "sweep[] in a host of possible anticompetitive conduct" that is unrelated to this case, and "offer scant notice of what conduct would violate the judgment." *Search*, 2025 WL 2523010, at *99.

125.5.    The Court should reject Plaintiffs' proposals because they fail to "describe in

50

reasonable detail . . . the act or acts . . . required" of Google under Plaintiffs'
proposal. Fed. R. Civ. P. 65(d).

126.    Even worse, Plaintiffs suggest that not the Court, but **_Plaintiffs_**, should retain sole
discretion over dozens of provisions in their proposed final judgment, ranging from what is
contained in the "Final Auction Logic" (i.e., how much of DFP must be gutted by the open-
sourcing proposal in the phased DFP divestiture), ECF No. 1663-1 § VII.A, to how long customer
migration to a new version of AdX should take, ECF No. 1663-1 § VI.O, to what "assets are
reasonably necessary to operate AdX" and should therefore be divested, ECF No. 1663-1 § IV.11.
Plaintiffs do not even include a provision for judicial supervision over such critical questions about
the scope of the Court's degree. Plaintiffs have cited no authority for the proposition that a court
can or should delegate to the executive branch such vast powers to fill in the gaps of a vague
decree. Nor have Plaintiffs identified any instance of a court delegating such authority to a party
to create and enforce the parameters of a judicial decree. It would be improper to subject "a party
to" such "a Potemkin jurisdiction," which would "so mock[] the party's rights as to render end-of-
the-line correction inadequate." _United States v. Microsoft_, 147 F.3d 935, 954 (D.C. Cir. 1998)
(referring to a court-appointed Special Master); _cf. City of New York v. Mickalis Pawn Shop, LLC_,
645 F.3d 114, 145-146 (2d Cir. 2011) (identifying "serious constitutional questions" arising where
injunction delegated power to determine the terms of the injunction to the Special Master, but that
"Constitutional questions aside . . . the injunctions' sweeping delegations of power to the Special
Master violate Rule 64(d).").

127.    Finally, Plaintiffs propose a remedy that would demand a supervision period of at
minimum 10 years, and possibly extending longer to complete the various technically complex
tasks contemplated in Plaintiffs' proposed final judgment. The United States has previously

acknowledged that such a "ten-year term" could create a "substantial risk that the decree will become highly regulatory in nature." *New York v. Microsoft Corp.*, 231 F. Supp. 2d 203, 253 (D.D.C. 2002). That is particularly so where the markets are already in the process of being reshaped by technological and market forces, including trends such as growing ad formats, supply path optimization, and artificial intelligence. For comparison, in the decade from roughly 2008 to 2018, which is how long (at minimum) Plaintiffs' proposal would take: DoubleClick was acquired, Google and others innovated real-time bidding, new ad formats like in-app ads and Streaming TV ads emerged, and header bidding was created and exploded in popularity. Plaintiffs propose that the Court—or Plaintiffs—oversee markets while that level of change, or more, takes place. "Not infrequently, the quickly shifting gears of market innovation outstrip the slowly grinding gears of the law." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064,1071 (10th Cir. 2013) (Gorsuch, J.). The Court should reject Plaintiffs' proposal that would interfere with natural market innovation and competition, and instead enter Google's proposal that would restore competition efficiently, predictably, and with caution not to harm customers.

Dated: September 19, 2025

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Justina K. Sessions (*pro hac vice*)
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276
justina.sessions@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ
429 N. St. Asaph Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Erica Spevack (*pro hac vice*)
Bryon P. Becker (VSB #93384)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, DC 20004-2637
Telephone: (202) 240-2900
kdunn@dirllp.com