**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

# [PROPOSED] FINAL JUDGMENT

WHEREAS, Plaintiff United States of America and Plaintiffs Commonwealth of Virginia and States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia (together, the "Plaintiff States," and together with the United States, the "Plaintiffs"), filed their Complaint on January 24, 2023;

AND WHEREAS, the Court conducted a bench trial in September 2024 and entered a Memorandum Opinion on April 17, 2025;

AND WHEREAS, the Court found Defendant Google LLC liable for violating Section 2 of the Sherman Act, 15 U.S.C. § 2, by unlawfully acquiring and maintaining monopoly power in the Open-Web Display Publisher Ad Server market and the Open-Web Display Ad Exchange market;

AND WHEREAS, the Court found Google liable for violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, by unlawfully tying its Open-Web Display Publisher Ad Server (DFP) to its Open-Web Display Ad Exchange (AdX);

AND WHEREAS, the Court conducted a bench trial on remedies in September 2025 and entered a Memorandum Opinion on September 2, 2026;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google.

## II. APPLICABILITY

A. This Final Judgment applies to Google and **[Plaintiffs:** all other persons in active concert or participation with Google who receive actual notice of this Final Judgment**]** **[Google:** to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns**]**.

B. Unless otherwise specified in Section V.E, this Final Judgment applies solely to Indirect Demand. Nothing in this Final Judgment applies to any Inventory except for Open-Web Display Ad Inventory.

C. Nothing in this Final Judgment applies to AdSense, AdMob, DV360, or any other current Google advertising technology tool besides Google Ad Manager or Google Ads.

D. **[Google:** Google is not prohibited from operating or competing in any relevant market found by the Court, but will be subject to the restrictions stated herein] **[Plaintiffs (if Google's language is accepted):** and all applicable laws**]**.

E. **[Google:** This Final Judgment applies to Google Ads only to the extent explicitly stated herein, and the relief applicable to Google Ads stated herein is not predicated upon any finding that Google Ads competes in any relevant market defined by the Court, or possesses market power or monopoly power in any relevant market.**]** **[Plaintiffs omit this subsection]**

F. **[Google:** The proposed timelines presented to the Court in Google's post-trial Proposed Final Judgment, ECF No. 1811-2, were provided on the premise that the mandated relief would apply only to the United States. Accordingly, for each element of Mandated Relief listed below containing a mandated timeline, those timelines apply to the United States. Consistent with the terms of the Final Judgment, each element of Mandated Relief will also be implemented outside of the United States, by a time not to exceed 24 months after the Effective Date, except that this period may be extended to the extent necessary to comply with applicable law, which may include mandated contractual notice requirements and regimes regulating data sharing, privacy, and competition, in the relevant jurisdiction(s).**] [Plaintiffs omit this subsection]**

G. Nothing in this Final Judgment is intended to confer upon any person other than a party to this action any **[Plaintiffs:** enforcement**]** rights or remedies of any nature.

## III. DEFINITIONS

1. "Ad Buying Tool" means a program or service that submits Bids to purchase Open-Web Display Ad Inventory on behalf of one or more Advertisers on an automated basis. Google Ads is an example of an Ad Buying Tool.

2. "Ad Exchange" means a product or service through which two or more Buying Tools can place Open Auction Bids and/or Private Auction Bids in real-time auctions for Open-Web Display Ad Inventory offered for Purchase by or on behalf of two or more Publishers, and that transacts Open-Web Display Ads for one or more Publishers unaffiliated with the provider or operator of such Ad Exchange. AdX is an example of an Ad Exchange.

3. "Ad Impression" or "Impression" means the service of a single Open-Web Display Ad to a single user on a single occasion.

4. "Ad Inventory" or "Inventory" means the space on Publishers' digital Property offered for the sale or placement of digital advertising.

5. "Advertiser" means a person or entity that, directly or through one or more intermediaries, places one or more Open-Web Display Ads intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's website so that it is viewed by at least one User visiting such Property.

6. "AdWords" or "Google Ads" means Google's Ad Buying Tool, now known as Google Ads, that is the Advertiser-facing component of Google's ad network, through which advertisers can buy, *inter alia*, Open-Web Display Ad Inventory and set up media campaigns to show digital ads on Google-owned and third-party partner websites.

7. "AdX" means the **[Plaintiffs:** Ad Exchange functionality**]** **[Google:** Open Auction Ad Exchange functionality and the Private Auction Ad Exchange functionality**]** of Google Ad Manager, Google Ad Manager 360, or a successor to either product that offers Ad Exchange functionality. AdX does not include DFP, AdSense, AdMob, or any other **[Plaintiffs:** current**]** Google product, regardless of any similarity in features or implementation such product may share with the Ad Exchange functionality of Google Ad Manager.

8. "AdX Bid Data" means, for any given Publisher, data, in a structured data format, showing the Bid values and identity of the bidder and Ad Buying Tool, except where a non-Google bidder or Ad Buying Tool explicitly requests their identity not be shared in association with their Bid, for any winning and losing Bids received by AdX from Google and non-Google Ad Buying Tools for Open-Web Display Ad Inventory.

9. "AdX-Prebid Integration" means one or more software components, modules, or other units of code released, published, or contributed by Google from time-to-time that, when integrated with the existing code for Prebid.js (as published by Prebid.org at https://github.com/prebid/prebid.js or a successor location) or Prebid Server (as published by Prebid.org at https://github.com/prebid/prebid-server or a successor location), collects relevant signals for, formats, and transmits RTB Requests to AdX and receives Bids sent by AdX in response. Although the AdX-Prebid Integration is designed to interface with AdX (or specific API endpoints provided by AdX), only the code compiled into (or otherwise designed to be distributed with) Prebid.js or Prebid Server, and not any code compiled into (or otherwise designed to be run together with) AdX or any of its components, shall be included in the definition of "AdX-Prebid Integration."

10. "API" means application programming interface.

11. "Bid" or "Real-Time Bid" means an offer, made in response to **[Plaintiffs:** a Query**]** **[Google:** an Open Auction Query or a Private Auction Query**]**, to pay a specified amount in exchange for the right to render an Open-Web Display Ad in a unit of Inventory.

12. "DFP" or "DoubleClick for Publishers" means the Publisher Ad Server functionality of Google Ad Manager, Google Ad Manager 360, or a successor to either product that offers Publisher Ad Server functionality. DFP does not include AdX, AdSense, AdMob, or any other **[Plaintiffs:** current**]** Google product, regardless of any similarity in Features or implementation such product may share with the Publisher Ad Server functionality of Google Ad Manager.

13. "DFP-Prebid Integration" means one or more software components, modules, or other units of code released, published, or contributed by Google from time-to-time that, when

integrated with the existing code for Prebid.js (as published by Prebid.org at https://github.com/prebid/prebid.js or a successor location) or Prebid Server (as published by Prebid.org at https://github.com/prebid/prebid-server or a successor location), allows Prebid Server to submit one or more Bids directly to DFP over a server-to-server connection, including the collection and transmission of all relevant signals. Although the DFP-Prebid Integration is designed to interface with DFP (or specific API endpoints provided by DFP), only the code compiled into (or otherwise designed to be distributed with) Prebid.js or Prebid Server, and not any code compiled into (or otherwise designed to be run together with) DFP or any of its components, shall be included in the definition of "DFP-Prebid Integration."

14. "DV360" means one of Google's Ad Buying Tools that is marketed as Display & Video 360 and formerly known as DoubleClick Bid Manager or DBM.

15. "Effective Date" means, with respect to this Final Judgment or any provision thereof, the date that is 60 days after the Final Judgment is entered, provided that, when calculating any deadline specified in this Final Judgment with reference to the Effective Date, such date shall be tolled, day-for-day, for so long as the relevant provision of this Final Judgment (or the Final Judgment as a whole) is or was stayed pursuant to an order of this Court, the United States Court of Appeals for the Fourth Circuit, or the United States Supreme Court (regardless of whether such stay is subsequently vacated).

16. "First Look" means the DFP feature found by the Court to require a Publisher to offer AdX a right-of-first refusal on Open-Web Display Ad Inventory before offering other Ad Exchanges an opportunity to bid on such Open-Web Display Ad Inventory.

17. "Floor Price" means the limitation on how low an Advertiser or Buying Tool can Bid for Open-Web Display Ad Inventory while still being eligible to win the Impression.

18. **[Plaintiffs:** "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in Mountain View, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, and similar or equivalent entities outside of the United States, as well as their directors, officers, managers, agents, and employees.**] [Google omits this subsection]**

19. "Google Ad Manager" or "Google Ad Manager 360" means Google's tool that offers Publishers the functionality of a Publisher Ad Server and an Ad Exchange, including any successor products.

20. "Google First-Party Data" means **[Google:** individual**]** data about a specific individual User's activity on Google's owned-and-operated **[Plaintiffs:** products or**]** properties (including YouTube, Gmail, and Google Search).

21. "Header Bidding Trafficking" means the Google feature by the same name that enables the Google Publisher Tag on a Publisher's website to collect Bid data for Open-Web Display Ads from the Prebid.js header bidding wrapper running on the Publisher's website and allow the collected bids to compete for Impressions on the basis of the collected price, as described at https://support.google.com/admanager/answer/12273163.

22. "including" and "include" mean including, but not limited to.

23. "Indirect Demand" means demand to purchase Ad Inventory through Open Auctions or Private Auctions.

24. "Last Look" means the DFP feature found by the Court to require a Publisher to provide AdX a right-of-last refusal on Open-Web Display Ad Inventory, including by passing the highest Bid from another demand source as a Floor Price for AdX or otherwise allowing

AdX to see a competing Bid from another Ad Exchange before AdX submits its Bid for such Open-Web Display Ad Inventory.

25. **[Plaintiffs:** "Malfeasance" means conduct wholly outside the bounds of the law or reasonable disagreement.**] [Google omits this subsection]**

26. "Monitor" has the meaning provided in Section VII(A).

27. "Monitor Staff" means any staff, agents, experts, consultants, personnel, or advisors hired, contracted, appointed, or retained by the Monitor under the terms of this Final Judgment, as well as members of the Technical Committee.

28. "Open Auction" means an auction for Ad Inventory that is made available to all buyers otherwise eligible to Bid on AdX and excludes Preferred Deals, Programmatic Guaranteed Deals, and similar transactions subject to terms individually and directly negotiated between a Publisher and an Advertiser or its agent.

29. "Open-Web Display Ad" or "Open-Web Display Advertising" has the same meaning as set forth at page 21 in the Court's April 17, 2025 opinion ("a display ad that runs on websites that use third-party ad tech infrastructure to match advertisers' ads to Publishers' Inventory"). Open-Web Display Advertising, as found by the Court, does not include native ads, in-stream video ads, or search ads, and does not include digital ads appearing on social media platforms, search engines, mobile apps, embedded video players, video streaming services, and connected televisions.

30. "Open-Web Display Ad Exchange" has the same meaning as "ad exchanges for open-web display advertising," as set forth at pages 50–54 of the Court's April 17, 2025, Memorandum Opinion.

31. "Open-Web Display Ad Inventory" means Inventory offered by a Publisher for the sale or placement of Open-Web Display Advertising via Open Auction or Private Auction by a Google Ad Manager Publisher customer **[Google:** in good standing and otherwise complying with the terms of and conditions of the Publisher's relevant contractual agreement(s) with Google].

32. "Open-Web Display Publisher Ad Server" has the same meaning as "publisher ad servers for open-web display advertising," as set forth at pages 43–50 of the Court's April 17, 2025, Memorandum Opinion.

33. "Preferred Deal" means a type of direct transaction between a Publisher and Advertiser or its agent that occurs programmatically in which that Advertiser is given an initial (i.e., preferred) opportunity to buy an Impression (but the purchase/sale is not guaranteed).

34. "Preferred Deal Inventory" means Open-Web Display Ad Inventory, offered for sale via Preferred Deal by a Google Ad Manager Publisher customer **[Google:** in good standing and otherwise complying with the terms and conditions of the Publisher's relevant contractual agreement(s) with Google**]**.

35. "Private Auction" means an auction for Inventory that is made available to a limited set of Advertisers or Buying Tools selected by a Publisher or its agent and excludes Preferred Deals, Programmatic Guaranteed Deals, and similar transactions subject to terms individually and directly negotiated between a Publisher and an Advertiser.

36. "Programmatic Guaranteed Deal" means a type of direct transaction between a Publisher and Advertiser or its agent that occurs programmatically in which a Publisher's Inventory is reserved (i.e., guaranteed) for that Advertiser.

37. "Programmatic Guaranteed Inventory" means Open-Web Display Ad Inventory, offered for sale via Programmatic Guaranteed Deal by a Google Ad Manager Publisher customer **[Google:** in good standing and otherwise complying with the terms and conditions of the Publisher's relevant contractual agreement(s) with Google**]**.

38. "Property" means a website containing space that is Purchased or offered for Purchase for the placement of Open-Web Display Advertising.

39. "Publisher" means a person or entity operating a website.

40. "Publisher Ad Server" means a product, service, or system (or, where the context requires, the provider or operator of such Publisher Ad Server) that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Open-Web Display Ad (or source from which such Open-Web Display Ad shall be obtained) for a unit of Inventory, for one or more publishers unaffiliated with the provider or operator of such Publisher Ad Server.

41. "Publisher Configuration Data" means data reflecting the Publisher's then-existing Open-Web Display Ad units, orders, line items, and creatives, as are otherwise maintained by Google in the ordinary course of business and made available to Publishers via Google Ad Manager's interfaces.

42. "Publisher DFP Data" refers collectively to a Publisher's then-existing Publisher Configuration Data and then-existing Publisher Historical Data.

43. "Publisher Historical Data" means log-level DFP data reflecting the Publisher's then-existing historical data regarding **[Plaintiffs:** all bids for a Publisher's Open-Web Display Ad Inventory, whether the Bid won the Ad Impression or not, including the type of deal, Bid price, Bid rejection reason, Bid seller reserve price, Bid source type, country, key part, optimization type, processing date and hour, and time,**]** the number of Queries received and

Impressions served for each of the Publisher's configured Open-Web Display Ad units, **[Google:** provided that Publisher Historical Data shall only include data otherwise maintained by Google in the ordinary course of business and made available to Publishers via Google Ad Manager's interfaces,**]** **[Plaintiffs:** regardless of whether the data was previously made available to the Publisher,**]** and shall include the data made available in the Google Ad Manager Data Transfer files, including those described at https://support.google.com/admanager/answer/13947328?hl=en. **[Plaintiffs:** The data shall contain a persistent identifier per impression and shall be unhashed and untruncated.**]**

44. "Purchase," when used in connection with Open-Web Display Ad Inventory or Impressions, means to obtain, directly or indirectly through one or more intermediaries, the right to render or display an Open-Web Display Ad in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

45. "Qualified Prebid Client Instance" means an instance of Prebid.js into which an AdX-Prebid Integration or DFP-Prebid Integration, in each case in the form most recently released, published, or contributed by Google, has been compiled, linked, or otherwise incorporated. An instance is not a Qualified Prebid Client Instance if its AdX-Prebid Integration or DFP-Prebid Integration has been modified in a manner that would require Google to modify the DFP or AdX side of the integration, or that would degrade the quality or availability of signals or other data passed between the Prebid.js instance and DFP or AdX.

46. "Qualified Prebid Instance" means a Qualified Prebid Client Instance or a Qualified Prebid Server Instance.

47. "Qualified Prebid Server Instance" means an instance of Prebid Server into which an AdX-Prebid Integration or DFP-Prebid Integration, in each case in the form most recently

released, published, or contributed by Google, has been compiled, linked, or otherwise incorporated. An instance is not a Qualified Prebid Server Instance if its AdX-Prebid Integration or DFP-Prebid Integration has been modified in a manner that would require Google to modify the DFP or AdX side of the integration, or that would degrade the quality or availability of signals or other data passed between the Prebid Server instance and DFP or AdX. For the avoidance of doubt, a Qualified Prebid Server Instance may be operated by Google.

48. "Query" means a request to provide a Bid for an Open-Web Display Ad to be rendered in a unit of Inventory, whether denominated as an "ad request," "bid request," or otherwise.

49. "RTB Request" or "Real-Time Bid Request" means a request for an Open Auction Bid or Private Auction Bid, including, but not limited to, a request formatted in accordance with the published OpenRTB standard, or a successor standard thereto, or such other format as has been published by Google in connection with a particular provision of this Final Judgment.

50. "Separate Contract" means an independent agreement between the Publisher and Google for the use of Ad Exchange functionality or the Publisher Ad Server functionality of Google Ad Manager. If there is a primary contract specifying terms generally applicable to a Publisher's use of Google Ad Manager appending both an addendum or schedule stating terms applicable to the Ad Exchange functionality and a separate addendum or schedule stating terms applicable to the Publisher Ad Server functionality, each addendum or schedule would constitute a Separate Contract under the meaning of this provision.

51. "Technical Committee" has the meaning provided in Section VII(A).

52. "Unified Pricing Rules" means the DFP policy that the Court found prohibited Publishers using DFP from setting higher price floors for AdX than for other Ad Exchanges and prohibited DFP Publishers from setting higher price floors for AdWords demand than for demand from other Ad Buying Tools.

53. "User" means an end user visiting or using a website.

## IV. EFFECTIVE DATE AND TERM

A. ***Effective Date.*** **[Google:** Subject to the outcome of any motion to stay this Final Judgment pending appeal,**]** This Final Judgment shall take effect on the Effective Date.

B. ***Term of Final Judgment.*** This Final Judgment **[Google:** including the provisions relating to the Monitor,**]** will expire on the sixth anniversary of the Effective Date, unless the Court extends the term.

## V. INTEROPERABILITY AND DATA SHARING

A. ***AdX-Prebid Interoperability.*** No later than **[Plaintiffs:** 6**] [Google:** 12**]** months from the Effective Date, Google must create and implement an adapter to enable an AdX Publisher Customer using Qualified Prebid Instances to submit RTB Requests from such Qualified Prebid Instances to AdX and receive Real-Time Bids from AdX in response for all Indirect Demand for Open-Web Display Inventory. Google shall make itself available for the duration of the Final Judgment to provide reasonable technical support to Qualified Prebid Instances to enable them to integrate with AdX in accordance with this subsection.

B. ***AdX-Publisher Ad Server Interoperability***. No later than **[Plaintiffs:** 6**] [Google:** 12**]** months from the Effective Date, Google shall enable AdX Publisher customers using non-Google Publisher Ad Servers to submit RTB Requests from such Publisher Ad Servers to AdX and receive Real-Time Bids from AdX in response for all Indirect Demand for Open-Web

Display Ad Inventory. Google shall publish specifications to allow Publishers to submit RTB Requests to AdX using a non-Google Publisher Ad Server. Google shall make itself available for the duration of the Final Judgment to provide reasonable technical support to Publisher Ad Servers to enable them to integrate with AdX.

C. When a Publisher submits an RTB Request to AdX for Open-Web Display Ad Inventory via a Publisher Ad Server or Qualified Prebid Instance, AdX shall respond to an RTB Request in a functionally equivalent manner and on materially identical **[Google:** <u>commercial</u>**]** terms as AdX responds to RTB Requests from DFP. To that end:

a. When a Publisher submits an RTB Request to AdX for Open-Web Display Inventory via a Publisher Ad Server or Qualified Prebid Instance, AdX shall not intentionally reduce or throttle the frequency with which it passes the Query to an Ad Buying Tool or responds to an RTB Request with a Real-Time Bid **[Plaintiffs:** <u>, nor alter the value or price of the Real-Time Bid,</u>**]** **[Google:** <u>solely</u>**]** on the basis that the RTB Request is submitted via a Publisher Ad Server or Qualified Prebid Instance rather than via DFP unless expressly instructed by an Advertiser or non-Google Ad Buying Tool**.**

b. When a Publisher submits an RTB Request to AdX for Open-Web Display Inventory via a Publisher Ad Server or Qualified Prebid Instance, Google shall not charge such Publisher a greater AdX revenue share or other AdX fee than it would have charged had such Publisher submitted the same request via DFP.

c. When a Publisher submits an RTB Request to AdX for Open-Web Display Inventory via a Publisher Ad Server or Qualified Prebid Instance, Google shall not intentionally introduce any additional latency that does not otherwise exist as

a technical reality given that AdX operates on a different infrastructure from Publisher Ad Servers and Qualified Prebid Instances and shall take reasonable steps to ensure that there is no additional latency.

d. When a Publisher submits an RTB Request to AdX for Open-Web Display Inventory via a Publisher Ad Server or Qualified Prebid Instance, Google shall not intentionally reduce the information passed by AdX via the Bid response as compared to the information AdX would pass had such Publisher called AdX directly from DFP, provided that Google is not required to pass any information outside of Google that it is prohibited from passing to a third party under Google's internal privacy policies and/or governing laws. Google must not apply or change its internal privacy policies in a way **[Plaintiffs:** <u>that circumvents or frustrates</u>**]** **[Google:** <u>designed to circumvent or frustrate</u>**]** Google's obligations in this subsection.

D. ***DFP-Prebid Interoperability.*** No later than 12 months from the Effective Date, Google must create and implement a server-to-server integration between DFP and Qualified Prebid Server Instances through which Publishers using Qualified Prebid Server Instances can submit **[Plaintiffs:** <u>Queries</u>**]** **[Google:** <u>Bid requests</u>**]** from DFP to such Qualified Prebid Server Instances and such Qualified Prebid Server Instances can submit Bids to DFP in response for Open-Web Display Ad Inventory via a DFP-Prebid Integration. Google shall submit **[Plaintiffs:** <u>Queries</u>**]** **[Google:** <u>Bid requests</u>**]** in a functionally equivalent manner and on materially identical **[Google**: <u>commercial</u>**]** terms as DFP interoperates with and requests Bids from AdX, **[Google:** <u>insofar as technically possible given the technical reality that DFP operates on a different infrastructure from Qualified Prebid Server Instances,</u>**]** and shall not intentionally introduce to

the DFP-Prebid Integration any degradation **[Google:** that does not otherwise exist as a technical reality given that DFP operates on a different infrastructure from Qualified Prebid Server Instances or**]** that is not pursuant to the instruction of the Publisher or Qualified Prebid Server Instance.

E. Google also shall, no later than 15 months from the Effective Date, provide a server-to-server connection between DFP and Qualified Prebid Server Instances through which Publishers using Qualified Prebid Server Instances can effectuate Programmatic Guaranteed Deals and Preferred Deals between DFP and such Qualified Prebid Server Instances for Programmatic Guaranteed Deal Inventory or Preferred Deal Inventory via a DFP-Prebid Integration.

F. No later than 12 months from the Effective Date, when a Publisher using DFP uses a non-Google Ad Exchange or Qualified Prebid Instance to submit an RTB Request, unless otherwise specified by the Publisher, DFP shall pass to the non-Google Ad Exchange or Qualified Prebid Instance the same or functionally equivalent information as DFP passes to AdX, **[Plaintiffs:** including all pricing information, including the pricing (line item and temporary) and pacing of direct-sold campaigns, and Google audience data—including first- and third-party data on users of the open web—that it shares with AdX, to all participants in the Prebid auction.] **[Google:** specifically including DFP pricing rules, publisher audience data, and any deal information,**]** provided that Google is not required to pass any information outside of Google that it is prohibited from passing to a third party under Google's internal privacy policies and/or governing laws. Google must not apply or change its internal privacy policies in a way **[Plaintiffs:** that circumvents or frustrates**]** **[Google:** designed to circumvent or frustrate**]** Google's obligations in this subsection.

G. Google shall make itself available for the duration of the Final Judgment to provide reasonable technical support to Qualified Prebid Server Instances to enable Qualified Prebid Server Instances to integrate with DFP in accordance with this Section V.

H. Nothing in this Final Judgment shall require Publishers to submit Programmatic Guaranteed Deals and Preferred Deals to DFP through a Qualified Prebid Server Instance intermediary, but Google shall build the technical integration to give Publishers the ability to do so if they choose.

I. No later than **[Plaintiffs:** 6**]** **[Google:** 12**]** months from the Effective Date, Google must implement a Publisher control such that DFP Publishers will be able to choose whether a Real-Time Bid Request to AdX for **[Plaintiffs:** any single Ad Impression of**]** Open-Web Display Inventory shall be submitted either from DFP directly to AdX or through a DFP-Prebid Integration from a Qualified Prebid Server Instance to AdX, and not both. Nothing in this Section V(I) shall restrict Publishers' existing ability to configure their header bidding integrations. Google must ensure that DFP log data provides sufficient information to enable the Monitor and/or the Court to determine the path within DFP through which AdX real-time bids for Open-Web Display Ad Inventory are provided to ensure that Publishers are not making simultaneous or sequential Real-Time Bid Requests to AdX both directly from DFP and through the DFP-Prebid Integration for the same Impression.

J. ***Publisher DFP Data Portability.*** Google shall, no later than 3 months from the Effective Date, enable a Publisher who **[Plaintiffs:** is considering or evaluating using**]** **[Google:** chooses to use] a non-Google Publisher Ad Server to export its Publisher DFP Data and to pass on its Publisher DFP Data to any non-Google Publisher Ad Server. To effectuate the obligation set forth in this subsection, it is ordered that:

1. Google shall, no later than 3 months from the Effective Date, enable Publishers using DFP to export, without charge, their Publisher Configuration Data and Publisher Historical Data from DFP in a structured data format, via an API or otherwise, when they **[Plaintiffs:** evaluate or consider using**]** **[Google:** choose to use**]** a non-Google Publisher Ad Server.

2. Google shall, no later than 3 months from the Effective Date, publish sufficient documentation to reasonably enable Publisher Ad Servers to understand and import the data in Section V(J)(1) into their systems. Google shall also make itself available for the duration of the Final Judgment to provide reasonable technical support to Publisher Ad Servers to the extent necessary for such Publisher Ad Servers to understand and import the data in Section V(J)(1) into their systems.

K. ***Publisher AdX Data Portability.*** Google shall, no later than 12 months from the Effective Date, enable Publishers **[Plaintiffs:** to export their own AdX Bid Data or, if they choose**]** **[Google:** choosing**]** to use AdX with a non-Google Publisher Ad Server, to designate one or more Publisher Ad Servers to receive such Publisher's AdX Bid Data, provided that nothing in this subparagraph shall require a Publisher to make such a designation or require Google to disclose a Publisher's AdX Bid Data absent such designation or consent. Google shall, no later than 12 months from the Effective Date, publish sufficient documentation to reasonably enable Publisher Ad Servers to import and understand the data referenced in this subsection into their systems. Google shall also make itself available for the duration of the Final Judgment to provide reasonable technical support to Publisher Ad Servers to the extent necessary for such Publisher Ad Servers to import and understand the data in this subsection. The Monitor, in consultation with the Technical Committee, may identify additional information that Google

must make available to other Publisher Ad Servers to enable them to import and understand the data referenced in this subsection.

L. ***DFP Technical Documentation.*** Google shall, no later than 12 months from the Effective Date, make available on request and without charge to all Publisher customers of DFP a data file covering the next seven days ("auction data file") showing, for each Ad Impression served, the ad candidate prices and any price adjustments used in executing the DFP "final logic" to select the ad that is served (e.g., the price(s) **[Plaintiffs:** and pacing**]** of any direct deals and their priority considered, any programmatic bids considered, and any bid adjustments applied and the category of adjustment made). Google shall also make available to Publisher customers of DFP technical documentation that shall describe the DFP "final logic" to select the ad served and enable a Publisher, using an auction data file and an auction identifier provided by Google as inputs, to independently verify the winner of that auction. **[Plaintiffs:** Google must make the data file available to each DFP Publisher customer on a daily or more frequent basis. The Monitor, in consultation with the Technical Committee, may identify additional data fields that Google must make available to Publisher customers to provide sufficient transparency into DFP's decision-making process.**]** **[Google:** The parties shall work with the Monitor and Technical Committee as needed to devise an agreed-upon approach that further defines the specifics of the documentation.**]**

## VI. PROHIBITIONS ON DISTORTING THE COMPETITIVE PROCESS

A. ***Direct Bidding.*** Google shall not build any direct bidding integrations between Google Ads and DFP through which Google Ads can provide Real-Time Bids directly to DFP for Indirect Demand for Open-Web Display Ad Inventory, provided that nothing in this subsection shall prevent Google Ads, or any other Google Ad Buying Tool, from directly

submitting Bids to or purchasing Open-Web Display Ad Inventory from a DFP Publisher customer via Prebid.js, a Prebid Server Instance, or equivalent without having to buy through an Ad Exchange intermediary.

B. ***Non-Discriminatory Bidding Behavior.*** Absent the express instructions of Advertisers, from the Effective Date, AdWords, when submitting Real-Time Bids for Indirect Demand for Open-Web Display Inventory, shall not prioritize bidding (including when and how to submit bids, how much to bid, and what information to transmit with bids) based upon the fact of whether a Publisher is using **[Plaintiffs:** any of Google's ad tech products, including**]** AdX or DFP. Notwithstanding the foregoing, AdWords may prioritize bidding on AdX **[Google:** or Publishers using DFP**]** only for the purpose of achieving advertiser return on investment **[Google:** (i.e., access to more and/or more effective information, access to higher quality Impressions, reduced latency, more transparent or efficient pathways, better fraud and auction integrity protection, protections against advertisers bidding against themselves, and/or better privacy protection)**]**, so long as the fact of Google's ownership is not a factor in AdWords' bidding behavior **[Plaintiffs:** and the advertiser has expressly instructed such prioritization based on AdX providing more effective information, access to higher quality Impressions, better fraud protection, or better privacy protection. Any prioritization of AdX by AdWords under this subsection based on these factors must be reasonable, supported, and verifiable. The Monitor and Technical Committee shall consider data, metrics, and/or other relevant information from independent, non-Google parties to evaluate any such prioritization**]**.

C. Google must not seek, offer, or accept any compensation or other remuneration for preferentially routing any Indirect Demand for Open-Web Display Ad Inventory to any Open-Web Display Ad Exchange or any Open-Web Display Publisher Ad Server, unless in

accordance with directions from and/or configurations set by Publishers and/or Advertisers. For the avoidance of doubt, this provision does not prohibit Advertisers and/or Publishers from negotiating discounts **[Google:** nor does it prohibit Google from charging a fee for services provided in accordance with this Final Judgment**]**.

D. **[Plaintiffs:** ***Non-Discriminatory Use of Data Signals.*** Subject to Publisher preferences and governing laws, insofar as Google uses or disseminates certain information relating to Indirect Demand for Open-Web Display Ads generated by virtue of its ownership and control of DFP and the DoubleClick domain—specifically, cookie identifiers, user identifiers, user location, device identifiers, and URL—Google must do so without regard to whether a Publisher or advertiser is using any of Google's products, including DFP, and without regard to whether an ad tech tool receiving or processing this information is owned by or affiliated with Google. This subsection does not require Google to share data inconsistent with its internal privacy policies, insofar as Google does not apply or change those policies in a way **[Plaintiffs:** that circumvents or frustrates**] [Google (if Plaintiffs' language is accepted):** designed to circumvent or frustrate**]** Google's obligations in this subsection.**] [Google has proposed relevant provisions at subsections V.C, V.D, V.F, and VI.F.]**

E. ***Non-Discriminatory Ad Serving.*** DFP must serve Open-Web Display Ad Inventory according to Publishers' preferences and directions and without regard to the fact of whether the winning bid is from a Google ad tech tool. For the avoidance of doubt, this Section VI(E) does not apply to Google owned-and-operated Ad Inventory (*i.e.*, Ad Inventory for Google products, such as YouTube).

F. ***Non-Discriminatory Ad Exchange.*** No later than **[Plaintiffs:** 12**] [Google:** 18**]** months from the Effective Date, when a Publisher uses AdX to submit a Real-Time Bid Request

for Open-Web Display Ad Inventory, AdX shall ensure equivalent information is available to all Ad Buying Tools, unless otherwise specified by the Publisher, without regard to whether the Publisher or Advertiser is using any of Google's products, provided that Google is not required to pass any information outside of Google that it is prohibited from passing to a third party under **[Google:** Google's internal privacy policies and/or**]** governing laws. This subsection does not require Google to share data inconsistent with its internal privacy policies, insofar as Google does not apply or change those policies in a way **[Plaintiffs:** that circumvents or frustrates**]** **[Google:** designed to circumvent or frustrate**]** Google's obligations in this subsection.

G. ***Non-Discriminatory Use of Google First-Party Data.*** Subject to Publisher preferences, **[Google:** Google's internal privacy policies,**]** and governing laws, AdWords shall not use Google First-Party Data to determine or modify the Bid price for an Open-Web Display Impression for a specific user, unless it does so without regard to whether the RTB Request is submitted by **[Plaintiffs:** any of Google's products, including DFP and**]** AdX **[Plaintiffs:** , or whether a tool receiving or processing the Google First-Party Data is owned by or affiliated with Google,**]** and in compliance with applicable privacy laws **[Google:** and Google's privacy policies**]**. Google may use Google First-Party Data **[Plaintiffs:** to respect**]** **[Google:** for other purposes, including, but not limited to, respecting**]** user opt-outs from personalized ads and to prevent personalized ads from being shown to children.

H. ***Tying DFP to AdX Real-Time Bids.*** From and after the Effective Date, Google shall not enforce any policies or contract terms that restrict the sharing of Real-Time Bids from Indirect Demand for Open-Web Display Ad Inventory from AdX with a non-Google Publisher Ad Server. To effectuate the prohibition contained in this subsection, it is ordered that:

1. No later than 3 months from the Effective Date, Google shall ensure that any agreement, contract terms, or policy restricting Publishers from passing an AdX Real-Time Bid for Open-Web Display Ad Inventory through another system (including the Publisher's own system) that dynamically or programmatically allocates ad calls based on actual or estimated real-time pricing information is formally rescinded, including by removing it from Google's public-facing documentation of policies applicable to the use of Google Ad Manager, DFP, or AdX.

2. From and after the Effective Date, Google shall not enter into, maintain, or enforce any agreement that conditions a Publisher's ability to sell Open-Web Display Ad Inventory using AdX on the Publisher's use of DFP. To effectuate the obligation set forth in this subsection VI(H)(2), it is ordered that:

    a. No later than 3 months from the Effective Date, Google shall provide written notice to any Publisher then-contracted to use DFP and AdX that they are not required as a condition of their use of AdX to sell Open-Web Display Ad Inventory to use DFP, or vice versa, and Google shall not enforce any such contractual requirement.

    b. Beginning no later than 6 months from the Effective Date, Google shall not enter into or renew any agreement permitting a Publisher to sell Open-Web Display Ad Inventory using AdX or to serve Open-Web Display Ad Inventory using DFP, unless such agreement is a Separate Contract, provided that nothing in this Final Judgment shall

require Google to offer DFP or AdX services to any Publisher.

I. ***First Look and Last Look.*** Google must not reimplement either First Look or Last Look features or functionality within DFP or AdX with respect to Indirect Demand for Open-Web Display Ad Inventory. To further effectuate this commitment, to expand Publisher access to header bidding, and to provide Publishers greater ability to put indirect AdX demand in direct competition with indirect demand from rival Ad Exchanges in a single head-to-head clearing auction within Prebid, it is ordered that Google shall, no later than 6 months from the Effective Date, make Header Bidding Trafficking available to all DFP Publisher customers for Open-Web Display Ad Inventory. For the avoidance of doubt, Google shall not restrict the availability of Header Bidding Trafficking to DFP Publisher customers based on a publisher's size, usage, or subscription to the Google Ad Manager 360 service.

J. ***Unified Pricing Rules***. Google must deprecate and must not reimplement Unified Pricing Rules in DFP for Indirect Demand for Open-Web Display Ad Inventory. To effectuate this obligation, it is ordered that Google must not require Publishers setting Floor Prices within DFP or Google Ad Manager for Indirect Demand for Open-Web Display Ad Inventory to do so on a uniform basis across multiple Ad Buying Tools or Ad Exchanges, and Google must not provide a discount on fees charged for the use of DFP in exchange for the Publisher's agreement to set Floor Prices within DFP for Indirect Demand for Open-Web Display Ads on a uniform basis across multiple Ad Buying Tools or Ad Exchanges.

## VII. MONITORING, ADMINISTRATION, AND COMPLIANCE

### A. Monitor

1. ***Appointment.*** **[Plaintiffs:** Plaintiffs] **[Google:** Google**]** will propose a slate of three monitor candidates from which **[Plaintiffs:** Google] **[Google:** Plaintiffs**]** may choose,

subject to Court approval. **[Plaintiffs:** All monitor candidates must have (a) substantial experience as a judicial officer, mediator, arbitrator, or antitrust lawyer and (b) experience with technology, cybersecurity, IP, or similar cases.**]** No monitor candidate may be a current employee of Google or a Google ad tech competitor. No monitor candidate may have a current non-de minimis financial interest in Google or a Google ad tech competitor. No monitor candidate may have served as a testifying expert (or worked on behalf of a testifying expert) or as a fact witness in the liability or remedies phase of this case or any substantially-related ad tech case. **[Plaintiffs:** If Google objects that one of the monitor candidates proposed by Plaintiffs is unqualified or conflicted, Google must provide a written explanation within seven days of receiving Plaintiffs' proposed candidates, and the Parties shall meet and confer within two days of receiving Google's explanation.**]** **[Google:** If Plaintiffs object that one of the monitor candidates proposed by Google is unqualified or conflicted, Plaintiffs must provide a written explanation within seven days of receiving Google's proposed candidates, and the Parties shall meet and confer within two days of receiving Plaintiffs' explanation.]

The Monitor will serve from appointment until the Final Judgment expires. Once appointed, the Monitor will be an arm and representative of the Court. Google must **[Plaintiffs:** cooperate fully with**]** **[Google:** take no action to interfere with or impede**]** the Monitor and **[Plaintiffs:** assist**]** **[Google:** provide reasonable assistance to**]** the Monitor in exercising his or her duties and powers under this Final Judgment. **[Plaintiffs:** Google must promptly (i.e. within 14 days) provide the Monitor and Monitor Staff with full and complete access to all personnel (current and former), agents, consultants, books, records, source code, and facilities.**]** **[Google (if Plaintiffs' language is accepted):** insofar as consistent with the duties and powers delineated in Subsection VII.A.5 below.**]**

The Monitor may not perform any work for Google or any Google ad tech competitor during their tenure as Monitor and for one year after ceasing to serve as Monitor.

2. ***Technical Committee.*** There will be a three-member Technical Committee to provide technical advice and support to the Monitor, and the members will report to the Monitor and be treated as part of the Monitor Staff. The Technical Committee will be composed of three members selected as follows: (i) each side shall select one member; and (ii) the two members selected by the parties will jointly select a third member of the committee. No member of the Technical Committee may be a current employee of Google or a Google ad tech competitor or have a current non-de minimis financial interest in Google or a Google ad tech competitor. No member of the Technical Committee may have served as a testifying expert (or worked on behalf of a testifying expert) or as a fact witness in the liability or remedies phase of this case or any substantially-related ad tech case.

If any party determines that a member of the Technical Committee has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the Technical Committee is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the Technical Committee, the person or persons that originally selected the Technical Committee member will select a replacement member in the same manner as provided for in this section.

Any member of the Technical Committee may provide input and advice to the Monitor, Plaintiffs, and (if requested) the Court.

No member of the Technical Committee may have performed or perform any work for Google or any Google ad tech competitor for the six-month period immediately preceding their

tenure as a member of the Technical Committee, during their tenure as a member of the Technical Committee, and for one year after ceasing to serve as a member of the Technical Committee.

3. ***Work Plans.*** Within 45 calendar days after appointment by the Court, and on a yearly basis thereafter, the Monitor must provide Plaintiffs and Google a proposed written work plan approved by **[Plaintiffs:** the United States, after consultation with Plaintiff States, and by**]** the Court. The Monitor may propose changes or amendments to the Monitor's work plan, which shall be provided to Plaintiffs and Google and approved by **[Plaintiffs:** the United States, after consultation with Plaintiff States, and by**]** the Court.

4. ***Confidentiality Agreement.*** The Monitor shall monitor Google's compliance with its obligations under this Final Judgment, and the Monitor and Monitor Staff shall be bound by an appropriate confidentiality agreement in connection therewith prohibiting disclosure of any information obtained in the course of performing his or her duties as a Monitor, or as a person assisting the Monitor, to anyone other than the Monitor, a consultant or staff hired by the Monitor, the parties, or the Court.

5. ***Duties and Powers.*** **[Google:** Subject to the provisions of such confidentiality agreement,**]** The Monitor has all powers and authorities **[Google:** reasonably**]** necessary to carry out his or her **[Plaintiffs:** duties**]** **[Google:** duty to ascertain Google's compliance with its obligations under this Final Judgment**]**. The Monitor's duties, powers, and authorities include **[Google:** , on reasonable notice to Google's designated representative**]**:

a. the duty to oversee and ensure Google's compliance with its obligations under this Final Judgment;

b. the duty to investigate and report on Google's compliance with this Final Judgment, including by providing quarterly reports to Plaintiffs and Google

from the entry of this Final Judgment regarding the Monitor's activities pursuant to this Final Judgment, Google's efforts to comply with its obligations under this Final Judgment, and any recommendations the Monitor makes;

c. the duty to notify Plaintiffs and Google immediately if the Monitor becomes aware of any facts that the Monitor concludes may constitute a violation of this Final Judgment;

d. the duty to receive and investigate any complaints regarding Google's compliance with this Final Judgment;

e. the duty to account for all reasonable costs and expenses incurred, including agreed-upon fees for the services of the Monitor and Monitor Staff, subject to the written approval of Plaintiffs and the Court;

f. the authority to communicate with and interview non-parties, so long as the confidentiality of information obtained from Google is maintained;

g. the authority to interview, either informally or on the record, any **[Plaintiffs:** Google personnel**]** **[Google:** current Google employee**]**, who may have their individual or company counsel present, *provided that* any such interview must be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

h. the power to **[Plaintiffs:** compel Google**]** **[Google:** require current Google employees**]** to produce documents, data, and other information in the possession, custody, or control of Google;

i. the power to **[Plaintiffs:** inspect,**]** **[Google:** obtain reasonable access to,] study, or interact with any relevant Google source code or algorithms;

j. **[Plaintiffs:** the power to compel Google to provide complete written responses to interrogatories;**]**

k. the authority to obtain reasonable access to any system or equipment to which Google personnel have access;

l. the authority to obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access;

m. the authority to hire Monitor Staff, at the cost and expense of Google, with prior notice to Google and subject to written approval by the Plaintiffs and the Court; and

n. any other powers the Court deems appropriate.

6. The Monitor must exercise his or her powers under this Final Judgment solely for the purpose of fulfilling the Monitor's duties under this Final Judgment.

7. The Monitor may delegate any of his or her powers under this Final Judgment to Monitor Staff.

8. ***Hiring Monitor Staff.*** Within three business days of hiring any member of the Monitor Staff, the Monitor must provide written notice to Google and Plaintiffs of the identity of the hired individual and the rate of his or her compensation or reimbursement. Monitor Staff will be directed by and solely accountable to the Monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications.

9. ***Objections to the Monitor's Findings.*** If the Monitor has reason to believe that Google may have failed to comply with any term of this Final Judgment, the Monitor shall

promptly notify the United States, the Plaintiff States, and Google, setting forth in writing the relevant details. Google shall be allowed a reasonable period (which will ordinarily be not less than 30 calendar days) to respond to the Monitor's concerns before any party discloses the matter to the Court or takes other enforcement action.

10. ***Resolution of Complaints or Inquiries.*** The Monitor will communicate with Google about how potential or actual complaints or inquiries may be resolved. Google shall be allowed a reasonable period (which shall ordinarily be not less than 30 calendar days) to respond to any complaint before the Monitor discloses the matter to the Court **[Google:** or Plaintiffs**]** or takes any enforcement action.

11. ***Disputes About the Monitor's Duties or Powers.*** Google shall be allowed a reasonable period (which will ordinarily be not less than **[Plaintiffs:** 15**]** **[Google:** 30**]** calendar days) to raise any dispute between Google and the Monitor regarding whether an action is in fulfillment of the Monitor's duties under this Final Judgment. **[Plaintiffs:** Any dispute must be conveyed in writing to Plaintiffs within 10 calendar days of Google raising the dispute, or the objection is waived.**]** Google or the Monitor may thereafter seek **[Plaintiffs:** prospective**]** clarification of the Monitor's duties or powers by motion to the Court, and Plaintiffs, Google, and the Monitor may participate fully in such a proceeding. **[Plaintiffs:** Google may not seek retrospective relief in connection with a dispute about the nature or scope of the Monitor's duties or powers under this Final Judgment, and such a dispute is not a basis for Google to withhold or refuse payment for accounted-for costs and expenses of the Monitor or the Monitor Staff. Google must pay the Monitor's costs associated with resolving any dispute about the nature or scope of the Monitor's duties or powers under this Final Judgment.**]**

12. No attorney-client relationship will be formed between Google and the Monitor, and the Monitor has no responsibility or obligation for operation of Google's business.

13. ***Google's Duty to Pay the Monitor.*** **[Plaintiffs:** Google must pay all accounted-for costs and expenses of the Monitor and the Monitor Staff, including at least a quarterly advance for expenses consistent with the approved work plan, except for costs and expenses that are determined to be the result of Malfeasance pursuant to Section VII(A)(16).**]** Google and the Monitor must enter into a written agreement, the terms of which shall be approved by Plaintiffs and the Court, governing the Monitor's service in accordance with this Final Judgment and Google's payment obligations, on terms and conditions, including confidentiality requirements and conflict of interest certifications. **[Google:** Such agreement shall provide for a reasonable fee to be paid by Google to the Monitor and the Monitor Staff for their services commensurate with their experience and responsibilities.**]** **[Plaintiffs:** The compensation of the Monitor and the Monitor Staff must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. The written agreement must also indemnify the Monitor and the Monitor's Staff for any action taken within the scope of their duties. If Google and the Monitor are unable to execute such a written agreement within 14 calendar days of the Monitor's appointment, or if Plaintiffs decline to approve the proposed written agreement, Plaintiffs may take appropriate action, including making a recommendation to the Court, and the Court may set the terms and conditions for Google's payment of the Monitor's costs and expenses.**]**

14. **[Plaintiffs:** Any failure by Google to pay accounted-for costs and expenses of the Monitor or the Monitor Staff within the time permitted by Google's agreement with the Monitor, constitutes a violation of this Final Judgment and may result in sanctions imposed by the Court.**]** **[Google omits this subsection as unnecessary.]**

15. **[Plaintiffs:** Any failure by Google to meet a deadline imposed by the Monitor or to comply with requests or orders made by the Monitor constitutes a violation of this Final Judgment and may result in sanctions imposed by the Court.**] [Google omits this subsection as unnecessary.]**

16. **[Plaintiffs:** ***Objections to Compensation for the Monitor's Work.*** Google may not object to compensating the Monitor for any action already taken by the Monitor in fulfillment of his or her duties under this Final Judgment on any ground other than Malfeasance by the Monitor. Disagreements between the Monitor and Google related to the nature or scope of the Monitor's duties, powers, or authorities do not constitute Malfeasance. Objections by Google must be conveyed in writing to Plaintiffs and the Monitor within 10 calendar days of the action that gives rise to Google's objection, or the objection is waived. Any timely objection must be resolved in the first instance by the United States, after consultation with Plaintiff States. If Google makes a timely objection on the ground of Malfeasance, Google will have the burden to show Malfeasance by clear and convincing evidence. Following a determination by the United States relating to an allegation of Malfeasance, Google or the Monitor may subsequently seek relief by motion to the Court, and Plaintiffs, Google, and the Monitor may participate fully in such a proceeding. If Google makes a timely objection in writing to Plaintiffs on the grounds of Malfeasance, Google must deposit any disputed costs and expenses into an escrow account until the dispute is resolved.**] [Google proposed a relevant provision at subsection VII.A.13.]**

17. **[Plaintiffs:** ***Ex Parte Communication.*** The Monitor may communicate *ex parte* with the Court, Plaintiffs, or Google when, in the Monitor's sole discretion, such communication is reasonably necessary to fulfill his or her duties under this Final Judgment, including if Google

fails to comply with its payment obligations or otherwise violates this Final Judgment.] **[Google omits this subsection as unnecessary.]**

18. **[Plaintiffs: *Substitution.*** If Plaintiffs determine that the Monitor is not acting diligently or in a reasonably cost-effective manner, or if the Monitor resigns or becomes unable to accomplish his or her duties, Plaintiffs may recommend that the Court appoint a substitute Monitor.**] [Google omits this subsection as unnecessary.]**

19. ***Confidential Information.*** To facilitate the Monitor's work, the Court's Amended Protective Order, ECF No. 203, is hereby amended as follows:

a. Paragraph 1(*l*) is amended to clarify that any non-privileged documents, testimony, or other materials provided to or generated by the Monitor or Monitor Staff while this Final Judgment is in effect constitute "Litigation Materials" **[Google:** that are Highly Confidential**]**;

b. Paragraph 14 is amended to add the Monitor and Monitor Staff as persons authorized to receive Highly Confidential Information, who shall execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of the Amended Protective Order, ECF No. 203, in the form of Appendix A attached therefore, before receiving any Highly Confidential Information;

c. Paragraph 15 is amended to add the Monitor and Monitor Staff as persons authorized to receive Confidential Information, who shall execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of the Amended Protective Order, ECF No. 203, in the form of Appendix A attached therefore, before receiving any Confidential Information;

d. Paragraph 24 is amended to clarify that implementing this Final Judgment, including the conduct of the Monitor's and Monitor Staff's work, is considered "for the conduct of the Action" and is a permitted use of Highly Confidential Information and Confidential Information;

e. Paragraphs 25 and 26 are amended to clarify that the Monitor and Monitor Staff must comply with the procedures set forth in those paragraphs as if they were Parties.

### B. <u>Internal Compliance Officer</u>[1]

1. ***Appointment.*** Within **[Plaintiffs:** <u>30</u>**]** **[Google:** <u>60</u>**]** calendar days of entry of this Final Judgment, Google must designate an employee of Google as the internal Compliance Officer who is responsible for **[Plaintiffs:** <u>ensuring</u>**]** **[Google:** <u>helping to ensure</u>**]** Google's compliance with this Final Judgment **[Google:** <u>, as overseen by the Monitor</u>**]**. The Compliance Officer must be an **[Plaintiffs:** <u>officer, director, or executive</u>**]** **[Google:** <u>employee</u>] of Google **[Plaintiffs:** <u>with sufficient authority</u>**]** to facilitate Google's cooperation with the Monitor and Google's compliance with this Final Judgment. Within 15 calendar days of any vacancy in the Compliance Officer position, Google must appoint a replacement. The Compliance Officer may be assisted by other employees of Google. **[Plaintiffs:** <u>Any appointment of a Compliance Officer is subject to Plaintiffs' written approval.</u>**]** Within seven calendar days of a Compliance Officer's appointment, Google must identify to Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.

2. ***Duties.*** The Compliance Officer has the following duties:

---

[1] Google proposed relevant monitoring and compliance provisions in subsection VII.A. *See also* ECF No. 1811-2. In light of the Court's remedies opinion, Google has also proposed relevant language here and in Sections VIII and IX, but reserves all rights.

a. **[Plaintiffs:** within 30 calendar days after entry of this Final Judgment,**]** **[Google:** promptly**]** distributing a copy of this Final Judgment to **[Plaintiffs:** all officers and employees of Google**]** **[Google:** the Chief Executive Officer; the Chief Business Officer; the Chief Legal Officer; the SVP of Knowledge & Information; the President, Global Partnerships and Corporate Development; the VP/GM of Ads, the VP/GM of Display Advertising, and VP, Global Partnerships, Sellside Monetization of Google**]**;

b. distributing a copy of this Final Judgment to any person who **[Plaintiffs:** becomes an officer or employee of Google**]** **[Google:** succeeds to a position described in 2.a above**]** within 30 calendar days of the date the person starts that position;

c. **[Plaintiffs:** informing**]** **[Google:** ensuring**]** officers and employees of Google **[Google:** are informed**]** that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment, U.S. antitrust laws **[Plaintiffs:** , or obligations to preserve and produce materials for use in investigations, litigations, or regulatory filings**]**;

d. obtaining from each **[Plaintiffs:** officer and employee of Google**]** **[Google:** person designated above in 2.a**]** an annual written certification that he or she: **[Plaintiffs:** (i) has read and agrees to abide by**]** **[Google**: understands**]** the terms of this Final Judgment **[Plaintiffs:** ; and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court**]**;

e. maintaining a record of all **[Plaintiffs:** current and former officers and employees of Google**]** **[Google**: persons designated above in 2.a**]** to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII(B)(2)(d) has been obtained;

f. **[Plaintiffs:** establishing**]** **[Google:** maintaining**]** a confidential means for any Google employee to report potential violations of this Final Judgment or the U.S. antitrust laws by Google, and **[Plaintiffs:** annually communicating to all employees pursuant to Section VII(C)(1)**]** **[Google:** advising Google employees**]** that they may disclose information concerning such potential violations **[Plaintiffs:** to the Plaintiffs, Compliance Officer, or Monitor,**]** without reprisal for such disclosure;

g. ensuring Google employees retain all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment.

**C. Anti-Reprisal**

1. Google must **[Plaintiffs:** establish and/or**]** maintain a policy **[Plaintiffs:** , annually communicated to all of its employees, that Google employees may disclose any information to the Plaintiffs, Compliance Officer, or Monitor without reprisal for such disclosure**]** **[Google:** that Google employees may report any potential violation of this Final Judgment or the U.S. antitrust laws by Google, and advising Google employees that they may disclose information about such potential violations without reprisal**]**.

2. Nothing herein limits **[Plaintiffs:** Plaintiffs' ability to request, either independently or on behalf of the Monitor, or**]** the Court's authority to order, other, additional, or

alternative relief or penalties or to modify this Final Judgment, including as otherwise provided in this Final Judgment.

**D. Status Reports**

1. The parties, with input from the Monitor and Technical Committee, will file a status report within 90 calendar days of the Effective Date, and on future dates as set by the Court.

## VIII. [Plaintiffs: AFFIDAVITS] [Google: STATUS REPORTS]

**[Plaintiffs: *Compliance Affidavits*.]** Every 30 calendar days after the entry of this Final Judgment until the Monitor has executed an agreement with Google, Google must deliver to Plaintiffs **[Plaintiffs:** an affidavit, signed by Google's Chief Financial Officer and General Counsel,**]** **[Google:** a status report from the Internal Compliance Officer (or another employee with visibility into Google's efforts to comply with this Final Judgment until the ICO is designated)**]** describing in reasonable detail the fact and manner of Google's efforts to comply with this Final Judgment. Plaintiffs may approve different signatories for such **[Plaintiffs:** affidavits**]** **[Google:** reports**]**.

## IX. COMPLIANCE INSPECTION

**[Google:** If Plaintiffs have reason to believe that Google may have failed to comply with any term of this Final Judgment or is taking action to impede or interfere with the Monitor's duties,**]** For the purposes of **[Google:** assisting the Monitor in**]** determining or securing compliance with this Final Judgment or of related orders or of determining whether this Final Judgment should be modified, upon written request of an authorized representative of the United States, including the Assistant Attorney General for the Antitrust Division of the Department of Justice, and reasonable notice to Google, Google must permit **[Google:,** from time to time and

subject to legally recognized privileges,**]** authorized representatives, including agents retained by Plaintiffs:

1. to have access during Google's business hours to inspect and copy, or at the option of Plaintiffs, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents, wherever located, in Google's possession, custody, or control relating to any matters contained in this Final Judgment;

2. to interview, either informally or on the record, any Google officers, employees, or agents, wherever located, who may have their individual or company counsel present, relating to any matters contained in this Final Judgment, and *provided that* any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; and

3. to require Google to provide written reports to Plaintiffs or to respond to written interrogatories from Plaintiffs, under oath if requested, relating to any matters contained in this Final Judgment.

## X. PUBLIC DISCLOSURE AND CONFIDENTIALITY

A. No information or documents obtained pursuant to any provision of this Final Judgment, including reports the Monitor provides to Plaintiffs pursuant to Section VII(A)(5)(b), **[Google:** or activities of the Monitor**]** may be divulged by Plaintiffs or the Monitor to any person other than an authorized representative of the executive branch of the United States or an authorized representative of the Plaintiff States **[Google:** for the purpose of securing compliance with this Final Judgment**]**, except **[Plaintiffs:** (1) in the course of legal proceedings to which a

Plaintiff is a party, including grand-jury proceedings, (2) for the purpose of securing compliance with this Final Judgment, (3) for law enforcement purposes, or (4)**]** as otherwise required by law.

B. In the event of a request by a third party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, or analogous Plaintiff State disclosure laws, for disclosure of information obtained pursuant to any provision of this Final Judgment, the United States will act in accordance with that statute and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information at 28 C.F.R. § 16.7, and the Plaintiff States will act in accordance with their applicable disclosure laws. **[Plaintiffs:** When Google submits information to any Plaintiff or the Monitor, it should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).**]** **[Google:** Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation (including state laws or regulations applicable to any of the Plaintiff States), for any material it submits to the Monitor, the United States, or Plaintiff States under this Final Judgment. After appropriate consideration of such claim of protection, the United States or Plaintiff States will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of their intent to disclose the material.**]**

C. If, at the time Google furnishes information or documents to any Plaintiff or the Monitor pursuant to any provision of this Final Judgment, Google represents and identifies in writing information or documents for which a claim of protection may be asserted under Federal Rule of Civil Procedure 26(c)(1)(G), and Google marks each pertinent page of such material,

"Subject to claim of protection under Federal Rule of Civil Procedure 26(c)(1)(G)," **[Plaintiffs:** Plaintiffs must give Google 10 calendar days' notice before divulging such material in any legal proceeding (other than a grand jury proceeding)**]** **[Google:** Plaintiffs and the Monitor shall be required to file such material under seal in any filing pursuant to the relevant provisions of the Modified Protective Order**]**.

## XI. RETENTION OF JURISDICTION

The Court retains jurisdiction:

1. **[Plaintiffs:** to enable Plaintiffs or the Monitor to enforce compliance, or to punish violations of its provisions;**]** **[Google omits this subsection as unnecessary.]**
2. to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, modify any of this Final Judgment's provisions, or to object if any such modifications are sought; and
3. to enable any party to this Final Judgment or the Monitor to pursue any Court-supervised procedure expressly set forth in this Final Judgment.

## XII. [Plaintiffs: ENFORCEMENT OF FINAL JUDGMENT

A. Plaintiffs retain and reserve all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court.

B. This Final Judgment should be interpreted to give full effect to its purposes. Google may be held in contempt of, and the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of this Final Judgment's purposes and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face.

C. If the Court finds that Google has violated this Final Judgment, Plaintiffs may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with any successful effort by Plaintiffs to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Google must reimburse Plaintiffs for all their costs, including the fees and expenses of Plaintiffs' attorneys and experts, incurred in connection with enforcing this Final Judgment, including in the investigation of the potential violation.

D. For a period of four years following the expiration of this Final Judgment, if Plaintiffs discover evidence that Google violated this Final Judgment before it expired, Plaintiffs may file an action against Google in this Court requesting that the Court order: (1) Google to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) any appropriate contempt remedies; (3) additional relief needed to ensure Google complies with the terms of this Final Judgment; and (4) fees or expenses.**]**

**[Google omits this section as unnecessary.]**

## XIII. [Plaintiffs: RESERVATION OF RIGHTS

This Final Judgment terminates only the claims stated in the Complaint against Google and does not affect other charges or claims Plaintiffs may file.**]**

**[Google omits this section as unnecessary.]**

Date: ____________________

______________________________

Hon. Leonie M. Brinkema
United States District Judge